UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**QUICKIE, LLC,**

                    Plaintiff,

        -against-

**GREENBERG TRAURIG, LLP,**

                  Defendant.

07 Civ. 10331 (RMB) (DFE)
ECF CASE

**NOTICE OF MOTION
FOR SUMMARY JUDGMENT**

---

Sirs:

       Please take notice that, upon the Declaration of Paul J. Sutton dated July 22, 2008, the exhibits annexed thereto, the accompanying Rule 56.1 Statement, and the pleadings and prior proceedings herein, defendant Greenberg Traurig will move this Court (Hon. Richard M. Berman), on September 16, 2008, at Courtroom 21D at the United States Courthouse 500 Pearl Street, New York New York, New York 10007 for an summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing this action on the ground that defendant is entitled to judgment as a matter of law granting defendant such other and further relief as the Court may deem just and proper.

       Please take further notice that, pursuant to the Stipulation and Order scheduling the motion, all answering papers on this motion are due on or before August 26, 2006.

Dated: July 22, 2008
       New York, New York

Yours, etc.,

POLLACK & KAMINSKY

By: _____

Martin I. Kaminsky (MK 3033)
Justin Y. K. Chu (JC 7810)
114 West 47th Street
New York, New York 10036
Tel No. (212) 575-4700
Fax No. (212) 575-6560
*Attorneys for Defendant*
*Greenberg Traurig LLP*

TO:

Richard I. Janvey
Joan M. Secofsky
DIAMOND MCCARTHY, LLP
620 Eighth  Avenue
New York, New York 10018
Tel. No. (212) 430-5400
Fax No. (212) 430-5499
-and-

Allan Diamond
Walter J. Scott
Stephen T. Loden
DIAMOND MCCARTHY, LLP
Two Houston Center
909 Fannin, Suite 1500
Houston, Texas 77010
Tel. No. (713) 333-5100
Fax No. (713) 333-5199
*Attorneys for Plaintiff*
*Quickie LLC*

# SUTTON
# DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**QUICKIE, LLC,**

                             Plaintiff,

        -against-

**GREENBERG TRAURIG, LLP,**

                          Defendant.

07 Civ. 10331 (RMB) (DFE)
ECF CASE

**DECLARATION
IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

---

Paul J. Sutton states and declares, under the penalty of perjury:

1. I am a shareholder of defendant Greenberg Traurig LLP ["GT"], and am Senior Chair of its Intellectual Property & Technology Practice.

2. I make this Declaration in support of GT's move for summary judgment, pursuant to Fed. R. Civ. P. 56, dismissing this action against GT on the ground that, as a matter of law, GT is not liable to plaintiff Quickie LLP ["Quickie"].

3. This Declaration is based on my personal knowledge and both the sworn testimony and documentary evidence from the depositions in this action. For the convenience of the Court, attached at the end of this Declaration is a list of the exhibits (including deposition excerpts and documents) presented in support of this motion, the authenticity of which I hereby affirm.

## SUMMARY OF THE MOTION

4. This is a legal malpractice action based on the alleged failure of attorneys for Plaintiff Quickie LLC ["Quickie"] to pay, or to advise Quickie to pay, a maintenance fee ["the Maintenance Fee"] which was due during the period May 23, 2003 through May 23, 2004 on Quickie's Patent No. 6,066,160 ["the '160 Patent"]. That non-payment resulted in the loss of the '160 Patent [see Moving Exhibits AO and AP for Quickie's Complaint and GT's Answer].

5.  As detailed in the accompanying moving memorandum, GT contends, in moving for summary judgment, that:

[a] GT was not Quickie's attorney as to the '160 Patent when the Maintenance Fee became due. Another law firm had replaced and succeeded GT before the Maintenance Fee became due; and that other law firm represented Quickie as to the '160 Patent during the *entire* period in which the Maintenance Fee could have been paid. Hence, GT can not be contended to have committed legal malpractice for the failure to pay the Maintenance Fee;

[b] the fact that Quickie's successor counsel could have assured that the Maintenance Fee was paid, and thus kept the '160 Patent alive, is and  provides a complete defense to any claim against GT based on the non-payment of the Maintenance Fee;

[c] Quickie's claims for negligence and negligent mispresentation are legally insufficient since they are based on the same operative facts as Quickie's malpractice claim and thus impermissibly duplicative of it; and

[d] in any event, Quickie's claims against GT are barred by the statute of limitations, since the alleged wrongdoing and harm occurred over three years before Quickie filed its Complaint and the continuous representation doctrine does not apply here.

## <u>SUMMARY OF THE PERTINENT FACTS</u>

6.  Quickie has admitted that, prior to Quickie's replacement of GT, "Todd Sharinn advised Quickie that maintenance fees were due on the '160 Patent 3.5 years from the date of issuance . . ." [Mov.  Ex. H ¶21; see also Mov. Ex. Q at 26-27].  Sharinn was the lawyer at GT and a predecessor firm who had acted as Quickie's patent counsel.

2

7. GT was not counsel to Quickie when the Maintenance Fee became and was due, and thus is not responsible for the failure to pay the fee. Rather, GT had previously been replaced by Thelen Reid & Priest LLP ["Thelen"] before the Maintenance Fee was due.

8. The Maintenance Fee for the '160 Patent first became due on November 23, 2003. Quickie could actually have prepaid it beginning on May 23, 2003; and Quickie had a year thereafter (i.e. until May 23, 2004) in which to pay the fee. For simplicity, since the Maintenance Fee could have been paid on May 23, 2003, I will refer herein to that date as the "due date", even though the fee was not actually due until six months thereafter, i.e. on November 23, 2003.

9. By May 2003, i.e. the first date in which the Maintenance Fee could be paid, Thelen had replaced GT as Quickie's lawyer.

10. On March 4, 2003 --- months before the Maintenance Fee became due --- Quickie revoked, in a writing submitted to the U.S. Patent & Trademark Office ["PTO"], any authority that GT had previously had as to the '160 Patent and appointed Thelen (specifying Robert Krebs and several other Thelen attorneys) as its counsel for all further communications as to the '160 Patent ["Quickie's Revocation/Appointment"] [Mov. Ex. A]. As Quickie has admitted, under oath, this constituted the replacement of GT by Thelen as to all aspects of the '160 Patent, "including . . . timely payment of the Maintenance Fee" [Mov. Ex. F; Mov. Ex. E at 1-4; Mov. Ex. Q at 95-102].

11. GT was formally notified of that change and Quickie's Revocation/Appointment by a Notice from the PTO on April 2, 2003, a month and a half *before* the Maintenance Fee first became due [see Mov. Ex. B].

12. GT was also advised by Quickie's General Counsel Alan Fell and one of its senior members Dr. Stephen Colvin that GT would no longer represent Quickie as to the '160 Patent [Mov. Ex. T at 96, 101, 105, 153; Mov. Ex. S at 291-94; Mov. Ex. R at 48].

13. Thereafter and as a result, GT ceased all activity as to the '160 Patent, and GT's database, noting the transfer of responsibility for the '160 Patent to another firm, ceased tracking it [see detailed discussion *infra*].

14. Thelen, although having full responsibly for the '160 Patent and the Maintenance Fee [Mov. Ex. K; see also Mov. Exs. E, F, G], failed to advise Quickie that the Maintenance Fee was due, or to pay the Maintenance Fee for Quickie, resulting in the loss of the patent.

15. In 2006 and 2007, Quickie (through another new patent counsel) petitioned unsuccessfully to revive the '160 Patent [Mov. Exs. D through G; see also Mov Exs. H, L, M].

16. In its sworn statements and other filings to the PTO, Quickie confirmed that GT had had no responsibility as to the Maintenance Fee and that Thelen (rather than GT) was solely responsible for the failure to pay the Maintenance Fee [see Mov. Exs. E and F]. For example, in its Supplement to Petition, Quickie stated [Mov. Ex. E at 1-4]:

> "[GT's] responsibility for the '160 Patent ended *prior to* the time period when the payment of a first Maintenance Fee was due (see Mov. Ex. A]).
> $$*\qquad *\qquad *$$
> Thelen Reid & Priest was granted and held *sole and full* power in the '160 patent from March 4, 2003 through August 14, 2006 (see [Mov. Exs. A and B]). This period of time covered the time period up until May 23, 2004 for timely paying the first maintenance fee, and the entire two-year time period, starting from the date of the '160 patent's expiration to file a remedial Petition under the intention provision (37 CFR 1.378(c)); this two-year expiration period ending on May 24, 2006.
> The actions and inactions of *Thelen Reid & Priest* . . . led the Patent Owner to believe that their [sic] '160 Patent was viable.
> $$*\qquad *\qquad *$$
> The Patent Owner [Quickie] fully believed that their [sic]

valuable legal rights in the '160 patent would be justly protected by the attorneys and law firm of *Thelen Reid & Priest* when the Patent Owner chose them for representation and executed the Power of Attorney dated March 4, 2003 (see [Mov. Ex. A])". (emphasis added)

17. Quickie's Managing Member, Dr. Aubrey Galloway, also stated *under oath* [Mov. Ex. F, ¶¶1, 2]:

". . . I am the Managing Partner of Quickie, LLC, the owner of US Patent No. 6,066,160.

As the Managing Partner for Quickie, LLC, *I retained* Robert E. Krebs et al. of the *Thelen, Reid & Priest, LLP* law firm to transact all post-issuance proceedings and responsibilities in the Patent and Trademark Office *including, but not limited to . . . timely payment of the Maintenance Fee*". (emphasis added)

18. Quickie reaffirmed those statements and their accuracy in response to GT's Request to Admit [Mov. Ex. H ¶¶ 11-17; Mov. Ex. I ¶¶18-20, 22-25, 40, 42-43].[1]

19. Dr. Galloway and Quickie's General Counsel Alan Fell also reaffirmed those statement in their depositions [Mov. Ex. Q, at 59-64, 83-84, 86-102; Mov. Ex. R at 70-74, 78-81; see also Mov. Ex. L at 4].

20. They also admitted that Quickie has never told the PTO (*to this day*) that any of those statements was inaccurate [*Id.*]. Indeed, several affirmative statements in Quickie's Complaint itself also say the same thing that Quickie told the PTO [Mov. Ex. AO ¶¶ 14, 15, 19].

## STATUS OF THE CASE

21. On April 18, 2007, Quickie sued GT and Thelen as well as the principal Thelen partner involved, i.e. Robert Krebs, charging them with "legal malpractice", "negligence" and "negligent misrepresentation" in "fail[ing] to notify Plaintiff before fees were due to maintain the patent" [Mov. Ex. AO ¶2].

5

22. GT denied all wrongdoing, and asserted several affirmative defenses and cross-claims against the Thelen defendants [Mov. Ex. AP].

23. The Thelen defendants filed a third-party action against Rick Steiner Fell & Benowitz, LLP and Alan Fell and Todd Sharinn (formerly an attorney at GT). Various of those parties then cross-claimed against each other.

24. As shown in the court records, Quickie has settled with Thelen, Krebs, Rick Steiner and Fell, resulting in the dismissal of all claims against them and Sharinn (who was only a third-party defendant), and leaving GT as the sole remaining defendant in the action.

25. I understand that fact discovery has been completed.

26. As shown in the court records, the parties have stipulated that no expert testimony will be presented on this motion; and that no issues as to damages will be raised or need be dealt with on this motion  The parties are in the midst of expert discovery, which is proceeding simultaneously with this motion.

## BACKGROUND FACTS

### Quickie and the Subject Patent

27. Quickie is the owner by assignment of Patent No. 6,066,160 ["the '160 Patent"], issued on May 23, 2000 [Mov. Ex. H ¶1; Mov. Ex. L at 1; Mov. Ex. R at 30-31].

28. Under applicable law and regulations, the owner of a patent must pay periodic maintenance fees to keep the patent in effect.

29. The first Maintenance Fee for the '160 Patent was due during the one year period beginning May 23, 2003 through May 23, 2004 [Mov. Ex. L at 1].

---

[1]   Several of  Quickie's specific Responses are outright admissions. In others (unlike those cited here), although Quickie admitted the fact involved, Quickie sought to add a denial of any inference from the admitted fact. GT Objects to such add-ons in Quickie's Responses (and hereby moves to strike them) as inappropriate. .

30. The '160 Patent "expired" due to non-payment of the Maintenance Fee during that one year period [Mov. Ex. L at 1].

**The Law Firms Vis-à-vis the '160 Patent**

31. Between 1998 and 2001, Pepe & Hazard LLP ["Pepe"], with whom Sharinn was then associated, represented Quickie in connection with its application for what became the '160 Patent [Mov. Ex. R at 33].

32. Sharinn left Pepe to become an associate of GT in 2001 [Mov. Ex. R at 33]. Thereafter, GT provided services to Quickie as to the '160 Patent until it was replaced by Thelen in the fall of 2002 and spring of 2003 [Mov. Ex. R at 33-34; see details *infra*].

33. Thelen replaced GT as Quickie's counsel with respect to the '160 Patent; and Quickie filed formal papers with the PTO in March 2003 revoking all prior authority of GT as to the '160 Patent and designating Thelen as its attorney and the appropriate counsel for all communications and proceedings as to the '160 Patent [see details *infra*].

34. Alan Fell, a member of Quickie [Mov. Ex. R. at 10], is a lawyer at the Rick Steiner law firm who served as Quickie's General Counsel overseeing its patent counsel [Mov. Ex. R at 25, 86-87; Mov. Ex. T at 230].

**Quickie's Knowledge That The Maintenance Fee Would Be Owing**

35. Quickie has *admitted* that "Todd Sharinn advised Quickie that the Maintenance Fee was due on the '160 Patent 3.5 years from the date of issuance . . .", failing which Quickie would lose the '160 Patent [Mov. Ex. H ¶21; see also Mov. Ex. Q at 23, 26-27; Mov. Ex. R at 97-99].

36. But, neither Quickie nor its General Counsel calendared the due dates or otherwise assured that the Maintenance Fee would be paid [Mov. Ex. Q at 26-27; Mov. Ex. R at 60-61].

37. A similar reminder was given to Quickie (in connection with another different patent) in April 2004 while the period for payment of the Maintenance Fee on the '160 Patent was still in progress [Mov. Ex. R at 97-99; Mov. Ex. AK].

## GT's Calendaring of the Due Dates for the Maintenance Fee

38. GT maintained a database calendaring the due dates for maintenance fees on patents for which GT had responsibility [Mov. Ex. S at 88-89, 167, see also 20-21; Mov. Ex. T at 149].

39. Unlike Pepe, GT made no undertaking to notify Quickie of the due dates for the Maintence Fee; and GT did not assume Pepe's undertaking to do so [Mov. Ex. S at 271, 273-76, 278, 286-87].

40. But, when Sharinn joined GT, GT put the '160 Patent into GT's internal database system, where it remained until Quickie revoked GT's authority and role as to that patent in March 2003 [Mov. Ex. S at 20, 28-29, 39, 60-61, 66-68, 71-72, 79-81, 93, 96, 100, 167-69, 172-73, 216-17, 249-50; see also 52-53, 62-64, 144-46; Mov. Ex. T at 149; Mov. Exs. A, O, P, AO ¶¶ 14, 15, 19].

41. When GT received Notice of the Revocation/Appointment as to the '160 Patent, GT's database was marked accordingly and GT ceased to follow that patent, since its authority and role as to the '160 Patent had ended [see Mov. Exs. O, P and details *infra*].

## Quickie's License with Medtronic and Lawsuit Against Medtronic

42. Quickie sought to get entities capable of turning the '160 Patent into a product to sign licenses for it [Mov. Ex. T at 69-72; Mov. Ex. Q at 37-41; Mov. Ex. R at 60-61].

43. But, only one company, Medtronic Inc., with whom Quickie had another relationship showed any interest [Mov. Ex. T at 69-72; Mov. Ex. Q at 37-41; Mov. Ex. R at 60-61]. The others were not interested [Mov. Ex. R at 28-30; Mov. Ex. Q at 39-40].

8

44. However, "shortly after the [license] agreement was entered into . . . Medtronic was already trying to break the agreement" [Mov. Ex. T at 72; Mov. Ex. AO ¶9].

45. Medtronic terminated the license [Mov. Ex. R at 25; Mov. Ex. AO ¶9], concluding the technology was not capable of being commercialized [Mov. Ex. R at 25-28; Mov. Ex. Q at 39-40].

46. Quickie was angered by the termination, and later, using Sharinn and GT, sued Medtronic for patent infringement action in early 2002 ["the Medtronic Action"] [Mov. Ex. T at 54-55].

**Quickie's Initial Replacement of GT with Thelen as to the '160 Patent**

47. In the meantime, Mark Evens, a partner at Thelen, became the brother-in-law of Dr. Colvin of Quickie [Mov. Ex. Q at 56; Mov. Ex. S at 299-300; see also Mov. Ex. R at 47].

48. Quickie told us that it was fully satisfied with Sharinn's/GT's services [see also Mov. Ex. Q at 57].

49. But, Dr. Colvin decided to transfer Quickie's patent work to Thelen to help Evens' position there [Mov. Ex. S at 293-95, 299-300; Mov. Ex. T at 161-63; cf. Mov. Ex. Q at 55-57].

50. Accordingly, virtually from the outset of the Medtronic case, GT consulted with Thelen and kept it advised as to the '160 Patent [Mov Ex. S at 212, 293-97, 299-302; see also 161-62].

51. That signaled to us that Thelen would likely be assuming responsibility for the '160 Patent in place of GT. As I explained in my deposition, "the process began at least as early as April 11, 2002 where Mark Evens was monitoring" the matter [Mov. Ex. S at 212, see also 294-97, 299-302].

52. GT also sent its "file wrapper" for the '160 Patent to Thelen in April 2002 [Mov. Ex. V], providing Thelen with full information as to the '160 Patent, including the due dates for the Maintenance Fee [Mov. Ex. S at 123-24, 212, 217-18, 309; Mov. Ex. T at 201-02].

53. GT continued to serve as lead counsel in the Medtronic Action, and successfully prosecuted the Markman hearing delineating the scope of the infringement claims [Mov. Ex. Q at 56-57; Mov. Ex. T at 167, see also 161-62].

54. However, promptly after the Court's Markman decision, Quickie fired GT and substituted Thelen as its counsel [Mov. Ex. W; Mov. Ex. T at 153; Mov. Ex. S at 62-64, 66-67; Mov. Ex. R at 50-51].

55. Quickie's General Counsel Fell initially told Sharinn that "you and Greenberg Traurig will continue to handle various patent applications" [Mov. Ex. W].

56. But, Fell and Dr. Colvin soon told Sharinn that he and GT were going to be completely replaced as to the '160 Patent [Mov. Ex. T at 96-97, 100-01 105, 153, 185-86, 194; see also Mov Ex. R at 48].

57. Sharinn thus explained in his deposition [Mov. Ex. T at 101]:

> "<u>Subsequent to the Markman Hearing</u>, whenever the date was, whether it was the next day or the day after the ruling was issued, <u>my responsibilities to that patent [i.e. the '160 Patent] immediately terminated by actions of *Steve Colvin and Alan Fell. They told me that flat out, transfer the files, you're no longer responsible*</u>." (emphasis added)

58. They also confirmed that to me [Mov. Ex. S at 291-94].

59. As a result, on October 16, 2002, GT sent to Thelen not only the papers for the Medtronic Action, but also GT's "General/Main File" for the '160 Patent and its file entitled "U.S. Patent No. 6,066,160 File History & Prior Art: [Mov. Ex. X items 4 and 5], i.e. the

complete documentation, history and other information regarding the '160 Patent [Mov. Ex. T at 198-200; Mov. Ex. S at 308-10, 314-19].

**The Medtronic Reexamination Proceeding**

60. In November 2002, in reaction to the Markman decision, Medtronic petitioned the PTO to "reexamine" the '160 Patent, i.e. to review the patent and redetermine whether the invention is actually patentable and, if so, to what extent ["the Reexamination Proceeding"] [Mov. Ex. R at 83; see also Mov. Ex. N; Mov. Ex. Q at 183-88].

61. Quickie selected Thelen (not GT) as its counsel in the Reexamination Proceeding [Mov. Ex. T at 189].

62. Initially, Fell and Colvin would call Sharinn for his thoughts as to aspects of the Reexamination Proceeding [Mov. Ex. T at 106].

63. Hence, and hoping to be more involved, Sharinn opened a client matter at GT for the Reexamination Proceeding [Mov. Ex. Z; see also Mov. Ex. T at 187-89, 191, 239-41].

64. But, it soon became clear that GT would not actually be involved [Mov. Ex. T 94-95, 100-05; 153, 187-89, 191].

65. As Sharinn has explained on his deposition [Mov. Ex. T at 191]:

> "At one point they did say that [Sharinn would be involved
> in the Reexamination Proceeding] and . . . I opened up a
> matter, and then nothing ever really came of it . . ."

66. Sharinn therefore told Quickie that he understood that Quickie had taken all responsibility as to the '160 Patent away from him, and that he would not do anything further as to it unless GT was actually engaged to do so [Mov. Ex. T at 188-89, 190]:

67. Thus, Sharinn testified on his deposition [Mov. Ex. T at 190]:

> "I made clear to them, you fired me, you have new
> counsel, your new counsel is Thelen Reid & Priest, you

need to take this up with Mark Evens or we can be reengage[d] and then we can deal with this."

68. Quickie therefore stopped discussing the '160 Patent with Sharinn [Mov. Ex. T at 190].

69. GT's billing records confirm that, showing that GT's work on the '160 Patent completely ceased in March 2003 [Mov. Exs. AR, AM], when Quickie's formal Revocation/Appointment was filed [see also Mov. Ex. T at 239-45, 266-67].

70. During the Reexamination Proceedings, the PTO sent some papers to the Bryan Cave law firm [Mov. Ex. Y]. Bryan Cave apparently asked Sharinn's *secretary* if he was supposedly still responsible for the '160 Patent [Mov. Ex. Y], so that Bryan Cave could forward the papers to GT. As Sharinn has explained, that was not a conversation with Sharinn himself, but rather an administrative employee [Mov. Ex. T at 144-46]. But, in any event, the conversation was merely to see if Bryan Cave should send the papers to Sharinn for transmittal to Thelen [Mov. Ex. T at 145]. As a result, Bryan Cave did so, and GT did forward the documents to Fell/Quickie the next day, December 3, 2002 [Mov. Ex. AA].

71. The Reexamination Proceeding has resulted in a gutting of the '160 Patent. The PTO has rejected and overruled 32 of the 34 claims in the patent, and sustained only 2 of them [Exs. N, AN]. Initially, on April 6, 2004, the PTO issued an office action rejecting all but 3 of the claims in the '160 Patent [Mov. Ex. AJ; Mov. Ex. R at 83]. Thereafter, Medtronic sought a further reexamination in June 2004 [Mov. Ex. AL]. On February 25, 2008, the PTO rendered its final decision in the Reexamination Proceeding [Mov. Ex. N]. In its decision, the PTO rejected virtually all of the claims in the '160 Patent, and confirmed only 2 of the 34 claims in the patent [Mov. Ex. N at 3; see also Mov. Ex. Q at 186; Mov. Ex. R at 83-86]. On, July 7, 2008, the PTO

issued its "Final Action" confirming its rejection of all but those 2 claims in the '160 Patent [Mov. Ex. AS].

**Quickie's Final Replacement of GT with Thelen as to the '160 Patent**

72. In March 2003, completing the transfer to Thelen of all matters as to the '160 Patent, as explained earlier, Quickie filed a formal Revocation/Appointment with the PTO revoking GT's authority and role as to the '160 Patent and designating Thelen as its counsel in GT's place [Mov. Exs. A, C; Mov. Ex. R at 45, 50-51].

73. Thelen sent a copy of the Revolcation/Appointmentt, as filed, to Quickie [Mov. Ex. AE].

74. The Revocation/Appointment, as detailed above, stated that all prior power and authority of GT as to the '160 Patent had been revoked [Mov. Exs. A, C; Mov. Ex. Q at 59-62], and that, in place of GT, Quickie had appointed Thelen (indeed several Thelen attorneys) as its counsel as to the '160 Patent [Mov. Exs. A, C; Mov. Ex. Q at 63-64].

75. On April 2, 2003, the PTO therefore sent GT formal Notice of the Revocation/Appointment [Mov. Ex. B; Mov. Ex. T at 242], advising GT:

> "The Power of Attorney to you . . . has been revoked . . . as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record (37 CFR 1.33)."

76. As corroborated by the copy of the Revocation/Appointment sent to Quickie by Thelen, the "*new address of record*" was, of course, Thelen [Mov. Ex. AE at QLLC 62224]:

> "Robert E. Krebs
> Thelen Reid & Priest
> P.O. Box 640640
> San Jose, CA 95164-0640
> Telephone (408) 292-5800
> Facsimile (408) 287-8040"

[See also Mov. Ex. J. ¶¶2, 4, 5, 6]

77. Sharinn correctly understood that the Notice meant that "there is a new person in charge of this file", and that he and GT had no further role as to the '160 Patent [Mov. Ex. T at 188, 242, 244, 251, 267].

78. Hence, after receiving the PTO's Notice [Mov. Ex. B], Sharinn sent a letter with a copy of the Notice to Quickie, expressing disappointment but stating [Mov. Ex. AF]:

> "[W]e respect [Dr. Colvin's] decision and will take no further action on this matter. . . [W]e will forward our final bills under separate cover."

[Accord Mov. Ex. T at 188-89, 242-45, 267; see also Mov. Ex. R at 51-54].

79. As Sharinn testified [Mov. Ex. T at 188 and 189]:

> "[M]y understanding was that my powers of attorney and involvement in this case were fully revoked.  And when I say this case, I don't mean the litigation, I mean the '160's existence.
> 　　　*　　　*　　　*
> They had made this abundantly clear to me that that was their intention and that was their desire."

80. No one from Quickie, including Fell (its General Counsel and Member), told Sharinn that, notwithstanding the Revocation/Appointment and Sharinn's letter, Quickie would still be looking to GT or Sharinn for further services as to the '160 Patent [Mov. Ex. T at 244-45; Mov. Ex. R at 54].

81. Fell admitted on his deposition [Mov. Ex. R at 54]:

> "Q. Did you call Mr. Sharinn up and say to him 'Todd, thanks for sending me this notice, but we're still going to be looking to you about the '160 Patent? Did you ever that conversation with him?
> 　　A.  I don't recall.
> 　Q. You don't recall ever having that conversation, do you?
> 　　A. Right."

[see also Mov. Ex. R at 56; Mov. Ex. I ¶¶22, 23].

82. Sharinn also testified [Mov. Ex. T at 244-45]:

> "Q.  Did Mr. Fell or Dr. Colvin or anyone else from the
> Colvin entities or Quickie call you up after that and say to
> you, oh, no, wait a minute Todd, we're still looking to you
> or to Greenberg Traurig to continue work on the '160
> Patent?
>     A.  No."

83. Having received the Notice [Ex. B], GT removed the '160 Patent from its internal

system so as not to interfere with a matter on which its client had retained different counsel, and

noted  in the system that that patent "has been transferred to another firm" [Mov. Ex. O: "POA

revoked" and "transferred to another firm"; Mov. Ex. P: "status: inactive; sub status:

transferred"; see also Mov. Ex. S at 20, 28-29, 39, 60-61, 66-68, 71-72, 79-81, 93, 96, 100, 167-

69; 172-73, 216-17, 249-50, 289-90; see also 52-53, 62-64, 144-46].

84. I also explained [Mov. Ex. S at 39], as to a printout from GT's database [Mov. Ex.

O]:

> "[B]y the records being marked as transferred or inactive . .
> . there would be no subsequent reports that included those
> cases because those matters were thereafter being handled
> by the firm to whom the cases have been transferred."

and [Mov. S at 79-81]:

> "Q. Next column to the right you'll see that April 2, 2003
> date under the column response.. . .What does that refer to?
>     A.  <u>That indicates that a response to the due date for the
> first maintenance fee was taken care of via the revocation
> of the Power of  Attorney and the responsibility for this
> case.</u>  That's the date of the formal revocation of the Power
> of Attorney . . . <u>so that we would no longer be responsible
> for the payment of any maintenance fees.</u>
>             *               *               *
> [I]f our Power of Attorney is revoked and <u>we're asked to
> no longer do anything with respect to,</u> for example, <u>here the
> '160 Patent or anything associated with that '160 Patent,</u>
> we put in that field the date of the formal revocation of our
> authority to act as attorneys for the client in that regard, and

that's the reason for the entry of 4/2/2003 in each of the M1, M2, and M3, the three maintenance fees there.

That indicates that someone else, this report indicates that the client has asked and instructed someone else to do this activity." (emphasis added)

and [Mov. Ex. S at 172-73]:

"Q. How about notices or reminders that were kicked out from the computerized docketing system?

A. There would be no reminder or notice on the computerized docketing system because our Power of Attorney was revoked well prior to the deadline in May . . . for paying the first maintenance fee.

So there would be no reminder or report . . . We were no longer representing Quickie in that regard. Our power had been revoked. It would have been inappropriate for us to be involved thereafter." (emphasis added)

[Accord: Mov. Ex. S at 250: "Once Thelen assumed responsibility by virtue of our [sic] revocation of our Power of Attorney, we had no responsibility thereafter"; and at 62: reports "were not generated after Greenberg Traurig was notified that its Power of Attorney was going to be revoked and [GT] would no longer represent the client in this regard"; see also 60-61, 66-68, 71-72, 79-81, 93, 96, 100, 167-69; 172-73, 216-17, 249-50, 289-90].

85. Quickie's own later sworn statements and other submissions to the PTO corroborate that Quickie considered GT to have been fully replaced by Thelen and *Thelen* to be *solely* responsible after March 2003 for the '160 Patent, including *"timely payment of the maintenance fees"* [Mov. Exs. E, F, G].

86. Thelen's conduct was consistent with those statements. Thus, in December 2003, Thereafter, Thelen filed a 'change of address notice" as to the '160 Patent [Mov. Ex. C; sell also Mov. Ex. AO ¶¶15].

87. GT's time and billing records also corroborate that, showing  GT did indeed cease all work on the '160 Patent after receiving the Revocation/Appointment [Mov. Exs. AR, AM].

88. While GT continued to complete the successful prosecution of another *different* patent [*Id.*; Mov. Exs. AG, AH, AI, AK], GT had no further role, and did no further work on or as to the '160 Patent [*Id.*; see also Mov. Ex. T at 244-45, 266-67].

89. Ironically but unfortunately, if Quickie had not revoked GT's authority, the '160 Patent would have remained active in GT's system and would have alerted GT that the Maintenance Fee was becoming due [Mov. Ex. S at 49, 52-53, 144-46]. GT either would have advised Quickie or paid the Fee itself as a disbursement [Mov. Ex. S at 114-15, 144-46].

90. But, as Sharinn explained [Mov. Ex. T at 250-51]: "I've always understood it, and as someone who has filed them with regards to others, means that those others are no longer permitted to participate in the prosecution or the maintenance of the referenced patent.". That is also consistent with my understanding and experience.

**Thelen's Failure as to the Maintenance Fee and the Loss of the '160 Patent**

91. Coincidentally, before joining GT, I was a senior patent counsel at Thelen [Mov. Ex. S at 20-21].

92. While I was at Thelen, I had set up an internal system for tracking the patents as to which Thelen had responsibility[[Mov. Ex. S at 20-21, see also 88-89, 117-18, 121-22].

93. The materials and documents which GT sent to Thelen (both when Thelen first became involved and after Thelen replaced GT) showed when the Maintenance Fee on the '160 Patent would become due [Mov. Ex. S at 123-24, 128-29, 136-37, see also 212, 217-18, 309; Mov. Ex. T at 198-202; see also Mov. Exs. W, X; Mov. Ex. R at 63-64; Mov. Ex. I ¶¶22, 23].

94. Thelen thus had an opportunity, indeed ample opportunity --- *both* when the Maintenance Fee first became payable *and* during the entire one-year period when it could be

paid --- to pay the Maintenance Fee or to advise Quickie to do so and thus avoid loss of the '160

Patent [Mov. Ex. R at 96-97; Mov. Ex. AO ¶19].

     95. For unexplained reasons, Thelen failed to do either, resulting in the expiration of the

'160 Patent [Mov. Ex. AO ¶19; see also Mov. Exs. E, F, G, L, M].

     96. Thelen was aware of its responsibility as to the '160 Patent [Mov. Ex. AE].

     97. Thelen itself had prepared and filed the Revocation/Appointment in March 2003

[Mov. Ex. Q at 66; Mov. Ex. AO ¶14; see also Mov. Ex. AE].

     98. Moreover, Evens later confirmed that Thelen had been responsible for payment of the

Maintenance Fee [Mov. Ex. K]. In an email to another Thelen partner in October 2006, after

Evens had left Thelen, Evens acknowledged [Mov. Ex. K]:

> "[M]y understanding at the time was that we (TRP) was
> [sic] taking responsibility for the patent, and that is how I
> read Bob's [Krebs'] filing [of the Revoca-
> tion/Appointment]. Second, I remember a conversation
> early on with Bob about not missing fee deadlines. Finally,
> maintenance fees are part of representing the patent, so I
> am surprised that Bob, as a practiced patent prosecutor,
> wouldn't advisee [sic] Quickie and Steve that deadlines
> were approaching so he would not lose his patent."
> (emphasis added)

     99. Quickie has said the same thing [Mov. Ex. E at 4]:

> "The Patent Owner fully believed that their valuable legal
> rights in the '160 patent would be justly protected by the
> attorneys and law firm of Thelen Reid & Priest, when the
> Patent Owner chose them for representation and executed
> the Power of Attorney on March 4, 2003 [Mov. Ex. a].
> Unfortunately, such did not occur. . ."

Accord: Mov. Exs. G and F: Quickie "retained Robert E. Krebs et al of . . . Thelen . . .[for] . .

*including timely payment of the maintenance fee*"]. Sharinn also so testified [Mov. Ex. T at 188,

242, 245, 250-52, 266-67].

100.   The failure to pay the Maintenance Fee during the one-year period from May 23, 2003 through May 23, 2004 resulted in the loss of the '160 Patent [Mov. Exs. L, M; AO ¶19].

**Quickie's Unsuccessful Petition to Revive the '160 Patent**

101. After the learning of the loss of its '160 Patent in 2006, Quickie fired Thelen [Mov. Ex. AN; Mov. Ex. R at 101; Mov. Ex. Q at 75-77].

102. Quickie (through its new counsel) then filed a Petition to revive the patent pursuant to 37 CFR §1.378(b) [Mov. Exs. E, F,G; Mov. Ex. Q at 44-48, 77-102; see also Mov. Ex. R at 65-71, 74-75, 78-81], claiming (as detailed above) that it had relied on Thelen to assure that the Maintenance Fee was paid but that Thelen had failed to do so [*Id.*].

103. To support its Petition, Quickie expressly requested and received a Statement from Sharinn corroborating its own statements that GT and he had been replaced by Thelen and had no responsibility as to the '160 Patent after March 4, 2003 [Mov. Ex. T at 254, see also 253-64].

104. Quickie's counsel (who had initially drafted the Sharinn Statement [Mov. Ex. T at 254-56]) submitted Sharinn's Statement as proof corroborating that Thelen had had sole responsibility for the Maintenance Fee and for the loss of the '160 Patent [Mov. Exs. E and F]. Quickie has never requested a contrary statement from Sharinn [Mov. Ex. Q at 90; Mov. Ex. T at 256].

105. Nor has Quickie ever advised the PTO that its prior statements to the PTO blaming Thelen alone --- including that Thelen had had sole responsibility for payment of the Maintenance Fee --- were false or inaccurate [Mov. Ex. Q at 89, 90, 96, 97, 99, 100, 102; Mov. Ex. R at 74-75, 80-81; Mov. Ex. T at 256].

106. The PTO denied Quickie's Petition on March 6, 2007 [Mov. Ex. L; Mov. Ex. R at 81; Mov. Ex. Q at 121].

107. In denying the Petition, the PTO expressly noted and relied on Quickie's statements to the PTO that Thelen "was responsible for payment of the maintenance fee" and that Sharinn and GT had not been "responsible for the patent" after March 2003 [Mov. Ex. L at 4].

108. Quickie filed a petition for reconsideration of that decision [Mov. Ex. R at 81; Mov. Ex. Q at 103-105].

109. On October 5, 2007, the PTO also denied that petition [Mov. Ex. M; Mov. Ex. Q at 102-04; Mov. Ex. R at 81].

110. In denying the petition for reconsideration, the PTO again referenced Quickie's prior statements and held that Quickie remained bound by them, including the Sharinn Statement which Quickie had sought and filed and which it had left extant [Mov. Ex. M at 3-4; Mov. Ex. Q at 107-09]. Quickie has not sought a further review of that decision [Mov. Ex. Q at 123-24].

### RESPONDING TO QUICKIE'S APPARENT CONTENTIONS

111. Sharinn, a former professional athlete and college coach [Mov. Ex. T at 16-17], correctly summed up the situation in sports vernacular [Mov. Ex. T at 103-04]:

> "So, if I seem a bit upset about it, it's because I've been accused of messing up where I did not mess up and . . . my former firm [GT] is being accused of me messing up where they did not mess up. We didn't have the ball to run with. It was taken away from us and handed to a different back, to speak metaphorically. . . We were pulled out of the game."

112. Quickie appears to be contending that GT is nevertheless responsible based on unrelated matters, events predating Quickie's discharge and replacement of GT and mischaracterizations of the facts.

#### GT's work on another different patent

113. Quickie contends that, since GT briefly continued to represent Quickie in the prosecution of another different patent, Patent No. 6,716,243 ["the '243 Patent"; see Mov. Ex. T

at 271], GT should be held liable for not reminding Quickie that the Maintenance Fee on the '160 Patent would become payable after GT had been relieved of all responsibility as to that patent. That, of course, is directly contrary to what Quickie *swore* to the PTO (and has left extant) --- and to what GT had been told and relied on.

**the fall 2002 change of address**

114.  In discovery, Quickie has pointed out that GT filed a change of address with the PTO (signed in October 2002 but filed in December 2002) advising the '160 Patent that Sharinn's office had moved from GT's 200 Park Avenue office to its office at 885 Third Avenue [Mov. Ex. AB; Mov. Ex. S at 192].

115. However, as Sharinn and I have explained, that was done administratively as  a matter of course since GT then still  had an extant power of attorney as to the '160 Patent, [Mov. Ex. AB; Mov. Ex. S at 196-98; Mov. Ex. T at 135-36].

116. In any event, that *predated* Quickie's March 2003 Revocation/Appointment replacing GT with Thelen [Mov. Exs. A, B, C, AE, AF; Mov Ex. S at 196-97]. The change of address, of course, became moot and irrelevant when Quickie filed the Revocation/Appointment [*Id.*].

**the Pepe 2000 letter**

117. Quickie may also seek to rely on Pepe's statement in 2000 (when the '160 Patent was issued) that "*we* will notify you regarding payment of the Maintenance Fees several months before they are due" (emphasis added) [Mov. Ex. U at 2].

118. As I explained above, GT made no such undertaking as to the '160 Patent; but GT did place the '160 Patent into its internal database to follow.

119. However, Quickie *thereafter* revoked GT's authority and role as to the '160 Patent, and replaced GT with Thelen as Quickie's patent counsel as to the '160 Patent, indeed months *before* the Maintenance Fee became due.

120. Hence, GT had appropriately ceased work as to '160 Patent in March 2003, and properly noted (in its internal notification system) that the matter had been transferred to another law firm, so that GT was no longer involved.

## Sharinn's relationship with Colvin and Fell

121. Sharinn left GT in 2005; and he admitted, GT had no involvement whatever with Quickie after that [Mov. Ex. T at 18; see also Mov. Ex. S at 34-46].

122. Sharinn continued to talk with Fell and Colvin after GT had been relieved [e.g. Mov. Ex. T at 108-11, 219], since they had developed a personal friendship while he had been counsel for Quickie [Mov. Ex. T at 108-10].

123. But, Sharinn was never again engaged as their counsel [Mov. Ex. T at 96, 101, 105, 153]; and, as Sharinn has explained, such discussions were not in the context of a lawyer-client relationship, much less as to the '160 Patent [cf. Mov. Ex. T at 244-45; Mov. Ex. R at 54].

124. To the contrary, Colvin and Fell had made clear that he had been "relieved of all duties" as to the '160 Patent [Mov. Ex. T at 189]; and Sharinn had told them [*Id.*]:

> "I made clear to them you fired me, you have new counsel,
> your new counsel is Thelen Reid & Priest, you need to take
> this up with Mark Evens or we can be reengage[d] . . ."

## client intake forms

125. Quickie spent extended time in discovery as to the GT client intake forms that Sharinn's secretary filled out in the fall and early winter of 2002.

126. All of those forms *predate* the Revocation/Appointment in March 2003.

127.  Moreover, Sharinn has explained that he and she "opened" possible matters because "I had always hoped in the back of my mind and in my heart" to get Quickie back as a client and to "put forth the best foot I could forward for making partner at Greenberg Traurig"[Mov. Ex.  T at 110, see also 108-10].

**misaddressed correspondence**

128. Quickie also pointed to correspondence from or to Sharinn in the fall and winter of 2002-03 which was addressed to Quickie or referred to it on the 're' line [see, e.g., Mov. Ex. T at 203-10; see also Mov. Exs. AA and AG; see also Mov. Exs. AA and AG].

129. That correspondence predates Quickie's March 2003 Revocation/Appointment as to the '160 Patent.

130. Moreover, as the evidence and testimony showed, the parties often misaddressed the entity as to which letters were sent and misidentified the matter about which they were communicating [Mov. Ex. R at 91-95; Mov. Ex. T at 230-36;  Mov. Exs. AA and AG]. Sharinn, Fell and Quickie sometimes simply referred to matters or addressed them to Quickie as a shorthand [Mov. Ex. T at 209-11]. Fell thus relied on the body of the correspondence to determine what the communication was really about [Mov. Ex. R at 94-95].  Those  parties did not  pay  strict  attention  to  such  matters,  and  these aberrant examples are not worthy of significance [Mov. Ex. R at 95].

## AS TO THE STATUTE OF LIMITATIONS

131. As explained above, Quickie discharged GT and replaced it with Thelen as to the '160 Patent in March 2003; and, as corroborated by GT's billing records, GT did no further work as to the '160 Patent after that [Mov. Ex. AR, AM].

132. This action was not commenced until mid-April 2007, more than four years later. As a result, Quickie's claim is barred by the statute of limitations.

133. There was no "mutual understanding" for GT to continue doing anything as to the '160 Patent after Quickie's revocation of GT's authority as to the '160 Patent and appointment of new counsel (i.e. Thelen) as to the '160 Patent in March 2003 [Mov. Exs. A, B and C].

134. Rather, as confirmed in Quickie's later sworn statements in support of Quickie's petition to revive the patent [Mov. Exs. E. F and G], Quickie was no longer looking to GT as to the '160 Patent or the Maintenance Fee that would become due on it.

135. Sharinn (of GT) had also been told that by Quickie and its General Counsel; and he had confirmed that in his May 15, 2003 letter [Mov. Ex. AF]; and  GT's billing records  show that GT did no other work on '160 Patent after that [Mov. Ex. AR, AM].


Dated: July 22, 2008
       New York, New York

_____
Paul Sutton

# EXHIBIT LIST

Quickie LLC v. Greenberg Traurig LLP                    July 22 , 2008
   07 Civ. 10331 (RMB) (DFE)

## LIST OF MOVING EXHIBITS
## ON MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| Moving Exhibit. A | Quickie's Revocation of Prior Powers of Attorney/New Power of Attorney dated March 4, 2003 filed in March 2003 [part of Dep. Ex. 51] |
| Moving Exhibit B | PTO Notice of Change of Power of Attorney dated April 2, 2003 received by Greenberg Traurig [Dep. Ex. 50] |
| Moving Exhibit C | Thelen Change of Address filed in December 2003 [Dep. Ex. 57] |
| Moving Exhibit D | Petition by Quickie to revive '160 Patent [Dep. Ex. 55] |
| Moving Exhibit E | Supplement to Quickie's Petition to revive '160 Patent [Dep. Ex. 54] |
| Moving Exhibit F | Statement of Aubrey Galloway in Support of Quickie's Petition to revive '160 Patent [Dep. Ex. 53] |
| Moving Exhibit G | Statement of Todd Sharinn in Support of Quickie's Petition to revive '160 Patent [Dep. Ex. 52] |
| Moving Exhibit H | Quickie's Response to GT's Request for Admissions |
| Moving Exhibit I | Fell/Rick Steiner Response to GT's Request for Admissions [Dep. Ex. 65] |
| Moving Exhibit J | Thelen/Krebs Response to GT's Request for Admissions |
| Moving Exhibit K | Evens email to Thelen of October 25, 2006 [Dep. Ex. 62] |
| Moving Exhibit L | PTO Decision of March 6, 2007  [Dep. Ex. 59] |
| Moving Exhibit M | PTO Decision of  October 5, 2007 [Dep. Ex. 60] |
| Moving Exhibit N | PTO Decision of February 20, 2008 [Dep. Ex. 63] |

| | |
|---|---|
| Moving Exhibit O | Print-Out from GT internal computer docketing system for '160 Patent [Dep. Ex. 3] |
| Moving Exhibit P | Print-Out from other GT internal computer docketing system for '160 Patent [Dep. Ex. 8] |
| Moving Exhibit Q | Galloway (Quickie) Deposition Excerpts |
| Moving Exhibit R | Fell (Rick Steiner) Deposition Excerpts |
| Moving Exhibit S | Sutton (GT) Deposition Excerpts |
| Moving Exhibit T | Sharinn Deposition Excerpts |
| Moving Exhibit U | Pepe & Hazard letter to Quickie of May 30, 2000 [Dep. Ex. 21] |
| Moving Exhibit V | GT letter to Thelen of April 11, 2002 [Dep. Ex. 5] |
| Moving Exhibit W | Fell letter to Sharinn of October 15, 2002 [Dep. Ex. 22] |
| Moving Exhibit X | GT letter to Thelen of October 16, 2002 [part of Dep. Ex. 25] |
| Moving Exhibit Y | Email to Sharinn dated December 2, 2002 [Dep. Ex. 37] |
| Moving Exhibit Z | GT Client Intake Form of December 5, 2002 [Dep. Ex. 19] |
| Moving Exhibit AA | GT letter to Fell dated December 3, 2002 [Dep. Ex. 66] |
| Moving Exhibit AB | Change of Correspondence Address of October 22, 2002 filed with PTO by GT in December 2002 [Dep. Ex. 7] |
| Moving Exhibit AC | GT letter to Quickie of January 29, 2003 re other patent [Dep. Ex. 39] |
| Moving Exhibit AD | GT letter to Quickie of February 21, 2003 re other patent [Dep. Ex. 40] |
| Moving Exhibit AE | Thelen letter to Quickie dated April 16, 2003 [Dep. Ex. 51] |
| Moving Exhibit AF | GT letter to Quickie dated May 15, 2003 [Dep. Ex. 27] with copy of Notice to GT of revocation |
| Moving Exhibit AG | GT letter to QuickieVision dated October 14, 2003 [Dep. Ex. 67] |

Moving Exhibit AH          GT letter to Quickie dated December 2, 2003 re '243 Patent
                           [Dep. Ex. 41]

Moving Exhibit AI          GT letter to Fell of December 2, 2003 [Dep. Ex. 44]

Moving Exhibit AJ          Thelen letter to Court in Medtronic Action of April 6, 2004
                           with PTO initial decision in reexamination proceeding re
                           '160 Patent

Moving Exhibit AK          GT letter to Quickie dated April 13, 2004 [Dep. Ex. 33]

Moving Exhibit AL          Medtronic Request for Reexamination '160 Patent of June 16,
                           2004

Moving Exhibit AM          GT letter to Quickie of September 23, 2004 re outstanding
                           invoices  [Dep. Ex. 36]

Moving Exhibit AN          Quickie letter to Thelen of August 14, 2006 for transfer of files
                           to Evens' new law firm [Dep. Ex. 58]

Moving Exhibit AO          Quickie's Complaint

Moving Exhibit AP          GT's Answer

Moving Exhibit AQ          Thelen's file index for '160 Patent

Moving Exhibit AR          GT billing '160 Patent [Dep. Ex. 45, 48 and 49 and part of 42]

Moving Exhibit AS          Final Action of PTO as to '160 Patent dated July 7, 2008

# EXHIBIT A

PATENT

Practitioner's Docket No._____034521-002_____

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Patent No:    6,066,160

Issued:    May 23, 2000
Title:    PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN
    MINIMALLY INVASIVE SURGERY AND TO FACILITATE
    STANDARD TISSUE SECURING
Inventors:    Stephen Colvin, Eugene Grossi, Allan Katz, Paul Oddo

Commissioner of Patents and Trademarks
Washington, D.C. 20231

POWER OF ATTORNEY BY ASSIGNEE OF ENTIRE INTEREST
(REVOCATION OF PRIOR POWERS)

As assignee of record of the entire interest of the above identified patent,

REVOCATION OF PRIOR POWERS OF ATTORNEY

all powers of attorney previously given are hereby revoked and

NEW POWER OF ATTORNEY

the following attorney(s) and/or agent(s) are hereby appointed to prosecute and
transact all business in the Patent and Trademark Office connected therewith.

Robert E. Krebs, Registration No. 25,885; David B. Ritchie, Registration No. 31,562; Marc S.
Hanish, Registration No. 42,626; John P. Schaub, Registration No. 42,125; Adrienne
Yeung, Registration No. 44,000; Steven J. Robbins, Registration No. 40,299; Thierry K. Lo,
Registration No. 49,097; William Samuel Niece, Registration No.: 47,824; J. Davis Gilmer,
Registration No. 44,711; William E. Winters, Registration No. 42,232, Masako Ando, (37
C.F.R.§10.9 (b)); and John Klaas Uilkema, Registration No. 20,282; Becky L. Troutman,
Registration No. 36,703; Hal J. Bohner, Registration No. 27,856;

QUICK 005088

Quickie, LLC

(type or print identify of assignee of entire interest.)

3 New York Plaza
Attn: Alan Fell
New York, NY 10004

Address

Recorded in PTO on _____11/23/1998_____
Reel_____9608_____
Frame _____0640_____

## ASSIGNEE STATEMENT

The undersigned states that he is authorized to act on behalf of the assignee.

Signature

Date_____3/4/03_____

Aubrey C. Galloway

(type or print name of person authorized to sign
on behalf of assignee)

Managing Partner.

Title

QUICK 005089

2

QLLC 0062223

Attorney Docket No. 034521-003

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT:    Stephen Colvin, Eugene Grossi, Allan Katz, Paul Oddo

PATENT NO.:    6,066,160

ISSUE DATE:    May 23, 2000

TITLE:    PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN
MINIMALLY INVASIVE SURGERY AND TO FACILITATE
STANDARD TISSUE SECURING

EXAMINER:    Woo, J.

ART UNIT:    3731

---

## CERTIFICATE OF MAILING

I hereby certify that this paper is being deposited with the United States Postal Service as First Class
Mail in an envelope addressed to: Commissioner for Patents, Washington, DC 20231, on the date
printed below.

Date: 3/20/03         Name: _____
                              Annette Valdivia

---

COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

## CHANGE OF ATTORNEY DOCKET NUMBER
## AND CHANGE OF ADDRESS NOTICE

Please change the Attorney Docket No. for this patent application from

**034521-002 to 034521-003.**

Please address all further communications regarding this application to:

Robert E. Krebs
Thelen Reid & Priest LLP
P.O. Box 640640
San Jose, CA 95164-0640
Telephone (408) 292-5800; Facsimile (408) 287-8040

Respectfully submitted,
THELEN REID & PRIEST LLP

Dated: 20 March, 2003     _____

Hal Jay Bohner
Reg. No. 27,856

QUICK 005090

# EXHIBIT B

**EXHIBIT**

50


UNITED STATES
PATENT AND
TRADEMARK OFFICE

Commissioner for Patents
Washington, DC 20231
www.uspto.gov

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 09/198,087 | 11/23/1998 | STEPHEN COLVIN | QUIC-1 |

**CONFIRMATION NO. 2082**

Todd S. Sharinn
Greenburg Traurig LLP
885 Third Avenue 21st Floor
New York, NY 10022


*OC000000009757041*

Date Mailed: 04/02/2003

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 04/02/2003.

• The Power of Attorney to you in this application has been revoked by the assignee who has intervened as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

DAVID O LIPSCOMB
OPR (703) 308-7127

FORMER ATTORNEY/AGENT COPY

GT 0000373

# EXHIBIT C

12-05-03   11:47am   From-Thelen, Reid, & Priest LLP-

T-198   P 001/002   F-254

**Thelen Reid & Priest LLP**
Attorneys At Law

225 West Santa Clara Street, Suite 1200
San Jose, CA 95113-1723
Tel. 408.292.5800
Fax 408.287.8040
www.thelenreid.com

# F A X   C O V E R   P A G E

**RECEIVED**
**CENTRAL FAX CENTER**

DEC 0 5 2003

**OFFICIAL**

Date:  December 5, 2003

Total Pages: 2
*(including cover)*

To:  Commissioner for Patents
USPTO

Fax:  703.872.9306

Phone:

From:  Annette Valdivia

Fax:

Phone:  408/282-1818

E-Mail:  avaldivia@thelenreid.com

## C E R T I F I C A T E   O F   T R A N S M I S S I O N   U N D E R   3 7   C F R   1 . 8

I hereby certify that this correspondence is being facsimile transmitted with the United States Patent and Trademark Office to
Director for Patents, Fax No. (703) 872-9306 on the date printed below.

Date: 12/5/03        Signature: _Annette Valdivia_

Annette Valdivia

**EXHIBIT**
**57**
6-12-08

RE:  Control No.   90/006,460
Filed:  November 25, 2002
Docket No:   034521-003

Dear Sir or Madam:

Respectfully submitted is the following:

1. Change of attorney docket number and change of address notice

If you have any questions, please do not hesitate to contact us.

Regards,
Annette Valdivia

In case of a problem with this transmission, please call the Fax Operator at 408.282.1866

| JOB # | ATTORNEY # | CLIENT-MATTER | RETURN TO | ROOM # |
|-------|-----------|---------------|-----------|--------|
|       | 40935     | 034521-003    |           |        |

**IMPORTANT:** This fax transmission is intended only for the addressee. It contains information from the law firm of Thelen Reid &
Priest LLP which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination, distribution, or
copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this transmission is received in
error, please notify Thelen Reid & Priest LLP immediately at the telephone number indicated above. We will reimburse your costs
incurred in connection with this erroneous transmission and your return of these materials. THANK YOU.

SV #150497 v1

12-05-03    11:47am    From-Thelen, Reid, & Priest LLP                    T-198   P.002/002   F-254

Attorney Docket No. 034521-003

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT:    Stephen Colvin, Eugene Grossi, Allan Katz, Paul Oddo

CONTROL NO.: 90/006,460

PATENT NO.:   6,066,160

FILING DATE:  November 25, 2002

TITLE:    PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN
          MINIMALLY INVASIVE SURGERY AND TO FACILITATE
          STANDARD TISSUE SECURING

EXAMINER:     Woo, J.

ART UNIT:     3731

RECEIVED
CENTRAL FAX CENTER

DEC 0 5 2003

OFFICIAL

---

CERTIFICATE OF TRANSMISSION UNDER 37 CFR 1.8

I hereby certify that this correspondence is being facsimile transmitted with the United States Patent and Trademark Office to Director for Patents, Fax No. (703) 872-9306 on the date printed below.

Date: 12/5/03    Name: _Annette Valdivia_
                       Annette Valdivia

---

COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

### CHANGE OF ATTORNEY DOCKET NUMBER
### AND CHANGE OF ADDRESS NOTICE

Please change the Attorney Docket No. for this patent application to 034521-003.

Please address all further communications regarding this application to:

Robert E. Krebs
Thelen Reid & Priest LLP
P.O. Box 640640
San Jose, CA 95164-0640
Telephone (408) 292-5800; Facsimile (408) 287-8040

Respectfully submitted,
THELEN REID & PRIEST LLP

Dated: 12/2/03

Robert E. Krebs
Reg. No. 25,885

# EXHIBIT D



DAC

PTO/SB/65 (10-05)
Approved for use through 04/30/2009. OMB 0651-0016
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PETITION TO ACCEPT UNAVOIDABLY DELAYED PAYMENT OF MAINTENANCE FEE IN AN EXPIRED PATENT (37 CFR 1.378(b)) | Docket Number (Optional) Quickie-001-PT |
|---|---|

Mail to: Mail Stop Petition
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450
Fax: (571) 273-8300

**EXHIBIT**
**55**
6-12-08

NOTE: If information or assistance is needed in completing this form, please contact Petitions Information at (571) 272-3282.

Patent No. ___6,066,160___     Application Number ___09/198,087___

Issue Date ___May 23, 2000___     Filing Date ___November 23, 1998___

CAUTION:  Maintenance fee (and surcharge, if any) payment must correctly identify: (1) the patent number (or reissue patent number, if a reissue) and (2) the application number of the actual U.S. application (or reissue application) leading to issuance of that patent to ensure the fee(s) is/are associated with the correct patent. 37 CFR 1.366(c) and (d).

**Also complete the following information, if applicable**

The above-identified patent:

☐   is a reissue of original Patent No. _____ original issue date _____ ;
     original application number _____ ,
     original filing date _____ .

☐   resulted from the entry into the U.S. under 35 U.S.C. 371 of international
     application _____ filed on _____ .

---

**CERTIFICATE OF MAILING OR TRANSMISSION (37 CFR 1.8(a))**
I hereby certify that this paper (along with any paper referred to as being attached or enclosed) is
    (1) being deposited with the United States Postal Service on the date shown below with sufficient postage as first class mail in an envelope addressed to Mail Stop Petition, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 OR
    (2) transmitted by facsimile on the date shown below to the United States Patent and Trademark Office at (571) 273-8300.

| _____ | _____ |
|---|---|
| Date | Signature |

10/30/2006 SLUANG1  00000001 6066160
01 FC:1599              1600.00 OP

| _____ |
|---|
| Typed or printed name of person signing Certificate |

This collection of information is required by 37 CFR 1.378(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop Petition, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

BEST AVAILABLE COPY



PTO/SB/65 (10-05)
Approved for use through 04/30/2009. OMB 0651-0016
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

1. SMALL ENTITY

☐ Patentee claims, or has previously claimed, small entity status. See 37 CFR 1.27.

2. LOSS OF ENTITLEMENT TO SMALL ENTITY STATUS

☐ Patentee is no longer entitled to small entity status. See 37 CFR 1.27(g).

3. MAINTENANCE FEE (37 CFR 1.20(e)-(g))

The appropriate maintenance fee must be submitted with this petition, unless it was paid earlier.

| NOT Small Entity | | | Small Entity | | |
|---|---|---|---|---|---|
| Amount | Fee | (Code) | Amount | Fee | (Code) |
| ☒ $ 900.00 | 3 1/2 yr fee | (1551) | ☐ $ _____ | 3 1/2 yr fee | (2551) |
| ☐ $ _____ | 7 1/2 yr fee | (1552) | ☐ $ _____ | 7 1/2 yr fee | (2552) |
| ☐ $ _____ | 11 1/2 yr fee | (1553) | ☐ $ _____ | 11 1/2 yr fee | (2553) |

MAINTENANCE FEE BEING SUBMITTED $ _____

4. SURCHARGE

The surcharge required by 37 CFR 1.20(i)(1) of $ 700.00 (Fee Code 1557) must be paid as a condition of accepting unavoidably delayed payment of the maintenance fee.

SURCHARGE FEE BEING SUBMITTED $ 700.00 _____

5. MANNER OF PAYMENT

☐ Enclosed is a check for the sum of $ _____

☐ Please charge Deposit Account No. _____ the sum of $ _____ . A duplicate copy of this authorization is attached.

☒ Payment by credit card. Form PTO-2038 is attached.

6. AUTHORIZATION TO CHARGE ANY FEE DEFICIENCY

☒ The Director is hereby authorized to charge any maintenance fee, surcharge or petition fee deficiency to Deposit Account No. _____ . A duplicate copy of this authorization is attached.

PTO/SB/85 (10-05)
Approved for use through 04/30/2009. OMB 0651-0016
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

7. OVERPAYMENT

As to any overpayment made please

[X]  Credit to Deposit Account No. _____

OR

[ ]  Send refund check.

**WARNING:**

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

8. SHOWING

The enclosed statement will show that the delay in timely payment of the maintenance fee was unavoidable since reasonable care was taken to ensure that the maintenance fee would be paid timely and that this petition is being filed promptly after the patentee was notified of, or otherwise became aware of, the expiration of the patent. The statement must enumerate the steps taken to ensure timely payment of the maintenance fee, the date and the manner in which the patentee became aware of the expiration of the patent, and the steps taken to file the petition promptly.

9. PETITIONER(S) REQUESTS THAT THE DELAYED PAYMENT OF THE MAINTENANCE FEE BE
   ACCEPTED AND THE PATENT REINSTATED.

| | |
|---|---|
| _Signature(s) of Petitioner(s)_ | 10/27/06 <br> Date |
| Timothy J. Maier <br> Typed or printed name(s) | 51,986 <br> Registration Number, if applicable |
| 128 N. Pitt St. 2ND Floor <br> Address | 703 740-8322 <br> Telephone Number |
| Alexandria, VA 22314 <br> Address | |

ENCLOSURES:

[X]  Maintenance Fee payment

[X]  Statement why maintenance fee was not paid timely

[X]  Surcharge under 37 CFR 1.20(i)(1) (fee for filing the maintenance fee petition)

[ ]  Other: _____

PTO/SB/65 (10-05)
Approved for use through 04/30/2009. OMB 0651-0016
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

37 CFR 1.378(d) states: "Any petition under this section must be signed by an attorney or agent registered to practice before the Patent and Trademark Office, or by the patentee, the assignee, or other party in interest."

| _____ | _____ |
| Signature | Date |

10/27/06

| _____ | _____ |
| Typed or printed name | Registration Number, if applicable |

Timothy J. Maier

51,986

## STATEMENT
(In the space below, please provide the showing of unavoidable delay recited in paragraph 8 above.)

See Attached.

*(Please attach additional sheets if additional space is needed)*

[Page 4 of 4]



PATENT
Customer No.62008
Attorney Docket No. QUICKIE-001-PT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent of: | ) |
| | ) |
| **Colvin et al.** | ) Group Art Unit: NA |
| | ) |
| US Patent No.: 6,066,160 | ) Examiner: Gary Jackson |
| | ) |
| Issue Date: May 23, 2000 | ) |
| | ) |
| For: Passive knotless suture terminator | ) |
| for use in minimally invasive surgery and | ) |
| to facilitate standard tissue securing | ) |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

### GRANT OF LIMITED POWER OF ATTORNEY

### TO FILE 37 C.F.R. 378(C) PETITION

The undersigned representative of Quickie, LLC, owner by virtue of assignment

of the above-identified application, hereby grants limited power of attorney in the above

action to Maier & Maier, PLLC., Customer Number 62,008, Timothy J. Maier, Reg. No.

51,986; Christopher J. Maier, Reg. No. 53,255; both jointly and separately as their

attorneys with full power of substitution and revocation to file and prosecute this, the

above-reference petition, in the Patent and Trademark Office.

Attorney Docket No. Quickie-001-PT
Patent No.: 6,066,160

Please send all future correspondence concerning this Petition to Maier & Maier, PLLC at the following address:

> Maier & Maier, PLLC
> 128 N. Pitt St.
> 2nd Floor
> Alexandria, VA 22314

The undersigned is empowered with limited Power of Attorney on behalf of the assignee.

Dated: _10/25/06_

Title: _Managing Partner_

Quickie, LLC

By: _Aubrey Galloway M.D_

Aubrey C. Galloway, MD

# EXHIBIT E



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | U.S. Patent No.:  6,066,160 |
| | Owner:  Quickie L.L.C. |
| Colvin *et al.* | Filed:  November 23, 1998 |
| Appl. No. 09/198,087 | Issued:  May 23, 2000 |
| For:  **Passive Knotless Suture Terminator For Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing** | Art Unit:  3731 |

## Supplement to Petition Under 37 C.F.R. § 1.378(b)

Commissioner for Patents
PO Box 1450
Alexandria, VA  22313-1450

Sir:

The above-referenced patent expired for delayed payment of the first maintenance fee.

This supplement is filed to further show to the satisfaction of the Commissioner that the delay in payment of the first maintenance fee has been unavoidable to the Patent Owner, and that reasonable care was taken by the Patent Owner to insure that timely payment of the maintenance fee would be made.

A Declaration by Todd S. Sharinn, Esq., is being added to Exhibit 7 showing that he was an attorney at Pepe & Hazard, LLP, and was responsible for the '160 patent. Later, he left Pepe & Hazard, but continued to be responsible for the '160 patent as an attorney at Greenberg Traurig, LLP (Exhibit 8). Further, his responsibility for the '160 patent ended prior to the time period when the payment of a first maintenance fee was due. (See Exhibits 3 and 10, Revocation of Prior Powers of Attorney signed on the behalf of the Patent Owner, on March 4, 2003).

**EXHIBIT**

54

6/11/08

Also, a response from counsel for Greenberg Traurig, LLP, and associated documentation is being added to Exhibit 8 showing the transfer of responsibility from Pepe & Hazard, and Todd Sharrin, to Greenberg Traurig.

Further, new Exhibit 13 is added to provide relevant MPEP sections on filing amendments in a reexamination proceeding on an expired patent, and new Exhibit 14 is added showing that Robert E. Krebs of Thelen, Reid & Priest did errantly twice amend the original claims of the '160 patent during merged reexamination proceedings.

Furthermore, the only response received from Thelen, Reid & Priest is being added to Exhibit 10. This response includes an engagement letter for representation of the Patent Owner, dated July 3, 2001 for litigation services related to the Patent Owner's legal action against Medtronic, Inc. The response also includes: an index for patent prosecution files sent on September 28, 2006; a file transfer letter and index dated October 6, 2006; and a file transfer letter dated November 1, 2006; all of which were sent to Sterne, Kessler, Goldstein & Fox, PLLC. Additionally, the response contains a letter dated August 14, 2006 from Aubrey Galloway instructing Thelen, Reid & Priest to transfer responsibility for all maters relating to the Patent Owner to Sterne, Kessler, Goldstein & Fox. Thelen, Reid & Priest's response does not mention their responsibility to pay maintenance fees and does not include a copy of their docket records for the '160 patent maintenance fee payment.

Thelen, Reid & Priest was granted and held sole and full power in the '160 patent from March 4, 2003 through August 14, 2006 (Exhibits 3, 9 and 10). This period of time covered the time period up until May 23, 2004 for timely paying the first maintenance fee, and the entire two-year time period, starting from the date of the '160 patent's

- 3 -

Colvin *et al.*
Appl. No. 09/198,087

expiration, to file a remedial Petition under the unintentional provision (37 CFR 1.378(c)); this two-year expiration period ending on May 24, 2006.

The actions and inactions of Thelen, Reid & Priest, Medtronic's Reexamination Requests, and even the USPTO, led the Patent Owner to believe that their '160 patent was viable. Not until July 23, 2006 did the Patent Owner first learn that their valuable '160 patent had expired.

Thelen, Reid & Priest erred by preparing and filing amendments to claims of the '160 patent in merged Reexamination Nos. 90/006460 & 90/007085 (Exhibit 14). The USPTO erred in accepting the January 11 and June 20, 2005 amendments to the claims of the '160 patent (See Exhibit 13). If the USPTO had properly dismissed the claim amendments, pursuant to MPEP 2250-III & 2234 (Exhibit 13), the Patent Owner would have been notified and made aware of the '160 patent's expiration, and under the unintentional provision, timely taken the proper remedial action well before the May 24, 2006 deadline date to reinstate the '160 patent. Thelen, Reid & Priest failed to discover and know that the '160 patent had expired when they prepared and filed amendments to the claims in reexamination (See Exhibit 14). It also appears that Thelen, Reid & Priest failed to docket the patent for payment of maintenance fees.

No such opportunity to be made aware of the '160 patent expiration was timely afforded to the Patent Owner and, thus, the failure to reinstate the '160 patent by May 24, 2006 was clearly unavoidable to the Patent Owner.

As to the "reasonable care" burden of the Patent Owner under 37 CFR 1.378(b), we submit that the Patent Owner fully executed such by continuously taking due care to acquire reputable and reliable legal services of law firms and attorneys to be fully responsible for, and fully represent their legal rights in, all post-issuance matters

- 4 -                                                             Colvin *et al.*
                                                             Appl. No. 09/198,087

concerning their valuable '160 patent property; which included litigation and

Reexamination Proceedings conducted by the firm of Thelen, Reid & Priest.

   The Patent Owner fully believed that their valuable legal rights in the '160 patent

would be justly protected by the attorneys and law firm of Thelen, Reid & Priest, when

the Patent Owner chose them for representation and executed the Power of Attorney

dated March 4, 2003 (See Exhibit 9). Unfortunately, such did not occur and the Patent

Owner was shocked to learn from another party on July 23, 2006 that their '160 patent

had expired, which gravely prejudiced post-issuance litigation proceedings and

negotiations.

   This Supplement has been prepared and is filed with due care of the duty of

diligence and has only been delayed by the acquisition of Declarations and other facts

and evidence.

                                        Respectfully submitted,
                                        MAIER & MAIER, PLLC

                                        *Timothy J. Maier*

Date: <u>December 1, 2006</u>

c/o Timothy J. Maier, Esq.
Maier & Maier, PLLC
128 N. Pitt St., Second Floor
Alexandria, VA 22314 USA
(703) 740 – 8322 x101

# EXHIBIT F

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re application of: | U.S. Patent No.: | 6,066,160 |
| Colvin *et al.* | Filed: | November 23, 1998 |
| Appl. No. 09/198,087 | Issued: | May 23, 2000 |
| For: **Passive Knotless Suture Terminator For Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing** | Art Unit: | 3731 |

### Statement in Support of Petition Under 37 C.F.R. § 1.378(b)

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

In accordance with the requirements of 37 C.F.R. § 1.378(b) and M.P.E.P. § 2590, Petitioner makes the following declaration.

I, Aubrey C. Galloway, hereby declare:

(1)   I am a Professor, Vice Chairman and Director of Cardiac Surgical Research at NYU Medical Center and I am the Managing Partner of Quickie, LLC, the owner of US Patent No. 6,066,160.

(2)   As the Managing Partner for Quickie, LLC, I retained Robert E. Krebs *et al.* of the Thelen, Reid & Priest, LLP law firm to transact all post-issuance proceedings and responsibilities in the Patent and Trademark Office including, but not limited to reexamination proceedings and timely payment of the maintenance fee.

**EXHIBIT**

53

6/11/08

- 2 -

Colvin *et al.*
Appl. No. 09/198,087

(3)  As Managing Partner for Quickie, LLC, I retained the law firm of Thelen,

Reid & Priest to concurrently conduct litigation services for Quickie,

LLC.

## Conclusion

I declare that all statements made herein of my own knowledge are true and that

these statements were made with the knowledge that willful false statements or the like

so made are punishable by fine or imprisonment or both under Section 1001 of Title 18

of the United States Code, and that such willful false statements may jeopardize the

validity and enforceability of the '160 patent.

Respectfully submitted,

Aubrey C. Galloway, MD

Date: 10/27/06

c/o Maier & Maier, PLLC
128 North Pitt Street, Second Floor
Alexandria, VA 22314
(703) 740-8322

# EXHIBIT G

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | U.S. Patent No.:    6,066,160 |
| Colvin *et al.* | Filed:    November 23, 1998 |
| Appl. No. 09/198,087 | Issued:    May 23, 2000 |
| For:   Passive Knotless Suture Terminator For Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing | Art Unit:    3731 |

**Statement in Support of Petition Under 37 C.F.R. § 1.378(b)**

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

In accordance with the requirements of 37 C.F.R. § 1.378(b) and M.P.E.P. § 2590, Petitioner makes the following declaration.

I, Todd S. Sharrin, hereby declare:

(1)    I was an attorney at Pepe & Hazard, LLP, and was responsible for US Patent No. 6,066,160, owned by Quickie, LLC, and responsibility for the subject patent was transferred from Pepe & Hazard to me as an attorney at Greenberg Traurig, LLP, as evidenced by the enclosed letter signed by Alan Fell, Esq., on May 14, 2001, as well as, the Change of Correspondence Address Form dated October 22, 2002 signed by me, the "Fee Address" Indication Form also dated October 22, 2002 also signed by me, the Certificated of Mailing by First Class Mail (37 C.F.R. 1.8)

EXHIBIT
52
6/11/08

- 2 -                                          Colvin *et al.*
Appl. No. 09/198,087

certifying that both forms were mailed to the USPTO on October 22, 2002, and the PTO/Change of Address/Power of Attorney Form indicating that Pepe & Hazard's responsibility for the subject patent has been superseded.

(2)   My responsibility, including the payment of any maintenance fee that may become due, for the subject patent ended prior to the date where the payment of a first maintenance fee was due as evidenced by the enclosed Revocation of Prior Powers of Attorney signed on the behalf of Quickie, LLC, on March 4, 2003 wherein "all prior powers of attorney previously given [were] hereby revoked."

## *Conclusion*

I declare that all statements made herein of my own knowledge are true and that these statements were made with the knowledge that willful false statements or the like so made are punishable by fine or imprisonment or both under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity and enforceability of the '160 patent.

Respectfully submitted,

Todd S. Sharinn, Esq.

Date: 11/20/05

c/o Maier & Maier, PLLC
128 North Pitt Street, Second Floor
Alexandria, VA 22314
(703) 740-8322

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| QUICKIE, LLC, | : | |
| Plaintiff | : | |
| | : | 07-cv-10331 (RMB)(DFE) |
| - against - | : | |
| | : | |
| GREENBERG TRAURIG, LLC, THELEN, | : | |
| REID, BROWN, RAYSMAN & STEINER, | : | |
| L.L.P. (FORMERLY KNOWN AS THELEN, | : | |
| REID & PRIEST, LLP); and ROBERT E. | : | |
| KREBS, ESQ | : | |
| | : | |
| Defendants | : | |

| | |
|---|---|
| THELEN, REID, BROWN, RAYSMAN & | : |
| STEINER, L.L.P. (FORMERLY KNOWN AS | : |
| THELEN, REID & PRIEST, LLP); and | : |
| ROBERT E. KREBS, ESQ | : |
| | : |
| Third Party Plaintiffs | : |
| | : |
| - against – | : |
| | : |
| TODD SHARINN, PEPE & HAZARD LLP, | : |
| ALAN FELL, and RICK, STEINER, FELL, | : |
| & BENOWITZ, LLP | : |
| | : |
| Third Party Defendants | : |

## QUICKIE, LLC'S OBJECTIONS AND RESPONSES TO
## GREENBERG TRAURIG LLC'S REQUESTS FOR ADMISSIONS

Quickie, LLC ("Quickie") objects and responds to Defendant Greenberg Traurig LLC's

("GT") Requests for Admission as follows:

1. Plaintiff Quickie LLC is the owner by assignment of the Patent No. 6,066,160 issued

on May 23, 2000 ["the '160 Patent"].

**Admit.**

134389-1                          1

2.  Exhibit A hereto is a true and correct copy of the Revocation of Prior Powers of Attorney dated March 4, 2003 [the "Revocation"] which Quickie filed with the United States Patent & Trademark Office ["the PTO"].

**Quickie admits that Exhibit A is a true and correct copy of the Revocation of Prior Powers of Attorney signed by Quickie for the Patent Re-exam Proceeding (Control No. 90/006,460) on March 4, 2003 (the "Thelen Power of Attorney"), but denies Quickie itself filed any such document with the PTO.  Moreover, Quickie denies any implication in this request that the Thelen Power of Attorney was filed in the PTO on March 4, 2003.**

3.  In the Revocation, Quickie revoked any authority that GT previously had as to the '160 Patent.

**Denied.**

4.  In the Revocation, Quickie appointed Robert Krebs and other attorneys at Thelen Reid & Priest [referred to collectively with its successor Thelen Reid Brown Raysman & Steiner LLP. as "Thelen"] as the new attorneys for Quickie with respect to the '160 Patent to "prosecute and transact all business" in the PTO.

**Quickie admits that the Thelen Power of Attorney was filed with the PTO, and that such document speaks for itself.**

5.  The Revocation listed Krebs and other Thelen attorneys (e.g. Marc Hanish, Adrienne Yeung, Hal Bohner, et al.) as replacement "attorney(s) and/or agent(s)" in place of GT for the '160 Patent.

**Quickie admits that the Thelen Power of Attorney was filed with the PTO, and that such document speaks for itself.  Quickie denies that the Thelen Power of Attorney makes any mention of replacement attorneys or GT.**

134389-1                                          2

6. All persons listed at the bottom of page 1 of the Revocation are or were persons at Thelen.

**Quickie admits that the Thelen Power of Attorney was filed with the PTO, and that such document speaks for itself.**

7. Exhibit B hereto is a true and correct copy of the Notice Regarding Change of Power of Attorney [the "PTO Notice"] which the PTO sent to GT on April 2, 2003.

**Quickie admits that Exhibit B is a true and correct copy of the PTO Notice sent to GT on April 2, 2003.**

8. The PTO Notice states that the power of attorney previously given to GT as to the '160 Patent had been revoked by Quickie.

**Quickie admits that the PTO Notice contains several statements, including the language referenced in this request, all of which speaks for itself.**

9. The PTO Notice states that future correspondence will be mailed to the new address of record.

**Quickie admits that the PTO Notice contains several statements, including the language referenced in this request, all of which speaks for itself.**

10. The PTO Notice was sent to GT as Quickie's "former attorney/agent".

**Quickie admits that the PTO Notice contains several statements, including the language referenced in this request, all of which speaks for itself. Quickie denies this request to the extent it implies that GT was Quickie's former attorney, that the PTO Notice was sent to GT as Quickie's former attorney or agent, or that the PTO Notice somehow terminated GT's and Quickie's attorney-client relationship.**

11.  Exhibit C hereto is a true and correct copy of the Supplement to Petition dated December 1, 2006 which was filed with the PTO by Quickie through its counsel Maier & Maier, PLLC in December 2006 ["the Supplement to Petition"].

**Admit.**

12.  Quickie authorized the filing of the Supplement to Petition.

**Quickie admits that, in connection with Quickie's efforts to reinstate the '160 Patent which had expired due to GT's negligence, the Supplement to Petition was filed by Quickie's authorized representatives at Maier & Maier, PLLC.**

13.  Quickie reviewed the Supplement to Petition before it was filed with the PTO.

**Quickie admits that, in connection with Quickie's efforts to reinstate the '160 Patent which had expired due to GT's negligence, Quickie assisted its authorized representatives at Maier & Maier, PLLC in filing the Supplement to Petition.**

14.  The statements in the Supplement to Petition are true and accurate.

**Quickie admits that the statements set forth in the Supplement to Petition were true and correct to the best of Quickie's knowledge and belief at the time such document was filed with the PTO in connection with Quickie's efforts to reinstate the '160 Patent which had expired due to GT's negligence.**

15.  The following statement in the Supplement to Petition is true and accurate:

> "his [i.e. Todd Sharinn's] responsibility for the '160 Patent ended prior to the time period when the payment of a first maintenance fee was due".

**Quickie admits that the referenced statement in the Supplement to Petition was true and correct to the best of Quickie's knowledge and belief at the time such document was filed with the PTO in connection with Quickie's efforts to reinstate the '160 Patent which had expired to GT's negligence, but denies any implication in this request that such**

statement indicates that all of GT's and Todd Sharinn's responsibilities with respect to the '160 Patent ended prior to the time period when the payment of a first maintenance fee was due.

16. The following statement in the Supplement to Petition is true and accurate:

> "Thelen Reid & Priest was granted and held sole and full power in the '160 patent from March 4, 2003 through August 14, 2006".

Quickie admits that the referenced statement in the Supplement to Petition was true and correct to the best of Quickie's knowledge and belief at the time such document was filed with the PTO in connection with Quickie's efforts to reinstate the '160 Patent which had expired to GT's negligence, but denies any implication in this request that such statement indicates that all of GT's and Todd Sharinn's responsibilities with respect to the '160 Patent ended prior to the time period when the payment of a first maintenance fee was due.

17. The following statement in the Supplement to Petition is true and accurate:

> "The Patent Owner [i.e. Quickie] fully believed that their valuable legal rights in the '160 patent would be justly protected by the attorneys and law firm of Thelen Reid & Priest when the Patent Owner chose them for representation and executed the Power of Attorney dated March 4, 2003".

Quickie admits that the referenced statement in the Supplement to Petition was true and correct to the best of Quickie's knowledge and belief at the time such document was filed with the PTO in connection with Quickie's efforts to reinstate the '160 Patent which had expired to GT's negligence, but denies any implication in this request that such statement indicates that Quickie was not also looking to GT and Todd Sharinn to protect its valuable legal rights in the '160 Patent.

134389-1                                    5

18. The maintenance fee on the '160 Patent ["the Maintenance Fee"] first became due on May 23, 2003.

**Denied.**

19. GT was no longer Quickie's attorney as to the '160 Patent when the Maintenance Fee first became due.

**Denied.**

20. Thelen was Quickie's counsel as to the '160 Patent when the Maintenance Fee first became due.

**Quickie admits that Thelen was Quickie's counsel as to the '160 Patent when the Maintenance Fee first became due, but denies any implication that GT was not also Quickie's counsel as to the '160 Patent when the Maintenance Fee first became due.**

21. The Maintenance Fee was payable at any time during the one year period commencing May 23, 2003 and ending approximately May 23, 2004 ["the One-Year Period In Issue"].

**Quickie admits that Todd Sharinn advised Quickie that maintenance fees were due on the '160 Patent 3.5 years from the date of issuance, but objects to this request to the extent it seeks a legal conclusion concerning interpretation of PTO regulations.**

22. GT was no longer Quickie's attorney as to the '160 Patent during the One- Year Period In Issue when the Maintenance Fee was due and could have been paid.

**Denied.**

23. Thelen was Quickie's counsel during the One-Year Period In Issue when the Maintenance Fee was due and could have been paid.

134389-1                                6

**Quickie admits that Thelen was Quickie's counsel as to the '160 Patent when the Maintenance Fee first became due and could have been paid, but denies any implication that GT was not also Quickie's counsel as to the '160 Patent when the Maintenance Fee first became due and could have been paid.**

24. Exhibit D hereto is a true and correct copy of the Statement in Support of Petition dated October 27, 2006 signed by Aubrey Galloway as the Managing Partner of Quickie which was filed with the PTO in 2006 ["the Statement in Support"].

**Admit.**

25. The Statement in Support was made under the penalty of perjury pursuant to 18 U.S.C. 1001.

**Quickie admits that the Statement in Support contains language referring to the referenced United States Code provision, which language speaks for itself.**

26. The statements in the Statement in Support are true and accurate.

**Quickie admits that the statements set forth in the Statement in Support were true and correct to the best of Quickie's knowledge and belief at the time such document was filed with the PTO in connection with Quickie's efforts to reinstate the '160 Patent which had expired due to GT's negligence.**

27. The following statement by Aubrey Galloway of Quickie in the Statement in Support is true and accurate:

> "As the Managing Partner for Quickie, LLC, I retained Robert E. Krebs et al. of the Thelen, Reid & Priest, LLP law firm to transact all post-issuance proceedings and responsibilities in the Patent and Trademark Office including, but not limited to reexamination proceedings and timely payment of the maintenance fee".

Quickie admits that the referenced statement in the Statement in Support was true and correct to the best of Quickie's knowledge and belief at the time such document was filed with the PTO in connection with Quickie's efforts to reinstate the '160 Patent which had expired to GT's negligence, but denies any implication in this request that such statement indicates that all of GT's and Todd Sharinn's responsibilities with respect to the '160 Patent ended prior to the time period when the payment of a first maintenance fee was due.

28.  Exhibit E hereto is a true and correct copy of the Change of Attorney Docket Number and Change of Notice concerning the '160 Patent which was filed with the PTO by Thelen several months before the expiration of the One-Year Period In Issue.

Quickie admits that Exhibit E is a true and correct copy of the Change of Attorney Docket Number and Change of Notice concerning Control No. 90/006,460 which was filed with the PTO by Thelen on December 5, 2003, otherwise, this request is denied.

29.  Under applicable law and regulations, the owner of a patent must pay periodic maintenance fees to keep the patent in effect.

Quickie Objects to this request as calling for a legal conclusion.

30.  The first Maintenance Fee for the '160 Patent was due during the One-Year Period In Issue.

Quickie admits that Todd Sharinn advised Quickie that maintenance fees were due on the '160 Patent 3.5 years from the date of issuance, but objects to this request to the extent it seeks a legal conclusion concerning interpretation of PTO regulations.

31.  The Maintenance Fee for the '160 Patent could have be paid at any time during the One-Year Period In Issue.

**Quickie admits that Todd Sharinn advised Quickie that maintenance fees were due on the '160 Patent 3.5 years from the date of issuance, but objects to this request to the extent it seeks a legal conclusion concerning interpretation of PTO regulations.**

32. The '160 Patent has now expired due to nonpayment of the Maintenance Fee which was due during the One-Year Period In Issue.

**Quickie admits that the '160 Patent has now expired for failure to pay maintenance fees due to GT's negligence in not providing the promised notice prior to such maintenance fees becoming due.**

33. Rick, Steiner, Fell & Benowitz, LLP and in particular its partner Alan Fell [collectively "Rick Steiner"] was and is the general counsel and chief legal adviser for Quickie in all of its business dealings, including the '160 Patent, during the One-Year Period In Issue.

**Denied.**

34. Rick Steiner had oversight and direct responsibility for assuring that the '160 Patent was maintained and kept extant.

**Denied.**

35. Rick Steiner knew and was advised, prior to and during the One-Year Period In Issue that the maintenance fee would be due and had to be paid.

**Quickie admits that it has reviewed correspondence from Todd Sharinn wherein he advised Rick Steiner that he would provide notice prior to maintenance fees becoming due on the '160 Patent 3.5 years from the date of issuance. After reasonable inquiry, however, the information known or easily obtainable is insufficient to enable Quickie to admit or deny this request to the extent it seeks information concerning Rick Steiner's knowledge concerning such correspondence.**

36.  In 1998, Pepe & Hazard LLP, ["Pepe"] was engaged by Quickie to provide services in connection with the '160 Patent.

**Admit.**

37.  Thereafter, in 2001, Greenberg Traurig LLP ["GT"] was engaged to provide services concerning the '160 Patent.

**Quickie admits that it hired GT in 2001 to provide services concerning the '160 Patent, but denies any implication in this request that its relationship with Pepe was terminated when GT was hired.**

38.  Prior to mid-March 2003, Quickie replaced GT with Thelen as its attorneys with respect to all other aspects of the '160 Patent.

**Objection – this request is vague and ambiguous in that it references "all other aspects" of the '160 Patent but provides no indication as to what other aspects are being referenced. Otherwise, this request is denied.**

39.  When it hired Thelen as to the '160 Patent, Quickie terminated GT's role, responsibility and services as to the '160 Patent.

**Denied.**

40.  Quickie had an opportunity to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

**Denied.  Due to GT's negligence, Quickie did not know the Maintenance Fee was due and, thus, Quickie did not have an opportunity to pay the Maintenance Fee.**

41.  Quickie had an opportunity to pay the Maintenance Fee after GT was no longer its attorney as to the '160 Patent and before the '160 Patent expired for non-payment of the Maintenance Fee.

Denied.  GT was still Quickie's attorney with respect to the '160 Patent through the time period the '160 Patent expired for non-payment of the Maintenance Fee.  In addition, due to GT's negligence, Quickie did not know the Maintenance Fee was due and, thus, Quickie did not have an opportunity to pay the Maintenance.

42.  Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before it was due.

Quickie admits that Thelen had an opportunity to pay the Maintenance Fees or advise Quickie to do the same, but Quickie denies this request to the extent it implies that GT and Todd Sharinn had no responsibility for honoring their promise to provide notice prior to those maintenance fees becoming due.

43.  Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

Quickie admits that Thelen had an opportunity to pay the Maintenance Fees or advise Quickie to do the same, but Quickie denies this request to the extent it implies that GT and Todd Sharinn had no responsibility for honoring their promise to provide notice prior to those maintenance fees becoming due.

44.  Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before the '160 Patent expired for non-payment of the Maintenance Fee.

Quickie admits that Thelen had an opportunity to pay the Maintenance Fees or advise Quickie to do the same, but Quickie denies this request to the extent it implies that GT and Todd Sharinn had no responsibility for honoring their promise to provide notice prior to those maintenance fees becoming due.

45. Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before it was due.

**Quickie admits that Rick Steiner had an opportunity to pay the Maintenance Fees or advise Quickie to do the same, but Quickie denies this request to the extent it implies that Rick Steiner had any such obligation, that Quickie was relying on Rick Steiner to pay the maintenance fees or provide such notice, or that GT and Todd Sharinn had no responsibility for honoring their promise to provide notice prior to those maintenance fees becoming due.**

46. Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

**Quickie admits that Rick Steiner had an opportunity to pay the Maintenance Fees or advise Quickie to do the same, but Quickie denies this request to the extent it implies that Rick Steiner had any such obligation, that Quickie was relying on Rick Steiner to pay the maintenance fees or provide such notice, or that GT and Todd Sharinn had no responsibility for honoring their promise to provide notice prior to those maintenance fees becoming due.**

47. Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before the '160 Patent expired for non-payment of the Maintenance Fee.

**Quickie admits that Rick Steiner had an opportunity to pay the Maintenance Fees or advise Quickie to do the same, but Quickie denies this request to the extent it implies that Rick Steiner had any such obligation, that Quickie was relying on Rick Steiner to pay**

134389-1                                    12

the maintenance fees or provide such notice, or that GT and Todd Sharinn had no responsibility for honoring their promise to provide notice prior to those maintenance fees becoming due.

48. Quickie had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

**Objection – this request is vague, ambiguous, and nonsensical in that it asks whether "Quickie had opportunities . . . to advise Quickie to cure the nonpayment . . . ." Otherwise, this request is denied.**

49. Thelen had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

**Quickie admits that Thelen had the referenced opportunities, but denies this request to the extent it implies that GT did not also have such opportunities or that Thelen's failure to recognize those opportunities relieves GT and Todd Sharinn of their promise to notify Quickie prior to maintenance fees becoming due on the '160 Patent.**

50. Rick Steiner had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

**Quickie admits that anyone, including Rick Steiner, GT, or Thelen, had an opportunity to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment, but Quickie denies this request to the extent it implies that Rick Steiner had any such obligation, that Quickie was relying on Rick Steiner to pay the maintenance**

fees, or that Thelen's failure to recognize those opportunities relieves GT and Todd Sharinn of their promise to notify Quickie prior to maintenance fees becoming due on the '160 Patent.

Dated: New York, New York
        March 31, 2008

By: _____
    Richard I. Janvey (RJ1160)
    Joan M. Secofsky (JS4035)
    Stephen T. Loden (SL8754)
    Allan B. Diamond (Pro Hac Vice)
    Clifford H. Walston (Pro Hac Vice)

    DIAMOND MCCARTHY LLP
    620 Eighth Avenue, 39th Floor
    New York, New York 10018
    Telephone No.:  (212) 430-5400
    Facsimile No:  (212) 430-5499

    ATTORNEYS FOR
    PLAINTIFF QUICKIE LLC

134389-1                        14

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 31, 2008, I caused to be served the within Plaintiff Quickie, LLC's Responses to Defendant Greenberg Traurig LLP's Requests for Admissions in the above captioned cause by United States first Class Mail, facsimile, and/or electronic mail to the following:

Martin I. Kaminsky
Justin Y. K. Chu
Pollack & Kaminsky
114 West 47th Street
New York, New York 10036
mikaminsky@pollacklawfirm.com
jchu@pollacklawfirm.com

Steven C. Krane
Proskauer Rose LLP
1585 Broadway
New York, NY 10036-8299
skrane@proskauer.com

Pamela A. Bresnahan
Vorys, Sater, Seymour and Pease LLP
1828 I Street, N.W., 11th Floor
Washington, DC 20036-5109
pbresnahan@vssp.com

Clifford H. Walston

134389-1                                     15

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QUICKIE, LLC,<br><br>        **Plaintiff**<br><br>        v.<br><br>**GREENBERG TRAURIG, LLP, THELEN<br>REID BROWN RAYSMAN & STEINER, LLP<br>(f/k/a THELEN, REID & PRIEST, LLP)<br>and ROBERT KREBS,**<br><br>        **Defendants**<br>  | )<br>)<br>)<br>)  07 Civ. 10331 (RMB) (DFE)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| **THELEN REID BROWN RAYSMAN &<br>STEINER, LLP and ROBERT E. KREBS,**<br><br>        **Third-Party Plaintiffs**<br><br>        v.<br><br>**TODD SHARINN, PEPE & HAZARD, LLP,<br>ALAN FELL and RICK, STEINER, FELL &<br>BENOWITZ, LLP,**<br><br>        **Third-Party Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## RICK STEINER DEFENDANTS' RESPONSES TO
## GREENBERG TRAURIG'S REQUEST FOR ADMISSIONS

       Third-Party Defendants, Alan Fell and Rick, Steiner, Fell & Benowitz, LLP, (the

"Rick Steiner Defendants"), by their undersigned counsel, respond to Greenberg

Traurig's Request for Admissions.  The Rick Steiner Defendants reserve the right to

supplement or amend any response as discovery proceeds.

### REQUEST TO ADMIT NO. 1:

       Plaintiff Quickie LLC ["Quickie"] is the owner by assignment of the Patent No.
6,066,160 issued on May 23, 2000 ["the '160 Patent"].



**RESPONSE TO REQUEST TO ADMIT NO. 1:**

The Rick Steiner Defendants deny Request to Admit No. 1.

**REQUEST TO ADMIT NO. 2:**

Exhibit A hereto is a true and correct copy of the Revocation of Prior Powers of Attorney dated March 4, 2002 [the "Revocation"] which Quickie filed with the United States Patent & Trademark Office [the "PTO"].

**RESPONSE TO REQUEST TO ADMIT NO. 2:**

The Rick Steiner Defendants admit Request to Admit No. 2.

**REQUEST TO ADMIT NO. 3:**

In the Revocation, Quickie revoked any authority that GT previously had as to the '160 Patent.

**RESPONSE TO REQUEST TO ADMIT NO. 3:**

The Rick Steiner Defendants object to Request to Admit No. 3 on the basis that

the response calls for a legal conclusion. To the extent that an admission or denial is

required, the Rick Steiner Defendants deny Request to Admit No. 3.

**REQUEST TO ADMIT NO. 4:**

In the Revocation, Quickie appointed Robert Krebs and other attorneys at Thelen Reid & Priest [referred to collectively with its successor Thelen Reid Brown Raysman & Steiner LLP as "Thelen"] as the new attorneys for Quickie with respect to the '160 Patent to "prosecute and transact all business" in the PTO.

**RESPONSE TO REQUEST TO ADMIT NO. 4:**

The Rick Steiner Defendants admit Request to Admit No. 4.

**REQUEST TO ADMIT NO. 5:**

The Revocation listed Krebs and other Thelen attorneys (e.g. Marc Hanish, Adrienne Yeung, Hal Boner, et al.) as replacement "attorney(s) and/or agent(s)" in place of GT for the '160 Patent.

**RESPONSE TO REQUEST TO ADMIT NO. 5:**

The Rick Steiner Defendants object to Request to Admit No. 5 on the basis that

the word "replacement attorneys" is vague and ambiguous. To the extent that an

admission or denial is required, the Rick Steiner Defendants deny Request to Admit No.

5.

**REQUEST TO ADMIT NO. 6:**

All persons listed at the bottom of page 1 of the Revocation are or were persons at
Thelen.

**RESPONSE TO REQUEST TO ADMIT NO. 6:**

The Rick Steiner Defendants object to this request because the phrase "persons at

Thelen" is vague and ambiguous. Further, the Rick Steiner Defendants are unable to

admit or deny Request to Admit No. 6 because they have no way to readily determine

which, if any, of the persons listed at the bottom of page 1 of the Revocation were

associated with Thelen. To the extent that an admission or a denial is necessary, the Rick

Steiner Defendants deny Request to Admit No. 6.

**REQUEST TO ADMIT NO. 7:**

Exhibit B hereto is a true and correct copy of the Notice Regarding Change of
Power of Attorney [the "PTO Notice"] which the PTO sent to GT on April 2, 2003.

**RESPONSE TO REQUEST TO ADMIT NO. 7:**

The Rick Steiner Defendants admit Request to Admit No. 7.

**REQUEST TO ADMIT NO. 8:**

The PTO Notice states that the power of attorney previously given to GT as to the

'160 Patent had been revoked by Quickie.

**RESPONSE TO REQUEST TO ADMIT NO. 8:**

The Rick Steiner Defendants deny Request to Admit No. 8.

**REQUEST TO ADMIT NO. 9:**

The PTO Notice states that future correspondence will be mailed to the new address of record.

**RESPONSE TO REQUEST TO ADMIT NO. 9:**

The Rick Steiner Defendants admit Request to Admit No. 9.

**REQUEST TO ADMIT NO. 10:**

The PTO Notice was sent to GT as Quickie's "former attorney/agent".

**RESPONSE TO REQUEST TO ADMIT NO. 10:**

The Rick Steiner Defendants admit Request to Admit No. 9.

**REQUEST TO ADMIT NO. 11:**

Exhibit C hereto is a true and correct copy of the Supplement to Petition dated December 1, 2006 which was filed with the PTO by Quickie through its counsel Maier & Maier, PLLC in December 2006 ["the Supplement to Petition"].

**RESPONSE TO REQUEST TO ADMIT NO. 11:**

The Rick Steiner Defendants deny Request to Admit No. 11.

**REQUEST TO ADMIT NO. 12:**

Quickie authorized the filing of the Supplement to Petition.

**RESPONSE TO REQUEST TO ADMIT NO. 12:**

The Rick Steiner Defendants are unable to admit or deny Request to Admit No.

12 because they have no way to readily determine whether Quickie authorized the filing

of the Supplement to Petition. To the extent that an admission or a denial is necessary,

the Rick Steiner Defendants deny Request to Admit No. 12.

**REQUEST TO ADMIT NO. 13:**

Quickie reviewed the Supplement to Petition before it was filed with the PTO.

**RESPONSE TO REQUEST TO ADMIT NO. 13:**

The Rick Steiner Defendants are unable to admit or deny Request to Admit No. 12 because they have no way to readily determine whether Quickie reviewed the Supplement to Petition before it was filed with the PTO as Quickie retained other counsel to represent it before the PTO in its Petition Pursuant to 37 CFR 1.378(b). To the extent that an admission or a denial is necessary, the Rick Steiner Defendants deny Request to Admit No. 13.

**REQUEST TO ADMIT NO. 14:**

The statements in the Supplement to Petition are true and accurate.

**RESPONSE TO REQUEST TO ADMIT NO. 14:**

The Rick Steiner Defendants are unable to admit or deny Request to Admit No. 14 because they have no way of knowing whether the statements in the Supplement to Petition are true and accurate since the Rick Steiner Defendants were not involved in the preparation of this document and Quickie retained other counsel to represent it before the PTO in its Petition Pursuant to 37 CFR 1.378(b). To the extent that an admission or a denial is necessary, the Rick Steiner Defendants deny Request to Admit No. 14.

**REQUEST TO ADMIT NO. 15:**

The following statement in the Supplement to Petition is true and accurate:

"his [i.e. Todd Sharinn's] responsibility for the '160 Patent ended prior to the time period when the payment of a first maintenance fee was due."

**RESPONSE TO REQUEST TO ADMIT NO. 15:**

The Rick Steiner Defendants deny Request to Admit No. 15.

**REQUEST TO ADMIT NO. 16:**

The following statement in the Supplement to Petition is true and accurate:

"Thelen Reid & Priest was granted and held sole and full power
in the '160 patent from March 4, 2003 through August 14, 2006."

**RESPONSE TO REQUEST TO ADMIT NO. 16:**

The Rick Steiner Defendants deny Request to Admit No. 16.

**REQUEST TO ADMIT NO. 17:**

The following statement in the Supplement to Petition is true and accurate:

The Patent Owner [i.e. Quickie] fully believed that their valuable
Legal rights in the '160 patent would be justly protected by the
attorneys and law firm of Thelen Reid & Priest when the Patent Owner
chose them for representation and executed the Power of Attorney
dated March 4, 2003."

**RESPONSE TO REQUEST TO ADMIT NO. 17:**

The Rick Steiner Defendants deny Request to Admit No. 17 and further states that

they have know way of knowing what, if anything, Quickie fully believed on or about

March 4, 2003.

**REQUEST TO ADMIT NO. 18:**

The maintenance fee on the '160 Patent ["the Maintenance Fee"] first became
due on May 23, 2003.

**RESPONSE TO REQUEST TO ADMIT NO. 18:**

The Rick Steiner Defendants admit Request to Admit No. 18.

**REQUEST TO ADMIT NO. 19:**

GT was no longer Quickie's attorney as to the '160 Patent when the Maintenance
fee first became due.

**RESPONSE TO REQUEST TO ADMIT NO. 19:**

The Rick Steiner Defendants admit that GT was no longer Quickie's attorney as to the '160 Patent as of the date of the Revocation; however, the Rick Steiner Defendants deny that GT had no responsibility for advising Quickie prior to the Revocation that the maintenance fee for the '160 Patent was due.

**REQUEST TO ADMIT NO. 20:**

Thelen was Quickie's counsel as to the '160 Patent when the Maintenance Fee first became due.

**RESPONSE TO REQUEST TO ADMIT NO. 20:**

The Rick Steiner Defendants admit Request to Admit No. 20.

**REQUEST TO ADMIT NO. 21:**

The Maintenance Fee was payable at any time during the one year period commencing May 23, 2003 and ending approximately May 23, 2004 ["the One-Year Period in Issue"].

**RESPONSE TO REQUEST TO ADMIT NO. 21:**

The Rick Steiner Defendants deny Request to Admit No. 21.

**REQUEST TO ADMIT NO. 22:**

GT was no longer Quickie's attorney at to the '160 Patent during the One-Year Period In Issue when the Maintenance Fee was due and could have been paid.

**RESPONSE TO REQUEST TO ADMIT NO. 22:**

The Rick Steiner Defendants admit Request to Admit No. 22.

**REQUEST TO ADMIT NO. 23:**

Thelen was Quickie's counsel during the One-Year Period in Issue when the Maintenance Fee was due and could have been paid.

**RESPONSE TO REQUEST TO ADMIT NO. 23:**

The Rick Steiner Defendants admit Request to Admit No. 23.

**REQUEST TO ADMIT NO. 24:**

Exhibit D is a true and correct copy of the Statement in Support of Petition dated October 27, 2006 signed by Aubrey Galloway as the Managing Partner of Quickie which was filed with the PTO in 2006 ["Statement in Support"].

**RESPONSE TO REQUEST TO ADMIT NO. 24:**

The Rick Steiner Defendants admit Request to Admit No. 24.

**REQUEST TO ADMIT NO. 25:**

The Statement in Support was made under the penalty of perjury pursuant to 18 U.S.C. 1001.

**RESPONSE TO REQUEST TO ADMIT NO. 25:**

The Rick Steiner Defendants admit Request to Admit No. 25.

**REQUEST TO ADMIT NO. 26:**

The statements in the Statement in Support are true and accurate.

**RESPONSE TO REQUEST TO ADMIT NO. 26:**

The Rick Steiner Defendants have no way of knowing whether the statements in the Statement in Support are true and accurate and therefore deny Request to Admit No. 26.

**REQUEST TO ADMIT NO. 27:**

The following statement by Aubrey Galloway of Quickie in the Statement in Support is true and accurate:

"As the Managing Partner for Quickie, LLC, I retained Robert E. Krebs et al. of the Thelen, Reid & Priest, LLP law firm to transact All post-issuance proceedings and responsibilities in the Patent and Trademark Office including, but not limited to reexamination Proceedings and timely payment of the maintenance fees."

**RESPONSE TO REQUEST TO ADMIT NO. 27:**

The Rick Steiner Defendants have no way of knowing the reasons why Aubrey Galloway retained Robert E. Krebs and therefore deny Request to Admit No. 27.

**REQUEST TO ADMIT NO. 28:**

Exhibit E hereto is a true and correct copy of the Change of Attorney Docket Number and Change of Notice concerning the '160 Patent which was filed with the PTO by Thelen several months before the expiration of the One-Year Period In Issue.

**RESPONSE TO REQUEST TO ADMIT NO. 28:**

The Rick Steiner Defendants deny Request to Admit No. 28 as phrased

**REQUEST TO ADMIT NO. 29:**

Under applicable law and regulations, the owner of a patent must pay periodic maintenance fees to keep the patent in effect.

**RES{PONSE TO REQUEST TO ADMIT NO. 29:**

The Rick Steiner Defendants deny Request to Admit No. 29.

**REQUEST TO ADMIT NO. 30:**

The first Maintenance Fee for the '160 Patent was due during the One-Year Period In Issue.

**RESPONSE TO REQUEST TO ADMIT NO. 30:**

The Rick Steiner Defendants admit Request to Admit No. 30.

**REQUEST TO ADMIT NO. 31:**

The Maintenance Fee for the '160 Patent could have be[en] (sic) paid at any time during the One-Year Period In Issue.

**RESPONSE TO REQUEST TO ADMIT NO. 31:**

The Rick Steiner Defendants deny Request to Admit No. 31.

**REQUEST TO ADMIT NO. 32:**

The '160 Patent has now expired due to nonpayment of the Maintenance Fee which was due during the One-Year Period In Issue.

**RESPONSE TO REQUEST TO ADMIT NO. 32:**

The Rick Steiner Defendants deny Request to Admit No. 32.

**REQUEST TO ADMIT NO. 33:**

Rick, Steiner, Fell & Benowitz, LLP and in particular its partner Alan Fell [collectively "Rick Steiner"] was and is the general counsel and chief legal adviser for Quickie in all of its business dealings, including the '160 Patent, during the One-Year Period In Issue.

**RESPONSE TO REQUEST TO ADMIT NO. 33:**

The Rick Steiner Defendants deny Request to Admit No. 33.

**REQUEST TO ADMIT NO. 34:**

Rick Steiner had oversight and direct responsibility for assuring that the '160 Patent was maintained and kept extant.

**RESPONSE TO REQUEST TO ADMIT NO. 34:**

The Rick Steiner Defendants deny Request to Admit No. 34.

**REQUEST TO ADMIT NO. 35:**

Rick Steiner knew and was advised prior to and during the One-Year Period In Issue that the maintenance fee would be due and had to be paid.

**RESPONSE TO REQUEST TO ADMIT NO. 35:**

The Rick Steiner Defendants deny Request to Admit No. 35.

**REQUEST TO ADMIT NO. 36:**

In 1998, Pepe & Hazard LLP, ["Pepe"] was engaged by Quickie to provide services in connection with the '160 Patent.

**RESPONSE TO REQUEST TO ADMIT NO. 36:**

The Rick Steiner Defendants admit Request to Admit No. 36.

**REQUEST TO ADMIT NO. 37:**

Thereafter, in 2001, Greenberg Traurig LLP ["GT"] was engaged to provide services concerning the '160 Patent.

**RESPONSE TO REQUEST TO ADMIT NO. 37:**

The Rick Steiner Defendants admit Request to Admit No. 37.

**REQUEST TO ADMIT NO. 38:**

Prior to mid-March 2003, Quickie replaced GT with Thelen as its attorneys with respect to all other aspects of the '160 Patent.

**RESPONSE TO REQUEST TO ADMIT NO. 38:**

The Rick Steiner Defendants object to Request to Admit No. 38 because the

request is incomprehensible. To the extent that an admission or a denial is necessary, the

Rick Steiner Defendants deny Request to Admit No. 38.

**REQUEST TO ADMIT NO. 39:**

When it hired Thelen as to the '160 Patent, Quickie terminated GT's role, responsibility and services as to the '160 Patent.

**RESPONSE TO REQUEST TO ADMIT NO. 39:**

The Rick Steiner Defendants deny Request to Admit No. 39.

**REQUEST TO ADMIT NO. 40:**

Quickie had an opportunity to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

**RESPONSE TO REQUEST TO ADMIT NO. 40:**

The Rick Steiner Defendants admit Request to Admit No. 40.

**REQUEST TO ADMIT NO. 41:**

Quickie had an opportunity to pay the Maintenance Fee after GT was no longer its attorney as to the '160 Patent and before the '160 Patent expired for non-payment of the Maintenance Fee.

**RESPONSE TO REQUEST TO ADMIT NO. 41:**

The Rick Steiner Defendants object to Request to Admit No. 41 because the Request, as worded, is vague and ambiguous as it does not state when GT ceased to be Quickie's attorney as to the '160 Patent. To the extent that an admission or denial is required, the Rick Steiner Defendants deny Request to Admit No. 41.

**REQUEST TO ADMIT NO. 42:**

Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before it was due.

**RESPONSE TO REQUEST TO ADMIT NO. 42:**

The Rick Steiner Defendants admit that Thelen had an opportunity to advise Quickie to pay the Maintenance Fee before it was due, but deny that Thelen had the opportunity to pay the Maintenance Fee before it was due.

**REQUEST TO ADMIT NO. 43:**

Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

**RESPONSE TO REQUEST TO ADMIT NO. 43:**

The Rick Steiner Defendants admit Request to Admit No. 43.

**REQUEST TO ADMIT NO. 44:**

Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before the '160 Patent expired for non-payment of the Maintenance Fee.

**RESPONSE TO REQUEST TO ADMIT NO. 44:**

The Rick Steiner Defendants deny request to Admit No. 44.

**REQUEST TO ADMIT NO. 45:**

Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before it was due.

**RESPONSE TO REQUEST TO ADMIT NO. 45:**

The Rick Steiner Defendants deny Request to Admit No. 45.

**REQUEST TO ADMIT NO. 46:**

Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

**RESPONSE TO REQUEST TO ADMIT NO. 46:**

The Rick Steiner Defendants deny Request to Admit No. 46.

**REQUEST TO ADMIT NO. 47:**

Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before the '160 Patent expired for non-payment of the Maintenance Fee.

**RESPONSE TO REQUEST TO ADMIT NO. 47:**

The Rick Steiner Defendants deny Request to Admit No. 47.

**REQUEST TO ADMIT NO. 48:**

Quickie had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

**RESPONSE TO REQUEST TO ADMIT NO. 48:**

The Rick Steiner Defendants object to Request to Admit No. 48, because it is

incomprehensible how Quickie could advise itself "to cure the nonpayment". To the

extent that an admission or denial is required, the Rick Steiner Defendants deny Request

No. 48.

<u>**REQUEST TO ADMIT NO. 49**</u>:

Thelen had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

<u>**RESPONSE TO REQUEST TO ADMIT NO. 49**</u>:

The Rick Steiner Defendants admit Request to Admit No. 49.

<u>**REQUEST TO ADMIT NO. 50**</u>:

Rick Steiner had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

<u>**RESPONSE TO REQUEST TO ADMIT NO. 50**</u>:

The Rick Steiner Defendants deny request to Admit No. 50.

14

_Pamela A. Bresnahan_

Pamela A. Bresnahan
Elizabeth Treubert Simon
Vorys, Sater, Seymour and Pease LLP
1828 L Street, N.W.,  11th Floor
Washington, D.C. 20036
(202) 467-8800

Frank W. Ryan
Nixon Peabody LLP
437 Madison Avenue
New York, NY  10022
(212) 940-3000

Attorneys for Third-Party Defendants
Rick, Steiner, Fell & Benowitz, LLP and
Alan Fell

15

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of March, 2008, a copy of the

foregoing Rick Steiner Defendants' Responses to Greenberg Traurig's Request for

Admissions was mailed, first class and postage pre-paid to:

Stephen Loden
Diamond McCarthy, LLP
Two Houston Center
909 Fanin, Suite 1500
Houston, Texas 77010
Counsel for Plaintiff

Richard Janvey
Diamond McCarthy
620 8th Avenue, 39th Floor
New York, New York  10018
Counsel for Plaintiff

Martin I. Kaminsky
Justin Y.K. Chu
Pollack & Kaminsky
114 W. 47th Street
New York, New York  10036
Counsel for Defendants
Greenberg Traurig, LLP and Todd Sharinn

Steven C. Krane
Proskauer Rose LLP
1585 Broadway
New York, New York  10036-8299
Counsel for Defendants/Third-Party Plaintiffs
Thelen Reid Brown Raysman & Steiner LLP and
Robert E. Krebs

Pamela A. Bresnahan

# EXHIBIT J

Steven C. Krane
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
(212) 969-3435
skrane@proskauer.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

QUICKIE, LLC,

                              Plaintiff,          07 Civ. 10331 (RMB) (DFE)

            -against-                             **THELEN DEFENDANTS' RESPONSE
                                                  TO GREENBERG TRAURIG'S
                                                  REQUEST FOR ADMISSION**

GREENBERG TRAURIG, LLP, THELEN            **ECF CASE**
REID BROWN RAYSMAN & STEINER LLP
(f/k/a THELEN, REID & PRIEST LLP) and
ROBERT E. KREBS,

                              Defendants.

———————————————————

THELEN REID BROWN RAYSMAN &
STEINER LLP (f/k/a THELEN, REID &
PRIEST LLP) and ROBERT E. KREBS,

                  Third-Party Plaintiffs,

            -against-

TODD SHARINN, ALAN FELL and
RICK, STEINER, FELL & BENOWITZ, LLP,

                  Third-Party Defendants.

———————————————————

        In accordance with Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendants

Thelen Reid Brown Raysman & Steiner LLP ("Thelen") and Robert E. Krebs ("Krebs")

(collectively the "Thelen Defendants"), by and through their attorneys, Proskauer Rose LLP,

hereby object and respond to Greenberg Traurig's Request for Admission (the "Requests") as follows:

## GENERAL RESPONSES AND OBJECTIONS

The following General Responses and Objections apply to and are expressly made part of the Thelen Defendants' specific responses, set forth below, to each request.

By responding to any of the specific Requests, the Thelen Defendants do not waive the right to object to the use of any such information disclosed herein for any reason including, but not limited to, relevancy objections. In responding to each Request, the Thelen Defendants do not concede that any of the information provided is relevant, material, admissible in evidence or reasonably calculated to lead to the discovery of admissible evidence.

1.    The Thelen Defendants object to the Requests as a whole, and to each Request contained therein, to the extent they request information that is protected from disclosure by the attorney-client privilege, the attorney work-product doctrine and/or any other applicable privilege or immunity.

2.    The Thelen Defendants object to the Requests as a whole, and to each Request contained therein, to the extent they request information, the disclosure of which would constitute an unwarranted invasion of the affected individuals' constitutional, statutory and/or common-law rights of privacy and confidentiality.

3.    The Thelen Defendants object to the Requests as a whole, and to each Request contained therein, to the extent they seek private, privileged, and confidential commercial, financial or proprietary business information.

2

4.      The Thelen Defendants object to the Requests as a whole, and to each Request contained therein, to the extent they are overbroad as to time and scope, and/or unduly burdensome and oppressive.

5.      The Thelen Defendants object to the Requests as a whole, and to each Request contained therein, to the extent they seek information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

6.      The Thelen Defendants object to the Requests as a whole, and to each Request contained therein, to the extent they are vague and ambiguous or unintelligible, in the context of this matter.

## RESPONSES TO SPECIFIC REQUESTS FOR ADMISSIONS

Subject to and without waiver of any of the General Responses and Objections, the Thelen Defendants respond to the specific Requests as follows:

### Overview

Request No. 1

Plaintiff Quickie LLC ["Quickie"] is the owner by assignment of the Patent No. 6,066,160 issued on May 23, 2000 ["the '160 Patent"].

Response to Request No. 1

Admit.

Request No. 2

Exhibit A hereto is a true and correct copy of the Revocation of Prior Powers of Attorney dated March 4, 2003 [the "Revocation"] which Quickie filed with the United States Patent & Trademark Office ["the PTO"].

Response to Request No. 2

Deny, except admit that Exhibit A is an authentic copy of a document on file with the PTO.

Request No. 3

In the Revocation, Quickie revoked any authority that GT previously had as to the '160 Patent.

Response to Request No. 3

Deny.

Request No. 4

In the Revocation, Quickie appointed Robert Krebs and other attorneys at Thelen Reid & Priest [referred to collectively with its successor Thelen Reid Brown Raysman & Steiner LLP. as "Thelen"] as the new attorneys for Quickie with respect to the '160 Patent to "prosecute and transact all business" in the PTO.

Response to Request No. 4

Object. The Revocation speaks for itself.

Request No. 5

The Revocation listed Krebs and other Thelen attorneys (e.g. Marc Hanish, Adrienne Yeung, Hal Bohner, et al.) as replacement "attorney(s) and/or agent(s)" in place of GT for the '160 Patent.

Response to Request No. 5

Object. The Revocation speaks for itself.

Request No. 6

All persons listed at the bottom of page 1 of the Revocation are or were persons at Thelen.

4

<u>Response to Request No. 6</u>

Admit.

<u>Request No. 7</u>

Exhibit B hereto is a true and correct copy of the Notice Regarding Change of Power of Attorney [the "PTO Notice"] which the PTO sent to GT on April 2, 2003.

<u>Response to Request No. 7</u>

Deny, except admit that Exhibit B is an authentic copy of a document on file with the PTO.

<u>Request No. 8</u>

The PTO Notice states that the power of attorney previously given to GT as to the '160 Patent had been revoked by Quickie.

<u>Response to Request No. 8</u>

Object. The PTO Notice speaks for itself.

<u>Request No. 9</u>

The PTO Notice states that future correspondence will be mailed to the new address of record.

<u>Response to Request No. 9</u>

Object. The PTO Notice speaks for itself.

<u>Request No. 10</u>

The PTO Notice was sent to GT as Quickie's "former attorney/agent".

<u>Response to Request No. 10</u>

Object. The PTO Notice speaks for itself.

Request No. 11

Exhibit C hereto is a true and correct copy of the Supplement to Petition dated December 1, 2006 which was filed with the PTO by Quickie through its counsel Maier & Maier, PLLC in December 2006 ["the Supplement to Petition"].

Response to Request No. 11

Deny, except admit that Exhibit C is an authentic copy of a document on file with the PTO.

Request No. 12

Quickie authorized the filing of the Supplement to Petition.

Response to Request No. 12

Deny knowledge or information sufficient to form a belief as to the truth of the statement. The facts are within the exclusive possession of Quickie.

Request No. 13

Quickie reviewed the Supplement to Petition before it was filed with the PTO.

Response to Request No. 13

Deny knowledge or information sufficient to form a belief as to the truth of the statement. The facts are within the exclusive possession of Quickie.

Request No. 14

The statements in the Supplement to Petition are true and accurate.

Response to Request No. 14

Object. This Request is overbroad as to scope, and/or unduly burdensome and oppressive.

Request No. 15

The following statement in the Supplement to Petition is true and accurate:

6

"his [i.e. Todd Sharinn's] responsibility for the '160 Patent ended prior to the time period when the payment of a first maintenance fee was due".

Response to Request No. 15

Deny.

Request No. 16

The following statement in the Supplement to Petition is true and accurate:

"Thelen Reid & Priest was granted and held sole and full power in the '160 patent from March 4, 2003 through August 14, 2006".

Response to Request No. 16

Deny.

Request No. 17

The following statement in the Supplement to Petition is true and accurate:

"The Patent Owner [i.e. Quickie] fully believed that their valuable legal rights in the '160 patent would be justly protected by the attorneys and law firm of Thelen Reid & Priest when the Patent Owner chose them for representation and executed the Power of Attorney dated March 4, 2003 ".

Response to Request No. 17

Deny knowledge or information sufficient to form a belief as to the truth of the statement. The facts are within the exclusive possession of Quickie.

Request No. 18

The maintenance fee on the '160 Patent ["the Maintenance Fee"] first became due on May 23, 2003.

Response to Request No. 18

Admit.

7

Request No. 19

GT was no longer Quickie's attorney as to the '160 Patent when the Maintenance Fee first became due.

Response to Request No. 19

Deny.

Request No. 20

Thelen was Quickie's counsel as to the '160 Patent when the Maintenance Fee first became due.

Response to Request No. 20

Deny, except admit that Thelen was one of at least three law firms representing Quickie when the Maintenance Fee first became due.

Request No. 21

The Maintenance Fee was payable at any time during the one year period commencing May 23, 2003 and ending approximately May 23, 2004 ["the One-Year Period In Issue"].

Response to Request No. 21

Admit.

Request No. 22

GT was no longer Quickie's attorney as to the '160 Patent during the One-Year Period In Issue when the Maintenance Fee was due and could have been paid.

Response to Request No. 22

Deny.

8

Request No. 23

Thelen was Quickie's counsel during the One-Year Period In Issue when the Maintenance Fee was due and could have been paid.

Response to Request No. 23

Deny, except admit that Thelen was one of at least three law firms representing Quickie during the One-Year Period In Issue when the Maintenance Fee was due and could have been paid.

Request No. 24

Exhibit D hereto is a true and correct copy of the Statement in Support of Petition dated October 27, 2006 signed by Aubrey Galloway as the Managing Partner of Quickie which was filed with the PTO in 2006 ["the Statement in Support"].

Response to Request No. 24

Deny, except admit that Exhibit D is an authentic copy of a document on file with the PTO.

Request No. 25

The Statement in Support was made under the penalty of perjury pursuant to 18 U.S.C. 1001.

Response to Request No. 25

Object. The Statement in Support speaks for itself.

Request No. 26

The statements in the Statement in Support are true and accurate.

Response to Request No. 26

Deny knowledge or information sufficient to form a belief as to the truth of the statement. The facts are within the exclusive possession of Quickie.

9

Request No. 27

The following statement by Aubrey Galloway of Quickie in the Statement in Support

is true and accurate:

> "As the Managing Partner for Quickie, LLC, I retained Robert E.
> Krebs et al. of the Thelen, Reid & Priest, LLP law firm to transact
> all post-issuance proceedings and responsibilities in the Patent and
> Trademark Office including, but not limited to reexamination
> proceedings and timely payment of the maintenance fee".

Response to Request No. 27

Deny.

Request No. 28

Exhibit E hereto is a true and correct copy of the Change of Attorney Docket Number

and Change of Notice concerning the '160 Patent which was filed with the PTO by Thelen

several months before the expiration of the One-Year Period In Issue.

Response to Request No. 28

Deny, except admit that Exhibit E is an authentic copy of a document on file with the

PTO.

**Further Background Facts**

Request No. 29

Under applicable law and regulations, the owner of a patent must pay periodic

maintenance fees to keep the patent in effect.

Response to Request No. 29

Admit.

Request No. 30

The first Maintenance Fee for the '160 Patent was due during the One-Year Period In

Issue.

Response to Request No. 30

    Admit.

Request No. 31

    The Maintenance Fee for the '160 Patent could have been paid at any time during the One-Year Period In Issue.

Response to Request No. 31

    Admit.

Request No. 32

    The '160 Patent has now expired due to nonpayment of the Maintenance Fee which was due during the One-Year Period In Issue.

Response to Request No. 32

    Admit.

Request No. 33

    Rick, Steiner, Fell & Benowitz, LLP and in particular its partner Alan Fell [collectively "Rick Steiner"] was and is the general counsel and chief legal adviser for Quickie in all of its business dealings, including the '160 Patent, during the One-Year Period In Issue.

Response to Request No. 33

    Admit.

Request No. 34

    Rick Steiner had oversight and direct responsibility for assuring that the '160 Patent was maintained and kept extant.

Response to Request No. 34

    Admit.

11

Request No. 35

Rick Steiner knew and was advised, prior to and during the One-Year Period In Issue that the maintenance fee would be due and had to be paid.

Response to Request No. 35

Admit.

Request No. 36

In 1998, Pepe & Hazard LLP, ["Pepe"] was engaged by Quickie to provide services in connection with the '160 Patent.

Response to Request No. 36

Admit.

Request No. 37

Thereafter, in 2001, Greenberg Traurig LLP ["GT"] was engaged to provide services concerning the '160 Patent.

Response to Request No. 37

Admit.

Request No. 38

Prior to mid-March 2003, Quickie replaced GT with Thelen as its attorneys with respect to all other aspects of the '160 Patent.

Response to Request No. 38

Deny.

Request No. 39

When it hired Thelen as to the '160 Patent, Quickie terminated GT's role, responsibility and services as to the '160 Patent.

<u>Response to Request No. 39</u>

Deny.

<u>Request No. 40</u>

Quickie had an opportunity to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

<u>Response to Request No. 40</u>

Admit.

<u>Request No. 41</u>

Quickie had an opportunity to pay the Maintenance Fee after GT was no longer its attorney as to the '160 Patent and before the '160 Patent expired for non-payment of the Maintenance Fee.

<u>Response to Request No. 41</u>

Deny, except admit that Quickie had an opportunity to pay the Maintenance Fee before the '160 Patent expired for non-payment of the Maintenance Fee.

<u>Request No. 42</u>

Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before it was due.

<u>Response to Request No. 42</u>

Deny.

<u>Request No. 43</u>

Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

Response to Request No. 43

Deny.

Request No. 44

Thelen had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before the '160 Patent expired for non-payment of the Maintenance Fee.

Response to Request No. 44

Deny.

Request No. 45

Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before it was due.

Response to Request No. 45

Admit.

Request No. 46

Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee during the One-Year Period In Issue when the Maintenance Fee was due.

Response to Request No. 46

Admit.

Request No. 47

Rick Steiner had an opportunity to pay the Maintenance Fee or to advise Quickie to pay the Maintenance Fee before the '160 Patent expired for non-payment of the Maintenance Fee.

Response to Request No. 47

Admit.

14

Request No. 48

Quickie had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

Response to Request No. 48

Admit.

Request No. 49

Thelen had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

Response to Request No. 49

Deny.

Request No. 50

Rick Steiner had opportunities to cure the nonpayment of the Maintenance Fee, or to advise Quickie to cure the nonpayment after the One-Year Period In Issue had expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

Response to Request No. 50

Admit.

Dated: New York, New York
       March 31, 2008

PROSKAUER ROSE LLP

By:
       Steven C. Krane

1585 Broadway
New York, NY  10036-8299
(212) 969-3435
skrane@proskauer.com
*Attorneys for Thelen Reid Brown*
*Raysman & Steiner LLP and Robert*
*E. Krebs*

16

TO:

Richard I. Janvey
Joan M. Secofsky
Diamond McCarthy, LLP
620 Eighth Avenue
39th Floor
New York, New York 10018
rjanvey@diamondmccarthy.com
jsecofsky@diamondmccarthy.com

Stephen T. Loden
Diamond McCarthy, LLP
Two Houston Center
909 Fannin, Suite 1500
Houston, Texas 77010
sloden@diamondmccarthy.com

*Attorneys for Plaintiff*

Martin I. Kaminsky
Justin Y. K. Chu
Pollack & Kaminsky
114 West 47th Street
New York, New York 10036
mikaminsky@pollacklawfirm.com
jchu@pollacklawfirm.com

*Attorneys for Greenberg Traurig & Todd Sharinn*

Pamela A. Bresnahan
Elizabeth Treubert Simon
Vorys, Sater, Seymour and Pease LLP
1828 L Street NW
Eleventh Floor
Washington, D.C. 20036-5109
pabresnahan@vssp.com
etsimon@vssp.com

Frank W. Ryan
Nixon Peabody LLP
437 Madison Avenue
New York, NY 10022
fryan@nixonpeabody.com

*Attorneys for Rick, Steiner, Fell & Benowitz and Alan Fell*

# EXHIBIT K

Spiglanin, Patty

om:   Ness, Andrew
nt:    Wednesday, October 25, 2006 3:05 PM
To:    Blum, Robert
Subject: FW: Revocation of power of Attorney & remarks & interview summary in merged reexam of 460 patent

Guess we know where he stands. i don't propose to respond further (since its only going to draw more of the same) unless you think otherwise.

Andy

-----Original Message-----
From: Mark F. Evens [mailto:MEVENS@skgf.com]
Sent: Wednesday, October 25, 2006 4:51 PM
To: Ness, Andrew
Subject: RE: Revocation of power of Attorney & remarks & interview summary in merged reexam of 460 patent

Thanks, Andy. I don't profess to be the expert, but my understanding at the time was that we (TRP) was taking responsibility for the patent, and that is how I read Bob's filing. Second, I remember a conversation early on with Bob about not missing fee deadlines. Finally, maintenance fees are part of representing the patent, so I am surprised that Bob, as a practiced patent prosecutor, wouldn't advisee Quickie and Steve that deadlines were approaching so he would not lose his patent. To take the position that he only represented the patent on the Re-exam (which is not my memory or my reading of the document) seems unduly myopic. Bob constantly went around me to the client, and, under those circumstances, I just feel he would have advised the client that fees were due.
Anyway, I wanted you to have my thoughts.

Mark Fox Evens
      tor
>   , Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

EXHIBIT
62
6/12/08

From: Ness, Andrew [mailto:adness@thelenreid.com]
Sent: Wednesday, October 25, 2006 2:14 PM
To: Mark F. Evens
Subject: RE: Revocation of power of Attorney & remarks & interview summary in merged reexam of 460 patent

Mark:

Thanks for the info. I looked over the documents you sent and have heard from Bob Krebs regarding them. Both documents relate only to the reexamination proceeding for the '160 patent. The Patent Office has very specific rules for registering as the fee address for maintenance fee purposes. Bob pointed me to 37 CFR 1.136 and 1.363 which govern this specifically, and you might want to look at them.

The fee address for maintenance fee purposes is where the PTO sends all notices and correspondence regarding maintenance fees, and its "the correspondence address used during prosecution of the application" unless specifically changed as provided in th  ' regulations. TRP did not prosecute the patent application, and was never the fee address for maintenance fee purposes. ʼ  TRP never received any of the maintenance fee notices or took on any responsibility for maintenance fees.

Th  .ee address for maintenance fee purposes (per the PTO web site) is Pepe & Hazard, a law firm in Connecticut. Quickie should be looking in that direction if it wants to ask why the maintenance fee did not get paid and Quickie did not hear about it.

2/1/2007

I hope this is helpful.

Andy

-----Original Message-----
From: Mark F. Evens [mailto:MEVENS@skgf.com]
Sent: Tuesday, October 24, 2006 3:18 PM
To: Ness, Andrew
Subject: FW: Revocation of power of Attorney & remarks & interview summary in merged reexam of 460 patent

Andy,
    A few weeks ago, I met to discuss the issue Quickie has with TRP regarding the '160 Patent. As we discussed, Dr. Colvin, on behalf of Quickie, LLC , our client while I was at TRP, was attempting to negotiate a settlement of the issues with Medtronic or sell the IP to a third party. Numbers bandied about exceeded $5m.
Unfortunately, Medtronic and the 3/p pointed out that because maintenance fees were not paid, the '160 patent had expired. Fees were due on or about May 2004 and the final date was May 2006.
The attached documents show that TRP had responsibility for the patent, including paying maintenance fees or notifying Quickie that the fees were due.
Dr. Colvin tells me he never received such notice.
I know he is incurring significant sums in an effort to have the patent reinstated.
As you can imagine, Dr. Colvin is quite frustrated. Delay in the Patent Office delayed resolution of this matter. But with a resolution within reach ( which would have resulted in payment of appropriate outstanding invoices), he found out that the patent had expired.
I wanted to advise you of the attached so appropriate action can be taken in this matter.

Hope all is going well otherwise.
                    Mark

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

---

From: Sandra Ortiz [mailto:ortizs02@med.nyu.edu]
Sent: Tuesday, October 24, 2006 9:39 AM
To: Alan Fell; Mark F. Evens
Cc: akatz@vtsmedical.com; grossl@cv.med.nyu.edu; galloway@cv.med.nyu.edu
Subject: Revocation of power of Attorney & remarks & interview summary in merged reexam of 460 patent

Gentleman,  FYI, Please see attachments

<<460 patent.pdf>> <<Krebbs POA.pdf>>

--
New York University School of Medicine
Department of Cardiothoracic Surgery
Sandra Ortiz Perez
Phone (212) 263-6273
Fax (212) 263-6546

2/1/2007

# EXHIBIT L



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

MAIER & MAIER, PLLC
128 N. PITT STREET
SECOND FLOOR
ALEXANDRIA, VA 22314

**COPY MAILED**

MAR 0 6 2007

**OFFICE OF PETITIONS**

> **EXHIBIT**
> 59
> 6/12/08

In re Patent of                              :
Colvin et al.                                :
Patent No. 6,066,160                         :
Issue Date: 05/23/2000                       :
Application No 09/198087                      :    DECISION
Filing or 371(c) Date: 11/23/1998            :    ON PETITION
Title of Invention:                          :
PASSIVE KNOTLESS SUTURE                      :
TERMINATOR FOR USE IN                        :
MINAMALLY INVASIVE SURGERY AND               :
TO FACILITATE STANDARD TISSUE                :
SECURING                                     :

This is a decision on the petition under 37 CFR § 1.378(b), to reinstate the above-identified patent, filed October 27, 2006, and supplemented December 4, 2006.

The petition is **DISMISSED**.

Any further petition to revive the above-identified application must be submitted within TWO (2) MONTHS from the mail date of this decision. Extensions of time under 37 CFR 1.136(a) are permitted. The reconsideration request should include a cover letter entitled "Renewed Petition under 37 CFR 1.137." This is **not** final agency action within the meaning of 5 U.S.C. § 704.

Background

The patent issued May 23, 2000. Patentee could have paid the three and one half (3½) year maintenance fee between May 23, 2003, and November 23, 2003, without a surcharge, or within the six (6) month grace period between November 24, 2003 and May 23, 2004. Patentee failed to do so; accordingly, the patent became expired on May 24, 2004.

The instant petition

Patentee files the instant petition and explains that the law firm responsible for payment of the maintenance fee, Thelen, Reid & Priest, LLP, ("Thelen Reid"), failed to pay the maintenance fee.

Petitioner asserts that this office also failed to Notify the Patentee that the maintenance fee was due, and that this office allowed the Patentee to file amendments in the above-identified reissue application during the period after the patent had become abandoned, without notifying the Patentee that the patent had expired.

Applicable Law, Rules and MPEP

37 CFR 1.378(b) provides that a patent may be reinstated at any time following expiration of the patent for failure to timely pay a maintenance fee. A petition to accept late payment of a maintenance fee, where the delay was unavoidable, must include:

> (A) the required maintenance fee set forth in 37 CFR 1.20(e)-(g);
> (B) the surcharge set forth in 37 CFR 1.20(i)(1); and
> (C) a showing that the delay was unavoidable since reasonable care was taken to ensure that the maintenance fee would be paid timely and that the petition was filed promptly after the patentee was notified of, or otherwise became aware of, the expiration of the patent.

The required showing must enumerate the steps taken to ensure timely payment of the maintenance fee, the date and the manner in which patentee became aware of the expiration of the patent, and the steps taken to file the petition promptly. Furthermore, an adequate showing requires a statement by all persons with direct knowledge of the cause of the delay, setting forth the facts as they know them. Copies of all documentary evidence referred to in a statement should be furnished as exhibits to the statement. (Emphasis supplied).

As language in 35 U.S.C. § 41(c)(1) is identical to that in 35 U.S.C. § 133 (i.e., "unavoidable" delay), a late maintenance fee for the unavoidable delay standard is considered under the same standard for reviving an abandoned application under 35 U.S.C. § 133. See Ray v. Lehman, 55 F.3d 606, 608-09, 34 USPQ2d 1786, 1787 (Fed. Cir. 1995) (quoting In re Patent No. 4,409,763, 7 USPQ2d 1798, 1800 (Comm'r Pat. 1988), aff'd sub nom. Rydeen v. Quigg, 748 F. Supp. 900, 16 USPQ2d 1876 (D.D.C. 1990), aff'd, 937 F.2d 623 (Fed. Cir. 1991) (table), cert. denied, 502 U.S. 1075 (1992)). See MPEP § 711.03(c) for a general discussion of the "unavoidable" delay standard.

Because 35 U.S.C. § 41(c) requires the payment of fees at specified intervals to maintain a patent in force, rather than some response to a specific action by the Office under 35 U.S.C. § 133, a reasonably prudent person in the exercise of due care and diligence would have taken steps to ensure the timely payment of such maintenance fees. Ray, 55 F.3d at 609, 34 USPQ2d at 1788. That is, an adequate showing that the delay in payment of the maintenance fee at issue was "unavoidable" within the meaning of 35 U.S.C. § 41(c) and 37 CFR 1.378(b)(3) requires a showing of the steps taken to ensure the timely payment of the maintenance fees for this patent. Id. Thus, where the record fails to disclose that the patentee took reasonable steps, or discloses that the patentee took no steps, to ensure timely payment of the maintenance fee, 35 U.S.C. 41(c) and 37 CFR 1.378(b)(3) preclude acceptance of the delayed payment of the maintenance fee under 37 CFR 1.378(b).

In view of the requirement to enumerate the steps taken to ensure timely payment of the maintenance fee, the patentee's lack of knowledge of the need to pay the maintenance fee and the failure to receive the Maintenance Fee Reminder does not constitute unavoidable delay. See Patent No. 4,409,763, supra. See also Final Rule entitled "Final Rules for Patent Maintenance Fees," published in the Federal Register at 49 Fed. Reg. 34716, 34722-23 (August 31, 1984), and republished in the Official Gazette at 1046 Off. Gaz. Pat. Office 28, 34 (September 25, 1984). Under the statutes and rules, the Office has no duty to notify patentees of the requirement to pay maintenance fees or to notify patentees when the maintenance fees are due. It is solely the responsibility of the patentee to assure that the maintenance fee is timely paid to prevent expiration of the patent. The lack of knowledge of the requirement to pay a maintenance fee and the failure to receive the Maintenance Fee Reminder will not shift the burden of monitoring the time for paying a maintenance fee from the patentee to the Office. Thus, evidence that despite reasonable care on behalf of the patentee and/or the patentee's agents, and reasonable steps to ensure timely payment, the maintenance fee was unavoidably not paid, could be submitted in support of an argument that the delay in payment was unavoidable.

Moreover, the Patent and Trademark Office must rely on the actions or inactions of duly authorized and voluntarily chosen representatives of the applicant, and applicant is bound by the consequences of those actions or inactions. Link v. Wabash, 370 U.S. 626, 633-34 (1962); Huston v. Ladner, 973 F.2d 1564, 1567, 23 USPQ2d 1910, 1913 (Fed. Cir. 1992); see also Haines v. Quigg, 673 F. Supp. 314, 317, 5 USPQ2d 1130, 1132 (D.N. Ind. 1987). Specifically, petitioner's delay caused by the actions or inactions of his voluntarily chosen representative does not constitute unavoidable delay within the meaning of 35 USC 133 or 37 CFR 1.137(a). Haines v. Quigg, 673 F. Supp. 314, 5 USPQ2d 1130 (D. Ind. 1987); Smith v. Diamond, 209 USPQ 1091 (D.D.C. 1981); Potter v. Dann, 201 USPQ 574 (D.D.C. 1978); Ex parte Murray, 1891 Dec. Comm'r Pat. 130, 131 (Comm'r Pat. 1891). In re Mattullath, 38 App. D.C. 497, 514-15 (1912)(quoting Ex parte Pratt, 1887 Dec. Comm'r Pat. 31, 32-33 (1887)); see also Winkler v. Ladd, 221 F. Supp. 550, 552, 138 USPQ 666, 167-68 (D.D.C. 1963), aff'd, 143 USPQ 172 (D.C. Cir. 1963); Ex parte Henrich, 1913 Dec. Comm'r Pat. 139, 141 (1913).

Opinion

Initially it is noted that, as iterated supra, under the statutes and rules, the Office has no duty to notify patentees of the requirement to pay maintenance fees or to notify patentees when the maintenance fees are due. Accordingly, Patentee may not rely upon the failure to receive a maintenance fee reminder to justify unavoidable delay in paying the maintenance fee. It is solely the responsibility of the patentee to assure that the maintenance fee is timely paid to prevent expiration of the patent. The lack of knowledge of the requirement to pay a maintenance fee and the failure to receive the Maintenance Fee Reminder will not shift the burden of monitoring the time for paying a maintenance fee from the patentee to the Office. Moreover, a reasonably prudent person in the exercise of due care and diligence would have taken steps to ensure the timely payment of such maintenance fees that did not include receipt of maintenance fee reminders from this Office.

Similarly, that the Patentee was allowed to file amendments in the reexamination application after the patent had expired, and this Office failed to notify the Patentee that the patent had expired, does not amount to unavoidable delay. Applicant's assertion, that this Office failed to

Patent No. 6,066,160                                    Page 4

notify the Patentee that the patent had expired, does not shift the burden of monitoring the time for paying a maintenance fee from the patentee to the Office. It is solely the responsibility of the Patentee to assure that the maintenance fee is timely paid to prevent expiration of the patent. Moreover, the patent had expired on May 24, 2004. In addition, Applicant filed amendments in the re-examination application on January 11, and June 20, 2005, several months after the patent had expired. A showing of unavoidable delay must include a showing that the failure to pay the maintenance fee was unavoidable from the time the payment was due, May 24, 2004, through the filing of a grantable petition.

Patentee is also advised that a delay caused by the actions or inactions of Patentee's voluntarily chosen representative, does not constitute unavoidable delay. Patentee asserts that Thelen Reid was responsible for payment of the maintenance fee, but failed to pay the maintenance fee. Patentee, however, may not rely upon a delay caused by the actions or inactions of Thelen Reid to support an assertion that payment of the maintenance fee was unavoidable.

Patentee alleges that it reasonably relied upon Thelen Reid to provide timely payment of the maintenance fee. However, Thelen Reid indicated to Petitioner that they were not responsible for payment of the maintenance fees, but was only empowered to act in the Re-examination proceedings for this patent. October 26, 2006 Letter from Maier & Mairer, PLLC ("Maier"), to Pepe & Hazard LLP. Applicant has also filed copies of a letter from Thelen Reid to the patentee dated July 3, 2001, wherein Thelen Reid states that it was retained only to provide litigation services related to the Patentee against Medtronic, Inc. Patentee has not provided any evidence from Thelen Reid, supporting the assertion that Thelen Reid was responsible for payment of the maintenance fee.

Finally, the petition states that on March 4, 2003, Attorney Todd Sharinn was responsible for the patent until March 4, 2003. Subsequently, on December 5, 2003, Patentee filed a Change of Attorney Docket Number and Change of Address Notice, changing the correspondence address to that of Thelen Reid. Patentee has failed to account for the period of time between March 4, 2003, when attorney Sharrin's responsibility for the patent terminated, and December 5, 2003, when Patentee filed a Change of Attorney Docket Number and Change of Address Notice. Patentee has thus failed to account for the entire delay.

Conclusion

Patentee has failed to demonstrate that the failure to pay the maintenance fee was unavoidable. The petition is dismissed.

Petitioner's current options

I. Petitioner may file a request for reconsideration.

If reconsideration of this decision is desired, a petition for reconsideration must be filed within TWO (2) MONTHS from the mail date of this decision.[1] The petition for reconsideration should

---

[1] No extension of this two-month time limit can be granted under 37 CFR 1.136(a) or (b). This is not a final agency action within the meaning of 5 U.S.C. § 704.

Patent No. 6,066,160                                    Page 5

be entitled "Petition for Reconsideration under 37 CFR 1.378(b)." Any petition for reconsideration of this decision must be accompanied by a non-refundable petition fee of $400 as set forth in 37 CFR 1.17(h).

*After a decision on the petition for reconsideration, no further reconsideration or review of the matter will be undertaken by the Commissioner.* Therefore, it is extremely important that petitioner supply **any** and **all** relevant information and documentation with his request for reconsideration. The Director's decision will be based solely on the administrative record in existence. Petitioner should remember that it is not enough that the delay was unavoidable; petitioner must <u>prove</u> that the delay was unavoidable. A petition will not be granted if petitioner provides insufficient evidence to 'show' that the delay was unavoidable. Therefore, if a request for reconsideration is filed, it must establish that the entire delay in the submission of the maintenance fee was unavoidable.

II. <u>Petitioner may request a refund of the maintenance fee and surcharge which accompanied the petition.</u>

Petitioner may request a refund of the maintenance fee and surcharge by writing to the Office of Finance, Refund Section, Director for Patents, Washington, DC, 20231. A copy of this decision should accompany petitioner's request.

Further correspondence with respect to this matter should be addressed as follows:

By mail:            Mail Stop PETITIONS
                    Commissioner for Patents
                    PO Box 1450
                    Alexandria, VA 22313-1450

By FAX:             (571) 273-0025
                    Attn: Office of Petitions

By hand:            Customer Service Window
                    Randolph Building
                    401 Dulany Street
                    Alexandria, VA 22314

Telephone inquiries concerning this matter should be directed to the undersigned at (571) 272-3232.

Derek L. Woods
Attorney
Office of Petitions

# EXHIBIT M

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

MAIER & MAIER, PLLC
128 N. PITT STREET
SECOND FLOOR
ALEXANDRIA, VA 22314

EXHIBIT
60
6/12/08

COPY MAILED

OCT 0 5 2007

OFFICE OF PETITIONS

In re Patent of                          :
Colvin et al.                            :
Patent No. 6,066,160                     :
Issue Date: 05/23/2000                   :
Application No 09/198087                 :   DECISION
Filing or 371(c) Date: 11/23/1998        :   ON PETITION
Title of Invention:                      :
PASSIVE KNOTLESS SUTURE                  :
TERMINATOR FOR USE IN                    :
MINAMALLY INVASIVE SURGERY AND           :
TO FACILITATE STANDARD TISSUE            :
SECURING                                 :

This is a decision on the petition for reconsideration under 37 CFR § 1.378(e), to reinstate the above-identified patent, filed May 7, 2007.

The petition is **DENIED**.

<u>Background</u>

The patent issued May 23, 2000. Patentee could have paid the three and one half (3½) year maintenance fee between May 23, 2003, and November 23, 2003, without a surcharge, or within the six (6) month grace period between November 24, 2003 and May 23, 2004. Patentee failed to do so; accordingly, the patent became expired on May 24, 2004.

<u>The October 27, 2006, Petition, supplemented December 4, 2006</u>

Patentee filed a petition to reinstate the above-identified patent on October 27, 2006, and supplemented December 4, 2006, wherein Petitioner explained that the law firm responsible for payment of the maintenance fee, Thelen, Reid & Priest, LLP, ("Thelen Reid"), failed to pay the maintenance fee. Petitioner also asserted that this Office also failed to Notify the Patentee that the maintenance fee was due, and that this office allowed the Patentee to file amendments in the above-identified reissue application during the period after the patent had become expired, without notifying the Patentee that the patent had expired.

## The March 6, 2007 Decision dismissing the petition

A Decision dismissing the petition was mailed on March 6, 2007. The Decision informed Petitioner that the Office has no duty to notify patentees of the requirement to pay maintenance fees or to notify patentees when the maintenance fees are due, and that the lack of knowledge of the requirement to pay a maintenance fee and the failure to receive the Maintenance Fee Reminder will not shift the burden of monitoring the time for paying a maintenance fee from the patentee to the Office.

The Decision also informed Petitioner that a delay caused by the actions or inactions of Patentee's voluntarily chosen representative, does not constitute unavoidable delay. Patentee asserted that Thelen Reid was responsible for payment of the maintenance fee, but failed to pay the maintenance fee. Patentee was informed that it may not rely upon a delay caused by the actions or inactions of Thelen Reid to support an assertion that payment of the maintenance fee was unavoidable.

Finally, the Decision noted that Attorney Todd Sharinn was responsible for the patent until March 4, 2003. Subsequently, on December 5, 2003, Patentee filed a "Change of Attorney Docket Number and Change of Address Notice," changing the correspondence address to that of Thelen Reid. Patentee has failed to account for the period of time between March 4, 2003, when attorney Sharrin's responsibility for the patent terminated, and December 5, 2003, when Patentee filed the "Change of Attorney Docket Number and Change of Address Notice." Patentee had thus failed to account for the entire delay.

## The present petition for reconsideration

## Preliminary issues

Petitioner files the present petition for reconsideration and initially requests clarification as to whether the renewed petition may be filed under 37 CFR 1.137 or 1.378(b), and whether extensions of time are available?

Petitioner is advised that, as language in 35 U.S.C. § 41(c)(1) is identical to that in 35 U.S.C. § 133 (i.e., "unavoidable" delay), a late maintenance fee for the unavoidable delay standard is considered under the same standard for reviving an abandoned application under 35 U.S.C. § 133. *See Ray v. Lehman*, 55 F.3d 606, 608-09, 34 USPQ2d 1786, 1787 (Fed. Cir. 1995) (quoting *In re Patent No. 4,409,763*, 7 USPQ2d 1798, 1800 (Comm'r Pat. 1988), *aff'd sub nom. Rydeen v. Quigg*, 748 F. Supp. 900, 16 USPQ2d 1876 (D.D.C. 1990), aff'd, 937 F.2d 623 (Fed. Cir. 1991) (table), *cert. denied*, 502 U.S. 1075 (1992)). See MPEP § 711.03(c) for a general discussion of the "unavoidable" delay standard. Regarding whether extensions of time were available, the applicable rule, 37 CFR 1.378(e), states:

> Reconsideration of a decision refusing to accept a maintenance fee upon petition filed pursuant to paragraph (a) of this section may be obtained by filing a petition for reconsideration within two months of, or such other time as set in the decision refusing to accept the delayed payment of the maintenance fee.

The Decision set a two (2) month period for reply, and Petitioner timely filed the present request for reconsideration.

Petitioner also takes issue with the statement in the petition that the showing of unavoidable delay must include the showing from the time the payment was due, May 24, 2004, through the filing of a grantable petition. Petitioner asserts that May 24, 2004 was the date that the patent expired, not the date that the payment was due. Petitioner asserts that the error in the citing of the significance of these dates renders the entire decision subject to question.

As Petitioner correctly notes, May 24, 2004 was the date that the patent expired. Petitioner is advised that, had the payment been received on May 23, 2004, the patent would not have expired. While the three and one-half (3½) year maintenance fee due date is the date the maintenance fee is to be paid, this Office extends a six (6) month grace period such that the patent does not expire until six (6) months after the due date. "Unless payment of the applicable maintenance fee is received in the United States Patent and Trademark Office on or before the date the fee is due or within a grace period of 6 months thereafter, the patent will expire as of the end of such grace period." See 35 U.S.C. § 41(b)

Further to this, 37 CFR 1.378, Acceptance of delayed payment of maintenance fee in expired patent to reinstate patent, states:

(a) The Director may accept the payment of any maintenance fee due on a patent after expiration of the patent if, upon petition, the delay in payment of the maintenance fee is shown to the satisfaction of the Director to have been unavoidable (paragraph (b) of this section) or unintentional (paragraph (c) of this section) and if the surcharge required by § 1.20(i) is paid as a condition of accepting payment of the maintenance fee.

Finally, 37 CFR 1.137, Revival of abandoned application, terminated reexamination proceeding, or lapsed patent, states in relevant part that the showing required must include (a) (3) A showing to the satisfaction of the Director that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this paragraph was unavoidable;

Accordingly, the showing of unavoidable delay required under 37 CFR 1.378(b) runs from the due date for the reply – the day after which the patent is expired - to the filing of a grantable petition.

Petitioner next disagrees with the Decision's conclusion that Sharinn's responsibility concluded on March 4, 2003, and that there is no objective evidence to support this conclusion.

A review of the Supplement to Petition filed December 24, 2006 reveals that Petitioner herein filed a Statement in Support of Petition Under 37 C.F.R. 1.378(b) executed by Todd Sharinn wherein Mr. Sharinn states on page two that

[m]y responsibility, including the payment of any maintenance fee that may become due, for the subject patent ended prior to the date where payment of a first maintenance fee was due as evidenced by the enclosed Revocation of Prior Powers of Attorney signed on

Page 4

the behalf of Quickie, LLC, on March 4, 2003 wherein 'all powers of attorney previously given [were] hereby revoked.'

Statement of Mr. Sharinn at p.2.

The patent expired on March 24, 2004. The relevant period is the period between March 24, 2004 and the filing of a grantable petition.

## The response to the Decision

As to the Decision, Petitioner states that the delay was unavoidable because at all relevant times, Thelen held Petitioner's general power of attorney and Greenberg/Sharinn were the designated recipients of all office communications concerning maintenance fees on the '160 Patent. In light of these facts, Petitioner states that "it is self-evident that Petitioner was reasonably looking to its outside counsel to handle maintenance fees on the patent, and thus the failure to pay the maintenance fees was unavoidable to petitioner." Request for Reconsideration at p.4.

Petitioner asserts that the responsibility to present a complete record due to the failure to obtain the client files and other documents related to the representation of his client Thelen and Greenberg fall squarely at the feet of Thelen and Greenberg. Petitioner requests, at a minimum, additional time to produce documents from Thelen and Greenberg.

## Applicable Law, Rules and MPEP

37 CFR 1.378(b) provides that a patent may be reinstated at any time following expiration of the patent for failure to timely pay a maintenance fee. A petition to accept late payment of a maintenance fee, where the delay was unavoidable, must include:

- (A) the required maintenance fee set forth in 37 CFR 1.20(e)-(g);
- (B) the surcharge set forth in 37 CFR 1.20(i)(1); and
- (C) a showing that the delay was unavoidable since reasonable care was taken to ensure that the maintenance fee would be paid timely and that the petition was filed promptly after the patentee was notified of, or otherwise became aware of, the expiration of the patent.

The required showing must enumerate the steps taken to ensure timely payment of the maintenance fee, the date and the manner in which patentee became aware of the expiration of the patent, and the steps taken to file the petition promptly. Furthermore, an adequate showing requires a statement by all persons with direct knowledge of the cause of the delay, setting forth the facts as they know them. Copies of all documentary evidence referred to in a statement should be furnished as exhibits to the statement. (Emphasis supplied).

As language in 35 U.S.C. § 41(c)(1) is identical to that in 35 U.S.C. § 133 (i.e., "unavoidable" delay), a late maintenance fee for the unavoidable delay standard is considered under the same standard for reviving an abandoned application under 35 U.S.C. § 133. See Ray v. Lehman, 55 F.3d 606, 608-09, 34 USPQ2d 1786, 1787 (Fed. Cir. 1995) (quoting In re Patent No. 4,409,763, 7 USPQ2d 1798, 1800 (Comm'r Pat. 1988), aff'd sub nom. Rydeen v. Quigg, 748 F. Supp. 900,

Patent No. 6,066,160                                           Page  5

16 USPQ2d 1876 (D.D.C. 1990), aff'd, 937 F.2d 623 (Fed. Cir. 1991) (table), cert. denied, 502 U.S. 1075 (1992)). See MPEP § 711.03(c) for a general discussion of the "unavoidable" delay standard.

Because 35 U.S.C. § 41(c) requires the payment of fees at specified intervals to maintain a patent in force, rather than some response to a specific action by the Office under 35 U.S.C. § 133, a reasonably prudent person in the exercise of due care and diligence would have taken steps to ensure the timely payment of such maintenance fees. Ray, 55 F.3d at 609, 34 USPQ2d at 1788. That is, an adequate showing that the delay in payment of the maintenance fee at issue was "unavoidable" within the meaning of 35 U.S.C. § 41(c) and 37 CFR 1.378(b)(3) requires a showing of the steps taken to ensure the timely payment of the maintenance fees for this patent. Id. Thus, where the record fails to disclose that the patentee took reasonable steps, or discloses that the patentee took no steps, to ensure timely payment of the maintenance fee, 35 U.S.C. 41(c) and 37 CFR 1.378(b)(3) preclude acceptance of the delayed payment of the maintenance fee under 37 CFR 1.378(b).

In view of the requirement to enumerate the steps taken to ensure timely payment of the maintenance fee, the patentee's lack of knowledge of the need to pay the maintenance fee and the failure to receive the Maintenance Fee Reminder does not constitute unavoidable delay. See Patent No. 4,409,763, supra. See also Final Rule entitled "Final Rules for Patent Maintenance Fees," published in the Federal Register at 49 Fed. Reg. 34716, 34722-23 (August 31, 1984), and republished in the Official Gazette at 1046 Off. Gaz. Pat. Office 28, 34 (September 25, 1984). Under the statutes and rules, the Office has no duty to notify patentees of the requirement to pay maintenance fees or to notify patentees when the maintenance fees are due. It is solely the responsibility of the patentee to assure that the maintenance fee is timely paid to prevent expiration of the patent. The lack of knowledge of the requirement to pay a maintenance fee and the failure to receive the Maintenance Fee Reminder will not shift the burden of monitoring the time for paying a maintenance fee from the patentee to the Office. Thus, evidence that despite reasonable care on behalf of the patentee and/or the patentee's agents, and reasonable steps to ensure timely payment, the maintenance fee was unavoidably not paid, could be submitted in support of an argument that the delay in payment was unavoidable.

Moreover, the Patent and Trademark Office must rely on the actions or inactions of duly authorized and voluntarily chosen representatives of the applicant, and applicant is bound by the consequences of those actions or inactions. Link v. Wabash, 370 U.S. 626, 633-34 (1962); Huston v. Ladner, 973 F.2d 1564, 1567, 23 USPQ2d 1910, 1913 (Fed. Cir. 1992); see also Haines v. Quigg, 673 F. Supp. 314, 317, 5 USPQ2d 1130, 1132 (D.N. Ind. 1987). Specifically, petitioner's delay caused by the actions or inactions of his voluntarily chosen representative does not constitute unavoidable delay within the meaning of 35 USC 133 or 37 CFR 1.137(a). Haines v. Quigg, 673 F. Supp. 314, 5 USPQ2d 1130 (D. Ind. 1987); Smith v. Diamond, 209 USPQ 1091 (D.D.C. 1981); Potter v. Dann, 201 USPQ 574 (D.D.C. 1978); Ex parte Murray, 1891 Dec. Comm'r Pat. 130, 131 (Comm'r Pat. 1891). In re Mattullath, 38 App. D.C. 497, 514-15 (1912)(quoting Ex parte Pratt, 1887 Dec. Comm'r Pat. 31, 32-33 (1887)); see also Winkler v. Ladd, 221 F. Supp. 550, 552, 138 USPQ 666, 167-68 (D.D.C. 1963), aff'd, 143 USPQ 172 (D.C. Cir. 1963); Ex parte Henrich, 1913 Dec. Comm'r Pat. 139, 141 (1913).

Patent No. 6,066,160                                    Page 6

Opinion

Petitioner/Patentee is advised that it is immaterial to reinstatement of the patent as to whether the actions or inactions of Thelen, Greenberg, Sharinn, or any other voluntarily chosen representative of the Patentee resulted in the failure to timely pay the maintenance fee. A delay caused by the actions or inactions of Patentee's voluntarily chosen representative, does not constitute unavoidable delay. Patentee may not rely upon a delay caused by the actions or inactions of a voluntarily chosen representative to support an assertion that payment of the maintenance fee was unavoidable. As the court stated in Haines v. Quigg, 673 F. Supp. 314, 317, 5 USPQ2d 1130, 1132 (D.N. Ind. 1987), Plaintiff

> cannot, however, ask the court to overlook Attorney Knoblock's action or inaction with regard to the patent application. He hired Knoblock to represent him; Knoblock's actions must be imputed to him. *Link v. Wabash Railroad Co., 370 U.S. 626, 633-34, 82 S. Ct. 1386, 1390-91, 8 L. Ed. 2d 734 (1962)* ("Petitioner voluntarily chose his attorney as his representative in the action and he cannot now avoid the consequences of the acts or omissions of this freely selected agent . . . . Each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'"); *Inryco, Inc. v. Metropolitan Engineering Co., Inc., 708 F.2d 1225, 1233 (7th Cir. 1983)* ("Courts hesitate to punish a client for its lawyer's gross negligence, especially when the lawyer affirmatively misled the client," but "if the client freely chooses counsel, it should be bound to counsel's actions."). See also, e.g., *Wei v. State of Hawaii, 763 F.2d 370, 372 (9th Cir. 1985); LeBlanc v. I.N.S., 715 F.2d 685, 694 (1st Cir. 1983).*

Lastly, as to Petitioners request for, at a minimum, additional time to produce documents from Thelen and Greenberg Petitioner is advised that, as stated in 37 CFR 1.378(e), "[a]fter the decision on the petition for reconsideration, no further reconsideration or review of the matter will be undertaken by the Director."

Decision

The instant petition under 37 CFR 1.378(e) is granted to the extent that the decision of March 6, 2007 has been reconsidered; however, the renewed petition to accept under 37 CFR 1.378(e) the delayed payment of a maintenance fee and reinstate the above-identified patent is **DENIED**.

This patent file is being forwarded to the Files Repository.

Telephone inquiries concerning this matter should be directed to Attorney Derek L. Woods at (571) 272-3232.

Charles Pearson
Director
Office of Petitions

# EXHIBIT N



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,460 | 11/25/2002 | 6066160 | 034521-003 | 3789 |

a-l 90/007085

| | |
|---|---|
| 7590    02/21/2008 | EXAMINER |
| Robert E. Krebs | WOO |
| Thelen Reid & Priest LLP | |
| P.O. Box 640640 | ART UNIT    PAPER NUMBER |
| San Jose, CA  95164-0640 | 3773 |

RECEIVED

FEB 2 5 2008

TRBRS LLP
Patent Docket

DATE MAILED: 02/21/2008

Please find below and/or attached an Office communication concerning this application or proceeding.



EXHIBIT
63
6/12/08



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,460 | 11/25/2002 | 6066160 | 034521-003 | 3789 |

and 90/007085

7590    02/21/2008

Robert E. Krebs
Thelen Reid & Priest LLP
P.O. Box 640640
San Jose, CA  95164-0640

| EXAMINER |
|---|
| Woo |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3773 | |

DATE MAILED: 02/21/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

| Office Action in Ex Parte Reexamination | Control No. 90/006,460 and 90/007085 | Patent Under Reexamination 6066160 | |
|---|---|---|---|
| | Examiner Julian W. Woo | Art Unit 3773 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☒ Responsive to the communication(s) filed on 05 October 2007 .          b☐ This action is made FINAL.
c☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire 2 month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d).  EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I     THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1.  ☐ Notice of References Cited by Examiner, PTO-892.        3. ☐ Interview Summary, PTO-474.

2.  ☐ Information Disclosure Statement, PTO/SB/08.        4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a.  ☒ Claims *1-34* are subject to reexamination.

1b.  ☐ Claims _____ are not subject to reexamination.

2.  ☐ Claims _____ have been canceled in the present reexamination proceeding.

3.  ☒ Claims *26 and 30* are patentable and/or confirmed.

4.  ☒ Claims *1-25,27-29 and 31-34* are rejected.

5.  ☐ Claims _____ are objected to.

6.  ☐ The drawings, filed on _____ are acceptable.

7.  ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8.  ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All  b)☐ Some* c)☐ None     of the certified copies have

1☐ been received.

2☐ not been received.

3☐ been filed in Application No. _____ .

4☐ been filed in reexamination Control No. _____ .

5☐ been received by the International Bureau in PCT application No. _____ .

* See the attached detailed Office action for a list of the certified copies not received.

9.  ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

Application/Control Number: 90/006,460 and
90/007,085
Art Unit: 3773

Page 2

## DETAILED ACTION

### Reexamination

1.    In view of the October 5, 2007 decision to deny reinstatement of U.S. Patent

6,066,160, further reexamination of this patent will be on unamended patent claims 1-34

only.  All amendments to the patent claims and all claims that were added during the

proceeding are withdrawn.  Any response to this office action should include an

amendment presenting claims 1-34 as originally issued or canceled and canceling all

other claims.  See MPEP 2250(III) and 2287(IV)(M).

2.    The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 6,066,160 throughout the course of this reexamination

proceeding.  See MPEP §§ 2207, 2282 and 2286.

### Claim Rejections - 35 USC § 102

3.    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

4.    Claims 1-12, 32, and 34 are rejected under 35 U.S.C. 102(b) as being anticipated

by Emery (3,988,810).  Emery discloses, in the figures, a suture securing apparatus

comprising an apparatus body having an upper surface (e.g., at 26), a lower surface

(23); a first internal surface (at 25); a second internal surface (at 24) at an acute angular

narrowing (with respect to the axis running along the suture shown in figure 3 or 7), an

Application/Control Number: 90/006,460 and
90/007,085
Art Unit: 3773

Page 3

outer surface (27 or 28), first and second apertures that are mirror images of each other

(see fig. 7), and an integral locking means comprising at least one ridge (30 or 41),

where each aperture has longitudinal and latitudinal axes (located along and/or between

the first and second internal surfaces) facilitating longitudinal and latitudinal directions

for a suture (T), where each aperture has a length, where at least a portion of the

locking means extends along the length of an aperture (rather than the *entire* length of

an aperture), where each ridge is formed of a rigid, biocompatible NYLON material (see

col. 1, lines 19-23, for its use in wearing apparel, and col. 3, lines 9-11) and has a

rounded surface farthest from the aperture surface (see figures 3 and 4), where each

ridge is formed at an angle greater than about 30 deg. or at an angle of about 45 deg.

(see col. 2, lines 9-15).

5.      Claims 13 and 18-21 are rejected under 35 U.S.C. 102(b) as being anticipated by

Richardson (1,243,105).  Richardson discloses, in figures 2-4 and 6, a suture securing

apparatus with an apparatus body having an upper surface (left side of the body as

viewed in fig. 6), a lower surface (right side of the body as viewed in fig. 6), an outer

surface (e.g., at 18), first and second apertures (a) each with a longitudinal axis and

upper, middle and lower portions as claimed; and first and second movable, serrated

cam members (10a) captured in the middle portion of each of the first and second

apertures; where each cam member has an engagement end and a rotation end (at 12)

or rounded portion, the rotation end being wider than the widths of the upper and lower

portions of the aperture; where a cavity of an aperture has a rounded portion (13)

cooperating with the rounded portion of the cam member and includes a retaining wall

Application/Control Number: 90/006,460 and
90/007,085

Page 4

Art Unit: 3773

(to the left or right of 13 as viewed in fig. 2); where each cam member moves to an

unengaged position (with a suture) in a first longitudinal direction and an engaged

position in a second longitudinal direction; and where the first and second apertures and

the first and second cam members are mirror images of each other.


6.      Claim 33 is rejected under 35 U.S.C. 102(b) as being anticipated by Creager

(536,684).  Creager discloses, in the figures, a suture securing apparatus with an

apparatus body (A), first and second apertures (F) each with a longitudinal axis and a

cavity (J), and first and second movable cam members (B) in the apertures; where the

first and second apertures and the first and second cam members are mirror images of

each other, as defined by a mirror plane equidistant from them.

### Claim Rejections - 35 USC § 103

7.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.      Determining the scope and contents of the prior art.
2.      Ascertaining the differences between the prior art and the claims at issue.
3.      Resolving the level of ordinary skill in the pertinent art.
4.      Considering objective evidence present in the application indicating
        obviousness or nonobviousness.

Application/Control Number: 90/006,460 and    Page 5
90/007,085
Art Unit: 3773

8.    Claims 14-17, 22, and 23 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Richardson (1,243,105) in view of Plante (5,070,805). Richardson

discloses the invention substantially as claimed, where the invention can be "used in

various ways" as chosen by a user.   However, Richardson does not disclose that the

middle portion of the aperture comprises ridges, and that the apparatus is made from

elastic, rigid, biocompatible, or biodegradable materials. Plante teaches a suture

securing apparatus, in col. 1, lines 35-42, where, depending on the application for the

apparatus, the apparatus can be made of cast metal or plastic. In figures 2 and 3,

Plante teaches a middle portion of an aperture that has ridges (48). Plante also

teaches, in figure 3, that the apparatus is attached to an unspecified surface (53). Thus,

it would have been obvious to one having ordinary skill in the art at the time the

invention was made to form the apparatus, or parts thereof, from materials as claimed,

since it has been held to be within the general skill of a worker in the art to select a

known material on the basis of its suitability for the intended use as a matter of obvious

design choice. It also would be obvious to one having ordinary skill in the art at the time

the invention was made, in view of Plante, to includes ridges in the middle portion of an

aperture of the device of Richardson. Such ridges would aid in the better securement of

a suture retained by Richardson's device.

9.    Claims 24, 25, and 27 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Emery (3,988,810) in view of Samuels et al. (3,976,079). Emery

discloses the invention substantially as claimed, but does not disclose a medical

Application/Control Number: 90/006,460 and 90/007,085                    Page 6
Art Unit: 3773

prosthesis device in physical contact or engagement or integrally formed with the suture

securing apparatus. Samuels et al. teach, in figures 3 and 9, a suture securing

apparatus (34) for temporary, physical contact or engagement or integral formation with

a medical prosthesis device (40). It would have been obvious to one having ordinary

skill in the art at the time the invention was made to apply the apparatus of Emery with

the medical prosthesis device of Samuels et al. The apparatus of Emery would

conveniently allow quick suture securement to the prosthesis device (and quick release

of the suture from prosthesis device) with the advantage of a one-piece design, where

there are no additional parts to operate or lose as in the device of Samuels et al.

10.    Claims 28, 29, and 31 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Richardson (1,243,105) in view of Samuels et al. (3,976,079).

Richardson discloses the invention substantially as claimed, where the invention can be

"used in various ways" as chosen by a user. Moreover, Richardson discloses that

"further or others uses and modifications of the device in detailed construction or

otherwise will suggest themselves to the skilled mechanic, and the invention may be

changed or modified in details or design." However, Richardson does not disclose that

the apparatus contacts or engages a medical prosthesis device. Samuels et al. teach,

in figures 3 and 9, a suture securing apparatus (34) for temporary, physical contact or

engagement or integral formation with a medical prosthesis device (40). It would have

been obvious to one having ordinary skill in the art at the time the invention was made

to apply the apparatus of Richardson with the medical prosthesis device of Samuels et

al. The apparatus of Richardson would conveniently allow quick suture securement to

Application/Control Number: 90/006,460 and                          Page 7
90/007,085
Art Unit: 3773

the prosthesis device (and quick release of the suture from prosthesis device) with the

advantage that the Richardson apparatus does not have additional small parts that can

be lost during use as in the device of Samuels et al.

### Patentable and/or Confirmed Subject Matter

11.    Claims 26 and 30 are patentable and/or confirmed.

12.    The following is a statement of reasons for the indication of patentable and/or

confirmed subject matter:  None of the prior art of record, alone or in combination

discloses a securable medical prosthesis device comprising a securable medical

prosthesis device with, inter alia, a medical prosthesis device and a suture securing

apparatus comprising an apparatus body having an upper surface, a lower surface, a

first internal surface, a second internal surface, an outer surface, at least one aperture,

and a movable cam member or a locking means comprising at least one ridge; and

where the medical prosthesis device is a sewing ring implant.

### Conclusion

13.    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Julian W. Woo whose telephone number is (571) 272-

4707.  The examiner can normally be reached Mon.-Fri., 7:00 AM to 3:00 PM Eastern

Time, alternate Fridays off.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Jackie Ho can be reached on (571) 272-4696.  The fax phone number for

the organization where this application or proceeding is assigned is (571) 273-8300.

Application/Control Number: 90/006,460 and                                    Page 8
90/007,085
Art Unit: 3773

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).


/Julian W. Woo/
Primary Examiner, Art Unit 3773


February 20, 2008

# EXHIBIT O

| OPER | PC | ENTERED | 8/9/2002 | MODIFIED | 7/10/2003 | ATTORNEYS | PJS | / | TSS | / | ADR | PRINTED ON: | 8/14/2007 |

ST# | 51822.010700US | CNTRY | US | UNITED STATES | | NEW/CON | NEW | | RELATED | |

ATS# | P15275US0 | | TYPE | UTL | SERIAL# | 90/006,460 | PATENT# | 6,066,160 | STAT | TRANSFER |

TITLE | Passive Knotless Suture Terminator for Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing | CONF# |

CLIENT | 51822 | Quickie, LLC | | 1 | CREF | | SE | YE | PUBL# |

AGENT | | | AREF | 09/198,087 | CLAIMS | | OLD# |

PRIOR | 11/23/1998 | MAIL | 11/23/1998 | FILE | 11/25/2002 | PUBL | | ISSUE | 5/23/2000 | TFD | y | 4/2/2003 | 1ST | 11/23/1998 |

| ID | O | ACTION | BASE | DUE IN | DUE | EXTNS | FINAL | EXT | RESPONSE | CALL | 1 | 2 | P |
|----|---|--------|------|--------|-----|-------|-------|-----|----------|------|---|---|---|
| | Y | POA REVOKED | 4/2/2003 | | | | | | | | | | |
| M1 | N | 1ST MAINT FEE DUE | 5/23/2000 | 42 M | 11/23/2003 | 1 6 | 5/23/2004 | 0 | 4/2/2003 | 6 M | Y | Y | Y |
| M2 | N | 2ND MAINT FEE DUE | 5/23/2000 | 90 M | 11/23/2007 | 1 6 | 5/23/2008 | 0 | 4/2/2003 | 6 M | Y | Y | Y |
| M3 | N | 3RD MAINT FEE DUE | 5/23/2000 | 138 M | 11/23/2011 | 1 6 | 5/23/2012 | 0 | 4/2/2003 | 6 M | Y | Y | Y |

This application has been transferred to another firm (unknown).

| INVENTORS | ASSIGNEES |
|-----------|-----------|
| Colvin, Stephen B. | Quickie LLC |
| Grossi, Eugene | |
| Katz, Alan | |
| Oddo, Paul | |

NOTES

Request for Ex-Parte Reexamination is granted. The previous ser.# is 09/198,067, with file date of 11/23/98.

EXHIBIT
3
6-10-08

GT 0001019

# EXHIBIT P

# Patent Record Sheet

| | | | |
|---|---|---|---|
| Docket ID | 051822-010700/US | Other Party | ☐ |
| Alternative ID | | File Reference | |

| | | | |
|---|---|---|---|
| Patentee/Assignees | Quickie, LLC | Client/Business Units | Quickie, LLC |
| Cost Centres | | Attorneys | Jacobs Albert L., Tropper Matthew B. |
| Inventors | Katz Alan, Grossi Eugene, Oddo Paul, Colvin Stephen B. | Office | New York |
| Country | United States of America | Prosecuting/Admin Agent | |
| Short Title | Passive Knotless Suture Terminator for Use in Minimally Invasive Surgery and to Fascilitate Standard Tissue Securing | Representative Agent | |
| | | Tax Receiver / Patent Office | |

| | | | |
|---|---|---|---|
| Convention | Priority | Application No | 90/006,460 |
| Origin | | Application Date | 25-Nov-2002 |
| Type | Patent | Grant No | 6,066,160 |
| Sub Type | Non-provisional application | Grant Date | 23-May-2000 |
| Status | Inactive | Independent Claims | |
| Sub Status | Transferred | Number of Dependent Claims | |
| | | Number of Multiple Dependent Claims | |

| License of Right ☐ | Small Entity ☑ | File Status Inactive | Annuity Instructions |
|---|---|---|---|

**Claimed Priorities & Parent Records**

| Relation | Docket ID | Date | No | Primary |
|---|---|---|---|---|
| Priority | 051822-010700/US/ | 11/23/1998 | | ☑ |

Long Title

Abstract Summary

Memo    Per phone conference with Al Jacobs on 4/18/06, he has taken responsibility for clients that Todd Sharinn worked on.
NOTE : Request for Ex-Parte Reexamination is granted. The previous ser.# is 09/198,067, with file date of 11/23/98.

International Classes

National Classes

Keywords

Utilizations

Technology Areas

Prior Art

Literature



EXHIBIT
8
6-10-08

GT 0001017

# Patent Record Sheet

Patents/Inventions

Related Cases

Diary

| Docketed | Action / Event<br>Memo | Recorded No | Reminder | Due | Done/Record | Resp Party |
|---|---|---|---|---|---|---|
| 09-Aug-2002 | Priority Date | | | | 23-Nov-1998 | |
| 09-Aug-2002 | Mailed Date | | | | 23-Nov-1998 | |
| 09-Aug-2002 | Grant Date | 6,066,160 | | | 23-May-2000 | |
| 09-Aug-2002 | Application Date | 90/006,460 | | | 25-Nov-2002 | |
| 09-Aug-2002 | Expiration Date | | | | 02-Apr-2003 | |
| | POA REVOKED | | | | 02-Apr-2003 | TSS |
| | 3.5 Tax Due | | | 23-Nov-2003 | 02-Apr-2003 | TSS |
| | Base Date: 5/23/2000 Old Action: 1ST MAINT FEE DUE | | | | | |
| | 1ST MAINT FEE DUE - Final | | | 23-May-2004 | 02-Apr-2003 | TSS |
| | Base Date: 5/23/2000 | | | | | |
| | 2ND MAINT FEE DUE | | | 23-Nov-2007 | 02-Apr-2003 | TSS |
| | Base Date: 5/23/2000 | | | | | |
| | 2ND MAINT FEE DUE - Final | | | 23-May-2008 | 02-Apr-2003 | TSS |
| | Base Date: 5/23/2000 | | | | | |
| | 3RD MAINT FEE DUE | | | 23-Nov-2011 | 02-Apr-2003 | TSS |
| | This application has been transferred to another firm (unknown).<br>Base Date: 5/23/2000 | | | | | |
| | 3RD MAINT FEE DUE - Final | | | 23-May-2012 | 02-Apr-2003 | TSS |
| | This application has been transferred to another firm (unknown).<br>Base Date: 5/23/2000 | | | | | |

| | | | |
|---|---|---|---|
| Date created | 09-Aug-2002 | Created by | PC |
| Date Amended | 25-Oct-2006 | Updated by | CORDESP |

Document Management System (DMS)

GT 0001018

# EXHIBIT Q

**Dr. Aubrey Galloway**

Page 1

1

2 UNITED STATES DISTRICT COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 ------------------------------

5 QUICKIE, LLC,

6          Plaintiff,

7    vs.                          07-CV-10331

8 GREENBERG TRAURIG, LLC,      (RMB)(DFE)

9 et al.,

10          Defendants.

11 ------------------------------

12

13

14                              COPY

15

16      DEPOSITION OF AUBREY GALLOWAY

17         Thursday, June 12, 2008

18               9:30 a.m.

19

20

21

22 Reported by:

23 Joan Urzia, RPR

24 JOB NO. 203729

25

**Dr. Aubrey Galloway**

Page 23

1              A. Galloway

2 BY MR. KAMINSKY:

3    Q.    **Please try to answer my question.**

4         **When is the first time that you**

5 **personally learned that maintenance fees**

6 **would have to be paid by a patent holder?**

7 **I'm simply asking you when you learned that**

8 **fact.**

9    A.    Sometime around the time of the

10 issuance of the S&A Rings patent and the

11 '160 Patent.

12   Q.    **So that would have been in the**

13 **late 1990s or about 2000, is that correct?**

14   A.    Correct.

15   Q.    **And Mr. Sharinn told you that**

16 **fact, didn't he?**

17   A.    To my recollection, correct.

18   Q.    **Now, did you or anyone else at**

19 **the Colvin Galloway companies do anything**

20 **within the companies to make a note of the**

21 **fact that maintenance fees were going to**

22 **become due on the patent or patents?**

23   A.    Yes, we employed Mr. Sharinn's

24 law firm to do that.

25   Q.    **Did you do anything internally**

**Dr. Aubrey Galloway**

Page 26

1                    A. Galloway

2 patents?

3    A.    I don't think I can simply answer

4 that yes or no.

5    **Q.    Can you say anything more than**

6 **you can't answer it yes or no to tell us**

7 **whether you were or were not looking to**

8 **Mr. Fell for that role?**

9    A.    Well, I mean, I thought you

10 wanted a yes or no answer.

11    **Q.    Well, can you say yes, I was to**

12 **this extent or not to that extent, is there**

13 **anything more you can say?  If there isn't,**

14 **okay, I'm going to let it go at that.**

15    A.    No, there's nothing else.

16    **Q.    Okay.**

17         **Now, Mr. Sharinn told you when**

18 **each patent was issued that maintenance**

19 **fees would be due three and a half years,**

20 **seven and a half years and 11 and a half**

21 **years from the date the patent issues, is**

22 **that correct?**

23    A.    I believe that's probably

24 correct, yes.

25    **Q.    Did anyone within the Colvin**

**Dr. Aubrey Galloway**

Page 27

1          A. Galloway

2 Galloway companies diary any of those dates

3 or make any entries in your records to keep

4 track of those dates?

5     A.    I don't know the answer to that.

6     **Q.    You were the managing member of**

7 **the entities, is that correct?**

8     A.    That's correct.

9     **Q.    Did you do so?**

10    A.    No.

11    **Q.    Did you direct anyone to do so?**

12    A.    No.

13    **Q.    Now, are you aware that the bills**

14 **for the various Colvin Galloway entities**

15 **were sent to Mr. Steiner's law firm?**

16    A.    Yes.

17    **Q.    Who decided -- I'm sorry, did I**

18 **say Mr. Steiner's law firm?  I meant**

19 **Mr. Fell's law firm.  Did you understand**

20 **that?**

21    A.    The Rick Steiner law firm that

22 employed Mr. Fell, correct.

23    **Q.    Who directed that the legal bills**

24 **from the various IP counsel should go to**

25 **the entity's care of the Rick Steiner law**

**Dr. Aubrey Galloway**

Page 37

1            A. Galloway

2 at times significant expenditures beyond

3 the inflow of cash, particularly once we

4 were not within a development agreement,

5 and so therefore there were calls for

6 capital cash flow into that.

7    **Q.    Now, Quickie, as you said, had**

8 **two patents, correct?  Did Quickie enter**

9 **into a license agreement with anyone other**

10 **than Medtronic with respect to the '160**

11 **Patent?**

12    A.    No, we entered into -- the only

13 license agreement that we actually entered

14 into with the '160 Patent was Medtronic.

15    **Q.    How long did that license**

16 **agreement last?**

17            MR. DIAMOND:  Objection to form.

18            MR. KAMINSKY:  Okay.  Let me

19    restate the question.

20 BY MR. KAMINSKY:

21    **Q.    What was the duration of that**

22 **license agreement?**

23    A.    I don't recall the exact amount

24 of time.  It was to my recollection several

25 years, maybe two years, maybe around that

**Dr. Aubrey Galloway**

Page 38

1                      A. Galloway

2 time.

3      Q.     And Medtronic terminated the

4 license agreement, is that correct?

5      A.     Correct.

6      Q.     Why did Medtronic terminate the

7 license agreement?

8             MR. DIAMOND:   Objection to form.

9      Lack of foundation.   If you know.

10     A.     First of all, I don't know

11 exactly their business reasons for

12 terminating the agreement.   We were working

13 on a specific product with Medtronic and we

14 got up to a certain point and they at that

15 point decided they did not want to go

16 forward with that development agreement,

17 but the specific reasons I don't know.

18     Q.     Who would know the answer to that

19 question?

20     A.     I suppose the people in Medtronic

21 that made that decision.

22     Q.     Did Mr. Fell ever tell you that

23 Medtronic told him that they didn't think

24 that the technology was capable of being

25 commercialized?

**Dr. Aubrey Galloway**

Page 39

```
 1                    A. Galloway

 2      A.    I don't recall that.

 3      Q.    There was a lawsuit between

 4 Quickie and Medtronic in the Federal Court

 5 in New York starting in 2002 and for some

 6 years thereafter, is that correct?

 7      A.    That's correct.

 8      Q.    You were deposed in that lawsuit,

 9 is that correct?

10      A.    That's correct.

11      Q.    Are you aware that Mr. Fell was

12 also deposed in that lawsuit?

13      A.    I believe that's correct.

14      Q.    Did you ever read Mr. Fell's

15 deposition in that lawsuit?

16      A.    Not that I recall.

17      Q.    I'm going to read you some

18 testimony from Mr. Fell's deposition and

19 tell me if this is the first time you've

20 ever heard that, this testimony.

21            This is on page 87 of his

22 transcript:

23            QUESTION:   So Medtronic never

24      told you why they terminated the

25      agreement?
```

**Dr. Aubrey Galloway**

Page 40

```
 1            A. Galloway
 2         ANSWER:   Not specifically.
 3         QUESTION:   Did they generally?
 4         ANSWER:   Generally, they said
 5     they didn't think the technology was
 6     capable of being commercialized."
 7     Q.    Did you ever hear that testimony
 8 before?
 9     A.    Not that I recall.
10     Q.    Were you aware that Mr. Fell had
11 given testimony substantially of that
12 nature?
13         MR. DIAMOND:   Objection to form.
14     A.    Well, I was aware that he gave
15 testimony, but as I said, I hadn't really
16 read his testimony.
17     Q.    Now, the Colvin Galloway entities
18 did not attempt to license the '160 Patent
19 to anyone else after Medtronic terminated
20 its license with Quickie, is that correct?
21     A.    No, that's -- well, let me think
22 about that one minute -- no, that's not
23 correct.
24     Q.    Do you remember that you were
25 deposed in the Quickie Medtronic case on
```

**Dr. Aubrey Galloway**

Page 41

1              A. Galloway

2 July 30, 2003?

3     A.    Yes, I do.

4     **Q.    In that deposition you were asked**

5 **this question and gave this answer on page**

6 **128:**

7              QUESTION:    After the

8         termination, did you attempt to pursue

9         this technology we've been talking

10        about with a company other than

11        Medtronic?

12              ANSWER:    No.

13              Do you recall giving that

14 testimony?

15    A.    Yes, I do.

16    **Q.    Okay.**

17         **Is that testimony correct?**

18    A.    At that time it was correct.

19    **Q.    Have you since this deposition**

20 **sought to license the '160 Patent?**

21    A.    Yes.

22    **Q.    When did you attempt to do so?**

23    A.    It was -- I don't know the exact

24 date -- it was approximately the same time

25 that we found that the patent had not been

**Dr. Aubrey Galloway**

Page 44

1              A. Galloway

2 2006 that you learned that?

3    A.    It appeared that according to

4 this document that it was around 2006.

5    **Q.    Do you have any other information**

6 **as to when you learned or -- strike that.**

7         **Do you deny that it was on July**

8 **23rd, 2006?**

9         MR. DIAMOND:  Objection to form.

10   A.    I guess I can't confirm or deny.

11 I don't remember specifically.

12   **Q.    After the patent expired, Quickie**

13 **attempted to get the patent reinstated, is**

14 **that correct?**

15   A.    That's correct.

16   **Q.    Did you participate with**

17 **Quickie's counsel in preparing the papers**

18 **that were submitted in support of the**

19 **petition to reinstate the patent?**

20   A.    No.

21   **Q.    Do you remember submitting a**

22 **statement in support of the petition to**

23 **reinstate the patent?**

24   A.    I remember there was a statement

25 submitted.

**Dr. Aubrey Galloway**

Page 45

```
 1              A. Galloway

 2      Q.    Let me show you a document that's

 3 been marked Exhibit 54, which is a

 4 supplement to the petition that's signed by

 5 Maier & Maier.

 6           Do you know who Maier & Maier

 7 are?

 8      A.    Yes, I do.

 9      Q.    They were your, they were

10 Quickie's counsel in connection with the

11 application and petition to reinstate the

12 patent, is that right?

13      A.    Yes, they were.

14      Q.    And, in fact, you personally

15 signed the Power of Attorney that gave him

16 authority to do that on behalf of Quickie,

17 didn't you?

18      A.    Not that I recall.

19           (Exhibit 55, Petition to Accept

20      Unavoidably Delayed Payment of

21      Maintenance Fees in an Expired Patent

22      (37 CFR 1.378(b)), marked for

23      identification, as of this date.)

24 BY MR. KAMINSKY:

25      Q.    Let me show you a document
```

**Dr. Aubrey Galloway**

Page 46

1              A. Galloway

2 which we are marking Exhibit 55.

3 It's entitled petition to accept

4 unavoidably delayed payment of

5 maintenance fees in an expired patent

6 (37 CFR 1.378(b)).

7              I ask you whether you've ever

8 seen that document before.

9     A.    Yes, I must have seen this

10 document and I signed this document.

11    **Q.    And does that refresh your**

12 **recollection that you signed the grant of**

13 **limited Power of Attorney whereby you**

14 **appointed Maier & Maier as counsel for**

15 **Quickie in connection with the petition to**

16 **reinstate the patent?**

17    A.    This document says that we

18 granted limited Power of Attorney to Maier

19 & Maier for the above-referenced petition

20 in the Patent and Trademark Office.

21    **Q.    In fact, it says, to be complete,**

22 **that Maier & Maier, Timothy Maier and**

23 **Christopher Maier, both jointly and**

24 **separately as attorneys with full power of**

25 **substitution and revocation file and**

**Dr. Aubrey Galloway**

Page 47

1          A. Galloway

2 prosecute this, the above petition, in the

3 Patent and Trademark Office, is that

4 correct?

5     A.    That's what it says, correct.

6     **Q.    And that's what the Power of**

7 **Attorney is for, is that right?**

8     A.    My understanding is that's true.

9     **Q.    And you signed it, correct?**

10    A.    Correct.

11    **Q.    Now, would you look again at**

12 **Exhibit 54 that I handed to you.    That's a**

13 **document that Maier & Maier submitted on**

14 **behalf of Quickie, is that correct, in**

15 **connection with the petition to reinstate**

16 **the patent, correct?**

17    A.    Yes, it appears that that's a

18 letter prepared by Timothy Maier.

19    **Q.    On behalf of Quickie, correct?**

20    A.    Correct.

21    **Q.    As a supplement to the petition**

22 **under 37 CFR Section 1.378(b), correct?**

23    A.    Correct.

24    **Q.    Would you look at the first full**

25 **paragraph of that supplement, do you see in**

**Dr. Aubrey Galloway**

Page 48

```
 1              A. Galloway
 2 that Mr. Maier says on behalf of Quickie:
 3         "The actions and inactions of
 4 Thelen Reid & Priest, Medtronic's
 5 re-examination requests and even the U.S.
 6 PTO led the patent owner to believe that
 7 their '160 Patent was viable.  Not until
 8 July 23, 2006 did the patent owner first
 9 learn that their valuable '160 Patent had
10 expired."
11         Do you see that?
12    A.    Yes, I do.
13    Q.    Is that a correct statement?
14    A.    I believe that's correct.
15    Q.    Now, between July 2003 when you
16 gave your deposition in the Medtronic
17 action and July 2006 when Quickie learned
18 that the patent had expired, did Quickie
19 enter into a license agreement with any
20 other entity?
21    A.    Are you asking related to the
22 '160 Patent?
23    Q.    Yes.
24    A.    Between that time interval,
25 Quickie did not enter into a licensing
```

**Dr. Aubrey Galloway**

Page 55

1          A. Galloway

2      **Q.      And do you recall that the**

3  **Greenberg firm remained counsel through the**

4  **Markman Hearing which occurred in September**

5  **of 2002?**

6      A.      Yes.

7      **Q.      Promptly thereafter Greenberg**

8  **Traurig was replaced as counsel for Quickie**

9  **in that matter, is that correct?**

10     A.      Correct.

11     **Q.      That being the Medtronic case?**

12     A.      Yeah, shortly after the Markman

13  Hearing we replaced Greenberg Traurig as a

14  representative for litigation against

15  Medtronic with Thelen.

16     **Q.      Who made the decision to transfer**

17  **the case from Greenberg Traurig to Thelen**

18  **Reid & Priest?**

19     A.      Dr. Colvin and I did.

20     **Q.      Was there a particular lawyer at**

21  **Thelen Reid & Priest that you transferred**

22  **the case to?**

23     A.      I believe that -- well, there was

24  I think two lawyers, there was Mark Evens

25  and Bob Krebs.

**Dr. Aubrey Galloway**

Page 56

1              A. Galloway

2      Q.      Did you know either of those two

3  lawyers before the fall of 2002?

4      A.      Personally I did not.

5      Q.      Did Dr. Colvin know them?

6      A.      I believe Dr. Colvin knew Mark

7  Evens.

8      Q.      During that year Mark Evens

9  became Dr. Colvin's brother-in-law, is that

10 correct?

11     A.      I believe that's correct.

12     Q.      Is that why the business was

13 transferred to Thelen Reid & Priest?

14     A.      No.  I think that's how

15 Dr. Colvin became to know Mark Evens and

16 then Dr. Colvin and I discussed how we

17 wanted to proceed with our litigation and

18 we felt that Thelen Reid & Priest was the

19 team we wanted to use.

20     Q.      Well, in fact, everyone was more

21 than satisfied with the result of the

22 Markman Hearing, isn't that correct?

23              MR. DIAMOND:  Objection to form.

24 BY MR. KAMINSKY:

25     Q.      Is it not correct that Quickie

**Dr. Aubrey Galloway**

Page 57

1              A. Galloway

2 was more than satisfied with the result of

3 the Markman Hearing that Greenberg Traurig

4 had handled for Quickie?

5      A.    Well, I can't speak for

6 Dr. Colvin, I can't speak for Alan Fell.  I

7 of my simplistic view of the Markman

8 Hearing understood that it was a fairly

9 favorable hearing.  So I was relatively

10 pleased with that.

11     **Q.    Did you have any criticism of**

12 **Greenberg Traurig or Mr. Sharinn in the**

13 **handling of the Medtronic case in or as of**

14 **September and October 2002?**

15              MR. DIAMOND:  You personally.

16     A.    I personally had a very good

17 personal and professional interaction with

18 Greenberg Traurig.

19     **Q.    Did you feel they had let you**

20 **down in any way?**

21     A.    No.

22     **Q.    Were you satisfied with their**

23 **legal services?**

24     A.    Yes.

25     **Q.    Did you feel that their legal**

**Dr. Aubrey Galloway**

Page 59

1          A. Galloway

2 had become his brother-in-law?

3          MR. DIAMOND:  Objection.  Form.

4     A.    I'm not aware of that.

5     Q.    Now, at a certain point you

6 revoked the authority for Greenberg Traurig

7 to represent Quickie before the United

8 States Patent and Trademark Office with

9 respect to the '160 Patent, is that

10 correct?

11          MR. DIAMOND:  Objection to form.

12    A.    Well, I don't know if that's -- I

13 don't know the specifics of that.

14    Q.    Let us show you Exhibit 50.

15          Exhibit 50 is a notice of a

16 change of Power of Attorney that was sent

17 to Todd Sharinn of the Greenberg firm on

18 April 2003.

19          Were you aware that there had

20 been a change of the Power of Attorney with

21 respect to the '160 Patent at the U.S.

22 Patent and Trademark Office?

23    A.    Yes.

24    Q.    That's just one page.  You're

25 welcome to look at anything you want.

**Dr. Aubrey Galloway**

Page 60

1              A. Galloway

2    A.    Yes, yes.

3    **Q.    Okay.**

4          **Now would you look at --**

5          MR. DIAMOND:  I don't know if

6    this is a good time, but wherever you

7    get a breaking point.

8          MR. KAMINSKY:  Sure, by all

9    means.

10         (Recess taken from 10:46 a.m. to

11    10:55 a.m.)

12 BY MR. KAMINSKY:

13    **Q.    Do you remember that Quickie**

14 **signed a revocation of the powers of**

15 **attorney that Greenberg Traurig previously**

16 **had with respect to the '160 Patent?**

17    A.    Yes.

18    **Q.    Let me show you a document which**

19 **has been marked Exhibit 51.  It's a letter**

20 **from Thelen Reid & Priest to Dr. Colvin at**

21 **Quickie dated April 16th which encloses and**

22 **attaches a revocation of power form with**

23 **respect to the '160 Patent.**

24          **Have you ever seen that document**

25 **before?**

**Dr. Aubrey Galloway**

Page 61

```
 1              A. Galloway
 2      A.    I don't recall that I have.
 3      Q.    Okay.
 4            Would you look at the last
 5 page -- I'm sorry, the second-to-last page
 6 of the document and do you see there is a
 7 signature on that, above the name that's
 8 printed Aubrey C. Galloway.
 9            Do you see that?
10      A.    Yes, I do.
11      Q.    Is that your signature above
12 that?
13      A.    Yes, it is.
14      Q.    Now, would you look at the page
15 just before that and do you see that that
16 is a document which is entitled Power of
17 Attorney by assignee of entire interest
18 revocation of prior powers.
19            Do you see that?
20      A.    Yes.
21      Q.    You signed that document on
22 behalf of Quickie, is that right?
23      A.    Yes.
24      Q.    And there is a handwritten date
25 of March 4, 2003.
```

**Dr. Aubrey Galloway**

Page 62

1          A. Galloway

2          Do you see that?

3     A.    Yes.

4     **Q.    Did you write that date in?**

5     A.    Yes.

6     **Q.    And is that the date you signed**

7 **the document?**

8     A.    Yes.

9     **Q.    Do you know when this document**

10 **was submitted to the United States Patent**

11 **and Trademark Office?**

12    A.    It looks like it was mailed on

13 3/20/03.

14    **Q.    And you're looking at the**

15 **certificate of mailing on the last page of**

16 **the document, is that correct?**

17    A.    Correct.

18    **Q.    Now, turning to the first page of**

19 **that document, do you see that the cover**

20 **letter says in the second paragraph "Also**

21 **enclosed is a copy of Power of**

22 **Attorney/Revocation of Prior Powers of**

23 **Attorney filed with the United States**

24 **Patent and Trademark Office on March 20,**

25 **2003 for your records."**

**Dr. Aubrey Galloway**

Page 63

1          A. Galloway

2          Do you see that?

3     A.   Yes.

4     Q.   Is that when you understand that

5 Thelen Reid & Priest on behalf of Quickie

6 filed this document with the United States

7 Patent Office, that is the enclosed Power

8 of Attorney/Revocation of Prior Power Form?

9     A.   Yes.

10    Q.   Now, turning to the Power of

11 Attorney/Revocation of Prior Powers Form,

12 do you see that the document says under the

13 heading Revocation of Prior Powers of

14 Attorney, "All Powers of Attorney

15 previously given are hereby revoked"?

16         Do you see that?

17    A.   Yes.

18    Q.   And then it says, new Power of

19 Attorney, it says, "The following attorneys

20 or agents are hereby appointed to prosecute

21 and transact all business in the Patent and

22 Trademark Office connected therewith."

23         Do you see that?

24    A.   Yes.

25    Q.   And then there are a number of

**Dr. Aubrey Galloway**

Page 64

1                    A. Galloway

2 names underneath that starting with Robert

3 E. Krebs.

4            Do you see that?

5    A.    Yes.

6    Q.    **Mr. Krebs was a partner at Thelen**

7 **Reid & Priest, is that right?**

8    A.    Yes.

9    Q.    **Is it your understanding that all**

10 **of these other attorneys or getting the new**

11 **Power of Attorney were attorneys at Thelen**

12 **Reid & Priest?**

13    A.    Yes.

14    Q.    **And this is, as it says at the**

15 **top, a form in connection with Patent**

16 **Number 6,066,160.**

17            **Is that right?**

18    A.    Yes.

19    Q.    **The passive knotless suture**

20 **terminator for use in minimally invasive**

21 **surgery and to facilitate standard tissue**

22 **securing, is that right?**

23    A.    Yes.

24    Q.    **And that's the one that's at**

25 **issue in this lawsuit, is that right?**

**Dr. Aubrey Galloway**

Page 66

1                A. Galloway

2 for the following attorneys are appointed

3 to prosecute and transact all business in

4 the Patent and Trademark Office connected

5 therein, as it says.

6       **Q.    And who typed in the names of the**

7 **new attorneys, that is the Thelen Reid &**

8 **Priest attorneys?  Do you know who typed**

9 **those names in?**

10      A.    I don't know.

11      **Q.    Who prepared the form before it**

12 **was signed and submitted?**

13      A.    I don't know.

14      **Q.    Who advised Quickie that it**

15 **should submit this form to the U.S. Patent**

16 **and Trademark Office?**

17      A.    I believe that either Hal Berner

18 or Robert Krebs from Thelen may have

19 prepared the form, but I'm not sure, and

20 that Alan Fell would have reviewed the form

21 and advised us to sign it.

22      **Q.    And you did so, right?**

23      A.    Correct.

24      **Q.    Are you aware that another copy**

25 **of this form was signed and submitted in**

**Dr. Aubrey Galloway**

Page 75

1           A. Galloway

2 I didn't mean to interrupt you.

3    A.    I don't think that was the

4 question you asked me before.

5    **Q.    What were you doing by this**

6 **letter?**

7    A.    At this point I have to recall

8 where we were with the -- I mean, what I

9 recall is that we were giving powers of

10 attorney and the matters related to Quickie

11 with our own going patent and/or

12 infringement cases to Mark Evens and Sterne

13 Kessler Goldstein and Fox.

14    **Q.    You were essentially replacing**

15 **Thelen Reid & Priest with Mark Evens' new**

16 **firm, isn't that correct?**

17    A.    Correct.

18    **Q.    As your counsel in connection**

19 **with your patent matters?**

20    A.    That's what I believe we were

21 doing at that point, yes.

22    **Q.    Yes.**

23           **And that's shortly after you have**

24 **learned as we've showed before that the**

25 **'160 Patent has expired, is that right, or**

**Dr. Aubrey Galloway**

Page 76

```
 1                 A. Galloway
 2 had been abandoned or deemed abandoned by
 3 the Patent Office, whatever the correct
 4 terminology is, from the Patent Office?
 5     A.     I believe that's the correct time
 6 period.
 7     Q.     Is that why you replaced Thelen
 8 Reid & Priest, because the abandonment of
 9 the patent?
10           MR. DIAMOND:   Objection to form.
11     A.     That may have been one of the
12 reasons.   Another reason -- I don't recall
13 our entire thought processes, but again, I
14 think we had a lot of confidence in Mark
15 Evens as an attorney and as he changed the
16 firms, we had confidence to deal with them.
17     Q.     Now, shortly after that, you
18 hired Maier & Maier to petition to
19 reinstate the '160 Patent, correct?
20     A.     I don't recall the exact
21 timetable.
22     Q.     Let me show you Exhibit 55 again.
23           Does that refresh your
24 recollection, looking at the third page of
25 that document, that it was in October 2006
```

**Dr. Aubrey Galloway**

Page 77

1                    A. Galloway

2 that you gave a Power of Attorney to the

3 Maier & Maier firm to petition to reinstate

4 the '160 Patent?

5      A.    Yes, that's what this says.

6      **Q.    Now, you personally signed a**

7 **statement in support of that petition,**

8 **didn't you?**

9      A.    I don't recall.

10     **Q.    Let me show you a document which**

11 **we've marked Exhibit 53 in a previous**

12 **deposition.  It is a statement in support**

13 **of petition under 37 CFR Section 1.378(c)**

14 **which appears to bear the signature on the**

15 **second page Aubrey C. Galloway and the**

16 **handwritten date of October 27, 2006.**

17            **Is that your signature on the**

18 **second page?**

19     A.    No.

20     **Q.    Whose signature is that?**

21     A.    Well, I recall this circumstance.

22 You can look at the other signatures, it's

23 clearly not the same signature.

24            At the time that the patent was,

25 we found out that patent was not, had not

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

Dr. Aubrey Galloway

Page 78

1              A. Galloway

2 continued because of lack of payment, we

3 shortly thereafter hired or retained Maier

4 & Maier to have Power of Attorney to

5 attempt to get that reinstated and granted

6 them Power of Attorney as you showed me in

7 Exhibit 55.

8              I recall that they were under

9 some pressure to go to the Patent Office

10 and wanted to walk through a petition to

11 reinstate and that they would fax something

12 up to my office or send something up to my

13 office to give them that authority.

14              I recall that I was going to be

15 in the operating room, or I was in the

16 operating room, I operate every day, and I

17 believe this exhibit came up, it was signed

18 by someone in my office and then sent back

19 to them due to the matter of what was

20 related to me to be an urgency of

21 turnaround.

22    Q.    **Did you authorize someone to sign**

23 **on your behalf?**

24    A.    Yes, I would have spoken promptly

25 to Maier & Maier and authorized someone in

Dr. Aubrey Galloway

Page 79

```
1                   A. Galloway
2  my office to sign on my behalf.
3      Q.    So you stand by that signature as
4  if it were your own signature, is that
5  correct?
6      A.    I stand by that I authorized
7  someone to sign this, but I actually didn't
8  see this until a couple of weeks ago.
9      Q.    In this action we served requests
10 to admit upon Quickie, and in response to
11 the request to admit, a clean copy of which
12 we will mark Exhibit 58, we asked for an
13 admission on the following item, number 24
14 and got the following response:
15            Exhibit D, this is number 24,
16 "Hereto is a true and correct copy of the
17 statement in support of petition dated
18 October 27, 2006 signed by Aubrey Galloway
19 as the managing partner of Quickie which
20 was filed with PTO in 2006 (the statement
21 in support)."
22            The response is admit.  Do you
23 see that.
24     A.    Yes, I see that.
25            MR. DIAMOND:  I understand
```

Page 80

1          A. Galloway

2     there's a difference in who has got

3     which copies, but we'll stipulate that

4     it says what it says.

5          Also, for the record, we'll be

6     supplementing, because when these were

7     submitted and filed, we did not know

8     either as to the testimony that

9     Dr. Galloway has now given.

10     **Q.    Dr. Galloway, are you telling us**

11 **you told someone in your office they could**

12 **sign a document without your having first**

13 **read it?**

14     A.     Yeah.

15     **Q.     And you never read that document**

16 **again after that until just before this**

17 **deposition?**

18     A.     That's correct.

19     **Q.     Is that what you're telling us?**

20          **Did you ever read the materials**

21 **that Maier & Maier submitted on your behalf**

22 **in this lawsuit?**

23     A.     I subsequently read other

24 materials that Maier & Maier submitted on

25 our behalf, I think, several months beyond

**Dr. Aubrey Galloway**

Page 81

1          A. Galloway

2 this letter that I think fully outlined the

3 reasons that we thought the patent should

4 not have lapsed, and I think that was

5 submitted several months after that to a

6 much more extensive document to the Patent

7 Office, around March or something like

8 that.

9     **Q.    Were you aware at the time you**

10 **authorized someone to sign this document**

11 **that the statements that were going to be**

12 **made were being made under the penalties of**

13 **perjury?**

14     A.    I probably was, yes.

15     **Q.    Okay.**

16          **Have you ever notified the Patent**

17 **and Trademark Office that any statement in**

18 **Exhibit 53 is false and incorrect?**

19          MR. DIAMOND:  Objection to form.

20     A.    Well, I think, again, the

21 Maier --

22     **Q.    I'm going to restate the question**

23 **because I don't want to have an objection**

24 **here.**

25          **Have you ever notified the United**

**Dr. Aubrey Galloway**

Page 82

1                   A. Galloway

2  States Patent and Trademark Office that any

3  statement in Exhibit 53, the statement

4  signed for you under your name, was

5  incorrect?

6     A.     Our attorneys Maier & Maier

7  notified the Patent Office of a more

8  extensive clarification of that statement

9  which was not incorrect, but was

10  incomplete.

11     **Q.     Did you ever tell the Patent**

12  **Office that there were incorrect statements**

13  **in your statement?**

14              MR. DIAMOND:  Objection to form.

15     A.     Are you asking me personally?

16     **Q.     Well, I'll start with you**

17  **personally.**

18              **Did you personally ever do that?**

19     A.     No.

20     **Q.     Has anyone on your behalf filed a**

21  **statement by you under penalty of perjury**

22  **saying that the prior statement you gave to**

23  **the Patent Office was incorrect in any way?**

24              MR. DIAMOND:  Objection to form.

25     A.     I don't think it was incorrect.

**Dr. Aubrey Galloway**

Page 83

1              A. Galloway

2    **Q.    Okay.**

3    A.    It was incomplete.

4    **Q.    Okay.**

5          **But you don't think it was**

6    **incorrect, is that right?**

7    A.    I don't think it was incorrect.

8    I think it was incomplete.

9    **Q.    All right.**

10          **Now, let me read you a statement**

11    **in the statement submitted under your**

12    **signature, or over your signature.**

13          **Paragraph 2 says:  "As the**

14    **managing partner for Quickie, LLC, I**

15    **retained Robert E. Krebs, et al. of the**

16    **Thelen Reid & Priest, LLP law firm to**

17    **transact all post-issuance proceedings and**

18    **responsibilities in the Patent and**

19    **Trademark Office, including but not limited**

20    **to re-examination proceedings and timely**

21    **payment of the maintenance fee."**

22          **Do you see that?**

23    A.    Yes, I do.

24    **Q.    Is that statement correct?**

25    A.    I think it is correct.

**Dr. Aubrey Galloway**

Page 84

1          A. Galloway

2     **Q.    When did you retain Mr. Krebs to**

3 **do that?**

4     A.    I don't recall the specific date.

5     **Q.    Is that at the time that the**

6 **Power of Attorney revocation of Power of**

7 **Attorney form that we showed you before**

8 **that's included in Exhibit 51 was submitted**

9 **to the United States Patent and Trademark**

10 **Office?**

11    A.    I think that would be correct.

12    **Q.    Now, there is a second statement**

13 **in paragraph 3 that says:**

14          **"As managing partner of Quickie,**

15 **LLC, I retained the law firm of Thelen Reid**

16 **& Priest to concurrently conduct litigation**

17 **services for Quickie, LLC."**

18          **Is that statement correct?**

19    A.    Yes, I believe it is.

20    **Q.    And is that referring to the**

21 **Medtronic case?**

22    A.    I believe that's correct.

23    **Q.    Are you aware of any other**

24 **litigation on behalf of Quickie that the**

25 **Thelen Reid & Priest firm signed -- strike**

**Dr. Aubrey Galloway**

Page 85

1                    A. Galloway

2    that.

3            Are you aware of any other

4    litigation on behalf of Quickie in which

5    the Thelen Reid & Priest firm acted as

6    your, as Quickie's counsel?

7        A.    No.

8        Q.    **Did you read any of the other**

9    **documents at the time that were submitted**

10   **by the Maier & Maier firm in connection**

11   **with the petition to reinstate the '160**

12   **Patent?**

13           MR. DIAMOND:  Objection to form.

14       It's a little broad.

15       A.    Can I proceed with clarification?

16       Q.    **Sure.**

17       A.    Did I read at the time that the

18   documents were being submitted?  Did I read

19   them at that time?

20       Q.    **Yes.**

21       A.    No.

22       Q.    **Did you ever read them after**

23   **that?**

24       A.    Yes.

25       Q.    **When did you read them after they**

**Dr. Aubrey Galloway**

Page 86

1                    A. Galloway

2 were first submitted to the Patent Office?

3            MR. DIAMOND:  Same objection.

4      I'm not quite sure what documents

5      we're talking about here.

6            MR. KAMINSKY:  Okay.  Well, I'll

7      show specific documents to the witness

8      in a moment, and if I miss one, I'm

9      not trying to trap you.  That's not

10     the intention.

11 BY MR. KAMINSKY:

12     Q.    Do you remember when you

13 first read any of the documents that

14 were being submitted to or had been

15 submitted to the Patent Office on

16 behalf of Quickie in connection with

17 a petition to reinstate the patent?

18     A.    I don't remember exactly when.

19     Q.    Okay.

20           Let me show you a document which

21 we've marked Exhibit 52.

22           Exhibit 52 is a statement in

23 support of petition under 37 CFR 1.37(b)

24 signed by Todd S Sharinn dated November 20,

25 2006.

**Dr. Aubrey Galloway**

Page 87

1          A. Galloway

2          Have you ever seen that document

3  before?

4     A.    Yes, I have.

5     **Q.    When did you first see that**

6  **document?**

7     A.    Probably approximately two weeks

8  ago.

9     **Q.    In paragraph 2 of that document,**

10 **Mr. Sharinn states:**

11         **"My responsibility, including the**

12 **payment of any maintenance fee that may**

13 **become due, for the subject patent ended**

14 **prior to the date where the payment of a**

15 **first maintenance fee, was due as evidenced**

16 **by the enclosed revocation of prior powers**

17 **of attorney signed on behalf of Quickie,**

18 **LLC on March 4, 2003 wherein 'all prior**

19 **powers of attorney previously given (were)**

20 **hereby revoked.'"**

21         **Do you see that statement?**

22    A.    Yes, I do.

23    **Q.    Is that statement correct?**

24    A.    No.

25    **Q.    Are you aware of anyone on behalf**

**Dr. Aubrey Galloway**

1                    A. Galloway

2 of Quickie ever filing a paper or other

3 statement by Todd Sharinn ever retracting

4 this statement?

5     A.    Well, I'm going to read this

6 statement, if I may, that he certified that

7 the fee indication form in October 2002

8 certified and the forms was mailed to the

9 Patent Office on October 22nd and that the

10 PTO change of address form indicating Pepe

11 & Hazard was superseded.

12            That change of address form to my

13 understanding he sent to Greenberg and

14 remained at Greenberg and still remains at

15 Greenberg, if it exists.

16            He states, therefore, that his

17 responsibility, including the payment of

18 any maintenance fees, was therefore not due

19 because we revoked Power of Attorney, which

20 is clearly not true, because we continued

21 to employ Greenberg for the following year,

22 year and a half, related to Quickie,

23 related to additional patents with Quickie

24 that we subsequently got, related to

25 maintenance of this patent, and relating to

**Dr. Aubrey Galloway**

Page 89

1           A. Galloway

2 several other intellectual properties with

3 Quickie, and we paid them a hell of a lot

4 of money over that time, several hundred

5 thousand dollars.

6           So for him to make that statement

7 is completely God damn false -- excuse my

8 language.  But it's a misconception or a

9 misinterpretation of our entire business

10 relationship with him.

11     **Q.     Have you ever filed a statement**

12 **by you with the Patent Office, the Patent**

13 **and Trademark Office, saying what you just**

14 **said?**

15     A.     No.

16     **Q.     Are you aware of anybody filing a**

17 **statement by Mr. Sharinn saying that when I**

18 **made this statement under penalty of**

19 **perjury this statement was false?**

20     A.     It's incomplete.  It's

21 incomplete.

22     **Q.     Are you aware of anybody filing**

23 **any statement for Mr. Sharinn contradicting**

24 **this statement at any time?**

25     A.     I'm not aware, no.

**Dr. Aubrey Galloway**

Page 90

1          A. Galloway

2     Q.     Are you aware of anybody going to

3  Mr. Sharinn at any time and saying to

4  Mr. Sharinn, Mr. Sharinn, you filed this

5  statement on our behalf, we do not think it

6  is correct, we want you to file a different

7  statement?

8          Are you aware of that ever

9  happening?

10    A.     As I told you, I just saw this

11 statement two weeks ago.

12    Q.     So you're not aware of that

13 happening?

14    A.     That's correct.

15    Q.     Okay.

16          Now, are you aware that Maier &

17 Maier drafted this statement for

18 Mr. Sharinn to sign and went over it with

19 him before it was signed?

20    A.     No, I'm not.

21    Q.     Do you see that below

22 Mr. Sharinn's signature and the date, the

23 statement says care of Maier & Maier, PLLC,

24 and has their address, do you see that?

25    A.     I do see that, and I see that and

**Dr. Aubrey Galloway**

Page 91

1              A. Galloway

2 again, if I recall my dates, that was in

3 November 2006, and I recall that Maier &

4 Maier submitted a statement to the Patent

5 Office several months after that that

6 clarified and expanded our understanding of

7 this statement.

8    **Q.    Are you aware that in denying**

9 **your application, the U.S. Patent and**

10 **Trademark Office relied, among other**

11 **things, on this very statement that was**

12 **submitted by your counsel, Quickie's**

13 **counsel, to the U.S. Patent and Trademark**

14 **Office?**

15           MR. DIAMOND:  Object to the form.

16    A.    I don't know whether that's true

17 or not, and I'm not aware of how they make

18 their decision.

19    **Q.    Let me show you a document which**

20 **we'll mark Exhibit 59.**

21           **(Exhibit 59, Decision, marked for**

22      **identification, as of this date.)**

23 **BY MR. KAMINSKY:**

24    **Q.    Exhibit 59 is a decision on**

25 **petition by the U.S. Patent and Trademark**

**Dr. Aubrey Galloway**

Page 92

1              A. Galloway

2 Office which dismisses, in other words

3 denies, the petition by Quickie to

4 reinstate the patent.

5              Have you ever seen that document

6 before?  It's dated, by the way, March 6,

7 2007.

8      A.    Yes, I believe I've seen it.

9      Q.    **Now, would you look at page 4 of**

10 **that statement, of that decision.**

11     A.    Okay.

12     Q.    **Do you see the final paragraph,**

13 **before the conclusion, it says:**

14              **"Finally, the petition states**

15 **that on March 4, 2003 attorney Todd Sharinn**

16 **was responsible for the patent until March**

17 **4, 2003.  Subsequently, on December 5,**

18 **2003, patentee filed a change of attorney**

19 **docket and change of address notice**

20 **changing the correspondence address to that**

21 **of Thelen Reid.  Patentee has failed to**

22 **account for the period between March 4,**

23 **2003 when Sharinn's responsibility for the**

24 **patent terminated in December 5, 2003 when**

25 **the patentee filed a change of attorney**

**Dr. Aubrey Galloway**

Page 93

```
 1              A. Galloway
 2 docket number and change of address
 3 notice."
 4         Do you see that?
 5    A.    Yes, I do.
 6    Q.    Do you see Mr. Sharinn's
 7 statement earlier, it says that his
 8 authority was revoked, or his
 9 responsibility ended with the revocation of
10 powers, prior powers of attorney signed on
11 behalf of Quickie on March 4, 2003.
12              Do you see that?
13    A.    Are you referring to Exhibit 52?
14    Q.    Yes.
15    A.    Yes, I do see that.
16    Q.    Now, would you look again at
17 Exhibit 51, that's the letter that you
18 signed -- that's the letter that contains
19 the form, the March 2003 -- it's the letter
20 from Thelen Reid & Priest to Quickie
21 attaching the form that was filed with the
22 Patent Office in March -- do you see that
23 that's form you signed on March 4, 2003?
24    A.    Yes.
25    Q.    That's the form that Mr. Sharinn
```

**Dr. Aubrey Galloway**

Page 94

```
 1                 A. Galloway
 2 is referring to, isn't it?
 3             MR. DIAMOND:  Objection to form.
 4     A.    I don't know what he's referring
 5 to, but he may be referring to that.  He's
 6 referring to a Power of Attorney, and I
 7 think this was the Power of Attorney form,
 8 so it probably was.
 9     Q.    A Power of Attorney dated March
10 4, 2003?
11     A.    Correct.
12     Q.    That's what he says?
13     A.    Correct.
14     Q.    Are you aware of any other such
15 form dated March 4, 2003 that Quickie ever
16 signed?
17     A.    No.
18             MR. DIAMOND:  Objection to form.
19     Other than the one we've already
20     discussed today?
21             MR. KAMINSKY:  Yes.
22             MR. DIAMOND:  There were two.
23             MR. KAMINSKY:  I think I said
24     it -- yes, okay.
25 BY MR. KAMINSKY:
```

**Dr. Aubrey Galloway**

Page 95

1           A. Galloway

2     Q.    With your counsel's correction,

3  there were actually two of those forms

4  signed on March 4, 2003, both of which

5  revoked the prior Powers of Attorney and

6  appointed Thelen Reid & Priest and various

7  attorneys there as Quickie's counsel,

8  correct?

9     A.    Correct.

10    Q.    And are you aware of any other

11 form besides those two that was signed at

12 that time?

13    A.    I'm not aware of any.

14    Q.    Let me show you Exhibit 54.

15 Exhibit 54 is a supplement to petition

16 under 37 CFR Section 1.378(b) dated

17 December 4, 2006 and signed by Mr. Maier on

18 behalf of Quickie.  He actually dated it

19 December 1st, but the file stamp from the

20 Patent Office says December 4th.

21           Do you see that?

22    A.    Yes, I do.

23    Q.    When was the first time you ever

24 saw this document?

25    A.    I don't remember whether I

**Dr. Aubrey Galloway**

Page 96

1              A. Galloway

2 reviewed it in detail or read it in detail,

3 but I do recall that we were making an

4 amendment or a clarification to a filing

5 with the PPO at this time that this

6 document was going out, but I don't recall

7 that I read it in detail.

8      Q.    **When do you think you first read**

9 **it?**

10     A.    In detail, I probably first read

11 it approximately two weeks ago.

12     Q.    **Now, are you aware of anyone ever**

13 **filing a statement with the Patent Office**

14 **on behalf of Quickie saying that anything**

15 **in this supplemented petition, which we've**

16 **marked as Exhibit 54, is inaccurate?**

17     A.    I'm not aware of it.

18     Q.    **When you read it, did you**

19 **determine that anything in the statement**

20 **was inaccurate?**

21     A.    No, not that I recall.

22     Q.    **And that was two weeks ago,**

23 **correct?**

24     A.    Correct.

25     Q.    **Now, let's look on the first page**

**Dr. Aubrey Galloway**

Page 97

1                A. Galloway

2 of the document in the third paragraph, and

3 it says:

4                "A declaration by Todd Sharinn is

5 being added to Exhibit 7 showing that he

6 was an attorney at Pepe & Hazard, LLP and

7 was responsible for the '160 Patent.  Later

8 he left Pepe & Hazard, but continued to be

9 responsible for the '160 Patent as an

10 attorney at Greenberg Traurig (Exhibit 8).

11                "Further, his responsibility for

12 the '160 Patent ended prior to the time

13 period when payment of a first maintenance

14 fee was due) see Exhibits 3 and 10,

15 revocation of prior powers of attorney

16 signed on behalf of the patent owner on

17 March 4, 2003)."

18                Are you aware of anyone on behalf

19 of Quickie ever advising the Patent Office

20 that this statement made to the Patent

21 Office in December 2006 was false?

22                MR. DIAMOND:  Objection to form.

23      A.    I'm not aware of anyone making

24 that statement to me.

25      **Q.    Are you aware of anyone advising**

**Dr. Aubrey Galloway**

Page 98

1              A. Galloway

2 the Patent Office that this statement was

3 inaccurate in any way?

4     A.    No.

5     Q.    Now, continuing on, on page 2 --

6 at the bottom of page 2 in the last

7 paragraph that carries over to page 3, the

8 statement says:

9              "Thelen Reid & Priest was granted

10 and held sole and full power in the '160

11 Patent from March 4, 2003 through August

12 14, 2006 (Exhibits 3, 9 and 10).  This

13 period of time covered the time period up

14 until May 23, 2004 for timely paying the

15 first maintenance fee and the entire 2-year

16 time period starting from the date of the

17 '160 Patent's expiration to file a remedial

18 petition under the unintentional provision

19 (37 CFR 1.37(c)); this 2-year expiration

20 period ending on May 24, 2006."

21              Do you see that statement?

22     A.    Yes, I do.

23     Q.    Has anyone on behalf of Quickie

24 ever advised the U.S. Patent Office that

25 this statement that had been made to the

**Dr. Aubrey Galloway**

Page 99

```
 1                A. Galloway
 2 U.S. Patent Office was false?
 3            MR. DIAMOND:  Objection to form.
 4    Misleading.
 5    A.    I don't know if we've had any
 6 correspondence with the Patent Office on
 7 this or not.  I'm not aware if we have.
 8    Q.    Are you aware of anyone on behalf
 9 of Quickie advising the U.S. Patent Office
10 that this statement was inaccurate in any
11 way?
12            MR. DIAMOND:  Same objection.
13    A.    I'm personally not aware of it.
14    Q.    Would you look at the second full
15 paragraph on page 3 and let me read to you
16 the last two sentences of that paragraph:
17            "Thelen Reid & Priest failed to
18 discover and know that the '160 Patent had
19 expired when they filed, prepared and filed
20 amendments to claims and re-examination,
21 (Exhibit 14).  It also appears that Thelen
22 Reid & Priest failed to docket the patent
23 for payment of maintenance fees."
24    A.    No.
25    Q.    Are you aware of anyone on behalf
```

**Dr. Aubrey Galloway**

Page 100

1              A. Galloway

2 of Quickie ever advising the U.S. Patent

3 Office that that statement was false?

4     A.    No.

5     **Q.    Are you aware of anyone on behalf**

6 **of Quickie ever advising the U.S. Patent**

7 **and Trademark Office that that statement**

8 **was inaccurate in any way?**

9     A.    I seem to remember that there was

10 further correspondence with, from Maier to

11 the Patent Office, but I don't recall

12 exactly the specifics of that

13 correspondence.

14    **Q.    So you're not aware, as you sit**

15 **here, you personally are not aware of**

16 **anyone advising the U.S. Patent and**

17 **Trademark Office that the particular**

18 **statement I read to you was inaccurate?**

19              MR. DIAMOND:  Objection to form.

20       I think it mischaracterizes his

21       testimony.

22    A.    Again, all I can say is I believe

23 that there was a follow-up document to the

24 Patent Office from Maier which may have

25 further clarified this.  Whether that

**Dr. Aubrey Galloway**

Page 101

1               A. Galloway

2 characterizes it as accurate or not, I

3 can't say.

4     Q.    Let me read to you another

5 statement from the supplemental petition

6 that was filed on behalf of Quickie, on

7 page 4 --

8           MR. DIAMOND:  Same exhibit?

9           MR. KAMINSKY:  Same Exhibit 54.

10 BY MR. KAMINSKY:

11     Q.    "The patent owner" -- that's

12 Quickie, correct?

13     A.    Correct.

14     Q.    "The patent owner fully believed

15 that their valuable legal rights in the

16 '160 Patent would be justly protected by

17 the attorneys and law firm of Thelen Reid &

18 Priest when the patent owner chose them for

19 representation and executed the Power of

20 Attorney dated March 4, 2003 (see Exhibit

21 9).

22           "Unfortunately, such did not

23 occur and the patent owner was shocked to

24 learn from another party on March 23, 2006

25 that their '160 Patent had expired which

**Dr. Aubrey Galloway**

Page 102

1          A. Galloway

2 gravely prejudiced post-issuance litigation

3 proceedings and negotiations."

4          Do you see that statement?

5    A.    Yes, sir.

6    **Q.    Are you aware of anyone on behalf**

7 **of Quickie ever advising the U.S. Patent**

8 **office that that statement was false?**

9          MR. DIAMOND:  Objection to form.

10   A.    I'm not aware of anyone advising

11 the Patent Office specifically on this

12 statement.

13   **Q.    Are you aware of anyone advising**

14 **the Patent Office that statement was**

15 **inaccurate?**

16          MR. DIAMOND:  Same objection.

17   A.    Again, I don't have the documents

18 in front of me, but I am aware of Maier,

19 the Maier firm sending a further

20 correspondence to the Patent Office and I

21 don't, I'm not really, I guess, equipped to

22 say whether that would characterize this as

23 inaccurate or incomplete.

24   **Q.    Now, you are aware as you've just**

25 **said that the Maier firm submitted a**

**Dr. Aubrey Galloway**

Page 103

1            A. Galloway

2 petition for reconsideration of the

3 decision I showed you earlier and we marked

4 as Exhibit 59, denying the petition to

5 reinstate the patent, is that right?

6    A.    Yes.

7    **Q.    Did you ever read the decision by**

8 **the U.S. Patent and Trademark Office with**

9 **respect to the petition for**

10 **reconsideration?**

11            MR. DIAMOND:  Objection to form.

12    Asked and answered.

13            MR. KAMINSKY:  I don't think I

14    asked that.

15            MR. DIAMOND:  I thought we

16    covered this document, no?

17            MR. KAMINSKY:  No, this is the

18    second one.

19            MR. LODEN:  You're talking about

20    59?

21            MR. DIAMOND:  No, 59 is the

22    decision denying the petition to

23    reinstate the patent.

24            The witness has told us there was

25    a motion by Maier & Maier for

**Dr. Aubrey Galloway**

Page 104

1          A. Galloway

2     reconsideration of that decision.

3          Now I'm asking the witness did he

4     ever read the decision of the U.S.

5     Patent and Trademark Office with

6     respect to that petition for

7     reconsideration.

8          MR. DIAMOND:  Withdraw the

9     objection.

10    A.    I don't recall that I read it

11 specifically.  I was certainly aware of the

12 ruling and we were going to petition for

13 reconsideration, but I don't recall that I

14 specifically read their denial.

15    **Q.    They did deny the petition for**

16 **reconsideration, though, is that correct?**

17    A.    I believe that's correct.

18          MR. KAMINSKY:  Let me show you

19     Exhibit 60.

20          (Exhibit 60, Decision, marked for

21     identification, as of this date.)

22 BY MR. KAMINSKY:

23    **Q.    This is the decision on petition**

24 **of the U.S. Patent and Trademark Office**

25 **that is file stamped to show copy mailed**

**Dr. Aubrey Galloway**

Page 105

1                    A. Galloway

2  October 5, 2007.

3             I ask you if you've ever seen

4  that document before today.

5             MR. DIAMOND:  Just to clarify, we

6       haven't yet in these documents

7       identified whatever was filed on May

8       7, 2007, correct?

9             MR. KAMINSKY:  That's not an

10      exhibit, no.

11            MR. DIAMOND:  Okay.

12      A.    So can I hear the question again?

13      **Q.    Yes.**

14            **Have you ever seen this decision**

15  **of the U.S. Patent and Trademark Office?**

16      A.    Yes, I believe I have.

17      **Q.    When did you see this document?**

18      A.    I again may have seen it around

19  the time of its issuance, but I don't

20  recall specifics and I certainly reviewed

21  it approximately two weeks ago.

22      **Q.    Now, you explained that Maier &**

23  **Maier took issue with some of the prior**

24  **rulings of the U.S. Patent and Trademark**

25  **Office and filed some further papers, is**

**Dr. Aubrey Galloway**

Page 107

```
1              A. Galloway
2         MR. DIAMOND: Excuse me, sorry to
3     interrupt you.  I'm looking at the
4     original, it look like it's missing
5     pages or is incomplete, and I just
6     want to make sure.
7         MR. KAMINSKY: Oh, I wanted to
8     read page 3 and page 5, so you're
9     right.
10         Will you trust me to read it
11     faithfully?
12         MR. DIAMOND: Yes.
13         MR. KAMINSKY: I apologize.  We
14     didn't notice that.
15 BY MR. KAMINSKY:
16     Q.    Actually, the document consists
17 of six pages and what may have happened is
18 that we copied every other page, for which
19 I apologize.
20         I will read to you from page 3
21 that continues on to page 4.  At the bottom
22 of page 3, the decision says:
23         "Petitioner next disagrees with
24 the decisions, conclusion that Sharinn's
25 responsibility concluded on March 4, 2003
```

**Dr. Aubrey Galloway**

Page 108

1                    A. Galloway

2  and that there is no objective evidence to

3  support this conclusion."

4              In review of the supplement to

5  petition filed December 24, 2006 reveals

6  that petitioner herein filed a statement in

7  support of petition under 37 CFR 1.37 B

8  executed by Todd Sharinn wherein

9  Mr. Sharinn states on page 2 that:

10             "My responsibility included the

11 payment of any maintenance fee that may

12 become due for the subject patent ended

13 prior to the date wherein payment of a

14 first maintenance fee was due as evidenced

15 by the enclosed revocation of prior powers

16 of attorney signed on behalf of Quickie on

17 March 4, 2003 wherein all powers of

18 attorney previously given (were) hereby

19 revoked," and cites the statement of

20 Mr. Sharinn at P2.

21             Then it says the patent expired

22 on March 24, 2004.  The relevant period is

23 the period March 24, 2004 and the filing of

24 a grantable petition.

25             When you read this decision, did

**Dr. Aubrey Galloway**

Page 109

1                  A. Galloway

2 you see that the United States Patent and

3 Trademark Office had relied in denying your

4 petition for reconsideration on the

5 statement that Mr. Sharinn had made and

6 which your counsel had submitted on behalf

7 of Quickie that I read to you earlier?

8                  MR. DIAMOND:  Objection to form.

9     A.    I do see what they said here and

10 what they gave as their reasons, and I

11 guess that that -- that's about all I can

12 conclude from it.

13     **Q.    Has anyone gone back to the**

14 **Patent Office again, that is the Patent and**

15 **Trademark Office, and said with respect to**

16 **the petition for reconsideration wait a**

17 **minute, give us a chance to get another**

18 **statement that shows that what Mr. Sharinn**

19 **had said and that we submitted to you was**

20 **incorrect?**

21     A.    Excuse me, what's the date of

22 this document?

23     **Q.    The front page has a file stamp**

24 **from the office itself, that's the office**

25 **of the patent, the Patent and Trademark**

**Dr. Aubrey Galloway**

Page 121

1                    A. Galloway

2 this very statement, namely that his

3 responsibility had ended on March 4, 2003

4 when that revocation of Power of Attorney

5 form was filed.

6              Do you remember that?

7     A.    I do recall that.

8     **Q.    And you saw that in Exhibit 60**

9 **the decision of the Patent and Trademark**

10 **Office denying your petition for**

11 **reconsideration on pages 3 and 4, the U.S.**

12 **Patent and Trademark Office said we don't**

13 **agree with you there's no objective**

14 **evidence, in fact we specifically refer to**

15 **Mr. Sharinn's statement -- do you remember**

16 **that?**

17              MR. DIAMOND:  Objection to form.

18     A.    Yeah, I do understand what was

19 said in Exhibit 60.

20     **Q.    Do you take issue with the U.S.**

21 **Patent and Trademark Office's conclusion in**

22 **Exhibit 60 that there is objective evidence**

23 **in the record submitted by Quickie's**

24 **counsel and in fact Mr. Sharinn's**

25 **responsibility had ended on March 4, 2004?**

**Dr. Aubrey Galloway**

Page 123

1              A. Galloway

2 be taken under consideration, which they

3 did.

4              What I disagree with is that that

5 was all of the evidence involved for making

6 that decision.  I think there's potentially

7 other evidence that they could consider to

8 make that decision which they didn't have

9 available at the time of that decision.

10     Q.    Now, are you aware of any other

11 such evidence that was submitted to the

12 U.S. Patent and Trademark Office at any

13 time that contradicts Mr. Sharinn's

14 statement other than the statement in

15 Exhibit 61, your petition for

16 reconsideration that you don't agree with

17 Mr. Sharinn's statement, or that you then

18 don't, no longer agree with Mr. Sharinn's

19 statement?

20     A.    As of this time, we've not given

21 any other or we haven't submitted any other

22 petition to the Patent Office for further

23 reconsideration beyond what we submitted in

24 Exhibit 61.

25     Q.    This is now a year and a month

Dr. Aubrey Galloway

Page 124

1                    A. Galloway

2 after the U.S. Patent and Trademark Office

3 has denied your petition for

4 reconsideration, correct?

5      A.     Correct.

6      **Q.     And as of this time, you've**

7 **submitted no further evidence to the Patent**

8 **and Trademark Office, is that right?**

9           MR. DIAMOND:  Objection.  Asked

10     and answered.

11     A.     At this time or since that time,

12 since that rejection would have been in

13 litigation and we felt it's not wise to

14 submit for reconsideration while we were in

15 litigation, and it's my understanding that

16 at the time of this consideration that

17 there were many documents requested, that

18 we requested from Greenberg and from Thelen

19 and from Todd Sharinn for the Patent Office

20 which they didn't have available when they

21 made this decision and which we should

22 eventually make available to them so they

23 would have complete objective evidence.

24           But since we were in litigation,

25 we decided not to submit that information

**Dr. Aubrey Galloway**

Page 183

```
 1              A. Galloway

 2         (Pause)

 3 BY MR. KAMINSKY:

 4    Q.    Let me show you a document that

 5 we are marking 63.

 6         (Exhibit 63, U.S. Patent and

 7    Trademark Office decision, marked for

 8    identification, as of this date.)

 9    Q.    Let me show you a document which

10 we're marking Exhibit 63.  It is an action

11 taken by the U.S. Patent and Trademark

12 Office dated February 20, 2008 and

13 represents the decision on Medtronic's

14 request for re-examination of the '160

15 Patent.

16         Have you ever seen that before?

17    A.    No, I don't recall that I've seen

18 this before.

19    Q.    Are you aware that the U.S.

20 Patent and Trademark Office rendered a

21 decision that significantly narrowed the

22 '160 Patent from what had originally been

23 issued?

24         MR. DIAMOND:  Objection to form.

25    Assumes facts not in evidence.  Calls
```

**Dr. Aubrey Galloway**

Page 184

```
 1              A. Galloway
 2      for a legal conclusion.
 3              Also, when you say you, again, I
 4      have to clarify, I don't want to
 5      testify, but Dr. Colvin was aware of
 6      this in great detail on behalf of
 7      Quickie, so --
 8              MR. KAMINSKY:  Well, just to
 9      clarify for this, since Dr. Colvin has
10      passed away, we are assuming that
11      Dr. Galloway is the testifying expert
12      for Quickie and so I can't ask
13      Dr. Colvin obviously.
14              MR. DIAMOND:  Certainly.
15              MR. KAMINSKY:  So I'm really
16      asking him in that capacity.
17      A.      So as a representative of
18 Quickie, I was aware that there was such a
19 ruling and I think actually was made aware
20 of that by Dr. Colvin, but I didn't really
21 read that ruling and I haven't really seen
22 this until now.
23      Q.      Would you look at the third page
24 of the document, the page that's entitled,
25 "Office action and ex parte reexamination."
```

**Dr. Aubrey Galloway**

Page 185

1         A. Galloway

2             Do you see that?

3             Under part 2 where it says

4 summary of action, do you see that under

5 box 1A the decision of the Patent Office

6 notices that claims 1 through 34 were the

7 subject of a re-examination?

8     A.    Yes, I see that.

9     **Q.    And that's all of the claims that**

10 **were in the patent, is that right?**

11            MR. DIAMOND:  Objection to form.

12    If you know.

13    A.    I don't know specifically, but if

14 those were the 34 claims in the patent, I

15 understand that they were the subject of

16 reexamination, so I assume that's true.

17    **Q.    Were you aware that Medtronic was**

18 **making a challenge and seeking a**

19 **re-examination of the entire patent?**

20    A.    Yes.

21    **Q.    Now, do you see under part 2,**

22 **item 3 on the page we're talking about, the**

23 **patent office determined that claims 26 and**

24 **30 are patentable and are confirmed?**

25    A.    I do see that.

**Dr. Aubrey Galloway**

Page 186

1          A. Galloway

2      Q.    So they agreed that two of the

3  claims were patentable and confirmed,

4  correct?

5      A.    Connect.

6      Q.    And do you see under item 4 that

7  they determined that claims 1 through 25,

8  27 through 29 and 31 through 34 were

9  rejected, do you see that?

10     A.    Yes.

11     Q.    So they struck those claims from

12 the patent, is that right?

13          MR. DIAMOND:  Objection to form.

14 BY MR. KAMINSKY:

15     Q.    Is that what you understand

16 happened?

17     A.    I understand that the claims

18 listed under number 4, 1 to 25, 27 to 29

19 and 31 through 34 were rejected.

20     Q.    And therefore were not going to

21 be patentable, is that right?

22          MR. DIAMOND:  Objection to

23     form.

24     A.    Well, according to this ruling,

25 they were rejecting -- we would have I

**Dr. Aubrey Galloway**

Page 187

1          A. Galloway

2 think an opportunity to appeal that.

3     **Q.     Have you appealed that?**

4     A.     I think that we would have to go

5 back to the Patent Office in my

6 understanding for potential re-examination.

7 I'm not the attorney, so I don't know for

8 sure.

9     **Q.     Has Quickie instructed anyone to**

10 **appeal this decision or do anything to**

11 **attempt to overturn this decision that is**

12 **reflected in Exhibit 63?**

13          MR. DIAMOND:  You can answer

14     other than in the instructions that

15     you or Quickie would have given to its

16     counsel.

17          THE WITNESS:  Sure.

18     A.     Again, up until this point, since

19 we're under litigation, I think we haven't

20 instructed a specific action on this part

21 at this time.

22          MR. KAMINSKY:  No further

23     questions.

24          MR. DIAMOND:  I will reserve all

25     my questions for this witness until

**Dr. Aubrey Galloway**

Page 188

1          A. Galloway

2      the time of trial.

3          MR. KAMINSKY:  Okay.  Thank you.

4          (Time noted:  1:46 p.m.)

5

6                    _____

7                    AUBREY GALLOWAY

8

9  Subscribed and sworn to before me

10 this ____ day of _____, 2008.

11

12 _____

13

14

15

16

17

18

19

20

21

22

23

24

25

**Dr. Aubrey Galloway**

Page 189

1

2              C E R T I F I C A T E

3   STATE OF NEW YORK        )

4                            : ss.

5   COUNTY OF NEW YORK       )

6

7        I, Joan Urzia, a Notary Public

8   within and for the State of New York,

9   do hereby certify:

10       That AUBREY GALLOWAY, the witness

11  whose deposition is hereinbefore set

12  forth, was duly sworn by me and that

13  such deposition is a true record of the

14  testimony given by the witness.

15       I further certify that I am not

16  related to any of the parties to this

17  action by blood or marriage, and that I

18  am in no way interested in the outcome

19  of this matter.

20       IN WITNESS WHEREOF, I have

21  hereunto set my hand this 13th day of

22  June, 2008.

23

24  _____

25              Joan Urzia

# EXHIBIT R

**Alan Fell**

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------------------

5  QUICKIE, LLC,

6

7                          Plaintiff,

8

9          vs.        07-CV-10331 (RMB) (DFE)

10

11  GREENBERG TRAURIG, LLC, et al.,

12

13                          Defendants.

14  ------------------------------------------

15

16

17

18            DEPOSITION OF ALAN FELL

19            Friday, June 20, 2008

20                  9:30 a.m.            COPY

21

22

23

24  Reported by:  Joan Urzia, RPR

25  JOB NO. 203749

Alan Fell

Page 10

```
 1                    Fell
 2  member of an LLC I've occasionally brought
 3  lawsuits.
 4       Q     How many LLCs are you a member
 5  of?
 6       A     Eight or nine probably.
 7       Q     What businesses are they in?
 8       A     Most of them are real estate
 9  businesses.
10       Q     How many are not?
11       A     One.
12       Q     Is that Quickie?
13       A     Uh-huh.
14       Q     Do you still have a 4 percent
15  interest in Quickie?
16       A     Yes, I do.
17       Q     How long have you had that
18  interest?
19       A     I don't know exactly when.  It
20  was 2001 -- I don't remember exactly.
21       Q     Did you make any capital
22  contribution to Quickie to get that
23  interest?
24       A     No.
25       Q     How did you come to get that
```

Alan Fell

Page 25

1                        **Fell**

2      A      An attorney from Medtronic.  I

3  think his name was Tom, I think it's Tom

4  Irlinger, I think.

5      **Q      Do you recall that the agreement**

6  **provides that all notices that were going**

7  **to go to Quickie were going to go to you?**

8      A      Yes.

9      **Q      Why was that?**

10     A      Because I was the general

11 counsel.

12     **Q      Do you recall that the agreement**

13 **did not provide for notices to go to**

14 **Mr. Sharinn?**

15     A      I don't recall that, but I'm not

16 surprised.

17     **Q      At a certain point Medtronic**

18 **terminated that agreement, is that correct?**

19     A      That's correct.

20     **Q      Why did they terminate the**

21 **agreement?**

22     A      My recollection is that they

23 weren't happy, weren't -- I don't know if

24 happy is the correct word -- they weren't

25 satisfied with the progress of the

Alan Fell

Page 26

```
1                    Fell
2   development of the device.  I did receive a
3   letter.  I don't remember the specifics of
4   the letter.
5       Q      Do you recall that they stated
6   that it was something that they did not
7   think could be commercialized?
8       A      I don't recall that, but if it's
9   in the letter, it's in the letter.
10      Q      You did give testimony in the
11  Quickie action against Medtronic, correct?
12      A      Yes.
13      Q      You do recall that you gave a
14  deposition in that case, correct?
15      A      Yes.
16      Q      Your deposition was taken on
17  July 29, 2003, do you recall that?
18      A      Generally, yes.
19      Q      And it was taken at the offices
20  of the McDermott Will & Emery firm?
21      A      Uh-huh.
22      Q      At page 79 of your transcript
23  did you give this testimony:
24              "QUESTION:  Did you have any
25      understanding as to why they wanted to
```

Alan Fell

Page 27

1                          **Fell**
2          **do that?"**
3                  MR. KAMINSKY:  We should go back
4          a bit, referring to the letter that I
5          think you mentioned before.
6                  "QUESTION:  Do you understand
7          what that refers to?
8                  "ANSWER:  Yes, that they were
9          going to terminate the agreement,
10         which is what they did.
11                 "QUESTION:  Okay.  Did you have
12         any understanding as to why they
13         wanted to do that?
14                 "ANSWER:  Not -- not
15         specifically, no.
16                 "QUESTION:  They never told you?
17                 "ANSWER:  Well they -- no, I
18         mean that's something I don't
19         understand.  I don't understand the
20         technology.  They just didn't think
21         apparently that the way they stated
22         it, that it was something that could
23         be commercialized."
24 BY MR. KAMINSKY:
25         **Q      Do you remember giving that**

Alan Fell

Page 28

1                          **Fell**

2    **testimony?**

3        A      No, but if it's there, I'm sure

4    I did.

5        Q      **And you'll stand by that**

6    **testimony?**

7        A      I'm not going to say I'm a liar.

8        Q      **Well, I'm asking you if you want**

9    **to change it.**

10       A      I probably had the letter in

11   front of me at the time.  You're asking me

12   to testify without the letter in front of

13   me.  So, you know, it's the best of my

14   recollection.

15       Q      **So as you sit here today, you're**

16   **not going to change that testimony?**

17              MR. LODEN:  Objection.  Form.

18  BY MR. KAMINSKY:

19       Q      **Correct?**

20       A      Correct.

21       Q      **Did anyone else sign a license**

22   **agreement with Quickie for the technology**

23   **that's covered by the patent that was**

24   **involved in the Medtronic license?**

25       A      No.

Alan Fell

Page 29

1                          Fell

2        Q        Did anyone else offer to sign

3    such a license?

4        A        No.

5        Q        You did approach at least two

6    other companies, is that right?

7        A        That's correct.

8        Q        Which two entities did you

9    approach?

10       A        Ethicon and U.S. Surgical.

11       Q        Is it correct that neither of

12   those entities was interested in doing a

13   license?

14       A        Correct.  But may I say

15   something?  My recollection is one of the

16   concerns they had is the ancillary rights

17   that Medtronics may have had under the

18   agreement.

19       Q        Well, after Medtronic terminated

20   the license agreement it had, Quickie never

21   made an effort to go back to U.S. Surgical

22   or Ethicon to see if they would then be

23   interested in licensing the patent, is that

24   correct?

25       A        That's correct.

Alan Fell

```
                                          Page 30
 1                        Fell
 2        Q       In fact, Quickie never went to
 3   anyone else to see about licensing the
 4   product, is that right?
 5        A       That's correct.
 6        Q       Did Quickie do anything to
 7   attempt to commercialize the patent that
 8   was covered by the Medtronic agreement?
 9              MR. LODEN:  Objection.  Form.
10         The reason for the objection, when the
11         Medtronic agreement was signed, I
12         don't believe there was a patent.
13              MR. KAMINSKY:  Well, let's
14         clarify.
15   BY MR. KAMINSKY:
16        Q       There ultimately was a patent
17   that was issued on the knotless suture
18   device, is that right?
19        A       Yes.
20        Q       It's Patent No. 6,066,160, is
21   that correct?
22        A       If you say so.  I don't have it
23   in front of me.
24              MR. KAMINSKY:  Can we show the
25         witness Exhibit 55?
```

**Alan Fell**

Page 31

```
 1                          Fell
 2              It's not 55, okay.
 3              (Whereupon, Exhibit 64 was
 4       marked for Identification.)
 5 BY MR. KAMINSKY:
 6       Q      I show you a document marked
 7  Exhibit 64, it's Patent No. 6,066,160,
 8  dated May 23, 2000.
 9              Have you ever seen that document
10  before?
11       A      Yes.
12       Q      Is that the patent that was
13  issued to Quickie for the passive knotless
14  suture terminator?
15       A      Yes.  I think it was issued to
16  the inventors and then assigned to Quickie,
17  yes.
18       Q      Is that the patent that was the
19  subject of the license agreement with
20  Quickie?
21       A      Yes.
22       Q      Now has Quickie made any other
23  effort besides the license agreement with
24  Medtronic that was terminated and the
25  approaches to U.S. Surgical and Ethicon to
```

**Alan Fell**

Page 33

```
 1                         Fell
 2        Q      What ongoing rights did
 3   Medtronic have?
 4        A      I don't have -- something in the
 5   agreement that gave them, that they were
 6   concerned about.  I don't recall exactly
 7   what it was.
 8        Q      Had Medtronic asserted any
 9   rights with respect to the '160 Patent
10   since it terminated the agreement?
11        A      Not to my knowledge.
12        Q      Has Quickie used any other
13   patent counsel since its existence?
14        A      Yes.
15        Q      Who else did Quickie use as
16   patent counsel?
17        A      Beside whom?  Let's --
18        Q      Well, you mentioned Todd
19   Sharinn.
20        A      Okay.  Well, Todd Sharinn was
21   with several firms, two firms I believe,
22   Pepe & Hazard and Greenberg Traurig which
23   were each patent counsel to Quickie.  Then
24   Thelen was involved with the litigation and
25   some patent issues as well.
```

**Alan Fell**

Page 34

1                           Fell

2        Q       Well, actually Thelen handled

3    the re-examination proceeding for this same

4    patent, isn't that correct?

5        A       I believe so, yes.   Then there

6    was another gentleman named Tim Maier also.

7        Q       In fact, Thelen was Quickie's

8    counsel as to the '160 Patent when

9    maintenance fees first became due on that

10   patent, isn't that correct?

11       A       I don't remember the date or who

12   was counsel when.

13       Q       Do you remember that maintenance

14   fees became payable on the '160 Patent

15   commencing on May 23, 2003 and ending May

16   23, 2004?

17       A       I wasn't aware of that until

18   after I found out that the time had expired

19   to pay the fees.

20       Q       Well, in fact, you were and

21   we'll show you that you were --

22       A       Okay.

23       Q       -- aware, but do you remember as

24   you sit here today that maintenance fees

25   were due on the patent during the one-year

Alan Fell

Page 45

```
 1                    Fell
 2       Q      So I take it you stand by the
 3  first clause, and then we'll go to the
 4  second clause -- before I go back to that,
 5  do you know what we're referring to by
 6  revocation?
 7       A      I think I had seen it recently.
 8       Q      Do you recall that there was a
 9  revocation of the prior Powers of Attorney
10  that had been given to Greenberg Traurig by
11  Quickie?
12       A      Yes.
13       Q      Do you recall that that
14  revocation was filed with the United States
15  Patent and Trademark Office on or about
16  March 4, 20003?
17       A      I don't remember the specific
18  date of the filing, but I remember the
19  existence of a revocation.
20       Q      Let me show you a document which
21  has been marked Exhibit 56.
22              Exhibit 56 is a revocation of
23  prior Powers of Attorney and an appointment
24  of new attorneys by Quickie signed by
25  Aubrey Galloway as managing partner of
```

Alan Fell

Page 47

```
 1                      Fell
 2   retaining the Thelen law firm?
 3        A     Who chose the Thelen law firm,
 4   is that what you're referring to?
 5        Q     Well, let's start with that.
 6   Who chose the Thelen law firm?
 7        A     Probably Dr. Colvin and
 8   Dr. Galloway.
 9        Q     Do you know why they chose the
10   Thelen law firm?
11        A     I think Dr. Colvin was upset
12   that Paul Sutton who was a patent
13   partner -- I don't know if he's still
14   there -- but Greenberg Traurig had not
15   taken a more active role in the case and
16   the other reason as well is that there was
17   a partner at Thelen that was a relative, a
18   cousin, I think, of Dr. Colvin's then
19   girlfriend.
20        Q     Isn't it a fact that Mark Evens
21   who was a partner at the Thelen law firm
22   became a relative of Dr. Colvin?
23        A     Yes, that's correct.
24        Q     And isn't that why the business
25   was shifted to the Thelen law firm?
```

Alan Fell

Page 48

1               **Fell**

2       A       That wasn't the only reason.

3       **Q       Who told Greenberg Traurig that**
4       **they were going to be replaced by the**
5       **Thelen law firm?**

6       A       I probably called Todd because I
7       had a personal relationship with Todd
8       before -- I think I sent a letter
9       subsequently to reconfirm, but I think I
10      called him personally to tell him.

11      **Q       Did you tell him that Dr. Colvin**
12      **was bothered about Paul Sutton's**
13      **involvement?**

14      A       I don't recall.

15      **Q       You did tell him, however, about**
16      **Dr. Colvin's personal relationship with**
17      **Mark Evens, is that correct?**

18      A       I might have, but he might have
19      known that anyway.  I think Mark Evens
20      attended the Markman Hearing where at the
21      point that Todd and his firm was still
22      representing Quickie.

23      **Q       Didn't you tell Todd Sharinn**
24      **that the Greenberg firm was going to be**
25      **replaced because Dr. Colvin wanted to give**

**Alan Fell**

Page 50

1                        **Fell**

2     **knew that Quickie had filed a revocation**

3     **notice with the U.S. Patent Office in March**

4     **of 2002, correct?**

5               MR. LODEN:   Objection.  Form.

6          A     Are we at admission 19 still, or

7     where are we?

8          **Q     Well, actually if you want to**

9     **get that admission, go back to admission**

10    **number 2.**

11         A     I'm just trying to have the same

12    frame of reference.

13         **Q     I'm not at the moment reading**

14    **you an admission.  I'm just making clear.**

15         A     Okay.

16         **Q     You were aware in March 2003**

17    **that Quickie had filed a revocation of**

18    **Greenberg Traurig's authority with respect**

19    **to the '160 Patent with the U.S. Patent and**

20    **Trademark Office, correct?**

21         A     Correct.

22         **Q     And you were aware that in that**

23    **document Quickie had designated the Thelen**

24    **lawyers as the lawyers with whom the Patent**

25    **Office should deal thenceforth with respect**

**Alan Fell**

Page 51

```
 1                    Fell
 2  to the '160 Patent, correct?
 3     A     Correct.
 4     Q     Did you discuss that with anyone
 5  at Quickie at the time?
 6     A     I probably discussed it with
 7  Dr. Galloway and Dr. Colvin.  I don't have
 8  a specific recollection of a conversation
 9  that I had.
10     Q     Did you discuss it with the
11  Thelen lawyers?
12     A     I probably spoke to Mark Evans.
13  I didn't have much interaction with
14  Mr. Krebs.
15     Q     Did you discuss that with Todd
16  Sharinn at the time?
17     A     I already testified that I
18  called Todd Sharinn and told him that
19  Greenberg Traurig was going to be replaced
20  as attorneys in connection with the Quickie
21  litigation.  I don't know if I've had
22  conversation after that.  I probably spoke
23  to Todd, I did speak to him after that.
24     Q     Do you recall that Mr. Sharinn
25  received a notification from the patent
```

Alan Fell

Page 52

```
 1                        Fell
 2    office that Greenberg Traurig had been
 3    replaced as counsel with respect to the
 4    '160 Patent?
 5         A    I don't recall, but based on the
 6    revocation I'm assuming that they were
 7    notified.
 8         Q    When did you first hear about
 9    that?
10         A    When did I first hear about
11    what?
12         Q    That Mr. Sharinn had received
13    such a notification from the U.S. Patent
14    office.
15         A    I don't know.  I don't remember
16    specifically.
17         Q    Do you remember receiving a
18    letter from Mr. Sharinn enclosing a copy of
19    the revocation notice?
20         A    I don't remember, but it's a
21    possibility that I received it.
22         Q    Let me show you a document that
23    was pre-marked Exhibit 27.
24         A    Uh-huh.
25         Q    Exhibit 27 is a letter to
```

Alan Fell

Page 53

1                          Fell

2    Quickie, care of Rick Steiner, dated May

3    15, 2003.

4              Do you recall receiving that

5    letter?

6         A    Not specifically, but I'm sure I

7    did.

8         Q    Do you see that it's addressed

9    to "Dear Alan"?

10        A    Yes, of course.

11        Q    Do you see that it refers to the

12   re-examination of the U.S. Patent No.

13   6,066,160?

14             Do you see that?

15        A    Yes, I do.

16        Q    That's the '160 Patent, correct?

17        A    Correct.

18        Q    Do you see that it encloses a

19   notice to Mr. Sharinn of Greenberg Traurig

20   that is dated April 2, 2003, and it states

21   that the Power of Attorney to you in this

22   application has been revoked?

23             Do you see that?

24        A    Yes.

25        Q    Do you see it says future

**Alan Fell**

Page 54

1                          **Fell**

2    **correspondence will be mailed to the new**

3    **attorney of record?**

4              **Do you see that?**

5         A    Yes, I do.

6         **Q    New attorney of record were the**

7    **Thelen lawyers, is that correct?**

8         A    Correct.

9         **Q    Did you have any conversation**

10   **with Mr. Sharinn after you received this**

11   **letter about this letter and the notice**

12   **that it contained?**

13        A    I have no recollection of

14   conversations I might have had with

15   Mr. Sharinn at that time.

16        **Q    Did you call Mr. Sharinn up and**

17   **say to him, Todd, thanks for sending me**

18   **this notice, but we're still going to be**

19   **looking to you about the '160 Patent?  Did**

20   **you ever have that conversation with him?**

21        A    I don't recall.

22        **Q    You don't recall ever having**

23   **that conversation, do you?**

24        A    Right.

25        **Q    Now in request number 3 -- I'm**

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

Alan Fell

Page 60

1               Fell

2          Exhibit 21 is a letter from the

3   Pepe & Hazard law firm, dated May 30, 2000,

4   to Stephen Colvin and it shows a CC on the

5   second page to Alan Fell.

6          You received a copy of that

7   letter, isn't that right?

8      A     I'm sure I did.

9      Q     Now do you see that in the

10  second page, in the paragraph that's there,

11  that the letter tells you that the fees are

12  due on or before three and a half, seven

13  and a half and eleven and a half years from

14  the date of the patent, from the date the

15  patent issues?

16          Do you see that?

17     A     I see that.

18     Q     Now you were looking to

19  Mr. Sharinn to advise you of that, you're

20  saying, is that right?

21     A     It says in the letter:  "We will

22  notify you regarding payment of the

23  maintenance fees several months before they

24  are due," and that's what I was relying on.

25     Q     Now did you diary at any time --

Alan Fell

Page 61

```
 1                         Fell
 2       A      I didn't diary this, no.  I was
 3  relying on patent counsel to notify me.
 4       Q      Now, in fact, you were reminded
 5  that patent fees were due three and a half
 6  years after patent issued before the patent
 7  fees were due in this case, weren't you?
 8                MR. LODEN:  Objection.  Form.
 9       If you understand it.
10       A      I don't understand the question.
11       Q      Did you understand that there
12  was a one-year period in which to pay the
13  patent fees?
14                MR. LODEN:  Objection.  Form.
15       A      I was relying on patent counsel
16  to notify me.
17       Q      I understand what you say you're
18  relying on, Mr. Fell, but what I want to
19  find out is what you knew.
20       A      I didn't know, okay?
21       Q      You didn't know?
22       A      I received this letter.  I
23  didn't diary.  I was relying on patent
24  counsel to notify me.
25       Q      Did you talk to Thelen Reid &
```

**Alan Fell**

Page 63

```
 1                        Fell
 2   when the '160 Patent maintenance fees
 3   became due, isn't that correct?
 4        A     I still think that Greenberg
 5   Traurig was handling certain matters with
 6   regard to the '160 Patent, including the
 7   maintenance fees.
 8        Q     Can you answer my question,
 9   please?
10              Greenberg Traurig was no longer
11   Quickie's attorney as to the '160 Patent
12   during the period when the maintenance fee
13   was due and could have been paid, isn't
14   that correct?
15        A     I don't know if that's
16   completely correct.
17        Q     Okay.
18              Would you look at request number
19   22?
20        A     Sure.
21        Q     Okay.
22              Page 7.  The request says:  "GT
23   was no longer Quickie's attorney as to the
24   '160 Patent during the one-year period in
25   issue when the maintenance fee was due and
```

Alan Fell

Page 64

```
1                        Fell
2  could have been paid."
3              The response is:  "The Rick
4  Steiner defendants admit request to admit
5  number 22."
6       A     Uh-huh.
7       Q     You stand by that statement,
8  don't you?
9              MR. LODEN:  Objection.  Form.
10      For the same basis that we talked
11      about earlier.  Who is you?
12 BY MR. KAMINSKY:
13      Q     You, Alan Fell.
14      A     Yeah, I stand by that.
15      Q     Both personally and on behalf of
16 your firm, is that right?
17      A     Yes.
18      Q     Now the next request said:
19 "Thelen was Quickie's counsel during the
20 one-year period in issue when the
21 maintenance fee was due and could have been
22 paid."
23              And the response was:  "The Rick
24 Steiner defendants deny request to admit
25 number 15."
```

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

Alan Fell

Page 65

```
 1                        Fell
 2       A      I'm sorry, you're at 15?
 3       Q      Forgive me, I'm wrong.
 4              The response was:  "The Rick
 5   Steiner defendants admit request to admit
 6   number 23," correct?
 7       A      Correct.
 8       Q      And you stand by that statement
 9   as well, don't you?
10       A      Yes.
11       Q      Now do you remember that Rick
12   Steiner -- strike that.
13              Do you remember that Quickie
14   replaced the Thelen law firm after the
15   patent was deemed to have expired?
16       A      I'm sorry, could you repeat that
17   question?
18       Q      Yes.
19              Do you remember that after the
20   '160 Patent had expired for non-payment of
21   the maintenance fees, Quickie retained
22   different counsel to replace Thelen?
23       A      Yes.
24       Q      Do you know the name of the
25   counsel?
```

Alan Fell

Page 66

1                        **Fell**

2      A      I think it was Maier & Maier.

3      **Q      Did you have anything to do with**

4 **the retention of Maier & Maier?**

5      A      What do you mean did I have

6 anything to do with?

7      **Q      Did you interview Maier & Maier?**

8      A      I spoke to Tim Maier on the

9 phone.

10     **Q      Who on behalf of Quickie chose**

11 **to retain Maier & Maier?**

12     A      Dr. Colvin and Galloway.

13     **Q      Did you recommend the Maier &**

14 **Maier firm?**

15     A      No.

16     **Q      How did Quickie come to meet**

17 **Mr. Maier?**

18     A      I think Mark Evens had

19 recommended Mr. Maier.

20     **Q      Did you have any dealings with**

21 **Mr. Maier while he represented the Quickie**

22 **firm?**

23     A      I spoke to him on the phone, he

24 e-mailed me some documents to review.

25     **Q      Do you remember that the Maier**

Alan Fell

Page 67

1                     Fell
2    firm represented Quickie in connection with
3    a petition by Quickie for a re-examination
4    or a resuscitation --
5         A    I don't think it's
6    re-examination.  I think it was --
7         Q    -- or revival of the patent,
8    correct?
9         A    Yes, yes.
10        Q    Did you review any of the papers
11   that the Maier firm submitted on behalf of
12   Quickie in connection with that effort?
13        A    I believe I did.
14        Q    Do you remember that
15   Dr. Galloway gave a statement in support of
16   the petition to revive the patent?
17        A    I don't remember specifically,
18   but he is the managing member of Quickie,
19   so.....
20        Q    Do you remember that Todd
21   Sharinn was also asked to give a statement
22   in support of the petition?
23        A    I recall that.
24        Q    Did you read any of those
25   statements at the time?

Alan Fell

Page 68

**Fell**

1

2    A       I probably did.

3    **Q       Did you read the petition?**

4    A       I possibly did.

5    **Q       And did you read the supplement**
6    **to the petition that was also filed by the**
7    **Quickie firm?**

8    A       I possibly did.

9    **Q       Maier & Maier filed all of those**
10   **papers on behalf of Quickie, is that**
11   **correct?**

12   A       That's correct.

13   **Q       And they were authorized to do**
14   **so, correct?**

15   A       Correct.

16   **Q       In fact, they got a specific**
17   **limited Power of Attorney authorizing them**
18   **to do so, is that right?**

19   A       I don't specifically recall, but
20   that might be true.

21           MR. LODEN:  Marty, just so you
22           know, whenever you want to take a
23           break, I think I can reach out to Alan
24           and Skip and see if we can -- we've
25           been going about an hour.

Alan Fell

Page 69

1                        Fell

2              MR. KAMINSKY:  Okay.  Whenever

3         you want to do it.

4              (Discussion held off record.)

5    BY MR. KAMINSKY:

6         Q     Let me show you a document which

7    has been marked Exhibit 55, and if you

8    would look at the last two pages of that

9    document and tell me if that refreshes your

10   recollection that the Maier & Maier firm

11   received a Power of Attorney to represent

12   Quickie in connection with the petition to

13   revive the '160 Patent.

14        A     Yes.

15        Q     Let me show you two documents,

16   Exhibits 52 and 61.  Exhibit 61 is the

17   petition for reconsideration -- strike

18   that.

19              Let me also ask you to look at

20   the first part of Exhibit 55 and tell me if

21   that is the petition to accept unavoidably

22   delayed payment of the maintenance fee in

23   an expired patent.

24        A     Yes.

25        Q     Did you see that at or about the

**Alan Fell**

Page 70

```
 1                        Fell
 2   time that it was filed, that is --
 3        A    I don't specifically recall, but
 4   in all likelihood, I did.
 5        Q    Now let me show you a document
 6   that's been marked as Exhibit 52.
 7             Exhibit 52 is a supplement to
 8   the petition that was filed in December
 9   2006.
10             Did you see that document?
11        A    Yes.
12        Q    And that was about the time of
13   the petition proceeding, is that right?
14             MR. LODEN:  I'm sorry, you're on
15        52?
16             MR. KAMINSKY:  54.
17        A    This says 52.
18        Q    I meant 54.  My apologies.  Let
19   me start this again.
20             You saw Exhibit 54, the
21   supplemental petition, while the
22   proceedings seeking to revive the patent
23   were going on, is that correct?
24        A    I have no specific recollection,
25   but in all likelihood, I did.
```

**Alan Fell**

Page 71

```
 1                    Fell
 2      Q     Now let me show you Exhibits 52
 3  and 53, which are statements in support of
 4  the petition that were filed in the Fall of
 5  2006 and their statements by Dr. Galloway
 6  and by Todd Sharinn.
 7            Did you see those documents at
 8  or about that time?
 9      A     I have, again, no specific
10  recollection, but in all likelihood I did.
11      Q     Now would you look first at
12  Exhibit 53, the statement by Dr. Galloway.
13            Do you see that in paragraph 2
14  of that statement Dr. Galloway says:  "As
15  managing partner for Quickie LLC, I
16  retained Robert E. Krebs, et al. of Thelen
17  Reid & Priest LLP law firm to transact all
18  post issuance proceedings and
19  responsibilities in the Patent and
20  Trademark Office, including but not limited
21  to re-examination proceedings and timely
22  payment of the maintenance fee."
23            Do you see that?
24      A     Yes.
25      Q     Did you ever tell Dr. Galloway
```

Alan Fell

Page 72

1                    **Fell**

2  **that there was anything incorrect in that**

3  **statement?**

4            MR. LODEN:  Objection.  I just

5       caution the witness to the extent that

6       gets into attorney client relationship

7       or communications, be careful.

8            MR. KAMINSKY:  Okay.

9            MR. LODEN:  I think the question

10      does get into that topic.

11           MR. KAMINSKY:  All right.

12           As I understand it, Quickie is

13      asserting the attorney client

14      privilege as to communications with

15      respect to legal advice with respect

16      to Mr. Fell and his law firm, is that

17      correct?

18           MR. LODEN:  I'm asserting the

19      privilege with respect to the question

20      you asked of Mr. Fell, and that was

21      whether he ever told Dr. Galloway that

22      there was anything incorrect in that

23      statement.

24           MR. KAMINSKY:  All right.

25           Well, I think I need to know

**Alan Fell**

Page 73

1               Fell

2       because one cannot assert the

3       privilege selectively.  Am I correct

4       that in this lawsuit Quickie is

5       asserting the attorney client

6       privilege as to communications between

7       Mr. Fell and Quickie and his law firm

8       and Quickie that involved legal

9       advice?

10          MR. LODEN:  I think that's

11      generally correct.

12          MR. KAMINSKY:  Okay.  It's on

13      the basis of that objection that

14      you're asking the witness not to

15      reveal attorney client communication

16      as to this document, correct?

17          MR. LODEN:  As to the

18      question -- yeah, yeah, that's

19      correct.

20   BY MR. KAMINSKY:

21       Q    Now I'm going to ask you a

22   question that calls for a yes or no answer,

23   and Quickie's counsel can determine whether

24   to assert an objection to that as well, but

25   did you ever have any discussion with

Alan Fell

Page 74

```
 1                    Fell
 2   Dr. Galloway about paragraph 2 of the
 3   statement he submitted in support of
 4   Quickie's petition in the Fall of 2006?
 5              MR. LODEN:  Yeah, again, Marty,
 6         I don't want to be obstructionist, but
 7         I do think even putting the question
 8         that way to answer yes or no asks him
 9         to confirm whether or not that topic
10         was discussed, which would get into
11         privileged communication.  So we do
12         instruct the witness not to answer.
13   BY MR. KAMINSKY:
14         Q    Are you aware of any statement
15   by Quickie made to the U.S. Patent Office
16   ever saying to the U.S. Patent Office that
17   any of the statements in Dr. Galloway's
18   statement that has been marked Exhibit 53
19   were or are incorrect?
20         A    I'm not aware of any.
21         Q    Now would you look at the
22   document that we've marked Exhibit 54,
23   which is the supplement to the petition.
24              Do you see that on the first
25   page the document says:  "A declaration
```

Alan Fell

Page 75

1                          Fell

2    by Todd S. Sharinn is being added as

3    Exhibit 7."

4              Do you see that?

5         A    I think it says "to Exhibit 7."

6         Q    Correct.  Do you see that?

7         A    Yes.

8         Q    Do you see that it continues in

9    the second sentence and says:  "His

10   responsibility for the '160 Patent ended

11   prior to the time period when the payment

12   of a first maintenance fee was due (see

13   Exhibits 3 and 10, revocation of prior

14   Powers of Attorney signed on behalf of the

15   patent owner on March 4, 2003)."

16             Do you see that?

17        A    Yes.

18        Q    Did you have any discussion with

19   anyone at Quickie with respect to that

20   statement in the supplemental petition?

21             MR. LODEN:  Same objection to

22        the extent those discussions involve

23        the giving of legal advice, we assert

24        the privilege and I instruct the

25        witness not to answer, to the extent

Alan Fell

Page 78

```
 1                          Fell

 2      withdrew or contradicted these statements.

 3          A      This is from the 52, 53 and --

 4          Q      This is from 54.

 5          A      54, okay.

 6          Q      I'll read you specific

 7      provisions in the interest of time.

 8                  If you would look on the second

 9      page of that exhibit, at the bottom of the

10      page, the document that is the supplement

11      to the petition stated to the U.S. Patent

12      Office that:  "Thelen Reid & Priest was

13      granted and held sole and full power in the

14      '160 Patent from March 4, 2003 through

15      August 14, 2006 (Exhibits 3, 9 and 10).

16      This period of time covered the time period

17      up to May 23, 2004 for timely paying the

18      first maintenance fee and the entire 2-year

19      period starting from the date of the '160

20      Patent's expiration to file a remedial

21      petition under the unintentional provision

22      (37 CFR 1.378(c)); this 2-year expiration

23      period ending on May 24, 2006."

24                  Do you see that statement?

25          A      Yes, I do.
```

Alan Fell

Page 79

```
 1                          Fell
 2        Q        Are you aware of any statement
 3   by Quickie withdrawing or otherwise stating
 4   to the U.S. Patent office that this prior
 5   statement by Quickie was incorrect?
 6        A        The statement by Quickie, no.
 7        Q        Do you see continuing on page 3,
 8   the supplemented petition says:  "The
 9   actions and inactions of Thelen Reid &
10   Priest, Medtronics examination requests" --
11        A        Re-examination requests.
12        Q        Re-examination requests, thank
13   you -- "and even the U.S. PTO, led the
14   patent owner to believe that their '160
15   Patent was viable."
16                 Do you see that?
17        A        Yes.
18        Q        And then it continues:  "Not
19   until July 23, 2006 did the patent owner
20   first learn that their valuable '160 Patent
21   had expired."
22                 Do you see that?
23        A        Yes, I do.
24        Q        And then continuing on in the
25   next paragraph, the last two sentences
```

Alan Fell

Page 80

```
1                        Fell
2    read:   "Thelen Reid & Priest failed to
3    discover and know that the '160 Patent had
4    expired when they prepared and filed
5    amendments to the claims and re-examination
6    (Exhibit 14).  It also appears that Thelen
7    Reid & Priest failed to docket the patent
8    for payment of maintenance fees."
9               Do you see that?
10       A    Yes, I do.
11       Q    Are you aware of any statement
12   by Quickie advising the U.S. Patent office
13   that there was any error in the statements
14   I just read?
15       A    No.
16       Q    Would you look on page 4.
17               Do you see that in the second to
18   last paragraph the supplemental petition
19   states:   "The patent owner fully believed
20   that their valuable legal rights in the
21   '160 Patent would be justly protected by
22   the attorneys and law firm of Thelen Reid &
23   Priest when the patent owner chose them for
24   representation and executed the Power of
25   Attorney dated March 4, 2003 (see Exhibit
```

**Alan Fell**

Page 81

```
 1                         Fell
 2    9).   Unfortunately that did not occur --
 3         A      Such did not occur.
 4         Q      -- such did not occur."
 5                Do you see that?
 6         A      Yes.
 7         Q      Are aware of any statement by
 8    Quickie to the U.S. Patent office that
 9    there was any error in the statement I just
10    read to you?
11         A      No.
12         Q      The petition was denied, is that
13    correct?
14         A      Correct.
15         Q      Do you recall that Quickie then
16    sought reconsideration of the petition?
17         A      Yes.
18         Q      And that was also denied, do you
19    recall that?
20         A      Yes.
21         Q      Did you ever see the decision of
22    the Patent Office denying the petition for
23    reconsideration?
24         A      I believe I did.
25         Q      Let me show you a document which
```

Alan Fell

Page 83

```
 1                     Fell
 2   question?
 3        Q     Yes.
 4              While these proceedings that
 5   I've just been asking you about were going
 6   on, Medtronic had asked the U.S. Patent
 7   office to re-examine the patent and
 8   determine whether all of the claims in the
 9   patent were actually allowable and
10   patentable, is that correct?
11              MR. LODEN:  Same objection.
12        A     That's correct.
13        Q     And the U.S. Patent Office
14   issued two decisions in connection with the
15   patent on requests for re-examination by
16   Medtronic, is that right?
17        A     I believe so.
18        Q     Do you remember that the Patent
19   Office significantly narrowed the scope of
20   the patent?
21              MR. LODEN:  Object to the form.
22        A     I don't remember specifically.
23        Q     Let me show you a document which
24   has been marked Exhibit 63, which is a
25   decision of the U.S. Patent office in
```

Alan Fell

Page 84

1                      **Fell**

2  **February of 2008.  It's dated February 20,**

3  **2008.**

4                  **Have you ever seen that document**

5  **before?**

6      A      I don't specifically recall, but

7  I probably did.

8      **Q      Do you see that in the third**

9  **page of that exhibit under part 2 entitled**

10  **summary of action, item 3 states that**

11  **claims 26 and 30 in the patent are**

12  **patentable and are confirmed?**

13                  **Do you see that?**

14      A      Just for a second, I don't

15  recall seeing this document.  This is

16  relatively recently, right?  This is this

17  year?

18      **Q      Yes.**

19      A      I don't actually recall seeing

20  this document.

21      **Q      Okay.**

22                  **Well, would you turn to the**

23  **third page?**

24      A      Yes.

25      **Q      Okay.**

Alan Fell

```
                                              Page 85
 1                      Fell
 2        A      This is a week and a half before
 3   Dr. Colvin died.
 4        Q      Very recently, correct.
 5        A      Yeah.
 6        Q      The page that's entitled office
 7   action in ex parte examination, do you see
 8   that page?
 9        A      Yes, I do.
10        Q      Do you see that part two
11   summarizes the action that was taken by the
12   Patent Office?
13        A      Yes.
14        Q      Do you see that item 1A notes
15   that claims 1 through 34 were subject to
16   re-examination?
17        A      Yes.
18        Q      There were 34 claims in the
19   patent?
20        A      Uh-huh.
21        Q      Do you see that item 3 says that
22   claims 26 and 30 are patentable and were
23   confirmed?
24        A      Uh-huh.
25        Q      And then item 4 says that claims
```

**Alan Fell**

Page 86

1                          **Fell**

2    **1 through 25, 27 through 29, and 31 through**

3    **34 were rejected?**

4          A      Uh-huh.

5          **Q      Were you advised that all except**

6    **two claims in the patent were declared**

7    **unpatentable when the re-examination**

8    **proceeding was decided?**

9                 MR. LODEN:  I just caution you

10         to the extent your answer does not

11         involve --

12         A      I don't recall seeing this

13   decision.

14         **Q      Well, my question really is were**

15   **you advised by anyone that, in fact, there**

16   **had been such a decision?**

17         A      I don't recall being advised by

18   anyone.

19         **Q      Do you know if Quickie has taken**

20   **any steps to seek an appeal or reverse this**

21   **decision that's reflected in Exhibit 63?**

22         A      Not to my knowledge.

23         **Q      Do you recall that all the**

24   **billings for work that Greenberg Traurig**

25   **did for Quickie or its affiliates were sent**

Alan Fell

Page 87

1                          Fell
2    to you as general counsel of Quickie?
3         A      Yes.
4         Q      There were actually more than
5    one entity that was involved, is that
6    right?
7         A      That's correct.
8         Q      What other entities was
9    Greenberg Traurig doing work for?
10        A      I think they were doing work for
11   S&A rings and another entity called
12   E-Surge.  There might have been some other
13   entities, but I don't think they did much
14   or much happened to it.
15               There was something called
16   BioSurge, I think, and Quickie Vision or
17   something, but I don't -- nothing really
18   happened with those entities.
19        Q      Those entities were all LLCs, is
20   that correct?
21        A      Correct.
22        Q      And some of the members of those
23   entities were different, is that correct?
24        A      Correct.
25        Q      So that they didn't have all the

Alan Fell

Page 94

```
 1                    Fell
 2  specifically, but it would have come to me.
 3       Q    Do you see that both those
 4  documents refer to Quickie devices in the
 5  Re portion of the letter?
 6       A    Yes.
 7       Q    Yet, for example, when
 8  discussing the re-examination of the '160
 9  Patent by Medtronic, Mr. Sharinn wrote the
10  letter to S&A Rings.
11            Do you see that?
12       A    Yes.
13       Q    You knew he was referring to a
14  Quickie device when you got this letter,
15  didn't you?
16       A    Yeah, I would go by the Re, not
17  how it was addressed generally.
18       Q    Well, you'd actually go by the
19  body of the letter, wouldn't you?
20            MR. LODEN:  Objection.  Form.
21       A    Yeah, yeah.
22       Q    Do you see that in Exhibit 67
23  the letter is addressed to Quickie Vision,
24  care of your law firm, but it's really
25  referring to bills for a Quickie patent?
```

Alan Fell

Page 95

```
 1                      Fell
 2      A      Right.
 3      Q      Once again, you'd look at the
 4 body of the letter, is that right?
 5      A      Yes.
 6      Q      Were you always careful to make
 7 sure that you used the appropriate Re or
 8 address in letters relating to Quickie or
 9 S&A Rings when you communicated with
10 Mr. Sharinn?
11             MR. LODEN:  Objection.  Form.
12      A      I would try to be specific.
13      Q      But you're not certain if you
14 were, is that right?
15             MR. LODEN:  Same objection.
16      A      I guess I could have made
17 mistakes occasionally.
18      Q      During this period you were
19 talking to Mr. Sharinn quite frequently,
20 weren't you?
21             MR. LODEN:  Objection.  Form.
22 BY MR. KAMINSKY:
23      Q      2002 and 2003?
24             MR. LODEN:  Objection.  Form.
25      A      Probably.
```

Alan Fell

Page 96

```
 1                        Fell
 2        Q      So you weren't confused as to
 3   which matters you were talking to him
 4   about, were you?
 5        A      I probably could figure it out
 6   from the substance of the letter.  I don't
 7   recall, you know, what interaction I had
 8   with regard to these specific letters.
 9        Q      Now returning again to the
10   period during when maintenance fees were
11   due on the '160 Patent, Thelen which was --
12        A      I'm sorry, are we going back to
13   the admission?
14        Q      Yes.
15               During that period when Thelen
16   was counsel for Quickie with respect to the
17   '160 Patent, Thelen had an opportunity to
18   advise Quickie that maintenance fees were
19   due, isn't that correct?
20        A      Uh-huh, yes, that's correct.
21        Q      And to make sure that Quickie
22   paid the maintenance fees, is that right?
23        A      Yes.
24        Q      Rick Steiner also had an
25   opportunity during that period to advise
```

Alan Fell

Page 97

1              Fell

2   Quickie that the maintenance fees were due,

3   is that true?

4       A     Well, Quickie had retained

5   patent counsel and we were relying on

6   patent counsel to notify us as to

7   maintenance fees.

8       Q     And at that time, as stated to

9   the PTO, your patent counsel for the '160

10  Patent was the Thelen firm, is that right?

11              MR. LODEN:  Objection.  Form.

12      A     That's right.

13              (Recess taken)

14              (Resumed 11:10 a.m.)

15  BY MR. KAMINSKY:

16      Q     Now I mentioned to you earlier

17  that you had been reminded that patent fees

18  on a patent were due within three and a

19  half years of the issuance of patent before

20  the expiration of the period to pay the

21  patent fees on the '160 Patent.

22              Do recall me mentioning that?

23      A     Yes, yes.

24      Q     And you didn't recall being

25  reminded of that, is that right?

Alan Fell

Page 98

1                          **Fell**

2        A      Not specifically, no.

3        Q      **Well, let me show you a document**

4  **which has been marked as Exhibit 33, which**

5  **is a letter to you -- I'm sorry, a letter**

6  **to Dr. Colvin which shows a CC to you on**

7  **April 13, 2003.**

8               **Do you remember getting a copy**

9  **of that letter?**

10       A      Not specifically, but I'm sure I

11  did.

12       Q      **Now that's about the concentric**

13  **passive knotless suture terminator,**

14  **correct?**

15       A      Yeah.

16       Q      **Which is a Quickie patent,**

17  **correct?**

18       A      Yeah.  That's not the '160

19  Patent.  That's a different patent, the

20  '243, we'll call it the '243 perhaps.

21       Q      **'745 -- oh, '243 Patent, yes,**

22  **correct.**

23       A      '243.

24       Q      **Okay.**

25               **Do you see that in that letter**

Alan Fell

Page 99

1                    **Fell**

2    **on the second page there is a specific**

3    **statement --**

4         A      I think it's on the first page,

5    the bottom of the first page.

6         **Q      Yes, you're correct.  On the**

7    **first page there is a specific statement**

8    **that patent fees would be due three and a**

9    **half years from the issuance of the patent?**

10        A      Yes.

11        **Q      Mark Evens was an attorney at**

12   **the Thelen firm, is that correct?**

13        A      That's correct.

14        **Q      And he was the attorney at the**

15   **Thelen firm to whom Quickie initially**

16   **transferred the proceedings as to the '160**

17   **Patent, is that correct?**

18        A      I believe so, yes.

19        **Q      What was his role specifically**

20   **at the Thelen firm?**

21        A      He was, I believe, a patent --

22   he was a litigator, but I think he had done

23   patent litigation.

24        **Q      You're familiar with the name**

25   **Robert Krebs, is that right?**

Alan Fell

Page 101

1                      Fell

2    the exact word, but he was the initial

3    contact person with whom we were introduced

4    to at the firm and I think that we would go

5    to him first before we'd go to Krebs, I

6    think, but I think Dr. Colvin had more

7    dealings with Mr. Krebs than I did.   I

8    think he went to the Patent Office with

9    Mr. Krebs on at least one or two occasions.

10        Q      Do you recall that when

11   Mr. Quickie took its business away from the

12   Thelen firm, it transferred that business

13   to Mr. Evans' new firm in Washington D.C.,

14   Stern Kessler Goldstein & Fox?

15        A      Yes.

16        Q      Were you involved in the

17   decision to transfer the business to

18   Mr. Evens' new firm?

19        A      I was aware of it because

20   Dr. Colvin had made that decision

21   primarily.   I frankly probably would have

22   tried to find a smaller firm in New York

23   than a Washington firm.

24        Q      But Dr. Colvin picked --

25        A      Dr. Colvin picked this firm,

# EXHIBIT S

Page 1

1

2 UNITED STATES DISTRICT COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 - - - - - - - - - - - - - - - - - - - - - - - - - - -

5 QUICKIE, LLC,

6          Plaintiff,

7     vs.                        07-CV-10331

8 GREENBERG TRAURIG, LLC,       (RMB)(DFE)

9 et al.,

10          Defendants.

11 - - - - - - - - - - - - - - - - - - - - - - - - - - -

12

13

14                                   **COPY**

15

16          DEPOSITION OF PAUL SUTTON

17             Tuesday, June 10, 2008

18                  9:30 a.m.

19

20

21

22 Reported by:

23 Joan Urzia, RPR

24 JOB NO. 203573

25

**Paul Sutton**

Page 20

1                    P. Sutton

2 testimony on those categories.  I spoke to

3 people, I took notes, I reviewed documents,

4 I took notes and have brought notes with me

5 today to assist in getting you accurate

6 dates and information.

7      Q.    Okay.

8           You say that you sought to obtain

9 information and documents to review the

10 categories listed on Exhibit 1.

11           What information and documents

12 did you seek?

13      A.    Anything and everything having to

14 do with Quickie and that related to what I

15 understood those categories to be.

16      Q.    How did you conduct that search?

17      A.    I personally went to people who

18 are responsible for these various

19 functions, interviewed them, requested that

20 they provide in my office documents so that

21 I could review them, and quite candidly, I

22 confessed to having a particular interest

23 in this matter, because at Thelen I headed

24 up IP, I actually brought the intellectual

25 property practice to Thelen from our

**Paul Sutton**

Page 21

1                    P. Sutton

2 boutique, and I actually set up at Thelen

3 their computerized docketing system that is

4 the subject of this litigation.

5    Q.    **You set up Thelen's docketing**

6 **system.**

7          **Did you set up Greenberg's as**

8 **well?**

9    A.    Yes, I did -- not alone, with

10 assistance from others.  I did bring to

11 Greenberg a computerized docketing system

12 and established that at Greenberg as well.

13   Q.    **Okay.**

14          **We'll get to that later.**

15          **But I want to turn back to what**

16 **you -- your search for documents and your**

17 **interviews.**

18          **Who did you interview?**

19   A.    Several paralegals and clerks and

20 asked the assistance of people who we call

21 assistants and/or secretaries.

22   Q.    **Can you give me a list of names**

23 **that you spoke with, names of the people**

24 **you spoke with?**

25   A.    Well, I don't believe I can give

**Paul Sutton**

Page 28

```
 1              P. Sutton
 2              Reminders for the timely filing
 3  of continuation or continuing type
 4  applications, whether they be continuations
 5  or continuations in part.
 6              I reviewed documents and
 7  representative examples of our GT -- I'm
 8  going to use GT for Greenberg Traurig if I
 9  can -- GT's marking of our system database
10  with the status of cases that have been
11  moved from our firm to another firm where
12  the status is marked with either the term
13  transferred and/or the term inactive so
14  that reports thereafter do not include
15  those and they thereafter do not show up on
16  future monthly, weekly or daily reports.
17              I reviewed examples of patent
18  record sheets and status docket reports if
19  files are sent from our firm to another
20  firm, and I also confirmed that the latest
21  or last status information in our system is
22  not deleted from GT's system so that we can
23  confirm at a later date, which I have, the
24  fact that our system was marked with the
25  terms transferred and/or inactive for
```

Paul Sutton

Page 29

1                      P. Sutton

2 matters such as the transfer of the '160

3 Patent files to the Thelen firm.

4              I confirmed that the information

5 is not deleted so that this same

6 information is available as it is today and

7 can be accessed to answer questions that

8 may later arise.

9      Q.    Okay.

10     A.    In addition -- I mean, I obtained

11 a lot.  I reviewed an April 11, 2002 piece

12 of correspondence from Todd Sharinn to Mark

13 Evens of the Thelen firm confirming that

14 back in April 2002, Mark, who I know

15 because he worked in my department at

16 Thelen, actually received all of the '160

17 Patent information and had an opportunity

18 at that point back in April of 2002 to

19 enter that into the system that I set up at

20 Thelen.

21     Q.    Let me stop you there.

22              Do you have a copy of that April

23 correspondence?  Did you bring one today?

24     A.    If I don't have it, I'm sure -- I

25 may not have brought it with me, but I'm

Paul Sutton

Page 39

1              P. Sutton

2  to another firm who thereby assumed

3  responsibility.

4     Q.    So, again, my question then is

5  why did you believe that reviewing those

6  unrelated patent docket entries was

7  relevant to your testimony today?

8     A.    It would indicate that by the

9  records being marked as transferred or

10 inactive, that there would be no subsequent

11 reports that included those cases because

12 those matters were thereafter being handled

13 by the firm to whom the cases have been

14 transferred.

15    Q.    And did your review of those

16 other patent docket entries confirm that

17 understanding?

18    A.    It did.

19    Q.    Did you keep a list of the other

20 docket entries that you looked at?

21    A.    I reviewed several.  I did not

22 make a list of any except the one involving

23 the '160 Patent.  I thought that that would

24 be the area that you'd want to question me

25 on.

Page 49

1              P. Sutton

2 '160 Patent and it sounds like Exhibit 3 is

3 not a monthly docket report.

4          MR. CHU:  He didn't say that.

5     A.    I think you're either not

6 understanding my testimony or you're taking

7 issue with me.

8          Exhibit 3 is a type of report

9 provided to working attorneys and their

10 assistants and is sometimes referred to as

11 a patent record sheet.  We give these and

12 refer to them by different names so that we

13 can distinguish their format.

14    Q.    Let me go back then.

15          Did you review any monthly docket

16 reports concerning the '160 Patent?

17    A.    I don't believe I could, no,

18 because the record was marked as having

19 been transferred to another firm.  I wanted

20 a report to be generated that reflected the

21 '160 Patent.  It wouldn't come out on there

22 because it was transferred to another firm

23 that assumed full responsibility and our

24 reports no longer contained the '160 Patent

25 once the entry has been made that it's been

**Paul Sutton**

Page 52

1              P. Sutton
2 BY MR. LODEN:
3    Q.    It's a simple yes or no question.
4    A.    I don't believe a simple yes or
5 no answer is appropriate, and I've already
6 indicated within my last response to you
7 the negative response and the reason for
8 it.
9    Q.    So the answer is no, you did not
10 review any monthly docket reports for the
11 '160 Patent, right?
12    A.    My answer is the answer I gave to
13 you already to the same question.
14    Q.    When a monthly docket report is
15 printed out, what happens to it?
16    A.    In the ordinary course of
17 business at our firm, monthly docket
18 reports are generated and copies thereof
19 are provided to working attorneys and their
20 assistants.
21    Q.    Were you a working attorney on
22 the '160 Patent?
23    A.    Not on the patent prosecution of
24 the '160 Patent, but I was associated with
25 interacting with Dr. Steve Covan on the

**Paul Sutton**

Page 53

1              P. Sutton

2 litigation involving Medtronic.

3     **Q.    Who was the working attorney then**

4 **that would have received the monthly docket**

5 **reports for the '160 Patent?**

6     A.    I think your question makes an

7 assumption that's not correct.

8     **Q.    What's that assumption?**

9     A.    I believe that there would be no

10 monthly docket report relating to the '160

11 Patent where our firm had been replaced in

12 all respects regarding the '160 Patent well

13 prior to that time.

14          Let be me more specific if you

15 wish me to --

16     **Q.    No, I think I understand your**

17 **answer.  Let's look at Exhibit 3.**

18     A.    Yes.

19     **Q.    Which you said earlier was a**

20 **patent record sheet for the '160 Patent?**

21     A.    My time indicated that people in

22 our firm refer to Exhibit 3 as the type of

23 report that is called a patent record

24 sheet.

25     **Q.    Okay.**

**Paul Sutton**

Page 60

1                      P. Sutton

2 been assumed by the new attorney and that

3 it would be inappropriate for us to do

4 anything further on this matter.

5              MR. LODEN:   Objection.

6        Nonresponsive.

7        A.    I'm not sure I understand.   What

8 was not responsive?

9        Q.    **My question, Mr. Sutton, is does**

10 **TFD entry, does the TFD entry on Exhibit 3**

11 **refer to whether or not the patent was**

12 **transferred and the date upon which it was**

13 **transferred?**

14        A.    I believe that that is the

15 occasion as a result of the Power of

16 Attorney being revoked.

17              MR. LODEN:   Objection.

18        Nonresponsive to the nonresponsive

19        portion of that answer.

20 BY MR. LODEN:

21        Q.    **So my question is then, prior to**

22 **the patent being transferred on April 2,**

23 **2003, were monthly docket reports prepared?**

24        A.    I think you misspoke.   When you

25 say the patent was transferred, our Power

Page 61

1                    P. Sutton

2 of Attorney was revoked and a new Power of

3 Attorney given to the Thelen firm.

4        Q.    Okay.

5        A.    So it's not a matter of a

6 transfer of patent.

7        Q.    Understood.

8        A.    As much as our authority to act

9 on behalf of the client in this regard was

10 revoked.

11       Q.    So prior to that transfer taking

12 place, were monthly docket reports prepared

13 for the '160 Patent?

14       A.    I'm not certain that they were,

15 because I don't believe that they would be

16 necessary.

17       Q.    Why?

18       A.    I'm not sure I understand why you

19 think they would be.  I'm not understanding

20 your question.

21       Q.    My question is pretty simple.

22            Prior to the transfer on April 2,

23 2003 to the Thelen firm, Greenberg Traurig

24 was docketing and monitoring the deadlines

25 for maintenance fees on the '160 Patent,

Paul Sutton

Page 62

```
 1              P. Sutton
 2 correct?
 3     A.    Greenberg Traurig and others,
 4 correct.
 5     Q.    So in connection with Greenberg
 6 Traurig's monitoring and docketing of the
 7 maintenance fee deadlines, were monthly
 8 docket reports prepared for the '160
 9 Patent?
10     A.    Not after -- it's my
11 understanding that they were not generated
12 after Greenberg Traurig was notified that
13 its Power of Attorney was going to be
14 revoked and they would no longer represent
15 the client in this regard.
16     Q.    Prior to that time?
17     A.    Yes, well prior.  I believe that
18 our firm was notified the day after the
19 Markman Hearing, September 5th, that all
20 responsibility in connection with the '160
21 Patent and the Medtronic litigation was
22 being transferred to the Thelen firm, in
23 particular Mark Evens would be leading that
24 responsibility at the Thelen firm, I
25 believe the specific date was September 5,
```

**Paul Sutton**

Page 63

```
 1              P. Sutton

 2  2002.

 3     Q.    Who informed you of that transfer

 4  on September 5, 2002?

 5     A.    Our firm was notified to that

 6  effect by Alan Fell and that was confirmed

 7  to our firm by Dr. Steve Covan, who

 8  indicated that he wanted a relative of his

 9  family, Mark Evens, to assume

10  responsibility in all effects for the '160

11  Patent and the Medtronic litigation.

12              That was the first formal notice

13  that our, that we would no longer be

14  representing Quickie with respect to any

15  aspect of the '160 Patent.

16     Q.    And that was a verbal notice?

17     A.    The initial notice was verbal,

18  and of course written notices followed.

19     Q.    Did they explain why they no

20  longer wanted Greenberg Traurig to

21  represent Quickie?

22              MR. CHU:  I think he just

23       explained it.

24     A.    Yes.  As I just indicated in my

25  prior answer, Mark Evens, a former partner
```

**Paul Sutton**

Page 64

1                    P. Sutton

2 of mine at Thelen, is related to the family

3 of Dr. Stephen Covan, and they wanted to

4 help him by transferring -- they had no

5 problem with the quality of our work, but

6 they wanted him to benefit from the monies

7 generated by the work on the '160 Patent

8 and the Medtronic litigation and all

9 aspects of those two.

10    Q.    So it's your testimony then, I

11 want to make sure I got this right, it's

12 your testimony then that after September 5,

13 2002 when this conversation you say

14 occurred, Greenberg stopped preparing

15 reports, docket reports for the '160

16 Patent?

17    A.    That's not my testimony.

18    Q.    What part of what I said is

19 wrong?

20          MR. CHU:  Please --

21          MR. LODEN:  If you have an

22    objection, under the federal rules,

23    Justin, you can say, "Objection,

24    form."  That's it.

25 BY MR. LODEN:

Paul Sutton

Page 66

```
 1              P. Sutton
 2         MR. LODEN:  Thank you, I
 3     appreciate you stopping.
 4         MR. CHU:  Please let me speak
 5     without you interrupting me, as I've
 6     allowed you to do.
 7 BY MR. LODEN:
 8     Q.    Mr. Sutton, did Greenberg ever
 9 prepare a monthly docket report for the
10 '160 Patent?
11     A.    It did not generate a monthly
12 docket report after being notified that it
13 would no longer be representing Quickie
14 with respect to the '160 Patent and the
15 Medtronic litigation.
16         MR. LODEN:  Objection.
17     Nonresponsive.  I'll read back my
18     exact question to you.
19 BY MR. LODEN:
20     Q.    Mr. Sutton, did Greenberg ever
21 prepare a monthly docket report for the
22 '160 Patent?
23     A.    I don't understand your question
24 because as I've testified, well prior to
25 the date that the maintenance fee was due,
```

Paul Sutton

Page 67

1                    P. Sutton

2 Greenberg Traurig was notified that it was

3 not to be representing Quickie and its

4 Power of Attorney was revoked.  So it would

5 be inappropriate to be generating a report

6 for an ex-client who had revoked our power.

7      **Q.    Are you done?**

8      A.    I'm not sure I understand.

9      **Q.    Are you finished with your**

10 **answer?**

11     A.    I am.

12          MR. LODEN:  Objection.

13     Nonresponsive.

14 BY MR. LODEN:

15     **Q.    My question is very simple.**

16          **As you sit here today, are you**

17 **aware of Greenberg ever, at any time,**

18 **preparing a monthly docket report for the**

19 **'160 Patent?**

20     A.    I believe I've answered that

21 question fully and given you the reasons

22 for my answer.

23     **Q.    So the answer is, as you sit here**

24 **today, you're not aware of any monthly**

25 **docket reports being prepared by Greenberg**

**Paul Sutton**

Page 68

1               P. Sutton

2 **for the '160 Patent?**

3    A.    Would you please indicate a due

4 date for which you're referring to?

5    Q.    **I've said it numerous times; any**

6 **time, any time, at any time in history.**

7    A.    No, I'm asking you to please help

8 me so I can answer you completely and

9 fully.

10         Would you please provide me with

11 a due date that would appear on a monthly

12 docket report that your question relates to

13 and I'll be happy to answer it.

14         MR. CHU:  Steve -- can I go off

15    the record just to talk to you.

16         (Whereupon, an off-the-record

17    discussion was held.)

18    A.    The monthly docket report

19 reflects due dates or matters that require

20 attention within the month thereafter.

21         I'm not aware of any due dates or

22 matters that require attention that

23 occurred affecting the '160 Patent prior to

24 our firm's Power of Attorney being revoked.

25         So that your question really, it

**Paul Sutton**

Page 69

```
 1                  P. Sutton
 2 doesn't make sense frankly.
 3     Q.     Looking back at Exhibit 3, up on
 4 the top left-hand corner -- and I apologize
 5 for the quality of the copy here, this is
 6 the way it was produced to us -- but you
 7 will see it looks like GT number up there
 8 on the top?
 9     A.     I believe that those letters
10 reflect GT number sign.
11     Q.     And then out there to the right
12 there is a number.
13             What does that number reflect?
14     A.     There are five digits followed by
15 a period and then six digits and the
16 letters U.S.  The five digits that precede
17 the period reflects the Greenberg Traurig
18 client number assigned to that client.
19             The numerical, the six numerical
20 digits that follow that period reflect the
21 matter number for that client that this
22 relates to, and the U.S. reflects that the
23 matter that's a subject of Exhibit 3 is a
24 United States matter as opposed to one for
25 a foreign country.
```

**Paul Sutton**

Page 70

1              P. Sutton

2    **Q.    So then if I'm understanding that**

3 **entry correct, is 51822, is that the client**

4 **number assigned for Quickie by Greenberg**

5 **Traurig?**

6    A.    It's my understanding that the

7 number 51822 is one of several -- I'm

8 sorry, strike that, please, I may have

9 misspoken.

10              I believe the number 51822

11 references a client number associated with

12 Quickie.  I don't know whether that's the

13 only client number associated with Quickie.

14    **Q.    Okay.**

15              **And then the 6 digits after the**

16 **period there is 010700, did I understand**

17 **you to say that that is the matter for**

18 **which this patent record sheet was created?**

19    A.    The number 010700 reflects the

20 matter associated with the client number

21 51822 for which this Exhibit 3 is

22 referencing, with the U.S. being United

23 States.

24              There are times that other

25 letters are used to abbreviate the names of

**Paul Sutton**

Page 71

1              P. Sutton

2 foreign countries other than the U.S. which

3 may carry either the same matter number or

4 the same GT client number.

5    **Q.    Okay.**

6          **Going to the right-hand column,**

7 **it looks like the third line, do you see**

8 **where there is STAT and then in the field**

9 **it says transfer?**

10          **Do you see that on the right-hand**

11 **side?**

12    A.    Yes.

13    **Q.    What does that entry reflect?**

14    A.    I believe that the letters STAT

15 refer to the status of this particular case

16 or matter.  The field indicates that all

17 responsibility, the term transfer indicates

18 that, in that field indicates that our

19 firm's responsibility in all respects has

20 been revoked by the client that another

21 firm or the client is responsible for this,

22 and by the presence of the word transfer,

23 this case will not appear in certain

24 reports generated thereafter such as

25 monthly reports.

**Paul Sutton**

Page 72

1                    P. Sutton

2     Q.    So in other words, it says matter

3  number 010700 has been transferred to

4  another firm and Greenberg is no longer

5  responsible for that matter?

6     A.    I believe you're trying to

7  summarize my testimony.  I think my

8  testimony is accurate and you can draw your

9  own conclusions, but I think abbreviating

10 my testimony --

11    Q.    Well, okay.  Let me read back

12 your testimony then.

13          You said, "The field indicates

14 that all responsibility, the term transfer

15 indicates that, in that field indicates

16 that our firm's responsibility in all

17 respects has been revoked on this

18 particular case or matter."

19    A.    No, I perhaps have misspoken.  It

20 indicates, transfer indicates that the

21 matter has been transferred to another firm

22 per the instructions of the client.

23    Q.    Okay.

24    A.    And further on down on April 2,

25 2003, there is an entry that indicates that

Paul Sutton

Page 79

1                    P. Sutton

2  would be required other than the normal

3  maintenance fee, there would have to be an

4  additional fee or one or more other things

5  required to be filed with the PTO.

6      Q.    Okay.

7            The next column to the right EXT,

8  is that extension?

9      A.    That's my understanding.

10      Q.    And it says 0 there.  What does

11  the 0 refer to?

12      A.    That's, I believe, filled in the

13  default field -- I'm sorry, that's the

14  default entry in that field unless it's

15  modified by the person handling the

16  computerized docketing system.

17      Q.    Okay.

18            Next column to the right you'll

19  see that April 2, 2003 date under the

20  column response.

21      A.    Yes.

22      Q.    What does that refer to?

23      A.    That indicates that a response to

24  the due date for the first maintenance fee

25  was taken care of via the revocation of the

**Paul Sutton**

Page 80

1                    P. Sutton

2 Power of Attorney and the responsibility

3 for this case.

4              That's the date of the formal

5 revocation of the Power of Attorney, but

6 that is but one of -- that date reflects

7 the date on which the PTO revoked per the

8 client's request our Power of Attorney so

9 that we would no longer be responsible for

10 the payment of any maintenance fees.

11      **Q.    Well, the response in that column**

12 **heading, does that refer to a response to**

13 **the maintenance fee deadline or**

14 **responsibility?**

15      A.    In this case, we enter -- if our

16 Power of Attorney is revoked and we're

17 asked to no longer do anything with respect

18 to, for example, here the '160 Patent, or

19 anything associated with that '160 Patent,

20 we put in that field the date of the formal

21 revocation of our authority to do anything

22 in that regard, our authority to act as

23 attorneys for the client in that regard,

24 and that's the reason for the entry of

25 4/2/2003 in each of the M1, M2 and M3, the

**Paul Sutton**

Page 81

1                    P. Sutton

2  three maintenance fees there.

3             That indicates that someone else,

4  this report indicates that the client has

5  asked and instructed someone else to do

6  this activity.

7             MR. LODEN:  Objection.

8       Nonresponsive.

9  BY MR. LODEN:

10      **Q.    The response -- do you see the**

11  **column entitled Response, do you see that?**

12      A.    Yes.

13      **Q.    Doesn't that heading reflect the**

14  **field in which the software records the**

15  **date upon which a response was taken to the**

16  **item which was docketed?**

17      A.    Only if our Power of Attorney had

18  not been revoked and had we filed a

19  response, would that date of the filing of

20  the response have been entered there.

21             If our Power of Attorney had not

22  been revoked or, for example, Mark Evens

23  firm, the Thelen firm, knowing that it

24  would be taking responsibility for the '160

25  Patent, it would enter the date that it

Paul Sutton

Page 88

1                    P. Sutton
2  got this right.
3            I believe earlier today, and tell
4  me if I'm wrong, but I believe earlier
5  today, you said that when you came to
6  Greenberg Traurig, you assisted in setting
7  up the docketing system that we're
8  referring to here?
9     A.    When I left Thelen to join
10  Greenberg Traurig, I set up the
11  computerized docketing system for Greenberg
12  Traurig that provides the type of
13  information that you see here in Exhibit 3.
14     Q.    And as part of that setting up
15  process, were there procedures put in place
16  or any other sort of directives given to
17  Greenberg Traurig employees on how to use
18  the system?
19     A.    When I moved my group from Thelen
20  to Greenberg Traurig, it included a number
21  of attorneys and one or more paralegals who
22  were already familiar and running the
23  computerized system at Thelen, and we
24  simply moved that entire group to Greenberg
25  Traurig so that we had people who for years

**Paul Sutton**

Page 89

```
 1                    P. Sutton
 2 had operated the computerized docketing
 3 system and knew its ins and outs and from
 4 time to time benefitted from support from
 5 the software company.
 6     Q.    And those same people that you
 7 said moved from Thelen to Greenberg, were
 8 those the same paralegals that, or the same
 9 staff, excuse me, that was responsible for
10 entering the data on the patent record
11 sheet reflected in Exhibit 3?
12     A.    I don't like -- the people who
13 entered data on Exhibit 3 were among those
14 that moved with me from Thelen to Greenberg
15 Traurig.
16     Q.    So then who entered the data on
17 Exhibit 3?
18     A.    One of several paralegals who are
19 or have been employees at Greenberg
20 Traurig.
21     Q.    Do you know in particular who by
22 name?
23     A.    I can't be certain, so I'd rather
24 not guess.
25     Q.    Okay.
```

**Paul Sutton**

Page 93

1                    P. Sutton

2    Q.    And where do paralegals obtain

3 the data that they enter into the docketing

4 system?

5    A.    By way of example, on our firm's

6 receipt of the revocation of Greenberg

7 Traurig's Power of Attorney on April 2,

8 2003, that document from the Patent and

9 Trademark Office would be the basis of the

10 entry of the information in the database.

11    Q.    But that document was sent to the

12 attorney in charge, correct, is addressed

13 to the attorney of record at Greenberg,

14 right?

15    A.    I'm not sure I understand your

16 question.

17    Q.    Well, my question is:  How did

18 the document that you referred to get into

19 the hands of the paralegal who was entering

20 the data into the computerized docketing

21 system?

22    A.    I believe that there is a

23 procedure set up where communications from

24 the U.S. Patent and Trademark Office are

25 sorted and separated during the mail,

Paul Sutton

Page 96

```
 1              P. Sutton
 2      Q.     Okay.
 3              How about for the GT number, the
 4  client matter number that we spoke to
 5  earlier on the top left corner of Exhibit
 6  3, who told the paralegal or how -- strike
 7  that.
 8              How did the paralegal know what
 9  client matter number to place in that
10  field?
11      A.     When the mail is sorted, that
12  information may appear on the document or
13  documents that arrive in the mail, so
14  that's one way that the paralegal can
15  obtain that information.
16              Another way would be to see what
17  client the mail relates to, and then our
18  firm has a computerized system that our
19  folks can access to see what client number
20  and what matter number it relates to.
21              So enough information is usually
22  on the mail to permit the paralegal to
23  glean that information and to go to the
24  proper part of the database.
25      Q.     The '160 Patent was issued by the
```

**Paul Sutton**

Page 100

1                    P. Sutton

2 relevant files were handled properly.

3            I did not do that alone.  I did

4 that together with Todd Sharinn because it

5 was his relationship and his client.

6    Q.    **Understood.**

7            **You said that Dr. Covan agreed to**

8 **give us, Greenberg Traurig, this**

9 **responsibility.**

10            **What responsibility are you**

11 **referring to, the responsibility for**

12 **docketing the deadlines for the '160**

13 **Patent?**

14    A.    He gave us Power of Attorney to

15 handle the '160 Patent and its enforcement

16 against Medtronic, both.

17    Q.    **Well, when you take on a -- okay,**

18 **you said both, it sounds like there are two**

19 **pieces of the responsibility, enforcement**

20 **and --**

21    A.    No, there are no two pieces, no.

22    Q.    **Okay.**

23    A.    It's all part of the same ball of

24 wax.  If you're enforcing a patent against

25 another party or seeking to license them or

Paul Sutton

Page 117

1          P. Sutton

2 Greenberg was still responsible for

3 monitoring the maintenance fee deadlines on

4 the patent, right, that's what you said

5 earlier?

6          MR. CHU:   Objection.

7    A.    Our power had not been revoked as

8 of April 11, 2002.

9    Q.    So is it then your testimony that

10 it's standard procedure in the system that

11 you set up at Thelen that that system would

12 include deadlines for payment of fees for

13 patents for which Thelen was not

14 responsible at the time?

15   A.    At Thelen, it was my practice

16 that where we understood that there was

17 either a likelihood or a certainty that one

18 or more matters were to be transferred to

19 our firm, that on receipt of information

20 having to do with patents, such as the '160

21 Patent and the number, for example, by

22 virtue of the April 11, 2002 letter to Mark

23 Evens there, it was our practice to enter

24 that information and any deadlines

25 associated with that patent into the

**Paul Sutton**

Page 118

1                    P. Sutton

2 computerized docketing system in force and

3 operating at Thelen.

4    **Q.    Why?  If you're not responsible,**

5 **why enter the deadlines?**

6              MR. CHU:  Objection.

7    A.    I just explained why.  If we had

8 reason to believe that a relative of ours,

9 namely a relative of Mark Evens is going to

10 be transferring matters relating to the

11 '160 Patent to us, even if it's not a

12 certainty, we would, it was my practice

13 back then to enter that information into

14 the system so that the very matter that

15 occurred would not occur.

16              In other words, if it was in the

17 system and if it was monitored as it was

18 our practice when I was at Thelen, there

19 would have been, the maintenance fee would

20 have been paid by them.  So there would be

21 no abandonment.

22    **Q.    And is that still your practice**

23 **today, that even if you at Greenberg don't**

24 **have responsibility for maintenance fee**

25 **deadlines on a particular patent, if you**

Paul Sutton

Page 121

```
 1                 P. Sutton
 2     A.    If we have, as I've given the
 3 example, reason to believe that a file will
 4 be transferred to us, and according to my
 5 practice I enter the information into our
 6 system so that we can monitor that, if the
 7 matter is transferred to us formally and we
 8 are given a Power of Attorney, that
 9 information is already in the system but we
10 have the double-check that when the
11 physical files are transferred to us, when
12 the paralegal goes to enter the data, it's
13 already there and you have that
14 double-check.
15     Q.    Okay.
16           So then let's talk about
17 procedures to make sure nothing falls
18 through the cracks when files are
19 transferred from Greenberg, what happens
20 then?
21     A.    Okay.  Let's take the specifics.
22           When I was at Thelen, it was the
23 practice to do the exact same thing so that
24 when Todd Sharinn on April 11, 2002 gave
25 Mark Evens the identification of the patent
```

**Paul Sutton**

Page 122

1                   P. Sutton

2  number, the 160, it was my practice then,

3  and I assume was still the practice at

4  Thelen, to enter into their computerized

5  docketing system the '160 Patent and its

6  maintenance fee deadlines so that it could,

7  as those dates became due, pay those

8  maintenance fees regardless of whether or

9  not it got further information.

10             In other words, it was my

11  practice at Thelen, it was -- it is my

12  practice at Greenberg Traurig.  I'm

13  surprised, frankly, that it was not done at

14  Thelen, because that was our practice when

15  I was there.

16      Q.    So this April 11, 2002 letter,

17  which, frankly, I'll be honest with you,

18  Mr. Sutton, I don't have included in my

19  list of documents to discuss today, it

20  sounds like it's a critical part of your

21  testimony, at least with respect to the

22  matter that we're discussing today, so I'll

23  ask you:  Do you have a copy of it?

24      A.    I don't.

25      Q.    Does your counsel have a copy of

Page 123

1              P. Sutton

2  it?

3          MR. CHU:  Let's just go off the

4      record.

5          (Recess taken from 1:19 p.m. to

6      1:22 p.m.)

7          (Exhibit 5, Correspondence dated

8      4/11/02, marked for identification, as

9      of this date.)

10 BY MR. LODEN:

11     Q.    **Mr. Sutton, the reporter has just**

12 **handed you what's been marked as Exhibit 5.**

13     A.    Yes.

14     Q.    **Is this the April 11, 2002**

15 **correspondence that you were referring to?**

16     A.    What I've been referring to in my

17 testimony regarding a Todd Sharinn April

18 11, 2002 letter to Mark Evens includes two

19 sheets, the letter which appears to respond

20 to a request for Mark Evens for the patent

21 number, but in addition, attached to the

22 letter itself is a photocopy of the

23 Greenberg Traurig physical file cover sheet

24 with information on there, further

25 information on there, that permits Thelen

**Paul Sutton**

Page 124

```
 1                    P. Sutton
 2 to enter that into their system without
 3 even having to go online.
 4          They have all of the information
 5 available to them between the first and the
 6 second sheet of Exhibit 5.
 7          MR. LODEN:  Objection.
 8   Nonresponsive.  Move to strike.
 9 BY MR. LODEN:
10   Q.    Mr. Sutton, why was Todd Sharinn
11 sending this letter to Mark Evens?
12   A.    It appears that Mark Evens
13 requested this information perhaps to enter
14 the information into the computerized
15 docketing system of Thelen.
16   Q.    Well, you say it appears.  Do you
17 or do you not know?
18   A.    Just from looking at it, "It was
19 a pleasure speaking to you today" -- see,
20 I'm familiar from my conversations with
21 Steve Colvin as to what was going on in
22 terms of during this period where he wanted
23 Mark Evens to benefit from this entire
24 effort of handling the '160 Patent and the
25 action against Medtronic so that -- and I
```

Paul Sutton

Page 128

1                    P. Sutton

2       Q.      Your counsel just made my point.

3  You're speculating that anything is

4  possible as to why --

5       A.      No, that's not correct --

6       Q.      As to why he made that request,

7  isn't that correct, Mr. Sutton?

8       A.      No.  Again, you've disregarded my

9  testimony.

10             The attachment to the first page

11  of Exhibit 5 is not the file history.

12  That's my point.  It is the cover of the

13  physical file, not the file history, that

14  gives the data that will be used or would

15  be used by Thelen to enter the '160 Patent

16  within their computerized docketing system

17  for purposes of monitoring the deadlines

18  for paying the maintenance fees.

19      Q.      Turn to the second page.

20      A.      Yes.

21      Q.      What piece of information on the

22  second page of Exhibit 5 tells Thelen Reid

23  when the first maintenance fee is due on

24  the '160 Patent?

25      A.      Every bit of that information

**Paul Sutton**

Page 129

1              P. Sutton

2 yields that -- for example, the patent

3 number, the date granted, the serial

4 number, the filing date, the title, the

5 group number, the assignee -- every piece

6 of information on the second page of

7 Exhibit 5 which has a Bates number QLLC

8 000029 provides Mark Evens and Thelen with

9 the information to enable it to put into

10 their computerized docketing system to be

11 able to monitor and take care of the

12 maintenance fees on the '160 Patent.

13    Q.    And is that the only purpose for

14 that information, or does that information

15 have other purposes as well?

16    A.    I don't understand your question.

17    Q.    Well, it seems like you're saying

18 the only possible reason that this

19 information could have been transferred to

20 Mark Evens was because he wanted to enter

21 it into the docketing system?

22    A.    Could you please show me where I

23 testified that way?

24    Q.    Well, are there other reasons --

25    A.    No, please show me where I have

**Paul Sutton**

Page 136

1              P. Sutton

2 patent at issue?

3    A.    Please tell me what you mean by

4 file wrapper.

5    Q.    Well, Todd Sharinn refers to the

6 file wrapper in Exhibit 5 and attaches this

7 sheet.

8    A.    I'm asking you what you mean by

9 it.

10    Q.    That's what I'm talking about,

11 file wrapper.

12    A.    I don't know what Todd Sharinn

13 means.  I do know that what is attached as

14 constituting the second page of Exhibit 5

15 is a photocopy of the cover of what people

16 refer to as the file wrapper, which

17 contains the file history.

18          The reason I'm asking you that

19 question is people often confuse file

20 history with file wrapper, and I just want

21 to understand if you're asking me a

22 question to be answered under oath what you

23 mean by it.

24    Q.    Okay.

25          Well, the document that is

**Paul Sutton**

Page 137

1              P. Sutton

2  **attached as page 2 to Exhibit 5, that's a**

3  **copy of the file wrapper?**

4      A.     It's my understanding --

5      **Q.     Did I get that right?**

6      A.     It's my belief that it is a

7  photocopy of the outside cover containing

8  the file wrapper, the physical

9  manila-colored 3-part file, physical file,

10 that patent attorney, we as patent

11 attorneys use to conclude, that includes

12 the file history but also correspondence

13 with the client, things that the Patent and

14 Trademark Office doesn't see.

15           I'm making that distinction just

16 so we're clear with one another.  I don't

17 believe that the entire file wrapper

18 accompanied the first page of Exhibit 5.  I

19 believe what Todd meant was the cover, a

20 photocopy of the cover of the file wrapper,

21 which is our physical file.

22     **Q.     Well, looking at page 1, he**

23 **doesn't say I enclose a copy of the cover**

24 **of the file wrapper, does he?  He didn't**

25 **say that there, did he?**

Paul Sutton

Page 144

1            P. Sutton

2 Patent and the litigation matters involving

3 the '160 Patent were going to be

4 transferred to Mark Evens at Thelen.

5    Q.    So that information about that

6 conversation between Alan Fell and Todd

7 Sharinn came secondhand to you, Todd

8 Sharinn told you about that conversation,

9 you weren't present for the conversation,

10 correct?

11    A.    That's correct.

12    Q.    For a patent for which Greenberg

13 is responsible for the maintenance fees and

14 a maintenance fee deadline appears on a

15 monthly docket report, what is GT's

16 standard operating procedure then when that

17 deadline appears on a monthly operating

18 report?

19    A.    We check with the client in some

20 instances if we have reason to believe that

21 the client may not want to incur the fees

22 associated with that.  If the patent is

23 involved in a litigation, we pay the

24 maintenance fee and bill the client because

25 we can't imagine that the client would want

Paul Sutton

Page 145

1                    P. Sutton

2 the patent to lapse if it's involved in a

3 litigation.  And that payment would occur

4 at or near the initial deadline.

5      Q.    **What happens if the patent is not**

6 **in litigation and you have no reason to**

7 **believe that the patent would want to allow**

8 **the patent -- the client would not want to**

9 **allow the patent to expire?**

10     A.    If there are circumstances where

11 we're unable to get a hold of the client,

12 either through the client traveling or

13 whatever and -- we try to contact the

14 client.

15          If we're unable to, if in doubt,

16 we would pay the maintenance fee and bill

17 the client -- or we would not pay the

18 maintenance fee and since the client didn't

19 get back to us and pay it after that

20 initial deadline, there are subsequent

21 deadlines, and simply the client, because

22 it did not get back to us, has to pay a

23 higher disbursement for payment after that

24 initial deadline, but the patent would not

25 lapse because the maintenance fee would be

**Paul Sutton**

Page 146

1                    P. Sutton

2 paid.

3              We don't pay those maintenance

4 fees.  Our standard practice is not to pay

5 the maintenance fees months in advance.

6      Q.    **Earlier this morning we talked**

7 **about the docketing systems and some this**

8 **afternoon.**

9      A.    May I correct myself?

10      Q.    **Sure.**

11      A.    There have been some clients who

12 wish to look at an entire year in advance

13 when they view their portfolio, and rather

14 than be bugged with reminders during the

15 year, if their portfolio is large, they

16 make a decision earlier in the year as to

17 all those patents it wishes to maintain and

18 all those it doesn't wish to maintain, and

19 we sometimes get instructions en masse to

20 simply pay all those maintenance fees and

21 we do so throughout the year without our

22 having to interact with the client

23 thereafter.

24      Q.    **Okay.**

25              **Focusing then on the docketing**

**Paul Sutton**

Page 161

1                    P. Sutton

2    A.    I just never had occasion to

3 consider a transaction like that.

4    **Q.    Is there someone at Greenberg**

5 **with responsibility for maintenance of the**

6 **docketing, computerized docketing system?**

7    A.    I believe we have a service

8 contract or support contract with the

9 vendor.

10   **Q.    Who is the vendor?**

11   A.    DIAMS.  When we had the PATS

12 system, and the systems are the same in the

13 context of what they do, we had a support

14 arrangement with PATS.

15   **Q.    Okay.**

16        **The vendor would install the**

17 **software on Greenberg's computer system?**

18   A.    Are you asking me what actually

19 occurred?

20   **Q.    What actually occurred, yes,**

21 **thank you.**

22   A.    The vendor would certainly play a

23 role in the installation of the system on

24 Greenberg's computers.

25   **Q.    And I think you just answered the**

Paul Sutton

Page 162

```
 1              P. Sutton
 2  question, but let me be sure, we're talking
 3  about a software package that runs on a
 4  standard desktop, it's not a separate
 5  computer that the system is maintained on?
 6      A.    You're making an assumption that
 7  I don't know is accurate.
 8      Q.    Okay.
 9      A.    I don't know whether there is a
10  server on which the software is installed
11  which would not be the same as an attorney
12  or a paralegal's desktop computer.
13      Q.    Okay.
14            MR. LODEN:  Let me ask the
15       reporter to mark Exhibit 6, I believe.
16            (Exhibit 6, Greenberg Traurig's
17       Responses to Plaintiff's
18       Interrogatories, marked for
19       identification, as of this date.)
20  BY MR. LODEN:
21      Q.    Mr. Sutton, the reporter has just
22  handed you what's been marked as Exhibit 6.
23            Do you recognize this document?
24      A.    This appears to be a copy of
25  Greenberg Traurig's responses to
```

Paul Sutton

Page 167

1              P. Sutton

2      that last question?

3      Q.    Yeah.

4              My question was:  Do you know if

5  Greenberg Traurig charged Quickie for

6  monitoring the deadlines on the '160

7  Patent, and your response was I'd have to

8  review the invoices.

9      A.    Well, that's one thing I'd want

10  to review, but I believe that in the

11  response to interrogatory number 16 it

12  indicates that GT voluntarily monitored the

13  '160 Patent before Quickie revoked all

14  powers of attorney given to GT as to the

15  '160 Patent no later than March 4, 2003.

16              The use of the word monitor as I

17  used it, since I signed this response on

18  August 13, 2007, is that we put it into our

19  system so that we would have the

20  information available to us, and we didn't

21  charge the client -- that's what the term

22  voluntarily suggests -- we put it into the

23  system and did not charge the client for

24  doing so.

25      Q.    So then I take it --

Paul Sutton

Page 168

1                    P. Sutton

2        A.    Or I'm not aware of any instance

3    where we charged the client for simply

4    having that information in our system.

5        Q.    So then you don't need to go back

6    and look at the invoices.  You're saying

7    that no charge was incurred or levied?

8        A.    Well, I would want to check the

9    invoices to see if, in fact, if there is an

10    entry for charging, I'd want to be able to

11    confirm that my testimony is accurate.

12            But the voluntarily monitoring

13    that's referred to in response to

14    interrogatory number 16 refers to our

15    having it in our computerized docketing

16    system.

17        Q.    And the volunteer language there

18    means, you intended that to mean that

19    Greenberg was not charging Quickie for that

20    monitoring service?

21        A.    That's what I understood to be

22    the case when I signed the response to the

23    interrogatory.

24        Q.    Okay.

25            If I could get you to turn to

**Esquire Deposition Services**
**1-800-944-9454**

Paul Sutton

Page 169

1                    P. Sutton

2 interrogatory number --

3     A.    I'm sorry, and it also meant that

4 we had no responsibility -- you have to

5 look at the question and the answer no that

6 precedes the statement about voluntarily

7 monitoring.  So really in fairness you have

8 to look at the entire response to

9 interrogatory number 16.

10            MR. LODEN:  Objection.  Move to

11      strike.  Nonresponsive.

12 BY MR. LODEN:

13      Q.    Look at interrogatory number 11,

14 please.  It begins on the bottom of page 5

15 and goes over to page 6.  Do you see where

16 I'm at?

17      A.    Yes.

18      Q.    The response starts off with, "GT

19 does not believe it receives such a notice

20 or reminder," and then the part I want to

21 talk about is the second sentence, "GT has

22 searched its records and not found such a

23 notice or reminder and its patent attorneys

24 do not recall having received one."

25            Were you involved in the search

Paul Sutton

Page 172

1                P. Sutton

2 consulted?

3    A.    I don't know, as I'm sitting here

4 today, what the names of any other patent

5 attorneys who were consulted, what those

6 names are, or if there are any others.

7    Q.    In that search, what were they

8 looking for?

9    A.    The response to interrogatory

10 number 11.

11    Q.    Right, but interrogatory number

12 11 asks if GT ever received any notice or

13 reminder concerning the need to pay

14 maintenance fees.

15        So my question is what notices or

16 reminders were being searched for just --

17    A.    Any, any.

18    Q.    Any.

19        So that would include notices or

20 reminders that came from the Patent and

21 Trademark Office?

22    A.    It would include any notice or

23 reminder.

24    Q.    How about notices or reminders

25 that were kicked out from the computerized

Paul Sutton

Page 173

1                P. Sutton
2 docketing system?
3    A.      There would be no reminder or
4 notice on the computerized docketing system
5 because our Power of Attorney was revoked
6 well prior to the deadline in May -- I'm
7 sorry, the deadline for paying the first
8 maintenance fee.
9              So there would be no reminder or
10 report that would include that for that
11 reason.  We were no longer representing
12 Quickie in that regard.  Our power had been
13 revoked.  It would be inappropriate for us
14 to be involved thereafter.
15    Q.    So then it's your testimony then
16 that after -- after the Power of Attorney
17 was revoked, that the computerized
18 docketing system no longer would generate
19 reminders or notices of maintenance fees
20 due on the '160 Patent?
21    A.      I've given you a lot of testimony
22 earlier today with respect to that issue
23 and I think you've mischaracterized my
24 prior testimony.
25    Q.    Okay.  I think your prior

**Paul Sutton**

Page 192

1                    P. Sutton

2     A.     I'm not sure I understand your

3 question.  The forms say what they say.

4     Q.     Okay.

5     A.     I have no personal knowledge

6 regarding this particular exhibit except to

7 recognize our IP department was originally

8 located at 200 Park Avenue, then moved to

9 885 and then moved back to 200 Park.

10            So we've had a couple of changes

11 of address for use by the Patent and

12 Trademark Office, so that we get this stuff

13 sent directly to us.

14     Q.     Okay.

15            So tell me and I'll see if I can

16 make this quicker, in page number 382 --

17     A.     Yes.

18     Q.     -- this is the form that Todd

19 Sharinn used to inform the Patent and

20 Trademark Office where to send all

21 correspondence other than fee

22 correspondence concerning the '160 Patent?

23     A.     I actually don't have personal

24 knowledge as to Exhibit 7 so that when Todd

25 is here tomorrow and testifies, he should

**Paul Sutton**

Page 196

1                    P. Sutton

2  number.

3      Q.    Do you have any idea why if on

4  April 11, 2002 Todd Sharinn was sending the

5  file wrapper to Mark Evens so that Mark

6  Evens could docket the fees, do you have

7  any idea why months later in October 2002

8  Mr. Sharinn was telling the PTO that he was

9  still the person to receive correspondence

10 about fees?

11     A.    I don't believe that the

12 revocation of the Power of Attorney had

13 occurred as yet so that technically

14 Greenberg Traurig was still the attorney of

15 record in that case.

16     Q.    Same question with respect to

17 this conversation that you referenced

18 between Mr. Fell and Mr. Sharinn on

19 September 5, 2002 where Mr. Fell

20 purportedly told Mr. Sharinn that Thelen is

21 coming on to take over the case, do you

22 have any idea why Mr. Sharinn was filing

23 PTO fee address notifications after that

24 conversation took place?

25     A.    If it was, if Greenberg Traurig

Paul Sutton

Page 197

1              P. Sutton

2 was still attorney of record until its

3 power was revoked we would want the pat at

4 any time and trademark office to have a

5 correct address to send correspondence.  So

6 that would be one reason to file such a

7 notice.

8    Q.    Well, wasn't the purpose of the

9 file wrapper being sent to Thelen so that

10 they could start monitoring and docketing

11 the deadlines, isn't that what you

12 testified to earlier?

13    A.    I don't understand why what you

14 just said conflicts with what I just said.

15 I don't understand.  Your question suggests

16 some conflict.  I just don't understand.

17           If Greenberg Traurig was still

18 the attorney of record and wished to have a

19 correct address at the Patent and Trademark

20 Office to receive mail from the Patent and

21 Trademark Office until its power was

22 revoked.  The fact that Mark Evens could or

23 should have been entering data in the

24 Thelen docketing system would have nothing

25 to do with the formal notices until the

Paul Sutton

Page 212

1                    P. Sutton

2 **confusion later down the road?**

3     A.    In circumstances such as the one

4 that's in litigation that I'm giving

5 testimony in, months and months prior to

6 transfer of files or revocation of the

7 Power of Attorney, the new law firm was

8 given all information that it needed or

9 could possibly want in connection with

10 assuming responsibility so that whether or

11 not it did anything with that information

12 is another matter, but in effect in the

13 present circumstances Mark Evens began the

14 assumption of responsibility even prior to

15 Allan Fell telling Todd Sharinn that our

16 firm was being replaced and our power was

17 going to be revoked because Mark Evens was

18 actually sitting at the table in the

19 Markman Hearing and he wasn't an attorney

20 of record.

21            So that process began at least as

22 early as April 11, 2002 where Mark Evens

23 was monitoring and had information and had

24 the ability to enter any and all deadlines

25 in the system at Thelen.

Paul Sutton

Page 216

```
 1                    P. Sutton
 2  to my prior answer as well.
 3      Q.    What about pending deadlines in
 4  the matter that's being transferred, should
 5  those be mentioned?
 6            MR. CHU:  Well, you're asking,
 7      you know --
 8            MR. LODEN:  I'm sorry, was that
 9      an objection?
10      A.    There are instances where pending
11  deadlines, especially if they are imminent
12  where it is desirable, not under the
13  present circumstances with the Quickie
14  matter however.
15      Q.    And who determined that it was
16  not desirable under present circumstances
17  with the Quickie matter that it was not
18  desirable to reference pending deadlines,
19  who made that determination?
20      A.    I think you assume a fact not in
21  evidence.  So I --
22      Q.    What assumption is that?
23      A.    That there was a determination.
24  I think the determination was made by the
25  client in revoking well prior to the
```

**Paul Sutton**

Page 217

```
 1                P. Sutton
 2  deadline the Power of Attorney so that the
 3  client made that decision and Mark Evens
 4  made the decision or Thelen made the
 5  decision not to pay timely that maintenance
 6  fee.
 7      Q.    Did Quickie say Mr. Sutton, I
 8  want you to transfer the files and I don't
 9  want you to tell them what the deadlines
10  are for maintenance fees?
11      A.    It's clear from the revocation
12  that the client wanted us not to be
13  involved in any way any further, and the
14  revocation was not partial, it was
15  complete, and the client had the benefit of
16  counsel other than Greenberg Traurig who
17  had the knowledge and the ability and the
18  wherewithal to pay the maintenance fee and
19  to docket it, namely Alan Fell, Steve
20  Colvin himself who was a very sharp
21  individual, Mark Evens and people at Thelen
22  and then there's the issue of Maier & Maier
23  could in my view have reinstated that
24  patent so that it was not lapsed.
25              MR. LODEN:  Objection.
```

**Paul Sutton**

Page 218

1            P. Sutton

2    Nonresponsive.  Move to strike.

3 BY MR. LODEN:

4    Q.    My question was very simple

5 again.  I'll reread it to you.

6         Did Quickie say Mr. Sutton, I

7 want you to transfer the files and I don't

8 want you to tell them what the deadlines

9 are for maintenance fees?  Did Quickie ever

10 say that to you?

11    A.    I don't recall anyone at Quickie

12 telling me, using those words in any

13 conversation with me.

14    Q.    Have you ever heard that those

15 words were used in a conversation with Todd

16 Sharinn?

17    A.    I have no personal information

18 one way or another, but I do, it is clear

19 that well prior to the maintenance fee

20 deadline, the initial deadline which

21 payment could be made thereafter that

22 Thelen for many months had the information,

23 could have and should have had the

24 information in its docketing system and

25 could have and should have paid that

**Paul Sutton**

Page 249

```
 1                   P. Sutton
 2 this.  So I do, I can say that this is,
 3 this relates to the claims of infringement
 4 of the '160 Patent against Medtronic.
 5      Q.    Okay.
 6            And that's matter number 0 --
 7      A.    And also possibly Guidant
 8 Corporation, if you'll see at the end of
 9 the first paragraph because that was a
10 potential target as well, infringer.
11            As we're talking about this, a
12 couple of things come to mind.
13            While we went back and forth
14 regarding letters to and from clients or to
15 and from new attorneys of record --
16      Q.    Let me just -- there wasn't a
17 question pending, so what are you doing
18 here?
19      A.    Well, this refreshes my
20 recollection on something that has to do
21 with my testimony here today and that
22 concerns the -- you asked me previously
23 about letters accompanying papers or files
24 or whatever going to or from new attorneys
25 or coming from other attorneys to my firm,
```

**Paul Sutton**

Page 250

```
 1                    P. Sutton
 2 and I just wanted to be clear that, because
 3 I hesitated about what is good practice or
 4 whatever, that I didn't want that to be
 5 misconstrued as anything other than our
 6 view, my view, my personal view that when
 7 Quickie revoked our Power of Attorney that
 8 we had no responsibility whatsoever for the
 9 '160 Patent thereafter.
10           If that was not clear, it's
11 important that I make that clear on the
12 record.  This representation letter,
13 Exhibit 14, just brings this to mind that
14 here Exhibit 14 is we're taking on
15 responsibility of a matter, but earlier you
16 talked about transferring of the matter to
17 Thelen.  Once Thelen assumed responsibility
18 by virtue of our revocation of our Power of
19 Attorney, we had no responsibility
20 thereafter.
21      Q.    Are you done with that statement?
22      A.    Yes, yes.
23            MR. LODEN:  Objection.
24      A.    What I'm doing is clarifying
25 prior testimony that I gave you.
```

Paul Sutton

Page 271

1                    P. Sutton

2 **refusal to answer any questions about --**

3    A.    I said if you want to waste your

4 time and ask me specific questions

5 regarding Exhibit 20, I prepared you for

6 the fact that this is something that you

7 and/or your firm had prepared that I have

8 not seen before and that I didn't want you

9 to waste your time.

10            But go ahead and ask me what

11 you'd like and I'll give you an answer as

12 to each with respect to Exhibit 20.

13    Q.    **Mr. Sutton, were you aware that**

14 **Todd Sharinn had promised Quickie to**

15 **provide notice before maintenance fees were**

16 **due on the '160 Patent?**

17    A.    What time frame are you talking

18 about, please?

19    Q.    **When you hired Todd Sharinn, when**

20 **Greenberg Traurig hired Todd Sharinn.**

21    A.    I don't believe the premise of

22 your question is accurate.

23    Q.    **What premise is inaccurate?**

24    A.    Regarding a promise.  I believe

25 you misspoke.

**Paul Sutton**

Page 273

1              P. Sutton

2    Q.    -- will you read that into the

3 record, please.

4    A.    This is page 2, the last sentence

5 of the very first paragraph, yes?

6    Q.    Will you read that in the record,

7 please.

8    A.    Yes.

9          "We, namely Pepe & Hazard" --

10    Q.    Does it say -- stop.

11    A.    Please let me finish -- "will

12 notify you regarding payment of the

13 maintenance fees several months before they

14 are due."  Signed by Todd S. Sharinn on

15 behalf of Pepe & Hazard.

16    Q.    Where in that last sentence does

17 it say we, meaning Pepe & Hazard, will

18 notify you regarding payment?

19    A.    I'll refer you to the upper left

20 corner of the very first page of Exhibit

21 21, Pepe & Hazard, this letter is being

22 written on behalf of Pepe & Hazard by Todd

23 S. Sharinn.

24    Q.    So were you aware that Todd S.

25 Sharinn had written this letter when he was

Paul Sutton

Page 274

```
 1              P. Sutton
 2 hired by Greenberg Traurig?
 3    A.    I had no personal information
 4 about this letter at or about the time that
 5 Todd Sharinn was hired, and I don't believe
 6 I've seen anything in our records that
 7 would indicate an assumption of
 8 responsibility that may have been
 9 undertaken by Pepe & Hazard.
10           MR. LODEN:  Objection.
11    A.    That was part of our engagement.
12           MR. LODEN:  Objection.
13    Nonresponsive.  Move to strike.
14 BY MR. LODEN:
15    Q.    Mr. Sutton, are you aware of Todd
16 Sharinn ever telling Quickie that Greenberg
17 Traurig would not monitor the maintenance
18 fee deadlines after Todd moved to
19 Greenberg?
20    A.    I can't answer your question
21 because the premise is not accurate.
22    Q.    What premise is not accurate?
23    A.    I'm not aware of any personal
24 promise made by Todd Sharinn.  I see
25 reference to a statement in Exhibit 21,
```

**Paul Sutton**

Page 275

```
 1                P. Sutton
 2 where is reference by Mr. Sharinn about
 3 Pepe & Hazard's undertaking
 4 responsibilities during Pepe & Hazard's
 5 representation of Quickie, but I see
 6 nothing about any that would suggest any
 7 personal assumption of responsibility by
 8 Todd Sharinn individually.
 9     Q.    Are you aware of Todd Sharinn
10 ever telling Quickie that Pepe & Hazard's
11 responsibility for providing notice about
12 maintenance fees was not being transferred
13 to Greenberg when Todd moved to Greenberg?
14     A.    Are you talking about prior to
15 the time that Todd Sharinn joined Greenberg
16 Traurig?
17     Q.    I'm talking about at the time he
18 joined Greenberg Traurig.
19     A.    I don't recall knowing or meeting
20 Todd Sharinn at or about the time he was
21 hired by Greenberg Traurig.
22     Q.    At any time, are you aware of
23 Todd Sharinn telling Quickie that Greenberg
24 Traurig would not honor the commitment that
25 you say Pepe & Hazard made in Exhibit 21?
```

**Paul Sutton**

Page 276

1          P. Sutton

2     A.    The premise of your question is

3 ridiculous in the sense that it suggests an

4 obligation on the part of Greenberg Traurig

5 to honor an obligation of another law firm

6 that previously represented Quickie.  I

7 really don't understand the premise or the

8 content of your question.  It makes no

9 sense.

10    **Q.    Maybe you're misunderstanding my**

11 **question.**

12    A.    I don't think so.

13    **Q.    Well, let me try it again.**

14          **As you sit here today, do you**

15 **know whether Todd Sharinn ever told Quickie**

16 **that Greenberg would not provide the notice**

17 **of maintenance fees that you say Pepe &**

18 **Hazard committed to provide as reflected in**

19 **Exhibit 21?**

20          MR. CHU:  Objection.

21    A.    You've mischaracterized my

22 testimony and --

23    **Q.    I'm asking --**

24    A.    Please let me finish.  If you

25 don't get the answer you like, you

**Paul Sutton**

Page 278

1              P. Sutton

2 notice in Exhibit 7?

3              MR. CHU:   Objection.

4      A.      You are confusing -- your prior

5 questions had to do with an obligation of

6 Pepe & Hazard that might or might not have

7 existed while they represented Quickie.

8 There is nothing that I'm aware of, and

9 it's ridiculous to suggest that Greenberg

10 Traurig would assume a questionable

11 obligation that may have been undertaken by

12 Pepe & Hazard prior to Greenberg's

13 representation of Quickie.

14              It makes no sense whatsoever and

15 the premise of your question, frankly, is

16 ridiculous.  I'm sorry to use terms that

17 strong, but where you're going makes no

18 sense whatsoever and the question makes no

19 sense.

20              Until you showed me Exhibit 21, I

21 never testified about Pepe & Hazard in

22 connection with any obligation possible or

23 otherwise that they might have undertaken

24 to Quickie.  So I just think my response to

25 the prior question is appropriate here as

**Paul Sutton**

Page 286

1                    P. Sutton

2  & Hazard, if any, to Quickie prior to

3  Greenberg Traurig's representation of

4  Quickie.

5            Your questions really are, I'm

6  sorry, but make no sense.

7     Q.    I'm trying to find common ground

8  with you, Mr. Sutton.

9     A.    No.  This is not a negotiation to

10 find common ground.  I'm here to give you

11 truthful testimony.

12    Q.    Okay.  Well, let's see if this

13 one works for you then.

14            Would you agree with me that when

15 the file was transferred from Pepe & Hazard

16 to Greenberg Traurig, Greenberg Traurig had

17 no obligation to provide advanced notice of

18 maintenance fees for the '160 Patent?

19    A.    I don't understand your question.

20 I'm sorry.

21    Q.    You know --

22    A.    At the time that Greenberg

23 Traurig was retained by Quickie, it

24 undertook obligations to perform legal

25 services to Quickie, and from that date

**Paul Sutton**

Page 287

1              P. Sutton

2 forward I'm not aware of any agreement.

3         It's ridiculous to suggest an

4 agreement that Greenberg Traurig undertook

5 obligations of a prior firm.  It really

6 makes no sense, I'm sorry.

7    Q.    **I'm not suggesting that they did.**

8    A.    I'm sorry, but you did suggest

9 that we did, and I'm sorry, but I cannot

10 let you -- I must disabuse you of that

11 concept.  It just makes no sense.

12    Q.    **You're misunderstanding my**

13 **question, but I'll move on.**

14         **At some point, though, you would**

15 **agree with me Greenberg Traurig did take on**

16 **the responsibility for monitoring and**

17 **docketing maintenance fee deadlines on the**

18 **'160 Patent, correct?**

19    A.    You've asked me those questions

20 and I gave you answers previously today and

21 I'm not going to repeat them again.  I

22 mean, why go back over stuff that you've

23 asked me and I've answered?

24    Q.    **I'm trying to make sure that your**

25 **testimony is clear.**

Page 289

```
 1              P. Sutton
 2 '160 Patent at some point, and your
 3 response was you've already asked me those
 4 questions and I'm not going to repeat my
 5 answers again.
 6         So my question is:  Do you have
 7 any reason to supplement those prior
 8 answers, or do you believe that they are
 9 still accurate and correct, as you sit here
10 right now?
11    A.    To augment and supplement my
12 prior testimony, all of the data
13 transferred from the PATS computerized
14 docketing system to the DIAMS computerized
15 docketing system, all of that data was
16 transferred so that what was put into DIAMS
17 corresponded to what was previously in the
18 PATS system.  That's number one.
19         Number two, to the extent that Al
20 Jacobs' name appears on Exhibit 8, his name
21 was added in connection with administrative
22 responsibilities.
23         Three, at the time that Greenberg
24 Traurig's Power of Attorney was revoked, it
25 is my view that it had no further
```

**Paul Sutton**

Page 290

1                    P. Sutton

2  responsibility to Quickie and that that

3  responsibility lay with Thelen.

4            Other than that, I don't wish at

5  the present time to augment or correct or

6  to supplement any of my testimony that I

7  gave previously today.

8      **Q.    Nothing else at all?**

9      A.    If I have additional information

10 to share with you, I will, I'll feel

11 comfortable offering that to you and you

12 can take it, if you're willing.

13            MR. LODEN:  I'll ask the reporter

14     to mark Exhibit 22.

15            (Exhibit 22, Document, marked for

16     identification, as of this date.)

17 BY MR. LODEN:

18     **Q.    Mr. Sutton, you've just been**

19 **handed what's been marked as Exhibit 22.**

20            **Have you seen this document**

21 **before?**

22     A.    I believe I have seen Exhibit 22

23 prior to today.

24     **Q.    When did you last see Exhibit 22?**

25     A.    I do not recall.

**Paul Sutton**

Page 291

```
 1                   P. Sutton
 2       Q.    Did you look at it during your
 3  preparation for today?
 4       A.    I may have.  I reviewed many,
 5  many documents so that I may have, but I
 6  don't recall.
 7       Q.    Do you see in the regarding line
 8  it references Quickie, LLC versus
 9  Medtronic, do you see that?
10       A.    I do.
11       Q.    And then Civil Action Number
12  02-CV-1157, do you see that?
13       A.    I see those numbers.
14       Q.    Do you recall if that's the case
15  number assigned to the Quickie versus
16  Medtronic litigation?
17       A.    I do not recall from memory the
18  civil action number.
19       Q.    How did you become aware that
20  Thelen Reid was going to be substituted for
21  Greenberg Traurig in that litigation?
22       A.    I became aware through a number
23  of instances of events.  I became aware
24  from Steve Colvin that he wanted to help
25  his family's relative Mark Evens in
```

**Paul Sutton**

Page 292

```
 1                 P. Sutton
 2 connection with the income derived from
 3 handling matters that we were handling.
 4         The fact that -- let me give you
 5 those.  The fact that Mark Evens asked to
 6 monitor and counsel Quickie in connection
 7 with the Medtronic and 160 matters that we
 8 were handling for Quickie and that Steve
 9 Colvin asked us to cooperate and to,
10 cooperate with him in that regard.
11         The communications between Mark
12 Evens, myself and Mark Evens and Todd
13 Sharinn gave that indication, the fact that
14 Mark Evens of Thelen sat at the table, at
15 counsel's table during the Markman Hearing
16 is another instance.
17         The fact that Allan Fell told
18 Todd Sharinn the day after the Markman
19 Hearing, September 5, 2002, that Thelen was
20 going to replace Greenberg Traurig.
21         This Exhibit 22, the October 15,
22 2002 letter, I think, there were
23 indications over several months that this
24 was likely going to happen, notwithstanding
25 what Allan Fell refers to in the next to
```

Paul Sutton

Page 293

```
 1              P. Sutton
 2 last paragraph, "I want to personally thank
 3 you for the superb job you have done in
 4 litigating this matter."
 5              If you're doing a superb job, you
 6 don't transfer the work to another firm,
 7 except under special circumstances such as
 8 this, where he wanted to help one of his
 9 relatives.
10     Q.    Allan Fell wanted to help one of
11 his relatives?
12     A.    Steve Colvin and Quickie wanted
13 to help Mark Evens, who was a relative of
14 Stephen Colvin's family.
15     Q.    And how did you know that
16 Dr. Colvin had that desire?
17     A.    He personally told that to me
18 himself.
19     Q.    In person or over the phone?
20     A.    Possibly both.  He shared a
21 number of things with me and I shared a
22 number of things with him in person and
23 over the phone, if you're interested in
24 what those were.
25     Q.    When did those conversations take
```

**Paul Sutton**

Page 294

1              P. Sutton

2 **place?**

3     A.    They took place, they began

4 during the summer of 2001 and occurred then

5 and thereafter.

6     **Q.    So when did Dr. Colvin tell you**

7 **that he wanted to give the income from this**

8 **litigation to his family member?**

9     A.    Well, he let us know when I very

10 first met Dr. Colvin in person at his

11 offices at the hospital, I think it was on

12 a weekend, his office had a remarkable view

13 because it was a clear day, a view of the

14 East River because I'm a boater, I'm a

15 sailor -- he indicated that he was

16 considering giving the matter to Mark

17 Evens.

18          I informed him that I knew Mark

19 Evens, that he's a former partner of mine

20 and that I headed up the practice that Mark

21 was part of, and I gave him information

22 regarding the number of litigations that I

23 was involved in, and it was the gray hair

24 or no hair experience factor that I think

25 influenced Steve, that he indicated to that

**Paul Sutton**

Page 295

1                    P. Sutton

2 effect that he wanted us to negotiate with

3 Medtronic, see if we could settle it, if

4 not to litigate.

5            He also indicated that he had a

6 very fine relationship with Medtronic where

7 they relied on him for ideas and inventions

8 and that he felt that his existing

9 relationship with Medtronic would influence

10 them in terms of Medtronic's actions and

11 possible settlement.

12     **Q.    Who else was present when**

13 **Dr. Colvin --**

14     A.    I didn't finish.  You want to

15 know the remainder of the conversation?

16     **Q.    Sure.**

17     A.    I indicated to Dr. Colvin the

18 potential problems associated with, that

19 there were no guarantee on the outcome of a

20 fight with Medtronic, that they had

21 resources to put into the defense, and I

22 indicated to him that there were questions

23 that they would raise about infringement

24 because the patent, the '160 Patent has a

25 focus which was not identical with the

**Paul Sutton**

Page 296

1                    P. Sutton

2 product that Medtronic was marketing and

3 there were genuine questions about how the

4 claims would be interpreted and whether or

5 not there would be an ultimate finding of

6 infringement, and I explained to him about

7 the Markman Hearing and how there would be

8 a de novo Markman Hearing by the Court of

9 Appeals for the Federal Circuit, so that he

10 understood that these cases are often

11 litigated through appeal because sometimes

12 the district court judge's decision on

13 Markman is disregarded by the Court of

14 Appeals for the Federal Circuit.

15          So I gave him explanations as to

16 what to expect from the litigation because

17 I don't believe he had ever been through

18 one of these patent infringement fights

19 previously, and there were other things

20 that we discussed, but why don't you ask me

21 your next question.

22    Q.    **My next question is anything else**

23 **that you discussed?**

24    A.    Yes.   I got into discussions

25 about damages because sometimes you can

**Paul Sutton**

Page 297

1                      P. Sutton

2 win, but the attorneys' fees can exceed the

3 amount of damages that you can recover.

4              So we discussed -- he had a hope

5 that he would recover 8 figures, $10

6 million or more from Medtronic.  I tried to

7 temper -- managing client expectations is a

8 tricky business and not realizing that the

9 patent would be gutted and rendered almost

10 worthless by the re-examination, I tried to

11 prepare him for the possibility that you

12 could win, but that you might not wind up

13 with anything because we were not taking

14 this case on a contingency basis, this was

15 going to be on a fee basis.

16              We discussed -- I asked him

17 whether he had licensed any other parties,

18 and he indicated no, he had not, and I

19 explained to him that if he had that that

20 would enhance his chances of success in the

21 court.

22              I asked him if he ever marketed a

23 product covered by the '160 Patent because

24 that would enhance his chances in the

25 court.  He said no.

**Paul Sutton**

Page 299

1                    P. Sutton

2  us were in the room together -- what I just

3  testified to was discussed some in person,

4  some by phone.  Some of those were

5  discussed between the two of us while I was

6  negotiating with Hal Patton at Medtronic.

7       Q.    On the phone conversations, was

8  anyone else on the phone other than you and

9  Dr. Colvin?

10      A.    I don't recall anyone else being

11 on the phone.

12      Q.    And you've mentioned that Todd

13 Sharinn accompanied you to Dr. Colvin's

14 office --

15      A.    Actually, he brought me to

16 Dr. Colvin's office to introduce me to him

17 because he was familiar with Dr. Colvin.  I

18 had not met him before.  Although I had

19 heard of his reputation as a thoracic

20 surgeon.

21      Q.    And was it at that meeting that

22 Dr. Colvin informed you that he wanted to

23 transfer the file to Mark Evens to give

24 Mr. Evens the revenue?

25      A.    I believe it was at that meeting

Paul Sutton

Page 300

```
 1                P. Sutton
 2 that he informed us or me that he had, he
 3 knew somebody affiliated with his family
 4 who was in the business of litigating
 5 patents, namely Mark Evens, and it was just
 6 a coincide that Mark and I knew each other
 7 because we were at the same firm.  He came
 8 in while I was heading up the IP practice
 9 there.
10     Q.    What I'm trying to find out,
11 though, is when did Dr. Colvin tell you I
12 want to give the work to Mark because I
13 want to give him the money?
14     A.    I had the feeling from the very
15 beginning, including that very first
16 meeting, that there was a possibility,
17 possibly a strong possibility that at any
18 time this work would or could be
19 transferred to Mark Evens because of the
20 nature of the conversations I've described.
21          MR. SCOTT:  Just hang on a
22     second.  Just because I want to speed
23     this up.
24          MR. LODEN:  Thank you.
25          MR. SCOTT:  With all due respect,
```

**Paul Sutton**

Page 301

```
 1                 P. Sutton
 2     Mr. Sutton, we let you go on and give
 3     your jury argument and all that.  His
 4     question was simply when did
 5     Dr. Colvin tell you that he wanted to
 6     give the case to Evens and you went on
 7     to I had this feeling.  So I'm just
 8     asking you --
 9          THE WITNESS:  Okay, it began with
10     his asking us to permit Mark to
11     monitor it and that we should
12     cooperate with Mark and give him
13     copies of documents so that he could
14     independently guide and counsel and
15     represent Dr. Colvin and Quickie.
16          So it was not a sudden thing that
17     occurred.  It occurred over time where
18     initially he may be aware of Mark
19     Evens and the relationship, then
20     asking us to share and to permit Mark
21     to monitor, and then his indicating
22     that he wanted to help Mark.
23  BY MR. LODEN:
24     Q.    And how did he indicate that he
25  wanted to help Mark?
```

**Paul Sutton**

Page 302

1                    P. Sutton

2     A.    By making statements to the

3 effect that he'd like Mark to get involved,

4 words to that effect, which to me I

5 interpreted to mean Mark would take an

6 increasing role and an increasingly

7 important role headed towards his taking

8 over the case.

9     **Q.    So then Dr. Colvin never actually**

10 **said I want Mark to get involved because I**

11 **want him to get the fees for this case?**

12     A.    I don't remember the specific

13 words that Dr. Colvin used, but that's my

14 interpretation because there would be no

15 other reason for Mark to be involved, if

16 the client thought our work was superb and

17 we had more experience than Mark, and Mark,

18 I don't know that Mark has a technical

19 background.  He has handled litigation, but

20 I believe that that was the obvious reason.

21          MR. LODEN:  If I could get the

22     reporter to mark Exhibit 23, please.

23          (Exhibit 23, Fax dated 11/11/02,

24     marked for identification, as of this

25     date.)

**Paul Sutton**

Page 308

```
 1              P. Sutton
 2     Q.    Okay.
 3           Did he call you or did you call
 4  him?
 5     A.    I don't recall who initiated the
 6  call.
 7     Q.    Okay.
 8           Do you recall why it is that if
 9  Mr. Evens' correspondence in Exhibit 23 was
10  directed to Todd Sharinn why you ended up
11  talking to Mr. Evens about the file
12  transfer?
13     A.    Yes.  Mark Evens was a former
14  partner of mine at Thelen.  Part of my
15  intellectual property department.  I had a
16  fine relationship with him.  Frankly, I
17  welcomed the opportunity to say hello to
18  him because I hadn't spoken to him in a
19  while.  So the transfer of these files
20  opened up an opportunity for me to say
21  hello to him or if he called me to have a
22  nice conversation with him.
23     Q.    Okay.
24           At the end of the first sentence
25  there you reference relevant files relating
```

**Paul Sutton**

Page 309

1              P. Sutton

2  to the above-referenced litigation.

3          Do you see that?

4     A.    I do.

5     Q.    What files are you referring to

6  there?

7     A.    Those would be physical files

8  that related to the Quickie versus

9  Medtronic litigation.

10          Prior to that time, Mark had

11 received from Todd Sharinn possibly the

12 entire file wrapper, I just don't know, but

13 certainly the information on the first

14 cover of the file wrapper with Todd's April

15 11, 2002 letter.  So that anything that we

16 had that enabled us to prosecute this

17 litigation is something that we will have

18 turned over to Mark so that he could

19 continue that.

20    Q.    Do you know if the patent record

21 sheet was included in those files that were

22 transferred?

23    A.    Well, Mark had that information

24 on the patent record sheet already.  I

25 don't know whether that was included in

Paul Sutton

Page 310

1               P. Sutton

2 this because I don't believe I personally

3 physically handled the assembly of the

4 documents in the boxes.

5     Q.    Who did handle that assembly?

6     A.    I don't know the specific name,

7 but that would normally be done by a

8 litigation, a patent litigation paralegal.

9     Q.    Okay.

10          The first -- the paragraph that

11 begins finally, the last paragraph there --

12    A.    Yes.

13    Q.    You say, "Finally, for the

14 benefit of our mutual client Quickie" --

15 why was Quickie a mutual client if you were

16 transferring the litigation to Thelen?

17    A.    I don't understand your question.

18    Q.    Well, was Quickie still a client

19 of yours after the litigation was

20 transferred to Thelen?

21    A.    The revocation of --

22    Q.    I'm talking about in October '02.

23    A.    I know.  The revocation of our

24 Power of Attorney involving the '160 Patent

25 I believe occurred in 2003.

Paul Sutton

Page 314

```
 1                P. Sutton

 2 and it looks like it was faxed from Paul

 3 Jergensen of Greenberg Traurig, that's the

 4 paralegal you referred to previously, if

 5 you look at the first page, fax cover page?

 6      A.    I see the title paralegal under

 7 his name.

 8      Q.    I'm on the first page.

 9      A.    I'm sorry, okay, Exhibit 25, I

10 see.  Yes, I see Paul A. Jergensen.

11      Q.    And that is a paralegal at, he is

12 a paralegal at Greenberg Traurig, correct?

13      A.    I believe he was as of the date,

14 as of October 16, 2002.

15      Q.    And then turning to the second

16 page dated October 16, 2002, it looks like

17 he's writing to someone at Thelen Reid &

18 Priest.

19            Do you see that?

20      A.    Yes.

21      Q.    And on the RE line he references

22 Quickie, LLC versus Medtronic, Inc.

23            Do you see that?

24            MR. CHU:  He hasn't got the page

25      yet, hold on.
```

**Paul Sutton**

Page 315

```
 1                   P. Sutton
 2             MR. LODEN:  No, he's at the page
 3      I'm talking about.
 4             MR. CHU:  Oh, I'm sorry.
 5      A.     Bear with me.
 6      Q.     You're looking at the right --
 7      A.     No, excuse me -- okay.
 8             Now, I'm looking at the page
 9 ending in 98948 Bates number of Exhibit 25.
10      Q.     That's correct.
11      A.     Yes.
12      Q.     Mr. Jergensen references Quickie,
13 LLC versus Medtronic, Inc.
14             Do you see that?
15      A.     I do.
16      Q.     And then he states "our reference
17 number."
18             Do you have an understanding as
19 to who "our" refers to there, is that
20 Greenberg Traurig?
21      A.     That would be Greenberg Traurig's
22 reference number.
23      Q.     And then the number there
24 51822.010400, do you see that?
25      A.     I see that number.
```

**Paul Sutton**

Page 316

1                    P. Sutton

2    Q.    If you look back to Exhibit 13 --

3    A.    I have it in front of me.

4    Q.    That's the matter entitled

5  Quickie, LLC versus Medtronics, correct?

6    A.    Correct.

7    Q.    Did you ask Mr. Jergensen to send

8  this letter to Thelen Reid & Priest?

9    A.    Actually, Mark Evens in Exhibit

10 23, his letter of October 11th, 2002 on the

11 fourth line in the first paragraph starting

12 in the third line, please send the file,

13 see attention of Shari Markovitz-Savit, it

14 was Mark Evens that requested that this be

15 done.

16    Q.    Well, he requested that be done

17 and he made that request to Todd Sharinn.

18 My question is how did Paul Jergensen end

19 up being the one to respond to Mr. Evens'

20 request?

21    A.    Well, you'll note in the second

22 paragraph Mr. Sutton has instructed me to

23 get these documents into the hands of Mark

24 Evens pronto.

25    Q.    Okay.

**Paul Sutton**

Page 317

1              P. Sutton

2      A.      So Paul Jergensen is reflecting

3 my request that he take care of that ASAP.

4      Q.      Okay.

5              And actually, this letter from

6 Mr. Jergensen dated October 16, 2002, if

7 you look at the last sentence of the first

8 paragraph, he says a copy of my cover

9 letter accompanying the files is faxed

10 herewith.

11      A.      I'm sorry, where are you?

12      Q.      The last sentence of the first

13 paragraph.  A copy of my cover letter

14 accompanying the files is faxed herewith.

15              Do you see that?

16      A.      Yes, I see that sentence.

17      Q.      And then if you turn to the next

18 page, you'll see a two-page letter written

19 by Mr. Jergensen.

20      A.      Yes, with item number 5

21 reflecting the '160 Patent and its file

22 history and prior art as being forwarded on

23 October 16th.

24              MR. LODEN:  Objection.

25      Nonresponsive.

Paul Sutton

Page 318

1                 P. Sutton

2 BY MR. LODEN:

3     Q.    So the two-page, the last two

4 pages of Exhibit 25, the letter from

5 Mr. Jergensen, the two-page letter dated

6 October 16, 2002, it also references

7 Quickie, LLC versus Medtronic.

8            Do you see that?

9     A.    It references not only Quickie,

10 LLC versus Medtronic, but also it makes

11 express reference to U.S. Patent No.

12 6,066,160 file history and prior art next

13 to number 5 on the first page of the letter

14 to Shari Markovitz-Savit dated October 16,

15 2002.

16     Q.    And the reference for the client

17 matter number on this document is

18 51822.010400, correct?

19     A.    It appears on the top, in the

20 reference clause of the first page of Paul

21 Jergensen's letter to Markovitz-Savit.

22     Q.    Where in the 137 items listed

23 here on this letter would there be

24 reference to the patent record sheet for

25 the '160 Patent?  Is it included in that

**Paul Sutton**

Page 319

1              P. Sutton

2 list?

3     A.     Item number 5 is broad enough to

4 include that?  You're saying that the

5 patent record sheet in Exhibit 3 was

6 included as part of item number 5.

7              Certainly -- the description

8 under item number 5 on Exhibit 25 I read as

9 broad enough to contemplate inclusion of

10 that patent record sheet of Exhibit 3.

11 BY MR. LODEN:

12    Q.    If I could get you to turn to

13 Exhibit 8?

14    A.     8?

15    Q.     8.

16    A.    It's in front of me.

17    Q.    The two-page document that's in

18 Exhibit 8 was this document, the two-page

19 document, was it transferred to Shari

20 Markovitz-Savit at Thelen Reid as part of

21 this letter that we're looking at in

22 Exhibit 25?

23    A.    Very possibly under item number

24 5, but I personally did not pack a copy of

25 Exhibit 8 in the box at the time that Paul

# EXHIBIT T

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ---------------------------- COPY

5  QUICKIE, LLC,

6             Plaintiff,

7      vs.                        07-CV-10331

8  GREENBERG TRAURIG, LLC,        (RMB)(DFE)

9  et al.,

10             Defendants.

11 ----------------------------

12

13

14

15

16      DEPOSITION OF TODD SHARINN

17       Wednesday, June 11, 2008

18             9:30 a.m.

19

20

21

22 Reported by:

23 Joan Urzia, RPR

24 JOB NO. 203575

25

**Todd Sharrin**

Page 16

1              T. Sharinn

2      Q.    And you were there for about how

3 long?

4      A.    A couple of years, few years.

5      Q.    Okay.

6            And then you moved to the east

7 coast?

8      A.    I did.

9      Q.    And Pepe & Hazard or --

10     A.    No, no, I took a coaching job

11 with Yale, so I worked with a patent

12 boutique called St. Onge.

13     Q.    And where is that firm?

14     A.    New Haven.

15     Q.    And then you were there for how

16 long?

17     A.    About a year, and then I took a

18 job somewhere else for coaching hockey.  I

19 was head coach at Villanova.  The early

20 part of my legal career followed my hockey

21 career.

22     Q.    So you were working at a

23 different law firm while you were moving

24 from different coaching positions?

25     A.    Well, playing and coaching, yes.

**Todd Sharrin**

Page 17

```
 1                  T. Sharinn

 2      Q.    Well, then, just walk me through.

 3 So you were then at Villanova?

 4      A.    Yes, sir.

 5      Q.    And that's in Pennsylvania?

 6      A.    It is.

 7      Q.    And what's the firm there?

 8      A.    I did a lot of work for St. Onge

 9 actually by proxy.

10      Q.    Okay.  So you were in a sense

11 freelancing a bit?

12      A.    Yes.

13      Q.    All right.

14            And so what's the next firm that

15 you associate yourself with during this --

16      A.    Well, pretty much my hockey

17 career came to an abrupt end and I went and

18 worked for one of my law school professors,

19 it was a firm called Levenson Lerner.

20      Q.    And where is that?

21      A.    New York City.

22      Q.    And you were there for how long?

23      A.    About a year.

24      Q.    And then you --

25      A.    Bryan Cave.
```

**Todd Sharrin**

Page 54

1                T. Sharinn

2            (Exhibit 34, Letter dated 5/4/01,

3        marked for identification, as of this

4        date.)

5 BY MR. SCOTT:

6    Q.    On the second page you'll see

7 some different files, if you will, that are

8 to be transferred or not transferred.

9            This is a May 4, 2001 letter from

10 one of your former colleagues at Pepe &

11 Hazard to Alan Fell in connection with your

12 prospective departure from Pepe to

13 someplace else.

14    A.    Right.  I didn't -- I'm very

15 funny -- it's not funny, but it's just the

16 way I do things -- when I've left jobs in

17 the past, until I was walking out the door,

18 I never told anybody where I was going

19 unless I felt it was appropriate.  I never

20 felt it was their business.  I look at them

21 as my past, not my future.

22    Q.    So they didn't know you were

23 going to Greenberg?

24    A.    I didn't tell them anything other

25 than I was going to be leaving, and then

**Todd Sharrin**

Page 55

```
 1                  T. Sharinn
 2 when it was time to go, I gave them my
 3 address as to where they should mail the
 4 stuff.
 5    Q.    In this particular instance, Mr.
 6 Urbanik is writing to Alan on behalf of
 7 Pepe & Hazard to basically say do you want
 8 the files to stay here or do you want them
 9 to go with Todd Sharinn?
10    A.    They didn't want it to go,
11 obviously.  I mean, they're a law firm.
12    Q.    At this time frame, do you have
13 any general recollection as to the amount
14 of annualized income that's coming off of
15 the Quickie group, if you will?
16    A.    At the time it seemed like a lot.
17 In retrospect, it was very, very little.
18    Q.    Any kind of numbers that go with
19 that?
20    A.    I would say probably 115, maybe
21 100 at the most.
22    Q.    Well, that was worth a lot more
23 than it is now?
24    A.    Yeah, I'm saying at the most.  It
25 was really -- maybe even less than that.  I
```

**Todd Sharrin**

Page 56

```
 1              T. Sharinn
 2 don't remember offhand.
 3         I remember this, that as an
 4 associate I always was treated differently
 5 because I always had some origination of my
 6 own, and it wasn't just from them, I had
 7 other clients, but it was never enough to
 8 be treated really different, like to be put
 9 into the realm of we've got to make this
10 guy a partner sooner than later.
11    Q.    But this is a tidy book of
12 business on a pretty --
13    A.    Again, as I'm reflecting on it, I
14 think it's probably lower than that.   I
15 think probably realistically that was my
16 whole book of business, with other clients
17 too, I was thinking maybe like 75, 80, now
18 that I'm looking about it a little more.   I
19 don't know offhand.
20    Q.    So they don't want it to go, of
21 course.   You're expecting it to go with
22 you, right?
23    A.    That was the indication I had
24 gotten when I had spoken to Steve and Alan.
25    Q.    And in fact, Quickie has followed
```

**Todd Sharrin**

Page 69

1                    T. Sharinn

2        Q.    And what are those, is that the

3    licensing negotiations?

4        A.    They were negotiations, right, to

5    try and get a licensed deal for Quickie

6    because Medtronic, while they were -- I

7    guess we'll talk about that obviously --

8    while they were expressing some interest in

9    the technology, weren't being particularly

10   overly interested, and so Steve wanted to

11   go out and build a sense of urgency and

12   necessity.

13       Q.    So he has this idea, and is it

14   just the '160 Patent that he's trying to

15   shop to Ethicon U.S. surgical or Medtronic,

16   or is there other stuff as well?

17       A.    No, just the 160, as I recall.

18       Q.    So the 160, you get it patented

19   while you're at Pepe & Hazard, right?

20       A.    I did, yes.

21       Q.    Applied for in 1998, issued in

22   May of 2000, does that jive with your

23   recollection?

24       A.    Sounds about right.

25       Q.    So it's prior to you going over

**Todd Sharrin**

Page 70

1                    **T. Sharinn**

2  **to Greenberg Traurig --**

3      A.      Right.

4      **Q.      -- that it issues?**

5      A.      Right.

6              The other matter, this General

7  Corp, I have no recollection at all of what

8  that is.

9      Q.      **All right.**

10             **I just want to come back to -- so**

11 **were there negotiations with Ethicon U.S.**

12 **Surgical and Medtronic prior to the**

13 **issuance of the '160 Patent or only after?**

14     A.      Prior.

15     **Q.      Prior.**

16     A.      There were no -- we should

17 understand something, there were no real

18 negotiations.  There was a non-disclosure

19 agreement/non-compete agreement that I

20 negotiated with each of those specific

21 companies that were entered into by both

22 those companies.

23     **Q.      Just so you can look?**

24     A.      So look and talk, because the

25 application was still pending.

**Todd Sharrin**

Page 71

1          T. Sharinn

2          Ethicon, I'm not quite sure we

3 were even on the plane back from

4 Cincinnati, it was where they were located

5 before they had said they weren't

6 interested.  They couldn't have shown less

7 interest at the meeting if they tried.

8          In fact, I remember Steve was

9 very upset because the guy that was

10 supposed to meet with us didn't even come

11 to meet with us, and we ate in a cafeteria

12 which he made a comment about.

13          U.S. Surgical, they were nicer,

14 but I don't think they took even a week

15 before they started avoiding phone calls,

16 and then it ultimately took my pressing

17 their lawyer to say, guys, my guys are a

18 little anxious here to know what's going

19 on, can someone give us some information.

20 And they basically at that point said they

21 were going to punt.

22     Q.    All right.

23          Medtronic, it reflects license

24 agreement.  There is something there?

25     A.    There was negotiations that were

**Todd Sharrin**

Page 72

1                     T. Sharinn

2 ongoing, even when I was at Pepe & Hazard.

3 I think the agreement actually was entered

4 into at Pepe & Hazard, and I also think

5 shortly after the agreement was entered

6 into that Medtronic was already trying to

7 break the agreement.

8     Q.    **All right.**

9           **But you do recall that there was**

10 **a license and development agreement that**

11 **was executed in connection with Medtronic?**

12    A.    Oh, sure, absolutely.

13    Q.    **While we're at it, let's go**

14 **ahead -- Exhibit 21, which was marked**

15 **yesterday --**

16    A.    Do I need this document any

17 longer?

18    Q.    **Yeah, for a second.**

19    A.    Okay, then I'll hold onto it.

20           I've got it.  Is this what you're

21 looking for?

22    Q.    **Yeah.**

23    A.    Okay.

24    Q.    **These are the ones that were**

25 **marked yesterday, just so you know as we go**

**Todd Sharrin**

Page 94

 1                T. Sharinn

 2 that, but it was very sporadic and it was

 3 always -- again, this was part of the

 4 problem is that Steve, like I said, would

 5 call me sometimes at 3 in the afternoon,

 6 sometimes at 3:00 in the morning to just

 7 talk about anything from boats, the

 8 Yankees -- he wasn't really a Yankees,

 9 Grasse would be more Yankees -- but boats

10 or his divorce at one point, at other

11 points it was his new wife, about patents,

12 about how much Thelen Reid was getting on

13 his nerves, how much they were billing him,

14 what they were doing.

15           And I would constantly tell him

16 that I was no longer engaged by him in that

17 capacity, that I felt uncomfortable talking

18 to him about it.

19           Listen, let's understand

20 something.  I would have loved continue

21 doing this case for them, and in my heart I

22 think I could have won at least on the

23 liability issues.  But I was replaced, and

24 I knew that, and I told him flat out I

25 would be very happy to pick up the pieces

Page 95

```
 1                  T. Sharinn
 2 where Thelen Reid had started to drop them
 3 and try to fix for him what they were
 4 doing, but that I was really not permitted
 5 to do what he was asking me to do.
 6           At one point he asked me if I
 7 wanted to consult or if I would consider
 8 consulting.  At another point he actually
 9 suggested I open a matter and be co-counsel
10 in a very undefined way.  But it didn't,
11 never happen really.
12      Q.    Now I want to try and segregate,
13 if I can.
14      A.    Sure.
15      Q.    And I don't know that based on
16 the testimony that you can --
17      A.    It's hard, because again, you
18 have to understand who the people you are
19 dealing with.  It sounds like you knew
20 Steve.
21      Q.    For a time.
22      A.    Well, to know Steve for any real
23 period of time and to have real involvement
24 with him, I don't think there's a person
25 who has known him that would argue with me
```

**Todd Sharrin**

Page 96

```
 1                T. Sharinn
 2 that Steve could be a lot of different
 3 things at the same time to a lot a
 4 different people in the same room.
 5    Q.    All right.
 6          Did you understand your
 7 responsibility with regards to the '160
 8 Patent to cease upon your being replaced in
 9 connection with the Medtronic litigation?
10    A.    Absolutely.
11    Q.    Now, this is a different
12 question.  If you don't understand the
13 difference, just stop me.
14    A.    That's fine.
15    Q.    Did you understand your
16 responsibility with regards to Quickie as
17 their intellectual property counsel at
18 Greenberg Traurig to cease with your
19 replacement in the Medtronic litigation?
20          MR. KAMINSKY:  Objection to the
21     form of the question.
22    A.    That's how I understood it.
23 Let's understand something.  I got a call
24 at around 9:30 at night from Alan Fell.  I
25 was out celebrating from a different case
```

**Todd Sharrin**

Page 97

```
 1              T. Sharinn
 2 that we had just won, a trademark case --
 3    Q.    By the way, I think you had
 4 reason to celebrate with regards to the
 5 Quickie Markman Hearing as well.
 6    A.    Thank you.  Well, you know, we
 7 felt good.  But I actually didn't celebrate
 8 that night because I saw the writing on the
 9 wall, knew where it was going.
10              One of the only times my ex-wife
11 and I had any real conversation about my
12 career was at night.  I left the
13 celebration after I got that call because I
14 felt like my life at Greenberg Traurig, as
15 I understood it and how I defined it, had
16 pretty much been confirmed to go now in a
17 much different direction than I had hoped.
18              So my understanding was, yes,
19 that -- how to put this other than they had
20 just taken everything that had to do with
21 Quickie away from me.
22    Q.    And what I'm trying to
23 understand, Mr. Sharinn, is that prior to
24 let's just say the Markman Hearing, your
25 involvement with Quickie was multifaceted
```

**Todd Sharrin**

Page 101

1                    T. Sharinn

2 being litigated, the '160 Patent.  I was

3 the attorney of record with the PTO for

4 that matter, and Greenberg Traurig was the

5 firm of record.

6              Subsequent to the Markman

7 Hearing, whenever the date was, whether it

8 was the next day or the day after the

9 ruling was issued, my responsibilities to

10 that patent immediately terminated by

11 actions of Steve Colvin and Alan Fell.

12 They told me flat out, transfer the files,

13 you're no longer responsible.

14      **Q.    And I hear you loud and clear on**

15 **that.**

16      A.    Okay.

17      **Q.    I'm simply asking now did you see**

18 **that as extending to your responsibilities**

19 **or relationship with Quickie as a whole?**

20      A.    Yes, sir.

21      **Q.    Separate and apart from just the**

22 **'160 Patent?**

23      A.    I don't know that there was

24 anything else for Quickie other than the

25 '160 Patent and the litigation or defense

**Todd Sharrin**

Page 105

```
 1                 T. Sharinn
 2 is separate and apart from the '160 Patent
 3 enforcement or defense in the
 4 re-examination, did you see yourself as
 5 having a continuing relationship with
 6 Quickie in any other respect once you got
 7 that call following the Markman Hearing?
 8     A.    No.
 9     Q.    Fair enough.
10     A.    And just to add to that, I do not
11 recall there being any other matters
12 besides the litigation or the actual
13 Quickie patents management at that time
14 that were active.
15     Q.    All right.
16           And let me just try and step
17 through those hoops now.
18           There was a re-examination, there
19 was a re-examination matter opened at
20 Greenberg Traurig for the Quickie '160
21 Patent.
22     A.    Okay.
23           MR. KAMINSKY:   Objection to the
24     form of the question.
25     Q.    And it's the point 0109 matter
```

**Todd Sharrin**

Page 106

1                    T. Sharinn

2 **that is billed to for re-examination**

3 **purposes.  So you had some involvement, as**

4 **I think you testified following the Markman**

5 **Hearing in connection with the**

6 **re-examination.**

7      A.     Let me see if I can put it this

8 way.  Steve Colvin became very disenchanted

9 with Thelen Reid very early on in the

10 process.  Alan Fell, I'm not sure was ever

11 enchanted with them, I don't know one way

12 or the other.  I only know what I remember

13 him saying to me.

14            They called me on a few occasions

15 to talk to me about what was going on in

16 the case.  I obviously lent them my ear

17 because I wanted the case back, it was a

18 good case, I was really proud -- you asked

19 me before what was I proud of, I was proud

20 of the Markman results.

21      Q.     **As you should have been.**

22      A.     Okay, I thought we did a really

23 good job and we got a result that nobody

24 expected to get, most importantly

25 Medtronic.  And if I'm not mistaken, and

**Todd Sharrin**

Page 135

```
 1              T. Sharinn
 2 embarrassing as it is to say in this day a
 3 little bit of puffing on my part internally
 4 for Greenberg Traurig.
 5    Q.    Exhibit 7.
 6    A.    Exhibit 7.
 7          MR. KAMINSKY:  Exhibit 7, we have
 8    it here.
 9 BY MR. SCOTT:
10    Q.    Mr. Sharinn, if you would just
11 take a moment to look at that.
12    A.    Okay.
13    Q.    This is a piece of correspondence
14 sent on Greenberg Traurig's letterhead by
15 Marsha Twitty --
16    A.    To Marsha Twitty.
17    Q.    I'm sorry, to Marsha Twitty from
18 the PTO, right?
19    A.    From the PTO.
20    Q.    And it's sent by Linda Garamone?
21    A.    Right.
22    Q.    Who is she?
23    A.    Linda was my patent paralegal at
24 Greenberg Traurig.
25    Q.    And what is being sent to the
```

**Todd Sharrin**

Page 136

1          T. Sharinn

2 Patent Office?

3      A.     This would be just a pro forma

4 document.  We had moved offices while at

5 Greenberg Traurig, we were in the lipstick

6 building originally and then moved over to

7 200 Park Avenue, and my guess is she had

8 run this out for every matter I had ever

9 had any kind of responsibility for.

10     Q.     On its face, it's telling the

11 Patent Office that you are the

12 correspondent and fee address of record,

13 right?

14            MR. KAMINSKY:  Objection to the

15     form of the question.

16     A.     On the face it says change of

17 correspondence, address.  It says it's a

18 patent.  It clearly refers to the '160

19 Patent.  I don't know what else to say

20 about that.

21     Q.     All right.

22            But in looking at the change of

23 correspondence address form, it is

24 reflecting for the '160 Patent that you are

25 the person at Greenberg Traurig that is

Todd Sharrin

Page 144

1                    T. Sharinn

2      Q.     Exhibit 37 is an e-mail from I

3 think the disaster secretary --

4      A.     No, no, that's a different

5 Adrienne.  This one is from Bryan Cave.

6      Q.     And she is the trademark

7 administrator IP docket manager at Bryan

8 Cave, to your knowledge?

9      A.     That's what it says.  I mean, I

10 don't remember.

11     Q.     Do you recall whether she is that

12 person or not?

13     A.     Only remember her name, but I

14 mean, I read what it says.

15     Q.     Do you know why she is sending

16 this e-mail to you?

17     A.     It sounded like they had gotten

18 some correspondence concerning the '160

19 Patent and I reached out to find out

20 whether or not we should be getting those

21 documents.

22     Q.     And what was your response to

23 her?

24     A.     I told her just to send it over

25 and that I would get it to the right

**Todd Sharrin**

Page 145

1              T. Sharinn

2 people.

3    Q.    Now, what she says here is:

4         "Dear Todd, thank you for having

5 your secretary call me this morning to

6 confirm that you are still responsible for

7 U.S. Patent No. 6,066,160."

8         The 160, the patent, right?

9    A.    Yes, sir, that's what it says.

10    Q.    Did you understand at that time

11 in December of 2002 that you were in fact

12 responsible for the '160 Patent for

13 purposes of the Patent Office?

14    A.    No, I did not.

15    Q.    And it's your testimony that the

16 conversation you had with her was simply

17 get it to me and I'll get it to the right

18 people?

19    A.    Yes.

20         MR. KAMINSKY:    Objection to the

21    form of the question.

22    Q.    He doesn't like me characterizing

23 your testimony.

24    A.    It's okay.  I mean, the reason I

25 would do something like this, so I would

**Todd Sharrin**

Page 146

1            T. Sharinn

2 understand, is she's a docketing clerk at

3 Bryan Cave, why would I want to go through

4 the trouble of explaining to her that I've

5 been relieved of my duties with regards to

6 this client when I could just as easily

7 just have the documents walked over to my

8 office and walk them over to Steve's?

9            It's just the relationship I had

10 with Steve.  It wouldn't make any sense to

11 do that.

12    Q.    Do you recall who the secretary

13 was that would have made the call to

14 Ms. Leven?

15    A.    I would assume by the year it was

16 either Adrienne Ivan or Paula Specht.  Am I

17 right?

18    Q.    I don't know.

19    A.    Oh, I thought this was a quiz.

20    Q.    No.  Trust me.  There are just

21 some questions --

22    A.    Well, you know, I saw your

23 colleague hand you a note.  I thought

24 maybe --

25    Q.    No, he wants to know who is the

**Todd Sharrin**

Page 149

1                    T. Sharinn

2 these two forms?

3     A.    Never seen them before today.

4     Q.    You testified earlier that it was

5 standard practice to docket a patent that

6 you were responsible for during the time

7 that you were responsible, right?

8     A.    I'm not sure if that's exactly

9 what I said, but --

10     Q.    I'm pretty sure it wasn't exactly

11 what you said.

12     A.    What's standard, and I think it

13 would be true of any reputable IP practice

14 is it's standard to, you know, enter dates

15 that are important with ticklers in the age

16 of computers that would pop up and let you

17 know when things are due.  This looks like

18 a printout this would have shown something

19 along those lines.

20     Q.    It's fair to say that most IP

21 practices have an IP docketing system in

22 place?

23     A.    As far as I know.

24     Q.    And it's an electronic one

25 typically nowadays?

**Todd Sharrin**

Page 153

1                    T. Sharinn

2     Q.     Revoked and then it has the date

3 of 4/2/2003, right?

4     A.     I see that, yes, sir.

5     Q.     Do I understand, though, that

6 your testimony is that you ceased having

7 responsibility for the '160 Patent as of

8 the date that you received the phone call

9 on October of 2002 from Steve following the

10 Markman Hearing?

11     A.     That would have been my

12 understanding, yes, sir.

13     Q.     And it didn't take any revocation

14 of any Power of Attorney for you to have

15 that understanding?

16     A.     They made it very clear on the

17 telephone conversations that we had that I

18 was to do no more work and bill no more

19 time.

20     Q.     So the revocation of a Power of

21 Attorney would have been a formality in

22 your, to your understanding?

23             MR. KAMINSKY:  Objection to form

24     of the question.

25     A.     I guess that would be a fair

**Todd Sharrin**

Page 161

1              T. Sharinn

2      A.     Probably, yeah.

3      Q.     Do you recall whether Steve

4  Colvin was considering other counsel

5  besides Greenberg Traurig for the Medtronic

6  litigation?

7      A.     I think he was.

8      Q.     Do you recall that he was

9  considering Mark Evens at that time as a

10 potential alternative?

11     A.     I think he was.

12     Q.     Do you recall that it was the

13 thought or effort of Greenberg Traurig to

14 persuade Steve to come to Greenberg Traurig

15 with that litigation in part by including

16 Paul Sutton as one of the attorneys who

17 would be working on that matter

18 specifically?

19     A.     No, that's not why Paul was

20 brought in.

21     Q.     Why was Paul brought in?

22     A.     Because I didn't feel comfortable

23 taking on a case of this magnitude without

24 senior supervision.

25     Q.     Did you have any sense that Steve

**Todd Sharrin**

Page 162

1                    T. Sharinn

2 Colvin wasn't comfortable with you handling

3 it on your own without somebody like Paul

4 Sutton?

5      A.    Quite the contrary.

6      Q.    Can you elaborate on that?  Was

7 there anything specific that gave you that

8 sense that he was not concerned about that?

9      A.    Yeah.  Steve, if I remember

10 correctly, had mentioned Mark Evens to me

11 because I think at that time he was pending

12 nuptials, I'm not sure if he was actually

13 married at that point, and actually put

14 Mark on the phone, and the way Steve always

15 does things, I think he tried to make a

16 match between GT and Mark to bring him

17 almost in to do it.

18           I think Mark may have raised

19 concerns that I wasn't gray enough at the

20 time to handle it, but if I remember

21 correctly, Steve had told me he wasn't too

22 worried about it and, you know, he knew

23 this was, for lack of a better term, our

24 baby.

25           We had worked on this from the

**Todd Sharrin**

Page 167

1               T. Sharinn

2  compensation purposes.

3               There are much better ways to go

4  about what he was hoping to do than to

5  initiate a litigation -- I shouldn't say

6  better ways, safer ways, less expensive

7  ways than patent infringement litigation,

8  if that makes sense.

9     Q.    If the re-examination of the

10  patent essentially resulted in the adoption

11  of the claim construction by Judge Lynch,

12  would you consider that to be a good

13  result?

14     A.    Say that one more time?  I'm

15  trying to even read it and it didn't come

16  out quite that clear.

17     Q.    Let's back up.

18          You had the Markman Hearing, the

19  Markman decision came out with a claim

20  construction for purposes of the patent,

21  right?

22     A.    Yes, sir.

23     Q.    And that was a good construction

24  for Quickie's purposes?

25     A.    It was better than good.

Todd Sharrin

Page 185

1                T. Sharinn

2      Q.     And that Thelen Reid will be

3 substituted in for Greenberg Traurig for

4 purposes of the litigation?

5      A.     Do you mind if I read this?

6      Q.     Oh, please.

7      A.     It says that, yes, sir.

8      Q.     And in the third paragraph, it

9 states you and Greenberg Traurig will

10 continue to handle various patent

11 application pending on behalf of Quickie,

12 LLC and Quickie Vision, LLC, right?

13     A.     Yes, sir.

14     Q.     And that was your understanding,

15 that you would continue on behalf of

16 Quickie after the substitution of counsel

17 with regards to the litigation?

18          MR. KAMINSKY:  Objection to the

19     form of the question.

20     A.     No, sir.

21     Q.     You take issue with the statement

22 made here?

23     A.     My understanding was that I was

24 to transfer all Quickie matters.  So when I

25 see, and the first time I had ever looked

**Todd Sharrin**

Page 186

1           T. Sharinn

2 at this letter in any real meaningful way

3 would have been when I met with counsel the

4 other day -- and when I saw the Quickie

5 LLC -- I think the Quickie Vision makes

6 perfect sense, and if it had said S&A

7 Rings, that would make perfect sense.

8           I suspect that was a typo by

9 Mr. Fell -- there would be no reason for me

10 to continue prosecuting patents on behalf

11 of Quickie because I don't think Quickie

12 had any pending patents.

13           And so if I had even noticed that

14 when the letter was sent to me, I would not

15 have said anything about it only because

16 what was the point?

17    Q.    It's kind of, you know -- it's

18 just, again, talking about taking the high

19 road, it just didn't make a difference, and

20 just so we're clear, I don't want to get

21 into any great detail, as far as you were

22 concerned, as of this date for sure and

23 before this date in terms of the call that

24 was made to you, any and all activity on

25 behalf of you or Greenberg Traurig with

Todd Sharrin

Page 187

1                T. Sharinn

2 regards to the '160 Patent was done, over,

3 finite?

4    A.    By the date of this letter, that

5 was my understanding, yes, sir.

6    Q.    And so any subsequent actions

7 with regards to the re-examination or the

8 transfer of powers of attorney or

9 revocation of Power of Attorney was

10 essentially noise and of no real

11 consequence in your mind?

12    A.    I think that noise is a good way

13 to describe.  I wouldn't say there was no

14 consequence.  In my mind and in my heart at

15 that time there was a hope to get back in

16 the game.  So if they called me, I was very

17 clear to make sure they understood I wasn't

18 going to do work without being compensated,

19 particularly on this matter.

20            I mean, there was no, how do I

21 put this -- there was a very open

22 relationship between us.  On other matters,

23 they wanted to bounce something off me and

24 say, hey, do you think this is patentable,

25 I had asked to set up a new matter.

**Todd Sharrin**

Page 188

1              T. Sharinn

2            But with this one, because of

3 what had occurred, there is no way I would

4 have engaged in any real meaningful

5 conversation without them having engaged me

6 to do it, because my understanding was that

7 my powers of attorney and my involvement in

8 this case were fully revoked.  And when I

9 say this case, I don't just mean the

10 litigation, I mean the 160's existence.

11    Q.    So that begs the question,

12 **Mr. Sharinn, as to how did you ensure that**

13 **that was full legal communicated to your**

14 **client, former client, however you want to**

15 **describe it, Quickie, LLC that you were**

16 **done, over, finite, had no further**

17 **responsibility with regards to that patent**

18 **in any way, shape or form?**

19            MR. KAMINSKY:  I'm just going to

20       object to the very beginning of that

21       question.  I don't object to the

22       question part of it, but the phrase

23       "so that begs the question" I do

24       object to.

25            You can answer the question that

**Todd Sharrin**

Page 189

1          T. Sharinn

2     follows that, which is how did you

3     communicate this to your client.

4          THE WITNESS:  Okay.

5          MR. SCOTT:  And I'm withdraw the

6     prelude.

7     A.     That's fine.  Just to answer your

8 question, I didn't feel like I needed to

9 communicate that fact.  They had made this

10 abundantly clear to me that that was their

11 intention and that was their desire.

12          But if for purposes of, as I used

13 the term weenie before, famous Latin term,

14 I was a weenie, too, and I was not going to

15 do work on this, and I made it clear to

16 them you fired me, you have new counsel,

17 your new counsel is Thelen Reid & Priest,

18 you need to take this up with Mark Evens or

19 we can be reengage the and then we can deal

20 with this.

21          So if that's not communication

22 enough, then I'm guilty.

23     Q.     **That communication was oral**

24 **though, that you've just referred to?**

25     A.     As far as I can recall.  I mean,

**Todd Sharrin**

Page 190

1                    T. Sharinn

2  I might have sent an e-mail, I don't know.

3  It wouldn't be beyond me to have sent an

4  e-mail or to respond to an e-mail.  I mean,

5  Steve didn't e-mail.  Gene e-mailed at

6  times.

7              I know Gene was very upset about

8  this, Gene Grassi, or at least that's the

9  impression I got.  Alan, very rarely he

10 e-mailed.  He was a big fax guy.  But I

11 would have e-mailed Alan from time to time,

12 I would think.  I certainly sent him a

13 fax -- I don't know.

14    Q.    You certainly would have sent him

15 a fax essentially stating what you just

16 described for the record?

17    A.    If I were going to write

18 something.  I'm not sure at the time it

19 called for that.  It seemed pretty clear

20 that they did not want me to do anything on

21 this.  Every time I pushed back and I said

22 I'm not going to do this without being

23 engaged to do it, then they stopped and we

24 went on to something else.

25    Q.    All right.  I just haven't

**Todd Sharrin**

Page 191

1                    T. Sharinn

2  seen --

3     A.     No, I'm just saying it's not like

4  they said to me, okay, Todd, engage.  At

5  one point they did say that and if I'm not

6  mistaken it filled out, you know, I opened

7  up a matter and then nothing ever really

8  came of it because it was just a minimal

9  amount of work and it was just asking me my

10 opinion on the document.

11    Q.     Let me just make sure, though,

12 that the record is there that you don't

13 have any records of your own that haven't

14 already been produced, that's right, right?

15    A.     Well, I think the question you're

16 asking right now is better asked of

17 Greenberg Traurig.  I don't have any

18 records that pertain to this or any other

19 matters while I was at Greenberg Traurig

20 concerning the Colvin group.

21    Q.     I just haven't seen anything in

22 writing along the lines you described.  I

23 just want to make sure that it's not out

24 there and I just haven't gotten it.

25    A.     Don't know.  I don't know if it

Todd Sharrin

Page 194

```
 1              T. Sharinn
 2 even think of it that way.  I would just
 3 think of it as we're referring to Steve
 4 Colvin, et al.
 5    Q.    Just so we're clear, did you not
 6 consider Quickie to be your client any
 7 longer as of October 15, 2002?
 8    A.    It's a long time ago, but yeah,
 9 that's my recollection.
10    Q.    That's your testimony?
11    A.    Well, it's my testimony because
12 it's on the transcript, but yes, that's my
13 recollection.
14    Q.    And so to the extent that Paul
15 understood that that was not, that was not
16 an understanding that you shared with them?
17    A.    Say that again.
18    Q.    To the extent that Paul
19 understood that Quickie was still a client
20 of the firm Greenberg Traurig, that was not
21 an understanding that you shared with him?
22         MR. KAMINSKY:  Objection to the
23      form of the question.
24    A.    I don't know what Paul thought,
25 and I never discussed it with Paul, to my
```

Todd Sharrin

Page 198

1                    T. Sharinn

2  the client matter number which pertained to

3  that litigation and that litigation alone,

4  right?

5      A.    That's what he was asked to send

6  over, I'm assuming, but I also see number 5

7  on your list items now that I'm looking at

8  it more closely, and number 4, which would

9  have had all to do with prosecution and

10 nothing to do with litigation.

11     Q.    Well, but the prosecution file

12 does relate to the litigation?

13     A.    I don't want to debate this with

14 you.  You asked me a question and I'm

15 giving you a full answer.

16     Q.    If you disagree with me --

17     A.    I disagree with you.

18     Q.    Let's back up.

19     A.    No, I'll answer your question

20 very succinctly.

21            There would be no reason to send

22 item number 5 in particular unless we were

23 transferring the prosecution files,

24 otherwise we wouldn't have them.  You asked

25 us for the 160 file history and prior art.

**Todd Sharrin**

Page 199

1              T. Sharinn

2 That's exactly what it is.  That's the file

3 wrapper.

4     **Q.    Have you ever undertaken a patent**

5 **litigation without getting the file**

6 **wrapper?**

7     A.    Of course not, but that would be

8 our file right there, that's what we're

9 sending them.

10     **Q.    You must look at in connection**

11 **with any enforcement litigation, is it not?**

12     A.    Not when it's your personal file,

13 you could get that from the PTO if you're

14 defending or prosecuting depending upon

15 where you fall in the V, but in this

16 particular instance, it makes perfect sense

17 to me that that's what was being sent over

18 there.  Paul didn't even know it himself.

19 I'm sorry.  I mean, you're asking me a

20 question, I'm giving you an answer.

21     **Q.    And all I want to make clear, and**

22 **if you disagree, you disagree, that for**

23 **purposes of a litigation it would be**

24 **appropriate to send over the file wrapper**

25 **and the prosecution file so that those**

Todd Sharrin

Page 200

1                  T. Sharinn

2 matters are available to successor counsel?

3            MR. KAMINSKY:  Objection to the

4      form of the question.

5 BY MR. SCOTT:

6      Q.    That would be standard practice,

7 would it not?

8            MR. KAMINSKY:  Objection to the

9      form of the question.

10    A.    It would be, but they would have

11 been covered under number 13, and they

12 would have been covered under number 12 and

13 they would have been covered under number

14 16 and they would have been covered under

15 number 17.  There would be no reason to

16 make a separate point of putting that in

17 there.

18    Q.    The file wrapper is not something

19 separate and apart from documents produced

20 by Quickie and documents produced by

21 Medtronic?

22    A.    It is something separate and

23 apart, because the documents, as part of

24 the production, would have been the file

25 wrapper that was not attorney-client

Todd Sharrin

Page 201

1                    T. Sharinn

2 privilege.

3      **Q.     The file wrapper would include**

4 **discovery?**

5      A.      The file -- let's understand

6 something.   In the file wrapper, there's 3

7 folds in it.   There is the center fold,

8 which has the correspondence from the PTO

9 and to the PTO on the right side in my

10 files, at least there is correspondence

11 between the client and yourself.

12            On the left side there is prior

13 art and other underlying information that

14 was required in either the drafting of the

15 prosecution of the actual patent.   Some of

16 that stuff is discoverable or producible

17 and some of it is not.

18            If you're making a production of

19 all of this stuff here for purposes of a

20 litigation, you would produce all of this.

21            If you're producing, if you're

22 sending over all your documents that relate

23 to that client in a patent litigation, and

24 if you were the one who had ultimately

25 prosecuted that matter, you'd be sending

**Todd Sharrin**

Page 202

1             T. Sharinn

2 over, you know, if you're sending over the

3 prosecution materials you're sending over

4 the prosecution materials.

5             There would be no reason to set

6 up a separate category because all the

7 relevant documents would be under 13 for

8 the litigation.  These other documents

9 would include documents that wouldn't have

10 been produced under 13 and you're sending

11 that over because they need to be able to

12 mount it or the application, they're taking

13 responsibility for this, like you asked me

14 when I read this do I see --

15     Q.    **That's all I can do is ask you**

16 **what you understand this to be.**

17     A.    That's my understanding when I

18 look at it today.  What my understanding

19 was on October 16, 2002, I don't even know

20 where I was on October 16, 2002.  I'm sure

21 I was somewhere outside of Paul Jergensen's

22 office, but who knows.

23     Q.    **You are not transferring the**

24 **files with regards to any re-examination**

25 **proceedings at that point in time, were**

**Todd Sharrin**

Page 203

1                    T. Sharinn

2 you?

3    A.    I don't think there were any at

4 that point, were there?  We wouldn't

5 transfer files for that because we weren't

6 handling that.  We're not the attorneys of

7 record for the re-examination as far as I

8 know.  I don't recall ever being that.  I

9 may be wrong again.

10            (Exhibit 39, Letter, marked for

11     identification, as of this date.)

12    Q.    Would you identify that for the

13 record, please?

14    A.    It's a letter to Steve Colvin

15 dated January 29, 2003 and since we're

16 making a big thing about who the letter is

17 to, it's not to Quickie, LLC, it's not to

18 any of the ring companies like S&A, not to

19 Quickie Endoscope.

20            It's to Stephen Colvin at his

21 office at NYU and it's regarding a nonslip

22 surgical inside straight.

23    Q.    Which happens to bear the Quickie

24 client number, does it not, 51822?

25    A.    Yes, sir, that's what I've been

Todd Sharrin

Page 204

1                    T. Sharinn

2 told today.

3    Q.    And the 0108 is one of the

4 Quickie intake matters that we looked at

5 previously, right?

6    A.    Right, but we also discussed that

7 it was very possible that it was put into

8 the wrong group.

9    Q.    But for the client, you're

10 referring to it as a Quickie matter by way

11 of the Greenberg Traurig billing entry,

12 right?

13          MR. KAMINSKY:  Objection to the

14     form of the question.

15          MR. SCOTT:  Yeah, that's a bad

16     question.

17 BY MR. SCOTT:

18    Q.    For the client's purposes in

19 receiving this letter, he is seeing your

20 reference which is the Quickie client

21 matter --

22    A.    Okay, let me answer this, if

23 Steve were alive today and you said to

24 Steve, Steve does the number 51822 have any

25 significance to you, Steve wouldn't be able

**Todd Sharrin**

Page 205

```
1                T. Sharinn
2  to tell you, and I can tell you undoubtedly
3  I'll testify anywhere to that --
4      Q.    I beg to differ, it would matter
5  to him today.
6      A.    Well, only if you coached him
7  enough to remember that and he actually
8  listened to you and paid attention to you
9  and then chose to say it.
10         And I will notice another thing,
11 it says dictated but not read in bold
12 italics at the bottom.  So I wouldn't have
13 even known whether or not this was the
14 right number on it and I notice that my
15 former assistant Adrienne Ivan is the one
16 who signed this.
17     Q.    Who you don't want to vouch for?
18     A.    I wouldn't vouch for Adrienne on
19 her own birthday.
20     Q.    What success are you referring to
21 here, if you can recall?
22     A.    I honestly don't know.  So it
23 sounds to me like this may have been one of
24 the days where Steve liked Thelen Reid and
25 had something positive to say about them,
```

**Todd Sharrin**

Page 206

1              T. Sharinn

2 and so, again, I told you, I tried to

3 always take the high road on things, I

4 congratulated him on it.  I don't know what

5 else you'd say to somebody under those

6 circumstances.

7              (Exhibit 40, Letter, marked for

8      identification, as of this date.)

9      Q.    Let's look at what's been marked

10 as Exhibit 40 to your deposition.  If you

11 could identify that?

12      A.    This is another letter just to

13 Steve Colvin, not to Quickie or S&A Rings

14 or anybody else, talking about the

15 concentric passive knotless suture

16 terminator.  This one was not dictated, but

17 not read.  So apparently I did sign and

18 read this one.

19      Q.    And that also bears a Quickie

20 client and matter number, correct?

21      A.    This is what I'm told.

22      Q.    Well, it's not only what you're

23 told --

24      A.    I think I've also testified --

25 no, no, we've been over this several times.

**Todd Sharrin**

Page 207

```
 1              T. Sharinn
 2 It's not going to change, you may like it
 3 to, but it won't --
 4      Q.    Let me just finish the question.
 5      A.    Sorry.
 6      Q.    -- that the 51822 is the client
 7 matter number at Greenberg Traurig for
 8 Quickie, LLC, right?
 9      A.    Absolutely.  Don't know that
10 that's the correct assignment of the
11 matter, though, and so I'm going to tell
12 you right now, you can ask me this, you
13 know, for as long as you'd like, I have no
14 idea whether this was or was not a Quickie
15 matter.  I would tend to doubt it was.
16           (Exhibit 41, Letter, marked for
17      identification, as of this date.)
18      Q.    Let me hand you what's marked as
19 Exhibit 41 to your deposition.
20           Could you identify that for the
21 record, please?
22      A.    Looks like I did pretty good
23 here.  It's a letter to Dr. Colvin again,
24 not to Quickie or anybody else, and I'm
25 sorry to make a joke of this, but I mean,
```

**Todd Sharrin**

Page 208

1                    T. Sharinn

2 it is clearly just a letter to him and it

3 talks about again the concentric passive

4 knotless suture.  In this case, we're

5 advising them that the patent has been

6 issued.  I guess I got him more patents

7 than I thought I did.

8      Q.    **What is the date of that letter,**

9 **please?**

10     A.    2003, December 2nd.

11     Q.    **Understand all the**

12 **qualifications, it likewise bears a Quickie**

13 **client matter number, correct?**

14     A.    Yes, sir.

15     Q.    **Let me go ahead and ask you to**

16 **look at what is Exhibit 26 previously**

17 **marked in Mr. Sutton's deposition?**

18     A.    Just so you understand, what is

19 being shown here -- may I show you

20 something because maybe you'd like to see

21 it.

22           This letter that was, I guess,

23 marked Exhibit 44 to Alan Fell is to S&A

24 Rings, again with the reference number that

25 you're saying is for Quickie.

**Todd Sharrin**

Page 209

1                    T. Sharinn

2      **Q.      Right.**

3      A.      Okay.  So that's what I'm saying,

4 that these get confused a lot and that

5 people just use the same number.  It's not

6 unlikely for Ms. Ivan to have just cut and

7 paste a new body into an old letter.

8      **Q.      Make no mistake, and I'm not**

9 **trying to play games, it's very clear that**

10 **there was, I don't want to call it a**

11 **Chinese menu, but it borders on somewhat**

12 **indiscriminate use of billing numbers.**

13      A.      I don't disagree at all.

14           MR. KAMINSKY:  And names.  So

15      long as we agree on that, we can save

16      ourselves a lot of questions.

17           I think all Mr. Sharinn has been

18      trying to say to you is that we used

19      the name Quickie as a shorthand but

20      that some of these things were

21      actually for S&A Rings rather than the

22      Quickie entity or vice versa, but

23      internally we just referred to that as

24      a Quickie matter.

25           Is that right.

**Todd Sharrin**

Page 210

1              T. Sharinn

2         THE WITNESS:  That's correct.

3    And hours ago I had said that the

4    concentric passive knotless would not

5    in my recollection have fallen into

6    the Quickie domain, it would have

7    fallen into S&A Rings, and lo and

8    behold, Exhibit 44 I guess from

9    Mr. Sutton's deposition would bear out

10   that fact.

11        MR. KAMINSKY:  And if you go back

12   and you look as you showed before in

13   the exhibits, when you have the intake

14   memo from this concentric passive

15   knotless suture terminator, it says

16   address Quickie.  We all know that

17   that particular device was one for S&A

18   Rings as shown by this letter to

19   Mr. Fell.

20        Correct, Mr. Sharinn.

21        THE WITNESS:  Yes, sir.

22   BY MR. SCOTT:

23   Q.   And I'm not disputing that there

24   was a somewhat haphazard use of some of the

25   number for some of the claim matter numbers

**Todd Sharrin**

Page 211

1              T. Sharinn

2 and the various entities within the Colvin

3 group.

4         What I am trying to show again,

5 just to put it out there, is that there

6 were also times when you knew what you were

7 using it for and you used it consistently,

8 whether it was for the litigation in the

9 0104 or for the re-examination in the 0109

10 or with regards to the 0107 matter.

11         MR. KAMINSKY:  I think the

12     witness has been trying to tell you

13     that it wasn't used consistently and

14     that he didn't pay attention to those

15     references.

16         Is that correct, Mr. Sharinn.

17         THE WITNESS:  Yes, sir.

18         MR. SCOTT:  I understand the

19     testimony.

20     A.    Do you want me to talk to Number

21 26, Exhibit 26?

22     Q.    Yes, that's where we are, thank

23 you for bringing me back to the question.

24     A.    My pleasure, glad to help.

25     Q.    This is a letter dated March 11,

**Todd Sharrin**

Page 230

1                    T. Sharinn

2  EXAMINATION BY

3  MR. KAMINSKY:

4      Q.    **Mr. Sharinn, your communications**

5  **in this matter included frequent**

6  **communications -- strike that.**

7           **Your communications in connection**

8  **with your representation of the Colvin**

9  **clients included communications with**

10  **Mr. Fell, is that right?**

11     A.    It did.

12     Q.    **What did you understand his**

13  **position to be?**

14     A.    He acted in the role of general

15  counsel.

16     Q.    **And did you speak with him**

17  **frequently about the Colvin matters?**

18     A.    I spoke to him frequently, and

19  Colvin was among things that we had spoken

20  about.

21     Q.    **Now, you saw in the client intake**

22  **matters that the address of the client was**

23  **given Quickie, care of Mr. Fell and his law**

24  **firm, is that right?**

25           Do you want to go back and --

**Todd Sharrin**

Page 231

1              T. Sharinn

2     A.     No, no, I was just thinking about

3 your question.  Yes, that's correct.

4     Q.     And the billings went to

5 Mr. Fell, in other words, the billings for

6 these matters were sent to Mr. Fell, is

7 that right?

8     A.     Yes, sir.

9     Q.     And were you --

10     A.     I think there may have one or two

11 occasions where they weren't sent to Mr.

12 Fell.  They were actually sent to Steve

13 Colvin, and I think that may have been a

14 time when Steven and Alan may have had a

15 little bit of a falling out.

16     Q.     But, for example, if you look at

17 Exhibit 43, you know, that he was shown by

18 Quickie's counsel, the cover letter goes to

19 Alan Fell, Quickie, LLC, care of Rick

20 Steiner -- that's Mr. Fell's law firm,

21 correct?

22     A.     It is, but that's not my

23 signature.

24     Q.     Exhibit 42, same thing?

25     A.     Yes.

Todd Sharrin

Page 232

1                  T. Sharinn

2      Q.     That's the address, correct?

3      A.      Correct.

4      Q.     Were you relying on Mr. Fell to

5  sort out which particular Colvin or Quickie

6  or Quickie or XYZ or S&L or whatever the

7  client was and to appropriately sign the

8  charge to appropriate client?

9            MR. SCOTT:  Objection to form.

10 BY MR. KAMINSKY:

11     Q.     Were you relying upon Mr. Fell to

12 determine by particular Colvin entity,

13 particular charges and bills applied to?

14           MR. SCOTT:  Objection.  Form.

15     A.     May I answer?

16     Q.     Yes.

17     A.     Okay.  From what I understand,

18 you're asking me did I wait for Mr. Fell to

19 figure out who should be paying me what,

20 and the answer is yes.

21           Mr. Fell and I established a

22 protocol regards to the Colvin matters that

23 it was just crazy to try and sort them out

24 separately.  So he would read the bills and

25 if he had a question about it and a

Todd Sharrin

Page 233

1                  T. Sharinn

2 reference he would ask me about it.

3    Q.    And so you, yourself, didn't try

4 to figure out the specific relationship

5 between the Quickie entities or the Colvin

6 entities, is that right?

7    A.    I did early on and then I gave up

8 and that was long before I ever got to

9 Greenberg Traurig.

10    Q.    Now, sometimes you wrote to

11 Mr. Fell with a reference to a matter that

12 might relate to a company other than

13 Quickie and yet you addressed your letter

14 to him care of Quickie, is that right?

15    A.    That did occur.

16          MR. SCOTT:  Objection to form.

17 BY MR. KAMINSKY:

18    Q.    And sometimes you wrote to

19 Mr. Fell about a matter that related to a

20 different Colvin entity and you wrote to

21 Mr. Fell care of his law firm, but

22 referenced that entity, isn't that right?

23    A.    That's correct.

24    Q.    For example, let me show you a

25 document which we're going to mark Exhibit

**Todd Sharrin**

Page 234

1                    T. Sharinn

2 **44 --**

3              (Exhibit 44, Letter, marked for

4      identification, as of this date.)

5      Q.      -- which is a letter from Todd

6 Sharinn to Alan Fell, S&A Rings, LLC,

7 December 2, 2003 and it has the Bates

8 number GT505 to 507.

9              Is that an example of a letter

10 that you wrote to Mr. Fell referring to a

11 matter that involved S&A Rings, LLC?

12     A.      Yeah, I mean, in this letter it's

13 addressed to S&A Rings, LLC and this

14 concerns the passive knotless suture

15 terminator, and it does have what I've been

16 drilled into today to learn the Quickie

17 reference number.

18     Q.      **Now, this is the concentric**

19 **terminator, start?**

20     A.      Concentric passive knotless

21 suture terminator.

22     Q.      **And was that a matter for S&A**

23 **Rings or would it be Quickie?**

24     A.      No, it would be S&A Rings, I

25 would think.  The real way to determine

**Todd Sharrin**

Page 235

```
 1                  T. Sharinn
 2  that would be to look at the actual letters
 3  patent and see who the assignee was.
 4     Q.    Do you remember there was a
 5  Patent Number 745 that related to the
 6  concentric terminator?
 7     A.    That would be an application
 8  number, not a patent, but yes.
 9     Q.    Okay.
10           And that's different than the
11  '160 Patent, isn't it?
12     A.    Again, one would be an
13  application, one would be a serial number
14  for the application, yeah, there would be
15  the actual letters patent and its
16  registration number, but yes, it's a
17  different number than what would have been
18  on the '160.
19     Q.    Do you remember when you looked
20  at client intake form for this concentric
21  passive knotless suture terminator it was
22  stated the client address as Quickie?
23     A.    I do.
24     Q.    But yet this really was a matter
25  for S&A Rings, is that correct?
```

**Todd Sharrin**

Page 236

1              T. Sharinn

2              MR. SCOTT:  Objection.  Form.

3      A.     That's correct.

4      Q.     So this is an example of where

5  you used the references to Quickie as sort

6  of a shorthand for all of the Colvin

7  matters, is that a fair thing to say?

8              MR. SCOTT:  Objection to the

9      form.

10     A.     Yeah, if it means I was sloppy in

11  my billing, they be, I guess I was sloppy

12  in my billing.

13     Q.     Did you use references to Quickie

14  as a shorthand to the various Colvin

15  matters?

16     A.     I did.

17             MR. LODEN:  Objection to form.

18     Q.     Now I'm going to show you a

19  number of documents that we've marked, I'm

20  going to mark exhibits.

21             We're marking Exhibits 45, 46,

22  47, 48 and 49.  Why don't I just identify

23  them for the record.  Is that okay with

24  you, Skip?

25             MR. SCOTT:  That's fine.

Todd Sharrin

Page 239

1                    T. Sharinn

2      A.    No.

3      Q.    Do you remember you opened up a

4 new file in December of 2002 with a view to

5 possibly doing work on this matter, is that

6 right?

7      A.    I don't have any independent

8 recollection of that.

9      Q.    Let me show you Exhibit 19.

10     A.    Yes, sir.

11     Q.    And do you recall that Mr. Scott

12 showed you that document earlier and

13 pointed out that you had opened up a client

14 intake matter in December of 2002 after you

15 had already been replaced with respect to

16 the '160 Patent?

17           MR. SCOTT:  Object to the form.

18 BY MR. KAMINSKY:

19     Q.    Do you recall that?

20     A.    Yes, sir.

21     Q.    Looking at the first page of

22 Exhibit 45 --

23     A.    Yes, sir.

24     Q.    -- these are the time entries

25 that we found for this particular matter.

Todd Sharrin

Page 240

1                    T. Sharinn

2            Do you see any entries that occur

3  after December 13, 2002?

4    A.    No.

5    Q.    So is it correct to say that

6  although you opened up a new client matter

7  in anticipation of doing work on this

8  matter, in fact you didn't bill Quickie for

9  work and become directly involved as

10  counsel in the re-examination after that?

11            MR. SCOTT:  Object to the form.

12    A.    That appears to be the case.

13    Q.    Now, if you look at the second

14  page of that exhibit, it actually refers to

15  the passive knotless suture system.

16            Do you see that?

17    A.    I do.

18    Q.    And it has two entries on it in

19  March of 2003.

20            Do you see that?

21    A.    I do.

22    Q.    Can you tell us what work you

23  were doing at that time?

24    A.    No.

25    Q.    Do you see that the second entry

Page 241

1              T. Sharinn

2 says telephone interview with examiner 0.4

3 hours.

4          Do you see that?

5      A.    I do.

6      Q.    Do you know what that involved?

7      A.    No.

8      Q.    Do you remember doing any work as

9 counsel for Quickie in connection with the

10 re-examination matter after December of

11 2002?

12     A.    I don't have any specific

13 recollection.

14     Q.    Do you remember that after March

15 of 2002 you received a notice from the

16 Patent Office that all authority that you

17 or Greenberg Traurig had had with respect

18 to the '160 Patent had been revoked?

19          MR. SCOTT:  Object to the form.

20          MR. LODEN:  Object to the form.

21     A.    I don't recall the date of the

22 revocation.

23          MR. KAMINSKY:  Let me show you a

24     document which we will mark Exhibit

25     50.

**Todd Sharrin**

Page 242

```
 1                T. Sharinn

 2           (Exhibit 50, Notice, marked for

 3       identification, as of this date.)

 4       Q.    Is Exhibit 50 a copy of a notice

 5 which you received?

 6       A.    I'm sorry?

 7       Q.    Is Exhibit 50 a copy of the

 8 notice that you received from the Patent

 9 Office?

10       A.    It appears to be.

11       Q.    Do you see that the notice is

12 dated April 2, 2003, do you see that?

13       A.    It does.

14       Q.    And as a patent lawyer, what do

15 you understand this notice to be telling

16 you?

17       A.    That there is a new person in

18 charge of this file.

19       Q.    Do you have any further authority

20 as to this matter after that?

21            MR. SCOTT:  Object.  Form.

22       A.    No.

23       Q.    Is that what you understood to be

24 the case?

25       A.    I can't speak of what I
```

Todd Sharrin

Page 243

1                 T. Sharinn

2 understood back then.  It's what I

3 understand, as I sit here today.

4     Q.     Let me show you a document which

5 has been previously marked Exhibit 27 in

6 this case.

7           Is that a letter that you wrote

8 to Quickie, care of Mr. Fell's law firm on

9 May 15, 2003?

10    A.     It appears to be.

11    Q.     And do you see that you write in

12 the first paragraph, "Enclosed for your

13 information and records are a copy of a

14 notice regarding change of Power of

15 Attorney filed in connection with the

16 above-referenced re-examination

17 application."

18           Do you see that?

19    A.     Yes, sir.

20    Q.     And attached to it as the

21 enclosure is a copy of Exhibit 50, is that

22 right?

23    A.     Yes, sir.

24    Q.     So you sent a copy of this notice

25 to Quickie, is that right?

Page 244

1                    T. Sharinn

2     A.     I did.

3     Q.     And then you continue on and say

4  well, we are surprised to have received

5  this document in view of the conversation I

6  had with Dr. Colvin, we respect his

7  decision and take no further action on this

8  matter.

9            Do you see that?

10    A.     I do.

11    Q.     What were you saying to Quickie?

12           MR. SCOTT:  Objection to form.

13    A.     What was I what?

14    Q.     What were you trying to say to

15  Quickie?

16    A.     I don't know if it could be

17  anymore clearer than that, I will take no

18  further action on this matter.

19           MR. SCOTT:  My objection is to

20     the repeat of the same question.

21  BY MR. KAMINSKY:

22    Q.     Did Mr. Fell or Dr. Colvin or

23  anyone else from the Colvin entities or

24  Quickie call you up after that and say to

25  you, oh, no, wait a minute, Todd, we're

**Todd Sharrin**

Page 245

1                    T. Sharinn

2 still looking to you or to Greenberg

3 Traurig to continue to work on '160 Patent?

4     A.    No.

5     Q.    They did call you at various

6 times, both before and after the fact about

7 the re-examination petition to discuss

8 things that were going on with the Thelen

9 firm, is that correct?

10    A.    Yes, sir.

11    Q.    What did you tell them about your

12 status vis-a-vis the '160 Patent in those

13 conversations?

14    A.    I don't know that we ever really

15 talked about it in any great terms, but I'm

16 certain knowing myself and the way I would

17 conduct myself that I would have told them

18 I had been relieved of all duties for that

19 case.

20    Q.    And is that what you understood

21 had happened?

22    A.    That's what I wrote in the

23 letter, yes, sir.

24    Q.    Now, when you say that case, what

25 are you referring to by the words "that

**Todd Sharrin**

Page 250

1                     T. Sharinn

2   senior attorney because he's number one on

3   here.

4       Q.    And the form involved references

5   the passive knotless suture terminator.

6             Do you see that?

7       A.    Yes, sir.

8       Q.    And that's the '160 Patent, is

9   that right?

10      A.    Yes, it is.

11      Q.    As noted by the patent number at

12  the top of the form?

13      A.    Yes, sir.  If this was directed

14  to only the re-examination, it would have

15  the re-examination serial number.

16      Q.    But this was with respect to the

17  patent itself, is that right?

18      A.    Yes, sir.

19      Q.    Now, as an attorney who is

20  admitted to practice before the Patent

21  Office and experienced in these matters, is

22  the effect of this form to say that whoever

23  had a Power of Attorney before no longer

24  has any involvement here and now these new

25  attorneys listed below are the attorneys

**Todd Sharrin**

Page 251

1                    T. Sharinn

2 with respect to this patent?

3              MR. SCOTT:  Objection to form.

4     A.      Yeah.  I mean, you're really

5 asking me for my experience what this means

6 as opposed to being a witness in this case.

7              My opinion on this would be that

8 or my interpretation of this document as

9 I've always understood it and as someone

10 who has filed them with regards to others

11 means that those others are no longer

12 permitted to participate in the prosecution

13 or the maintenance of the referenced

14 patent.

15             MR. SCOTT:  I'm going to object

16     and move to strike to the extent that

17     you're not designated as an expert.

18             THE WITNESS:  I'm not, and I

19     don't want to be considered one.

20 BY MR. KAMINSKY:

21     Q.      But you have experience before

22 the Patent Office, is that correct?

23     A.      I've been doing this for a while.

24     Q.      You fill this kind of form out

25 for clients of your own, is that right?

**Todd Sharrin**

Page 252

1                      T. Sharinn

2      A.      Never.

3      Q.      Have you ever seen this kind of

4 form before?

5      A.      I have and it's always been

6 filled out by a paralegal on my behalf.

7      Q.      But in other words, you've

8 submitted them on behalf of your clients?

9      A.      I've signed them.

10      Q.      And your understanding from your

11 own personal knowledge and observation that

12 the purpose of this form is to replace one

13 attorney or set of attorneys with a new set

14 of attorneys?

15      A.      It has two purposes.  The first

16 purpose is to remove all powers from the

17 original or existing attorneys with power;

18 and second, in some cases could be a

19 designation of a new attorney.  There is

20 another form similar to this that does not

21 designate other attorneys.  It's a

22 substitute.

23      Q.      But the one that we've marked

24 here did designate new attorneys, correct?

25      A.      Yes, it does.

**Todd Sharrin**

Page 253

1          T. Sharinn

2     Q.    Now, do you remember that you

3  were asked at a certain point to submit an

4  affidavit in support of an application by

5  Quickie petitioning for reinstatement of

6  the '160 Patent?

7     A.    Yes.  I will tell you what I

8  remember most.

9     Q.    Please tell us what you remember

10  about the request that you submit that

11  declaration of affidavit of statement.

12     A.    I remember submitting it.

13     Q.    Did you submit a statement in

14  support of a petition?

15     A.    I submitted a statement in

16  support of a petition.

17     Q.    I'm going to show you a document

18  that we're going to deem marked Exhibit 52

19  and tomorrow we'll substitute a clean copy

20  of it.

21          MR. SCOTT:  It's agreed.

22     A.    Yes, sir.

23          (Exhibit 52, Statement, marked

24     for identification, as of this date.)

25     Q.    It's a two-page statement.

**Todd Sharrin**

Page 254

1                    T. Sharinn

2          Is that your signature at the end

3 of it?

4    A.    Yes.

5    Q.    And is that a copy of the

6 statement you submitted in November of 2006

7 in support of Quickie's petition?

8    A.    May I look at it?

9    Q.    Yes, please do.

10   A.    Yes, this was a paper that I was

11 asked personally by Alan Fell, and I don't

12 recall, but possibly Steve Colvin to sign

13 and then I ended it a little bit, and yes,

14 I did sign this.

15   Q.    Was it initially drafted by the

16 Maier & Maier firm as counsel for Quickie?

17   A.    It had always been drafted by

18 them.

19   Q.    And you reviewed it and made some

20 changes?

21   A.    My own ones, yes, sir.

22   Q.    And before you signed it, did you

23 have conversations with anyone at Maier &

24 Maier telling them that you were now

25 satisfied and were prepared to sign?

**Todd Sharrin**

Page 255

1                    T. Sharinn

2        A.      Yeah.

3        Q.      Now, in paragraph number two --

4        A.      They didn't tell me what it was

5   going to be used for specifically other

6   than they had mentioned to me that the

7   patent had been abandoned, which I was

8   surprised to hear.

9        Q.      Was that the first that you

10  learned that the patent had been abandoned?

11       A.      Yes, sir.

12       Q.      Now, this is November 2006.  You

13  write in paragraph 2:

14              "My responsibility, including the

15  payment of any maintenance fee that may

16  become due for the subject patent ended

17  prior to the date where the payment of a

18  first maintenance fee was due as evidenced

19  by the enclosed revocation of prior powers

20  of attorney signed on behalf of Quickie,

21  LLC on March 4, 2003 wherein all prior

22  powers of attorney previously given were

23  hereby revoked."

24              Do you see that?

25       A.      I do.

**Todd Sharrin**

Page 256

1                    T. Sharinn

2     Q.     Does that refresh your

3 recollection that you had been shown that

4 revocation form sometime before you signed

5 this statement?

6     A.     I must have been.  I wouldn't

7 have signed it if I hadn't looked at it.

8     Q.     And is the statement that I just

9 quoted from paragraph 2 true?

10    A.     It is.

11    Q.     Was it true then?

12    A.     It's true always.

13    Q.     Did anyone ever come to you

14 afterwards and say Todd, the statement you

15 submitted at our request on November 20,

16 2006 was actually wrong and we want you to

17 submit a different statement retracting

18 what you said in Exhibit 2?

19    A.     No.

20    Q.     Had anyone ever asked you to say

21 anything different to the Patent Office

22 than was said there?

23    A.     No.

24            (Exhibit 53, Statement, marked

25      for identification, as of this date.)

### Todd Sharrin

Page 257

1                    T. Sharinn

2      Q.    I'll show you a document which we

3  will mark, deem marked Exhibit 53, which is

4  a statement in support of petition by

5  Aubrey Galloway signed on either October

6  27, 2006 or on November 27, 2006.  It's a

7  little hard to see what the date is.

8      A.    It's October 27th.

9      Q.    Have you ever seen his signature

10 before?

11     A.    Sure.

12     Q.    Does that appear to be his

13 signature?

14     A.    Yes.

15     Q.    Have you ever seen this document

16 before?

17     A.    I may have.  I don't recall

18 specifically.  So you understand, I tried

19 my hardest not to be involved in any

20 further matters with the Colvin companies.

21 This is while I was at Baker McKenzie, and

22 I had very little interest in even doing

23 this.

24     Q.    Now, Dr. Galloway says under oath

25 in paragraph 2:

Todd Sharrin

Page 258

1          T. Sharinn

2          "As the managing partner for

3 Quickie, LLC, I retained Robert E. Krebs,

4 et al. of Thelen Reid & Priest, LLP law

5 firm to transact all post-issuance

6 proceedings and responsibilities in the

7 Patent and Trademark Office including, but

8 not limited to, re-examination proceedings

9 and timely payment of the maintenance

10 fees."

11          Continuing in paragraph 3, he

12 says:

13          "As managing partner for Quickie,

14 LLC, I retained the law firm of Thelen Reid

15 & Priest to concurrently conduct litigation

16 services for Quickie, LLC."

17          Is that consistent with your

18 understanding of what had happened when you

19 were replaced by Thelen Reid & Priest in

20 the fall of 2002 or early 2003?

21     A.    It is.  It, in fact, underscores

22 another point that unfortunately, and

23 Mr. Scott had asked me earlier whether

24 Dr. Colvin expressed dissatisfaction with

25 the fact that Paul Sutton wasn't involved

**Todd Sharrin**

Page 259

1              T. Sharinn

2 in the case, and this actually reminds me

3 that, no, Steve Colvin did not.

4          But Aubrey who always seemed to

5 have a problem with everything did express

6 some concern about certain things, not with

7 the Paul Sutton thing, but that he had

8 expressed a favoritism towards Thelen Reid,

9 I remember that.

10    Q.    Let me show you one other

11 document.

12          This is a supplement to the

13 petition in the Quickie reexamination

14 proceeding relating to the '160 Patent,

15 which we'll mark Exhibit 54.

16    A.    Okay.

17          (Exhibit 54, Petition supplement,

18    marked for identification, as of this

19    date.)

20    Q.    It is signed by Maier & Maier as

21 counsel for Quickie, dated December 1,

22 2006.

23          Have you seen this document

24 before?

25    A.    I would need to look at it.  I'm

**Todd Sharrin**

Page 260

1              T. Sharinn

2 not sure.

3    **Q.    Please do.**

4    A.    I don't believe I have seen this

5 before, no.  I may have, and the only

6 reason I say may have is there was an

7 article written about me in IP360, which is

8 a Reg in the IP industry, IP meaning

9 intellectual property, and I got very upset

10 because I was never called by them to ask

11 what my opinion of all this was and that's

12 actually how I learned about the lawsuit in

13 the first place.

14              I had no idea about this until I

15 saw the article.  And so I had a paralegal

16 pull off some materials from the PTO

17 website, and I may have looked at this

18 document when I had written them a nasty

19 e-mail saying that I expected a full

20 retraction of the statements that they

21 issued, which they ultimately did do.  They

22 republished a new article.

23    **Q.    Do you see that in the third**

24 **paragraph of this petition -- I'm sorry,**

25 **supplement to petition, Quickie's counsel**

**Todd Sharrin**

Page 261

1                    T. Sharinn

2 writes:

3                "A declaration by Todd S.

4 Sharinn is being added as Exhibit 7 showing

5 that he was attorney at Pepe & Hazard, LLP

6 and was responsible for the '160 Patent.

7 Later, he left Pepe & Hazard, but continued

8 to be responsible for the '160 Patent as an

9 attorney at Greenberg Traurig (Exhibit 8).

10              "Further, his responsibility for

11 the '160 Patent ended prior to the time

12 when the payment of a first maintenance fee

13 was due (Exhibits 3 and 10) revocation of

14 prior powers of attorney signed on behalf

15 of the patent owner on March 4, 2003."

16           Do you see that?

17    A.    I do.

18    Q.    Is this statement that your

19 responsibility for the '160 Patent had

20 ended prior to the time the payment of the

21 first maintenance fee was due correct?

22    A.    It is.

23           MR. SCOTT:  Objection.  Form.

24 BY MR. KAMINSKY:

25    Q.    Did Mr. Maier ever call you up

**Todd Sharrin**

Page 262

```
 1                    T. Sharinn
 2  after submitting this document to the PTO
 3  and say, Todd, we submitted a document
 4  stating that your responsibility for the
 5  '160 Patent had ended prior to the time
 6  that the first maintenance fee was due, we
 7  were wrong about that, will you sign a new
 8  statement and confirm that we were wrong?
 9      A.    No.
10      Q.    Would you have signed such a
11  statement if he had asked you to do that?
12      A.    If, in fact, I had messed up and
13  done that, yes.  But I didn't and he
14  didn't.
15      Q.    Based on your understanding
16  today, the statement that your
17  responsibility had ended before the
18  maintenance fee was due is correct, is that
19  right?
20      A.    It is.
21      Q.    Now, in the supplemental
22  petition, Quickie's counsel goes on to say
23  on page 2:
24          "Thelen Reid & Priest was granted
25  and held sole and full power in the '160
```

Page 263

1                    T. Sharinn

2  Patent from March 4, 2003 through August

3  14, 2006 (Exhibits 3, 9 and 10).  This

4  period of time covered the time period up

5  until May 23, 2004 for timely paying the

6  first maintenance fee and then the entire

7  two-year time period starting from the date

8  of the '160 Patent's expiration to file a

9  remedial petition under the unintentional

10 provision (37 CFR 1.378(c)); this time

11 two-year expiration period ended on March

12 24, 2006."

13         Is it your understanding that

14 that is a correct statement of Thelen Reid

15 & Priest's responsibility and power?

16         MR. SCOTT:  Objection.  Form.

17 BY MR. KAMINSKY:

18    Q.   Did anyone on behalf of Quickie

19 ever call you up after that and say we made

20 a mistake when we said that Thelen Reid &

21 Priest have the sole and full power with

22 respect to the maintenance fees and we need

23 to correct that?

24    A.   No one called me up after that.

25 I had gotten calls in the past that said

**Todd Sharrin**

Page 264

```
 1              T. Sharinn
 2 they made a mistake with Thelen Reid &
 3 Priest.
 4    Q.    When you say made a mistake with
 5 Thelen Reid & Priest, were they referring
 6 to the fact that they felt they made a
 7 mistake in hiring Thelen Reid & Priest?
 8    A.    Yes, sir.
 9    Q.    Not in what they said to the PTO
10 about Thelen Reid & Priest's
11 responsibility, is that correct?
12    A.    That's correct.
13    Q.    Now, in an earlier question, the
14 transcript doesn't reflect an answer.
15         I read you a statement from this
16 petition about Thelen Reid & Priest ease
17 responsibility and power of responsibility
18 of the patent.
19         Is it your understanding that
20 that statement in the supplement to the
21 petition was correct?
22    A.    Yes, sir.
23         Can we take a break for a minute?
24         (Recess taken from 2:49 p.m. to
25 2:55 p.m.)
```

Todd Sharrin

Page 266

1              T. Sharinn

2 than the concentric passive knotless suture

3 terminator, for convenience you've turned

4 to the last page of the last time entry, do

5 you see any time entries after March of

6 2003 which is the last month before you

7 received notice of the revocation of your

8 Power of Attorney in connection with the

9 '160 Patent?

10    A.    No.

11    Q.    And as we said before, as you

12 explained before, the concentric passive

13 knotless suture terminator relates to an

14 S&A patent, correct?

15         MR. SCOTT:  Object to form.

16    A.    Yes.

17    Q.    Now, finally, you were shown

18 Exhibit 27, which is a letter from you to

19 Quickie, care of Rick Steiner, dated May

20 15, 2003, sending a copy of the notice of

21 the change of the Power of Attorney that

22 you had received.

23         Do you recall that?

24    A.    Yes, sir.

25    Q.    Did you bill Quickie for sending

Page 267

1                T. Sharinn

2 them this letter?

3    A.    I hope not.

4    Q.    Do you remember ever having done

5 so?

6    A.    I'm having trouble at this point

7 today remembering yesterday.  No.

8    Q.    And as you saw in the time

9 entries that we've marked, there is no time

10 entry for such a bill, is there?

11    A.    That's correct.

12    Q.    Because as far as you were

13 concerned, you were no longer an attorney

14 for Quickie in connection with the '160

15 Patent after the beginning of April at the

16 latest 2003, is that correct?

17         MR. LODEN:  Objection to form.

18         MR. SCOTT:  Objection to form.

19    A.    That's correct.  I mean, I don't

20 know how many different ways I can say it.

21         MR. KAMINSKY:  No further

22    questions.

23         MR. SCOTT:  Can I just see

24    Exhibit 27?

25 FURTHER EXAMINATION BY

# EXHIBIT U

# PEPE&HAZARD LLP

LAW OFFICES

GOODWIN SQUARE
HARTFORD, CONNECTICUT 06103-4302
860/522-5175   FACSIMILE 860/522-2796

**TODD S. SHARINN**
‡Only Admitted in PA & MA
Direct Dial: (860) 241-2631
tsharinn@pepehazard.com

May 30, 2000

282 9347 211

**VIA FEDERAL EXPRESS**

Stephen B. Colvin, M.D.
530 First Avenue - Suite 9 V
New York, NY 10016-0648

| | | | |
|---|---|---|---|
| Re: | U.S. Patent No.: | 6,066,160 | Issued: 5/23/2000 |
| | Serial No.: | 09/198,087 | Filed: 11/23/1998 |
| | For: | Passive Knotless Suture Terminator For Use in Minimally | |
| | | Invasive Surgery and to Facilities Standard Tissue Securing | |
| | Our Reference No.: | 29620-1 | |

Dear Dr. Colvin:

We take pleasure in forwarding to you for safekeeping the enclosed official United States Letters Patent, identified as follows:

Inventor(s):    Stephen Colvin; Eugene Grossi, Allan Katz and Paul Oddo

Title:    Passive Knotless Suture Terminator For Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing

Patent No.:    6,066,160

Expiration Date:    November 23, 2018
(20 years from earliest claimed U.S. priority appln. no. – no renewal)

Issue Date:    5/23/2000    Assignee:  Quickie LLC

Notice
Requirement:    All items manufactured under this patent should be marked "U.S. Patent No. 6,066,160." Failure to do so may result in loss of right to collect damages in the event of patent infringement.

Application
Serial No.:    09/198,087    Filed: 11/23/1998

TSS/29620/1/469773v1
05/27/00-HRT/CMW    BOSTON    ﹖    HARTFORD    ﹖    SOUTHPORT



EXHIBIT
21
6-10-08

T000732

PEPE&HAZARD LLP

Stephen Colvin, M.D.
May 30, 2000
Page 2

Please note that the United States Patent and Trademark Office requires the payment of fees for maintaining patents issuing from patent applications filed in the United States on or after December 12, 1980. You have already qualified for the lower fees accorded small entities. The Patent and Trademark Office must be notified of any change in small entity status. The fees are due on or before 3 1/2, 7 1/2, and 11 1/2 years from the date the patent issues. Failure to pay the fees will result in loss of the patent. We will notify you regarding payment of the maintenance fees several months before they are due.

Please review the patent for any printing errors. If necessary, we will then request a Certificate of Correction, which will be forwarded to you for attachment to the patent.

Please sign and return the duplicate copy of this letter to acknowledge receipt of the patent.

Very truly yours,

Todd S. Sharinn

Enclosures
cc:    Alan Fell, Esq. (*w/photocopy of enclosure*)

Receipt of the above-identified patent is acknowledge
this _____ day of _____, 2000.

_____
Stephen B. Colvin, M.D.

TSS/29620/1/469773v1
05/27/00-HRT/CMW

T000733

# EXHIBIT V



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 11, 2002

Mark F. Evens, Esq.
Thelen Reid & Priest LLP
701 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20004-2608

        Re:    Medtronic/Guidant Litigation
               Client-Matter No. 51822.010400

Dear Mark:

        It was a pleasure speaking to you earlier today. I enclose a copy of the file wrapper for
U.S. Patent No. 6,066,160 (the patent in issue for the above referenced matter).

        If you have any questions or comments, please do not hesitate to contact me.

                                  Very truly yours,

                                  Todd S. Sharinn

TSS:pjs
Enclosures

```
┌─────────────────────┐
│      EXHIBIT        │
│        5            │
│     6-10-08         │
└─────────────────────┘
```

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com

NEW YORK  MIAMI  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  CHICAGO  BOSTON  PHOENIX  WILMINGTON  LOS ANGELES  DENVER
SAO PAULO  FORT LAUDERDALE  BOCA RATON  WEST PALM BEACH  ORLANDO  TALLAHASSEE

QLLC 0000028

Patent No. 6,066,160

Granted 5-23-2000

Applicant STEPHEN COLVIN, EUGENE GROSSI, ALLAN KATZ, PAUL ODDO

Ser. No. 09/198,087          Group 3731

Filed November 23,1998          Room

For PASSIVE NOVEL KNOTLESS SUTURE SYSTEM FOR USE IN MINALLY INVASIVE SURGERY AND TO FACILITATE STANDARD TISSUE SECURING TECHNIQUE

Drawings_____Sheets. Executed_____          Forwarded

Allowed_____          Allowance Notice Sent_____

Final Fee Sent_____          Receipt for Final Fee_____

Patent Delivered to_____

Assignee QUICKIE LLC

Assignment Forwarded_____          Recorded_____          Reel_____          Frame_____

Assignment Returned_____          Delivered Assignee_____

Foreign_____

29620

QLLC 0000029

Applicant's Residence_____

Post Office Address_____

# EXHIBIT W

RICK, STEINER, SEGAL, FELL & BENOWITZ, P.C.
ATTORNEYS AT LAW
THREE NEW YORK PLAZA
NEW YORK, N.Y. 10004
TELEPHONE: (212) 422-0488
FAX: (212) 422-0158

NEW JERSEY OFFICE
111 PATERSON AVENUE
HOBOKEN, N.J. 07030
(201) 798-6613

October 15, 2002

HAND DELIVERY

Todd Sharinn, Esq.
Greenberg Traurig, LLP
885 Third Avenue, Suite 2400
New York, NY 10022

RE:  Quickie, LLC v. Medrtonic, Inc.
Civil Action No. 02 CV1157 (GEL)

Dear Todd:

This letter will confirm our recent conversation concerning the above referenced matter.  I am writing this leter as general counsel to Quickie, LLC.

You are aware that the firm of Thelen, Reid, Priest will be substituted for Greenberg Traurig in the above referenced litigation.  You will arrange to have the files prepared to be picked up by Thelen Reid Priest.  If you would let me know when the files are ready and how many boxes are included, I will arrange to have them picked up.

You and Greenberg Traurig will continue to handle various patent applications pending on behalf of Quickie, LLC and Quickievision, LLC.

I am aware that there are pending bills outstanding from your firm. Quickie will be making a payment today on account and intends to pay the entire balance by the end of this year.  I am hoping that your firm will waive its usual requirement and release the files immediately.

I want to personally thank you for the superb job you have done in litigating this matter.  The result of the Markman hearing was excellent.

All the best.

Sincerely,

ALAN FELL

AF:ags

cc:  Stephen B. Colvin, M.D.

EXHIBIT
22
6-10-08

QLLC 0098946

# EXHIBIT X

10/16/2002   16:43   GREENBERG/TRAURIG + 776#51822#010400#2632246                NO.954   P001



## GREENBERG
ATTORNEYS AT LAW
## TRAURIG

02 OCT 16 PM 4:23

### Transmittal Cover Sheet

**TO**

| | | | |
|---|---|---|---|
| Name: | Stephen B. Colvin, M.D. | Name: | Mark Evens, Esq. |
| Company: | | Company: | Thelen Reid & Priest |
| Fax No.: | (212) 263-2246 | Fax No.: | (202) 508-4321 |
| Phone No.: | | Phone No.: | |
| | | | |
| Name: | Alan Fell, Esq. | Name: | Shari Markowitz-Savitt |
| Company: | | Company: | Thelen Reid & Priest |
| Fax No.: | (212) 422-0158 | Fax No.: | (212) 603-2001 |
| Phone No.: | | Phone No.: | |
| | | | |
| Name: | | Name: | |
| Company: | | Company: | |
| Fax No.: | | Fax No.: | |
| Phone No.: | | Phone No.: | |
| | | | |
| Name: | | Name: | |
| Company: | | Company: | |
| Fax No.: | | Fax No.: | |
| Phone No.: | | Phone No.: | |

**FROM**      Paul A. Juergensen

**File Number**      51822.010400

**Comments**

**Date**      October 16, 2002

**Time**      3:47 PM

**No. Pages**      Including this cover sheet    4

Please notify us immediately if not received properly at 212-801-2100.

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

885 Third Avenue, New York, New York 10022   (212) 801-2100 Fax (212) 688-2449

EXHIBIT
25
6-10-08

QLLC 0098947

10/16/2002    16:43    GREENBERG/TRAURIG → 776#51822#010400#2632246                    NO.954    P002



# GREENBERG
ATTORNEYS AT LAW
# TRAURIG

Paul A. Juergensen
212-801-3173
juergensenp@gtlaw.com

October 16, 2002

**VIA FACSIMILE**

Shari Markowitz-Savitt
Thelen Reid & Priest LLP
40 West 57th Street
New York, New York 10019

      Re:  Quickie, LLC v. Medtronic, Inc.
            <u>Our Reference No.: 51822.010400</u>

Dear Shari :

    Confirming our conversation this afternoon, our files concerning the above-referenced matter are ready to be picked-up by your office. A copy of my cover letter accompanying the files is faxed herewith.

    We understand that you are unable to pick-up these documents today, and that you may be sending a representative from your office to pick the files up tomorrow, depending upon the weather. Mr. Sutton has instructed me to get these documents into the hands of Mark Evens "pronto", so that we ask that you not delay picking them up as soon as possible. Please contact me in advance so that I know when someone will be here to pick-up the files.

                             Very truly yours,

                             Paul A. Juergensen
                             Paralegal

Enclosures
(6 Boxes)

cc:  Stephen B. Colvin, M.D.
     Mark Evens, Esq.
     Alan Fell, Esq.
     Paul J. Sutton, Esq.
     Todd S. Sharinn, Esq.

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

QLLC 0098948



Paul A. Jœrgensen
212-101-3173
jœrgensœn@gtlaw.com

October 16, 2002

**MESSENGER PICK-UP**

Shari Markowitz-Savitt
Thelen Reid & Priest LLP
40 West 57th Street
New York, New York 10019

> Re:   Quickie, LLC v. Medtronic, Inc.
>        Our Reference No.: 51822.010400

Dear Shari :

    We enclose Greenberg Traurig's files concerning the above-referenced matter. These files include the following document types:

1.   Correspondence;

2.   Pleadings;

3.   Transcripts;

4.   General/Main File;

5.   U.S. Patent No. 6,066,160 File History & Prior Art;

6.   Slides – Markman Hearing;

7.   Key Cases & Definitions Re: Markman Hearing;

8.   Prototype Photos;

9.   Medtronic Device;

10   Allan Katz Prototypes;

11.   Medtronic Prototypes;

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100    FAX 212-688-2469    www.gtlaw.com
ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

QLLC 0098949

10/16/2002    16:43    GREENBERG/TRAURIG → 776#51822#010400#2632246    NO.954    0004

Shari Markowitz-Savitt
October 16, 2002
Page 2

12.    Cases Re: Claim Construction;

13.    Documents Produced by Quickie;

14.    Documents Produced by Medtronic;

15.    Attorney Work Files;

16.    Patent Research/Searches; and

17.    Original Documents from Quickie.


To the extent that we discover any additional materials, we will forward them immediately.

Please do not hesitate to call if you have any questions.

Very truly yours,

Paul A. Juergensen
Paralegal

Enclosures
(6 Boxes)

cc:  Stephen B. Colvin, M.D.
     Mark Evens, Esq.
     Alan Fell, Esq.
     Paul J. Sutton, Esq.
     Todd S. Sharinn, Esq.

GREENBERG TRAURIG, LLP

QLLC 0098950

# EXHIBIT Y

**Levin, Adrienne**

| | |
|---|---|
| **From:** | Levin, Adrienne |
| **Sent:** | Monday, December 02, 2002 10:35 AM |
| **To:** | 'sharinnt@gtlaw.com' |
| **Subject:** | US Patent No. 6,066,160 and reexamination requested |

Dear Todd:

Thank you for having your secretary call me this morning to confirm that you are still responsible for US Patent No. 6,066,160. In that regard, I am forwarding to you by messenger the November 22, 2002 letter and enclosures from Daniel Latham, Esq., of Medtronic, Inc., in respect of the reexamination requested for the subject patent.

Best regards,
Adrienne Levin
Trademark Administrator/IP Docket Manager
Bryan Cave LLP-NY Office
alevin@bryancave.com
(212) 692-1927

1



EXHIBIT
37

RS002009

# EXHIBIT Z

## GREENBERG TRAURIG
## CLIENT/MATTER INTAKE MEMORANDUM

NOTE:    Must obtain approval from Intake Committee Member or Department Head before any work is performed for this matter.

| Please Check One: | ☐ NEW CLIENT | ☒ EXISTING CLIENT/NEW MATTER ONLY |
|---|---|---|

| Billable File?: | ☒ Yes | ☐ No | Authored By:    Sharinn, Todd S. / Ivan, Adrienne K. |
|---|---|---|---|

### I.   CLIENT INFORMATION
December 3, 2002

| 1.  Client Number:   51822 | 2.  Client Name (Last, First):    Quickie, LLC |
|---|---|
| 3.  Address:<br>Attn:  Alan Fell, Esq.<br>c/o Rick, Steiner, Segal & Fell<br>Three New York Plaza<br>New York, NY  10004 | 3a.  Send Bill to attention of:<br>Quickie, LLC<br>c/o Rick, Steiner, Segal & Fell<br>Three New York Plaza<br>New York, NY  10004<br>Attn: Alan L. Fell, Esq. |
| | 3b.  Check if billing address should be marked "Personal and Confidential"   ☐ |

4.  If a new client, describe how the Client was acquired and/or the referral source (Be specific or mark N/A):
N/A

5.  Insure that all relevant parties have been added (if closely held or controlled, include list of Offices and Directors.)  See the last page for a printout from the system.

### II.  MATTER INFORMATION        51822 . 0109        Pending Matter Number:   PM099889

6.  Matter Name (Required):    Reexamination of U.S. Patent No. 6,066,160 by Medtronic

7.  Description of matter including amount & other material details (Required:  Must be sufficient detail so extent & significance of matter are clear):
Amount: $0.00 ; Matter Description:

8.  Check if this representation requires registering under any applicable lobbying rules:   ☐
(If checked, please indicate applicable rules and person responsible for compliance):

### III.  BILLING INFORMATION

| 9.  File Attorneys: | | | RECORDS MGMT USE ONLY |
|---|---|---|---|
| a)  Billing Attorney | → | Sharinn, Todd S. | |
| b)  Working Attorney | → | Sharinn, Todd S. | |
| c)  Originating Attorney | → | Todd Sharinn | |

| 10.  Other Information: | | |
|---|---|---|
| a)  Telephone Number | → | |
| b)  Facsimile Number | → | |

| 11.  Invoices Prepared:  ☒ Monthly   ☐ Quarterly   ☐ Other | 12a.  Special Billing Instructions: |
|---|---|
| If "Other," Matter will be coded as "Delay." Please describe: | |
| Expected 1st Bill Date: | 12b.  Collection Department Follow Up:<br>☒ Yes   ☐ No (Requires Finance Committee signature<br>[see line 28]) |
| Expected 1st Payment Date: | |

| 13.  Office Information: | | |
|---|---|---|
| a)  Office | → | New York |
| b)  Assigned Department | → | Intellectual Property |
| c)  Type of Law | → | IP/License |

### IV.  RECORDS INFORMATION

14.  Additional Folder Files for the matter:

| 15. | LABEL ONLY ☐ | REGULAR BROWN ☐ | EXPANDABLE ☐ | BINDER BLACK ☐ | |
|---|---|---|---|---|---|
| | BINDER RED ☐ | PLEADING GREEN ☐ | PLEADING RED ☐ | USE DISCRETION ☐ | YELLOW RETENTION JACKET ☐ |

16.  Location of File ("Return This File To"):    Sharinn, Todd S.

EXHIBIT
19
6-10-08

GT 0000731

## V. FEE ARRANGEMENT

| 17. | Expected fees for this matter (must be estimated with particularity in each instance even if not itemized with client): | | $ | 0.00 |

18. Fee arrangement with client:

A. (1) Standard Hourly Rate per Timekeeper: [ ] Yes

(2) Success Fee or Business Contingency: [ ] Yes

(3) Legal Contingency Fee:* [ ] Yes
    * Legal Contingencies must be approved by the Contingency Committee

(4) Discount or Premium: [ ] Yes

(5) Fixed Fee: [ ] Yes

(6) Equity:** [ ] Yes
    ** If checked, see Item 20 below

B. Check box if estimated collection percentage against "Rate 1" for Life of File is below 90%. If checked, this matter must be approved by Department Head, unless Client exempted. [ ]

19. A. Is a representation agreement letter in place? [ ] Yes [X] No    B. Has a fee agreement letter been mailed? [ ] Yes [X] No

C. Is a reasonable retainer in place? [ ] Yes [X] No    If yes, please enter retainer amount:

[Note: Except for currently exempt clients, all litigation & bankruptcy matters require reasonable retainers unless approved by Department Head]

20. Check box if the law firm or its investment fund has made or will make investment in this client or if the retention arrangement involves the taking of equity in the client in lieu of all or part of fees. [ ] If this box is checked, please also check the following boxes to confirm each of the following requirements:

[ ] A written engagement letter exists, incorporating the required language for matters in which firm has equity interest.

[ ] The necessary approval process for this type of equity interest has been followed and affirmatively completed.

[ ] An e-mail has been sent to the appropriate parties per the instructions at http://www.intranet.gtlaw.com/admin/fileopening/equity.htm.

## VI. CONFLICTS

Conflict search run on: _____    Run by: _____

21. I affirm that any potential legal conflicts have been resolved / waived *    initial here: _____
    * All actual conflicts to be cleared or decided by CEO or General Counsel of firm before file is opened.

22. Describe any potential business conflicts and status of waiver [This field is to be entered by hand. If any text here, 25A cannot be "Yes"]:

23. Describe any known business, personal and/or financial relationship between this client and the firm, or any of the firm's Attorneys or Employees, not otherwise expressly disclosed herein (any such relationship to be approved by CEO in every instance):

## VII. AUTHORIZATION   (This section to be filled out by hand)

24. **Billing Attorney Signature** [always required]:

Sign: _____    Date: 12/3/02

25. A. Is client exempt from intake signature? [ ] Yes [X] No    B. Is Department Head approval needed per requirements above? [ ] Yes [X] No
    (Applies only to collection percentage and, as to litigation and bankruptcy matters, retainers.)

26. **Intake Committee Member Signature**
    [REQUIRED UNLESS CLIENT IS EXEMPT – MUST INCLUDE CLIENT AND RELATED PARTIES BILLING HISTORY REVIEW, TO BE ATTACHED BY BILLING ATTORNEY]:
    (An intake member in one's own department must sign this memo absent extreme emergency. Except for minor matters, if the file being opened is in a substantive area outside of that intake member's discipline, he/she should consult with the shareholder in the appropriate substantive area prior to signing.)

[X] Signature required    Sign: _____    Date: 12/4/02

27. **Department Head Signature** [Only required if (i) contingency or discount could result in less than 90% collection percentage, OR (ii) est. collection percentage is less than 90%, including Pro Bono matters, OR (iii) a client is not exempt and there is no or insufficient retainer for litigation and bankruptcy matters]:
    [Emergency measure only: In the event that Department Head approval is required and it is difficult or impossible to obtain such approval due to time urgencies and circumstances, this form should be sent to the Chairman of the Intake Committee for signature in lieu of Department Head.]

[ ] Signature required    Sign: _____    Date: _____

28. **Finance Committee Signature** [Only required to keep administrative collection staff from contacting the client with regards to a past due invoice (see 12b).]

[ ] Signature required    Sign: _____    Date: _____

12/06/2002    11:36    GREENBERG/TRAURIG → 51822#010000#13055790717    NO.858    P003

## V. FEE ARRANGEMENT

17. Expected fees for this matter (must be estimated with particularity in each instance even if not formalized with client)    $    0.00

18. Fee arrangement with client.

    A. (1) Standard Hourly Rate per Timekeeper.    ☐ Yes

        (2) Success Fee or Business Contingency:    ☐ Yes

        (3) Legal Contingency Fee.*    ☐ Yes
           * Legal Contingencies must be approved by the Contingency Committee

        (4) Discount or Premium    ☐ Yes

        (5) Fixed Fee:    ☐ Yes

        (6) Equity:**    ☐ Yes
           ** If checked, see item 20 below

    B. Check box if estimated collection percentage against "Rate 1" for Life of File is below 90%. If checked, this matter must be approved by Department Head, unless Client exempted.    ☐

19. A. Is a representation agreement letter in place?    ☐ Yes    ☒ No    B. Has a fee agreement letter been mailed?    ☐ Yes    ☒ No

    C. Is a reasonable retainer in place?    ☐ Yes    ☒ No    If yes, please enter retainer amount.

    [Note: Except for currently exempt clients, all litigation & bankruptcy matters require reasonable retainers unless approved by Department Head]

20. Check box if the law firm or its investment fund has made or will make investment in this client or if the retention arrangement involves the taking of equity in the client in lieu of all or part of fees.    ☐    If this box is checked, please also check the following boxes to confirm each of the following requirements:

    ☐ A written engagement letter exists, incorporating the required language for matters in which firm has equity interest.

    ☐ The necessary approval process for this type of equity interest has been followed and affirmatively completed.

    ☐ An e-mail has been sent to the appropriate parties per the instructions at http://www.gtlaw.com/admin/fileopening/equity.htm.

## VI. CONFLICTS

    Conflict search run on:    Number by:

21. I affirm that any potential legal conflicts have been resolved / waived *    Initial here ►    **PM099889**
    * All actual conflicts to be cleared or decided by CEO or General Counsel of firm before file is opened.

22. Describe any potential business conflicts and status of waiver (This field is to be entered by hand. If any text here, 25A cannot be "Yes")

23. Describe any known business, personal and/or financial relationship between this client and the firm, or any of the firm's Attorneys or Employees, not otherwise expressly disclosed herein (any such relationship to be approved by CEO in every instance):

## VII. AUTHORIZATION    (This section to be filled out by hand)

24. **Billing Attorney Signature** (always required):

    Sign:    Date:

25. A. Is client exempt from intake signature?    ☐ Yes    ☒ No    B. Is Department Head approval needed per requirements above?    ☐ Yes    ☒ No
    (Applies only to collection percentage and, as to litigation and bankruptcy matters, retainers.)

26. **Intake Committee Member Signature**
    (REQUIRED UNLESS CLIENT IS EXEMPT - MUST INCLUDE CLIENT AND RELATED PARTIES BILLING HISTORY REVIEW, TO BE ATTACHED BY BILLING ATTORNEY):
    (An intake member in one's own department must sign this memo absent extreme emergency. Except for minor matters, if the file being opened is in a substantive area outside of that intake member's discipline, he/she should consult with the shareholder in the appropriate substantive area prior to signing.)

    ☒ Signature required    Sign:    Date:

27. **Department Head Signature** [Only required if (i) contingency or discount could result in less than 90% collection percentage, or (ii) est. collection percentage is less than 90%, including Pro Bono matters, OR (iii) a client is not exempt and there is no or insufficient retainer for litigation and bankruptcy matters]:
    (Emergency measure only: In the event that Department Head approval is required and it is difficult or impossible to obtain such approval due to time urgencies and circumstances, this form should be sent to the Chairman of the Intake Committee for signature in lieu of Department Head.)

    ☐ Signature required    Sign:    Date:

28. **Finance Committee Signature** [Only required to keep administrative collection staff from contacting the client with regards to a past due invoice (see 12b).]:

    ☐ Signature required    Sign:    Date:

Greenberg Traurig Client/Matter Intake Memo    Page 2 of 4    08/15/01 revision

GT 0000733

#5 Attachment          Name all relevant related parties (if corporation, include list of Officers and Directors):

GT 0000734

## CLIENT STATISTICS

### Quickie, LLC (51822)

#### Aged WIP and A/R

|     | Current | 31 – 60 | 61 – 90 | 91 – 120 | 121 – 180 | Over 180 | Total |
|-----|---------|---------|---------|----------|-----------|----------|-------|
| A/R | $ 972.34 | $ 2,603.72 | $ 39,158.32 | $ 19,123.02 | $ 148.65 | $ 0.00 | $ 61,956.05 |
| WIP | $ 2,960.80 | $ 3,720.60 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 6,681.40 |

| Unbilled WIP | | Unapplied Funds | |
|-----|-----|-----|-----|
| Hours | 30.40 | Retainer | $ 0.00 |
| Fees | $ 6,666.50 | Cash | $ 0.00 |
| Costs | $ 14.90 | O/A Fees | $ 0.00 |
| Total WIP | $ 6,681.40 | O/A Costs | $ 0.00 |

#### Total Worked and Billed

|     | Hours | | Value | |
|-----|--------|--------|--------|--------|
|     | Worked | Billed | Worked | Billed |
| MTD | 0.00 | 0.00 | $ 0.00 | $ 0.00 |
| YTD | 797.05 | 749.75 | $ 229,513.50 | $ 218,411.50 |

#### Billing and Payment History

|     | Fees | | Retainers | | | Costs | |
|-----|--------|--------|--------|--------|--------|--------|--------|
|     | Billed | Paid | Billed | Paid | Applied | Billed | Paid |
| MTD | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| YTD | $ 218,411.50 | $ 167,894.98 | $ 0.00 | $ 72,500.00 | $ 0.00 | $ 14,741.01 | $ 11,777.18 |

#### Write-Offs Life-To-Date

|     | Fees | Costs | Retainer | O/A Fees | O/A Costs |
|-----|--------|--------|--------|--------|--------|
| LTD | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

GT 0000735

# EXHIBIT AA





ATTORNEYS AT LAW

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

## VIA FIRST CLASS MAIL

December 3, 2002

Alan Fell, Esq.
S & A Rings LLC
c/o Rick, Steiner P.C.
3 New York Plaza
New York, NY  10004

> Re:    Quickie, LLC
> Re-examination of U.S. Patent No. 6,066,160 by Medtronic
> Our Reference: 51822

Dear Alan:

We enclose papers relating to Medtronic Inc.'s Request for Re-Examination of U.S. Patent No. 6,066,160 filed with the United States Patent and Trademark Office on November 22, 2002.

Please contact the undersigned to discuss.

Very truly yours,

Todd S. Sharinn

TSS:ai
Enclosure

cc:  Steve Colvin, MD (w/out enclosures)

> EXHIBIT
> 66
> 6-2008

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com

ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

# EXHIBIT AB



## Transmittal Cover Sheet

| | |
|---|---|
| **TO** | Marsha Twitty |
| **Company** | U.S. Patent and Trademark Office |
| **Fax Number** | 703-305-1013 |
| **Phone Number** | 703-308-9692 |
| **FROM** | Linda Garramone |
| **File Number** | 51822.010700 |
| **Comments** | Change of Correspondence Address and Fee Address Indication Form |

| | |
|---|---|
| **Date** | December 16, 2002 |
| **No. Pages** | Including this cover sheet    4 |

Please notify us immediately if not received properly at 212-801-2100

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

885 Third Avenue, New York, New York 10022   (212) 801-2100 Fax (212) 688-2449



EXHIBIT
7
6-10-08

GT 0000380

# MESSAGE CONFIRMATION

12/16/2002  12:21
ID=GREENBERG/TRAURIG

| DATE | S,R-TIME | DISTANT STATION ID | MODE | PAGES | RESULT | |
|------|----------|--------------------|------|-------|--------|--|
| 12/16 | 02'00" | 7033051013 | TX | 004 | OK | 0000 |

12/16/2002    12:18    GREENBERG/TRAURIG → 51822#010700#17033051013                    NO.984    0001



**Transmittal Cover Sheet**

|  |  |
|--|--|
| **TO** | Marsha Twitty |
| **Company** | U.S. Patent and Trademark Office |
| **Fax Number** | 703-305-1013 |
| **Phone Number** | 703-308-9692 |
| **FROM** | Linda Garramone |
| **File Number** | 51822.010700 |
| **Comments** | Change of Correspondence Address and Fee Address Indication Form |

GT 0000381

Please type a plus sign (+) inside this box ⟶ + 

PTO/SB/123 (10-00)
Approved for use through 10/31/2002. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| CHANGE OF CORRESPONDENCE ADDRESS *Patent* | Patent Number | 6,066,160 |
|---|---|---|
| | Issue Date | May 23, 2000 |
| | Application Number | 09/198,087 |
| Address to: Assistant Commissioner for Patents Washington, D.C. 20231 | Filing Date | November 23, 1998 |
| | First Named Inventor | Colvin |

Please change the Correspondence Address for the above-identified patent to:

☐ Customer Number  [_____]  ⟶   *Place Customer Number Bar Code Label here*

*Type Customer Number here*

OR

☐

| Firm or Individual Name | Todd S. Sharinn |
|---|---|
| Address | Greenberg Traurig, LLP |
| Address | 885 Third Avenue, 21st Floor |
| City | New York | State | NY | ZIP | 10022 |
| Country | US |
| Telephone | 212-801-2157 | Fax | 212-688-2449 |

This form cannot be used to change the data associated with a Customer Number. To change the data associated with an existing Customer Number use "Request for Customer Number Data Change" (PTO/SB/124).

This form will not affect any "fee address" provided for the above-identified patent. To change a "fee address" use the "Fee Address Indication Form" (PTO/SB/47).

I am the :

☐  Patentee.

☐  Assignee of record of the entire interest. See 37 CFR 3.71.
   Statement under 37 CFR 3.73(b) is enclosed.  (Form PTO/SB/96).

☒  Attorney or agent of record.

| Typed or Printed Name | Todd S. Sharinn |
|---|---|
| Signature | |
| Date | October 22, 2002 |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☐  *Total of _____ forms are submitted.

Burden Hour Statement: This form is estimated to take 3 minutes to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

GT 0000382

| CERTIFICATE OF MAILING BY FIRST CLASS MAIL (37 CFR 1.8) | Docket No. |
|---|---|
| Applicant(s):  Colvin et al. | 51822.010700 |

| Serial No. 09/198,087 | Filing Date November 23, 1998 | Examiner Gary Jackson | Group Art Unit 3731 |
|---|---|---|---|

Invention:  **PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN MINIMALLY INVASIVE SURGERY AND TO FACILITATE STANDARD TISSUE SECURING**

I hereby certify that this   Change of Correspondence Address, Fee Address Indication Form & Post Card
*(Identify type of correspondence)*

is being deposited with the United States Postal Service as first class mail in an envelope addressed to: The

Assistant Commissioner for Patents, Washington, D.C. 20231 on _____ October 22, 2002 _____
*(Date)*

**Linda Garramone**
*(Typed or Printed Name of Person Mailing Correspondence)*

*Linda Garramone*
*(Signature of Person Mailing Correspondence)*

**Note: Each paper must have its own certificate of mailing.**

P07A/REV03

GT 0000384

# EXHIBIT AC



**COPY**

Todd S. Sharinn
212-801-2157
sharinn@gtlaw.com

January 29, 2003

Dr. Stephen B. Colvin
530 First Avenue - Suite 9V
New York, New York 10016-0648

Re:    NON-SLIP SURGICAL INCISE DRAPE
       Our Reference: 51822.010800

Dear Steve:

It was great speaking with you earlier today. I was particularly pleased to learn of your most recent success in the Quickie v. Medtronic matter.

We enclose the most recent draft of the Non-Slip Surgical Incise Drape patent application, which we prepared at your request. Kindly review the contents of this document, and forward any comments, questions or suggestions you may have. You will note that this draft now includes the embodiment incorporating the grit surface.

I look forward to discussing the application with you shortly.

In the interim, if you have any questions or comments please do not hesitate to contact me.

*Dictated but not read.*

Very truly yours,

Todd S. Sharinn

TSS:ai
Enclosures

cc:    Alan Fell, Esq.
       (w/out enclosures)

**EXHIBIT**

**39**

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS002051

# EXHIBIT AD



**COPY**

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

February 21, 2003

Dr. Stephen B. Colvin
530 First Avenue - Suite 9V
New York, New York 10016-0648

> Re:    US Patent Application Serial No.: 09/660,745
>          CONCENTRIC PASSIVE KNOTLESS SUTURE TERMINATOR
>          <u>Our Reference: 51822.010200</u>

Dear Steve:

    This is to advise you of the status of the above noted application.  We telephoned the Examiner who explained that there has been a heavy backlog of applications and some art groups are currently being assigned applications in whose art the examiner does not specialize.  This is being done to alleviate the work load burdening the specialty art groups in an effort to ameliorate the waiting time for examination of all applications.

    On the basis of our telephone calls to the Examiner, we expect to receive the first office action shortly.  We will advise you upon our receipt of same.  In the interim, if you have any questions or concerns please do not hesitate to contact me.

Very truly yours,

Todd S. Sharinn

TSS:ai

cc:    Alan Fell, Esq.

\\ny2-srv01\686436v01

**EXHIBIT**
**40**

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS002822

# EXHIBIT AE



**Thelen Reid & Priest LLP**
*Attorneys At Law*

225 West Santa Clara Street, Suite 1200
San Jose, CA 95113-1723

Tel. 408.292.5800
Fax 408.287.8040

www.thelenreid.com

Hal Bohner
hbohner@thelenreid.com

April 16, 2003

```
┌──────────────────┐
│     EXHIBIT      │
│                  │
│       51         │
└──────────────────┘
```

Steve Colvin
Quickie LLC
3 New York Plaza
New York, NY 10004

> Re:  United States Patent No. 6,066,160
>      Entitled: "Passive Knotless Suture Terminator For Use In Minimally
>      Invasive Surgery and to Facilitate Standard Tissue Securing"
>      Issued: May 23, 2000
>      Inventors: Colvin et al

Dear Mr. Colvin:

Enclosed please find a copy of the Statement of Patent Owner and Amendment in Reexamination for the above referenced application as filed with the United States Patent Office on March 17, 2003 for your records.

Also, enclosed is a copy of Power of Attorney/Revocation of Prior Powers of Attorney filed with the United States Patent and Trademark Office on March 20, 2003 for your records.

If you have any questions, please do not hesitate to contact us.

Very truly yours,

Hal Bohner

HB/av
Enclosure
cc:    Mark Evens
       Robert E. Krebs
SV #129505 v1

QUICK 005086

Serial/Patent.No.: 6066160

Filing/Issue Date: 5/23/00

Applicant: Stephen Colvin et al

Title: Passive Knotless Suture Terminator for use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing

Atty/Secty Initials: REK/HB/zv

TRP Docket No.: 054521-005

Date Mailed: 3/20/05

Docket Due Date:

The following has been received in the U.S. Patent & Trademark Office on the date stamped hereon:

☐ Amendment/Response (_____ pgs.)
☐ Appeal Brief (_____ pgs.) (in triplicate)
☐ Application - Utility (_____ pgs. with cover & abstract)
☐ Application – Rule 1.53(b) Continuation (_____ pgs.)
☐ Application – Rule 1.53(b) Division (_____ pgs.)
☐ Application – Rule 1.53(b) CIP (_____ pgs.)
☐ Application – Rule 1.53(d) CPA (_____ pgs.)
☐ Application – PCT (_____ pgs.)
☐ Application – Provisional (_____ pgs.)
☐ Assignment and Cover Sheet
☐ Certificate of Correction
☒ Certificate of Mailing
☐ Declaration & POA (_____ pgs.)
☐ Fee Transmittal
☐ Drawings (informal)
    _____ # of sheets include: _____ figures
☒ Other
    Change of Address and docket number; Revocation of
    Power of Attorney

☐ IDS & PTO 1449 (_____ pgs.)
☐ _____ Pieces of Prior Art Enclosed
☐ Issue Fee Transmittal
☐ Submission of Formal Drawings
    _____ # of sheets includes _____ figures
☐ Notice of Appeal
☒ Postcard
☐ Preliminary Amendment (_____ pgs.)
☐ Reply Brief (_____ pgs.)
☐ Req and Cert. Not to Publish – Rule 1.213
☐ Request for Continued Examination (RCE) (_____ pgs.)
☐ Request for Extension of Time _____ Months)
☐ Response to Notice to File Missing Parts
☐ Copy of PTO Notice to File Missing Parts
☐ Transmittal Letter (original & copy)
☐ Express Mail No.:
☐ Check(s) $
☐ Deposit Acct. No. 50-1698 $
    Patent Code
    Client/Matter # 34521 - 3

QUICK 005087

PATENT

Practitioner's Docket No._____034521-002_____

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Patent No:    6,066,160

Issued:    May 23, 2000
Title:    PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN
    MINIMALLY INVASIVE SURGERY AND TO FACILITATE
    STANDARD TISSUE SECURING
Inventors:    Stephen Colvin, Eugene Grossi, Allan Katz, Paul Oddo

Commissioner of Patents and Trademarks
Washington, D.C. 20231

POWER OF ATTORNEY BY ASSIGNEE OF ENTIRE INTEREST
(REVOCATION OF PRIOR POWERS)

As assignee of record of the entire interest of the above identified patent,

REVOCATION OF PRIOR POWERS OF ATTORNEY

all powers of attorney previously given are hereby revoked and

NEW POWER OF ATTORNEY

the following attorney(s) and/or agent(s) are hereby appointed to prosecute and
transact all business in the Patent and Trademark Office connected therewith.

Robert E. Krebs, Registration No. 25,885; David B. Ritchie, Registration No. 31,562; Marc S.
Hanish, Registration No. 42,626; John P. Schaub, Registration No. 42,125; Adrienne
Yeung, Registration No. 44,000; Steven J. Robbins, Registration No. 40,299; Thierry K. Lo,
Registration No. 49,097; William Samuel Niece, Registration No.: 47,824; J. Davis Gilmer,
Registration No. 44,711; William E. Winters, Registration No. 42,232, Masako Ando, (37
C.F.R.§10.9 (b)); and John Klaas Uilkema, Registration No. 20,282; Becky L. Troutman,
Registration No. 36,703; Hal J. Bohner, Registration No. 27,856;

QUICK 005088

Quickie, LLC

(type or print identify of assignee of entire interest)

3 New York Plaza
Attn: Alan Fell
New York, NY 10004

Address

Recorded in PTO on _____11/23/1998_____
Reel_____9608_____
Frame _____0640_____

## ASSIGNEE STATEMENT

The undersigned states that he is authorized to act on behalf of the assignee.

Date_____3/4/03_____

Signature

Aubrey C. Gallaway

(type or print name of person authorized to sign
on behalf of assignee)

Managing Partner.

Title

QUICK 005089

2

QLLC 0062223



Attorney Docket No. 034521-003

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT:     Stephen Colvin, Eugene Grossi, Allan Katz, Paul Oddo

PATENT NO.:    6,066,160

ISSUE DATE:    May 23, 2000

TITLE          PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN
               MINIMALLY INVASIVE SURGERY AND TO FACILITATE
               STANDARD TISSUE SECURING

EXAMINER:      Woo, J.

ART UNIT:      3731

---

### CERTIFICATE OF MAILING

I hereby certify that this paper is being deposited with the United States Postal Service as First Class
Mail in an envelope addressed to: Commissioner for Patents, Washington, DC 20231, on the date
printed below

Date: 3/20/03            Name: _Annette Valdivia_
                                Annette Valdivia

---

COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

## CHANGE OF ATTORNEY DOCKET NUMBER
## AND CHANGE OF ADDRESS NOTICE

Please change the Attorney Docket No. for this patent application from

**034521-002 to 034521-003.**

Please address all further communications regarding this application to:

Robert E. Krebs
Thelen Reid & Priest LLP
P.O. Box 640640
San Jose, CA 95164-0640
Telephone (408) 292-5800; Facsimile (408) 287-8040

Respectfully submitted,
THELEN REID & PRIEST LLP

_Hal Jay Bohner_

Hal Jay Bohner
Reg. No. 27,856

Dated: 20 March, 2003

QUICK 005090

QLLC 0062224

# EXHIBIT AF

05/19/2003    10:09    GREENBERG/TRAURIG → 2#010200#12122632246                    NO.549    003



# GREENBERG

ATTORNEYS AT LAW

# TRAURIG

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

May 15, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

Re:    Quickie, LLC
       Reexamination of U.S. Patent No. 6,066,160 by Medtronic
       Our Ref. 51872.010900

Dear Alan:

We enclose for your information and records, a copy a of a Notice Regarding Change of Power of Attorney filed in connection with the above-referenced re-examination application. While we are surprised to have received this document in view of the conversations I had with Dr. Colvin, we respect his decision and will take no further action on this matter.

If we could be of any additional assistance with this matter in the future, please do not hesitate the contact the undersigned. In the interim, kindly note that, it is firm policy that all outstanding fees and expenses incurred in connection with matters be paid upon closing of the same. For your convenience, we will forward our final bills under separate cover.

Very truly yours,

Todd S. Sharinn

TSS/ai

Cc:    Stephen B. Colvin, M.D.

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100 FAX 212-801-2400 www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON



QLLC 0103020

05/19/2003    10:09    GREENBERG/TRAURIG + 2#010200#12122632246    NO.549    D04

Page 1 of 1

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
Washington, DC 20231
www.uspto.gov

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 09/198,087 | 11/23/1998 | STEPHEN COLVIN | QUIC-1 |

**CONFIRMATION NO. 2082**

Todd S. Sharinn
Greenburg Traurig LLP
885 Third Avenue 21st Floor
New York, NY 10022

*OC000000009757041*

Date Mailed: 04/02/2003

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 04/02/2003.

- The Power of Attorney to you in this application has been revoked by the assignee who has intervened as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

DAVID O LIPSCOMB
OPR (703) 306-7127

FORMER ATTORNEY/AGENT COPY

QLLC 0103021

# EXHIBIT AG



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Todd S. Sharinn
212-801-2157
sharinn@gtlaw.com

October 14, 2003

Quickie Vision LLC
c/o. Rick, Steiner, Segal & Fell
Three New York Plaza
New York, NY 10004

Attn: Rick Steiner

Re:   Concentric Passive Knotless Suture Terminator
      Our. Ref. No.: 55217.010200

Dear Rick:

Enclosed please find invoice no. 1112914 for fees and expenses incurred through September 30, 2003. The total amount of the invoice is $2,776.02. Please note that this amount includes an outstanding balance of $615.12.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Todd S. Sharinn

Enclosures

**EXHIBIT**

67

H-7-08

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100   FAX 212-688-2449   www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS002748

# EXHIBIT AH



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

December 2, 2003

Dr. Stephen B. Colvin
530 First Avenue - Suite 9V
New York, New York 10016-0648

Re:    US Patent Application Serial No.: 09/660,745
       CONCENTRIC PASSIVE KNOTLESS SUTURE TERMINATOR
       Our Reference: 51822.010200

Dear Steve:

   I am pleased to inform you that the U.S. patent examiner has issued a notice of allowance in this application. A copy of the notice of allowance and issue fee due and the notice of allowability are enclosed for your files.

   The issue fee is due on or before **February 24, 2004**. There is no possibility of obtaining an extension of time and if a response to this notice is not filed by the February 24, 2004 due date this application will go abandoned. The Examiner's reasons for allowance appear to be acceptable. If you wish to respond, the response must be filed no later than the date of payment of the issue fee.

   Please contact me at your earliest convenience with your instructions. I look forward to hearing from you.

                                   Very truly yours,

                                   Todd S. Sharinn

Enclosures

cc:    Alan Fell, Esq.

EXHIBIT
41

GREENBERG TRAURIG, LLP
885 Third Avenue
\\ny2-srv01\715588v01                    New York, New York 10022-4834
212-801-2100   Fax 212-688-2449   www.gtlaw.com
New York  Atlanta  Boca Raton  Boston  Chicago  Denver  Fort Lauderdale  Los Angeles  Miami  Orlando  Philadelphia  Phoenix
Tallahassee  Tysons Corner  Washington, D.C.  West Palm Beach  Wilmington

GT 0000508

# MESSAGE CONFIRMATION

12/02/2003  10:49
ID=GREENBERG/TRAURIG

| DATE | S.R-TIME | DISTANT STATION ID | MODE | PAGES | RESULT | |
|------|----------|--------------------|------|-------|--------|---|
| 12/02 | 04'09" | 2122636546 | CALLING | 14 | OK | 0000 |

12/02/2003    10:44    GREENBERG/TRAURIG → 2#010200#12122632246              NO.346    P01

# GREENBERG
ATTORNEYS AT LAW
# TRAURIG

**Transmittal Cover Sheet**

| | | | |
|---|---|---|---|
| **TO** | Dr. Stephen Colvin | **Company** | |
| **Fax Number** | 212-263-2246 | **Phone Number** | |
| **FROM** | Todd Sharinn | | |
| **File Number** | 51822.010200 | | |
| **Comments** | | | |

GT 0000509



**Transmittal Cover Sheet**

| | | |
|---|---|---|
| **TO** | Dr. Stephen Colvin | **Company** |
| **Fax Number** | 212-263-2246 | **Phone Number** |
| **FROM** | Todd Sharinn | |
| **File Number** | 51822.010200 | |
| **Comments** | | |

| | |
|---|---|
| **Date** | December 2, 2003 |
| **Time** | |
| **No. Pages** | Including this cover sheet    14 |

Please notify us immediately if not received properly at 212-801-2100.

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

885 Third Avenue, New York, New York 10022   (212) 801-2100 Fax (212) 688-2449

GT 0000510

# EXHIBIT AI





EXHIBIT
44

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

December 2, 2003

Alan Fell, Esq.
S & A Rings LLC
c/o Rick, Steiner P.C.
3 New York Plaza
New York, NY 10004

Re:    US Patent Application Serial No.: 09/660,745
       CONCENTRIC PASSIVE KNOTLESS SUTURE TERMINATOR
       Our Reference: 51822.010200

Dear Alan:

I hope this letter finds you well and having enjoyed a bountiful Thanksgiving. I am pleased to inform you that the U.S. patent examiner has issued a notice of allowance for the above-referenced patent application. A copy of the notice of allowance and issue fee due and the notice of allowability are enclosed for your files.

After you have had a chance to review the same, please give me a call so that we may discuss. As time is of the essence, I would like to get this matter handled as soon as possible in order to avoid abandonment.

I look forward to hearing from you.

Very truly yours,

Todd S. Sharinn

Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100 FAX 212-688-2449 www.gtlaw.com
NEW YORK ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI ORLANDO PHILADELPHIA PHOENIX
TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON

\\ny2-srv01\715588v01

GT 0000505

# MESSAGE CONFIRMATION

12/02/2003  10:43
ID=GREENBERG/TRAURIG

| DATE | S.R-TIME | DISTANT STATION ID | MODE | PAGES | RESULT | |
|------|----------|--------------------|------|-------|--------|--|
| 12/02 | 04'11" | 212 422 0158 | CALLING | 14 | OK | 0000 |

12/02/2003    10:38    GREENBERG/TRAURIG → 2#010200#12124220158    NO.345    D01

# GREENBERG
ATTORNEYS AT LAW
# TRAURIG

## Transmittal Cover Sheet

| | | |
|---|---|---|
| **TO** | Alan Fell | **Company** |
| **Fax Number** | 212-422-0158 | **Phone Number** |
| **FROM** | Todd Sharinn | |
| **File Number** | 51822.010200 | |
| **Comments** | | |

GT 0000506



## GREENBERG
### ATTORNEYS AT LAW
## TRAURIG

### Transmittal Cover Sheet

| | | |
|---|---|---|
| **TO** | Alan Fell | **Company** |
| **Fax Number** | 212-422-0158 | **Phone Number** |
| **FROM** | Todd Sharinn | |
| **File Number** | 51822.010200 | |
| **Comments** | | |

| | |
|---|---|
| **Date** | December 2, 2003 |
| **Time** | |
| **No. Pages** | Including this cover sheet    14 |

Please notify us immediately if not received properly at 212-801-2100.

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

885 Third Avenue, New York, New York 10022   (212) 801-2100 Fax (212) 688-2449

GT 0000507

# EXHIBIT AJ



**The len Reid & Priest LLP**

*Attorneys At Law*

Mark Fox Evens

202.508.4053 Direct Dial
202.654.1831 Direct Fax
mevens@thelenreid.com

701 Pennsylvania Avenue, N.W., Suite 800
Washington, DC  20004-2608

Tel. 202.508.4000
Fax 202.508.4321

www.thelenreid.com

April 6, 2004

The Honorable Gerard E. Lynch
United States District Judge
United States District Court
Southern District of New York
United States Courthouse
40 Centre Street, Room 803
New York, NY  10007

RE:   *Quickie, LLC v. Medtronic, Inc., Southern District of New York, 02 CV
1157 (SDNY) GEL*

Dear Judge Lynch:

By this letter, both Plaintiff Quickie, LLC and Defendant Medtronic, Inc., jointly
advise this Court of the initial office action taken by the examiner at the United States
Patent and Trademark Office ("USPTO") in response to the *ex parte* reexamination
requested by Defendant. A copy of the office action is attached hereto. In the office
action, the examiner rejected claims 1 through 23, 28, 29 and 31 through 59. This office
action materially affects this case because Quickie has alleged that Medtronic infringed
Claims 13 and 33 (and the related dependant claims) which have now been preliminarily
rejected by the examiner. Under USPTO rules, Quickie's response to this initial office
action is due within 60 days of the action. With the rejection of those claims, though not
a final agency action, the parties believe that the best interests of justice would be served
by staying this case for six months.

A two week trial in this matter is currently scheduled to begin May 3. The parties
are preparing oppositions to a dozen recently filed motions *in limine* that are due on or
about April 9th. A stay would ensure that the parties will not needlessly spend attorneys'
fees and the Court's time while Quickie responds to the examiner's rejection of the
pertinent claims.

Quickie and Medtronic respectfully request that the Court schedule a conference
with counsel as soon as possible to discuss the best way to proceed in view of the office
action.

DC #165422 v2



**Thelen Reid & Priest LLP**

The Honorable Gerard E. Lynch
April 6, 2004
Page 2


The parties regret any inconvenience this request causes to the Court.

Cordially yours,

*Mark Fox Evens*

Mark Fox Evens

Enclosure

cc:    Michael Sommer, Esq.
       Brian Ferguson. Esq.
       Dr. Stephen Colvin

04/02/2004 14:41 FAX 703 305 3782          TC3700 DIRECTOR'S OFFICE                    ☑002/012

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,460 | 11/25/2002 | 6066160 | | 3789 |

| | | | EXAMINER |
|---|---|---|---|
| 7590 | 04/02/2004 | | Woo |

Robert E. Krebs
Thelen Reid & Priest LLP
P.O. Box 640640
San Jose, CA 95164-0640

| ART UNIT | PAPER NUMBER |
|---|---|
| 3731 | 12 |

DATE MAILED: 04/02/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Office Action in Ex Parte Reexamination* | Control No. 90/006,460 | | Patent Under Reexamination 6066160 | |
|---|---|---|---|---|
| | Examiner Julian W. Woo | | Art Unit 3731 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☒ Responsive to the communication(s) filed on <u>05 December 2003</u> .         b☐ This action is made FINAL.
c☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I     THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1.  ☒ Notice of References Cited by Examiner, PTO-892.        3.  ☐ Interview Summary, PTO-474.
2.  ☒ Information Disclosure Statement, PTO-1449.              4.  ☐ _____.

Part II    SUMMARY OF ACTION

1a. ☐ Claims _____ are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2.  ☐ Claims _____ have been canceled in the present reexamination proceeding.
3.  ☒ Claims <u>24,27,30</u> are patentable and/or confirmed.
4.  ☒ Claims <u>1-23,28,29 and 31-59</u> are rejected.
5.  ☐ Claims _____ are objected to.
6.  ☐ The drawings, filed on _____ are acceptable.
7.  ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.
8.  ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some*  c)☐ None     of the certified copies have
      1☐ been received.
      2☐ not been received.
      3☐ been filed in Application No. _____ .
      4☐ been filed in reexamination Control No. _____.
      5☐ been received by the International Bureau in PCT application No. _____.
   * See the attached detailed Office action for a list of the certified copies not received.

9.  ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____.

cc: Requester (if third party requester)
U.S. Patent and Trademark Office
PTOL-466 (Rev. 04-01)                          Office Action in Ex Parte Reexamination                      Part of Paper No. 12

04/02/2004 14:42 FAX 703 305 3782    TC3700 DIRECTOR'S OFFICE    ☒004/012

Application/Control Number: 90/006,460    Page 2
Art Unit: 3731

## DETAILED ACTION

### *Reexamination*

1.     Claims 35-44 are rejected under 35 U.S.C. 305 as enlarging the scope of the

claim(s) of the patent being reexamined.  In 35 U.S.C. 305, it is stated that "[n]o

proposed amended or new claim enlarging the scope of a claim of the patent will be

permitted in a reexamination proceeding... ."  A claim presented in a reexamination

"enlarges the scope" of the patent claim(s) where the claim is broader than any claim of

the patent.  A claim is broader in scope than the original claims if it contains within its

scope any conceivable product or process which would not have infringed the original

patent.  A claim is broadened if it is broader <u>in any one respect</u>, even though it may be

narrower in other respects.   These new claims broaden the scope of the patent claims

with respect to the "locking means," which is cited as comprising a cam or cam member.

Claims 35-44 depend from claim 1, an independent, means-plus-function claim, which

during prosecution of the parent application (09/198087), was directed to an

embodiment shown in figures 1-3 of the patent, where the structure of the "locking

means" is not a cam or cam member.

### *Claim Rejections - 35 USC § 112*

2.     The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

3.     Claims 33, 35-44, and 59 are rejected under 35 U.S.C. 112, second paragraph,

as being indefinite for failing to particularly point out and distinctly claim the subject

matter which applicant regards as the invention.  With respect to claims 33 and 59, "the

Application/Control Number: 90/006,460                                    Page 3

Art Unit: 3731

middle aperture," "said first cavity," and "said second cavity" lack antecedent bases.

Claims 35-44 cite that the "locking means" comprises a cam or cam member, which is a

structure not linked to the embodiment originally claimed as the "locking means" in claim

1 of U.S. Patent No. 6,066,160.

### Claim Rejections - 35 USC § 102

4.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

5.      Claims 1-12, 32, 34, and 45-48 are rejected under 35 U.S.C. 102(b) as being

anticipated by Emery (3,988,810). Emery discloses, in the figures, a suture securing

apparatus comprising an apparatus body having an upper surface (e.g., at 26), a lower

surface (23); a round, first internal surface (at 25); an angulated, second internal surface

(at 24) at an acute angular narrowing (with respect to the axis running along the suture

shown in figure 3 or 7), an outer surface (27 or 28), first and second apertures that are

mirror images of each other (see fig. 7), and an integral locking means comprising at

least one ridge (30 or 41), where each aperture has longitudinal and latitudinal axes

(located along and/or between the first and second internal surfaces) facilitating

longitudinal and latitudinal directions for a suture (T), where each ridge is formed of a

rigid, biocompatible NYLON material (see col. 1, lines 19-23, for its use wearing

apparel, and col. 3, lines 9-11) and has a rounded surface farthest from the aperture

Application/Control Number: 90/006,460                          Page 4
Art Unit: 3731

surface (see figures 3 and 4), where each ridge is formed at an angle greater than

about 30 deg. or at an angle of about 45 deg. (see col. 2, lines 9-15).

6.      Claims 13-21, and 33 are rejected under 35 U.S.C. 102(b) as being anticipated

by Plante (5,070,805). Plante discloses, in the figures, a suture securing apparatus with

an apparatus body having an upper surface (at 50), a lower surface (at 50), an outer

surface (21), first and second apertures (14, 15) each with a longitudinal axis and upper,

middle and lower portions; and movable, serrated cam members (36 and 37 as seen in

fig. 6); where each middle portion of an aperture has ridges (48, 49) formed of elastic or

rigid materials (see col. 1, lines 35-42), and where the first and second apertures and

the first and second cam members are mirror images of each other.

7.      Claims 13 and 49-58 are rejected under 35 U.S.C. 102(b) as being anticipated by

Preissman (5,540,698). Preissman discloses, in figures 1, 5, 7, and 10-12, a suture

securing apparatus with an apparatus body (86) having an upper surface (e.g., at the

side of 48), a lower surface, an outer surface, an aperture (fig.7) with a longitudinal axis

and upper, middle and lower portions; a movable cam member (60), a retaining wall

(the side of the aperture that is part of 100), and where the middle portion of an aperture

a swollen, rounded cavity and opposing first and second surfaces (an angulated surface

and an orthogonal surface with respect to the suture's longitudinal axis), where the

middle portion is wider than the upper and lower portions, where the cam member has a

rounded, engagement end and a rotation end (at 62), where the rotation end is wider

than the widths of the upper and lower portions portion of the aperture and is near the

second surface, and where the engagement end is near the first surface.

04/02/2004 14:43 FAX 703 305 3782    TC3700 DIRECTOR'S OFFICE    ☒007/012

Application/Control Number: 90/006,460                                         Page 5
Art Unit: 3731

8.    Claims 33 and 59 are rejected under 35 U.S.C. 102(b) as being anticipated by

Creager (536,684). Creager discloses, in the figures, a suture securing apparatus with

an apparatus body (A), first and second apertures (F) each with a longitudinal axis and

a cavity (J), and first and second movable cam members (B); where the first and second

apertures and the first and second cam members are mirror images of each other.


### Claim Rejections - 35 USC § 103

9.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

> 1.    Determining the scope and contents of the prior art.
> 2.    Ascertaining the differences between the prior art and the claims at issue.
> 3.    Resolving the level of ordinary skill in the pertinent art.
> 4.    Considering objective evidence present in the application indicating
>        obviousness or nonobviousness.

10.    Claims 22, 23, 28, 29, and 31 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Plante. Plante discloses the invention substantially as claimed, but

do not specifically disclose that the apparatus is made of biocompatible or

biodegradable materials and that the apparatus contacts or engages a medical

04/02/2004 14:43 FAX 703 305 3782          TC3700 DIRECTOR'S OFFICE                    @008/012

Application/Control Number: 90/006,460                                    Page 6
Art Unit: 3731

prosthesis device. Nevertheless, Plante discloses, in col. 1, lines 35–42, that,

depending on the application for the apparatus, the apparatus can be made of cast

metal or plastic. Plante also discloses, in figure 3, that the apparatus is attached to an

unspecified surface (53). Thus, it would have been a matter of design choice, to make

the apparatus out of a biocompatible or biodegradable material, if an application calls

for such a material. It would also be a matter of design choice to attach the apparatus

to the surface of a medical prosthesis device (e.g., a bone plate or a splint), if the device

and application require wiring or sutures for its securance to a patient's body part.

### Patentable and/or Confirmed Subject Matter

11.    Claims 24–27 and 30 are patentable and/or confirmed.

12.    The following is a statement of reasons for the indication of patentable and/or

confirmed subject matter: None of the prior art of record, alone or in combination

discloses a securable medical prosthesis device comprising a medical prosthesis device

in physical contact or engagement with, inter alia, a suture securing apparatus

comprising an apparatus body having an upper surface, a lower surface, a first internal

surface, a second internal surface, an outer surface, at least one aperture, and a

movable cam member or a locking means comprising at least one ridge. The prior art

of record also does not disclose that the abovementioned medical prosthesis device is a

sewing ring implant.

Application/Control Number: 90/006,460                              Page 7
Art Unit: 3731

### *Conclusion*

13.    The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure. Richardson (1,243,105), Laird (1,545,501), Emery (3,574,900),

and Randall (4,899,423) teach suture-securing apparatuses.

Application/Control Number: 90/006,460                                    Page 8
Art Unit: 3731

14.     Any inquiry concerning this communication or earlier communications from the examiner should be directed to Julian W. Woo whose telephone number is (703) 308-0421. The examiner can normally be reached Mon.-Fri., 7:00 AM to 3:00 PM Eastern Time, alternate Fridays off.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Michael J. Milano can be reached at (703) 308-2496.

General inquiries relating to the status of this application should be directed to the Group receptionist at (703) 308-0858. The official FAX number is (703) 872-9306.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Julian W. Woo
Primary Examiner

March 30, 2004

| *Notice of References Cited* | Application/Control No. | Applicant(s)/Patent Under Reexamination | |
|---|---|---|---|
| | 90/006,480 | 6066160 | |
| | Examiner | Art Unit | Page 1 of 1 |
| | Julian W. Woo | 3731 | |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-1,243,105 | 10-1917 | Richardson, W.A. | 24/134R |
| | B | US-1,545,501 | 07-1925 | LAIRD EDWIN C | 24/72.5 |
| | C | US-3,574,900 | 04-1971 | Emery, Reginald John | 24/130 |
| | D | US-4,899,423 | 02-1990 | Randall, Richard C. | 24/134R |
| | E | US-5,070,805 | 12-1991 | Plante, Wilfred M. | 114/218 |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

04/02/2004 14:44 FAX 703 305 3782        TC3700 DIRECTOR'S OFFICE            ☑ 012/012

Page 1 of 1

| INFORMATION DISCLOSURE STATEMENT | Atty. Docket No.: 8958.0853 | | Control No.: 90/006,460 |
|---|---|---|---|
| | | | Examiner: Woo, J. |
| | Patent in Reexamination: 6,066,160 | | |
| | Filed: November 25, 2002 | | Group: 3731 |

### U.S. PATENT DOCUMENTS

| Examiner Initial | Document Number | Date | Name | Class | SubClass | Filing Date If Appropriate |
|---|---|---|---|---|---|---|
| | 5,984,933 | 11-16-1999 | Yoon | 606 | 148 | |
| | 3,988,810 | 11-02-1976 | Emery | 24 | 128 R | |
| | 5,741,301 | 04-21-1998 | Pagedas | 606 | 232 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

RECEIVED
MAY 1 2 2003
TECHNOLOGY CENTER R3700

### FOREIGN PATENT DOCUMENTS

| Examiner Initial | | Document Number | Date | Country | Class | SubClass | Translation Yes | No |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

### OTHER DOCUMENTS (Including Authors, Title, Date, Pertinent Papers, etc.)

| | |
|---|---|
| | |
| | |
| | |
| | |

| EXAMINER | Date Considered |
|---|---|
| *Julien W. Woo* | 3-29-04 |

*Examiner: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

Based on Form PTO-FB-A820                     Patent and Trademark Office, U.S. Department of Commerce
(Also form PTO-1449)

# EXHIBIT AK



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 13, 2004

Dr. Stephen B. Colvin
530 First Avenue - Suite 9V
New York, New York 10016-0648

> Re:     US Patent Application Serial No.: 09/660,745
> CONCENTRIC PASSIVE KNOTLESS SUTURE TERMINATOR
> Our Reference: 51822.010200

Dear Steve:

We are pleased to inform you that the above-identified patent application has issued under U.S. Patent No. 6,716,243 B1. We enclose the formal patent deed, together with two soft copies of the patent, for your file. If you note any errors which require correction, please let us know and we will attend to obtaining a Certificate of Correction.

You may now refer to any product covered by this patent as "Covered by U.S. Patent No. 6,716,243 B1" or the like. In this regard, we note that if the benefits of the patent marking statute, 35 U.S.C. 287, are to be preserved, all products which embody the subject invention of the above-noted patent, and which are made, sold or used in or introduced into the United States by or under your authority on or after the date of the patent, should have affixed thereto a notice such as:

**U.S. PATENT NO. 6,716,243 B1**

If such patent marking is not applied, no damages may be recovered for infringement of the patent claims, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event, damages may be recovered only for infringements occurring after such notice.

Please note that maintenance fees are required to be paid at 3 1/2 years (October 6, 2007), 7 1/2 years (October 6, 2011) and 11 1/2 years (October 6, 2015) after issuance to keep the patent in force. We have docketed these dates and will send you reminders in due course. Please let us know if your address changes so we can ensure that these reminders will reach you.

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100   FAX 212-688-2449   www.gtlaw.com

\\ny2-srv01\715583v01

ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

**EXHIBIT**

*33*

GT 0000503

Dr. Stephen B. Colvin
April 13, 2004
Page 2

Kindly confirm your receipt of these patent documents by signing and dating the enclosed copy of this letter and returning it to the undersigned at the above address. If you have any questions or comments, please do not hesitate to contact us.

Very truly yours,

Todd S. Sharinn

Enclosures

cc:    Alan Fell, Esq. (w/o encl.)
       Eugene Grossi (w/o encl.)

RECEIPT ACKNOWLEDGED

_____

DATED:_____

GREENBERG TRAURIG, LLP

GT 0000504

# EXHIBIT AL

PTO/SB/57 (04-04)
Approved for use through 04/30/2007 OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. PTO

(Also referred to as FORM PTO-1465)                                                                    90007085

## REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

06/16/04

Address to:
Mail Stop *Ex Parte Reexam*    66548  U.S. PTO
Commissioner for Patents
P.O. Box 1450                                          Attorney Docket No.: 52734-101
Alexandria, VA 22313-1450
                        06/16/04                       Date: June 16, 2004

1. [X] This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of patent number  6,066,160
   issued  May 23, 2000          . The request is made by:

        [ ] patent owner.              [X] third party requester.

2. [X] The name and address of the person requesting reexamination is:

   Kenneth L. Cage

   McDermott, Will & Emery, LLP

   600 13th Street, NW, Washington, DC 20005-3096

3. [ ]  a.  A check in the amount of $_____ is enclosed to cover the reexamination fee, 37 CFR 1.20(c)(1);

   [X]  b.  The Director is hereby authorized to charge the fee as set forth in 37 CFR 1.20(c)(1) of 2,520.00
            to Deposit Account No.  500417          (submit duplicate of this form for fee processing); or

   [ ]  c.  Payment by credit card. Form PTO-2038 is attached.

4. [X]  Any refund should be made by [ ] check or [X] credit to Deposit Account No.  500417
        37 CFR 1.26(c). If payment is made by credit card, refund must be to credit card account.

5. [X]  A copy of the patent to be reexamined having a double column format on one side of a separate
        paper is enclosed. 37 CFR 1.510(b)(4)

6. [ ]  CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table

7.      Nucleotide and/or Amino Acid Sequence Submission
        *If applicable, all of the following are necessary.*

        a. [ ] Computer Readable Form (CRF)
        b. Specification Sequence Listing on:

                i. [ ] CD-ROM (2 copies) or CD-R (2 copies); or
                ii. [ ] paper

        c. [ ] Statements verifying identity of above copies

8. [ ]  A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is included.

9. [X]  Reexamination of claim(s)  13, 18-20, 22 and 33                  is requested.

10. [X] A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof on
        Form PTO-1449 or equivalent.              06/23/2004 MTWITTY  00000002 500417    90007085

11. [X] An English language translation of all necessary and pertinent non-English language patents and/or printed
        publications is included.

[Page 1 of 2]

This collection of information is required by 37 CFR 1.510. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 27 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop *Ex Parte Reexam*, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Reexamination Request For U.S. Patent 6,000,100

## VI.   CONCLUSION

A substantial new question of patentability of claims 13, 18-20, 22 and 33 is raised in

view of:

      (i)    the `698 Preissman Patent alone, or considered in view of the `188 Shepherd

Patent;

      (ii)    the `684 Creager Patent alone, or considered in view of the `188 Shepherd Patent;

and/or

      (iii)    the `805 Plante Patent alone, considered in view of the `188 Shepherd Patent.

The Requester respectfully submits that the `160 Colvin Patent be reexamined in view of

the showing in this Request that a substantial new question of patentability is present.

Respectfully submitted,

Kenneth L. Cage
Registration No. 26,151

McDermott, Will & Emery
600 13th Street, NW
Washington, D.C.  20005
(202) 756-8000
Date: June 16, 2004
Facsimile (202) 756-8087

## CERTIFICATE OF SERVICE

I hereby certify that the attached papers (Associate Power Of Attorney and Change Of

Correspondence Address) were served this day, June 16, 2004, on Robert E. Krebs, attorney of

record for the Patent Owner, by causing a true copy of said papers to be deposited with the

United States Post Office as First Class Mail in an envelope addressed to:

Robert E. Krebs
Thelen Reid & Priest LLP
P.O. Box 640640
San Jose, CA 95164-0640

Lawrence T. Cullen
McDERMOTT, WILL & EMERY
600 13th Street, N.W.
Washington, DC  20005-3096
Tel:  (202) 756-8380

-66-

# EXHIBIT AM

# Greenberg
# Traurig

Todd S. Sharinn
212-801-2157

September 23, 2004

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Rick Steiner

Re:    Outstanding Statement
       Client Number: 51822

Dear Rick:

　　　　Enclosed please find our outstanding statement of invoices as of October 7, 2004.
Thank you in advance for your assistance in processing these payments.

　　　　If you have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

Todd S. Sharinn

Enclosure

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DENVER

FORT LAUDERDALE

LOS ANGELES

MIAMI

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

SILICON VALLEY

TALLAHASSEE

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

WILMINGTON

ZURICH

**EXHIBIT**
**36**

RS003187

# Greenberg Traurig

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, NY 10004

Attn: Rick Steiner

Outstanding invoices as of October 07, 2004

| File Number | Titled | Invoice # | Dated | Billed thru | Invoice Balance Due |
|---|---|---|---|---|---|
| 51822.010000 | General | | | | |
| | | *999539 | 02/12/03 | 01/31/03 | 365.68 |
| | | *1022875 | 04/08/03 | 03/31/03 | 70.00 |
| | | | | Balance due this file    $ | 435.68 |
| 51822.010200 | Concentric Passive Knotless Suture Terminator | | | | |
| | | *1129334 | 11/14/03 | 10/31/03 | 1,602.09 |
| | | *1157465 | 01/20/04 | 12/31/03 | 316.64 |
| | | 1217480 | 05/14/04 | 04/30/04 | 835.05 |
| | | | | Balance due this file    $ | 2,753.78 |
| 51822.010400 | Quickie LLC v. Medtronics | | | | |
| | | *930770 | 09/09/02 | 09/04/02 | 29,358.99 |
| | | *942637 | 10/04/02 | 09/30/02 | 2,603.72 |
| | | *961002 | 11/11/02 | 10/31/02 | 573.67 |
| | | *1042103 | 05/13/03 | 04/30/03 | 25.47 |
| | | | | Balance due this file    $ | 32,561.85 |
| 51822.010800 | Surgical Drape Patent Application | | | | |
| | | *986683 | 01/14/03 | 12/31/02 | 3,578.30 |

Page 1

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212-801-9200  FAX 212-801-6400  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  SAO PAULO
FORT LAUDERDALE  WEST PALM BEACH  ORLANDO  TALLAHASSEE  BOCA RATON  CHICAGO

RS003188

# Greenberg Traurig

|  | *999540 | 02/12/03 | 01/31/03 | 400.90 |
|---|---|---|---|---|
|  |  | Balance due this file | $ | 3,979.20 |

51822.010900    Reexamination of U.S. Patent No. 6,066,160 by Medtronic

|  | *986682 | 01/14/03 | 12/31/02 | 1,561.51 |
|---|---|---|---|---|
|  |  | Balance due this file | $ | 1,561.51 |
|  |  | Total client balance | $ | 41,292.02 |

HIL:AM

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212-801-9200   FAX 212-801-6400   www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  SAO PAULO
FORT LAUDERDALE  WEST PALM BEACH  ORLANDO  TALLAHASSEE  BOCA RATON  CHICAGO

RS003189

# EXHIBIT AN

Aug 15 2006 10:09AM    HP LASERJET FAX                202 371 2540    P.3    P.3

AUG-14-2006  16:53        SKGF

34521

```
EXHIBIT
  58
6/12/08
```

August 14, 2006

WRITER'S DIRECT NUMBER
(212)213-7101
INTERNET ADDRESS
markevens@skgf.com

Via Email

Andrew D. Ness, Esq.
Thelen Reid & Priest LLP
701 8th Street, NW
Washington, D.C. 20001

Re:    Transfer of Files

Dear Mr. Ness:

Responsibility for all matters relating to Quickie, LLC are to be transferred to STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C. Therefore, please forward all related files and future correspondence to the attention of Mark F. Evens at the address listed below:

Mark Fox Evens, Esq.
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Avenue, NW
Washington, DC 20005-3934
(202) 772-8888
mevens@skgf.com

If you have any questions or concerns please contact us. We appreciate your prompt reply to this request and we look forward to the transfer of the requested files.

Very truly yours,

Aubrey C. Galloway, M.D.
Managing Partner

344030_1.DOC

# EXHIBIT AO

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

QUICKIE, LLC,

*Plaintiff*

*against*

GREENBERG TRAURIG, LLC: THELEN, REID,
BROWN, RAYSMAN & STEINER, L.L.P. (FORMERLY
KNOWN AS THELEN, REID & PRIEST, LLP); AND
ROBERT E. KREBS, ESQ.,

*Defendant*

**Index No.**   105235/07

*Plaintiff   designates*
New York

*County as the place of trial*

*The basis of the venue is* principal pla
of business of Plaintiff

**AMENDED**
**Summons**

Plaintiff's principal place of
business is c/o Rick, Steiner,
Segal & Fell, 3 New York Plaza
New York, NY 10004
**County of**   New York

*To the above named Defendant*

**You are hereby summoned** to answer the complaint in this action and to serve a copy
*of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's
Attorney(s) within* 20  *days after the service of this summons, exclusive of the day of service (or within 30 days
after the service is complete if this summons is not personally delivered to you within the State of New York); and in
case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.*

*Dated,*   New York, New York
      May 14, 2007

*Defendant's address:*

Greenberg Traurig, 200 Park Avenue, NY, NY 10166
Thelen Reid Brown Raysman & Steiner LLP,
 875 Third Avenue, NY, NY  10022
Robert E. Krebs, c/o Thelen Reid, Brown Raysman
 & Steiner LLP, 225 West Santa Clara Street,
 Suite 1200, San Jose, CA  95113

JANVEY, GORDON, HERLANDS, RANDOLPH
& COX, LLP
      *Attorney(s) for Plaintiff*
   *Office and Post Office Address*
355 Lexington Avenue, 10th Fl.
New York, New York  10017
(212) 986-1200

NEW YORK
COUNTY CLERK'S OFFICE

MAY 1 5 2007

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

QUICKIE, LLC,

:  Index No. 105235/07

                                    Plaintiff,

:

-against-

:  AMENDED COMPLAINT

GREENBERG TRAURIG, LLC; THELEN REID
BROWN RAYSMAN & STEINER LLP (FORMERLY       :
KNOWN AS THELEN, REID & PRIEST, LLP); AND
ROBERT E. KREBS, ESQ.                       :

                                                       :

                                    Defendants.

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

       Plaintiff, Quickie, LLC, by and through its attorneys, Janvey, Gordon, Herlands,

Randolph & Cox, LLP and Diamond, McCarthy, L.L.P., as and for its Amended Complaint,

alleges as follows:

## SUMMARY OF CLAIMS

       1.    This is a legal malpractice action seeking to redress the harms caused by

Greenberg Traurig, LLP ("Greenberg"), Robert E. Krebs, Esq.("Krebs"), and the law firm in

which Krebs currently serves as an equity partner, Thelen Reid Brown Raysman & Steiner

LLP, formerly known as Thelen, Reid & Priest, L.L.P. ("Thelen" and, collectively with

Greenberg and Krebs, "Defendants").   Quickie, LLC ("Quickie" or "Plaintiff") retained

Defendants to provide legal expertise and advice concerning a valuable medical device patent

held by Quickie.

       2.    Defendants' negligence and malpractice occurred when, despite their

affirmative representations to the contrary, Defendants failed to notify Plaintiff before fees

were due to maintain the patent. Thelen and Krebs were further negligent and committed malpractice by seeking to amend Plaintiff's patent after it had expired and without reasonable inquiry to ensure that the patent was in force and amendable, thereby causing Plaintiff to miss an opportunity to reinstate the expired patent.

3.    Defendants' conduct materially damaged Quickie – a company formed by leading cardiovascular surgeons and physicians – all of whom reasonably, justifiably and foreseeably relied on Defendants' representations and legal expertise to ensure that Quickie's patent rights were appropriately protected and pursued. Upon information and belief, Quickie has suffered more than $10 million in actual and consequential damages a result of Defendant's wrongdoing.

## PARTIES, JURISDICTION AND VENUE

4.    Plaintiff Quickie, LLC is a limited liability company organized and existing under the laws of the State of New York, and having its principal place of business at Rick, Steiner, Segal & Fell, 3 New York Plaza, New York, New York, 10004, Attention Alan L. Fell, Esq.

5.    Defendant Greenberg Traurig, LLP is a New York registered limited liability partnership with its principal place of business in the State of New York located at 200 Park Avenue, New York, New York 10166.

6.    Defendant Thelen Reid Brown Raysman & Steiner LLP (formerly known as Thelen, Reid & Priest, L.L.P.) is a registered limited liability partnership with its principal place of business located at 875 Third Avenue, New York, New York, 10022. In 2006, Thelen, Reid & Priest, L.L.P. merged with Brown, Raysman, Millstein, Felder & Steiner, L.L.P., to form Thelen Reid Brown Raysman & Steiner LLP, named as Defendant herein.

Upon information and belief, Thelen assumed all of Thelen, Reid, & Priest, L.L.P.'s liabilities at issue in this action pursuant to that merger.

7.    Defendant Robert E. Krebs, Esq. is a resident of the State of California and was, at all relevant times, an equity partner at Thelen who transacted business in New York State.

8.    Quickie's claims arise under the laws of New York. Venue is proper under CPLR 503 because Plaintiff resides in New York County.

## BACKGROUND

9.    In the late 1990's, Quickie developed a device known as the "Passive Knotless Suture Terminator for Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing" for use in open-heart surgeries (the "Quickie Device"). In 1998, Quickie retained Todd S. Sharinn, Esq. ("Sharinn"), a New York licensed attorney then-employed at the law firm Pepe & Hazard L.L.P. ("Pepe"), to file an application with the United States Patent and Trademark Office (the "PTO") seeking a patent covering the Quickie Device. In November 1998, Quickie signed a licensing and product development agreement with Medtronic, Inc. ("Medtronic"), and agreed to share confidential and proprietary information to assist Medtronic's evaluation of the Quickie Device. Medtronic ultimately declared that it was not interested in licensing the Quickie Device, and that it was terminating the license and product development agreement.

10.    On May 23, 2000, the PTO issued U.S. Patent No. 6,066,160 covering the Quickie Device (the "160 Patent"). On May 30, 2000, Sharinn, while he was still employed by Pepe, wrote to Quickie to inform it that the PTO had issued the 160 Patent, and that he "will notify [Quickie] regarding payment of the maintenance fees several months before they are

due." Shortly thereafter, Sharinn joined Greenberg's New York City office. The Quickie engagement was transferred to Greenberg, and Greenberg thereby assumed and became bound by Sharinn's promise and representation to notify Quickie several months before the maintenance fees were due.

11. Shortly thereafter, Medtronic began marketing a device that was virtually identical to the Quickie Device, thus infringing on the 160 Patent. Upon discovering Medtronic's infringement, Plaintiff retained Greenberg to pursue infringement claims against Medtronic in the United States District Court for the Southern District of New York, Civil Action No. 02 Civ. 1157 (the "Medtronic Litigation"). On July 3, 2002, Quickie and Thelen executed a written engagement agreement whereby Quickie retained Thelen to replace Greenberg as lead litigation counsel in the Medtronic Litigation, while Greenberg continued to counsel Plaintiff in connection with proceedings before the PTO.

12. On October 22, 2002, Greenberg, by and through Sharinn, completed an official PTO form entitled "Fee Address Indication Form" specifying that all PTO correspondence related to maintenance fees for the 160 Patent should be sent to Sharinn at Greenberg's offices in New York City. Sharinn mailed the Fee Address Indication Form to the PTO on October 22, 2002, and faxed it to the PTO on December 16, 2002, using Greenberg stationary.

13. On November 25, 2002, Medtronic commenced reexamination proceedings before the PTO, seeking to redefine the 160 Patent in a manner that would arguably moot the Medtronic Litigation (the "Reexamination"). Thereafter, Quickie retained Thelen and Krebs (collectively, "Thelen/Krebs") to transact all post-issuance business before the PTO related to the 160 Patent.

14.    Specifically, on March 4, 2003, Thelen/Krebs prepared, and Quickie signed, a general power of attorney (the "Thelen Power of Attorney") revoking all prior powers of attorney and designating Krebs as the lead attorney to prosecute and transact all business in the PTO concerning the 160 Patent application.  Krebs and other Thelen attorneys working under Kreb's direction and supervision had regular contact with PTO representatives concerning all aspects of the 160 Patent including, but not limited to, construction and enforcement of the 160 Patent.

15.    In December 2003, Thelen/Krebs prepared, and Quickie approved, a second PTO filing stating that all PTO communications concerning the 160 Patent should be sent directly to Krebs (the "Thelen Address Notice").  Plaintiff reasonably understood from the Thelen Address Notice that Thelen/Krebs would be responsible for handling all written and oral communications with the PTO concerning the 160 Patent.  Plaintiff now has reason to believe, however, that Thelen/Krebs did not file a "Fee Address Indication Form" to inform the PTO that correspondence related to maintenance fees on the 160 Patent should be sent to their attention.  Moreover, upon further information and belief, Quickie now understands that neither Greenberg nor Sharinn notified the PTO that they were no longer the designated recipient of all PTO communications concerning payment of maintenance fees on the 160 Patent.

16.    Plaintiff's decision to rely upon Defendants to handle all PTO matters concerning the 160 Patent was based, in part, on Defendants' representation that they were each highly competent in practicing before the PTO, that they were well-versed in PTO regulations and procedures, and that they would competently and aggressively prosecute and protect the 160 Patent.  For example, Greenberg's website states that its patent capabilities:

> run the gamut from application preparation and filing to examination and appeal processes to maximizing technology

> transfer opportunities – as well as handling patent litigation, when necessary. Through our experience working with a wide range of clients, we have developed a structured process for obtaining patent claims that provides strategic flexibility for our clients to best achieve their business goals.

Sharinn's biography similarly reports that he is admitted to practice before the PTO and has "over fourteen years of legal experience in the worldwide acquisition, exploitation and aggressive enforcement of intellectual property rights."

17.    Thelen's and Krebs' experience in representing patent owners before the PTO is likewise widely reported in their marketing materials.  For example, Thelen's web site states that its patent group:

> [c]ounsels clients in all aspects of acquiring, perfecting, and protecting the client's interests in its patents and other intellectual property, including . . . representation in reexamination, reissues, oppositions, interferences, protests, and appeals.

Thelen's website also states that Krebs has over 30 years of patent prosecution experience, focusing on representing patent owners in the prosecution and protection of patents before the PTO.  Thelen appointed Krebs co-chair of its intellectual property and trade regulation group, and reported in its publications that Krebs was named in 2005 as one of the top 30 IP lawyers in the United States.  Krebs states in the fall 2005 edition of Thelen's Intellectual Property and Trade Regulation Journal that his prior work as in-house general counsel allows him to "see issues and problems through the eyes of my clients . . . I've sat in their chair and I've stood in their shoes, and that's my perspective on their problems."

18.    Pursuant to 37 C.F.R. §1.362(e)(1), the window for payment of maintenance fees on the 160 Patent opened on May 23, 2003, and closed one year later on May 23, 2004. During the entire period between May 23, 2003 to May 23, 2004, Greenberg was on record at the PTO as the designated recipient of all communications related to maintenance fees

on the 160 Patent. Moreover, Greenberg, by hiring Sharinn, adopted Sharinn's express representation that they would notify Quickie several months before the maintenance fees were due. Nevertheless, Greenberg never forwarded the PTO's reminder notices concerning maintenance fees on the 160 Patent, nor did it notify Quickie shortly before maintenance fees were due.

19. On May 23, 2004, Thelen/Krebs held Quickie's general power of attorney, and Thelen/Krebs had previously represented to Quickie that they would receive all PTO correspondence concerning the 160 Patent. Nevertheless, Thelen/Krebs did not pay the maintenance fees when they were due on May 23, 2004, nor did they timely notify or advise Quickie that the maintenance fees were due. Accordingly, pursuant to PTO regulations, the 160 Patent expired on May 24, 2004, and the two year period to reinstate the 160 Patent pursuant to 37 C.F.R. § 1.378(c) (the "Reinstatement Period") expired on May 24, 2006.

20. In June 2004, a second reexamination proceeding concerning the 160 Patent was commenced in the PTO (the "Second Reexamination"), and Quickie further retained Thelen/Krebs to serve as lead counsel in connection therewith. In December 2004, the PTO merged the Reexamination and the Second Reexamination (collectively, the "Reexamination Proceedings").

21. In January and June 2005, Thelen/Krebs filed written amendments to the 160 Patent (the "Amendments") wherein they represented that the 160 Patent claims were pending and able to be substantively amended. PTO regulations required Thelen/Krebs to make a reasonable inquiry to gather supporting evidence prior to making those representations. *See* 37 C.F.R. § 10.18(b)(2)(iii) (2007). Upon information and belief, Thelen/Krebs made no such inquiry prior to filing the Amendments with the PTO and sending them to Plaintiff.

22.    In fact, the 160 Patent had expired months earlier, and PTO regulations prohibited entry of the amendments Thelen/Krebs sought. *See* 37 C.F.R. §1.530(j) (2007). Had Thelen and Krebs inquired about the status of the 160 Patent before making those representations and filing the Amendments, they would have discovered the maintenance fees had not been paid during the Reinstatement Period. In failing to inquire as to the 160 Patent's status prior to filing the Amendments, Thelen and Krebs violated PTO regulations that required such an inquiry and that prohibited all efforts to make substantive amendments to expired patents. Moreover, in affirmatively representing that the 160 Patent was pending and able to be substantively amended at a time when it had in fact expired, Thelen/Krebs misled Quickie into believing that the 160 Patent was still in force.

23.    While the Reexamination Proceedings continued before the PTO, the court hearing the Medtronic Litigation issued multiple continuances and delayed the trial setting several times. When it became clear that the Reexamination Proceedings would not be resolved quickly, the court dismissed the Medtronic Litigation without prejudice pursuant to a stipulation agreed to by Quickie and Medtronic and providing that, pending resolution of the Reexamination Proceedings, the Medtronic Litigation would be dismissed without prejudice, all statutes of limitation would be tolled, and any revived litigation would be filed in the same court.

24.    In July, 2006, Quickie learned for the very first time that the 160 Patent had expired when a medical device company withdrew from ongoing negotiations to license the Quickie Device. Shortly thereafter, the Reexamination Proceedings were terminated, and the PTO issued a determination that the 160 Patent was no longer valid.

## CAUSES OF ACTION

25.    Plaintiff pleads all causes of action in the alternative, and no factual or legal assertion in connection with one cause of action is intended to be or shall be construed as an admission with respect to any other cause of action.

### FIRST CAUSE OF ACTION
(Negligence/Legal Malpractice against Greenberg Traurig, LLC)

26.    Plaintiff repeats and realleges paragraphs 1 through 25 and incorporates them by reference.

27.    At all relevant times, an attorney-client relationship existed between Greenberg and Plaintiff with respect to the preservation of Plaintiff's ownership interests in the 160 Patent. In so representing Plaintiff, Sharinn was at all relevant times acting within the course and scope of his employment with Greenberg.    Pursuant to the attorney-client relationship, Greenberg owed Plaintiff a duty to exercise the reasonable skill, care and knowledge expected of the legal profession, including, but not limited to, a duty to monitor and inform Quickie of deadlines to pay PTO maintenance fees on the 160 Patent.

28.    In breach of its duties to Plaintiff, Greenberg failed to exercise the reasonable skill, care and knowledge expected of the legal profession.    Specifically, upon information and belief, Greenberg failed to establish an effective calendaring system to monitor the deadlines for maintenance payments on the 160 Patent, failed to notify Quickie that said maintenance fees could have been paid at any time between May 23, 2003 and May 23, 2004, and failed to forward PTO reminder notices for payment of maintenance fees on the 160 Patent in violation of 37 C.F.R. § 10.23(c)(8) (2007).

29.    Upon information and belief, Greenberg's breaches of the duties owed to Plaintiff caused Plaintiff to suffer serious economic damages in excess of $10 million that

continue through the present, including, but not limited to: (1) loss of Plaintiff's ability to recover infringement damages from Medtronic upon conclusion of the Medtronic Litigation; (2) attorneys' fees and expenses incurred in pursuit of the Medtronic Litigation; (3) lost royalties Quickie would have earned from licensing the 160 Patent; and (4) attorneys' fees and expenses incurred to remedy Defendant's malpractice and negligence.

30.    Upon information and belief, but for Greenberg's negligence, the maintenance fees for the 160 Patent would have been paid when they were due, the 160 Patent would be viable today, the Medtronic Litigation would have resulted in a judgment awarding Plaintiff damages as a result of Medtronic's infringement of the 160 Patent, and Plaintiff would have licensed the Quickie Device to third parties. All conditions precedent to Plaintiff's recovery on this cause of action have occurred or have been satisfied.

31.    By reason of the foregoing, Greenberg is liable to Plaintiff.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation against Greenberg Traurig, LLC)

32.    Plaintiff repeats and realleges paragraphs 1 through 25 and incorporates them by reference.

33.    At all relevant times, an attorney-client relationship existed between Greenberg and Plaintiff with respect to preservation of Plaintiffs' ownership of the 160 Patent. As part of that relationship, Sharinn represented to Plaintiff that he would provide notice several months before maintenance fees were due to be paid on the 160 Patent. In hiring Sharinn and notifying the PTO that all PTO correspondence concerning payment of maintenance fees on the 160 Patent was to be sent to Greenberg's offices, Greenberg adopted Sharinn's representations to Quickie. Further, as part of the attorney-client relationship between Greenberg and Plaintiff, Greenberg represented that it was highly competent in

practicing before the PTO, that it was well-versed in PTO regulations and procedures, and that it would prosecute and protect the 160 Patent.

34.    Greenberg intended that Quickie rely, or should have reasonably foreseen that Quickie would so rely, on the above-referenced representations. Nevertheless, upon information and belief, Greenberg did not establish reliable calendaring systems to ensure that the promised notice would be provided, and it therefore did not have any reasonable basis for believing the promised notice would be provided to Quickie.

35.    Quickie reasonably and foreseeably relied on Greenberg's negligent misrepresentations. Had Quickie known that Greenberg did not establish reliable calendaring systems for monitoring the deadlines for payment of maintenance fees on the 160 Patent, Quickie would not have authorized Greenberg to designate itself as the recipients of all PTO correspondence concerning such maintenance fees, nor would Quickie have relied upon Greenberg's promise to provide notice before the maintenance fees were due.

36.    Upon information and belief, as a proximate result of its reliance on Greenberg's negligent misrepresentations, Plaintiff suffered serious economic damages in excess of $10 million that continue to the present including, but not limited to: (1) loss of Plaintiff's ability to recover infringement damages from Medtronic upon conclusion of the Medtronic Litigation; (2) attorneys' fees and expenses in pursuit of the Medtronic Litigation; (3) lost royalties Quickie would have earned from licensing the 160 Patent; and (4) attorneys' fees and expenses incurred to remedy Greenberg's negligence and malpractice. All conditions precedent to Plaintiff's recovery on this cause of action have occurred or have been satisfied.

37.    By reason of the foregoing, Greenberg is liable to Plaintiff.

### THIRD CAUSE OF ACTION
(Negligence/Legal Malpractice against Thelen Reid Brown
Raysman & Steiner LLP and Robert E. Krebs, Esq.)

38.    Plaintiff repeats and realleges paragraphs 1 through 25 and incorporates them by reference.

39.    Beginning on July 2, 2002 and continuing to August 14, 2006, an attorney-client relationship existed between Thelen/Krebs and Plaintiff with respect to the prosecution and transaction of all business in the United States Patent and Trademark Office concerning the 160 Patent. In so representing Plaintiff, Krebs was at all relevant times acting within the course and scope of his employment and partnership with Thelen. Pursuant to the attorney-client relationship between Thelen/Krebs and Plaintiff, Thelen/Krebs owed Plaintiff a duty to exercise the reasonable skill, care and knowledge expected of a member of the legal profession, including, but not limited to, a duty to monitor and inform Quickie of deadlines to pay PTO maintenance fees on the 160 Patent.

40.    In breach of their duties to Plaintiff, Thelen/Krebs failed to exercise the reasonable skill, care and knowledge expected of a member of the legal profession. Specifically, Thelen/Krebs failed to establish an effective calendaring system to monitor the deadlines for maintenance payments on the 160 Patent, failed to notify Quickie that said maintenance fees were due on May 23, 2004, and failed to pay such maintenance fees when they were due.

41.    Upon information and belief, Thelen/Krebs' breaches of the duties they owed to Plaintiff caused Plaintiff to suffer serious economic damages in excess of $10 million that continue through the present including, but not limited to: (1) loss of Plaintiff's ability to recover infringement damages from Medtronic upon conclusion of the Medtronic Litigation; (2) attorneys' fees and expenses incurred in pursuit of the Medtronic Litigation; (3) lost

royalties Quickie would have earned from licensing the 160 Patent; and (4) additional attorneys' fees and expenses incurred to remedy Defendants' malpractice and negligence.

42.     Upon information and belief, but for Thelen/Krebs' malpractice and negligence, the maintenance fees for the 160 Patent maintenance would have been paid when they were due, the 160 Patent would be viable today, the Medtronic Litigation would have resulted in a judgment awarding Plaintiff damages as a result of Medtronic's infringement of the 160 Patent, and Plaintiff would have licensed the Quickie Device other interested parties. All conditions precedent to Plaintiff's recovery on this cause of action have occurred or have been satisfied.

43.     By reason of the foregoing, Thelen/Krebs are liable to Plaintiff.

### FOURTH CAUSE OF ACTION
(Negligence/Legal Malpractice against Thelen Reid Brown
Raysman & Steiner LLP and Robert E. Krebs, Esq.)

44.     Plaintiff repeats and realleges paragraphs 1 through 25 and incorporates them by reference.

45.     Beginning on July 2, 2002 and continuing to August 14, 2006, an attorney-client relationship existed between Thelen/Krebs and Plaintiff with respect to the prosecution and transaction of all business in the United States Patent and Trademark Office concerning the 160 Patent. In so representing Plaintiff, Krebs was at all relevant times acting within the course and scope of his employment and partnership with Thelen. Pursuant to the attorney-client relationship between Thelen/Krebs and Plaintiff, Thelen/Krebs owed Plaintiff a duty to exercise the reasonable skill, care and knowledge expected of a member of the legal profession, including, but not limited to, a duty to competently, appropriately, and honestly represent Quickie in all aspects of the Reexamination Proceedings before the PTO.

108754-5                                   13

46.    In breach of their duties, Thelen/Krebs failed to exercise the reasonable skill, care and knowledge expected of a member of the legal profession.    Specifically, Thelen/Krebs failed to exercise the reasonable skill, care and knowledge expected of a member of the legal profession by prosecuting the Reexamination Proceedings concerning the 160 Patent, and filing the Amendments seeking to substantively amend the 160 Patent, without first making a reasonable inquiry as to the status of the 160 Patent as required by 37 C.F.R. § 10.18(b)(2)(iii) (2007).  Thelen/Krebs further failed to exercise the reasonable skill, care and knowledge expected of a member of the legal profession when they represented to the PTO and Plaintiff that the 160 Patent claims were pending and capable of substantive amendment when, in fact, they had already expired and PTO regulations specifically forbid entry of the amendments Thelen/Krebs sought. *See* 37 C.F.R. § 1.530(j) (2007).

47.    Upon information and belief, Thelen/Krebs' breaches of the duties owed Plaintiff caused Plaintiff to suffer serious economic damage in excess of $10 million that continue to today including, but not limited to: (1) loss of Plaintiff's ability to recover infringement damages from Medtronic upon conclusion of the Medtronic Litigation; (2) attorneys' fees and expenses incurred in pursuit of the Medtronic Litigation; (3) lost royalties Quickie would have earned from licensing the 160 Patent to third parties; and (4) attorneys' fees and expenses incurred to remedy Defendants' malpractice and negligence.

48.    Upon information and belief, but for Thelen/Krebs' malpractice and negligence, Quickie would have discovered and reinstated the 160 Patent's expiration during the Reinstatement Period, the Medtronic Litigation would have resulted in a judgment awarding Plaintiff damages as a result of Medtronic's infringement of the 160 Patent, and

Plaintiff would have licensed the Quickie Device to other interested parties. All conditions precedent to Plaintiff's recovery on this cause of action have occurred or have been satisfied.

    49.    By reason of the foregoing, Thelen/Krebs are liable to Plaintiff.

## FIFTH CAUSE OF ACTION
(Negligent Misrepresentation against Thelen Reid Brown
Raysman & Steiner LLP and Robert E. Krebs, Esq.)

    50.    Plaintiff repeats and realleges paragraphs 1 through 25 and incorporates them by reference.

    51.    Beginning on July 2, 2002 and continuing to August 14, 2006, an attorney-client relationship existed between Thelen/Krebs and Quickie. As part of that relationship, Thelen/Krebs represented to Quickie that they would prosecute and transact all business before the PTO concerning the 160 Patent application. Further, as part of that attorney-client relationship Thelen/Krebs represented to Quickie that they were highly competent in practicing before the PTO, that they were will-versed in PTO regulations and procedures, and that they would competently and aggressively prosecute and protect the 160 Patent. Thelen/Krebs further represented to Quickie and the PTO that the 160 Patent claims were pending and capable of substantive amendment when the Amendments were filed in January and June 2005. At all times relevant to these allegations, Krebs was acting within the course and scope of his employment and partnership with Thelen.

    52.    In making the above-references representations, Thelen/Krebs intended that Quickie rely, or should have reasonably foreseen that Quickie would so rely, on said representations. Nevertheless, Thelen/Krebs did not establish a reliable calendaring system to ensure that the maintenance fees on the 160 Patent would be paid, nor did Thelen/Krebs have any reasonable basis for believing that they would monitor the due date for such fees and

provide Quickie reasonable notice before the fees were due. Moreover, Thelen/Krebs made no inquiry reasonable under the circumstances to confirm their representations to Plaintiff that the 160 Patent claims were pending and capable of substantive amendment in January and June 2005.

53.    Quickie reasonably and foreseeably relied on Thelen/Krebs' negligent misrepresentations. Had Quickie known that Thelen/Krebs had not established a reliable calendaring system for monitoring the deadlines for payment of maintenance fees on the 160 Patent, Quickie would not have given Thelen/Krebs a general power of attorney to prosecute and transact all business before the PTO concerning the 160 Patent application, nor would Quickie have looked to Thelen/Krebs to ensure that the maintenance fees were timely paid. Moreover, had Quickie known that Thelen/Krebs made no inquiry reasonable under the circumstances to confirm that the 160 Patent was pending and capable of substantive amendment when the Amendments were filed, Quickie would not have allowed Thelen/Krebs to file the Amendments on Quickie's behalf.

54.    Upon information and belief, as a proximate result of its reliance on Thelen/Krebs' negligent misrepresentations, Plaintiff has suffered serious economic damages in excess of $10 million that continue to today including, but not limited to: (1) loss of Plaintiff's ability to recover infringement damages from Medtronic upon conclusion of the Medtronic Litigation; (2) attorneys' fees and expenses incurred in pursuit of the Medtronic Litigation; (3) lost royalties Quickie would have earned from licensing the 160 Patent to third parties; and (4) attorneys' fees and expenses incurred to remedy Thelen/Krebs' malpractice and negligence.

55.    Upon information and belief, but for Thelen/Krebs' negligent misrepresentations, Quickie would not have relied on Thelen/Krebs to prosecute and transact

all business before the PTO concerning the 160 Patent, the 160 Patent would be viable today, the Medtronic Litigation would have resulted in a judgment awarding Plaintiff damages as a result of Medtronic's infringement of the 160 Patent, and Plaintiff would have licensed the Quickie Device to other interested parties.  All conditions precedent to Plaintiff's recovery on this cause of action have occurred or have been satisfied.

  56. By reason of the foregoing, Thelen/Krebs are liable to Plaintiff.

### PRAYER FOR RELIEF

  WHEREFORE, Plaintiff Quickie, LLC requests that this Court grant it judgment against Defendants and award it:

  1. Actual, consequential, statutory, and exemplary damages and attorneys' fees, as permitted by law, with interest thereon; and

  2. Such other and further relief to which Plaintiff is entitled.

Dated: New York, New York
   May 15, 2007

       Respectfully submitted,

       JANVEY, GORDON, HERLANDS, RANDOLPH
       & COX, LLP
       Attorneys for Plaintiff

       By: _____
        Richard I. Janvey  (RJ1160)
        Joan M. Secofsky (JS4053)
       A Member of the Firm
       355 Lexington Avenue
       New York, New York  10017
       (212) 986-1200

       DIAMOND McCARTHY, LLP
       Of Counsel
       Two Houston Center
       909 Fannin, Suite 1500
       Houston, Texas 77010
       (713) 333-5100

108754-5         17

# EXHIBIT AP

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

**QUICKIE, LLC,**

                              Plaintiff,                              Index No. 10523/07

              - against -

**GREENBERG TRAURIG, LLP**, THELEN REID
BROWN RAYSMAN & STEINER LLP (FORMERLY
KNOWN AS THELEN, REID & PRIEST LLP); AND
ROBERT E. KREBS, ESQ.,

                              Defendants.
------------------------------------------------------------------x
**THELEN REID BROWN RAYSMAN & STEINER
LLP** and ROBERT E. KREBS,

                              Third-Party Plaintiffs,

              -against-

TODD **SHARINN**, PEPE & HAZARD LLP,
ALAN FELL and RICK, STEINER, FELL &
BENOWITZ, LLP,

                              Third-Party Defendants.
------------------------------------------------------------------x

### AMENDED ANSWER AND CROSS-CLAIMS
### OF GREENBERG TRAURIG LLP

Defendant Greenberg Traurig, LLP ["GT"] responds to the Amended Complaint of

plaintiff Quickie, LLC ["Quickie"]  and cross-claims against Thelen Reid Brown Raysman &

Steiner LLP and Robert E. Kreb [collectively "the Thelen Defendants"], and against Rick,

Steiner, Fell & Benowitz, LLP and Alan Fell [collectively "the Rick Steiner Defendants"] as

follows:

  1.    Denies paragraph 1 insofar as it relates to GT, except admits that Quickie retained

GT for a period of time; further admits on information and belief that Quickie thereafter replaced

GT and retained defendants Thelen Reid Brown Raysman & Steiner LLP (as successor to Thelen Reid & Priest LLP) and Robert E. Krebs, Esq. [collectively "the Thelen Defendants"]; and denies knowledge and information sufficient to respond as to the Thelen Defendants.

2.    Denies paragraphs 2 and 3 insofar as they relate to GT; and denies knowledge and information sufficient to respond as to other persons or entities.

3.    Admits on information and belief paragraph 4.

4.    Denies paragraphs 5, except admits that GT is a limited liability partnership engaged in the practice of law in New York, with an office at 200 Park Avenue, New York, New York.

5.    Denies knowledge and information sufficient to respond to paragraphs 6 and 7, except admit on information and belief that the Thelen Defendants were attorneys for Quickie and practiced law in New York, New York.

6.    Denies knowledge and information sufficient to respond to paragraph 8, except admits that venue is proper in New York County.

7.    Denies knowledge and information sufficient to respond to paragraph 9, except admits on information and belief that Quickie contends it developed the device described therein ["the Quickie Device"], that Quickie (at some point prior to engaging GT) engaged another law firm in which Todd Sharrin was an attorney, that Quickie filed an application with the U.S. Patent & Trademark Office ["the PTO"] on the Quickie Device, and that Quickie had discussions with Medtronic, Inc. ["Medtronic"] about the Quickie Device.

8.    Denies paragraph 10, except admits that Quickie was issued U.S. Patent No. 6,066,160 ["the '160 Patent"] on the Quickie Device in about 2000, and that Sharinn joined GT sometime after the '160 Patent was issued; refers to the alleged correspondence and

communications referred to in that paragraph for their contents; and declines to respond to matters of law.

9.   Denies knowledge and information sufficient to respond to paragraph 11; except admits that Quickie sued Medtronic with respect to '160 Patent in the United States District Court for the Southern District of New York ["the Medtronic Litigation"], and that GT represented Quickie in the Medtronic Litigation for a period of time; and admits on information and belief that Quickie signed an engagement letter with the Thelen Defendants, and that the Thelen Defendants replaced GT as counsel in the Medtronic Litigation no later than the summer of 2002.

10.   Denies paragraph 12 insofar as it relates to GT, except admits that Sharinn was employed by GT at its New York City office for a period of time, and that Sharinn filed a Fee Address Indication Form ["the FAI Form"]  with the PTO; and refers to that form for its contents.

11.   Denies knowledge and information sufficient to respond to paragraph 13, except admits on information and belief that the Thelen Defendants were engaged to transact all business before the PTO concerning the '160 Patent beginning no later than early March 2003.

12.   Denies knowledge and information sufficient to respond to paragraph 14, except admits on information and belief that, on or about March 4, 2003, plaintiff executed a form or forms revoking its prior powers of attorney and giving the Thelen Defendants a general power of new attorney to prosecute and transact all business in the PTO concerning the '160 Patent, and that thereafter the Thelen Defendants had contact with the PTO on behalf of Quickie regarding the '160 Patent.

13. Denies paragraph 15, except admits that GT did not act for Quickie concerning the '160 Patent after GT was replaced as Quickie's counsel with respect to that patent; and admits on information and belief that the Thelen Defendants filed a form or forms (including a "Change of Attorney Docket Number and Change of Address Notice ["the Change Form"]) with the PTO in December 2003, directing that all further communications with respect to the '160 Patent be sent to the Thelen Defendants; and denies knowledge and information sufficient to respond to the balance of that paragraph.

14. Denies paragraph 16 insofar as it relates to GT, except admits that GT has a website and that its website states certain things about GT's law practice as to patents, and refers to the website for its contents; and denies knowledge and information sufficient to respond to the balance of that paragraph.

15. Denies knowledge and information sufficient to respond to paragraph 17, except admits on information and belief that the Thelen law firm has a website, and refers to that website for its contents.

16. Denies paragraph 18, except admits that, during some part of 2003, the Thelen Defendants had not yet filed their Change Form; and declines to respond to matters of law.

17. Denies knowledge and information sufficient to respond to paragraph 19, except admits on information and belief that the Thelen Defendants held Quickie's general power of attorney after at least March 2003; and declines to respond to matters of law.

18. Denies knowledge and information sufficient to respond paragraph 20.

19. Denies knowledge and information sufficient to respond to paragraphs 21 and 22, except declines to respond to matters of law.

20. Denies knowledge and information sufficient to respond to paragraphs 23 and 24, except admits on information and belief that there were continuances of the Medtronic Litigation and that the Medtronic Litigation was transferred to the Court's Suspense Docket.

21. Denies paragraph 25, except admits that Quickie alleges what is in that paragraph.

22. Repeats its responses to paragraphs 1 through 25.

23. Denies paragraphs 27, except admits that an attorney-client relationship with respect to the '160 Patent existed between Quickie and GT for a period of time ending no later than March 2003, that Sharinn was an attorney at GT during that period; and declines to respond to matters of law.

24. Denies paragraphs 28, 29, 30, and 31.

25. Repeats its responses to paragraphs 1 through 25.

26. Denies paragraphs 33, except admits that an attorney-client relationship with respect to the '160 Patent existed between Quickie and GT for a period of time ending no later than March 2003, that Sharinn was an attorney at GT during that period; and declines to respond to matters of law.

27. Denies paragraphs 34, 35, 36, and 37.

28. Repeats its responses to paragraphs 1 through 25.

29. Denies knowledge and information sufficient to respond to paragraph 39, except admits on information and belief that an attorney-client relationship with respect to the '160 Patent existed between Quickie and the Thelen Defendants for a period of time commencing no later than July 2002.

30. Denies knowledge and information sufficient to respond to paragraphs 40, 41, 42, and 43.

31. Repeats its responses to paragraphs 1 through 25.

32. Denies knowledge and information sufficient to respond to paragraph 45, except admits on information and belief that an attorney-client relationship with respect to the '160 Patent existed between Quickie and the Thelen Defendants for a period of time commencing no later than July 2002.

33. Denies knowledge and information sufficient to respond to paragraphs 46, 47, 48, and 49.

34. Repeats its responses to paragraphs 1 through 25.

35. Denies knowledge and information sufficient to respond to paragraph 51, except admits on information and belief that an attorney-client relationship with respect to the '160 Patent existed between Quickie and the Thelen Defendants for a period of time commencing no later than July 2002.

36. Denies knowledge and information sufficient to respond to paragraphs 52, 53, 54, 55 and 56.

## FIRST AFFIRMATIVE DEFENSE

37. The Amended Complaint fails to state a cause of action against GT.

## SECOND AFFIRMATIVE DEFENSE

38. Quickie's claims are barred by the statute of limitations.

## THIRD AFFIRMATIVE DEFENSE

39. Quickie terminated its engagement of GT no later than March 4, 2003; and Quickie revoked all powers of attorney given to GT regarding the '160 Patent. After that, GT owed no duty to Quickie. Thus, GT did not owe a duty to Quickie with respect to the maintenance fees for the '160 Patent which became initially due on May 23, 2003.

## FOURTH AFFIRMATIVE DEFENSE

40. Quickie terminated its engagement of GT and revoked all powers of attorney given to GT regarding the '160 Patent no later than March 4, 2003. After that, GT did not have authority to act for Quickie. Thus, GT had no authority to act for Quickie vis-à-vis the '160 Patent when the maintenance fees for the '160 Patent became initially due on May 23, 2003.

## FIFTH AFFIRMATIVE DEFENSE

41. Any damages suffered by Quickie as a result of the alleged failure to pay maintenance fees and the alleged expiration of the '160 Patent, or otherwise due to the events alleged in the Complaint, were caused by others besides GT and not proximately caused by GT, including (without limitation) the conduct of other professionals or other persons besides GT.

## SIXTH AFFIRMATIVE DEFENSE

42. The Thelen Defendants had already succeeded GT as counsel for Quickie with respect to the '160 Patent before the maintenance fees for the '160 Patent became due on May 23, 2003 and before the deadline for payment of those fees. Quickie had ample and full opportunity to pay those fees after GT ceased to represent Quickie and before the '160 Patent allegedly expired; but the Thelen Defendants failed to advise and properly represent Quickie with respect to that matter. Thus, the conduct (including action and inaction) of the Thelen Defendants concerning the '160 Patent (including, without limitation, as to the maintenance fees due thereon) was the direct, superseding an/or intervening cause, or a contributing cause, of any damages which Quickie claims it suffered and it may have suffered as alleged in this action.

## SEVENTH AFFIRMATIVE DEFENSE

43. The Thelen Defendants had already succeeded GT as counsel for Quickie in the PTO and in the Medtronic Litigation before the maintenance fees for the '160

Patent became due on May 23, 2003 and before the deadline for payment of those fees. In that capacity, the Thelen Defendants had further opportunities to know of and to assure payment (and cure non-payment) of the maintenance fees and thus keep the '160 Patent extant. Thus, the conduct (including action and inaction) of the Thelen Defendants concerning the '160 Patent (including, without limitation, as to the maintenance fees due thereon) was the direct, superseding and/or intervening cause, or a contributing cause, of any damages which Quickie claims to have suffered (as alleged in the Amended Complaint).

## EIGHTH AFFIRMATIVE DEFENSE

44. Quickie has submitted statements, some under oath, to the PTO that, during the relevant period, the Thelen Defendants were responsible for the '160 Patent, including the timely payment of any maintenance fees due for that patent. Quickie is therefore estopped and otherwise barred from contending that GT had that responsibility and that GT caused or is liable for the damages Quickie claims to have suffered (as alleged in the Amended Complaint).

## NINTH AFFIRMATIVE DEFENSE

45. The Rick Steiner Defendants were outside general counsel for Quickie throughout the period that GT acted as counsel for Quickie, and, as such, they advised Quickie with respect to the '160 Patent before the maintenance fees for the '160 Patent became due on May 23, 2003 and before the deadline for payment of those fees. Quickie had ample and full opportunity to pay those fees after GT ceased to represent Quickie and before the '160 Patent allegedly expired; but the Rick Steiner Defendants failed to advise and properly represent Quickie with respect to that matter. Thus, the conduct (including action and inaction) of the Rick Steiner Defendants concerning the '160 Patent (including, without limitation, as to the maintenance fees due

thereon) was the direct, superseding and/or intervening cause, or a contributing cause, of any damages which Quickie claims it suffered and it may have suffered as alleged in this action.

## TENTH AFFIRMATIVE DEFENSE

46. Quickie was negligent or contributorily negligent in failing to assure that the maintenance fees were paid and the '160 Patent remained extant. Quickie knew of the obligation to pay maintenance fees; and Quickie had ample and full opportunity to pay the maintenance fees due on the '160 Patent before and after GT ceased to represent Quickie and before the '160 Patent allegedly expired. Thus, Quickie's conduct (including action and inaction) concerning the '160 Patent (including, without limitation, the maintenance fees due thereon) was the direct, superseding and/or intervening cause, or a contributing cause, of any damages which Quickie claims it suffered or may have suffered as alleged in this action.

## ELEVENTH AFFIRMATIVE DEFENSE

47. Quickie's own conduct, whether negligent or not, was the proximate cause of any damages it suffered or may have suffered as alleged in this action.

## TWELFTH AFFIRMATIVE DEFENSE

48. GT did not adopt any statements by Sharinn allegedly made while he was previously employed at another law firm; and, in particular, GT did not adopt Sharinn's alleged statement that he would provide notice to Quickie several months before maintenance fees were due on the '160 Patent. Any such statements, if made, were not made by or on behalf of GT, and (if made) were made at a time when there was no contractual, fiduciary or other special relationship between GT and Quickie. Thus, there is no basis for the negligent misrepresentation cause of action (Second Cause of Action) against GT.

### THIRTEENTH AFFIRMATIVE DEFENSE

49. The negligent misrepresentation claim (Second Cause of Action) is duplicative of the malpractice claim, and is therefore barred.

### FOURTEENTH AFFIRMATIVE DEFENSE

50. GT acted vis-à-vis Quickie at all times in good faith, with due diligence and reasonably as to the '160 Patent, consistent with the conduct of reasonable skill, care and knowledge of a patent counsel, sufficiently fulfilling any duties it may have had to Quickie.

### FIFTH AFFIRMATIVE DEFENSE

51. The damages sought by Quickie are speculative, and not ascertainable or provable with reasonable certainty and competent proof, and thus, are not recoverable.

### SIXTEENTH AFFIRMATIVE DEFENSE
### and
### FIRST CROSS-CLAIM
(against The Thelen Defendants)

Greenberg Traurig LLP ["GT"] hereby cross-claims against the Thelen Defendants (i.e. Thelen Reid Brown Raysman & Steiner LLP as successor to Thelen  Reid & Priest LLP and Robert E. Krebs, Esq.), and, in doing so, alleges as follows (on information and belief as to paragraphs 54 through 57, 63, 64, 67 through 70, and 72):

### Nature Of The Cross-Claim

52. GT denies any wrongdoing in its representation of Quickie. But, if and to the extent GT is found liable to plaintiff, the Thelen Defendants are liable to GT as successor counsel to the full extent GT is found liable. The action or inaction of the Thelen Defendants, who had already replaced and succeeded GT as counsel to Quickie with respect to the '160 Patent (including without limitation in the PTO and in the Medtronic Litigation [defined elsewhere herein]) when the maintenance fees for the '160 Patent became due on May 23, 2003, was the direct,

superseding and/or intervening cause, or a contributing cause, of any injuries resulting from the nonpayment of maintenance fee. If Quickie's claims against GT are not dismissed, then the Thelen Defendants are responsible and liable to GT to the extent GT may be found liable to Quickie or for contribution as to that liability.

## The Parties

53. Cross-claimant Greenberg Traurig LLP is a New York limited liability partnership engaged in the practice of law, with offices in the City, County and State of New York.

54. Cross-claim defendant Thelen Reid Brown Raysman & Steiner LLP ["the Thelen Law Firm"] is a limited liability partnership engaged in the practice of law, with offices in the City, County and State of New York. It is a successor by merger of Thelen Reid & Priest LLP, formerly a law firm with offices in the City, County and State of New York prior to its merger with Brown Raysman & Steiner LLP in 2006, and thus is liable for any wrongdoing at issue herein by either of those law firms.

55. Defendant and cross-claim defendant Robert E. Krebs, Esq. is a partner of defendant the Thelen Law Firm, who transacted business in providing legal services in New York.

56. Quickie is the owner by assignment of U.S. Patent No. 6,066,160 ["the '160 Patent"], issued on May 23, 2000.

57. Stephen Colvin is an inventor of the patented device covered under the '160 Patent and a principal of Quickie.

## Jurisdiction And Venue

58. This Court has personal jurisdiction over the Thelen Law Firm, since it is located and doing business in the State of New York.

59. This Court has jurisdiction over Robert E. Krebs, since the claims against him arose out of: [a] a transaction of business in New York and the providing of legal services in New York, and/or, [b] a tortious act by him causing injury in New York at a time when Krebs conducted sufficient business in New York or interstate commerce to be subject to personal long-arm jurisdiction in New York under CPLR §302.

60. Venue is properly situated in New York County, since GT and the Thelen Law Firm are residents of, located in, and maintain offices in this County.

## Background

**The '160 Patent**

61. The '160 Patent covers a medical device designed to assist in heart surgeries ["the Quickie Device"].

62. Under applicable law and regulations, the owner of a patent must pay periodic maintenance fees to keep the patent in effect.

63. The first maintenance fee for the '160 Patent was due during the one year period beginning May 23, 2003 through May 23, 2004. The fee could be paid any time during that one year period.

64. The '160 Patent has now expired due to nonpayment of the maintenance fee which was due during the one year period from May 23, 2003 through May 23, 2004.

**Greenberg Traurig's Engagement**

65. In late 2001 and early 2002, GT was engaged by Quickie to provide litigation services in support of a claim by Quickie that Medtronic, Inc. ["Medtronic"] was infringing the '160 Patent. In connection therewith, GT filed an action on behalf of plaintiff against Medtronic

in the U.S. District Court for the Southern District of New York in February 2002 ["the Medtronic litigation"].

66. Quickie also engaged GT to represent it in the PTO concerning the '160 Patent. In connection therewith, GT filed a Change of Correspondence Address form and a Fee Address Indication Form with the PTO in December 2002.

**The Replacement of GT by the Thelen Defendants**

67. In no later than July 2002, Quickie replaced GT with Thelen Reid & Priest as its attorneys in the Medtronic Litigation.

68. Quickie also replaced GT with the Thelen Defendants as its counsel with respect to all other aspects of the '160 Patent, including dealings with and in the United States Patent & Trademark Office ["the PTO"] including (without limitation) assuring timely payment of maintenance fees.

69. A formal engagement agreement between Quickie and Thelen Reid & Priest was executed in July 2002. A Stipulation and Order of Substitution of Counsel was entered in the Medtronic Litigation in November 2002, pursuant to which Thelen Reid & Priest replaced GT as counsel of record for plaintiff.

70. Quickie replaced GT as its counsel as to the '160 Patent because Colvin, the inventor of the Quickie Device and a principal of Quickie, had a relative (a new son-in-law) who was an attorney at Thelen Reid & Priest and Colvin wanted to give that legal business to his relative's law firm.

71. When it hired the Thelen Defendants as to the '160 Patent, Quickie terminated GT's role, responsibility and services as to the '160 Patent.

72. Quickie executed a Revocation of Prior Powers of Attorney dated March 4, 2003, which was thereafter submitted to the PTO. In that same document, Quickie appointed the Thelen Defendants as the new attorneys for Quickie with respect to the '160 Patent with full and sole authority to "prosecute and transact all business" in the PTO. Thelen Reid & Priest also submitted to the PTO a Change of Attorney Docket and Change of Address Notice in December 2003, directing that all further communications regarding the '160 Patent be sent to the Thelen Defendants.

73. Thus, when maintenance fees on the '160 Patent became due, during the one year period commencing May 23, 2003, GT was no longer Quickie's attorney, having been replaced by the Thelen Defendants. GT's authority to act for Quickie (and any duty it had in that respect) had already ended two months earlier when Quickie had revoked all prior powers of attorney and appointed the Thelen Defendants to act for it instead.

**The Thelen Defendants' Opportunities to Make or Assure Payment**

74. The Thelen Defendants had the opportunity to pay the maintenance fees, or advise Quickie to pay the fees, before they were due and the '160 Patent expired for non-payment of those fees.

75. The Thelen Defendants had further opportunities to pay the maintenance fees, or advise Quickie to pay the fees, during the one year period commencing May 23, 2003 through May 23, 2004; and the Thelen Defendants also had opportunities to cure the nonpayment, or to advise Quickie to cure the nonpayment after the one year payment period expired on May 23, 2004, including when the Thelen Defendants filed amendments to the '160 Patent in 2005.

76. Any alleged failures concerning payment of those fees when and as due and any expiration of the '160 Patent due to such failures were caused by the Thelen Defendants.

77. The conduct (including action or inaction) of the Thelen Defendants concerning the maintenance fees due on the '160 Patent were the direct, superseding and/or intervening cause of any alleged damages to Quickie which resulted from the nonpayment of the maintenance fees on the '160 Patent and the alleged expiration of the '160 Patent.

78. Accordingly, if and to the extent GT is found liable to Quickie, the Thelen Defendants are responsible to GT for the full amount for which GT is found liable or for contribution as to any such liability in the proportionate amount of the responsibility of the Thelen Defendants for Quickie's damages as determined at trial.

### SEVENTEENTH AFFIRMATIVE DEFENSE
### and
### SECOND CROSS-CLAIM
(against The Rick Steiner Defendants)

Greenberg Traurig LLP ["GT"] hereby cross-claims against the Rick Steiner Defendants (i.e. Rick, Steiner Fell & Benowitz LLP and Alan Fell, Esq.), and, in doing so, alleges as follows (on information and belief as to paragraphs 81 through 84, those paragraphs reallleged in paragraph 87 which were originally alleged on information and belief , 88 and 89):

### Nature Of The Cross-Claim

79. GT denies any wrongdoing in its representation of Quickie. But, if and to the extent GT is found liable to plaintiff, the Rick Steiner Defendants are liable to GT as contemporaneous and subsequent continuing counsel to Quickie to the full extent GT is found liable. The action or inaction of the Rick Steiner Defendants, who were and served as outside general counsel to Quickie during the period that GT represented Quickie (including without limitation with respect to the '160 Patent [defined elsewhere herein]) when the maintenance fees for the '160 Patent became due, was the direct, superseding and/or intervening cause, or a contributing cause, of any injuries resulting from the nonpayment of maintenance fee. If Quickie's claims against GT are

not dismissed, then the Rick Steiner Defendants are responsible and liable to GT to the extent GT may be found liable to Quickie or for contribution as to that liability.

## The Parties

80. Cross-claimant Greenberg Traurig LLP is a New York limited liability partnership engaged in the practice of law, with offices in the City, County and State of New York.

81. Cross-claim defendant Rick, Steiner Fell & Benowitz LLP ["the Rick Steiner Law Firm"] is a limited liability partnership engaged in the practice of law, with offices in the City, County and State of New York.

82. Cross-claim defendant Alan Fell, Esq. is a partner of defendant the Rick Steiner Law Firm, who transacted business in providing legal services in New York.

83. Quickie is the owner by assignment of U.S. Patent No. 6,066,160 ["the '160 Patent"], issued on May 23, 2000. Quickie maintains its business address at and through the Rick Steiner Law Firm.

84. Stephen Colvin is an inventor of the patented device covered under the '160 Patent and a principal of Quickie.

## Jurisdiction And Venue

85. This Court has personal jurisdiction over the Rick Steiner Defendants, since they are residents of, located in, and doing business in the State of New York.

86. Venue is properly situated in New York County, since GT and the Rick Steiner Defendants are residents of, located in, and maintain offices in this County.

## Background

### The '160 Patent and GT's Engagement

87. GT repeats and realleges paragraphs 62 through 67 above as if separately and specifically alleged in this cross-claim.

### The Rick Steiner Defendants' Role and Responsibility

88. During the period of GT's engagement and services for Quickie, the Rick Steiner Defendants were outside general counsel for Quickie in all of its business dealings, including (without limitation) with respect to the '160 Patent.

89. In that capacity, the Rick Steiner Defendants knew of and were advised that maintenance fees would have to be paid, and when they were due, with respect to the '160 Patent; and they had oversight responsibility as to Quickie's assets and dealing, including for assuring that the '160 Patent was maintained and kept extant.

90. The Rick Steiner Defendants were kept fully advised of, and maintained direct and continual oversight over, the work and services of GT for Quickie.

### The Rick Steiner's Defendants' Opportunities to Make or Assure Payment

91. The Rick Steiner Defendants had the opportunity to pay the maintenance fees, or advise Quickie to pay the fees, before they were due and the '160 Patent expired for non-payment of those fees.

92. The Rick Steiner Defendants had further opportunities to pay the maintenance fees, or advise Quickie to pay the fees, during the one year period commencing May 23, 2003 through May 23, 2004; and the Rick Steiner Defendants also had opportunities to cure the nonpayment, or to advise Quickie to cure the nonpayment after the one year payment period expired on May 23, 2004, including when amendments were filed to the '160 Patent in 2005.

93. Any alleged failures concerning payment of those fees when and as due and any expiration of the '160 Patent due to such failures were caused by the Rick Steiner Defendants.

94. The conduct (including action or inaction) of the Rick Steiner Defendants concerning the maintenance fees due on the '160 Patent were the direct, superseding and/or intervening cause of any alleged damages to Quickie which resulted from the nonpayment of the maintenance fees on the '160 Patent and the alleged expiration of the '160 Patent.

95. Accordingly, if and to the extent GT is found liable to Quickie, the Rick Steiner Defendants are responsible to GT for the full amount for which GT is found liable or for contribution as to any such liability in the proportionate amount of the responsibility of the Rick Steiner Defendants for Quickie's damages as determined at trial.

WHEREFORE, defendant and cross-claimant GT respectfully requests judgment in its favor as follows:

1. dismissing the Amended Complaint;

2. awarding judgment against, directing payment by, the Thelen Defendants under GT's First Cross-Claim in any amount GT is found liable to Quickie or for contribution as to any such liability in the proportionate amount of the responsibility of the Thelen Defendants for Quickie's damages as determined at trial;

3. awarding judgment against, directing payment by, the Rick Steiner Defendants under GT's Second Cross-Claim in any amount GT is found liable to Quickie or for contribution as to any such liability in the proportionate amount of the responsibility of the Rick Steiner Defendants for Quickie's damages as determined at trial;

4. awarding GT costs and disbursements of this action and GT's cross-claims; and

5. granting GT such other and further relief as the Court may deem just and proper.

Dated:  July 9, 2007
        New York, New York

POLLACK & KAMINSKY

By: _____
       Martin I. Kaminsky
       Justin Y. K. Chu
114 West 47th Street
New York, New York 10036
       (212) 575-4700

Attorneys for Defendant and Cross-Claimant
Greenberg Traurig, LLP

# EXHIBIT AQ

**BOX #1**

| Folder | Description |
|---|---|
| 100-1-1 Corr. | 1/23/02 letter from Greenberg to Colvin enclosing a copy of Quickie's patent No. 6,066,160 and print-outs of web-pages relating to Medtronic's device believed to infringe upon same |
| | 2/5/02 fax from Greenberg to Colvin and Rick Steiner Segal & Fell enclosing copy of complaint |
| | 2/02 correspondence between Quickie and Greenberg regarding retainer agreement |
| | 2/14/02 transmittal from Greenberg to Rick Steiner Segal & Fell of stamped Summons and Complaint |
| | 2/25/02 letter from Greenberg to TRP enclosing copies of the file wrappers to patent nos. 6,231,056; 6,331,157; 6,331,158; and 6,283,912 |
| | 3/1/02 letter from Greenberg to TRP enclosing copies of certain prior art references cited by the Guidant patents |
| | 3/5/02 letter from Greenberg to Medtronic regarding patent no. 6,066,160.  Attached is copy of complaint, including exhibits. |
| | 3/6/02 leter from Colvin to Greenberg enclosing transcription of voicemail from Bob Huburt |
| | 3/15/02 letter from Greenberg to Cardiac Surgery Technologies regarding rejection of offer to settle the outstanding patent infringement dispute; counter-offer |
| | 3/22/02 transmittal from Greenberg to Colvin, Eugene Grossi, and A. Katz of draft of memo regarding Claims chart for US Patent No. 6,066,160 (Claims 13, 18, 19, 20, 22, and 33) |
| | 3/22/02 transmittal from Greenberg to Colvin and Rick Steiner Segal & Fell of draft of letter to Cardiac Surgery Technologies rejecting Medtronic's counter-proposal |
| | 3/28/02 letter from McDermott to Greenberg requesting 20 day extension to respond to the complaint |
| | 3/28/02 letter from Greenberg to McDermott regarding response for request for 20 day extension to respond to the complaint |
| | 4/1/02 fax from McDermott to Greenburg enclosing a stipulation and order extending Medtronic's time to respond to the complaint |
| | 4/11/02 letter from Greenberg to TRP enclosing copy of the file wrapper for patent |
| | 4/16/02 letter from Greenberg to Rick Steiner Segal & Fell regarding preparation and strategy for Markman Hearing |
| | 4/17/02 letter from Greenberg to McDermott regarding Quickie's proposed schedule |
| | 4/25/02 transmittal from Greenberg to TRP, Colvin, and Rick Steiner Segal & Fell of Answer to Complaint and Counterclaim |
| | 4/25/02 letter from Greenberg to McDermott regarding Medtronic's proposed schedule |
| | 4/25/02 letter from McDermott to Greenberg regarding proposed schedule |
| | 4/26/02 transmittal from Greenberg to Colvin and Rick Steiner Segal & Fell of Copy of 4/26/02 New York Times article entitled "Medtronic Must Pay Rival $158 Million" |
| | 5/1/02 letter from McDermott to Greenberg enclosing order from Judge Lynch granting the admission, *pro hac vice*, of Raphael V. Lupo, Donna M. Tanguay, Brian E. Ferguson, and Stephen K. Shahida as counsel for the defendant |
| | 5/3/02 letter from McDermott to Greenberg enclosing a draft of Medtronic's proposed protective order |
| | 5/7/02 letter from Greenberg to McDermott enclosing Quickie's proposed Stipulation and Protective Order and First Set of Interrogatories, First Request for Production of Documents and Things, and First Request Request for Admissions |
| | 5/8/02 letter from Greenberg to McDermott enclosing Second Set of Interrogatories |
| 100-1-2 Corr. Cont. | 5/14/02 letter from McDermott to Greenberg regarding proposed protective order and enclosing First Set of Interrogatories, Document Requests, and Requests for Admission |
| | 5/15/02 transmittal from Greenberg to TRP, Colvin, and Rick Steiner Segal & Fell of Defendant's First Set of Discovery Requests |
| | 5/15/02 letter from Greenberg to McDermott regarding receipt of discovery requests and proposed protective order (patent prosecution bar) |

| | |
|---|---|
| 100-1-2<br>Corr.<br>Cont. | 5/17/02 transmittal from Greenberg to TRP, Colvin, and Rick Steiner Segal & Fell of Scheduling Order |
| | 5/20/02 fax from NYU School of Medicine to Todd Sharinn enclosing Medtronic Pricing Proposal for NYU Hospital Center |
| | 5/24/02 fax from McDermott to Greenberg enclosing revised, redlined version of the draft Stipulation and Protective Order |
| | 6/14/02 letter from Greenberg enclosing Quickie's responses to Defendant's Requests for Admission, Documents and Things and Interrogatories, as well as Quickie's production documents |
| | 7/1/02 letter from Greenberg to Clerk of the SDNY regarding extension to file and serve Markman briefs |
| | 7/8/02 letters from Greenberg to TRP, Colvin, and Rick Steiner Segal & Fell enclosing a copy of Quickie's Memorandum on Claim Construction, Declaration of Sharinn in support of same, Medtronic's Opening Brief on Claim Construction Issues and accompanying Declaration of Stephen K. Shahida |
| | 7/26/02 letter from Greenberg to McDermott enclosing supplemental production in response to Medtronic's document requests and red-lined version of Quickie's proposed changes to the Protective Order |
| | 8/2/02 letters from Greenberg to TRP, Dr. Stephen Colvin, and Rick Steiner Segal & Fell enclosing a copy of Quickie's Reply Memorandum on Claim Construction and Declaration of Todd S. Sharinn in support of same, and a copy of Medtronic's Reply Brief on Claim Construction |
| 100-2-1<br>Corr.<br>Cont. | 9/3/02 letter from Greenberg to McDermott enclosing photographs of prototypes designed and developed by Quickie and/or Medtronic |
| | 9/5/02 Transcript Order Form from Greenberg Traurig to Southern District Reporters for 9/4/02 Markman Hearing and Invoice |
| | 9/5/02 letter from Greenberg to Judge Lynch enclosing the set of color slides introduced by Quickie during Markman Hearing of 9/4/02 |
| | 9/27/02 letter from Greenberg to Rick Steiner Segal & Fell enclosing copy of the transcript of the 9/4/02 Markman Hearing |
| | 10/1/02 transmittal from Greenberg to Colvin, Mark Evens, and Rick Steiner Segal & Fell of Order adopting Plaintiff's construction of the disputed terms |
| | 10/11/02 letter from TRP to NYU Medical Center and Rick Steiner Segal & Fell regarding problems with transfer of files |
| | 10/11/02 letter from TRP to Greenberg requesting transfer of files |
| | 10/15/02 letter from Greenberg to TRP regarding Stipulation of Substitution of Counsel |
| | 10/16/02 letter from Greenberg to TRP regarding pick-up of Greenberg's files and index of contents |
| | 10/17/02 email from Shari Markowitz-Savitt to Linda Cruz regarding Settlement documents |
| | 10/17/02 email from Shari Markowitz-Savitt to Evens and Richard Taffet regarding document requests and production |
| | 10/18/02 letter from TRP to Greenberg regarding Stipulation of Substitution of Counsel |
| | 10/21/02 fax from TRP NY to TRP DC - Comp. Set/Volume Index Report dated 10/21 |
| | 11/26/02 fax from TRP to Doar Reick & Mack enclosing Stipulation (return date of Defendant's Motion to Dismiss, Plaintiff's answering papers, and Defendant's Reply papers) |
| | 12/6/02 letter from TRP to Todd Sharinn (Greenberg) regarding Sharinn's Affidavit for use in Opposition to Motion to Stay |
| | 12/10/02 letter from McDermott to Judge Lynch regarding improper attachment of Exhibit 10 to the Affirmation of Brian E. Ferguson in Support of Medtronic's Motion to Stay (also Judge's order endorsing letter) |
| | 12/24/02 letter from TRP to Judge Lynch enclosing Affidavits of Shari Markowitz and Mark Fox Evens In Support of Plaintiff's Opposition to Defendants Motion to Stay and Plaintiff's Opposition to Defendant's Motion to Stay |
| | 12/26/02 letter from TRP to McDermott regarding missing Table of Contents and Table of Authorities |

| | 1/14/03 letter from McDermott to Judge Lynch enclosing motion papers in support of and in opposition to Medtronic's Motion to Stay District Court Proceedings Pending U.S. Patent & Trademark Office Reexamination Proceeding |
| --- | --- |
| | 01/17/03 Order denying Defendant's motion for a stay |

| 401-1-1 | Legal Research - Cases cited by Medtronic in reply brief regarding claim construction |
| --- | --- |
| 401-1-2 | Legal Research - Patent Ownership search with Medtronic as Assignee |

| 401-2-1 | Legal Research - Key Cases Regarding Claim Construction and Definitions: *CCS Fitness v. Brunswick* |
| --- | --- |
| 401-2-2 | Legal Research - Key Cases Regarding Claim Construction and Definitions: *Johnson v. Zebco* |
| 401-2-3 | Legal Research - Key Cases Regarding Claim Construction and Definitions: Definitions - "Aperture" |
| 401-2-4 | Legal Research - Key Cases Regarding Claim Construction and Definitions: Articles regarding Apertures from A. Katz |
| 401-2-5 | Legal Research - Key Cases Regarding Claim Construction and Definitions: Definitions - "Cam" |

| 405-1-1 | Prototypes - Medtronic (EMPTY FOLDER) |
| --- | --- |
| 405-1-2 | Prototypes - Photographs (copies and disk) |
| 405-1-3 | Prototypes - Alan Katz (EMPTY FOLDER) |
| | Actual Prototypes |

**BOX #2**

| 405-2-1 | Medtronic Infringing Device "OCTOBASE" Retractor - actual device and photos on disk |
| --- | --- |
| 405-2-2 | Quickie's Demonstrative Exhibits in Support of its Claim Construction Arguments - Markman Hearing |
| 405-2-3 | Plaintiff's Privilege Log |
| 405-2-4 | Judge's Rules |
| 405-2-5 | Attorney Notes and Working Papers - contains attorney biographies and notes |
| 405-2-6 | Medtronic Webpage - Minimally Invasive Cardiac Surgery, What's new and Hot |
| 405-2-7 | Documents to be retained as privileged pending agreement/reply from Medtronic |
| 405-2-8 | 6/5/01 letter from Fell to Medtronic enclosing a copy of the Concentric Passive Knotless Suture Terminator Patent Application |
| 405-2-9 | 6/27/00 correspondence from Medtronic to A. Katz enclosing samples |
| 405-2-10 | 7/20/99 correspondence from Medtronic to A. Katz enclosing latest radial retainer |
| 405-2-11 Dr. Colvin's File | 12/11/98 fax from Medtronic to Fell transmitting Agreement for Mutual Exchange of Confidential Information |
| | Correspondence regarding the Amendment to the Knotless Suturing Agreement |
| | 8/29/00 letter from Medtronic to Colvin regarding continued development initiatives with Quickie on a Facilitated Heart Valve attachment system |
| | 1/16/02 letter from Colvin to Members of Quickie regarding agreement with Medtronic for an auto securing mechanism |
| 405-2-12 | Ring Drawings - Valve (Originals) |
| 405-2-13 | Allen Fell's File (Empty Folders) |
| 405-2-14 | Seagate 30(b)6 and Compaq 30(b)6 Outline |

| 405-3-1 | Patent & File History: Patent No. 6,066,160 - Copy of Patent, Quicke File History of US Patent & Trademark Office filings, and Prior Art References |
| --- | --- |

**BOX #3**

| 405-3-2: | Patent & File History: Patent No. 6,066,160 - Copy of Patent, Faxpat Report of US Patent & Trademark Office filings, and Prior Art References |
|---|---|
| 405-3-3 | Patent & File History: Patent No. 6,066,160 - Prior Art References |
| 405-3-4 | Patent & File History: Patent No. 6,331,157 - Copy of Patent, Quickie File History Containing US Patent & Trademark Office filings, and Prior Art References |

**BOX #4**

| 405-3-5 | Patent & File History: Patent No. 6,283,912 - Copy of Patent, Faxpat Report of US Patent & Trademark Office filings, and Prior Art References |
|---|---|
| 405-3-6 | Patent & File History: Patent No. 6,331,158 - Copy of Patent, Faxpat Report of US Patent & Trademark Office filings, and Prior Art References |
| 405-3-7 | Patent & File History: Patent No. 6,231,506 - Copy of Patent, Faxpat Report of US Patent & Trademark Office filings, and 7/21/99 fax from Tim Ryan (Medtronic) to A. Katz regarding proposed modicifations to 206349, Rev. 3 (Retainer) |
| 405-3-8 | Patent & File History: Patent No. 6,231,506 - Prior Art References |

**BOX #5**

| 405-3-9 | Patent & File History: Patent No. 6,231,506 - Referenced Cites to Patent (printouts of various patents) |
|---|---|
| 405-3-10 | Patent & File History for Patent No. 6,231,506 - Prior Art References |
| 405-3-11 Patent & File History - Other Patent Apps | 3/13/01 letter from Sharinn to A. Fell enclosing most recent communication received from US Patent & Trademark Office - License for Foreign Filing |
| | 10/16/00 letter from Sharinn to Colvin and Eugene Grossi regarding Provisional Patent Application No. 60/160,662 for Wide View Endoscopic Compatible with HDTV Format - request for more technical information.  Attached is drawing. |
| | 10/3/00 letter from Sharinn to A. Fell regarding Provisional Patent Application No. 60/160,662 - request for further information to file Patent Application.  Attached is Provisional Patent Application |
| | 9/25/00 letter from Sharinn to A. Fell enclosing a copy of Amendment for Application No. 09/327,823 (Novel Annuloplasty Rings of Particular Use in Surgery for Mitral Valve) filed 9/20/00 |
| 405-3-12 Patent & File History - GT Patent File | 10/18/98 Fax from A. Fell to Sharinn regarding patent application - names and addresses of inventors |
| | 11/13/98 letter from Sharinn to A. Fell regarding Passive Knotless Suture Terminator Patent Application |
| | 11/17/98 letter from A. Fell to Colvin enclosing Patent Application for Knotless Suture Terminator |
| | 11/30/98 letter from Sharinn to A. Fell regarding Patent Application for Knotless Suture Terminator - notification that patent has been filed and request for material prior art information |
| | 1/25/99 letter from Sharinn to A. Fell regarding Patent Application for Knotless Suture Terminator - information regarding foreign patent protection |
| | 8/12/99 letter from Sharinn to A. Fell regarding Patent Application Serial No. 09/198,087 - enclosing a copy of the Amendment prepared in response to Office Action mailed 7/22/99 |
| | 12/15/99 letter from Pepe & Hazard to A. Fell regarding filing fee for Patent Application No. 09/198,087 |
| | 5/30/00 letter from Sharinn to Colvin enclosing official US Letters Patent |
| | Drawings |
| 405-3-13 | Patent & File History: Prosecution of Patent 610 (EMPTY) |
| 405-3-14 Patent & File History | 2/4/99 letter from Sharinn to A. Fell regarding Estimated Costs for foreign patent filing |
| | International Application dated 6/2/00 |
| | 7/19/00 letter from Pepe & Hazard to A. Fell regarding foreign application - allotted European Patent Application No. 99972518.7 |

QLLC 0006574

| | |
|---|---|
| | 1/3/01 letter from Pepe & Hazard to Fell regarding foreign application - request to specify countries to seek protection |
| | Patent Cooperation Treaty - Notice informing the applicant of the communication of the international application to the designated offices |
| | 10/12/99 letter from Sharinn to Fell regarding Filing Cost in Taiwan |
| | 2/18/99 memo from Fell to Sharinn regarding foreign filing - Quickie wishes to proceed with foreign filing |
| 405-3-15 Patent & File History | Medtronic Heart Valves Santa Ana Facility Quality System Procedures - Product Development Protocol, Design Control and Review dated 7/13/01 |
| | 6/7/99 letter from Foster (Medtronic) to Fell responding to request to provide a summary of the status of the Quickie Attachment Mechanism Project along with a proposal on how to move forward related to the contract - regulatory control. |
| | 6/18/99 letter from Fell to Foster (Medtronic) regarding November 5, 1998 License and Development Agreement between Quickie and Medtronic |

**BOX #6**

| | |
|---|---|
| 405-4-1 | TSS Working Copy of US Patents regarding Guidant - Patent 6,231,506 Faxpat Report of US Patent & Trademark Office Filings |
| 405-4-2 | TSS Working Copy of US Patents regarding Guidant - Patent 6,331,157 Faxpat Report of US Patent & Trademark Office Filings |
| 405-4-3 | TSS Working Copy of US Patents regarding Guidant - Prior art references for Patent 6,283,912 |
| 405-4-4 | TSS Working Copy of US Patents regarding Guidant - Prior art references for Patent 6,331,157 |
| 405-4-5 | TSS Working Copy of US Patents regarding Guidant - Prior art references for Patent 6,331,158 |
| 405-4-6 | TSS Working Copy of US Patents regarding Guidant - Patent 6,331,158 Faxpat Report of US Patent & Trademark Office Filings |
| 405-4-7 | US Patent & Trademark Office, Patent Full Text and Image Database: Printouts of numerous patents relating to retractors |

**BOX #7**

| | |
|---|---|
| 405-4-8 | TSS Working Copy of US Patents regarding Guidant - Patent 6,283,912 B1 Faxpat Report of US Patent & Trademark Office Filings |
| 405-4-9 | TSS Working Copy of US Patents regarding Guidant - Patent 1,583,727 Faxpat Report of US Patent & Trademark Office Filings |
| 405-4-10 | TSS Working Copy of US Patents regarding Guidant - Patent 1,244,537 Faxpat Report of US Patent & Trademark Office Filings |

| | |
|---|---|
| 500-1-1 | Pleadings - Quickie v. Medtronic (Volume 1) |
| 500-1-1a | Pleadings - Quickie v. Medtronic (Volume 1A) |
| 500-1-2 | Pleadings - Quickie v. Medtronic (Volume 2) |
| 500-1-3 | Pleadings - Quickie v. Medtronic (Volume 3) |
| 501-1-1 | Pleadings - Quickie v. Medtronic (Original Discovery) |

**BOX #8**

| 606-1-1 Client Docs | Quickie Articles of Organization and Operating Agreement |
| --- | --- |
| | Fax log report for S.B. Colvin |
| | Copy of Patent 6,066,160 |
| | Drawings dated 9/26 |
| | 11/13/98 Fax from Todd Sharinn to Les Hoffman enclosing drawings |
| | 4/9/99 Letter from Todd Sharinn to Patent & Trademark Office enclosing copies of erroneous materials the patent office prepared and forwarded to Sharinn |
| | US Patent & Trademark Office Notice of Disposition of Database Discrepancy to Sharinn dated 3/31/99 |
| | 3/30/99 letter from Sharinn to US Patent & Trademark Office regarding Patent Application Serial No. 09198087, enclosing copy of the Notice of Recordation of Assignment Document |
| | 2/22/99 letter from Charles Koeber regarding Novelty search, Surgical Robot Automation |
| | 2/11/99 letter from Sharinn to Charles Koeber requesting patent novelty search - Automations of Surgical Robots |
| | Draft of Memo regarding Robotic Surgical Automations of Particular Use in Minimally Invasive or Endoscopic Surgery dated 2/8/99 |
| | Memo regarding Passive Knotless Suture Terminator For Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing |
| | 7/12/99 fax from Pepe & Hazard to Les Hoffman enclosing drawings |
| | 8/14/99 letter from Colvin to Medtronic regarding follow up to conversation following the "wet lab" session on Long Island on 8/13/99 |
| | 7/30/99 email from Eugene A. Grossi to Todd Sharinn regarding ideas for Patent 5,391,173 |
| | US Patent & Trademark Office Action Summary to Sharinn regarding Application No. 09/198,087, responding to communication filed 11/23/98, allowing claims 14-34 and rejecting claims 1-5 and 7-13. Attached is notice of References cited (Patents 5,391,173; 5,306,290; 4,823,794; and 3,541,591) and copies of patent summaries of each |
| | Copy of Ring Drawings - Valve |
| | Folder from Colvin to Greenberg containing disk and notebook of notes and drawings |
| 606-1-2 Client Corp. Docs | 6/16/99 memo from A. Katz to Colvin regarding an evaluation of Medtronic Prototype (Product was mis-designed by Medtronic). Attached are drawings. |
| | A. Katz notes on conversation with Tim Ryan on 6/16/99. Manufacturing of Knotless device was not done to spec. |
| | 6/16/99 letter from A. Katz to Alan Fell (Rick Steiner) and Todd Sharrin regarding product supplied by Medtronic. Product was mis-designed by Medtronic and manufactured poorly. |
| | 6/7/99 inter-office memo by Tim Ryan (Medtronic) regarding the status for Project Quickie (Suture Retention System) |
| | 6/7/99 inter-office memo by Jeff Gross (Medtronic) regarding Project Quickie Key Issues |
| | 4/16/02 letters from Greenberg to Quickie enclosing invoice no. 874423 and no. 874424 for legal services and expenses rendered through and including March 31, 2002 |
| | 2/13/02 letter from Rick Steiner Segal & Fell to TRP regarding Quickie and Medtronic, possible patent infringement claim. |
| | Citibank Bank Account Information |
| | Quickie Tax Information |
| | Legal Bills |

QLLC 0006576

| 610-1-1 | 1/28/99 letter from A. Fell (Rick Steiner) to Medtronic regarding notification from the US Patenet & Trademark Office that patent application no. 09/198,087 has been filed **(MEDQ 00001-00005)** |
|---|---|
| Docs | |
| Produced | 10/16/98 email from Todd Sharinn to Peter Forrest (Medtronic) regarding revised product description. Attached is patent no. 5,413,585 (Self Locking Suture Lock) **(MEDQ 00008-00018)** |
| by Med | |
| (MEDQ | 9/28/98 email from Peter Forest to unknown recipient Regarding NYU Language **(MEDQ 00019-00020)** |
| 00001- | |
| 00638) | 6/1/99 letter from Medtronic to A. Fell (Rick Steiner) regarding license Agreement Quickie & Medtronic. Requesting copy of patent application. **(MEDQ 00021)** |
| | 10/28/99 letter from Medtronic to A. Fell regarding the completed wet lab regarding the quickie attachment mechanism. **(MEDQ 00022)** |
| | Copy of Patent 6,066,160 and numerous other patents **(MEDQ 00050-00638)** |
| 610-1-2 | Printout of numerous patents **(MEDQ 00639-950)** |
| Produced | File for patent no. 6,066,160 - documents filed with US Patent & Trademark Office **(MEDQ00951-01048)** |
| by Med | |

| 610-2-1 | Documents Produced by Quickie **(Quick 1-576)** - Quickie File History for US Patent No. 6,066,160 |
|---|---|
| 610-2-2 | Documents Produced by Quickie **(Quick 577-1161)** - Faxpat File for US Patent No. 6,231,506 |

**BOX #9**

| 610-2-3 | Documents Produced by Quickie **(Quick 1162-1935)** - Copies of Surgical Patents (Various Inventors and Assignees) |
|---|---|
| 610-2-4 | Documents Produced by Quickie **(Quick 1936-2522)** - US Patent & Trademark Office, Patent Full Text and Image Database: Printout of various surgical patents (Various Inventors and Assignees) |
| 610-2-5 | Documents Produced by Quickie **(Quick 2523-3126)** - Faxpat File for Patent No. 6,311,157 and prior art references |
| 610-2-6 | Documents Produced by Quickie **(Quick 3127-3760)** - Copies of Surgical Patents (Various Inventors and Assignees) |

**BOX #10**

| 610-2-7 | Documents Produced by Quickie **(Quick 3761-4380)** - Copies of Surgical Patents (Various Inventors and Assignees) |
|---|---|
| 610-2-8 | Medtronic Manual: Directions for use of OCTOBASE 28707 - Suture Holding Inserts **(Quick 004463-004492)** |
| Docs | |
| Produced | Medtronic Meeting Summary dated 11/30/99.  Subject: Project Status, Wet Lab Results - Quickie Suture Retention System Status and Quickie Band.  Attached is Knotless Retainer, Annuloplasty |
| by | Band Project Status and Wet-lab/Demo Plan dated 10/8/1999 **(Quick 4493-4508)** |
| Quickie | Medtronic Meeting Summary dated 8/16/99.  Subject: Project Status, Wet Lab Results - Quickie Suture Retention System Status and Quickie Band.  Attached is Knotless Retainer, Annuloplasty |
| (4463-4643) | Band Project Status and Wet-lab/Demo Plan dated 8/13/1999 and four prototype candidate retainer designs **(Quick 4509-4532)** |
| | 6/17/99 letter from Tim Ryan (Medtronic) to Eugene Grossi and Allan Katz responding to June 16th letter: Medtronic Prototype Suture Retention Parts.  Attached are drawings. **(Quick 4533-4544)** |
| | Medtronic NYU Band, Retention Divide Status Report dated 4/19/99 **(Quick 4545-4552)** |
| | Medtronic Meeting Summary dated 5/6/99.  Subject: Project Status - NYU Partial Band, Suture Retention System Status.  **(Quick 4553-4556)** |
| | Medtronic Meeting Summary dated 2/3/99.  Subject: Partial annuloplasty ring development and suture retention system.  **(Quick 4557-4559)** |
| | Quotation from Phillips Origen (Metal Injection Molding) to Medtronic for Retainer dated 8/21/99. **(Quick 4560-4568)** |
| 610-2-9 | Documents Produced by Quickie **(Quick 4644-4671)** - Photos of Prototype |

| 820-1-1 | Extra Copies of Quickie v. Medtronic Pleadings |
| 820-2-1 | Duplicates of Quickie Productions |

QLLC 0006578

# EXHIBIT AR



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 9, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

       Re:    Quickie, LLC
            Passive Knotless Suture System Patent (6,066,160)
            <u>Our Ref. 51822.010700</u>

Dear Alan:

     Enclosed please find our invoice no. 1022157 for a total amount of $739.60 for legal services and expenses rendered through and including March 31, 2003.

     If you have any questions, please do not hesitate to contact me.

                 Very truly yours,

                 Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003097



Invoice No. :  1022157
File No.    :  51822.010700
Bill Date   :  April 7, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:  Passive Knotless Suture System Patent (6,066,160)

Legal Services through March 31, 2003:

|  | | |
|---|---|---|
| Total Fees: | $ | 735.00 |

Expenses:

| | | |
|---|---|---|
| Facsimile Charges | 4.00 | |
| Photocopy Charges | 0.60 | |
| Total Expenses: | $ | 4.60 |
| Current Invoice: | $ | 739.60 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100 FAX 212-688-2449 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS003098



Invoice No. :  1022157
File No.   :  51822.010700

WIRING INSTRUCTIONS FOR GT FIRM ACCOUNT
FOR FEES & COSTS ARE AS FOLLOWS:

TO:                CITIBANK, F.S.B.
ABA #:             266086554
CREDIT TO:         GREENBERG TRAURIG ACCOUNT
ACCOUNT #:         3200175071

PLEASE
REFERENCE:    CLIENT NAME:      QUICKIE, LLC
              FILE NUMBER:      51822.010700
              INVOICE NUMBER:   1022157
              ATTORNEY NAME:    Paul J. Sutton

PS:YA
Tax ID:  13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  NEW
JERSEY
ORLANDO  PHILADELPHIA  PHOENIX  TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON
ZURICH

RS003099

Invoice No.:    1022157                                                         Page  1
Re:             Passive Knotless Suture System Patent (6,066,160)
Matter No.:     51822.010700

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|---|
| 03/18/03 | Todd S. Sharinn | Review PTO reexamination statement and file (.9); review prior art cited (.6); telephone call with examiner (.2). | 1.70 | 595.00 |
| 03/19/03 | Todd S. Sharinn | Telephone interview with Examiner (.4). | 0.40 | 140.00 |
| | | Total Time: | 2.10 | |
| | | Total Fees: | | $ 735.00 |

RS003100

Invoice No.:　　1022157　　　　　　　　　　　　　　　　　　　　　　　　　Page 2
Re:　　　　　　Passive Knotless Suture System Patent (6,066,160)
Matter No.:　　51822.010700

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 10/22/02 | Copy; 4 Page(s) by 2157 | $ | 0.60 |
| 12/16/02 | Facsimile; 17033051013, 4 Page(s) by 7431 | $ | 4.00 |
| | Total Expenses: | $ | 4.60 |

RS003101

Invoice No.:   986682                                                          Page  1
Re:            Reexamination of U.S. Patent No. 6,066,160 by Medtronic
Matter No.:    51822.010900



EXHIBIT
45

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 12/03/02 | Todd S. Sharinn | Telephone call with S. Colvin (.2); review papers filed by Medtronic (1.5); legal research regarding options available (.8). | 2.80 | 882.00 |
| 12/06/02 | Todd S. Sharinn | Telephone call from M. Evens (.3). | 0.30 | 94.50 |
| 12/09/02 | Todd S. Sharinn | Confer with A. Een regarding status and strategy (.3). | 0.30 | 94.50 |
| 12/10/02 | Todd S. Sharinn | Confer with M. Evens regarding status and strategy (.3) review and revise affirmation of T. Sharinn (.6). | 0.90 | 283.50 |
| 12/12/02 | Todd S. Sharinn | Exchange emails with M. Evens and revise declaration (.3). | 0.30 | 94.50 |
| 12/13/02 | Todd S. Sharinn | Finalize and forward declaration (.3). | 0.30 | 94.50 |

|  | Total Time: | 4.90 |
|--|-------------|------|
|  | Total Fees: | $ 1,543.50 |

GT 0015177

Invoice No.:    1022157                                                    Page 1
Re:             Passive Knotless Suture System Patent (6,066,160)
Matter No.:     51822.010700

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 03/18/03 | Todd S. Sharinn | Review PTO reexamination statement and file (.9); review prior art cited (.6); telephone call with examiner (.2). | 1.70 | 595.00 |
| 03/19/03 | Todd S. Sharinn | Telephone interview with Examiner (.4). | 0.40 | 140.00 |
| | | Total Time: | 2.10 | |
| | | Total Fees: | | $ 735.00 |

DUPLICATE COPY

Invoice No.:     800739
Re:              General
Matter No.:      51822.010000

EXHIBIT

48

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|---|---|---|---|
| 09/09/01 | Todd S. Sharinn | Review and revise Colvin consulting agreement (.9). | 0.90 |
| 09/10/01 | Todd S. Sharinn | Telephone calls with Alan Fell regarding consulting agreement (.3). | 0.30 |
| 09/21/01 | Todd S. Sharinn | Memo to A. Fell regarding Colvin consulting agreement (1.3). | 1.30 |
| 09/24/01 | Todd S. Sharinn | Review Quickie/Medtronic Facilitated Surgical Attachment License and Development Agreement (1.1). | 1.10 |
| 09/25/01 | Todd S. Sharinn | Review Quickie/Medtronic Facilitated Surgical Attachment License and Development Agreement (.7); review Medtronic Product Development process (.5); telephone calls with A. Fell (.7). | 1.90 |

Total Time:    5.50

Summary of Fees (51822.010000)

| Timekeeper | Hours | | Amount |
|---|---|---|---|
| Todd S. Sharinn | 5.50 | | 1,540.00 |
| Totals: | 5.50 | $ | 1,540.00 |

DUPLICATE

GT 0015288

Invoice No.    817895
Re    General
Matter No.    51822.010000

## Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|-----------|-------------|-------|
| 10/01/01 | Todd S. Sharinn | Review concentric passive knotless suture terminator patent application and revise Facilitated Surgical Attachment License and Development Agreement (6.2). | 6.20 |
| 10/02/01 | Todd S. Sharinn | Draft and revise license agreement with Medtronic (3.7). | 3.70 |
| 10/03/01 | Todd S. Sharinn | Draft and revise license agreement with Medtronic (2.4). | 2.40 |
| 10/04/01 | Todd S. Sharinn | Telephone call from A. Fell (.2); revise license agreement (.4). | 0.60 |
| 10/30/01 | David . Heath | Discussed new patent application with T. Sharinn and clients Gene Grossi and Allan katz re new patent application and reviewed file of previous patent for clients. (Arterial Fixation Avoiding Sutures Device Patent Application) | 3.50 |
| 10/30/01 | Todd S. Sharinn | Telephone call with G. Grossi regarding description of device (.3); confer with David Heath regarding preparation of patent application (.3). | 0.60 |

|  |  | Total Time: | 17.00 |
|--|--|-------------|-------|

## Summary of Fees (51822.010000)

| Timekeeper | Hours | Amount |
|-----------|-------|--------|
| David . Heath | 3.50 | 805.00 |
| Todd S. Sharinn | 13.50 | 3,780.00 |
| Totals: | 17.00 | $    4,585.00 |

GT 0015292

Page 1

Invoice No.:      82246E
Re:               General
Matter No.:       51822.010000

## Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|---|---|---|---|
| 11/05/01 | Todd S. Sharinn | Review issues raised by Medtronic regarding changes to license agreement and status and strategy for responding to same (.3). | 0.30 |
| 11/21/01 | Todd S. Sharinn | Telephone call from G. Grossi regarding possible infringement of first knotless patent by Medtronic (.2). | 0.20 |
| 11/26/01 | Todd S. Sharinn | Telephone call from G. Grossi (.2); compare Medtronic "Octobase" device with claims of U.S. Patent No. 6,066,160 (.7); review license agreement (.6); review file wrapper to U.S. Patent No. 6,066,160 (.8); telephone call with Alan Fell regarding status and strategy for dealing with potential infringement of U.S. Patent No. 6,066,160 (.3). | 2.40 |
| 11/28/01 | Denise . Alexander | Search of USPTO records for use of patent 6066160 as prior art in subsequent filings. Also checked foreign patent files. | 1.50 |
| 11/28/01 | Todd S. Sharinn | Reviewed Medtronic, Inc. patent for similiarly worded patents. Telephone call with Alan Fell regarding status and strategy (.3); due diligence regarding potential infringement of U.S. Pat. No. 6,066,160 (.8); confer with Denise Alexander regarding research to be conducted (.2); telephone call from G. Grossi regarding device (.2); telephone call from Alan Fell regarding status and strategy of responding to Medtronic's revisions of Facilitated Attachment License Agreement (.6); review modified Facilitated Attachment License Agreement (2.4). | 4.50 |
| 11/30/01 | Paralegal Clerk | Patent research for Denise Alexander | 0.20 |
| | | Total Time: | 9.10 |

## Summary of Fees (Current Invoice)

| Timekeeper | Hours | Amount |
|---|---|---|
| Todd S. Sharinn | 7.40 | 2,072.00 |
| Denise . Alexander | 1.50 | 240.00 |
| Paralegal Clerk | 0.20 | 30.00 |
| Totals: | 9.10 | $    2,342.00 |

GT 00152

Invoice No.    869847
Re:    General
Matter No    51822.010000

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 03/22/05 | Todd S. Sharinn | Telephone call with search agent (.3); letter to patent search service regarding novelty search for improved surgical drape (.4). | 0.70 | 220.50 |
| | | Total Time: | 0.70 | |
| | | Total Fees: | | $ 220.50 |

DUPLICATE COPY

GT 0015299

Invoice No.:    920624
Re:    General
Matter No.:    51822.010000

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 07/11/0? | Paralegal Clerk | Library Research on status of patent application for T. Sharinn | 0.30 | 45.00 |
| 07/31/0? | Todd S. Sharinn | Review Facilitated Surgical Attachment License and Development Agreement (.3); telephone calls from Alan Feld regarding issues arising under agreement sections 2.1, 2.2 and 6.8 (.2). | 0.50 | 157.50 |

| | | | Total Time: | 0.80 | |
| | | | Total Fees: | | $ 202.50 |

DUPLICATE COPY

Page 1

Invoice No.    999530
Re:            General
Matter No.:    51822.010000

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 01/03/03 | Todd S. Sharinn | Prepare patent application (1.0) | 1.00 | 350.00 |
| | | Total Time: | 1.00 | |
| | | Total Fees: | | $ 350.00 |

DUPLICATE COPY

Invoice No.     1022875                                              Page 1
Re:             General
Matter No.:     51822 010000

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 03/27/03 | Todd S. Sharinn | Letter to Dr. Colvin regarding status and strategy for various pending matters (.2). | 0.20 | 70.00 |
|  |  | Total Time: | 0.20 | |
|  |  | Total Fees: | | $ 70.00 |

DUPLICATE COPY

GT 0015311

Invoice No.:    838282
Re:             Quickie LLC v. Medtronics
Matter No.:     51822.010400

Page



Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | AMOUNT |
|------|-----------|-------------|--------|
| 12/03/01 | Todd S. Sharinn | Confer with Denise Alexander regarding status of search (.1); review preliminary results of due diligence searches (.7). | 224.00 |
| | | Total Fees: | $ 224.00 |

DUPLICATE COPY

GT 0015191

Invoice No.:    862518                                                         Page 1
Re:             Quickie LLC v. Medtronic
Matter No.:     51822.010400

## Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | AMOUNT |
|------|-----------|-------------|--------|
| 02/02/02 | Todd S. Sharinn | Meeting with S. Colvin, G. Grossi, A. Katz and P. Sutton regarding causes of action against Medtronic (1.5); Internet search (.3). | 0.00 |
| 02/02/02 | Paul J. Sutton | Meeting with S. Colvin, G. Grossi, A. Katz and P. Sutton regarding causes of action against Medtronic (1.5); Internet search (.3). | 0.00 |
| 02/04/02 | Joseph V. Saphia | Reviewed licensing and development agreement in preparation of drafting complaint; discussed facts of the case with T. Sharinn; drafted complaint. | 240.00 |
| 02/04/02 | Todd S. Sharinn | Telephone calls from Gene Grossi, Stephen Colvin and Alan Fell (.4). | 126.00 |
| 02/05/02 | Denise . Alexander | Pulled two patents. | 80.00 |
| 02/05/02 | Todd S. Sharinn | Review license and non-disclosure agreements and correspondence (3.2); review Medtronic's web-site (.6); review patent claims and infringing device with Paul Sutton (.3); prepare Complaint (2.3). | 2016.00 |
| 02/11/02 | David G. Palmer | Assisted Todd Sharinn with preparing Complaint, Summons, Rule 1.9 statement and Civil cover sheet. | 202.50 |
| 02/11/02 | Todd S. Sharinn | Review and revise Complaint and have filed in Southern District of New York (.6). | 189.00 |
| 02/12/02 | Todd S. Sharinn | Telephone calls with Dr. S. Colvin and A. Galloway (.3); telephone call with Alan Fell regarding status and strategy (.2). | 157.50 |
| 02/13/02 | Denise . Alexander | Further search for patents and retrieval of patents off website. | 80.00 |
| 02/13/02 | Meg A. Blewitt | Reviewed emails re: various file histories; meet with Todd and retrieve patents. | 45.00 |
| 02/14/02 | Denise . Alexander | Retrieving off website further patents for attorney. | 112.00 |
| 02/14/02 | Meg A. Blewitt | Reviewed emails from TSharinn re: various file histories; telephone calls to Faxpat for retrieval of same. | 75.00 |
| 02/14/02 | Todd S. Sharinn | Review United States Patent No. 6,331,157 B2 in view of Quickie Patent and review related patents granted by the United States Patent and Trademark Office (1.1); review Quickie/Ethicon file (.3). | 441.00 |
| 02/15/02 | Todd S. Sharinn | Telephone call from Dr. Colvin regarding status of investigation and strategy for moving forward (.2). | 63.00 |
| 02/20/02 | Meg A. Blewitt | Reviewed invoices against file histories sent via Fed-ex; emails to TSharinn and DAlexander re: incoming files. | 45.00 |
| 02/20/02 | Todd S. Sharinn | Telephone call from Stephen Colvin regarding status and strategy (.2); confer with patent search service regarding status of investigation (.2). | 126.00 |
| 02/21/02 | Todd S. Sharinn | Review file wrapper to U.S. Patent No. 6,331,157 (3.7); prepare memo to file regarding same (1.1). | 1512.00 |
| 02/22/02 | Todd S. Sharinn | Review and revise memo regarding U.S. Patent No. 6,331,157 (.7); confer with Paul Sutton regarding status and strategy (.2); review and prepare memo regarding file wrapper to U.S. Patent No. 6,231,506 (6.4). | 2299.50 |
| 02/25/02 | Paralegal Clerk | Library Research for attorney Todd Sharinn. (patent research) | 150.00 |
| 02/25/02 | Paralegal Clerk | Library Research on patent family for incision apparatus for T. Sharinn | 112.50 |

Invoice No.:    862518                                                                 Page 2
Re:             Quickie LLC v. Medtronics
Matter No.:     51822.010400

Description of Professional Services Rendered

| | | | |
|---|---|---|---|
| 02/25/02 | Paralegal Clerk | Library Research Search and pull 57 patents for T. Sharinn. | 150.00 |
| 02/25/02 | Paralegal Clerk | Research regarding patent information from list of patents provided by Todd Sharin. Search United States Patent and Trademark Office database for information regarding patent application and issue date, claims information and abstract and forward for each patent researched to Denise Alexander | 150.00 |
| 02/25/02 | Todd S. Sharinn | Letter to Mark Evans (.2); legal and technical research (2.7). | 913.50 |
| 02/26/02 | Paralegal Clerk | Library Research on patent family for incision apparatus for T. Sharinn | 112.50 |
| 02/26/02 | Paralegal Clerk | Library Research on patent family of incision apparatus for T. Sharinn | 30.00 |

Total Fees:        $ 9,428.00

GT 0015196

Invoice No.:      888138                                                                                    Page 1
Re:               Quickie LLC v. Medtronics
Matter No.:       51822.010400

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | AMOUNT |
|------|-----------|-------------|--------|
| 04/01/02 | Todd S. Sharinn | Telephone calls from opposing counsel regarding stipulation to provide Defendant additional time to answer (.4); review and revise proposed stipulation to extend time for Defendant to answer Complaint (.2). | 189.00 |
| 04/01/02 | Habibah Tamraz | Familiarization with case history. Research on the information to be used to draft Interrogatories and Requests for Documents and Things. | 240.00 |
| 04/02/02 | Todd S. Sharinn | Telephone call from A. Fell regarding status and strategy (.2); telephone calls from opposing counsel (.3); confer with H. Tamra regarding preparing request for production of documents and things and interrogatories (.3); confer with P. Sutton regarding status and strategy for filing motion for summary judgment (.3); legal research (1.1). | 693.00 |
| 04/02/02 | Habibah Tamraz | First draft of First Set of Interrogatories and First Request for Production of Documents and Things. | 108.00 |
| 04/03/02 | Daniel A. Ladow | Conference with T. Sharinn and P. Sutton re: motion and Markman strategy and related issues | 135.00 |
| 04/03/02 | Todd S. Sharinn | Confer with P. Sutton and D. Ladow regarding strategy from case, filing of summary judgment and hearing (.8); research regarding hearing (1.9). | 850.50 |
| 04/03/02 | Habibah Tamraz | Re-drafting of First Set of Interrogatories and First Request for Production of Documents and Things. | 120.00 |
| 04/04/02 | Todd S. Sharinn | Confer with Alan Fell regarding status and strategy (.4). | 126.00 |
| 04/04/02 | Habibah Tamraz | Re-drafting of First Set of Interrogatories and First Request for Production of Documents and Things. | 300.00 |
| 04/05/02 | Habibah Tamraz | Finalization of first draft of First Set of Interrogatories and First Request for Production of Documents and Things. | 300.00 |
| 04/10/02 | Todd S. Sharinn | Telephone call with Alan Fell regarding Summary Judgment (.2); legal research (.8); review prior art (.7); prepare for conference call with Mark Evens, Alan Fell and Paul Sutton (.2). | 598.50 |
| 04/10/02 | William G. Todd | Review U.S. Patent No. 6,066,160 and Complaint against Medtronic Inc. | 250.00 |
| 04/11/02 | Todd S. Sharinn | Review Judge Lynch's notice of conference and template for scheduling order (.3); letter to opposing counsel (.2); telephone conference with Alan Fell, Paul Sutton and Mark Evens regarding status and strategy for case (.9); review Idea Submission and Evaluation Agreement and follow-up call with Alan Fell (.2); review file wrapper and prepare letter forwarding copy of same to Mark Evens (.5); legal research regarding Judge Lynch (.2). | 724.50 |
| 04/11/02 | Paul J. Sutton | Preparation for and conference with T. Sharinn re strategy and status; preparation for and participating in conference call with A. Fell; preparation for and participating in conference call with A. Fell and M. Evans re summary judgement, Markman, Rule 26 conference with Judge Lynch, scheduling and other case issues | 1272.00 |
| 04/11/02 | Habibah Tamraz | Re-drafting of First Set of Interrogatories and First Request for Production of Documents and Things. | 180.00 |

| Invoice No.: | 888138 | | Page 2 |
| Re | | Quickie LLC v. Medtronics | |
| Matter No.: | 51822.010400 | | |

Description of Professional Services Rendered

| 04/12/02 | Denise . Alexander | Order patent file history for #6066160 for Todd Sharrin. | 48.00 |
|---|---|---|---|
| 04/12/02 | Todd S. Sharinn | Telephone call with Mark Evens regarding status and strategy (.4). | 126.00 |
| 04/12/02 | Eli Weiss | Reviewing Quickie Patent 6,066,160 and device of Medtronics | 2625.00 |
| 04/15/02 | Todd S. Sharinn | Legal research regarding Judge Lynch (.6); telephone call from opposing counsel regarding preparing scheduling order (.2); confer with Eli Weiss regarding Medtronic device and complaint and exhibits thereto (.2); letter to opposing counsel (.1). | 546.50 |
| 04/15/02 | Eli Weiss | Studying Quickie patent No. 6,066,160 and device of Medtronics | 3468.75 |
| 04/16/02 | Todd S. Sharinn | Conference with Paul Sutton and Bill Todd regarding strategy for case management plan (.7); telephone conference with opposing counsel regarding case management plan and protective order (.4); letter to opposing counsel regarding same (.3). | 441.00 |
| 04/16/02 | William G. Todd | Attend meeting with P. Sutton and T. Sharinn; outline pre-trial schedule, prepare file memorandum. | 500.00 |
| 04/16/02 | Eli Weiss | Reviewing claims of patent No. 6,066,160, device of Medtronics, and claim chart | 2062.50 |
| 04/22/02 | Scott J. Bornstein | Review complaint and patent-in-suit; preparation of litigation notebook. | 525.00 |
| 04/24/02 | William G. Todd | Initial preparation of written discovery requests. | 500.00 |
| 04/25/02 | Todd S. Sharinn | Review and respond to letter from opposing counsel regarding proposed schedule and various pre-conference issues (.3); review Answer filed by Medtronic (.4); confer with Alan Fell (.2); telephone call from Dr. Colvin regarding status and strategy (.2); confer with Bill Todd regarding interrogatories (.3). | 441.00 |
| 04/26/02 | Todd S. Sharinn | Confer with Bill Todd and Paul Sutton regarding conference/hearing (.2); legal research regarding assignee estoppel doctrine and applicability to present circumstances (.6); travel to and attend conference/hearing (3.9). | 1480.50 |
| 04/26/02 | William G. Todd | Review '160 patent specification and claims; prepare interrogatories and document requests. | 3000.00 |
| 04/29/02 | Scott J. Bornstein | Attend meeting with W. Todd and T. Sharinn; conduct infringement analysis to determine which claims to assert; review prior art patent. | 700.00 |
| 04/29/02 | Todd S. Sharinn | Legal research regarding Defendant's possible arguments as indicated during the April 16, 2002 conference (1.7); conference with Bill Todd and Scott Bornstein regarding status and strategy (1.2); review PTO wrapper (.9); review file correspondence with Medtronic (.3); review prior art patent (.4). | 1291.50 |
| 04/29/02 | Paul J. Sutton | Consideration of argument re disclosure of invasive versus stand-alone external re infringement; conference with T. Sharinn re same. | 265.00 |
| 04/29/02 | William G. Todd | Attend meeting with T. Sharinn and S. Bornstein; formulate infringement strategy; identify presently asserted claims. | 1000.00 |
| 04/30/02 | Todd S. Sharinn | Confer with Bill Todd regarding status and strategy (.3); telephone calls with opposing counsel regarding Markman hearing (.3); prepare request for admissions and interrogatories (1.2). | 567.00 |

Invoice No.:    888138                                                    Page 3
Re:             Quickie LLC v. Medtronics
Matter No.:     51822.010400

Description of Professional Services Rendered

Total Fees:          $ 25,474.25

DUPLICATE COPY

GT 0015202

Invoice No.:    900854                                                     Page  1
Re              Quickie LLC v. Medtronics
Matter No.:     51822.010400

## Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 05/01/02 | Todd S. Sharinn | Prepare requests for admission (4.2); telephone calls and exchange correspondence with opposing counsel (.6); prepare first set of interrogatories (.6). | 5.40 | 1701.00 |
| 05/01/02 | William G. Todd | Review and index file history for U.S. Patent No. 6,066,160; supplement Requests for Admissions. | 2.00 | 1000.00 |
| 05/02/02 | Scott J. Bornstein | Review specification of '160 patent for language supporting asserted claims; review draft requests for admissions; pursue strategy with T. Sharinn. | 2.50 | 875.00 |
| 05/02/02 | Todd S. Sharinn | Prepare requests for admissions (6.4); confer with W. Todd regarding status and strategy (.2); review and revise interrogatories (.3). | 6.90 | 2173.50 |
| 05/03/02 | Todd S. Sharinn | Review and revise admissions (.9); telephone calls from opposing counsel regarding stipulation and protective order (.4); review and revise proposed protective order (1.6); confer with W. Todd and S. Bornstein regarding status and strategy (.4); prepare interrogatories and request for documents and things (2.4). | 5.70 | 1795.50 |
| 05/03/02 | Paul J. Sutton | Receipt and review of proposed Protective Order to be used to govern the parties' confidential documents. | 0.60 | 318.00 |
| 05/03/02 | William G. Todd | Attention to pre-trial discovery matters; formulate strategic plan (claim construction issues); related consultations with T. Sharinn and S. Bornstein. | 2.00 | 1000.00 |
| 05/06/02 | Todd S. Sharinn | Review and revise Protective Order (1.2); legal research regarding opposing counsel (.4); review and revise interrogatories (.4); review and revise admissions (.4); review and revise document requests (.5); telephone calls with opposing counsel regarding scope of case and protective order (.6); prepare new proposed protective order (2.3); legal research (1.2). | 7.00 | 2205.00 |
| 05/06/02 | William G. Todd | Review and redraft written discovery requests, principally Rule 36 requests for admissions; attention to Protective Order issues; related consultations with T. Sharinn and S. Bornstein; finalize index for '160 file history. | 1.50 | 750.00 |
| 05/07/02 | Denise . Alexander | Faxed letter to opposing counsel. | 0.40 | 64.00 |
| 05/07/02 | Scott J. Bornstein | Review draft requests for admissions. | 0.10 | 35.00 |
| 05/07/02 | Todd S. Sharinn | Legal research (2.6); prepare protective order (2.9); review and revise requests for admissions (.4); review and revise document requests (.4); review and revise interrogatories (.3); telephone calls with opposing counsel regarding protective order, and establishing methods of service and communication (.4); letter to opposing counsel (.5). | 7.50 | 2362.50 |

GT 0015207

Invoice No.:    900854                                                            Page 2
Re:             Quickie LLC v. Medtronics
Matter No.:     51822.010400

Description of Professional Services Rendered

| 05/08/02 | Todd S. Sharinn | Confer with William Todd (.2); legal research regarding discovery in Markman proceedings (1.6); prepare second set of interrogatories (.7); letter to opposing counsel (.1). | 2.60 | 819.00 |
|---|---|---|---|---|
| 05/10/02 | Todd S. Sharinn | Legal research and strategy (1.2). | 1.20 | 378.00 |
| 05/13/02 | Todd S. Sharinn | Legal research regarding docket and status of case (.6); confer with Judge's clerk (.3). | 0.90 | 283.50 |
| 05/14/02 | Todd S. Sharinn | Review and respond to letter from opposing counsel (.3); review outline response to Defendant's Request for Documents and Things, Interrogatories and Requests for Admissions (2.6). | 2.90 | 913.50 |
| 05/14/02 | William G. Todd | Review Medtronic's written discovery requests; related consultation with T. Sharinn. | 0.50 | 250.00 |
| 05/15/02 | Todd S. Sharinn | Confer with Bill Todd regarding responses to Defendant's requests, etc. (.3); prepare responses to Defendant's requests, etc. (3.7); review Judge Lynch's rules (.4); telephone call with clerk to Judge Lynch regarding scheduling issues and issues regarding dispute over protective order (.3); telephone call with Alan Fell (.2); telephone call to Steve Colvin and Gene Grossi (.1); confer with Jenifer Shahan and Habibah Tamraz regarding production of documents (.2). | 5.20 | 1638.00 |
| 05/16/02 | Scott J. Bornstein | Review and revise draft discovery requests. | 0.50 | 175.00 |
| 05/16/02 | Jenifer T. Shahan | Discussion of manner of production work to be done, e.g., what codes to be used in flag/pull of documents, with paralegal and fellow associate. Receipt and response re: production of documents with paralegal to determine codes used in production. Various emails during the day with assistant and para re: documents and file. | 0.80 | 204.00 |
| 05/16/02 | Todd S. Sharinn | Telephone call with A. Katz (.1); review letter from counsel regarding protective order (.1); telephone call with opposing counsel regarding protective order and various discovery issues (.4). | 0.60 | 189.00 |
| 05/16/02 | William G. Todd | Attention to discovery matters (claim construction); review incoming correspondence; related consultations with T. Sharinn. | 0.50 | 250.00 |
| 05/17/02 | Ann Marie D'Isiria | Meeting with T. Sharin and J. Shahan re: upcoming production | 0.25 | 35.00 |
| 05/17/02 | Jenifer T. Shahan | Call into paralegal for meeting with Todd Sharinn re: document review/production. Meeting with T Sharinn concerning scope and instructions as to document production; follow up with paralegal as to timing and what order production will follow. Discussion with Assistant re: copying of materials for review. (1.2) Follow up with paralegal concerning work and timing of production; deadline check with Lead Associate on matter. (.4) Quick discussion with fellow associate concerning work needed on project. (.2) | 1.80 | 459.00 |

| Invoice No.: | 900854 | | | Page 2 |
| Re: | Quickie LLC v. Medtronic | | | |
| Matter No. | 51822.010400 | | | |

Description of Professional Services Rendered

| 05/17/02 | Todd S. Sharinn | Organize plaintiff's document production (.6); confer with Jenifer Shahan and Ann Marie D'Istria (.2). | 0.80 | 252.00 |
|---|---|---|---|---|
| 05/20/02 | Jenifer T. Shahan | Make arrangements with assistant regarding files for review; forward information and instructions to fellow associate. | 0.40 | 102.00 |
| 05/20/02 | Todd S. Sharinn | Confer with opposing counsel (.6). | 0.60 | 189.00 |
| 05/21/02 | Jenifer T. Shahan | Receipt and review of instructions from assistant regarding CD; follow up with associate concerning time and availability of work on project. Review of instructions from Lead Associate on project. | 0.40 | 102.00 |
| 05/21/02 | Todd S. Sharinn | Preparation of responses to Defendant's requests (1.3). | 1.30 | 409.50 |
| 05/22/02 | Jenifer T. Shahan | Discussion with and explanation of project with summer associate concerning production work needed and time to be spent on it (examine her experience with prosecution, Markman hearings, etc.). Follow up with assistant concerning TSharinn's instructions to hold on matter until his return. (.7) Various follow up emails throughout the day concerning timing and coordination of efforts. (.2) | 0.90 | 229.50 |
| 05/22/02 | Todd S. Sharinn | Preparation of responses to Defendant's requests (1.9). | 1.90 | 598.50 |
| 05/22/02 | William G. Todd | Prepare claim charts for '160 patent (claims 13 and 33). | 0.50 | 250.00 |
| 05/23/02 | Jenifer T. Shahan | Discuss matters of production and work to be done, order of, matters to be covered, considered, etc. with both paralegal and associate. (.5) Various emails and discussion with paralegal and associate concerning codes to be given in designation of documents through production review. Additional work with assistant arranging for copies of pleadings and other documents to be reviewed with assistant. (.6) Coordinate time of meeting with Senior Associate to discuss matter. (.3) | 1.40 | 357.00 |
| 05/24/02 | Jenifer T. Shahan | Brief discussion with summer concerning meeting to be had later in Day to discuss manner of review for documents, things to look for in consideration of purpose of Markman hearing. Review documents & things provided by Todd Sharinn very quickly to discern what materials are included. Various emails confirming meeting later with associate (next week). | 0.60 | 153.00 |
| 05/27/02 | Todd S. Sharinn | Review and revise proposed changes to protective order (1.0). | 1.00 | 315.00 |
| 05/28/02 | Jennifer H. Burdman | Preparation of documents in response to defendant's document request, including marking documents for privilege and relevance. | 4.00 | 740.00 |

Invoice No.:     900854                                                          Page  4
Re:              Quickie LLC v. Medtronic
Matter No.:      51822.010400

Description of Professional Services Rendered

| Date | Name | Description | Hours | Amount |
|---|---|---|---|---|
| 05/28/02 | Jenifer T. Shahan | Various emails coordinating time to analyze documents with summer associate. (.3)  Analysis and notes thereof of complaint, document requests (from Medtronic).  (.4) Review and analysis of documents for production pursuant to requests for production, as they relate to our complaint as filed and matters involved therewith (and in light of purpose of Markman hearing) with (temp) associate.  (1.0) | 1.70 | 433.50 |
| 05/29/02 | Jennifer H. Burdman | Preparation of documents in response to defendant's document request, including marking documents for  privilege and relevance. | 5.50 | 1017.50 |
| 05/29/02 | Jenifer T. Shahan | Review specification and drawings on morning commute into office. (.5)  Respond to email from associate working on review of documents.  (.2)  Review questions (via email) concerning document relevance/privilege from associate; respond to each question providing instructions for identification of documents in question. (1.0) | 1.70 | 433.50 |
| 05/29/02 | Todd S. Sharinn | Exchange e-mails with Scott Bornstein and William Todd (.2); confer with opposing counsel regarding protective order (.7). | 0.90 | 283.50 |
| 05/29/02 | William G. Todd | Review proposed Protective Order; research alternative forms. | 1.00 | 500.00 |
| 05/30/02 | Jennifer H. Burdman | Preparation of documents in response to defendant's document request, including marking documents for  privilege and relevance. | 1.00 | 185.00 |
| 05/30/02 | Jenifer T. Shahan | Additional questions addressed with associate reviewing the documents.  Follow up with paralegal concerning timing and possible final review of materials. | 0.50 | 127.50 |
| 05/31/02 | Jenifer T. Shahan | Various emails; discussion with associate concerning any other questions and any other items per her review.  Follow up on review of associate; certain items determined relevant; notes as to others; notice of certain privileged documents. (2.6). | 2.60 | 663.00 |
| 05/31/02 | William G. Todd | Assemble litigation notebook; revisit Medtronic's discovery requests (interrogatories, documents, admissions). | 1.00 | 500.00 |

|  |  | Total Time: | 89.05 |  |
|  |  | Total Fees: |  | $ 27,714.50 |

GT 0015210

Invoice No.:    911671                                                      Page 1
Re:             Quickie LLC v. Medtronic
Matter No.:     51822.010400

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | AMOUNT |
|------|-----------|-------------|--------|
| 06/03/02 | Jenifer T. Shahan | Finish up quick coverage of production from Alan Fell's materials.(.2) Discuss status of production with TSharinn & later with associate concerning later discussions/meeting to be had. (.3) | 127.50 |
| 06/04/02 | Jennifer H. Burdman | Prepare documents for production in response to request by defendant (Markman hearing). | 277.50 |
| 06/04/02 | Jenifer T. Shahan | Brief discussion with associate concerning production. (.2) Meeting with TSharinn and associate concerning manner of progress and future work needed to be accomplished. (.5) Follow up with summer Associate concerning what items I will be reviewing. (.2)  Begin review of additional materials in company files. (1.0) Continue with review of work concerning materials in Quickie's own files; come across several materials concerning/regarding prosecution. Notes made concerning certain documents and producibility of such.  Additional notes made.  Materials (flags).  Compare documents to documents in 160 patent; refer to patent at several aspects for determination of relevance.  Provide materials to TSharinn with note to discuss questions at later time. (2.7) | 1020.00 |
| 06/05/02 | Jennifer H. Burdman | Evaluate and prepare documents and CDs for possible document production in Markman hearing. | 277.50 |
| 06/05/02 | Jenifer T. Shahan | Discuss matters of files & organization with assistant.  Arrange discussion with TSharinn. | 127.50 |
| 06/06/02 | Jenifer T. Shahan | Review files for documents to be disclosed in discovery. (.8) Discuss other materials and organization done by summer associate. (.5) Additional discussions with TSharinn concerning matters of disclosure (.3) ; follow up with paralegal concerning when will send to copier for replication. (.4) | 510.00 |
| 06/07/02 | Jenifer T. Shahan | Discussion of materials needed to be disclosed with TSharinn as well as items to be included in privilege log. | 102.00 |
| 06/07/02 | Todd S. Sharinn | Review Defendant's objections to discovery requests (.8); telephone calls with local counsel regarding protective order and Defendant's objections to discovery (.4); prepare documents for production (.4). | 504.00 |
| 06/07/02 | Paul J. Sutton | Receipt and review of Medtronic responses to Quickie's discovery requests: consideration of motion to compel/motion to strike Medtronic's pleadings; advice to T. Sharinn. | 424.00 |
| 06/10/02 | Jennifer H. Burdman | Evaluate information on CDs in preparation for document production in response to document request. | 92.50 |
| 06/10/02 | Jenifer T. Shahan | Go through files with assistant to determine what materials will be turned over per discovery (Markman hearing). (.2) Retrieve other materials from summer associate. (.5) Additional review of documents: notes made and categorization of materials to be discussed with Todd Sharinn at later date. (2.0) | 510.00 |
| 06/11/02 | Jennifer H. Burdman | Evaluate information contained on CDs in preparation for document production. | 185.00 |

GT 0015215

| Invoice No.: | 911671 | | Page 2 |
| Re: | Quickie LLC v. Medtronic | | |
| Matter No.: | 51822.010400 | | |

Description of Professional Services Rendered

| 06/11/02 | Jenifer T. Shahan | Review and notes of documents to review at later time with TSharinn. Check with assistant regarding instuctions for document production. Work with paralegal locating file history and other materials to be turned over. Various emails to group working on production (para's and TSharinn concerning final questions. (1.6) Continue with review while creating of privilege log. Begin drafting of privilege log. (1.8) Email certain questions regarding privileged documents to TSharinn. Resume additional review. (.6) | 892.50 |
| 06/11/02 | William G. Todd | Revisit Medtronic's Requests for Admissions; prepare summary memorandum; related consultations with T. Sharinn. | 500.00 |
| 06/12/02 | Edmund E. Christian | Prepare responses to interrogatories, requests for admissions and document requests. | 1325.00 |
| 06/12/02 | Jenifer T. Shahan | Various emails and checks with TSS concerning documents reviewed; production, etc. Arrange with paralegal those materials for bates stamping and production. Begin work/revisions on privilege log after consultation with BTodd on privilege; begin review of data into log. Continue coordination of matters for copying/production. Draft cover letter; forward to BTodd & TSS. Various emails and checks TSS & para. Continue review of materials for production; get materials on prior art together with para; Continue coordination of matters for copying/production. | 1377.00 |
| 06/12/02 | William G. Todd | Review and evaluate Medtronic's discovery responses; analyze Medtronic's written discovery requests (Interrogatories, Document Requests, Admissions); formulate responsive strategy; review selected production documents; outline schedule of privileged documents; related consultations with T. Sharinn, E. Christian and J. Shahan. | 1000.00 |
| 06/13/02 | Edmund E. Christian | Prepare responses to interrogatories, request for admissions and document requests. | 1855.00 |
| 06/13/02 | Jenifer T. Shahan | Work on production; continue drafting of privilege log. Check at various times during the day with BTodd concering matters of privilege. Various emails and checks with TSS concerning production; timing, etc. Work with paralegal managing materials for bates stamping and production to opposing counsel. Continue work on privilege log; consult with Word Processing for cost saving work; get paralegal to work on data entry. Continue coordination of matters for copying/production. Work on cover letter. | 1683.00 |
| 06/13/02 | Todd S. Sharinn | Confer with Jenifer Shahan regarding document production (.3); confer with Ed Christian regarding responses/objectives to outstanding discovery requests (.3); confer with Bill Todd regarding responses to requests for admissions (.4). | 315.00 |
| 06/13/02 | Habibah Tamraz | Entering description of documents for production into summation. | 60.00 |
| 06/13/02 | William G. Todd | Redraft Quickie's Responses to Medtronic's First Requests for Admissions | 1000.00 |
| 06/14/02 | Ann Marie D'Istria | Assist J. Shahan with Privilege Log corrections | 70.00 |

Invoice No.:    911671                                                  Page 3
Re:             Quickie LLC v. Medtronic
Matter No.:     51822.010400

Description of Professional Services Rendered

| 06/14/02 | Jenifer T. Shahan | Review emails and messages from TSharinn and paralegal working on production. Various discussions concerning matters of production, confidentiality and timing of production with both TSS & para. Call in to document production center on costs, timing, questions. Draft letter to opposing counsel; discuss such with TSS, edit and redraft. Email information for TSS & para. Arrange materials into folders for storage. Continue drafting in privilege log; various discussions with para throughout day re: production. Delivery of materials from production center; arrange and explain data entry into privilege log; additional and various emails/discussions throughout the day. | 969.00 |
| 06/14/02 | Todd S. Sharinn | Prepare responses to Defendant's requests for documents and things, requests for admission and interrogatories (3.5); review and revise privilege log and review documents withheld as privileged on log (1.6). | 1606.50 |
| 06/14/02 | William G. Todd | Additional redrafting of Quickie's responses to Medtronic's written discovery; related consultations with T. Sharinn. | 1000.00 |
| 06/17/02 | Jenifer T. Shahan | Review additional documents as directed by TSS; separate and designate certain documents as privileged. Email instructions, etc. to para for supplemental production. (2.0) Additional work reviewing and preparing documents to send to copy center for bates stamping and correlating them with the privileged documents they were attached to. (.6) Continue work (email/discussions) with paralegal providing instructions re: copying. Follow up with TSharinn concerning questions on productions. (.2) | 516.00 |
| 06/17/02 | Todd S. Sharinn | Review documents withheld as privileged and confer with Jenifer Shahan regarding handling of same (91.4); review documents produced by defendant (3.3); legal research in preparation of Markman Hearing (1.2). | 1858.50 |
| 06/18/02 | Jenifer T. Shahan | Follow up with paralegal concerning new documents for production; follow up to send data entry work to Summer Associate. (.5) Prepare necessary requests and additional materials re: summer work (on data entry) and make further arrangements. (.7) | 306.00 |
| 06/18/02 | Todd S. Sharinn | Prepare Markman brief and conduct legal research (2.6). | 819.00 |
| 06/19/02 | William G. Todd | Formulate strategy for claim construction brief; related consultations with T. Sharinn. | 500.00 |
| 06/20/02 | Todd S. Sharinn | Prepare Markman brief (1.8). | 567.00 |
| 06/20/02 | Jennifer L. Smith | Entered documents into a Privilege Log for Todd Sharinn. | 370.00 |
| 06/21/02 | Todd S. Sharinn | Prepare Markman brief (.9). | 283.50 |
| 06/25/02 | Jenifer T. Shahan | Follow up conversation with Todd Sharinn concerning status of case, possibility of settling case and summer associate's work on privilege log. | 102.00 |
| 06/30/02 | Todd S. Sharinn | Prepare Markman Brief (1.6). | 504.00 |
| 07/01/02 | Todd S. Sharinn | Prepare Markman brief and claim chart (7.1). | 2236.50 |
| 07/02/02 | Todd S. Sharinn | Prepare memorandum of claim construction and claim chart (7.2). | 2268.00 |
| 07/03/02 | Todd S. Sharinn | Prepare and file Markman brief and supporting exhibits and claim chart (9.4). | 2961.00 |
| 07/05/02 | Todd S. Sharinn | Review Medtronic Markman papers (4.1) | 1291.50 |

Invoice No.:        911671                                                            Page 4
Re                  Quickie LLC v. Medtronics
Matter No.:         51822.010400

Description of Professional Services Rendered

Total Fees:        $ 32,387.50

DUPLICATE COPY

GT 0015218

Invoice No.:        930770                                          Page  3
Re:                 Quickie LLC v. Medtronics
Matter No.:         51822.010400

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 08/01/02 | Scott J. Bornstein | Review and finalize reply memorandum; incorporate changes to memorandum proposed by M. Evens; discussions w/ W. Todd and T. Sharinn. | 4.00 | 1400.00 |
| 08/01/02 | Jennifer H. Burdman | Research regarding use of prior art as extrinsic evidence. | 2.00 | 370.00 |
| 08/01/02 | Todd S. Sharinn | Prepare insert to reply brief (.8); exchange e-mails with Bill Todd and Scott Bornstein (.3); finalize and arrange for filing and service of reply brief (.7); confer with Scott Bornstein and Willing Todd regarding changes to reply brief (.1). | 1.90 | 598.50 |
| 08/02/02 | Scott J. Bornstein | Case organization and administration. | 0.25 | 87.50 |
| 08/02/02 | Todd S. Sharinn | Confer with opposing counsel (.3); telephone call from clerk to Judge (.3); review papers filed by Medtronic in reply (.9). | 1.50 | 472.50 |
| 08/04/02 | William G. Todd | Review/analyze Medtronic's Reply Brief on Claim Construction Issues. | 0.50 | 250.00 |
| 08/05/02 | Todd S. Sharinn | Review judge's rules (.2); prepare letter to court requesting oral argument (.1). | 0.30 | 94.50 |
| 08/07/02 | Scott J. Bornstein | Review Medtronic's reply memorandum. | 1.50 | 525.00 |
| 08/08/02 | Paul A. Juergensen | Conference with Todd Sharinn and review files. | 0.50 | 75.00 |
| 08/08/02 | Todd S. Sharinn | Confer with Bill Todd and Scott Bornstein regarding strategy for oral argument (.2); confer with clerk to Judge Lynch regarding oral argument (.3); confer with Paul Juergensen regarding preparation for hearing (.2). | 0.70 | 220.50 |
| 08/09/02 | Todd S. Sharinn | Review Medtronic's reply papers (2.2); telephone conferences with Judge's chambers (.6); follow-up call with opposing counsel (.4). | 3.20 | 1008.00 |
| 08/13/02 | Todd S. Sharinn | Telephone call with client's office regarding oral argument (.2); confer with Bill Todd regarding hearing and preparation of argument (.1); telephone call with opposing counsel (.2); letter to opposing counsel (.2); telephone call with Alan Fell regarding status and strategy (.2). | 0.90 | 283.50 |
| 08/13/02 | William G. Todd | Office consulation with T. Sharinn. | 0.30 | 150.00 |
| 08/14/02 | Todd S. Sharinn | Legal research regarding Medtronic's argument (1.1). | 1.10 | 346.50 |
| 08/15/02 | Paul A. Juergensen | Pull cases cited in Medtronic Reply Brief. | 0.50 | 75.00 |
| 08/15/02 | Todd S. Sharinn | Legal research regarding arguments presented by Medtronic (2.4); telephone call with opposing counsel and Judge's clerk (.4); telephone call with Bill Todd and Mark Evans (.6). | 3.40 | 1071.00 |
| 08/15/02 | William G. Todd | Prepare for and conduct telephone conference with M. Evens and T. Sharinn. | 0.50 | 250.00 |
| 08/16/02 | Todd S. Sharinn | Prepare for oral argument (1.3). | 1.30 | 409.50 |
| 08/22/02 | Todd S. Sharinn | Prepare for hearing (1.4); legal research (1.0). | 2.40 | 756.00 |
| 08/23/02 | Todd S. Sharinn | Prepare for hearing (2.2). | 2.20 | 693.00 |
| 08/26/02 | Todd S. Sharinn | Prepare for hearing (1.8). | 1.80 | 567.00 |

GT 0015222

Invoice No.:    930770                                                          Page 2
Re:             Quickie LLC v. Medtronics
Matter No.:     51822.010400

Description of Professional Services Rendered

| 08/27/02 | Paul A. Juergensen | Pull additional cases and shepardize cases cited in Medtronic's Reply Brief on claim construction. | 2.00 | 300.00 |
| 08/27/02 | Todd S. Sharinn | Prepare for hearing (7.2). | 7.20 | 2268.00 |
| 08/27/02 | William G. Todd | Preparation for Markman hearing; related consultations with T. Sharinn. | 0.50 | 250.00 |
| 08/28/02 | Paul A. Juergensen | Organize files; preparation for Markman hearing; and prepare materials for binders. | 7.20 | 1080.00 |
| 08/28/02 | Todd S. Sharinn | Prepare for hearing (8.1). | 8.10 | 2551.50 |
| 08/28/02 | William G. Todd | Preparation for Markman hearing; related consultations with T. Sharinn. | 1.00 | 500.00 |
| 08/29/02 | Paul A. Juergensen | Further preparation for Markman hearing and preparation of binders; pull all cases cited in Markman Brief; prepare Table of Authorities; and conferences with Todd Sharinn. | 7.80 | 1170.00 |
| 08/29/02 | Todd S. Sharinn | Prepare for hearing (7.6). | 7.60 | 2394.00 |
| 08/29/02 | William G. Todd | Preparation for Markman hearing; related consultations with T. Sharinn. | 1.00 | 500.00 |
| 08/30/02 | Todd S. Sharinn | Prepare for hearing (7.1). | 7.10 | 2236.50 |
| 08/30/02 | William G. Todd | Preparation for Markman hearing; related consultations with T. Sharinn. | 1.00 | 500.00 |
| 08/31/02 | Todd S. Sharinn | Prepare for oral hearing (2.1). | 2.10 | 661.50 |
| 09/01/02 | Todd S. Sharinn | Prepare for hearing and telephone calls with Dr. Colvin and conference call with Bill Todd, Dr. Colvin and Mark Evens (2.7). | 2.70 | 850.50 |
| 09/02/02 | Todd S. Sharinn | Prepare argument and prepare for hearing (6.1). | 6.10 | 1921.50 |
| 09/03/02 | Scott J. Bornstein | Discussions with T. Sharinn re strategy for Markman hearing. | 0.25 | 87.50 |
| 09/03/02 | Paul A. Juergensen | Conferences with Todd Sharinn; prepare for Markman hearing including preparation of slides; exhibits, binders, etc.; take photographs of prototypes and prepare for production; and meet with Allan Katz regarding topics covered by proposed testimony. | 14.00 | 2100.00 |
| 09/03/02 | Todd S. Sharinn | Telephone calls with Judge's clerk (.3); telephone calls with opposing counsel (.2); letter to opposing counsel (.2); prepare for hearing (9.1); telephone call with M. Evens regarding status and strategy (.2); confer with Paul Sutton regarding argument (.4). | 10.40 | 3276.00 |
| 09/03/02 | William G. Todd | Preparation for Markman hearing; redraft direct testimony of A. Feld. | 2.00 | 1000.00 |
| 09/04/02 | Paul A. Juergensen | Further preparation for Markman hearing; conferences with Todd Sharinn; and attend Markamn hearing before Judge Lynch. | 8.00 | 1200.00 |
| 09/04/02 | Todd S. Sharinn | Prepare for, travel to and attend hearing before Judge Gerard E. Lynch (8.2). | 8.20 | 2583.00 |

Total Time:    135.00
Total Fees:              $ 37,133.00

| Invoice No.: | 942637 | Page 1 |
| Re.: | Quickie LLC v. Medtronics | |
| Matter No.: | 51822.010400 | |

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 09/03/0? | Paul J. Sutton | Meeting with T. Sharinn and preparation for September 4 Markman hearing. | 0.70 | 371.00 |
| 09/05/0? | Paul A. Juergensen | Proof and revise Markman hearing slides and prepare set for Judge and opposing counsel. | 1.20 | 180.00 |
| 09/05/0? | Todd S. Sharinn | Telephone call with Judge's clerk (.2); prepared extra set of exhibits for Judge and opposing counsel (.2); letter to judge (.2). | 0.60 | 189.00 |
| 09/11/0? | Paul A. Juergensen | Review and update all files and create additional files. | 4.00 | 600.00 |
| 09/12/0? | Paul A. Juergensen | Review and update files. | 2.80 | 420.00 |

|  | Total Time: | 9.30 | |
|  | Total Fees: | | $ 1,760.00 |

DUPLICATE COPY

GT 0015228

Invoice No.:    961002
Re              Quickie LLC v. Medtronics                          Page  1
Matter No.:     51822.010400

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 10/16/02 | Paul A. Juergensen | Prepare files for transfer to Thelen Reid & Priest; conferences with Todd Sharinn; telephone conference with Shari Savitt; and letters to Shari Savitt regarding same. | 3.30 | 495.00 |

|  |  |  | Total Time: | 3.30 |  |
|  |  |  | Total Fees: |  | $ 495.00 |

DUPLICATE COPY

# EXHIBIT AS



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,460 | 11/25/2002 | 6066160 | 034521-003 | 3789 |

and 90/007085

50086    7590    07/07/2008

LAW OFFICE OF DAVID H. JUDSON
15950 DALLAS PARKWAY
SUITE 225
DALLAS, TX 75248

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 07/07/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| Office Action in Ex Parte Reexamination | Control No.<br>90/006,460 and 90/007085 | Patent Under Reexamination<br>6066160 |
|---|---|---|
| | Examiner<br>Julian W. Woo | Art Unit<br>3773 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a ☒ Responsive to the communication(s) filed on <u>22 April 2008</u> .    b ☒ This action is made FINAL.
c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.
2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-34* are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☒ Claims *26 and 30* are patentable and/or confirmed.

4. ☒ Claims *1-25, 27-29 and 31-34* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____ .

   5☐ been received by the International Bureau in PCT application No. _____ .

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
   matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D.
   11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

Application/Control Number: 90/006,460 and
90/007,085
Art Unit: 3773

## DETAILED ACTION

### *Reexamination*

1.    The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 6,066,160 throughout the course of this reexamination

proceeding.  See MPEP §§ 2207, 2282 and 2286.

### *Claim Rejections - 35 USC § 102*

2.    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

3.    Claims 1-12, 32, and 34 are rejected under 35 U.S.C. 102(b) as being anticipated

by Emery (3,988,810).  Emery discloses, in the figures, a suture securing apparatus

comprising an apparatus body having an upper surface (e.g., at 26), a lower surface

(23); a first internal surface (at 25); a second internal surface (at 24) at an acute angular

narrowing (with respect to the axis running along the suture shown in figure 3 or 7), an

outer surface (27 or 28), first and second apertures that are mirror images of each other

(see fig. 7), and an integral locking means comprising at least one ridge (30 or 41),

where each aperture has longitudinal and latitudinal axes (located along and/or between

the first and second internal surfaces) facilitating longitudinal and latitudinal directions

for a suture (T), where each aperture has a length, where at least a portion of the

locking means extends along the length of an aperture (rather than the *entire* length of

an aperture), where each ridge is formed of a rigid, biocompatible NYLON material (see

col. 1, lines 19-23, for its use in wearing apparel, and col. 3, lines 9-11) and has a

rounded surface farthest from the aperture surface (see figures 3 and 4), where each

ridge is formed at an angle greater than about 30 deg. or at an angle of about 45 deg.

(see col. 2, lines 9-15).  Moreover, the introductory statement of intended use (for

"suture securing") has been carefully considered but deemed not to impose any

structural limitations on the claims patentably distinguishable over Emery's device,

which is capable of being used as claimed if one desires to do so.


4.    Claims 13 and 18-21 are rejected under 35 U.S.C. 102(b) as being anticipated by

Richardson (1,243,105).  Richardson discloses, in figures 2-4 and 6, a suture securing

apparatus with an apparatus body having an upper surface (left side of the body as

viewed in fig. 6), a lower surface (right side of the body as viewed in fig. 6), an outer

surface (e.g., at 18), first and second apertures (a) each with a longitudinal axis and

upper, middle and lower portions as claimed; and first and second movable, serrated

cam members (10a) captured in the middle portion of each of the first and second

apertures; where each cam member has an engagement end and a rotation end (at 12)

or rounded portion, the rotation end being wider than the widths of the upper (14) and

lower (13) portions of the aperture; where a cavity of an aperture has a rounded portion

(13) cooperating with the rounded portion of the cam member and includes a retaining

wall (to the left or right of 13 as viewed in fig. 2); where each cam member moves to an

unengaged position (with a suture) in a first longitudinal direction and an engaged

Application/Control Number: 90/006,460 and
90/007,085
Art Unit: 3773

Page 4

position in a second longitudinal direction; and where the first and second apertures and

the first and second cam members are mirror images of each other. Moreover, the

introductory statement of intended use (for "suture securing") has been carefully

considered but deemed not to impose any structural limitations on the claims patentably

distinguishable over Richardson's device, which is capable of being used as claimed if

one desires to do so.

5.      Claim 33 is rejected under 35 U.S.C. 102(b) as being anticipated by Creager

(536,684). Creager discloses, in the figures, a suture securing apparatus with an

apparatus body (A), first and second apertures (F) each with a longitudinal axis and a

cavity (J), and first and second movable cam members (B) in the apertures; where the

first and second apertures and the first and second cam members are mirror images of

each other, as defined by a mirror plane equidistant from them.   Moreover, the

introductory statement of intended use (for "suture securing") has been carefully

considered but deemed not to impose any structural limitations on the claims patentably

distinguishable over Creager's device, which is capable of being used as claimed if one

desires to do so.

### Claim Rejections - 35 USC § 103

6.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and

Application/Control Number: 90/006,460 and
90/007,085
Art Unit: 3773

Page 5

the prior art are such that the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.  Determining the scope and contents of the prior art.
2.  Ascertaining the differences between the prior art and the claims at issue.
3.  Resolving the level of ordinary skill in the pertinent art.
4.  Considering objective evidence present in the application indicating obviousness or nonobviousness.

7.  Claims 14-17, 22, and 23 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Richardson (1,243,105) in view of Plante (5,070,805). Richardson

discloses the invention substantially as claimed, where the invention can be "used in

various ways" as chosen by a user. However, Richardson does not disclose that the

middle portion of the aperture comprises ridges, and that the apparatus is made from

elastic, rigid, biocompatible, or biodegradable materials. Plante teaches a suture

securing apparatus, in col. 1, lines 35-42, where, depending on the application for the

apparatus, the apparatus can be made of cast metal or plastic. In figures 2 and 3,

Plante teaches a middle portion of an aperture that has ridges (48). Plante also

teaches, in figure 3, that the apparatus is attached to an unspecified surface (53). Thus,

it would have been obvious to one having ordinary skill in the art at the time the

invention was made to form the apparatus, or parts thereof, from materials as claimed,

since it has been held to be within the general skill of a worker in the art to select a

known material on the basis of its suitability for the intended use as a matter of obvious

Application/Control Number: 90/006,460 and                                    Page 6
90/007,085
Art Unit: 3773

design choice. In other words, one of ordinary skill in the art would choose a metal or

plastic that is elastic, rigid, biocompatible, or biodegradable according to the intended

purpose of the device, and because the devices of Richardson and Plante are

manipulable by or exposed to humans or animals (i.e., the devices cannot be irritating to

tissues). It also would be obvious to one having ordinary skill in the art at the time the

invention was made, in view of Plante, to includes ridges in the middle portion of an

aperture of the device of Richardson. Such ridges would aid in the better securement of

a suture retained by Richardson's device.

8.      Claims 24, 25, and 27 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Emery (3,988,810) in view of Samuels et al. (3,976,079). Emery

discloses the invention substantially as claimed, but does not disclose a medical

prosthesis device in physical contact or engagement or integrally formed with the suture

securing apparatus. Samuels et al. teach, in figures 3 and 9, a suture securing

apparatus (34) for temporary, physical contact or engagement or integral formation with

a medical prosthesis device (40). It would have been obvious to one having ordinary

skill in the art at the time the invention was made to modify the apparatus of Emery, so

that it is applied with the medical prosthesis device of Samuels et al. The apparatus of

Emery would conveniently allow quick suture securement to the prosthesis device (and

quick release of the suture from prosthesis device) with the advantage of a one-piece

design, where there are no additional parts to operate or lose as in the device of

Samuels et al.

Application/Control Number: 90/006,460 and .
90/007,085
Art Unit: 3773

Page 7

9.    Claims 28, 29, and 31 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Richardson (1,243,105) in view of Samuels et al. (3,976,079).

Richardson discloses the invention substantially as claimed, where the invention can be

"used in various ways" as chosen by a user.   Moreover, Richardson discloses that

"further or others uses and modifications of the device in detailed construction or

otherwise will suggest themselves to the skilled mechanic, and the invention may be

changed or modified in details or design."   However, Richardson does not disclose that

the apparatus contacts or engages a medical prosthesis device.  Samuels et al. teach,

in figures 3 and 9, a suture securing apparatus (34) for temporary, physical contact or

engagement or integral formation with a medical prosthesis device (40).  It would have

been obvious to one having ordinary skill in the art at the time the invention was made

to modify the apparatus of Richardson, so that it is applied with the medical prosthesis

device of Samuels et al.  The apparatus of Richardson would conveniently allow quick

suture securement to the prosthesis device (and quick release of the suture from

prosthesis device) with the advantage that the Richardson apparatus does not have

additional small parts that can be lost during use as in the device of Samuels et al.

### Patentable and/or Confirmed Subject Matter

10.    Claims 26 and 30 are patentable and/or confirmed.

11.    The following is a statement of reasons for the indication of patentable and/or

confirmed subject matter:  None of the prior art of record, alone or in combination

discloses a securable medical prosthesis device comprising a securable medical

prosthesis device with, inter alia, a medical prosthesis device and a suture securing

apparatus comprising an apparatus body having an upper surface, a lower surface, a

first internal surface, a second internal surface, an outer surface, at least one aperture,

and a movable cam member or a locking means comprising at least one ridge; and

where the medical prosthesis device is a sewing ring implant.

### *Response to Arguments*

12.    Applicant's arguments filed on April 21, 2008 have been fully considered but they

are not persuasive. The Examiner's response to arguments with respect to each ground

is presented below.

Ground 1.  The Requester contends that Emery "does not disclose or suggest a

'suture securing apparatus,'" that the preambular use of the word "suture," among other

characterizations by the Requester, defines the apparatus's primary use in the medical

arts or with "medical sutures, " and that Emery does not teach or suggest medical use

for his apparatus.  The Examiner disagrees.  As the Requester has pointed out and as

Emery states, Emery's apparatus is "not limited to use on wearing apparel."  Emery's

apparatus is for use with "cord," which includes "elongate articles," such as "cords,

cables, ropes."  Suture is an elongate article.  Furthermore, Merriam-Webster's

Collegiate Dictionary, 10th edition, defines "cord" to be "a long slender flexible material

usu. consisting of several strands (as of thread or yarn) woven or twisted together."

Even the Requestor has stated that suture, for example, may include "stranded

stainless steel."   Such "stranded stainless steel" also meets the definition of "cord."

Therefore, suture can be defined as a type of cord.  In short, Emery indeed discloses a

securing apparatus for suture, and the claim statements regarding the intended, medical

use of the device do not impose any structural limitations on the claims patentably

distinguishable over Emery's device, which is capable of being used as claimed.

The Requester also contends that Emery's device does not have "internal

surfaces" as claimed and that the aperture of Emery's device does not have

"longitudinal and latitudinal axes." Respectfully, the Requestor has mischaracterized

the Examiner's' position that was set forth in the Office action February 21, 2008. The

Examiner cited "internal surfaces" to be "*at* 25" and "*at* 24." That is, the "internal

surfaces" are the surfaces (exposed to the apertures) of the internal structures labeled

as "25" and "24" in the figure. (The Examiner understands that "drawing surfaces in the

figure" are not representative of actual or "true surfaces.") The Examiner only pointed

out that the "internal surfaces" are about or "at" elements 25 and 24 in the figure.

Moreover, the aperture and the movement of a cord within the aperture are

indeed defined with respect to "longitudinal and latitudinal axes." That is, the aperture is

a three-dimensional structure defined by three orthogonal axes, and the "V-shaped"

construction of the aperture has at least a longitudinal component or dimension and a

latitudinal component. Also, the vector of movement of a cord within the aperture also

has these components. Thus, Emery indeed discloses the structure as claimed.

Ground 2. The Requester contends that Richardson "does not disclose or

suggest a 'suture securing apparatus,'" that the preambular use of the word "suture,"

among other characterizations by the Requester, defines the apparatus's primary use in

the medical arts or with "medical sutures, " and that Richardson does not teach or

suggest a medical application for his apparatus. On the contrary, Richardson discloses

that his apparatus is applicable to "flexible cord or similar tying or holding element."

Again, suture is indeed a type of cord, and suture certainly is a tying or holding element.

In short, Richardson indeed discloses a suture securing apparatus, and the claim

statements regarding the intended, medical use of the device do not impose any

structural limitations on the claims patentably distinguishable over Richardson's device,

which is capable of being used as claimed.

Moreover, Richardson indeed discloses an aperture with upper and lower

portions, where the "rotation end" of a "movable cam member" has a width wider than

upper and lower portions of the aperture.  The upper and lower portions of the aperture

include, respectively, openings 14 and 13 as shown in figure 2.

Ground 3. The Requester contends that Creager "does not disclose or suggest a

'suture securing apparatus,'" that the preambular use of the word "suture," among other

characterizations by the Requester, defines the apparatus's primary use in the medical

arts or with "medical sutures, " and that Creager does not teach or suggest a medical

application for his apparatus.  On the contrary, the ENCARTA World English Dictionary

includes, in its definition of "suture":  "a piece of material used to close a wound or

connect tissues, e.g. catgut, thread, or wire."  That is, suture can be defined as "wire,"

or stranded metal as the Requester has suggested.  Creager discloses that his

apparatus is usable with "wires" or specifically, wires that are conductive of electricity--

likely to be metallic wires, even stranded metal.  Thus, Creager's device indeed is a

securing apparatus applicable to suture, and the claim statements regarding the

intended, medical use of the device do not impose any structural limitations on the

claims patentably distinguishable over Creager's device, which is capable of being used as claimed. . Also, wires are movable through the apertures of Creager. This movement can be characterized as threading.

Moreover, Creager's device indeed allows for cam member movement between engaged and unengaged positions, where suture is moved or threaded through an aperture in a first longitudinal direction for engagement with or locking by the cam member and a second longitudinal direction for disengagement with or release from the cam member.

Ground 4.   The Requester contends that Richardson and Plante have nothing to do with medical sutures.  As argued above, Richardson indeed is applicable to sutures, and Richardson discloses the invention substantially as claimed.  Plante's device is within the same, analogous art as Richardson's device (the art of securing cords and ropes), and Plante offers teachings regarding the materials and structural features used to form a securing apparatus.  Regarding materials for the devices, for example:  One of ordinary skill would choose a biocompatible material to form either of the devices of Richardson and Plante, since the devices are exposed to human bodies.  And since a device can be rendered biocompatible, it can have a medical application or be used with medical sutures.  Thus, Richardson and Plante were combined to arrive at the invention as claimed, and a prima facie of obviousness was presented in the Office action.

Ground 5.   The Requester contends that Emery and Samuels do not suggest the subject matter of claim 1. On the contrary and as argued above, Emery indeed is applicable to medical sutures, and Emery discloses the invention substantially as

claimed. The device of Samuels is within the same, analogous art as Emery's device

(the art of securing cords), and Samuels offers teachings regarding medical prosthesis

device used with a suture securing apparatus. Thus, Emery and Samuels were

combined to arrive at the invention as claimed, and a prima facie of obviousness was

presented in the Office action.

Ground 6. The Requester contends that Richardson and Samuels do not

suggest the subject matter of claim 13. On the contrary and as argued above,

Richardson indeed is applicable to medical sutures, and Richardson discloses the

invention substantially as claimed. The device of Samuels is within the same,

analogous art as Richardson's device (the art of securing cords), and Samuels offers

teachings regarding medical prosthesis device used with a suture securing apparatus.

Thus, Richardson and Samuels were combined to arrive at the invention as claimed,

and a prima facie of obviousness was presented in the Office action.

The Requester further contends that the invention produced an "unexpected

result" in securing suture and that the result was not predictable in view of Emery,

Richardson, Plante, Samuels, or combinations thereof. The Requester is reminded that

it is well-settled that a patent cannot be granted for the discovery of a result, even

though it may be unexpectantly good, which would flow logically from the teachings of

the prior art. As shown in the Office action and as argued above, the securement of

suture, as claimed, flows logically from the teachings of Emery, Richardson, Plante,

Samuels, or combinations thereof.

Application/Control Number: 90/006,460 and                                    Page 13
90/007,085
Art Unit: 3773

Finally, the Requestor contends that the prior art cited above (except for

Samuels) is "non-analogous" to the art of the invention. The Requester is reminded that

the determination that a prior art reference is from a non-analogous art is twofold. First,

the Office decides if the reference is within the field of inventor's endeavor. If it is not,

the Office proceeds to determine whether the reference is reasonably pertinent to the

particular problem with which the inventor was involved. In this case, the Examiner

posits that Emery, Richardson, Plante, and Samuels are within the same, analogous

art—the art of securing elongated, flexible articles, such as cords, ropes, wires, and

sutures. Although Emery, Richardson, and Plante may not explicitly teach or suggest

medical use for their devices, these references are indeed reasonably pertinent to the

particular problem with which the inventor was involved (i.e., the securement of suture).

### *Conclusion*

13.    **THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire TWO (2)

MONTHS from the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination**

**proceedings**. The provisions of 37 CFR 1.136 apply only to "an applicant" and not to

parties in a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR

1.550(a), it is required that reexamination proceedings "will be conducted with special

dispatch within the Office."

Application/Control Number: 90/006,460 and                              Page 14
90/007,085
Art Unit: 3773

Extensions of time in reexamination proceedings are provided for in 37
CFR 1.550(c). A request for extension of time must be filed on or before the day on
which a response to this action is due, and it must be accompanied by the petition fee
set forth in 37 CFR 1.17(g). The mere filing of a request will not effect any extension of
time. An extension of time will be granted only for sufficient cause, and for a reasonable
time specified.

The filing of a timely first response to this final rejection will be construed as
including a request to extend the shortened statutory period for an additional month,
which will be granted even if previous extensions have been granted. In no event
however, will the statutory period for response expire later than SIX MONTHS from the
mailing date of the final action. See MPEP § 2265.

14.    Any inquiry concerning this communication or earlier communications from the
Examiner should be directed to Julian W. Woo whose telephone number is (571) 272-
4707. The examiner can normally be reached Mon.-Fri., 7:00 AM to 3:00 PM Eastern
Time, alternate Fridays off.

If attempts to reach the examiner by telephone are unsuccessful, the Examiner's
supervisor, Jackie Ho can be reached on (571) 272-4696. The fax phone number for
the organization where this application or proceeding is assigned is (571) 273-8300.

Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system. Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.

Application/Control Number: 90/006,460 and
90/007,085
Art Unit: 3773

Page 15

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).


/Julian W. Woo/
Primary Examiner, Art Unit 3773

Conferees:

/(Jackie) Tan-Uyen T. Ho/
Supervisory Patent Examiner, Art Unit 3773

/Darwin P. Erezo/
Primary Examiner, Art Unit 3773

July 6, 2008

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

DANIEL W. LATHAM

MEDTRONIC, INC.

710 MEDTRONIC PKWY, NE MS-LC 340

MINNEAPOLIS, MN 55432

## *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO  90/006460

PATENT NO.  6,066,160

ART UNIT  3773

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

KENNETH L. CAGE

McDERMOTT, WILL & EMERY, LLP

600 13th STREET, N.W.

WASHINGTON, DC 20005-3095

## *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO  90/007085

PATENT NO.  6,066,160.

ART UNIT    3773

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).