UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————

**QUICKIE, LLC,**

      Plaintiff,    07 Civ. 10331 (RMB) (DFE)
                 ECF CASE

  -against-

**GREENBERG TRAURIG, LLP,**

      Defendant.
—————————————————————————

**GREENBERG TRAURIG'S**
**MEMORANDUM IN SUPPORT**
**<u>OF MOTION FOR SUMMARY JUDGMENT</u>**

POLLACK & KAMINSKY
 Martin I. Kaminsky  (MK 3033)
 Justin Y. K. Chu  (JC7810)
114 West 47th Street
New York, New York 10036
 Tel No. (212) 575-4700
 Fax No. (212) 575-6560

*Attorneys for Defendant*
 *Greenberg Traurig LLP*

July  22, 2008

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................... 1

SUMMARY OF THE MOTION ................................................................. 1

STATUS OF THE CASE ........................................................................ 4

    BACKGROUND FACTS ...................................................................... 5

        Quickie and the Subject Patent ........................................................ 5

        The Law Firm's Vis-à-vis the '160 Patent ........................................... 5

        Quickie's Knowledge that the Maintenance Fee Would Be Owing.................. 6

        GT's Calendaring of the Due Dates for the Maintenance Fee.......................... 6

        Quickie's License with Medtronic and Lawsuit Against Medtronic................... 7

        Quickie's Initial Replacement of GT with Thelen as to the '160 Patent............7

        The Medtronic Reexamination Proceeding …………………………………..…9

        Quickie's Final Replacement of GT with Thelen as to the '160 Patent............ 10

        Thelen's Failure As to the Maintenance Fee and the Loss of the '160 Patent......14

        Quickie's Unsuccessful Petition to Revive the '160 Patent………..………….....16

    ARGUMENT AND THE LAW…………………………………………………….17

        POINT I

            GT IS NOT LIABLE TO QUICKIE BECAUSE IT WAS NOT
            QUICKIE'S COUNSEL AS TO THE '160 PATENT
            WHEN THE MAINTENANCE FEE WAS DUE………………………17

        POINT II

            EVEN IF GT HAD COMMITTED MALPRACTICE, THELEN'S
            ROLE AND CONDUCT (AS QUICKIE'S SUCCESSOR COUNSEL)
            ABSOLVES GT OF ANY POSSIBLE LIABLITY…………………20

        POINT III

            QUICKIE'S CLAIMS FOR ALLEGED NEGLIGENT
            MISPREPRESENTATION IS LEGALLY INSUFFICIENT…………....21

        POINT IV

            QUICKIE'S CLAIM IS BARRED BY THE STATUTE
            OF LIMITIATIONS………………………………………………..23

    CONCLUSION…………………………………………………………………....25

## PRELIMINARY STATEMENT

Defendant Greenberg Traurig LLP ["GT"] moves for summary judgment, pursuant to Fed. R. Civ. P. 56, dismissing this action against GT on the grounds that, as a matter of law, GT is not liable to plaintiff Quickie, LLC ["Quickie"].

## SUMMARY OF THE MOTION

This is a legal malpractice action based on the alleged failure of attorneys for Quickie to pay, or to advise Quickie to pay, a maintenance fee ["the Maintenance Fee"] which was due during the period May 23, 2003 through May 23, 2004 on Quickie's Patent No. 6,066,160 ["the '160 Patent"]. That non-payment resulted in the loss of the '160 Patent [see Moving Exhibits AO and AP for Quickie's Complaint and GT's Answer].

GT moves for summary judgment on the grounds that:

[1] GT was *not* Quickie's attorney as to the '160 Patent when the Maintenance Fee became due. Another law firm had replaced and succeeded GT *before* the Maintenance Fee became due; and that other law firm represented Quickie as to the '160 Patent during the *entire* period in which the Maintenance Fee could have been paid. Hence, GT can not be contended to have committed legal malpractice for the failure to pay the Maintenance Fee;

[2] the fact that Quickie's successor counsel could have assured that the Maintenance Fee was paid, and thus kept the '160 Patent alive, is and provides a complete defense to any claim against GT based on the non-payment of the Maintenance Fee;

[3] Quickie's claims for negligence and negligent mispresentation are legally insufficient since they are based on the same operative facts as Quickie's malpractice claim and thus impermissibly duplicative of it; and

[4] in any event, Quickie's claims against GT are barred by the statute of

1

limitations, since the alleged wrongdoing and harm occurred over three years before Quickie filed its Complaint and the continuous representation doctrine does not apply here.

In sum:

GT bears no responsibility for the loss of the patent since GT was not counsel to Quickie when the Maintenance Fee became and was due, and thus is not responsible for the failure to pay the fee. Rather, *as Quickie has stated under oath and admitted in this action*, GT had previously been replaced by Thelen Reid & Priest LLP ["Thelen"] before the Maintenance Fee was due.

The Maintenance Fee for the '160 Patent first became due on November 23, 2003. Quickie could actually have prepaid it beginning on May 23, 2003; and Quickie had a year thereafter (i.e. until May 23, 2004) in which to pay the fee.[1]  By May 2003, i.e. the first date in which the Maintenance Fee could be paid, Thelen had replaced GT as Quickie's lawyer.

On March 4, 2003 --- months *before* the Maintenance Fee became due --- Quickie revoked, in a writing submitted to the U.S. Patent & Trademark Office ["PTO"], any authority that GT previously had as to the '160 Patent and appointed Thelen (specifying Robert Krebs and other Thelen attorneys) as its counsel for all further communications as to the '160 Patent ["Quickie's Revocation/Appointment"] [Mov. Ex. A]. Quickie has admitted that this constituted a replacement of GT by Thelen as to all aspects of the '160 Patent, "*including . . . timely payment of the Maintenance Fee*" [Mov. Ex. F; Mov. Ex. E at 1-4;  Mov. Ex. Q at 95-102].

GT was formally notified of that change and Quickie's Revocation/Appointment by a Notice from the PTO on April 2, 2003, a month and a half *before* the Maintenance Fee first became due [see Mov. Ex. B]. GT was also advised by Quickie's General Counsel Alan Fell and one of its senior members Dr. Stephen Colvin that GT would no longer represent Quickie as to

---

[1] the definition --- Since the Maintenance Fee could have been paid on May 23, 2003, we refer herein to that date as the "due date", even though the fee was not actually due until six months thereafter, i.e. on November 23, 2003.

the '160 Patent [Mov. Ex. T at 96, 101, 105, 153; Mov. Ex. S at 291-94; Mov. Ex. R at 48].  GT

ceased all activity as to the '160 Patent; and GT's database, noting the transfer of responsibility

for the '160 Patent to another firm, ceased tracking it [see detailed discussion *infra*].

Thelen, although now having full responsibly for the '160 Patent and the Maintenance

Fee [Mov. Ex. K; see also Mov. Exs. E, F, G], failed to advise Quickie that the Maintenance Fee

was due, or to pay the Maintenance Fee for Quickie, resulting in the loss of the patent.[2]

In 2006 and 2007, Quickie (through new patent counsel) petitioned unsuccessfully to

revive the '160 Patent [Mov. Exs. D through G; see also Mov Exs. H, L, M].

In its *sworn* statements and other filings to the PTO, Quickie confirmed that GT had had

no responsibility as to the Maintenance Fee and that Thelen (rather than GT) was solely

responsible for the failure to pay the Maintenance Fee [see Mov. Exs. E and F].  For example, in

its Supplement to Petition, Quickie stated [Mov. Ex. E at 1-4]:

> "[GT's] responsibility for the '160 Patent ended *prior to* the time
> period when the payment of a first Maintenance Fee was due (see
> Mov. Ex. A]).
>                    *          *          *
> Thelen Reid & Priest was granted and held *sole and full* power
> in [sic] the '160 patent from March 4, 2003 through August 14,
> 2006 (see [Mov. Exs. A and B]).  This period of time covered the
> time period up until May 23, 2004 for timely paying the first
> maintenance fee, and the entire two-year time period, starting from
> the date of the '160 patent's expiration to file a remedial Petition
> under the intention provision (37 CFR 1.378(c)); this two-year
> expiration period ending on May 24, 2006.
> The actions and inactions of *Thelen Reid & Priest* . . . led the
> Patent Owner to believe that their [sic] '160 Patent was viable.
>                    *          *          *
> The Patent Owner [Quickie] fully believed that their [sic]
> valuable legal rights in the '160 patent would be justly protected

---

[2]  Quickie's knowledge --- Quickie has also *admitted* that, prior to Quickie's replacement of GT, "Todd Sharinn advised Quickie that maintenance fees were due on the '160 Patent 3.5 years from the date of issuance . . ." [Mov. Ex. H ¶21; see also Mov. Ex. Q at 26-27].  Sharinn was the lawyer at GT and at a predecessor firm who had acted as Quickie's patent counsel.

by the attorneys and law firm of _Thelen Reid & Priest_ when the Patent Owner chose them for representation and executed the Power of Attorney dated March 4, 2003 (see [Mov. Ex. A])". (emphasis added)

Quickie's Managing Member, Dr. Aubrey Galloway, also stated *under oath* [Mov. Ex. F, ¶¶1, 2]:

". . . I am the Managing Partner of Quickie, LLC, the owner of US Patent No. 6,066,160.
        As the Managing Partner for Quickie, LLC, I retained Robert E. Krebs et al. of the _Thelen, Reid & Priest, LLP_ law firm to transact all post-issuance proceedings and responsibilities in the Patent and Trademark Office _including, but not limited to . . . timely payment of the Maintenance Fee_". (emphasis added)

Quickie expressly *reaffirmed* those statements and their accuracy in response to GT's Request to Admit [Mov. Ex. H ¶¶ 11-17; Mov. Ex. I ¶¶18-20, 22-25, 40, 42-43][3] and in the depositions taken of Quickie (by Dr. Galloway) and its General Counsel (Alan Fell) in this action [Mov. Ex. Q, at 59-64, 83-84, 86-102; Mov. Ex. R at 70-74, 78-81; see also Mov. Ex. L at 4]. Further, they have admitted that Quickie has never told the PTO (*to this day*) that any of those statements was inaccurate [*Id.*]. Indeed, several affirmative statements in Quickie's Complaint itself also say the same thing [Mov. Ex. AO ¶¶ 14, 15, 19]. Those constitute judicial admissions of these critical facts which are binding on Quickie.

## STATUS OF THE CASE

On April 18, 2007, Quickie sued GT and Thelen as well as the principal Thelen partner involved, i.e. Robert Krebs, charging them with "legal malpractice", "negligence" and "negligent misrepresentation" in "fail[ing] to notify Plaintiff before fees were due to maintain the patent" [Mov. Ex. AO ¶2]. GT denied all wrongdoing, and asserted several affirmative defenses

---

[3] as to Quickie's Responses to GT's Request for Admissions [Mov. Ex. H] --- Several of Quickie's specific Responses are outright admissions. In others (unlike those cited here), although Quickie admitted the fact involved, Quickie sought to add a denial of any inference from the admitted fact. GT Objects to such add-ons in Quickie's Responses (and hereby moves to strike them) as inappropriate. GT's Requests stated only the fact that is admitted; and that is all that should have been responded to or included in Quickies' Responses.

4

and cross-claims against the Thelen defendants [Mov. Ex. AP]. The Thelen defendants filed a third-party action against Rick, Steiner, Fell & Benowitz, LLP and Alan Fell and Todd Sharinn (formerly an attorney at GT). Various of those parties then cross-claimed against each other.

Quickie has settled with Thelen, Krebs, Rick Steiner and Fell, resulting in the dismissal of all claims against them and Sharinn (who was only a third-party defendant), and leaving GT as the sole remaining defendant in the action.

Fact discovery has been completed. GT now moves for summary judgment on liability grounds. The parties have stipulated that no expert testimony will be presented on this motion; and that no issues as to damages will be raised or need be dealt with on this motion[4].

## BACKGROUND FACTS

### Quickie and the Subject Patent

Quickie is the owner by assignment of the '160 Patent, which was issued on May 23, 2000 [Mov. Ex. H ¶1; Mov. Ex. L at 1; Mov. Ex. R at 30-31]. Under applicable law and regulations, the owner of a patent must pay periodic maintenance fees to keep the patent in effect. The first Maintenance Fee for the '160 Patent was due during the one year period beginning May 23, 2003 through May 23, 2004 [Mov. Ex. L at 1]. The '160 Patent "expired" due to non-payment of the Maintenance Fee during that one year period [Mov. Ex. L at 1].

### The Law Firms Vis-à-vis the '160 Patent

Between 1998 and 2001, Pepe & Hazard LLP ["Pepe"], with whom Sharinn was then associated, represented Quickie in connection with its application for what became the '160 Patent [Mov. Ex. R at 33]. Sharinn left Pepe to become an associate of GT in 2001 [Mov. Ex. R at 33]. After that, GT provided services to Quickie as to the '160 Patent until it was replaced by

---

[4]   as to experts --- The parties are in the midst of expert discovery, which is proceeding simultaneously with this motion. The only experts identified by the parties are experts as to issues of damages.

Thelen in the fall of 2002 and spring of 2003 [Mov. Ex. R at 33-34; see details *infra*].

Thelen replaced GT as Quickie's counsel with respect to the '160 Patent; and Quickie filed formal papers with the PTO revoking all prior authority of GT as to the '160 Patent and designating Thelen as its attorney and the appropriate counsel for all communications and proceedings as to the '160 Patent [see detailing *infra*].

Alan Fell, a member of Quickie [Mov. Ex. R. at 10], is a lawyer who served as Quickie's General Counsel overseeing its patent counsel [Mov. Ex. R at 25, 86-87 ; Mov. Ex. T at 230].

## Quickie's Knowledge That The Maintenance Fee Would Be Owing

Quickie has *admitted* that "Todd Sharinn advised Quickie that maintenance fees were due on the '160 Patent 3.5 years from the date of issuance . . .", failing which Quickie would lose the '160 Patent [Mov. Ex. H ¶21; see also Mov. Ex. Q at 23, 26-27; Mov. Ex. R at 97-99].[5]  But, neither Quickie nor its General Counsel calendared the due dates or otherwise assured that the Maintenance Fee would be paid [Mov. Ex. Q at 26-27;  Mov. Ex. R at 60-61].

## GT's Calendaring of the Due Dates for the Maintenance Fee

GT maintained a database calendaring the due dates for maintenance fees on patents for which GT had responsibility [Mov. Ex. S at 88-89, 167, see also 20-21; Mov. Ex. T at 149].

When Sharinn joined GT, GT put the '160 Patent into GT's internal database system, where it remained until Quickie revoked GT's authority and role as to that patent in March 2003 [Mov. Ex. S at  20, 28-29, 39, 60-61, 66-68, 71-72, 79-81, 93, 96, 100, 167-69, 172-73, 216-17, 249-50; see also 52-53, 62-64, 144-46; Mov. Ex. T at 149; Mov. Exs. A, O, P, AO¶¶ 14, 15,19][6].

---

[5]  further notice to Quickie --- A similar reminder was given to Quickie (in connection with another different patent) in April 2004 while the period for payment of the Maintenance Fee on the '160 Patent  was still in progress [Mov. Ex. R at 97-99; Mov. Ex. AK].

[6]  Pepe's undertaking --- Upon notifying Quickie of the due dates for maintenance fees in  2000, Pepe had said "*we will notify you regarding payment of the maintenance fee several months before they are due*" [Mov. Ex. U at 2]. But, Pepe never gave such notice to Quickie, obviously believing and understanding that its responsibility to do so

When GT received Notice of the Revocation/Appointment as to the '160 Patent, GT's database was marked accordingly and GT ceased to follow that patent, since its authority and role as to the '160 Patent had ended [see Mov. Exs. O, P and details *infra*].

## Quickie's License with Medtronic and Lawsuit Against Medtronic

Quickie sought to get entities capable of turning the invention underlying the '160 Patent into a product to sign licenses to use it [Mov. Ex. T at 69-72; Mov. Ex. Q at 37-41; Mov. Ex. R at 60-61]. But, only one, Medtronic Inc., with whom Quickie had another relationship showed any interest [Id.]. The others were not interested [Mov. Ex. R at 28-30; Mov. Ex. Q at 39-40].

However, "shortly after the [license] agreement was entered into . . . Medtronic was already trying to break the agreement" [Mov. Ex. T at 72; Mov. Ex. AO ¶9]. Medtronic thus terminated the license [Mov. Ex. R at 25; Mov. Ex. AO ¶9], concluding the technology was not capable of being commercialized [Mov. Ex. R at 25-28; Mov. Ex. Q at 39-40].

Quickie was angered by the termination, and later, using Sharinn and GT, sued Medtronic for patent infringement action in early 2002 ["the Medtronic Action"] [Mov. Ex. T at 54-55].

## Quickie's Initial Replacement of GT with Thelen as to the '160 Patent

In the meantime, Mark Evens, a partner at Thelen, became the brother-in-law of Dr. Colvin of Quickie [Mov. Ex. Q at 56; Mov. Ex. S at 299-300; see also Mov. Ex. R at 47]. Although Quickie was fully satisfied with Sharinn's/GT's services [Mov. Ex. Q at 57], Dr. Colvin decided to transfer Quickie's patent work to Thelen to help Evens' position there [Mov. Ex. S at 293-95, 299-300; Mov. Ex. T at 161-63; cf. Mov. Ex. Q at 55-57].

---

ended when Pepe was replaced as counsel. Quickie argues, incorrectly, that GT assumed Pepe's promise when Sharinn joined GT. GT did not do so [Mov. Ex. S at 271, 273-76, 278, 286-87]. Nevertheless, as explained above, GT did docket the '160 Patent, and (as explained infra) GT would have notified Quickie or paid the Maintenance Fee itself if Quickie had not filed the Revocation/Appointment in and replaced GT with Thelen as to the '160 Patent.

Accordingly, virtually from the outset of the Medtronic case, GT consulted with Thelen and kept it advised as to the '160 Patent [Mov Ex. S at 212. 293-97, 299-302; see also 161-62]. That signaled that Thelen would be assuming responsibility for the '160 Patent in place of GT [Mov. Ex. S at 212: "the process began at least as early as April 11, 2002 where Mark Evens was monitoring" the matter; see also 294-97, 299-302].

GT also sent its "file wrapper" of the '160 Patent to Thelen in April 2002 [Mov. Ex. V], providing Thelen with full information as to the '160 Patent, including the due dates for the Maintenance Fee [Mov. Ex. S at 123-24, 212, 217-18, 309; Mov. Ex. T at 201-02].

GT continued to serve as lead counsel in the Medtronic Action, and successfully prosecuted the Markman hearing delineating the scope of the patent infringement claims [Mov. Ex. Q at 56-57; Mov. Ex. T at 167, see also 161-62]. However, promptly after the Court's Markman decision, Quickie fired GT and substituted Thelen as its counsel [Mov. Ex. W; Mov. Ex. T at 153; Mov. Ex. S at 62-64, 66-67; Mov. Ex. R at 50-51].

Quickie's General Counsel Fell initially told Sharinn that "you and Greenberg Traurig will continue to handle various patent applications" [Mov. Ex. W].

But, Fell and Dr. Colvin soon told Sharinn that he and GT were going to be completely replaced as to the '160  Patent [Mov. Ex. T at 96-97, 100-01 105, 153, 185-86, 194; see also Mov Ex. R at 48]. As Sharinn has explained [Mov. Ex. T at 101]:

> "Subsequent to the Markman Hearing, whenever the date was, whether it was the next day or the day after the ruling was issued, my responsibilities to that patent [i.e. the '160 Patent] immediately terminated by actions of *Steve Colvin and Alan Fell. They told me* that flat out, transfer the files, *you're no longer responsible.*" (emphasis added)

They also confirmed that to Paul Sutton, the head of GT's patent group [Mov. Ex. S at 291-94].

As a result, on October 16, 2002, GT sent to Thelen not only the papers for the Medtronic Action, but also GT's "General/Main File" for the '160 Patent and its file entitled "U.S. Patent No. 6,066,160 File History & Prior Art: [Mov. Ex. X items 4 and 5], i.e. the complete documentation, history and other information regarding the '160 Patent [Mov. Ex. T at 198-200; Mov. Ex. S at 308-10, 314-19].

**The Medtronic Reexamination Proceeding**

In November 2002, in reaction to the Markman decision, Medtronic petitioned the PTO to "reexamine" the '160 Patent, i.e. to review the patent and redetermine whether the invention is actually patentable and, if so, to what extent ["the Reexamination Proceeding"] [Mov. Ex. R at 83; see also Mov. Ex. N; Mov. Ex. Q at 183-88]. Tellingly, Quickie selected Thelen (not GT) as its counsel in the Reexamination Proceeding [Mov. Ex. 189].

Initially, Fell and Colvin would call Sharinn for his thoughts as to aspects of the Reexamination Examination [Mov. Ex. T at 106]. Hence, and hoping to be more involved, Sharinn opened a client matter at GT for the Reexamination [Mov. Ex. Z; see also Mov. Ex. T at 187-89, 191, 239-41]. But, it soon became clear that GT would not actually be involved [Mov. Ex. T 94-95, 100-05; 153, 187-89, 191]. As Sharinn has explained [Mov. Ex. T at 191]:

> "At one point they did say that [Sharinn would be involved in the Reexamination Proceeding] and . . . I opened up a matter, and then nothing ever really came of it . . ."

Sharinn therefore told Quickie that he understood that Quickie had taken all responsibility as to the '160 Patent away from him, and that he would not do anything further as to it unless GT was actually engaged to do so [Mov. Ex. T at 188-89, 190]:

> "I made clear to them, you fired me, you have new counsel, your new counsel is Thelen Reid & Priest, you need to take this up with Mark Evens or we can be reengage[d] and then we can deal with this."

9

Quickie therefore stopped discussing the '160 Patent with Sharinn [Mov. Ex. T at 190]. GT's billing records confirm that, showing that GT's work on the '160 Patent completely ceased in March 2003 [Mov. Exs. AR, AM], when Quickie's formal Revocation/Appointment was filed [see also Mov. Ex. T at 239-45, 266-67].[7]

The Reexamination Proceeding has resulted in a gutting of the '160 Patent. The PTO has rejected and overruled 32 of the 34 claims in the patent, and sustained only 2 of them[8].

**Quickie's Final Replacement of GT with Thelen as to the '160 Patent**

In March 2003, completing the transfer to Thelen of all matters as to the '160 Patent, Quickie filed the Revocation/Appointment with the PTO formally revoking GT's authority and role as to the '160 Patent and designating Thelen as its counsel in GT's place [Mov. Exs. A C; Mov. Ex. R at 45, 50-51]. Thelen sent a copy, as filed, to Quickie [Mov. Ex. AE].

The Revocation/Appointment, as detailed above, stated that all prior authority of GT as to the '160 Patent had been revoked [Mov. Exs. A, C; Mov. Ex. Q at 59-62], and that, in place of GT, Quickie had appointed Thelen (indeed several Thelen attorneys) as its counsel as to the '160 Patent [Mov. Ex. A, C; Mov. Ex. Q at 63-64].

---

[7] the Bryan Cave email red herring -- During discovery proceedings, Quickie questioned Sharinn about a December 2, 2002 email from the Bryan Cave law firm [Mov. Ex. Y] which purports to confirm remarks by Sharinn's *secretary* that he was supposedly still responsible for the '160 Patent, so that Bryan Cave could forward to GT papers in connection with the Reexamination Proceeding. That was not a conversation with Sharinn himself, but rather an administrative employee [Mov. Ex. T at 144-46]. In any event, as Sharinn explained, that was merely to have Bryan Cave send the papers to him for transmittal by Sharinn to Thelen [Mov. Ex. T at 145]. Consistent with that purpose, GT did forward the documents to Fell/Quickie the next day, December 3, 2002 [Mov. Ex. AA].

[8] the Reexamination Proceeding -- In November 2002, Medtronic had filed a petition to reexamine the '160 Patent [Mov. Ex. Q at 76-102; Mov. Ex. R at 83; Mov. Ex. T at 102-03]. On April 6, 2004, the PTO issued an office action rejecting all but 3 of the claims in the '160 Patent [Mov. Ex. AJ; Mov. Ex. R at 83]. Thereafter, Medtronic sought a further reexamination in June 2004 [Mov. Ex. AL]. On February 25, 2008, the PTO rendered a further decision in the Reexamination Proceeding [Mov. Ex. N]. The PTO rejected virtually all of the claims in the '160 Patent, and confirmed only 2 of the 34 claims in the patent [Mov. Ex. N at 3; see also Mov. Ex. Q at 186; Mov. Ex. R at 83-86]. On, July 7, 2008, the PTO issued its "Final Action" confirming its rejection of all but those 2 claims in the '160 Patent [Mov. Ex. AN].

On April 2, 2003, the PTO therefore sent GT formal Notice of the Revocation/Appointment [Mov. Ex. B; Mov. Ex. T at 242], advising GT:

> "The Power of Attorney to you . . . has been revoked . . . as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record (37 CFR 1.33)."

As corroborated by the copy of the Revocation/Appointment sent to Quickie by Thelen, the "*new address of record*" was, of course, Thelen [Mov. Ex. AE at QLLC 62224]:

> "Robert E. Krebs
> Thelen Reid & Priest
> P.O. Box 640640
> San Jose, CA 95164-0640
> Telephone (408) 292-5800
> Facsimile (408) 287-8040"

[See also Mov. Ex. J ¶¶2, 4,5,6].

Sharinn correctly understood that the Notice meant that "there is a new person in charge of this file", and that he and GT had no further role as to the '160 Patent [Mov. Ex. T at 188, 242, 244, 251, 267]. Hence, after receiving the PTO's Notice [Mov. Ex. B], Sharinn sent a letter with a copy of the Notice to Quickie, expressing disappointment but stating [Mov. Ex. AF]:

> "[W]e respect [Dr. Colvin's] decision and will take no further action on this matter. . . [W]e will forward our final bills under separate cover." [9]

[Accord Mov. Ex. T at 188-89, 242-45, 267; see also Mov. Ex. R at 51-54]. As Sharinn has explained [Mov. Ex. T at 188 and 189]:

> "[M]y understanding was that my powers of attorney and involvement in this case were fully revoked. And when I

---

[9]  the "re" in the letter -- In the past, Quickie has contended that, because Sharinn's letter specifically references the Reexamination Proceeding, it does not show that GT was actually relieved as to the '160 Patent. But, of course, the Reexamination Proceeding was then the only other extant matter as to the '160 Patent, i.e. other than the Medtronic Action as to which GT had been formally replaced in October 2002. Moreover, the fact that GT's time and billing records corroborate that GT did no further work on the '160 Patent after the Revocation/Appointment also shows that GT and Quickie both proceeded on the understanding that GT was no longer responsible for that Patent. In any event, the evidence shows that the parties often used the wrong addresses and re's in their letters [see note 13 *infra*].

say this case, I don't mean the litigation, I mean the '160's existence

         *        *        *

They had made this abundantly clear to me that that was their intention and that was their desire."

No one from Quickie, including Fell (its General Counsel and Member), told Sharinn that, notwithstanding the Revocation/Appointment and Sharinn's letter, Quickie would still be looking to GT or Sharinn for further services as to the '160 Patent [Mov. Ex. T at 244-45; Mov. Ex. R at 54]. As Fell admitted [Mov. Ex. R at 54]:

> "Q. Did you call Mr. Sharinn up and say to him Todd, thanks for sending me this notice, but we're still going to be looking to you about the '160 Patent? Did you ever that conversation with him?
>     A. I don't recall.
> Q. You don't recall ever having that conversation, do you?
>     A. Right."

[see also Mov. Ex. R at 56; Mov. Ex. I ¶¶22, 23]. Sharinn also testified [Mov. Ex. T at 244-45]:

> "Q. Did Mr. Fell or Dr. Colvin or anyone else from the Colvin entities or Quickie call you up after that and say to you, oh, no, wait a minute Todd, we're still looking to you or to Greenberg Traurig to continue work on the '160 Patent?
>     A. No."

Having received the Notice [Ex. B], GT removed the '160 Patent from its internal tracking system so as not to interfere with a matter on which its client had retained different counsel, and noted in the system that that patent "has been transferred to another firm" [Mov. Ex. O: "POA revoked" and "transferred to another firm"; Mov. Ex. P: "status: inactive; sub status: transferred"; see also Mov. Ex. S at 20, 28-29, 39, 60-61, 66-68, 71-72, 79-81, 93, 96, 100, 167-69; 172-73, 216-17, 249-50, 289-90; see also 52-53, 62-64, 144-46].

Sutton (the head of GT's Patent Group) thus explained [Mov. Ex. S at 39]:

> "[B]y the records being marked as transferred or inactive . .
> . there would be no subsequent reports that included those
> cases because those matters were thereafter being handled
> by the firm to whom the cases have been transferred."

and [Mov. S at 79-81], explaining the printout from GT's database [Mov. Ex. O]:

> "Q. Next column to the right you'll see that April 2, 2003
> date under the column response.. . .What does that refer to?
>     A.    That indicates that a response to the due date for the
> first maintenance fee was taken care of via the revocation
> of the Power of  Attorney and the responsibility for this
> case._ That's the date of the formal revocation of the Power
> of Attorney . . . so that we would no longer be responsible
> for the payment of any maintenance fees.
>
>                    *              *              *
>
> [I]f our Power of Attorney is revoked and we're asked to
> no longer do anything with respect to, for example, here the
> '160 Patent or anything associated with that '160 Patent,
> we put in that field the date of the formal revocation of our
> authority to act as attorneys for the client in that regard, and
> that's the reason for the entry of 4/2/2003 in each of the
> M1, M2, and  M3, the three maintenance fees there.
>     That indicates that someone else, this report indicates
> that the client has asked and instructed someone else to do
> this activity."  (emphasis added)

and [Mov. Ex. S at 172-73]:

> "Q. How about notices or reminders that were kicked out
> from the computerized docketing system?
>     A. There would be no reminder or notice on the
> computerized docketing system because our Power of
> Attorney was revoked well prior to the deadline in May . . .
> for paying the first maintenance fee.
>     So there would be no reminder or report . . . We were no
> longer representing Quickie in that regard.  Our power had
> been revoked. It would have been inappropriate for us to be
> involved thereafter." (emphasis added)

[Accord: Mov. Ex. S at 250: "Once Thelen assumed responsibility by virtue of our [sic]

revocation of our Power of Attorney, we had no responsibility thereafter"; and at 62: reports

"were not generated after Greenberg Traurig was notified that its Power of Attorney was going

to be revoked and [GT] would no longer represent the client in this regard";  see also 60-61, 66-68, 71-72, 79-81, 93, 96, 100, 167-69; 172-73, 216-17, 249-50, 289-90]. [10]

Quickie's own later sworn statements and other submissions to the PTO corroborate that Quickie considered GT to have been fully replaced by Thelen and *Thelen* to be *solely* responsible after March 2003 for the '160 Patent, including *"timely payment of the maintenance fees"* [Mov. Exs. E,  F,  G].  GT's time and billing records also corroborate that, showing  GT did indeed cease all work on the '160 Patent after receiving the Revocation/Appointment [Mov. Exs.. AR, AM]. While GT continued to complete the successful prosecution of another *different*  patent [*Id.*; Mov. Exs. AG, AH, AI, AK], GT had no further role, and did no further work, on or as to the '160 Patent [*Id.*; see also Mov. Ex. T at  244-45, 266-67].

Thelen's conduct was consistent with those statements. Thus, in December  2003, Thereafter, Thelen filed a further 'change of address notice" as to the '160 Patent [Mov. Ex. C; sell also Mov. Ex. AO ¶¶15].

**Thelen's Failure as to  the Maintenance Fee  and the Loss of the '160 Patent**

Coincidentally, before joining GT, Sutton was a senior patent counsel at Thelen [Mov. Ex. S at 20-21].  While there, Sutton had set up an internal system for tracking the patents as to which Thelen had responsibility [Mov. Ex. S at 20-21, see also 88-89, 117-18, 121-22].

The materials and documents which GT sent to Thelen (both when Thelen first became involved and after Thelen replaced GT) showed when the Maintenance Fee on the '160 Patent

---

[10]  the unfortunate effect of the Revocation/Appointment --- Ironically but unfortunately, if Quickie had  not revoked GT's authority, the '160 Patent would have remained active in GT's system and would have alerted GT that the Maintenance Fee was becoming due [Mov. Ex. S at 49, 52-53, 144-46]. GT either would have advised Quickie or paid the Fee itself as a disbursement [Mov. Ex. 114-15, 144-46]. But, consistent with Sutton, Sharinn said  [Mov. Ex. T at 250-51]: "I've always understood it, and as someone who has filed them with regards to others, means that those others are no longer permitted to participate in the prosecution or the maintenance of the referenced patent."

would become due [Mov. Ex. S at 123-24, 128-29, 136-37, see also 212, 217-18, 309; Mov. Ex. T at 198-202; see also Mov. Exs. W, X; Mov. Ex. R at 63-64; Mov. Ex. I ¶¶22, 23].

Thelen thus had an opportunity, indeed ample opportunity --- *both* when the Maintenance Fee first became payable *and* during the entire one-year period when it could be paid --- to pay the Maintenance Fee or to advise Quickie to do so and thus avoid loss of the '160 Patent [Mov. Ex. R at 96-97; Mov. Ex. AO ¶19]. For unexplained reasons, Thelen failed to do either, resulting in the expiration of the '160 Patent [Mov. Ex. AO ¶19; see also Mov. Exs. E, F, G, L, M].

Thelen was well aware of its responsibility as to the '160 Patent. Thelen itself had prepared and filed the Revocation/Appointment in March 2003 [Mov. Ex. Q at 66; Mov. Ex. AO ¶14; see also Mov. Ex. AE]; and it sent a copy, as filed, to Quickie on April 16, 2003 [Mov. Ex. AE]. Moreover, Evens later confirmed that Thelen had been responsible for payment of the Maintenance Ffee [Mov. Ex. K]. In an email to another Thelen partner in October 2006, after Evens had left Thelen, Evens acknowledged [Mov. Ex. K]:

> "[M]y understanding at the time was that we (TRP) was [sic] taking responsibility for the patent, and that is how I read Bob's [Krebs'] filing [of the Revocation/Appointment]. Second, I remember a conversation early on with Bob about not missing fee deadlines. Finally, maintenance fees are part of representing the patent, so I am surprised that Bob, as a practiced patent prosecutor, wouldn't advisee [sic] Quickie and Steve that deadlines were approaching so he would not lose his patent." (emphasis added)

Quickie has said the same thing [Mov. Ex. E at 4]:

> "The Patent Owner fully believed that their valuable legal rights in the '160 patent would be justly protected by the attorneys and law firm of Thelen Reid & Priest, when the Patent Owner chose them for representation and executed the Power of Attorney on March 4, 2003 [Mov. Ex. a]. Unfortunately, such did not occur. . ."

[Accord: Mov. Exs. G and F: Quickie "retained Robert E. Krebs et al of . . . Thelen . . .[for] . . *including timely payment of the maintenance fee*"]. Sharinn also so testified [Mov. Ex. T at 188, 242, 245, 250-52, 266-67].

The failure to pay the Maintenance Fee during the one-year period from May 23, 2003 through May 23, 2004 resulted in the loss of the '160 Patent [Mov. Exs. L, M; AO ¶19] .

**Quickie's Unsuccessful Petition to Revive the '160 Patent**

After the learning of the loss of its '160 Patent  in 2006, Quickie fired Thelen [Mov. Ex. AN; Mov. Ex. R at 101; Mov. Ex. Q at 75-77].

Quickie (through another new counsel) then filed a Petition to revive the patent pursuant to 37 CFR §1.378(b) [Mov. Exs. E, F,G; Mov. Ex. Q at 44-48, 77-102; see also Mov. Ex. R at 65-71, 74-75, 78-81]. In doing so, Quickie claimed (as detailed above) that it had relied on Thelen to assure that  the Maintenance Fee was paid but that Thelen had failed to do so [*Id.*].

To support its Petition, Quickie expressly requested and received a Statement from Sharinn corroborating its own statements that GT and he had been replaced by Thelen and had had no responsibility as to the '160 Patent after March 4, 2003 [Mov. Ex. T at 254, see also 253-64]. Quickie's counsel (who had initially drafted the Sharinn Statement [Mov. Ex. T at 254-56]) submitted Sharinn's Statement as proof corroborating that Thelen had sole responsibility for the Maintenance Fee and for the loss of the '160 Patent [Mov. Exs. E and F]. Quickie has never requested a contrary statement from Sharinn [Mov. Ex. Q at 90; Mov. Ex. T at 256].

Nor has Quickie ever advised the PTO that its prior statements to the PTO blaming Thelen alone --- including that Thelen had had sole responsibility for payment of the Maintenance Fee  --- were false or inaccurate [Mov. Ex. Q at 89,90, 96, 97, 99, 100, 102; Mov. Ex. R at 74-75, 80-81; Mov. Ex. T at 256].

The PTO denied Quickie's Petition on March 6, 2007 [Mov. Ex. L; Mov. Ex. R at 81; Mov. Ex. Q at 121]. In so doing, the PTO expressly noted and relied on Quickie's statements to the PTO that Thelen "was responsible for payment of the maintenance fee" and that Sharinn and GT had not been "responsible for the patent" after March 2003 [Mov. Ex. L at 4].

Quickie filed a petition for reconsideration of that decision [Mov. Ex. R at 81; Mov. Ex. Q at 103-105]. But, on October 5, 2007, the PTO also denied that petition [Mov. Ex. M; Mov. Ex. Q at 102-04; Mov. Ex. R at 81]. In so ruling, the PTO again referenced Quickie's prior statements and held that Quickie remained bound by them, including the Sharinn Statement which Quickie had sought and filed and which it had left extant [Mov. Ex. M at 3-4; Mov. Ex. Q at 107-09]. Quickie has not sought a further review of that decision [Mov. Ex. Q at 123-24].

## ARGUMENT AND THE LAW

### POINT I:
### GT IS NOT LIABLE TO QUICKIE BECAUSE IT WAS NOT QUICKIE'S COUNSEL AS TO THE '160 PATENT WHEN THE MAINENCANCE FEE WAS DUE

GT had been replaced by Thelen as to the '160 Patent before the Maintenance Fee became due, and was not counsel as to that patent during the period when that fee could be paid.

Sharinn, a former professional athlete and college coach [Mov. Ex. T at 16-17], correctly summed up the situation in sports vernacular [Mov. Ex. T at 103-04]:

> "So, if I seem a bit upset about it, it's because I've been accused of messing up where I did not mess up and . . . my former firm [GT] is being accused of me messing up where they did not mess up. We didn't have the ball to run with. It was taken away from us and handed to a different back, to speak metaphorically. . . We were pulled out of the game."

As a result, GT can not be claimed to have committed malpractice by virtue of the non-payment of that fee. Somma v. Dansker & Aspromonte Associates, 44 A.D.3d 376, 377 (1st

17

Dept. 2007) (complaint dismissed since "defendants no longer represented plaintiff" when the alleged malpractice occurred); <u>Perks v. Lauto & Garabedian</u>, 306 A.D.2d 261, 262 (2nd Dept. 2003) (counsel who had been replaced by successor counsel two months before plaintiff settled auto accident case was not liable for alleged failure to first confirm assets and insurance of defendant driver); <u>Golden v. Cascione, Checkanover & Purcigliotti</u>, 286 A.D.2d 281, 281-82 (1st Dept. 2001) (malpractice complaint dismissed against law firm that had been discharged and replaced by successor counsel before harm occurred); <u>Greenwich v. Markoff</u>, 234 A.D.2d 112, 114 (1st Dept. 1996) (complaint seeking to hold two successive law firms for plaintiff liable dismissed against first law firm since plaintiff's injury occurred "after the first law firm had been discharged"). See also: <u>C&F Pollution Control v. Fidelity & Casualty Co.</u>, 222 A.D.2d 828, 829-30 (3rd Dept. 1995).

Quickie nevertheless seeks to hold GT responsible based on unrelated matters, events predating Quickie's discharge and replacement of GT and a mischaracterizations of the facts.

1. <u>GT's work on another different patent</u> --- Quickie contends that, since GT briefly continued to represent Quickie in the prosecution of *another different patent,* Patent No. 6,716,243 ["the '243 Patent"; see Mov. Ex. T at 271], GT should be held liable for not reminding Quickie that the Maintenance Fee on the '160 Patent would become payable *after* GT had been relieved of all responsibility as to that patent. That, of course, is *directly contrary* to what Quickie *swore* to the PTO (and has left extant) --- and (as detailed above) to what GT had been told and relied on.[11]

---

[11]  <u>the reminder to Quickie</u> --- GT's representation as to the '243 Patent also undercuts Quickie's position. On April 13, 2004 when the '245 Patent was issued, GT expressly reminded Quickie that maintenance fees "are required to be paid . . . to keep the patent in force" and the time periods when such fees are due  [Mov. Ex. AK at 1].  That repeated what Quickie and its General Counsel Fell *admittedly* had earlier been told by Sharinn. At that time, the one year period in which to pay the Maintenance Fee had not expired, and would not expire for another month and a half. Thus, Quickie, Fell (its General Counsel) and/or Thelen (Quickie's then counsel as to the '160 Patent) still had time to pay the Maintenance Fee.  But, none of them applied that information to the '160 Patent.

2. the fall 2002 change of address --- In discovery, Quickie has pointed out that GT filed a change of address with the PTO (signed in October 2002 but filed in December 2002) advising the PTO that Sharinn's office had moved from GT's 200 Park Avenue office to its office at 885 Third Avenue [Mov. Ex. AB; Mov. Ex. S at 192]. However, as Sutton and Sharinn have explained, that was done administratively as a matter of course since GT then still had an extant power of attorney as to the '160 Patent, [Mov. Ex. AB; Mov. Ex. S at 196-98; Mov. Ex. T at 135-36]. In any event, that *predated* Quickie's March 2003 Revocation/Appointment replacing GT with Thelen [Mov. Exs. A, B, C, AE, AF; Mov Ex. S at 196-97]. The change of address, of course, became moot and irrelevant when Quickie later filed the Revocation/Appointment [*Id.*].

3. the Pepe 2000 letter --- Quickie is also expected to rely on Pepe's statement in 2000 (when the '160 Patent was issued) that "*we* will notify you regarding payment of the Maintenance Fees several months before they are due" (emphasis added) [Mov. Ex. U at 2]. As explained above [footnote 6 *supra*], GT made no such undertaking as to the '160 Patent; but GT did place the '160 Patent into its internal database for following. However, Quickie *thereafter* revoked GT's authority and role as to the '160 Patent, and replaced GT with Thelen as Quickie's patent counsel as to the '160 Patent, indeed months *before* the Maintenance Fee became due. Hence, GT appropriately ceased work as to '160 Patent in March 2003, and properly noted (in its internal notification system) that the matter had been transferred to another law firm, so that GT was no longer involved.

4. Sharinn's relationship with Colvin and Fell --- Sharinn continued to talk with Fell and Colvin after GT had been relieved [e.g. Mov. Ex. T at 108-11, 219], since they had developed a personal friendship while he had been counsel for Quickie [Mov. Ex. T at 108-10].[12] But, *he*

---

[12] Sharinn's departure from GT -- Sharinn left GT in 2005; he and GT had no involvement whatever with Quickie after that. [Mov. Ex. T at 18; see also Mov. Ex. S at 34-46]

*was never again engaged as their counsel* [Mov. Ex. T at 96, 101, 105, 153]. There is no evidence that such discussions were in the context of a lawyer-client relationship, much less as to the '160 Patent [cf. Mov. Ex. T at 244-45; Mov. Ex. R at 54]. To the contrary, they made clear that he had been "relieved of all duties" as to the '160 Patent [Mov. Ex.. T at 189]; and Sharinn told them [*Id.*]:

> "I made clear to them you fired me, you have new counsel,
> your new counsel is Thelen Reid & Priest, you need to take
> this up with Mark Evens or we can be reengage[d] . . ."

5. client intake forms --- Quickie spent extended time in discovery as to the GT client intake forms that Sharinn's secretary filled out in the fall and early winter of 2002. But, all of those forms *predate* the Revocation/Appointment in March 2003. Moreover, Sharinn explained that he and she "opened" possible matters because "I had always hoped in the back of my mind and in my heart" to get Quickie back as a client and to "put forth the best foot I could forward for making partner at Greenberg Traurig"[Mov. Ex. T at 110, see also 108-10]. [13]

### POINT II :
### THELEN'S ROLE (AS (QUICKIE'S SUCCESSOR COUNSEL) ABSOLVES GT OF ANY POSSIBLE LIABILITY

GT can not be held liable because, after it was replaced by Thelen as to the '160 Patent, Thelen (as successor counsel) had ample opportunity (more than a year) to see that the Maintenance Fee was duly paid before the expiration of the patent in May 2004. As Quickie stated to the PTO, has admitted in this action, and has never retracted, GT's *"responsibility for*

---

[13] misaddressed letters and "re" on letters -- Quickie also pointed to correspondence from or to Sharinn in the fall and winter of 2002-03 which was addressed to Quickie or referred to it on the 're' line [see, e.g., Mov. Ex. T at 203-10; see also Mov. Exs. AA and AG; see also Mov. Exs. AA and AG]. But, such also *predates* Quickie's March 2003 Revocation/Appointment as to the '160 Patent.

Moreover, as the evidence and testimony show, the parties often misaddressed the entity as to which letters were sent and misidentified the matter about which they were communicating [Mov. Ex. R at 91-95; Mov. Ex. T at 230-36; Mov. Exs. AA and AG]. Sharinn, Fell and Quickie sometimes simply referred to matters or addressed them to Quickie as a shorthand [Mov. Ex. T at 209-11]. Fell relied on the body of the correspondence to determine what

the '160 Patent ended prior to the time period when the payment of a first Maintenance Fee was due" [Mov. Ex. E at 1] and Thelen "was granted and held sole and full power in [sic] the '160 patent from March 4, 2003 through August 14, 2006" [Mov. Ex. E at 2], including, but not limited to . . . timely payment of the Maintenance Fee" [Mov. Ex. F ¶2].

New York law is settled that, even where, unlike GT here, an attorney has committed malpractice, there is no viable claim against that attorney if successor counsel had an opportunity to prevent the injury to the plaintiff in the matter as to which prior counsel was allegedly negligent. As aptly explained in Albin v. Pearson, 289 A.D. 272, 272-73 (2nd Dept. 2001):

> "The malpractice claim should have been dismissed, since Pearson cannot prove that 'but for' the appellants' negligence, her counterclaim against Judith Albin to foreclose certain mortgages would not have been dismissed [citation omitted]. There is no evidence to support a finding that the appellants' alleged negligence was a proximate cause of Pearson's injury, since foreclosure of the subject mortgages remained viable for nearly three years after the appellants' were discharged and successor counsel had sufficient time to adequately protect Pearson's rights [citations omitted]." (emphasis added)

Accord: Somma, 44 A.D.3d 376, 377 (1st Dept. 2007) (complaint dismissed where "successor counsel had sufficient time and opportunity to adequately protect plaintiff's rights"): Perks, 306 A.D.2d at 262 (complaint dismissed since "subsequent counsel had sufficient opportunity to protect plaintiff's rights", so that the defendant's negligence "was not the proximate cause of the plaintiff's alleged damages"); Reibman v. Senie, 302 A.D. 2d 290, 291 (1st Dept. 2003) (complaint dismissed since "the failure to establish proximate cause mandates the dismissal of a legal malpractice action, regardless of the negligence" of original counsel who had been replaced before the plaintiff's injury had occurred); Golden, 286 A.D. 2d at 281 ("because successor

---

the communication was really about [Mov. Ex. R at 94-95]. Those parties simply did not pay strict attention to such matters, and these aberrant examples are not worthy of significance [Mov. Ex. R at 95].

counsel had sufficient time to adequately protect plaintiff's rights, there is no evidence to support

a finding that the Olshan firm's alleged negligence proximately caused plaintiff any injury");

Kozmol v. Law Firm of Allen L. Rothenberg, 241 A.D. 2d 484, 485-86 (2nd Dept. 1997):

> "Since the Mantone action was dismissed on April 26,
> 1995, the plaintiffs had until August 26, 1995 . . . .in which
> to recommence the Mantone action. Inasmuch as the
> plaintiffs had replaced the Rothenberg firm with
> DiGiovanna [successor counsel] on September 7, 1994,
> DiGiovanna could have timely commenced an action
> against Mantone. . . . Accordingly, the plaintiffs' legal
> malpractice claim [against the Rothenberg firm] is without
> merit and the defendants' motion for summary judgment
> should have been granted [citations omitted]."

See also: Parker Duryee Rosoff & Haft v. Ariss, 250 A.D. 2d 414 (1st Dept. 1998).

## POINT III:
## QUICKIE'S CLAIMS FOR ALLEGED NEGLIGENCE AND NEGLIGENT MISREPRESENTATION ARE LEGALLY INSUFFICIENT

Quickie's claims for negligence and negligent misrepresentation are duplicative of its

malpractice claim and therefore legally insufficient, since they arise from and involve the same

operative facts as the legal malpractice claim. As the Court held in Sonnenschine v. Giacomo,

295 A.D.2d 287, 288 (1st Dept. 2002):

> "Plaintiffs' remaining causes of action for . . . intentional
> and negligent misrepresentation allege the same operative
> facts as the cause of action for legal malpractice, and
> accordingly were properly dismissed for failure to state a
> cause of action."

Accord: Mecca v. Shang, 258 A.D.2d 569, 570 (2nd Dept. 1999) ("the court should have

dismissed Dr. Mecca's negligent misrepresentation and gross negligence causes of action since

these claims . . . arise from the same facts as his legal malpractice claim and are duplicative of

that cause of action").

**POINT IV:**
**QUICKIE'S CLAIM IS BARRED**
**BY THE STATUTE OF LIMITATIONS**

Quickie discharged GT and replaced it with Thelen as to the '160 Patent in March 2003; and, as corroborated by GT billings, GT did no further work as to the '160 Patent after that [Mov. Ex. AR, AM]. The testimony detailed above further corroborates that fact. This action was not commenced until mid- April 2007, more than four years later. As a result, Quickie's claim is barred by the statute of limitations.

New York CPLR 214(6) provides that a legal malpractice action, "regardless of whether the underlying theory is based in contract or tort", must be commenced within three years of the alleged malpractice. Zorn v. Gilbert, 8 N.Y.3d 933 (2007) ("an action for damages arising from legal malpractice must be commenced within three years of accrual"). As explained in Glamm v. Allen, 57 N.Y.2d 87, 95 (1982):

> "[A] cause of action against an attorney for malpractice accrues at the time of the malpractice complained of [citation omitted].
> It matters not that plaintiff was unaware of the malpractice until after the attorney died. What is important is when the malpractice was committed, not when the client discovered it."

Under the "continuous representation doctrine", New York law tolls the legal malpractice statute of limitation where the defendant-attorney continued to represent the plaintiff-client --- but *only* for that period in which the attorney continued to represent the client on the *same specific matter* in which the alleged malpractice occurred. The statute is *not* tolled for periods in which the attorney continued to represent the client on *other* matters. As explained in Shumsky v. Eisenstein, 96 N.Y.2d 164, 167 (2001):

> "'The concern is, of course, whether there has been continuous treatment, and not merely a continuing relation .

> . . [citation omitted]. Thus, the doctrine is not applicable to
> a client's . . . continuing general relationship with a lawyer
> . . . . involving . . . miscellaneous legal representation . . .
> unrelated to the matter upon which the allegations of
> malpractice are predicated. [citations omitted]. Instead, <u>in
> the context of a legal malpractice action, the continuous
> representation doctrine tolls the Statute of Limitations only
> where the continuing representation pertains *specifically to
> the matter in which the attorney committed the alleged
> malpractice* [citations omitted].</u>" (emphasis added)

Accord: <u>Glamm</u>, 57 N.Y.2d at 94 ("the continuous representation rule . . . is limited to situations

in which the attorney who allegedly was responsible for the malpractice continues to represent

the client in that case"); <u>Hasty Hills Stables v. Dorfman Lynch Knoebel & Conway</u>, --- A.D.3d. -

--, 2008 WL 2390326 at *2 (2nd Dept. 2008) ("defendant's subsequent representation of the

plaintiffs in matters unrelated to the *specific matter* that gave rise to the alleged malpractice was

insufficient to toll the statute of limitations" [emphasis added]).

GT's representation of Quickie during 2004 as to another *different* patent (i.e. the '243

Patent as opposed to the '160 Patent) does not satisfy the "specific matter" requirement. Indeed,

GT billed for and handled each such matter as a separate matter [Mov. Exs. AM, AR]. See, e.g.,

<u>Williamson v. Lipper Convertibles, L.P.</u>, 9 N.Y.3d 1, 7 and 9-11 (2007) (continuous represen--

tation rule does not apply where accounting firm continued to do annual audits of company since

each audit was a discrete matter).

As the Court of Appeals further explained in <u>Shumsky</u>, 96 N.Y.2d at 168-69, the

continuous representation doctrine may toll the statute after the attorney has completed work on

the specific matter *if* there is "a *mutual* understanding" between the attorney and the client that

the attorney will provide further work after the malpractice on that specific matter --- *but, <u>not</u>*

<u>where as here</u> there is no such "mutual understanding, and  client knows that the attorney will not

be performing further services:

"Of course, <u>even when further representation concerning the specific matter</u> in which the attorney allegedly committed the complained of malpractice <u>is needed and contemplated by the client, the continuous representation would nonetheless end once the client is informed . . . of the attorney's withdrawal from representation</u>." (emphasis added)

Accord: <u>Zorn</u>, 8 N.Y.3d 933 (2007) ("the continuous representation doctrine tolls the statute of limitations . . . where there is a *mutual understanding* of the need for further representation on the specific subject matter underlying the malpractice claim").

Here, the evidence shows that there was no such "*mutual understanding*" for GT to continue work as to the '160 Patent. Rather, as expressly confirmed by Quickie's later sworn statements [Mov. Exs. E, F and G], Quickie was no longer looking to GT as to the '160 Patent or the Maintenance Fee that would become due on it. In addition, Sharinn (of GT) had told that to Quickie and its General Counsel; and he had confirmed that in his May 15, 2003 letter [Mov. Ex. AF: we "will take no further action on this matter"]. GT's billings also show that GT did no other work on '160 Patent after that date [Mov. Ex. AR, AM].

## CONCLUSION

GT's motion for summary judgment should be granted.

Dated: July 22, 2008

Respectfully submitted,

POLLACK & KAMINSKY

By: _____

Martin I. Kaminsky  (MK 9033)
Justin Y. K. Chu  (JC 7810)
114 West 47th Street
New York, New York 10036
Tel No. (212) 575-4700
Fax No. (212) 575-6560

*Attorneys for Defendant*
*Greenberg Traurig, LLP*

25