UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

QUICKIE, LLC,

                    Plaintiff,                          07 Civ. 10331 (RMB) (DFE)

    -against-

GREENBERG TRAURIG, LLP, THELEN
REID BROWN RAYSMAN & STEINER, LLP          **ECF CASE**
(f/k/a THELEN, REID & PRIEST LLP) and
ROBERT E. KREBS,

                    Defendants.

---

## QUICKIE, LLC'S RESPONSE TO GREENBERG
## TRAURIG, LLP'S MOTION FOR SUMMARY JUDGMENT

DIAMOND MCCARTHY LLP
Allan B. Diamond (*pro hac vice*)
Walter J. "Skip" Scott (*pro hac vice*)
Stephen T. Loden (SL8754)
620 Eighth Avenue, 39th Floor
New York, New York 10018
Tel: (212) 430-5400

*Attorneys for Quickie, LLC*

August 26, 2008

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

SUMMARY JUDGMENT STANDARD ................................................... 3

STATEMENT OF FACTS .................................................................... 4

RESPONSE ...................................................................................... 12

    Quickie Did Not Discharge GT As Its Attorney With Respect
    To The Monitoring And Payment Of The '160 Patent
    Maintenance Fee .......................................................................... 13

    There are Genuine Issues of Material Fact Concerning The Scope
    And Duration of the GT/Quickie Attorney Client Relationship ..................... 13

    GT Is Not Entitled to Summary Judgment on Its Proximate
    Cause Arguments ......................................................................... 20

    GT Is Not Entitled to Summary Judgment on Its Statute of
    Limitations Arguments ................................................................... 22

    GT Is Not Entitled to Summary Judgment on Quickie's
    Negligent Misrepresentation Claim ................................................... 23

CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337,
   n. 2 (2nd Cir. 2006).................................................................................................13

*Albin v. Pearson*, 289 A.D.2d 272, 734 N.Y.S.2d 564 (2nd Dept. 2001)...........................22

*C.K. Indus. Corp. v. C.K. Indus. Corp.*, 213 A.D.2d 846, 848,
   623 N.Y.S.2d 410, 411 (3rd Dept. 1995)..............................................................14

*Campbell v. Fine, Olin & Anderson, .P.C.*, 168 Misc.2d 305,
   306, 642 N.Y.S.2d 819, 820 (N.Y. Sup. Ct. 1996)...........................................19, 21

*Diamond v. Sokol*, 468 F.Supp. 626, 632 (S.D.N.Y. 2006)..........................................passim

*Glamm v. Allen*, 57 N.Y.2d 87, 93, 439 N.E.2d 390, 393 (N.Y. 1982)........................23, 24

*Golden v. Cascione, Chechanover & Purcigliotti*, 286 A.D.2d 281,
   729 N.Y.S.2d 140 (1st Dept. 2001) .........................................................................18

*Greenwich v. Markhoff*, 234 A.D.2d 112, N.Y.S.2d 704 (1st Dept. 1996).........................18

*Harris v. Provident Life and Accident Ins Co.*, 310 F.3d 73, 79
   (2nd Cir. 2002)......................................................................................................4, 13

*Kozmol v. Law Firm of Allen L. Rothenberg*, 241 A.D.2d 484,
   660 N.Y.S.2d 63 (2nd Dept. 1997)..........................................................................22

*Lama Holding Co. v. Shearman & Sterling*, 758 F.Supp. 159,
   161 (S.D.N.Y. 1991)...............................................................................................25

*Mason Tenders Dist. Counsel Pension Fund v. Messera*, 4 F.Supp.2d 293,
   303 (S.D.N.Y. 1998)...............................................................................................25

*McLenithan v. McLenithan*, 273 A.D.2d 757, 710 N.Y.S.2d 674
   (3rd Dept. 2000)................................................................................................19, 20

*Parker Duryee Rosoff & Haft v. Ariss*, 250 A.D.2d 414,
   673 N.Y.S.2d 11 (1st Dept. 1998).............................................................................22

*Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 760 N.Y.S.2d 231
   (2nd Dept. 2003) ......................................................................................................18

*Reibman v. Senie*, 302 A.D.2d 290, 756 N.Y.S.2d 164 (1st Dept. 2003).........................22

*Sage Realty Corp. v. Proskauer Rose LLP*, 251 A.D.2d 35, 39,
   675 N.Y.S.2d 14, 18 (1st Dept. 1998).....................................................................25

*Shanley v. Welch*, 31 A.D.3d 1127, 1128, 818 N.Y.S.2d 878,
   880 (4th Dept. 2006)...............................................................................................20

*Shumsky v. Eisenstein*, 96 N.Y.2d 164, 166, 750 N.E.2d 67,
   69 (N.Y. 2001)...................................................................................................23, 24

*Solondz v. Barash*, 225 A.D.2d 996, 998, 639 N.Y.S.2d 561,
   564 (3rd Dept. 1996)........................................................................................14, 17, 25

*Somma v. Dansker & Aspromonte Assoc.*, 44 A.D.3d 376,
   843 N.Y.S.2d 577 (1st Dept. 2007) ..........................................................................18

*Tropp v. Lumer*, 23 A.D.3d 550, 551, 806 N.Y.S.2d 599,
   600 (2nd Dept. 2005) .......................................................................................14, 19, 20

## Statutes

NY CODE OF PROFESSIONAL RESPONSIBILITY, Ethical Consideration 2-41 (2007)................26

Quickie, LLC ("Quickie") responds to Greenberg Traurig, LLP's ("GT") Motion for Summary Judgment (the "GT Motion") as follows:

## PRELIMINARY STATEMENT

1.     At its heart, this litigation presents one central fact issue for the jury, namely:

**Was GT Quickie's attorney as to the '160 Patent
when maintenance fees were due on May 23, 2004?**

To answer that question under New York substantive law, the jury will be asked to examine GT's and Quickie's words and actions to determine whether GT either:  (a) affirmatively led Quickie to believe that it was acting as Quickie's attorney, or (b) knowingly allowed Quickie to proceed under that misconception.  As discussed below, there is substantial evidence from which the jury could answer that question in Quickie's favor.  For example:

- Months after Mr. Sharinn claims he was terminated, he told the United States Patent and Trademark Office and Quickie that he was Quickie's agent for receipt of all correspondence and reminders related to maintenance fees on the '160 Patent [Resp. Ex. M; Resp. Ex. U, p. 135, line 7 – p. 143, line 19];

- When the '160 Patent maintenance fees were due, GT and Mr. Sharinn were still on record at the PTO as Quickie's agents for receipt of all maintenance fee related correspondence. [Resp. Ex. M];

- GT cannot point to a single document showing that GT transferred client/matter number "51822.010700" (the matter in which it billed Quickie for monitoring maintenance fee deadlines) to Thelen. Resp. Ex. U, p. 228, line 19 - p. 229, line 23];

- Mr. Sharinn admits that he sent Quickie bills for work that was not actually performed, that he relied entirely on his assistant to ensure that his time was billed to the correct Quickie matter number, that GT's bills to Quickie were "very confusing," and that he did not pay close attention to them other than to see that the fees were reasonable and that they were being paid; [Resp. Ex. U, p. 113, line 13 – p. 115, line 6; p. 227, line 10 – p. 288, line 18; p. 268, line 3 – p. 269, line 25];

1

- GT and Mr. Sharinn continued to bill Quickie for work related to the '160 Patent and other intellectual property even after Mr. Sharinn claims that GT had been discharged for all engagements [Resp. Ex. U, p. 221, line 13 - p. 226, line 21];

- Even after Mr. Sharinn claims to have been discharged, he continued to provide advice and counsel to Quickie concerning the Medtronic litigation, the Reexamination Proceedings, and other Quickie matters [Resp. Ex. U, p. 105, line 18 - p. 110, line 11]; and

- Even though GT knew that Quickie was relying on it to monitor the maintenance fee deadlines, GT never told Quickie - in writing or orally - that it removed the '160 Patent maintenance fee deadlines from its internal calendaring systems; nor did Mr. Sharinn communicate the deadlines to Quickie or Thelen at the time he was allegedly terminated. [Fell Declaration, ¶ 7; Galloway Declaration ¶¶ 5-6, 10-13; Evens Declaration, ¶¶ 9 – 10; Resp. Ex. U, p. 187, line 6 – p. 189, line 22].

GT argues that this evidence should be either ignored or viewed in a light most favorable to GT, in an effort to obtain summary judgment on what, at base, is an inherently factually-intensive and hotly disputed material issue at the heart of this litigation.

2.      Not only does GT ask the Court to entirely ignore significant parts of the evidentiary record, it also asks the Court to ignore inconsistencies in the admissible evidence GT does cite. For example, GT asks the Court to disregard what it refers to as "aberrant examples" of sloppy file transfer letters where Mr. Sharinn expressly referred to specific matters, to the exclusion of what they now claim was transferred to Thelen. [GT Motion, p. 20, n. 13.] Indeed, GT even asks the Court to ignore the inconsistent testimony between *GT's own witnesses* on the topic of when they were allegedly discharged by Quickie: Mr. Sutton argues that GT's responsibility for maintenance fees on the '160 Patent was discharged by the March 2003 Reexamination Power of Attorney [Sutton Declaration, ¶ 89], but Mr. Sharinn maintains that the power of attorney was a mere "formality" and that GT had been terminated months earlier. [Resp. Ex. U, p. 153, line 5 – p. 154, line 2]. GT further asks the Court to rely on Mr. Sutton's

2

outright speculation as to Quickie's and Thelen's intentions, and to accept as hard fact Mr. Sutton's recounting and interpretation of conversations *for which he was not even a participant. See, e.g.,* Sutton Declaration, ¶¶ 55, 56, 62, 66, 70, 80, 98, 103, 122, 123, 124, 128, 129, 130, and 135.[1]

3.    Although GT spends two-third of its motion presenting a selective sampling of the "evidence" to argue that no jury could find in Quickie's favor, it fails to cite a single case supporting its request that the Court consider facially inadmissible evidence, weigh that evidence, make credibility judgments, and resolve ambiguities in its favor to reach the desired summary judgment result. In fact, GT *cannot* cite such a case for the simple reason that such cases do not exist - black-letter law holds that a Court is not required to consider inadmissible evidence, weigh the admissible evidence and make credibility assessments to resolve a Rule 56 motion for summary judgment. Instead, the Court is only required to review all of the admissible evidence and determine whether a reasonable jury could determine that GT was in fact Quickie's attorney for the '160 Patent as of the May 23, 2004 maintenance fee due date.

4.    As discussed below, a full review of the admissible evidence presents more than enough facts from which a reasonable jury could find that GT was in fact *not* discharged in October 2002, March 2003, or whatever other date GT maintains the discharge allegedly occurred. For that reason, GT has failed to sustain its summary judgment burden, and Quickie thus respectfully asks the Court to deny the GT Motion in its entirety.

## SUMMARY JUDGMENT STANDARD

5.    GT makes two broad summary judgment arguments: (1) GT had been fired as Quickie's attorneys prior to the maintenance fees becoming due, and thus there was no

---

[1]    Concurrently herewith, Quickie is also filing its Motion to Strike Inadmissible Summary Judgment Evidence.

3

negligence, there is no proximate cause, and the statute of limitations on Quickie's claims has expired; and (2) Quickie's negligent misrepresentation claim should be dismissed because it is duplicative of the legal malpractice claims. To be entitled to summary judgment, GT must "demonstrate that no genuine issue respecting any material fact exists" as to one or more elements of Quickie's claims. *Harris v. Provident Life and Accident Ins Co.*, 310 F.3d 73, 79 (2nd Cir. 2002). A genuine issue of material fact exists if the evidence is such that a reasonable jury could find that GT did in fact continue to represent Quickie when the maintenance fees became due. *Diamond v. Sokol*, 468 F.Supp. 626, 632 (S.D.N.Y. 2006). In reviewing the summary judgment evidence, all ambiguities and reasonable references must be resolved in the light most favorable to Quickie, and the Court is not to make any credibility assessments or weigh the evidence. *Id.*

## STATEMENT OF FACTS

6.      In May 1998, Quickie retained Todd Sharinn and the law firm in which he was employed, Pepe Hazard LLP ("PH"), to pursue a patent application for a device known as the "Passive Knotless Suture Terminator for use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing" for use in heart surgeries (the "Quickie Device"). [Galloway Declaration, ¶ 3; Fell Declaration, ¶ 3]. Mr. Sharinn was the PH attorney-in-charge of the Quickie representation, and he filed the Quickie Device patent application with the PTO on November 23, 1998. [Galloway Declaration, ¶ 3].

7.      On May 23, 2000, the PTO issued U.S. Patent No. 6,066,160 covering the Quickie Device (the "160 Patent"). [Galloway Declaration, ¶ 4; Fell Declaration, ¶ 5]. On May 30, 2000, Sharinn wrote to inform Quickie that the '160 Patent had been granted, and stated that

4

he and PH would monitor the deadlines to pay maintenance fees on the '160 Patent and notify

Quickie prior to those fees becoming due:

> Please note that the United States Patent and Trademark Office
> requires the payment of fees for maintaining patents issuing from
> patent applications filed in the United States on or after December
> 12, 1980 . . . . The fees are due on or before 3 ½, 7 ½, and 11 ½
> years from the date the patent issues. Failure to pay the fees will
> result in loss of the patent. We will notify you regarding payment of
> the maintenance fees several months before they are due.

[Fell Declaration, ¶ 5].

     8.    When Mr. Sharinn left PH and joined GT in May 2001, Quickie and Mr. Sharinn

agreed that he would continue as Quickie's patent attorney. [Resp. Ex. U, p. 54, line 2 – p. 56,

line 24]. Thus, Mr. Alan Fell, a member of Quickie as well as Quickie's general outside counsel,

instructed PH to transfer all of Quickie's files to Mr. Sharinn at GT. [Fell Declaration, ¶ 6].

Shortly thereafter, GT completed a client matter intake memorandum for use in GT's accounting

and conflicts systems, and Quickie was assigned client number "51822." [Resp. Ex. U, p. 110,

line 22 - p. 111, line 10; Resp. Ex. T, p. 221, line 14 - p. 223, line 10]. GT's patent docketing

clerks also entered the '160 Patent maintenance fee deadlines into GT's internal calendaring

systems under the GT client/matter number "51822.010700." [Resp. Ex. U, p. 148, line 19 - p.

151, line 25; Resp. Ex. T, p. 69, line 3 – p. 71, line. 4].

     9.    When Quickie learned that Medtronic, Inc. was marketing a product that infringed

on the '160 Patent, its engagement with GT was expanded to include the investigation and pursuit

of patent infringement claims against Medtronic and possibly others. [Galloway Declaration, ¶ 7;

Fell Declaration, ¶ 8].    In that regard, GT opened a new client/matter for the Medtronic

Litigation, designated as "51822.010400." [Resp. Ex. U, p. 123, line 17 - p. 124, line 16].  At

that time, however, Mr. Sharinn was not yet a partner at GT and he felt uncomfortable taking on

a case of that magnitude, so he asked Paul Sutton, GT's Senior Chair for Intellectual Property and Technology, to provide senior supervision on the litigation. [Resp. Ex. U, p. 161, lines 3 - 24].

10.      Messrs. Sharinn and Sutton were initially responsive to Quickie's needs, but Mr. Sutton failed to appear for the Markman hearing on September 4, 2002, leaving Mr. Sharinn to handle that critical hearing himself. [Fell Declaration, ¶ 9; Galloway Declaration, ¶ 8; Evens Declaration, ¶ 3]. Judge Lynch eventually issued a very favorable Markman hearing, but Mr. Sutton's failure to appear for the hearing, despite having billed Quickie for time preparing for the hearing, caused Quickie to be concerned about GT's handling of a significant piece of litigation. [Galloway Declaration, ¶ 8; Fell Declaration, ¶ 9; Evens Declaration, ¶ 3].

11.      Shortly after the Markman hearing, Quickie therefore decided to transfer the Medtronic litigation to Thelen, Reid & Priest LLP ("Thelen") and Mr. Mark Evens who was not only an experienced patent litigator, but was also someone familiar as the brother-in-law of Dr. Stephen Colvin, one of Quickie's founding members. [Galloway Declaration, ¶ 9; Fell Declaration, ¶ 9; Evens Declaration, ¶ 3]. Mr. Fell informed Mr. Sharinn of Quickie's decision in a telephone call in early October 2002. [Fell Declaration, ¶ 9; Resp. Ex. U, p. 96, line 15 – p. 97, line 21]. In that conversation, Mr. Fell asked Mr. Sharinn to transfer the Medtronic Litigation file to Thelen, but stated that Quickie wanted Mr. Sharinn and GT to continue to act as Quickie's patent counsel for all other aspects of the ' 160 Patent. [Fell Declaration, ¶ 10]. Mr. Fell confirmed those instructions in a letter to Mr. Sharinn dated October 15, 2002, in which he stated that while Thelen was being substituted for GT in connection with the Medtronic Litigation, Mr. Sharinn and GT would continue to handle various other patent applications on Quickie's behalf. [Fell Declaration, ¶¶ 10 - 11].

6

12.    Consistent with Mr. Fell's instructions, on October 16, 2002, GT sent the Medtronic litigation files to Thelen with a cover letter referencing client/matter number 51822.010400 (the Medtronic Litigation matter number), not 51822.010700 (the '160 Patent matter number). [Krebs Declaration, ¶¶ 3 - 4; Evens Declaration, ¶¶ 4 – 8; Resp. Ex. U, p. 195, line 4 - p. 196, line 2]. Thereafter, Mr. Sharinn and GT continued to bill Quickie for work related to the '160 Patent (client/matter 51822.010700), thus indicating their acknowledgement that GT continued to be engaged as Quickie's attorney with respect to all aspects of the '160 Patent other than the Medtronic Litigation. [Galloway Declaration, ¶ 10; Fell Declaration, ¶ 11; Resp. Ex. U, p. 221, line 13 - p. 226, line 21]. GT further acknowledged its continuing responsibility for the '160 Patent when, on December 16, 2002, Mr. Sharinn instructed the PTO to deliver all maintenance fee-related correspondence concerning the '160 Patent to Mr. Sharinn at his GT office located at 200 Park Avenue, New York, New York. [Resp. Ex. F; Resp. Ex. U, p. 135, line 5 -p 143, line 19; Fell Declaration, ¶ 11; Galloway Declaration, ¶ 10; Krebs Declaration, ¶ 4; Evens Declaration, ¶ 8].

13.    In late 2003, Medtronic commenced reexamination proceedings before the PTO in an effort to limit the scope of the '160 Patent so that Medtronic would no longer infringe on the '160 Patent (the "Reexamination Proceedings") [Fell Declaration, ¶ 12; Galloway Declaration, ¶ 7; Evens Declaration, ¶ 11]. Mr. Sharinn initially hoped that Quickie would hire him to handle the Reexamination Proceedings, so he opened a new GT client/matter number "51822.010900" for the Reexamination Proceedings. [Resp. Ex. U, p. 132, line 8 – p. 134, line 3; GT Motion, p. 20].

14.    Because the Reexamination Proceedings were an off-shoot of the Medtronic Litigation, Quickie decided instead that it would be more appropriate and cost-effective for

7

Thelen to handle those matters. [Galloway Declaration, ¶ 11; Fell Declaration, ¶ 12; Evens Declaration, ¶ 11]. Quickie and Thelen thus expanded their engagement to include the Reexamination Proceedings, and Thelen prepared and asked Quickie to execute a power of attorney (the "Reexamination Power of Attorney") to permit Thelen to represent Quickie before the PTO in connection with those Proceedings. [Galloway Declaration, ¶ 11; Fell Declaration, ¶ 12; Evens Declaration, ¶ 12; Krebs Declaration, ¶¶ 6-8].

15.    On March 17, 2003, Thelen filed the Reexamination Power of Attorney in the Reexamination Proceedings, *not* in the PTO's primary '160 Patent file. [Krebs Declaration, ¶¶ 6 - 8]. The Reexamination Power of Attorney prominently refers to Control No. 90/006,460, which is the number the PTO assigned to the Reexamination Proceedings. [Krebs Declaration, ¶ 8]. Mr. Krebs testifies, and Mr. Evens confirms, that the Reexamination Power of Attorney in no way indicated Thelen's acceptance of GT's responsibility for monitoring maintenance fee deadlines on the '160 Patent. [Krebs Declaration, ¶ 7; Evens Declaration, ¶¶ 12-15]. In fact, the Reexamination Power of Attorney does not even appear in the file history for the '160 Patent application. [Krebs Declaration, ¶ 8]. Likewise, when Dr. Galloway executed the Reexamination Power of Attorney, he understood that Quickie was only authorizing Thelen to represent it in connection with the Reexamination Proceedings. [Galloway Declaration, ¶¶ 11-13].

16.    When Thelen filed the Reexamination Power of Attorney, Mr. Sharinn and GT were still on record at the PTO as the designated recipients of all communications concerning maintenance fees on the '160 Patent. [Krebs Declaration, ¶ 7; Resp. Ex. M; Resp. Ex. U, p. 135, line 5 - p. 143, line 19]. Moreover, pursuant to Mr. Sharinn's communications with Mr. Fell in October 2002, and as demonstrated by Mr. Sharinn's delivery of the Fee Address Notice to Quickie, GT was aware that Quickie was still relying on it to monitor and provide notice of the

8

maintenance fee deadlines. [Fell Declaration, ¶¶ 13 – 15; Krebs Declaration, ¶ 7; Resp Ex. U, p. 135, line 5 - p. 143, line 19]. Indeed, Mr. Sharinn and GT continued to represent Quickie concerning a wide range of intellectual property matters at that time, so it was entirely appropriate for Quickie to expect to be specifically told by GT that it should no longer rely on GT to monitor the '160 Patent. [Fell Declaration, ¶¶ 10-15].

17.    Mr. Sharinn was surprised that Quickie decided to hire Thelen, rather than GT, to handle the Reexamination Proceedings. [Resp. Ex. U, p. 243, line 4 - p. 244, line 18; Mov. Ex. AF]. He expressed that surprise in a letter to Mr. Fell dated May 19, 2003, stating that he received notice that the Reexamination Power of Attorney had been "filed in connection with the above-referenced re-examination application" and that, "while we are surprised to have received this document in view of the conversations I had with Dr. Colvin, we respect his decision and will take no further action in this matter." [Resp. Ex. U, p. 243, line 4 - p. 244, line 18; Mov. Ex. AF].    The matter Mr. Sharinn referred to, GT client/matter number 51822.010900 (the Reexamination Proceedings number) is prominently set forth in the "Re:" line of the correspondence.[2] [Mov. Ex. AF]

18.    Mr. Sharinn's correspondence referenced only the Reexamination Proceedings, and said nothing about GT client/matter numbers 51822.010100 (the matter GT opened for work related to the Quickie Device), 51822.010400 (the GT matter for the Medtronic litigation), or

---

[2]    GT asks the Court to disregard this and other "aberrant examples" of GT's failure to clearly state that it was transferring the matters it now claims were transferred. [GT Motion, p. 20, n. 13.] Instead, GT asks the Court to find, as a matter of law, that "the parties simply did not pay strict attention to such matters" and that they are "not worthy of significance." *Id.* In other words, GT not only asks the Court to find an ambiguity in a patently unambiguous document, but to then compound the error by resolving that ambiguity, and drawing all reasonable references, in favor of *GT*, not Quickie as required by applicable law. *Diamond v. Sokol*, 468 F.Supp. at 632.

51822.010700 (the matter under which GT calendared the maintenance fee deadlines). [3] [Mov. Ex. AF]. Moreover, Mr. Sharinn's correspondence says *absolutely nothing* about the fact that GT had also decided at that time to stop monitoring the '160 Patent maintenance fee deadlines. [Mov. Ex. AF]. Equally important, there is not a single piece of evidence - a letter, a document, a conversation, an email, or otherwise - remotely suggesting that GT *ever* informed Quickie that it was going to stop monitoring the maintenance fee deadlines, and Mr. Sharinn testified that he "wouldn't even begin to guess" whether any such documents exist because "it's just not something that I would even think about." [Resp. Ex. U, p. 228, line 19 - p. 229, line 23]. Instead, Mr. Sharinn and GT silently stood by as the '160 Patent expired despite the fact that they continued to represent Quickie's intellectual property interests at the time. They even went so far as to remind Quickie to pay the maintenance fees on another patent *at the same time* that the '160 Patent was expiring, yet they never said a word to Quickie about their unilateral decision to remove the '160 Patent from GT's calendaring systems. [Evens Declaration, ¶ 16, Resp. Ex. U]. Mr. Fell thus had no reason to suspect that Mr. Sharinn intended the reference in his May 19, 2003, correspondence to "this matter" to actually refer to all Quickie matters. [Fell Declaration, ¶¶ 13 - 15; Galloway Declaration, ¶ 12].

19.    Despite the fact that Quickie had paid GT thousands of dollars to monitor and protect the '160 Patent, and that Quickie was continuing to pay GT to protect other patents, Quickie did not learn of the '160 Patent's expiration until St. Jude Medical, a large medical device company, pulled out of negotiations to license the '160 Patent from Quickie. [Galloway Declaration, ¶ 14]. Shortly thereafter, Quickie hired Timothy Maier of the law firm, Maier & Maier LLC, to petition the PTO to reinstate the '160 Patent. [Galloway Declaration, ¶ 14]. Mr.

---

[3]    For the record, GT did not reveal its unilateral decision to stop monitoring those deadlines until it was forced to do so during discovery in this litigation.

Maier asked Dr. Galloway, Quickie's managing member, to execute a declaration describing Quickie's efforts to ensure that maintenance fees on the '160 Patent were monitored and paid. [Galloway Declaration, ¶ 15]. Because of Dr. Galloway's surgery schedule and the urgent need to file Quickie's reinstatement application, he asked his staff to place his signature on the declaration without actually reading it himself. [Galloway Declaration, ¶ 15]. It was only when Dr. Galloway reviewed his declaration during preparation for his deposition in this litigation that he realized it did not fully describe Quickie's expectations of its outside patent counsel with respect to the '160 Patent. [Galloway Declaration, ¶ 16].

20.    Dr. Galloway thus testified in his deposition that the declaration was incomplete in that Quickie continued to expect GT and Mr. Sharinn to monitor and provide notice of the maintenance fee deadlines even after Thelen had been retained to litigate the Reexamination Proceedings. [Resp. Ex. P, p. 82, line 20 - p. 83, line 9]. Quickie also informed the PTO in a subsequent filing that, while Thelen was in fact Quickie's authorized representative in connection with the Reexamination Proceedings, Quickie nevertheless had every reason to expect GT and Mr. Sharinn to continue to monitor the maintenance fee deadlines and provide notice shortly before those fees were due to be paid. [Galloway Declaration, ¶¶ 17 - 18; Resp. Ex. Q, pps. 3-4]. Ironically, while GT now questions Galloway's credibility because he did not closely review his declaration before authorizing his staff to sign it, Mr. Sharinn testified that he did the same thing when executing the Fee Address Notice. Specifically, he said that he did not pay "a lot of attention" to the Fee Address Form which, he says, was "generated by a paralegal and probably put in front of me with a stack of others just like it." [Resp. Ex. U, p. 135, line 7 – p 139, line 10]. Of course, the Fee Address Notice is one of the primary documents by which GT notified the PTO and Quickie that GT was responsible for handling maintenance fees on the '160 Patent.

11

However, unlike Dr. Galloway and Quickie who both have supplemented their originally incomplete statements to the PTO, neither Mr. Sharinn nor GT have undertaken any effort whatsoever to notify the PTO or Quickie that their filing of the Fee Address Notice was in error or that they are not the proper parties to receive PTO correspondence concerning maintenance fees on the '160 Patent.

21.    Quickie sought GT's assistance in providing documents and information to support the efforts to revive the '160 Patent, but GT flatly refused to answer any of Quickie's questions or provide any of GT's documents. [Galloway Declaration, ¶ 19]. After the '160 Patent expired, Quickie was unable to pursue its patent infringement claims against Medtronic and other manufacturers of products that infringe on the '160 Patent. Medtronic and those other manufacturers continue to this day to make millions of dollars off of Quickie's invention.[4] [Galloway Declaration, ¶ 20].

### RESPONSE

22.    As discussed, GT argues that summary judgment is appropriate because: (1) GT had been fired as Quickie's attorneys prior to the maintenance fees becoming due, and thus there was no negligence, there is no proximate cause, and the statute of limitations on Quickie's claims has expired; and (2) Quickie's negligent misrepresentation claim should be dismissed because it is duplicative of the legal malpractice claims. As discussed below, none of those arguments merit summary judgment for the simple fact that GT has failed to satisfy its burden of "demonstrate[ing] that no genuine issue respecting any material fact exists" as to one or more

---

[4]    Pursuant to the stipulation approved by the Court on June 23, 2008 [Dkt. No. 33], GT's summary judgment motion was to be limited solely to liability issues to the exclusion of damages issues. Nevertheless, the GT Motion argues that Quickie sustained no damages because the '160 Patent was allegedly "gutted" in subsequent PTO proceedings. *See, e.g.*, GT Motion pps. 10, n. 8. In light of the stipulation, Quickie asks the Court to strike GT's arguments and summary judgment on those issues.

elements of Quickie's claims. *Harris v. Provident Life and Accident Ins Co.*, 310 F.3d 73, 79 (2nd Cir. 2002). Whether malpractice has occurred is "normally a factual determination for the jury" and on summary judgment the Court is only required to determine whether there is sufficient evidence from which a reasonable jury could find that GT did in fact continue to represent Quickie when the maintenance fees became due. *Diamond v. Sokol*, 468 F.Supp. 626, 632 (S.D.N.Y. 2006).

**Quickie Did Not Discharge GT As Its Attorney With
Respect To The Monitoring And Payment Of
The '160 Patent Maintenance Fees**

23.     New York substantive law applies to determine the scope and duration of the attorney-client relationship between Quickie and GT. *Diamond*, 468 F.Supp. at 632, *citing Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337, n. 2 (2nd Cir. 2006) (deeming New York law applicable to legal malpractice claim regardless of the basis for federal jurisdiction). As discussed, there is a significant amount of evidence from which a jury could conclude that GT continued to represent Quickie with respect to the '160 Patent beyond the time when maintenance fees were due. For similar reasons, GT's proximate cause and statute of limitations arguments fail. Accordingly, GT has not demonstrated that it is entitled to summary judgment.

*There are genuine issues of material fact concerning
the scope and duration of the GT/Quickie attorney-client relationship.*

24.     GT's summary judgment arguments are premised on one central contention; namely, that GT was discharged as Quickie's attorney with respect to the '160 Patent before the maintenance fees were due. *See, e.g.*, GT Motion, p. 2 ("In sum, GT bears no responsibility for the loss of the patent since GT was not counsel to Quickie when the Maintenance Fee became and was due . . . . [sic]"). In New York, the jury must look to the words and actions of the parties

13

to construe the scope and duration of the attorney-client relationship between GT and Quickie. *Tropp v. Lumer*, 23 A.D.3d 550, 551, 806 N.Y.S.2d 599, 600 (2nd Dept. 2005); *C.K. Indus. Corp. v. C.K. Indus. Corp.*, 213 A.D.2d 846, 848, 623 N.Y.S.2d 410, 411 (3rd Dept. 1995). Evidence that the defendant "either affirmatively led plaintiff to believe that he was acting as plaintiffs attorney or knowingly allowed plaintiff to proceed under that misconception," raises fact issues concerning the extent and duration of the attorney-client relationship, thus making summary judgment inappropriate. *See Solondz v. Barash*, 225 A.D.2d 996, 998, 639 N.Y.S.2d 561, 564 (3rd Dept. 1996) (affirming summary judgment after noting that plaintiff failed to introduce any such evidence).

25.     As recited previously, there is ample evidence from which a jury could conclude that Quickie reasonably expected GT to continue acting as its attorneys with respect to its intellectual property interests generally and the '160 Patent in particular through the time when the maintenance fees were due. Specifically, Quickie's summary judgment evidence confirms that:

- GT became Quickie's attorney for monitoring and providing notice of the maintenance fees when Mr. Sharinn joined GT [Resp. Ex. U, p. 148, line 19 - p. 151, line 25; Resp. Ex. T, p. 69, line 3 - p. 71, line 4];

- GT entered the '160 Patent maintenance fee deadlines into its internal calendaring system [Resp. Ex. U, p. 110, line 22 - p. 111, line 10; Resp. Ex. T, p. 221, line 14 - p. 223, line. 10];

- Months after Mr. Sharinn says he was "fired," he notified the PTO and Quickie that he was Quickie's agent for receipt of maintenance fee correspondence concerning the ' 160 Patent [Resp. Ex. U, p. 135, line 5 - p. 143, line 19; Fell Declaration, ¶ 11];

- Months after Mr. Sharinn says he was "fired," he continued to represent Quickie concerning the '160 Patent and other intellectual property matters [Resp. Ex. U, p. 105, line 18 - p. 110, line 11; p. 221, line 13 - p. 226, line 21];

14

- None of the correspondence transferring files from GT to Thelen references the client/matter numbers GT established for monitoring maintenance fees on the '160 Patent [Mov. Ex. AF; Resp. Ex. U, p. 228, line 19 - p. 229, line 23];

- The Thelen partner in charge of representing Quickie in the Reexamination Proceedings confirms that GT conveniently now misconstrues the purpose and legal effect of the Reexamination Power of Attorney [Krebs Declaration, ¶¶ 6-8]; and

- Even though GT had more than enough reason to be aware that Quickie was expecting GT to continue monitoring the maintenance fee deadlines, GT *never* told Quickie that it had removed the '160 Patent from its internal calendaring systems. [Galloway Declaration, ¶¶ 10-13; Fell Declaration, ¶¶ 13-15].

26.    The jury will not just hear from Quickie's witnesses about how they were led to believe that GT was honoring its commitments, they will also hear that GT's own witnesses cannot agree on when and how GT was allegedly discharged from those commitments to Quickie. Mr. Sharinn, for example, will testify that the Reexamination Power of Attorney was a "formality," and that it had no effect on his responsibility for looking after the '160 Patent:

Q:    Do I understand, though, that your testimony is that you ceased having responsibility for the '160 Patent as of the date that you received the phone call on October of 2002 from [Quickie] following the Markman hearing?

A:    That would have been my understanding, yes, sir.

Q:    And it didn't take any revocation of any Power of Attorney for you to have that understanding?

A.    They made it very clear on the telephone [in October 2002] that we had, that I was to do no more work and bill no more time.

Q.    So the revocation of a Power of Attorney would have been a formality in your, to your understanding?[5]

---

[5]    GT's counsel asserted a general objection to the form of this question, but did not specify the basis for that objection.

A:    I guess that would be a fair characterization.

[Resp. Ex. U, p. 153, line 5 - p. 154, line 2]. Mr. Sutton, on the other hand, will testify that, but for the Reexamination Power of Attorney, GT would have "advised Quickie or paid the Fee itself as a disbursement." GT Motion, p. 14, n. 14; Sutton Declaration, p. 17, ¶ 89.

27.    For its part, GT will argue that the jury should disregard that evidence because Dr. Galloway signed a sworn declaration, and Quickie filed PTO pleadings, that do not mention GT as having responsibility for the '160 Patent, but those filings are just one side of the disputed issue *See, e.g.,* GT Motion, pps. 3 - 4. As discussed, Dr. Galloway testified in deposition that his declaration was incomplete in that he was still expecting GT to honor its commitment to monitor the '160 Patent, and Quickie did in fact file supplemental PTO pleadings clarifying its arguments with respect to GT's ongoing responsibilities. [Galloway Declaration, ¶¶ 15-16; Resp. Ex. P, p. 82, line 20 p. 83, line 9; Resp. Ex. Q]. GT simply ignores this evidence, and improperly asks the Court to give no weight to it, but instead find that Dr. Galloway's deposition testimony is not credible in light of his earlier statements to the PTO. Ironically, GT asks the Court to discredit Dr. Galloway's declaration and deposition testimony, yet at the same time GT ignores the fact that, unlike Dr. Galloway and Quickie, neither Mr. Sharinn nor GT has *ever* retracted the Fee Address Notice that they filed with the PTO in December 2002.

28.    Of course, it is the jury's function to assess a witnesses' credibility at trial, it is not the Court's responsibility to make that assessment when deciding a motion for summary judgment. *See Diamond*, 468 F.Supp. at 632 ("the court is not to make any credibility assessments or weigh the evidence at this stage.") Rather than weighing the evidence and making credibility assessments, the Court is only required to determine whether, after reviewing the evidence and making all reasonable inferences and resolving all ambiguities in Quickie's

16

favor, a reasonable jury could find that GT either "affirmatively led [Quickie] to believe that [it] was acting as [Quickie's] attorney or knowingly allowed [Quickie] to proceed under that misconception." *Solondz*, 225 AD.2d at 998; *Diamond*, 468 F.Supp. at 632. Judge Lynch stated in *Diamond*:

> While the standard for proving legal malpractice is a challenging one, plaintiff need not prove her case at this stage. She need only show what is required to survive any summary judgment motion, which is that a reasonable jury *could* find in her favor on the existing record. "[W]hether malpractice has been committed is normally a factual determination to be made by the jury." Once the plaintiff has shown sufficient evidence that a reasonable fact finder, drawing all inferences in her favor, could find the required elements, she is entitled to proceed to trial, no matter how strong or weak her case may seem to the Court [internal citations omitted].

*Diamond*, 468 F.Supp. at 634. As discussed, the record contains an abundance of evidence from which a reasonable jury could find that GT committed malpractice in failing to provide the promised maintenance fee reminders. For that reason alone, GT is not entitled to summary judgment.

29.     Moreover, none of the cases GT cites support its request for summary judgment on the evidentiary record present here. For example, GT cites *Somma v. Dansker & Aspromonte Assoc.*, 44 A.D.3d 376, 843 N.Y.S.2d 577 (1st Dept. 2007), yet that one-page decision simply states, without any discussion whatsoever, that "defendants no longer represented plaintiff at the time" of the alleged malpractice. *Id.* GT cites other cases that likewise contain no discussion of the evidence. *See, e.g.*, *Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 760 N.Y.S.2d 231 (2nd Dept. 2003) (dismissing plaintiff's malpractice claims after tersely noting only that the defendant "submitted evidence establishing that plaintiffs discharged them and hired new counsel"); *Golden v. Cascione, Chechanover & Purcigliotti*, 286 A.D.2d 281, 729 N.Y.S.2d 140 (1st Dept.

2001) (finding, without any discussion whatsoever, that defendant was not plaintiff's attorney at the time of the alleged malpractice).

30.    GT does cite one case in which the Court discussed the plaintiffs evidence, but that discussion does not support GT's summary judgment arguments here.  *Greenwich v. Markhoff*, 234 A.D.2d 112, N.Y.S.2d 704 (1st Dept. 1996).  In *Greenwich*, the plaintiff argued that his former litigation counsel was negligent by failing to commence a workers compensation lawsuit before the statute of limitations expired.  *Id.* at 113.  In upholding the trial court's dismissal of those claims, the appellate division found that because the plaintiff acknowledged that he replaced his former litigation counsel at least two years before limitations expired, the former law firm could not be held responsible for malpractice *in handling that litigation.  Id.* at 114.    The *Greenwich* decision might be relevant if Quickie asserted that GT committed malpractice in the Medtronic litigation, but that is not what Quickie claims.  Instead, Quickie's malpractice claims are based upon an engagement that was separate and apart from GT's prior role as counsel to Quickie in the Medtronic litigation.  For that reason, *Greenwich* likewise fails to support GT's summary judgment arguments.

31.    In contrast to the sparse evidentiary records revealed in the cases GT cites in its motion, Quickie has presented an abundance of evidence raising questions about the scope and duration of the Quickie/GT engagement.  New York courts routinely deny summary judgment after reviewing the type of evidentiary record that is present here.  For example, in *Tropp*, 23 A.D.2d at 551, the Court denied summary judgment because the evidence showed that, as is the case here, the defendant said he would monitor the plaintiffs' case and that plaintiff and defendant discussed the case on a regular basis.  *Id.*  In another case, the court affirmed denial of a defendant's motion for summary judgment because:

18

> although defendant testified that he did not 'directly' understand that
> plaintiffs were expecting him to provide legal services vis-à-vis the
> project, he admitted that he never specifically disavowed his role as
> their attorney.

*McLenithan v. McLenithan*, 273 A.D.2d 757, 710 N.Y.S.2d 674 (3rd Dept. 2000). Similarly,

summary judgment was denied for a law firm who missed the deadline to file a workers

compensation lawsuit, even though that law firm argued that its engagement did not include

bringing lawsuits. *Campbell v. Fine, Olin & Anderson, P.C.*, 168 Misc.2d 305, 306, 642

N.Y.S.2d 819, 820 (N.Y. Sup. Ct. 1996). In so finding, the trial court made an observation that

is equally applicable to the present case: if the law firm believed that the engagement was

limited, it had "an affirmative duty to ensure that the client understands [the] limits imposed by

the attorney on the extent of the work to be performed." *Id*. Indeed, even where the plaintiff

acknowledged that the attorney played no role whatsoever in the negotiation of a settlement

agreement that had been set aside because it was not drafted and executed properly, summary

judgment was still denied because there was evidence that the defendant was plaintiff's attorney

for the related task of drafting and executing that agreement. *Shanley v. Welch*, 31 A.D.3d 1127,

1128, 818 N.Y.S.2d 878, 880 (4th Dept. 2006).

32.    Likewise here, Quickie has presented evidence that GT told Quickie that it would

monitor the '160 Patent maintenance fee deadlines. *See* Statement of Facts, *infra; see also*

*Tropp*, 23 A.D.2d at 551 (denying summary judgment where defendant said he would monitor

the plaintiffs' case). Moreover, although Mr. Sharinn maintains that he was fired as Quickie's

attorney in October 2002, he informed the PTO in December 2002 that he was still Quickie's

attorney for maintenance fees, and he continued to "lend his ear" when Quickie called him to talk

about what was happening in the case. [Resp. Ex. U, p. 105, line 18 - p. 106, line 19]. *See*

*McLenithan*, 273 A.D.2d at 759 (denying summary judgment in part because plaintiffs offered

evidence other than their "unilateral beliefs" to show an attorney-client relationship). Similarly, even though GT may have thought that Quickie was not expecting GT to continue monitoring the '160 Patent maintenance fees after Thelen was hired, GT never disavowed its role as Quickie's attorney in that regard. *McLenithan*, 273 A.D.2d at 759 (finding triable fact issues where defendant attorney failed to specifically disavow responsibility for one part of a real estate project where he represented plaintiff in other respects concerning the same project); *see also Campbell*, 168 Misc.2d at 308 (denying summary judgment because "an attorney has an affirmative duty to ensure that the client understands any limits imposed by the attorney on the extent of the work to be performed.")

33.    As Judge Lynch noted in *Diamond*, it is the jury's function to review this evidence and determine whether or not GT committed malpractice here. 468 F.Supp. at 634. Quickie has offered compelling evidence that will lead any reasonable jury to conclude that GT absolutely committed malpractice when it failed to timely provide the promised reminder that maintenance fees were due on the '160 Patent. For those reasons, Quickie asks the Court to deny GT's motion for summary judgment.

*GT is not entitled to summary judgment on its proximate cause arguments*

34.    Citing many of the same cases it cites in support of the assertion that GT had been fired before the maintenance fees were due, GT also argues that summary judgment is appropriate because GT could not have proximately caused Quickie's damages after it had allegedly been replaced by Thelen. [GT Motion, pps. 20 22.] As discussed previously, it is hardly a foregone conclusion that GT was in fact replaced by Thelen as to the '160 Patent maintenance fees, and there is ample evidence from which a jury could conclude that GT was never discharged from that responsibility. GT's failure to demonstrate the absence of fact issues

as to the scope and extent of its engagement as Quickie's attorney is fatal to its proximate cause arguments.

35.    The cases GT cites in support of its proximate cause arguments also fail to support the entry of summary judgment on the evidentiary record present here. For example, GT cites *Albin v. Pearson* and *Reibman v. Senie*, yet those cases simply state that proximate cause was lacking because the plaintiff had discharged his prior counsel well before the alleged malpractice occurred, without any discussion at all of the evidence in support of that conclusion. *Albin v. Pearson*, 289 A.D.2d 272, 734 N.Y.S.2d 564 (2nd Dept. 2001); *Reibman v. Senie*, 302 A.D.2d 290, 756 N.Y.S.2d 164 (1st Dept. 2003). *Kozmol* is likewise of no help to GT's arguments because it assumes, again without discussion, that proximate cause was lacking because the plaintiff had hired new counsel to pursue his failed personal injury lawsuit. *Kozmol v. Law Firm of Allen L. Rothenberg*, 241 A.D.2d 484, 660 N.Y.S.2d 63 (2nd Dept. 1997).

36.    The only proximate cause case GT cites in which the Court analyzed the evidence actually supports denial of summary judgment here. *Parker Duryee Rosoff & Haft v. Ariss*, 250 A.D.2d 414, 673 N.Y.S.2d 11 (1st Dept. 1998). In *Parker*, plaintiff's prior counsel argued proximate cause was lacking because he had been replaced with new counsel in the underlying arbitration proceeding. *Id.* The court agreed that the claims should be dismissed, but only because the successor attorney testified that:

> he was able to present all of plaintiff's claims and evidence at the arbitration, [thus] negating any claim that the unfavorable result of the arbitration was proximately cause by [the first attorney's] alleged negligence.

*Ariss*, 250 A.D.2d at 414. Had Thelen similarly testified that it was responsible for the '160 Patent maintenance fees and that GT's failure to monitor the deadlines had no impact on Thelen's failure to pay those fees, *Parker* might support GT's assertion that proximate cause is lacking.

21

Thelen, however, testified that it *did not* take on responsibility for the maintenance fees and that GT misread the Reexamination Power of Attorney, thus creating a fact issue for the jury to resolve. [Krebs Declaration, ¶¶ 6 - 8]. Regardless of what the jury ultimately decides, it is clear that summary judgment is inappropriate on the evidentiary record present in this case.

*GT is not entitled to summary judgment on its statute of limitations arguments*

37.    GT's limitations arguments incorrectly assume, without any discussion or legal support whatsoever, that Quickie's malpractice claims arose when the Reexamination Power of Attorney was filed in March, 2003. [GT Motion, p. 23.] On the contrary, New York substantive law provides that when an attorney is accused of missing a deadline to take some action, the malpractice occurs when the deadline expires. *See Shumsky v. Eisenstein*, 96 N.Y.2d 164, 166, 750 N.E.2d 67, 69 (N.Y. 2001) (noting that a claim for failing to bring a cause of action before the statute of limitations expired accrues when the limitations period expired); *Glamm v. Allen*, 57 N.Y.2d 87, 93, 439 N.E.2d 390, 393 (N.Y. 1982) (finding that plaintiff's malpractice claim arose when plaintiff's attorney missed the deadline to timely file a notice of claim).

38.    Quickie asserts that GT committed malpractice by (a) failing to notify Quickie shortly before maintenance fees were due on the '160 Patent, and (b) failing to pay those fees itself. The last day to pay maintenance fees on the '160 Patent was May 23, 2004, and it was the failure to pay those fees on that date that caused Quickie's damages. As with the statute of limitations cases cited above, therefore, Quickie's malpractice claims against GT arose when the period to pay maintenance fees expired on May 23, 2004. *Shumsky*, 96 N.Y.2d at 166; *Glamm*, 57 N.Y.2d at 93. This action was commenced on April 18, 2007, less than three years later. [Resp. Ex. R]. Accordingly, Quickie's claims against GT clearly fall within New York's three-year statute of limitations.

39.    Even if one assumes that Quickie's malpractice claims against GT did arise in March 2003, the deadline to bring those claims will be tolled by the continuous representation doctrine to the extent the trier of fact determines that GT continued to represent Quickie as to the '160 Patent at least until April 18, 2004 (three years before commencement of this lawsuit). *See Shumsky*, 96 N.Y.2d at 169-71 (applying continuous representation rule where the record established that "plaintiffs were left with the reasonable impression that defendant was, in fact, actively addressing their legal needs.")  As discussed previously, there is an abundance of evidence showing that after GT accepted Quickie's request that it monitor the '160 Patent deadlines, and while GT continued to act as Quickie's intellectual property counsel, GT stopped monitoring the '160 Patent with no notice whatsoever to Quickie. That evidence raises triable fact issues concerning the scope and extent of the Quickie/GT engagement, thus rendering summary judgment inappropriate. *Troop*, 23 A.D.2d at 551 (finding that, in light of the triable issues with respect to the duration of an attorney client relationship, "plaintiff" raised a triable issue of fact as to whether the three-year statute of limitations was tolled by the doctrine of continuous representation.")  For those reasons, Quickie asks the Court to reject GT's statute of limitations summary judgment arguments.

**GT is not entitled to summary judgment on**
**Quickie's negligent misrepresentation claim**

40.    Quickie alleges that GT was its attorney with respect to maintenance fees on the '160 Patent up to and through the May 23, 2004 deadline to pay those fees.  If the jury agrees with Quickie on that issue, then Quickie's negligent misrepresentation claims may be duplicative of its legal malpractice claims. *See Sage Realty Corp. v. Proskauer Rose LLP*, 251 AD.2d 35, 39, 675 N.Y.S.2d 14, 18 (1st Dept. 1998) (dismissing negligent misrepresentation claims in favor of allowing malpractice claims to proceed).  On the other hand, if the jury finds that GT was not

Quickie's attorney on May 23, 2004, then Quickie's negligent misrepresentation claims will survive to the extent Quickie is able to show a "special relationship" between itself and GT. *Lama Holding Co. v. Shearman & Sterling*, 758 F.Supp. 159, 161 (S.D.N.Y. 1991) (allowing negligent misrepresentation claims to proceed against law firm that was alleged to have promised to notify plaintiff if there were any significant changes to United States tax laws.) As such, summary judgment is inappropriate because resolution of Quickie's negligent misrepresentation claim hinges on how the jury resolves the fact issues concerning the scope and duration of the Quickie/GT attorney client relationship.

41.     In New York, a negligent misrepresentation claim may be asserted against attorneys who are in a "special relationship" with the plaintiff that approaches privity. *Mason Tenders Dist. Counsel Pension Fund v. Messera*, 4 F.Supp.2d 293, 303 (S.D.N.Y. 1998). A "special relationship" exists where parties are "so close as to approach that of privity" such that they are held to a "closer degree of trust than an ordinary business relationship." *See Solondz*, 225 A.D.2d at 998 (upholding negligent misrepresentation claims after finding that there was no attorney-client relationship); *Lama Holding Co.*, 758 F.Supp. at 161 (allowing negligent misrepresentation claims to proceed against law firm that was alleged to have promised to notify plaintiff if there were any significant changes to United States tax laws.) Moreover, even had GT been discharged, ethics rules required GT to take steps to ensure Quickie's rights were not jeopardized by the transfer of the matter to Thelen, and GT admits that it took no such steps. NY CODE OF PROFESSIONAL RESPONSIBILITY, Ethical Consideration 2-41 (2007).

42.     The summary judgment evidence demonstrates that GT acted as Quickie's agent with respect to the '160 Patent and specifically promised to notify Quickie before the maintenance fees were due. While GT will undoubtedly argue otherwise, the Court need not

weigh the evidence and make credibility assessments in deciding GT's motion for summary judgment. Instead, the Court is only required to determine whether a reasonable jury, when presented with the evidence of a special relationship between Quickie and GT, could find that such a relationship did exist. *Diamond*, 468 F.Supp. at 634. For the reasons discussed, there is more than enough evidence from which a reasonable jury could find a "special relationship" between Quickie and GT even in the unlikely event that they find no attorney-client relationship. Quickie therefore asks the Court to deny GT's motion for summary judgment on Quickie's negligent misrepresentation claim.

## CONCLUSION

For all of these reasons, Quickie requests the Court to: (i) deny GT's Motion for Summary Judgment; (ii) enter an order setting this matter for trial; and (iii) grant Quickie all other relief to which it is entitled.

Dated: August 26, 2008
New York, New York

DIAMOND McCARTHY LLP

By: __/s/ Stephen T. Loden_____
Allan B. Diamond *(pro hac vice)*
Walter J. "Skip" Scott *(pro hac vice)*
Stephen T. Loden (SL8754)
620 Eighth Avenue, 39th Floor
New York, New York 10018

*Attorneys for Plaintiff Quickie, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|                              |   |                        |
|------------------------------|---|------------------------|
| QUICKIE, LLC,                | : |                        |
|           Plaintiff          | : |                        |
|                              | : | 07-cv-10331 (RMB)(DFE) |
|      - against -             | : |                        |
|                              | : | ECF CASE               |
| GREENBERG TRAURIG, LLC,      | : |                        |
|                              | : |                        |
|           Defendant          | : |                        |

## DECLARATION OF MARK F. EVENS

I, Mark F. Evens, hereby declare as follows:

1.      I am a director of the Washington, D.C. based law firm Sterne Kessler Goldstein Fox, PLLC ("Stern Kessler"), where I focus my practice on intellectual property litigation, including infringement claims, trademark issues, false advertising matters and trade secret cases. Prior to joining Sterne Kessler in 200_, I was a partner of the Thelen Reid & Priest *aka* Thelen, Reid, Brown, Raysman & Steiner, L.L.P. ("Thelen") law firm. This declaration is based on my personal knowledge and experience, as well as my review of relevant documents. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

2.      On July 3, 2002, Quickie, LLC ("Quickie") retained Thelen and me to provide "litigation services related to the Quickie, LLC legal action against Medtronic, Inc." [Resp. Ex. A]. At that time, Quickie's suit against Medtronic was already pending before the Honorable Judge Gerard A. Lynch in the United States District Court for the Southern District of New York.   Greenberg Traurig, LLC ("Greenberg"), and in particular Paul Sutton and

Todd Sharinn of that firm, represented Quickie in that suit against Medtronic. Greenberg represented Quickie in the *Medtronic* litigation even after Thelen and I were initially retained as co-counsel.

3.    In or around October 2002, however, after Mr. Sutton failed to appear for a pivotal *Markman* hearing, Quickie decided to remove Greenberg as its counsel in the *Medtronic* litigation and proceed with only Thelen as counsel of record. [Resp. Ex. B]. Quickie was upset about Mr. Sutton's absence at the critical hearing and overall disappearance in the case, especially in the face of ongoing billing entries, as well as over Mr. Sharinn's relatively limited first-hand trial experience. I requested the litigation files from Greenberg and asked Todd Sharinn to execute a Substitution of Counsel. [Resp. Ex. C].

4.    On October 15, 2002, Paul Sutton sent the signed substitution of counsel to Thelen. [Resp. Ex. D]. On October 16, 2002, Greenberg transferred the litigation files to me at Thelen, which contained a copy from their files of the file history of the '160 Patent equivalent to the file history held by the United States Patent and Trademark Office (the "PTO"), prior art, and other documentation for the '160 Patent that was at issue in the litigation against Medtronic. [Resp. Ex. E].

5.    I was one of the intended recipients of the Greenberg file transfer letter which specifically states that the files being transferred related to the *Medtronic* litigation, Greenberg matter number 010400. [Resp. Ex. E]. I requested the *Medtronic* litigation files solely so that I could fully represent Quickie in connection with the pending litigation. [Resp. Ex. C]. Quickie did not ask me or Thelen to take responsibility for prosecution or maintenance of the '160 Patent, and Greenberg did not mention, let alone transfer, that responsibility when it sent the *Medtronic* litigation files to me. At the time, Greenberg sent me copies of documents, but

2

no original files for the '160 Patent.

6.    Indeed, because I understood that an attorney must be licensed based upon examination and satisfaction of prerequisite experience to practice before the PTO, which I am not, I could not then nor at any other time seek or accept responsibility for any patent in relation to the PTO. And I was not asked, nor did I personally do so, then or at any time in connection with the '160 Patent. My sole direction from Quickie, which I communicated to Greenberg, was to assume responsibility for litigation against Medtronic in the then-pending lawsuit, a suit in which Thelen and I had been previously engaged as co-counsel with Greenberg. I felt well-qualified to handle that responsibility alone as litigation counsel going forward.

7.    In short, Thelen and I only served as Quickie's litigation counsel against Medtronic. [Resp. Ex. A]. No more and no less. Greenberg generally, and Mr. Sharinn in particular, were Quickie's established intellectual property counsel for not only the '160 Patent, but also Quickie's other intellectual property interests: before Thelen and I joined the *Medtronic* litigation as co-counsel; during the time that we acted as co-counsel with them; and after Greenberg withdrew from the litigation. In my experience, it is not at all unusual as here for clients like Quickie to hire separate litigation counsel to handle adversarial actions against potential infringers while retaining primary intellectual property counsel to oversee the general prosecution, exploitation and maintenance of their intellectual property interests. That is my understanding of the relationship between Quickie, Greenberg and Thelen during the *Medtronic* litigation. Greenberg remained at all times Quickie's general or primary intellectual property counsel, while Thelen was retained as special litigation counsel in connection with the *Medtronic* litigation.

.

3

8.      The contemporaneous documentation supports my basic understanding.  To begin with, there is Greenberg's above-referenced file transfer letter that only and specifically references the *Medtronic* litigation.  [Resp. Ex. E].  In addition, even after Greenberg transferred the *Medtronic* litigation files to us at Thelen, Mr. Sharinn notified the PTO, pursuant to 37 C.F.R 1.363(a)(3), that he was to receive all correspondence concerning maintenance fees on the '160 Patent.  [Resp. Ex. F].  And furthermore, there is the October 15, 2002, letter to Greenberg and Mr. Sharinn from Quickie's General Counsel, Alan Fell, following Quickie's decision to remove Greenberg as counsel in the *Medtronic* litigation. [Resp. Ex. B].  In the letter, Mr. Fell confirms that Quickie would continue to look to Mr. Sharinn and Greenberg as its primary intellectual property counsel.

9.      That Mr. Sharinn understood and represented as much at the time is evidenced as well by a December 2, 2002, email to him from Adrienne Levin of the Bryan Cave law firm (where Sharinn used to work) thanking him for confirming that he was still responsible for the '160 Patent.  [Resp. Ex. V; Resp. Ex. U, p. 143, line 20 – p. 147, line 19].  It is certainly what I understood at the time from all of the contemporaneous discussions and correspondence.  Neither Mr. Sharinn nor anyone else at Greenberg or otherwise ever said or indicated anything to the contrary.  In fact, there was a noticeable resistance and reluctance on the part of Mr. Sharinn to transfer files or otherwise relinquish any authority or responsibility. It was for this reason that I finally had to contact Mr. Sutton to have the files actually transferred. [Resp. Ex. W].

10.     As a practicing attorney who has both transferred clients and files to successor counsel and had clients and files transferred to me from predecessor counsel, I would have expected Greenberg to expressly advise me in writing of any discharge of its responsibilities

4

to Quickie apart from representation in the *Medtronic* litigation. Moreover, I would have expected to expressly acknowledge the same in writing. This is particularly true with respect to clients involving multiple entities and/or matters.

11.     Subsequently, on November 25, 2002, shortly after the *Markman* decision in which the '160 Patent's claims were favorably construed by Judge Lynch (from Quickie's perspective), Medtronic changed course and sought to have the PTO reexamine the '160 Patent in an effort to otherwise limit the claims that had been construed by Judge Lynch. In as much as the reexamination proceedings were an integral part of the pending lawsuit and accordingly adversarial in nature, I suggested to Quickie that Thelen also handle the reexamination proceedings. More specifically, I suggested that Robert Krebs, a very well-respected and experienced patent attorney duly registered upon examination to practice before the PTO, head up a team of attorneys at Thelen to specifically handle the reexamination proceedings. Quickie agreed, and Quickie and Thelen accordingly expanded the engagement, authorizing Thelen to represent Quickie before the PTO in connection with the reexamination proceeding.

12.     Further to representing Quickie in the PTO reexamination, Mr. Krebs executed a PTO form Revocation of Prior Powers of Attorney and New Power of Attorney (the "Reexamination Power of Attorney") that explicitly displayed the "CONTROL NO." for the reexamination. [Resp. Ex. G]. I understood from Mr. Krebs that he was directed to do so by the PTO to ensure that he and other Thelen attorneys were recognized by the PTO as Quickie's authorized representatives in connection with reexamination of the '160 Patent. On March 17, 2003, Thelen filed the Reexamination Power of Attorney with the PTO, along with a Change of Attorney Docket Number and Change of Address Notice [Resp. Ex. H] to ensure

that Thelen received all PTO communications concerning the reexamination.

13.    Indicative of the related nature between the pending litigation and reexamination proceedings, Medtronic openly acknowledged in discussions with me and Quickie at the time that it resorted to the PTO reexamination proceedings to hopefully negate Judge Lynch's *Markman* ruling in favor of Quickie,[1] and that a settlement was likely if the reexamination proceedings proved unsuccessful.    Medtronic suggested, therefore, that Quickie agree to put the trial on hold pending a determination in the reexamination.    After a great deal of discussion and consideration, Quickie agreed.    Accordingly, in July 2005, the *Medtronic* litigation was dismissed without prejudice pursuant to a stipulation agreed to by Quickie, Medtronic, and the Court pending resolution of the reexamination proceedings.

14.    Thelen's representation of Quickie in the closely-related reexamination proceedings in no way affected Greenberg's ongoing and preexisting role as Quickie's primary intellectual property counsel.    I certainly did not understand anything that Thelen did in connection with the reexamination proceedings to alter that responsibility.    And, again, the contemporaneous documentation bears this out.    On approximately May 19, 2003, Mr. Sharinn sent Mr. Fell of Quickie a fax in which he expressed surprise and understandable upset that he and Greenberg would not be handling the reexamination proceedings on behalf of Quickie.    Tellingly, he further advised that neither he nor Greenberg would take any "further action on *this matter* (emphasis added)," expressly referring to the internal Greenberg client/matter number (51822.010900) that he had opened for the reexamination proceedings. [Resp. Ex. X].

15.    Notwithstanding Greenberg's primary role and responsibility for Quickie's

---

[1]    Judge Lynch also had by that time denied summary judgment for Medtronics and trial was but a month or two away.

overall intellectual property interests in general, and specifically maintenance of the '160 Patent, I also was and am of the view that Thelen should have checked as a matter of prudence on the status of the '160 Patent in the course of the reexamination proceedings. Greenberg has taken comments of mine to that effect out of context and without further inquiry of me to suggest that this somehow absolves Greenberg. I do not believe that it does. I do not believe that Greenberg's responsibility for allowing Quickie's valuable and costly intellectual property rights in the '160 Patent to prematurely expire for lack of the most basic attention is at all mutually exclusive of what I believe Thelen should have done; and believed that Sharinn and Greenberg were at all relevant times Quickie's primary intellectual property counsel, with the '160 Patent being but one of many intellectual property interests, and with Mr. Sharinn and Greenberg being a key common denominator.

16.     Indeed, in a most telling and disturbing fact, Mr. Sharinn and Greenberg wrote to Quickie in April 2004 – just a month before the '160 Patent lapsed – to advise Quickie about the issuance of yet another separate patent to Quickie. [Resp. Ex. Y]. Care was again taken to promise to timely remind Quickie of maintenance fees as they became due. And yet, no mention was made of the then perilously overdue maintenance fees on the '160 Patent. It can hardly be argued that Quickie was not then a Greenberg client, and it is asking a lot of a client to split hairs as finely as Greenberg now claims to have done so in unilaterally abandoning responsibility for timely reminding Quickie of the maintenance fees that actually had to be paid at that time on the '160 Patent.

17.     I eventually learned in July 2006 that the '160 Patent had expired while the reexamination proceedings were still pending due to the failure to pay maintenance fees. Steve Colvin of Quickie informed me that St. Jude Medical, a large medical device company,

pulled out of negotiations to license the '160 Patent from Quickie at that time because the '160 Patent had expired. Upon confirming that the '160 Patent had indeed expired, I referred Quickie to Timothy Maier of the law firm of Maier & Maier LLC to represent Quickie in petitioning the PTO to reinstate the patent. I had by that time left Thelen and joined the law firm of Stern, Kessler Goldstein Fox in Washington, D.C. I referred the matter since I am not a registered patent attorney and because Stern Kessler was also otherwise conflicted due to representation of Medtronic in unrelated intellectual property matters.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C. on the 26th day of August, 2008.

Mark F. Evans

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| QUICKIE, LLC, | : |
|           Plaintiff | : |
| | :     07-cv-10331 (RMB)(DFE) |
|   - against - | : |
| | :     ECF CASE |
| GREENBERG TRAURIG, LLC, | : |
| | : |
|           Defendant | : |

## DECLARATION OF ALAN FELL

1.     I am a partner in the New York, New York office of Rick, Steiner, Fell &
Benowitz LLP. ("Rick Steiner"). I am also a member of Quickie LLC ("Quickie"). I am over
the age of 21 years, am of sound mind, and have never been convicted of a felony or crime of
moral turpitude. This declaration is based on my personal knowledge and experience, as well as
my review of relevant documents. If I were called upon to testify, I could and would testify
competently to the facts set forth herein.

2.     I have provided legal counsel to Dr. Stephen Colvin and Dr. Aubrey Galloway
since the mid 1990's. In 1998, I advised Drs. Colvin and Galloway in the formation of Quickie,
which was formed to hold certain intellectual property that the doctors were contemplating
licensing to Medtronics, Inc. ("Medtronics"). I also advised Quickie in connection with the
negotiations with Medtronics concerning licensing for a valuable suture-holding product that
Drs. Colvin, Galloway, and others developed which was referred to as the "Quickie Device."

3.     My legal practice is general in nature, and I am not admitted to practice before the
United States Patent and Trademark Office (the "PTO"), nor am I familiar with the PTO

proceedings and procedures to obtain a patent. When Quickie needed patent counsel to pursue a patent on the Quickie Device, I thus recommended that Dr. Colvin contact Todd Sharinn, who was referred to me through a mutual friend. At that time, Mr. Sharinn was practicing law at Pepe Hazard LLP ("Pepe").

4.    Although I had periodic interactions with Mr. Sharinn due to the overlapping issues between his efforts to obtain a patent for the Quickie Device and my discussions with Medtronics concerning their interest in licensing whatever patent Quickie may obtain, in no way did I oversee, supervise, or direct Mr. Sharinn's work. As discussed previously, I am not a patent attorney, and thus I relied upon Mr. Sharinn's patent expertise to handle all aspects of the '160 Patent.

5.    On or about May 30, 2000, I received a letter from Sharinn stating that the PTO had granted a patent for the Quickie Device (the "'160 Patent"). [Mov. Ex. U.] In that letter, Mr. Sharinn stated that periodic fees would need to be paid to the PTO to maintain the '160 Patent, and that he would monitor the deadlines for paying those fees and notify Quickie before the fees were due. As a member of Quickie as well as Quickie's attorney, I relied upon Mr. Sharinn's patent expertise and his promise to provide notice before the fees were due to be paid, and thus I did not separately calendar those deadlines myself.

6.    In approximately May 2001, Sharinn left Pepe to join Greenberg Traurig LLP ("GT"). At that time, Quickie had a good working relationship with Mr. Sharinn and wanted him to continue as Quickie's attorney after he left Pepe. I thus sent a letter to Pepe on May 14, 2001, directing Pepe to transfer all of Quickie's files to Mr. Sharinn at GT's offices in New York City, including all files concerning the '160 Patent. [Resp. Ex. L]. In light of the file transfer and the fact that GT thereafter billed Quickie for legal work related to the '160 Patent, I

understood and expected that Sharinn would continue to monitor maintenance fee deadlines on the '160 Patent even after he joined GT.

7.     Significantly, neither Sharinn nor GT ever told me or Quickie that GT did not intend to honor Sharinn's prior promise to monitor and provide advance notice of the '160 Patent maintenance fee deadlines.   Quite the contrary, Mr. Sharinn and GT acknowledged that responsibility by directing a GT docketing clerk to enter the maintenance fee deadlines in GT's internal calendaring systems.   GT and Mr. Sharinn further confirmed their responsibility for handling maintenance fees on the '160 Patent when they sent me a copy of the notice they filed with the PTO on December 16, 2002, stating that all correspondence concerning maintenance fees on the '160 Patent should be delivered to Sharinn at his GT office in New York City (the "Fee Address Notice").   [Resp. Ex. M].  As such, not only was Quickie reasonably relying on Sharinn and GT to monitor and provide notices of the deadlines, GT and Sharinn were both fully aware that they were being relied upon to perform that critical function.

8.     When Quickie learned that Medtronics and other medical device manufacturing companies were selling products that infringed on the '160 Patent, Quickie asked Sharinn to investigate a potential infringement action against Medtronics.   Shortly thereafter, Quickie expanded its relationship with Sharinn and GT to include bringing a patent infringement lawsuit against Medtronic.  Sharinn was not yet a partner at GT, however, so he stated that he would ask Paul Sutton to act as the lead partner in charge of the engagement, and that Mr. Sutton  would oversee Mr. Sharinn's work on the litigation.

9.     Despite those statements, however, Sutton did not attend the Markman hearing in the Medtronics Litigation.  While Mr. Sutton's failure to appear obviously put a lot of pressure on Sharinn to handle the hearing by himself, he performed well and, in the end, the Court issued

a Markman opinion that was very favorable to Quickie. Despite that success, however, Quickie still had concerns about Mr. Sutton's failure to appear and GT's commitment to the litigation and to Quickie. In light of those concerns, Drs. Colvin and Galloway decided to transfer the litigation to Mark Evens ("Evens") at Thelen, Reid & Priest LLP ("Thelen") in approximately October 2002. [Resp. Exs. A-E]. Mr. Evens was referred to Quickie by Dr. Colvin, who was his brother-in-law.

10.    By that point I had developed a personal relationship with Mr. Sharinn, so I called him in early October 2002 to tell him about Quickie's decision to transfer the litigation to Thelen. In that conversation, which was solely between myself and Mr. Sharinn and no other person, I told Todd that Quickie had decided to transfer the Medtronic litigation to Thelen, but that Quickie wanted GT to continue to act as Quickie's patent counsel for various other patent applications pending on behalf of Quickie. I followed that conversation up with a letter dated October 15, 2002, to Mr. Sharinn in which I formally informed him of the decision to transfer the Medtronics litigation to Thelen, but stated that Quickie would continue to rely upon GT to "handle various patent applications pending on behalf of Quickie." [Mov. Ex. W].

11.    I am aware that Mr. Sharinn now says that I told him that all Quickie matters were being transferred to Thelen, but that is simply not the case. First, I never told Mr. Sharinn that he was being fired from all Quickie matters. Secondly, the letter I sent to Mr. Sharinn on October 15, 2002, clearly states that Thelen was being substituted for GT in connection with "the above referenced litigation" against Medtronics, but that Mr. Sharinn and GT would continue to handle various patent applications for Quickie. [Mov. Ex. W]. Third, Mr. Sharinn's assertion that he was totally relieved of all responsibility for the '160 Patent is contradicted by the Fee Address Notice wherein he notified the PTO on December 16, 2002 – approximately two months *after* he

claims to have been fired – that he was to receive all maintenance fee-related correspondence concerning the '160 Patent. [Resp. Ex. M]. Finally, GT and Sharinn continued to bill Quickie for work legal work on the '160 Patent well after October 2002. *See, e.g.,* [Mov. Ex. AM]; [Resp. Ex. N].

12.     When Medtronic commenced proceedings asking the PTO to redefine the '160 Patent in a way that would absolve Medtronics of any infringement liability (the "Reexamination Proceedings"), Quickie and Thelen expanded their engagement to authorize Thelen to represent Quickie before the PTO. In that regard, Thelen asked Quickie to execute a document that Thelen needed to file with the PTO to permit Thelen to represent Quickie in connection with the Reexamination Proceedings (the "Reexamination Power of Attorney"). [Resp. Ex. G].

13.     On approximately May 19, 2003, Mr. Sharinn sent me a fax to say that he had been notified that the Reexamination Power of Attorney had been "filed in connection with the above-referenced re-examination application." [Mov. Ex. AF]. Continuing, Mr. Sharinn stated that, in light of that notice, neither he nor GT would take any "further action on this matter," referring back to the Reexamination Proceedings. [Mov. Ex. AF]. Mr. Sharinn further stated that he would separately send a final bill for the client/matter number 51822.010900, which was GT's internal billing number to refer to the Reexamination Proceedings. [Mov. Ex. AF].

14.     As discussed previously, by the time I received Mr. Sharinn's May 15, 2003 correspondence I had already told Mr. Sharinn that Thelen would handle the Medtronic Litigation and the Reexamination Proceedings, and that GT would continue to act as Quickie's counsel for all other aspects of the '160 Patent. I thus understood Mr. Sharinn's correspondence to confirm, as we had previously discussed, that neither he nor GT would take any further actions with respect to the Reexamination Proceeding.

15.    Moreover, in May 2003 Mr. Sharinn and GT continued to be the designated recipient of all maintenance fee-related PTO correspondence concerning the '160 Patent and, as discussed previously, they were fully aware that Quickie was relying on them to ensure that the maintenance fees were timely paid. [Resp. Ex. M].  There is no suggestion whatsoever in Mr. Sharinn's May 15, 2003 correspondence that they were going to do otherwise, so I reasonably expected them to honor their commitments to monitor and provide notice of the maintenance fee deadlines.  As a result, there was no need to write back to Mr. Sharinn or GT to confirm that Quickie still expected them to honor their prior commitments.

Dated: August 25, 2008
      New York, New York

_____
Alan Fell

**STATE OF NEW YORK**

**COUNTY OF** New York

    BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared Alan Fell known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they have read the foregoing instrument, and that they executed the same for the purposes and consideration therein expressed in the capacity therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this 25 day of August, 2008.

_____
Notary Public in and for the
State of New York

My commission expires:

_____

RAYMOND W. LEW
Notary Public, State of New York
No. 02LE6074045
Qualified in Queens County
Commission Expires May 6, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| QUICKIE, LLC,<br>           Plaintiff | : <br> : <br> : |
|  | :    07-cv-10331 (RMB)(DFE) |
| - against - | : |
|  | :    ECF CASE |
| GREENBERG TRAURIG, LLC, | : |
|  | : |
|          Defendant | : |

---

## DECLARATION OF AUBREY C. GALLOWAY, M.D.

1.    I am Director of the Cardiothoracic Surgery Residency program, the Seymour

Cohn professor of Cardiothoracic Surgery, and Chairman of the Department of Cardiothoracic

Surgery at NYU Langone Medical Center.  I am also a member of and managing partner for

Quickie LLC ("Quickie").  I am over the age of 21 years, am of sound mind, and have never

been convicted of a felony or crime of moral turpitude.  This declaration is based on my personal

knowledge and experience, as well as my review of relevant documents.  If I were called upon to

testify, I could and would testify competently to the facts set forth herein.

2.    Quickie is a limited liability corporation established to hold valuable intellectual

property developed by several cardiac surgeons, including myself, who are on staff at the NYU

Langone Medical Center.  At its inception, Quickie retained Alan Fell ("Mr. Fell") as its outside

counsel to handle various legal and business matters for Quickie.  For example, Quickie looked

to Mr. Fell as a transactional attorney to handle negotiations with entities who were interested in

licensing Quickie's intellectual property.  While Mr. Fell is very experienced and skilled in

handling business negotiations, his expertise does not include the pursuit of patent applications

and other patent proceedings before the United States Patent and Trademark Office (the "PTO").

Quickie therefore hired other outside counsel to handle the pursuit and maintenance of intellectual property matters.

3.    In November 1998, Quickie retained Todd Sharinn ("Sharinn") and the law firm for which he was employed, Pepe & Hazard LLP ("Pepe"), to pursue a patent application for a device known as the "Passive Knotless Suture Terminator for use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing" for use in heart surgeries (the "Quickie Device"). [Resp. Ex. J]. Sharinn was the Pepe attorney-in-charge of the representation for the inventors of the Quickie Device, and he filed the Quickie Device patent application with the PTO on November 23, 1998.  [Resp. Ex. K].

4.    On May 30, 2000, Quickie received correspondence from Sharinn stating that the United States Patent and Trademark Office (the "PTO") had approved the '160 Patent Filing. [Mov. Ex. U].  In that correspondence, Mr. Sharinn stated that "we will notify you regarding payment of the maintenance fees several months before they are due," which I understood to mean that Quickie's attorney, Mr. Sharinn, would monitor the deadlines for payment of maintenance fees on the '160 Patent and provide notice before those fees were due to be paid. [Mov. Ex. U].

5.    In approximately May 2001, Mr. Sharinn left Pepe to join Greenberg Traurig, LLP ("GT").  At that time, Quickie and Mr. Sharinn agreed that he would continue to act as Quickie's attorney with respect to the '160 Patent, and thus Quickie instructed Pepe to transfer all files related to the '160 Patent to GT.  [Resp. Ex. L].  When Quickie and Sharinn agreed that he would continue as Quickie's counsel after the transfer to GT, I understood that Sharinn would continue to monitor and provide notice of the deadlines for payment of maintenance fees on the '160 Patent, and neither Mr. Sharinn nor anyone else at GT stated otherwise.  My understanding

that GT and Mr. Sharinn would continue to monitor the maintenance fee deadlines was based upon Mr. Sharinn's correspondence to Quickie [Mov. Ex. U] as well as the fact that Mr. Sharinn had instructed a GT docketing clerk to enter the '160 Patent maintenance fee deadlines in GT's calendaring systems.

6.    My understanding that Mr. Sharinn would continue to be Quickie's counsel after he moved to GT, with responsibility for monitoring and paying maintenance fees on the '160 Patent, was further based upon the notice Sharinn filed with the PTO on December 16, 2002, a copy of which was provided to Quickie, stating that all correspondence concerning maintenance fees on the '160 Patent should be delivered to Sharinn at his GT office in New York City (the "Fee Address Notice"). [Resp. Ex. M].

7.    Shortly thereafter, Quickie learned that Medtronic, LLC ("Medtronic") and other medical device manufacturing companies were selling products that infringed on the '160 Patent. Accordingly, Quickie retained Sharinn and GT to bring a patent infringement lawsuit against Medtronic. At the time of that engagement, Sharinn was not a partner at GT, so Quickie had some concern that Sharinn may not have enough experience to be able to effectively handle a trial of that magnitude. Quickie's concerns were alleviated, however, when Paul Sutton ("Sutton") was brought onto the case to act as the lead partner in charge of the engagement.

8.    Sharinn and Sutton were initially responsive to Quickie's needs and they aggressively pursued the litigation against Medtronic. However, Quickie's concerns about Sharinn's experience resurfaced when Sutton failed to appear for the Markman hearing on September 4, 2002. In the end the Markman hearing turned out to be very favorable to Quickie's claims against Medtronic, and I had no complaints about Sharinn's performance to that point. Nevertheless, Sutton's failure to appear for the hearing, despite having billed Quickie for time

preparing for the hearing, caused Quickie to be concerned about the future handling of this significant piece of litigation.

9.    In part as a result of those concerns about GT's commitment to fully staff and pursue the infringement litigation against Medtronic, Quickie decided to transfer the litigation to Mark Evens ("Evens") at Thelen, Reid & Priest LLP ("Thelen") in approximately October 2002. [Resp. Exs. A-E]. Mr. Evens was the brother-in-law of Dr. Stephen Colvin who was one of the co-inventors of the Quickie Device and a member of Quickie.

10.    Despite Quickie's hiring of Thelen to take over the Medtronic Litigation, for several reasons I continued to understand and expect that GT would serve as Quickie's counsel in connection with all other aspects of the '160 Patent, including monitoring and payment of maintenance fees. First, I expected Mr. Sharinn to continue to act as Quickie's attorney in that capacity in light of his written promise [Mov. Ex. U] to monitor the deadlines and provide notice before the maintenance fees were due and the fact that neither Mr. Sharinn nor anyone else at GT notified Quickie that they did not intend to continue in that engagement after Thelen was hired. Second, I expected Mr. Sharinn and GT to continue in that capacity as Quickie's attorney after reviewing a copy of the Fee Address Notice in which Mr. Sharinn and GT notified the PTO that they were to receive all correspondence concerning maintenance fees on the '160 Patent. [Resp. Ex. M]. Third, my expectation that Sharinn and GT would continue to act as Quickie's attorney for all non-litigation aspects of the '160 Patent was based upon the fact that Quickie continued to receive and pay GT's bills for services related to the '160 Patent even after Thelen was hired to take over the Medtronic Litigation. [Resp. Ex. N]. In short, Quickie's expectation that Sharinn and GT would continue to act as Quickie's attorney with respect to the monitoring and payment of maintenance fees on the '160 Patent after the Medtronic Litigation was transferred to Thelen

was entirely based upon communications by, and documents received from, Sharinn and GT, as well as the fact that nobody from GT ever notified Quickie that they would not continue to act in that capacity as Quickie's counsel.

11.     In approximately late November or early December 2002, Quickie learned that Medtronic had commenced reexamination proceedings before the PTO in an effort to limit the scope of the '160 Patent in a manner that would allow Medtronic to continue marketing its products without infringing on the '160 Patent (the "Reexamination Proceedings"). At that same time, Quickie and Thelen expanded their engagement to authorize Thelen to represent Quickie before the PTO. I was asked to sign, and did sign, a document that Thelen needed to file with the PTO to permit Thelen to represent Quickie in connection with the Reexamination Proceedings (the "Reexamination Power of Attorney"). [Resp. Ex. G].

12.     At no time prior to commencement of this litigation did Sharinn, Sutton, or anyone else at GT notify Quickie that they were going to stop monitoring the maintenance fee deadlines and remove the '160 Patent from their GT's calendar system after receiving notice that the Reexamination Power of Attorney had been filed with the PTO. Nor did Quickie receive a copy of any PTO filing by Sharinn, Sutton, or GT stating that GT and Sharinn were revoking the Fee Address Notice. In fact, Quickie first learned that GT had unilaterally removed the '160 Patent from its calendar docketing system during discovery in this litigation.

13.     Even after Thelen filed the Reexamination Power of Attorney, Quickie continued to expect Sharinn and GT to act as Quickie's counsel for all aspects of the '160 Patent other than the Medtronics Litigation and the Reexamination Proceedings. That understanding was based upon several factors. First, Quickie relied on Sharinn's written promise to provide notice of the maintenance fees becoming due [Mov. Ex. U]. Second, Quickie relied upon its knowledge that

GT had entered the maintenance fee deadlines in its internal calendaring systems. Third, Quickie relied upon the Fee Address Notice that Sharinn filed with the PTO and copied to Quickie [Resp. Ex. M]. Fourth, Quickie relied upon the fact that GT and Sharinn continued to represent Quickie in connection with other intellectual property in addition to the '160 Patent. Fifth, Quickie relied upon the fact that it never received any notice whatsoever from Sharinn, Sutton, or anyone else at GT stating that GT had unilaterally decided to stop monitoring the '160 Patent after receiving the Reexamination Power of Attorney.

14.    Quickie first learned that the '160 Patent had expired due to the failure to pay maintenance fees when St. Jude Medical, a large medical device company, pulled out of negotiations to license the '160 Patent from Quickie. [Resp. Ex. O, point #5]. Upon confirming that the '160 Patent had indeed expired, Quickie retained Timothy Maier of the law firm, Maier & Maier LLC, to represent Quickie in petitioning the PTO to reinstate the patent. Quickie was referred to Mr. Maier and his firm by Mark Evens who, after leaving Thelen and joining the law firm of Stern, Kessler, Goldstein & Fox PLLC ("Stern Kessler"), was unable to continue representing Quickie in the Medtronics Litigation and the Reexamination Proceedings because Stern Kessler represented Medtronics in unrelated intellectual property matters.

15.    As part of Mr. Maier's efforts to obtain reinstatement of the '160 Patent, I was asked to execute a declaration describing Quickie's retention of outside counsel to monitor the '160 Patent to ensure that the maintenance fees were paid. [Mov. Ex. F]. Due to my surgery schedule and the urgent need to get Quickie's reinstatement application on file with the PTO, however, I was not able to review the declaration prior to the deadline to file the reinstatement application. As such, I authorized my assistant, Sondra Ortiz, to sign the declaration on my behalf, in the expectation that it was accurate and complete.

16.    It was only after my declaration had been filed that I learned that, while accurate, it was incomplete in that it did not fully describe my expectations of Quickie's outside counsel as concerns the '160 Patent. I thus testified in my deposition in this litigation that the declaration was incomplete. [Resp. Ex. P, p. 82, line 20 – p. 83, line 9]. Specifically, while it was true that Quickie was relying on Thelen to monitor and pay maintenance fees on the '160 Patent in conjunction with its representation of Quickie in the Reexamination Proceedings, Quickie continued to expect Mr. Sharinn and GT to honor their commitments to monitor the '160 Patent and provide notice of the maintenance fee deadlines shortly before they were due. As described previously, that expectation was based upon documents and communications received from Mr. Sharinn and GT. [Resp. Exs. L-N and Mov. Ex. U].

17.    Shortly thereafter, the PTO ruled on the reinstatement application and, in so doing, made clear that it was relying on an incomplete presentation of the facts concerning Quickie's efforts to ensure that the '160 Patent maintenance fees were timely paid. Quickie thus filed a motion asking the PTO to reconsider that decision. [Resp. Ex. Q].    In that motion, Quickie clarified that while Thelen was in fact Quickie's authorized representative in connection with the Reexamination Proceedings, Quickie nevertheless had every reason to expect GT and Mr. Sharinn to continue to monitor the maintenance fee deadlines and provide notice shortly before those fees were due to be paid. [Resp. Ex. Q, pps. 3 - 4].

18.    At or about that same time, I learned that Mr. Sharinn had submitted a false declaration in support of the reinstatement application, in which he asserted that his responsibility for payment of the '160 Patent maintenance fees expired upon the filing of the Reexamination Power of Attorney, presumably in an effort to clear himself of any responsibility for expiration of the '160 Patent. I was not pleased when I learned that Mr. Sharinn's false

affidavit had been submitted to the PTO in support of Quickie' reinstatement application. However, at that time I also knew that it was pointless to ask Mr. Sharinn to re-submit an accurate declaration because Quickie had made multiple attempts to discuss these issues with GT and Sharinn, only to be rebuffed at every attempt.

19.    Not only did Quickie attempt to engage GT and Sharinn in discussions concerning expiration of the '160 Patent, Quickie also asked GT to provide documents for filing with the PTO to show that GT was in fact monitoring the maintenance fee deadlines for the '160 Patent as Quickie expected it to do. Despite multiple such requests, however, GT refused to produce any documents or assist in Quickie's efforts to reinstate the '160 Patent. As a result, Quickie was unable to provide the PTO with documents showing that GT had calendared the maintenance fee deadlines. Quickie was also unable to show the PTO that Quickie was completely unaware that GT had unilaterally decided to remove those calendar entries without any notice whatsoever to Quickie. As a result, Quickie's efforts to reinstate the '160 Patent were unsuccessful. GT's and Sharinn's flat-out refusal to assist Quickie in seeking reinstatement of the '160 Patent leads to only one conclusion:  despite having received thousands of dollars in fees from Quickie for obtaining and overseeing the '160 Patent, Sharinn and GT have wiped their hands of Quickie in an attempt to place the entire blame for the '160 Patent's expiration at Thelen's and Mr. Fell's feet.

20.    When the '160 Patent expired, Quickie was no longer able to pursue litigation in an effort to require Medtronic and other medical device manufacturers to pay royalties for their use of Quickie's intellectual property. As a result, Medtronic and other companies continue to market devices using Quickie's intellectual property to this day. Were it not for GT's and Mr. Sharinn's promise to monitor the '160 Patent and provide notice before the maintenance fees

were due – promises which neither GT nor Sharinn ever told Quickie they had no intention of

honoring – the '160 Patent would be alive today and Quickie would be earning royalties on

Medtronic's and other companies' use of the Quickie Device.

Dated: August 25, 2008
New York, New York

_Aubrey C. Galloway_ M.D.

Aubrey C. Galloway, M.D.

**STATE OF NEW YORK**

**COUNTY OF** NY

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared Aubrey C. Galloway known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they have read the foregoing instrument, and that they executed the same for the purposes and consideration therein expressed in the capacity therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 25 day of August, 2008.

_Ellen R. Cherrick_

Notary Public in and for the
State of New York

My commission expires:
06/05/11

ELLEN R. CHERRICK
Notary Public, State of New York
No. 31-02CH4951914
Qualified in New York County
Commission Expires June 5, 2011

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| QUICKIE, LLC, | : | |
| Plaintiff | : | |
| | : | 07-cv-10331 (RMB)(DFE) |
| - against - | : | |
| | : | ECF CASE |
| GREENBERG TRAURIG, LLC, | : | |
| | : | |
| Defendant | : | |

## DECLARATION OF ROBERT E. KREBS

1.     I am a partner in the San Jose, California, office of Thelen, Reid, Brown, Raysman & Steiner, L.L.P. ("Thelen"). This declaration is based on my personal knowledge and experience, as well as my review of relevant documents. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

2.     On July 3, 2002, Quickie, LLC ("Quickie") retained Thelen, and in particular Mark Evens, to provide "litigation services related to the Quickie, LLC legal action against Medtronic, Inc." Exhibit A. From time to time thereafter, Mark Evens asked for my assistance and assistance of associate attorneys in the San Jose office in the representation of Quickie. At first, Greenberg Traurig, LLC ("Greenberg"), and in particular Paul Sutton and Todd Sharinn of that firm, also represented Quickie in the litigation as co-counsel. In or around October 2002, however, Quickie decided to replace Greenberg with Thelen as its counsel in the *Medtronic* litigation. Exhibit B. Accordingly, Mark Evens requested the litigation files from Greenberg, and asked Todd Sharinn to execute a Substitution of Counsel. Exhibit C.

3.    On October 15, 2002, Paul Sutton sent Thelen the signed substitution of counsel. Exhibit D. On October 16, 2002, Greenberg transferred the litigation files to Thelen, which contained a copy from their files of the file history of the '160 Patent equivalent to the file history held by the United States Patent and Trademark Office (the "PTO"), prior art, and other documentation for the '160 Patent that was at issue in the litigation against Medtronic. Exhibit E.

4.    The Greenberg file transfer letter specifically states that the files being transferred related to the *Medtronic* litigation, Greenberg matter number 010400. Exhibit E. Thelen requested the *Medtronic* litigation files solely so it could fully represent Quickie in connection with that litigation. Exhibit C. Quickie did not ask Thelen to take responsibility for prosecution or maintenance of the '160 Patent, and Greenberg did not transfer that responsibility, nor even its original file for the '160 Patent, to Thelen when it sent the *Medtronic* litigation files to Thelen. Indeed, after Greenberg transferred the *Medtronic* litigation files to Thelen, Todd Sharinn notified the PTO, pursuant to 37 C.F.R 1.363(a)(3), that he was to receive all correspondence concerning maintenance fees on the '160 Patent. Exhibit F.

5.    On November 25, 2002, following a *Markman* ruling favorable to Quickie, Medtronic filed a request that the PTO reexamine the '160 Patent. When the PTO granted Medtronic's reexamination petition on January 15, 2003, Quickie asked Thelen to represent it in the resulting '160 Patent reexamination proceedings before the PTO, which was perfectly sensible since the reexamination was simply an adversarial offshoot of the *Medtronics* litigation, involving many of the same issues relating to the prior art.

6.     Shortly thereafter and as a result of discussions with the PTO, I was asked to review and sign a form for Revocation of Prior Powers of Attorney and New Power of Attorney (the "Reexamination Power of Attorney") that explicitly displayed the "CONTROL NO." for the reexamination to ensure that I and other Thelen attorneys were recognized by the PTO as Quickie's authorized representatives in connection with reexamination of the '160 Patent. Exhibit G. On March 17, 2003, Thelen filed the Reexamination Power of Attorney with the PTO, along with a Change of Attorney Docket Number and Change of Address Notice (Exhibit H) to ensure that Thelen received all PTO communications concerning the reexamination.

7.     The Reexamination Power of Attorney did not affect Greenberg's ongoing responsibility for maintenance fees on the '160 Patent, and any interpretation of that document to the contrary is unsubstantiated. None of the documents that Thelen filed in the PTO on March 17, 2003 (the Reexamination Power of Attorney, the Change of Attorney Docket Number, or the Change of Address Notice), mentioned maintenance fees, had any effect whatsoever on the address for maintenance fee correspondence, or indicated that Thelen was taking responsibility in any way for any action whatsoever in connection with payment of maintenance fees on the '160 Patent. Moreover, at no time did I or anyone else at Thelen notify the PTO that Thelen was to receive correspondence concerning maintenance fees on the '160 Patent.

8.     Indeed, neither the Reexamination Power of Attorney nor any of the other documents Thelen filed in the PTO on March 17, 2003 appear at all in the file history for the '160 Patent. Instead, those documents are only found in the '160 Patent reexamination file because, as the prominent "CONTROL NO." on the documents makes clear, they relate only

to the reexamination (90/006,460), not to the original '160 Patent application (09/198,087).

Exhibits G & H. In fact, when Mark Evens sought Quickie's execution of the Reexamination

Power of Attorney, he specifically stated that it was a form "for filing with the PTO" so

Thelen could "represent Quickie in the Re-Exam." Exhibit I.

Dated: August 4 , 2008
      San Jose, California

Robert E. Krebs

# EXHIBIT A

07/31/2002 12:05 FAX 212 422 0168        RICK STEINER SEGAL FELL                            ☒003
07/31/2002 16:07 FAX                                                                         ☒002

# THELEN REID & PRIEST LLP

### ATTORNEYS AT LAW

NEW YORK
WASHINGTON, D.C.
MORRISTOWN, N.J.

MARKET SQUARE, SUITE 800
701 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004-2608
TEL (202) 508-4000  FAX (202) 508-4321
www.thelenreid.com

SAN FRANCISCO
LOS ANGELES
SILICON VALLEY

July 3, 2001

Alan Fell, Esq.
Rick, Steiner, Segal & Fell, P.C.
Three New York Plaza
New York, NY 10004

Re: Representation of Quickie, LLC

Dear Mr. Fell:

We would like to welcome Quickie, LLC as a client of Thelen Reid & Priest LLP. Our team is very excited about working with Quickie, LLC. We have found that it is important to express as clearly as possible our expectations and intentions when taking on a new legal representation. For that reason, and also because the law requires us to put certain information in a written agreement with clients, we have prepared this letter agreement and enclosed a statement of our Billing and Payment Policies.

We have already discussed the nature of legal services for which you have retained our firm. So that we have a common understanding about the scope of our legal representation, we would like to set out briefly here what you have asked us to do: Provide litigation services related to the Quickie, LLC legal action against Medtronic, Inc.

Our fees for our legal services are based primarily on the value of the actual time spent on any particular matter by the attorneys and legal assistants performing the services. Our billing rates for attorneys and legal assistants vary according to their experience and expertise. As discussed with you, I will be the principal attorney involved in this matter. My billing rate is $450 per hour. In addition, I may rely on other partners and associates to assist me in this matter, as needed. Richard Taffet, Robert Krebs, Jeffrey Gans may work on this matter. Their rates are $495, $435, and $305 respectively. These rates are generally adjusted on a yearly basis. If it is necessary and appropriate, we also may use other attorneys and paralegals for this representation.

In addition to legal fees, we charge for other costs incurred by us on your behalf, including telephone charges, photocopying costs, postage, computerized research, secretarial overtime, word processing costs, meals, cabs and travel expenses.

As a condition of your becoming and continuing as a client of our firm, we request that you agree to the enclosed Billing and Payment Policies. Please confirm your agreement by executing the enclosed copy of this letter in the space provided and returning it to me.

DC#118595.v1

07/31/2002 12:05 FAX 212 422 0158          RICK STEINER SEGAL FELL                          ☒004

THELEN REID & PRIEST LLP

    Alan Fell, Esq.
    Rick, Steiner, Segal & Fell, P.C
    July 3, 2002
    Page 2


        Naturally, we trust and hope that you will be satisfied with our services and will return to us for your future legal needs. If you request additional services from us in the future which are either related or unrelated to the scope of the representation described above, it is understood that those future legal services will be provided by us under the same billing and payment terms as are set forth in this letter and the attachment.

        On behalf of our entire firm, we thank you for the confidence you have shown in us by retaining Thelen Reid & Priest LLP. We look forward to working with you.

        Sincerely,

        Mark Fox Evens

The foregoing is agreed to:

QUICKIE, LLC

By:

THELEN REID & PRIEST LLP

Alan Fell, Esq.
Rick, Steiner, Segal & Fell, P.C
July 3, 2002
Page 3

## BILLING AND PAYMENT POLICIES
## of
## THELEN REID & PRIEST LLP

1.    Fees for Legal Services.

Unless otherwise agreed, the fees for our legal services will be based on the number of hours worked multiplied by the hourly rates then in effect for the attorneys, legal assistants and other persons on our staff performing the services.

Our firm may utilize attorneys, legal assistants and other staff in a manner which we believe will best serve a client's requirements consistent with providing the proper level of skill and experience at the most reasonable costs. Our schedule of hourly rates for attorneys, legal assistants and other members of the professional staff is based upon years of experience, specialization and level of professional attainment.

Currently, our rates are $150-$570 per hour for attorneys and from $95-$210 per hour for law clerks and legal assistants. The current rates for Mark P. Evens, Richard Taffet, Robert Krebs, Jeffrey Gans, who will be working on the matter are $450, $495, $435, and $305 respectively.

We are sometimes requested by clients to give estimates of fees and costs that we expect to be incurred in connection with a specific matter. While we will work closely with clients on budgets for matters, clients should be aware that estimates and budgets are by their natures imprecise and are subject to unforeseeable future events. Unless we have expressly agreed to a fixed fee or maximum fee to be charged or other billing arrangement, the actual amounts billed may be different from estimated or budgeted amounts.

2.    Other Charges.

Non-fee charges are separately itemized on our statements in accordance with the attached schedule. In cases where costs incurred for outside materials or services exceed $200, we may forward the vendors' statements directly to our client for payment with the understanding that they will be discharged promptly. As a result of billing delays by outside vendors, some charges may be billed later than the period in which the corresponding legal services were rendered.

3.    Revisions to Fees for Legal Services and Non-Fee Charges.

Our rates and non-fee charges are reviewed periodically and adjusted from time to time. It is not the policy of the firm to send out a schedule to each client every time our rates or non-fee charges are adjusted, and we reserve the right to adjust rates and charges in a reasonable manner

07/31/2002 12:06 FAX 212 422 0158          RICK STEINER SEGAL FELL                    ☒006

THELEN REID & PRIEST LLP

Alan Fell, Esq.
Rick, Steiner, Segal & Fell, P.C
July 3, 2002
Page 4

without prior notice. Unless otherwise agreed, the rates that are being charged for all personnel will be reflected in the invoices itemizing our charges.

4.      **Insurance Coverage.**

Unless otherwise agreed in writing, you will be responsible for paying your invoices directly in accordance with these billing and payment policies. In the event you have insurance coverage for our fee and/or non-fee charges, you will be responsible for seeking reimbursement from your insurer(s). If you retain us to attempt to obtain insurance coverage for a legal matter we are handling on your behalf, we will represent you in seeking to obtain insurance reimbursement for our fee and non-fee charges, but you will remain responsible for direct payment of all invoices. If you do not retain us to attempt to obtain insurance coverage for a legal matter we are handling on your behalf, we will cooperate with any reasonable requests for billing and payment information you may require in connection with any independent efforts you may make to obtain insurance coverage for our fee and non-fee charges, but you will remain responsible for direct payment of all invoices.

5.      **Monthly Statements Due Upon Receipt.**

Our statements generally will be prepared and mailed during the month following the end of the month in which the services are rendered. Statements are due upon receipt. In litigation matters in which we prosecute monetary claims on the client's behalf, we shall have a lien on the proceeds from those claims to the extent of any unpaid fees or other charges, and such lien shall attach to any judgment, settlement or other recovery obtained by the client on those claims.

6.      **Past Due Amounts.**

To avoid burdening those clients who pay their statements promptly with higher fees to reflect the added costs we incur as a result of clients who are delinquent, a monthly service charge of 10% per annum accruing from the due date may at our discretion be added to statements which remain unpaid for 30 days or more. In no event will the service charge be greater than the maximum rate permitted by any applicable law. In the unlikely event that we are required to institute legal proceedings to collect our fees or other amounts due to us, the prevailing party will be entitled to recover reasonable attorneys' fees (not to exceed $40,000) and other costs of collection.

7.      **Termination of Services.**

Our clients have the right to terminate our services at any time. We will have the same right, subject to any professional obligation to give a client reasonable notice to arrange alternative

DC #116393 v1

07/31/2002 12:06 FAX 212 422 0158          RICK STEINER SEGAL FELL                          ☒007

THELEN REID & PRIEST LLP

Alan Fell, Esq.
Rick, Steiner, Segal & Fell, P.C
July 3, 2002
Page 5


representation and subject to the rules of any applicable court or tribunal.  In the event of a
termination of our services, the client will be obligated to pay for our fees and other charges
incurred prior to the delivery of notice of termination.

    8.     Arbitration.

To the extent applicable, notice is given that New York law provides, with certain exceptions,
that you have the right to arbitrate fee disputes if the amount of the dispute is between $1,000
and $50,000.

07/31/2002 12:06 FAX 212 422 0158          RICK STEINER SEGAL FELL                           ☒008

THELEN REID & PRIEST LLP

Alan Fell, Esq.
Rick, Steiner, Segal & Fell, P.C
July 3, 2002
Page 6

## SCHEDULE OF CHARGES OTHER THAN

## FOR PROFESSIONAL SERVICES

| | |
|---|---|
| Copying | $.18/page |
| Velobinding | $1.50 per bind |
| Facsimile | $2.00/page (outgoing only) |
| Postage | No charge, except for unusually large mailings which are billed at U.S. Postal rates |
| Mileage | Internal Revenue Service standard mileage rate |
| Other Travel | At Cost |
| Airfare | Coach class for domestic flights, business class for international flights |
| Text editing | No charge |
| Telephone | No charge for local calls. Long distance calls at cost. |
| Computerized Legal Research | Billed at rates charged by computerized research vendors (e.g. Lexis, Westlaw) |
| Other Third-Party Charges | All other third-party charges (e.g., filing fees, expert witness fees, travel on client's behalf) are billed at the rates charged by these third-parties |

DC #118393 v1

# EXHIBIT B

RICK, STEINER, SEGAL, FELL & BENOWITZ, P.C.
ATTORNEYS AT LAW
THREE NEW YORK PLAZA
NEW YORK, N.Y. 10004
TELEPHONE (212) 422-0480
FAX (212) 422-0168

NEW JERSEY OFFICE
111 PATERSON AVENUE
HOBOKEN, N.J. 07030
(201) 798-6613

October 15, 2002

HAND DELIVERY

Todd Sharinn, Esq.
Greenberg Traurig, LLP
885 Third Avenue, Suite 2400
New York, NY 10022

RE:  Quickie, LLC v. Medrtonic, Inc.
     Civil Action No. 02 CV1157 (GEL)

Dear Todd:

This letter will confirm our recent conversation concerning the
above referenced matter.  I am writing this leter as general
counsel to Quickie, LLC.

You are aware that the firm of Thelen, Reid, Priest will be
substituted for Greenberg Traurig in the above referenced
litigation.  You will arrange to have the files prepared to be
picked up by Thelen Reid Priest.  If you would let me know when the
files are ready and how many boxes are included, I will arrange to
have them picked up.

You and Greenberg Traurig will continue to handle various patent
applications pending on behalf of Quickie, LLC and Quickievision,
LLC.

I am aware that there are pending bills outstanding from your firm.
Quickie will be making a payment today on account and intends to
pay the entire balance by the end of this year.  I am hoping that
your firm will waive its usual requirement and release the files
immediately.

I want to personally thank you for the superb job you have done in
litigating this matter.  The result of the Markman hearing was
excellent.

All the best.

Sincerely,

ALAN FELL

AF:ags

cc:  Stephen B. Colvin, M.D.

EXHIBIT
22
6-10-08

QLLC 0098946

# EXHIBIT C

@001

```
************************
***   TX REPORT   ***
************************

TRANSMISSION OK

TX/RX NO              0752
CONNECTION TEL        34521#000002#12126882449
CONNECTION ID
ST. TIME              10/11 17:20
USAGE T               00'53
PGS. SENT             3
RESULT                OK
```

Thelen Reid & Priest LLP

OCT 1 1 2002

**FAXED**

# THELEN REID & PRIEST LLP
### ATTORNEYS AT LAW

## Fax Cover Page

| JOB # |

In case of a problem
with this transmission,
call the **Fax Operator**
at **(202) 508-4070**

Market Square, Suite 800
701 Pennsylvania Avenue, N.W.
Washington, DC 20004

Phone ☎ (202) 508-4000
Fax 🖷 (202) 508-4321
www.thelenreid.com

***IMPORTANT:*** *This fax transmission is intended only for the addressee. It contains information from the law firm of Thelen Reid & Priest LLP which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination, distribution, or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this transmission is received in error, please notify Thelen Reid & Priest LLP immediately at the telephone number indicated above. We will reimburse your costs incurred in connection with this erroneous transmission and your return of these materials. THANK YOU.*

| ATTORNEY # | CLIENT-MATTER # | RETURN TO | ROOM # |
|---|---|---|---|
| 03477 | 034521/000002 | Mark Fox Evens | |

**Total Pages Sent: 3**     October 11, 2002          Via Fax Only
(including this page)

**To**

| Todd S. Sharinn, | Fax: | 212 688-2449 |
|---|---|---|
| Greenberg Traurig | Phone: | 212 801-2100 |

**From**

| Mark Fox Evens | Phone: | 202 508-4053 |
|---|---|---|
| | Email: | mevens@thelenreid.com |
| | Direct Fax: | |

**Message**



QLLC 0069674

# THELEN REID & PRIEST LLP

ATTORNEYS AT LAW

NEW YORK
WASHINGTON, D.C.
MORRISTOWN, N.J.

MARKET SQUARE, SUITE 800
701 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004-2608
TEL (202) 508-4000  FAX (202) 508-4321
www.thelenreid.com

SAN FRANCISCO
LOS ANGELES
SILICON VALLEY

October 11, 2002

VIA FACSIMILE

Todd S. Sharinn, Esq.
Greenberg Traurig, LLP
885 Third Avenue
New York, NY 10022-4834

Re:    Transfer of Files
       *Quickie v. Medtronic*, Southern District of New York
       02 CIV. 1157 (GEL)

Dear Todd:

Pursuant to our telephone conversation this afternoon, I am formally requesting that you transfer all of the litigation files in the above-captioned action to our office in New York as soon as possible. The address is 40 West 57th Street. Please send the files to the attention of Shari Markowitz-Savitt, Esq. We also need any files related to negotiations on behalf of Quickie to license its intellectual property. You told me that any such files are contained in the litigation files, but I want to make sure that we have everything.

As we discussed, we would like to accomplish the file transfer as soon as next week as possible. You responded that you must comply with your firm's procedures. I understand that all firms have procedures for the transfer of files. However, recognizing your past relationship with the client and the continuing relationship, I trust that you will ensure an expeditious review so that we will receive all of the files no later than the end of next week. If, for some reason, you are unable to transmit the files, please notify me of any problems as soon as possible so that we can address the problems and obtain the files. I also understand that Dr. Colvin sent you a box of materials that he though were pertinent. I would like those materials transmitted to our firm as soon as possible as well. Again, given your past relationship with the client, I trust transmittal of these files and documents will not be a problem.

Finally, we are sending over a stipulation to substitute our firm as counsel. Please execute the form and return it by messenger to Ms. Markowitz.

DC #130307 v1

QLLC 0069675

THELEN REID & PRIEST LLP

Todd S. Sharinn, Esq.
October 11, 2002
Page 2

If you have any questions, or if I can be of additional service, please do not
hesitate to contact me.

Cordially yours,

*Mark*

Mark Fox Evens

cc:    Alan Fell, Esq.
       Dr. Stephen Colvin

DC #130307 v1

QLLC 0069676

# EXHIBIT D



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Paul J. Sutton

Direct Dial
(212) 801-2108
Email
suttonp@gtlaw.com

October 15, 2002

**VIA FAX & FEDERAL EXPRESS**

Mark Fox Evens, Esq.
Thelen Reid & Priest
Market Square, Suite 800
701 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2608

        Re:    Quickie v. Medtronic
               <u>02 Civ. 1157 (GEL)</u>

Dear Mark:

      It was good to talk to you this afternoon, and this will re-confirm for your and TRP's records that I will facilitate the prompt transfer of relevant files relating to the above-referenced litigation to Shari at the New York office.

      Mark, I am enclosing with this fax a copy of the Stipulation of substitution of counsel, which I have signed, and the original of which is being sent this afternoon to you via FedEx.

      Finally, for the benefit of our mutual client, Quickie, I will try to make myself available to both you and Steve if you feel I can be of any help regarding either the prosecution of the litigation or any settlement negotiations that come up. Please send my regards to my friends at TRP. I referred a significant asbestos defense to TRP's Jon Siegfried last week, since our representation of the tobacco industry conflicts us out (as you know, a typical asbestos defense points to smokers and the industry). Best regards.

                    Cordially yours,

                    Paul J. Sutton
                    Chairman, Patent Practice

pjs:sp\ltr1\Evens
Encl.
cc: Stephen B. Colvin, M.D.

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-848-1000  FAX 212-688-2449  www.gtlaw.com
NEW YORK  MIAMI  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  CHICAGO  BOSTON  PHOENIX  WILMINGTON  LOS ANGELES  DENVER
SÃO PAULO  FORT LAUDERDALE  BOCA RATON  WEST PALM BEACH  ORLANDO  TALLAHASSEE

**EXHIBIT**
24
6-10-08

QLLC 0069662

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -X
QUICKIE, LLC,                                          :    Civ. No.: 02 CV 1157 (GEL)
                                                       :
                             Plaintiff,                :
                                                       :
          -against-                                    :    **STIPULATION OF**
                                                       :    **SUBSTITUTION OF COUNSEL**
MEDTRONIC, INC.,                                       :
                                                       :
                             Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -X

          IT IS HEREBY STIPULATED AND AGREED by and between the undersigned,

that the attorneys of record for plaintiff Quickie, LLC in the above-entitled action be changed and

that Thelen Reid & Priest LLP with offices located at 40 West 57th Street, New York, New York

10019 be substituted for Greenberg Traurig, with offices located at 885 Third Avenue, New

York, New York, New York 10022, as attorneys of record for such plaintiff herein.

Dated:  New York, New York
        October 13, 2002

GREENBERG TRAURIG                          THELEN REID & PRIEST LLP
Outgoing attorneys for Plaintiff           Incoming attorneys for Plaintiff


By: _____              By: _____
    Paul J. Sutton (PS 8630)                   Shari Markowitz Savitt (SM 6366)
    Todd S. Sharinn (TS 0581)                  40 West 57th Street
    885 Third Avenue                           New York, New York  10019-4097
    Suite 2400                                 (212) 603-2000
    New York, New York 10022
    (212) 801-9200                                            and

                                           Mark F. Evens
                                           Jeffrey Gans
                                           THELEN REID & PRIEST LLP
                                           Market Square
                                           701 Pennsylvania Avenue, N.W., Suite 800
                                           Washington, D.C. 20004

                                                           NY #493697 v1

QLLC 0069663

# EXHIBIT E



# GREENBERG
ATTORNEYS AT LAW
# TRAURIG

02 OCT 16  1  4:20

## Transmittal Cover Sheet

### TO

| | | | |
|---|---|---|---|
| Name: | Stephen B. Colvin, M.D. | Name: | Mark Evens, Esq. |
| Company: | | Company: | Thelen Reid & Priest |
| Fax No.: | (212) 263-2246 | Fax No.: | (202) 508-4321 |
| Phone No.: | | Phone No.: | |
| Name: | Alan Fell, Esq. | Name: | Shari Markowitz-Savitt |
| Company: | | Company: | Thelen Reid & Priest |
| Fax No.: | (212) 422-0158 | Fax No.: | (212) 603-2001 |
| Phone No.: | | Phone No.: | |
| Name: | | Name: | |
| Company: | | Company: | |
| Fax No.: | | Fax No.: | |
| Phone No.: | | Phone No.: | |
| Name: | | Name: | |
| Company: | | Company: | |
| Fax No.: | | Fax No.: | |
| Phone No.: | | Phone No.: | |

**FROM**        Paul A. Juergensen

**File Number**    51822.010400

**Comments**

**Date**        October 16, 2002

**Time**        3:47 PM

**No. Pages**    Including this cover sheet    4

Please notify us immediately if not received properly at 212-801-2100.

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

885 Third Avenue, New York, New York 10022   (212) 801-2100 Fax (212) 688-2449

**EXHIBIT**

25

6-10-08

QLLC 0098947



# GREENBERG
### ATTORNEYS AT LAW
# TRAURIG

Paul A. Juergensen
212-801-3173
juergensenp@gtlaw.com

October 16, 2002

**VIA FACSIMILE**

Shari Markowitz-Savitt
Thelen Reid & Priest LLP
40 West 57th Street
New York, New York 10019

Re:    Quickie, LLC v. Medtronic, Inc.
   Our Reference No.: 51822.010400

Dear Shari :

Confirming our conversation this afternoon, our files concerning the above-referenced matter are ready to be picked-up by your office. A copy of my cover letter accompanying the files is faxed herewith.

We understand that you are unable to pick-up these documents today, and that you may be sending a representative from your office to pick the files up tomorrow, depending upon the weather. Mr. Sutton has instructed me to get these documents into the hands of Mark Evens "pronto", so that we ask that you not delay picking them up as soon as possible. Please contact me in advance so that I know when someone will be here to pick-up the files.

Very truly yours,

Paul A. Juergensen
Paralegal

Enclosures
(6 Boxes)

cc:    Stephen B. Colvin, M.D.
   Mark Evens, Esq.
   Alan Fell, Esq.
   Paul J. Sutton, Esq.
   Todd S. Sharinn, Esq.

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-9200  Fax 212-688-2449  www.gtlaw.com
ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

QLLC 0098948

10/16/2002    16:43    GREENBERG/TRAURIG → 776#51822#010400#2632246    NO.954    P003



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Paul A. Juergensen
212-801-3173
juergenerp@gtlw.com

October 16, 2002

**MESSENGER PICK-UP**

Shari Markowitz-Savitt
Thelen Reid & Priest LLP
40 West 57th Street
New York, New York 10019

      Re:    Quickie, LLC v. Medtronic, Inc.
            <u>Our Reference No.: 51822.010400</u>

Dear Shari :

    We enclose Greenberg Traurig's files concerning the above-referenced matter. These files include the following document types:

    1.    Correspondence;

    2.    Pleadings;

    3.    Transcripts;

    4.    General/Main File;

    5.    U.S. Patent No. 6,066,160 File History & Prior Art;

    6.    Slides – Markman Hearing;

    7.    Key Cases & Definitions Re: Markman Hearing;

    8.    Prototype Photos;

    9.    Medtronic Device;

    10    Allan Katz Prototypes;

    11.    Medtronic Prototypes;

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

QLLC 0098949

Shari Markowitz-Savitt
October 16, 2002
Page 2

   12. Cases Re: Claim Construction;

   13. Documents Produced by Quickie;

   14. Documents Produced by Medtronic;

   15. Attorney Work Files;

   16. Patent Research/Searches; and

   17. Original Documents from Quickie.


   To the extent that we discover any additional materials, we will forward them immediately.

   Please do not hesitate to call if you have any questions.

         Very truly yours,

         Paul A. Juergensen
         Paralegal

Enclosures
(6 Boxes)

cc: Stephen B. Colvin, M.D.
  Mark Evens, Esq.
  Alan Fell, Esq.
  Paul J. Sutton, Esq.
  Todd S. Sharinn, Esq.

QLLC 0098950

# EXHIBIT F



**Transmittal Cover Sheet**

| | |
|---|---|
| **TO** | Marsha Twitty |
| **Company** | U.S. Patent and Trademark Office |
| **Fax Number** | 703-305-1013 |
| **Phone Number** | 703-308-9692 |
| **FROM** | Linda Garramone |
| **File Number** | 51822.010700 |
| **Comments** | Change of Correspondence Address and Fee Address Indication Form |

| | |
|---|---|
| **Date** | December 16, 2002 |
| **No. Pages** | Including this cover sheet    4 |
| | Please notify us immediately if not received properly at 212-801-2100 |

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

885 Third Avenue, New York, New York 10022  (212) 801-2100 Fax (212) 688-2449

EXHIBIT

7

6-10-0?

GT 0000380

# MESSAGE CONFIRMATION

12/16/2002  12:21
ID=GREENBERG/TRAURIG

| DATE | S.R-TIME | DISTANT STATION ID | MODE | PAGES | RESULT | |
|------|----------|--------------------|------|-------|--------|--|
| 12/16 | 02'00" | 7033051013 | TX | 004 | OK | 0000 |

12/16/2002    12:18    GREENBERG/TRAURIG → 51822H010700H17033051013    NO.984    P001

## GREENBERG
ATTORNEYS AT LAW
## TRAURIG

**Transmittal Cover Sheet**

| | |
|---|---|
| **TO** | Marsha Twitty |
| **Company** | U.S. Patent and Trademark Office |
| **Fax Number** | 703-305-1013 |
| **Phone Number** | 703-308-9692 |
| **FROM** | Linda Garramone |
| **File Number** | 51822.010700 |
| **Comments** | Change of Correspondence Address and Fee Address Indication Form |

GT 0000381

Please type a plus sign (+) inside this box ⟶ [+]

PTO/SB/123 (10-00)
Approved for use through 10/31/2002. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# CHANGE OF CORRESPONDENCE ADDRESS
### *Patent*

Address to:
Assistant Commissioner for Patents
Washington, D.C. 20231

| | |
|---|---|
| Patent Number | 6,066,160 |
| Issue Date | May 23, 2000 |
| Application Number | 09/198,087 |
| Filing Date | November 23, 1998 |
| First Named Inventor | Colvin |

Please change the Correspondence Address for the above-identified patent to:

☐ Customer Number [            ] ⟶  Place Customer Number Bar Code Label here
*Type Customer Number here*

OR

☐

| | |
|---|---|
| Firm or Individual Name | Todd S. Sharinn |
| Address | Greenberg Traurig, LLP |
| Address | 885 Third Avenue, 21st Floor |
| City | New York    State NY    ZIP 10022 |
| Country | US |
| Telephone | 212-801-2157    Fax 212-688-2449 |

This form cannot be used to change the data associated with a Customer Number. To change the data associated with an existing Customer Number use "Request for Customer Number Data Change" (PTO/SB/124).

This form will not affect any "fee address" provided for the above-identified patent. To change a "fee address" use the "Fee Address Indication Form" (PTO/SB/47).

I am the :

☐ Patentee.

☐ Assignee of record of the entire interest. See 37 CFR 3.71.
Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96).

☒ Attorney or agent of record.

| | |
|---|---|
| Typed or Printed Name | Todd S. Sharinn |
| Signature | |
| Date | October 22, 2002 |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below".

☐ *Total of _____ forms are submitted.*

Burden Hour Statement: This form is estimated to take 3 minutes to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

GT 0000382

PTO/SB/47 (03-02)
Approved for use through 12/31/2002.  OMB 0651-0015
U.S. Patent and Trademark Office;  U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control

## "FEE ADDRESS" INDICATION FORM

Address to:
Assistant Commissioner for Patents
Box M Correspondence
Washington, D.C. 20231

**INSTRUCTIONS:** Only an address associated with a Customer Number can be established as the fee address for maintenance fee purposes (hereafter, fee address). A fee address should be specified when the patentee would like correspondence related to maintenance fees to be mailed to a different address than the correspondence address for the application. If there is a Customer Number already associated with the fee address for the patent or allowed application, check the first box below and provide the Customer Number in the space provided. If there is no Customer Number associated with the fee address for the patent or allowed application, you must check the second box below and attach a Request for Customer Number form (PTO/SB/125). For more information on Customer Numbers, see the Manual of Patent Examining Procedure (MPEP) Section 403.

Please recognize as the "Fee Address" under the provisions of 37 CFR 1.363 the following address associated with the following customer number:

☒   Customer Number          | 32361 |

Place Customer Number Bar
Code Label here
PATENT TRADEMARK OFFICE

**OR**          *Type Customer Number here*

☐   Request for Customer Number (PTO/SB/125) attached hereto

in the following listed application(s) for which the Issue Fee has been paid or patent(s).

| PATENT NUMBER (if known) | APPLICATION NUMBER |
|---|---|
| 6,066,160 | |

(check one)

☐  Applicant/Inventor

☒  Attorney or agent of record    **42,144**
(Reg. No.)

☐  Assignee of record of the entire interest. See
37 CFR 3.71. Statement under 37 CFR 3.73(b)
is enclosed enclosed. (Form PTO/SB/96)

☐  Assignment recorded at _____ From _____

Signature

**Todd S. Sbarinn**
Typed or printed name

**212-801-2157**
Requester's telephone number

**October 22, 2002**
Date

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☐  *Total of _____ _____ forms are submitted.

Burden Hour Statement: This collection of information is required by 37 CFR 1.363. This information is used by the public to submit (and by the USPTO to process) payment of patent maintenance fees. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 0.08 hours to complete, including gathering, preparing, and submitting the comlete payment of maintenance fees. Time will vary depending on the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231

GT 0000383

| CERTIFICATE OF MAILING BY FIRST CLASS MAIL (37 CFR 1.8) | | | Docket No.<br>51822.010700 |
|---|---|---|---|
| Applicant(s): Colvin et al | | | |
| Serial No.<br>09/198,087 | Filing Date<br>November 23, 1998 | Examiner<br>Gary Jackson | Group Art Unit<br>3731 |

Invention:  **PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN MINIMALLY INVASIVE SURGERY AND TO FACILITATE STANDARD TISSUE SECURING**

I hereby certify that this  Change of Correspondence Address, Fee Address Indication Form & Post Card
                                            (Identify type of correspondence)

is being deposited with the United States Postal Service as first class mail in an envelope addressed to: The

Assistant Commissioner for Patents, Washington, D.C. 20231 on          October 22, 2002
                                                                                                (Date)

Linda Garramone
(Typed or Printed Name of Person Mailing Correspondence)

*[signature]*
(Signature of Person Mailing Correspondence)

Note: Each paper must have its own certificate of mailing.

PO7A/REV03

GT 0000

# EXHIBIT G

Docket No. 034521-003

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT:    Stephen Colvin, Eugene Grossi, Allan Katz, Paul Oddo

CONTROL NO.: 90/006,460

PATENT NO.:    6,066,160

FILING DATE:    November 25, 2002

TITLE:    PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN MINIMALLY INVASIVE SURGERY AND TO FACILITATE STANDARD TISSUE SECURING

EXAMINER:    Woo, J.

ART UNIT:    3731

Commissioner for Patents

## POWER OF ATTORNEY BY ASSIGNEE OF ENTIRE INTEREST
### (REVOCATION OF PRIOR POWERS)

### REVOCATION OF PRIOR POWERS OF ATTORNEY

all powers of attorney previously given are hereby revoked and

### NEW POWER OF ATTORNEY

the following attorney(s) and/or agent(s) are hereby appointed to prosecute and transact all business in the Patent and Trademark Office connected therewith.

Robert E. Krebs, Registration No. 25,085; David B. Ritchie, Registration No. 31,552; Marc S. Hanish, Registration No. 42,526; John P. Schaub, Registration No. 42,125; Adrienne Yeung, Registration No. 44,000; Steven J. Robbins, Registration No. 40,298; Thierry K. Lo, Registration No. 49,097; William Samuel Niece, Registration No.: 47,824; J. Davis Gilmer, Registration No. 44,711; William E. Winters, Registration No. 42,232; Masako Ando, (37 C.P.R.§10.9 (b)); and John Klaas Ullkema, Registration No. 20,282; Becky L. Troutman, Registration No. 38,703; Hal J. Bohner, Registration No. 27,856;



Quickie, LLC

*(type or print identity of assignee of entire interest)*

3 New York Plaza
Attn: Alan Fell
New York, NY 10004

*Address*

Recorded in PTO on ___11/23/1998___
Reel_____9608_____
Frame_____0640_____

## ASSIGNEE STATEMENT

The undersigned states that he is authorized to act on behalf of the assignee.

Signature

Date   3/4/03

Aubrey C. Galloway
*(type or print name of person authorized to sign on behalf of assignee)*

Managing Partner.
Title

2

# EXHIBIT H

12-05-03   11:47am   From-Thelen, Reid, & Priest LLP                    T-198  P.002/002  F-254

Attorney Docket No. 034521-003

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT:      Stephen Colvin, Eugene Grossi, Allan Katz, Paul Oddo

CONTROL NO.: 90/006,460

PATENT NO.:      6,066,160

FILING DATE:     November 25, 2002

TITLE:      PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN
MINIMALLY INVASIVE SURGERY AND TO FACILITATE
STANDARD TISSUE SECURING

EXAMINER:      Woo, J.

ART UNIT:      3731

**RECEIVED**
**CENTRAL FAX CENTER**

**DEC 0 5 2003**

**OFFICIAL**

---

CERTIFICATE OF TRANSMISSION UNDER 37 CFR 1.8

I hereby certify that this correspondence is being facsimile transmitted with the United States Patent and Trademark Office to Director for Patents, Fax No. (703) 872-9306 on the date printed below:

Date: 12/5/03      Name: _____
Annette Valdivia

---

COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

### CHANGE OF ATTORNEY DOCKET NUMBER
### AND CHANGE OF ADDRESS NOTICE

Please change the Attorney Docket No. for this patent application to 034521-003.

Please address all further communications regarding this application to:

Robert E. Krebs
Thelen Reid & Priest LLP
P.O. Box 640640
San Jose, CA 95164-0640
Telephone (408) 292-5800; Facsimile (408) 287-8040

Respectfully submitted,
THELEN REID & PRIEST LLP

Dated: 12/4/03

Robert E. Krebs
Reg. No. 25,885

# EXHIBIT I

**Thelen Reid & Priest LLP**
Attorneys At Law

701 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20004-2608

Tel. 202.508.4000
Fax 202.508.4321

www.thelenreid.com

February 28, 2003

<u>VIA FEDERAL EXPRESS</u>

Dr. Stephen Colvin
NYU Medical Center
530 First Avenue
Suite 9V
New York, NY 10016

Dear Steve:

Enclosed are two copies of the form we need you to execute so we can represent Quickie in the Re-Exam before the U.S. Patent and Trademark Office. Please sign both and return them to me. Thanks.

Cordially yours,

*Mark*

Mark Fox Evens

Enclosure

Error! Unknown document property name.

NEW YORK        SAN FRANCISCO        WASHINGTON, DC        LOS ANGELES        SILICON VALLEY        MORRISTOWN, NJ

**PATENT**

Practitioner's Docket No._____034521-002_____

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Patent No:    6,066,160

Issued:       May 23, 2000
Title:        PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN
              MINIMALLY INVASIVE SURGERY AND TO FACILITATE
              STANDARD TISSUE SECURING
Inventors:    Stephen Colvin, Eugene Grossi, Allan Katz, Paul Oddo

**Commissioner of Patents and Trademarks**
**Washington, D.C. 20231**

### POWER OF ATTORNEY BY ASSIGNEE OF ENTIRE INTEREST
### (REVOCATION OF PRIOR POWERS)

As assignee of record of the entire interest of the above identified patent,

### REVOCATION OF PRIOR POWERS OF ATTORNEY

all powers of attorney previously given are hereby revoked and

### NEW POWER OF ATTORNEY

the following attorney(s) and/or agent(s) are hereby appointed to prosecute and
transact all business in the Patent and Trademark Office connected therewith.

**Robert E. Krebs, Registration No. 25,885; David B. Ritchie, Registration No. 31,562; Marc S.
Hanish, Registration No. 42,626; John P. Schaub, Registration No. 42,125; Adrienne
Yeung, Registration No. 44,000; Steven J. Robbins, Registration No. 40,299; Thierry K. Lo,
Registration No. 49,097; William Samuel Niece, Registration No.: 47,824; J. Davis Gilmer,
Registration No. 44,711; William E. Winters, Registration No. 42,232, Masako Ando, (37
C.F.R.§10.9 (b)); and John Klaas Ullkema, Registration No. 20,282; Becky L. Troutman,
Registration No. 36,703; Hal J. Bohner, Registration No. 27,856;**

**Quickie, LLC**

*(type or print identify of assignee of entire interest)*

**3 New York Plaza**
**Attn: Alan Fell**
**New York, NY 10004**

*Address*

Recorded in PTO on ____ 11/23/1998 _____
Reel _____ 9608 _____
Frame _____ 0640 _____

## ASSIGNEE STATEMENT

The undersigned states that he is authorized to act on behalf of the assignee.

Signature

Date _____

_____ Stephen Colvin _____
(type or print name of person authorized to sign
on behalf of assignee)

Title

2

# EXHIBIT J

<u>DECLARATION AND POWER OF ATTORNEY</u>

We, STEPHEN COLVIN, EUGENE GROSSI, ALLAN KATZ, and PAUL ODDO, hereby declare that we are citizens of the United States of America and residents of New York, New York, New York, New York, Freeport, New York, and Freeport, New York,; and that our Post Office Addresses are 1775 York Avenue, Apt. 32B, New York, New York 10028; 530 East 83rd Street, New York, New York 10028; 700 Miller Avenue, Freeport, New York 11520; and 216 Garfield Street, Freeport, New York, 11520 respectively; that we believe we are the original, first and joint inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled

PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE
IN MINIMALLY INVASIVE SURGERY AND TO
FACILITATE STANDARD TISSUE SECURING

the specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents of the above identified specification, including the claims.

We acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

We hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or

JRP/29630/11299254.1
11/13/98-MAZ/H)

imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

We hereby appoint Todd S. Sharinn, Registration No. 42,144, whose Post Office Address is Pepe & Hazard LLP, 225 Asylum Street, Hartford, Connecticut 06103, our attorney to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith. Address all correspondence to Todd S. Sharinn at the aforesaid address and direct all telephone calls to him at Area Code 860, Telephone No. 241-2631.

_____  _____
Date                   STEPHEN COLVIN
                       Residence Address:
                       1775 York Avenue, Apt. 32B
                       New York, New York 10028

_____  _____
Date                   EUGENE GROSSI
                       Residence Address:
                       530 East 83rd Street
                       New York, New York 10028

_____  _____
Date                   ALLAN KATZ
                       Residence Address:
                       700 Miller Avenue
                       Freeport, New York 11520

JRF/29620/1/297254.1
11/13/98-MAZ/H1

Date  11/17/98

PAUL ODBO
Residence Address:
216 Garfield Street
Freeport, New York 11520

JOSEPH T. MINUTELLO
Notary Public, State of New York
No. 4893609
Qualified in New York County
Commission Expires 8/20/49.

JR8739620/1/299254.1
11/13/98-MJAZ/JT1

# EXHIBIT K

S P E C I F I C A T I O N

TO ALL WHOM IT MAY CONCERN:

Be it known that We, STEPHEN COLVIN, EUGENE GROSSI, ALLAN
KATZ, and PAUL ODDO citizens of the United States of America, and
residents of New York, in the County of New York and State of New
York; New York, in the County of New York and State of New York;
Freeport, in the County of Nassau and State of New York; and
Freeport in the County of Nassau and State of New York;
respectively, have invented certain new and useful improvements
in a

PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE
IN MINIMALLY INVASIVE SURGERY AND TO
FACILITATE STANDARD TISSUE SECURING

of which the following is a specification:

RS000138

# PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN MINIMALLY INVASIVE SURGERY AND TO FACILITATE STANDARD TISSUE SECURING

## FIELD OF THE INVENTION

The instant invention relates to apparatus and systems for use in securing prosthetics to native tissue or tissue to native tissue in medical procedures. More particularly, this invention relates to apparatus and systems which facilitate securing the ends of standard sutures which can be used to secure tissues to native tissue or prosthetic devices to native tissue without requiring activation of the device.

## BACKGROUND OF THE INVENTION

Suturing is an integral part of surgery. It is used to hold tissues together or to secure prosthetics (including but not limited to, heart valve prosthetics, annuloplasty rings, vascular grafts, and orthopedic implants) to native tissue. Sutures have conventionally been used to fasten such implants. The suture material is passed through the native tissue and then through part of the prosthetic or adjacent native tissue. The two are then drawn and secured together by tying a knot on the end of the suture.

By way of example, heart valve replacements and prostheses have been used for many years and many improvements in both the functionality and ease of implantation have been made thereon. More precisely, during conventional heart valve replacement surgery, sutures are placed in the native annulus after removal of a damaged native valve. Often small pledgets are threaded on the sutures to buttress their contact with the native tissue. The suture is then inserted through the suture ring of the replacement heart valve. Knots are then tied on the sutures to secure the replacement heart valve to the native heart annulus in its desired position such that there will be no leakage around the replacement heart valve.

When it is recognized that each of the completed knots used to secure the replacement heart valve to the native annulus is actually composed of six or more individual knots, it will be appreciated that this task would take a surgeon a significant amount of time

1.

RS000139

to secure the replacement heart valve into position. Further, with the increased level of difficulty associated with this process, comes an increase in the likelihood of error by the surgeon. In addition, since the incision must be larger and the procedure requires greater time, the patient is exposed to collateral risk factors (which include, but are not limited to, an increased incidence of infection, hypothermia, and fluid loss).

Traditionally, the conventional prosthetic attachment procedure has required the surgeon to possess great dexterity and to be in close proximity to the knot. Emerging minimally invasive surgical techniques add an extra level of difficulty to this task since the incisions associated with such methods are generally much smaller than in conventional surgery. As a result, surgeons are required to spend more time tying off the sutures, or in some cases are required to stretch the incision in order to complete the task. By requiring the surgeon to make larger incisions to gain access to tie these knots, the advantages commonly associated with these minimally invasive surgical procedures, of quicker healing, less disruption to surrounding tissues, and less likelihood of infection, are jeopardized.

Sensitive to these new demands, methods and apparatus for implanting heart valve replacement apparatus under minimally invasive conditions have been developed. Examples of such replacement apparatus and methods for implanting heart valve replacement apparatus have been disclosed in U.S. Patent Nos. 4,655,773; 4,364,126; 4,204,283; 3,898,999; 3,996,623; 3,859,668; 3,534,411; and 5,776,188. Indeed, apparatus and methods have been disclosed that avoid the use of sutures altogether. For example, U.S. Patent No. 3,143,742 discloses spacing curved pins along the circumference of the apparatus to pierce the tissue of the native annulus of the heart at the desired attachment point. Unfortunately, due to vagaries in the native tissue, good coaptation along a geometrically perfect surface is not always possible.

Novel technologies have been deployed for the purpose of sewing heart valve subcomponents together. U.S. Patent Nos. 5,071,431; 4,863,460; and 4,743,253 each use a ductile or deformable locking ring as a means to bind the various subcomponents of the heart valve device. However, the aforementioned approaches do not avoid the securing of the implant to the native tissue without the use of traditional suturing methods.

RS000140

Recently, medical instruments have been developed, which permit surgeons to manipulate sutures through a small opening. However, these instruments, which provide an extension between the surgeon's hands and the suture, are cumbersome, thus impeding the surgeon's ability to appropriately place the suture knot.

In response to this problem, surgeons have sought alternatives to conventional knot-tying techniques. Various sutures and suture terminating devices have been disclosed. The most frequently disclosed among these alternatives, is the use of surgical clips, which are designed to replace suture knots.

Examples of surgical clips to terminate sutures have been disclosed in a number of patents including U.S. Patent Nos. 3,976,079; 5,282,832; 5,078,731; 5,474,572; 5,171,251; and 5,409,499. In general, these devices contain locking mechanisms which require the surgeon to deform the device on the suture's path and entrap the suture material in the clip. The suture is fixed in a single location and thus the necessity of tying a knot on the suture is avoided. These devices are problematic because they require actuation and, more importantly, pinpoint accuracy by the surgeon since they are not adjustable.

Still other configurations of surgical clips are disclosed in U.S. Patent Nos. 5,078,731; 5,474,572; 5,171,251; and 5,409,499. These clips are also actuated by the surgeon's deformation of the device. The locking mechanisms in these devices are incorporated into the device's body. However, lateral access is required in order to actuate these clips. This cumbersome configuration makes them difficult, if not impossible, to incorporate into prosthetics. Further, these clips also lock the suture into a single position once actuated. This abridges the surgeon's ability to further adjust the tension on the suture, thus requiring the surgeon to remove the suture and repeat the process in order to achieve, when necessary, better coaptation of the tissue by the suture.

Still other surgical clips are disclosed in U.S. Patent Nos. 3,976,079 and 5,282,832. Both of these clips incorporate an additional mating component (retaining clip 96 and retainer 120, respectively), which when attached to the clip locks the suture in place. However, the use of small loose parts is highly undesirable since it is easy to drop and lose

RS000141

such pieces through a minimally invasive incision. Indeed, if this were to occur, for example, inside a patient's heart, the potential for an arterial embolus and patient injury would greatly increase. Again, these clips, like all the aforementioned clips, lock the suture into a single position, which, as discussed above, has many disadvantages.

Additionally, modifications of sutures and surgical ties have been disclosed in U.S. Patent Nos. 5,123,913 and 4,955,913. The methods presented in these patents include the use of a modified suture or surgical tie having serrations or ridges on the suture's or tie's bodice, which when mated with the appropriate closure device, the suture or tie is allowed to be freely advanced towards closure and cannot slide backwards. This allows the surgeon to incrementally increase the tension on the suture or tie without the need to tie a knot. These modified sutures/ties are not suitable for most surgical applications, since they can not be passed through tissue or prosthetics like a standard suture. In addition, neither of these devices afford the surgeon with the opportunity for precise tightening of the suture or tie since the serrations or ridges are incremental. Further, U.S. Patent No. 5,123,913 discloses a modified suture terminating with a loop member which is designed to mate with the serrations along the length of the suture. While this will function as a surgical suture, the loop member increases the length of the device, making it unsuitable for certain surgical applications, such as securing a heart valve inside the heart. Additionally, these inventions are not compatible with standard sutures.

U.S. Patent No. 5,776,188 discloses three pertinent apparatus for securing a suture without a knot to a heart valve sewing ring. In the first apparatus, plugs 192 (as illustrated in Figure 5) have been credited as devices which help secure the suture in place. This is similar to the suture clip methodology which was discussed above. The drawbacks associated with these plugs are that they: (1) do not eliminate the need for a knot to be tied, (2) do not allow the tension to be incrementally adjusted on the suture, (3) have the potential to dislodge causing patient injury, and (4) may be difficult to position in a minimally invasive cardiac procedure.

The second apparatus provided by U.S. Patent No. 5,776,188, incorporates the use of ball 248 and chamfered slot 242. As illustrated in Figure 7, the ball and slot

RS000142

cooperate to effectuate the securing of sutures to a heart valve sewing ring without the necessity of a knot. While this embodiment may fasten a suture to the valve sewing ring, it is undesirable to surgeons for a number of reasons. First, this embodiment utilizes a free-floating piece (ball 248) which has the potential to dislodge or jam. Consistent with the concerns raised above, relating to U.S. Patent Nos. 3,976,079 and 5,282,832, if the ball were to dislodge from the device, it could harm the patient. Further, although this embodiment may engage the suture, the rounded nature of the ball will minimize the field of contact and the resulting integrity of the grip thereon. This greatly reduces suitability for such a device since most surgical procedures require a strong and permanent grip.

The final apparatus disclosed within U.S. Patent No. 5,776,188 relies on pressure generated by spring 252 to secure the suture. More particularly, spring 252, which is a small separate piece attached to the device, impedes the sutures movement by trapping it. Therefore, the stronger the spring used, the more pressure it applies to the suture and the more reliable its grip will be. However, as the pressure increases, the surgeon's ability to adjust or fine tune the tension applied to the suture is hampered. In addition, the strength of the grip is directly dependent upon the spring's stamina and strength. Further, consistent with the above discussion relating to the previous apparatus, spring 252 is not captured within the body of the device; accordingly, it is capable of breaking free from the device which could cause patient injury.

As will be more fully appreciated below, none of the aforementioned devices offer the ease and versatility for terminating sutures and thus securely locking tissues and/or prosthetics in place, as the instant invention. Indeed, the instant invention provides a means for securing tissues to native tissues and prosthetic implants to native tissue; the benefits of which may be most appreciated in operations where minimally invasive procedures are utilized.

The apparatus and systems disclosed herein obviate the need for manually tying knots, a procedure which typically requires the surgeon to manipulate his hands in tight proximity of the tissue being secured. This invention may be used as a freestanding

RS000143

device or may be incorporated into prosthetic implants such as heart valves, annuloplasty rings, orthopedic implants or the like, all of which require securing to native tissues.

Moreover, the devices of the instant invention are applicable to all instances of operative procedures where the surgeon needs to secure tissue with a suture, but has limited access for her/his hands to tie a knot. In instances of using sutures to stop bleeding or securing tissues or implants in minimally invasive procedures, the devices of the instant invention will facilitate the procedure by eliminating the time and physical exposure required to manually tie knots to terminate the suture. The present invention's advantages of enhanced tissue securing with minimal surgical exposure, decreased implementation time, and enhanced reliability are accentuated when compared to existing related technology.

## SUMMARY OF THE INVENTION

The present invention is directed to apparatus and systems for use in securing the ends of sutures. This invention can be used in a freestanding manner to terminate a suture which holds tissue together or it can be incorporated into a prosthetic in order to hold tissue to the prosthetic. The present invention terminates the ends of standard sutures without knots and without the need for manual proximity thus facilitating minimally invasive surgical procedures.

In one embodiment, the instant invention provides a suture securing apparatus comprising: an apparatus body having a upper surface, a lower surface, an outer surface, and at least one aperture, the aperture having a longitudinal axis extending from the upper surface to the lower surface and defining an aperture surface, wherein a first longitudinal direction and a second longitudinal direction thereof each extends along the longitudinal axis in opposite directions, the aperture including an integral locking means for engaging a suture threaded therethrough.

In a preferred embodiment of the instant invention, the locking means of the suturing securing apparatus comprises a least one ridge formed on at least a portion of the aperture surface for engaging the suture threaded therethrough, each ridge so formed as to facilitate the movement of a suture in the first longitudinal direction along the aperture and

RS000144

oppose the movement of the suture in the second longitudinal direction along the aperture. In another preferred embodiment of the invention, the locking means of the suture securing apparatus comprises a plurality of ridges formed on at least a portion of the aperture surface for engaging the suture threaded therethrough, each ridge so formed as to facilitate the movement of a suture in the first longitudinal direction along the aperture and oppose the movement of the suture in the second longitudinal direction along the aperture. In other preferred embodiments of the invention, each ridge is formed from an elastic material or a rigid material. In yet another preferred embodiment of the invention, a portion of each ridge extending farthest from the aperture surface is rounded. In a preferred embodiment of the invention, each ridge is formed at an angle of greater than about 30° to the longitudinal axis of the aperture and, even more preferably, each ridge is formed at an angle of about 45° to the longitudinal axis of the aperture.

In a preferred embodiment of the instant invention, the apparatus body of the suture securing device comprises a first aperture and a second aperture, wherein each ridge formed on the first aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction along the first aperture and oppose the movement of the suture in the second longitudinal direction along the first aperture and wherein each ridge formed on the second aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction along the second aperture and oppose the movement of the suture in the second longitudinal direction along the second aperture, wherein the first longitudinal direction along the first aperture and the first longitudinal direction along the second aperture are directed to the upper surface of the apparatus body. In another preferred embodiment of the instant invention, the first and second apertures are mirror images of each other, as defined by a mirror plane equidistant from them.

In a preferred embodiment of the instant invention, the apparatus body comprises a first aperture and a second aperture, wherein each ridge formed on the first aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction along the first aperture and oppose the movement of the suture in the second longitudinal direction along the first aperture and wherein each ridge formed on the

RS000145

second aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction along the second aperture and oppose the movement of the suture in the second longitudinal direction along the second aperture, wherein the first longitudinal direction along the first aperture and the second longitudinal direction along the second aperture are directed to the upper surface of the apparatus body. In other preferred embodiments of the instant invention, the suture securing apparatus is made from biocompatible materials or biodegradable materials.

In a second embodiment, the instant invention provides a suture securing apparatus comprising: (a) an apparatus body having a upper surface, a lower surface, an outer surface, and at least one aperture, the aperture having a longitudinal axis extending from the upper surface to the lower surface and defining an aperture surface, wherein a first longitudinal direction and a second longitudinal direction thereof each extends along the longitudinal axis in opposite directions, the aperture consisting of an upper portion, a middle portion, and a lower portion, the upper portion bounded by the upper surface of the apparatus body and the middle portion, the middle portion bounded by the upper portion and the lower portion, and the lower portion bounded by the middle portion and the lower surface of the apparatus body, wherein the middle portion has a first surface and second surface opposing each other and is wider than either of the upper portion and the lower portion and forms a cavity therein; and (b) a movable cam member disposed in the middle portion of the aperture, the cam member having an engagement end and a rotation end, the rotation end being wider than the width of the upper portion of the aperture thereof and the width of the lower portion of the aperture thereof and disposed near the second surface, and the engagement end disposed near the first surface; wherein the cam member moves to an unengaged position to facilitate the movement of a suture threaded through the aperture in the first longitudinal direction along the aperture and moves to an engaged position to engage the suture threaded through the aperture in the second longitudinal direction by compressing the suture between the engagement end of the cam member and the first surface of the middle aperture to oppose the movement of the suture in the second longitudinal direction along the aperture.

RS000146

In a preferred embodiment of the instant invention, the first surface of the middle aperture comprises at least one ridge, each ridge so formed as to facilitate the movement of a suture in the first longitudinal direction along the aperture and oppose the movement of the suture in the second longitudinal direction along the aperture. In another preferred embodiment of the instant invention, the first surface of the middle aperture comprises a plurality of ridges, each ridge so formed as to facilitate the movement of a suture in the first longitudinal direction along the aperture and oppose the movement of the suture in the second longitudinal direction along the aperture. In yet other preferred embodiments of the instant invention, each ridge is formed from an elastic material or a rigid material.

In yet another preferred embodiment of the instant invention, the engagement end of the cam member comprises serrations to grip the suture when engaged. In another preferred embodiment of the instant invention, the apparatus body includes a first aperture with a first movable cam member therein and a second aperture with a second movable cam member therein, wherein the first movable cam member moves to an unengaged position to facilitate the movement of a suture threaded through the first aperture in the first longitudinal direction along the aperture and moves to an engaged position to engage the suture threaded through the first aperture in the second longitudinal direction by compressing the suture between the engagement end of the first movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the first aperture; wherein the second movable cam member moves to an unengaged position to facilitate the movement of a suture threaded through the second aperture in the first longitudinal direction along the second aperture and moves to an engaged position to engage the suture threaded through the second aperture in the second longitudinal direction by compressing the suture between the engagement end of the first movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the second aperture; and wherein the first longitudinal direction along the first aperture and the first longitudinal direction along the second aperture are both directed to the upper surface of the apparatus

RS000147

body. In yet another preferred embodiment of the instant invention, the first and second apertures and first and second cam members are mirror images of each other, as defined by a mirror plane equidistant from them.

In still another preferred embodiment of the instant invention, the apparatus body includes a first aperture with a first movable cam member therein and a second aperture with a second movable cam member therein, wherein the first movable cam member moves to an unengaged position to facilitate the movement of a suture threaded through the first aperture in the first longitudinal direction along the aperture and moves to an engaged position to engage the suture threaded through the first aperture in the second longitudinal direction by compressing the suture between the engagement end of the first movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the first aperture; wherein the second movable cam member moves to an unengaged position to facilitate the movement of a suture threaded through the second aperture in the first longitudinal direction along the second aperture and moves to an engaged position to engage the suture threaded through the second aperture in the second longitudinal direction by compressing the suture between the engagement end of the first movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the second aperture; and wherein the first longitudinal direction along the first aperture and the second longitudinal direction along the second aperture are both directed to the upper surface of the apparatus body. In other preferred embodiments of the instant invention, the suture securing apparatus is made from biocompatible materials or biodegradable materials.

The instant invention also contemplates securable medical prosthesis device comprising a medical prosthesis device in physical contact, physical engagement, or integrally formed with at least one suture securing apparatus according to the instant invention. Such medical prosthesis devices include a sewing ring implant shaped and sized for attachment to the inner surface of a native annulus, the sewing ring implant having a

RS000148

plurality of suture securing apparatuses distributed around the circumference of the sewing ring implant.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top perspective view of a freestanding suture terminating device showing a technique for terminating a suture in accordance with one embodiment of the present embodiment.

FIG. 2 is a top plan view of the suture terminating device of FIG. 1.

FIG. 3 is a cross-sectional view of a suture terminating device taken along line 2-2 of FIG. 2 showing a technique for terminating a suture in accordance with one embodiment of the present embodiment.

FIG. 4 is a top perspective partially exploded view of an artificial arterial valve attached to the native tissue of the aorta in accordance with the present invention cut-away to reveal a suture terminating device, in accordance with the present invention, incorporated therein.

FIG. 5 is a top perspective view of a freestanding suture terminating device showing a technique for terminating a suture in accordance with another embodiment of the present embodiment.

FIG. 6 is a bottom plan view of the suture terminating device of FIG. 5.

FIG. 7 is a cross-sectional view of a suture terminating device taken along line 7-7 of FIG. 6 showing a technique for terminating a suture in accordance with another embodiment of the present embodiment.

FIG. 8 is a cross-sectional view of a suture terminating device also taken along line 7-7 of FIG. 6 showing a technique for terminating a suture in accordance with still another embodiment of the present embodiment.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIGS. 1-3 illustrate a freestanding version of the instant suture terminating device 10 in accordance with one embodiment of the present invention. As depicted, the

RS000149

present suture terminating device consists of a main member 12 having apertures 14(a) and 14(b) positioned therein to facilitate the threading of standard suture 16 therethrough. As the surgeon draws suture 16 through aperture 14, suture 16 is secured in place by the locking mechanism 18 which is housed within that same aperture 14.

Main member 12, which may (as illustrated in FIG. 1) exist as a freestanding device or (as illustrated in FIG. 4) be incorporated into a prosthetic device, may be constructed in a variety of manners including the milling or molding of biocompatible plastics and metals, or biodegradable materials. Depending upon the device's actual application, the size of the suture, and the material used, main member 12 should be large enough to both contain and support the sutures drawn therethrough without disruption or distortion to the local native tissue and/or the prosthetic device attached thereto or thereby. For example, if main member 12 is constructed of stainless steel and is intended to be used with 2-0 braided synthetic suture material for securing a heart valve sewing ring, then the main member 12 should be 0.1" (width) by 0.15" (length) by 0.1" (thickness). The width of main member 12 must naturally be greater than the diameter of the suture 16 which it is intended to contain and terminate.

An additional benefit of the present embodiment is that, under certain circumstances, main member 12 also functions as a pledget (i.e., dispersing the pressure of the suture over a surface area greater than that of the suture alone, thus bolstering the suture's coupling of the desired members (i.e., tissue to native tissue and/or prosthetic to native tissue) while reducing the likelihood of damage to the prosthetic device or the surrounding tissue.

The present suture terminating device will preferably incorporate two apertures within the main member 12 of the device. Apertures 14(a) and 14(b) are generally housed in the midline of main member 12. Although the apertures' alignment may vary under certain circumstances, they will generally have, as illustrated in FIG. 2, a mirror image orientation to one another. When arranged in this configuration, the apertures cooperate as pairs, each member receiving one of the two ends of the suture being secured. Each aperture, whether functioning independently or as a member of a cooperating pair,

RS000150

comprises a first opening 22 in the bottom portion 24 of main member 12, a locking mechanism 18, and a second opening 26 in the top portion 28 of main member 12.

First opening 22 is round in nature and of adequate size to accommodate the berth of suture 16. Further, as illustrated in FIG. 3, first opening 22 may be accentuated in a conical fashion in order to facilitate the surgeon's threading of suture 16 therethrough. Second opening 26 is eccentric and bi-polar. Returning to FIG. 2, first pole 42 is generally round with sufficient diameter to accommodate the berth of suture 16. Second pole 44 is formed by an acute angular narrowing orientated towards the axis of second opening 26. The rounded portions 46 and 48 of the first and second openings 22 and 26 respectively, are preferably offset from each other.

FIG. 3 depicts an alternate rendition of the present embodiment in which the inner surface 50 of the angulated portion 52 of aperture 14 may be lined with ridges 20, although under certain circumstances a single ridge may suffice. Ridges 20 are preferably shaped, and oriented so as to facilitate the passage of the suture in one direction and to oppose any movement in the other. The number, density, and amplitude of the ridges should be increased as the overall dimensions of the device and suture material used increases. The apex of the ridges are preferably rounded; this facilitates the entry of the suture material into the locking mechanism, while avoiding the use of a sharp edge which could potentially abrade, damage, or weaken the suture. Although it is generally preferable for the ridges to be constructed in an unyielding or rigid form, it may be desirable in certain circumstances to construct the ridges such that they possess elastic qualities in order to further enhance their gripping action. The longitudinal axis of ridges 20 generally extend out from the inner surface 50 of the angulated portion 52 at a 45° angle. The total taper (from bottom to top) between the opposing segments of aperture 14 which form the angulated portion 52 is, in the present version of this embodiment, 4°.

The apertures' orientation insures that when upward tension is placed on the suture, the suture is coerced, as illustrated in FIGS. 1-3, from position A in the rounded portion of 54 into angulated portion 52 of aperture 14, where the locking mechanism engages the suture, thus locking it in place. In other words, once the surgeon has positioned

RS000151

the tissue or prosthetic device, the suture terminating device need only be held in place while tension is applied simultaneously to both ends of the suture. This transverses and engages the locking mechanism within the aperture. As tension is placed on the suture and it is drawn through the aperture, the ridges lining the aperture engage the suture in a manner ensuring that the suture may advance, but not regress through the aperture. Multiple points of contact are made between the ridges lining the aperture and the suture material, thus providing for a secured union. Back pressure on the suture from the native tissue maintains its fixation within the suture terminating device's locking mechanism.

Generally, the suture is drawn through the device by the surgeon into its final position, thus providing the desired tension and coaptation of tissue by the suture. However, should the surgeon need to loosen the suture (in order to reposition it for example), the free ends of the suture could be pulled away from the narrowed angulated portion of the apertures. This maneuver would disengage the locking mechanism. Once disengaged, the suture is free to move in rounded portion 54 of aperture 14. In order to resecure the suture, the surgeon would again place tension on the suture to engage it in the locking mechanism and advance the suture until the desired tension was achieved.

FIG. 4 displays still another embodiment of the present invention. More particularly, as the cutaway view of FIG. 4 depicts, suture terminating device 10 is positioned inside valve 30 in this embodiment. Consistent with standard suturing techniques, suture 16 enters valve 30 from its bottom, is threaded through the suture terminating device positioned therein, and exits from the valve's top.

Under certain circumstances, it may be desirable for the surgeon to use a pledget when securing a suture with the suture terminating device of the present invention. For instance, when the portion of the suture terminating device contacting the tissue and/or the prosthetic is too small to effectively disperse the pressure placed upon that same tissue and/or prosthetic secured by the suture or suture terminating device, then the use of a pledget is desirable.

As discussed above, the use of a pledget may also be desirable when used in conjunction with the securing of a prosthetic to native tissue. For example, if suture

RS000152

terminating device 10 were incorporated in artificial arterial valve 30, as illustrated in Figure 4, were constructed of stainless steel and were intended to be used with 2-0 braided synthetic suture material for securing the sewing ring of an artificial arterial valve, then it might be desirable for the surgeon to use pledgets 40 in order to reduce the risk of damage to the valve 30 or the surrounding tissue (aorta wall 36 in this case). Although pledgets may take many forms, they are generally manufactured from THFLON® or DACRON®. They function by increasing the surface area over which the suture's tension is distributed.

Although placement of the pledget may vary from procedure-to-procedure, generally the surgeon, as illustrated in FIG. 4, will thread suture 16 first through pledget 40, then through the native tissue (aorta wall 36 in this case), and ultimately through the prosthetic and the suture terminating device 10 implanted therein. As depicted in the present illustration, the suture 16 transverses through valve 30 thus securing artificial arterial valve 30 to aorta 35. Once in place, the surgeon engages the locking mechanism as discussed above, and if satisfied with the coaptation, cuts off and removes the excess suture material.

A second preferred embodiment of the present invention is depicted in FIGS. 5-8. In this embodiment, suture terminating device 70 consists of a main member 72 having apertures 74(a) and 74(b) positioned therein to facilitate the threading of standard sutures 76 therethrough. As the surgeon draws the suture 76 through aperture 74, the suture is secured in place by locking mechanism 78 which is housed within the aperture.

Suture terminating device 70 may be constructed in a variety of manners including the milling or molding of biocompatable plastics and metals, or biodegradable materials. Depending upon the actual application, the size of the suture, and the material used, main member 72 should be large enough to both contain and support the sutures drawn therethrough without disruption or distortion to the local native tissue and/or the prosthetic device attached thereto or thereby.

As depicted by FIG. 5, apertures 74(a) and 74(b) which are housed within main member 72 comprise a first opening 80 in the bottom portion 82 of main member 72, a locking mechanism 78, and a second opening 84 on the top portion 86 of the main

RS000153

member. The first opening 80 is somewhat conical in nature, to facilitate the surgeon's introduction of the suture into the aperture. The second opening 84 is preferably round in nature and adequately sized to accommodate the berth of suture 76. Preferably, first and second openings 80 and 84 are aligned on top of each other. The orientation of aperture 74, is normal to that of main member 72.

The version of the present embodiment of the suture terminating device illustrated in FIGS. 5-8 incorporates two apertures within the main member 72 of the device. Apertures 74(a) and 74(b) are generally housed in the midline of main member 72. Although the placement of the apertures within suture terminating device 70 may vary under certain circumstances, they will generally have, as illustrated in FIG. 6, a mirror image orientation to one another. When arranged in this configuration, the apertures cooperate as pairs, each member receiving one of the two ends of the suture being secured. Each aperture, whether functioning independently or as a member of a cooperating pair, comprises, as discussed above and as illustrated by FIG. 7, a first opening 80 in the bottom portion 82 of main member 72, a locking mechanism 78, and a second opening 84 in the top portion 86 of main member 72.

As depicted in FIG. 7, medial aspect 104 of aperture 74 is flat, and is preferably lined with ridges or serrations 88 which are generally perpendicular to the aperture's orientation. Although, as depicted within FIG. 8, the ridges or serrations 88 may be absent in certain applications. Extending from aperture 74 and vertically aligned with directly medial aspect 104 within main member 72 is cavity 90, which has a rounded portion 98 preferably formed at the point furthest from the medial aspect of aperture 74.

Housed within cavity 90 is cam member 92. The thickness of cam member 92 would typically be uniform. It is preferably narrower than the diameter of aperture 74 and cavity 90. Cam member 92 is eccentric, having a swollen rounded portion 94 at the first end 106, and a protuberance 96 extending out from second end 108.

The rounded portion 94 of cam member 92 cooperates with the rounded portion 98 of cavity 90. To ensure that cam member 92 is permitted to move radially in a north/south orientation within cavity 90.

TSS/29620/1/289623.1
11/23/98-MAZ/HIL

16

RS000154

Cam member 92 is captured within cavity 90, since the largest dimension of the cam member is larger than either end opening of the aperture. This capturing prevents cam member 92 from breaking free from suture terminating device 70 and causing injury to the patient. Further, the spatial relationship between cam member 92 and cavity 90 minimizes any potential for mechanical failure associated with terminating device 70.

The second end 108 of cam member 92 protrudes into the center lumen of aperture 74. Preferably, there are ridges 110 on the surface of the second end of cam member 92. These ridges are, most preferably, orientated to cooperate with the ridges 88 on medial aspect 100 of aperture 74.

Cam member 92 and its mating receptacle in the wall of the aperture 74 are eccentric such that when cam member 92 is rotated in an upward direction, the eccentric edge of cam member 92 moves away from center lumen of the aperture rotating into the receptacle. When cam member 92 is rotated downwards, the cam member edge is brought further out into the lumen of the aperture and into incrementally increasing contact with the ridges lining the flat surface of the aperture apposition against the far wall of aperture 74. Engagement of locking mechanism 78 is accomplished when suture 76 is trapped between ridges 88 which medial aspect 100 of aperture 74 and ridges 110 which, as discussed above, line second end 78 of cam member 92. More precisely, as suture 76 is advanced through aperture 74, cam member 92 rotates, as illustrated by the arrows in FIG. 7 away from the medial aspect of aperture 74. Once the surgeon has applied her final tension to suture 76, back pressure from the native tissue causes suture 76 to slightly withdraw from aperture 74. As suture 76 withdraw, ridges 110 on cam 92 frictionally engages suture 76. This, in turn, causes cam 92 to rotate radially with suture 76. The asymmetric shape of cam member 92 ensures that, as cam member 92 rotates, ridges 110 cooperate with ridges 88 on the medial aspect of aperture 74, thus trapping the suture therein. Over rotation, which would undermine the integrity of locking mechanism 78, is prevented by retaining wall 112 of cavity 90.

If the surgeon needs to readjust the suture, placing tension on the suture end it will pull it upwards and disengage the second member from its trapped position against

RS000155

the aperture wall. Once repositioned, tension is reapplied, the second member re-engaged, and the suture locked into place.

EXAMPLE 1:

By way of example, this invention may be incorporated, as provided above, into heart valve prosthetics. By incorporating the present invention into the sewing ring of a heart valve or heart annuloplasty ring or device, the surgeon would merely have to feed the sutures into appropriately located apertures. The prosthesis would be positioned, and the sutures locked into place without the need for the proximity of manual knot tying.

Typically the surgeon would place double ended sutures through the native annular tissue in a concentric fashion around the valve annulus. Each paired suture end would then be threaded through the appropriately paired knotless suture device. These devices will be incorporated into the perimeter of prosthetic valve sewing ring at appropriate distances depending upon the application. The valve is then advanced from outside the patient's body into the heart. The surgeon then removes all slack from the suture the valve would then be placed in its desired position. Once engaged, the back pressure of the native tissue ensures that the suture remains locked within the suture terminating device. Depending upon the type of suture used (and the elasticity associated with the same), contraction of the suture may also compliment the engagement of the locking mechanism.

After verification of proper tension and valve position, the suture ends are cut off. This is particularly advantageous for use with minimally invasive techniques since, as discussed above, these apparatus and systems obviate the need for tying knots.

EXAMPLE 2:

The present invention will also be useful for thorascopic thoracic surgery. It is necessary to place sutures to stop bleeding during thoracic surgery. This invention would allow standard suture technique to be use through thorascopic ports, without forcing proximity to the site of the suture in order to terminate the suture ends. In this application, the body of the device (with two apertures) could either be used alone to terminate a suture

RS000156

or the device could be utilized with a pledget. In this fashion, once a standard suture is placed into the bleeding tissue, tension is placed on the tissue to compress and stop the bleeding. Normally the surgeon would then tie a knot to terminate the suture with the proper tension. Instead, using the suture securing device of the instant invention, the present suture termination is advanced along the suture until it encounters the tissue to be ligated. Tension is applied to the sutures. Once the desired tension on the ligated tissue is achieved, the suture terminating device is engaged, and the excess suture is trimmed.

If the tissue compression is required to be distributed over a greater surface area than that provided by the bottom of the body of the current invention or of a pledget, then the present suture terminating device should be incorporated into a fabric cuff which will enlarge the contact area.

EXAMPLE 3:

Likewise, the suture securing device of the instant invention can be used in orthopedic surgery to terminate sutures which are placed arthroscopically, where access for manual knot tying is limited. In this application, sutures are placed in standard fashion to repair torn ligaments. The knotless suture device of the instant invention would be threaded over the suture ends and advanced to the site of the repair. After the final appropriate tension had been applied to the suture material, the locking mechanism is engaged. Subsequently, the suture ends are cut off.

For the reasons discussed throughout, this application is highly desirable since it would avoid the necessity of manual proximity to tie a knot. Additionally, the embodiments of this invention can be incorporated into orthopedic implants to enhance and facilitate their fixation to native tissue.

As is known in the art, all exposed parts of the invention should generally be made of biocompatible materials, either synthetic or natural, from which surgical implants are typically made, for example, polymers, plastics, biological tissue, metals and alloys, and combinations thereof. In addition, embodiments of this invention can be constructed of biodegradable materials.

RS000157

As noted above, the Figures and Examples provided are intended to further describe the aspects of the present invention. Thus, the Figures and Examples are illustrative only and are not to be construed as limiting the scope of that which is regarded as the invention. Furthermore, while only two embodiments of the invention has been presented in detail in this disclosure, it will be apparent to those of skill in the art that many modifications, adaptations, and changes may be made thereto without departing from the spirit and scope of the invention. In short, the scope of the present invention is only to be limited by the following claims and the equivalents thereto.

TSS/296201/1299423.1
11/73498-MAZ/IH1

20

RS000158

## WHAT IS CLAIMED IS:

1.    A suture securing apparatus comprising:

an apparatus body having a upper surface, a lower surface, an outer surface, and at least one aperture,

the aperture having a longitudinal axis extending from the upper surface to the lower surface and defining an aperture surface, wherein a first longitudinal direction and a second longitudinal direction thereof each extends along the longitudinal axis in opposite directions, the aperture including an integral locking means for engaging a suture threaded therethrough.

2.    The suture securing apparatus according to claim 1, wherein the locking means comprises a least one ridge formed on at least a portion of the aperture surface for engaging the suture threaded therethrough, each ridge so formed as to facilitate the movement of a suture in the first longitudinal direction along the aperture and oppose the movement of the suture in the second longitudinal direction along the aperture.

3.    The suture securing apparatus according to claim 2, wherein the locking means comprises a plurality of ridges formed on at least a portion of the aperture surface for engaging the suture threaded therethrough, each ridge so formed as to facilitate the movement of a suture in the first longitudinal direction along the aperture and oppose the movement of the suture in the second longitudinal direction along the aperture.

4.    The suture securing apparatus according to claim 2, wherein each ridge is formed from an elastic material.

5.    The suture securing apparatus according to claim 2, wherein each ridge is formed from a rigid material.

RS000159

6.    The suture securing apparatus according to claim 2, wherein the portion of each ridge extending farthest from the aperture surface is rounded.

7.    The suture securing apparatus according to claim 2, wherein each ridge is formed at an angle of greater than about 30° to the longitudinal axis of the aperture.

8.    The suture securing apparatus according to claim 7, wherein each ridge is formed at an angle of about 45° to the longitudinal axis of the aperture.

9.    The suture securing apparatus according to claim 2, the apparatus body comprising a first aperture and a second aperture, wherein each ridge formed on the first aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction along the first aperture and oppose the movement of the suture in the second longitudinal direction along the first aperture and wherein each ridge formed on the second aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction along the second aperture and oppose the movement of the suture in the second longitudinal direction along the second aperture, wherein the first longitudinal direction along the first aperture and the first longitudinal direction along the second aperture are directed to the upper surface of the apparatus body.

10.    The suture securing apparatus according to claim 9, wherein the first and second apertures are mirror images of each other, as defined by a mirror plane equidistant from them.

11.    The suture securing apparatus according to claim 2, the apparatus body comprising a first aperture and a second aperture, wherein each ridge formed on the first aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction along the first aperture and oppose the movement of the suture in the second longitudinal direction along the first aperture and wherein each ridge formed on the second aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction along the second aperture and oppose the movement of the suture in the second longitudinal direction along the second aperture, wherein

TSS/29670/1/295623.1
11/23/98-MAZ/111

22

RS000160

the first longitudinal direction along the first aperture and the second longitudinal direction along the second aperture are directed to the upper surface of the apparatus body.

12.    The suture securing apparatus according to claim 2, wherein the suture securing apparatus is made from biocompatible materials.

13.    The suture securing apparatus according to claim 2, wherein the suture securing apparatus is made from biodegradable materials.

14.    A suture securing apparatus comprising:

(a)    an apparatus body having a upper surface, a lower surface, an outer surface, and at least one aperture, the aperture having a longitudinal axis extending from the upper surface to the lower surface and defining an aperture surface, wherein a first longitudinal direction and a second longitudinal direction thereof each extends along the longitudinal axis in opposite directions,

the aperture consisting of an upper portion, a middle portion, and a lower portion, the upper portion bounded by the upper surface of the apparatus body and the middle portion, the middle portion bounded by the upper portion and the lower portion, and the lower portion bounded by the middle portion and the lower surface of the apparatus body, wherein the middle portion has a first surface and second surface opposing each other and is wider than either of the upper portion and the lower portion and forms a cavity therein; and

(b)    a movable cam member disposed in the middle portion of the aperture, the cam member having an engagement end and a rotation end, the rotation end being wider than the width of the upper portion of the aperture thereof and the width of the lower portion of the aperture thereof and disposed near the second surface, and the engagement end disposed near the first surface;

wherein the cam member moves to an unengaged position to facilitate the movement of a suture threaded through the aperture in the first longitudinal direction along the aperture and moves to an engaged position to engage the suture threaded through the aperture in

TSS/29620/1/289623.1
11/23/98-MAZ/J11    23

RS000161

the second longitudinal direction by compressing the suture between the engagement end of the cam member and the first surface of the middle aperture to oppose the movement of the suture in the second longitudinal direction along the aperture.

15.    The suture securing apparatus according to claim 14, wherein the first surface of the middle aperture comprises at least one ridge, each ridge so formed as to facilitate the movement of a suture in the first longitudinal direction along the aperture and oppose the movement of the suture in the second longitudinal direction along the aperture.

16.    The suture securing apparatus according to claim 14, wherein the first surface of the middle aperture comprises a plurality of ridges, each ridge so formed as to facilitate the movement of a suture in the first longitudinal direction along the aperture and oppose the movement of the suture in the second longitudinal direction along the aperture.

17.    The suture securing apparatus according to claim 14, wherein each ridge is formed from an elastic material.

18.    The suture securing apparatus according to claim 14, wherein each ridge is formed from a rigid material.

19.    The suture securing apparatus according to claim 14, wherein the engagement end of the cam member comprises serrations to grip the suture when engaged.

20.    The suture securing apparatus according to claim 14, the apparatus body including a first aperture with a first movable cam member therein and a second aperture with a second movable cam member therein,

            wherein the first movable cam member moves to an unengaged position to facilitate the movement of a suture threaded through the first aperture in the first longitudinal direction along the aperture and moves to an engaged position to engage the suture threaded through the

733/29620/1/299623.1
11/23/04-MAZ/DH                                      24

RS000162

first aperture in the second longitudinal direction by compressing the suture between the engagement end of the first movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the first aperture;

wherein the second movable cam member moves to an unengaged position to facilitate the movement of a suture threaded through the second aperture in the first longitudinal direction along the second aperture and moves to an engaged position to engage the suture threaded through the second aperture in the second longitudinal direction by compressing the suture between the engagement end of the first movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the second aperture; and

wherein the first longitudinal direction along the first aperture and the first longitudinal direction along the second aperture are both directed to the upper surface of the apparatus body.

21.    The suture securing apparatus according to claim 20, wherein the first and second apertures and first and second cam members are mirror images of each other, as defined by a mirror plane equidistant from them.

22.    The suture securing apparatus according to claim 14, the apparatus body including a first aperture with a first movable cam member therein and a second aperture with a second movable cam member therein,

wherein the first movable cam member moves to an unengaged position to facilitate the movement of a suture threaded through the first aperture in the first longitudinal direction along the aperture and moves to an engaged position to engage the suture threaded through the first aperture in the second longitudinal direction by compressing the suture between the engagement end of the first movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the first aperture;

25

wherein the second movable cam member moves to an unengaged position to facilitate the movement of a suture threaded through the second aperture in the first longitudinal direction along the second aperture and moves to an engaged position to engage the suture threaded through the second aperture in the second longitudinal direction by compressing the suture between the engagement end of the first movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the second aperture; and

wherein the first longitudinal direction along the first aperture and the second longitudinal direction along the second aperture are both directed to the upper surface of the apparatus body.

23. The suture securing apparatus according to claim 14, wherein the suture securing apparatus is made from biocompatible materials.

24. The suture securing apparatus according to claim 14, wherein the suture securing apparatus is made from biodegradable materials.

25. A securable medical prosthesis device comprising a medical prosthesis device in physical contact with at least one suture securing apparatus according to claim 2.

26. A securable medical prosthesis device comprising a medical prosthesis device in physical engagement with at least one suture securing apparatus according to claim 2.

27. A securable medical prosthesis device comprising a medical prosthesis device integrally formed with at least one suture securing apparatus according to claim 2.

28. The securable medical device according to claim 24, wherein the medical prosthesis device is a sewing ring implant shaped and sized for attachment to the inner surface of a native annulus,

RS000164

the sewing ring implant having a plurality of suture securing apparatuses distributed around the circumference of the sewing ring implant.

29.    A securable medical prosthesis device comprising a medical prosthesis device in physical contact with at least one suture securing apparatus according to claim 14.

30.    A securable medical prosthesis device comprising a medical prosthesis device in physical engagement with at least one suture securing apparatus according to claim 14.

31.    A securable medical prosthesis device comprising a medical prosthesis device integrally formed with at least one suture securing apparatus according to claim 14.

32.    A securable medical device according to claim 30, wherein the medical prosthesis device is a sewing ring implant shaped and sized for attachment to the inner surface of a native annulus, the sewing ring implant having a plurality of suture securing apparatuses distributed around the circumference of the sewing ring implant.

33.    A suture securing apparatus comprising:

an apparatus body having a upper surface, a lower surface, an outer surface, a first aperture, and a second aperture, the first longitudinal direction of each aperture each being directed to the upper surface of the apparatus body,

wherein each ridge formed on the first aperture surface and second aperture surface is so formed as to facilitate the movement of a suture in the first longitudinal direction and oppose the movement of the suture in the second longitudinal direction, each ridge is formed at an angle of about 45° to the longitudinal axis of the respective aperture, and the portion of each ridge extending farthest from the aperture surface is rounded, and

wherein the first and second apertures are mirror images of each other, as defined by a mirror plane equidistant from them.

RS000165

34.    A suture securing apparatus comprising:

an apparatus body having a upper surface, a lower surface, an outer surface, and the apparatus body including a first aperture with a first movable cam member therein and a second aperture with a second movable cam member therein, the first longitudinal direction of each aperture each being directed to the upper surface of the apparatus body,

wherein the first movable cam member and second movable cam member each moves to an unengaged position to facilitate the movement of a suture threaded through the respective aperture in the first longitudinal direction along the aperture and moves to an engaged position to engage the suture threaded through the respective aperture in the second longitudinal direction by compressing the suture between the engagement end of the respective movable cam member and the first surface of the middle aperture thereof to oppose the movement of the suture in a second longitudinal direction along the respective aperture; and

wherein the first and second apertures and first and second cam members are mirror images of each other, as defined by a mirror plane equidistant from them.

RS000166

## ABSTRACT OF THE INVENTION

A suture securing apparatus comprising an apparatus body having a upper surface, a lower surface, an outer surface, and at least one aperture, the aperture having a longitudinal axis extending from the upper surface to the lower surface and defining an aperture surface, wherein a first longitudinal direction and a second longitudinal direction thereof each extends along the longitudinal axis in opposite directions, the aperture including an integral locking means for engaging a suture threaded therethrough.

TSS/29620/1/299623.1
11/23/98-MAZ/HI

29

RS000167

## DECLARATION AND POWER OF ATTORNEY

We, STEPHEN COLVIN, EUGENE GROSSI, ALLAN KATZ, and PAUL ODDO, hereby declare that we are citizens of the United States of America and residents of New York, New York, New York, New York, Freeport, New York, and Freeport, New York,; and that our Post Office Addresses are 1775 York Avenue, Apt. 32B, New York, New York 10028; 530 East 83rd Street, New York, New York 10028; 700 Miller Avenue, Freeport, New York 11520; and 216 Garfield Street, Freeport, New York, 11520 respectively; that we believe we are the original, first and joint inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled

PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE
IN MINIMALLY INVASIVE SURGERY AND TO
FACILITATE STANDARD TISSUE SECURING

the specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents of the above identified specification, including the claims.

We acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

We hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or

IRW/296200/1/299254.1
11/13/98-MAZA11

RS000168

imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

We hereby appoint Todd S. Sharinn, Registration No. 42,144, whose Post Office Address is Pepe & Hazard LLP, 225 Asylum Street, Hartford, Connecticut 06103, our attorney to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith.   Address all correspondence to Todd S. Sharinn at the aforesaid address and direct all telephone calls to him at Area Code 860, Telephone No. 241-2631.

_11/17/98_
Date

STEPHEN COLVIN
Residence Address:
1775 York Avenue, Apt. 32B
New York, New York 10028

_11/17/98_
Date

EUGENE GROSSI
Residence Address:
530 East 83rd Street
New York, New York 10028

_11/17/98_
Date

ALLAN KATZ
Residence Address:
700 Miller Avenue
Freeport, New York 11520

JRF/29620/1/299254.1
11/13/98-MAZ/SS

JOSEPH T. MINUTELLO
Notary Public, State of New York
No. 4890550
Qualified in New York County
Commission Expires 8/20/99

Joseph T. Minutello

RS000169

Date 11/17/99

PAUL ODDO
Residence Address:
216 Garfield Street
Freeport, New York 11520

JOSEPH T. MINUTELLO
Notary Public, State of New York
No. 4889589
Qualified in New York County
Commission Expires 8/20/99

Joseph T. Minutello

JRF/29620/1/299254.1
11/13/98-MAZ/TH1

RS000170



FIG 1

RS000171



RS000172



FIG.4

RS000173



RS000174



FIG 6

FIG 7

RS000175



FIG.8

RS000176

# EXHIBIT L

*◢*HAZARD LLP

◢W OFFICES

GOODWIN SQUARE
HARTFORD, CONNECTICUT 06103-4302
860/522-5175   FACSIMILE 860/522-2796

DAVID URBANIK
Executive Director
Direct Dial: (860) 241-2658
durbanik@pepehazard.com

May 4, 2001

BY FAX AND FIRST CLASS MAIL

Quickie, LLC
c/o Alan Fell, Esq.
Rick, Steiner P.C.
Three New York Plaza
New York, NY 10004

Re:    Transfer of Legal Matters/Documentation

Dear Mr. Fell:

As you may know, Todd Sharinn, who has handled various matters for you, will be leaving Pepe & Hazard soon to start his own firm. We very much regret losing Todd, but wish him well.

His departure, however, raises the question of responsibility for your files in the above-captioned matters. If you wish our firm to continue its representation, we would be pleased to do so. If, on the other hand, you wish Mr. Sharinn to assume responsibility for these cases, we will transfer the files to him.

Please indicate below whether you would like the files to be transferred, and return a signed copy of this letter to me either by fax at 860-522-2796 or by returning same in the enclosed self-addressed envelope. In the interim, if you have any questions you may contact Todd directly at 860-242-2977.

Sincerely,

David Urbanik

cc: Todd S. Sharinn, Esq.

EXHIBIT
34

EAY/29620/1/527249v1
05/04/01-HRT/EAY       BOSTON    ⬛    HARTFORD    ⬛    SOUTHPORT

PEPPER HAZARD LLP

January 15, 2001
Page 2

I hereby request that the files set forth above be transferred to Attorney Todd Sharinn.

|  | Please Transfer | Please Do Not Transfer |
|---|---|---|
| Novel Knotless Suture System For Use In | ✓ |  |
| Ethicon Endo-Surgery, Inc. | ✓ |  |
| U.S. Surgical | ✓ |  |
| Suture Termination Device | ✓ |  |
| General Corp | ✓ |  |
| Sutureless System For Attachment | ✓ |  |
| Medtronic License Agreement | ✓ |  |

_____

_____
Date    5 | 14 | 01

RS001954

# EXHIBIT M



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

02...... ...

**Transmittal Cover Sheet**

| | |
|---|---|
| **TO** | Marsha Twitty |
| **Company** | U.S. Patent and Trademark Office |
| **Fax Number** | 703-305-1013 |
| **Phone Number** | 703-308-9692 |
| **FROM** | Linda Garramone |
| **File Number** | 51822.010700 |
| **Comments** | Change of Correspondence Address and Fee Address Indication Form |

| | |
|---|---|
| **Date** | December 16, 2002 |
| **No. Pages** | Including this cover sheet    4 |

Please notify us immediately if not received properly at 212-801-2190

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

885 Third Avenue, New York, New York 10022   (212) 801-2100 Fax (212) 688-2449



EXHIBIT
7
6-10-08

GT 0000380

# MESSAGE CONFIRMATION

12/16/2002  12:21
ID=GREENBERG/TRAURIG

| DATE | S.R-TIME | DISTANT STATION ID | MODE | PAGES | RESULT |
|------|----------|--------------------|------|-------|--------|
| 12/16 | 02'00" | 7033051013 | TX | 004 | OK | 0000 |

12/16/2002    12:18    GREENBERG/TRAURIG → 51822#010700#17033051013    NO.984    0001



## GREENBERG
ATTORNEYS AT LAW
## TRAURIG

**Transmittal Cover Sheet**

| | |
|---|---|
| **TO** | Marsha Twitty |
| **Company** | U.S. Patent and Trademark Office |
| **Fax Number** | 703-305-1013 |
| **Phone Number** | 703-308-9692 |
| **FROM** | Linda Garramone |
| **File Number** | 51822.010700 |
| **Comments** | Change of Correspondence Address and Fee Address Indication Form |

GT 0000381

Please type a plus sign (+) inside this box → [ + ]

PTO/SB/123 (10-00)
Approved for use through 10/31/2002. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| CHANGE OF CORRESPONDENCE ADDRESS *Patent* | Patent Number | 6,066,160 |
|---|---|---|
| | Issue Date | May 23, 2000 |
| | Application Number | 09/198,087 |
| Address to: Assistant Commissioner for Patents Washington, D.C. 20231 | Filing Date | November 23, 1998 |
| | First Named Inventor | Colvin |

Please change the Correspondence Address for the above-identified patent to:

☐ Customer Number   [ _____ ]   →   *Place Customer Number Bar Code Label here*

    *Type Customer Number here*

OR

☐

| Firm or individual Name | Todd S. Sharinn | | | | |
|---|---|---|---|---|---|
| Address | Greenberg Traurig, LLP | | | | |
| Address | 885 Third Avenue, 21st Floor | | | | |
| City | New York | State | NY | ZIP | 10022 |
| Country | US | | | | |
| Telephone | 212-801-2157 | Fax | 212-688-2449 | | |

This form cannot be used to change the data associated with a Customer Number. To change the data associated with an existing Customer Number use "Request for Customer Number Data Change" (PTO/SB/124).

This form will not affect any "fee address" provided for the above-identified patent. To change a "fee address" use the "Fee Address Indication Form" (PTO/SB/47).

I am the :

☐   Patentee.

☐   Assignee of record of the entire interest. See 37 CFR 3.71 Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96).

☒   Attorney or agent of record.

| Typed or Printed Name | Todd S. Sharinn |
|---|---|
| Signature | |
| Date | October 22, 2002 |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☐ *Total of _____ forms are submitted.

Burden Hour Statement: This form is estimated to take 3 minutes to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

GT 0000382

PTO/SB/47 (03-02)
Approved for use through 12/31/2002.    OMB 0651-0016
U.S. Patent and Trademark Office;    U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control

## "FEE ADDRESS" INDICATION FORM

Address to:
Assistant Commissioner for Patents
Box M Correspondence
Washington, D.C. 20231

> **INSTRUCTIONS:** Only an address associated with a Customer Number can be established as the fee address for maintenance fee purposes (hereafter, fee address). A fee address should be specified when the patentee would like correspondence related to maintenance fees to be mailed to a different address than the correspondence address for the application. If there is a Customer Number already associated with the fee address for the patent or allowed application, check the first box below and provide the Customer Number in the space provided. If there is no Customer Number associated with the fee address for the patent or allowed application, you must check the second box below and attach a Request for Customer Number form (PTO/SB/125) For more information on Customer Numbers, see the Manual of Patent Examining Procedure (MPEP) Section 403.

Please recognize the "Fee Address" under the provisions of 37 CFR 1.363 the following address associated with the following customer number:

☒  Customer Number        32361        Place Customer Number Bar Code Label here
                     Type Customer Number here        PATENT TRADEMARK OFFICE

   **OR**

☐  Request for Customer Number (PTO/SB/125) attached hereto

in the following listed application(s) for which the Issue Fee has been paid or patent(s).

| PATENT NUMBER (if known) | APPLICATION NUMBER |
|---|---|
| 6,066,160 | |

(check one)

☐  Applicant/Inventor
☒  Attorney or agent of record  ___42,144___
                     (Reg. No.)
☐  Assignee of record of the entire interest.  See 37 CFR 3.71.  Statement under 37 CFR 3.73(b) is enclosed enclosed.  (Form PTO/SB/96)
☐  Assignment recorded at  ___ Frant ___

Signature
**Todd S. Sharinn**
Typed or printed name
212-801-2157
Requester's telephone number
October 22, 2002
Date

NOTE:  Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required.  Submit multiple forms if more than one signature is required, see below*.

☐  *Total of ___ forms are submitted.

Burden Hour Statement:  This collection of information is required by 37 CFR 1.363. This information is used by the public to submit (and by the USPTO to process) payment of patent maintenance fees. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 0.08 hours to complete, including gathering, preparing, and submitting the complete payment of maintenance fees. Time will vary depending on the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Washington, DC 20231.
DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  SEND TO: Assistant Commissioner for Patents, Washington, DC 20231

GT 0000383

| CERTIFICATE OF MAILING BY FIRST CLASS MAIL (37 CFR 1.8) | | | Docket No. |
|---|---|---|---|
| Applicant(s):   Colvin et al. | | | 51822.010700 |

| Serial No.<br>09/198,087 | Filing Date<br>November 23, 1998 | Examiner<br>Gary Jackson | Group Art Unit<br>3731 |
|---|---|---|---|

Invention:   **PASSIVE KNOTLESS SUTURE TERMINATOR FOR USE IN MINIMALLY INVASIVE SURGERY AND TO FACILITATE STANDARD TISSUE SECURING**

I hereby certify that this   **Change of Correspondence Address, Fee Address Indication Form & Post Card**
*(Identify type of correspondence)*

is being deposited with the United States Postal Service as first class mail in an envelope addressed to: The Assistant Commissioner for Patents, Washington, D.C. 20231 on          **October 22, 2002**
                                                                              *(Date)*

**Linda Garramone**
*(Typed or Printed Name of Person Mailing Correspondence)*

*Linda Garramone*
*(Signature of Person Mailing Correspondence)*

Note: Each paper must have its own certificate of mailing.

P07AV01EV03

GT 0000384

# EXHIBIT N



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

February 12, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

> Re:   Quickie, LLC
>       Our Ref. 51822.010000

Dear Alan:

Enclosed please find our invoice no. 999539 for an amount of $568.18 for legal services and expenses rendered through and including January 31, 2002.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-3449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003054



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No. :  999539
File No.   :  51822.010000
Bill Date  :  February 12, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York  10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:   General

Legal Services through January 31, 2003:

|  |  |  |
|---|---|---|
| Total Fees: | $ | 350.00 |

Expenses:

| | | |
|---|---|---|
| Federal Express Charges | 11.63 | |
| Photocopy Charges | 4.05 | |
| Total Expenses: | $ | 15.68 |
| Current Invoice: | $ | 365.68 |
| Previous Balance (see attached statement): | $ | 202.50 |
| Total Amount Due: | $ | 568.18 |

TOS:AM
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS003055



Invoice No.:  999539
File No.   :  51822.010000

## Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 08/09/02 | 920624 | 202.50 | 0.00 | 0.00 | 202.50 |
| | Totals:  $ | 202.50  $ | 0.00  $ | 0.00  $ | 202.50 |

TOS:AM
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-668-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS003056

Invoice No.:   999539                                            Page 1
Re:            General
Matter No.:    51822.010000

<u>Description of Professional Services Rendered:</u>

| <u>DATE</u> | <u>TIMEKEEPER</u> | <u>DESCRIPTION</u> | <u>HOURS</u> | <u>AMOUNT</u> |
|------|-----------|-------------|-------|--------|
| 01/03/03 | Todd S. Sharinn | Prepare patent application (1.0). | 1.00 | 350.00 |
| | | <u>Total Time:</u> | 1.00 | |
| | | <u>Total Fees:</u> | | $ 350.00 |

RS003057

Invoice No.:   999539                                        Page 2
Re:             General
Matter No.:   51822.010000

### Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 12/03/02 | Copy; 4 Page(s) by 3171 | $ | 0.60 |
| 12/04/02 | Copy; 6 Page(s) by 3171 | $ | 0.90 |
| 12/13/02 | VENDOR: FedEx INVOICE#: 912576024 DATE: 12/27/2002 Tracking #411538309744; From: TODD SHARINN, GREENBERG TRAURIG LLP, 885 3RD AVE FL 21, NEW YORK, NY 100224898; To: MARK F. EVENS,ESQ, THELEN REID & PRIEST LLP, 701 PENNSYLVANIA AVENUE, N.W.., WASHINGTON, DC 200040000 | $ | 11.63 |
| 01/09/03 | Copy; 13 Page(s) by 3171 | $ | 1.95 |
| 01/15/03 | Copy; 4 Page(s) by 3171 | $ | 0.60 |
| | Total Expenses: | $ | 15 68 |

RS003058



Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 9, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

       Re:   Quickie, LLC
             <u>Our Ref. 51822.010000</u>

Dear Alan:

    Enclosed please find our invoice no. 1022875 for an amount of $638.18 for legal services and expenses rendered through and including March 31, 2003.

    If you have any questions, please do not hesitate to contact me.

                      Very truly yours,

                      Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-9100 FAX 212-688-2449 www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003061



**GREENBERG**

ATTORNEYS AT LAW

**TRAURIG**

Invoice No. :   1022875
File No.     :   51822.010000
Bill Date    :   April 8, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn. Alan L. Fell, Esq.

## INVOICE

Re:  General

Legal Services through March 31, 2003:

|  |  |  |
|---|---|---|
| Total Fees: | $ | 70.00 |
| **Current Invoice:** | **$** | **70.00** |
| Previous Balance (see attached statement): | $ | 568.18 |
| Total Amount Due: | $ | 638.18 |

TOS:AM
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  NEW JERSEY
ORLANDO  PHILADELPHIA  PHOENIX  TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON  ZURICH

RS003062



Invoice No.:  1022875
File No.    :  51822.010000

***WIRING INSTRUCTIONS FOR GT FIRM ACCOUNT
FOR FEES & COSTS ARE AS FOLLOWS:***

| | |
|---|---|
| **TO:** | CITIBANK, F.S.B. |
| **ABA #:** | 266086554 |
| **CREDIT TO:** | GREENBERG TRAURIG ACCOUNT |
| **ACCOUNT #:** | 3200175071 |

**PLEASE
REFERENCE:**

| | |
|---|---|
| **CLIENT NAME:** | QUICKIE, LLC |
| **FILE NUMBER:** | 51822.010000 |
| **INVOICE NUMBER:** | 1022875 |
| **ATTORNEY NAME:** | Todd S. Sharinn |

TOS:AM
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS003063



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No. :  1022875
File No.    :  51822.010000

**Account Statement**

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 08/09/02 | 920624 | 202.50 | 0.00 | 0.00 | 202.50 |
| 02/12/03 | 999539 | 350.00 | 15.68 | 0.00 | 365.68 |
| | Totals: $ | 552.50 | $ 15.68 | $ 0.00 | $ 568.18 |

TOS:AM
Tax ID:  13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS003064

Invoice No.:     1022875
Re:              General
Matter No.:      51822.010000

Page 1

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 03/27/03 | Todd S. Sharinn | Letter to Dr. Colvin regarding status and strategy for various pending matters (.2). | 0.20 | 70.00 |
| | | Total Time: | 0.20 | |
| | | Total Fees: | | $ 70.00 |

RS003065

Invoice No.:    1022875·
Re:             General
Matter No.:     51822.010000

Page 2

Description of Expenses Billed:

DATE        DESCRIPTION                                          AMOUNT

**No expenses charged to this file**

RS003066

# Greenberg
# Traurig

Todd S. Sharinn
212-801-2157

September 23, 2004

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Rick Steiner

Re:    Outstanding Statement
       For: $435.68
       Client Number: 51822

Dear Rick:

Enclosed please find our outstanding statement of invoices as of August 31, 2004. Thank you in advance for your assistance in processing these payment.

If you have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

Todd S. Sharinn

Enclosure

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DENVER

FORT LAUDERDALE

LOS ANGELES

MIAMI

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

SILICON VALLEY

TALLAHASSEE

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

WILMINGTON

ZURICH

Ny2-811752451v01
Greenberg Traurig, LLP | Attorneys at Law | 885 Third Avenue | New York, NY 10022-4834 | Tel 212.801.2100 | Fax 212.688.2449     www.gtlaw.com

RS003038

# Greenberg Traurig

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, NY 10004

Attn:  Rick Steiner

Outstanding invoices as of August 31, 2004

| File Number | Titled | | Invoice # | Dated | Billed thru | Invoice Balance Due |
|---|---|---|---|---|---|---|
| 51822.010000 | General | | | | | |
| | | | 999539 | 02/12/03 | 01/31/03 | 365.68 |
| | | | 1022875 | 04/08/03 | 03/31/03 | 70.00 |
| | | | Balance due this file | | $ | 435.68 |
| | | | Total client balance | | $ | 435.68 |

TOS:AM

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212-801-9200  FAX 212-801-6400  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  SAO PAULO
FORT LAUDERDALE  WEST PALM BEACH  ORLANDO  TALLAHASSEE  BOCA RATON  CHICAGO

RS003039



Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 9, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

       Re:   Quickie, LLC
              Passive Knotless Suture Terminating System
              Our Ref. 51822.010100

Dear Alan:

     Enclosed please find our invoice no. 1022145 for a total amount of $90.59 for legal services and expenses rendered through and including March 31, 2003.

     If you have any questions, please do not hesitate to contact me.

                           Very truly yours,

                           Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100 FAX 212-688-2449 www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003049



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No. :  1022145
File No.    :  51822.010100
Bill Date   :  April 7, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York  10004

Attn: Alan L. Fell, Esq.

### INVOICE

Re:  Passive Knotless Suture Terminating System

Expenses:

| | | |
|---|---|---|
| Facsimile Charges | 18.00 | |
| Photocopy Charges | 0.30 | |
| Total Expenses: | $ | 18.30 |
| Current Invoice: | $ | 18.30 |
| Previous Balance (see attached statement): | $ | 72.29 |
| Total Amount Due: | $ | 90.59 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS003050



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Invoice No. :  1022145
File No.   :  51822.010100

┌─────────────────────────────────────────────┐
│  **WIRING INSTRUCTIONS FOR GT FIRM ACCOUNT**  │
│  **FOR FEES & COSTS ARE AS FOLLOWS:**  │
└─────────────────────────────────────────────┘

TO:                CITIBANK, F.S.B.
ABA #:             266086554
CREDIT TO:         GREENBERG TRAURIG ACCOUNT
ACCOUNT #:         3200175071

PLEASE
REFERENCE:         **CLIENT NAME:**      **QUICKIE, LLC**
                   **FILE NUMBER:**      51822.010100
                   **INVOICE NUMBER:**   1022145
                   **ATTORNEY NAME:**    Paul J. Sutton

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
865 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS003051



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Invoice No.:  1022145
File No.   :  51822.010100

## Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 07/15/02 | 911669 | 0.00 | 22.65 | 0.00 | 22.65 |
| 09/09/02 | 930762 | 0.00 | 49.64 | 0.00 | 49.64 |
| | Totals: $ | 0.00 | $ 72.29 | $ 0.00 | $ 72.29 |

FS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS003052

Invoice No.:    1022145                                          Page 2
Re:             Passive Knotless Suture Terminating System
Matter No.:     51822 010100

Description of Expenses Billed:

| DATE | DESCRIPTION | | | AMOUNT |
|------|-------------|---|---|--------|
| 12/10/02 | Facsimile; 2632246, 9 Page(s) by 3171 | | $ | 9.00 |
| 12/10/02 | Facsimile; 4220158, 9 Page(s) by 4776 | · | $ | 9.00 |
| 12/10/02 | Copy; 2 Page(s) by 3171 | | $ | 0.30 |
| | | Total Expenses: | $ | 18.30 |

RS003053



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

November 12, 2002

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

> Re:  Quickie, LLC
>       Concentric Passive Knotless Suture Terminator
>       <u>Our Ref. 51822.010200</u>

Dear Alan:

Enclosed please find our invoice no. 960926 for a total amount of $474.67 for legal services and expenses rendered through and including October 31, 2002.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100   FAX 212-688-2449   www.gtlaw.com
ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS002800



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No. :  960926
File No.    :  51822.010200
Bill Date  :  November 11, 2002

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:   Concentric Passive Knotless Suture Terminator

Legal Services through October 31, 2002:

|                                            |         |    |         |
|--------------------------------------------|---------|----|---------|
|                                 Total Fees: |         | $  | 346.50  |

Expenses:

| Photocopy Charges | 1.80 |
| Postage | 0.37 |

|                                            |         |    |         |
|--------------------------------------------|---------|----|---------|
| Total Expenses: | | $ | 2.17 |
| **Current Invoice:** | | **$** | **348.67** |
| Previous Balance (see attached statement): | | $ | 126.00 |
| **Total Amount Due:** | | **$** | **474.67** |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-848-1000  FAX 212-688-2449  www.gtlaw.com
MIAMI NEW YORK WASHINGTON, D.C. LOS ANGELES CHICAGO BOSTON PHOENIX DENVER ATLANTA TYSONS CORNER
PHILADELPHIA WILMINGTON ORLANDO TALLAHASSEE WEST PALM BEACH BOCA RATON FORT LAUDERDALE SAO PAULO

RS002801



Invoice No. : 960926
File No.   : 51822.010200

**Account Statement**

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 06/18/02 | 900850 | 126.00 | 0.00 | 0.00 | 126.00 |
| | Totals: $ | 126.00 $ | 0.00 $ | 0.00 $ | 126.00 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-848-1000  FAX 212-688-2449  www.gtlaw.com
MIAMI NEW YORK WASHINGTON, D.C. LOS ANGELES CHICAGO BOSTON PHOENIX DENVER ATLANTA TYSONS CORNER
PHILADELPHIA WILMINGTON ORLANDO TALLAHASSEE WEST PALM BEACH BOCA RATON FORT LAUDERDALE SAO PAULO

RS002802

Invoice No.:    960926                                                          Page 1
Re:             Concentric Passive Knotless Suture Terminator
Matter No.:     51822.010200

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 10/24/02 | Todd S. Sharinn | Review file and related prior art reference provided by Dr. Colvin. | 0.80 | 252.00 |
| 10/28/02 | Todd S. Sharinn | telephone conference with G. Grossi regarding patent application identified by Medtronic (.3). | 0.30 | 94.50 |
| | | Total Time: | 1.10 | |
| | | Total Fees: | | $ 346.50 |

RS002803

Invoice No.:    960926                                                          Page 2
Re:             Concentric Passive Knotless Suture Terminator
Matter No.:     51822.010200

## Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 09/20/02 | Copy; 7 Page(s) by 2157 | $ | 1.05 |
| 10/18/02 | Copy; 5 Page(s) by 2157 | $ | 0.75 |
| 10/18/02 | Postage by 1784 | $ | 0.37 |
| | | Total Expenses:  $ | 2.17 |

RS002804

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 9, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

        Re:    Quickie, LLC
               Concentric Passive Knotless Suture Terminator
               <u>Our Ref. 51822.010200</u>

Dear Alan:

    Enclosed please find our invoice no. 1022147 for a total amount of $615.12 for legal services and expenses rendered through and including March 31, 2003.

    If you have any questions, please do not hesitate to contact me.

                    Very truly yours,

                    Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP

RS002794



Invoice No.: 1022147
File No.  : 51822.010200
Bill Date  : April 7, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:  Concentric Passive Knotless Suture Terminator

Legal Services through March 31, 2003:

|  | | |
|---|---|---|
| Total Fees: | $ | 140.00 |

Expenses:

| Photocopy Charges | 0.45 | | |
|---|---|---|---|
| | Total Expenses: | $ | 0.45 |
| | Current Invoice: | $ | 140.45 |
| Previous Balance (see attached statement): | | $ | 474.67 |
| | Total Amount Due: | $ | 615.12 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS002795



Invoice No. :  1022147
File No.     :  51822.010200

> **WIRING INSTRUCTIONS FOR GT FIRM ACCOUNT**
> **FOR FEES & COSTS ARE AS FOLLOWS:**

TO:                  CITIBANK, F.S.B.
ABA #:               266086554
CREDIT TO:           GREENBERG TRAURIG ACCOUNT
ACCOUNT #:           3200175071

PLEASE
REFERENCE:           CLIENT NAME:       QUICKIE, LLC
                     FILE NUMBER:       51822.010200
                     INVOICE NUMBER:    1022147
                     ATTORNEY NAME:     Paul J. Sutton

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212 801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS002796



Invoice No. :   1022147
File No.    :   51822.010200

## Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 06/18/02 | 900850 | 126.00 | 0.00 | 0.00 | 126.00 |
| 11/11/02 | 960926 | 346.50 | 2.17 | 0.00 | 348.67 |
| | Totals: $ | 472.50 | $ 2.17 | $ 0.00 | $ 474.67 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS002797

Invoice No.:    1022147                                                          Page 1
Re:             Concentric Passive Knotless Suture Terminator
Matter No.:     51822.010200

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|------------|-------------|-------|--------|
| 02/20/03 | Todd S. Sharinn | Status inquiry and letter to client ( 4). | 0.40 | 140.00 |
| | | Total Time: | 0.40 | |
| | | Total Fees: | | $ 140.00 |

RS002798

Invoice No.: 1022147
Re: Concentric Passive Knotless Suture Terminator
Matter No.: 51822.010200

Page 2

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 02/21/03 | Copy; 2 Page(s) by 3171 | $ | 0.30 |
| 02/21/03 | Copy; 1 Page(s) by 3171 | $ | 0.15 |
| | | Total Expenses: $ | 0.45 |

RS002799



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Invoice No.:  1129334
File No.     :  51822.010200
Bill Date    :  November 14, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York  10004

Attn: Rick Steiner

## INVOICE

Re:  Concentric Passive Knotless Suture Terminator

Legal Services through October 31, 2003:

|  |  |  |  |
|---|---|---|---|
| Total Fees: | $ | 1,575.00 |  |

Expenses:

| Photocopy Charges | 10.95 |  |  |
| Postage | 16.14 |  |  |
| Total Expenses: | $ | 27.09 |  |
| Current Invoice: | $ | 1,602.09 |  |
| Previous Balance (see attached statement): | $ | 2,776.02 |  |
| Total Amount Due: | $ | 4,378.11 |  |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100 FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS002812



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No.:  1129334
File No.   :  51822.010200

> ### FOR YOUR CONVENIENCE,
> ### WIRING INSTRUCTIONS FOR GT FIRM ACCOUNT
> ### FOR FEES & COSTS ARE AS FOLLOWS:

TO:                CITIBANK, F.S.B.
ABA #:             266086554
CREDIT TO:         GREENBERG TRAURIG ACCOUNT
ACCOUNT #:         3200175071

PLEASE
REFERENCE:         CLIENT NAME:       QUICKIE, LLC
                   FILE NUMBER:       51822.010200
                   INVOICE NUMBER:    1129334*
                   ATTORNEY NAME:     Paul J. Sutton

* If paying more than one invoice, please reference all invoice numbers in wiring instructions.

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS002813



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No. : 1129334
File No.   : 51822.010200

### Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 06/18/02 | 900850 | 126.00 | 0.00 | 0.00 | 126.00 |
| 11/11/02 | 960926 | 346.50 | 2.17 | 0.00 | 348.67 |
| 04/07/03 | 1022147 | 140.00 | 0.45 | 0.00 | 140.45 |
| 10/14/03 | 1112914 | 2,160.00 | 0.90 | 0.00 | 2,160.90 |
| | Totals: | $  2,772.50 | $  3.52 | $  0.00 | $  2,776.02 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS002814

Invoice No.:    1129334                                                    Page 1
Re:             Concentric Passive Knotless Suture Terminator
Matter No.:     51822.010200

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|------------|-------------|-------|--------|
| 10/08/03 | Todd S. Sharian | Review file; review office action; review and revise response to office action. | 3.50 | 1225.00 |
| 10/28/03 | Todd S. Sharian | Telephone interview with patent examiner; revise specification and claims. | 1.00 | 350.00 |
| | | Total Time: | 4.50 | |
| | | Total Fees: | | $ 1,575.00 |

RS002815

Invoice No.:    1129334                                                    Page 2
Re:             Concentric Passive Knotless Suture Terminator
Matter No.:     51822.016200

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 09/24/03 | Copy; 34 Page(s) by 2157 | $ | 5.10 |
| 09/24/03 | Postage by 8654 | $ | 1.66 |
| 10/08/03 | Copy; 11 Page(s) by 2157 | $ | 1.65 |
| 10/08/03 | Postage by 4776 | $ | 13.65 |
| 10/09/03 | Copy; 15 Page(s) by 2157 | $ | 2.25 |
| 10/09/03 | Postage by 3933 | $ | 0.83 |
| 10/28/03 | Copy; 13 Page(s) by 2157 | $ | 1.95 |
| | | Total Expenses: $ | 27.09 |

RS002816



Invoice No. :   1157465
File No.    :   51822.010200
Bill Date   :   January 20, 2004

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Rick Steiner

## INVOICE

Re:   Concentric Passive Knotless Suture Terminator

Legal Services through December 31, 2003:

| | | | |
|---|---|---|---|
| Total Fees: | $ | 175.00 | |

Expenses:

| | | | |
|---|---|---|---|
| Facsimile Charges | 28.00 | | |
| New York PTO Filing Fee - Electronic | 110.00 | | |
| Postage | 3.64 | | |
| Total Expenses: | | $ | 141.64 |
| **Current Invoice:** | | $ | 316.64 |
| Previous Balance (see attached statement): | | $ | 4,378.11 |
| **Total Amount Due:** | | $ | 4,694.75 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS002806



Invoice No.:  1157465
File No.    :  51822.010200

---

*FOR YOUR CONVENIENCE,*
*WIRING INSTRUCTIONS FOR GT FIRM ACCOUNT*
*FOR FEES & COSTS ARE AS FOLLOWS:*

---

TO:                CITIBANK, F.S.B.
ABA #:             266086554
CREDIT TO:         GREENBERG TRAURIG ACCOUNT
ACCOUNT #:         3200175071

PLEASE
REFERENCE:     CLIENT NAME:        QUICKIE, LLC
               FILE NUMBER:        51822.010200
               INVOICE NUMBER:     1157465*
               ATTORNEY NAME:      Paul J. Sutton

\* If paying more than one invoice, please reference all invoice numbers in wiring instructions.

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS002807



Invoice No.:  1157465
File No.   :  51822.010200

## Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 06/18/02 | 900850 | 126.00 | 0.00 | 0.00 | 126.00 |
| 11/11/02 | 960926 | 346.50 | 2.17 | 0.00 | 348.67 |
| 04/07/03 | 1022147 | 140.00 | 0.45 | 0.00 | 140.45 |
| 10/14/03 | 1112914 | 2,160.00 | 0.90 | 0.00 | 2,160.90 |
| 11/14/03 | 1129334 | 1,575.00 | 27.09 | 0.00 | 1,602.09 |
| | Totals: $ | 4,347.50 | $ 30.61 | $ 0.00 | $ 4,378.11 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS002808

Invoice No.:    1157465                                                          Page 1
Re:             Concentric Passive Knotless Suture Terminator
Matter No.:     51822.010200

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 12/01/03 | Todd S. Sharinn | Review Notice of Allowance and notice of allowability; prepare letters to Alan Fell and Dr. Colvin re: same. | 0.50 | 175.00 |
| | | Total Time: | 0.50 | |
| | | Total Fees | | $ 175.00 |

RS002809

Invoice No.:     1157465                                                     Page 2
Re:              Concentric Passive Knotless Suture Terminator
Matter No.:      51822.010200

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 11/03/03 | USPTO Fee: Petition for extension of time. Serial No. 09/660,745. | $ | 110.00 |
| 11/03/03 | Postage by 4776 | $ | 1.98 |
| 12/02/03 | Facsimile, 12124220158, 14 Page(s) by 2157 | $ | 14.00 |
| 12/02/03 | Facsimile, 12122632246, 14 Page(s) by 2157 | $ | 14.00 |
| 12/02/03 | Postage by 3993 | $ | 1.66 |
| | | Total Expenses: $ | 141.64 |

RS002810

# Greenberg
# Traurig

Invoice No. : 1217480
File No.    :  51822.010200
Bill Date   :  May 14, 2004

Quickie, LLC
c/o Rick, Steiner, Segall & Fell, PC
Attn:  Alan Fell, Esq.
Three New York Plaza
New York, New York  10004

Attn: Rick Steiner

## INVOICE

Re:  Concentric Passive Knotless Suture Terminator

Legal Services through April 30, 2004:

|  |  | Total Fees: | $ | 150.00 |
|---|---|---|---|---|

Expenses:

| Local Travel | 6.00 | | | |
|---|---|---|---|---|
| New York PTO Filing Fee - Electronic | 674.00 | | | |
| Photocopy Charges | 1.50 | | | |
| Postage | 3.55 | | | |
| | Total Expenses: | $ | 685.05 | |
| | Current Invoice: | $ | 836.05 | |

| Previous Balance (see attached statement): | $ | 1,918.73 |
|---|---|---|
| Total Amount Due: | $ | 2,753.78 |

TOS:AM
Tax ID: 13-3613083

Greenberg Traurig, LLP | Attorneys at Law | 885 Third Avenue | New York, New York 10022 | Tel 212.801.2100 | Fax 212.688.2449 | www.gtlaw.com

RS003176

# Greenberg Traurig

Invoice No. :  1217480
File No.   :  51822.010200



TO:                    CITIBANK, F.S.B.
ABA #:                 266086554
CREDIT TO:             GREENBERG TRAURIG ACCOUNT
ACCOUNT #:             3200175071

PLEASE
REFERENCE:             CLIENT NAME:        QUICKIE, LLC
                       FILE NUMBER:        51822.010200
                       INVOICE NUMBER:     1217480*
                       BILLING
                       PROFESSIONAL:       Todd S. Sharinn

* If paying more than one invoice, please reference all invoice numbers in wiring instructions.

TOS:AM
Tax ID: 13-3613083

Greenberg Traurig, LLP | Attorneys at Law | 885 Third Avenue | New York, New York 10022 | Tel 212.801.2100 | Fax 212.688.2449 | www.gtlaw.com

RS003177

# Greenberg
# Traurig

Invoice No. : 1217480
File No.    : 51822.010200

## Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 11/14/03 | 1129334 | 1,575.00 | 27.09 | 0.00 | 1,602.09 |
| 01/20/04 | 1157465 | 175.00 | 141.64 | 0.00 | 316.64 |
| | Totals: $ | 1,750.00 | $    168.73 | $    0.00 | $    1,918.73 |

TOS:AM
Tax ID: 13-3613083

Greenberg Traurig, LLP | Attorneys at Law | 885 Third Avenue | New York, New York 10022 | Tel 212.801.2100 | Fax 212.688.2449 | www.gtlaw.com

RS003178

Invoice No.:   1217480                                              Page 1
Re:            Concentric Passive Knotless Suture Terminator
Matter No.:    51822.010200

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 04/13/04 | Todd S. Sharinn | Review issued patent for recovery and letter to client. | 0.40 | 150.00 |
| | | Total Time: | 0.40 | |
| | | Total Fees: | | $ 150.00 |

RS003179

Invoice No.:    1217480                                          Page 2
Re:             Concentric Passive Knotless Suture Terminator
Matter No.:     51822.010200

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 05/19/03 | Copy; 10 Page(s) by 3171 | $ | 1.50 |
| 06/03/03 | Train Fare - Court | $ | 6.00 |
| | VENDOR: Juergensen, Paul A.; INVOICE#: 060303A; DATE: 6/3/2003 - Petty Cash Reimbursement | | |
| 02/18/04 | USPTO Fee: Payment of Issue fee. | $ | 665.00 |
| 02/18/04 | Postage by 8486 | $ | 0.60 |
| 02/26/04 | USPTO Fee: Printed copy of patent matter without color sent via USPS or Electronic means. Serial No. 09/660,745. Billed from charges deducted from the PTO account. | $ | 9.00 |
| 04/13/04 | Postage by 8486 | $ | 2.21 |
| 04/14/04 | Postage by 1784 | $ | 0.74 |
| | Total Expenses: | $ | 685.05 |



RS003180



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

November 12, 2002

Quickie Vision, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

      Re:   Quickie LLC v. Medtronic
             <u>Our Ref. 51822.010400</u>

Dear Alan:

     Enclosed please find our invoice no. 961002 for a total amount of $61,206.59 for legal services and expenses rendered through and including October 31, 2002.

     If you have any questions, please do not hesitate to contact me.

                       Very truly yours,

                       Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100   FAX 212-688-2449   www.gtlaw.com
ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003087



Invoice No.: 961002
File No.   :  51822.010400
Bill Date  :  November 11, 2002

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:  Quickie LLC v. Medtronics

Legal Services through October 31, 2002:

|  |  | Total Fees: | $ | 495.00 |
|---|---|---|---|---|

Expenses:

| Facsimile Charges | 51.00 | | | |
|---|---|---|---|---|
| Messenger Services | 23.17 | | | |
| Photocopy Charges | 4.50 | | | |
| | Total Expenses: | $ | 78.67 | |
| | **Current Invoice:** | **$** | **573.67** | |
| | Previous Balance (see attached statement): | $ | 60,632.92 | |
| | **Total Amount Due:** | **$** | **61,206.59** | |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-848-1000  FAX 212-688-2449  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  LOS ANGELES  CHICAGO  BOSTON  PHOENIX  DENVER  ATLANTA  TYSONS CORNER
PHILADELPHIA  WILMINGTON  ORLANDO  TALLAHASSEE  WEST PALM BEACH  BOCA RATON  FORT LAUDERDALE  SAO PAULO

RS003088



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No.: 961002
File No.  : 51822.010400

## Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 08/12/02 | 921521 | 18,920.52 | 0.00 | 0.00 | 18,920.52 |
| 09/09/02 | 930770 | 37,133.00 | 1,975.68 | 0.00 | 39,108.68 |
| 10/04/02 | 942637 | 1,760.00 | 843.72 | 0.00 | 2,603.72 |
| | Totals: | $    57,813.52 | $    2,819.40 | $    0.00 | $    60,632.92 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-848-1000  FAX 212-688-2449  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  LOS ANGELES  CHICAGO  BOSTON  PHOENIX  DENVER  ATLANTA  TYSONS CORNER
PHILADELPHIA  WILMINGTON  ORLANDO  TALLAHASSEE  WEST PALM BEACH  BOCA RATON  FORT LAUDERDALE  SAO PAULO

RS003089

Invoice No.:     961002
Re:              Quickie LLC v. Medtronics
Matter No.:      51822.010400

Page 1

<u>Description of Professional Services Rendered:</u>

| <u>DATE</u> | <u>TIMEKEEPER</u> | <u>DESCRIPTION</u> | <u>HOURS</u> | <u>AMOUNT</u> |
|------|------------|-------------|-------|--------|
| 10/16/02 | Paul A. Juergensen | Prepare files for transfer to Thelen Reid & Priest; conferences with Todd Sharinn; telephone conference with Shari Savitt; and letters to Shari Savitt regarding same. | 3.30 | 495.00 |
| | | <u>Total Time:</u> | 3.30 | |
| | | <u>Total Fees:</u> | | $ 495.00 |

RS003090

Invoice No.:    961002                                              Page 2
Re:             Quickie LLC v. Medtronics
Matter No.:     51822.010400

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 09/03/02 | Todd Sharinn 51822.010400 To: Mc Dermott, Will & Emery/50 Rockefeller Plaza on 9/03. Job #10136668 VENDOR: LASERSHIP, INC. - I; INVOICE#: 21001500915; DATE: 9/15/2002 - Account #100150: Charges for 9/01 to 9/15/02. | $ | 14.92 |
| 09/05/02 | VENDOR: Airline Delivery, Invoice Date: 9/13/2002 - From: TOD SHARINN, 885 3RD AVE, To: DISTRICT COURT, 40 CENTRE ST | $ | 8.25 |
| 10/01/02 | Facsimile; 2632246, 9 Page(s) by 4776 | $ | 9.00 |
| 10/01/02 | Facsimile; 4220158, 9 Page(s) by 4776 | $ | 9.00 |
| 10/01/02 | Facsimile; 12025084321, 9 Page(s) by 4776 | $ | 9.00 |
| 10/01/02 | Copy; 21 Page(s) by 3171 | $ | 3.15 |
| 10/03/02 | Copy; 9 Page(s) by 3171 | $ | 1.35 |
| 10/16/02 | Facsimile; 4220158, 4 Page(s) by 4776 | $ | 4.00 |
| 10/16/02 | Facsimile; 12025084321, 4 Page(s) by 4776 | $ | 4.00 |
| 10/16/02 | Facsimile; 6032001, 4 Page(s) by 4776 | $ | 4.00 |
| 10/16/02 | Facsimile; 2632246, 4 Page(s) by 4776 | $ | 4.00 |
| 10/18/02 | Facsimile; 4220158, 2 Page(s) by 2157 | $ | 2.00 |
| 10/18/02 | Facsimile; 2632246, 2 Page(s) by 2157 | $ | 2.00 |
| 10/18/02 | Facsimile; 2635534, 2 Page(s) by 2157 | $ | 2.00 |
| 10/18/02 | Facsimile; 12025084321, 2 Page(s) by 2157 | $ | 2.00 |
| | | Total Expenses:  $ | 78.67 |

RS003091



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

February 20, 2003

Quickie Vision, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

       Re:    Quickie LLC v. Medtronic
             <u>Our Ref. 51822.010400</u>

Dear Alan:

      Enclosed please find our invoice no. 1000231 for a total amount of $61,261.59 for legal services and expenses rendered through and including January 31, 2002.

      If you have any questions, please do not hesitate to contact me.

                           Very truly yours,

                           Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003110



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No. : 1000231
File No.    : 51822.010400
Bill Date  : February 12, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York  10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:  Quickie LLC v. Medtronics

Expenses:

| | | |
|---|---|---|
| Business Meals | 15.00 | |
| Photocopy Charges | 40.00 | |
| Total Expenses: | $ | 55.00 |
| | | |
| Current Invoice: | $ | 55.00 |
| | | |
| Previous Balance (see attached statement): | $ | 61,206.59 |
| Total Amount Due: | $ | 61,261.59 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS003111



Invoice No. :  1000231
File No.    :  51822.010400

**Account Statement**

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 08/12/02 | 921521 | 18,920.52 | 0.00 | 0.00 | 18,920.52 |
| 09/09/02 | 930770 | 37,133.00 | 1,975.68 | 0.00 | 39,108.68 |
| 10/04/02 | 942637 | 1,760.00 | 843.72 | 0.00 | 2,603.72 |
| 11/11/02 | 961002 | 495.00 | 78.67 | 0.00 | 573.67 |
| | Totals: $ | 58,308.52 $ | 2,898.07 $ | 0.00 $ | 61,206.59 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  NEW
JERSEY
ORLANDO  PHILADELPHIA  PHOENIX  TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON
ZURICH

**RS003112**

Invoice No.:     1000231                                                          Page 2
Re:              Quickie LLC v. Medtronics
Matter No.:      51822.010400

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 12/22/02 | VENDOR: Termaine Tyler, Petty Cash , Custodian; INVOICE#: 123102; DATE: 12/31/2002 - J. James/Lunch-copy project requested by T. Sharinn. | $ | 15.00 |
| 12/22/02 | VENDOR: Termaine Tyler, Petty Cash , Custodian; INVOICE#: 123102; DATE: 12/31/2002 - J. james/Copy project-10 documents requested by T. Sharinn. | $ | 40.00 |
| | Total Expenses: | $ | 55.00 |

RS003113

 

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

May 19, 2003

Quickie Vision, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

      Re:   Quickie LLC v. Medtronic
           Our Ref. 51822.010400

Dear Alan:

    Enclosed please find our invoice no. 1042103 for a total amount of $47,287.06 for legal services and expenses rendered through and including April 30, 2003.

    If you have any questions, please do not hesitate to contact me.

Very truly yours,

Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100 FAX 212-688-2449 www.gtlaw.com

NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003102



Invoice No. :  1042103
File No.    :  51822.010400
Bill Date   :  May 13, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:  Quickie LLC v. Medtronics

Expenses:

| | | |
|---|---|---|
| Facsimile Charges | 23.00 | |
| Photocopy Charges | 2.10 | |
| Postage | 0.37 | |
| Total Expenses: | $ | 25.47 |
| | | |
| Current Invoice: | $ | 25.47 |
| | | |
| Previous Balance (see attached statement): | $ | 47,261.59 |
| Total Amount Due: | $ | 47,287.06 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS003103



Invoice No. : 1042103
File No.   : 51822.010400

> ## WIRING INSTRUCTIONS FOR GT FIRM ACCOUNT
> ## FOR FEES & COSTS ARE AS FOLLOWS:

TO:                 CITIBANK, F.S.B.
ABA #:              266086554
CREDIT TO:          GREENBERG TRAURIG ACCOUNT
ACCOUNT #:          3200175071

**PLEASE
REFERENCE:**        **CLIENT NAME:**      **QUICKIE, LLC**
                    **FILE NUMBER:**      **51822.010400**
                    **INVOICE NUMBER:**   **1042103**
                    **ATTORNEY NAME:**    **Paul J. Sutton**

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100 FAX 212-688-2449 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS003104



Invoice No. :  1042103
File No.   :  51822.010400

## Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 08/12/02 | 921521 | 4,975.52 | 0.00 | 0.00 | 4,975.52 |
| 09/09/02 | 930770 | 37,133.00 | 1,975.68 | 0.00 | 39,108.68 |
| 10/04/02 | 942637 | 1,760.00 | 843.72 | 0.00 | 2,603.72 |
| 11/11/02 | 961002 | 495.00 | 78.67 | 0.00 | 573.67 |
| | Totals: $ | 44,363.52 | $ 2,898.07 | $ 0.00 | $ 47,261.59 |

PS:YA
Tax ID:  13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS003105

Invoice No.:    1042103
Re:             Quickie LLC v. Medtronics
Matter No.:     51822.010400

Page 2

## Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 02/20/03 | Copy; 4 Page(s) by 3171 | $ | 0.60 |
| 03/05/03 | Copy; 5 Page(s) by 3171 | $ | 0.75 |
| 03/11/03 | Facsimile; 12122632246, 4 Page(s) by 3171 | $ | 4.00 |
| 03/11/03 | Facsimile; 12124220158, 4 Page(s) by 3171 | $ | 4.00 |
| 03/11/03 | Copy; 3 Page(s) by 3171 | $ | 0.45 |
| 03/11/03 | Postage by 4776 | $ | 0.37 |
| 03/27/03 | Facsimile; 12122632246, 15 Page(s) by 3171 | $ | 15.00 |
| 04/11/03 | Copy; 2 Page(s) by 3171 | $ | 0.30 |
| | | Total Expenses: $ | 25.47 |

RS003106

05/21/03  WED 15:20 FAX 2124809028                                          ☒001

```
                    ***************************
                    ***   TX REPORT   ***
                    ***************************


    TRANSMISSION OK

    TX/RX NO                0948
    DEPT. ACCESS CODE       1013
    CONNECTION TEL                  12122632246
    SUBADDRESS
    CONNECTION ID
    ST. TIME                05/21 15:19
    USAGE T                 01'20
    PGS.                    5
    RESULT                  OK
```

RS003107



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 9, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

Re:    Quickie, LLC
Passive Knotless Suture System Patent (6,066,160)
Our Ref. 51822.010700

Dear Alan:

Enclosed please find our invoice no. 1022157 for a total amount of $739.60 for legal services and expenses rendered through and including March 31, 2003.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003097



## GREENBERG
ATTORNEYS AT LAW
## TRAURIG

Invoice No. :  1022157
File No.    :  51822.010700
Bill Date   :  April 7, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

### INVOICE

Re:  Passive Knotless Suture System Patent (6,066,160)

Legal Services through March 31, 2003:

| | | |
|---|---|---|
| Total Fees: | $ | 735.00 |

Expenses:

| | | |
|---|---|---|
| Facsimile Charges | | 4.00 |
| Photocopy Charges | | 0.60 |
| Total Expenses: | $ | 4.60 |
| | | |
| Current Invoice: | $ | 739.60 |

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C.  WEST PALM BEACH WILMINGTON ZURICH

RS003098



Invoice No. :  1022157
File No.    :  51822.010700

---

### WIRING INSTRUCTIONS FOR GT FIRM ACCOUNT
### FOR FEES & COSTS ARE AS FOLLOWS:

TO:                CITIBANK, F.S.B.
ABA #:             266086554
CREDIT TO:         GREENBERG TRAURIG ACCOUNT
ACCOUNT #:         3200175071

PLEASE
REFERENCE:         **CLIENT NAME:**      **QUICKIE, LLC**
                   **FILE NUMBER:**      **51822.010700**
                   **INVOICE NUMBER:**   **1022157**
                   **ATTORNEY NAME:**    **Paul J. Sutton**

PS:YA
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW
JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON
ZURICH

RS003099

| | | | Page 1 |
|---|---|---|---|
| Invoice No.: | 1022157 | | |
| Re: | Passive Knotless Suture System Patent (6,066,160) | | |
| Matter No.: | 51822.010700 | | |

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|---|
| 03/18/03 | Todd S. Sharinn | Review PTO reexamination statement and file (.9); review prior art cited (.6); telephone call with examiner (.2). | 1.70 | 595.00 |
| 03/19/03 | Todd S. Sharinn | Telephone interview with Examiner (.4). | 0.40 | 140.00 |
| | | Total Time: | 2.10 | |
| | | Total Fees: | | $ 735.00 |

RS003100

| | | | Page 2 |
|---|---|---|---|
| Invoice No.: | 1022157 | | |
| Re: | Passive Knotless Suture System Patent (6,066,160) | | |
| Matter No.: | 51822.010700 | | |

<u>Description of Expenses Billed:</u>

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 10/22/02 | Copy; 4 Page(s) by 2157 | $ | 0.60 |
| 12/16/02 | Facsimile; 17033051013, 4 Page(s) by 7431 | $ | 4.00 |
| | | Total Expenses: $ | 4.60 |

RS003101



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

| | | |
|---|---|---|
| Invoice No. | : | 986683 |
| File No. | : | 51822.010800 |
| Bill Date | : | January 14, 2003 |

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:  Surgical Drape Patent Application

Legal Services through December 31, 2002:

| | | |
|---|---|---|
| Total Fees: | $ | 7,314.00 |

Expenses:

| | | |
|---|---|---|
| Facsimile Charges | 14.00 | |
| Photocopy Charges | 0.30 | |
| Total Expenses: | $ | 14.30 |
| Current Invoice: | $ | 7,328.30 |

---

| QUICKIE, LLC | | 1028 |
|---|---|---|
| | | 1-1-210 |

DATE  8/21/03

PAY TO THE ORDER OF  *Greenberg Traurig, LLP*  | $ *3750 ⁰⁰*

*Thirty seven hundred fifty & no/100*  DOLLARS

THE BANK OF NEW YORK
One Wall Street
New York, NY 10286

FOR  *Invoice # 986683 patent report*

⑈0010 28⑈ ⑈0210000 18⑈ ⑈63 0222 6553⑈

885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
MIAMI NEW YORK WASHINGTON, D.C. LOS ANGELES CHICAGO BOSTON PHOENIX DENVER ATLANTA TYSONS CORNER
PHILADELPHIA WILMINGTON ORLANDO TALLAHASSEE WEST PALM BEACH BOCA RATON FORT LAUDERDALE SAO PAULO

RS002686



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

February 12, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

    Re: Quickie, LLC
       Surgical Drape Patent Application
       <u>Our Ref. 51822.010800</u>

Dear Alan:

   Enclosed please find our invoice no. 999540 for a total amount of $7,729.20 for legal services and expenses rendered through and including January 31, 2002.

   If you have any questions, please do not hesitate to contact me.

         Very truly yours,

         Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100   FAX 212-688-2449   www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS002687



Invoice No. :  999540
File No.      :  51822.010800

## Account Statement

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|----------|--------------|-----------|-----------|
| 01/14/03 | 986683 | 7,314.00 | 14.30 | 0.00 | 7,328.30 |
| | Totals: $ | 7,314.00 | $    14.30 | $    0.00 | $    7,328.30 |

TOS:AM
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS002688

Invoice No.:   999540                                     Page 1
Re.              Surgical Drape Patent Application
Matter No.:   51822.010800

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | | HOURS | AMOUNT |
|------|-----------|-------------|---|-------|--------|
| 01/09/03 | Todd S. Sharinn | Review and revise application (1.0). | | 1.00 | 350.00 |
| | | | Total Time: | 1.00 | |
| | | | Total Fees: | | $ 350.00 |

RS002689

| Invoice No.: | 999540 | | | Page 2 |
| Re: | Surgical Drape Patent Application | | | |
| Matter No.: | 51822.010800 | | | |

Description of Expenses Billed:

| DATE | DESCRIPTION | | | AMOUNT |
|------|-------------|---|---|--------|
| 01/09/03 | Special Clerical Serivces, 12-15-02, Ivan, Adrienne | | $ | 50.00 |
| 01/15/03 | Copy; 6 Page(s) by 3171 | | $ | 0.90 |
| | | Total Expenses: | $ | 50.90 |

RS002690

02/19/03  WED 11:40 FAX 2124809028                                    ☑001

```
                        ************************
                        ***   TX REPORT   ***
                        ************************


        TRANSMISSION OK

        TX/RX NO              0372
        DEPT. ACCESS CODE     1234
        CONNECTION TEL                    2632246
        SUBADDRESS
        CONNECTION ID
        ST. TIME             02/19 11:37
        USAGE T              03'11
        PGS.                  11
        RESULT               OK
```

RS002691



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

January 15, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

       Re:    Quickie, LLC
              Surgical Drape Patent Application
              Our Ref. 51822.010800

Dear Alan:

      Enclosed please find our invoice no. 986683 for a total amount of $7,328.30 for legal services and expenses rendered through and including December 31, 2002.

      If you have any questions, please do not hesitate to contact me.

                        Very truly yours,

                        Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS002692



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No. :  986683
File No.     :  51822.010800
Bill Date    :  January 14, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:   Surgical Drape Patent Application

Legal Services through December 31, 2002:

|                          |    |           |
|--------------------------|----|-----------|
| Total Fees:              | $  | 7,314.00  |

Expenses:

| Facsimile Charges  | 14.00 |    |          |
|--------------------|-------|----|----------|
| Photocopy Charges  | 0.30  |    |          |
| Total Expenses:    |       | $  | 14.30    |
| Current Invoice:   |       | $  | 7,328.30 |

TOS:AM
Tax ID:  13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  LOS ANGELES  CHICAGO  BOSTON  PHOENIX  DENVER  ATLANTA  TYSONS CORNER
PHILADELPHIA  WILMINGTON  ORLANDO  TALLAHASSEE  WEST PALM BEACH  BOCA RATON  FORT LAUDERDALE  SAO PAULO

RS002693

Invoice No.: 986683                                                      Page 1
Re:          Surgical Drape Patent Application
Matter No.:  51822.010800

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 10/22/02 | Jennifer H. Burdman | Research regarding surgical incise drapes patents. | 3.00 | 600.00 |
| 10/23/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 4.50 | 900.00 |
| 10/25/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 1.50 | 300.00 |
| 10/28/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 1.00 | 200.00 |
| 10/29/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 2.00 | 400.00 |
| 10/30/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 4.50 | 900.00 |
| 11/19/02 | Jennifer H. Burdman | Draft patent application. | 3.00 | 600.00 |
| 11/19/02 | Todd S. Sharinn | Review and revise patent application (2.5). | 2.50 | 787.50 |
| 11/20/02 | Jennifer H. Burdman | Draft patent application; conference with T. Sharinn regarding draft application. | 3.00 | 600.00 |
| 11/20/02 | Todd S. Sharinn | Review and revise patent application (2.6). | 2.60 | 819.00 |
| 12/04/02 | Todd S. Sharinn | Revise patent application (1.1). | 1.10 | 346.50 |
| 12/06/02 | Jennifer H. Burdman | Research regarding the addition of particle granulars to provide non-slip surface; draft additional embodiment for patent application. | 2.10 | 420.00 |
| 12/20/02 | Todd S. Sharinn | Review and revise application (1.4). | 1.40 | 441.00 |

|  |  | Total Time: | 32.20 |  |
|  |  | Total Fees: |  | $ 7,314.00 |

RS002694

Invoice No.:    986683                                    Page 2
Re:             Surgical Drape Patent Application
Matter No.:     51822.010800

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 11/20/02 | Facsimile; 12124220158, 14 Page(s) by 3171 | $ | 14.00 |
| 11/20/02 | Copy; 2 Page(s) by 3171 | $ | 0.30 |
| | Total Expenses: | $ | 14.30 |

RS002695

Invoice No.:     978380                                              Page 1
Re:              New Surgical Drape Patent License
Matter No.:      51822.010800

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 10/22/02 | Jennifer H. Burdman | Research regarding surgical incise drapes patents. | 3.00 | 600.00 |
| 10/23/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 4.50 | 900.00 |
| 10/25/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 1.50 | 300.00 |
| 10/28/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 1.00 | 200.00 |
| 10/29/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 2.00 | 400.00 |
| 10/30/02 | Jennifer H. Burdman | Draft patent application for surgical incise drape. | 4.50 | 900.00 |
| 11/19/02 | Jennifer H. Burdman | Draft patent application. | 3.00 | 600.00 |
| 11/19/02 | Todd S. Sharinn | Review and revise patent application (2.5). | 2.50 | 787.50 |
| 11/20/02 | Jennifer H. Burdman | Draft patent application; conference with T. Sharinn regarding draft application. | 3.00 | 600.00 |
| 11/20/02 | Todd S. Sharinn | Review and revise patent application (2.6). | 2.60 | 819.00 |

Total Time:     27.60
Total Fees:              $ 6,106.50

RS002696

Invoice No.:    978380                                    Page 2
Re:             New Surgical Drape Patent License
Matter No.:     51822.010800

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 11/20/02 | Facsimile; 12124220158, 14 Page(s) by 3171 | $ | 14.00 |
| 11/20/02 | Copy; 2 Page(s) by 3171 | $ | 0.30 |
| | | Total Expenses: $ | 14.30 |

RS002697



GREENBERG
ATTORNEYS AT LAW
TRAURIG

Invoice No.:  999540
File No.    :  51822.010800
Bill Date   :  February 12, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

## INVOICE

Re:  Surgical Drape Patent Application

Legal Services through January 31, 2003:

|  |  |  |
|---|---|---|
| Total Fees: | $ | 350 00 |

Expenses:

| | | |
|---|---|---|
| Photocopy Charges | 0.90 | |
| Special Clerical Services | 50.00 | |
| Total Expenses: | $ | 50.90 |
| | | |
| Current Invoice: | $ | 400.90 |
| | | |
| Previous Balance (see attached statement): | $ | 7,328.30 |
| Total Amount Due: | $ | 7,729.20 |

TOS:AM
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE NEW YORK, NEW YORK 10022
212-801-2100   FAX 212-688-2449   www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW YORK NEW JERSEY
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

RS002698



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

January 15, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

        Re:    Quickie, LLC
               Reexamination of U.S. Patent No. 6,066,160 by Medtronic
               <u>Our Ref. 51822.010900</u>

Dear Alan:

    Enclosed please find our invoice no. 986682 for a total amount of $1,561.51 for legal services and expenses rendered through and including December 31, 2002.

    If you have any questions, please do not hesitate to contact me.

                        Very truly yours,

                        Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

RS003092



**GREENBERG**
ATTORNEYS AT LAW
**TRAURIG**

Invoice No. : 986682
File No.     : 51822.010900
Bill Date    : January 14, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Alan L. Fell, Esq.

### INVOICE

Re:  Reexamination of U.S. Patent No. 6,066,160 by Medtronic

Legal Services through December 31, 2002:

|  | | |
|---|---|---|
| Total Fees: | $ | 1,543.50 |

Expenses:

| | | | |
|---|---|---|---|
| Facsimile Charges | 8.00 | | |
| Federal Express Charges | 8.81 | | |
| Photocopy Charges | 1.20 | | |
| Total Expenses: | | $ | 18.01 |
| | | | |
| Current Invoice: | | $ | **1,561.51** |

TOS:AM
Tax ID: 13-3613083

GREENBERG TRAURIG, LLP
885 THIRD AVENUE  NEW YORK, NEW YORK 10022
212-801-2100  FAX 212-688-2449  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  LOS ANGELES  CHICAGO  BOSTON  PHOENIX  DENVER  ATLANTA  TYSONS CORNER
PHILADELPHIA  WILMINGTON  ORLANDO  TALLAHASSEE  WEST PALM BEACH  BOCA RATON  FORT LAUDERDALE  SAO PAULO

RS003093

| | | | | |
|---|---|---|---|---|
| Invoice No.: | 986682 | | | Page 1 |
| Re: | Reexamination of U.S. Patent No. 6,066,160 by Medtronic | | | |
| Matter No.: | 51822.010900 | | | |

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|---|
| 12/03/02 | Todd S. Sharinn | Telephone call with S. Colvin (.2); review papers filed by Medtronic (1.8); legal research regarding options available (.8). | 2.80 | 882.00 |
| 12/06/02 | Todd S. Sharinn | Telephone call from M. Evens (.3). | 0.30 | 94.50 |
| 12/09/02 | Todd S. Sharinn | Confer with A. Pell regarding status and strategy (.3). | 0.30 | 94.50 |
| 12/10/02 | Todd S. Sharinn | Confer with M. Evens regarding status and strategy (.3); review and revise affirmation of T. Sharinn (.6). | 0.90 | 283.50 |
| 12/12/02 | Todd S. Sharinn | Exchange emails with M. Evens and revise declaration (.3). | 0.30 | 94.50 |
| 12/13/02 | Todd S. Sharinn | Finalize and forward declaration (.3). | 0.30 | 94.50 |
| | | Total Time: | 4.90 | |
| | | Total Fees: | | $ 1,543.50 |

RS003094

| Invoice No.: | 986682 | Page 2 |
| Re: | Reexamination of U.S. Patent No. 6,066,160 by Medtronic | |
| Matter No.: | 51822.010900 | |

Description of Expenses Billed:

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 10/15/02 | VENDOR: FedEx INVOICE#: 912576955 DATE: 10/28/2002 Tracking #411538302143; From: TODD SHARINN, GREENBERG TRAURIG LLP, 885 3RD AVE FL 21, NEW YORK, NY 100224898. To: MARK F. EVENS,ESQ. THELEN REID & PRIEST LLP, 701 PENNSYLVANIA AVENUE, N.W.,, WASHINGTON, DC 200040000 | $ | 8.81 |
| 12/13/02 | Facsimile; 4220158, 4 Page(s) by 3171 | $ | 4.00 |
| 12/13/02 | Facsimile; 2632246, 4 Page(s) by 3171 | $ | 4.00 |
| 12/13/02 | Copy; 5 Page(s) by 3171 | $ | 0.75 |
| 12/13/02 | Copy; 2 Page(s) by 3171 | $ | 0.30 |
| 12/13/02 | Copy; 1 Page(s) by 3171 | $ | 0.15 |
| | | Total Expenses: $ | 18.01 |

RS003095

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 9, 2003

Quickie Vision, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

       Re:    Quickie LLC v. Medtronic
               Our Ref. 51822.010400

Dear Alan:

    Enclosed please find our summary of outstanding invoice nos. 921521, 930770, 942637, and 961002 for a total amount of $47,261.59 for legal services and expenses rendered through and including March 31, 2003.

    If you have any questions, please do not hesitate to contact me.

                     Very truly yours,

                     Todd S. Sharinn

TSS:ai
Enclosures

GREENBERG TRAURIG, LLP

RS003108

# GREENBERG
# TRAURIG

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, NY 10004

Attn: Alan L. Fell, Esq.

Outstanding invoices as of April 07, 2003

| File Number | Titled | Invoice # | Dated | Billed thru | Invoice Balance Due |
|---|---|---|---|---|---|
| 51822.010400 | Quickie LLC v. Medtronics | | | | |
| | | 921521 | 08/12/02 | 07/31/02 | 4,975.52 |
| | | 930770 | 09/09/02 | 09/04/02 | 39,108.68 |
| | | 942637 | 10/04/02 | 09/30/02 | 2,603.72 |
| | | 961002 | 11/11/02 | 10/31/02 | 573.67 |

Balance due this file $ 47,261.59

Total client balance $ 47,261.59

PXS:YA

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212-801-9200  FAX 212-801-6400  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  SAO PAULO
FORT LAUDERDALE  WEST PALM BEACH  ORLANDO  TALLAHASSEE  BOCA RATON  CHICAGO

RS003109

# Greenberg
# Traurig

Todd S. Sharinn
212-801-2157

September 23, 2004

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004

Attn: Rick Steiner

Re:    Outstanding Statement
       Client Number: 51822

Dear Rick:

    Enclosed please find our outstanding statement of invoices as of October 7, 2004.
Thank you in advance for your assistance in processing these payments.

    If you have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

Todd S. Sharinn

Enclosure

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DENVER
FORT LAUDERDALE
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SILICON VALLEY
TALLAHASSEE
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
WILMINGTON
ZURICH

\tay2-fb1\753451v01
Greenberg Traurig, LLP | Attorneys at Law | 885 Third Avenue | New York, NY 10022-4834 | Tel 212.801.2100 | Fax 212.688.2449    www.gtlaw.com

RS003187

# Greenberg Traurig

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, NY 10004

Attn: Rick Steiner

Outstanding invoices as of October 07, 2004

| File Number | Titled | Invoice # | Dated | Billed thru | Invoice Balance Due |
|---|---|---|---|---|---|
| 51822.010000 | General | | | | |
| | | *999539 | 02/12/03 | 01/31/03 | 365.68 |
| | | *1022875 | 04/08/03 | 03/31/03 | 70.00 |
| | | | Balance due this file | $ | 435.68 |
| 51822.010200 | Concentric Passive Knotless Suture Terminator | | | | |
| | | *1129334 | 11/14/03 | 10/31/03 | 1,602.09 |
| | | *1157465 | 01/20/04 | 12/31/03 | 316.64 |
| | | 1217480 | 05/14/04 | 04/30/04 | 835.05 |
| | | | Balance due this file | $ | 2,753.78 |
| 51822.010400 | Quickie LLC v. Medtronics | | | | |
| | | *930770 | 09/09/02 | 09/04/02 | 29,358.99 |
| | | *942637 | 10/04/02 | 09/30/02 | 2,603.72 |
| | | *961002 | 11/11/02 | 10/31/02 | 573.67 |
| | | *1042103 | 05/13/03 | 04/30/03 | 25.47 |
| | | | Balance due this file | $ | 32,561.85 |
| 51822.010800 | Surgical Drape Patent Application | | | | |
| | | *986683 | 01/14/03 | 12/31/02 | 3,578.30 |

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212-801-9200   FAX 212-801-6400   www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  SAO PAULO
FORT LAUDERDALE  WEST PALM BEACH  ORLANDO  TALLAHASSEE  BOCA RATON  CHICAGO

RS003188

# Greenberg Traurig

|  |  | *999540 | 02/12/03 | 01/31/03 |  | 400.90 |
|---|---|---|---|---|---|---|
|  |  |  | Balance due this file | $ |  | 3,979.20 |
| 51822.010900 | Reexamination of U.S. Patent No. 6,066,160 by Medtronic |  |  |  |  |  |
|  |  | *986682 | 01/14/03 | 12/31/02 |  | 1,561.51 |
|  |  |  | Balance due this file | $ |  | 1,561.51 |
|  |  |  | Total client balance | $ |  | 41,292.02 |

HIL:AM

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212-801-9200  FAX 212-801-6400  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  SAO PAULO
FORT LAUDERDALE  WEST PALM BEACH  ORLANDO  TALLAHASSEE  BOCA RATON  CHICAGO

RS003189

# Greenberg Traurig

Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

November 16, 2004

Mr. Alan Fell
S&A Rings LLC
c/o Rick, Steiner, Segal & Fell
3 New York Plaza
New York, New York 10004

Re:    Outstanding Invoices for Legal Services

Dear Alan:

Enclosed please find our outstanding statement of invoices as of November 15, 2004. Thank you in advance for your assistance in processing these payments.

If you have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

Todd S. Sharinn

TSS/cak
Enclosures

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DENVER
FORT LAUDERDALE
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SILICON VALLEY
TALLAHASSEE
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
WILMINGTON
ZURICH

www.gtlaw.com

Greenberg Traurig, LLP | Attorneys at Law | Met Life Building | 200 Park Avenue | New York, NY 10166 | Tel 212.801.9200 | Fax 212.801.6400

RS003198

# Greenberg Traurig

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, NY 10004

Attn:  Rick  Steiner

Outstanding invoices as of November 15, 2004

| File Number | Titled | Invoice # | Dated | Billed thru | Invoice Balance Due |
|---|---|---|---|---|---|
| 51822.010000 | General | | | | |
| | | *999539 | 02/12/03 | 01/31/03 | 365.68 |
| | | *1022875 | 04/08/03 | 03/31/03 | 70.00 |
| | | | | Balance due this file $ | 435.68 |
| 51822.010200 | Concentric Passive Knotless Suture Terminator | | | | |
| | | *1129334 | 11/14/03 | 10/31/03 | 1,602.09 |
| | | *1157465 | 01/20/04 | 12/31/03 | 316.64 |
| | | 1217480 | 05/14/04 | 04/30/04 | 835.05 |
| | | | | Balance due this file $ | 2,753.78 |
| 51822.010400 | Quickie LLC v. Medtronics | | | | |
| | | *930770 | 09/09/02 | 09/04/02 | 29,358.99 |
| | | *942637 | 10/04/02 | 09/30/02 | 2,603.72 |
| | | *961002 | 11/11/02 | 10/31/02 | 573.67 |
| | | *1042103 | 05/13/03 | 04/30/03 | 25.47 |
| | | | | Balance due this file $ | 32,561.85 |
| 51822.010800 | Surgical Drape Patent Application | | | | |
| | | *986683 | 01/14/03 | 12/31/02 | 3,578.30 |

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212 801 9200   FAX 212 801-6400  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  SAO PAULO
FORT LAUDERDALE  WEST PALM BEACH  ORLANDO  TALLAHASSEE  BOCA RATON  CHICAGO

RS003199

# Greenberg
# Traurig

|  |  | *999540 | 02/12/03 | 01/31/03 | 400.90 |
|---|---|---|---|---|---|
|  |  |  | Balance due this file | $ | 3,979.20 |

| 51822.010900 | Reexamination of U.S. Patent No. 6,066,160 by Medtronic | | | | |
|---|---|---|---|---|---|
|  |  | *986682 | 01/14/03 | 12/31/02 | 1,561.51 |
|  |  |  | Balance due this file | $ | 1,561.51 |
|  |  |  | Total client balance | $ | 41,292.02 |

HIL:AM

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212-801-9200  FAX 212-801-6400  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  SAO PAULO
FORT LAUDERDALE  WEST PALM BEACH  ORLANDO  TALLAHASSEE  BOCA RATON  CHICAGO

RS003200

# EXHIBIT O

## Mark F. Evens

**From:**    Sandra Ortiz [ortizs02@med.nyu.edu]
**Sent:**    Friday, September 01, 2006 4:02 PM
**To:**      Mark F. Evens
**Subject:** patent

--
New York University School of Medicine
Department of Cardiothoracic Surgery
Sandra Ortiz Perez
Phone (212) 263-6273
Fax (212) 263-6546

-----Original Message-----
**From:** Girard, Michael [mailto:MGirard@sjm.com]
**Sent:** Sunday, July 23, 2006 1:22 PM
**To:** colvin@cv.med.nyu.edu
**Cc:** Fazio, George J
**Subject:** Questions

Dr. Colvin,

I hope you had a great vacation last week. As we discussed on Friday, there are a number of questions that have come up as I have been working with our Corporate IP and Business Development people to prepare a proposed structure for a collaboration Agreement. To follow-up from our conversation on Friday here is a list of the specific questions:

1. Are US patent #'s 6,066,160 and 6,716,243 the only knotless suture patents that exist or are there other applications pending? If so, can we have access to any pending applications?
2. There are two different companies listed on the two patents, Quickie, LLC and Quickie, Inc. Are there two companies or one?
3. What IP (other MIS related IP) is owned by Quickie?
4. Based on the re-examination of the '160 patent the claims have been modified and will be reissued, can we get a copy of the new claims since they have not yet been published?
5. It appears that the maintenance fees for the '160 patent have not been paid and the patent has lapsed. Is this correct?
6. Who is all of the affiliates of Quickie that would be part of the collaboration with St. Jude (Drs. Colvin, Galloway, Grossi, Mr. Katz, others)?
7. If there is new joint IP generated during our collaboration will NYU have any rights or will it be entirely owned by Quickie?
8. Who is Paul Oddo and what is his relationship with Quickie and its affiliates?
9. Is VTS Inc. or NYU associated with Quickie in any way?
10. What is the history of Quickie, LLC and Quickie, Inc.?
11. Can we get a quick summary of the history of the relevant patents held by Quickie and its affiliates? In particular, please describe any attempts to invalidate the patents and changes in

QLLC 0097258

ownerships rights of the patents.
12. Does NYU or Medtronic have any rights to any of the IP held by Quickie and/or its affiliates relating to knot-free suture technology or minimally invasive approaches?
13. Can we get a summary of the history of the Medtronic relationship with Quickie and can we get a copy or verbal overview of the Medtronic Agreement?
14. Are there any royalty payments owed to or by Quickie and its affiliates relating to the relevant patents or any rights to future potential royalty payments relating to the IP?
15. When do the patents expire?
16. Is Quickie's IP counsel Allan Fell (sp?) at 212-422-0488?
17. Does he also serve as the general counsel? If not, who is Quickie's their corporate counsel?
18. Is Estech involved with Quickie, or other entities?

Please take a look at the above questions and let me know who I should contact to discuss. Thanks for your help.

Best Regards,

Mike

Michael J. Girard, P.E.
Sr. Director, Research & Development

St. Jude Medical, Inc.
Cardiac Surgery Division
177 County Road B East
St. Paul, MN 55117
Ph. (651) 486-4003
Fax. (651) 486-4095
Email: mgirard@sjm.com

9/1/2006

QLLC 0097259

# EXHIBIT P

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------

QUICKIE, LLC,

        Plaintiff,

    vs.                 07-CV-10331

GREENBERG TRAURIG, LLC,    (RMB)(DFE)

et al.,

        Defendants.

------------------------------


DEPOSITION OF AUBREY GALLOWAY

Thursday, June 12, 2008

9:30 a.m.




Reported by:

Joan Urzia, RPR

JOB NO. 203729

2 (Pages 2 to 5)

|  | Page 2 |
|---|---|
| 1 |  |
| 2 | June 12, 2008 |
| 3 | 9:30 a.m. |
| 4 | New York, New York |
| 5 | . |
| 6 |  |
| 7 | DEPOSITION of AUBREY GALLOWAY, |
| 8 | held at the offices of Pollack & Kaminsky, |
| 9 | 114 West 47th Street, New York, New York, |
| 10 | pursuant to Notice, before Joan Urzia, a |
| 11 | Notary Public of the State of New York. |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 4 |
|---|---|
| 1 |  |
| 2 | IT IS HEREBY STIPULATED AND |
| 3 | AGREED, by and between the attorneys |
| 4 | for the respective parties herein, that |
| 5 | filing and sealing be and the same are |
| 6 | hereby waived. |
| 7 | IT IS FURTHER STIPULATED AND |
| 8 | AGREED that all objections, except as |
| 9 | to the form of the question, shall be |
| 10 | reserved to the time of the trial. |
| 11 | IT IS FURTHER STIPULATED AND |
| 12 | AGREED that the within deposition may |
| 13 | be sworn to and signed before any |
| 14 | officer authorized to administer an |
| 15 | oath, with the same force and effect as |
| 16 | if signed and sworn to before the |
| 17 | Court. |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 3 |
|---|---|
| 1 |  |
| 2 | A P P E A R A N C E S : |
| 3 |  |
| 4 |  |
| 5 | DIAMOND McCARTHY, LLP |
| 6 | Attorneys for Plaintiff |
| 7 | 620 Eighth Avenue |
| 8 | 39th Floor |
| 9 | New York, New York 10018 |
| 10 | BY: STEPHEN T. LODEN, ESQ. |
| 11 | ALLAN DIAMOND, ESQ. |
| 12 |  |
| 13 |  |
| 14 | POLLACK & KAMINSKY |
| 15 | Attorneys for Defendant |
| 16 | 114 West 47th Street |
| 17 | New York, New York 10036 |
| 18 | BY: MARTIN I. KAMINSKY, ESQ. |
| 19 | JUSTIN Y.K. CHU, ESQ. |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 5 |
|---|---|
| 1 | A. Galloway |
| 2 | A U B R E Y   G A L L O W A Y, |
| 3 | called as a witness, having been duly |
| 4 | sworn by a Notary Public, was examined |
| 5 | and testified as follows: |
| 6 | EXAMINATION BY |
| 7 | MR. KAMINSKY: |
| 8 | **Q. Can you state your full name for** |
| 9 | **the record, please.** |
| 10 | A. My name is Aubrey Galloway. |
| 11 | **Q. Would you state your residence** |
| 12 | **address for the record.** |
| 13 | A. 17 Sunset Avenue, Bronxville, New |
| 14 | York 10708. |
| 15 | **Q. Do you have a business address?** |
| 16 | A. Yes, my business address is 530 |
| 17 | First Avenue, suite 9V, New York, New York. |
| 18 | **Q. Are you employed by anyone?** |
| 19 | A. I'm currently employed by NYU |
| 20 | School of Medicine. |
| 21 | **Q. What is your position there?** |
| 22 | A. I'm a professor and chairman of |
| 23 | cardiothoracic surgery at NYU School of |
| 24 | Medicine. |
| 25 | **Q. Do you have any other business** |

3 (Pages 6 to 9)

Page 6

1           A. Galloway
2  affiliations?
3      A.   I have -- yes, I have private
4  business affiliations.
5      **Q.   What are they?**
6      A.   I have, I'm a member of several
7  limited liability corporations. Those
8  would include an entity called S&A Rings,
9  LLC, Quickie, LLC, E-surge, LLC and A.
10 Galloway Realty, LLC.
11     **Q.   Is there any common ownership in**
12 **any of these entities, in other words,**
13 **among various different persons?**
14     A.   There is some common ownership
15 between some of the members of S&A Rings,
16 Quickie and E-surge.
17     **Q.   Can you explain in a little more**
18 **detail what the common ownership is?**
19     A.   In terms of the people?
20     **Q.   Yes. Are they the same people,**
21 **same entities that are vested in them, et**
22 **cetera?**
23     A.   Some of the people are the same
24 and some of the people are different. Each
25 entity was formed for very specific

Page 7

1           A. Galloway
2  business development purpose, and the
3  entity of S&A Rings, for example, was
4  formed between myself and Dr. Stephen
5  Colvin and Dr. Eugene Grassi and Alan Katz
6  to develop a very specific valve repair
7  products or ring angioplasties.
8          Dr. Colvin and Dr. Grassi and
9  Alan Katz are colleagues of mine.
10 Dr. Colvin and Dr. Grassi are surgeons.
11 Dr. Alan Katz is an engineer.
12         In terms of Quickie, those
13 parties are also members of Quickie, LLC
14 which was established to handle our
15 intellectual property and development of
16 certain groups of devices related to less
17 invasive attachment devices, facilitating
18 devices for less invasive surgery and
19 related matters to that specific entity.
20         Similarly, E-surge, LLC has those
21 three common members in addition to other
22 people which is a different set of ideas
23 related to not those other two groups that
24 I just discussed, but a different set of
25 ideas related to, if you will, profusion

Page 8

1           A. Galloway
2  technology for less invasive surgery.
3          The other real estate entity has
4  none of the common --
5      **Q.   That's a personal entity of your**
6  **own?**
7      A.   Yes.
8      **Q.   Do you also have a professional**
9  **corporation of your own?**
10     A.   Yes, I have a professional
11 corporation, Aubrey Galloway, MD, PC, which
12 handles my consulting, I do certain
13 consulting services for medical device
14 companies and that handles that consulting,
15 those consulting services or consulting
16 agreements are some of which are done
17 through that entity.
18     **Q.   Was Dr. Colvin involved with that**
19 **entity?**
20     A.   No.
21     **Q.   Dr. Grassi?**
22     A.   No.
23     **Q.   Mr. Katz?**
24     A.   No.
25     **Q.   What is your Social Security**

Page 9

1           A. Galloway
2  number?
3      A.   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.
4      **Q.   Now can you tell us --**
5          MR. DIAMOND: I'm sorry to
6      interrupt, I'm not sure why you needed
7      that, but for the record, that needs
8      to be highly confidential and
9      obviously under protective order. I
10     don't want someone's Social Security
11     number floating around in some
12     deposition transcript.
13 BY MR. KAMINSKY:
14     **Q.   Did any of the three entities**
15 **that were involved in making medical**
16 **devices or designing medical devices obtain**
17 **patents? The three entities I mean are S&A**
18 **Rings, E-surge and Quickie.**
19     A.   Yes, they did.
20     **Q.   Which ones?**
21     A.   Well, Quickie obtained two
22 patents. I don't know the complete patent
23 numbers. I refer to one as the '160
24 Patent. I think the other is the '243
25 Patent, which was a concentric ring,

4 (Pages 10 to 13)

Page 10

1           A. Galloway
2  concentric ring auto suture terminator
3  patent. And certain others were pursued
4  within Quickie but ultimately not obtained.
5           The ring angioplasty field, that
6  field was handled by S&A Rings, which is
7  completely a separate thing. And there was
8  one patent obtained by S&A Rings. I don't
9  recall, there's two other devices spun off
10 from that via business relationship,
11 but I think that those patents were
12 subsequently actually owned by the company
13 that we were under license and development.
14          E-surge, I don't believe, has any
15 independent patents.
16    **Q.   What is the patent that S&A Rings**
17 **obtained?**
18    A.   I don't know the patent number.
19 It was for an angioplasty valve repair
20 device.
21    **Q.   When is the first time that any**
22 **of the entities that you were associated**
23 **with obtained a patent?**
24    A.   I don't have the exact timetable
25 I guess in my mind in terms of specific

Page 11

1           A. Galloway
2  years, but to my recollection, the thing
3  that we did first was the development of
4  our idea for an angioplasty device via S&A
5  Rings, and that patent, I believe, was
6  issued, applied for first and issued first
7  to my recollection, I don't remember the
8  time.
9           I think after that, within a year
10 or so, we applied for and obtained what we
11 refer to as the '160 Patent and that was, I
12 don't know the legal terminology, it was
13 not assigned to Quickie but it was patented
14 to Quickie, assigned by the inventors to
15 Quickie and patented to Quickie, around
16 2000, sometime around then.
17          Around 2004, the concentric ring
18 '243 Patent was also granted and also under
19 Quickie, assigned to Quickie by the
20 inventors and the patented was granted to
21 Quickie. I think that's roughly the
22 timetable.
23    **Q.   The '160 Patent is for a passive**
24 **not suture terminator system?**
25    A.   Roughly, yeah.

Page 12

1           A. Galloway
2    **Q.   Now the first patent you got was**
3  **through S&A Rings, is that what you're**
4  **saying for the --**
5    A.   Correct.
6    **Q.   -- for the angioplasty?**
7    A.   Right, right.
8    **Q.   Who was your counsel in obtaining**
9  **that patent?**
10   A.   Again, to my recollection it was,
11 Todd Sharinn was the individual, and I
12 think it was at that time through Pepe &
13 Hazard, which was I believe his firm.
14   **Q.   That patent is still in existence**
15 **today?**
16   A.   Correct.
17   **Q.   So you've paid maintenance fees**
18 **on that patent?**
19   A.   Correct.
20   **Q.   The '160 Patent expired, is that**
21 **right, or was deemed abandoned, is that**
22 **right?**
23   A.   Correct.
24   **Q.   The '243 Patent still exists**
25 **today?**

Page 13

1           A. Galloway
2    A.   Yes.
3    **Q.   And you've paid maintenance fees**
4  **on that?**
5         MR. DIAMOND: Objection. Who is
6         "you"?
7         MR. KAMINSKY: It's a fair
8         question.
9  BY MR. KAMINSKY:
10   **Q.   I mean the patent holders.**
11   A.   As far as I know, yes.
12   **Q.   Which entity wrote the check for**
13 **patent fees for the S&A Rings' maintenance**
14 **fees?**
15   A.   I don't know the answer to that.
16   **Q.   Who handled paying the**
17 **maintenance fees, in other words who**
18 **actually did the physical paying of the**
19 **fees?**
20   A.   Again, I don't know the answer to
21 that exactly. My understanding of that is
22 that we have a general counsel within S&A
23 Rings, Alan Fell who, we also then have our
24 specialized counsel which for S&A Rings, I
25 believe, was initially Pepe & Hazard and

5  (Pages 14 to 17)

Page 14

```
 1         A. Galloway
 2  then Greenberg.
 3         I don't recall when the
 4  maintenance fee came up. I believe that
 5  that patent was assigned very quickly over
 6  to Medtronic and my understanding and my
 7  suspicion, but I can't specifically say --
 8         MR. DIAMOND: Don't guess. Tell
 9     him what you know.
10     A.  It was assigned to Medtronic.
11  It's my understanding that it may have been
12  Medtronic then that then assumed all
13  responsibilities for the patent once we
14  assigned the patent, but I don't know
15  specifically if that's true because I
16  haven't reviewed those records.
17     Q.  When you refer to that patent,
18  which patent are you referring to?
19     A.  The S&A Rings patent.
20     Q.  Now, Alan Fell acted as the
21  general counsel for the entities that we'll
22  call the Colvin Galloway entities, if
23  that's okay with you -- is that, for
24  purposes of this deposition can we refer to
25  the three entities S&A Rings, Quickie and
```

Page 15

```
 1         A. Galloway
 2  E-surge as the Colvin Galloway entities?
 3     A.  If you want to refer to those
 4  three entities as Colvin Galloway entities,
 5  then each of those three entities, yes,
 6  Alan Fell acted as general counsel for
 7  those three.
 8     Q.  Okay.
 9         And I understand that they had
10  some separate other additional owners
11  besides Dr. Grassi, Dr. Colvin, Alan Katz
12  and you?
13     A.  Correct.
14     Q.  But for convenience today, we'll
15  call them the Colvin Galloway entities.
16     A.  Okay.
17     Q.  Alan Fell was a partner in a law
18  firm, is that right?
19     A.  Yes, he is.
20     Q.  And he still remains a partner?
21     A.  Yes.
22     Q.  And is that law firm the Rick
23  Steiner Law Firm?
24     A.  Yes, it is.
25     Q.  How long has he been general
```

Page 16

```
 1         A. Galloway
 2  counsel for the Colvin Galloway entities?
 3     A.  I believe he's been general
 4  counsel since the beginning of each of the
 5  entities.
 6     Q.  And is that sometime in the mid
 7  1990s?
 8     A.  Yeah, sometime in the mid to late
 9  1990s.
10     Q.  And so do I understand your
11  testimony correctly that you looked to
12  Mr. Fell to in effect oversee the
13  individual patent counsel and assure that
14  whatever had to be done as to the patents
15  was done?
16     A.  No, not exactly. I think we
17  looked to Mr. Fell as general counsel to
18  primarily do negotiations with various
19  businesses and to handle contracts related
20  to those businesses which we've negotiated
21  from our intellectual property for these
22  different devices or for intellectual
23  property for these devices.
24         So he's primarily served as a
25  contract attorney for us. He also would
```

Page 17

```
 1         A. Galloway
 2  handle the taxes for the various entities.
 3         In terms of handling the
 4  intellectual property, we felt that was
 5  outside of the scope of his expertise and
 6  we contracted into outside firms to handle
 7  intellectual property matters.
 8     Q.  Who picked the outside counsel
 9  that you would hire to do intellectual
10  property matters?
11     A.  That was generally a consensus
12  between myself, Dr. Colvin and Alan Fell,
13  but primarily consensus between myself and
14  Dr. Colvin who, Dr. Colvin being one of the
15  major partners in each of the entities and
16  me being one of the major partners and the
17  managing partners of the different
18  entities.
19     Q.  Who determined to hire Todd
20  Sharinn and his firm Pepe & Hazard?
21         MR. DIAMOND: In connection with
22     which --
23  BY MR. KAMINSKY:
24     Q.  At any time.
25     A.  Again, my recollection it was a
```

6 (Pages 18 to 21)

Page 18

```
1          A. Galloway
2  decision between Dr. Colvin and myself.
3     Q.   Who recommended Mr. Sharinn or
4  Pepe & Hazard?
5     A.   I don't recall that.
6     Q.   Isn't it correct that Mr. Fell
7  was the one who recommended that firm?
8     A.   I don't know.
9     Q.   Who oversaw the work of Pepe &
10 Hazard and Mr. Sharinn when he was there?
11         MR. DIAMOND: Objection to form.
12    A.   I don't understand what you mean,
13 oversaw the work.
14    Q.   Did anybody check the work of
15 that firm to determine that it was
16 satisfactory?
17    A.   I don't know if that's true. I
18 think we hired the firm and they did work
19 and we worked with the firm, but we didn't
20 really check their work I don't think.
21    Q.   Are you aware that Mr. Fell had
22 regular contact with Mr. Sharinn while he
23 was doing work for the Colvin Galloway
24 entities?
25    A.   I'm sure they would have regular
```

Page 19

```
1          A. Galloway
2  contact.
3     Q.   Now, if Mr. Fell was not involved
4  in IP matters, why were they having regular
5  contact, as you understand it?
6     A.   Well, my understanding would be
7  that we're trying to sell that IP and Alan
8  Fell was helping us negotiating those
9  potential development, licensing and
10 developing agreements. So obviously a
11 status of the IP would be essential to
12 those business transactions.
13    Q.   Did you ever discuss the patents
14 with Mr. Fell?
15    A.   In what capacity?
16    Q.   In any way. Did you ever have a
17 conversation with Mr. Fell about the
18 patents that the Colvin Galloway entities
19 had?
20    A.   I would assume that we did at
21 some point, but I don't recall.
22         I recall that as we were
23 developing the patents and what we were
24 going to put into the patents and we were
25 prosecuting the patents or applying for the
```

Page 20

```
1          A. Galloway
2  patents, that those discussions were
3  primarily with Todd Sharinn related to what
4  we were going to put into the patents and
5  how the patents should be presented to the
6  Patent Office.
7          I'm sure at some point we, I
8  would have discussed it with Alan Fell
9  because without having a patent we had no
10 product, so -- but in terms of how the
11 patents were formed or put together that
12 wasn't Mr. Fell's role.
13    Q.   You said that the status of the
14 patents would be essential to what Mr. Fell
15 was going to do. Those are your words.
16         Did you discuss with Mr. Fell the
17 status of the patents?
18         MR. DIAMOND: Objection.
19 BY MR. KAMINSKY:
20    Q.   At any time, ever.
21         MR. DIAMOND: I'm going to
22    instruct you not to answer as to any
23    communications you would have had with
24    Mr. Fell in his role as counsel
25    because they're privileged.
```

Page 21

```
1          A. Galloway
2  BY MR. KAMINSKY:
3     Q.   I'm not asking you for legal
4  advice. I'm asking you whether you
5  discussed the fact, simply the fact of the
6  status of the patents with Mr. Fell. All I
7  ask for is a yes or no question.
8     A.   Well, if I can't remember what I
9  specifically discussed, I guess I can't
10 answer specifically yes or no.
11         I would assume we had discussions
12 about the patent at some point because as I
13 stated it would be essential for our
14 business entities that we have the patent.
15         So where we stand in the process,
16 I would assume that he communicated with
17 Todd Sharinn and his law firm as to where
18 we stood in that process.
19         Beyond that, I don't recall that
20 we would have any other particular specific
21 discussions. We could have, we could not
22 have, I don't recall.
23    Q.   When is the first time that you
24 personally became aware that maintenance
25 fees would become due sometime in the
```

7  (Pages 22 to 25)

| Page 22 |
|---|
| 1          A. Galloway |
| 2  future with respect to a patent -- strike |
| 3  that. |
| 4          When is the first time that you |
| 5  personally became aware that a patent |
| 6  holder had to pay maintenance fees to |
| 7  maintain a patent? |
| 8      A.    I can't remember whether it would |
| 9  be from the S&A Rings patent or whether it |
| 10  would be from the '160 Patent.  When those |
| 11  earlier patents came out, I do recall that |
| 12  Mr. Sharinn communicated with us that we |
| 13  have the patent and that he would keep us |
| 14  abreast of the maintenance fees of the |
| 15  patent and give us a schedule. |
| 16          My recollection is that we sold |
| 17  S&A Rings' patent shortly thereafter |
| 18  Medtronic and that they assumed that |
| 19  responsibility. |
| 20          My understanding is that |
| 21  Mr. Sharinn and his law firm that we |
| 22  continued to pay for this would continue to |
| 23  do that. |
| 24          MR. KAMINSKY:  I move to strike |
| 25      the answer now. |

| Page 23 |
|---|
| 1          A. Galloway |
| 2  BY MR. KAMINSKY: |
| 3      Q.    Please try to answer my question. |
| 4          When is the first time that you |
| 5  personally learned that maintenance fees |
| 6  would have to be paid by a patent holder? |
| 7  I'm simply asking you when you learned that |
| 8  fact. |
| 9      A.    Sometime around the time of the |
| 10  issuance of the S&A Rings patent and the |
| 11  '160 Patent. |
| 12      Q.    So that would have been in the |
| 13  late 1990s or about 2000, is that correct? |
| 14      A.    Correct. |
| 15      Q.    And Mr. Sharinn told you that |
| 16  fact, didn't he? |
| 17      A.    To my recollection, correct. |
| 18      Q.    Now, did you or anyone else at |
| 19  the Colvin Galloway companies do anything |
| 20  within the companies to make a note of the |
| 21  fact that maintenance fees were going to |
| 22  become due on the patent or patents? |
| 23      A.    Yes, we employed Mr. Sharinn's |
| 24  law firm to do that. |
| 25      Q.    Did you do anything internally |

| Page 24 |
|---|
| 1          A. Galloway |
| 2  within your company to take note of the |
| 3  fact that maintenance fees were going to |
| 4  become due? |
| 5      A.    Not that I recall. |
| 6      Q.    Did anyone within your company |
| 7  oversee Mr. Sharinn or any other lawyer to |
| 8  determine whether the law firms had done |
| 9  anything to assure that the maintenance |
| 10  fees would be paid? |
| 11      A.    I don't personally know. |
| 12      Q.    Do you know if Mr. Fell did that? |
| 13      A.    I don't know. |
| 14      Q.    Were you looking to Mr. Fell to |
| 15  do that as your general counsel? |
| 16      A.    I think we were looking to the |
| 17  firms that we hired to be our patent |
| 18  lawyers to do that.  That's what I think we |
| 19  were doing. |
| 20      Q.    Were you looking to Mr. Fell to |
| 21  oversee whether the maintenance fees were |
| 22  being paid on your patents? |
| 23          MR. DIAMOND:  Objection to form. |
| 24      Asked and answered. |
| 25      A.    Again, I don't know that we were |

| Page 25 |
|---|
| 1          A. Galloway |
| 2  specifically looking to Mr. Fell to do that |
| 3  specific thing.  I think that we contracted |
| 4  a law firm to handle our patent prosecution |
| 5  and maintenance and that was Mr. Sharinn's |
| 6  law firm, and he told us that he would give |
| 7  us a schedule on that, and I don't recall |
| 8  that we felt obligated to then follow up |
| 9  and do his work. |
| 10          MR. KAMINSKY:  I'm going to save |
| 11      motions to strike.  I don't think it |
| 12      makes sense for all of us.  We all can |
| 13      reserve that in the depositions and I |
| 14      think we all agree to that in each |
| 15      deposition. |
| 16          MR. DIAMOND:  That's fine. |
| 17  BY MR. KAMINSKY: |
| 18      Q.    Now I'm trying to get a simple |
| 19  yes or no answer from you.  If you can't |
| 20  answer it yes or no, that's fine, you can |
| 21  tell me that. |
| 22          But the question is:  Were you |
| 23  looking to Mr. Fell to oversee whether your |
| 24  individual patent counsel or anyone else |
| 25  was paying the maintenance fees on your |

8  (Pages 26 to 29)

| Page 26 |
| --- |

```
 1           A. Galloway
 2  patents?
 3      A.   I don't think I can simply answer
 4  that yes or no.
 5      Q.   Can you say anything more than
 6  you can't answer it yes or no to tell us
 7  whether you were or were not looking to
 8  Mr. Fell for that role?
 9      A.   Well, I mean, I thought you
10  wanted a yes or no answer.
11      Q.   Well, can you say yes, I was to
12  this extent or not to that extent, is there
13  anything more you can say?  If there isn't,
14  okay, I'm going to let it go at that.
15      A.   No, there's nothing else.
16      Q.   Okay.
17           Now, Mr. Sharinn told you when
18  each patent was issued that maintenance
19  fees would be due three and a half years,
20  seven and a half years and 11 and a half
21  years from the date the patent issues, is
22  that correct?
23      A.   I believe that's probably
24  correct, yes.
25      Q.   Did anyone within the Colvin
```

| Page 27 |
| --- |

```
 1           A. Galloway
 2  Galloway companies diary any of those dates
 3  or make any entries in your records to keep
 4  track of those dates?
 5      A.   I don't know the answer to that.
 6      Q.   You were the managing member of
 7  the entities, is that correct?
 8      A.   That's correct.
 9      Q.   Did you do so?
10      A.   No.
11      Q.   Did you direct anyone to do so?
12      A.   No.
13      Q.   Now, are you aware that the bills
14  for the various Colvin Galloway entities
15  were sent to Mr. Steiner's law firm?
16      A.   Yes.
17      Q.   Who decided -- I'm sorry, did I
18  say Mr. Steiner's law firm?  I meant
19  Mr. Fell's law firm.  Did you understand
20  that?
21      A.   The Rick Steiner law firm that
22  employed Mr. Fell, correct.
23      Q.   Who directed that the legal bills
24  from the various IP counsel should go to
25  the entity's care of the Rick Steiner law
```

| Page 28 |
| --- |

```
 1           A. Galloway
 2  firm?
 3      A.   I think we did as an entity.
 4      Q.   Did you personally do that?
 5      A.   No.
 6      Q.   Did Mr. Fell decide that and then
 7  advise you that's how it would be done?
 8      A.   I think as an entity, whether it
 9  was myself and Dr. Colvin, probably myself
10  and Dr. Colvin and Mr. Fell, we decided
11  that the bookkeeping checking, and checking
12  would be done and handled by Mr. Fell and
13  that the correspondence would go through
14  Mr. Fell.
15      Q.   So those things would go to
16  Mr. Fell and you would look to him to
17  appropriately assign the charges to the
18  correct entities, is that right?
19      A.   That's correct.
20      Q.   And were you aware that the IP
21  counsel were also sending copies of their
22  correspondence about the Colvin Galloway
23  companies to Mr. Fell?
24      A.   Yes.
25      Q.   And is that something that you
```

| Page 29 |
| --- |

```
 1           A. Galloway
 2  wanted to see occur?
 3      A.   Yes.
 4      Q.   Because, as you said, you were
 5  looking to Mr. Fell as the general counsel
 6  for your entities, is that right?
 7      A.   That's correct.
 8      Q.   Did you ever personally review
 9  the billings of any of the law firms that
10  are involved or were involved in this
11  lawsuit, and those include Pepe & Hazard,
12  Greenberg Traurig, Thelen Reid & Priest --
13  I'm going to put Rick Steiner to the side
14  for the moment -- did you ever review the
15  legal bills that were submitted by those
16  three firms?
17      A.   I reviewed the general numbers in
18  terms of the amount of money involved with
19  the legal bills, but I didn't review the
20  actual invoices or bills specifically.
21      Q.   And is that something you were
22  looking to Mr. Fell to do, in other words,
23  to review the invoices in detail?
24      A.   Yes.
25      Q.   And is it your understanding that
```

9 (Pages 30 to 33)

Page 30

1       A. Galloway
2  he did that?
3     A.   Yes.
4     Q.   And then what would happen, he
5  would tell you that he had approved a bill
6  and a certain amount of money was then owed
7  to this firm or that firm or whichever
8  firm?
9     A.   Yes. If we had bills, he would
10 then, he would then indicate to me or
11 discuss with me that we had bills and that
12 he would, that we owe these bills and then
13 ask or have authorization to pay the bills
14 and then he would pay the bills.
15    Q.   Would he pay the bills from his
16 law firm and then charge that back to the
17 entities?
18    A.   No. He would pay the bills from
19 the Quickie account because he had also
20 signatory rights on that account.
21    Q.   So there was a Quickie bank
22 account, correct?
23    A.   Correct.
24    Q.   And he had signature authority
25 and could then pay the bills out of that

Page 31

1       A. Galloway
2  account?
3     A.   Correct.
4     Q.   And then after that he would
5  apportion or charge-back to the particular
6  entities within the accounting records what
7  their obligations were for what he was
8  paying, is that correct?
9     A.   Correct.
10    Q.   Did you have outside accountants
11 that reviewed the books and records of the
12 various Colvin Galloway companies?
13    A.   I believe we do have an
14 accounting firm that did the accounting
15 work for the entity.
16    Q.   Is that an accounting firm that
17 Mr. Fell hired and dealt with, or did you
18 deal with that account?
19    A.   I think it was an accounting firm
20 that he hired and dealt with that then did
21 the accounting for the entity.
22    Q.   Do you know the name of the
23 accounting firm?
24    A.   No, not specifically.
25    Q.   Is that another area in which you

Page 32

1       A. Galloway
2  looked to Mr. Fell to deal with for the
3  Galloway, the Colvin Galloway companies and
4  then just to advise you with respect to
5  what he had discussed with the accounting
6  firm?
7     A.   Yes.
8     Q.   Did you get periodic financial
9  statements for the Colvin Galloway firms?
10    A.   Yes.
11    Q.   Were they more than annual K-1
12 forms and tax returns, annual tax returns?
13    A.   As a general, I guess as a
14 general policy we would talk about finances
15 at some point throughout the year depending
16 upon if cash was needed or not needed, but
17 generally were not specific in terms of the
18 fine details of that throughout the year
19 except that the year-end tax returns.
20    Q.   So as far as you know, you didn't
21 get quarterly financial statements or
22 monthly financial statements, is that
23 right?
24    A.   No. Mr. Fell handled that.
25    Q.   And you don't know if you got

Page 33

1       A. Galloway
2  quarterly or monthly or other periodic
3  financial statements other than on an
4  annual basis?
5     A.   I personally didn't.
6     Q.   And you don't know today whether
7  the entities did, do you?
8     A.   No.
9     Q.   When Mr. Fell billed you, that is
10 the Colvin Galloway entities, did he submit
11 separate bills for each of the entities, or
12 did he submit one bill and then internally
13 allocate the charges to the appropriate
14 entities?
15    A.   No, there were three very
16 distinct entities with three completely
17 different enterprises and objectives and he
18 would -- the books for the entities were
19 completely separate, the billing time for
20 Mr. Fell was also completely separate and
21 always allocated specifically for those
22 entities.
23    Q.   And would he submit actual
24 physical bills for the separate entities?
25    A.   Yes.

10 (Pages 34 to 37)

Page 34

1        A. Galloway
2    Q.   Now, how were his bills paid,
3  were those also paid after you approved the
4  bills out of that Quickie account?
5    A.   Yes, they were.
6    Q.   And then he was again responsible
7  to allocate as between the payments which
8  ones applied to which particular Colvin
9  Galloway entity, is that correct?
10    A.   No, that's not exactly correct,
11  at least to what I understand you're
12  saying.  The bills were paid for the S&A
13  Rings account out of the S&A Rings account.
14        The bills for the Quickie account
15  were paid out of the Quickie account, and
16  the bills for the E-surge account were paid
17  out of the E-surge account.  And the same
18  arrangement was true for each, but the
19  money was completely separate and the bills
20  were completely separate and the accounting
21  was completely separate.
22        So -- and then if there was not
23  cash within the entity to cover those
24  bills, then that would be proportioned out
25  to the members of that particular entity to

Page 35

1        A. Galloway
2  come up with the cash to pay for those
3  bills.
4        So if S&A Rings had bills, it
5  would be the members of S&A Rings and a
6  certain percentage of it put the money into
7  the S&A Rings account to pay for the S&A
8  Rings bills.
9        If it was a Quickie account, what
10  Quickie was doing, then Quickie would get
11  bills for what Quickie was doing and we
12  would pay for those Quickie bills through
13  Quickie, and then if we needed cash to
14  support that, that would go back to the
15  members of the corporation to come up with
16  that capital to pay for those bills.
17        And likewise, that same process
18  was separate and is what would happen with
19  E-surge.
20    Q.   And you looked to Mr. Fell to
21  manage that process for you?
22    A.   He managed each of the three
23  processes.
24    Q.   Were there ever, I'll call them
25  capital calls, upon the members of the

Page 36

1        A. Galloway
2  entities to contribute additional money to
3  pay bills?
4    A.   Yes.
5    Q.   Were there any for Quickie?
6    A.   Yes.
7    Q.   Were there any for S&A Rings?
8    A.   For S&A Rings, there were --
9  after initial start up capital cost, I
10  think there were no others beyond that
11  because S&A Rings quickly entered into a
12  development agreement and had cash within
13  the entity to pay for the bills through the
14  cash flow of that development entity.  So I
15  don't think there was additional capital
16  calls for that.
17        For E-surge, there was initial
18  capital expenses, but again not to my
19  recollection much, if any, very minimal, if
20  any, additional capital expenses for
21  E-surge because that entity ended into a
22  development agreement and there was cash
23  flow from that development agreement to pay
24  for that.
25        Quickie, on the other hand, had

Page 37

1        A. Galloway
2  at times significant expenditures beyond
3  the inflow of cash, particularly once we
4  were not within a development agreement,
5  and so therefore there were calls for
6  capital cash flow into that.
7    Q.   Now, Quickie, as you said, had
8  two patents, correct?  Did Quickie enter
9  into a license agreement with anyone other
10  than Medtronic with respect to the '160
11  Patent?
12    A.   No, we entered into -- the only
13  license agreement that we actually entered
14  into with the '160 Patent was Medtronic.
15    Q.   How long did that license
16  agreement last?
17        MR. DIAMOND:  Objection to form.
18        MR. KAMINSKY:  Okay.  Let me
19  restate the question.
20  BY MR. KAMINSKY:
21    Q.   What was the duration of that
22  license agreement?
23    A.   I don't recall the exact amount
24  of time.  It was to my recollection several
25  years, maybe two years, maybe around that

11 (Pages 38 to 41)

Page 38

1           A. Galloway
2  time.
3     Q.   And Medtronic terminated the
4  license agreement, is that correct?
5     A.   Correct.
6     Q.   Why did Medtronic terminate the
7  license agreement?
8           MR. DIAMOND:  Objection to form.
9  Lack of foundation.  If you know.
10    A.   First of all, I don't know
11 exactly their business reasons for
12 terminating the agreement.  We were working
13 on a specific product with Medtronic and we
14 got up to a certain point and they at that
15 point decided they did not want to go
16 forward with that development agreement,
17 but the specific reasons I don't know.
18    Q.   Who would know the answer to that
19 question?
20    A.   I suppose the people in Medtronic
21 that made that decision.
22    Q.   Did Mr. Fell ever tell you that
23 Medtronic told him that they didn't think
24 that the technology was capable of being
25 commercialized?

Page 39

1           A. Galloway
2     A.   I don't recall that.
3     Q.   There was a lawsuit between
4  Quickie and Medtronic in the Federal Court
5  in New York starting in 2002 and for some
6  years thereafter, is that correct?
7     A.   That's correct.
8     Q.   You were deposed in that lawsuit,
9  is that correct?
10    A.   That's correct.
11    Q.   Are you aware that Mr. Fell was
12 also deposed in that lawsuit?
13    A.   I believe that's correct.
14    Q.   Did you ever read Mr. Fell's
15 deposition in that lawsuit?
16    A.   Not that I recall.
17    Q.   I'm going to read you some
18 testimony from Mr. Fell's deposition and
19 tell me if this is the first time you've
20 ever heard that, this testimony.
21        This is on page 87 of his
22 transcript:
23        QUESTION:  So Medtronic never
24    told you why they terminated the
25    agreement?

Page 40

1           A. Galloway
2     ANSWER:  Not specifically.
3     QUESTION:  Did they generally?
4     ANSWER:  Generally, they said
5  they didn't think the technology was
6  capable of being commercialized."
7     Q.   Did you ever hear that testimony
8  before?
9     A.   Not that I recall.
10    Q.   Were you aware that Mr. Fell had
11 given testimony substantially of that
12 nature?
13          MR. DIAMOND:  Objection to form.
14    A.   Well, I was aware that he gave
15 testimony, but as I said, I hadn't really
16 read his testimony.
17    Q.   Now, the Colvin Galloway entities
18 did not attempt to license the '160 Patent
19 to anyone else after Medtronic terminated
20 its license with Quickie, is that correct?
21    A.   No, that's -- well, let me think
22 about that one minute -- no, that's not
23 correct.
24    Q.   Do you remember that you were
25 deposed in the Quickie Medtronic case on

Page 41

1           A. Galloway
2  July 30, 2003?
3     A.   Yes, I do.
4     Q.   In that deposition you were asked
5  this question and gave this answer on page
6  128:
7        QUESTION:  After the
8     termination, did you attempt to pursue
9     this technology we've been talking
10    about with a company other than
11    Medtronic?
12    ANSWER:  No.
13        Do you recall giving that
14 testimony?
15    A.   Yes, I do.
16    Q.   Okay.
17        Is that testimony correct?
18    A.   At that time it was correct.
19    Q.   Have you since this deposition
20 sought to license the '160 Patent?
21    A.   Yes.
22    Q.   When did you attempt to do so?
23    A.   It was -- I don't know the exact
24 date -- it was approximately the same time
25 that we found that the patent had not been

12 (Pages 42 to 45)

Page 42

1    A. Galloway
2  maintained, whenever we were aware of that,
3  whatever that time frame was that we
4  initially became aware of that.
5      I don't remember the specific
6  dates. We were actually in the process of
7  talking to medical device companies to
8  develop an auto attachment type of valve
9  product of which we thought we would have
10 two patents, which would be the '160 Patent
11 and the other '243 Patent, and then we
12 became aware that we didn't any longer have
13 the '160 Patent.
14   **Q. What year was that?**
15   A.  I don't recall off the top of my
16 head.
17   **Q.  When did you become aware that**
18 **you did not have the '160 Patent any**
19 **longer?**
20   A.  Again, I can't tell you the dates
21 off the top of my head.
22   **Q.  I'm going to read to you from**
23 **Quickie's response to interrogatories**
24 **served by Greenberg Traurig in this action,**
25 **this is a verified response of July 13,**

Page 43

1    A. Galloway
2  2007, and question 11 asks:
3      "State how Quickie learned that
4  the Quickie patent had expired and identify
5  who advised Quickie of that fact?"
6      Response: "On July 23, 2006,
7  Quickie learned that the '160 Patent had
8  expired not from the lawyers Quickie had
9  hired to pursue and protect the patent, but
10 from Michael J. Gerard, senior director of
11 research and development at St. Jude
12 Medical, who informed Dr. Stephen Colvin,
13 MD that St. Jude was no longer interested
14 in licensing the '160 Patent because it was
15 expired."
16   MR. DIAMOND:  And is that the
17 complete question and answer?
18   MR. KAMINSKY:  Yes.
19   A.  Can I see that document?
20   **Q.  You certainly can. It's**
21 **underlined. Some of the answer I would**
22 **think is not responsive, but we're going to**
23 **save all of that for a later time.**
24      **My question is: Does that**
25 **refresh your recollection that it was in**

Page 44

1    A. Galloway
2  2006 that you learned that?
3    A.  It appeared that according to
4  this document that it was around 2006.
5   **Q.  Do you have any other information**
6  **as to when you learned or -- strike that.**
7      **Do you deny that it was on July**
8  **23rd, 2006?**
9      MR. DIAMOND:  Objection to form.
10   A.  I guess I can't confirm or deny.
11 I don't remember specifically.
12   **Q.  After the patent expired, Quickie**
13 **attempted to get the patent reinstated, is**
14 **that correct?**
15   A.  That's correct.
16   **Q.  Did you participate with**
17 **Quickie's counsel in preparing the papers**
18 **that were submitted in support of the**
19 **petition to reinstate the patent?**
20   A.  No.
21   **Q.  Do you remember submitting a**
22 **statement in support of the petition to**
23 **reinstate the patent?**
24   A.  I remember there was a statement
25 submitted.

Page 45

1    A. Galloway
2   **Q.  Let me show you a document that's**
3  **been marked Exhibit 54, which is a**
4  **supplement to the petition that's signed by**
5  **Maier & Maier.**
6      **Do you know who Maier & Maier**
7  **are?**
8    A.  Yes, I do.
9    **Q.  They were your, they were**
10 **Quickie's counsel in connection with the**
11 **application and petition to reinstate the**
12 **patent, is that right?**
13   A.  Yes, they were.
14   **Q.  And, in fact, you personally**
15 **signed the Power of Attorney that gave him**
16 **authority to do that on behalf of Quickie,**
17 **didn't you?**
18   A.  Not that I recall.
19      (Exhibit 55, Petition to Accept
20 Unavoidably Delayed Payment of
21 Maintenance Fees in an Expired Patent
22 (37 CFR 1.378(b)), marked for
23 identification, as of this date.)
24 BY MR. KAMINSKY:
25   **Q.  Let me show you a document**

13 (Pages 46 to 49)

Page 46

```
 1            A. Galloway
 2  which we are marking Exhibit 55.
 3  It's entitled petition to accept
 4  unavoidably delayed payment of
 5  maintenance fees in an expired patent
 6  (37 CFR 1.378(b)).
 7         I ask you whether you've ever
 8  seen that document before.
 9     A.   Yes, I must have seen this
10  document and I signed this document.
11     Q.   And does that refresh your
12  recollection that you signed the grant of
13  limited Power of Attorney whereby you
14  appointed Maier & Maier as counsel for
15  Quickie in connection with the petition to
16  reinstate the patent?
17     A.   This document says that we
18  granted limited Power of Attorney to Maier
19  & Maier for the above-referenced petition
20  in the Patent and Trademark Office.
21     Q.   In fact, it says, to be complete,
22  that Maier & Maier, Timothy Maier and
23  Christopher Maier, both jointly and
24  separately as attorneys with full power of
25  substitution and revocation file and
```

Page 47

```
 1            A. Galloway
 2  prosecute this, the above petition, in the
 3  Patent and Trademark Office, is that
 4  correct?
 5     A.   That's what it says, correct.
 6     Q.   And that's what the Power of
 7  Attorney is for, is that right?
 8     A.   My understanding is that's true.
 9     Q.   And you signed it, correct?
10     A.   Correct.
11     Q.   Now, would you look again at
12  Exhibit 54 that I handed to you. That's a
13  document that Maier & Maier submitted on
14  behalf of Quickie, is that correct, in
15  connection with the petition to reinstate
16  the patent, correct?
17     A.   Yes, it appears that that's a
18  letter prepared by Timothy Maier.
19     Q.   On behalf of Quickie, correct?
20     A.   Correct.
21     Q.   As a supplement to the petition
22  under 37 CFR Section 1.378(b), correct?
23     A.   Correct.
24     Q.   Would you look at the first full
25  paragraph of that supplement, do you see in
```

Page 48

```
 1            A. Galloway
 2  that Mr. Maier says on behalf of Quickie:
 3         "The actions and inactions of
 4  Thelen Reid & Priest, Medtronic's
 5  re-examination requests and even the U.S.
 6  PTO led the patent owner to believe that
 7  their '160 Patent was viable.  Not until
 8  July 23, 2006 did the patent owner first
 9  learn that their valuable '160 Patent had
10  expired."
11         Do you see that?
12     A.   Yes, I do.
13     Q.   Is that a correct statement?
14     A.   I believe that's correct.
15     Q.   Now, between July 2003 when you
16  gave your deposition in the Medtronic
17  action and July 2006 when Quickie learned
18  that the patent had expired, did Quickie
19  enter into a license agreement with any
20  other entity?
21     A.   Are you asking related to the
22  '160 Patent?
23     Q.   Yes.
24     A.   Between that time interval,
25  Quickie did not enter into a licensing
```

Page 49

```
 1            A. Galloway
 2  agreement related to the '160 Patent.
 3     Q.   Has Quickie retained any outside
 4  consultant or expert at this time with
 5  respect to the '160 Patent?
 6         MR. DIAMOND:  Counsel has.
 7         MR. KAMINSKY:  Can you identify
 8     the person for us?
 9         MR. DIAMOND:  Yes.  You're going
10     to be getting an expert report in the
11     next couple of days.
12  BY MR. KAMINSKY:
13     Q.   Have you spoken to the potential
14  expert, Dr. Galloway?
15     A.   No.
16     Q.   Do you know the name of the
17  potential expert?
18     A.   No.
19         MR. KAMINSKY:  Mr. Diamond, do
20     you feel --
21         MR. DIAMOND:  I'll be happy to
22     tell you, it's Mark Berkman.
23  BY MR. KAMINSKY:
24     Q.   Do you know who Mark Berkman is?
25     A.   No.
```

14  (Pages 50 to 53)

| Page 50 | Page 52 |
|---|---|

**Page 50**

1        A. Galloway
2    **Q.    Have you ever read an expert**
3    **report in connection with this litigation?**
4    A.    Yes.
5    **Q.    Do you know whose expert report**
6    **you read?**
7    A.    I don't recall the name of the
8    expert, but the expert report that I read
9    was an expert report that was obtained for
10   us by Greenberg or at the request of
11   Greenberg in association with what we
12   termed the Markman Hearing on the initial,
13   as a part of the initial litigation of the
14   patent against Medtronic for patent
15   infringement, and there was an expert
16   retained that gave an evaluation of value
17   and damages and that report I read at some
18   point in the distant future, I don't recall
19   all the specifics of it.
20   **Q.    Do you know whose report that**
21   **was, in other words, who the author of that**
22   **report was?**
23   A.    No.
24   **Q.    Did you ever read an expert**
25   **report by Medtronic's expert?**

**Page 52**

1        A. Galloway
2    **Q.    Do you remember who introduced**
3    **you to Todd Sharinn?**
4    A.    I don't specifically recall.
5    **Q.    Now, thereafter, Mr. Sharinn left**
6    **Pepe & Hazard and joined Greenberg Traurig,**
7    **is that right?**
8    A.    That's correct.
9    **Q.    Quickie made the decision to**
10   **transfer its, the patent work of the**
11   **Quickie Galloway companies from Pepe &**
12   **Hazard to Greenberg Traurig, is that right?**
13   A.    Correct.
14   **Q.    Who made that decision?**
15   A.    That was made jointly by myself
16   and Dr. Colvin.
17   **Q.    Did Mr. Fell have any input in**
18   **that decision?**
19   A.    I don't recall.  I recall that we
20   were working with Todd Sharinn and we were
21   happy with Todd Sharinn and liked Todd
22   Sharinn, and when he moved firms we wanted
23   to follow him to that firm.
24   **Q.    Had you developed a personal**
25   **relationship with Mr. Sharinn?**

**Page 51**

1        A. Galloway
2    A.    I don't recall that I did.
3    **Q.    Initially in connection with the**
4    **'160 Patent, you said that Quickie or the**
5    **Colvin Galloway companies retained Todd**
6    **Sharinn and the Pepe & Hazard firm, is that**
7    **correct?**
8    A.    Initially Quickie retained Todd
9    Sharinn as a part of the Pepe & Hazard
10   firm, correct.
11   **Q.    Did you meet Todd Sharinn at that**
12   **time?**
13   A.    Yes.
14   **Q.    How did you come to meet him?**
15   A.    I don't remember specifically.
16   We had quite a few meetings with Todd
17   Sharinn.  Parts or at least some of the
18   meetings were related to the actual
19   technology and preparation of the patent
20   application.
21   **Q.    Who selected Todd Sharinn as**
22   **counsel?**
23       MR. DIAMOND:  Objection.  Asked
24   and answered.
25   A.    I don't recall.

**Page 53**

1        A. Galloway
2    A.    To some degree, yes.
3    **Q.    And are you aware that Dr. Colvin**
4    **had developed a personal relationship with**
5    **him?**
6    A.    Yes.
7    **Q.    How often did you speak to Todd**
8    **Sharinn during the period that he was at**
9    **Pepe & Hazard?**
10   A.    I personally did not speak with
11   him that frequently.
12   **Q.    Did anyone else on behalf of the**
13   **Colvin Galloway companies speak with**
14   **Mr. Sharinn?**
15   A.    I don't know specifically, but it
16   was my impression that Dr. Colvin spoke
17   with him quite frequently.
18   **Q.    How about Dr. Grasse?**
19   A.    I don't know specifically, but --
20   I don't know specifically.
21   **Q.    Now, when Todd Sharinn was at the**
22   **Greenberg Traurig firm, the Greenberg**
23   **Traurig firm acted as counsel for the**
24   **Colvin Galloway companies in connection**
25   **with their patent matters, is that correct?**

15 (Pages 54 to 57)

Page 54

1         A. Galloway
2    A.   When Todd Sharinn was at the
3  Greenberg Traurig firm, again to be more
4  specific, he initially, I believe, he may
5  have initially or may have not initially
6  still continued to represent some of our
7  matters with S&A Rings, but I think in
8  relatively short order there was less for
9  him to do with that because we were done
10 with that, if you will, and entered into a
11 licensing development agreement.
12        He represented Quickie for
13 several matters related to patents that we,
14 that patent and patents that we were
15 pursuing.
16   Q.   And when he was there, Quickie
17 began the lawsuit against Medtronic, is
18 that correct?
19   A.   Correct.
20   Q.   And initially Greenberg Traurig
21 would counsel for Quickie in that
22 litigation, is that right?
23   A.   In the initial litigation, in the
24 initial phase of the litigation the
25 Greenberg firm was counsel for Quickie.

Page 55

1         A. Galloway
2    Q.   And do you recall that the
3  Greenberg firm remained counsel through the
4  Markman Hearing which occurred in September
5  of 2002?
6    A.   Yes. ·
7    Q.   Promptly thereafter Greenberg
8  Traurig was replaced as counsel for Quickie
9  in that matter, is that correct?
10   A.   Correct.
11   Q.   That being the Medtronic case?
12   A.   Yeah, shortly after the Markman
13 Hearing we replaced Greenberg Traurig as a
14 representative for litigation against
15 Medtronic with Thelen.
16   Q.   Who made the decision to transfer
17 the case from Greenberg Traurig to Thelen
18 Reid & Priest?
19   A.   Dr. Colvin and I did.
20   Q.   Was there a particular lawyer at
21 Thelen Reid & Priest that you transferred
22 the case to?
23   A.   I believe that -- well, there was
24 I think two lawyers, there was Mark Evens
25 and Bob Krebs.

Page 56

1         A. Galloway
2    Q.   Did you know either of those two
3  lawyers before the fall of 2002?
4    A.   Personally I did not.
5    Q.   Did Dr. Colvin know them?
6    A.   I believe Dr. Colvin knew Mark
7  Evens.
8    Q.   During that year Mark Evens
9  became Dr. Colvin's brother-in-law, is that
10 correct?
11   A.   I believe that's correct.
12   Q.   Is that why the business was
13 transferred to Thelen Reid & Priest?
14   A.   No. I think that's how
15 Dr. Colvin became to know Mark Evens and
16 then Dr. Colvin and I discussed how we
17 wanted to proceed with our litigation and
18 we felt that Thelen Reid & Priest was the
19 team we wanted to use.
20   Q.   Well, in fact, everyone was more
21 than satisfied with the result of the
22 Markman Hearing, isn't that correct?
23        MR. DIAMOND: Objection to form.
24 BY MR. KAMINSKY:
25   Q.   Is it not correct that Quickie

Page 57

1         A. Galloway
2  was more than satisfied with the result of
3  the Markman Hearing that Greenberg Traurig
4  had handled for Quickie?
5    A.   Well, I can't speak for
6  Dr. Colvin, I can't speak for Alan Fell. I
7  of my simplistic view of the Markman
8  Hearing understood that it was a fairly
9  favorable hearing. So I was relatively
10 pleased with that.
11   Q.   Did you have any criticism of
12 Greenberg Traurig or Mr. Sharinn in the
13 handling of the Medtronic case in or as of
14 September and October 2002?
15        MR. DIAMOND: You personally.
16   A.   I personally had a very good
17 personal and professional interaction with
18 Greenberg Traurig.
19   Q.   Did you feel they had let you
20 down in any way?
21   A.   No.
22   Q.   Were you satisfied with their
23 legal services?
24   A.   Yes.
25   Q.   Did you feel that their legal

16 (Pages 58 to 61)

Page 58

1        A. Galloway
2   services were capable and adequate for your
3   needs?
4      A.   Absolutely.
5      Q.   Did Dr. Colvin ever say anything
6   to you to lead you to believe that he was
7   dissatisfied in any way with the legal
8   representation that you had been getting
9   from Mr. Sharinn or Greenberg Traurig?
10     A.   No.
11     Q.   Why then did you feel that it was
12  appropriate to make a change to Thelen Reid
13  & Priest if it was for any reason other
14  than that Mark Evens was now Dr. Colvin's
15  brother-in-law?
16     A.   Well, my recollection is that
17  Dr. Colvin for whatever reason, and I don't
18  know the reasons, felt that Thelen Reid &
19  Priest was the firm that we would want to
20  use going forward to proceed with
21  litigation and I deferred to him on that
22  decision.
23     Q.   Are you aware that Dr. Colvin
24  told Todd Sharinn that the reason that the
25  change was being made is because Mark Evens

Page 59

1        A. Galloway
2   had become his brother-in-law?
3        MR. DIAMOND: Objection. Form.
4      A.   I'm not aware of that.
5      Q.   Now, at a certain point you
6   revoked the authority for Greenberg Traurig
7   to represent Quickie before the United
8   States Patent and Trademark Office with
9   respect to the '160 Patent, is that
10  correct?
11       MR. DIAMOND: Objection to form.
12     A.   Well, I don't know if that's -- I
13  don't know the specifics of that.
14     Q.   Let us show you Exhibit 50.
15       Exhibit 50 is a notice of a
16  change of Power of Attorney that was sent
17  to Todd Sharinn of the Greenberg firm on
18  April 2003.
19       Were you aware that there had
20  been a change of the Power of Attorney with
21  respect to the '160 Patent at the U.S.
22  Patent and Trademark Office?
23     A.   Yes.
24     Q.   That's just one page. You're
25  welcome to look at anything you want.

Page 60

1        A. Galloway
2      A.   Yes, yes.
3      Q.   Okay.
4        Now would you look at --
5        MR. DIAMOND: I don't know if
6   this is a good time, but wherever you
7   get a breaking point.
8        MR. KAMINSKY: Sure, by all
9   means.
10       (Recess taken from 10:46 a.m. to
11  10:55 a.m.)
12  BY MR. KAMINSKY:
13     Q.   Do you remember that Quickie
14  signed a revocation of the powers of
15  attorney that Greenberg Traurig previously
16  had with respect to the '160 Patent?
17     A.   Yes.
18     Q.   Let me show you a document which
19  has been marked Exhibit 51. It's a letter
20  from Thelen Reid & Priest to Dr. Colvin at
21  Quickie dated April 16th which encloses and
22  attaches a revocation of power form with
23  respect to the '160 Patent.
24       Have you ever seen that document
25  before?

Page 61

1        A. Galloway
2      A.   I don't recall that I have.
3      Q.   Okay.
4        Would you look at the last
5   page -- I'm sorry, the second-to-last page
6   of the document and do you see there is a
7   signature on that, above the name that's
8   printed Aubrey C. Galloway.
9        Do you see that?
10     A.   Yes, I do.
11     Q.   Is that your signature above
12  that?
13     A.   Yes, it is.
14     Q.   Now, would you look at the page
15  just before that and do you see that that
16  is a document which is entitled Power of
17  Attorney by assignee of entire interest
18  revocation of prior powers.
19       Do you see that?
20     A.   Yes.
21     Q.   You signed that document on
22  behalf of Quickie, is that right?
23     A.   Yes.
24     Q.   And there is a handwritten date
25  of March 4, 2003.

17 (Pages 62 to 65)

Page 62

1        A. Galloway
2        Do you see that?
3    A.   Yes.
4    Q.   Did you write that date in?
5    A.   Yes.
6    Q.   And is that the date you signed
7    the document?
8    A.   Yes.
9    Q.   Do you know when this document
10   was submitted to the United States Patent
11   and Trademark Office?
12   A.   It looks like it was mailed on
13   3/20/03.
14   Q.   And you're looking at the
15   certificate of mailing on the last page of
16   the document, is that correct?
17   A.   Correct.
18   Q.   Now, turning to the first page of
19   that document, do you see that the cover
20   letter says in the second paragraph "Also
21   enclosed is a copy of Power of
22   Attorney/Revocation of Prior Powers of
23   Attorney filed with the United States
24   Patent and Trademark Office on March 20,
25   2003 for your records."

Page 63

1        A. Galloway
2        Do you see that?
3    A.   Yes.
4    Q.   Is that when you understand that
5    Thelen Reid & Priest on behalf of Quickie
6    filed this document with the United States
7    Patent Office, that is the enclosed Power
8    of Attorney/Revocation of Prior Power Form?
9    A.   Yes.
10   Q.   Now, turning to the Power of
11   Attorney/Revocation of Prior Powers Form,
12   do you see that the document says under the
13   heading Revocation of Prior Powers of
14   Attorney, "All Powers of Attorney
15   previously given are hereby revoked"?
16       Do you see that?
17   A.   Yes.
18   Q.   And then it says, new Power of
19   Attorney, it says, "The following attorneys
20   or agents are hereby appointed to prosecute
21   and transact all business in the Patent and
22   Trademark Office connected therewith."
23       Do you see that?
24   A.   Yes.
25   Q.   And then there are a number of

Page 64

1        A. Galloway
2    names underneath that starting with Robert
3    E. Krebs.
4        Do you see that?
5    A.   Yes.
6    Q.   Mr. Krebs was a partner at Thelen
7    Reid & Priest, is that right?
8    A.   Yes.
9    Q.   Is it your understanding that all
10   of these other attorneys or getting the new
11   Power of Attorney were attorneys at Thelen
12   Reid & Priest?
13   A.   Yes.
14   Q.   And this is, as it says at the
15   top, a form in connection with Patent
16   Number 6,066,160.
17       Is that right?
18   A.   Yes.
19   Q.   The passive knotless suture
20   terminator for use in minimally invasive
21   surgery and to facilitate standard tissue
22   securing, is that right?
23   A.   Yes.
24   Q.   And that's the one that's at
25   issue in this lawsuit, is that right?

Page 65

1        A. Galloway
2    A.   Yes.
3    Q.   Now, do you also see that on the
4    second page of the form, the form has a
5    typed identity of the assignee of the
6    patent as Quickie, LLC? Do you see that on
7    the page that you signed right above your
8    signature?
9    A.   Yes, I see that.
10   Q.   And it gives an address,
11   attention Alan Feil, is that right?
12   A.   Yes.
13   Q.   Now, did you understand when you
14   signed this form that Quickie was revoking
15   any prior powers of attorney that had been
16   given to other attorneys in connection with
17   the '160 Patent?
18       MR. DIAMOND: I'm sorry, could
19   you read that back?
20       (Whereupon, the requested portion
21   was read back by the court reporter.)
22   A.   I understand that there was a
23   revocation of the powers of attorney and
24   all powers of attorney previously given are
25   hereby revoked and new Power of Attorney

18 (Pages 66 to 69)

Page 66

1           A. Galloway
2  for the following attorneys are appointed
3  to prosecute and transact all business in
4  the Patent and Trademark Office connected
5  therein, as it says.
6      **Q.   And who typed in the names of the**
7  **new attorneys, that is the Thelen Reid &**
8  **Priest attorneys?  Do you know who typed**
9  **those names in?**
10     A.   I don't know.
11     **Q.   Who prepared the form before it**
12 **was signed and submitted?**
13     A.   I don't know.
14     **Q.   Who advised Quickie that it**
15 **should submit this form to the U.S. Patent**
16 **and Trademark Office?**
17     A.   I believe that either Hal Berner
18 or Robert Krebs from Thelen may have
19 prepared the form, but I'm not sure, and
20 that Alan Fell would have reviewed the form
21 and advised us to sign it.
22     **Q.   And you did so, right?**
23     A.   Correct.
24     **Q.   Are you aware that another copy**
25 **of this form was signed and submitted in**

Page 67

1           A. Galloway
2  December of 2003?
3      A.   I don't recall.
4      **Q.   Let me correct myself.**
5          **Are you aware that another copy**
6  **of the form that you signed in March was**
7  **submitted again to the U.S. Patent and**
8  **Trademark Office in December 2003?**
9      A.   I don't recall specifically.
10         MR. KAMINSKY:  Let me show you a
11     document which we will mark Exhibit
12     56.
13         (Exhibit 56, Power of
14     Attorney/Revocation of Prior Powers
15     form, marked for identification, as of
16     this date.)
17 BY MR. KAMINSKY:
18     **Q.   This is another copy of the Power**
19 **of Attorney/Revocation of Prior Powers Form**
20 **with respect to the '160 Patent signed by**
21 **Dr. Galloway on March 4, 2003, which has**
22 **some other material on it.**
23         **Have you ever seen that document**
24 **before?**
25     A.   Yes.

Page 68

1           A. Galloway
2      **Q.   Do you see that on the last page**
3  **of that document there is a certificate of**
4  **transmission and a change of address form**
5  **again signed by people at Thelen Reid &**
6  **Priest in December of 2003.**
7          **Do you see that?**
8      A.   Yes.
9      **Q.   Do you know why a second such**
10 **form was sent to the U.S. Patent and**
11 **Trademark Office?**
12     A.   No, personally I don't.
13     **Q.   Now, looking at Exhibit 56 --**
14         MR. DIAMOND:  Marty, it's not an
15     objection and I don't want to
16     interrupt your examination, but I do
17     want to just note for the record that
18     the two form are not identical and I
19     just want to make sure there's not
20     anything misleading here as if they
21     are identical forms, the one filed in
22     March versus the one that was filed in
23     December.
24 BY MR. KAMINSKY:
25     **Q.   I think what your counsel is**

Page 69

1           A. Galloway
2  referring to is the fact that some of the
3  names under the new Power of Attorney may
4  be different.
5          MR. KAMINSKY:  Is that what
6      you're thinking about, Mr. Diamond?
7          MR. DIAMOND:  No, there are a lot
8      of differences.  There is a control
9      number that's different on the form in
10     December.  There is a different docket
11     number at the top of the page from the
12     other form.
13 BY MR. KAMINSKY:
14     **Q.   Do you know why a second form was**
15 **filed, Dr. Galloway?**
16     A.   No.
17     **Q.   Do you see that the date of your**
18 **signature is still March 4, 2003?**
19     A.   Yes, I do see that.
20     **Q.   Do you remember signing more than**
21 **one form in March of 2003?**
22     A.   I see from these -- no, I don't
23 remember signing.
24         MR. KAMINSKY:  Let me show you a
25     document which we will mark Exhibit

19 (Pages 70 to 73)

Page 70

1        A. Galloway
2    57.
3        (Exhibit 57, Certificate of
4    Transmission fax, marked for
5    identification, as of this date.)
6    BY MR. KAMINSKY:
7        Q.   This is a fax cover page showing
8    the fax of a certificate of transmission
9    under 37 CFR 1.8, and it has a second page
10   which is dated December 5, 2003.
11       Have you ever seen that document
12   before?
13       A.   I don't recall that I have.
14       Q.   Exhibit 57 lists on the second
15   page as the attorney Thelen Reid & Priest,
16   Robert E. Krebs.
17       Is that who you understood at
18   that time was your counsel in connection
19   with the '160 Patent?
20       A.   I'm sorry, could you repeat that?
21       Q.   Yes, I'll break it up for you.
22       Looking at the second page of
23   Exhibit 57, do you see that at the bottom
24   of the page it has a change of address
25   notice, and that is signed by Thelen Reid &

Page 71

1        A. Galloway
2    Priest, Robert E. Krebs, registration
3    number 25,885 and there is a handwritten
4    date of December 2, 2003.
5        Do you see that?
6        A.   Yes.
7        Q.   Was Mr. Krebs your attorney in
8    connection with the '160 Patent at the time
9    that this form was filed?
10       MR. DIAMOND:  Objection to form.
11       A.   Well, Mr. Krebs was our attorney
12   related to the re-examination of the patent
13   and to all litigating matters related to
14   the patent.
15       Q.   Do either of these forms, look at
16   Exhibits 51 and 56, provide any limitation
17   of the authority of Mr. Krebs and the
18   Thelen Reid & Priest firm in connection
19   with their authority as to the '160 Patent?
20       MR. DIAMOND:  Objection to form.
21       A.   Which documents are you referring
22   to?
23       Q.   Look at Exhibit 51 and look at
24   Exhibit 56 and look at 57 as well and tell
25   me if you see in any of those documents any

Page 72

1        A. Galloway
2    statement that says that the authority of
3    Thelen Reid & Priest in connection with the
4    '160 Patent is limited in any way.
5        MR. DIAMOND:  Objection to form.
6        A.   If you're asking me that there is
7    a statement that says we are limiting the
8    authority of Krebs or the attorneys at
9    Thelen Reid, I do not see that on those two
10   exhibits.
11       Q.   Now, who did you deal with in
12   connection with the -- strike that.
13       At a certain point in time,
14   Thelen Reid & Priest was replaced as
15   counsel for Quickie in connection with the
16   '160 Patent, is that correct?
17       A.   Not completely correct.
18       Q.   Is it not correct that all
19   matters related to the Quickie were
20   transferred from Thelen Reid & Priest to
21   another law firm that Mark Evens joined in
22   2006?
23       A.   No.
24       MR. DIAMOND:  Objection to form.
25       MR. KAMINSKY:  Let me show you a

Page 73

1        A. Galloway
2    document which we will mark Exhibit
3    58.
4        (Exhibit 58, Letter, marked for
5    identification, as of this date.)
6    BY MR. KAMINSKY:
7        Q.   Exhibit 58 is a letter from
8    Aubrey Galloway to Thelen Reid & Priest
9    dated August 14, 2006.
10       Have you ever seen that document
11   before?
12       A.   Yes.
13       Q.   Is that your signature?
14       A.   Yes.
15       Q.   And this is a letter you wrote to
16   Thelen Reid & Priest in August of 2006, is
17   that right?
18       A.   Correct.
19       Q.   And do you see that the letter
20   says to Thelen Reid & Priest:
21       "Responsibility for all matters
22   relating to Quickie, LLC are to be
23   transferred to Sterne, S-T-E-R-N-E,
24   Kessler, K-E-S-S-L-E-R, Goldstein and Fox,
25   PLLC.  Therefore, please forward all

20 (Pages 74 to 77)

Page 74

1           A. Galloway
2  related files and future correspondence to
3  the attention of Mark Evens, E-V-E-N-S, at
4  the address listed below."
5           And then it lists Mr. Evens' name
6  and address.          .
7           Do you see that?
8     A.   Yes, I see that.
9     Q.   **Does that refresh your**
10 **recollection that all matters relating to**
11 **Quickie that Thelen Reid & Priest had been**
12 **handling were transferred to Mark Evens'**
13 **new firm when he left Thelen Reid & Priest**
14 **in 2006?**
15          MR. DIAMOND: Objection to form.
16    Misleading.
17    A.    This letter says, dated in August
18 2006, that in August 2006 we were
19 transferring all matters related to Quickie
20 to Sterne, Kessler, Goldstein and Fox and
21 requested that Thelen Reid attorneys
22 forward all information to them at that
23 time.
24    Q.    **Why did you direct them to do**
25 **that?  Were you finished with your answer?**

Page 75

1           A. Galloway
2  I didn't mean to interrupt you.
3     A.   I don't think that was the
4  question you asked me before.
5     Q.   **What were you doing by this**
6  **letter?**
7     A.    At this point I have to recall
8  where we were with the -- I mean, what I
9  recall is that we were giving powers of
10 attorney and the matters related to Quickie
11 with our own going patent and/or
12 infringement cases to Mark Evens and Sterne
13 Kessler Goldstein and Fox.
14    Q.    **You were essentially replacing**
15 **Thelen Reid & Priest with Mark Evens' new**
16 **firm, isn't that correct?**
17    A.    Correct.
18    Q.    **As your counsel in connection**
19 **with your patent matters?**
20    A.    That's what I believe we were
21 doing at that point, yes.
22    Q.    **Yes.**
23          **And that's shortly after you have**
24 **learned as we've showed before that the**
25 **'160 Patent has expired, is that right, or**

Page 76

1           A. Galloway
2  had been abandoned or deemed abandoned by
3  the Patent Office, whatever the correct
4  terminology is, from the Patent Office?
5     A.    I believe that's the correct time
6  period.
7     Q.   **Is that why you replaced Thelen**
8  **Reid & Priest, because the abandonment of**
9  **the patent?**
10          MR. DIAMOND: Objection to form.
11    A.    That may have been one of the
12 reasons. Another reason -- I don't recall
13 our entire thought processes, but again, I
14 think we had a lot of confidence in Mark
15 Evens as an attorney and as he changed the
16 firms, we had confidence to deal with them.
17    Q.    **Now, shortly after that, you**
18 **hired Maier & Maier to petition to**
19 **reinstate the '160 Patent, correct?**
20    A.    I don't recall the exact
21 timetable.
22    Q.    **Let me show you Exhibit 55 again.**
23          **Does that refresh your**
24 **recollection, looking at the third page of**
25 **that document, that it was in October 2006**

Page 77

1           A. Galloway
2  that you gave a Power of Attorney to the
3  Maier & Maier firm to petition to reinstate
4  the '160 Patent?
5     A.    Yes, that's what this says.
6     Q.    **Now, you personally signed a**
7  **statement in support of that petition,**
8  **didn't you?**
9     A.    I don't recall.
10    Q.    **Let me show you a document which**
11 **we've marked Exhibit 53 in a previous**
12 **deposition.  It is a statement in support**
13 **of petition under 37 CFR Section 1.378(c)**
14 **which appears to bear the signature on the**
15 **second page Aubrey C. Galloway and the**
16 **handwritten date of October 27, 2006.**
17          **Is that your signature on the**
18 **second page?**
19    A.    No.
20    Q.    **Whose signature is that?**
21    A.    Well, I recall this circumstance.
22 You can look at the other signatures, it's
23 clearly not the same signature.
24          At the time that the patent was,
25 we found out that patent was not, had not

21 (Pages 78 to 81)

Page 78

```
 1         A. Galloway
 2  continued because of lack of payment, we
 3  shortly thereafter hired or retained Maier
 4  & Maier to have Power of Attorney to
 5  attempt to get that reinstated and granted
 6  them Power of Attorney as you showed me in
 7  Exhibit 55.
 8         I recall that they were under
 9  some pressure to go to the Patent Office
10  and wanted to walk through a petition to
11  reinstate and that they would fax something
12  up to my office or send something up to my
13  office to give them that authority.
14         I recall that I was going to be
15  in the operating room, or I was in the
16  operating room, I operate every day, and I
17  believe this exhibit came up, it was signed
18  by someone in my office and then sent back
19  to them due to the matter of what was
20  related to me to be an urgency of
21  turnaround.
22      Q.   Did you authorize someone to sign
23  on your behalf?
24      A.   Yes, I would have spoken promptly
25  to Maier & Maier and authorized someone in
```

Page 79

```
 1         A. Galloway
 2  my office to sign on my behalf.
 3      Q.   So you stand by that signature as
 4  if it were your own signature, is that
 5  correct?
 6      A.   I stand by that I authorized
 7  someone to sign this, but I actually didn't
 8  see this until a couple of weeks ago.
 9      Q.   In this action we served requests
10  to admit upon Quickie, and in response to
11  the request to admit, a clean copy of which
12  we will mark Exhibit 58, we asked for an
13  admission on the following item, number 24
14  and got the following response:
15         Exhibit D, this is number 24,
16  "Hereto is a true and correct copy of the
17  statement in support of petition dated
18  October 27, 2006 signed by Aubrey Galloway
19  as the managing partner of Quickie which
20  was filed with PTO in 2006 (the statement
21  in support)."
22         The response is admit. Do you
23  see that.
24      A.   Yes, I see that.
25         MR. DIAMOND:  I understand
```

Page 80

```
 1         A. Galloway
 2  there's a difference in who has got
 3  which copies, but we'll stipulate that
 4  it says what it says.
 5         Also, for the record, we'll be
 6  supplementing, because when these were
 7  submitted and filed, we did not know
 8  either as to the testimony that
 9  Dr. Galloway has now given.
10      Q.   Dr. Galloway, are you telling us
11  you told someone in your office they could
12  sign a document without your having first
13  read it?
14      A.   Yeah.
15      Q.   And you never read that document
16  again after that until just before this
17  deposition?
18      A.   That's correct.
19      Q.   Is that what you're telling us?
20         Did you ever read the materials
21  that Maier & Maier submitted on your behalf
22  in this lawsuit?
23      A.   I subsequently read other
24  materials that Maier & Maier submitted on
25  our behalf, I think, several months beyond
```

Page 81

```
 1         A. Galloway
 2  this letter that I think fully outlined the
 3  reasons that we thought the patent should
 4  not have lapsed, and I think that was
 5  submitted several months after that to a
 6  much more extensive document to the Patent
 7  Office, around March or something like
 8  that.
 9      Q.   Were you aware at the time you
10  authorized someone to sign this document
11  that the statements that were going to be
12  made were being made under the penalties of
13  perjury?
14      A.   I probably was, yes.
15      Q.   Okay.
16         Have you ever notified the Patent
17  and Trademark Office that any statement in
18  Exhibit 53 is false and incorrect?
19         MR. DIAMOND:  Objection to form.
20      A.   Well, I think, again, the
21  Maier --
22      Q.   I'm going to restate the question
23  because I don't want to have an objection
24  here.
25         Have you ever notified the United
```

22 (Pages 82 to 85)

Page 82

1        A. Galloway
2   States Patent and Trademark Office that any
3   statement in Exhibit 53, the statement
4   signed for you under your name, was
5   incorrect?
6       A.   Our attorneys Maier & Maier
7   notified the Patent Office of a more
8   extensive clarification of that statement
9   which was not incorrect, but was
10  incomplete.
11      Q.   Did you ever tell the Patent
12  Office that there were incorrect statements
13  in your statement?
14          MR. DIAMOND:  Objection to form.
15      A.   Are you asking me personally?
16      Q.   Well, I'll start with you
17  personally.
18          Did you personally ever do that?
19      A.   No.
20      Q.   Has anyone on your behalf filed a
21  statement by you under penalty of perjury
22  saying that the prior statement you gave to
23  the Patent Office was incorrect in any way?
24          MR. DIAMOND:  Objection to form.
25      A.   I don't think it was incorrect.

Page 83

1        A. Galloway
2       Q.   Okay.
3       A.   It was incomplete.
4       Q.   Okay.
5           But you don't think it was
6   incorrect, is that right?
7       A.   I don't think it was incorrect.
8   I think it was incomplete.
9       Q.   All right.
10          Now, let me read you a statement
11  in the statement submitted under your
12  signature, or over your signature.
13          Paragraph 2 says:  "As the
14  managing partner for Quickie, LLC, I
15  retained Robert E. Krebs, et al. of the
16  Thelen Reid & Priest, LLP law firm to
17  transact all post-issuance proceedings and
18  responsibilities in the Patent and
19  Trademark Office, including but not limited
20  to re-examination proceedings and timely
21  payment of the maintenance fee."
22          Do you see that?
23      A.   Yes, I do.
24      Q.   Is that statement correct?
25      A.   I think it is correct.

Page 84

1        A. Galloway
2       Q.   When did you retain Mr. Krebs to
3   do that?
4       A.   I don't recall the specific date.
5       Q.   Is that at the time that the
6   Power of Attorney revocation of Power of
7   Attorney form that we showed you before
8   that's included in Exhibit 51 was submitted
9   to the United States Patent and Trademark
10  Office?
11      A.   I think that would be correct.
12      Q.   Now, there is a second statement
13  in paragraph 3 that says:
14          "As managing partner of Quickie,
15  LLC, I retained the law firm of Thelen Reid
16  & Priest to concurrently conduct litigation
17  services for Quickie, LLC."
18          Is that statement correct?
19      A.   Yes, I believe it is.
20      Q.   And is that referring to the
21  Medtronic case?
22      A.   I believe that's correct.
23      Q.   Are you aware of any other
24  litigation on behalf of Quickie that the
25  Thelen Reid & Priest firm signed -- strike

Page 85

1        A. Galloway
2   that.
3           Are you aware of any other
4   litigation on behalf of Quickie in which
5   the Thelen Reid & Priest firm acted as
6   your, as Quickie's counsel?
7       A.   No.
8       Q.   Did you read any of the other
9   documents at the time that were submitted
10  by the Maier & Maier firm in connection
11  with the petition to reinstate the '160
12  Patent?
13          MR. DIAMOND:  Objection to form.
14      It's a little broad.
15      A.   Can I proceed with clarification?
16      Q.   Sure.
17      A.   Did I read at the time that the
18  documents were being submitted?  Did I read
19  them at that time?
20      Q.   Yes.
21      A.   No.
22      Q.   Did you ever read them after
23  that?
24      A.   Yes.
25      Q.   When did you read them after they

23 (Pages 86 to 89)

Page 86

1        A. Galloway
2  were first submitted to the Patent Office?
3        MR. DIAMOND: Same objection.
4     I'm not quite sure what documents
5     we're talking about here.
6        MR. KAMINSKY: Okay. Well, I'll
7     show specific documents to the witness
8     in a moment, and if I miss one, I'm
9     not trying to trap you. That's not
10    the intention.
11 BY MR. KAMINSKY:
12    Q.   Do you remember when you
13 first read any of the documents that
14 were being submitted to or had been
15 submitted to the Patent Office on
16 behalf of Quickie in connection with
17 a petition to reinstate the patent?
18    A.   I don't remember exactly when.
19    Q.   Okay.
20        Let me show you a document which
21 we've marked Exhibit 52.
22        Exhibit 52 is a statement in
23 support of petition under 37 CFR 1.37(b)
24 signed by Todd S Sharinn dated November 20,
25 2006.

Page 87

1        A. Galloway
2     Have you ever seen that document
3  before?
4     A.   Yes, I have.
5     Q.   When did you first see that
6  document?
7     A.   Probably approximately two weeks
8  ago.
9     Q.   In paragraph 2 of that document,
10 Mr. Sharinn states:
11       "My responsibility, including the
12 payment of any maintenance fee that may
13 become due, for the subject patent ended
14 prior to the date where the payment of a
15 first maintenance fee, was due as evidenced
16 by the enclosed revocation of prior powers
17 of attorney signed on behalf of Quickie,
18 LLC on March 4, 2003 wherein 'all prior
19 powers of attorney previously given (were)
20 hereby revoked.'"
21       Do you see that statement?
22    A.   Yes, I do.
23    Q.   Is that statement correct?
24    A.   No.
25    Q.   Are you aware of anyone on behalf

Page 88

1        A. Galloway
2  of Quickie ever filing a paper or other
3  statement by Todd Sharinn ever retracting
4  this statement?
5     A.   Well, I'm going to read this
6  statement, if I may, that he certified that
7  the fee indication form in October 2002
8  certified and the forms was mailed to the
9  Patent Office on October 22nd and that the
10 PTO change of address form indicating Pepe
11 & Hazard was superseded.
12       That change of address form to my
13 understanding he sent to Greenberg and
14 remained at Greenberg and still remains at
15 Greenberg, if it exists.
16       He states, therefore, that his
17 responsibility, including the payment of
18 any maintenance fees, was therefore not due
19 because we revoked Power of Attorney, which
20 is clearly not true, because we continued
21 to employ Greenberg for the following year,
22 year and a half, related to Quickie,
23 related to additional patents with Quickie
24 that we subsequently got, related to
25 maintenance of this patent, and relating to

Page 89

1        A. Galloway
2  several other intellectual properties with
3  Quickie, and we paid them a hell of a lot
4  of money over that time, several hundred
5  thousand dollars.
6        So for him to make that statement
7  is completely God damn false -- excuse my
8  language. But it's a misconception or a
9  misinterpretation of our entire business
10 relationship with him.
11    Q.   Have you ever filed a statement
12 by you with the Patent Office, the Patent
13 and Trademark Office, saying what you just
14 said?
15    A.   No.
16    Q.   Are you aware of anybody filing a
17 statement by Mr. Sharinn saying that when I
18 made this statement under penalty of
19 perjury this statement was false?
20    A.   It's incomplete. It's
21 incomplete.
22    Q.   Are you aware of anybody filing
23 any statement for Mr. Sharinn contradicting
24 this statement at any time?
25    A.   I'm not aware, no.

24 (Pages 90 to 93)

Page 90

```
1        A. Galloway
2    Q.  Are you aware of anybody going to
3  Mr. Sharinn at any time and saying to
4  Mr. Sharinn, Mr. Sharinn, you filed this
5  statement on our behalf, we do not think it
6  is correct, we want you to file a different
7  statement?
8        Are you aware of that ever
9  happening?
10   A.  As I told you, I just saw this
11  statement two weeks ago.
12   Q.  So you're not aware of that
13  happening?
14   A.  That's correct.
15   Q.  Okay.
16        Now, are you aware that Maier &
17  Maier drafted this statement for
18  Mr. Sharinn to sign and went over it with
19  him before it was signed?
20   A.  No, I'm not.
21   Q.  Do you see that below
22  Mr. Sharinn's signature and the date, the
23  statement says care of Maier & Maier, PLLC,
24  and has their address, do you see that?
25   A.  I do see that, and I see that and
```

Page 91

```
1        A. Galloway
2  again, if I recall my dates, that was in
3  November 2006, and I recall that Maier &
4  Maier submitted a statement to the Patent
5  Office several months after that that
6  clarified and expanded our understanding of
7  this statement.
8    Q.  Are you aware that in denying
9  your application, the U.S. Patent and
10  Trademark Office relied, among other
11  things, on this very statement that was
12  submitted by your counsel, Quickie's
13  counsel, to the U.S. Patent and Trademark
14  Office?
15        MR. DIAMOND:  Object to the form.
16   A.  I don't know whether that's true
17  or not, and I'm not aware of how they make
18  their decision.
19   Q.  Let me show you a document which
20  we'll mark Exhibit 59.
21        (Exhibit 59, Decision, marked for
22  identification, as of this date.)
23  BY MR. KAMINSKY:
24   Q.  Exhibit 59 is a decision on
25  petition by the U.S. Patent and Trademark
```

Page 92

```
1        A. Galloway
2  Office which dismisses, in other words
3  denies, the petition by Quickie to
4  reinstate the patent.
5        Have you ever seen that document
6  before?  It's dated, by the way, March 6,
7  2007.
8    A.  Yes, I believe I've seen it.
9    Q.  Now, would you look at page 4 of
10  that statement, of that decision.
11   A.  Okay.
12   Q.  Do you see the final paragraph,
13  before the conclusion, it says:
14        "Finally, the petition states
15  that on March 4, 2003 attorney Todd Sharinn
16  was responsible for the patent until March
17  4, 2003.  Subsequently, on December 5,
18  2003, patentee filed a change of attorney
19  docket and change of address notice
20  changing the correspondence address to that
21  of Thelen Reid.  Patentee has failed to
22  account for the period between March 4,
23  2003 when Sharinn's responsibility for the
24  patent terminated in December 5, 2003 when
25  the patentee filed a change of attorney
```

Page 93

```
1        A. Galloway
2  docket number and change of address
3  notice."
4        Do you see that?
5    A.  Yes, I do.
6    Q.  Do you see Mr. Sharinn's
7  statement earlier, it says that his
8  authority was revoked, or his
9  responsibility ended with the revocation of
10  powers, prior powers of attorney signed on
11  behalf of Quickie on March 4, 2003.
12        Do you see that?
13   A.  Are you referring to Exhibit 52?
14   Q.  Yes.
15   A.  Yes, I do see that.
16   Q.  Now, would you look again at
17  Exhibit 51, that's the letter that you
18  signed -- that's the letter that contains
19  the form, the March 2003 -- it's the letter
20  from Thelen Reid & Priest to Quickie
21  attaching the form that was filed with the
22  Patent Office in March -- do you see that
23  that's form you signed on March 4, 2003?
24   A.  Yes.
25   Q.  That's the form that Mr. Sharinn
```

25 (Pages 94 to 97)

Page 94

1         A. Galloway
2  is referring to, isn't it?
3         MR. DIAMOND: Objection to form.
4     A.    I don't know what he's referring
5  to, but he may be referring to that. He's
6  referring to a Power of Attorney, and I
7  think this was the Power of Attorney form,
8  so it probably was.
9     Q.    A Power of Attorney dated March
10 4, 2003?
11    A.    Correct.
12    Q.    That's what he says?
13    A.    Correct.
14    Q.    Are you aware of any other such
15 form dated March 4, 2003 that Quickie ever
16 signed?
17    A.    No.
18         MR. DIAMOND: Objection to form.
19 Other than the one we've already
20 discussed today?
21         MR. KAMINSKY: Yes.
22         MR. DIAMOND: There were two.
23         MR. KAMINSKY: I think I said
24 it -- yes, okay.
25 BY MR. KAMINSKY:

Page 95

1         A. Galloway
2     Q.    With your counsel's correction,
3  there were actually two of those forms
4  signed on March 4, 2003, both of which
5  revoked the prior Powers of Attorney and
6  appointed Thelen Reid & Priest and various
7  attorneys there as Quickie's counsel,
8  correct?
9     A.    Correct.
10    Q.    And are you aware of any other
11 form besides those two that was signed at
12 that time?
13    A.    I'm not aware of any.
14    Q.    Let me show you Exhibit 54.
15 Exhibit 54 is a supplement to petition
16 under 37 CFR Section 1.378(b) dated
17 December 4, 2006 and signed by Mr. Maier on
18 behalf of Quickie. He actually dated it
19 December 1st, but the file stamp from the
20 Patent Office says December 4th.
21         Do you see that?
22    A.    Yes, I do.
23    Q.    When was the first time you ever
24 saw this document?
25    A.    I don't remember whether I

Page 96

1         A. Galloway
2  reviewed it in detail or read it in detail,
3  but I do recall that we were making an
4  amendment or a clarification to a filing
5  with the PPO at this time that this
6  document was going out, but I don't recall
7  that I read it in detail.
8     Q.    When do you think you first read
9  it?
10    A.    In detail, I probably first read
11 it approximately two weeks ago.
12    Q.    Now, are you aware of anyone ever
13 filing a statement with the Patent Office
14 on behalf of Quickie saying that anything
15 in this supplemented petition, which we've
16 marked as Exhibit 54, is inaccurate?
17    A.    I'm not aware of it.
18    Q.    When you read it, did you
19 determine that anything in the statement
20 was inaccurate?
21    A.    No, not that I recall.
22    Q.    And that was two weeks ago,
23 correct?
24    A.    Correct.
25    Q.    Now, let's look on the first page

Page 97

1         A. Galloway
2  of the document in the third paragraph, and
3  it says:
4         "A declaration by Todd Sharinn is
5  being added to Exhibit 7 showing that he
6  was an attorney at Pepe & Hazard, LLP and
7  was responsible for the '160 Patent. Later
8  he left Pepe & Hazard, but continued to be
9  responsible for the '160 Patent as an
10 attorney at Greenberg Traurig (Exhibit 8).
11        "Further, his responsibility for
12 the '160 Patent ended prior to the time
13 period when payment of a first maintenance
14 fee was due) see Exhibits 3 and 10,
15 revocation of prior powers of attorney
16 signed on behalf of the patent owner on
17 March 4, 2003)."
18        Are you aware of anyone on behalf
19 of Quickie ever advising the Patent Office
20 that this statement made to the Patent
21 Office in December 2006 was false?
22        MR. DIAMOND: Objection to form.
23    A.    I'm not aware of anyone making
24 that statement to me.
25    Q.    Are you aware of anyone advising

26 (Pages 98 to 101)

Page 98

1       A. Galloway
2   the Patent Office that this statement was
3   inaccurate in any way?
4       A.   No.
5       Q.   Now, continuing on, on page 2 --
6   at the bottom of page 2 in the last
7   paragraph that carries over to page 3, the
8   statement says:
9        "Thelen Reid & Priest was granted
10  and held sole and full power in the '160
11  Patent from March 4, 2003 through August
12  14, 2006 (Exhibits 3, 9 and 10). This
13  period of time covered the time period up
14  until May 23, 2004 for timely paying the
15  first maintenance fee and the entire 2-year
16  time period starting from the date of the
17  '160 Patent's expiration to file a remedial
18  petition under the unintentional provision
19  (37 CFR 1.37(c)); this 2-year expiration
20  period ending on May 24, 2006."
21       Do you see that statement?
22      A.   Yes, I do.
23      Q.   Has anyone on behalf of Quickie
24  ever advised the U.S. Patent Office that
25  this statement that had been made to the

Page 99

1       A. Galloway
2   U.S. Patent Office was false?
3        MR. DIAMOND: Objection to form.
4   Misleading.
5       A.   I don't know if we've had any
6   correspondence with the Patent Office on
7   this or not. I'm not aware if we have.
8       Q.   Are you aware of anyone on behalf
9   of Quickie advising the U.S. Patent Office
10  that this statement was inaccurate in any
11  way?
12       MR. DIAMOND: Same objection.
13      A.   I'm personally not aware of it.
14      Q.   Would you look at the second full
15  paragraph on page 3 and let me read to you
16  the last two sentences of that paragraph:
17       "Thelen Reid & Priest failed to
18  discover and know that the '160 Patent had
19  expired when they filed, prepared and filed
20  amendments to claims and re-examination,
21  (Exhibit 14). It also appears that Thelen
22  Reid & Priest failed to docket the patent
23  for payment of maintenance fees."
24      A.   No.
25      Q.   Are you aware of anyone on behalf

Page 100

1       A. Galloway
2   of Quickie ever advising the U.S. Patent
3   Office that that statement was false?
4       A.   No.
5       Q.   Are you aware of anyone on behalf
6   of Quickie ever advising the U.S. Patent
7   and Trademark Office that that statement
8   was inaccurate in any way?
9       A.   I seem to remember that there was
10  further correspondence with, from Maier to
11  the Patent Office, but I don't recall
12  exactly the specifics of that
13  correspondence.
14      Q.   So you're not aware, as you sit
15  here, you personally are not aware of
16  anyone advising the U.S. Patent and
17  Trademark Office that the particular
18  statement I read to you was inaccurate?
19       MR. DIAMOND: Objection to form.
20  I think it mischaracterizes his
21  testimony.
22      A.   Again, all I can say is I believe
23  that there was a follow-up document to the
24  Patent Office from Maier which may have
25  further clarified this. Whether that

Page 101

1       A. Galloway
2   characterizes it as accurate or not, I
3   can't say.
4       Q.   Let me read to you another
5   statement from the supplemental petition
6   that was filed on behalf of Quickie, on
7   page 4 --
8        MR. DIAMOND: Same exhibit?
9        MR. KAMINSKY: Same Exhibit 54.
10  BY MR. KAMINSKY:
11      Q.   "The patent owner" -- that's
12  Quickie, correct?
13      A.   Correct.
14      Q.   "The patent owner fully believed
15  that their valuable legal rights in the
16  '160 Patent would be justly protected by
17  the attorneys and law firm of Thelen Reid &
18  Priest when the patent owner chose them for
19  representation and executed the Power of
20  Attorney dated March 4, 2003 (see Exhibit
21  9).
22       "Unfortunately, such did not
23  occur and the patent owner was shocked to
24  learn from another party on March 23, 2006
25  that their '160 Patent had expired which

27 (Pages 102 to 105)

Page 102

1         A. Galloway
2  gravely prejudiced post-issuance litigation
3  proceedings and negotiations."
4         Do you see that statement?
5    A.   Yes, sir.
6    Q.   Are you aware of anyone on behalf
7  of Quickie ever advising the U.S. Patent
8  office that that statement was false?
9         MR. DIAMOND: Objection to form.
10   A.   I'm not aware of anyone advising
11 the Patent Office specifically on this
12 statement.
13   Q.   Are you aware of anyone advising
14 the Patent Office that that statement was
15 inaccurate?
16        MR. DIAMOND: Same objection.
17   A.   Again, I don't have the documents
18 in front of me, but I am aware of Maier,
19 the Maier firm sending a further
20 correspondence to the Patent Office and I
21 don't, I'm not really, I guess, equipped to
22 say whether that would characterize this as
23 inaccurate or incomplete.
24   Q.   Now, you are aware as you've just
25 said that the Maier firm submitted a

Page 103

1         A. Galloway
2  petition for reconsideration of the
3  decision I showed you earlier and we marked
4  as Exhibit 59, denying the petition to
5  reinstate the patent, is that right?
6    A.   Yes.
7    Q.   Did you ever read the decision by
8  the U.S. Patent and Trademark Office with
9  respect to the petition for
10 reconsideration?
11        MR. DIAMOND: Objection to form.
12 Asked and answered.
13        MR. KAMINSKY: I don't think I
14 asked that.
15        MR. DIAMOND: I thought we
16 covered this document, no?
17        MR. KAMINSKY: No, this is the
18 second one.
19        MR. LODEN: You're talking about
20 59?
21        MR. DIAMOND: No, 59 is the
22 decision denying the petition to
23 reinstate the patent.
24        The witness has told us there was
25 a motion by Maier & Maier for

Page 104

1         A. Galloway
2  reconsideration of that decision.
3         Now I'm asking the witness did he
4  ever read the decision of the U.S.
5  Patent and Trademark Office with
6  respect to that petition for
7  reconsideration.
8         MR. DIAMOND: Withdraw the
9  objection.
10   A.   I don't recall that I read it
11 specifically. I was certainly aware of the
12 ruling and we were going to petition for
13 reconsideration, but I don't recall that I
14 specifically read their denial.
15   Q.   They did deny the petition for
16 reconsideration, though, is that correct?
17   A.   I believe that's correct.
18        MR. KAMINSKY: Let me show you
19 Exhibit 60.
20        (Exhibit 60, Decision, marked for
21 identification, as of this date.)
22 BY MR. KAMINSKY:
23   Q.   This is the decision on petition
24 of the U.S. Patent and Trademark Office
25 that is file stamped to show copy mailed

Page 105

1         A. Galloway
2  October 5, 2007.
3         I ask you if you've ever seen
4  that document before today.
5         MR. DIAMOND: Just to clarify, we
6  haven't yet in these documents
7  identified whatever was filed on May
8  7, 2007, correct?
9         MR. KAMINSKY: That's not an
10 exhibit, no.
11        MR. DIAMOND: Okay.
12   A.   So can I hear the question again?
13   Q.   Yes.
14        Have you ever seen this decision
15 of the U.S. Patent and Trademark Office?
16   A.   Yes, I believe I have.
17   Q.   When did you see this document?
18   A.   I again may have seen it around
19 the time of its issuance, but I don't
20 recall specifics and I certainly reviewed
21 it approximately two weeks ago.
22   Q.   Now, you explained that Maier &
23 Maier took issue with some of the prior
24 rulings of the U.S. Patent and Trademark
25 Office and filed some further papers, is

28 (Pages 106 to 109)

Page 106

1          A. Galloway
2  that right?
3      A.    That's my understanding.
4      Q.    **Did you have a role in the**
5  **preparation of the papers that they filed**
6  **seeking reconsideration of the Patent and**
7  **Trademark Office's first decision that we**
8  **marked Exhibit 59?**
9      A.    I don't recall that I have a
10  specific role in it other than agreeing
11  that we needed to fill out our first
12  petition and clarify it and that I knew
13  that they were going to do that, but I
14  didn't have a role in the preparation.
15      Q.    **Did you ever read what they filed**
16  **with the U.S. Patent and Trademark Office**
17  **to use your word "clarify" the prior**
18  **filings?**
19      A.    Again, I believe I likely either
20  read it or was certainly aware of it at the
21  time, but I don't recall specifics and I
22  did see the document approximately two
23  weeks ago.
24      Q.    **Now would you look at page 3 of**
25  **Exhibit 60, please?**

Page 107

1          A. Galloway
2      MR. DIAMOND: Excuse me, sorry to
3  interrupt you. I'm looking at the
4  original, it look like it's missing
5  pages or is incomplete, and I just
6  want to make sure.
7      MR. KAMINSKY: Oh, I wanted to
8  read page 3 and page 5, so you're
9  right.
10      Will you trust me to read it
11  faithfully?
12      MR. DIAMOND: Yes.
13      MR. KAMINSKY: I apologize. We
14  didn't notice that.
15  BY MR. KAMINSKY:
16      Q.    **Actually, the document consists**
17  **of six pages and what may have happened is**
18  **that we copied every other page, for which**
19  **I apologize.**
20      **I will read to you from page 3**
21  **that continues on to page 4. At the bottom**
22  **of page 3, the decision says:**
23      **"Petitioner next disagrees with**
24  **the decisions, conclusion that Sharinn's**
25  **responsibility concluded on March 4, 2003**

Page 108

1          A. Galloway
2  and that there is no objective evidence to
3  support this conclusion."
4      In review of the supplement to
5  petition filed December 24, 2006 reveals
6  that petitioner herein filed a statement in
7  support of petition under 37 CFR 1.37 B
8  executed by Todd Sharinn wherein
9  Mr. Sharinn states on page 2 that:
10      "My responsibility included the
11  payment of any maintenance fee that may
12  become due for the subject patent ended
13  prior to the date wherein payment of a
14  first maintenance fee was due as evidenced
15  by the enclosed revocation of prior powers
16  of attorney signed on behalf of Quickie on
17  March 4, 2003 wherein all powers of
18  attorney previously given (were) hereby
19  revoked," and cites the statement of
20  Mr. Sharinn at P2.
21      Then it says the patent expired
22  on March 24, 2004. The relevant period is
23  the period March 24, 2004 and the filing of
24  a grantable petition.
25      When you read this decision, did

Page 109

1          A. Galloway
2  you see that the United States Patent and
3  Trademark Office had relied in denying your
4  petition for reconsideration on the
5  statement that Mr. Sharinn had made and
6  which your counsel had submitted on behalf
7  of Quickie that I read to you earlier?
8      MR. DIAMOND: Objection to form.
9      A.    I do see what they said here and
10  what they gave as their reasons, and I
11  guess that that -- that's about all I can
12  conclude from it.
13      Q.    **Has anyone gone back to the**
14  **Patent Office again, that is the Patent and**
15  **Trademark Office, and said with respect to**
16  **the petition for reconsideration wait a**
17  **minute, give us a chance to get another**
18  **statement that shows that what Mr. Sharinn**
19  **had said and that we submitted to you was**
20  **incorrect?**
21      A.    Excuse me, what's the date of
22  this document?
23      Q.    **The front page has a file stamp**
24  **from the office itself, that's the office**
25  **of the patent, the Patent and Trademark**

29 (Pages 110 to 113)

Page 110

1         A. Galloway
2  Office, that says copy mailed October 5,
3  2007.
4         The decision itself does not
5  appear to have an actual date on it?
6         MR. LODEN: Maybe on the pages
7     that are missing?
8         MR. KAMINSKY: I'll look at them,
9     but I don't see them, but I could be
10    wrong.
11 BY MR. KAMINSKY:
12    Q.   However, that file stamp that's
13 there is a stamp of the United States
14 Patent and Trademark Office. We got it
15 from that office with that stamp on it.
16       MR. DIAMOND: The question is has
17    there been any filing since and the
18    time frame is still alive from our
19    perspective, but answer the question.
20    A.   To my understanding, the question
21 has there been a filing since this October
22 time stamp of this to reexamine or
23 reconsider this decision, and to my
24 knowledge, no.
25    Q.   Were you advised that Mr. Sharinn

Page 111

1         A. Galloway
2  testified yesterday in this lawsuit?
3     A.   I understand that he did.
4     Q.   Were you advised that he was
5  shown the statement he had made in 2006
6  that was submitted to the Patent and
7  Trademark Office in connection with your
8  petition to reinstate the '160 Patent?
9     A.   I don't recall I was specifically
10 advised of that, but I understand he
11 testified.
12    Q.   And are you aware that he
13 testified that he stands by that statement
14 as of today and would not file a contrary
15 statement if asked to do it today?
16       MR. DIAMOND: Object to the form.
17    A.   I am personally not aware of
18 whether that's true or not, no.
19    Q.   But to your knowledge, no one has
20 asked him to sign any further statement, is
21 that correct?
22    A.   I don't know if anyone has asked
23 him to sign a further statement or not. To
24 my knowledge, he hasn't signed a further
25 statement.

Page 112

1         A. Galloway
2     Q.   You haven't asked him, have you?
3     A.   No.
4     Q.   Have you ever directed any of
5  your counsel, that is Maier & Maier, or
6  your current counsel to approach
7  Mr. Sharinn either directly or through his
8  counsel and ask him to file a further
9  different statement than the one that he
10 filed on your behalf at the request of your
11 then counsel in 2006?
12       MR. DIAMOND: Objection to the
13    extent that you're asking him whether
14    he had an instruction to his counsel,
15    that would be privileged. If it's
16    something other than that, then I
17    could be okay with it.
18       So is the question asking him did
19    he instruct his counsel to do
20    something, because that would be
21    privileged, and I would instruct you
22    not to answer that.
23       MR. KAMINSKY: Okay, I won't
24    pursue it if you feel that way. I
25    think he probably could answer that,

Page 113

1         A. Galloway
2  but we'll let it go at that.
3        Let's take a break for a couple
4  of minutes, is that okay?
5        MR. DIAMOND: Sure.
6        (Recess taken from 12:01 p.m. to
7  12:10 p.m.)
8        MR. KAMINSKY: What I read to
9     you, I'll show you, Dr. Galloway,
10 started down here, right here. There
11 is a section where they make a
12 decision on what issue, and that
13 started the next issue.
14       Now, you mentioned that your
15 counsel Maier & Maier had submitted
16 papers on that petition for
17 reconsideration, and I now want to
18 show you a document which we're
19 marking Exhibit 61, which consists of
20 a petition for reconsideration and
21 various attachments to it, has a file
22 stamp with a U.S. Patent and Trademark
23 Office May 7, 2007.
24       (Exhibit 61, Decision, marked for
25 identification, as of this date.)

30 (Pages 114 to 117)

Page 114

1           A. Galloway
2      Q.   Have you ever seen that document
3    before?
4      A.   Yes, I have.
5      Q.   And is that what you understand
6    to be the petition for reconsideration that
7    your counsel Maier & Maier filed after the
8    initial decision of the U.S. Patent and
9    Trademark Office denying the reinstatement
10   of petition that we marked Exhibit 59?
11     A.   Yes, it is.
12     Q.   Now, would you look at page 3,
13   and do you see that in the two full
14   paragraphs on that page, they're pretty
15   long so unless you want me to, I won't read
16   all of that into the record for the moment,
17   do you see that is in that section that
18   your counsel recites the initial decisions
19   statement about Mr. Sharinn's
20   responsibility having ended on March 4th
21   and then your counsel says that you
22   disagree with that conclusion and says why,
23   and I'll come back to more of it, but would
24   you read those two paragraphs?
25     A.   Yes, I have read those

Page 115

1           A. Galloway
2    paragraphs.
3      Q.   Now, do you see in the second
4    paragraph your counsel says -- well, before
5    I go into that, strike that.
6           Did you read this document before
7    it was submitted to the U.S. Patent and
8    Trademark Office?
9      A.   I don't recall that I did. I
10   knew that this document was being submitted
11   in a general nature, but I don't recall
12   specifically that I read the document prior
13   to its submission.
14     Q.   Do you see in the first sentence
15   of the second full paragraph your counsel
16   says:
17          "At the outset, petitioner
18   disagrees with the office's conclusion that
19   Sharinn's responsibility for the '160
20   Patent terminated on March 4, 2003, and
21   petitioner further notes that there is no
22   objective evidence in the record that would
23   support the office's conclusion in that
24   regard."
25          Do you see that?

Page 116

1           A. Galloway
2      A.   Yes, I do.
3           MR. DIAMOND: I'm sorry, I think
4    the document is all messed up.
5           MR. KAMINSKY: Oh, no.
6           MR. DIAMOND: I just want to make
7    sure the record is clear. If you take
8    a look after page 3, there should be
9    more pages and they're missing, and
10   then there is a document attached that
11   is probably in the a part of this
12   document -- off the record.
13          MR. KAMINSKY: For the record
14   we're going to substitute a full and
15   mutually agreed full copy of this, and
16   I apologize for the miscopying that we
17   seem to have done here, but in the
18   meantime --
19   BY MR. KAMINSKY:
20     Q.   In the meantime, do you have page
21   3 in front of you?
22     A.   Yes, I do.
23     Q.   That's the section I wanted to
24   concentrate on in any event.
25          You saw that I read the first

Page 117

1           A. Galloway
2    sentence of that paragraph of the second
3    full paragraph on page 3, is that right?
4      A.   Yes.
5      Q.   And then it goes on to say,.
6          "Moreover, even assuming that the
7    March 4th date was the date upon which
8    Sharinn's responsibility ended, an
9    assumption that petitioner vehemently
10   contests, the Power of Attorney filed by
11   Thelen on the very same date shows that at
12   least Thelen had responsibility for
13   maintenance fees during the March 4, 2003
14   to March 5, 2003 period referenced in the
15   decision."
16          Do you see that?
17     A.   Yes.
18     Q.   So your counsel was saying that
19   even if it's correct that Sharinn ceased to
20   have responsibility because of that Power
21   of Attorney dated March 4th, that Thelen's
22   letter shows they submitted at that time,
23   that at least Thelen had the
24   responsibility, is that right?
25     A.   And that's on page -- which page?

31 (Pages 118 to 121)

Page 118

```
 1        A. Galloway
 2    Q.   3, in the second full paragraph,
 3  the second sentence that begins "Moreover."
 4        MR. DIAMOND: You've got the
 5  wrong document in front of you.
 6        MR. LODEN: Marty, I took out
 7  what I thought were the inadvertent
 8  inclusion pages. So look at that.
 9        MR. KAMINSKY: Terrific. Let's
10  take a look.
11        (Whereupon, an off-the-record
12    discussion was held.)
13  BY MR. KAMINSKY:
14    Q.   I want to give you an opportunity
15  to read those two paragraphs again.
16    A.   Okay.
17    Q.   Now, in the first sentence of the
18  second paragraph, your counsel is saying we
19  don't agree that Sharinn's responsibility
20  ended on March 4th and there is no
21  objective evidence in the record that would
22  support the office's conclusion in that
23  regard.
24        Do you see that?
25    A.   Yes.
```

Page 119

```
 1        A. Galloway
 2    Q.   In the second sentence they say,
 3  even assuming that's the case, as to which
 4  "petitioner vehemently contests," the Power
 5  of Attorney filed by Thelen on the very
 6  same day shows that at least Thelen had
 7  responsibility for maintenance fees during
 8  the March 4, 2003 to December 5, 2003
 9  period referenced in the decision.
10        Do you see that?
11    A.   Yes, I do.
12    Q.   So your counsel is saying that
13  because of that March 4th revocation of
14  Power of Attorney and Power of Attorney
15  form that we've marked as Exhibit 51 or
16  that's attached to the letter, both of
17  which comprise Exhibit 51, means that at
18  least Thelen had responsibility because
19  they filed that form in March of 2004,
20  correct?
21    A.   I believe counsel was saying that
22  while we disagreed that Sharinn does not
23  have responsibility, we disagree with that
24  conclusion, we do agree that Thelen did
25  have responsibility based upon this Power
```

Page 120

```
 1        A. Galloway
 2  of Attorney.
 3    Q.   Okay.
 4        Now, your counsel said there is
 5  no objective evidence in the record to
 6  support the conclusion that the Patent and
 7  Trademark Office reached that Sharinn's
 8  responsibility ended on March 4th.
 9        Do you see that?
10    A.   Yes.
11    Q.   What is the basis for them saying
12  that there was no objective evidence in the
13  record for that fact?
14    A.   Well, as I said, I didn't really
15  read this specifically at the time, and so
16  I don't know if I'm really qualified to say
17  what their basis is for saying that.
18    Q.   Did you ever discuss that with
19  him, did you ever discuss that particular
20  sentence with him?
21    A.   Not that I recall.
22    Q.   Now, you do recall that there was
23  a statement for Mr. Sharinn that your
24  counsel submitted to the Patent and
25  Trademark Office in which Mr. Sharinn said
```

Page 121

```
 1        A. Galloway
 2  this very statement, namely that his
 3  responsibility had ended on March 4, 2003
 4  when that revocation of Power of Attorney
 5  form was filed.
 6        Do you remember that?
 7    A.   I do recall that.
 8    Q.   And you saw that in Exhibit 60
 9  the decision of the Patent and Trademark
10  Office denying your petition for
11  reconsideration on pages 3 and 4, the U.S.
12  Patent and Trademark Office said we don't
13  agree with you there's no objective
14  evidence, in fact we specifically refer to
15  Mr. Sharinn's statement -- do you remember
16  that?
17        MR. DIAMOND: Objection to form.
18    A.   Yeah, I do understand what was
19  said in Exhibit 60.
20    Q.   Do you take issue with the U.S.
21  Patent and Trademark Office's conclusion in
22  Exhibit 60 that there is objective evidence
23  in the record submitted by Quickie's
24  counsel and in fact Mr. Sharinn's
25  responsibility had ended on March 4, 2004?
```

Page 122

1          A. Galloway
2          MR. DIAMOND: Objection to form.
3     A.   Yes, I do.
4     Q.   Okay.
5          So you don't recognize
6     Mr. Sharinn's statement and the revocation
7     of power forms as objective evidence
8     supporting the Patent and Trademark
9     Office's conclusion that Mr. Sharinn's
10    responsibility had ended on March 4, 2003?
11    A.   I don't recognize that as being
12    all of the evidence or documents involved
13    for that decision.
14    Q.   Well, all I'm asking you is the
15    Patent and Trademark Office says there is
16    some objective evidence in the record that
17    supports our conclusion that Mr. Sharinn's
18    responsibility for the '160 Patent ended on
19    March 4, 2003.
20         Do you disagree with that
21    statement by the Patent Office that there
22    is objective evidence in the record?
23         MR. DIAMOND: Objection to form.
24    A.   Again, I don't know if -- I think
25    what the statement says is some evidence to

Page 123

1          A. Galloway
2     be taken under consideration, which they
3     did.
4          What I disagree with is that that
5     was all of the evidence involved for making
6     that decision. I think there's potentially
7     other evidence that they could consider to
8     make that decision which they didn't have
9     available at the time of that decision.
10    Q.   Now, are you aware of any other
11    such evidence that was submitted to the
12    U.S. Patent and Trademark Office at any
13    time that contradicts Mr. Sharinn's
14    statement other than the statement in
15    Exhibit 61, your petition for
16    reconsideration that you don't agree with
17    Mr. Sharinn's statement, or that you then
18    don't, no longer agree with Mr. Sharinn's
19    statement?
20    A.   As of this time, we've not given
21    any other or we haven't submitted any other
22    petition to the Patent Office for further
23    reconsideration beyond what we submitted in
24    Exhibit 61.
25    Q.   This is now a year and a month

Page 124

1          A. Galloway
2     after the U.S. Patent and Trademark Office
3     has denied your petition for
4     reconsideration, correct?
5     A.   Correct.
6     Q.   And as of this time, you've
7     submitted no further evidence to the Patent
8     and Trademark Office, is that right?
9          MR. DIAMOND: Objection. Asked
10    and answered.
11    A.   At this time or since that time,
12    since that rejection would have been in
13    litigation and we felt it's not wise to
14    submit for reconsideration while we were in
15    litigation, and it's my understanding that
16    at the time of this consideration that
17    there were many documents requested, that
18    we requested from Greenberg and from Thelen
19    and from Todd Sharinn for the Patent Office
20    which they didn't have available when they
21    made this decision and which we should
22    eventually make available to them so they
23    would have complete objective evidence.
24         But since we were in litigation,
25    we decided not to submit that information

Page 125

1          A. Galloway
2     until the litigation is settled.
3     Q.   Okay.
4          Can you point to any specific
5     objective evidence, as you personally sit
6     here today, that shows that the prior
7     statements made by Quickie to the Patent
8     Office and the prior statements that it
9     submitted to the Patent Office on this
10    subject were incorrect?
11         MR. DIAMOND: Objection to form.
12    A.   Yeah, I think there's evidence
13    that we had a continued ongoing
14    relationship with Greenberg and Quickie for
15    maintenance of the '160 Patent and for
16    further prosecution of the '243 Patent for
17    the following two and a half to three years
18    after that, as well as other potential
19    intellectual property prosecution that was
20    being handled by Todd Sharinn and Greenberg
21    until he left the firm and that that is
22    evidence that they had some responsibility,
23    since they were billing us and charging us
24    for that, to advise us of what was going
25    on.

33 (Pages 126 to 129)

Page 126

1          A. Galloway
2          It wasn't like we ended the
3   relationship with them.  We had an ongoing
4   relationship with them for Quickie, for
5   this, for another patent application for
6   Quickie, and for several other things with
7   Quickie, and continued to interact with
8   them.  We just weren't doing the
9   re-examination of the patent with them.
10         So I think that evidence should
11  have been made available.  It wasn't made
12  available, which I think is an ethical
13  problem with Greenberg because they were
14  our clients and we hired them to do that
15  and we requested that through the Patent
16  Office why didn't they make that available
17  and why didn't Todd Sharinn make it
18  available since we were continuing to do
19  work with them -- that seems like a little
20  out of line to me, and also Thelen should
21  have made it available.  So I'm not like
22  giving any of them off.
23         You know, but again, we were
24  four, three heart surgeons operating 80 to
25  100 hours a week, we have a small

Page 127

1          A. Galloway
2   organization we put together here, we hire
3   this big firm, we spend millions of
4   dollars, I expected a little bit more from
5   these firms than that.
6      Q.   You said that there is evidence
7   that we had a continued ongoing
8   relationship with Greenberg and Quickie for
9   maintenance of the '160 Patent.
10         What is that evidence of an
11  ongoing relationship with Greenberg for
12  maintenance of the '160 Patent?
13     A.   Well, I think they billed us for
14  that.  I think that's the first evidence.
15         So I think -- and we had other
16  intellectual property within Quickie that
17  they billed us for during that time, but I
18  guess that wasn't the specific question.
19     Q.   All right.
20         I will tell you that we are not
21  aware of any bill for maintenance of the
22  '160 Patent and certainly for any bill with
23  respect to the '160 Patent after March of
24  2004.
25     A.   If I could further expand on --

Page 128

1          A. Galloway
2      Q.   -- 2003.
3          With that said, and your counsel
4   can correct me if I'm wrong, because I'm
5   not trying to misstate something, with that
6   said, let's put aside the issue of billing,
7   is there anything other than in your mind
8   that you feel they billed you for that and
9   build you for other IP work that you say
10  shows that there was a continuing
11  relationship with Greenberg for maintenance
12  of the '160 Patent?
13     A.   Well, yes.  Again, if I recall --
14     Q.   Let me stop you for just a
15  minute.
16         I certainly want to let you
17  answer, but just in the interests of
18  time -- I understand how you feel about it
19  and you've explained why you think they
20  should have had a responsibility, and if
21  you want to add to that you're welcome to
22  do it -- but when I'm asking you is there
23  any evidence, what I'm really asking you is
24  do you have a letter, an agreement, a
25  document, testimony from somewhere from

Page 129

1          A. Galloway
2   somebody else, someone who is other than,
3   you know, what you've explained before you
4   feel about this, and as I say I'm happy to
5   let you restate that, but what I'm really
6   looking for is do you have some sort of a
7   piece of paper or testimony or something
8   like that?
9          Now, with that said, is there
10  evidence that supports your statement that
11  the Greenberg Traurig firm had a continuing
12  relationship with Quickie for maintenance
13  of the '160 Patent after the revocation of
14  Power of Attorney form was filed in March
15  of 2003?
16     A.   Well, yes, I think there is.
17         First I think there were a letter
18  or letters from either Mark Evens on behalf
19  of Thelen to Todd Sharinn or by Alan Fell
20  or both saying that they would take and
21  would like to have the litigation
22  information related to the '160 Patent, but
23  that they would continue to work on all
24  other aspects of things related to Quickie.
25         I don't know the specifics of

34 (Pages 130 to 133)

Page 130

1       A. Galloway
2  that letter, but I remember something along
3  those lines.
4       Which -- give me one second to
5  think because I'm stretching my memory a
6  little bit.
7    **Q.   By all means take as much time as**
8  **you need, within reason of course, but**
9  **think it out and if there is something else**
10 **you can point to, please do.**
11    A.   Well, again, it was my
12 expectation that if they were transferring
13 that right which -- if Greenberg was
14 transferring the need to inform us of the
15 patent file filing fees, if they were
16 transferring that to Thelen, that they
17 would have wanted to inform us of that, and
18 two they would have informed the Patent
19 Office of that, which I don't think they
20 did.
21       So it's my understanding that the
22 Patent Office still lists Greenberg as the
23 maintenance patent attorneys, which I think
24 is evidence that was their
25 responsibility.

Page 131

1       A. Galloway
2       I think there's absence of
3  evidence that they asked for transfer of
4  that to Thelen, or that Thelen asked for
5  transfer of that.  So neither one of them
6  evidently thought that was clear that they
7  were asked that that would happen, and
8  therefore I thought it was their
9  responsibility to continue that as we
10 continued to work with them on other
11 things.  We didn't fire Greenberg.  We were
12 still working with Greenberg, Quickie was
13 working with Greenberg.
14    **Q.   Now, let me show you a document**
15 **which has been previously marked Exhibit**
16 **22. It's a letter from Alan Fell to Todd**
17 **Sharinn at Greenberg Traurig dated October**
18 **15, 2002.**
19       **Do you see, read the third**
20 **paragraph and tell me if that's the letter**
21 **that you were referring to a moment ago**
22 **where you said that Greenberg will continue**
23 **to handle patent applications for Quickie.**
24    A.   Well, I think this letter is -- I
25 don't know if it's the same letter -- this

Page 132

1       A. Galloway
2  letter is somewhat nebulous, but it says
3  back in paragraph 2 that Thelen Reid &
4  Priest will be substituted for Greenberg
5  Traurig in the referenced litigation and
6  you and Greenberg Traurig, and in paragraph
7  3, it says you and Greenberg Traurig will
8  continue to have various patent
9  applications pending on behalf of Quickie,
10 LLC and Quickie Vision, LLC.
11    **Q.   Now, the date of this letter is**
12 **October 2002, correct?**
13    A.   Correct.
14    **Q.   That's about 5 months before**
15 **Quickie submitted through Thelen Reid &**
16 **Priest a revocation of Greenberg Traurig's**
17 **Power of Attorney with respect to the '160**
18 **Patent, correct?**
19       MR. DIAMOND:  Objection to form.
20    A.   I believe that's the timing of
21 that, yes.
22    **Q.   Now, you said that the PTO still**
23 **listed Greenberg Traurig as counsel. I**
24 **will tell you, I'm not aware of it, but**
25 **let's take you at what you remember.**

Page 133

1       A. Galloway
2       You are aware that Quickie,
3  through Thelen Reid & Priest, submitted to
4  the PTO two forms revoking the powers of
5  attorney for Greenberg Traurig and changing
6  the address for all communications to
7  Thelen Reid & Priest.
8       Those are the forms we showed you
9  earlier that are dated March 4, 2003 that
10 you signed, is that right?
11    A.   Yes, I am aware of the forms you
12 showed me earlier.
13    **Q.   And you saw that Greenberg**
14 **Traurig received a notice from the PTO that**
15 **we marked as Exhibit 50 that we showed you**
16 **that advised Greenberg Traurig that the**
17 **Power of Attorney to you in this**
18 **application has been revoked and that**
19 **"further correspondence will be mailed to**
20 **the new addressee of record."**
21       **Do you see that in Exhibit 50?**
22    A.   Yes, I do.
23    **Q.   Now let me show you a document**
24 **that we will mark Exhibit 62.**
25       (Exhibit 62, E-mail, marked for

35 (Pages 134 to 137)

Page 134

1       A. Galloway
2    identification, as of this date.)
3  BY MR. KAMINSKY:
4    Q.   It is an e-mail from Mark
5  Evens -- actually, it's a chain of e-mails
6  in October 2006 between Mark Evens and
7  Thelen Reid & Priest, and it was produced
8  by Thelen in this case under Bates number T
9  758 to 759.
10      Have you ever seen that document
11  before?
12      MR. LODEN: Marty, let me just
13    note for the record that I believe
14    Thelen took the position at some point
15    that certain of these e-mails were
16    inadvertently produced.
17      I'm looking at the e-mail at the
18    top from Andrew Ness to Robert Blum,
19    that appears to be a communication
20    within Thelen itself, and I know that
21    Steve Crane took the position that
22    these were inadvertent productions and
23    asked us to return them.
24      I don't recall whether you were
25    included on that or not, but I just

Page 135

1       A. Galloway
2  want to note for the record this may
3  be one of those documents that Thelen
4  recalled.
5      MR. CHU: He did say this might
6    have been inadvertently produced. He
7    hasn't asked us to return it. He said
8    he might. He hasn't done it.
9      MR. LODEN: He asked us, and we
10    did.
11      MR. KAMINSKY: We'll look into
12    that question.
13      MR. LODEN: Okay.
14      MR. KAMINSKY: And if for some
15    reason we're using a document that
16    should not be used, then we'll just
17    expunge this aspect of it.
18      MR. LODEN: Fair enough.
19      MR. DIAMOND: It's between you
20    and Thelen.
21      MR. KAMINSKY: Yes. We'll talk
22    to them about it. But it's not our
23    intention to use attorney-client
24    material that may have been
25    inadvertently produced.

Page 136

1       A. Galloway
2      MR. LODEN: Of course.
3  BY MR. KAMINSKY:
4    Q.   In any event, for the moment,
5  let's continue on.
6      Do you see that in the second
7  e-mail in this chain that we've marked
8  Exhibit 62, Mark Evens, who was no longer
9  at that time with Thelen, writes to Andrew
10  Ness at Thelen, writes:
11      "Thanks, Andy, I don't profess to
12  be an expert, but my understanding at the
13  time was that question (TRP) was taking
14  responsibility for the patent and that is
15  how I read Bob's filing.
16      "Second, I remember a
17  conversation early on with Bob about not
18  missing fee deadlines.
19      "Finally, maintenance fees are
20  part of representing the patent, so I am
21  surprised that Bob as a practice patent
22  prosecutor wouldn't advise Quickie and
23  Steve that deadlines were approaching so we
24  would not lose his patent."
25      MR. DIAMOND: He would not lose.

Page 137

1       A. Galloway
2      MR. KAMINSKY: Thank you for the
3    correction, he would not loss his
4    patent.
5  BY MR. KAMINSKY:
6    Q.   Do you see that?
7    A.   Yes.
8    Q.   Were you aware that Thelen was
9  being told by its former partner that
10  Mr. Evens himself felt that Thelen had
11  taken on the responsibility for the
12  maintenance fees?
13    A.   This is the first time I've seen
14  this document, so I wasn't aware of this
15  document.
16    Q.   Okay.
17      Now, just some other general
18  questions for the moment with you.
19      Have you ever been involved in
20  another lawsuit?
21    A.   Related to?
22    Q.   Anything.
23    A.   Anything. I've been involved in
24  one or two legal malpractice lawsuits.
25    Q.   Have you given testimony by way

36 (Pages 138 to 141)

Page 138

1         A. Galloway
2  of deposition or at trial in those matters?
3         MR. DIAMOND:  I just want to make
4     clear for the record, when you say
5     legal malpractice, you mean medical
6     malpractice?
7         THE WITNESS:  I meant medical
8     malpractice.
9     A.    Medical malpractice lawsuits.
10    Q.    Are these lawsuits that were
11 brought against you?
12    A.    There have been, I think, maybe
13 one or two that I've given a deposition of
14 lawsuits brought against me and there may
15 have been one or two that I've given
16 deposition in as a defense for lawsuits
17 brought against someone else.
18    Q.    Do you have copies of the
19 transcripts of those depositions?
20    A.    No.
21    Q.    Did any of those cases go to
22 trial?
23    A.    I believe one case did go to
24 trial.
25    Q.    Was that a case that was against

Page 139

1         A. Galloway
2  you?
3     A.    Yes.
4     Q.    What was the result of the trial?
5     A.    There was an out-of-court
6  settlement with that case.
7     Q.    Did you give trial testimony
8  before the court?
9     A.    Yes.
10    Q.    Before the settlement?
11    A.    Yes.
12    Q.    And do you have a copy of the
13 trial transcript?
14    A.    No.
15    Q.    Have you ever been the subject of
16 a disciplinary proceeding or other kind of
17 proceeding against you besides the cases
18 you've just told us about?
19    A.    I have not been the subject of
20 any disciplinary proceeding.
21    Q.    Have you been the subject of any
22 administrative proceeding?
23    A.    No.
24    Q.    Your counsel told us about one
25 expert. Are you aware of any other expert

Page 140

1         A. Galloway
2  that's been retained by Quickie in
3  connection with this case?
4     A.    No.
5         MR. DIAMOND:  Well, I'm going to
6     state for the record that we'll make a
7     decision on the, question as counsel
8     will make a decision on disclosure of
9     experts in a timely fashion.
10        MR. KAMINSKY:  Let's go off the
11    record for a minute.
12        (Whereupon, an off-the-record
13    discussion was held.)
14 BY MR. KAMINSKY:
15    Q.    Now talking about the '160
16 Patent, can you tell us what your
17 understanding of the patented technology
18 is?
19    A.    Yes.  The '160 Patent was really,
20 encompassed two separate inventions or
21 methodologies for auto securing or auto
22 attaching suture without the need for tying
23 knots, which would have the potential to
24 simplify and streamline various aspects of
25 surgical procedures.

Page 141

1         A. Galloway
2     Q.    And what was the intended product
3  for the patented technology?
4     A.    Well, there was multiple
5  potential products for that technology
6  since the field of cardiac surgery is
7  significantly changing in that the field
8  had a need for more automated attachments
9  when sutures were used to secure a device
10 to a tissue or sutures were used to retract
11 or pull on a tissue rather than tying knots
12 shall because the field was moving to a
13 less invasive format overall.
14        So our idea was that if we could
15 facilitate that movement with a new
16 technology, we could rapidly retain sutures
17 without the need for the surgeons to tie
18 the conventional knots, which is the way
19 it's been done for 100 years.
20        And this was, the ideas that we
21 came up with to obtain that were the ideas
22 that were put in and captured in the '160
23 Patent.
24    Q.    Was this a suturing device for
25 heart valve replacement surgery?

37 (Pages 142 to 145)

Page 142

1          A. Galloway
2     A.    This was -- it's not a suturing
3   device.  This was a device for attachment
4   of any mechanical tissue or mechanical
5   device to tissue without the need for tying
6   or placing knots in suture.
7          So one potential usage would be
8   for heart valve attachment.  One potential
9   usage would be for tissue attachment or
10  tissue retraction.  Other potential usages
11  would be for attachment of any medical
12  device to a tissue, pacemakers to a tissue,
13  devices to a vessel wall, devices
14  intra-abdominally to intra-abdominal
15  tissues would be a potential manifestation
16  of that device.
17    Q.    Does that include heart valve
18  replacement?
19    A.    It does include heart valve
20  replacement.
21    Q.    Do you perform any of this kind
22  of surgery yourself?
23    A.    Yes, I perform a large volume of
24  heart valve replacement surgery and other
25  surgery and particularly the inventors,

Page 143

1          A. Galloway
2   myself and Dr. Colvin and Dr. Grassi in
3   particular felt that we had an idea of
4   where the technological needs of the field
5   were going and we felt that one of those
6   technological questions at that needed to
7   be answered was the way to more easily
8   secure material to tissue without the need
9   for knots.
10         That's what then led us to look
11  at ways we could do that and develop this
12  invention and then obtain the patent.
13    Q.    Do you use this invention in your
14  own surgery at this time?
15    A.    Well, the invention -- first of
16  all -- the answer is no at the present
17  time.
18    Q.    And is that because it's never
19  been actually developed and manufactured?
20    A.    That's correct.
21    Q.    Now, there is heart surgery that
22  you do when the heart is beating and heart
23  surgery that you do when the heart is not
24  beating, is that correct?
25    A.    That's correct.

Page 144

1          A. Galloway
2     Q.    Is this product or the product
3   that you anticipated would be developed in
4   the '160 Patent different from a suture
5   holder insert that might be used in a
6   retractor for beating heart surgery?
7     A.    Well, I think the suture holder
8   that was subsequently developed for
9   retraction in beating heart surgery we felt
10  was a knockoff or infringement on this
11  patent by a company that saw the technology
12  and then transferred the engineer to
13  another section of the company and then
14  came back a year later and used the device
15  within that section of the company.
16         So if that's the retraction
17  device you're referring to, then that was
18  our invention and we felt that that was
19  subsequently then knocked off by, if you
20  will, or duplicate by several other
21  companies as an infringement on our patent.
22    Q.    Have you brought infringement
23  action -- did you bring any infringement
24  actions against any of those companies?
25    A.    We brought infringement actions

Page 145

1          A. Galloway
2   against Medtronic and we had others that we
3   were discussing infringement action
4   against, but we, such as Guidant I think
5   was one, but we never actually brought it
6   because it was just too costly to proceed
7   with too many actions at once.
8     Q.    Can you tell us in your own words
9   what is your understanding of the benefits
10  or what would be the benefits of the '160
11  Patent to a manufacturer?
12    A.    Well, again, that would depend
13  upon what field of use that that was going
14  to be used in.
15         I've previously testified, and
16  you should have probably access to that,
17  the benefits of the '160 Patent to the
18  suture retraction off-pump technology or
19  for use in off-pump bypass surgery because
20  that was the way that we felt Medtronic was
21  infringing on our product or on our
22  invention.
23         So in that particular field,
24  then, it would be used to elevate and
25  retract the heart in the various positions

Page 146

1          A. Galloway
2    that would enable the surgeon to do
3    coronary bypass surgery without having to
4    place the patient on the heart lung machine
5    and without having to stop the heart, and
6    we felt and many other surgeons, if fact
7    the whole field was beginning to feel, that
8    that would have some significant advantages
9    in certain groups of patients because it
10   would avoid them to certain risk of the
11   heart lung machine and this device was
12   essential to achieving that retraction and
13   placement in the heart that allowed that
14   type of what was a relatively new technique
15   at that time in cardiology.
16          If you're speaking of valve
17   technology, there is potential to
18   place valves either without the heart lung
19   machine, which we're still working on with
20   similar technology, different, and there is
21   potential through less invasive incisions
22   or even through conventional incisions to
23   replace the valve without having to tie the
24   knots, which would roughly cut in half the
25   amount of time that was required for the

Page 147

1          A. Galloway
2    heart surgery, therefore lower the
3    morbidity risk to the patient and improve
4    outcomes.
5          That was the manifestation of the
6    technology that we initially licensed to
7    Medtronic to develop that aspect of the
8    technology.
9          Then there are other potential
10   uses, but I won't --
11   **Q.    That sounds like the benefits to**
12   **the end user, in other words, the user of**
13   **the product. What are the particular**
14   **benefits to the manufacturer of the**
15   **product?**
16   A.    Well, in anything -- anything
17   that ultimately benefits the patient, any
18   medical device that improves outcomes on a
19   patient is going to change or has the
20   potential to dramatically change the way
21   that health care is delivered.
22          So you start with the potential
23   for benefit to the patient, and if that
24   potential is strong enough then there is a
25   huge market value for that because that

Page 148

1          A. Galloway
2    would totally change the market of what
3    devices were being used to treat that type
4    of patient population.
5          So if you have the two
6    populations that we're talking about,
7    you're talking about the population of
8    coronary artery disease and you're talking
9    about the population of valve heart
10   disease, you're talking about the
11   population that kills more Americans than
12   any other disease, and both of which this
13   particular patent had a potential to impact
14   on the way those patients were treated to
15   improve their outcomes which then would
16   allow surgeons to have different approaches
17   that could be safer for the patient and
18   have better and produce better outcomes.
19   **Q.    Did anyone ever do a market study**
20   **for Quickie defining the market, what the**
21   **costs were, what the economics of**
22   **production would be if this patent were**
23   **actually put into a product that was**
24   **manufactured?**
25   A.    Well, Quickie -- again, we're a

Page 149

1          A. Galloway
2    small group, four, five guys, so we
3    couldn't afford to do that sort of market
4    assessment ourselves.
5          Certainly related to the valvular
6    aspects, that one narrow part, and it
7    covered more than that, that one narrow
8    part of the invention, the part of the
9    invention that related to ease of
10   implementation of aortic valves that would
11   cut time, potentially cut a substantial
12   amount of away from aortic valves.
13          I'm fairly certain, and although
14   I haven't completely seen every specific
15   one out there, I'm fairly certain that
16   Medtronic did an analysis of the impact of
17   that on market share and then factored that
18   number into the initial development
19   agreement price that we were, and the
20   initial licensing and developing agreement
21   that we signed with them and the potential
22   amount of patent royalties that they would
23   be able it payout based upon how that would
24   impact their version of market share.
25   **Q.    So Quickie didn't do that itself,**

39 (Pages 150 to 153)

Page 150

1           A. Galloway
2    correct?
3      A.   Medtronic did that analysis.
4      Q.   So the answer is that Quickie
5    didn't do it itself, Quickie did not do a
6    market analysis, cost analysis, an economic
7    analysis on its own?
8      A.   On our own Quickie did not do
9    that.
10     Q.   You believe that Medtronic did
11   it, is that what you're saying?
12         MR. DIAMOND:  I'm also going to
13      say, object only to the extent, I'm
14      looking for a definition of Quickie.
15      If Quickie also includes Quickie's
16      experts, I don't know whether the
17      answer would be the same or not.
18   BY MR. KAMINSKY:
19     Q.   Well, what I'm talking about is
20   when you were out trying to market the
21   device and when you made your efforts too
22   get people interested in it, as of that
23   time Quickie had not done a market
24   analysis, an economic analysis, a financial
25   analysis on its own, is that correct?

Page 151

1           A. Galloway
2      A.   When we began to market the
3    device to a company we marketed the device
4    as our perceived impact on outcomes and how
5    that would potentially shift market share,
6    and they then made their business decisions
7    based upon potential for market shares my
8    understanding.  But we didn't do that
9    analysis related to market share ourselves
10   within Quickie.
11     Q.   Just to be clear, you didn't
12   market the device, you were marketing the
13   patent, is that right?  You were trying to
14   license the patent, isn't that correct?  No
15   one has ever developed, actually produced
16   and put on the market a device itself, have
17   they?
18     A.   We licensed the idea, the idea,
19   and we had intellectual property to protect
20   the patent and we had a patent that was
21   patent protected intellectual property,
22   only idea.  We licensed that to Medtronic.
23         Medtronic in our opinion
24   subsequently infringed on that patent and
25   used that idea and marketed and sold it to

Page 152

1           A. Galloway
2    a significant number of people in the field
3    of use that they owned and had bought from
4    us after, but after they had terminated
5    their agreement with us.
6      Q.   But you were not marketing a
7    device, you were marketing the patent and
8    the rights to use whatever the patent
9    covered, is that correct?
10         MR. DIAMOND:  You being Quickie.
11   BY MR. KAMINSKY:
12     Q.   You being Quickie, and by Quickie
13   let me broaden this, the Colvin Galloway
14   companies, entities.
15     A.   Well, there is no Colvin Galloway
16   companies again.  I mean, that's not
17   exactly true.  There is an S&A Rings
18   company that is very specific, I don't
19   think we're talking about that, there is
20   a -- which really is Steven & Aubrey,
21   that's what that means, Steve & Aubrey,
22   it's a pretty small company.
23         There is a Quickie company,
24   Quickie, LLC that had the '160 Patent, it
25   also had the '243 Patent that relates to

Page 153

1           A. Galloway
2    ways to ease the attachment of devices to
3    facilitate surgery and we have attempted to
4    license those, that property, that
5    intellectual property to companies for
6    subsequent development and potential
7    market.
8      Q.   Okay.
9         So all I'm trying to clarify is
10   that what you were trying to market to
11   people was the use of your patent.  That's
12   what you were going out to people to say,
13   you should sign a contract with us so you
14   get the rights to use our patent, correct?
15     A.   Correct.
16     Q.   You, yourself, had not developed
17   a device, correct?
18         MR. DIAMOND:  Again, you being
19      Quickie?
20   BY MR. KAMINSKY:
21     Q.   You being Quickie, and the only
22   reason I used the broader term is because I
23   don't want to miss something if there was
24   someone else who was doing it for you, by
25   all means tell me.

40 (Pages 154 to 157)

Page 154

```
 1        A. Galloway
 2        But again, when I use the word
 3  you, I'm talking about Quickie or anybody
 4  acting on Quickie's behalf.
 5        So my question is, you, Quickie,
 6  did not actually develop a device, is that
 7  correct?
 8     A.  That's correct, it was never the
 9  intent of Quickie to develop or manufacture
10  a device within Quickie.
11     Q.  Now -- and you, Quickie, again on
12  your own, did not do or commission when you
13  were out trying to market the patent a
14  market study, a projection of revenue, any
15  sort of financial or analysis or analysis
16  of that type, is that correct?
17     A.  That's correct.
18     Q.  Now, you did go to Medtronic, is
19  that right?
20     A.  Correct.
21     Q.  And you did have a license with
22  Medtronic for a period of time as we
23  established, correct?
24     A.  Correct.
25     Q.  You said you believed that
```

Page 155

```
 1        A. Galloway
 2  Medtronic did some form of a market or
 3  economic analysis, is that right?
 4     A.  They indicated to me that they
 5  did, yes.
 6     Q.  Did you ever see that market or
 7  economic analysis?
 8     A.  No.
 9     Q.  Was one of produced in the course
10  of the Medtronic litigation, to the best of
11  your knowledge?
12     A.  To the best of my knowledge, none
13  was, there was no internal analysis of the
14  value of the patent related to valve
15  surgery produced within the litigation
16  against Medtronic.
17     Q.  Now, you also went to some other
18  companies at that time, that's when you
19  went to Medtronic, including U.S. Surgical
20  and Ethicon -- is that the correct
21  pronunciation?
22     A.  That's correct.
23     Q.  Did you ever -- and they chose
24  not to license the product, is that right,
25  or license the patent, is that right?
```

Page 156

```
 1        A. Galloway
 2     A.  Well, we went to -- at that time
 3  you're referring to, meaning the time that
 4  we went to U.S. Surgical and Ethicon, to my
 5  recollection the cardiovascular uses aspect
 6  of the '160 Patent were tied up with
 7  Medtronic.
 8        So we felt that was the most
 9  valuable aspects of the '160 Patent.  But
10  there were other potential uses for
11  non-cardiac use of the '160 Patent, like
12  gastrointestinal surgery, neurosurgery,
13  things such as that -- and since Ethicon
14  and U.S. Surgical produced products related
15  to those potential manifestations of the
16  patent, we went to speak with them.
17        It was my recollection that they
18  were not interested unless they could have
19  all the aspects of the 160 patent which
20  were the cardiovascular to the '160 Patent,
21  which were tied up at the time with
22  Medtronic, so we couldn't offer that.
23     Q.  Both U.S. Surgical and Ethicon
24  declined to enter into a licensing
25  agreement with Quickie, is that correct?
```

Page 157

```
 1        A. Galloway
 2     A.  Correct.
 3     Q.  And other than Quickie and
 4  Medtronic, no one else has entered into a
 5  license agreement with Quickie or -- strike
 6  that.
 7        Other than Medtronic, no one else
 8  entered into a license agreement with
 9  Quickie before the patent expired, is that
10  correct?
11     A.  That's correct.
12     Q.  After Medtronic terminated the
13  agreement with Quickie, did you go back to
14  U.S. Surgical and Ethicon to see if they
15  would license the patent at that time?
16     A.  No.  At that time we wanted to go
17  back and focus on valve technologies.  So
18  the next thing we did is we went back and
19  developed another licensing agreement,
20  again with Medtronic, believe it or not,
21  but without the use of the '160 Patent, but
22  in the need of use for valve attachment
23  that we wanted to use the '160 Patent, and
24  that agreement with Medtronic precluded us
25  from developing anything with any other
```

41 (Pages 158 to 161)

Page 158

1         A. Galloway
2  cardiovascular device companies as long as
3  we were under that next potential license
4  agreement with Medtronic, which went for
5  about a year to a year and a half.
6         In that development we then got
7  to a point where they decided it was not
8  economically feasible to go to market with
9  the invention that we were producing,
10  released us from that agreement, which then
11  freed us again to go use the '160 Patent,
12  and I think by that time our '243 Patent to
13  work with other players in the valve
14  technology realm, just where we were at
15  that time going to focus.
16         So we then subsequently went to
17  St. Jude to potentially do a valve
18  attachment development agreement with them
19  to encompass the potentially the 160 and
20  the 243.
21         We then subsequently found that
22  the 160 was lapsed.  Those negotiations
23  fell apart.
24         Then we've subsequently gone to
25  Edwards Life Sciences and we don't have the

Page 159

1         A. Galloway
2  160 attachment part of the IP, but for
3  other ideas that we have are now signing a
4  development agreement with them.  But that
5  agreement will require that Quickie, LLC
6  transfer the '243 Patent over to the new
7  entity that will work with Edwards.
8     Q.  So you may be entering into a
9  license with Edwards for the '243 Patent,
10  correct?
11     A.  I think that the technical way
12  it's going to work is that we formed a new
13  company that will buy the '243 Patent from
14  Quickie, LLC and that new company will then
15  license that patent and enter into the
16  development agreement with Edward.
17     Q.  And you've been able to do that
18  notwithstanding the expiration of the '160
19  Patent, correct?
20     A.  I was able to do it, but it would
21  have helped if we have the '160 Patent.
22     Q.  But you've been able to do it,
23  correct?
24     A.  Correct.
25     Q.  Now, in fact, you didn't make any

Page 160

1         A. Galloway
2  effort after Medtronic terminated its
3  license agreement with you to go back to
4  U.S. Surgical or Ethicon to see if they
5  would then become interested in the '160
6  Patent, is that correct?
7     A.  That's correct.
8     Q.  Did you go to anyone else after
9  Medtronic terminated the license and before
10  you learned that the '160 Patent had been
11  abandoned or deemed abandoned or expired
12  besides St. Jude to see if you could do a
13  license that would cover the '160 Patent?
14     A.  No one else other than those
15  previously indicated.
16     Q.  Is St. Jude interested in the
17  '243 Patent?
18     A.  They were less interested in the
19  '243 Patent.
20     Q.  Is there written correspondence
21  with St. Jude of any nature that explains
22  why St. Jude passed on the '243 Patent?
23     A.  Not to my recollection.
24     Q.  Is there written correspondence
25  with St. Jude that discusses the fact that

Page 161

1         A. Galloway
2  the '160 Patent had expired?
3     A.  Not to my recollection.
4     Q.  Now, the '160 Patent's expiration
5  means that that technology or information
6  is available to anyone in the marketplace
7  at this time, is that right?
8         MR. DIAMOND:  Objection to form.
9     Calls for a legal conclusion.
10  BY MR. KAMINSKY:
11     Q.  What do you understand to be the
12  effect of the expiration of the '160 Patent
13  in terms of the ability of the market to
14  use whatever was covered by that patent?
15     A.  My understanding is that it's not
16  covered under intellectual property patent
17  law and therefore other people in the
18  market could potentially use that
19  technology.
20     Q.  Is anyone currently marketing a
21  device that does what the '160 Patent
22  covered, as far as you know?
23     A.  Absolutely.  Medtronic still
24  continues to produce the auto suture device
25  for off-pump valve surgery -- excuse me,

42 (Pages 162 to 165)

Page 162

1       A. Galloway
2   for off-pump coronary bypass surgery,
3   similar to what was described during the
4   Markman Hearing and was evaluated by
5   experts that we had at that time. They
6   continued to produce that in a field that
7   continues to grow market shares
8   significantly in the area of coronary
9   bypass surgery.
10      It was our understanding also
11  that Guidant also is using a device that
12  also is an infringement of the embodiments
13  of our patent for their off-pump surgery
14  platform.
15      Those platforms are not just
16  U.S., they're worldwide platforms, and
17  resulted in a significant shift in the type
18  of technology that's used for coronary
19  bypass surgery.
20  **Q.   Do you know the names of the**
21  **products that those companies are using**
22  **that you say would have been infringing on**
23  **your '160 Patent that it not expired?**
24      A.  Yes. The, we call floating cam
25  embodiment of the '160 Patent is the

Page 163

1       A. Galloway
2   embodiment of the patent that was used in
3   the October at that-based platform for the
4   entire October at that system, which is
5   their system for off-pump coronary bypass
6   surgery, and the Guidant base that has an
7   auto suturing mechanism is also in our
8   opinion an infringement of the embodiment
9   of the patent.
10  **Q.   Is there any other name for that,**
11  **for either of those products?**
12      A.  They're the mechanism for auto
13  securing of sutures onto the base of the
14  retractor in the off-pump system.
15  **Q.   Now, if they go to the market,**
16  **which I take it it's doctors, is that who**
17  **they would -- or hospitals, who would be**
18  **the market for these products?**
19      A.  Cardiac surgeons.
20  **Q.   They go to a cardiac surgeon.**
21  **What name do they give to the product that**
22  **they say they're going to offer you as a**
23  **cardiac surgeon that Quickie contends would**
24  **have infringed the '160 Patent?**
25      A.  The Medtronic system is, I

Page 164

1       A. Galloway
2   believe, called their off-pump platform
3   which includes an octabase,
4   O-C-T-A-B-A-S-E, which is a base retractor
5   which specifically uses the floating cam
6   mechanism within that retractor as well as
7   associated technology, all of which
8   together is a composite, allows surgeons to
9   do the off pump surgery.
10      In the Guidant system, I don't
11  know the specific name of it, but it's also
12  the similar auto attachment mechanism in
13  the base of their retractor system, which
14  is built into their retractor system, which
15  is their platform for off-pump.
16  **Q.   Now, you are a cardiac surgeon,**
17  **is that right?**
18      A.  Correct.
19  **Q.   Do you use either of these**
20  **devices in your surgery?**
21      A.  Yes, I use the Medtronic version
22  of this device.
23  **Q.   Does the device that would be**
24  **covered by patent have anything to do with**
25  **the product that would be used as an**

Page 165

1       A. Galloway
2   external holder of sutures?
3       A.  I guess it could be used as an
4   external holder of sutures. It's a
5   mechanism for auto securing sutures and
6   there's various mechanisms to do that, but
7   it can be used as an external surer of
8   sutures.
9   **Q.   Are you aware of anyone using it**
10  **in that manner now at this time?**
11      A.  Well, again, I think, and it's a
12  matter of semantics, the octabase portion
13  of the off-pump system is really external,
14  it's not -- we're in the chest, but it's
15  external to the body, it's not
16  intravascular use.
17      It's a system that's placed on
18  the chest that allows the auto securing and
19  placement and tractional systems that will
20  have an impact on the heart for positioning
21  that then allows the surgeon to continue to
22  do the surgery without having to go on the
23  heart lung machine.
24      So, technically, it is external,
25  not being intravascular, and it's not

43 (Pages 166 to 169)

Page 166

1           A. Galloway
2  implantable, it's not left in, it's used
3  for the surgery and taken away.
4     Q.   But that's not what you normally
5  refer to as an external holder of sutures,
6  is it?
7     A.   Well, as a cardiac surgeon that's
8  what we refer to it as.  We externally hold
9  sutures to, for retraction.  Internal would
10 be inside the heart or inside the blood
11 vessel.
12    Q.   Have you ever seen anyone to this
13 day, including your expert do a forecast of
14 the size of the market for the patent
15 technology that would have been covered by
16 the '160 Patent?
17       MR. DIAMOND:  And let me just say
18    he's asking what you've seen as part
19    of that question with respect to
20    experts.
21       To the extent you haven't,
22    doesn't mean the expert has done it,
23    and he will get an appropriate report.
24 BY MR. KAMINSKY:
25    Q.   I'm trying to see whether you've

Page 167

1           A. Galloway
2  seen such an analysis as you sit here
3  today, June 12, 2008.
4     A.   Yes, yes.
5     Q.   Whose did you see?
6     A.   So again, it was back to the
7  question you asked me earlier, I don't
8  remember the name of the person.  It was
9  the analysis done as the expert at the
10 request of Greenberg Traurig in the
11 infringement lawsuit against Medtronic at
12 that time, which was I think 2004 roughly
13 for just that embodiment of the patent, and
14 it's my recollection that there was 7 to
15 $10 million estimate of market value at
16 that time by that expert and, for that
17 embodiment of this patent.
18       And beyond that, I don't know
19 what's transpired since then.
20    Q.   Are you sure that was done by,
21 you know, by an expert for Greenberg
22 Traurig at the time of the Markman Hearing?
23    A.   I'm not 100 percent sure.  It was
24 done at the time of the Markman Hearing, I
25 know that.

Page 168

1           A. Galloway
2     Q.   Are you talking about a report by
3  Mark Berman, is that right?
4     A.   I don't know.
5     Q.   Are you sure that wasn't done by,
6  you know, during the Thelen period when
7  they were running the Medtronic case after
8  Greenberg had already been replaced?
9     A.   I can't be sure of that.
10    Q.   But in any event, you're
11 referring to an expert report done for
12 Quickie in connection with the Medtronic
13 lawsuit, is that right?
14    A.   I'm referring to an expert
15 opinion that was done for Quickie at the
16 request of our counsel, whoever it was at
17 the time, in response to that, at the time
18 or shortly after the Markman ruling to
19 assess damages.
20    Q.   But in connection with the
21 Medtronic case?
22    A.   In connection with the Medtronic
23 case.
24    Q.   Has Quickie itself ever done any
25 market research with respect to the '160

Page 169

1           A. Galloway
2  Patent?  I think that's probably covered by
3  my prior questions, but I just want to make
4  clear that market research is not in your
5  mind something different than the kind of
6  analysis I was talking about before.
7     A.   No.
8     Q.   Now, I think you've told me this
9  before, but I just want to see if I'm
10 correct.  If you've said it before, you can
11 just say it's in my prior answer.
12       What is your understanding of why
13 U.S. Surgical and Ethicon declined it take
14 a license in the '160 Patent?
15    A.   Again, I believe that was in my
16 prior answer.
17    Q.   Okay.
18       Did Quickie develop any internal
19 licensing procedures or policies in writing
20 rather than orally?  In other words, did
21 you at any time when the '160 Patent was
22 extant have any set of written procedures
23 or policies for licensing the product?
24    A.   I don't believe so.
25    Q.   What royalty rate did Quickie

44 (Pages 170 to 173)

Page 170

1          A. Galloway
2  believe was the appropriate royalty rate
3  for a license of the '160 Patent?
4      A.   I believe the royalty rate that
5  we agreed upon was a 6 percent royalty
6  rate.
7      Q.   What factors did Quickie consider
8  in determining what the appropriate royalty
9  rate should be?
10         MR. DIAMOND: At what point in
11  time are we talking here?
12         MR. KAMINSKY: Prior to the
13  expiration of the patent whenever he
14  was attempting to license the patent
15  to anyone.
16     A.   Well, I think the 6 percent is at
17  least in our experience had been the going
18  rate of a royalty for an idea that you had
19  sole intellectual property to and they felt
20  could be a substantial part of a device or
21  system.
22         So I think that met that criteria
23  and I think that's what was agreed to by
24  Medtronic because they thought they had met
25  that criteria.

Page 171

1          A. Galloway
2      Q.   What did you review to determine
3  that that was a going rate for this kind of
4  a royalty?
5      A.   Well, we had a, let's just say we
6  had in a different system all together.
7  The S&A Rings company had an issued patent
8  or applied for a patent that was likely to
9  be issued on an angioplasty device, and at
10  least the way they wrote that initial
11  agreement, which is our first major
12  development agreement with the company was
13  that they would give, they would assign a 6
14  percent royalty if you ultimately had an
15  executed patent that was in place at the
16  time of production or once that patent was
17  in place then the royalty would be 6
18  percent -- and in least in that agreement
19  then the royalty prior to issuance would be
20  smaller rate, and if you didn't get
21  issuance of a patent but they still
22  continued with the product then it would be
23  a smaller rate.
24         So based upon that negotiation in
25  the past, we used that as our template and

Page 172

1          A. Galloway
2  it was a similar template that we developed
3  for the Quickie device '160 Patent.
4      Q.   Are you getting a 6 percent
5  royalty in your arrangement for the '243
6  Patent with Edwards?
7      A.   The Edwards arrangement is, they
8  figure royalties in a completely different
9  way. So the answer is no, they figure it a
10  completely different way, but it's roughly
11  equivalent it that.
12     Q.   Is it correct that you offered
13  some of the potential licensees a 4 percent
14  royalty or something less than a 6 percent
15  royalty?
16     A.   If you don't feel you have -- we
17  may have, I don't know what you're
18  referring to specifically, but as a general
19  rule if we have covered intellectual
20  property for an idea it would be a 6
21  percent royalty.
22         If we had either not all
23  embodiments of the patents, so if we were
24  restricted, or if that -- or if the device
25  would have to be hybrid with another

Page 173

1          A. Galloway
2  technology, we might decide to go to a
3  lesser royalty rate to have to go ahead and
4  produce the patent because we might make
5  the decision that that was the best way to
6  get to market and without other technology
7  we also couldn't get to market, so we might
8  negotiate down the royalty rate.
9      Q.   Did you ever get if your
10  negotiations with U.S. Surgical to a point
11  where you discussed a potential royalty
12  rate?
13     A.   I think U.S. Surgical and
14  Ethicon, again once, we got beyond the
15  point that we didn't have cardiovascular
16  usage, I don't recall that we ever got to
17  any particular point on royalty rate
18  because they would have wanted
19  cardiovascular usage.
20         So I'm not aware that we got
21  this, we could have, but I don't remember
22  specifically.
23     Q.   With either U.S. Surgical or
24  Ethicon, is that right?
25     A.   Correct.

45 (Pages 174 to 177)

Page 174

1        A. Galloway
2    **Q.    Did Quickie develop an internal**
3 **business plan with respect to the '160**
4 **Patent?**
5    A.    No.
6    **Q.    Did Quickie assign any particular**
7 **person within Quickie to do any analysis of**
8 **how the invention might be monetized, that**
9 **is the invention that's covered by the '160**
10 **Patent?**
11   A.    Well, I think the value of the
12 patent to the company, I think the method
13 we used to articulate what we thought the
14 value of the patent was to the companies
15 was myself and Dr. Colvin's articulation
16 about how we articulated this would be used
17 in the market.
18       As we explained the potential
19 usage of the patent and potential patient
20 benefits, that has certain implications on
21 market share and that's -- since we were
22 considered experts in the field, that's the
23 methodology that we used to negotiate
24 potential market impact and royalty rates
25 rather than a formal business plan.

Page 175

1        A. Galloway
2    **Q.    Now, prior to the invention that**
3 **was covered by the '160 Patent, what**
4 **methods were used for suturing in hard**
5 **surgery or the kind of surgery in which the**
6 **'160 Patent might be used?**
7    A.    Prior to that time, the vast
8 majority of attachment techniques for
9 medical devices have been through sutures
10 and the surgeons tying knots with their
11 fingers for the placement of those sutures
12 and attachment of the device there did
13 surgeons use hemostats or clamps.
14       Not for the embodiments that we
15 were talking about.
16   **Q.    How about coils of a helical**
17 **spring?**
18   A.    Again, not for the embodiments
19 that we're talking about.  That's simply
20 for holding out of the way, that was
21 different and specifically for holding out
22 of the way a suture for placement.
23       But that's different than
24 attaching under a certain degree of force a
25 suture that will allow a certain force to

Page 176

1        A. Galloway
2 be applied to the tissue, and that required
3 the embodiment of the patent that we
4 presented, which was one of the novel parts
5 of it.
6       So you couldn't do the same thing
7 with a hemostat or a coil, we just held the
8 sutures out of the way, that wasn't the
9 point.  You could, in fact, even attach the
10 suture tightly enough to secure a valve
11 against the force of contractility or to
12 secure, to displace the heart so we could
13 do surgery.  So that's a completely
14 different thing.  It wasn't the same.
15   **Q.    What about elongated flexible**
16 **plastic with overlapping ends?**
17   A.    I'm not familiar with what that's
18 used for.
19   **Q.    How about retention bars made of**
20 **a pliable material?**
21   A.    Again, retention bars are for a
22 completely different thing.
23       Retention bars are something
24 related to often coils that will just hold
25 sutures out of the way in a quasi temporary

Page 177

1        A. Galloway
2 fashion, but not under a certain degree of
3 force.
4       So they're used for, if you will,
5 organization of sutures, but not for actual
6 retention sutures under force, my feeling
7 of it.
8    **Q.    So that's another thing that you**
9 **feel is different than the '160 Patent, is**
10 **that right?**
11   A.    Yeah.
12   **Q.    Okay.**
13       **What about devices for tensioning**
14 **and securing surgical tape around tapered**
15 **plugs?**
16   A.    I think that would be different.
17   **Q.    And a suture organizer using**
18 **spring clips that is would be different?**
19   A.    Different.
20   **Q.    Were the prior suture holders or**
21 **other suture holders by Guidant competitive**
22 **to what you were doing or what your patent**
23 **would be enabling people to do?**
24   A.    You mean prior to our patent?
25   **Q.    Yes.**

46 (Pages 178 to 181)

Page 178

1           A. Galloway
2     A.   It was not my understanding they
3    were, no.
4     Q.   But they did have suture holders,
5    didn't they, Guidant did?
6     A.   I think they probably had some
7    type of suture holder, yeah.
8     Q.   Do you know what an obtrack
9    suture stay is?
10    A.   Not really.
11    Q.   That was a product as we
12   understand is sold by one of Ethicon's
13   companies, Cardiovasculance?
14    A.   Uh-huh.
15    Q.   You're not aware of that product?
16    A.   I'm aware of the company, but I'm
17   not off the top of my head specifically
18   aware of the product.
19    Q.   S-T-O-C-K-I-N-E-T, what is a
20   stockinet?
21    A.   A stockinet is sometimes, they
22   will use a sterile almost like a sock to
23   help retract the heart itself during
24   various parts to the procedure.
25    Q.   What other methods are currently

Page 179

1           A. Galloway
2    available to doctors to do what the '160
3    Patent does without infringing the '160
4    Patent?
5     A.   I'm not sure I know the answer to
6    that.
7     Q.   Do you know which method of doing
8    what the '160 Patent would do is the most
9    prevalent method that's currently in use by
10   doctors?
11        MR. DIAMOND:  Generally, all
12    applications?
13        MR. KAMINSKY:  Yes.
14        MR. DIAMOND:  Objection to the
15    extent that it's outside of his
16    expertise and experience, but go
17    ahead.
18    A.   I guess I don't know
19   specifically.  I would still think since
20   there is not yet an auto attachment valve
21   in use yet that embodies that exact
22   technology, that it's still likely one of
23   the October at that base type of
24   retractors, most likely still the Medtronic
25   system unless, and I don't know the answer

Page 180

1           A. Galloway
2    to this, unless they tried to design around
3    that after the lawsuit, which they may or
4    may not have, I don't know for sure.
5     Q.   Do you know in heart surgery
6    whether people are using methods that do
7    not infringe the '160 Patent at this time?
8     A.   Oh, I'm sure they are.
9     Q.   And do you know whether the uses
10   that would infringe the '160 Patent are
11   more prevalent than the uses which are not?
12    A.   Well, it would be my impression
13   that at least for the aspect of heart
14   surgery termed off-pump surgery that the
15   part of that system that I've previously
16   spoken about which is the embodiment of the
17   patent within the octabase or the
18   embodiment of the patent within a base of a
19   system by Guidant would infringe, and it's
20   also my understanding or my belief that
21   between the two of them they have the
22   largest by far and away market share of
23   off-pump cardiac surgery, and specifically
24   I think Medtronic by launching that
25   platform gained and has kept market share

Page 181

1           A. Galloway
2    leadership for off-pump surgery, and I
3    don't know who is second beyond Medtronic.
4     Q.   But as you've explained before,
5    you have never done a study of that, have
6    you?
7     A.   No.
8     Q.   And you've never seen a study
9    yourself, that is you, yourself, seen a
10   study of that?
11    A.   I think I seen studies that show
12   that Medtronic is the market share leader
13   of off-pump bypass surgery, which I know
14   that this is what we believe to be an
15   infringement or a patent that was
16   incorporated in that system that helped
17   them capture that market share.
18        So I have seen those data, but I
19   haven't seen the specifics of the market
20   study other than that they became the
21   market leader in that area.
22    Q.   Where have you seen such a study?
23    A.   I've seen that study in dealing
24   with my dealings with a company called
25   S-TEC, which we've done through our entity

47 (Pages 182 to 185)

Page 182

1        A. Galloway
2  E-Surge, a small development agreement with
3  them non-related to that device or
4  non-related to off-pump surgery.
5        But as part of that relationship
6  with them, they have strongly encouraged us
7  to use their off-pump coronary bypass
8  system and they've shown us that Medtronic
9  is the market leader, but try to give us
10 reasons why we should use their system
11 instead, which we haven't done because we
12 actually think the Medtronic products are a
13 better product, but that's where I saw that
14 information.
15    Q.   Have you gone a copy of any such
16 study or information?
17    A.   No.
18    Q.   Are you aware of any published
19 study that tells one what doctors are using
20 in relation to the type of product or
21 products that would have been covered by
22 the '160 Patent?
23    A.   I guess personally I'm not aware.
24       MR. KAMINSKY:  Give me two
25    seconds.

Page 183

1        A. Galloway
2        (Pause)
3  BY MR. KAMINSKY:
4    Q.   Let me show you a document that
5  we are marking 63.
6        (Exhibit 63, U.S. Patent and
7        Trademark Office decision, marked for
8        identification, as of this date.)
9    Q.   Let me show you a document which
10 we're marking Exhibit 63.  It is an action
11 taken by the U.S. Patent and Trademark
12 Office dated February 20, 2008 and
13 represents the decision on Medtronic's
14 request for re-examination of the '160
15 Patent.
16       Have you ever seen that before?
17    A.   No, I don't recall that I've seen
18 this before.
19    Q.   Are you aware that the U.S.
20 Patent and Trademark Office rendered a
21 decision that significantly narrowed the
22 '160 Patent from what had originally been
23 issued?
24       MR. DIAMOND:  Objection to form.
25    Assumes facts not in evidence.  Calls

Page 184

1        A. Galloway
2  for a legal conclusion.
3        Also, when you say you, again, I
4  have to clarify, I don't want to
5  testify, but Dr. Colvin was aware of
6  this in great detail on behalf of
7  Quickie, so --
8       MR. KAMINSKY:  Well, just to
9  clarify for this, since Dr. Colvin has
10 passed away, we are assuming that
11 Dr. Galloway is the testifying expert
12 for Quickie and so I can't ask
13 Dr. Colvin obviously.
14       MR. DIAMOND:  Certainly.
15       MR. KAMINSKY:  So I'm really
16 asking him in that capacity.
17    A.   So as a representative of
18 Quickie, I was aware that there was such a
19 ruling and I think actually was made aware
20 of that by Dr. Colvin, but I didn't really
21 read that ruling and I haven't really seen
22 this until now.
23    Q.   Would you look at the third page
24 of the document, the page that's entitled,
25 "Office action and ex parte reexamination."

Page 185

1        A. Galloway
2        Do you see that?
3        Under part 2 where it says
4  summary of action, do you see that under
5  box 1A the decision of the Patent Office
6  notices that claims 1 through 34 were the
7  subject of a re-examination?
8    A.   Yes, I see that.
9    Q.   And that's all of the claims that
10 were in the patent, is that right?
11       MR. DIAMOND:  Objection to form.
12    If you know.
13    A.   I don't know specifically, but if
14 those were the 34 claims in the patent, I
15 understand that they were the subject of
16 reexamination, so I assume that's true.
17    Q.   Were you aware that Medtronic was
18 making a challenge and seeking a
19 re-examination of the entire patent?
20    A.   Yes.
21    Q.   Now, do you see under part 2,
22 item 3 on the page we're talking about, the
23 patent office determined that claims 26 and
24 30 are patentable and are confirmed?
25    A.   I do see that.

48 (Pages 186 to 189)

Page 186

1         A. Galloway
2    Q.   So they agreed that two of the
3  claims were patentable and confirmed,
4  correct?
5    A.   Connect.
6    Q.   And do you see under item 4 that
7  they determined that claims 1 through 25,
8  27 through 29 and 31 through 34 were
9  rejected, do you see that?
10   A.   Yes.
11   Q.   So they struck those claims from
12  the patent, is that right?
13       MR. DIAMOND: Objection to form.
14  BY MR. KAMINSKY:
15   Q.   Is that what you understand
16  happened?
17   A.   I understand that the claims
18  listed under number 4, 1 to 25, 27 to 29
19  and 31 through 34 were rejected.
20   Q.   And therefore were not going to
21  be patentable, is that right?
22       MR. DIAMOND: Objection to
23  form.
24   A.   Well, according to this ruling,
25  they were rejecting -- we would have I

Page 187

1         A. Galloway
2  think an opportunity to appeal that.
3    Q.   Have you appealed that?
4    A.   I think that we would have to go
5  back to the Patent Office in my
6  understanding for potential re-examination.
7  I'm not the attorney, so I don't know for
8  sure.
9    Q.   Has Quickie instructed anyone to
10  appeal this decision or do anything to
11  attempt to overturn this decision that is
12  reflected in Exhibit 63?
13       MR. DIAMOND: You can answer
14   other than in the instructions that
15   you or Quickie would have given to its
16   counsel.
17       THE WITNESS: Sure.
18   A.   Again, up until this point, since
19  we're under litigation, I think we haven't
20  instructed a specific action on this part
21  at this time.
22       MR. KAMINSKY: No further
23   questions.
24       MR. DIAMOND: I will reserve all
25   my questions for this witness until

Page 188

1         A. Galloway
2    the time of trial.
3       MR. KAMINSKY: Okay. Thank you.
4       (Time noted: 1:46 p.m.)
5
6       _____
7              AUBREY GALLOWAY
8
9  Subscribed and sworn to before me
10  this ___ day of _____, 2008.
11
12  _____
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 189

1
2         C E R T I F I C A T E
3  STATE OF NEW YORK    )
4                 : ss.
5  COUNTY OF NEW YORK   )
6
7       I, Joan Urzia, a Notary Public
8  within and for the State of New York,
9  do hereby certify:
10      That AUBREY GALLOWAY, the witness
11  whose deposition is hereinbefore set
12  forth, was duly sworn by me and that
13  such deposition is a true record of the
14  testimony given by the witness.
15      I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I
18  am in no way interested in the outcome
19  of this matter.
20      IN WITNESS WHEREOF, I have
21  hereunto set my hand this 13th day of
22  June, 2008.
23
24      _____
25              Joan Urzia

49  (Page 190)

```
                                    Page 190
 1
 2  --------------- I N D E X -----------------
 3  WITNESS          EXAMINATION BY       PAGE
 4  AUBREY GALLOWAY   MR. KAMINSKY         5
 5
 6  ----------------- EXHIBITS -----------------
 7                        FOR ID.
 8  55  Petition to Accept Unavoidably    45
 9       Delayed Payment of Maintenance
10       Fees in an Expired Patent
11       (37 CFR 1.378(b)
12  56  Power of Attorney/Revocation      67
13       of Prior Powers form
14  57  Certificate of Transmission fax   70
15  58  Letter                 73
16  59  Decision               91
17  60  Decision               104
18  61  Decision               113
19  62  E-mail                 133
20  63  U.S. Patent and Trademark Office  183
21       decision
22
23
24
25
```

**Dr. Aubrey Galloway**

Page 188

1          A. Galloway

2    the time of trial.

3          MR. KAMINSKY:  Okay.  Thank you.

4          (Time noted:  1:46 p.m.)

5

6

7          AUBREY GALLOWAY

8

9  Subscribed and sworn to before me

10 this 3rd day of _____, 2008.

11

12 _____

13

14          ELLEN R. CHERRICK
           Notary Public, State of New York
15          No. 31-02CH4951814
           Qualified in New York County
           Commission Expires June 5, 2011

16

17

18

19

20

21

22

23

24

25

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

# EXHIBIT Q



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re application of: | U.S. Patent No.: | 6,066,160 |
| | Owner: | Quickie, L.L.C. |
| Colvin *et al.* | Filed: | November 23, 1998 |
| Appl. No. 09/198,087 | Issued: | May 23, 2000 |
| For:  **Passive Knotless Suture Terminator For Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing** | Art Unit: | 3731 |

## PETITION FOR RECONSIDERATION UNDER 37 CFR 1.378(e)

Mail Stop PETITIONS
Commissioner for Patents
PO Box 1450
Alexandria, VA  22313-1450

Sir:

The above-referenced patent, U.S. Patent No. 6,066,160 ("the '160 patent"), expired for delayed payment of the first maintenance fee.  Submitted herewith is Petitioner's Petition pursuant to 37 CFR 1.378(e) for Reconsideration of the Decision on Petition (the "Reconsideration Petition").   In connection therewith, Petitioner respectfully states as follows:

### I.    SUPPLEMENTS TO AND FURTHER COMMENTS CONCERNING THE EXHIBITS

Petitioner is providing a new Exhibit 15 setting forth Petitioner's most recent attempt to obtain documents from Thelen, Reid & Priest, LLP ("Thelen") and Greenberg Traurig, LLP ("Greenberg"), and their responses thereto.

On March 14, 2007, Petitioner wrote to Thelen again seeking production of the listed documentation for use in connection with the present Reconsideration Petition. Thelen apparently forwarded Petitioner's correspondence to outside counsel, who merely repeated Thelen's prior refusals to produce any documents to assist Petitioner in connection with this Reconsideration Petition.  To date, Thelen has not produced a single document for Petitioner's use in support of either the original Reinstatement Application or the current Reconsideration Petition.

61

Serial No.: 09/198,087, Patent No.: 6,066,160
Attorney Docket No.: Quickie-001-PT

Similarly, Exhibit 15 includes Petitioner's April 6, 2007 correspondence to Greenberg, likewise requesting production of the listed documentation for use in connection with the present Reconsideration Petition. Greenberg responded to this correspondence in an April 13, 2007 letter (also included), not to state that they have no responsive documents, but rather to reiterate that Greenberg was refusing to produce any such documents on the grounds that they are irrelevant because Greenberg had no responsibility for payment of maintenance fees on the '160 Patent. As with Thelen, to date Greenberg has not produced a single document to assist Petitioner in its efforts to reinstate the '160 Patent.

While Petitioner would undoubtedly prefer to attach more documentary evidence in support of its request for the '160 Patent's reinstatement, to date all efforts to obtain such documents and information from Petitioner's former counsel have been unsuccessful. Nevertheless, the available evidence demonstrates that the delay in paying maintenance fees was unavoidable as to Petitioner due to its outside counsel's failure to honor their statutory, regulatory, and contractual obligations. For that reason, as discussed below, Petitioner seeks entry of an order reversing the Decision on Petition and ordering reinstatement of the '160 Patent.

## II.    RESPONSE TO THE DECISION ON PETITION

### A. Preliminary issues needing clarification

The Decision on Petition contains several factual and procedural inconsistencies that render the conclusions reached therein subject to further scrutiny. For example, although the Office correctly states that the decision to dismiss is made under 37 CFR 1.378(b), the Decision goes on to incorrectly state that "[t]he reconsideration request should include a cover letter entitled 'Renewed Petition under 37 CFR 1.137'" and that extensions of time are permitted under 37 CFR 1.136(a). Decision at p. 1. Yet, correctly, the Decision grants Petitioner two months to file a "Petition for Reconsideration under 37 CFR 1.378(b)" where such time to file is not extendable. Decision at pp. 4-5 (including fn 1).

Moreover, the Decision states that "[a] showing of unavoidable delay must include a showing that the failure to pay the maintenance fee was unavoidable from the time the payment was due, May 24, 2004, through the filing of a grantable petition."

- 2 -

Serial No.: 09/198,087, Patent No.: 6,066,160
Attorney Docket No.: Quickie-001-PT

Decision at p. 4 (emphasis added). May 24, 2004, however, is the date that the patent expired, not the date where payment was due. See Decision at p. 1. November 23, 2003 was the due date of the 3.5 year maintenance fee after which, between November 24, 2003 and May 23, 2004, the fee could have been paid with a surcharge. See Decision at p. 1. Finally, May 23, 2003 was the first day the United States Patent and Trademark Office ("USPTO") would accept payment of the fee. See Decision at p. 1. The Decision on Petition's errors in the citing the significance of these dates renders the entire decision subject to question.

In addition to containing erroneous date references, the Decision also contains serious substantive errors concerning the documents and evidence Petitioner has presented. Specifically, the Decision concludes that "Patentee has failed to account for the period of time between March 4, 2003, when attorney [Todd] Sharrin's responsibility for the patent terminated, and December 5, 2003, when Patentee filed a Change of Attorney Docket Number and Change of Address Notice. Patentee has thus failed to account for the entire delay." Decision at p. 4. As discussed below, this conclusion cannot be supported by a review of the available facts and evidence.

At the outset, Petitioner disagrees with the Office's conclusion that Sharinn's responsibility for the '160 Patent terminated on March 4, 2003, and Petitioner further notes that there is no objective evidence in the record that would support the Office's conclusion in that regard. Moreover, even assuming that March 4, 2003 was the date upon which Sharinn's responsibility ended – an assumption that Petitioner vehemently contests – the power of attorney filed by Thelen on that very same date shows that at least Thelen had responsibility for maintenance fees during the March 4, 2003 to December 5, 2003 period referenced in the Decision. As such, Petitioner has accounted for the entire delay by showing with the available evidence that at all relevant times Greenberg/Sharinn and Thelen each had responsibility for maintenance fees on the '160 Patent. Contrary to the conclusion reached in the Decision, Petitioner has thus accounted for the entire period March 4, 2003 and December 5, 2003.

### B. Response to Decision, pg. 4, ¶ 1

The Decision states that "Patentee, however, may not rely upon a delay caused by the actions or inactions of Thelen to support an assertion that payment of a maintenance

- 3 -

Serial No.: 09/198,087, Patent No.: 6,066,160
Attorney Docket No.:,Quickie-001-PT

fee was unavoidable." Decision at p. 4. The assumption underlying this conclusion is
only partly correct – Petitioner relies on the delays caused by the inactions of *both*
Thelen *and* Greenberg. As discussed previously, Petitioner has shown with the available
evidence that the delay was unavoidable because at all relevant times, Thelen held
Petitioner's general power of attorney and Greenberg/Sharinn were the designated
recipients of all office communications concerning maintenance fees on the '160 Patent.
In light of those facts, it is self-evident that Petitioner was reasonably looking to its
outside counsel to handle maintenance fees on the '160 Patent, and thus the failure to pay
those fees was unavoidable to Petitioner.

### E. Response to Decision, pg. 4, ¶ 2, generally

Petitioner acknowledges that, in the best of circumstances, its former outside
counsel would honor their obligation to produce Petitioner's files such that the record on
this reinstatement application could be more complete. Unfortunately, both Thelen and
Greenberg have stonewalled every effort to obtain those client files and other documents
related to their representation of Petitioner before the Office in connection with the '160
Patent. For that reason, responsibility for failure to present a complete record in support
of Petitioner's reinstatement application falls squarely at the feet of Thelen and
Greenberg, not Petitioner's.

Nevertheless, as discussed herein, the evidence that is available demonstrates that
the delay in paying maintenance fees on the '160 Patent was unavoidable to Petitioner.
If the Office disagrees with that conclusion, then at a minimum Petitioner should be
allowed additional time to force Thelen and Greenberg to produce documents that are
necessary to complete the record on Petitioner's reinstatement application.

### III.    CONCLUSION

The delay in payment of maintenance fees on the '160 Patent was unavoidable to
Petitioner because both Thelen and Greenberg failed to honor their contractual, statutory,
and regulatory duties to monitor maintenance fees and notify Petitioner when those fees
were due. The available evidence – as well as the evidence that is surely in Thelen's and
Greenberg's hands that they are refusing to produce – demonstrates that the failure to
timely pay maintenance fees on the '160 Patent was unavoidable to Petitioner.

- 4 -

Serial No.: 09/198,087, Patent No.: 6,066,160
Attorney Docket No.: Quickie-001-PT

Simply stated, Petitioner reasonably looked to its outside counsel to monitor maintenance fees on the '160 Patent. Outside counsel placed itself firmly between the PTO and Petitioner, such that. Petitioner was entirely reliant upon counsel to communicate with the PTO concerning all aspects of the '160 Patent. Petitioner thus had no opportunity to discover that outside counsel was not honoring its duties, and likewise had no opportunity to discover that the maintenance fees had not been paid. Therefore, the entire tale of unfortunate events leading to non-payment of those maintenance fees was unavoidable to Petitioner and the sole fault of Greenberg/Sharinn and Thelen.

For all of those reasons, Petitioner respectfully requests reconsideration and reversal of the Decision on Petition, and entry of an order allowing late acceptance of maintenance fees and reinstatement of the '160 Patent. In the alternative, Petitioner requests entry of an order holding this proceeding in abeyance pending Petitioner's efforts to compel Thelen and Greenberg to produce documents and information to further supplement the record in this matter.

Enclosed herewith is the $400.00 fee required under 37 CFR 1.17(f). Payment is by credit card for $400.00. Form PTO-2038 is attached. As to any overpayment or refund, please send a refund check.

Respectfully submitted,
MAIER & MAIER, PLLC

Timothy J. Maier
Reg. No. 51,986

Date: May 4, 2007

c/o Timothy J. Maier, Esq.
Maier & Maier, PLLC
1000 Duke Street
Alexandria, VA 22314 USA
(703) 740 – 8322 x101

- 5 -

# EXHIBIT R

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

QUICKIE, LLC,                                     :       Index No. _105235/07_

                              Plaintiff,          :

    -against-                                     :       COMPLAINT

GREENBERG TRAURIG, LLC                            :                  NEW YORK ·
                                                                    COUNTY CLERK'S OFFICE
                              Defendant.          :
                                                                    APR 1 0 2007
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                                    NOT COMPARED
                                                                    WITH COPY FILE

        Plaintiff, Quickie, LLC, by and through its attorneys, Janvey, Gordon, Herlands,

Randolph & Cox, LLP and Diamond, McCarthy, Taylor, Finley & Lee L.L.P., as and for its

Complaint, alleges as follows:

## SUMMARY OF CLAIMS

        1.      This is a legal malpractice action seeking to redress the harms caused by

Greenberg Traurig, LLP ("Greenberg").   Quickie, LLC ("Quickie" or "Plaintiff") retained

Greenberg and Todd S. Sharinn, Esq. ("Sharinn"), a New York licensed attorney employed by

Greenberg and practicing law in Greenberg's New York City office, to provide legal expertise

and advice concerning a valuable medical device patent held by Quickie.

        2.      Defendant's negligence and malpractice occurred when, despite making

affirmative representations to the contrary, Defendant failed to notify Plaintiff shortly before

maintenance fees were due on the patent, and failed to forward maintenance fee reminder notices

Defendant received from the United States Patent and Trademark Office (the "PTO").

3.    Defendant's negligence and negligent misrepresentations materially damaged Quickie — a company formed by world-renowned cardiovascular surgeons and physicians – all of whom reasonably, justifiably and foreseeably relied on Defendant's written representations and legal expertise to ensure that Quickie's patent rights were appropriately pursued and protected. Upon information and belief, as a result of Defendant's wrongdoing, Quickie has suffered more than $10 million in actual and consequential damages, for which recovery is sought herein.

## PARTIES, JURISDICTION AND VENUE

4.    Plaintiff Quickie, LLC is a limited liability company organized and existing under the laws of the State of New York, and having its principal place of business at Rick, Steiner, Segal & Fell, 3 New York Plaza, New York, New York, 10004, Attention Alan L. Fell, Esq.

5.    Defendant Greenberg Traurig, LLP is a New York registered limited liability partnership with its principal place of business in the State of New York located at 200 Park Avenue, New York, New York 10166. Greenberg is liable for the acts of Sharrin by virtue of the principles of *respondeat superior*.

6.    Quickie's claims arise under the laws of New York. Venue is proper under CPLR 503 because Plaintiff resides in New York County.

## BACKGROUND

7.    In the late 1990's, Quickie developed a device known as the "Passive Knotless Suture Terminator for Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Securing" for use in open-heart surgeries (the "Quickie Device"). In 1998, Quickie retained Sharrin and his former law firm, Pepe & Hazard L.L.P. ("PH") to file an application with the PTO seeking a patent covering the Quickie Device. In November 1998, Quickie signed

108754-5                                    2

a licensing and product development agreement with Medtronic, Inc. ("Medtronic"), and agreed to share confidential and proprietary information to assist Medtronic's evaluation of the Quickie Device. Medtronic ultimately declared that it was no longer interested in licensing Quickie Device, and that it was terminating the license agreement.

8.    On May 23, 2000, the PTO issued U.S. Patent No. 6,066,160 covering the Quickie Device (the "160 Patent"). On May 30, 2000 and while he was still employed by PH, Sharinn wrote to Quickie to announce that the PTO had issued the '160 Patent, and that he "will notify [Quickie] regarding payment of the maintenance fees several months before they are due." When Sharinn left PH and joined Greenberg, the Quickie engagement likewise was transferred to Greenberg, and Greenberg assumed Sharinn's promise to notify Quickie before the maintenance fees were due.

9.    Shortly thereafter, Medtronic began marketing a device that was virtually identical to the Quickie Device, thus infringing on the newly-granted '160 Patent. On February 11, 2002, Defendant filed Quickie's infringement claims against Medtronic in the United States District Court for the Southern District of New York, Civil Action No. 02 Civ. 1157 (the "Medtronic Litigation").

10.    On October 22, 2002, Defendant completed an official PTO form entitled "Fee Address Indication Form," specifying that correspondence related to maintenance fees for the '160 Patent should also be sent to Sharinn at Greenberg's offices in New York City. Sharinn mailed the Fee Address Indication Form to the PTO on October 22, 2002, and faxed it to the PTO on December 16, 2002, using Greenberg stationary.

11.    Defendant's experience in representing patent owners before the PTO is reported in its marketing materials. For example, Greenberg's website states that its patent capabilities:

> run the gamut from application preparation and filing to examination and appeal processes to maximizing technology transfer opportunities – as well as handling patent litigation, when necessary. Through our experience working with a wide range of clients, we have developed a structured process for obtaining patent claims that provides strategic flexibility for our clients to best achieve their business goals.

Sharinn's biography similarly reports that he has "over fourteen years of legal experience in the worldwide acquisition, exploitation and aggressive enforcement of intellectual property rights," and that he is admitted to practice before the PTO. Given Defendant's and Sharinn's experience and reputation in assisting patent owners protect their inventions, at all relevant times Quickie reasonably relied on them to represent, protect, and maintain Quickie's ownership of the '160 Patent before the PTO.

12.    Pursuant to 37 C.F.R. §1.362(e)(1), the window for payment of maintenance fees on the '160 Patent opened on May 23, 2003, and closed one year later on May 23, 2004. During the entire period May 23, 2003 to May 23, 2004, Defendant was on record at the PTO as the designated recipient of all communications related to maintenance fees on the '160 Patent. Moreover, Defendant expressly represented to Quickie that it would notify Quickie several months before the maintenance fees were due. Nevertheless, Defendant did not forward PTO reminder notices concerning maintenance fees on the '160 Patent, nor did it notify Quickie shortly before maintenance fees were due as promised. Pursuant to PTO regulations, the '160 Patent thus expired on May 24, 2004.

108754-5                                              4

13.    In July, 2006, Quickie learned that the '160 Patent had expired when a medical device company pulled out of ongoing negotiations to license the Quickie Device. Shortly thereafter, the PTO issued a determination that the '160 Patent was no longer valid, and the Medtronic Litigation was dismissed.

## FIRST CAUSE OF ACTION
### (Negligence/Legal Malpractice)

14.    Plaintiff repeats and realleges paragraphs 1 through 13 and incorporates them by reference.

15.    At all relevant times, an attorney-client relationship existed between Defendant and Plaintiff with respect to the preservation of Plaintiff's ownership interests in the '160 Patent. In so representing Plaintiff, Sharinn was at all relevant times acting within the course and scope of his employment with Greenberg.    Pursuant to the attorney-client relationship, Defendant owed Plaintiff a duty to exercise the reasonable skill and common knowledge expected of the legal profession, including, but not limited to, a duty to monitor and inform Quickie of deadlines to pay PTO maintenance fees on the '160 Patent.

16.    In breach of its duties to Plaintiff, Defendant failed to exercise the reasonable skill and common knowledge expected of the legal profession. Specifically, upon information and belief, Defendant failed to establish an effective calendaring system to monitor the deadlines for maintenance payments on the '160 Patent, failed to notify Quickie that said maintenance fees could have been paid at any time between May 23, 2003 and May 23, 2004, and failed to forward PTO reminder notices for payment of maintenance fees on the '160 Patent.

17.    Upon information and belief, Defendant's breaches of the duties owed to Plaintiff caused Plaintiff to suffer serious economic damages in excess of $10 million that continue through the present,    including, but not limited to: (1) loss of Plaintiff's ability to

recover infringement damages from Medtronic upon conclusion of the Medtronic Litigation; (2) wasted attorneys' fees and expenses incurred in pursuit of the Medtronic Litigation; (3) loss of royalties Quickie would have earned from licensing the '160 Patent; and (4) additional attorneys' fees and expenses incurred to remedy Defendant's malpractice and negligence.

18.    Upon information and belief, but for Defendant's negligence and malpractice, the maintenance fees for the '160 Patent would have been paid when they were due, the '160 Patent would be viable today, the Medtronic Litigation would have resulted in a judgment awarding Plaintiff damages as a result of Medtronic's infringement of the '160 Patent, and Plaintiff would have licensed the Quickie Device to other interested parties. All conditions precedent to Plaintiff's recovery on this cause of action have occurred or have been satisfied.

19.    By reason of the foregoing, Defendant is liable to Plaintiff.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation)

20.    Plaintiff repeats and realleges paragraphs 1 through 19 and incorporates them by reference.

21.    At all relevant times, an attorney-client relationship existed between Defendant and Plaintiff with respect to preservation of Plaintiffs' ownership of the '160 Patent. As part of that relationship, Sharinn negligently misrepresented to Plaintiff that he would provide notice several months before maintenance fees were due to be paid on the '160 Patent. In hiring Sharinn and notifying the PTO that all PTO correspondence concerning payment of maintenance fees on the '160 Patent was to be sent to Greenberg's offices, Greenberg adopted Sharinn's negligent misrepresentations to Quickie in that regard. Further, as part of the attorney-client relationship between Defendant and Plaintiff, Defendant represented that it was highly

competent in practicing before the PTO, it was well-versed in PTO regulations and procedures, and that it would prosecute and protect the '160 Patent.

22.    Defendant intended that Quickie rely, or should have reasonably foreseen that Quickie would so rely, on the above-referenced negligent misrepresentations. Nevertheless, upon information and belief, Defendant did not establish reliable calendaring systems to ensure that the promised notice would be provided, nor did it have any reasonable basis for believing that such notice would be provided to Quickie.

23.    Quickie reasonably and foreseeably relied on Defendant's negligent misrepresentations. Had Quickie known that Defendant did not establish reliable calendaring systems for monitoring the deadlines for payment of maintenance fees on the '160 Patent, Quickie would not have authorized Defendant to designate itself as the recipients of all PTO correspondence concerning such maintenance fees, nor would Quickie have relied upon Defendant's promise to provide notice several months before the maintenance fees were due.

24.    Upon information and belief, as a proximate result of its reliance on Defendant's negligent misrepresentations, Plaintiff suffered serious economic damages in excess of $10 million that continue to the present including, but not limited to: (1) loss of Plaintiff's ability to recover infringement damages from Medtronic upon conclusion of the Medtronic Litigation; (2) wasted attorneys' fees and expenses in pursuit of the Medtronic Litigation; (3) loss of royalties Quickie would have earned from licensing the '160 Patent; and (4) additional attorneys' fees and expenses incurred to remedy Defendant's negligence and malpractice. All conditions precedent to Plaintiff's recovery on this cause of action have occurred or have been satisfied.

25.    By reason of the foregoing, Defendant is liable to Plaintiff.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Quickie, LLC requests that this Court grant it judgment against Defendant and award it:

1.    All applicable and appropriate actual, consequential, statutory, and exemplary damages and attorneys' fees, as permitted by law, with interest thereon; and

2.    Such other and further relief to which Plaintiff is entitled.

Dated: New York, New York
        April 17, 2007

Respectfully submitted,

JANVEY, GORDON, HERLANDS, RANDOLPH
& COX, LLP
Attorneys for Plaintiff

By: _____
        Richard N. Janvey
A Member of the Firm
355 Lexington Avenue
New York, New York 10017
(212) 986-1200

DIAMOND McCARTHY TAYLOR FINLEY
BRYANT & LEE, LLP
Of Counsel
Two Houston Center
909 Fannin, Suite 1500
Houston, Texas 77010
(713) 333-5100

108754-5                                 8

# EXHIBIT S

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------

QUICKIE, LLC,

                    Plaintiff,

          vs.        07-CV-10331 (RMB) (DFE)


GREENBERG TRAURIG, LLC, et al.,

                    Defendants.

-------------------------------------------




          DEPOSITION OF ALAN FELL

            Friday, June 20, 2008

                9:30 a.m.




Reported by:  Joan Urzia, RPR

JOB NO. 203749

2  (Pages 2 to 5)

Page 2

1
2
3
4                    June 20, 2008
5                    9:30 a.m.
6                    New York, New York
7
8
9
10             Deposition of Alan Fell, held
11    at the Offices of Pollack & Kaminsky,
12    114 West 47th Street, New York, New York,
13    Pursuant to Notice, before Joan Urzia, a
14    Notary Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2        IT IS HEREBY STIPULATED AND AGREED, by
3    and between the attorneys for the respective
4    parties herein, that filing and sealing of
5    the transcript be waived, and the same are
6    hereby waived.
7
8        IT IS FURTHER STIPULATED AND AGREED
9    that all objections, except as to the form
10    of the question, shall be reserved to the
11    time of the trial.
12
13        IT IS FURTHER STIPULATED AND AGREED
14    that the within deposition may be sworn to
15    and signed before any officer authorized to
16    administer an oath, with the same force and
17    effect as if signed and sworn to before the
18    Court.
19
20
21
22
23
24
25

Page 3

1
2   A P P E A R A N C E S:
3
4
5   DIAMOND MCCARTHY, LLP
6   Attorneys for Plaintiff
7          620 Eighth Avenue, 39th Floor
8          New York, New York 10018
9   BY:       STEPHEN T. LODEN, ESQ.
10
11
12   POLLACK & KAMINSKY
13   Attorneys for Defendant
14          114 West 47th Street
15          New York, New York  10036
16   BY:      MARTIN I. KAMINSKY, ESQ.
17          JUSTIN Y.K. CHU, ESQ.
18
19
20
21
22
23
24
25

Page 5

1                    Fell
2   A L A N   F E L L,
3          called as a witness, having been
4          duly sworn by a Notary Public, was
5          examined and testified as follows:
6
7   EXAMINATION BY
8   MR. KAMINSKY:
9        Q        Would you state your full name
10   for the record, please.
11        A    Alan Leslie Fell.
12        Q        Do you have a business address,
13   Mr. Fell?
14        A    Yes, 90 Broad Street, New York,
15   New York 10004.
16        Q        You're an attorney, is that
17   correct?
18        A    Yes.
19        Q        What is the name of your law
20   firm?
21        A    Rick Steiner Fell & Benowitz.
22        Q        How long have you been with that
23   law firm?
24        A    Eleven years.
25        Q        Do you have a residence address?

3 (Pages 6 to 9)

Page 6

1            **Fell**
2    A    Yes.
3    **Q    Can you please give us that?**
4    A    333 East 68th Street, New York,
5    New York 10065.
6    **Q    We'll seal this next question,**
7    **but what is your social security number?**
8    A    I'm not going to give you my
9    social security number. I don't think
10   that's relevant.
11   **Q    It is relevant to enable us to**
12   **investigate the situation. So if you won't**
13   **give it to us, we'll seek a ruling that we**
14   **should get it.**
15   A    Okay.
16   **Q    I don't think it's confidential.**
17       **Have you ever been subject to a**
18   **disciplinary proceeding?**
19   A    Yes.
20   **Q    Have you ever had a complaint**
21   **against you as an attorney?**
22   A    Yes.
23   **Q    By whom?**
24   A    I frankly don't remember the
25   names, about 27, 28 years ago, there were

Page 7

1            Fell
2    two separate complaints, one was about 28
3    years ago and one was maybe 25 years ago.
4    **Q    What were the complaints?**
5    A    One was -- I don't remember it
6    that well -- it was a litigation in
7    connection with real estate and one of the
8    parties was an attorney and he filed, he
9    filed a complaint.
10   **Q    And what was the disposition of**
11   **that?**
12   A    It was dismissed.
13   **Q    By whom?**
14   A    First Disciplinary Committee,
15   First Department, I believe.
16   **Q    Was there any hearing?**
17   A    No, it was just on papers.
18   **Q    Is that both complaints?**
19   A    Yes.
20   **Q    Have you ever been in a lawsuit?**
21   A    Yes.
22   **Q    How many lawsuits have you been**
23   **in?**
24   A    Quite a few. I manage real
25   estate and partners in real estate LLCs and

Page 8

1            Fell
2    I have been sued by tenants in connection
3    with such litigation.
4    **Q    Have you ever had a judgment**
5    **against you?**
6    A    I don't think so.
7    **Q    Have you ever had a decision by**
8    **a court adverse to your position in any of**
9    **those lawsuits?**
10   A    I might have. I just don't
11   know. They were usually handled by the
12   insurance company.
13   **Q    Have you given depositions in**
14   **those cases?**
15   A    Occasionally, sure.
16   **Q    Do you have copies of the**
17   **transcripts?**
18   A    Probably not.
19   **Q    When was the last time you gave**
20   **a deposition in a case?**
21   A    Aside from this litigation
22   because I testified, you know, in the
23   earlier --
24   **Q    In Medtronic, yes, yes.**
25   A    So that was in 2003 or 2004, I

Page 9

1            Fell
2    don't remember.
3    **Q    July 29, 2003.**
4    A    2003, okay. So it was probably
5    around the same time. It was a negligence
6    suit with a group. I had bought a property
7    and it was a baseball tenant that had, you
8    know, that had baseball for kids and there
9    was an accident which actually occurred
10   prior to our buying the property and they
11   brought us into the suit. I testified.
12   **Q    Have you ever testified at a**
13   **trial?**
14   A    I don't think so.
15   **Q    Did any of the cases that you**
16   **were a party in go to trial?**
17   A    No.
18   **Q    Did any of the cases that you**
19   **were a party in result in a summary**
20   **judgment motion against your side of the**
21   **case?**
22   A    Not to my recollection.
23   **Q    Have you ever personally brought**
24   **a lawsuit as a plaintiff?**
25   A    I have not personally, but as a

4 (Pages 10 to 13)

Page 10

```
1                    Fell
2    member of an LLC I've occasionally brought
3    lawsuits.
4        Q    How many LLCs are you a member
5    of?
6        A    Eight or nine probably.
7        Q    What businesses are they in?
8        A    Most of them are real estate
9    businesses.
10       Q    How many are not?
11       A    One.
12       Q    Is that Quickie?
13       A    Uh-huh.
14       Q    Do you still have a 4 percent
15   interest in Quickie?
16       A    Yes, I do.
17       Q    How long have you had that
18   interest?
19       A    I don't know exactly when.  It
20   was 2001 -- I don't remember exactly.
21       Q    Did you make any capital
22   contribution to Quickie to get that
23   interest?
24       A    No.
25       Q    How did you come to get that
```

Page 11

```
1                    Fell
2    interest?
3        A    Dr. Stephen Colvin assigned it
4    to me.
5        Q    What was the consideration that
6    you gave for the assignment?
7        A    No monetary consideration.  I
8    was doing legal work for the LLC.
9        Q    So that was in return for legal
10   services?
11       A    We never discussed it.  He just,
12   he had the authority amongst the original
13   members of the LLC to adjust the
14   percentages and at some point after the
15   original members were involved he assigned
16   that to me.
17       Q    Did you place a value on that
18   interest when you got it?
19       A    The accountant might have.  I
20   don't remember.
21       Q    Did you report it on your income
22   tax return?
23       A    I reported any distributions I
24   received from Quickie.
25       Q    Did you report the getting of
```

Page 12

```
1                    Fell
2    the interest itself?
3        A    I don't think that's a taxable
4    event, getting the interest.
5        Q    Why not?
6        A    I don't know what the value of
7    the interest would be.
8        Q    Well, if it was given to you in
9    return for legal services, it would be the
10   value of the legal services, wouldn't it?
11       A    But I'm not sure it was given to
12   me.
13       Q    So what was it given to you for?
14       A    Like I said, I don't know what
15   Dr. Colvin had in mind at the time, but he
16   reduced some of these interests and he gave
17   me 4 percent.
18       Q    Does Quickie file income tax
19   returns?
20       A    Yes.
21       Q    Have you ever seen them?
22       A    Yes.
23       Q    You're the general counsel, is
24   that right?
25       A    That is correct.
```

Page 13

```
1                    Fell
2        Q    Did Quickie report the giving of
3    an interest to you on any of its tax
4    returns?
5        A    If there was a distribution, I
6    would have received a K-1.
7        Q    Did they report the giving to
8    you of the 4 percent interest on their tax
9    returns?
10       A    Not to my knowledge.  I don't
11   know for sure.
12       Q    Do you know if Quickie -- strike
13   that.
14            Did Quickie file a gift tax
15   return with respect to giving of an
16   interest to you?
17       A    No, I don't think it would be
18   obligated to file a gift tax return.
19       Q    It wasn't a gift, was it?
20       A    I don't think Quickie would be
21   obligated to file a gift tax return.
22       Q    Did Dr. Colvin give you this
23   interest from his own interest?
24       A    I don't recall how he adjusted
25   it.
```

5  (Pages 14 to 17)

Page 14

1              Fell
2      Q      Were you Dr. Colvin's personal
3   attorney before he died?
4      A    Yes, I was.
5      Q      Are you representing his estate?
6      A    Yes, I am.
7      Q      Are you aware of any gift tax
8   return by Dr. Colvin that relates to the
9   4 percent interest that was given to you in
10  Quickie?
11     A    No.
12     Q      Is his estate filing any tax
13  return indicating that gift?
14     A    No.
15     Q      Does his estate remain a member
16  of Quickie LLC?
17     A    His estate was never a member of
18  the LLC.
19     Q      Was he personally?
20     A    No.
21     Q      Who were the members of Quickie
22  LLC?
23     A      I don't have the list in front
24  of me, but -- do you want me to do it from
25  memory?

Page 15

1              Fell
2      Q      As best you can, understanding
3   that you're not sure you're exactly right.
4      A      Aubrey Galloway.
5      Q      I'm sorry, if you can explain if
6   it's a personal interest, in other words if
7   it's held in a --
8      A      The membership interest, the
9   members of Quickie LLC are all individuals.
10     Q      Okay. Then please do identify
11  them as best you remember them.
12     A      Aubrey Galloway, Elaine
13  Brackfeld Colvin, Alan Katz, Eugene Grassi,
14  Paul Otto, Ibb -- I'm not sure on the
15  spelling, it's Lagfelden, I think,
16  something like that, and myself.
17     Q      Now from whom did Dr. Colvin
18  give you a 4 percent interest?
19     A      I don't recall.
20     Q      Do the records of Quickie
21  indicate that?
22     A      They probably would, yes.
23     Q      Have all of the persons involved
24  in Quickie that you mentioned -- strike
25  that.

Page 16

1              Fell
2          Have all of the persons who are
3   members of Quickie that you mentioned
4   signed agreements with Quickie?
5      A    Yes.
6      Q      Is there an LLC operating
7   agreement?
8      A    Yes.
9      Q      Who is the managing member?
10     A    Dr. Galloway.
11     Q      How did Stephen Colvin come to
12  give you a 4 percent interest if his wife
13  is the one who holds the interest?
14         MR. LODEN: Objection. Form.
15     A      If I recall correctly, the
16  members of Quickie, the original members,
17  had authorized Stephen Colvin to adjust the
18  percentage interests and they all agreed
19  to, they all signed that.
20     Q      There is a signed document to
21  that effect?
22     A    Yes.
23         MR. KAMINSKY: We ask that it be
24  produced.
25  BY MR. KAMINSKY:

Page 17

1              Fell
2      Q      Are there signed documents
3   that memorialize the giving to you of a
4   4 percent interest?
5      A      Might be. I don't recall.
6          MR. KAMINSKY: We'd ask to see
7      those as well.
8          MR. LODEN: Just for the record,
9      they should be in the production.  I
10     trust that you looked for them, and if
11     you haven't found them -- I know the
12     documents do exist.  I've seen them
13     myself.
14     A      My recollection, by the way, is
15  I have a looseleaf that has all the Quickie
16  documents that were, that was completely
17  duplicated early in the litigation.  So it
18  probably was produced.
19         MR. LODEN: And you've produced
20     documents, I believe.
21         THE WITNESS: Yes, yes.
22         MR. KAMINSKY: Okay. We'll take
23     a look again, but if not we'll ask you
24     to give us another copy or to point us
25     to it by Bates number or whatever.

6 (Pages 18 to 21)

Page 18

1           Fell
2      Thank you.
3  BY MR. KAMINSKY:
4     Q    Did Dr. Colvin personally ever
5  have an interest in Quickie?
6     A    No.
7     Q    Why not?
8     A    It's privileged.
9     Q    You're his attorney and so --
10    A    I was at the time, and yes,
11  yeah.
12    Q    Would you summarize your
13  educational background for us starting with
14  college.
15    A    I went to Franklin & Marshall
16  College. I have a BA in economics. I have
17  a JD from Temple Law School.
18    Q    Would you summarize your
19  occupational history for us.
20    A    I worked for two years for two
21  different small firms after I got out of
22  law school. I'm trying to think of the
23  name. You want me to give you the name?
24    Q    Yes, please.
25    A    Madeline & Schacter I think was

Page 19

1           Fell
2  the name of the first one. The second one
3  was Landis Tucker & Gelman.
4        Then I worked for a firm, then
5  mid-size Wall Street firm called
6  Guggenheimer & Undermeyer.
7        Then in about '80 or '81, I went
8  on my own. In '82 or '83, I joined a
9  gentleman named Solomon Friedman, the firm
10  was then Poulier & Friedman, I became a
11  partner in that firm, Pulier Friedman &
12  Fell.
13       Then in '94 or '95, we split up
14  and I was on my own for a couple of years
15  again.
16       Then I think it was in 1997, I
17  joined with then Rick Steiner.
18    Q    When did you first begin to do
19  legal work for Dr. Colvin?
20    A    I met Dr. Colvin through
21  Dr. Galloway. Originally, I hadn't been
22  doing work for him, but I knew of him
23  through Dr. Galloway.
24       I met Dr. Galloway in probably
25  '80 or so, '80 or '81, and then I probably

Page 20

1           Fell
2  started doing some legal work for
3  Dr. Colvin in the mid '90s, maybe '94, '95,
4  and then starting in about 10 years ago or
5  so I started to do most of his personal
6  work.
7     Q    Are you Dr. Galloway's personal
8  counsel?
9     A    I do work for Dr. Galloway. I
10  think he has other attorneys too, but I
11  still do work for Dr. Galloway as well.
12    Q    Do you do personal work for any
13  of the other members of Quickie?
14    A    I do some personal work for
15  Mrs. Colvin and for Dr. Grassi.
16    Q    How long have you done work for
17  Dr. Grassi?
18    A    Oh, just a few years, 3 or 4
19  years.
20    Q    When was Quickie formed?
21    A    I believe it was 1998.
22    Q    Was it formed for any specific
23  purpose?
24    A    Yes. It was forme because the
25  doctors at NYU contemplated entering into

Page 21

1           Fell
2  an agreement with Medtronics for the
3  development of some intellectual property.
4     Q    What was that intellectual
5  property?
6     A    It was basically a knotless
7  suture, suturing technique.
8     Q    Had Dr. Colvin and Dr. Galloway
9  formed any other company prior to Quickie
10  either together or with anyone else?
11    A    I don't know. I mean, I think I
12  had set up a PC for Dr. Galloway many years
13  ago, but -- and Dr. Colvin may have set up
14  other entities before I was representing
15  him.
16    Q    Had any of the doctors who
17  formed Quickie worked with you in creating
18  any other entity to deal with any
19  intellectual property prior to the
20  formation of Quickie?
21    A    No, not prior.
22    Q    Had you personally represented
23  any clients whose business involved
24  intellectual property prior to Quickie?
25    A    Not really, no.

7 (Pages 22 to 25)

Page 22

1          Fell
2    Q    When is the first time you dealt
3  with an entity that had patents -- strike
4  that.
5         When is the first time you
6  represented an entity that had patents?
7    A    It was at about that time when
8  we started negotiating with Medtronics.
9    Q    Had you ever negotiated a patent
10 license before that?
11   A    No.
12   Q    Did you negotiate the patent
13 license with Medtronic?
14   A    I participated in the
15 negotiation, but Todd Sharinn was the
16 expert I was relying upon.
17   Q    Who retained Todd Sharinn?
18   A    I guess Quickie did.
19   Q    Who made the determination that
20 Quickie would retain Todd Sharinn?
21   A    Dr. Colvin probably.
22   Q    Did you have any role in the
23 retention of Todd Sharinn?
24   A    Yeah, I think I recommended him.
25   Q    Did you interview Mr. Sharinn

Page 23

1          Fell
2  before he was selected as counsel for
3  Quickie?
4    A    I believe so. I don't recall
5  specifically, but I believe I did.
6    Q    On what basis did you recommend
7  Mr. Sharinn?
8    A    My recollection, and it's not
9  specific, is that somebody that, an
10 attorney that I knew, knew of Todd -- I
11 don't remember whether, I don't remember
12 the name of the attorney -- and that he
13 was, you know, a young attorney who had a
14 background in, I forgot what it was,
15 biology or something before he went to law
16 school and that he was very knowledgable in
17 intellectual property and that's what he
18 had been doing since he was admitted. Then
19 I think I did meet him at, I think I was in
20 the Chanon building at the time, 122 East
21 42nd Street.
22   Q    Did you know Mr. Sharinn's
23 family or any members of his family?
24   A    I knew his father. I don't
25 remember whether I was introduced to his

Page 24

1          Fell
2  father through Todd or Todd through his
3  father, but I did a little work for the
4  father. The father is an attorney and he
5  had a fairly well-known collection firm,
6  did a lot of collection work.
7         It may be that the person that
8  introduced me was someone that did a lot of
9  bankruptcy work and he may have known
10 Todd's father and then that may have been
11 the introduction.
12   Q    How old are you, sir?
13   A    I am 59.
14   Q    Now you say that you had a role
15 in negotiating the Medtronic agreement.
16 What was your role?
17   A    Well, I would discuss the issues
18 with Todd and, you know, listen to his
19 expertise, but I -- my recollection is that
20 I was really relying on his expertise.
21   Q    But what was your role?
22   A    I was kind of at that point
23 just -- you know, I tried to look at the
24 business side of the agreement.
25   Q    Who drafted the agreement?

Page 25

1          Fell
2    A    An attorney from Medtronic. I
3  think his name was Tom, I think it's Tom
4  Irlinger, I think.
5    Q    Do you recall that the agreement
6  provides that all notices that were going
7  to go to Quickie were going to go to you?
8    A    Yes.
9    Q    Why was that?
10   A    Because I was the general
11 counsel.
12   Q    Do you recall that the agreement
13 did not provide for notices to go to
14 Mr. Sharinn?
15   A    I don't recall that, but I'm not
16 surprised.
17   Q    At a certain point Medtronic
18 terminated that agreement, is that correct?
19   A    That's correct.
20   Q    Why did they terminate the
21 agreement?
22   A    My recollection is that they
23 weren't happy, weren't -- I don't know if
24 happy is the correct word -- they weren't
25 satisfied with the progress of the

8  (Pages 26 to 29)

Page 26

1          Fell
2  development of the device. I did receive a
3  letter. I don't remember the specifics of
4  the letter.
5      Q    Do you recall that they stated
6  that it was something that they did not
7  think could be commercialized?
8      A    I don't recall that, but if it's
9  in the letter, it's in the letter.
10     Q    You did give testimony in the
11  Quickie action against Medtronic, correct?
12     A    Yes.
13     Q    You do recall that you gave a
14  deposition in that case, correct?
15     A    Yes.
16     Q    Your deposition was taken on
17  July 29, 2003, do you recall that?
18     A    Generally, yes.
19     Q    And it was taken at the offices
20  of the McDermott Will & Emery firm?
21     A    Uh-huh.
22     Q    At page 79 of your transcript
23  did you give this testimony:
24     "QUESTION: Did you have any
25     understanding as to why they wanted to

Page 27

1          Fell
2  do that?"
3      MR. KAMINSKY: We should go back
4  a bit, referring to the letter that I
5  think you mentioned before.
6      "QUESTION: Do you understand
7  what that refers to?
8      "ANSWER: Yes, that they were
9  going to terminate the agreement,
10  which is what they did.
11     "QUESTION: Okay. Did you have
12  any understanding as to why they
13  wanted to do that?
14     "ANSWER: Not -- not
15  specifically, no.
16     "QUESTION: They never told you?
17     "ANSWER: Well they -- no, I
18  mean that's something I don't
19  understand. I don't understand the
20  technology. They just didn't think
21  apparently that the way they stated
22  it, that it was something that could
23  be commercialized."
24  BY MR. KAMINSKY:
25     Q    Do you remember giving that

Page 28

1          Fell
2  testimony?
3      A    No, but if it's there, I'm sure
4  I did.
5      Q    And you'll stand by that
6  testimony?
7      A    I'm not going to say I'm a liar.
8      Q    Well, I'm asking you if you want
9  to change it.
10     A    I probably had the letter in
11  front of me at the time. You're asking me
12  to testify without the letter in front of
13  me. So, you know, it's the best of my
14  recollection.
15     Q    So as you sit here today, you're
16  not going to change that testimony?
17     MR. LODEN: Objection. Form.
18  BY MR. KAMINSKY:
19     Q    Correct?
20     A    Correct.
21     Q    Did anyone else sign a license
22  agreement with Quickie for the technology
23  that's covered by the patent that was
24  involved in the Medtronic license?
25     A    No.

Page 29

1          Fell
2      Q    Did anyone else offer to sign
3  such a license?
4      A    No.
5      Q    You did approach at least two
6  other companies, is that right?
7      A    That's correct.
8      Q    Which two entities did you
9  approach?
10     A    Ethicon and U.S. Surgical.
11     Q    Is it correct that neither of
12  those entities was interested in doing a
13  license?
14     A    Correct. But may I say
15  something? My recollection is one of the
16  concerns they had is the ancillary rights
17  that Medtronics may have had under the
18  agreement.
19     Q    Well, after Medtronic terminated
20  the license agreement it had, Quickie never
21  made an effort to go back to U.S. Surgical
22  or Ethicon to see if they would then be
23  interested in licensing the patent, is that
24  correct?
25     A    That's correct.

9 (Pages 30 to 33)

| Page 30 | Page 32 |
|---|---|
| 1         Fell | 1         Fell |
| 2   **Q**   **In fact, Quickie never went to** | 2 **license this patent, which we'll refer to** |
| 3 **anyone else to see about licensing the** | 3 **as the '160 Patent, to anyone else?** |
| 4 **product, is that right?** | 4    A   At any point in time? |
| 5    A   That's correct. | 5   **Q**   **Yes.** |
| 6   **Q**   **Did Quickie do anything to** | 6    A   Yes, I believe they did. |
| 7 **attempt to commercialize the patent that** | 7   **Q**   **With whom did Quickie seek to** |
| 8 **was covered by the Medtronic agreement?** | 8 **license?** |
| 9      MR. LODEN: Objection. Form. | 9    A   Edward Scientific, I believe. |
| 10    The reason for the objection, when the | 10   **Q**   **Was Edward Scientific --** |
| 11    Medtronic agreement was signed, I | 11    A   Maybe St. Jude's also. |
| 12    don't believe there was a patent. | 12   **Q**   **Did either of those entities** |
| 13      MR. KAMINSKY: Well, let's | 13 **sign a license?** |
| 14    clarify. | 14    A   Not for this patent. |
| 15 BY MR. KAMINSKY: | 15   **Q**   **Other than those efforts to** |
| 16   **Q**   **There ultimately was a patent** | 16 **license the patent that we referred to, did** |
| 17 **that was issued on the knotless suture** | 17 **Quickie make any other effort to** |
| 18 **device, is that right?** | 18 **commercialize or to seek commercial** |
| 19    A   Yes. | 19 **royalties or benefits with respect to the** |
| 20   **Q**   **It's Patent No. 6,066,160, is** | 20 **'160 Patent?** |
| 21 **that correct?** | 21    A   No, but Edwards, I think, was |
| 22    A   If you say so. I don't have it | 22    very interested, but they were concerned |
| 23 in front of me. | 23    about Quickie's -- with Medtronic's ongoing |
| 24      MR. KAMINSKY: Can we show the | 24    rights even after the termination of the |
| 25    witness Exhibit 55? | 25    agreement. |

| Page 31 | Page 33 |
|---|---|
| 1         Fell | 1         Fell |
| 2    It's not 55, okay. | 2   **Q**   **What ongoing rights did** |
| 3      (Whereupon, Exhibit 64 was | 3 **Medtronic have?** |
| 4    marked for Identification.) | 4    A   I don't have -- something in the |
| 5 BY MR. KAMINSKY: | 5    agreement that gave them, that they were |
| 6   **Q**   **I show you a document marked** | 6    concerned about. I don't recall exactly |
| 7 **Exhibit 64, it's Patent No. 6,066,160,** | 7    what it was. |
| 8 **dated May 23, 2000.** | 8   **Q**   **Had Medtronic asserted any** |
| 9      **Have you ever seen that document** | 9 **rights with respect to the '160 Patent** |
| 10 **before?** | 10 **since it terminated the agreement?** |
| 11    A   Yes. | 11    A   Not to my knowledge. |
| 12   **Q**   **Is that the patent that was** | 12   **Q**   **Has Quickie used any other** |
| 13 **issued to Quickie for the passive knotless** | 13 **patent counsel since its existence?** |
| 14 **suture terminator?** | 14    A   Yes. |
| 15    A   Yes. I think it was issued to | 15   **Q**   **Who else did Quickie use as** |
| 16 the inventors and then assigned to Quickie, | 16 **patent counsel?** |
| 17 yes. | 17    A   Beside whom? Let's -- |
| 18   **Q**   **Is that the patent that was the** | 18   **Q**   **Well, you mentioned Todd** |
| 19 **subject of the license agreement with** | 19 **Sharinn.** |
| 20 **Quickie?** | 20    A   Okay. Well, Todd Sharinn was |
| 21    A   Yes. | 21    with several firms, two firms I believe, |
| 22   **Q**   **Now has Quickie made any other** | 22    Pepe & Hazard and Greenberg Traurig which |
| 23 **effort besides the license agreement with** | 23    were each patent counsel to Quickie. Then |
| 24 **Medtronic that was terminated and the** | 24    Thelen was involved with the litigation and |
| 25 **approaches to U.S. Surgical and Ethicon to** | 25    some patent issues as well. |

10 (Pages 34 to 37)

Page 34

1           Fell
2     Q    Well, actually Thelen handled
3  the re-examination proceeding for this same
4  patent, isn't that correct?
5     A    I believe so, yes. Then there
6  was another gentleman named Tim Maier also.
7     Q    In fact, Thelen was Quickie's
8  counsel as to the '160 Patent when
9  maintenance fees first became due on that
10  patent, isn't that correct?
11     A    I don't remember the date or who
12  was counsel when.
13     Q    Do you remember that maintenance
14  fees became payable on the '160 Patent
15  commencing on May 23, 2003 and ending May
16  23, 2004?
17     A    I wasn't aware of that until
18  after I found out that the time had expired
19  to pay the fees.
20     Q    Well, in fact, you were and
21  we'll show you that you were --
22     A    Okay.
23     Q    -- aware, but do you remember as
24  you sit here today that maintenance fees
25  were due on the patent during the one-year

Page 35

1           Fell
2  period commencing on May 23, 2003 and ending
3  approximately May 23, 2004?
4        MR. LODEN: Objection. Form.
5  BY MR. KAMINSKY:
6     Q    Do you recall that?
7        MR. LODEN: Same objection.
8     A    I'm not sure I understand your
9  question. You're saying at that time was I
10  aware of it or --
11     Q    Are you aware --
12     A    -- am I aware now?
13     Q    Yes.
14     A    Yes.
15     Q    Okay.
16        Is it correct Thelen was
17  Quickie's counsel as to the '160 Patent
18  when the maintenance fee first became due?
19     A    I don't know -- as I said, as I
20  testified a little while ago, I don't know
21  the specific dates when Pepe & Hazard,
22  Greenberg Traurig, Thelen were counsel.
23     Q    Do you remember that Thelen Reid
24  Brown Raysman & Steiner filed a third-party
25  action against you personally in this

Page 36

1           Fell
2  lawsuit?
3     A    Yes.
4     Q    Do you remember they also sued
5  your law firm?
6     A    Yes, of course.
7     Q    Do you remember that there were
8  discovery requests made to your law firm in
9  connection with the third-party action?
10     A    Yes.
11     Q    Do you remember that you and
12  your law firm were asked to admit certain
13  facts by Greenberg Traurig?
14     A    I don't know for sure. I mean,
15  I might have approved an admission that was
16  prepared by counsel.
17     Q    Who represented you in this
18  action?
19     A    In the malpractice?
20     Q    In this action that we're here
21  today about.
22     A    It's Vorys -- I forgot the name
23  of the firm -- Pam Bresnahan and her firm.
24        MR. LODEN: Just to be clear,
25  you're referring to representing

Page 37

1           Fell
2  Mr. Fell and his law firm as
3  third-party defendants in this
4  litigation, prior third-party
5  defendants?
6        MR. KAMINSKY: Yes.
7  BY MR. KAMINSKY:
8     Q    So it's Vorys Sater Seymour &
9  Pease, correct?
10     A    Okay, correct.
11     Q    Pam Bresnahan?
12     A    Correct.
13     Q    And also Nixon Peabody in New
14  York?
15     A    Local counsel, yes.
16     Q    Frank Ryan?
17     A    Yes.
18     Q    Okay. Let me show you a
19  document we're going to mark Exhibit 65.
20        (Whereupon, Exhibit 65 was
21        marked for Identification.)
22  BY MR. KAMINSKY:
23     Q    Mr. Fell, Exhibit 65 is a copy
24  of the Rick Steiner defendants' responses
25  to Greenberg Traurig's request for

11 (Pages 38 to 41)

Page 38

Fell

1
2    admissions. It's dated according to the
3    certificate of service March 28, 2008.
4        Have you ever seen that document
5    before?
6    A    Yes, I must have. I don't
7    recall specifically, but I'm sure I saw it
8    before.
9    Q    Did you discuss with your
10    counsel -- this is simply a yes or no
11    question, I don't the details of what you
12    may have discussed -- did you discuss with
13    your counsel a response to be made to
14    Greenberg Traurig's request for admissions
15    in this action?
16    A    Yes.
17    Q    Okay.
18        Now would you look at page 7 and
19    do you see that requests to admit number 20
20    was "Thelen was Quickie's counsel as to the
21    '160 Patent when the maintenance fee first
22    became due."
23        Do you see that?
24    A    Uh-huh.
25    Q    And the response to the request,

Page 39

Fell

1
2    which is made on behalf of both you and
3    your firm who are identified as the Rick
4    Steiner defendants on page 1 of the
5    response was: "The Rick Steiner defendants
6    admit requests to admit number 20."
7        Do you see that?
8    A    Uh-huh.
9    Q    Would you look at request to
10    admit number 21. It's states: "The
11    maintenance fee was payable during the
12    one-year period commencing May 23, 2003 and
13    ending approximately May 23, 2004 (the
14    one-year period at issue)."
15        The response to that request
16    was: "The Rick Steiner defendants deny
17    that request."
18        Do you see that?
19    A    Uh-huh.
20    Q    Now you stand by the admission,
21    I take it, in respect to request to admit
22    number 20, is that correct?
23        MR. LODEN: When you say you,
24    are you referring to Mr. Fell as one
25    of the Rick Steiner defendants?

Page 40

Fell

1
2        MR. KAMINSKY: Yes.
3    BY MR. KAMINSKY:
4    Q    Do you see on page 1 that the
5    defined term the Rick Steiner defendants
6    means third-party defendants Alan Fell and
7    Rick Steiner Fell & Benowitz LLP, do you
8    see that?
9    A    Yes.
10    Q    Okay.
11        MR. LODEN: So he's asking you
12    as the now dismissed third-party
13    defendant, not in your capacity as a
14    member or general counsel of Quickie.
15        THE WITNESS: Uh-huh.
16    BY MR. KAMINSKY:
17    Q    Do you stand by your admission
18    in request number 20?
19    A    Yes.
20    Q    Do you know why there was a
21    denial in request 21?
22    A    No, I'm not sure, but I'm sure
23    that my counsel had good reason for
24    comparing it that way.
25    Q    Okay.

Page 41

Fell

1
2        Let me read to you some further
3    requests and responses from this document,
4    Exhibit 65.
5        On page 6, request number 18,
6    the request stated: "The maintenance fee
7    on the '160 Patent (the maintenance fee)
8    first became due on May 23, 2003."
9        The response was: "The Rick
10    Steiner defendants admit request to admit
11    number 18."
12        Do you see that?
13    A    Uh-huh.
14    Q    Do you stand by that admission?
15    A    This document was prepared by my
16    counsel. I reviewed the document probably
17    somewhat quickly, but I relied on my
18    counsel to prepare the document that was
19    valid. I'm not going to at this point
20    undermine the document that was prepared by
21    my counsel.
22    Q    So you stand by the document as
23    you sit here today?
24    A    Yeah.
25    Q    Okay.

Page 42

1           Fell
2        Now in request number 19, the
3    request was: "GT was no longer Quickie's
4    attorney as to the '160 Patent when the
5    maintenance fee first became due."
6        And the response was: "The Rick
7    Steiner defendants admit that GT was no
8    longer Quickie's attorney as to the '160
9    Patent as of the date of the revocation;
10   however, the Rick Steiner defendants deny
11   that GT had no responsibility for advising
12   Quickie prior to the revocation that the
13   maintenance fee for the '160 Patent was
14   due."
15       Do you see that?
16   A    Yes, I do.
17   Q    Now why stand by the first
18   statement that Rick Steiner defendants
19   admit that GT was no longer Quickie's
20   attorneys as to the '160 Patent as of the
21   date of the revocation, which refers to the
22   revocation of Greenberg Traurig's authority
23   to deal with the Patent Office with respect
24   to the '160 Patent.
25       Do you stand by that?

Page 43

1           Fell
2    A    Yes, but I think I have to
3    qualify this because after Greenberg
4    Traurig was replaced, they were still doing
5    work for Quickie.
6    Q    All right. I'm going to come to
7    the rest of this admission.
8    A    But I think that's part of --
9    Q    Well, you stand by the first
10   clause, is that correct?  You agree that
11   Greenberg Traurig was no longer Quickie's
12   attorney to the '160 Patent as of the date
13   of the revocation, is that correct?
14       MR. LODEN:  Again, just to
15   clarify the record, you mean Rick
16   Steiner in its capacity as a dismissed
17   third-party defendant in this
18   litigation, correct?
19       MR. KAMINSKY:  And you
20   personally, both.
21       MR. LODEN:  Well, as a dismissed
22   third-party defendant.
23       MR. KAMINSKY:  Yes, yes.
24   BY MR. KAMINSKY:
25   Q    I'll explain to you why I'm

Page 44

1           Fell
2    doing this with you.  I don't have to do
3    this.  These are admissions in the case.
4    A    I understand that.
5    Q    You're being deposed here now,
6    you're being dismissed, and if there's
7    going to be any change from what I believe
8    is a binding admission in any event, I'd
9    like to know about it now since you're now
10   a dismissed defendant.
11       MR. LODEN:  And the reason I'm
12   making the clarification on the record
13   is I don't think it's a foregone
14   conclusion that any admissions that
15   Rick Steiner made on behalf of a
16   now dismissed party are binding on
17   anyone other than Rick Steiner.
18       MR. KAMINSKY:  I don't agree
19   with you, but that's why --
20       MR. LODEN:  Well, that's why I'm
21   clarifying the record.
22       MR. KAMINSKY:  Because you might
23   take that position, we're going to go
24   through this.
25   BY MR. KAMINSKY:

Page 45

1           Fell
2    Q    So I take it you stand by the
3    first clause, and then we'll go to the
4    second clause -- before I go back to that,
5    do you know what we're referring to by
6    revocation?
7    A    I think I had seen it recently.
8    Q    Do you recall that there was a
9    revocation of the prior Powers of Attorney
10   that had been given to Greenberg Traurig by
11   Quickie?
12   A    Yes.
13   Q    Do you recall that that
14   revocation was filed with the United States
15   Patent and Trademark Office on or about
16   March 4, 20003?
17   A    I don't remember the specific
18   date of the filing, but I remember the
19   existence of a revocation.
20   Q    Let me show you a document which
21   has been marked Exhibit 56.
22       Exhibit 56 is a revocation of
23   prior Powers of Attorney and an appointment
24   of new attorneys by Quickie signed by
25   Aubrey Galloway as managing partner of

13 (Pages 46 to 49)

Page 46

1           Fell
2   Quickie on March 4, 2003.
3           Have you ever seen that document
4   before?
5       A   Yes.
6       Q   Do you understand that that's
7   what we refer to when we're referring to
8   the revocation?
9       A   Yes.
10      Q   Did you see that document when
11  it was filed?
12      A   I don't specifically recall, but
13  I'm sure I did.
14      Q   Who retained the Thelen law firm
15  on behalf of Quickie?
16      A   I don't understand the question.
17      Q   At a certain point the Thelen
18  law firm was retained by Quickie?
19      A   By Quickie, I don't understand
20  who retained --
21      Q   Which person?
22      A   Which person what, signed the
23  retainer agreement?  I'm not sure I
24  understand what you're referring to.
25      Q   Who acted for Quickie in

Page 47

1           Fell
2   retaining the Thelen law firm?
3       A   Who chose the Thelen law firm,
4   is that what you're referring to?
5       Q   Well, let's start with that.
6   Who chose the Thelen law firm?
7       A   Probably Dr. Colvin and
8   Dr. Galloway.
9       Q   Do you know why they chose the
10  Thelen law firm?
11      A   I think Dr. Colvin was upset
12  that Paul Sutton who was a patent
13  partner -- I don't know if he's still
14  there -- but Greenberg Traurig had not
15  taken a more active role in the case and
16  the other reason as well is that there was
17  a partner at Thelen that was a relative, a
18  cousin, I think, of Dr. Colvin's then
19  girlfriend.
20      Q   Isn't it a fact that Mark Evens
21  who was a partner at the Thelen law firm
22  became a relative of Dr. Colvin?
23      A   Yes, that's correct.
24      Q   And isn't that why the business
25  was shifted to the Thelen law firm?

Page 48

1           Fell
2       A   That wasn't the only reason.
3       Q   Who told Greenberg Traurig that
4   they were going to be replaced by the
5   Thelen law firm?
6       A   I probably called Todd because I
7   had a personal relationship with Todd
8   before -- I think I sent a letter
9   subsequently to reconfirm, but I think I
10  called him personally to tell him.
11      Q   Did you tell him that Dr. Colvin
12  was bothered about Paul Sutton's
13  involvement?
14      A   I don't recall.
15      Q   You did tell him, however, about
16  Dr. Colvin's personal relationship with
17  Mark Evens, is that correct?
18      A   I might have, but he might have
19  known that anyway.  I think Mark Evens
20  attended the Markman Hearing where at the
21  point that Todd and his firm was still
22  representing Quickie.
23      Q   Didn't you tell Todd Sharinn
24  that the Greenberg firm was going to be
25  replaced because Dr. Colvin wanted to give

Page 49

1           Fell
2   the business to his relative?
3       A   I don't recall.
4       Q   One way or the other?
5       A   I don't recall saying that, no.
6       Q   How often did you speak to Todd
7   Sharinn during the period in which he
8   represented Quickie?
9       A   During the litigation or during
10  the, before the litigation?
11      Q   At any point?
12      A   Well, during the litigation I
13  spoke to him probably more frequently.
14          After the contract, the
15  agreement with Medtronics was negotiated,
16  you know, I might have spoken to him less
17  frequently.  I don't recall how frequently.
18  But he was also working on other IP matters
19  not related to --
20      Q   But you don't recall how
21  frequently you spoke to him?
22      A   No, I don't.
23      Q   Now let's go back to the
24  admissions that are here.
25          Now as you've explained, you

14 (Pages 50 to 53)

Page 50

Fell

1
2  knew that Quickie had filed a revocation
3  notice with the U.S. Patent Office in March
4  of 2002, correct?
5        MR. LODEN: Objection. Form.
6     A   Are we at admission 19 still, or
7  where are we?
8     Q   Well, actually if you want to
9  get that admission, go back to admission
10  number 2.
11     A   I'm just trying to have the same
12  frame of reference.
13     Q   I'm not at the moment reading
14  you an admission. I'm just making clear.
15     A   Okay.
16     Q   You were aware in March 2003
17  that Quickie had filed a revocation of
18  Greenberg Traurig's authority with respect
19  to the '160 Patent with the U.S. Patent and
20  Trademark Office, correct?
21     A   Correct.
22     Q   And you were aware that in that
23  document Quickle had designated the Thelen
24  lawyers as the lawyers with whom the Patent
25  Office should deal thenceforth with respect

Page 51

Fell

1
2  to the '160 Patent, correct?
3     A   Correct.
4     Q   Did you discuss that with anyone
5  at Quickie at the time?
6     A   I probably discussed it with
7  Dr. Galloway and Dr. Colvin. I don't have
8  a specific recollection of a conversation
9  that I had.
10     Q   Did you discuss it with the
11  Thelen lawyers?
12     A   I probably spoke to Mark Evans.
13  I didn't have much interaction with
14  Mr. Krebs.
15     Q   Did you discuss that with Todd
16  Sharinn at the time?
17     A   I already testified that I
18  called Todd Sharinn and told him that
19  Greenberg Traurig was going to be replaced
20  as attorneys in connection with the Quickie
21  litigation. I don't know if I've had
22  conversation after that. I probably spoke
23  to Todd, I did speak to him after that.
24     Q   Do you recall that Mr. Sharinn
25  received a notification from the patent

Page 52

Fell

1
2  office that Greenberg Traurig had been
3  replaced as counsel with respect to the
4  '160 Patent?
5     A   I don't recall, but based on the
6  revocation I'm assuming that they were
7  notified.
8     Q   When did you first hear about
9  that?
10     A   When did I first hear about
11  what?
12     Q   That Mr. Sharinn had received
13  such a notification from the U.S. Patent
14  office.
15     A   I don't know. I don't remember
16  specifically.
17     Q   Do you remember receiving a
18  letter from Mr. Sharinn enclosing a copy of
19  the revocation notice?
20     A   I don't remember, but it's a
21  possibility that I received it.
22     Q   Let me show you a document that
23  was pre-marked Exhibit 27.
24     A   Uh-huh.
25     Q   Exhibit 27 is a letter to

Page 53

Fell

1
2  Quickie, care of Rick Steiner, dated May
3  15, 2003.
4        Do you recall receiving that
5  letter?
6     A   Not specifically, but I'm sure I
7  did.
8     Q   Do you see that it's addressed
9  to "Dear Alan"?
10     A   Yes, of course.
11     Q   Do you see that it refers to the
12  re-examination of the U.S. Patent No.
13  6,066,160?
14        Do you see that?
15     A   Yes, I do.
16     Q   That's the '160 Patent, correct?
17     A   Correct.
18     Q   Do you see that it encloses a
19  notice to Mr. Sharinn of Greenberg Traurig
20  that is dated April 2, 2003, and it states
21  that the Power of Attorney to you in this
22  application has been revoked?
23        Do you see that?
24     A   Yes.
25     Q   Do you see it says future

15 (Pages 54 to 57)

Page 54

1          Fell
2    correspondence will be mailed to the new
3    attorney of record?
4          Do you see that?
5    A    Yes, I do.
6    Q    New attorney of record were the
7    Thelen lawyers, is that correct?
8    A    Correct.
9    Q    Did you have any conversation
10   with Mr. Sharinn after you received this
11   letter about this letter and the notice
12   that it contained?
13   A    I have no recollection of
14   conversations I might have had with
15   Mr. Sharinn at that time.
16   Q    Did you call Mr. Sharinn up and
17   say to him, Todd, thanks for sending me
18   this notice, but we're still going to be
19   looking to you about the '160 Patent?  Did
20   you ever have that conversation with him?
21   A    I don't recall.
22   Q    You don't recall ever having
23   that conversation, do you?
24   A    Right.
25   Q    Now in request number 3 -- I'm

Page 55

1          Fell
2    sorry, request number 4, in Exhibit 65, you
3    and your law firm --
4    A    I'm sorry, this exhibit is
5    not -- oh, it is, it's on the bottom.
6         · Go ahead, I'm listening.
7    Q    You and your law firm were asked
8    to admit "in the revocation" -- referring
9    to the document we just mentioned a moment
10   ago -- "Quickie appointed Robert Krebs and
11   others attorney at Thelen Reid & Priest
12   (referred to collectively with its
13   successor Thelen Reid Brown Raysman &
14   Steiner LLP as "Thelen") as the new
15   attorneys for Quickie with respect to the
16   '160 Patent to 'prosecute and transact all
17   business' in the PTO."
18        And the response was:  "The Rick
19   Steiner defendants admit request to admit
20   number 4."
21        Do you see that?
22   A    Yes.
23   Q    Do you stand by that admission
24   as you testify today?
25   A    As I said earlier, I'll stand by

Page 56

1          Fell
2    this admission.
3    Q    Do you stand by everything
4    that's in this request to admit?
5         MR. LODEN:  Have you looked at
6    it from page to page?
7    A    I haven't.  I haven't gone over
8    it.  I mean, as I say, I might have looked
9    at it some time ago, but I haven't looked
10   at it in a long time.
11   Q    Well, let's go through some more
12   items in it, okay?
13   A    Sure.
14   Q    Now as we pointed out earlier,
15   in response to request number 19, the first
16   clause of the Rick Steiner defendants, that
17   is you and your law firm, stated:  "The
18   Rick Steiner defendants admit that GT was
19   no longer Quickie's attorney as to the '160
20   Patent as of the date of the revocation."
21        Correct?
22   A    Correct.
23   Q    And you stand by that as you sit
24   here today, is that correct?
25   A    Yes.

Page 57

1          Fell
2    Q    Now the second part of your
3    response was that the Rick Steiner
4    defendants denied that GT, referring to
5    Greenberg Traurig, had no responsibility
6    for advising Quickie prior to the
7    revocation that the maintenance fee for the
8    '160 Patent was due.
9         Do you see that?
10   A    Uh-huh.
11   Q    Okay.
12        What is the basis for that
13   response?
14   A    Because I think that Greenberg
15   Traurig and Todd Sharinn had retained
16   certain responsibilities with regard to
17   Quickie and they were still doing work
18   after they were replaced by Thelen.
19   Q    Okay.
20        Do you remember what I read to
21   you before, request number 18, would you
22   look at that again, which was admitted and
23   that is that the maintenance fee first
24   became due on May 23, 2003.
25        Do you see that?

16 (Pages 58 to 61)

Page 58

Fell

1
2    A    Yes.
3    Q    The revocation, as you saw, was
4    on March 4, 2003, correct?
5    A    Uh-huh.
6    Q    Right.
7         So the revocation occurred
8    before the maintenance fee became due,
9    isn't that right?
10   A    Yes.
11   Q    So on what basis do the Rick
12   Steiner defendants or you say that
13   Greenberg Traurig had a responsibility to
14   advise Quickie prior to the revocation on
15   March 4 that the maintenance fee for the
16   '160 Patent was due and the maintenance fee
17   did not become due until May 2004, two
18   months later?
19   A    Because I think they, as I just
20   testified, I think Greenberg had retained
21   certain work that they were doing for
22   Quickie relating to IP and I think this was
23   their responsibility as well.
24   Q    So prior to the revocation, I
25   should have told you that a maintenance fee

Page 59

Fell

1
2    that was not yet due was due -- is that
3    what you're saying?
4         MR. LODEN: Objection. Form.
5    A    At some point they should have
6    told us that the maintenance fee was due.
7    Q    Now, in fact, you knew yourself
8    that a maintenance fee was going to be due
9    about that time, didn't you?
10   A    I don't think I was aware of it,
11   otherwise I would have made arrangements to
12   pay it.
13   Q    Weren't you told that when the
14   patent was first issued?
15   A    I probably was when the patent
16   was first issued, but I was relying on
17   patent counsel to provide me with a notice
18   or inform me in some way.
19   Q    Well, my question is whether you
20   knew it. You did know it, didn't you?
21   A    If I knew it, I would have made
22   arrangements to file the patent, the
23   maintenance fee.
24   Q    Let me show you a document
25   that's been marked Exhibit 21.

Page 60

Fell

1
2         Exhibit 21 is a letter from the
3    Pepe & Hazard law firm, dated May 30, 2000,
4    to Stephen Colvin and it shows a CC on the
5    second page to Alan Fell.
6         You received a copy of that
7    letter, isn't that right?
8    A    I'm sure I did.
9    Q    Now do you see that in the
10   second page, in the paragraph that's there,
11   that the letter tells you that the fees are
12   due on or before three and a half, seven
13   and a half and eleven and a half years from
14   the date of the patent, from the date the
15   patent issues?
16        Do you see that?
17   A    I see that.
18   Q    Now you were looking to
19   Mr. Sharinn to advise you of that, you're
20   saying, is that right?
21   A    It says in the letter: "We will
22   notify you regarding payment of the
23   maintenance fees several months before they
24   are due," and that's what I was relying on.
25   Q    Now did you diary at any time --

Page 61

Fell

1
2    A    I didn't diary this, no. I was
3    relying on patent counsel to notify me.
4    Q    Now, in fact, you were reminded
5    that patent fees were due three and a half
6    years after patent issued before the patent
7    fees were due in this case, weren't you?
8         MR. LODEN: Objection. Form.
9         If you understand it.
10   A    I don't understand the question.
11   Q    Did you understand that there
12   was a one-year period in which to pay the
13   patent fees?
14        MR. LODEN: Objection. Form.
15   A    I was relying on patent counsel
16   to notify me.
17   Q    I understand what you say you're
18   relying on, Mr. Fell, but what I want to
19   find out is what you knew.
20   A    I didn't know, okay?
21   Q    You didn't know?
22   A    I received this letter. I
23   didn't diary. I was relying on patent
24   counsel to notify me.
25   Q    Did you talk to Thelen Reid &

Page 62

```
 1          Fell
 2   Priest, your new patent counsel, as of
 3   March 2003 about the patent ever?
 4         MR. LODEN: Objection. Form.
 5      A   Yes.
 6      Q   And you were relying on Thelen
 7   Reid & Priest to tell you that the patent
 8   fees were due, weren't you?
 9      A   I was relying on patent counsel,
10   whoever they were.
11      Q   And that's Thelen Reid & Priest
12   after Greenberg Traurig's authority was
13   revoked with respect to the '160 Patent,
14   correct?
15      A   I still think that Greenberg
16   Traurig retained certain responsibilities
17   with regard to the patent.
18      Q   Thelen Reid & Priest, the Thelen
19   firm, was Quickie's counsel as to the '160
20   Patent when the maintenance fee first
21   became due, correct?
22      A   Yes.
23      Q   And GT, that's Greenberg
24   Traurig, and Mr. Sharinn, were no longer
25   Quickie's attorneys as to the '160 Patent
```

Page 63

```
 1          Fell
 2   when the '160 Patent maintenance fees
 3   became due, isn't that correct?
 4      A   I still think that Greenberg
 5   Traurig was handling certain matters with
 6   regard to the '160 Patent, including the
 7   maintenance fees.
 8      Q   Can you answer my question,
 9   please?
10          Greenberg Traurig was no longer
11   Quickie's attorney as to the '160 Patent
12   during the period when the maintenance fee
13   was due and could have been paid, isn't
14   that correct?
15      A   I don't know if that's
16   completely correct.
17      Q   Okay.
18          Would you look at request number
19   22?
20      A   Sure.
21      Q   Okay.
22          Page 7. The request says: "GT
23   was no longer Quickie's attorney as to the
24   '160 Patent during the one-year period in
25   issue when the maintenance fee was due and
```

Page 64

```
 1          Fell
 2   could have been paid."
 3          The response is: "The Rick
 4   Steiner defendants admit request to admit
 5   number 22."
 6      A   Uh-huh.
 7      Q   You stand by that statement,
 8   don't you?
 9          MR. LODEN: Objection. Form.
10          For the same basis that we talked
11   about earlier. Who is you?
12   BY MR. KAMINSKY:
13      Q   You, Alan Fell.
14      A   Yeah, I stand by that.
15      Q   Both personally and on behalf of
16   your firm, is that right?
17      A   Yes.
18      Q   Now the next request said:
19   "Thelen was Quickie's counsel during the
20   one-year period in issue when the
21   maintenance fee was due and could have been
22   paid."
23          And the response was: "The Rick
24   Steiner defendants deny request to admit
25   number 15."
```

Page 65

```
 1          Fell
 2      A   I'm sorry, you're at 15?
 3      Q   Forgive me, I'm wrong.
 4          The response was: "The Rick
 5   Steiner defendants admit request to admit
 6   number 23," correct?
 7      A   Correct.
 8      Q   And you stand by that statement
 9   as well, don't you?
10      A   Yes.
11      Q   Now do you remember that Rick
12   Steiner — strike that.
13          Do you remember that Quickie
14   replaced the Thelen law firm after the
15   patent was deemed to have expired?
16      A   I'm sorry, could you repeat that
17   question?
18      Q   Yes.
19          Do you remember that after the
20   '160 Patent had expired for non-payment of
21   the maintenance fees, Quickie retained
22   different counsel to replace Thelen?
23      A   Yes.
24      Q   Do you know the name of the
25   counsel?
```

18 (Pages 66 to 69)

Page 66

Fell

1
2    A    I think it was Maier & Maier.
3    Q    Did you have anything to do with
4    the retention of Maier & Maier?
5    A    What do you mean did I have
6    anything to do with?
7    Q    Did you interview Maier & Maier?
8    A    I spoke to Tim Maier on the
9    phone.
10    Q    Who on behalf of Quickie chose
11    to retain Maier & Maier?
12    A    Dr. Colvin and Galloway.
13    Q    Did you recommend the Maier &
14    Maier firm?
15    A    No.
16    Q    How did Quickie come to meet
17    Mr. Maier?
18    A    I think Mark Evens had
19    recommended Mr. Maier.
20    Q    Did you have any dealings with
21    Mr. Maier while he represented the Quickie
22    firm?
23    A    I spoke to him on the phone, he
24    e-mailed me some documents to review.
25    Q    Do you remember that the Maier

Page 67

Fell

1
2    firm represented Quickie in connection with
3    a petition by Quickie for a re-examination
4    or a resuscitation --
5    A    I don't think it's
6    re-examination. I think it was --
7    Q    -- or revival of the patent,
8    correct?
9    A    Yes, yes.
10    Q    Did you review any of the papers
11    that the Maier firm submitted on behalf of
12    Quickie in connection with that effort?
13    A    I believe I did.
14    Q    Do you remember that
15    Dr. Galloway gave a statement in support of
16    the petition to revive the patent?
17    A    I don't remember specifically,
18    but he is the managing member of Quickie,
19    so.....
20    Q    Do you remember that Todd
21    Sharinn was also asked to give a statement
22    in support of the petition?
23    A    I recall that.
24    Q    Did you read any of those
25    statements at the time?

Page 68

Fell

1
2    A    I probably did.
3    Q    Did you read the petition?
4    A    I possibly did.
5    Q    And did you read the supplement
6    to the petition that was also filed by the
7    Quickie firm?
8    A    I possibly did.
9    Q    Maier & Maier filed all of those
10    papers on behalf of Quickie, is that
11    correct?
12    A    That's correct.
13    Q    And they were authorized to do
14    so, correct?
15    A    Correct.
16    Q    In fact, they got a specific
17    limited Power of Attorney authorizing them
18    to do so, is that right?
19    A    I don't specifically recall, but
20    that might be true.
21        MR. LODEN: Marty, just so you
22    know, whenever you want to take a
23    break, I think I can reach out to Alan
24    and Skip and see if we can -- we've
25    been going about an hour.

Page 69

Fell

1
2        MR. KAMINSKY: Okay. Whenever
3    you want to do it.
4        (Discussion held off record.)
5    BY MR. KAMINSKY:
6    Q    Let me show you a document which
7    has been marked Exhibit 55, and if you
8    would look at the last two pages of that
9    document and tell me if that refreshes your
10    recollection that the Maier & Maier firm
11    received a Power of Attorney to represent
12    Quickie in connection with the petition to
13    revive the '160 Patent.
14    A    Yes.
15    Q    Let me show you two documents,
16    Exhibits 52 and 61. Exhibit 61 is the
17    petition for reconsideration -- strike
18    that.
19        Let me also ask you to look at
20    the first part of Exhibit 55 and tell me if
21    that is the petition to accept unavoidably
22    delayed payment of the maintenance fee in
23    an expired patent.
24    A    Yes.
25    Q    Did you see that at or about the

19 (Pages 70 to 73)

Page 70

Fell

1
2 time that it was filed, that is --
3    A    I don't specifically recall, but
4 in all likelihood, I did.
5    Q    Now let me show you a document
6 that's been marked as Exhibit 52.
7         Exhibit 52 is a supplement to
8 the petition that was filed in December
9 2006.
10        Did you see that document?
11   A    Yes.
12   Q    And that was about the time of
13 the petition proceeding, is that right?
14        MR. LODEN: I'm sorry, you're on
15 52?
16        MR. KAMINSKY: 54.
17   A    This says 52.
18   Q    I meant 54. My apologies. Let
19 me start this again.
20        You saw Exhibit 54, the
21 supplemental petition, while the
22 proceedings seeking to revive the patent
23 were going on, is that correct?
24   A    I have no specific recollection,
25 but in all likelihood, I did.

Page 71

Fell

1
2    Q    Now let me show you Exhibits 52
3 and 53, which are statements in support of
4 the petition that were filed in the Fall of
5 2006 and their statements by Dr. Galloway
6 and by Todd Sharinn.
7         Did you see those documents at
8 or about that time?
9    A    I have, again, no specific
10 recollection, but in all likelihood I did.
11   Q    Now would you look first at
12 Exhibit 53, the statement by Dr. Galloway.
13        Do you see that in paragraph 2
14 of that statement Dr. Galloway says: "As
15 managing partner for Quickie LLC, I
16 retained Robert E. Krebs, et al. of Thelen
17 Reid & Priest LLP law firm to transact all
18 post issuance proceedings and
19 responsibilities in the Patent and
20 Trademark Office, including but not limited
21 to re-examination proceedings and timely
22 payment of the maintenance fee."
23        Do you see that?
24   A    Yes.
25   Q    Did you ever tell Dr. Galloway

Page 72

Fell

1
2 that there was anything incorrect in that
3 statement?
4         MR. LODEN: Objection. I just
5 caution the witness to the extent that
6 gets into attorney client relationship
7 or communications, be careful.
8         MR. KAMINSKY: Okay.
9         MR. LODEN: I think the question
10 does get into that topic.
11        MR. KAMINSKY: All right.
12        As I understand it, Quickie is
13 asserting the attorney client
14 privilege as to communications with
15 respect to legal advice with respect
16 to Mr. Fell and his law firm, is that
17 correct?
18        MR. LODEN: I'm asserting the
19 privilege with respect to the question
20 you asked of Mr. Fell, and that was
21 whether he ever told Dr. Galloway that
22 there was anything incorrect in that
23 statement.
24        MR. KAMINSKY: All right.
25        Well, I think I need to know

Page 73

Fell

1
2 because one cannot assert the
3 privilege selectively. Am I correct
4 that in this lawsuit Quickie is
5 asserting the attorney client
6 privilege as to communications between
7 Mr. Fell and Quickie and his law firm
8 and Quickie that involved legal
9 advice?
10        MR. LODEN: I think that's
11 generally correct.
12        MR. KAMINSKY: Okay. It's on
13 the basis of that objection that
14 you're asking the witness not to
15 reveal attorney client communication
16 as to this document, correct?
17        MR. LODEN: As to the
18 question -- yeah, yeah, that's
19 correct.
20 BY MR. KAMINSKY:
21   Q    Now I'm going to ask you a
22 question that calls for a yes or no answer,
23 and Quickie's counsel can determine whether
24 to assert an objection to that as well, but
25 did you ever have any discussion with

20 (Pages 74 to 77)

Page 74

1    Fell
2    Dr. Galloway about paragraph 2 of the
3    statement he submitted in support of
4    Quickie's petition in the Fall of 2006?
5        MR. LODEN: Yeah, again, Marty,
6    I don't want to be obstructionist, but
7    I do think even putting the question
8    that way to answer yes or no asks him
9    to confirm whether or not that topic
10   was discussed, which would get into
11   privileged communication. So we do
12   instruct the witness not to answer.
13   BY MR. KAMINSKY:
14   Q    Are you aware of any statement
15   by Quickie made to the U.S. Patent Office
16   ever saying to the U.S. Patent Office that
17   any of the statements in Dr. Galloway's
18   statement that has been marked Exhibit 53
19   were or are incorrect?
20   A    I'm not aware of any.
21   Q    Now would you look at the
22   document that we've marked Exhibit 54,
23   which is the supplement to the petition.
24       Do you see that on the first
25   page the document says: "A declaration

Page 75

1    Fell
2    by Todd S. Sharinn is being added as
3    Exhibit 7."
4        Do you see that?
5    A    I think it says "to Exhibit 7."
6    Q    Correct. Do you see that?
7    A    Yes.
8    Q    Do you see that it continues in
9    the second sentence and says: "His
10   responsibility for the '160 Patent ended
11   prior to the time period when the payment
12   of a first maintenance fee was due (see
13   Exhibits 3 and 10, revocation of prior
14   Powers of Attorney signed on behalf of the
15   patent owner on March 4, 2003)."
16       Do you see that?
17   A    Yes.
18   Q    Did you have any discussion with
19   anyone at Quickie with respect to that
20   statement in the supplemental petition?
21       MR. LODEN: Same objection to
22   the extent those discussions involve
23   the giving of legal advice, we assert
24   the privilege and I instruct the
25   witness not to answer, to the extent

Page 76

1    Fell
2    those discussions again involve legal
3    advice.
4    BY MR. KAMINSKY:
5    Q    Can you answer without violating
6    the privilege?
7    A    No.
8    Q    Did you have any discussion with
9    the Maier & Maier firm about this statement
10   in the supplemental petition?
11       MR. LODEN: Same objection
12   again, and there I think it's even
13   more clear. If he was talking to
14   Maier & Maier, it more than likely
15   involved legal advice one way or the
16   other. But wait for the witness to
17   confirm that to be the case.
18       MR. KAMINSKY: Okay.
19       Just to simplify things and
20   maybe shorten things, may I assume
21   that any questions I ask about
22   questions regarding these documents
23   with Quickie and the Maier & Maier
24   firm will be objected to on the basis
25   of privilege so that I don't have to

Page 77

1    Fell
2    go through each one? I am going to go
3    through some other statements, but I'd
4    rather save us a little time.
5        MR. LODEN: I appreciate that.
6        I'm not willing to say that any
7    question you would ask, because you
8    know, we're both creative lawyers, who
9    knows what you could come up with.
10       But I will say, again, as to
11   communications between Mr. Fell in his
12   capacity as general counsel for
13   Quickie and either other members of
14   Quickie or other counsel for Quickie
15   concerning the provision of legal
16   advice, that those conversations are
17   privileged and we are asserting the
18   privilege as to those conversations.
19   BY MR. KAMINSKY:
20   Q    What I'm going to do then is
21   just call your attention, Mr. Fell, to
22   certain other statements in this document
23   and then the question I'll ask after that
24   is whether you're aware of any statement by
25   Quickie to the U.S. Patent office that

21 (Pages 78 to 81)

Page 78

Fell

1
2  withdrew or contradicted these statements.
3      A    This is from the 52, 53 and --
4      Q    This is from 54.
5      A    54, okay.
6      Q    I'll read you specific
7  provisions in the interest of time.
8          If you would look on the second
9  page of that exhibit, at the bottom of the
10  page, the document that is the supplement
11  to the petition stated to the U.S. Patent
12  Office that:  "Thelen Reid & Priest was
13  granted and held sole and full power in the
14  '160 Patent from March 4, 2003 through
15  August 14, 2006 (Exhibits 3, 9 and 10).
16  This period of time covered the time period
17  up to May 23, 2004 for timely paying the
18  first maintenance fee and the entire 2-year
19  period starting from the date of the '160
20  Patent's expiration to file a remedial
21  petition under the unintentional provision
22  (37 CFR 1.378(c)); this 2-year expiration
23  period ending on May 24, 2006."
24          Do you see that statement?
25      A    Yes, I do.

Page 79

Fell

1
2      Q    Are you aware of any statement
3  by Quickie withdrawing or otherwise stating
4  to the U.S. Patent office that this prior
5  statement by Quickie was incorrect?
6      A    The statement by Quickie, no.
7      Q    Do you see continuing on page 3,
8  the supplemented petition says:  "The
9  actions and inactions of Thelen Reid &
10  Priest, Medtronics examination requests" --
11      A    Re-examination requests.
12      Q    Re-examination requests, thank
13  you -- "and even the U.S. PTO, led the
14  patent owner to believe that their '160
15  Patent was viable."
16          Do you see that?
17      A    Yes.
18      Q    And then it continues:  "Not
19  until July 23, 2006 did the patent owner
20  first learn that their valuable '160 Patent
21  had expired."
22          Do you see that?
23      A    Yes, I do.
24      Q    And then continuing on in the
25  next paragraph, the last two sentences

Page 80

Fell

1
2  read:  "Thelen Reid & Priest failed to
3  discover and know that the '160 Patent had
4  expired when they prepared and filed
5  amendments to the claims and re-examination
6  (Exhibit 14).  It also appears that Thelen
7  Reid & Priest failed to docket the patent
8  for payment of maintenance fees."
9          Do you see that?
10      A    Yes, I do.
11      Q    Are you aware of any statement
12  by Quickie advising the U.S. Patent office
13  that there was any error in the statements
14  I just read?
15      A    No.
16      Q    Would you look on page 4.
17          Do you see that in the second to
18  last paragraph the supplemental petition
19  states:  "The patent owner fully believed
20  that their valuable legal rights in the
21  '160 Patent would be justly protected by
22  the attorneys and law firm of Thelen Reid &
23  Priest when the patent owner chose them for
24  representation and executed the Power of
25  Attorney dated March 4, 2003 (see Exhibit

Page 81

Fell

1
2  9).  Unfortunately that did not occur --
3      A    Such did not occur.
4      Q    -- such did not occur."
5          Do you see that?
6      A    Yes.
7      Q    Are aware of any statement by
8  Quickie to the U.S. Patent office that
9  there was any error in the statement I just
10  read to you?
11      A    No.
12      Q    The petition was denied, is that
13  correct?
14      A    Correct.
15      Q    Do you recall that Quickie then
16  sought reconsideration of the petition?
17      A    Yes.
18      Q    And that was also denied, do you
19  recall that?
20      A    Yes.
21      Q    Did you ever see the decision of
22  the Patent Office denying the petition for
23  reconsideration?
24      A    I believe I did.
25      Q    Let me show you a document which

22 (Pages 82 to 85)

Page 82

```
1              Fell
2    is marked Exhibit 59, and I will also show
3    you a document which has been marked
4    Exhibit 60.
5         Those are the two decisions of
6    the U.S. Patent Office denying the petition
7    and the petition for reconsideration, is
8    that correct?
9    A    I believe so, yes.
10   Q    Did you read those at the time?
11   A    I believe I did, yes.
12   Q    Am I correct that Quickie has
13   not filed any further application to the
14   U.S. Patent and Trademark Office to seek
15   relief from these two decisions?
16        MR. LODEN: Objection. Form.
17   A    Correct.
18   Q    Now while this was going on,
19   Medtronic had asked the U.S. Patent office
20   to re-examine the patent and determine
21   whether, in fact, all of the claims in the
22   patent were actually allowable and
23   patentable, is that correct?
24        MR. LODEN: Objection. Form.
25   A    I'm sorry, can you repeat that
```

Page 83

```
1              Fell
2    question?
3    Q    Yes.
4         While these proceedings that
5    I've just been asking you about were going
6    on, Medtronic had asked the U.S. Patent
7    office to re-examine the patent and
8    determine whether all of the claims in the
9    patent were actually allowable and
10   patentable, is that correct?
11        MR. LODEN: Same objection.
12   A    That's correct.
13   Q    And the U.S. Patent Office
14   issued two decisions in connection with the
15   patent on requests for re-examination by
16   Medtronic, is that right?
17   A    I believe so.
18   Q    Do you remember that the Patent
19   Office significantly narrowed the scope of
20   the patent?
21        MR. LODEN: Object to the form.
22   A    I don't remember specifically.
23   Q    Let me show you a document which
24   has been marked Exhibit 63, which is a
25   decision of the U.S. Patent office in
```

Page 84

```
1              Fell
2    February of 2008. It's dated February 20,
3    2008.
4         Have you ever seen that document
5    before?
6    A    I don't specifically recall, but
7    I probably did.
8    Q    Do you see that in the third
9    page of that exhibit under part 2 entitled
10   summary of action, item 3 states that
11   claims 26 and 30 in the patent are
12   patentable and are confirmed?
13        Do you see that?
14   A    Just for a second, I don't
15   recall seeing this document. This is
16   relatively recently, right? This is this
17   year?
18   Q    Yes.
19   A    I don't actually recall seeing
20   this document.
21   Q    Okay.
22        Well, would you turn to the
23   third page?
24   A    Yes.
25   Q    Okay.
```

Page 85

```
1              Fell
2    A    This is a week and a half before
3    Dr. Colvin died.
4    Q    Very recently, correct.
5    A    Yeah.
6    Q    The page that's entitled office
7    action in ex parte examination, do you see
8    that page?
9    A    Yes, I do.
10   Q    Do you see that part two
11   summarizes the action that was taken by the
12   Patent Office?
13   A    Yes.
14   Q    Do you see that item 1A notes
15   that claims 1 through 34 were subject to
16   re-examination?
17   A    Yes.
18   Q    There were 34 claims in the
19   patent?
20   A    Uh-huh.
21   Q    Do you see that item 3 says that
22   claims 26 and 30 are patentable and were
23   confirmed?
24   A    Uh-huh.
25   Q    And then item 4 says that claims
```

23 (Pages 86 to 89)

| Page 86 | Page 88 |
|---|---|

Page 86

1          **Fell**
2    **1 through 25, 27 through 29, and 31 through**
3    **34 were rejected?**
4      A    Uh-huh.
5      **Q    Were you advised that all except**
6    **two claims in the patent were declared**
7    **unpatentable when the re-examination**
8    **proceeding was decided?**
9          MR. LODEN:  I just caution you
10    to the extent your answer does not
11    involve --
12      A    I don't recall seeing this
13    decision.
14      **Q    Well, my question really is were**
15    **you advised by anyone that, in fact, there**
16    **had been such a decision?**
17      A    I don't recall being advised by
18    anyone.
19      **Q    Do you know if Quickie has taken**
20    **any steps to seek an appeal or reverse this**
21    **decision that's reflected in Exhibit 63?**
22      A    Not to my knowledge.
23      **Q    Do you recall that all the**
24    **billings for work that Greenberg Traurig**
25    **did for Quickie or its affiliates were sent**

Page 87

1          **Fell**
2    **to you as general counsel of Quickie?**
3      A    Yes.
4      **Q    There were actually more than**
5    **one entity that was involved, is that**
6    **right?**
7      A    That's correct.
8      **Q    What other entities was**
9    **Greenberg Traurig doing work for?**
10      A    I think they were doing work for
11    S&A rings and another entity called
12    E-Surge.  There might have been some other
13    entities, but I don't think they did much
14    or much happened to it.
15          There was something called
16    BioSurge, I think, and Quickie Vision or
17    something, but I don't -- nothing really
18    happened with those entities.
19      **Q    Those entities were all LLCs, is**
20    **that correct?**
21      A    Correct.
22      **Q    And some of the members of those**
23    **entities were different, is that correct?**
24      A    Correct.
25      **Q    So that they didn't have all the**

Page 88

1          **Fell**
2    **same members, is that right?**
3      A    That's correct.
4      **Q    All of the billings went to you**
5    **at Quickie, care of your law firm, do you**
6    **remember that?**
7      A    Yes.
8      **Q    Why were all the billings simply**
9    **sent to you for Quickie for all of those**
10    **entities?**
11          MR. LODEN:  Object to the form.
12      A    It's not just Quickie.  We're
13    talking about Quickie, S&A Rings and
14    E-Surge, correct?
15      **Q    Do you remember, though, that**
16    **all of the billings were addressed to**
17    **you --**
18      A    Yes, I already said that.
19      **Q    -- in care of Quickie?**
20      A    Care of Quickie?
21      **Q    Yes, the billings were addressed**
22    **to you and Quickie at your law firm.**
23      A    Yeah, I didn't know that it said
24    care of Quickie.
25      **Q    Was that a matter of, just for**

Page 89

1          **Fell**
2    **convenience?**
3          MR. LODEN:  Objection.  Form.
4      A    I don't know why it was done
5    that way.  It should have been the entity,
6    care of me or care of my law firm.
7      **Q    Let me show you a document**
8    **that's been marked Exhibit 36.  It's a**
9    **letter to you dated September 24, 2004 --**
10    **actually it's addressed to Quickie, care of**
11    **Rick Steiner.**
12          **Do you see that?**
13      A    Yes, I do.
14      **Q    Do you see that it attaches a**
15    **summary on the second page of outstanding**
16    **invoices owed to Greenberg Traurig, do you**
17    **see that?**
18      A    Yes, I do.
19      **Q    And again, it's entitled Quickie**
20    **LLC, care of Rick Steiner and your law**
21    **firm, correct?**
22      A    Yes.
23      **Q    Do you see, for example, that**
24    **there is a category called general, do you**
25    **see that?**

24 (Pages 90 to 93)

Page 90

Fell
1
2    A    Uh-huh.
3    Q    Is it your understanding that
4  that includes services for some of these
5  other entities that you talked about
6  besides Quickie?
7    A    I think the last, the surgical
8  drape patent application --
9    Q    Yes, I'm going to come to that.
10    A    I don't think that's Quickie
11  either.
12    Q    The fourth one, that was not
13  Quickie either, correct?
14    A    Yeah, that's correct.
15    Q    Do you remember that the bills
16  were addressed to Quickie, care of your law
17  firm?
18        MR. LODEN: Objection. Form.
19    A    I don't remember that, I don't
20  remember that, but whatever the bills say,
21  they say.
22    Q    For example, let me show you
23  Exhibit 42.
24    A    Sure.
25    Q    Exhibit 42 is a copy of a letter

Page 91

Fell
1
2  to Quickie, care of Rick Steiner, from
3  Greenberg Traurig in April, and it encloses
4  an invoice for general services.
5        Do you see that?
6    A    Yes.
7    Q    And again, the invoice in the
8  letter addressed to Quickie, is that right?
9    A    Yeah.
10    Q    Was that done just as a matter
11  of convenience?
12    A    I don't know.
13        MR. LODEN: Objection.
14  BY MR. KAMINSKY:
15    Q    Did you ever discuss that with
16  Mr. Sharinn?
17    A    I don't recall discussing it
18  with him.
19    Q    Did you pay the Greenberg
20  Traurig legal fee bills?
21        MR. LODEN: On behalf of
22  Quickie?
23    A    Yes, if we had funds.
24    Q    Did you also pay the bills for
25  the other attorneys such as Thelen?

Page 92

Fell
1
2    A    Yes. I think there were a
3  couple of times that Dr. Colvin paid
4  directly from his own account.
5    Q    Now at times Mr. Sharinn and
6  others would write to you on behalf of a
7  Quickie matter and yet addressed the letter
8  to you care of a different entity, is that
9  right?
10    A    I don't recall.
11    Q    Let me show you Exhibit 44,
12  which is a letter from Mr. Sharinn to you
13  dated December 2, 2003. It's addressed to
14  Alan Fell, S&A Rings, relating to the
15  concentric passive knotless suture
16  terminator.
17        Do you see that?
18    A    Yeah.
19    Q    The device referred to in the Re
20  is actually a Quickie device, is that
21  right?
22    A    That's correct.
23    Q    It's addressed to you, S&A
24  Rings, is that right?
25    A    Yes.

Page 93

Fell
1
2    Q    Did you pay any attention to
3  that when you got the letter?
4    A    I didn't notice. I don't
5  remember noticing it at the time.
6    Q    Do you remember that there are
7  other letters on which the same kind of
8  mixing up of names occurred?
9        MR. LODEN: Object to form.
10    A    I don't recall specifically. I
11  might have brought it to Todd's attention
12  at some point, but I don't remember.
13    Q    Let me show you two documents
14  that we'll mark as Exhibits 66 and 67.
15        Exhibit 66 is a letter from
16  Mr. Sharinn to Alan Fell at S&A Rings, care
17  of the Rick Steiner law firm, dated
18  December 3, 2002.
19        Exhibit 67 is a letter from
20  Mr. Sharinn to Quickie Vision LLC, care of
21  the Rick Steiner firm, dated October 14,
22  2003.
23        (Whereupon, Exhibits 66 and 67
24        were marked for Identification.)
25    A    I probably did, don't recall

Page 94

1          Fell
2    specifically, but it would have come to me.
3       Q    Do you see that both those
4    documents refer to Quickie devices in the
5    Re portion of the letter?
6       A    Yes.
7       Q    Yet, for example, when
8    discussing the re-examination of the '160
9    Patent by Medtronic, Mr. Sharinn wrote the
10   letter to S&A Rings.
11          Do you see that?
12      A    Yes.
13      Q    You knew he was referring to a
14   Quickie device when you got this letter,
15   didn't you?
16      A    Yeah, I would go by the Re, not
17   how it was addressed generally.
18      Q    Well, you'd actually go by the
19   body of the letter, wouldn't you?
20          MR. LODEN: Objection. Form.
21      A    Yeah, yeah.
22      Q    Do you see that in Exhibit 67
23   the letter is addressed to Quickie Vision,
24   care of your law firm, but it's really
25   referring to bills for a Quickie patent?

Page 95

1          Fell
2       A    Right.
3       Q    Once again, you'd look at the
4    body of the letter, is that right?
5       A    Yes.
6       Q    Were you always careful to make
7    sure that you used the appropriate Re or
8    address in letters relating to Quickie or
9    S&A Rings when you communicated with
10   Mr. Sharinn?
11          MR. LODEN: Objection. Form.
12      A    I would try to be specific.
13      Q    But you're not certain if you
14   were, is that right?
15          MR. LODEN: Same objection.
16      A    I guess I could have made
17   mistakes occasionally.
18      Q    During this period you were
19   talking to Mr. Sharinn quite frequently,
20   weren't you?
21          MR. LODEN: Objection. Form.
22   BY MR. KAMINSKY:
23      Q    2002 and 2003?
24          MR. LODEN: Objection. Form.
25      A    Probably.

Page 96

1          Fell
2       Q    So you weren't confused as to
3    which matters you were talking to him
4    about, were you?
5       A    I probably could figure it out
6    from the substance of the letter. I don't
7    recall, you know, what interaction I had
8    with regard to these specific letters.
9       Q    Now returning again to the
10   period during when maintenance fees were
11   due on the '160 Patent, Thelen which was --
12      A    I'm sorry, are we going back to
13   the admission?
14      Q    Yes.
15          During that period when Thelen
16   was counsel for Quickie with respect to the
17   '160 Patent, Thelen had an opportunity to
18   advise Quickie that maintenance fees were
19   due, isn't that correct?
20      A    Uh-huh, yes, that's correct.
21      Q    And to make sure that Quickie
22   paid the maintenance fees, is that right?
23      A    Yes.
24      Q    Rick Steiner also had an
25   opportunity during that period to advise

Page 97

1          Fell
2    Quickie that the maintenance fees were due,
3    is that true?
4       A    Well, Quickie had retained
5    patent counsel and we were relying on
6    patent counsel to notify us as to
7    maintenance fees.
8       Q    And at that time, as stated to
9    the PTO, your patent counsel for the '160
10   Patent was the Thelen firm, is that right?
11          MR. LODEN: Objection. Form.
12      A    That's right.
13          (Recess taken)
14          (Resumed 11:10 a.m.)
15   BY MR. KAMINSKY:
16      Q    Now I mentioned to you earlier
17   that you had been reminded that patent fees
18   on a patent were due within three and a
19   half years of the issuance of patent before
20   the expiration of the period to pay the
21   patent fees on the '160 Patent.
22          Do recall me mentioning that?
23      A    Yes, yes.
24      Q    And you didn't recall being
25   reminded of that, is that right?

26 (Pages 98 to 101)

Page 98

Fell
1
2     A     Not specifically, no.
3     Q     Well, let me show you a document
4  which has been marked as Exhibit 33, which
5  is a letter to you -- I'm sorry, a letter
6  to Dr. Colvin which shows a CC to you on
7  April 13, 2003.
8         Do you remember getting a copy
9  of that letter?
10    A     Not specifically, but I'm sure I
11 did.
12    Q     Now that's about the concentric
13 passive knotless suture terminator,
14 correct?
15    A     Yeah.
16    Q     Which is a Quickie patent,
17 correct?
18    A     Yeah.  That's not the '160
19 Patent.  That's a different patent, the
20 '243, we'll call it the '243 perhaps.
21    Q     '745 -- oh, '243 Patent, yes,
22 correct.
23    A     '243.
24    Q     Okay.
25         Do you see that in that letter

Page 99

Fell
1
2  on the second page there is a specific
3  statement --
4     A     I think it's on the first page,
5  the bottom of the first page.
6     Q     Yes, you're correct.  On the
7  first page there is a specific statement
8  that patent fees would be due three and a
9  half years from the issuance of the patent?
10    A     Yes.
11    Q     Mark Evans was an attorney at
12 the Thelen firm, is that correct?
13    A     That's correct.
14    Q     And he was the attorney at the
15 Thelen firm to whom Quickie initially
16 transferred the proceedings as to the '160
17 Patent, is that correct?
18    A     I believe so, yes.
19    Q     What was his role specifically
20 at the Thelen firm?
21    A     He was, I believe, a patent --
22 he was a litigator, but I think he had done
23 patent litigation.
24    Q     You're familiar with the name
25 Robert Krebs, is that right?

Page 100

Fell
1
2     A     Yes.
3     Q     What was his role in connection
4  with the '160 Patent?
5     A     I think he was more of a -- he
6  dealt with the Patent Office and the
7  re-examination, the Patent Office issues, I
8  believe.  He was a real patent lawyer.
9     Q     So he became the patent lawyer
10 for Quickie, is that right?
11         MR. LODEN:  Objection to form.
12    A     Yes.
13    Q     Did you communicate regularly
14 with Mr. Krebs?
15    A     No.
16    Q     Did you communicate regularly
17 with Mr. Evans?
18    A     I communicated occasionally with
19 Mr. Evans.  I think Dr. Colvin had more
20 communications with Mr. Evans than I did.
21    Q     Was Quickie looking to Mr. Evens
22 to oversee the patent attorneys in his firm
23 with respect to the patent matters that
24 Thelen was handling?
25    A     Oversee, I don't know if that's

Page 101

Fell
1
2  the exact word, but he was the initial
3  contact person with whom we were introduced
4  to at the firm and I think that we would go
5  to him first before we go to Krebs, I
6  think, but I think Dr. Colvin had more
7  dealings with Mr. Krebs than I did.  I
8  think he went to the Patent Office with
9  Mr. Krebs on at least one or two occasions.
10    Q     Do you recall that when
11 Mr. Quickie took its business away from the
12 Thelen firm, it transferred that business
13 to Mr. Evans' new firm in Washington D.C.,
14 Stern Kessler Goldstein & Fox?
15    A     Yes.
16    Q     Were you involved in the
17 decision to transfer the business to
18 Mr. Evens' new firm?
19    A     I was aware of it because
20 Dr. Colvin had made that decision
21 primarily.  I frankly probably would have
22 tried to find a smaller firm in New York
23 than a Washington firm.
24    Q     But Dr. Colvin picked --
25    A     Dr. Colvin picked this firm,

27 (Pages 102 to 105)

Page 102

1           Fell
2   yes.
3       Q    Now are you represented by
4   counsel as a witness here today?
5       A    Yes.
6       Q    Who is your counsel?
7       A    Mr. Loden.
8       Q    Mr. Loden?
9       A    Yes.
10      Q    So in other words, Quickie's
11  counsel is now going to represent you if
12  you testify in this action?
13      A    That's correct.
14          MR. LODEN:  Well, just so the
15  record is clear, Mr. Fell is a member
16  of Quickie.  So in that capacity,
17  Mr. Fell is my client, just the same
18  as Quickie is my client.
19          Mr. Fell is also general counsel
20  of Quickie.  So in the same capacity
21  Mr. Fell is my client.
22          It's not a new engagement.  It
23  was an engagement that started when I
24  was retained to represent Quickie.
25          MR. KAMINSKY:  No further

Page 103

1           Fell
2   questions.
3          MR. LODEN:  We'll reserve our
4   questions for the time of trial.
5          MR. KAMINSKY:  Thanks very much.
6          THE WITNESS:  Pleasure.
7          (Time noted 11:16 a.m.)
8          THE REPORTER:  Standing order?
9          MR. LODEN:  Standing order.
10         MR. CHU:  Standing order.
11         MR. KAMINSKY:  Standing order.
12         (Time noted 11:17 a.m.)
13
14
15
16  _____
17         ALAN FELL
18
19
20
21  Subscribed and sworn to
22  before me this      day
23  of          , 2008.
24  _____
25

Page 104

1
2           INDEX OF EXAMINATION
3
4   WITNESS                      PAGE
5   ALAN FELL...............................5
6
7
8   EXHIBITS FOR IDENTIFICATION
9
10  64........'160 Patent..................31
11  65........Defendant's Responses........37
12  66........12/3/02 Letter...............93
13  67........10/13/03 Letter..............93
14
15
16
17
18
19
20
21
22
23
24
25

Page 105

1
2           C E R T I F I C A T E
3   STATE OF NEW YORK )
4               : ss
5   COUNTY OF QUEENS  )
6
7       I, JOAN URZIA, a Notary Public within
8   and for the State of New York, do hereby
9   certify:
10      That ALAN FELL, the witness whose
11  deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is
13  a true record of the testimony given by the
14  witness.
15      I further certify that I am not related
16  to any of the parties to this action by
17  blood or marriage, and that I am in no
18  way interested in the outcome of this
19  matter.
20      IN WITNESS WHEREOF, I have hereunto set
21  my hand this 20th day of June 2008.
22
23
24  _____
25         JOAN URZIA, RMR

Alan Fell

Page 102

```
 1                    Fell
 2  yes.
 3       Q     Now are you represented by
 4  counsel as a witness here today?
 5       A     Yes.
 6       Q     Who is your counsel?
 7       A     Mr. Loden.
 8       Q     Mr. Loden?
 9       A     Yes.
10       Q     So in other words, Quickie's
11  counsel is now going to represent you if
12  you testify in this action?
13       A     That's correct.
14            MR. LODEN:  Well, just so the
15       record is clear, Mr. Fell is a member
16       of Quickie.  So in that capacity,
17       Mr. Fell is my client, just the same
18       as Quickie is my client.
19            Mr. Fell is also general counsel
20       of Quickie.  So in the same capacity
21       Mr. Fell is my client.
22            It's not a new engagement.  It
23       was an engagement that started when I
24       was retained to represent Quickie.
25            MR. KAMINSKY:  No further
```

Alan Fell

Page 103

1                        Fell

2      questions.

3              MR. LODEN:  We'll reserve our

4      questions for the time of trial.

5              MR. KAMINSKY:  Thanks very much.

6      THE WITNESS:  Pleasure.

7      (Time noted 11:16 a.m.)

8      THE REPORTER:  Standing order?

9              MR. LODEN:  Standing order.

10             MR. CHU:  Standing order.

11             MR. KAMINSKY:  Standing order.

12     (Time noted 11:17 a.m.)

13

14

15

16

17                  ALAN FELL

18

19

20

21  Subscribed and sworn to

22  before me this 22 day

23  of July        , 2008.

24                                    BARBARA EISENMAN
                                     Notary Public, State Of New York
25                                        No. 01EI6165910
                                     Qualified In Kings County
                                     Commission Expires 10/31/10

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:    Quickie v. Greenberg
Dep. Date:    June 20, 2008
Deponent:     Alan Fell

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|-----|-----|-----------|-------------|-------------------|
| 7 | 14 | First Disciplinary Committee | Disciplinary Committee | Correction |
| 7 | 25 | Partners in real estate LLCs | I am a member of a number of real estate LLC's | Correction |
| 15 | 13 | Brackfeld | Brachfeld | Correction |
| 15 | 13 | Grassi | Grossi | Correction |
| 15 | 14 | Otto | Oddo | Correction |
| 15 | 15 | Lggfelden | Lagfoged | Correction |
| 18 | 25 | Madeline | Matalon | Correction |
| 19 | 6 | Undermeyer | Untermyer | Correction |
| 19 | 9,10,11 | Friedmon | Freedman | Correction |
| 20 | 17,16 | Grassi | Grossi | Correction |
| 29 | 20 | Chanon | Chanin | Correction |

_____
Signature of Deponent

_____

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Quickie v. Greenberg
Dep. Date: June 20, 2008
Deponent: Alan Fell

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|-----|-----|-----------|-------------|-------------------|
| 25 | 4 | Irlinger | Ehrlinger | correction spelling |
| 32 | 9,10 | Edward | Edwards | correction spelling |
| 40 | 24 | Preparing | comparing | correction / grammar |
| 49 | 9,10 | during the | delete during the | correction / grammar |
| 59 | 22 | file the patent | delete file the patent and pay | correction / grammar |
| 84 | 16 | recently | recent | correction / grammar |
| 87,88 | 12,16,14 | E-Surg / BioSurg | E-Surg / Bio Surg | correction / spelling |

_____
Signature of Deponent

# EXHIBIT T

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------

QUICKIE, LLC,

       Plaintiff,

    vs.               07-CV-10331

GREENBERG TRAURIG, LLC,     (RMB)(DFE)

et al.,

       Defendants.

------------------------------

DEPOSITION OF PAUL SUTTON

Tuesday, June 10, 2008

9:30 a.m.

Reported by:

Joan Urzia, RPR

JOB NO. 203573

2 (Pages 2 to 5)

| | Page 2 |
|---|---|
| 1 | |
| 2 | June 10, 2008 |
| 3 | 9:30 a.m. |
| 4 | New York, New York |
| 5 | |
| 6 | |
| 7 | DEPOSITION of PAUL SUTTON, held |
| 8 | at the Offices of Diamond McCarthy, 620 |
| 9 | Eighth Avenue, New York, New York, pursuant |
| 10 | to Notice, before Joan Urzia, a Notary |
| 11 | Public of the State of New York. |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | |
| 2 | IT IS HEREBY STIPULATED AND |
| 3 | AGREED, by and between the attorneys |
| 4 | for the respective parties herein, that |
| 5 | filing and sealing be and the same are |
| 6 | hereby waived. |
| 7 | IT IS FURTHER STIPULATED AND |
| 8 | AGREED that all objections, except as |
| 9 | to the form of the question, shall be |
| 10 | reserved to the time of the trial. |
| 11 | IT IS FURTHER STIPULATED AND |
| 12 | AGREED that the within deposition may |
| 13 | be sworn to and signed before any |
| 14 | officer authorized to administer an |
| 15 | oath, with the same force and effect as |
| 16 | if signed and sworn to before the |
| 17 | Court. |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | |
| 2 | A P P E A R A N C E S: |
| 3 | |
| 4 | |
| 5 | DIAMOND McCARTHY, LLP |
| 6 | Attorneys for Plaintiff |
| 7 | 620 Eighth Avenue |
| 8 | 39th Floor |
| 9 | New York, New York 10018 |
| 10 | BY: STEPHEN T. LODEN, ESQ. |
| 11 | WALTER J. SCOTT, ESQ. |
| 12 | |
| 13 | |
| 14 | POLLACK & KAMINSKY |
| 15 | Attorneys for Defendant |
| 16 | 114 West 47th Street |
| 17 | New York, New York 10036 |
| 18 | BY: MARTIN I. KAMINSKY, ESQ. |
| 19 | JUSTIN Y.K. CHU, ESQ. |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | |
| 2 | PAUL SUTTON, |
| 3 | called as a witness, having been duly |
| 4 | sworn by a Notary Public, was examined |
| 5 | and testified as follows: |
| 6 | EXAMINATION BY |
| 7 | MR. LODEN: |
| 8 | Q.    Good morning, Mr. Sutton. |
| 9 | A.    Good morning. |
| 10 | Q.    My name is Steve Loden, and along |
| 11 | with Skip Scott today, we are here on |
| 12 | behalf of Quickie, LLC in the lawsuit that |
| 13 | Quickie has brought against Greenberg |
| 14 | Traurig. |
| 15 | Before we get into the substance, |
| 16 | I know that you're an experienced litigator |
| 17 | attorney. So I know that you know your way |
| 18 | around a deposition. |
| 19 | But have you, yourself, ever |
| 20 | given a deposition before? |
| 21 | A.    I have. |
| 22 | Q.    In what context was that? |
| 23 | A.    In one or more patent |
| 24 | infringement litigations I gave deposition |
| 25 | testimony. |

3 (Pages 6 to 9)

|  | Page 6 |
|---|---|
| 1 | P. Sutton |
| 2 | **Q. As a fact witness or expert** |
| 3 | **witness?** |
| 4 | A. I believe in both capacities as a |
| 5 | fact witness -- I believe In both |
| 6 | capacities. |
| 7 | **Q. Okay.** |
| 8 | **The one in which you were a fact** |
| 9 | **witness, were you an attorney handling the** |
| 10 | **patent at issue, or what made you a fact** |
| 11 | **witness for that matter?** |
| 12 | A. I was a fact witness because I |
| 13 | had rendered exculpatory opinions that were |
| 14 | the subject of the litigation. |
| 15 | **Q. And where was that litigation** |
| 16 | **pending?** |
| 17 | A. The Southern District of New |
| 18 | York. |
| 19 | **Q. And approximately what time** |
| 20 | **frame?** |
| 21 | A. It was several years ago. |
| 22 | **Q. Do you remember the judge?** |
| 23 | A. The case was before Judge Kevin |
| 24 | Duffy. |
| 25 | **Q. Who was the plaintiff?** |

|  | Page 7 |
|---|---|
| 1 | **P. Sutton** |
| 2 | A. Gaus, G-A-U-S, was the name of |
| 3 | the plaintiff, an individual. |
| 4 | **Q. And the defendant?** |
| 5 | A. Con Air Corporation was the |
| 6 | defendant. |
| 7 | **Q. Okay.** |
| 8 | **And you said that you also** |
| 9 | **testified as an expert witness previously?** |
| 10 | A. Many years ago. |
| 11 | **Q. Where was that matter pending?** |
| 12 | A. I'm not sure I recall where it |
| 13 | was, but I believe it was within the |
| 14 | Southern District of New York. |
| 15 | **Q. Do you remember the judge?** |
| 16 | A. I do not remember the judge. |
| 17 | **Q. You said several years ago.** |
| 18 | **Approximately 10, 15?** |
| 19 | A. More than 20 years ago. |
| 20 | **Q. And do you remember the plaintiff** |
| 21 | **in that case?** |
| 22 | A. I do not remember the name of the |
| 23 | plaintiff. |
| 24 | **Q. How about the defendant?** |
| 25 | A. I believe the defendant was Gulf |

|  | Page 8 |
|---|---|
| 1 | P. Sutton |
| 2 | & Western Corporation. |
| 3 | **Q. And you were an expert on behalf** |
| 4 | **of Gulf & Western?** |
| 5 | A. That's my recollection. |
| 6 | **Q. And what was the subject matter** |
| 7 | **of your testimony in that litigation?** |
| 8 | A. I headed up the patent department |
| 9 | of Gulf & Western Corporation. |
| 10 | **Q. Okay.** |
| 11 | **But what was the subject matter?** |
| 12 | **You said it was expert testimony, right?** |
| 13 | A. That's my recollection. |
| 14 | **Q. So on what matters were you** |
| 15 | **opining as an expert?** |
| 16 | A. It's my recollection that it had |
| 17 | to do with the document procedures at Gulf |
| 18 | & Western Corporation. |
| 19 | **Q. Can you be more specific, what** |
| 20 | **sort of document procedures?** |
| 21 | A. This is, this could be more than |
| 22 | 30 years ago. I really don't recall. |
| 23 | **Q. Okay.** |
| 24 | **So the answer is no, you can't be** |
| 25 | **more specific?** |

|  | Page 9 |
|---|---|
| 1 | **P. Sutton** |
| 2 | A. I do not recall. |
| 3 | **Q. What was the issue in that** |
| 4 | **litigation, if you recall? What was your** |
| 5 | **employer being sued for?** |
| 6 | A. I do not recall. |
| 7 | **Q. Did you -- well, strike that.** |
| 8 | **Did the matter go to trial?** |
| 9 | A. I do not recall whether it was |
| 10 | settled or it went to trial. |
| 11 | **Q. So then I assume you don't recall** |
| 12 | **if you testified at trial either then?** |
| 13 | A. That's correct. |
| 14 | **Q. Who was -- well, did Gulf &** |
| 15 | **Western have outside counsel for that** |
| 16 | **litigation?** |
| 17 | A. They did. |
| 18 | **Q. Who was that?** |
| 19 | A. I do not recall. |
| 20 | **Q. Any other instances where you've** |
| 21 | **given a deposition other than the two that** |
| 22 | **we've just talked about?** |
| 23 | A. I remember giving a deposition |
| 24 | here in New York at opposing counsel's |
| 25 | offices in a matter involving Leviton |

4 (Pages 10 to 13)

Page 10

1           P. Sutton
2 Manufacturing Company, Inc.
3     Q.    And in what capacity were you
4 testifying in that case?
5     A.    I believe that I obtained the
6 patent involved in that litigation.
7     Q.    I'm sorry, you said it was a
8 matter involving Leviton?
9     A.    L-E-V-I-T-O-N.
10    Q.    Okay.
11          Was that the plaintiff or
12 defendant?
13    A.    I'm not certain.
14    Q.    Do you remember the name of the
15 other party involved?
16    A.    I don't, I'm sorry.
17    Q.    Okay.
18    A.    I've literally litigated many
19 dozens of litigations for Leviton.
20    Q.    Okay.
21    A.    Most of them was where Leviton
22 was the plaintiff.
23    Q.    So this was a litigation in which
24 you had obtained the patent on behalf of
25 Leviton and then the patent went into

Page 11

1           P. Sutton
2 litigation?
3     A.    That's my recollection.
4     Q.    And that litigation was here in
5 the Southern District?
6     A.    My testimony occurred here in New
7 York.
8     Q.    Okay.
9           Where was the litigation pending?
10    A.    I'm not certain.  Their cases
11 have been all over the country.
12    Q.    Was this a litigation that
13 occurred while you were at Greenberg
14 Traurig or at some other firm?
15    A.    Prior to my being at Greenberg
16 Traurig.
17    Q.    So what firm would that be?
18    A.    I believe that litigation
19 occurred during a time when I headed up an
20 IP boutique firm.
21    Q.    Which firm was that?
22    A.    Over the years its name changed,
23 but its origins were Sutton & Magidoff,
24 M-A-G-I-D-O-F-F, but there were subsequent
25 names as the firm became larger.

Page 12

1           P. Sutton
2     Q.    Sure.
3           I'm sorry, you may have said this
4 earlier, but approximately what time frame
5 did this litigation take place?
6     A.    I'm sorry that I don't recall,
7 but it occurred more than 12 years ago.
8     Q.    Is Leviton still a client of
9 yours?
10    A.    It is.
11    Q.    So then when you left Sutton &
12 Magidoff and went to — where did you go
13 after that, Thelen?
14    A.    Our boutique firm merged with and
15 into what is now known as the Thelen firm,
16 where I headed up their intellectual
17 property practice.
18    Q.    So then during the merger, you
19 took Leviton with you as a client, or
20 Leviton was brought into the merged entity
21 as a client?
22    A.    Our boutique firm took all of its
23 clients, and those clients chose to remain
24 with us as we merged into and with Thelen
25 by its predecessor firm name Reid & Priest.

Page 13

1           P. Sutton
2     Q.    Okay, right.
3     A.    Read & Priest merged with Thelen
4 Marrin Johnson & Bridges, or a name
5 comparable to that, and its name was
6 changed at that point to Thelen Reid &
7 Priest.
8     Q.    And you said that Leviton is
9 still a client of yours today, so I assume
10 they left with you when you left Thelen?
11    A.    Leviton chose to move with us
12 from Thelen to Greenberg Traurig.
13    Q.    Any other instances in which you
14 recall giving deposition testimony in a
15 litigation?
16    A.    Not that I can recall at this
17 moment.
18    Q.    Okay.
19          I may have asked you already, if
20 I did, I apologize, but the Leviton matter
21 that we just spoke about, did it go to
22 trial?
23    A.    Which matter are you talking
24 about?
25    Q.    The one where you obtained the

5 (Pages 14 to 17)

Page 14

1          P. Sutton
2   patent and then you testified at
3   deposition.
4       A.   I do not believe that that matter
5   went to trial. I believe that that matter
6   was settled.
7       Q.   And you said that other than
8   these three instances, you don't recall any
9   other deposition testimony, correct?
10      A.   At this moment, I do not recall
11  anything other than what I've just
12  testified.
13      Q.   Okay.
14           Did you keep a transcript of your
15  testimony for any of those depositions we
16  just discussed?
17      A.   I did not keep a transcript of
18  any of my prior testimony.
19      Q.   If you wanted to obtain a
20  transcript, where would you go?
21      A.   I wouldn't want the transcript,
22  and I have no idea if I did, where I would
23  go.
24      Q.   Well, for example, when the
25  Leviton -- strike that.

Page 15

1          P. Sutton
2           When you moved from Thelen to
3   Greenberg and Leviton went with you, did
4   Leviton's files move over to Greenberg as
5   well?
6       A.   When I moved from Thelen to
7   Greenberg Traurig, certain of Leviton's
8   files were moved to Greenberg Traurig.
9       Q.   Was the file for this particular
10  piece of litigation that we're talking
11  about one of those files that was moved?
12      A.   I don't believe it was.
13      Q.   Why is that?
14      A.   Because it was a matter that
15  occurred many years prior to that and there
16  was no reason to keep it.
17      Q.   So the litigation matter had been
18  closed at the time you moved to Greenberg,
19  is that what you're saying?
20      A.   That's my recollection.
21      Q.   So then if one wanted to look at
22  the litigation file for that matter, he
23  would presume that Thelen would have it
24  then?
25      A.   I would not presume that Thelen

Page 16

1          P. Sutton
2   would have any Leviton records at all.
3       Q.   Well, then, what happened to the
4   Leviton records that were not transferred
5   to Greenberg Traurig?
6       A.   Those that existed, I believe,
7   were transferred from Thelen to Greenberg
8   Traurig. I would imagine the files that
9   you're questioning me about would have been
10  destroyed or given to the client well,
11  years prior to that time. They would have
12  been sent to James Pearse at the client.
13      Q.   Okay.
14           Like I said previously, I know
15  that you've been in depositions before
16  obviously, so I won't go through all the
17  standard rules of the road, as I like to
18  call them, for depositions other than to
19  say that if you don't understand my
20  question, I'm sure there will be instances,
21  please let me know.
22           Is that okay with you?
23      A.   It is, and if I could ask you,
24  because I'm slightly hard of hearing, if
25  you speak up, it will help me.

Page 17

1          P. Sutton
2       Q.   I will do that. I will do that.
3           If you need a break, say so.
4   We're happy to take breaks as needed.
5           In what capacities are you
6   appearing to testify today?
7       A.   I appear as a designated Rule
8   30(b)(6) witness as well as pursuant to a
9   notice that noticed me individually. I
10  understand that I am testifying at present
11  under Rule 30(b)(6). I'm not sure what
12  arrangements you've made with counsel.
13      Q.   Sure.
14           We served two 30(b)(6) notices.
15  Are you appearing --
16           MR. LODEN:  And we can go ahead
17      and mark them, I guess, and then we'll
18      talk about them.
19           (Exhibit 1, 30(b)(6) Notice of
20      Greenberg Traurig, marked for
21      identification, as of this date.)
22  BY MR. LODEN:
23      Q.   Mr. Sutton, I've just handed you
24  what's been marked as Exhibit 1, which is a
25  30(b)(6) Notice of Greenberg Traurig.

6 (Pages 18 to 21)

| Page 18 |
| --- |

1       **P. Sutton**
2       **If you turn to the last page, it**
3 **lists the items on which the notice will**
4 **focus or the deposition will focus.**
5       **I've referred to this as the**
6 **docketing clerk notice.**
7       **Do you see where I'm referring**
8 **to, the Exhibit A?**
9    A.   I do.
10    **Q.   And are you -- well, before we do**
11 **that, are you appearing today as**
12 **Greenberg's designated corporate**
13 **representative to testify with respect to**
14 **the items listed in Exhibit A?**
15    A.   I'm prepared to give testimony
16 today with respect to items 1, 3, 4, 5, 6,
17 7 and 8 under Exhibit A of Sutton Exhibit
18 1.
19    **Q.   So it looks like you're the**
20 **designated corporate rep then for all of**
21 **the items listed other than item number 2?**
22    A.   I'm prepared to give testimony on
23 those items that I've indicated. I did not
24 indicate item number 2.
25    **Q.   Why is that?**

| Page 19 |
| --- |

1       **P. Sutton**
2    A.   I understand that I have not been
3 designated to testify as with respect to
4 item number 2 on Exhibit A of Sutton 1.
5    **Q.   Who is Greenberg's designated**
6 **representative with respect to item number**
7 **2, if you know?**
8    A.   I'm not certain I know that at
9 all. It's possible I've given testimony on
10 the other categories that we'll wind up
11 with information that will be helpful to
12 you in item number 2.
13    **Q.   Okay.**
14       **What did you look at to prepare**
15 **to testify with respect to the items that**
16 **you've identified on Exhibit 1? What did**
17 **you do to prepare?**
18    A.   I actually looked at all of the
19 categories for which I have been designated
20 to testify when first receiving the
21 notices, and I, in addition to these 8
22 items on Exhibit A, there is another notice
23 with five categories.
24       I sought to obtain information
25 and documents to review so that I can give

| Page 20 |
| --- |

1       P. Sutton
2 testimony on those categories. I spoke to
3 people, I took notes, I reviewed documents,
4 I took notes and have brought notes with me
5 today to assist in getting you accurate
6 dates and information.
7    **Q.   Okay.**
8       **You say that you sought to obtain**
9 **information and documents to review the**
10 **categories listed on Exhibit 1.**
11       **What information and documents**
12 **did you seek?**
13    A.   Anything and everything having to
14 do with Quickie and that related to what I
15 understood those categories to be.
16    **Q.   How did you conduct that search?**
17    A.   I personally went to people who
18 are responsible for these various
19 functions, interviewed them, requested that
20 they provide in my office documents so that
21 I could review them, and quite candidly, I
22 confessed to having a particular interest
23 in this matter, because at Thelen I headed
24 up IP, I actually brought the intellectual
25 property practice to Thelen from our

| Page 21 |
| --- |

1       P. Sutton
2 boutique, and I actually set up at Thelen
3 their computerized docketing system that is
4 the subject of this litigation.
5    **Q.   You set up Thelen's docketing**
6 **system.**
7       **Did you set up Greenberg's as**
8 **well?**
9    A.   Yes, I did -- not alone, with
10 assistance from others. I did bring to
11 Greenberg a computerized docketing system
12 and established that at Greenberg as well.
13    **Q.   Okay.**
14       **We'll get to that later.**
15       **But I want to turn back to what**
16 **you -- your search for documents and your**
17 **interviews.**
18       **Who did you interview?**
19    A.   Several paralegals and clerks and
20 asked the assistance of people who we call
21 assistants and/or secretaries.
22    **Q.   Can you give me a list of names**
23 **that you spoke with, names of the people**
24 **you spoke with?**
25    A.   Well, I don't believe I can give

7 (Pages 22 to 25)

Page 22

1            P. Sutton
2 you a complete list. Some of them I know
3 by sight but not by name. Phyllis Cordes,
4 C-O-R-D-E-S. Marilyn Dawkins,
5 D-A-W-K-I-N-S. Shoba Jaglal, J-A-G-L-A-L.
6        Then there's a hyphenated name
7 after that I don't recall. There are
8 clerks responsible for -- oh, I may have
9 spoken to Courtney T-R-E-U-B-E-R-T. Those
10 are names that come to mind right now and
11 various clerks whose names I don't know but
12 who I interact with by sight or I simply go
13 to their offices.
14    Q.    Did someone ask you to conduct
15 those interviews, or did you do it on your
16 own?
17    A.    I undertook that as my
18 responsibility if I was to be designated as
19 a Rule 30(b)(6) witness.
20    Q.    What does Phyllis Cordes, what is
21 her role at Greenberg Traurig?
22    A.    She's a paralegal.
23    Q.    And why did you speak with her in
24 connection with today's deposition?
25    A.    To confirm my understanding of

Page 23

1            P. Sutton
2 procedures that were set up at Greenberg
3 Traurig for the handling of intellectual
4 property docketing matters.
5    Q.    What is Marilyn Dawkins' title at
6 Greenberg Traurig?
7    A.    She's my assistant.
8    Q.    And why did you speak with her in
9 connection with your preparation for today?
10    A.    Marilyn assists me with respect
11 to many things, including the gathering of
12 documents and oversight of tasks that I'm
13 involved in.
14    Q.    Is she your secretary?
15    A.    She is. We changed the name from
16 secretary a couple of years ago.
17    Q.    Understood.
18    A.    Out of respect for the fact that
19 they do more than just secretarial
20 functions.
21    Q.    I'm going to slaughter her name,
22 but Shoba Jaglal?
23    A.    Jaglal.
24    Q.    What is her role?
25    A.    She's an intellectual property

Page 24

1            P. Sutton
2 paralegal.
3    Q.    And why did you speak with her in
4 preparation for today?
5    A.    To see if she had any documents
6 or information that might be responsive to
7 the categories that I expected to give
8 testimony on.
9    Q.    Same questions for Courtney
10 Treubert.
11        What's her role?
12    A.    Courtney is a paralegal who in
13 litigation matters or interparty matters
14 assists in gathering documents and
15 information in the ordinary course of her
16 work activities.
17    Q.    Of the people you listed,
18 Phyllis, Marilyn, Shoba and Courtney, did
19 any of them work on matters for Quickie,
20 LLC?
21    A.    I'm not sure.
22    Q.    Was that not part of your
23 interview with any of those people?
24    A.    I just do not recall.
25    Q.    Did you keep notes of your

Page 25

1            P. Sutton
2 interviews with those people?
3    A.    I did and I typed them up myself.
4 I took personal notes and typed them up
5 myself, and I brought a copy of those notes
6 with me today.
7    Q.    Can I see a copy of those notes?
8    A.    Yes.
9    Q.    We can get a paralegal to make
10 copies of them here.
11    A.    There are two sheets.
12    Q.    Is that your only copy?
13    A.    It is.
14    Q.    Okay. Why don't we just set it
15 aside and we'll make copies during our
16 break and then we can talk about it.
17    A.    Thank you.
18    Q.    You also said earlier that you
19 requested these folks to provide you
20 documents.
21        Did they, in fact, provide you
22 documents?
23    A.    They did.
24    Q.    What documents did you obtain?
25    A.    I can't identify all of them for

8 (Pages 26 to 29)

### Page 26

1          P. Sutton
2   you, but one of the sheets of the notes
3   that I handed to you just now contains
4   information obtained from those documents.
5   So I think if I have that sheet. I could
6   probably give you --
7          MR. SCOTT: Why don't we just
8   break.
9          MR. LODEN: Yes, let's take a
10  5-minute break.
11         (Recess taken from 10:08 a.m. to
12  10:10 a.m.)
13         MR. LODEN: Why don't we go ahead
14  and mark that as Exhibit 2.
15         (Exhibit 2, Document, marked for
16  identification, as of this date.)
17  BY MR. LODEN:
18  **Q.   Mr. Sutton, before the break you**
19  **said that if you could refer to your notes**
20  **so you could better answer my question of**
21  **what documents you obtained during these**
22  **interviews we've been talking about.**
23  **       I've now given you a copy of your**
24  **notes which has been marked as Exhibit 2 to**
25  **your deposition.  Take a look and then see**

### Page 27

1          **P. Sutton**
2   **if you can answer my question about what**
3   **documents you obtained.**
4      A.   I reviewed many documents in
5   connection with preparation for giving
6   testimony under Rule 30(b)(6).  They
7   included representative copies of monthly
8   docket reports, weekly docket reports,
9   daily docket reports, status docket
10  reports, patent record sheets, reminders
11  for U.S. maintenance fees, reminders for
12  foreign taxes and annuities, reminders for
13  responses to official actions from the
14  Patent and Trademark Office, reminders for
15  the filing of cases in foreign countries
16  either nationally or under the patent
17  cooperation treaty, reminders for the
18  filing of assignments, reminders for
19  obtaining declarations, reminders relating
20  to publications, reminders for issues,
21  issue fees due, reminders associated with
22  the filing of IDSs, or information
23  disclosure statements, reminders for
24  confirming the firm's, our law firm's
25  obtaining filing receipts.

### Page 28

1          P. Sutton
2          Reminders for the timely filing
3   of continuation or continuing type
4   applications, whether they be continuations
5   or continuations in part.
6          I reviewed documents and
7   representative examples of our GT -- I'm
8   going to use GT for Greenberg Traurig if I
9   can -- GT's marking of our system database
10  with the status of cases that have been
11  moved from our firm to another firm where
12  the status is marked with either the term
13  transferred and/or the term inactive so
14  that reports thereafter do not include
15  those and they thereafter do not show up on
16  future monthly, weekly or daily reports.
17         I reviewed examples of patent
18  record sheets and status docket reports if
19  files are sent from our firm to another
20  firm, and I also confirmed that the latest
21  or last status information in our system is
22  not deleted from GT's system so that we can
23  confirm at a later date, which I have, the
24  fact that our system was marked with the
25  terms transferred and/or inactive for

### Page 29

1          P. Sutton
2   matters such as the transfer of the '160
3   Patent files to the Thelen firm.
4          I confirmed that the information
5   is not deleted so that this same
6   information is available as it is today and
7   can be accessed to answer questions that
8   may later arise.
9      **Q.   Okay.**
10     A.   In addition -- I mean, I obtained
11  a lot. I reviewed an April 11, 2002 piece
12  of correspondence from Todd Sharinn to Mark
13  Evens of the Thelen firm confirming that
14  back in April 2002, Mark, who I know
15  because he worked in my department at
16  Thelen, actually received all of the '160
17  Patent information and had an opportunity
18  at that point back in April of 2002 to
19  enter that into the system that I set up at
20  Thelen.
21     **Q.   Let me stop you there.**
22     **       Do you have a copy of that April**
23  **correspondence?  Did you bring one today?**
24     A.   If I don't have it, I'm sure -- I
25  may not have brought it with me, but I'm

9 (Pages 30 to 33)

Page 30

1          P. Sutton
2 sure we can get that for you.
3    **Q.   Was it included in Greenberg's**
4 **document production?**
5    A.   Hold on a second now.  There may
6 be a copy attached to the mediation
7 statement, but I'm not certain.  It's a
8 one-page short letter.
9    **Q.   The reason I'm asking is I'm not**
10 **familiar with a piece of correspondence**
11 **with that date on it as you've described**
12 **it.**
13       **Do you know if it was included in**
14 **Greenberg's document production?**
15    A.   I don't know.  I have no
16 information to tell me one way or another.
17       MR. LODEN: Justin, it looks like
18 you want to say something?
19       MR. CHU:  Can we go off the
20 record?
21       MR. LODEN: Sure.
22       (Whereupon, an off-the-record
23 discussion was held.)
24    A.   I reviewed a copy of the March 4,
25 2003 revocation of GT's Power of Attorney.

Page 31

1          P. Sutton
2 I reviewed a copy of the May 15, 2003 Todd
3 Sharinn letter to Alan Fell indicating that
4 he or our firm will take no further action,
5 and enclosing a notice of revocation from
6 the Patent and Trademark Office.
7       I reviewed an October 10, 2006
8 Aubrey Galloway statement under oath to the
9 Patent and Trademark Office indicating that
10 Thelen retained, was retained to transact
11 all post-issuance proceedings and
12 responsibilities at the Patent and
13 Trademark Office, including the timely
14 payment of maintenance fees.
15       I reviewed a December 1, 2006
16 Maier & Maier supplement to their petition,
17 indicating that Thelen was given the sole
18 and full Power of Attorney with respect to
19 the '160 Patent from the period March 4,
20 2003 through August 14, 2006.
21    **Q.   Okay.**
22    A.   I reviewed correspondence with
23 Alan Fell, who actually supervised and
24 oversaw all of our activities at Greenberg
25 Traurig in representing Quickie and Steve

Page 32

1          P. Sutton
2 Covan, Dr. Covan, including being
3 responsible for what we did and the fees
4 charged and obtained.
5    **Q.   What other documents?**
6    A.   I'm indicating those documents.
7    **Q.   Okay.**
8    A.   I reviewed the Patent and
9 Trademark Office re-examination of the '160
10 Patent that gutted that patent, leaving but
11 two of the 34 original claims and
12 indicating that the patent as originally
13 granted should not have been granted.
14       I reviewed correspondence between
15 myself and, I believe his name was Hal
16 Patton, P-A-T-T-O-N, I believe, of
17 Medtronic, referencing negotiations that I
18 had on behalf of Quickie with Medtronic in
19 early attempts to settle the dispute, the
20 patent infringement dispute between Quickie
21 and Medtronic and reflecting a telephone
22 conversations that I had with Hal Patton in
23 that regard.
24    **Q.   Okay.**
25    A.   I reviewed some documents, I

Page 33

1          P. Sutton
2 can't remember -- bear with me now.
3       I looked for evidence of
4 documents that would indicate that Quickie
5 had licensed the '160 Patent to any parties
6 other than Medtronic and confirmed that
7 there were no other licenses.
8    **Q.   Let me stop you there.  We may**
9 **have gone beyond the scope of my original**
10 **question.**
11       **My question is:  What documents**
12 **did you obtain during your interviews of**
13 **the four individuals that you listed**
14 **earlier?  It sounds like you may be going**
15 **beyond that now.**
16    A.   Actually, okay.  I'm including
17 what I looked for as well as what I found.
18 You want to know what I looked for as well?
19    **Q.   Understood.  No.**
20       **I'm just wondering, we've talked**
21 **about your interviews of the four**
22 **individuals you listed previously, and you**
23 **also said you obtained documents from those**
24 **folks.**
25    A.   Yes.

10 (Pages 34 to 37)

| Page 34 | Page 36 |
|---|---|

Page 34

1           P. Sutton
2     **Q.   So my question was, I think, more**
3  **limited than the one that you're answering**
4  **now.**
5       **My question was only what**
6  **documents did you obtain from the four**
7  **people that you interviewed?**
8     A.   Okay.  Let me continue in that
9  regard then.  So we have the PTO documents.
10  I reviewed the petition to revive, that
11  attempted to revive the '160 Patent.
12     **Q.   Who provided that document to**
13  **you?**
14     A.   One or more of those people
15  provided me with the physical copy of that
16  document.
17     **Q.   Do you remember who?**
18     A.   I don't know who physically
19  handed it to me, but it was one of those
20  people would have handed that to me.
21     **Q.   Has Greenberg set up a --**
22     A.   I'm not finished, but if you
23  want --
24     **Q.   Yeah, I would like to go to**
25  **another question now actually.**

Page 35

1           **P. Sutton**
2     A.   Okay, sure.
3     **Q.   Has Greenberg assigned a**
4  **paralegal to maintain this file, this file**
5  **being the litigation that we're now**
6  **currently in?**
7       MR. CHU:  Well, I'm not sure what
8     you mean, the litigation file.
9       MR. LODEN:  It's a poor question.
10     Let me ask it again.
11  BY MR. LODEN:
12     **Q.   Has Greenberg assigned a**
13  **paralegal to work on the litigation which**
14  **is Quickie, LLC versus Greenberg Traurig?**
15     A.   I have not assigned a paralegal
16  to do so.  We have outside counsel and we
17  have counsel for our firm who may or may
18  not have assigned a paralegal in that
19  regard.
20     **Q.   Well --**
21     A.   We no longer represent Quickie,
22  so --
23     **Q.   Understood.**
24     A.   -- so as concerns the litigation,
25  we rely on office of counsel with the firm

Page 36

1           P. Sutton
2  and outside counsel.
3     **Q.   Well, do you understand that in**
4  **the context of this Quickie versus**
5  **Greenberg Traurig litigation that Quickie**
6  **produced documents and provided those**
7  **documents to your outside counsel at**
8  **Pollack & Kaminsky, do you have that**
9  **understanding?**
10     A.   That is my understanding.
11     **Q.   And now it seems like you're**
12  **saying that to obtain copies of those**
13  **documents you spoke with a paralegal or**
14  **perhaps your secretary -- or excuse me,**
15  **assistant, at Greenberg Traurig to obtain**
16  **copies of those documents.**
17       **Is that what you were saying?**
18     A.   Copies of documents involving the
19  litigation that is the subject of this
20  deposition between Quickie and Greenberg
21  Traurig, I personally keep those copies
22  with the assistance of my assistant Marilyn
23  Dawkins.
24     **Q.   So after Quickie produced a set**
25  **of documents to your outside counsel, your**

Page 37

1           **P. Sutton**
2  **outside counsel provided a copy of those**
3  **documents to you, which you then keep in**
4  **your office, is that what you said?**
5     A.   I did not testify to that, no.
6     **Q.   Well, then, how did I get that**
7  **wrong?**
8     A.   Certain documents that may have
9  been produced in this litigation by either
10  party or any party I have copies of.  I
11  don't know that I have copies of all such
12  documents.
13     **Q.   Turning back to the first page of**
14  **Exhibit 2 --**
15     A.   You don't want me to continue?
16     **Q.   No, I'm fine.**
17     A.   Okay.
18     **Q.   Turning back to the first page of**
19  **Exhibit 2, you mentioned that you looked**
20  **for representative examples of cases where**
21  **the status was changed to transferred or**
22  **inactive.**
23       **Do you recall that testimony?**
24     A.   That's correct.
25     **Q.   Why did you want to look at**

11 (Pages 38 to 41)

Page 38

1          **P. Sutton**
2    **representative examples of that status**
3    **change?**
4        A.   I did that to confirm the fact
5    that GT's records were marked when its
6    Power of Attorney with regard to matters
7    affecting the '160 Patent were revoked. I
8    wanted to confirm that those records had at
9    that time been marked as transferred to the
10   Thelen firm.
11       **Q.   Well, I'm not talking about the**
12   **specific docket entries for the Quickie**
13   **'160 Patent.**
14        **You said that you looked at**
15   **docket entries for completely different**
16   **patents.**
17       A.   I looked at samples of others as
18   well, yes.
19       **Q.   What samples did you look at?**
20       A.   The one I recall right now,
21   because it's so relevant, is the one
22   involving the '160 Patent, but I have seen
23   others as well as examples of records
24   having been marked as our powers having
25   been revoked and the case being transferred

Page 39

1          P. Sutton
2    to another firm who thereby assumed
3    responsibility.
4        **Q.   So, again, my question then is**
5    **why did you believe that reviewing those**
6    **unrelated patent docket entries was**
7    **relevant to your testimony today?**
8        A.   It would indicate that by the
9    records being marked as transferred or
10   inactive, that there would be no subsequent
11   reports that included those cases because
12   those matters were thereafter being handled
13   by the firm to whom the cases have been
14   transferred.
15       **Q.   And did your review of those**
16   **other patent docket entries confirm that**
17   **understanding?**
18       A.   It did.
19       **Q.   Did you keep a list of the other**
20   **docket entries that you looked at?**
21       A.   I reviewed several. I did not
22   make a list of any except the one involving
23   the '160 Patent. I thought that that would
24   be the area that you'd want to question me
25   on.

Page 40

1          P. Sutton
2        **Q.   What is a monthly docket report?**
3        A.   It's a report that includes due
4    dates that occur or reminders that occur
5    within the monthly period that follows the
6    date of that report, deadlines or due dates
7    that require action or attention during the
8    period of one month after the generation of
9    that report.
10       **Q.   Who generates those monthly**
11   **docket reports at Greenberg Traurig?**
12       A.   Those reports --
13       **Q.   Let me be even more specific, I**
14   **apologize.**
15        **In 2003, who generated those**
16   **monthly docket reports at Greenberg**
17   **Traurig?**
18       A.   One or more paralegals have the
19   ability and do generate such reports.
20       **Q.   So the generation of one of those**
21   **reports, a monthly docket report, is a**
22   **function that a paralegal does once a month**
23   **then?**
24       A.   Our paralegals generate monthly
25   docket reports more frequently than once a

Page 41

1          P. Sutton
2    month within our various offices.
3        **Q.   Is there one paralegal who**
4    **generates reports for all patents for which**
5    **Greenberg is responsible, or how is it**
6    **decided who generates the reports for each**
7    **patent?**
8        A.   We have, our firm has dozens of
9    offices, many of which include intellectual
10   property attorneys who do patent
11   prosecution as you and I would understand
12   that term, which is quite apart from
13   litigation docket reports and paralegals,
14   one or more paralegals in those various
15   offices that have working attorneys who
16   work on cases who are responsible for
17   client matters in those various offices
18   generate reports from our computerized
19   system and provide those to the working
20   attorneys who are responsible for
21   responding or whose attention must be drawn
22   to those entries on the docket reports, but
23   they occur more than once a month. They
24   may occur more than once a month and
25   provide a period of one month which may not

12 (Pages 42 to 45)

Page 42

1           P. Sutton
2   coincide with a calendar period.
3       Q.   What then is the difference
4   between a monthly docket report and a
5   weekly docket report?
6       A.   The weekly docket report
7   generates comparable information for the
8   week following the generation of that
9   report.
10      Q.   You say comparable information.
11           Does it include more detail, less
12  detail, the same amount?
13      A.   It depends on who is generating
14  the report and what they want in that
15  report. There is a relational database
16  from which the information can be obtained,
17  but I have seen weekly docket reports with
18  the same kind of information as appears on
19  the monthly docket report, but for the
20  shorter period of one week.
21      Q.   I believe you said earlier that
22  you reviewed both monthly and weekly docket
23  reports in preparation for your testimony
24  today.
25      A.   Correct.

Page 43

1           P. Sutton
2       Q.   For which patents did those
3   reports relate?
4       A.   The reports that I reviewed
5   related to any number of different patents.
6   I was interested in seeing the format of
7   the report and the information that was
8   contained on that report.
9       Q.   Why was the format and the
10  information contained in the report, why
11  was that interesting to you?
12      A.   I wanted to confirm my
13  understanding that the system as operating
14  was as I understood it to be operating so
15  that I could give you truthful testimony
16  today.
17      Q.   Do you know if any of the docket
18  reports that you've reviewed for your
19  testimony today are included in Greenberg
20  Traurig's document production in this
21  litigation?
22      A.   I have not seen the document
23  production that Greenberg Traurig produced
24  to you, so I'm not in the position to
25  testify. To the extent that they included

Page 44

1           P. Sutton
2   matters unrelated to the matters involved
3   in this litigation, I would imagine that
4   they are not included.
5       Q.   Well, it sounds like just
6   previously you said that you were
7   interested to see those other docket
8   reports because it was relevant to your
9   testimony today.
10      A.   No, I wanted to see what kind of
11  reports, the kind of reports that GT
12  generates, I wanted to confirm that. I did
13  not want to confirm the content of those
14  reports that had matters unrelated and
15  frankly are sensitive, confidential
16  information of clients other than Greenberg
17  Traurig clients that are not involved in
18  this litigation.
19      Q.   Did you review any docket reports
20  for the '160 Patent in preparation for
21  today?
22      A.   I did see one or more reports
23  relating to the 160 patents.
24      Q.   Describe to me those reports that
25  you saw relating to the '160 Patent.

Page 45

1           P. Sutton
2       A.   They're on 8.5-by-11 paper
3   printed in landscape mode with identifying
4   information that identifies the case,
5   provides the docket number or matter
6   number, provides due dates, and there are a
7   number of headings, all of which I don't
8   recall right now which permit you to
9   identify the case and see what the due date
10  is for that case and what action or
11  attention is required.
12           That's one type of report that I
13  reviewed, for example.
14      Q.   Do you know if the docket reports
15  that you reviewed were included in
16  Greenberg's document production in this
17  litigation?
18      A.   I have seen one docket report at
19  least that I believe has been produced, but
20  without seeing it -- if you show it to me,
21  I probably will be able to.
22           MR. LODEN:  I'd ask the reporter
23       to mark Exhibit 3.
24           (Exhibit 3, Patent Record Sheet
25       Form, marked for identification, as of

13 (Pages 46 to 49)

Page 46

1           P. Sutton
2    this date.)
3    BY MR. LODEN:
4      Q.   Mr. Sutton, I've just handed you
5    what's been marked as Exhibit 3, which is a
6    one-page document bearing the Bates label
7    GT-0001019.
8           Do you see that?
9      A.   I do.
10     Q.   Is this one of the docket reports
11   that you were referring to in your earlier
12   testimony?
13     A.   This is an example of one of the
14   documents I reviewed in preparation for
15   giving testimony and reflects an entry of
16   the type that I referred to earlier where
17   it says this application has been
18   transferred to another firm.
19     Q.   Well, I appreciate that, but I
20   think I was asking a different question.
21     A.   I'm sorry, what were you asking?
22     Q.   My question is:  Is this one of
23   the docket reports that you were referring
24   to in your earlier testimony?
25     A.   This is one of the reports that I

Page 47

1           P. Sutton
2    was referring to in my earlier testimony.
3      Q.   The reason I ask is you say that
4    the reports you reviewed were printed in
5    landscape mode --
6      A.   Some of them were printed in
7    landscape mode, one or more were printed in
8    portrait mode.  It depends on the report.
9    I was giving you an example.
10     Q.   So this is one of the reports,
11   but you reviewed others, is that a fair --
12     A.   I reviewed this report, Exhibit
13   3, as well as others.
14     Q.   And what type of report is this
15   in Exhibit 3?
16     A.   This, I believe, is referred to
17   as a patent record sheet of the type I
18   previously testified to.
19     Q.   Well, you mentioned patent record
20   sheet previously, but we haven't talked
21   about that yet.
22     A.   I have been talking about that as
23   an example.  When I indicate reports, a
24   patent record sheets a type of a report.
25     Q.   Right, I understand that, but if

Page 48

1           P. Sutton
2    you look back at Exhibit 2, you've got
3    patent record sheet there on the top of the
4    first page and then right above that you
5    reference monthly, weekly and daily docket
6    reports.
7           So which one is this?  Is this a
8    docket report or is this a record sheet in
9    Exhibit 3?
10     A.   If you take a look under the
11   heading under which all of those entries on
12   Sutton 2, you'll see that the heading for
13   all of those items, the five items
14   underneath it, including the patent record
15   sheet, are reports for working attorneys
16   under assistance so that Exhibit 3 is an
17   example of a report.
18     Q.   But Exhibit 3 you said is a
19   patent record sheet, correct?
20     A.   Exhibit 3 is a patent record
21   sheet form of report for working attorneys
22   and their assistants.
23     Q.   I understand that, but my
24   question is:  You said previously that you
25   reviewed monthly docket reports for the

Page 49

1           P. Sutton
2    '160 Patent and it sounds like Exhibit 3 is
3    not a monthly docket report.
4           MR. CHU:  He didn't say that.
5      A.   I think you're either not
6    understanding my testimony or you're taking
7    issue with me.
8           Exhibit 3 is a type of report
9    provided to working attorneys and their
10   assistants and is sometimes referred to as
11   a patent record sheet.  We give these and
12   refer to them by different names so that we
13   can distinguish their format.
14     Q.   Let me go back then.
15          Did you review any monthly docket
16   reports concerning the '160 Patent?
17     A.   I don't believe I could, no,
18   because the record was marked as having
19   been transferred to another firm.  I wanted
20   a report to be generated that reflected the
21   '160 Patent.  It wouldn't come out on there
22   because it was transferred to another firm
23   that assumed full responsibility and our
24   reports no longer contained the '160 Patent
25   once the entry has been made that it's been

14  (Pages 50 to 53)

Page 50

1           P. Sutton
2  transferred to another firm.
3      Q.   For a patent that has not been
4  transferred, when the monthly docket report
5  is prepared, you say that it's --
6      A.   If I could, before you ask the
7  question, I just want to, I understand Mr.
8  Kaminsky is leaving, I just want to pay my
9  respects and say goodbye.
10     Q.   Sure.
11          (Whereupon, an off-the-record
12  discussion was held.)
13  BY MR. LODEN:
14     Q.   Before the break, Mr. Sutton, I
15  was about to -- well, we were talking about
16  monthly docket reports.
17     A.   Yes.
18     Q.   And I had asked you if you had
19  reviewed any monthly docket reports for the
20  '160 Patent, and you said no, they weren't
21  available.
22          Do you recall that?
23     A.   I don't believe that that's what
24  my response was.
25     Q.   Then I'm sorry, what was your

Page 51

1           P. Sutton
2  answer then to my question of whether you
3  reviewed any monthly docket reports for the
4  '160 Patent?
5          MR. CHU:  I think he's answered
6  that, but --
7  BY MR. LODEN:
8      Q.   Go ahead and answer it again.
9          THE WITNESS:  Could you read back
10  my answer?
11          (Whereupon, the requested portion
12  was read back by the court reporter.)
13     A.   That's correct, I was referring
14  to the entry on Exhibit 3.
15     Q.   Okay.
16          MR. LODEN:  I object to the
17  nonresponsive portion of that
18  response.
19     Q.   My question is -- it's a simple
20  yes or no question -- did you review any
21  monthly docket reports for the '160 Patent
22  prior to your deposition today.
23          MR. CHU:  I think he's answered
24  that, he's given you an explanation as
25  well.

Page 52

1           P. Sutton
2  BY MR. LODEN:
3      Q.   It's a simple yes or no question.
4      A.   I don't believe a simple yes or
5  no answer is appropriate, and I've already
6  indicated within my last response to you
7  the negative response and the reason for
8  it.
9      Q.   So the answer is no, you did not
10  review any monthly docket reports for the
11  '160 Patent, right?
12     A.   My answer is the answer I gave to
13  you already to the same question.
14     Q.   When a monthly docket report is
15  printed out, what happens to it?
16     A.   In the ordinary course of
17  business at our firm, monthly docket
18  reports are generated and copies thereof
19  are provided to working attorneys and their
20  assistants.
21     Q.   Were you a working attorney on
22  the '160 Patent?
23     A.   Not on the patent prosecution of
24  the '160 Patent, but I was associated with
25  interacting with Dr. Steve Covan on the

Page 53

1           P. Sutton
2  litigation involving Medtronic.
3      Q.   Who was the working attorney then
4  that would have received the monthly docket
5  reports for the '160 Patent?
6      A.   I think your question makes an
7  assumption that's not correct.
8      Q.   What's that assumption?
9      A.   I believe that there would be no
10  monthly docket report relating to the '160
11  Patent where our firm had been replaced in
12  all respects regarding the '160 Patent well
13  prior to that time.
14          Let me be more specific if you
15  wish me to --
16     Q.   No, I think I understand your
17  answer.  Let's look at Exhibit 3.
18     A.   Yes.
19     Q.   Which you said earlier was a
20  patent record sheet for the '160 Patent?
21     A.   My time indicated that people in
22  our firm refer to Exhibit 3 as the type of
23  report that is called a patent record
24  sheet.
25     Q.   Okay.

15 (Pages 54 to 57)

Page 54

1         P. Sutton
2         If you look at the top line, you
3 see where it says entered and then there is
4 a date there, 8/9/2002?
5    A.   I see those numbers at the top of
6 Exhibit 3.
7    Q.   What does that entry reflect?
8    A.   Sitting here today, I don't know.
9    Q.   Who would know?
10    A.   I don't know who would know
11 because I haven't studied that. I don't
12 know what entry those numbers relate to.
13 If you want, I can spend a couple of
14 minutes looking at it and see if I can give
15 you a more full response if you wish me to.
16         I note at the bottom request for
17 ex parte re-examination is granted, and I
18 don't know whether that number or date
19 refers to that entry or some other entry.
20         MR. LODEN: I'm going to ask the
21    court reporter to mark Exhibit 4 to
22    your deposition.
23         (Exhibit 4, 30(b)(6) Deposition
24    Notice, marked for identification, as
25    of this date.)

Page 55

1         P. Sutton
2 BY MR. LODEN:
3    Q.   Mr. Sutton, the court reporter
4 has just handed you Exhibit 4 to your
5 deposition, which I will represent to you
6 is a 30(b)(6) Deposition Notice for the
7 deposition of Greenberg Traurig's corporate
8 representative with knowledge with respect
9 to the five items on Exhibit A to that
10 deposition notice. Exhibit A is the last
11 page.
12         Do you see where I'm at?
13    A.   I do.
14    Q.   If you look at item number 2 on
15 Exhibit A, it states the collection entry
16 interpretation maintenance and handling of
17 the data reflected in document number
18 GT-0001019 -- do you see that?
19    A.   I do see those numbers in
20 category number 2.
21    Q.   Are you the Greenberg Traurig
22 corporate representative designated to
23 speak with respect to item number 2?
24    A.   I am.
25    Q.   So I ask you again, what does

Page 56

1         P. Sutton
2 entered 8/9/2002 mean on Exhibit 3?
3    A.   I would need to look at other
4 documents in order to respond to that.
5    Q.   What other documents?
6    A.   May I see the request for ex
7 parte re-examination and the date it was
8 granted, because that date would assist me.
9 I need to review documents other than
10 Exhibit 3 in order to provide you with an
11 answer.
12    Q.   You stated earlier that you set
13 up the docket system at Greenberg Traurig,
14 correct?
15    A.   Correct.
16    Q.   You and one other person, I
17 believe, is what your testimony was?
18    A.   That is not my testimony.
19    Q.   But you, yourself, were
20 responsible for it?
21    A.   I, myself, participated in that.
22    Q.   And the printout, the patent
23 record sheet that's reflected in Exhibit 3,
24 what software is this printed from, what is
25 the name of software program?

Page 57

1         P. Sutton
2    A.   I believe it's DIAMS.
3    Q.   And in DIAMS on a field entered
4 what does that field refer to in the DIAMS
5 software program?
6    A.   I believe that that field relates
7 to the date, one or more entries have been
8 made in the database.
9    Q.   Well, if you look just to the
10 right, you'll see modified, do you see
11 that?
12    A.   I see that word, yes.
13    Q.   What does the modified field in
14 DIAMS software reflect?
15    A.   That reflects a date on which a
16 modification has been made.
17    Q.   Looking to the right of the
18 modified field, do you see where it says
19 attorneys?
20    A.   Yes, I see that.
21    Q.   PJS, is that you?
22    A.   That would be me.
23    Q.   TSS, is that Todd Sharinn?
24    A.   I believe so.
25    Q.   And who is ADR?

16 (Pages 58 to 61)

Page 58

1           **P. Sutton**
2     A.    I believe that's an employee of
3  our firm that -- oh, that would be Augusto
4  D'Emilio Rogers.
5     **Q.   Is it Mr. Rogers?**
6     A.    It's Ms. Rogers.
7     **Q.   What was her role?**
8     A.    She's a paralegal within our
9  intellectual property department at our
10 firm.
11    **Q.   And is she still at Greenberg**
12 **Traurig?**
13    A.    She is.
14    **Q.   If you look -- let me just point**
15 **you to where I'm at. There is a section**
16 **that says TFD, do you see that, on Exhibit**
17 **3?**
18    A.    I see those letters, yes.
19    **Q.   What does TFD refer to?**
20    A.    I'm having a memory lapse right
21 this minute.
22    **Q.   Does it refer to transferred?**
23    A.    If I think about it for a bit, if
24 we come back to it or if I remember the
25 answer to that, I'll be happy to provide it

Page 59

1           P. Sutton
2  to you in a little bit.
3     **Q.   Going back to my prior**
4  **question --**
5     A.    If you could give me just a
6  second, let me just look at the entire
7  document because that may assist me.
8     **Q.   Sure.**
9     A.    I believe there are two fields
10 associated with TFD. I believe one
11 indicates whether or not it's been
12 transferred, and I believe that that Y
13 indicates yes, it has transferred to
14 another firm.
15          The second field, which carries
16 the date April 2, 2003, would be the date
17 that my firm's Power of Attorney was
18 revoked by the client, which is reflected
19 under action on the left, towards the left,
20 POA, Power of Attorney revoked, which
21 you'll see is that very same date.
22    **Q.   Okay.**
23    A.    So that that transfer indicates
24 that our Power of Attorney was revoked and
25 that all responsibility for this case has

Page 60

1           P. Sutton
2  been assumed by the new attorney and that
3  it would be inappropriate for us to do
4  anything further on this matter.
5          MR. LODEN: Objection.
6     Nonresponsive.
7     A.    I'm not sure I understand. What
8  was not responsive?
9     **Q.   My question, Mr. Sutton, is does**
10 **TFD entry, does the TFD entry on Exhibit 3**
11 **refer to whether or not the patent was**
12 **transferred and the date upon which it was**
13 **transferred?**
14    A.    I believe that that is the
15 occasion as a result of the Power of
16 Attorney being revoked.
17          MR. LODEN: Objection.
18    Nonresponsive to the nonresponsive
19    portion of that answer.
20 BY MR. LODEN:
21    **Q.   So my question is then, prior to**
22 **the patent being transferred on April 2,**
23 **2003, were monthly docket reports prepared?**
24    A.    I think you misspoke. When you
25 say the patent was transferred, our Power

Page 61

1           P. Sutton
2  of Attorney was revoked and a new Power of
3  Attorney given to the Thelen firm.
4     **Q.   Okay.**
5     A.    So it's not a matter of a
6  transfer of patent.
7     **Q.   Understood.**
8     A.    As much as our authority to act
9  on behalf of the client in this regard was
10 revoked.
11    **Q.   So prior to that transfer taking**
12 **place, were monthly docket reports prepared**
13 **for the '160 Patent?**
14    A.    I'm not certain that they were,
15 because I don't believe that they would be
16 necessary.
17    **Q.   Why?**
18    A.    I'm not sure I understand why you
19 think they would be. I'm not understanding
20 your question.
21    **Q.   My question is pretty simple.**
22          Prior to the transfer on April 2,
23 **2003 to the Thelen firm, Greenberg Traurig**
24 **was docketing and monitoring the deadlines**
25 **for maintenance fees on the '160 Patent,**

17 (Pages 62 to 65)

Page 62

1          P. Sutton
2  correct?
3      A.   Greenberg Traurig and others,
4  correct.
5      Q.   So in connection with Greenberg
6  Traurig's monitoring and docketing of the
7  maintenance fee deadlines, were monthly
8  docket reports prepared for the '160
9  Patent?
10     A.   Not after -- it's my
11 understanding that they were not generated
12 after Greenberg Traurig was notified that
13 its Power of Attorney was going to be
14 revoked and they would no longer represent
15 the client in this regard.
16     Q.   Prior to that time?
17     A.   Yes, well prior. I believe that
18 our firm was notified the day after the
19 Markman Hearing, September 5th, that all
20 responsibility in connection with the '160
21 Patent and the Medtronic litigation was
22 being transferred to the Thelen firm, in
23 particular Mark Evens would be leading that
24 responsibility at the Thelen firm, I
25 believe the specific date was September 5,

Page 63

1          P. Sutton
2  2002.
3      Q.   Who informed you of that transfer
4  on September 5, 2002?
5      A.   Our firm was notified to that
6  effect by Alan Fell and that was confirmed
7  to our firm by Dr. Steve Covan, who
8  indicated that he wanted a relative of his
9  family, Mark Evens, to assume
10 responsibility in all effects for the '160
11 Patent and the Medtronic litigation.
12         That was the first formal notice
13 that our, that we would no longer be
14 representing Quickie with respect to any
15 aspect of the '160 Patent.
16     Q.   And that was a verbal notice?
17     A.   The initial notice was verbal,
18 and of course written notices followed.
19     Q.   Did they explain why they no
20 longer wanted Greenberg Traurig to
21 represent Quickie?
22         MR. CHU:  I think he just
23     explained it.
24     A.   Yes. As I just indicated in my
25 prior answer, Mark Evens, a former partner

Page 64

1          P. Sutton
2  of mine at Thelen, is related to the family
3  of Dr. Stephen Covan, and they wanted to
4  help him by transferring -- they had no
5  problem with the quality of our work, but
6  they wanted him to benefit from the monies
7  generated by the work on the '160 Patent
8  and the Medtronic litigation and all
9  aspects of those two.
10     Q.   So it's your testimony then, I
11 want to make sure I got this right, it's
12 your testimony then that after September 5,
13 2002 when this conversation you say
14 occurred, Greenberg stopped preparing
15 reports, docket reports for the '160
16 Patent?
17     A.   That's not my testimony.
18     Q.   What part of what I said is
19 wrong?
20         MR. CHU:  Please --
21         MR. LODEN:  If you have an
22     objection, under the federal rules,
23     Justin, you can say, "Objection,
24     form." That's it.
25 BY MR. LODEN:

Page 65

1          P. Sutton
2      Q.   Please answer my question.
3         MR. CHU:  Excuse me. I haven't
4     said a thing.
5         MR. LODEN:  Well, you've been
6     offering speaking objections
7     throughout, but it's now going to
8     stop. If you have an objection, say
9     your objection and then the witness
10     can answer, unless you're directing
11     the witness not to answer.
12     A.   All aspects of your statement
13 just now are not accurate.
14         MR. CHU:  And for the future,
15     please ask the witness a question as
16     to facts, not about arguing with your
17     questions.
18         MR. LODEN:  Justin, please abide
19     by the rules. I will do the same when
20     you're deposing our witnesses. I only
21     ask for the same professional courtesy
22     from you.
23         Thank you.
24         MR. CHU:  And I've heard a lot
25     from you, so I'm going to stop, but --

18 (Pages 66 to 69)

Page 66

1          P. Sutton
2          MR. LODEN:  Thank you, I
3    appreciate you stopping.
4          MR. CHU:  Please let me speak
5    without you interrupting me, as I've
6    allowed you to do.
7    BY MR. LODEN:
8    **Q.   Mr. Sutton, did Greenberg ever**
9    **prepare a monthly docket report for the**
10   **'160 Patent?**
11   A.    It did not generate a monthly
12   docket report after being notified that it
13   would no longer be representing Quickie
14   with respect to the '160 Patent and the
15   Medtronic litigation.
16         MR. LODEN:  Objection.
17   Nonresponsive.  I'll read back my
18   exact question to you.
19   BY MR. LODEN:
20   **Q.   Mr. Sutton, did Greenberg ever**
21   **prepare a monthly docket report for the**
22   **'160 Patent?**
23   A.    I don't understand your question
24   because as I've testified, well prior to
25   the date that the maintenance fee was due,

Page 67

1          P. Sutton
2    Greenberg Traurig was notified that it was
3    not to be representing Quickie and its
4    Power of Attorney was revoked.  So it would
5    be inappropriate to be generating a report
6    for an ex-client who had revoked our power.
7    **Q.   Are you done?**
8    A.    I'm not sure I understand.
9    **Q.   Are you finished with your**
10   **answer?**
11   A.    I am.
12         MR. LODEN:  Objection.
13   Nonresponsive.
14   BY MR. LODEN:
15   **Q.   My question is very simple.**
16   **As you sit here today, are you**
17   **aware of Greenberg ever, at any time,**
18   **preparing a monthly docket report for the**
19   **'160 Patent?**
20   A.    I believe I've answered that
21   question fully and given you the reasons
22   for my answer.
23   **Q.   So the answer is, as you sit here**
24   **today, you're not aware of any monthly**
25   **docket reports being prepared by Greenberg**

Page 68

1          **P. Sutton**
2    **for the '160 Patent?**
3    A.    Would you please indicate a due
4    date for which you're referring to?
5    **Q.   I've said it numerous times; any**
6    **time, any time, at any time in history.**
7    A.    No, I'm asking you to please help
8    me so I can answer you completely and
9    fully.
10         Would you please provide me with
11   a due date that would appear on a monthly
12   docket report that your question relates to
13   and I'll be happy to answer it.
14         MR. CHU:  Steve -- can I go off
15   the record just to talk to you.
16         (Whereupon, an off-the-record
17   discussion was held.)
18   A.    The monthly docket report
19   reflects due dates or matters that require
20   attention within the month thereafter.
21         I'm not aware of any due dates or
22   matters that require attention that
23   occurred affecting the '160 Patent prior to
24   our firm's Power of Attorney being revoked.
25         So that your question really, it

Page 69

1          P. Sutton
2    doesn't make sense frankly.
3    **Q.   Looking back at Exhibit 3, up on**
4    **the top left-hand corner -- and I apologize**
5    **for the quality of the copy here, this is**
6    **the way it was produced to us -- but you**
7    **will see it looks like GT number up there**
8    **on the top?**
9    A.    I believe that those letters
10   reflect GT number sign.
11   **Q.   And then out there to the right**
12   **there is a number.**
13         **What does that number reflect?**
14   A.    There are five digits followed by
15   a period and then six digits and the
16   letters U.S.  The five digits that precede
17   the period reflects the Greenberg Traurig
18   client number assigned to that client.
19         The numerical, the six numerical
20   digits that follow that period reflect the
21   matter number for that client that this
22   relates to, and the U.S. reflects that the
23   matter that's a subject of Exhibit 3 is a
24   United States matter as opposed to one for
25   a foreign country.

19 (Pages 70 to 73)

Page 70

1          P. Sutton
2     Q.   So then if I'm understanding that
3  entry correct, is 51822, is that the client
4  number assigned for Quickie by Greenberg
5  Traurig?
6     A.   It's my understanding that the
7  number 51822 is one of several -- I'm
8  sorry, strike that, please, I may have
9  misspoken.
10         I believe the number 51822
11  references a client number associated with
12  Quickie. I don't know whether that's the
13  only client number associated with Quickie.
14     Q.   Okay.
15         And then the 6 digits after the
16  period there is 010700, did I understand
17  you to say that that is the matter for
18  which this patent record sheet was created?
19     A.   The number 010700 reflects the
20  matter associated with the client number
21  51822 for which this Exhibit 3 is
22  referencing, with the U.S. being United
23  States.
24         There are times that other
25  letters are used to abbreviate the names of

Page 71

1          P. Sutton
2  foreign countries other than the U.S. which
3  may carry either the same matter number or
4  the same GT client number.
5     Q.   Okay.
6         Going to the right-hand column,
7  it looks like the third line, do you see
8  where there is STAT and then in the field
9  it says transfer?
10         Do you see that on the right-hand
11  side?
12     A.   Yes.
13     Q.   What does that entry reflect?
14     A.   I believe that the letters STAT
15  refer to the status of this particular case
16  or matter. The field indicates that all
17  responsibility, the term transfer indicates
18  that, in that field indicates that our
19  firm's responsibility in all respects has
20  been revoked by the client that another
21  firm or the client is responsible for this,
22  and by the presence of the word transfer,
23  this case will not appear in certain
24  reports generated thereafter such as
25  monthly reports.

Page 72

1          P. Sutton
2     Q.   So in other words, it says matter
3  number 010700 has been transferred to
4  another firm and Greenberg is no longer
5  responsible for that matter?
6     A.   I believe you're trying to
7  summarize my testimony. I think my
8  testimony is accurate and you can draw your
9  own conclusions, but I think abbreviating
10  my testimony --
11     Q.   Well, okay. Let me read back
12  your testimony then.
13         You said, "The field indicates
14  that all responsibility, the term transfer
15  indicates that, in that field indicates
16  that our firm's responsibility in all
17  respects has been revoked on this
18  particular case or matter."
19     A.   No, I perhaps have misspoken. It
20  indicates, transfer indicates that the
21  matter has been transferred to another firm
22  per the instructions of the client.
23     Q.   Okay.
24     A.   And further on down on April 2,
25  2003, there is an entry that indicates that

Page 73

1          P. Sutton
2  our firm's Power of Attorney has been
3  revoked.
4     Q.   Looking at that same third line
5  going to the left, you'll see there's a
6  typed field.
7         Do you see that?
8     A.   No. Where are you? Oh yes, yes.
9  T-Y-P-E, yes.
10     Q.   Do you know what that UTL refers
11  to?
12     A.   That refers to the fact that the
13  subject case is a utility patent as opposed
14  to some other type of patent.
15     Q.   And then to the left of that,
16  again, it's cut off, but it looks like --
17  is that PATS number, do you see that?
18     A.   I can't read it, but I see the
19  letters ATS number sign, I see a number
20  that follows it, but --
21     Q.   Do you know what that number
22  refers to, or is that number familiar to
23  you?
24     A.   That number is not familiar to
25  me.

20 (Pages 74 to 77)

Page 74

1           P. Sutton
2   Q.   Okay.
3   A.   I can find out what that number
4   is, but as I'm testifying right now at this
5   moment, that number is not familiar to me.
6   Q.   Okay.
7        Looking down at where the columns
8   are, action, base, do-in -- do you see
9   where I'm at?
10  A.   Yes, yes.
11  Q.   Those columns.
12       We've already talked about the
13  POA, I believe you said that that indicates
14  Power of Attorney revoked?
15  A.   Yes.
16  Q.   And then the date there that it
17  was revoked, April 2, 2003.
18       Going to the second line in that
19  section, if you could just start from the
20  left and go to the right and tell me what
21  that first entry there means, first
22  maintenance fee due, what are those
23  entries?
24       I can take it one by one if you'd
25  rather do it that way.

Page 75

1           P. Sutton
2   A.   Do you have a copy of the patent
3   handy?
4   Q.   I don't.
5        MR. CHU:  You want me to show it
6   to him?
7        MR. LODEN:  Sure, if he wants to
8   look at it.
9   A.   I believe that the base date
10  under the base is the date from which
11  you're calculating the -- yeah, the date
12  May 23, 2000 is the date that the patent
13  was granted.
14  Q.   Okay.
15       Going to the far left of that
16  line, it says M1.
17       Do you see that?
18  A.   Yes.
19  Q.   What does that refer to?
20  A.   I believe that M1 is the first of
21  three maintenance fees.
22  Q.   Okay.
23       And to the right there under the
24  column, it looks like just O, there is an
25  N.

Page 76

1           P. Sutton
2   Q.   Do you know what that column O
3   refers to?
4   A.   Yes, that indicates that there is
5   no maintenance fee due as of the date of
6   that entry.  In other words, there's no
7   upcoming date that we are responsible for.
8   Q.   What does O stand for in that
9   column heading?
10  A.   Bear with me.  I believe that may
11  refer to other, but I'm not certain and I
12  have to confirm that.
13  Q.   Okay.
14       First maint fee due, that means
15  first maintenance fee due, right?
16  A.   Yes, I believe that's what that
17  entries means.
18  Q.   Then you've explained that
19  5/26/2000 is the issue date for the
20  patent --
21  A.   Yes.
22  Q.   -- due, and it looks like 42M.
23       Does that refers to 42 months?
24  A.   That would reflect a 3.5-year
25  period for which the first maintenance fee

Page 77

1           P. Sutton
2   would be due.
3   Q.   Which, if my math is correct, is
4   42 months?
5   A.   Correct.
6   Q.   That's 11/23/2003, is that the
7   due date for the first maintenance fee
8   then?
9   A.   I believe that's the beginning --
10  bear with me now -- I believe that that's
11  the beginning of a period any time within
12  which a maintenance fee can be timely paid
13  by our firm or the client or any of the
14  other attorneys who had this information to
15  put in their docket systems.
16  Q.   And actually, now that I look at
17  it, it looks like 11/23/03 is 3.5 years
18  from 5/23/03, the 3.5-year period that you
19  referred to previously.
20       Do you see that?
21  A.   I believe your calculation is
22  correct.
23  Q.   And then there is two columns
24  under the heading EXTNS -- does that stand
25  for extensions?

21 (Pages 78 to 81)

Page 78

1          P. Sutton
2     A.   I believe that that's the
3  abbreviation for the term to define those
4  fields thereunder.
5     Q.   And the 1-6, does that refer to
6  there's one extension and it's a six-month
7  extension?
8     A.   I believe that that's what those
9  numbers relate to.
10     Q.   Okay.
11          And then under the heading final,
12  you'll see there is a 5/23/2004, which is
13  four years after the issue date, is that
14  the last date upon which the maintenance
15  fee can be paid timely?
16     A.   Actually, it's the last date on
17  which a maintenance fee can be paid, but
18  not necessarily the ultimate last date that
19  a maintenance fee can be paid to preserve
20  the patent.
21     Q.   Understood.
22          But -- so what's the significance
23  of May 23, 2004 then, why was that number
24  entered?
25     A.   After that date, something other

Page 79

1          P. Sutton
2  would be required other than the normal
3  maintenance fee, there would have to be an
4  additional fee or one or more other things
5  required to be filed with the PTO.
6     Q.   Okay.
7          The next column to the right EXT,
8  is that extension?
9     A.   That's my understanding.
10     Q.   And it says 0 there.  What does
11  the 0 refer to?
12     A.   That's, I believe, filled in the
13  default field -- I'm sorry, that's the
14  default entry in that field unless it's
15  modified by the person handling the
16  computerized docketing system.
17     Q.   Okay.
18          Next column to the right you'll
19  see that April 2, 2003 date under the
20  column response.
21     A.   Yes.
22     Q.   What does that refer to?
23     A.   That indicates that a response to
24  the due date for the first maintenance fee
25  was taken care of via the revocation of the

Page 80

1          P. Sutton
2  Power of Attorney and the responsibility
3  for this case.
4          That's the date of the formal
5  revocation of the Power of Attorney, but
6  that is but one of -- that date reflects
7  the date on which the PTO revoked per the
8  client's request our Power of Attorney so
9  that we would no longer be responsible for
10  the payment of any maintenance fees.
11     Q.   Well, the response in that column
12  heading, does that refer to a response to
13  the maintenance fee deadline or
14  responsibility?
15     A.   In this case, we enter -- if our
16  Power of Attorney is revoked and we're
17  asked to no longer do anything with respect
18  to, for example, here the '160 Patent, or
19  anything associated with that '160 Patent,
20  we put in that field the date of the formal
21  revocation of our authority to do anything
22  in that regard, our authority to act as
23  attorneys for the client in that regard,
24  and that's the reason for the entry of
25  4/2/2003 in each of the M1, M2 and M3, the

Page 81

1          P. Sutton
2  three maintenance fees there.
3          That indicates that someone else,
4  this report indicates that the client has
5  asked and instructed someone else to do
6  this activity.
7          MR. LODEN:  Objection.
8     Nonresponsive.
9  BY MR. LODEN:
10     Q.   The response -- do you see the
11  column entitled Response, do you see that?
12     A.   Yes.
13     Q.   Doesn't that heading reflect the
14  field in which the software records the
15  date upon which a response was taken to the
16  item which was docketed?
17     A.   Only if our Power of Attorney had
18  not been revoked and had we filed a
19  response, would that date of the filing of
20  the response have been entered there.
21          If our Power of Attorney had not
22  been revoked or, for example, Mark Evens
23  firm, the Thelen firm, knowing that it
24  would be taking responsibility for the '160
25  Patent, it would enter the date that it

22 (Pages 82 to 85)

Page 82

1           P. Sutton
2  paid the maintenance fee had it paid that
3  maintenance fee pursuant to the client's
4  request.
5      MR. LODEN: Objection.
6  Nonresponsive.
7  BY MR. LODEN:
8      **Q.   Let me ask the question a little**
9  **bit different way then.**
10     A.   Yes.
11     **Q.   That field is the field in which**
12 **whatever response is being taken -- well,**
13 **strike that.**
14         **Had Greenberg paid the**
15 **maintenance fee for the '160 Patent --**
16 **let's just assume that they had paid it,**
17 **and that they paid it on May 1, 2004.**
18         **In that response heading would an**
19 **entry be placed May 2004 under that**
20 **hypothetical?**
21     A.   As you state, it's a hypothetical
22 and I'd like to consider that question, but
23 it has no relationship to anything that
24 actually has occurred.
25     **Q.   Well, take all the time you need**

Page 83

1           **P. Sutton**
2  **to consider it, I'm here all week --**
3      A.   All right, I'll be happy to see
4  if I can supplement that response.
5      **Q.   Well, my question is very simple,**
6  **Mr. Sutton.**
7          **My question is: What goes in the**
8  **response column there? I'm trying to ask**
9  **it multiple ways and I'm not getting a**
10 **clean answer from you.**
11         **My question is: Isn't that**
12 **response column the field in which you**
13 **indicated what response Greenberg Traurig**
14 **took in response to the item which was**
15 **scheduled?**
16     MR. CHU: Objection.
17     A.   No. You haven't heard my answer.
18     **Q.   No, I've heard your answer. I**
19 **understand you want to talk about**
20 **transfer --**
21     A.   Please, I'm in the middle of
22 telling you something.  Do you want to hear
23 It?
24     **Q.   Go ahead, I apologize.**
25     A.   The field, the entry in that

Page 84

1           P. Sutton
2  field is, under our system, a totally
3  appropriate entry of the date on which our
4  Power of Attorney was revoked, which
5  removed our responsibility and
6  appropriateness of doing anything further
7  for this client in regards to this case.
8         So your hypothetical,
9  notwithstanding the date 4/2/2003 that
10 appears, there is an entirely appropriate
11 entry.
12         MR. LODEN: Objection.
13     Nonresponsive.
14 BY MR. LODEN:
15     **Q.   Let me just say I understand that**
16 **you want to talk today about the transfer**
17 **to Mark Evens at Thelen and the revocation**
18 **of the Power of Attorney, and I understand**
19 **that that's relevant and we're going to**
20 **talk about it.**
21         **I promise you we will talk about**
22 **it, but right now I'm not asking questions**
23 **about that, and when you continue to bring**
24 **it up and not respond to the question, it's**
25 **just delaying and extending our deposition**

Page 85

1           **.P. Sutton**
2  **today, and I'm trying to ask a very simple**
3  **question, and my question is: What is the**
4  **purpose of that response field?**
5      A.   I'll tell you one more time, and
6  in doing so, I will tell you that I have no
7  special interest in giving you answers
8  referring to the transfer, but the document
9  that you've asked me to refer to, Exhibit
10 3, has transfer on it and that's why I'm
11 including that in my response.
12         The field under the column
13 response includes either if we paid a
14 maintenance fee, the date it is paid, or as
15 in the present circumstances where our
16 power of attorney is revoked, the date on
17 which our Power of Attorney is revoked as a
18 result of the transfer of authority to act
19 on this matter per the client's express
20 instructions, and per, frankly, the sworn
21 testimony of Aubrey Galloway in his October
22 10, 2006 oath and the Maier & Maier
23 supplement to the petition on December 1,
24 2006.
25         So I'm trying to give you

23 (Pages 86 to 89)

Page 86

1           P. Sutton
2  complete truthful answers.  It sounds like
3  you're not happy with those answers, but I
4  can't help that.
5           MR. LODEN:  Objection.
6  Nonresponsive.
7  BY MR. LODEN:
8     Q.   Other than the date upon which
9  Greenberg's Power of Attorney was revoked,
10  what other types of information is placed
11  in the response column?
12           MR. CHU:  Objection.
13  BY MR. LODEN:
14     Q.   Just in general, in general,
15  patents, not talking about the '160 Patent,
16  but in the DIAMS software system that
17  you've testified you set up at
18  Greenberg, when Greenberg's Power of
19  Attorney is not revoked what other types of
20  information is placed in that response
21  field?
22     A.   Your question recites facts that
23  do not accurately reflect my prior
24  testimony.  However, to the extent that I
25  understand your question, as far as what

Page 87

1           P. Sutton
2  types of entries DIAMS would include in
3  those fields I would have to review that
4  area of your query further.
5     Q.   What would you want to review?
6     A.   I have to consider what -- I'd
7  have to consider the question more because
8  I have not been asked that question before,
9  and when I consider it, I'll know at that
10  point what it is that I need to review.  It
11  may be that if we take a break I will be
12  able to either remember or I can inquire
13  potentially and if you are interested in
14  getting that answer.
15     Q.   Well, I certainly am.  We've
16  spent enough time on it.  I'm certainly
17  interested in getting the answer.
18           Let me see if we can approach it
19  this way.
20           Does Greenberg have a manual on
21  what data goes in the various fields that
22  DIAMS includes?
23     A.   I don't know the answer to that
24  question as I'm sitting here right now.
25     Q.   When you -- I want to make sure I

Page 88

1           P. Sutton
2  got this right.
3           I believe earlier today, and tell
4  me if I'm wrong, but I believe earlier
5  today you said that when you came to
6  Greenberg Traurig, you assisted in setting
7  up the docketing system that we're
8  referring to here?
9     A.   When I left Thelen to join
10  Greenberg Traurig, I set up the
11  computerized docketing system for Greenberg
12  Traurig that provides the type of
13  information that you see here in Exhibit 3.
14     Q.   And as part of that setting up
15  process, were there procedures put in place
16  or any other sort of directives given to
17  Greenberg Traurig employees on how to use
18  the system?
19     A.   When I moved my group from Thelen
20  to Greenberg Traurig, it included a number
21  of attorneys and one or more paralegals who
22  were already familiar and running the
23  computerized system at Thelen, and we
24  simply moved that entire group to Greenberg
25  Traurig so that we had people who for years

Page 89

1           P. Sutton
2  had operated the computerized docketing
3  system and knew its ins and outs and from
4  time to time benefitted from support from
5  the software company.
6     Q.   And those same people that you
7  said moved from Thelen to Greenberg, were
8  those the same paralegals that, or the same
9  staff, excuse me, that was responsible for
10  entering the data on the patent record
11  sheet reflected in Exhibit 3?
12     A.   I don't like -- the people who
13  entered data on Exhibit 3 were among those
14  that moved with me from Thelen to Greenberg
15  Traurig.
16     Q.   So then who entered the data on
17  Exhibit 3?
18     A.   One of several paralegals who are
19  or have been employees at Greenberg
20  Traurig.
21     Q.   Do you know in particular who by
22  name?
23     A.   I can't be certain, so I'd rather
24  not guess.
25     Q.   Okay.

24 (Pages 90 to 93)

Page 90

1          P. Sutton
2          If you wanted to be certain, is
3  there someplace that you could go check?
4     A.   Perhaps.  If you ask that I do,
5  I'll be happy to do so.
6     Q.   I'm asking that you do so.
7          Who are the possibilities?
8     A.   I'd rather not guess.  So why
9  don't I see if I can get you an accurate
10  answer.
11     Q.   I would appreciate that.
12          So the paralegals --
13     A.   I'm sorry, if I may, I just
14  recalled that Phyllis Cordes, I believe,
15  made the entry of the application has been
16  transferred to another firm, it's my
17  understanding that she is the paralegal who
18  made that entry.  So we have at least that
19  one name.
20     Q.   If you look back to Exhibit 3, on
21  the top left-hand corner, you'll see an
22  OPER heading and then PC.
23     A.   Yes.
24     Q.   Is that Phyllis Cordes, PC?
25     A.   It probably is, but I can't be

Page 91

1          P. Sutton
2  certain.
3     Q.   And was Phyllis Cordes one of the
4  Thelen employees who came over with you to
5  Greenberg Traurig?
6     A.   She was not.
7     Q.   So what training was Ms. Cordes
8  provided on the use of the DIAMS docketing
9  system?
10     A.   Almost all paralegals associated
11  with the intellectual property computerized
12  docketing system are hired already having
13  experience and having operated such systems
14  at other firms before we hired them.
15          There are a few exceptions to
16  that, where there is hands-on, day-to-day
17  training and oversight that extends over in
18  some cases years before those people are
19  given the responsibility.
20     Q.   And which of those two categories
21  did Ms. Cordes fall into?
22     A.   Ms. Cordes came to our firm with
23  extensive background and knowledge upon
24  running such a system.
25     Q.   Where did she obtain that

Page 92

1          P. Sutton
2  background and knowledge?
3     A.   I believe an intellectual
4  property boutique.
5     Q.   So am I correct in saying then
6  that it's actually the paralegals such as
7  Ms. Cordes that enter the data into the
8  DIAMS docketing system, is that what you're
9  saying?
10     A.   Paralegals are among those who
11  enter data into the computerized docketing
12  system.
13     Q.   Who else other than paralegals
14  enters data into the computerized docketing
15  system?
16     A.   I can't recall anybody right now,
17  but I believe it would be somebody with
18  either that -- it would be somebody with
19  that background and responsibility.
20     Q.   Well, I mean, are you referring
21  to attorneys?
22     A.   While I believe attorneys -- I
23  believe that paralegals are responsible for
24  entering data into the computerized
25  docketing system.

Page 93

1          P. Sutton
2     Q.   And where do paralegals obtain
3  the data that they enter into the docketing
4  system?
5     A.   By way of example, on our firm's
6  receipt of the revocation of Greenberg
7  Traurig's Power of Attorney on April 2,
8  2003, that document from the Patent and
9  Trademark Office would be the basis of the
10  entry of the information in the database.
11     Q.   But that document was sent to the
12  attorney in charge, correct, is addressed
13  to the attorney of record at Greenberg,
14  right?
15     A.   I'm not sure I understand your
16  question.
17     Q.   Well, my question is:  How did
18  the document that you referred to get into
19  the hands of the paralegal who was entering
20  the data into the computerized docketing
21  system?
22     A.   I believe that there is a
23  procedure set up where communications from
24  the U.S. Patent and Trademark Office are
25  sorted and separated during the mail,

25 (Pages 94 to 97)

Page 94

1           P. Sutton
2  incoming mail process and that the
3  paralegal responsible for docketing is
4  given a copy of correspondence or documents
5  that would require some entry into the
6  computerized docketing system.
7      Q.   Well, how about for the
8  maintenance fee entries on Exhibit 3, how
9  were those deadlines communicated to the
10 paralegal who entered them into the DIAMS
11 system?
12     A.   I don't understand your question.
13 I don't believe your question makes sense,
14 frankly.
15     Q.   What part of it is confusing to
16 you?
17     A.   The whole thing.
18     Q.   Let me ask it a different way.
19         The base date that we referred to
20 earlier for the first maintenance fee, do
21 the due date, the final date, where did the
22 paralegal obtain that information for entry
23 into the computerized docketing system?
24     A.   The computerized docketing system
25 has the capability of itself computing

Page 95

1           P. Sutton
2  deadlines as a result of the entry of base
3  information so that that's been programmed
4  into the system to eliminate possible human
5  error, and I believe that that's where
6  dates, due dates, that information comes
7  from.
8      Q.   So then are you saying that the
9  three entries for the first, second and
10 third maintenance fee due, and then the
11 data, I guess up to final column there on
12 Exhibit 3, that that was automatically
13 filled in by the software?
14     A.   I don't believe the way you've
15 characterized it is accurate, but let me
16 say that when the paralegal enters base
17 information such as the issue date of the
18 patent, the date that the patent is
19 granted, the base date, that the
20 computerized docketing system has been
21 programmed with accurate information that
22 automatically enters into the fields of the
23 due dates for the first, second and third
24 maintenance fees, those dates on which
25 action is notified.

Page 96

1           P. Sutton
2      Q.   Okay.
3         How about for the GT number, the
4  client matter number that we spoke to
5  earlier on the top left corner of Exhibit
6  3, who told the paralegal or how -- strike
7  that.
8         How did the paralegal know what
9  client matter number to place in that
10 field?
11     A.   When the mail is sorted, that
12 information may appear on the document or
13 documents that arrive in the mail, so
14 that's one way that the paralegal can
15 obtain that information.
16         Another way would be to see what
17 client the mail relates to, and then our
18 firm has a computerized system that our
19 folks can access to see what client number
20 and what matter number it relates to.
21         So enough information is usually
22 on the mail to permit the paralegal to
23 glean that information and to go to the
24 proper part of the database.
25     Q.   The '160 Patent was issued by the

Page 97

1           P. Sutton
2  PTO prior to Todd Sharinn joining Greenberg
3  Traurig, correct?
4      A.   I believe Todd Sharinn joined
5  Greenberg Traurig May of 2001, and I
6  believe the date that the patent was
7  granted is May 23rd, 2000.
8      Q.   Okay.
9         Was it Todd then or Mr. Sharinn
10 that asked for the '160 Patent to be
11 docketed in the DIAMS system?
12     A.   When Mr. Sharinn joined our firm
13 and when one or more of his clients
14 transferred matters to us, which may have
15 occurred then or thereafter, paralegals
16 went through those files to see which of
17 those relate to patent prosecution matters,
18 for example, and took that information and
19 entered it into the computerized docketing
20 system.
21     Q.   So you personally don't know
22 whether or not Mr. Sharinn directed that
23 the '160 Patent be docketed in GT's
24 docketing system?
25     A.   It's my understanding that

26 (Pages 98 to 101)

Page 98

1          P. Sutton
2   Mr. Sharinn did give that information and
3   those files to our paralegals to do just
4   that.
5      Q.   With the instruction to do just
6   that, in other words, here are the files,
7   please docket it, is that what you
8   understand occurred?
9      A.   By his simply giving the files to
10  the paralegals, it's automatic that they
11  would docket it so that he didn't even have
12  to give that instruction.
13     Q.   Okay.
14     A.   If he gave that instruction, that
15  would just be belt and suspenders.
16     Q.   Okay.
17          But you personally don't know
18  whether he took that belt-and-suspenders
19  approach here?
20     A.   I'm fairly certain that he did.
21     Q.   That he did specifically ask?
22     A.   That he did, in fact, ask our
23  paralegals to go through the files and that
24  were transferred and to seek out anything
25  that required entry into the computerized

Page 99

1          P. Sutton
2   docketing system.
3      Q.   And upon what information do you
4   base your statement that you're fairly
5   certain that that occurred?
6      A.   Well, I actually personally
7   played a role in convincing Dr. Steve Covan
8   to turn over to our firm the matter of
9   handling the '160 Patent and its
10  enforcement against Medtronic, and
11  personally met with Steve Covan,
12  communicated with him by telephone,
13  personally negotiated with one or more
14  representatives of Medtronic to try to
15  resolve it short of litigation, because
16  Dr. Covan had a relationship with Medtronic
17  already existing.
18          I personally visited Dr. Covan, I
19  believe it was on a sunny weekend, and
20  frankly, in an effort to convince him that
21  we would be the best firm to handle this
22  matter and thereafter when he agreed to
23  give us this responsibility, I played a
24  role in seeing that the matters were broad,
25  that the matter was brought in, that the

Page 100

1          P. Sutton
2   relevant files were handled properly.
3          I did not do that alone.  I did
4   that together with Todd Sharinn because it
5   was his relationship and his client.
6      Q.   Understood.
7          You said that Dr. Covan agreed to
8   give us, Greenberg Traurig, this
9   responsibility.
10         What responsibility are you
11  referring to, the responsibility for
12  docketing the deadlines for the '160
13  Patent?
14     A.   He gave us Power of Attorney to
15  handle the '160 Patent and its enforcement
16  against Medtronic, both.
17     Q.   Well, when you take on a -- okay,
18  you said both, it sounds like there are two
19  pieces of the responsibility, enforcement
20  and --
21     A.   No, there are no two pieces, no.
22     Q.   Okay.
23     A.   It's all part of the same ball of
24  wax.  If you're enforcing a patent against
25  another party or seeking to license them or

Page 101

1          P. Sutton
2   negotiate some kind of a deal with them,
3   you are handling as part of that the patent
4   in the case of the '160 Patent here, and
5   they did enter into our computerized
6   docketing system for the period that we
7   were representing Quickie prior to our
8   having our power revoked, we did have it on
9   our system the deadlines for the
10  maintenance fees that would have been due,
11  and that we would have paid had our Power
12  of Attorney not been revoked, or that,
13  frankly, Quickie could pay directly, or
14  Allan Fell could pay directly, or Mark
15  Evens, on learning that he was going to be
16  representing Quickie in connection with
17  this patent, any one or more of those
18  parties at least could have timely taken
19  care of the maintenance fee well prior to
20  the deadline and even thereafter, had a
21  proper petition been filed by Maier &
22  Maier, that patent would have been, as
23  originally granted, would have been
24  reinstated.
25          Of course, as the patent was

27 (Pages 102 to 105)

Page 102

1           P. Sutton
2  originally granted should not have been
3  granted in that form because only two of
4  the 34 claims have been canceled from that
5  patent as a result of the re-examination
6  proceeding.
7           MR. LODEN:  Objection.
8  Nonresponsive.
9           (Whereupon, a luncheon recess was
10  taken at 11:58 a.m.)
11
12           *   *   *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 103

1           P. Sutton
2  A F T E R N O O N   S E S S I O N
3           (Time noted:  12:55 p.m.)
4
5      A.    Before going on the record, I'll
6  just share with you that during the lunch
7  break I did the following in an effort to
8  get the information as to Exhibit 3 --
9           MR. CHU:  Just to let you know
10  you're on the record.
11           THE WITNESS:  Yes.
12      A.    Firstly, I called Phyllis Cordes,
13  who I believe are the initials at the top.
14  She's not, as it turns out, familiar with
15  this data sheet.  Her initials were put
16  there after her predecessor Latisha, I
17  forget her name, left our firm.  I forget
18  Latisha's last name.  We can get that for
19  you if needed.
20      Q.    Let me stop you there.
21           Who asked or who directed that
22  Phyllis' initials be placed here?
23      A.    We normally have some person,
24  some paralegal responsible for every
25  record, and so, who is with the firm, and

Page 104

1           P. Sutton
2  so our practice -- first of all, I should
3  say that our computerized docketing system
4  is one that we operate and keep in the
5  ordinary course of business as part of our
6  practice, our intellectual property
7  practice, and I should also add that it is
8  comparable and does the same functions as
9  the one I brought over from Thelen to
10  Greenberg Traurig.
11           We want a person whose name is
12  associated with each record to be
13  reachable, so if we need information we can
14  go to that person, and that's why her
15  initials are on there.
16      Q.    So then was it this Latisha
17  somebody who actually created the record
18  for the '160 Patent?
19      A.    I don't know if it was either her
20  or someone else.  There are other
21  paralegals who worked during her tenure
22  there.  So it could have been somebody
23  else.  I just don't know.
24      Q.    If you wanted to find out who it
25  actually was who created the entries, is

Page 105

1           P. Sutton
2  there a way to do that?
3      A.    Well, to be honest with you,
4  that's why I called Phyllis Cordes, and I
5  could not get that information.
6      Q.    She just didn't have it or didn't
7  have it at her fingertips?
8      A.    I'll explain why.  Phyllis works
9  with DIAMS.  The record that is reflected
10  by Exhibit 3 is a PATS, one generated by
11  the PATS system, that does the same thing
12  as DIAMS, but it's from a different
13  software vendor and it accomplishes the
14  same functions, and I was able to learn --
15      Q.    Let me make sure I understand.
16      A.    Why don't I complete my thought.
17      Q.    Go ahead, go ahead.
18      A.    I was able, once I realized that
19  this is the PATS, Exhibit 3 is a report
20  generated by the PATS system, I realized
21  that that field, PAT number sign, in the
22  upper left, is the number that PATS, that's
23  PATS's number that they assign to us.  So
24  that's a PATS number.
25           When I found out that it's a PATS

28 (Pages 106 to 109)

Page 106

P. Sutton

1
2   record, I then went to the interrogatory
3   responses that I signed on August 13, 2007
4   and made reference to the response to
5   interrogatory number 8 where it is
6   confirmed that it was during the year 2000
7   that we made the transition from PATS to
8   DIAMS.
9          What we did was we ran both
10  systems with an overlap, duplicated the
11  effort so that we'd know that the DIAMS
12  system was reliable and working properly
13  before we stopped using the PATS.
14         So there was an overlap period,
15  and during that time when we entered data
16  from the PATS system to the DIAMS system,
17  we recorded, we made an entry in the PATS
18  system that reflected the date on which we
19  were making those transfers, because
20  garbage in, garbage out, you want to be
21  careful that -- you can't just do an
22  automatic transfer.
23         So if you look at the date
24  modified at the top, July 10, 2003, it's my
25  best recollection that that would be the

Page 107

P. Sutton

1
2   date that reflected the transfer of data
3   from the PATS system to the DIAMS system,
4   and even though we no longer represented
5   Quickie, we keep their data in our system,
6   and currently it's in the DIAMS system, but
7   prior to that, it was in the PATS system.
8          So that -- what I've tried to do
9   is give you the identification of that P
10  number next to PATS number sign. The
11  reason for that date is the date 7/10/2003
12  does not reflect legal services or
13  activity, but more the transfer not to
14  another firm, but from one system within
15  our firm, one software vendor system to
16  another, that accomplishes all of the same
17  end results.
18  Q.   Okay.
19  A.   Sorry for the lengthy statement.
20  Q.   I made a note earlier in your
21  testimony this morning. I believe you said
22  that the Exhibit 3 was actually a DIAMS
23  printout. It sounds like you were mistaken
24  in that respect.
25  A.   I believe if I said that, I'd

Page 108

P. Sutton

1
2   like to correct that. I believe that the
3   printout of Exhibit 3 is actually a PATS
4   report, PATS-generated report.
5   Q.   When you say PATS-generated
6   report, is this a report that is generated
7   on a regular basis, or does someone have to
8   actually go in and ask for this report to
9   be generated?
10  A.   One goes in and asks for this.
11  For example, if we're transferring a case
12  to another law firm and we want them to
13  have information, we can generate this
14  report and send it along with the file so
15  that if they're not patent attorneys, for
16  example, or if it's the client, they'll
17  have something to give to their new
18  counsel.
19  Q.   Do you know if that occurred with
20  respect to the transfer to Thelen in this
21  instance?
22  A.   It's my understanding that that
23  would have occurred. I don't, I didn't
24  personally put the page in the file, but
25  it's my understanding that -- first of all,

Page 109

P. Sutton

1
2   Mark Evens had all of the relevant
3   information as of April 11, 2002, so he
4   didn't even need anything from us because
5   it's all a matter of public record and had
6   the number and could access that online.
7          I just also, just for the
8   purposes of completing the information I'm
9   giving you, you asked what else would
10  appear under the response field. One
11  possibility would be if we were attorneys
12  of record would be a date of a filing of a
13  response, that would be one possibility.
14         Another would be the one that you
15  see here where our power was revoked.
16         Another would be the date on
17  which a client instructed us not to pursue
18  this patent or patent application any
19  longer, either for financial reasons or for
20  some other reason, and what we would do is
21  put the date of that instruction in that
22  field.
23         There would be a note on the
24  bottom where it says, you know, transfer to
25  another firm, it would say client

Page 110

1           P. Sutton
2  Instructed us not to spend anymore money on
3  this case or whatever, but it would reflect
4  a note and the date of those instructions
5  to take no further action and to incur no
6  further fees.
7      **Q.  You said earlier that it's your**
8  **understanding that the document in Exhibit**
9  **3 was transferred to Thelen.**
10     A.   I don't know that of my own
11  personal knowledge, but if the new client
12  or the new attorney requests that, we
13  provide that.
14          If the new attorney is a patent
15  attorney and already has the information,
16  they actually don't need that information
17  because they already have it, as in the
18  case of Thelen.
19     **Q.   Then let me ask:  My question**
20  **earlier was do you know if that occurred**
21  **with respect to the transfer to Thelen in**
22  **this instance, and your answer was it's my**
23  **understanding that that would have**
24  **occurred.**
25          **So what do you base that**

Page 111

1           P. Sutton
2  **understanding on?**
3      A.   If they requested that, that
4  would have occurred.  I don't see any
5  reason for their having requested that.  I
6  left that phrase out.
7          If Thelen requested it, we would
8  provide that, but there would be no reason
9  for them to request it.
10     **Q.   So is it your testimony then that**
11  **only if the new attorney taking over the**
12  **matter requests for a listing of the**
13  **docketed deadlines does Greenberg then have**
14  **an obligation to provide those deadlines?**
15          MR. CHU:  Objection.
16     A.   You're asking me for a legal
17  opinion, and I don't think that that's
18  appropriate.
19     **Q.   Well, you're an attorney, aren't**
20  **you?**
21     A.   I am, but I'm not here as an --
22  I'm not here to give you legal opinions.
23  I'm here as a 30(b)(6) witness.
24     **Q.   Okay.**
25     A.   If you could point to the

Page 112

1           P. Sutton
2  category that your question relates to --
3      **Q.   Sure, sure.  Well, I don't even**
4  **need to do that.  Let me ask a different**
5  **question.**
6          **So as the 30(b)(6) corporate**
7  **representative for Greenberg, are you**
8  **saying then that it's Greenberg's standards**
9  **that Greenberg does not transfer the patent**
10  **record sheet for a patent to new counsel**
11  **unless they're specifically requesting that**
12  **information to be transferred?**
13     A.   That is not my testimony.
14     **Q.   Okay.**
15          **So -- well, you seemed to say**
16  **earlier that you would have expected Thelen**
17  **to ask for this information if they had**
18  **wanted it.**
19     A.   That's not my testimony.
20     **Q.   Okay.**
21          **Well, then, how did I get that**
22  **wrong?**
23     A.   I don't know.
24     **Q.   Okay.**
25          **Well, was this information from**

Page 113

1           **P. Sutton**
2  **the Exhibit 3 transferred to Thelen?**
3      A.   Yes, it was transferred to them
4  on April 11, 2002 in the first instance and
5  to others including Alan Fell and to the
6  client and to, and via Pepe & Hazard so
7  that the client and its counsel, other than
8  GT, had this information regarding the due
9  dates on the maintenance fees prior to the
10  formal revocation of GT's representation on
11  this case and as early as April 11, 2002.
12     **Q.   Well, on April --**
13     A.   Yes.
14     **Q.   Move to strike.  Nonresponsive.**
15          **On April 11, 2002, Greenberg was**
16  **still responsible for monitoring the**
17  **maintenance fee deadlines on the '160**
18  **Patent, correct?**
19     A.   I didn't dispute that.  What I
20  stated was that we communicated in a letter
21  to Mark Evens from Todd Sharinn the
22  information that provided him enough to put
23  into the Thelen system that I set up all of
24  the maintenance fee deadlines so that
25  Thelen had the opportunity as of April 11,

30 (Pages 114 to 117)

Page 114

1          P. Sutton
2  2002 to have that as part of their system.
3     Q.   But you as you sit here today,
4  you don't know whether this patent record
5  sheet, Exhibit 3, whether this actual
6  printout was included in the documents
7  transferred to Thelen?
8     A.   I can't -- I don't know that as
9  I'm sitting here today without checking
10 further.
11    Q.   But presumably, if it was
12 included, then it would be found in the
13 files that Thelen has?
14    A.    That assumes that Thelen, that it
15 was and that Thelen kept that record, but
16 it does not address the fact that Thelen
17 already had the information so that it did
18 not need that information.
19    Q.   When the information was provided
20 as you say to Thelen in April 2002, did
21 anyone tell Thelen that they were now
22 expected to monitor deadlines on the
23 patent?
24    A.    If we at Thelen -- it was my
25 practice that if we received the notice

Page 115

1          P. Sutton
2  that Todd Sharinn gave Mark Evens, that we
3  would put that into the computerized
4  docketing system at Thelen so that in
5  anticipation of our relative transferring
6  the business from GT to Thelen we'd have
7  that information in our system.
8     Also, frankly, if GT, if things
9  were reversed, we would have paid that
10 maintenance fee if the shoe were on the
11 other foot.
12     In other words, Thelen could have
13 had it in its computerized documents
14 system, they could have paid the
15 maintenance fee.  If there was a duplicate
16 payment, they would have been refunded for
17 duplicate -- and so Thelen chose not to
18 take responsibility for what it knew it was
19 going to have transferred to it.
20     MR. LODEN:  Objection.
21 Nonresponsive.  Move to strike.
22 BY MR. LODEN:
23    Q.   My question was:  When the
24 information was provided as you say to
25 Thelen in April 2002, did anyone tell

Page 116

1          P. Sutton
2  Thelen that they were now expected to
3  monitor deadlines on the patent?
4     A.    It was not necessary to tell
5  them --
6     Q.   So the answer is no, no one told
7  them?
8     A.    I don't know that that's the case
9  at all.
10    Q.   Did you, yourself, tell them?
11    A.    I don't believe I myself told
12 them, but I --
13    Q.   Do you know if --
14    A.    Excuse me, let me finish, please.
15     Thelen, on being given the
16 information on April 11, 2002 was given
17 that information so that they had the
18 ability to enter that into their system and
19 to monitor that and to keep their relative
20 informed as to what was due and the
21 deadlines.
22     MR. SCOTT:  Move to strike the
23 last part.
24 BY MR. LODEN:
25    Q.   But again, in April 2002,

Page 117

1          P. Sutton
2  Greenberg was still responsible for
3  monitoring the maintenance fee deadlines on
4  the patent, right, that's what you said
5  earlier?
6     MR. CHU:  Objection.
7     A.    Our power had not been revoked as
8  of April 11, 2002.
9     Q.   So is it then your testimony that
10 it's standard procedure in the system that
11 you set up at Thelen that that system would
12 include deadlines for payment of fees for
13 patents for which Thelen was not
14 responsible at the time?
15    A.    At Thelen, it was my practice
16 that where we understood that there was
17 either a likelihood or a certainty that one
18 or more matters were to be transferred to
19 our firm, that on receipt of information
20 having to do with patents, such as the '160
21 Patent and the number, for example, by
22 virtue of the April 11, 2002 letter to Mark
23 Evens there, it was our practice to enter
24 that information and any deadlines
25 associated with that patent into the

31 (Pages 118 to 121)

Page 118

1      P. Sutton
2  computerized docketing system in force and
3  operating at Thelen.
4     **Q.   Why? If you're not responsible,**
5  **why enter the deadlines?**
6      MR. CHU:  Objection.
7     A.   I just explained why.  If we had
8  reason to believe that a relative of ours,
9  namely a relative of Mark Evens is going to
10 be transferring matters relating to the
11 '160 Patent to us, even if it's not a
12 certainty, we would, it was my practice
13 back then to enter that information into
14 the system so that the very matter that
15 occurred would not occur.
16     In other words, if it was in the
17 system and if it was monitored as it was
18 our practice when I was at Thelen, there
19 would have been, the maintenance fee would
20 have been paid by them.  So there would be
21 no abandonment.
22    **Q.   And is that still your practice**
23 **today, that even if you at Greenberg don't**
24 **have responsibility for maintenance fee**
25 **deadlines on a particular patent, if you**

Page 119

1      P. Sutton
2  **think you might have that responsibility in**
3  **the future, you'll go ahead and docket**
4  **them?**
5     A.   If there is, if I feel that there
6  is a responsibility or a likelihood that
7  we're going to be taking over matters that
8  might be transferred to us or whether
9  there's a good chance or a moderate chance
10 that that's going to occur, it is my
11 practice to identify or have identified for
12 us, much like the April 11, 2002 letter, it
13 is my practice to enter into our system
14 matters that we have not been given a Power
15 of Attorney yet so that we can make sure
16 that nothing falls between the cracks.
17     It was my practice at Thelen,
18 it's my practice today to do that.
19 Obviously we can't charge for it.
20    **Q.   So what do you do then at**
21 **Greenberg Traurig to make sure that, as you**
22 **put it, nothing falls between the cracks**
23 **when patents are being transferred to or**
24 **from Greenberg Traurig?**
25     **I mean, what systems do you have**

Page 120

1      P. Sutton
2  **in place to make sure nothing falls between**
3  **the cracks?**
4      MR. CHU:  I object to that.
5     A.   It's actually very simple.  If in
6  fact when the matter is transferred to
7  us --
8     **Q.   So we're talking about**
9  **matters transferred to --**
10    A.   You're interfering with my --
11    **Q.   No, I'm --**
12    A.   You're interrupting my answer.
13    **Q.   Let me ask a more clear question**
14 **then.**
15    A.   Okay.
16    **Q.   What systems does Greenberg have**
17 **in place to ensure nothing falls between**
18 **the cracks when files are transferred to**
19 **Greenberg?**
20     MR. SCOTT:  To Greenberg?
21     MR. LODEN:  Yes, and then we'll
22 talk about from afterwards.
23 BY MR. LODEN:
24    **Q.   Let's talk about only to**
25 **Greenberg.**

Page 121

1      P. Sutton
2     A.   If we have, as I've given the
3  example, reason to believe that a file will
4  be transferred to us, and according to my
5  practice I enter the information into our
6  system so that we can monitor that, if the
7  matter is transferred to us formally and we
8  are given a Power of Attorney, that
9  information is already in the system but we
10 have the double-check that when the
11 physical files are transferred to us, when
12 the paralegal goes to enter the data, it's
13 already there and you have that
14 double-check.
15    **Q.   Okay.**
16     **So then let's talk about**
17 **procedures to make sure nothing falls**
18 **through the cracks when files are**
19 **transferred from Greenberg, what happens**
20 **then?**
21    A.   Okay.  Let's take the specifics.
22     When I was at Thelen, it was the
23 practice to do the exact same thing so that
24 when Todd Sharinn on April 11, 2002 gave
25 Mark Evens the identification of the patent

32 (Pages 122 to 125)

Page 122

1          P. Sutton
2  number, the 160, it was my practice then,
3  and I assume was still the practice at
4  Thelen, to enter into their computerized
5  docketing system the '160 Patent and its
6  maintenance fee deadlines so that it could,
7  as those dates became due, pay those
8  maintenance fees regardless of whether or
9  not it got further information.
10         In other words, it was my
11 practice at Thelen, it was -- it is my
12 practice at Greenberg Traurig. I'm
13 surprised, frankly, that it was not done at
14 Thelen, because that was our practice when
15 I was there.
16     **Q.  So this April 11, 2002 letter,**
17 **which, frankly, I'll be honest with you,**
18 **Mr. Sutton, I don't have included in my**
19 **list of documents to discuss today, it**
20 **sounds like it's a critical part of your**
21 **testimony, at least with respect to the**
22 **matter that we're discussing today, so I'll**
23 **ask you: Do you have a copy of it?**
24     A.  I don't.
25     **Q.  Does your counsel have a copy of**

Page 123

1          **P. Sutton**
2  **it?**
3          MR. CHU:  Let's just go off the
4  record.
5          (Recess taken from 1:19 p.m. to
6  1:22 p.m.)
7          (Exhibit 5, Correspondence dated
8  4/11/02, marked for identification, as
9  of this date.)
10 BY MR. LODEN:
11     **Q.   Mr. Sutton, the reporter has just**
12 **handed you what's been marked as Exhibit 5.**
13     A.  Yes.
14     **Q.   Is this the April 11, 2002**
15 **correspondence that you were referring to?**
16     A.   What I've been referring to in my
17 testimony regarding a Todd Sharinn April
18 11, 2002 letter to Mark Evens includes two
19 sheets, the letter which appears to respond
20 to a request for Mark Evens for the patent
21 number, but in addition, attached to the
22 letter itself is a photocopy of the
23 Greenberg Traurig physical file cover sheet
24 with information on there, further
25 information on there, that permits Thelen

Page 124

1          P. Sutton
2  to enter that into their system without
3  even having to go online.
4          They have all of the information
5  available to them between the first and the
6  second sheet of Exhibit 5.
7          MR. LODEN:  Objection.
8          Nonresponsive. Move to strike.
9  BY MR. LODEN:
10     **Q.   Mr. Sutton, why was Todd Sharinn**
11 **sending this letter to Mark Evens?**
12     A.   It appears that Mark Evens
13 requested this information perhaps to enter
14 the information into the computerized
15 docketing system of Thelen.
16     **Q.   Well, you say it appears.  Do you**
17 **or do you not know?**
18     A.   Just from looking at it, "It was
19 a pleasure speaking to you today" -- see,
20 I'm familiar from my conversations with
21 Steve Colvin as to what was going on in
22 terms of during this period where he wanted
23 Mark Evens to benefit from this entire
24 effort of handling the '160 Patent and the
25 action against Medtronic so that -- and I

Page 125

1          P. Sutton
2  believe that Mark Evens telephoned me
3  indicating that he was going to be involved
4  and that we should not be offended by that,
5  and I welcomed him to have information such
6  as this so that he could give Steve
7  independent advice and counseling.
8     **Q.   Well, in that phone call, did**
9  **Mr. Evens tell you that he wanted the file**
10 **wrapper for the '160 Patent so he could**
11 **docket the deadlines in the Thelen system?**
12     A.   Not in his conversation with me,
13 no.
14     **Q.   And were you party to the**
15 **conversation between Mr. Evens and**
16 **Mr. Sharinn concerning the file wrapper?**
17     A.   It's possible I was.  I don't
18 have a specific recollection of whether I
19 was in the room when Todd Sharinn took the
20 call.
21     **Q.   So when you say that it appears**
22 **that Mark Evens requested this information**
23 **perhaps to enter the information into the**
24 **computerized docketing system of Thelen,**
25 **you, yourself, personally have no knowledge**

33 (Pages 126 to 129)

Page 126

1         P. Sutton
2   of Mr. Evens actually making that request
3   of Mr. Sharinn, do you?
4       A.   The attachment of the photocopy
5   of the outside of our physical file
6   confirms to me that we would have no reason
7   to provide that but for a request of that
8   type from Mark.
9       Q.   But you have no personal
10  knowledge of Mr. Evens actually saying
11  Todd, send me the file wrapper so I can
12  docket the maintenance fee deadlines?
13       You're not testifying from
14  personal knowledge about that conversation
15  occurring, are you?
16      A.   I cannot testify today to the
17  exact words that Mark Evens used during his
18  telephone conversations with us.
19      Q.   So then the corollary of that
20  then is you're speculating, aren't you, as
21  to what was said in that conversation?
22       MR. CHU: Objection.
23      A.   I don't believe so.  Again, for
24  the reasons I've already put on the record,
25  I don't believe so.  I refer you again to

Page 127

1         P. Sutton
2   the attachment, the second sheet of Exhibit
3   5, which has to do with the prosecution
4   file history of the patent, not the
5   Medtronic litigation.
6       Q.   But isn't the prosecution of a
7   patent, isn't that a relevant item of
8   information when you're litigating the
9   validity of a patent or infringement of
10  that patent?
11      A.   During litigation involving a
12  patent, the filing history that led to that
13  patent is relevant in such a litigation.
14      Q.   So isn't it equally possible that
15  Mr. Evens said Todd, send me the file
16  wrapper since I'm now getting involved in
17  the litigation against Medtronic?
18       MR. CHU: Objection.
19       MR. LODEN:  What's the basis of
20  the objection?
21       MR. CHU:  Because you're talking
22  about he said possible, not possible.
23  Anything is possible.
24       MR. LODEN:  Thank you.
25  BY MR. LODEN:

Page 128

1         P. Sutton
2       Q.   Your counsel just made my point.
3   You're speculating that anything is
4   possible as to why --
5       A.   No, that's not correct --
6       Q.   As to why he made that request,
7   isn't that correct, Mr. Sutton?
8       A.   No.  Again, you've disregarded my
9   testimony.
10       The attachment to the first page
11  of Exhibit 5 is not the file history.
12  That's my point.  It is the cover of the
13  physical file, not the file history, that
14  gives the data that will be used or would
15  be used by Thelen to enter the '160 Patent
16  within their computerized docketing system
17  for purposes of monitoring the deadlines
18  for paying the maintenance fees.
19      Q.   Turn to the second page.
20      A.   Yes.
21      Q.   What piece of information on the
22  second page of Exhibit 5 tells Thelen Reid
23  when the first maintenance fee is due on
24  the '160 Patent?
25      A.   Every bit of that information

Page 129

1         P. Sutton
2   yields that -- for example, the patent
3   number, the date granted, the serial
4   number, the filing date, the title, the
5   group number, the assignee -- every piece
6   of information on the second page of
7   Exhibit 5 which has a Bates number QLLC
8   000029 provides Mark Evens and Thelen with
9   the information to enable it to put into
10  their computerized docketing system to be
11  able to monitor and take care of the
12  maintenance fees on the '160 Patent.
13      Q.   And is that the only purpose for
14  that information, or does that information
15  have other purposes as well?
16      A.   I don't understand your question.
17      Q.   Well, it seems like you're saying
18  the only possible reason that this
19  information could have been transferred to
20  Mark Evens was because he wanted to enter
21  it into the docketing system.
22      A.   Could you please show me where I
23  testified that way?
24      Q.   Well, are there other reasons --
25      A.   No, please show me where I have

34 (Pages 130 to 133)

Page 130

1           P. Sutton
2    said.
3       Q.   No, I strike the question.
4       A.   Oh, you strike the question,
5    fine, fine.
6       Q.   Are there other possible reasons
7    why Mark Evens could have requested this
8    file wrapper for the '160 Patent?
9       A.   I think that just the first page
10   alone would provide him with enough
11   information where the patent number is
12   listed, and it is my understanding that we
13   provided him the second page as a courtesy
14   for somebody who was my former partner and
15   for somebody who was going to be counseling
16   Quickie with regard to the '160 Patent and
17   the Medtronic litigation.
18       MR. LODEN: Objection. Move to
19   strike. Nonresponsive. Move to
20   strike.
21   BY MR. LODEN:
22       Q.   What are the possible reasons for
23   why Mark Evens could have requested the
24   file wrapper for the '160 Patent?
25       A.   Your question has to do with the

Page 131

1           P. Sutton
2    operation of the mind of Mark Evens.
3       Q.   Correct.
4       A.   Where on the deposition notice,
5    could you show me the category that this
6    relates to?
7       MR. CHU: Object to the question.
8    BY MR. LODEN:
9       Q.   This relates to your personal
10   deposition notice. You are testifying that
11   Mark Evens specifically requested the file
12   wrapper so that he could docket the
13   deadlines for maintenance fees on the
14   patent in Thelen's system. That's your
15   testimony today.
16       My question is what are the other
17   possible reasons that Mr. Evens could have
18   requested that information?
19       A.   Can I ask my counsel a question
20   regarding the 30(b)(6) versus individual
21   deposition notices because I don't know
22   which I'm testifying -- I've been
23   testifying as a --
24       MR. SCOTT: Let's just go off the
25   record.

Page 132

1           P. Sutton
2       THE WITNESS: One second, please.
3       A.   I've been testifying under the
4    30(b)(6) notice so far today. I'm not
5    clear whether my testimony, you wish to now
6    go to the other notice and that you wish
7    testimony under the personal notice. I
8    just want to confer with my counsel to find
9    out what's appropriate.
10       (Pause.)
11   BY MR. LODEN:
12       Q.   For the record, the agreement
13   with your counsel, Mr. Sutton, was that you
14   would appear today in your personal
15   capacity pursuant to that deposition which
16   started at 9 a.m. this morning pursuant to
17   the deposition notice, as well as the
18   30(b)(6) designated corp rep for the
19   docketing clerk and records clerks. That
20   was the instruction that I got from your
21   counsel, that you would be appearing in
22   those --
23       A.   And how will you know which of my
24   testimony is 30(b)(6) testimony that will
25   be binding on Greenberg Traurig and which

Page 133

1           P. Sutton
2    is my personal testimony?
3       Q.   If we need to cross that issue, I
4    don't think we've reached that issue yet
5    today, but if we get to that point, we'll
6    clarify that.
7       The cover letter on Exhibit 5, it
8    says nothing about docketing maintenance
9    fees, does it?
10       A.   It references, the very first
11   sentence says, "It was a pleasure speaking
12   to you earlier today" --
13       Q.   Let me stop you there.
14       A.   Please, let me finish.
15       So that this first sentence
16   incorporates by reference the conversation
17   that I testified to earlier between Mark
18   Evens and our firm.
19       Q.   And that was a conversation to
20   which you said you had no recollection of
21   whether you participated in or not?
22       A.   No, that's not what I said.
23       Q.   Did you participate in that
24   conversation?
25       A.   Please, let me finish my answer.

35 (Pages 134 to 137)

Page 134

1          P. Sutton
2          I indicated two things. I
3  indicated that I spoke with Mark Evens
4  myself alone, and I indicated that I may
5  have been a party to Mark Evens'
6  conversations with Todd Sharinn. I don't
7  recall right now whether I was in the room
8  with Todd Sharinn. Our offices -- we're
9  two offices apart, so I just don't recall
10  that.
11          But what I also testified earlier
12  is that I do not recall the exact words
13  that were used by Mark Evens during the
14  conversations.
15     Q.   So as you sit here today, in that
16  conversation, whether you were a party to
17  it or you heard it through the wall or you
18  weren't party to it at all, you don't know
19  if Mark said in this conversation Todd, I'd
20  like to get the file wrapper so I can
21  docket the fees? You don't know whether he
22  said that or not?
23     A.   The second page of Exhibit 5
24  leads me to believe that he was interested
25  in that information and may have requested

Page 135

1          P. Sutton
2  that information.
3     Q.   But that's your conclusion. You
4  have no personal knowledge of him actually
5  being interested in that information,
6  correct?
7     A.   I've already answered that
8  question.
9     Q.   Would you answer it again,
10  please.
11          THE WITNESS: Please read back my
12  prior answer.
13          (Whereupon, the requested portion
14  was read back by the court reporter.)
15     Q.   I don't think I've asked that
16  particular question.
17     A.   I think you have. I've already
18  indicated that I don't recall his specific
19  words, but taken -- if I'm looking at
20  Exhibit 5, the second page, I believe I've
21  given you my best recollection and the best
22  information I have today.
23     Q.   Have you ever, you, yourself,
24  ever litigated a patent infringement matter
25  without looking at the file wrapper for the

Page 136

1          P. Sutton
2  patent at issue?
3     A.   Please tell me what you mean by
4  file wrapper.
5     Q.   Well, Todd Sharinn refers to the
6  file wrapper in Exhibit 5 and attaches this
7  sheet.
8     A.   I'm asking you what you mean by
9  it.
10     Q.   That's what I'm talking about,
11  file wrapper.
12     A.   I don't know what Todd Sharinn
13  means. I do know that what is attached as
14  constituting the second page of Exhibit 5
15  is a photocopy of the cover of what people
16  refer to as the file wrapper, which
17  contains the file history.
18          The reason I'm asking you that
19  question is people often confuse file
20  history with file wrapper, and I just want
21  to understand if you're asking me a
22  question to be answered under oath what you
23  mean by it.
24     Q.   Okay.
25          Well, the document that is

Page 137

1          P. Sutton
2  attached as page 2 to Exhibit 5, that's a
3  copy of the file wrapper?
4     A.   It's my understanding --
5     Q.   Did I get that right?
6     A.   It's my belief that it is a
7  photocopy of the outside cover containing
8  the file wrapper, the physical
9  manila-colored 3-part file, physical file,
10  that patent attorney, we as patent
11  attorneys use to conclude, that includes
12  the file history but also correspondence
13  with the client, things that the Patent and
14  Trademark Office doesn't see.
15          I'm making that distinction just
16  so we're clear with one another. I don't
17  believe that the entire file wrapper
18  accompanied the first page of Exhibit 5. I
19  believe what Todd meant was the cover, a
20  photocopy of the cover of the file wrapper,
21  which is our physical file.
22     Q.   Well, looking at page 1, he
23  doesn't say I enclose a copy of the cover
24  of the file wrapper, does he? He didn't
25  say that there, did he?

36 (Pages 138 to 141)

Page 138

1           **P. Sutton**
2     A.   I'm looking, it says what it
3   says -- I'm looking at the second page and
4   it is just that. I'm trying to share with
5   you, and maybe you already know that the
6   second page is a photocopy of the cover.
7   You can even see the clip that holds the
8   file wrapper together shown in the
9   photocopy on the second page.
10    **Q.   You said that --**
11          MR. CHU: Excuse me for one
12      second just so I don't interrupt while
13      you have a question pending.
14          (Counsel confers with witness).
15  BY MR. LODEN:
16    **Q.   Would you like to go back on the**
17  **record and discuss what you and your**
18  **attorney just discussed?**
19          MR. CHU: Well, no, we wouldn't.
20  BY MR. LODEN:
21    **Q.   Well, what would you --**
22    A.   Would you like me to testify now
23  as to discussions I've just had with my
24  counsel regarding attorney-client
25  privilege?

Page 139

1           P. Sutton
2     **Q.   No.**
3     A.   Okay, then I have nothing to
4   share with you with respect to --
5     **Q.   Well, my question, Mr. Sutton, is**
6   **you stated previously, "I believe what Todd**
7   **meant, even though we've established that's**
8   **not what he said, but I believe what Todd**
9   **meant was the cover, a photocopy of the**
10  **cover of the file wrapper."**
11          **What do you base that belief on?**
12    A.   It's very simple. The file
13  wrapper is a relatively thick physical file
14  that contains dozens or hundreds of pages
15  and is available to Mark Evens, if he knows
16  the patent number from the first page, it's
17  a matter of public record, you can order it
18  or have access to it online.
19          I don't believe that Todd sent
20  the entire physical file, but look, maybe
21  he did.
22          What I see here is just a
23  photocopy of the front of the file wrapper.
24    **Q.   Just one enclosure, the**
25  **photocopy?**

Page 140

1           **P. Sutton**
2     A.   Well, the letter, if you'll
3   notice, says enclosure as plural.
4     **Q.   Exactly.**
5     A.   So I don't know what that means.
6   I don't know whether his secretary typed
7   plural accurately or mistakenly. I just
8   don't know.
9          So it's possible that Todd sent
10  the entire, all pages, but I don't know
11  that. I do see that he did send the cover
12  that contains a lot of critical
13  information.
14    **Q.   Would you agree with me that as**
15  **between yourself and Todd Sharinn, that**
16  **Todd would be the best witness to testify**
17  **as to what he discussed with Mark Evens and**
18  **why this correspondence was being sent to**
19  **Mark Evens?**
20    A.   Not necessarily, no, I don't
21  agree.
22    **Q.   Why is that?**
23    A.   You asked me what my belief is.
24  I certainly have no doubt that Todd Sharinn
25  can share information with you that will

Page 141

1           P. Sutton
2   supplement the information I'm giving you
3   today, but I don't think anything that Todd
4   will say will negate any of the information
5   that I was able to share with you today.
6     **Q.   That's not the question I asked.**
7          **As between yourself and Todd**
8   **Sharinn, wouldn't you agree that Todd**
9   **Sharinn, the author of this correspondence,**
10  **is the best person to talk about why he**
11  **sent this correspondence and what he meant**
12  **when he said what he said in it?**
13    A.   I believe that Todd Sharinn may
14  have testimony to give you regarding
15  Exhibit 5 and he will be likely doing that
16  tomorrow.
17    **Q.   Do you have any other evidence**
18  **that you're aware of to corroborate your**
19  **testimony today that this correspondence**
20  **was being sent because Mark wanted,**
21  **Mr. Evens wanted to docket the maintenance**
22  **fees?**
23    A.   I have to think about that, and
24  if I have further evidence or information,
25  I'll be happy to share that with you.

37 (Pages 142 to 145)

Page 142

P. Sutton

1
2      Q.   Please do.  If you don't, I'll
3  assume that this is all that you have, but
4  we can leave the deposition open at the
5  end, but I would like to find out all the
6  evidence upon which you say you testified
7  to that effect.
8      A.   I have no further information
9  that I can recall right now.
10     Q.   Okay.
11        Mr. Sutton, in your practice at
12  Greenberg Traurig, are you ever aware of
13  Greenberg missing a deadline for payment
14  ever maintenance fees for which Greenberg
15  was responsible?
16        MR. CHU:  Objection.
17     A.   I'm not certain.  I don't have a
18  specific recollection.
19     Q.   How about while you were at
20  Thelen?
21     A.   I have no recollection of that
22  occurring at Thelen.
23     Q.   I apologize if this seems scatter
24  shot, but I'm clearing up some items left
25  over from this morning.

Page 143

P. Sutton

1
2        The Markman Hearing on the '160
3  Patent before Judge Lynch, I believe, did
4  you attend that hearing?
5      A.   No, I did not.  Mark Evens and
6  Todd Sharinn did and -- I know at least
7  those two gentlemen did.
8      Q.   Do you know if Quickie was
9  expecting you to attend?
10     A.   If Quickie was expecting me to
11  attend, I would have attended.
12     Q.   You testified earlier that Alan
13  Fell said after that hearing that the '160
14  Patent was being transferred to Mark
15  Evens -- if you weren't present at the
16  hearing, then how do you know that that
17  conversation took place?
18     A.   That's not what I testified to.
19  I think you've incorrectly summarized or
20  characterized what I said.
21     Q.   Okay.  Well, I may have
22  misunderstood your earlier testimony then.
23     A.   Todd Sharinn was informed and
24  informed me that the day after the Markman,
25  Alan Fell instructed us, GT, that the '160

Page 144

P. Sutton

1
2  Patent and the litigation matters involving
3  the '160 Patent were going to be
4  transferred to Mark Evens at Thelen.
5      Q.   So that information about that
6  conversation between Alan Fell and Todd
7  Sharinn came secondhand to you, Todd
8  Sharinn told you about that conversation,
9  you weren't present for the conversation,
10  correct?
11     A.   That's correct.
12     Q.   For a patent for which Greenberg
13  is responsible for the maintenance fees and
14  a maintenance fee deadline appears on a
15  monthly docket report, what is GT's
16  standard operating procedure then when that
17  deadline appears on a monthly operating
18  report?
19     A.   We check with the client in some
20  instances if we have reason to believe that
21  the client may not want to incur the fees
22  associated with that.  If the patent is
23  involved in a litigation, we pay the
24  maintenance fee and bill the client because
25  we can't imagine that the client would want

Page 145

P. Sutton

1
2  the patent to lapse if it's involved in a
3  litigation.  And that payment would occur
4  at or near the initial deadline.
5      Q.   What happens if the patent is not
6  in litigation and you have no reason to
7  believe that the patent would want to allow
8  the patent -- the client would not want to
9  allow the patent to expire?
10     A.   If there are circumstances where
11  we're unable to get a hold of the client,
12  either through the client traveling or
13  whatever and -- we try to contact the
14  client.
15        If we're unable to, if in doubt,
16  we would pay the maintenance fee and bill
17  the client -- we would not pay the
18  maintenance fee and since the client didn't
19  get back to us and pay it after that
20  initial deadline, there are subsequent
21  deadlines, and simply the client, because
22  it did not get back to us, has to pay a
23  higher disbursement for payment after that
24  initial deadline, but the patent would not
25  lapse because the maintenance fee would be

38 (Pages 146 to 149)

Page 146

P. Sutton

1
2  paid.
3       We don't pay those maintenance
4  fees. Our standard practice is not to pay
5  the maintenance fees months in advance.
6    Q.   Earlier this morning we talked
7  about the docketing systems and some this
8  afternoon.
9    A.   May I correct myself?
10   Q.   Sure.
11   A.   There have been some clients who
12  wish to look at an entire year in advance
13  when they view their portfolio, and rather
14  than be bugged with reminders during the
15  year, if their portfolio is large, they
16  make a decision earlier in the year as to
17  all those patents it wishes to maintain and
18  all those it doesn't wish to maintain, and
19  we sometimes get instructions en masse to
20  simply pay all those maintenance fees and
21  we do so throughout the year without our
22  having to interact with the client
23  thereafter.
24   Q.   Okay.
25       Focusing then on the docketing

Page 147

P. Sutton

1
2  systems, I believe you testified earlier
3  that when the file is transferred or given
4  to the paralegal, that the paralegal then
5  goes through it and pulls out the relevant
6  dates or the relevant information including
7  dates and enters that information into the
8  docketing system?
9    A.   By way of example, I recently had
10  sent to me a patent application file where
11  we will be taking over responsibility -- we
12  haven't as yet. I take that information to
13  our docketing clerk, indicating that there
14  is a good chance that we'll be taking that
15  over. I open the many documents, segregate
16  out the patent prosecution oriented
17  documents, and the patent prosecution
18  paralegal has the skills, the day-to-day
19  skills to recognize what information is
20  important that goes into the various feels
21  of our computerized docketing beta base and
22  can do that.
23       There are some instances where I
24  do that with the paralegal, but it's more
25  likely that there will be more instances

Page 148

P. Sutton

1
2  where the paralegal does that on his or her
3  own.
4    Q.   When the paralegal does that
5  function on his or her own, is there a
6  check performed to make sure that he or she
7  got it right?
8    A.   There are times that after the
9  paralegal does that, that he or she will
10  generate a report, a status report, for
11  example -- I indicated several types of
12  reports -- that will list all of the
13  matters and that permits me to have a
14  checklist to reference or to
15  cross-reference with the physical files or
16  information when it's ultimately
17  transferred to us and we have the prior
18  firm's Power of Attorney revoked giving us
19  the full and sole responsibility.
20   Q.   And what instances would you or
21  the other responsible attorney perform that
22  check to make sure that the paralegal got
23  it right?
24       You said there are times that
25  that will occur, but I'm wondering about

Page 149

P. Sutton

1
2  what times.
3    A.   The paralegal does not need any
4  check. Our paralegals are, have many years
5  of day-to-day responsibilities and skills
6  so that they do not need an attorney
7  looking over their shoulder to do this.
8  There are systems in place where if the
9  data is entered by somebody who is not more
10  senior among the patent prosecution
11  paralegals, that a more senior person will
12  go over that and double-check it.
13   Q.   Okay.
14       Earlier you said that Latisha --
15  and you still don't remember her last name?
16   A.   I believe she was born in the
17  Philippines, but I don't remember the last
18  name, but I can get the name, but I just,
19  for the life of me, I just don't remember
20  her name right now. It's been several
21  years since she left the firm.
22   Q.   Understood.
23   A.   But I do know her first name was
24  Latisha.
25   Q.   Was she a senior paralegal that

39 (Pages 150 to 153)

Page 150

1           P. Sutton
2   would not need someone over her to
3   double-check her work?
4       A.   Yes. She had extensive
5   experience before we brought her into our
6   firm.
7       Q.   What experience did she have?
8       A.   Years of doing just this at one
9   or more patent IP boutiques.
10      Q.   When you say doing just this,
11  you're saying she worked with the PATS 97
12  system for years?
13      A.   That or its equivalent and/or its
14  equivalent. It may be that she worked with
15  more than just PATS. It's my recollection
16  that she worked with PATS, but I believe
17  that she was with firms that used other
18  systems that are, that perform the
19  identical functions, but possibly from
20  different vendors. There are several
21  vendors out there that provide software
22  that do these various functions.
23      Q.   When you say you believe that she
24  was with firms that used other systems,
25  upon what do you base that belief?

Page 151

1           P. Sutton
2       A.   I base that on my daily
3   conversations with her regarding PATS. It
4   was clear that she was familiar with PATS
5   and its forms of reports and its form of
6   database. That's my recollection.
7       Q.   So how -- strike that.
8           So she had the, Latisha,
9   whomever, had the requisite knowledge on
10  the use of PATS. How did you go about
11  ensuring that she had the requisite
12  knowledge and experience to know what
13  information to pull out of a patent history
14  to enter into PATS?
15      A.   She had demonstrated to us prior
16  to our hiring her that she was thoroughly
17  familiar on a day-to-day basis and had all
18  of the skills associated with running on a
19  senior level a computerized patent
20  docketing system.
21      Q.   When you say she demonstrated to
22  us, who is the us in that statement?
23      A.   Greenberg Traurig.
24      Q.   Were you a part of that
25  demonstration?

Page 152

1           P. Sutton
2       A.   I would have played some part in
3   that demonstration.
4       Q.   What role did you play?
5       A.   I was either head or senior or
6   co-head of the intellectual property
7   practice of Greenberg Traurig.
8       Q.   So is that one of the functions
9   then of the head or the co-head of the IP
10  practice is to vet, for lack of a better
11  term, paralegal candidates?
12      A.   I do that personally because
13  while paralegals are not seniormost people
14  in the hierarchy of a law firm, their daily
15  responsibilities are important, and I take
16  it upon myself to interview and vet
17  paralegals, whether they be on the patent
18  litigation end or on the patent prosecution
19  end.
20      Q.   So then did you personally
21  interview Latisha?
22      A.   I remember meeting her and
23  questioning her before she was hired.
24      Q.   How did she did go demonstrating
25  that she was thoroughly familiar with a

Page 153

1           P. Sutton
2   day-to-day basis and had all the skills
3   associated with running a computerized
4   patent docketing system?
5       A.   She was quizzed -- first of all,
6   I believe she was known to one or more
7   people at the prior firm that she was with.
8   I'm not certain of this, but I believe one
9   or more attorneys at Greenberg Traurig that
10  had joined our firm knew of her because
11  they had worked with her at the prior IP
12  boutique.
13          But quite apart from that, we
14  have questions that the answers to which
15  will give us information as to whether
16  someone is a person who is truly skilled in
17  this area. We can tell by the questions we
18  ask and the answers that they give and the
19  manner in which they give those answers
20      Q.   You say she was quizzed. Was
21  that a written quiz?
22      A.   No.
23      Q.   Verbal, oral quiz?
24      A.   Correct.
25      Q.   These questions that you're

40 (Pages 154 to 157)

Page 154

**P. Sutton**

1       **P. Sutton**
2    **referring to, are those questions written**
3    **down anywhere?**
4      A.    Not that I know of. They need
5    not be because we deal with this on a daily
6    basis.
7      **Q.   And again, who is the "we" in**
8    **that statement?**
9      A.    Greenberg Traurig, it would be
10   myself and one or more other patent
11   attorneys. We have 150, 200 intellectual
12   property attorneys at the firm. One or
13   more of us gets involved in this process.
14          If it's a patent prosecution
15   paralegal, the attorneys involved will be
16   more likely those whose practice is focused
17   on patent prosecution. In the case of a
18   patent litigation paralegal, it would be
19   one or more litigators, IP litigators,
20   specifically patent litigators that will be
21   involved in this vetting process.
22     **Q.   And what type of paralegal was**
23   **Latisha?**
24     A.    She was a patent prosecution
25   paralegal.

Page 155

1            P. Sutton
2      **Q.   What sort of documents would**
3    **Greenberg Traurig maintain concerning**
4    **Latisha's employment with the firm?**
5      A.    I don't know the answer as I'm
6    sitting here today. It would require -- I
7    mean, I'm not sure what category, but I
8    think it would have to involve a question
9    to human resources department of our firm
10   to see if they have some kind of record.
11   I'm sure they must have some record of her
12   having been employed by us in the period
13   that she was employed.
14     **Q.   Do you, yourself, have any files**
15   **concerning Latisha's employment?**
16     A.    No.
17     **Q.   When did Latisha leave Greenberg**
18   **Traurig?**
19     A.    I do not recall the date, but it
20   was several years ago. It was not, it was
21   not within the last year or two. So it was
22   at least -- I believe to the best of my
23   recollection it was more than two years
24   ago.
25     **Q.   Well, you said earlier that you**

Page 156

1          **P. Sutton**
2    **thought the July 10, 2003 date on Exhibit 3**
3    **was the date that the PATS information was**
4    **transferred over to the DIAMS system.**
5          **Do you recall if Latisha was**
6    **involved in that transfer?**
7      A.    I don't believe Latisha was
8    involved in that transfer. I believe that
9    Latisha -- I'm sorry, strike that. I
10   believe I misspoke.
11          Latisha may have been involved in
12   both the PATS and the DIAMS systems.
13     **Q.   So then is it fair to assume that**
14   **at least as of July 2003 she was still at**
15   **Greenberg Traurig?**
16     A.    To the best of my recollection.
17   I believe she was. That's 5 years ago. I
18   believe she was still with us.
19     **Q.   If you wanted to talk to Latisha**
20   **today, how would you reach her, do you**
21   **know?**
22     A.    I don't know.
23     **Q.   You don't know where shes?**
24     A.    I don't know.
25     **Q.   When is the last time you've**

Page 157

1          **P. Sutton**
2    **spoken with her?**
3      A.    When she was employed at our
4    firm. I wished her well just before she
5    was leaving.
6      **Q.   Do you know if your counsel have**
7    **spoken with her?**
8      A.    I'm sorry?
9      **Q.   Do you know if Greenberg's**
10   **outside counsel in litigation have spoken**
11   **with her?**
12     A.    I believe your question cross the
13   line on attorney-client privilege because
14   it would go to the substance of
15   communications.
16     **Q.   I'm not asking about the**
17   **substance. I'm just asking if they spoke,**
18   **if that conversation occurred. I don't**
19   **think that's privileged.**
20     A.    I don't know the answer to your
21   question as to whether or not anybody has
22   spoken to her since she's left.
23     **Q.   While you were at Thelen Reid,**
24   **was Thelen ever accused of malpractice on**
25   **matters for which you were working or**

41 (Pages 158 to 161)

Page 158

P. Sutton

1    P. Sutton
2    responsible?
3    A.    Not that I recall, no.
4    Q.    Same question with respect to
5    Greenberg, other than obviously this
6    matter, were there any other assertions
7    that Greenberg committed malpractice on
8    matters for which you had a role?
9    A.    Not that I know of.
10   Q.    How about Todd Sharinn?
11   A.    Not that I'm aware of.
12   Q.    The PATS docketing system, is
13   there a way to determine what changes were
14   made to the information in that record?
15       Let me give you an example. For
16   example, if someone went in and changed a
17   deadline, is there a log or some sort of
18   transaction report that shows on X date
19   this change was made by Y person? Do you
20   understand what I'm talking about?
21   A.    I'm not sure I do.
22   Q.    Okay.
23       Let me see if I can ask it a
24   different way, because I'm not sure what
25   I'm talking about, whether there's a name

Page 159

P. Sutton

1    P. Sutton
2    for it or not, but I'm looking really for a
3    transactions log.
4        You know, the first entry on it
5    would be on X date the entry was created by
6    Y person. The next date maybe this event
7    happened with respect to this record and
8    here is who did it, and then just down the
9    list?
10   A.    I don't recall seeing a
11   transaction log.
12   Q.    Well, do you know if it's
13   possible to generate one in that software
14   system?
15   A.    What time period are we talking
16   about?
17   Q.    We're talking about PATS 97, I
18   assume it's the same software today as it
19   is then?
20   A.    I don't know.
21   Q.    Let's just talk about PATS 97.
22   In that software program, is it possible to
23   generate a transaction log?
24   A.    I never encountered the question
25   before. I just don't know.

Page 160

P. Sutton

1    P. Sutton
2    Q.    What about DIAMS, do you know if
3    it's possible to generate a transaction log
4    in DIAMS?
5    A.    Again, I've never been faced with
6    that question, so I don't know the answer
7    to it.
8    Q.    Who would you ask at Greenberg to
9    see if that was possible?
10   A.    I wouldn't ask anybody. I'm not
11   sure I understand.
12   Q.    Well, I'm asking you as the
13   designated corporate rep to speak about the
14   systems if it's possible, and it sounds
15   like you don't know it's possible, but can
16   you find out if it's possible or not?
17   A.    I'll take your question under
18   advisement and discuss it with counsel.
19   Q.    Well, I think we're entitled to
20   an answer. I appreciate that you want to
21   discuss it with your counsel, but again,
22   I'll make a note of it and during a break
23   you can discuss it with your counsel and
24   then we'll circle back and if we need to
25   leave the depo open, we can.

Page 161

P. Sutton

1    P. Sutton
2    A.    I just never had occasion to
3    consider a transaction like that.
4    Q.    Is there someone at Greenberg
5    with responsibility for maintenance of the
6    docketing, computerized docketing system?
7    A.    I believe we have a service
8    contract or support contract with the
9    vendor.
10   Q.    Who is the vendor?
11   A.    DIAMS. When we had the PATS
12   system, and the systems are the same in the
13   context of what they do, we had a support
14   arrangement with PATS.
15   Q.    Okay.
16       The vendor would install the
17   software on Greenberg's computer system?
18   A.    Are you asking me what actually
19   occurred?
20   Q.    What actually occurred, yes,
21   thank you.
22   A.    The vendor would certainly play a
23   role in the installation of the system on
24   Greenberg's computers.
25   Q.    And I think you just answered the

42 (Pages 162 to 165)

Page 162

1       P. Sutton
2   question, but let me be sure, we're talking
3   about a software package that runs on a
4   standard desktop, it's not a separate
5   computer that the system is maintained on?
6       A.   You're making an assumption that
7   I don't know is accurate.
8       Q.   Okay.
9       A.   I don't know whether there is a
10  server on which the software is installed
11  which would not be the same as an attorney
12  or a paralegal's desktop computer.
13      Q.   Okay.
14           MR. LODEN:  Let me ask the
15      reporter to mark Exhibit 6, I believe.
16           (Exhibit 6, Greenberg Traurig's
17      Responses to Plaintiff's
18      Interrogatories, marked for
19      identification, as of this date.)
20  BY MR. LODEN:
21      Q.   Mr. Sutton, the reporter has just
22  handed you what's been marked as Exhibit 6.
23           Do you recognize this document?
24      A.   This appears to be a copy of
25  Greenberg Traurig's responses to

Page 163

1       P. Sutton
2   plaintiff's interrogatories, a copy of
3   which was signed by me on August 13, 2007.
4       Q.   So that's your signature there on
5   the last page?
6       A.   That appears to be my signature.
7       Q.   If I could get you to turn to the
8   interrogatory number 8 that appears on the
9   top of page 5 -- do you see where I'm at?
10      A.   Yes.
11      Q.   The responses -- well, you can
12  see what the response there is.
13      A.   Yes, that's the interrogatory
14  response that I referenced to shortly after
15  our lunch break.
16      Q.   Right.
17           Do you recall at what period in
18  late 2003 GT transferred to DIAMS?  Was it
19  the July --
20      A.   I believe that there was, it was
21  not a single day transfer.  I believe as
22  I've testified previously that both systems
23  were running simultaneously for a period of
24  time and that -- so there was not like a
25  single date.

Page 164

1       P. Sutton
2       Q.   Do you recall when the PATS 97
3   system was taken off-line?
4       A.   I don't remember the date when
5   that occurred, no.
6       Q.   Why did Greenberg switch?
7       A.   These systems and the vendors are
8   evaluated from time to time, and if in the
9   view of the firm, if there's a superior
10  system or there's a more cost
11  effectiveness, or support is better, or
12  there are many factors that can go into
13  choosing a software vendor, and on balance
14  DIAMS appeared to be more what was
15  preferable.
16           Keep in mind that we have a
17  system that is accessed over several
18  states, and I believe that the DIAMS system
19  lends itself well to several offices having
20  access to the data either simultaneously or
21  in seriatim.
22      Q.   At the end of the response there
23  to interrogatory number 8 in the
24  parenthesis, there is a mention that an
25  office had been using DIAMS since early

Page 165

1       P. Sutton
2   2003.
3           Do you see that?
4       A.   Yes.
5       Q.   Which office was that?
6       A.   I don't recall, but it was based
7   on their success with the use of DIAMS that
8   influenced our decision to go firm-wide
9   with DIAMS.
10      Q.   And when you say our decision,
11  were you personally part of the
12  decision-making process?
13      A.   I may have been, but I don't
14  believe I was involved in the day-to-day
15  details of the evaluation.
16      Q.   Does Greenberg Traurig charge its
17  clients to monitor patent deadlines with
18  this computerized docketing system?
19      A.   That's up to the attorney, on an
20  attorney-by-attorney basis as to what they
21  do.
22           So that how a client is billed is
23  a matter that's left to the discretion of
24  each attorney and that attorney's
25  relationship with his or her client.

43 (Pages 166 to 169)

Page 166

1              P. Sutton
2      Q.    When you say how a client is
3    billed --
4      A.    And what they're billed for.
5      Q.    Okay.
6            Well, in the instances where a
7    client is billed, are they billed just for
8    the time to use the system or is it a flat
9    fee, a monthly fee?
10     A.    That will vary from attorney to
11   attorney, and that's a decision that each
12   attorney responsible for a client makes and
13   negotiates with his or her client.
14     Q.    Do you know if Greenberg Traurig
15   charged Quickie for monitoring the
16   deadlines on the '160 Patent?
17     A.    I'd have to review the invoices
18   to know whether that's so or not.
19     Q.    When you reviewed the invoice --
20   well, you said you would have to review
21   invoices. What aspects of the invoices
22   would you be looking at, the time records
23   or the expenses or something else?
24     A.    Did you use the word monitoring?
25           THE WITNESS: Could you read back

Page 167

1              P. Sutton
2    that last question?
3      Q.    Yeah.
4            My question was: Do you know if
5    Greenberg Traurig charged Quickie for
6    monitoring the deadlines on the '160
7    Patent, and your response was I'd have to
8    review the invoices.
9      A.    Well, that's one thing I'd want
10   to review, but I believe that in the
11   response to interrogatory number 16 it
12   indicates that GT voluntarily monitored the
13   '160 Patent before Quickie revoked all
14   powers of attorney given to GT as to the
15   '160 Patent no later than March 4, 2003.
16           The use of the word monitor as I
17   used it, since I signed this response on
18   August 13, 2007, is that we put it into our
19   system so that we would have the
20   information available to us, and we didn't
21   charge the client -- that's what the term
22   voluntarily suggests -- we put it into the
23   system and did not charge the client for
24   doing so.
25     Q.    So then I take it --

Page 168

1              P. Sutton
2      A.    Or I'm not aware of any instance
3    where we charged the client for simply
4    having that information in our system.
5      Q.    So then you don't need to go back
6    and look at the invoices. You're saying
7    that no charge was incurred or levied?
8      A.    Well, I would want to check the
9    invoices to see if, in fact, if there is an
10   entry for charging, I'd want to be able to
11   confirm that my testimony is accurate.
12           But the voluntarily monitoring
13   that's referred to in response to
14   interrogatory number 16 refers to our
15   having it in our computerized docketing
16   system.
17     Q.    And the volunteer language there
18   means, you intended that to mean that
19   Greenberg was not charging Quickie for that
20   monitoring service?
21     A.    That's what I understood to be
22   the case when I signed the response to the
23   interrogatory.
24     Q.    Okay.
25           If I could get you to turn to

Page 169

1              P. Sutton
2    interrogatory number --
3      A.    I'm sorry, and it also meant that
4    we had no responsibility -- you have to
5    look at the question and the answer no that
6    precedes the statement about voluntarily
7    monitoring. So really in fairness you have
8    to look at the entire response to
9    interrogatory number 16.
10           MR. LODEN: Objection. Move to
11   strike. Nonresponsive.
12   BY MR. LODEN:
13     Q.    Look at interrogatory number 11,
14   please. It begins on the bottom of page 5
15   and goes over to page 6. Do you see where
16   I'm at?
17     A.    Yes.
18     Q.    The response starts off with, "GT
19   does not believe it receives such a notice
20   or reminder," and then the part I want to
21   talk about is the second sentence, "GT has
22   searched its records and not found such a
23   notice or reminder and its patent attorneys
24   do not recall having received one."
25           Were you involved in the search

44 (Pages 170 to 173)

Page 170

1         P. Sutton
2  of GT's records for a reminder or notice?
3     A.   From a supervisory standpoint,
4  yes, but I don't recall myself physically
5  going through page by page the records.
6         I did go through some documents,
7  but I don't recall which ones those were,
8  but we did not find a notice or reminder.
9     Q.   Who was actually involved in the
10 sifting through the documents?
11    A.   I don't know who, which -- today
12 as I'm testifying, I don't have a name for
13 you or names as to who participated in that
14 search other than myself.
15    Q.   Okay.
16        What records did they search?
17    A.   I believe they searched all of
18 the records having to do with patent
19 prosecution in any way associated with the
20 '160 Patent to confirm that something
21 wasn't misfiled or whatever.
22    Q.   I mean, did they pull documents
23 in from outside storage?
24    A.   I can't testify today as to the
25 location of the physical documents before

Page 171

1         P. Sutton
2  the search began.
3     Q.   The second half after the semi
4  colon in that sentence -- sorry -- oh, no,
5  I'm sorry, after the semi colon where it
6  says, "and its patent attorneys do not
7  recall having received one" -- what patent
8  attorneys are you referring to there?
9     A.   Those would be any and all patent
10 attorneys that had anything to do with
11 Quickie or its patent prosecution matters.
12    Q.   So that's obviously yourself?
13    A.   And Todd Sharinn.
14    Q.   So you spoke with Todd Sharinn?
15    A.   I believe that Todd Sharinn was
16 consulted.
17    Q.   Did you, yourself, consult him
18 concerning --
19    A.   I don't recall who consulted him.
20    Q.   Well, do you recall yourself
21 consulting him?
22    A.   I don't recall myself consulting
23 him in regard to the second sentence of the
24 response to interrogatory number 11.
25    Q.   What other patent attorneys were

Page 172

1         P. Sutton
2  consulted?
3     A.   I don't know, as I'm sitting here
4  today, what the names of any other patent
5  attorneys who were consulted, what those
6  names are, or if there are any others.
7     Q.   In that search, what were they
8  looking for?
9     A.   The response to interrogatory
10 number 11.
11    Q.   Right, but interrogatory number
12 11 asks if GT ever received any notice or
13 reminder concerning the need to pay
14 maintenance fees.
15        So my question is what notices or
16 reminders were being searched for just --
17    A.   Any, any.
18    Q.   Any.
19        So that would include notices or
20 reminders that came from the Patent and
21 Trademark Office?
22    A.   It would include any notice or
23 reminder.
24    Q.   How about notices or reminders
25 that were kicked out from the computerized

Page 173

1         P. Sutton
2  docketing system?
3     A.   There would be no reminder or
4  notice on the computerized docketing system
5  because our Power of Attorney was revoked
6  well prior to the deadline in May -- I'm
7  sorry, the deadline for paying the first
8  maintenance fee.
9         So there would be no reminder or
10 report that would include that for that
11 reason.  We were no longer representing
12 Quickie in that regard.  Our power had been
13 revoked.  It would be inappropriate for us
14 to be involved thereafter.
15    Q.   So then it's your testimony then
16 that after -- after the Power of Attorney
17 was revoked, that the computerized
18 docketing system no longer would generate
19 reminders or notices of maintenance fees
20 due on the '160 Patent?
21    A.   I've given you a lot of testimony
22 earlier today with respect to that issue
23 and I think you've mischaracterized my
24 prior testimony.
25    Q.   Okay.  I think your prior

45 (Pages 174 to 177)

Page 174

```
 1         P. Sutton
 2  testimony was -- it is what it is, we'll
 3  leave it at that.
 4         MR. LODEN: I'd like to get the
 5  reporter to mark Exhibit 7.
 6         (Exhibit 7, Document Bates
 7  stamped 380 to 384, marked for
 8  identification, as of this date.)
 9         THE WITNESS: Are you good for a
10  3-minute bathroom break?
11         MR. LODEN: That's fine.
12         (Recess taken from 2:24 p.m. to
13  2:31 p.m.)
14         (Exhibit 8, DIAMS Patent Record
15  Sheet, marked for identification, as
16  of this date.)
17  BY MR. LODEN:
18     Q.   Mr. Sutton, I've just handed you
19  what's been marked as Exhibit 8.
20         Do you recognize this document?
21  Take a moment to familiarize yourself.
22     A.   This appears to be a DIAMS patent
23  record sheet.
24     Q.   So then Exhibit 8 is the DIAMS
25  corollary to Exhibit 3, which is the PATS
```

Page 175

```
 1         P. Sutton
 2  record sheet?
 3     A.   I'm not comfortable with the
 4  language that you use.  It is a DIAMS
 5  patent record sheet relating to the '160
 6  Patent.
 7     Q.   Okay.
 8         Up on the top left-hand corner,
 9  here it's called docket ID, but it looks
10  like the same numbers as on PATS were
11  labeled as a GT number.
12     A.   That appears to be the client
13  matter number.
14     Q.   So that's a client matter number
15  in which this record was taken?
16     A.   That appears to be a client
17  matter number for a U.S. matter, namely the
18  '160 Patent.
19     Q.   Right.
20         Looking at the attorneys there on
21  the right-hand column, do you see where it
22  references Albert L. Jacobs and Matthew B.
23  Tropper?
24     A.   Yes.
25     Q.   Who is Albert L. Jacobs?
```

Page 176

```
 1         P. Sutton
 2     A.   Mr. Jacobs is a patent attorney
 3  who left our firm, I forget whether it was
 4  a year ago or two years ago, and then went
 5  to another firm, and Matthew Tropper is a
 6  patent attorney who works part-time in
 7  patent prosecution matters for our firm.
 8     Q.   Why isn't Todd Sharinn listed as
 9  an attorney here?
10     A.   These are patent prosecution
11  attorneys.  I believe that Todd Sharinn's
12  expertise is in the patent litigation area,
13  not in the patent prosecution area.  He
14  would be best -- I hope I'm not
15  misspeaking, but I believe he would
16  characterize his specialty as litigation as
17  opposed to patent prosecution.
18     Q.   Well, if you look back at Exhibit
19  3, I believe you said earlier that under
20  the attorneys, it uses initials, but the
21  initials TSS appear in that PATS record
22  sheet, and you said earlier that that was
23  Todd Sharinn, correct?
24     A.   Yes.
25     Q.   So why did Todd Sharinn appear on
```

Page 177

```
 1         P. Sutton
 2  the PATS record, but not on the DIAMS
 3  record?
 4     A.   You'll notice that my initials
 5  appear first, and one reason for his
 6  appearing there together with Augusto
 7  D'Emilio Rogers initials is that he would
 8  be given copies of reports as a result of
 9  his initials being there, so he could see
10  what was going on with his own client even
11  though his expertise may not be patent
12  prosecution.
13     Q.   But your name, Paul Sutton, also
14  does not appear under the list of attorneys
15  on the DIAMS record sheet in Exhibit 8,
16  correct?
17     A.   Well, if you'll take a look at
18  the memo note, when Todd Sharinn left the
19  firm, at some point Al Jacobs, the
20  Mr. Jacobs we've just referred to earlier
21  in the upper right hand, on April 18, 2006,
22  took over responsibility for clients that
23  Todd Sharinn serviced while he was with our
24  firm, and when I say that we need an
25  attorney associated with each record and Al
```

46 (Pages 178 to 181)

Page 178

1           P. Sutton
2 Jacobs requested that he be the person on
3 the matters that involve Todd Sharinn's
4 clients such as Quickie and that's the
5 reason for the memo.
6    **Q.    Well --**
7    A.    There would be no reason for both
8 myself and Al Jacobs to be on there.
9    **Q.    Well, Quickie was your client as**
10 **well as Todd's, right?**
11    A.    I always thought of Quickie as
12 Todd Sharinn's client. He originated that
13 client. It was his relationship with Allan
14 Fell that the client was referred to him.
15        I was brought in as somebody who
16 had more years of experience litigating
17 than Todd and Todd felt that we would stand
18 a better chance of obtaining that Medtronic
19 litigation if I was participating.
20    **Q.    So you say that Al Jacobs then**
21 **was substituted in for Todd Sharinn on**
22 **April 18, '06?**
23    A.    No, that's not what I said. Todd
24 Sharinn -- I don't know if Todd Sharinn
25 was -- when did Todd Sharinn leave our

Page 179

1           P. Sutton
2 firm?
3    **Q.    That's a good question.**
4        MR. CHU: It's in the
5 interrogatories. You can check that.
6        If you can look at 9.
7    A.    Yes. If you look to the response
8 to interrogatory number 9 it indicates that
9 Todd Sharinn left our firm on or about
10 September 26, 2005.
11        So it's not that Al Jacobs took
12 over for Todd Sharinn. Todd was no longer
13 with our firm. Al Jacobs simply requested
14 that if there were queries relating to this
15 matter, that he be the person who was
16 primarily the go to person or responsible.
17    **Q.    When Greenberg transferred from**
18 **the PATS system to the DIAMS system, Todd**
19 **Sharinn was still employed at Greenberg,**
20 **correct, in 2003?**
21    A.    That's correct.
22    **Q.    So when the patent record sheet**
23 **in DIAMS was created for the '160 Patent,**
24 **who were the attorneys listed?**
25    A.    You'll have to show me, you'll

Page 180

1           P. Sutton
2 have to show me a copy so I can give you
3 that information from the record. But this
4 is a -- let's see now --
5    **Q.    Well, I'll tell you, I've looked**
6 **for that sheet and it wasn't included in**
7 **Greenberg's production.**
8    A.    Well, then, it may not exist. If
9 it existed, I'm sure you would have a copy.
10 But if -- you see, this memo is an entry
11 that occurred on or after April 18, 2006
12 and Todd Sharinn is no longer with the
13 firm. So that's the reason why Todd
14 Sharinn would no longer be on this record.
15    **Q.    So is it fair to assume then that**
16 **sometime after April 18, 2006 Todd Sharinn**
17 **was removed from the record and Albert L.**
18 **Jacobs was inserted?**
19    A.    I'm not making any assumptions.
20 I'm here to give you truthful testimony.
21 So what's clear is that Todd Sharinn had
22 left our firm on or about September 26,
23 2005 and thereafter on April 18, 2006 per a
24 telephone conference with Al Jacobs, the
25 paralegal indicates that Al Jacobs will

Page 181

1           P. Sutton
2 have his name as the responsible attorney
3 for that matter in our computerized
4 docketing system.
5    **Q.    So you're not willing to assume**
6 **with me then that Todd Sharinn was**
7 **originally reflected in the DIAMS system as**
8 **an attorney for the '160 Patent?**
9    A.    I don't know your question at
10 all. I've already given testimony with
11 respect to Exhibit 3.
12    **Q.    Exhibit 3 is PATS, correct?**
13    A.    Yes, yes.
14    **Q.    I'm talking about DIAMS. When**
15 **the DIAMS system was put into place, how do**
16 **we know that Todd Sharinn was listed as the**
17 **attorney responsible for the '160 Patent in**
18 **the DIAMS system?**
19    A.    Why assume that he was or wasn't?
20 If you show me a document, I'll be able to
21 confirm what the fact is.
22    **Q.    Well, like I said, we've asked**
23 **for the document, but it wasn't produced.**
24 **So as you sit here today --**
25    A.    No, no, no, that's not correct.

47 (Pages 182 to 185)

**Page 182**

```
 1          P. Sutton
 2      When you say a document was not
 3  produced, that suggests that a document
 4  exists that you did not get a copy of.
 5      Q.  That's your spin.  I'm just
 6  saying no documents --
 7      A.   No, your spin is that -- I'm
 8  correcting your spin.  Your spin is that
 9  there's something that exists that wasn't
10  produced.
11      Q.  I'm not making a spin.  That's
12  your interpretation.  I don't know whether
13  it exists or not.  All I know is it wasn't
14  included in the production.
15      So my question to you is:  Do you
16  know whether Todd Sharinn was transferred
17  from the attorney listings in the PATS
18  system to the attorney listing in the DIAMS
19  system?
20      A.   I think it is likely and probable
21  that that is the case because otherwise why
22  would Al Jacobs need to transfer the Todd
23  Sharinn responsibility for that matter to
24  himself but for the existence of Todd
25  Sharinn on the initial DIAMS system for the
```

**Page 183**

```
 1          P. Sutton
 2  '160 Patent.
 3      So this suggests that Todd was an
 4  attorney listed on the DIAMS system when
 5  there was a conversion from PATS.
 6      Q.  Other than that suggestion, based
 7  upon your reading of Exhibit 8, do you have
 8  any other evidence to show that Todd
 9  Sharinn was carried over to the DIAMS
10  system?
11      A.   I have no evidence to suggest
12  other than what I have said.
13      Q.  Same question with respect to
14  yourself, you were listed as an attorney in
15  the patent -- excuse me, in the PATS
16  system, but your name does not appear on
17  the DIAMS record sheet.
18      Do you know whether your name
19  ever appeared on the DIAMS record sheet?
20      A.   I have, as I'm sitting here
21  today, I have not seen a DIAMS sheet with
22  my name on it relating to the '160 Patent.
23      Q.  You said several times that Al
24  Jacobs requested to have his name placed
25  into this record.
```

**Page 184**

```
 1          P. Sutton
 2      A.   Yes.
 3      Q.  Who did he make that request to?
 4      A.   A paralegal who made the notation
 5  or a paralegal, a patent prosecution
 6  paralegal.
 7      Q.  Were you present when Mr. Jacobs
 8  made that request?
 9      A.   No, I don't recall being present
10  when, during the phone conference
11  referenced on Exhibit 8.
12      Q.  So then how do you know that
13  Mr. Jacobs requested to be added to this
14  record?
15      A.   That's how I interpret the
16  sentence that I'm reading on Exhibit 8.
17      Q.  So Mr. Jacobs has not told you
18  that he wanted to be added?
19      A.   It appears on Exhibit 8 that
20  Mr. Jacobs told a patent prosecution
21  paralegal that he wanted to be, his name
22  should be there as having taken
23  responsibility.
24      Q.  Were you party to the decision to
25  list Al Jacobs as the person to take
```

**Page 185**

```
 1          P. Sutton
 2  responsibility for Mr. Sharinn's clients?
 3      A.   I don't recall.  I may have been,
 4  but I do not recall.
 5      Q.  How did Matthew Tropper's name
 6  get added to the DIAMS patent record sheet?
 7      A.   Somebody would have indicated to
 8  the paralegal, the patent prosecution
 9  paralegal that Mr. Tropper was to be added
10  as a working attorney on whatever matters
11  his name was on.
12      Q.  But you don't know who gave that
13  indication?
14      A.   I don't recall being present when
15  that indication was made.
16      Q.  If you'll turn to the second page
17  of Exhibit 8 bearing Bates number
18  GT-0001018, if you look there, there's a
19  reference to date amended 25 October 2006.
20      Do you see that?  It's about
21  halfway down on the left-hand side, below
22  the box.
23      A.   Yes.
24      Q.  Do you see that?
25      A.   Yes.
```

48 (Pages 186 to 189)

Page 186

1          P. Sutton
2     Q.   How was this record amended on
3  October 25, 2006?
4     A.   I see reference to Phyllis Cordes
5  on the same line and I have to go through,
6  I'd have to go through the record to see if
7  this updating had to do with Mr. Jacobs
8  being added as being responsible for this
9  client.
10    Q.   What record would you have to go
11 through?
12    A.   Any papers that would shed light
13 on amendments.
14    Q.   What papers would that be?
15    A.   I have, I don't know because I
16 haven't looked for them.  I was not faced
17 with this question before just now.
18    Q.   Well, I mean, like e-mails or
19 memos, those types of papers?
20    A.   I don't know.  That's, my point
21 is I'm not aware of the circumstances under
22 which this updating occurred on October 25,
23 2006.  I have no personal knowledge as to
24 what occurred on that date.  I do know that
25 the date of amendment is after the memo

Page 187

1          P. Sutton
2  entry about Mr. Jacobs.
3     Q.   On the created by section there
4  to the right, it says PC -- do you see
5  where I'm at on the second page?
6     A.   Yes.
7     Q.   And then updated by it's CORDESP.
8          Is that both a reference to
9  Phyllis Cordes?
10    A.   I would assume so.  I can't think
11 of anybody else's initials that are the
12 same.
13    Q.   Now, going to Exhibit 7, which I
14 marked earlier, Exhibit 7 for the record is
15 a multipage document produced by Greenberg
16 Traurig bearing the Bates numbers 380
17 through 384.
18          Mr. Sutton, have you seen Exhibit
19 7 before today?
20    A.   I believe I have.
21    Q.   When did you last look at Exhibit
22 7?
23    A.   I believe yesterday.
24    Q.   In prepping for today?
25    A.   Yes, but I may have seen it prior

Page 188

1          P. Sutton
2  to then as well because the original notice
3  was months ago.
4     Q.   Sure.
5          On the first page with Exhibit 7
6  there is, on the front line there is a
7  reference to Linda Garamone?
8     A.   Where are you?
9     Q.   On the first page.
10    A.   Oh, I'm sorry, yes, Linda
11 Garamone.
12    Q.   Who is that?
13    A.   Linda Garamone is a patent
14 prosecution paralegal at Greenberg Traurig.
15    Q.   Is she still at Greenberg
16 Traurig?
17    A.   She is.
18    Q.   And what is her responsibility
19 with -- or strike that.
20          What was Ms. Garamone's
21 responsibility with respect to the '160
22 Patent?
23    A.   I do not know the extent of her
24 involvement, if any, with the '160 Patent.
25          Linda Garamone is a seasoned

Page 189

1          P. Sutton
2  patent prosecution paralegal who also
3  serves as an assistant to patent attorneys
4  in our department in New York.
5     Q.   Okay.
6          Right underneath her name, you'll
7  see the file number and then it looks like
8  again the client matter number 518220107?
9  I'm still on the first page.
10    A.   Yes, I see that.
11    Q.   Do you see that?
12    A.   Yes, I do.
13    Q.   And then if you turn to the
14 second page, that document is 381, the
15 bottom right-hand corner, which looks like
16 the fax confirmation sheet --
17    A.   Yes.
18    Q.   In the middle of the page, do you
19 see where there's a header that was added
20 by the fax machine it looks like Greenberg
21 Traurig and then those numbers appear again
22 51822 pound 010700.
23          Do you see that?
24    A.   Yes.
25    Q.   What is the significance of those

49 (Pages 190 to 193)

Page 190

1          P. Sutton
2  numbers being entered prior to the phone
3  number to which the fax was being sent?
4      A.    You'll note that those are the
5  client and matter numbers that we've been
6  talking about for the '160 Patent.
7      Q.    So is that an entry then that
8  allows this particular fax to be billed to
9  that client matter number?
10     A.    I'm not certain about billing and
11 fax reference numbers. That's something
12 that I'd need information from someone else
13 on. That appears to be information that
14 would be entered in the telephone, fax
15 telephone system for billing purposes.
16     Q.    Okay.
17         Going to the next page, page
18 number 383 -- oh, excuse me, 382.
19     A.    Yes.
20     Q.    What is this document?
21     A.    It's entitled, Change of
22 Correspondence Address.
23     Q.    And then if you look at 383, the
24 next page, it's entitled Fee Address
25 Indication Form.

Page 191

1          P. Sutton
2      Q.    Do you see that?
3      A.    Yes.
4      Q.    In your experience in working
5  with the PTO, what is the difference
6  between a change of correspondence address
7  form and a fee address indication form?
8      A.    If you look a little below the
9  middle of 382, the page bearing Bates 382,
10 there is a statement on the form, this form
11 will not affect any "fee address" provided
12 for the above-identified patent.
13         To change a "fee address" use the
14 fee address indication form PTO SB-47. And
15 the following page 383 is entitled, Fee
16 Address Indication Form.
17     Q.    Okay.
18         So then the change of
19 correspondence address form says where to
20 send all correspondence other than fee
21 address correspondence concerning the
22 reference patent, and then the fee address
23 indication form says where to send fee
24 address correspondence for the reference
25 patent, right?

Page 192

1          P. Sutton
2      A.    I'm not sure I understand your
3  question. The forms say what they say.
4      Q.    Okay.
5      A.    I have no personal knowledge
6  regarding this particular exhibit except to
7  recognize our IP department was originally
8  located at 200 Park Avenue, then moved to
9  885 and then moved back to 200 Park.
10         So we've had a couple of changes
11 of address for use by the Patent and
12 Trademark Office, so that we get this stuff
13 sent directly to us.
14     Q.    Okay.
15         So tell me and I'll see if I can
16 make this quicker, in page number 382 --
17     A.    Yes.
18     Q.    -- this is the form that Todd
19 Sharinn used to inform the Patent and
20 Trademark Office where to send all
21 correspondence other than fee
22 correspondence concerning the '160 Patent?
23     A.    I actually have no personal
24 knowledge as to Exhibit 7 so that when Todd
25 is here tomorrow and testifies, he should

Page 193

1          P. Sutton
2  be able to help you with this. I'm just
3  not -- I don't have any information about
4  Exhibit 7.
5      Q.    You're not going to read the
6  language in Exhibit 7 and make a --
7      A.    Do you want me to confirm that
8  the form says what it says?
9      Q.    No, I'm just wondering if you're
10 willing to read the form and make a
11 conclusion about why Todd was doing what he
12 was doing in this form.
13     A.    Your question goes to the
14 operation of the mind of Todd Sharinn who
15 is going to testify tomorrow.
16         Why would you want me to guess as
17 to what was in his mind when you'll have
18 him here tomorrow.
19     Q.    Well, other than the fact that
20 you're willing to do it earlier, I thought
21 that maybe you might want to do it here.
22         The date on the bottom of page
23 382, do you see that October 22, 2002?
24     A.    I see October 22, 2002 on that
25 page.

50 (Pages 194 to 197)

Page 194

1           P. Sutton
2    **Q.  Okay.**
3        **If you turn to page 383 —**
4    A.  Yes.
5    **Q.  — again on the bottom right-hand**
6    **side, do you see where Todd S. Sharinn is**
7    **printed?**
8    A.  I see the name Todd S. Sharinn on
9    the bottom.
10   **Q.  On the signature line above that**
11   **name, do you recognize that signature?**
12   A.  No.
13   **Q.  The line below, there is a phone**
14   **number there beginning 212-801, do you see**
15   **that?**
16   A.  I see that.
17   **Q.  Do you recognize that phone**
18   **number?**
19   A.  I recognize the 212 and the 801
20   as being a Greenberg Traurig number that
21   corresponds to some Greenberg Traurig
22   employees, but I don't recognize the 2157.
23   **Q.  Okay.**
24       **And then the date underneath**
25   **that, October 22, 2002, do you see that?**

Page 195

1           P. Sutton
2    A.  I see those numbers, yes.
3    **Q.  If you turn to the last page,**
4    **page 384, the top right.**
5    A.  Yes.
6    **Q.  What is this document on page**
7    **304?**
8    A.  This is entitled Certificate of
9    Mailing by First Class Mail.
10   **Q.  And it looks like it's a**
11   **certificate from Linda Garamone certifying**
12   **that she mailed these documents to the PTO?**
13   A.  This appears to be a certificate
14   of mailing by first class mail that carries
15   the name of Linda Garamone in typed
16   lettering with a signature below.
17   **Q.  Do you recognize Ms. Garamone's**
18   **signature?**
19   A.  I don't recognize her signature,
20   no.
21   **Q.  Up on the top right-hand corner**
22   **of this last page, 384, you'll see again**
23   **the client matter number that Greenberg**
24   **established for Quickie.**
25   A.  I see that under the title docket

Page 196

1           P. Sutton
2    number.
3    **Q.  Do you have any idea why if on**
4    **April 11, 2002 Todd Sharinn was sending the**
5    **file wrapper to Mark Evens so that Mark**
6    **Evens could docket the fees, do you have**
7    **any idea why months later in October 2002**
8    **Mr. Sharinn was telling the PTO that he was**
9    **still the person to receive correspondence**
10   **about fees?**
11   A.  I don't believe that the
12   revocation of the Power of Attorney had
13   occurred as yet so that technically
14   Greenberg Traurig was still the attorney of
15   record in that case.
16   **Q.  Same question with respect to**
17   **this conversation that you referenced**
18   **between Mr. Fell and Mr. Sharinn on**
19   **September 5, 2002 where Mr. Fell**
20   **purportedly told Mr. Sharinn that Thelen is**
21   **coming on to take over the case, do you**
22   **have any idea why Mr. Sharinn was filing**
23   **PTO fee address notifications after that**
24   **conversation took place?**
25   A.  If it was, if Greenberg Traurig

Page 197

1           P. Sutton
2    was still attorney of record until its
3    power was revoked we would want the pat at
4    any time and trademark office to have a
5    correct address to send correspondence.  So
6    that would be one reason to file such a
7    notice.
8    **Q.  Well, wasn't the purpose of the**
9    **file wrapper being sent to Thelen so that**
10   **they could start monitoring and docketing**
11   **the deadlines, isn't that what you**
12   **testified to earlier?**
13   A.  I don't understand why what you
14   just said conflicts with what I just said.
15   I don't understand.  Your question suggests
16   some conflict.  I just don't understand.
17       If Greenberg Traurig was still
18   the attorney of record and wished to have a
19   correct address at the Patent and Trademark
20   Office to receive mail from the Patent and
21   Trademark Office until its power was
22   revoked.  The fact that Mark Evens could or
23   should have been entering data in the
24   Thelen docketing system would have nothing
25   to do with the formal notices until the

51 (Pages 198 to 201)

Page 198

1        P. Sutton
2 Power of Attorney was revoked.
3        So I don't understand your
4 question, frankly.
5    **Q.   Okay.**
6        **Maybe it was an unclear question.**
7 **We can move it along.**
8        **But am I correct in understanding**
9 **then that you would agree that at least as**
10 **of October 22, 2002 Todd Sharinn was the**
11 **attorney or agent of record for what**
12 **Greenberg has set up as client matter**
13 **number or matter number 0107, which is the**
14 **'160 Patent?**
15    A.   You'll have to show me the appear
16 I can't say on the '160 Patent so I can see
17 whose name --
18    **Q.   The appearance?**
19    A.   If I understand your question
20 correctly, you're asking me if Todd
21 Sharinn's -- maybe I don't understand your
22 question.
23    **Q.   Okay.**
24        **Well, let's look back at Exhibit**
25 **7.**

Page 199

1        **P. Sutton**
2    A.   Yes.
3    **Q.   Page number 382.**
4    A.   Yes.
5    **Q.   I believe it's the third one into**
6 **the document.**
7    A.   Yes.
8    **Q.   Todd Sharinn's name is printed,**
9 **and then I assume that's Todd Sharinn's**
10 **signature and then a date of October**
11 **22nd --**
12    A.   I don't know that to be his
13 signature.
14    **Q.   I know that, we'll find that out**
15 **tomorrow, but assume for purposes of today**
16 **that that's his signature -- above there**
17 **you see attorney or agent of record has an**
18 **X mark placed, do you see that?**
19    A.   I'm sorry.
20        MR. CHU: He's talking about
21 there.
22    A.   Okay, yes, I see, okay.
23    **Q.   And then if you look on page 383,**
24 **again down at the bottom the signature**
25 **block attorney or agent of record is marked**

Page 200

1        **P. Sutton**
2 **with a registration number 42144?**
3    A.   Yes.
4    **Q.   Do you know that to be Todd**
5 **Sharinn's registration number?**
6    A.   No, I don't.
7    **Q.   So then would you agree or**
8 **disagree with me that as of October 22,**
9 **2002 Todd Sharinn was the attorney or agent**
10 **of record for what Greenberg has**
11 **established as client matter number**
12 **518220107, the '160 Patent?**
13    A.   I'm unable to give you that
14 information because I'm just not, I don't
15 have information in front of me to state
16 under oath that that's the case.
17    **Q.   What other information would you**
18 **want to look at to confirm whether that's**
19 **the case?**
20    A.   I invite you to show me whatever
21 you'd like to.
22    **Q.   I don't have any other**
23 **information. What I've got is what you've**
24 **got.**
25    A.   Okay. Well, you've --

Page 201

1        P. Sutton
2    **Q.   So I'm not holding anything back**
3 **from you.**
4    A.   Okay, so you have Todd Sharinn
5 tomorrow to confirm all of that for you.
6 Again, I'm just not familiar with Exhibit
7 Number 7.
8    **Q.   Do you have any reason to believe**
9 **that he was not the agent of record for**
10 **that client matter?**
11    A.   I don't have enough information
12 to form a belief or opinion or to reach a
13 conclusion at this point.
14    **Q.   As the corporate representative**
15 **for Greenberg Traurig, Mr. Sutton, do you**
16 **have any reason to doubt the authenticity**
17 **of the documents contained in Exhibit 7?**
18    A.   I repeat, I don't have enough
19 information to form a belief or to give you
20 testimony under oath with respect to
21 Exhibit Number 7, but I believe Mr. Sharinn
22 tomorrow will be able to shed light on this
23 because I'm just not familiar with it.
24        MR. SCOTT: Off the record.
25        (Whereupon, an off-the-record

52 (Pages 202 to 205)

Page 202

1          P. Sutton
2    discussion was held.)
3  BY MR. LODEN:
4    Q.   We were talking about Exhibit 7.
5         My question was --
6         MR. CHU:  Let him ask a question.
7    Q.   As the corporate representative
8  for Greenberg Traurig, Mr. Sutton, do you
9  have any reason to doubt the authenticity
10  of the documents contained in Exhibit 7?
11        MR. CHU:  Let me just object.  I
12   don't know if he is in fact the
13   corporate representative, but I have
14   no objection to him answering what you
15   asked.
16   A.   I have no information to the
17  contrary.
18   Q.   So as you sit here today then,
19  you have no information to suggest that
20  Todd Sharinn was not the attorney or agent
21  of record for the '160 Patent, the client
22  matter 518220107 as of October 22, 2002?
23        MR. CHU:  Objection.  That's a
24   different question, but again, I'm not
25   saying he shouldn't answer.  As best

Page 203

1          P. Sutton
2    as he knows.
3  BY MR. LODEN:
4    Q.   I'm just asking if you have any
5  information suggesting that is not the
6  case.
7    A.   I have no information that would
8  contradict what is contained in Exhibit 7.
9    Q.   Did you interview Todd Sharinn
10  what he was hired by Greenberg Traurig?
11   A.   When he was hired, did you say?
12   Q.   Yes.
13   A.   I don't recall.
14   Q.   In response to interrogatory
15  number 9 you stated that Mr. Sharinn was
16  employed on May 14, 2001.  I'm just giving
17  you the date to see if that jogs your
18  memory.
19   A.   What page is that?
20   Q.   Page 5 of Exhibit 6.
21   A.   May 14, 2001?
22   Q.   Right.
23        Does that refresh your
24  recollection as to whether you were
25  involved in interviewing him?

Page 204

1          P. Sutton
2    A.   I just don't recall whether or
3  not I was involved in the interviewing of
4  Todd Sharinn.
5    Q.   Do you recall how Todd Sharinn
6  came to apply at Greenberg Traurig?
7    A.   Are you asking why he applied for
8  the job at Greenberg Traurig?
9    Q.   No.
10        What I'm asking is how did he
11  find out about the job at Greenberg
12  Traurig, did he just submit a resume or
13  does he know someone or --
14   A.   I do not know the circumstances
15  of why Mr. Sharinn or how he approached
16  Greenberg Traurig.
17   Q.   Okay.
18        Other than Quickie or really
19  other than Dr. Colvin, did Mr. Sharinn
20  bring any other clients to Greenberg
21  Traurig when he was hired?
22   A.   You mentioned Dr. Colvin as a
23  client.
24        Could you show me where --
25   Q.   Well, strike that.

Page 205

1          P. Sutton
2         Other than Quickie did Todd
3  Sharinn bring any other clients with him to
4  Greenberg Traurig?
5    A.   I don't recall if or whether he
6  did.
7    Q.   Were you involved in the transfer
8  of files from Todd's old firm Pepe & Hazard
9  to Greenberg Traurig?
10   A.   I was not personally involved in
11  the physical transfer of those files.
12   Q.   Well, did you have any role at
13  all in the transfer of those files?
14   A.   I don't recall the extent of my
15  involvement therein, if any, except that I
16  have testified earlier regarding assisting
17  in the transition of files and information
18  to the GT docketing system.
19   Q.   Files and information -- okay, I
20  understand what you're referring to now,
21  I'm sorry.
22        Have you ever had one of your
23  clients leave the firm in which you were
24  employed and hire other lawyers?
25   A.   Yes.

53 (Pages 206 to 209)

Page 206

P. Sutton

1
2    **Q.    Was that while you were at Thelen**
3    **Reid, Greenberg Traurig or some other firm?**
4    A.    It has occurred at Greenberg
5    Traurig and I don't recall whether or not
6    or if it had occurred at Thelen.
7    **Q.    I'm not going to ask for**
8    **specifics about the client, but what type**
9    **of representation was it, patent**
10   **prosecution, patent infringement litigation**
11   **or some other litigation or what?**
12   A.    Patent prosecution and patent
13   litigation matters have been transferred to
14   one or more other firms.
15   **Q.    And did that transfer occur while**
16   **the patent and litigation was pending, in**
17   **other words, a case was already on file?**
18   A.    Yes, that has occurred.
19   **Q.    And we're not talking about the**
20   **Quickie versus Medtronic litigation, we're**
21   **talking about something else, right, or**
22   **you're talking about something else, right?**
23   A.    I'm not talking about Quickie.
24   **Q.    Okay.**
25   A.    Clients come, clients go,

Page 207

P. Sutton

1
2    especially with downward pressure on fees.
3    **Q.    Understood.**
4        **The instance that you're**
5    **referring to that the patent prosecution**
6    **and patent litigation matters being**
7    **transferred to another firm, were you**
8    **personally involved in that transfer?**
9    A.    I'm not sure I understand what
10   you mean.
11   **Q.    Well, I'm referring to the**
12   **specific example other than Quickie that**
13   **you're saying that while you were at**
14   **Greenberg Traurig a client, patent**
15   **prosecution, patent litigation client chose**
16   **to hire other counsel for pending**
17   **litigation.**
18       **Are you with me there?**
19   A.    Yes.
20   **Q.    Okay.**
21       **So in the choice -- well, let me**
22   **be more basic than that.**
23       **How did find out that the client**
24   **had decided to hire other lawyers in that**
25   **instance?**

Page 208

P. Sutton

1
2    A.    I think your question requires me
3    to go into attorney-client communications
4    between myself and that non-Quickie client,
5    so I'm not sure I'm permitted to do that.
6    **Q.    Well, was it a letter, was it an**
7    **oral conversation? I'm not asking about**
8    **the substance, just how the conversation**
9    **took place.**
10   A.    At least an oral communication.
11   **Q.    And then when the case was**
12   **actually transferred, was there a written**
13   **communication that went with the transfer?**
14   A.    I believe so.
15   **Q.    And who authored that written**
16   **correspondence?**
17   A.    I don't know as I'm sitting here
18   today. It was likely a paralegal writing
19   to a counterpart or an attorney at the firm
20   taking over responsibility.
21   **Q.    Was that a matter for which**
22   **Greenberg was docketing and monitoring**
23   **maintenance fee deadlines on the patent at**
24   **issue?**
25   A.    I don't recall, but I don't

Page 209

P. Sutton

1
2    believe so. I believe that what I recall
3    are a patent application which had not
4    issued to generate maintenance fee
5    deadlines.
6    **Q.    Have you ever had a client leave**
7    **for whom you were monitoring deadlines?**
8    A.    I don't recall any.
9    **Q.    Would you agree with me that when**
10   **a client is transferred to another firm**
11   **that it's preferable to rely on, actually**
12   **have written communications for the**
13   **transfer as opposed to just verbal**
14   **communications about the transfer?**
15   A.    I think the instance that we're
16   involved in you have verbal or oral
17   communications from Alan Fell to Todd
18   Sharinn, you have oral communications
19   between Mark Evans, myself and Mark Evans
20   and Todd Sharinn, you have a substitute and
21   revocation Power of Attorney -- I think all
22   of those are means of communicating a
23   transfer of authority and responsibility to
24   a new firm.
25   **Q.    But looking back when you're**

54 (Pages 210 to 213)

Page 210

1       P. Sutton
2   trying to figure out what was actually
3   transferred and what occurred, I mean,
4   you're a litigator, wouldn't you rather
5   have a written document as opposed to
6   relying on oral conversations?
7       A.   I'm not certain that that would
8   be relevant as a litigator. So I don't
9   know, I haven't considered that question.
10      Q.   Have you ever transferred a
11  client to another law firm without having a
12  written letter confirming the transfer and
13  what's being transferred?
14      A.   I'd have to investigate to see
15  whether that's the case or not.
16      Q.   As you sit here today, nothing
17  comes to mind?
18      A.   I don't want to guess one way or
19  another.
20      Q.   In your practice, have you,
21  yourself, ever written a letter to new
22  lawyers for a former client saying the case
23  is now being transferred to you?
24      A.   What I recall is asking the
25  client to write the letter to the new firm

Page 211

1       P. Sutton
2   or to me giving instructions, because I
3   don't really have the authority to ask a
4   firm with a Power of Attorney to transfer
5   the files to me, it's the client that calls
6   that shot.
7       So really, what I rely upon over
8   the years is the client writing so that the
9   law firm has instructions from the party
10  who really has the authority to give those
11  instructions.
12      Q.   But once you get those
13  instructions, when you comply with those
14  instructions and actually transfer the
15  files, don't you include a cover letter
16  saying pursuant to the instructions here is
17  what's being transferred?
18      A.   I recall having done that in the
19  past.
20      Q.   And what sorts of -- would you --
21  well, strike that.
22      Would you agree with me in that
23  communication that it's important to
24  identify the matters that are being
25  transferred to the new lawyer so there's no

Page 212

1       P. Sutton
2   confusion later down the road?
3       A.   In circumstances such as the one
4   that's in litigation that I'm giving
5   testimony in, months and months prior to
6   transfer of files or revocation of the
7   Power of Attorney, the new law firm was
8   given all information that it needed or
9   could possibly want in connection with
10  assuming responsibility so that whether or
11  not it did anything with that information
12  is another matter, but in effect in the
13  present circumstances Mark Evens began the
14  assumption of responsibility even prior to
15  Allan Fell telling Todd Sharinn that our
16  firm was being replaced and our power was
17  going to be revoked because Mark Evens was
18  actually sitting at the table in the
19  Markman Hearing and he wasn't an attorney
20  of record.
21      So that process began at least as
22  early as April 11, 2002 where Mark Evens
23  was monitoring and had information and had
24  the ability to enter any and all deadlines
25  in the system at Thelen.

Page 213

1       P. Sutton
2       MR. LODEN: Objection.
3   Nonresponsive. Move to strike.
4   BY MR. LODEN:
5       Q.   My question was much more simple
6   than that.
7       My question was: Would you agree
8   with me that in the communication
9   transferring the files to the new lawyer
10  that it's important to identify the matters
11  that are being transferred so there is no
12  confusion down the road?
13      A.   I'm unable to answer that
14  question right now.
15      Q.   Why?
16      A.   I don't know the answer to the
17  question and I have to think about that
18  question.
19      Q.   When will you know the answer to
20  that question?
21      A.   I'm not certain. I have to think
22  about that because it's a loaded question
23  that you ask with a smile, so that it's
24  clear I want to think about that question
25  before I give you any kind of a response.

55 (Pages 214 to 217)

Page 214

1          P. Sutton
2   I just don't have a response for you right
3   now.
4       Q.    See, that's the problem, you've
5   been designated as a witness today to
6   answer our questions, I've asked what is a
7   very clear question that you've clearly
8   understood because you've interpreted my
9   meaning in asking it and you've said that
10  now you're not prepared to answer it now
11  because it's a loaded question and you want
12  to think about it --
13      A.    Right.
14      Q.    -- there is a question pending on
15  the table, we can, I'll just stop talking
16  and you let me know when you're done
17  thinking about it and then I'll get your
18  answer.
19      A.    You have no other questions
20  besides this one?
21      Q.    I'm willing to -- based upon your
22  testimony that you're going to need the
23  time that you need to think about the
24  answer, we'll take the time that you need
25  to answer it and then we'll go on to the

Page 215

1          P. Sutton
2   rest of my questions.
3          MR. SCOTT:  Well, again, let's
4       just go off the record rather than
5       having colloquy.
6          MR. LODEN:  Well, I don't want to
7       go off the record because then Justin
8       and the witness are going to talk
9       about --
10         MR. SCOTT:  I think you got your
11      record.  Let's just go off for a
12      second.
13         (Whereupon, an off-the-record
14      discussion was held.)
15         (Whereupon, the requested portion
16      was read back by the court reporter.)
17      A.    There are instances where that is
18  desirable.
19      Q.    And would you agree with me that
20  there are also instances where it's
21  desirable to identify the actual files that
22  are being transferred to the new lawyer?
23      A.    There are instances where that is
24  desirable.  There are instances where it is
25  unnecessary.  I should add the unnecessary

Page 216

1          P. Sutton
2   to my prior answer as well.
3       Q.    What about pending deadlines in
4   the matter that's being transferred, should
5   those be mentioned?
6          MR. CHU:  Well, you're asking,
7       you know --
8          MR. LODEN:  I'm sorry, was that
9       an objection?
10      A.    There are instances where pending
11  deadlines, especially if they are imminent
12  where it is desirable, not under the
13  present circumstances with the Quickie
14  matter however.
15      Q.    And who determined that it was
16  not desirable under present circumstances
17  with the Quickie matter that it was not
18  desirable to reference pending deadlines,
19  who made that determination?
20      A.    I think you assume a fact not in
21  evidence.  So I --
22      Q.    What assumption is that?
23      A.    That there was a determination.
24  I think the determination was made by the
25  client in revoking well prior to the

Page 217

1          P. Sutton
2   deadline the Power of Attorney so that the
3   client made that decision and Mark Evens
4   made the decision or Thelen made the
5   decision not to pay timely that maintenance
6   fee.
7       Q.    Did Quickie say Mr. Sutton, I
8   want you to transfer the files and I don't
9   want you to tell them what the deadlines
10  are for maintenance fees?
11      A.    It's clear from the revocation
12  that the client wanted us not to be
13  involved in any way any further, and the
14  revocation was not partial, it was
15  complete, and the client had the benefit of
16  counsel other than Greenberg Traurig who
17  had the knowledge and the ability and the
18  wherewithal to pay the maintenance fee and
19  to docket it, namely Alan Fell, Steve
20  Colvin himself who was a very sharp
21  individual, Mark Evens and people at Thelen
22  and then there's the issue of Maier & Maier
23  could in my view have reinstated that
24  patent so that it was not lapsed.
25         MR. LODEN:  Objection.

56 (Pages 218 to 221)

Page 218

1          P. Sutton
2    Nonresponsive. Move to strike.
3  BY MR. LODEN:
4    **Q.   My question was very simple**
5  **again.  I'll reread it to you.**
6        **Did Quickie say Mr. Sutton, I**
7  **want you to transfer the files and I don't**
8  **want you to tell them what the deadlines**
9  **are for maintenance fees?  Did Quickie ever**
10 **say that to you?**
11   A.   I don't recall anyone at Quickie
12 telling me, using those words in any
13 conversation with me.
14   **Q.   Have you ever heard that those**
15 **words were used in a conversation with Todd**
16 **Sharinn?**
17   A.   I have no personal information
18 one way or another, but I do, it is clear
19 that well prior to the maintenance fee
20 deadline, the initial deadline which
21 payment could be made thereafter that
22 Thelen for many months had the information,
23 could have and should have had the
24 information in its docketing system and
25 could have and should have paid that

Page 219

1          P. Sutton
2  maintenance fee.
3        MR. LODEN:  Object to the
4    nonresponsive part of that answer.
5    Move to strike.
6        I'll ask the reporter to mark
7    Exhibit 9.
8        (Exhibit 9, Client Matter Intake
9    Memorandum, marked for identification,
10   as of this date.)
11 BY MR. LODEN:
12   **Q.   Before we get to Exhibit 9, one**
13 **question from the previous topic.  I'll try**
14 **to make it as simple as possible so we**
15 **don't dwell on it a lot, but did you,**
16 **Mr. Sutton, ever tell anyone at Thelen that**
17 **Thelen is now responsible for monitoring**
18 **maintenance fees on the '160 Patent?**
19   A.   The client did and the Patent and
20 Trademark Office did.  There was no reason
21 for me to repeat that.  In addition, they
22 already had that information in hand.
23   **Q.   So the answer is no, you,**
24 **yourself, never told anyone at Thelen that?**
25   A.   My answer stands as being fully

Page 220

1          P. Sutton
2  responsive.
3    **Q.   Okay.**
4        **Well, let's break it down then.**
5        **You said the client told Thelen**
6  **that.  Were you present for that**
7  **conversation?**
8    A.   There was a Power of Attorney
9  that was done in written form with a Power
10 of Attorney.
11   **Q.   So when you say that the client**
12 **told Thelen that they were responsible,**
13 **that answer was based on your reading of**
14 **the written Power of Attorney?**
15   A.   And the fact that Thelen would
16 have gotten a copy of that.  The client
17 would not have sent the revocation of the
18 Power of Attorney without first having
19 consulted Thelen.
20   **Q.   But other than your reading of**
21 **the Power of Attorney, you have no other**
22 **facts within your personal knowledge**
23 **indicating that Quickie asked Thelen to**
24 **monitor deadlines for the maintenance fees?**
25   A.   I'm taking all of the facts and

Page 221

1          P. Sutton
2  circumstances of all the documents and the
3  matters I've reviewed to reach that
4  conclusion.
5    **Q.   But those facts and circumstances**
6  **do not include a conversation in which you**
7  **were personally involved, an oral**
8  **conversation in which you were personally**
9  **involved, correct?**
10   A.   I do not recall any instance
11 where I was present where there was a
12 communication between Quickie and Mark
13 Evens involving their responsibilities.
14   **Q.   Exhibit 9, do you recognize the**
15 **3-page document in Exhibit 9, Mr. Sutton?**
16   A.   I recognize the type of document
17 that it is.
18   **Q.   What type of document is this?**
19   A.   This is a Greenberg Traurig
20 client matter intake memorandum.
21   **Q.   Is this a standard form that**
22 **Greenberg Traurig uses in its legal**
23 **practice?**
24   A.   This is a form that has been used
25 by Greenberg Traurig, Exhibit 9 has been

57 (Pages 222 to 225)

Page 222

1           P. Sutton
2   the form has been used by Greenberg Traurig
3   on, in connection with the intake of
4   matters.
5       Q.   So that's a yes.
6           This is the initial client matter
7   intake form for Quickie, LLC, correct?
8       A.   I don't know that it's the
9   initial intake form or not, but it is an
10  intake client matter intake memorandum
11  involving Quickie, LLC with a date of July
12  30, 2001 appearing on it.
13      Q.   And up at the top it's the new
14  client box is checked.
15          Do you see that?
16      A.   I see an X in that box.
17      Q.   So that means that prior to July
18  30, 2001 Quickie was not a client of
19  Greenberg?
20      A.   I don't know that to be the case
21  or not. I have no personal information one
22  way or another.
23      Q.   And then you see under Roman
24  Numeral II, matter information there is a
25  handwritten notation 51822.01?

Page 223

1           P. Sutton
2       A.   I see that.
3       Q.   Do you see that?
4       A.   I see that number handwritten.
5       Q.   What is that number? Is that a
6   client matter number?
7       A.   That appears to be a Greenberg
8   Traurig client number to the left of the
9   decimal point and to the right it appears
10  to be the beginning of a matter number.
11      Q.   Just the beginning? Do you think
12  it's incomplete?
13      A.   It appears to be the first two of
14  six digits, so that the matter number would
15  be 010000, but that's how I interpret this.
16      Q.   Looking down under Roman Numeral
17  III, billing information, the billing
18  attorney is listed as Harlin -- Harley
19  Lewan, do you see that?
20      A.   Yes.
21      Q.   Who is Harley Lewan?
22      A.   Harley Lewan is a shareholder of
23  Greenberg Traurig.
24      Q.   Still present at Greenberg?
25      A.   He is.

Page 224

1           P. Sutton
2       Q.   Was he listed as the billing
3   attorney because he's a shareholder?
4       A.   That's possible. I believe at
5   that time Todd Sharinn was associate and
6   not a shareholder -- and not -- an
7   associate -- sorry, that Todd Sharinn was
8   an associate and neither of counsel or a
9   shareholder.
10      Q.   Turning to the second page, page
11  number 699 on it, under Roman Numeral IV,
12  fee arrangement, question number 19 says is
13  a representation agreement letter in place.
14          Do you see that?
15      A.   I see a box next to the word no
16  with an X in it.
17      Q.   Are you aware of any
18  representation agreement letter in place
19  with respect to client matter number
20  51822.0100?
21      A.   I have no personal information
22  one way or another.
23      Q.   You just don't know if one exists
24  or not?
25      A.   I have no information one way or

Page 225

1           P. Sutton
2   another, no personal information.
3       Q.   Under Roman Numeral V, conflicts,
4   a reference is a conflict search being run
5   on August 1, 2001.
6           Do you see that?
7       A.   I see that. I see the date
8   August 1, 2001.
9       Q.   And then if you look on line 21,
10  it says, "Describe any potential business
11  conflicts and status of waiver."
12          Do you see that?
13      A.   I do.
14      Q.   Does Greenberg have, for lack of
15  a better term, a two-part conflicts for new
16  clients where it checks the ethical legal
17  conflicts as well as potential business
18  conflicts for new matters?
19      A.   Greenberg Traurig considers on
20  intake of new matters whether there are
21  ethical conflicts and it also considers
22  whether or not there are any potential
23  business conflicts.
24      Q.   In other words, Greenberg might
25  not want to take on a client if that client

58 (Pages 226 to 229)

Page 226

1          P. Sutton
2 would present a conflict with a position
3 that another client is taking in another
4 case or --
5     A.   Greenberg Traurig on intake of a
6 new matter may decline representation in
7 that new matter because of an actual or a
8 potential business conflict.
9     Q.   Underline 23, billing attorney
10 signature, do you recognize that signature
11 there?
12    A.   I don't.
13    Q.   Under 24, intake committee member
14 signature, do you see that?
15    A.   I do.
16    Q.   Do you recognize that signature?
17    A.   I don't recognize the signature,
18 but it appears to spell out the name Albert
19 Jacobs.
20    Q.   What is the intake committee at
21 Greenberg Traurig?
22    A.   There are relatively senior
23 shareholders whose approval is required to
24 sign off on client matter intake memoranda.
25    Q.   Why is there approval required?

Page 227

1          P. Sutton
2     A.   To be sure that all of the
3 questions have been answered and that the
4 form is complete and that there is no
5 obvious reason to decline representation in
6 that particular matter for which the intake
7 memorandum is being generated.
8          So, for example, if there was no
9 conflict search run by having a signature
10 of a senior shareholder who can peruse the
11 memorandum and see if there's something
12 that has been omitted or there's something
13 that requires further attention.
14    Q.   Is the absence of a written
15 engagement letter, one of the items that
16 could require additional attention?
17    A.   It depends on the circumstances
18 as to whether or not it is customary in our
19 firm currently to have written engagement
20 letters with new clients coming in.
21          There have been instances in the
22 past in my practice where if you're
23 representing a client for 35 years and you
24 worked with a handshake for 35 years where
25 you may not have a new engagement letter,

Page 228

1          P. Sutton
2 but it is the standard practice at my firm
3 Greenberg Traurig today to have engagement
4 letters of record as new matters and new
5 clients come in.
6     Q.   Was that the standard practice at
7 Greenberg Traurig on July 30, 2001?
8     A.   I don't recall right now, but I
9 believe that there were instances -- I
10 don't recall, I'd rather not guess.
11    Q.   Well, in the instances where
12 there wasn't a written engagement letter,
13 you referenced earlier a handshake --
14    A.   That's in my practice prior to
15 joining Greenberg Traurig.
16    Q.   Okay.
17          Well, are you aware of clients of
18 Greenberg Traurig for which there is no
19 written engagement letter?
20    A.   I can't think of any right now.
21    Q.   How about ever in your tenure at
22 Greenberg Traurig?
23    A.   None come to mind as I'm sitting
24 here today.
25    Q.   But, again, the client intake

Page 229

1          P. Sutton
2 sheet or the memorandum in Exhibit 9
3 references there is no representation
4 letter in place, and you said that you
5 don't have any knowledge of that one way or
6 the other, right?
7     A.   You made a statement.
8     Q.   I'm just saying if I understood
9 your testimony correctly.
10    A.   My testimony was that there is an
11 X in the box next to the word no on line
12 number 19. That's what my testimony was.
13    Q.   If there was a written
14 representation letter in place, would that
15 be contained in Greenberg's files?
16    A.   It is my practice to retain a
17 copy of retainers or engagement letters.
18    Q.   Do you know if Greenberg produced
19 all copies of engagement letters with
20 Quickie in connection with this litigation?
21    A.   I did not personally review each
22 of the documents or copies thereof turned
23 over to you, so I don't know in the
24 litigation that this deposition is
25 occurring in what documents specifically

59 (Pages 230 to 233)

Page 230

1           P. Sutton
2  have been turned over to you.
3     Q.   Do you know if those documents
4  were even searched for?
5     A.   We have outside counsel, an
6  office of the firm's counsel who handle
7  matters of that kind in this litigation.
8  That's not something I was personally
9  charged with.
10    Q.   Okay.
11       Well, I'll represent to you that
12 I did not find in Greenberg's production a
13 written engagement letter for matter number
14 518220100.
15       Do you have any information
16 suggesting that there would be an
17 engagement letter or should be an
18 engagement letter for that matter number?
19    A.   I think my prior answer is
20 responsive to your inquiry. That's not
21 something I was charged with responsibility
22 for in the present litigation.
23       MR. LODEN:  I'll ask the reporter
24    to mark Exhibit 10.
25       (Exhibit 10, Client Matter Intake

Page 231

1           P. Sutton
2    Memorandum dated 9/9/01, marked for
3    identification, as of this date.)
4  BY MR. LODEN:
5     Q.   Mr. Sutton, you've just been
6  handed Exhibit 10, which is another 3-page
7  document which appears to be a Greenberg
8  Traurig client matter intake memorandum
9  with the date September 9, 2001 on there.
10       Do you see that?
11    A.   I see the date September 9, 2001
12 near the top on the right-hand side.
13    Q.   Do you see that this is a
14 Greenberg Traurig client matter intake
15 memorandum?
16    A.   I see that this document is just
17 that.
18    Q.   And this document is for an
19 existing client, new matter only -- do you
20 see that that box is check?
21    A.   I see the X in the box next to
22 those words.
23    Q.   And then the matter number
24 assigned is 51822.0101, do you see that?
25    A.   I see those digits on the line

Page 232

1           P. Sutton
2  containing Roman Numeral II.
3     Q.   And then the matter name
4  listed -- who, before I ask that, who
5  prepares these sheets?
6     A.   They're normally prepared by an
7  attorney associated with bringing the new
8  matter in.
9     Q.   For example, here up at the top
10 this one says authored by Todd S. Sharinn
11 and Paula J. S-P-E-C-H-T.
12       Do you see that?
13    A.   I'm sorry, where are you reading?
14    Q.   On the top of page 1 of Exhibit
15 10.
16    A.   Can you just point to -- okay.  I
17 see that. I see authored by the typed in
18 Todd S. Sharinn and Paula J. Specht.
19    Q.   So does that mean that
20 Mr. Sharinn and Ms. Specht authored this
21 document?
22    A.   I do not know, but I have no
23 reason to doubt that Todd Sharinn was
24 associated with authoring this client
25 matter intake memorandum.

Page 233

1           P. Sutton
2     Q.   Looking back at item number 7
3  under Roman Numeral II, the matter
4  description is patent prosecution.
5       Do you see that?
6     A.   I do.
7     Q.   What does that mean?
8     A.   We use the term sometimes patent
9  prosecution to distinguish between the
10 filing and prosecution of patent
11 applications as opposed to interparty
12 matters such as trial litigation.
13    Q.   And then yourself, you are listed
14 as the billing attorney for this matter, do
15 you see that?
16    A.   I see my name on that line.
17    Q.   Were you the billing attorney for
18 this matter?
19    A.   I have no reason to doubt that I
20 was.
21    Q.   Turning to page 2, line 19, this
22 is a representation agreement letter, the
23 box no is checked.
24       Do you see that?
25    A.   I see the X next to the word no.

60 (Pages 234 to 237)

Page 234

1           P. Sutton
2      Q.   Have you ever seen a
3  representation agreement letter for matter
4  number 0101?
5      A.   I don't recall seeing one or not
6  seeing one. I just don't have any personal
7  information at this point.
8      Q.   Under line 24 billing attorney
9  signature, is that your signature?
10     A.   That appears to be my signature,
11 yes.
12     Q.   And then under 26, is that
13 Mr. Jacobs' signature again?
14     A.   I don't know whether it's his
15 signature, but I do see that Albert Jacobs
16 is spelled out.
17     Q.   If you turn to --
18     A.   So I don't know whether he signed
19 it or somebody else signed it on his behalf
20 or what the story is on that on item number
21 26.
22     Q.   Where is Albert Jacobs spelled
23 out? You're just looking at the --
24     A.   I'm looking at A-L-B-E-R-T Jacobs
25 under item number 26.

Page 235

1           P. Sutton
2      Q.   Okay.
3           Turning to page 3.
4      A.   Yes.
5      Q.   Which appears to be another copy
6  of what we just talked about, at least half
7  of page 2, there is another line 19, do you
8  see that, there is a representation
9  agreement letter in place?
10     A.   Yes.
11     Q.   Do you see that?
12     A.   Yes.
13     Q.   And then out in the right-hand
14 side someone handwrote in existing client,
15 no engagement letter.
16          Do you see that?
17     A.   I see that.
18     Q.   Do you recognize that
19 handwriting?
20     A.   I do not.
21     Q.   You have no idea who placed that
22 handwriting on there?
23     A.   I do not recognize that
24 handwriting.
25     Q.   Do you have any idea who placed

Page 236

1           P. Sutton
2  that handwriting on there?
3      A.   If I don't recognize the
4  handwriting, how would I possibly know who
5  wrote it?
6      Q.   Someone could have told you I
7  wrote it on there, but you wouldn't
8  recognize that person's handwriting.
9           So I'm asking do you know who
10 wrote that on there?
11     A.   I do not.
12          MR. LODEN: I'd ask the reporter
13     to mark Exhibit 11.
14          (Exhibit 11, Client Matter Intake
15     Memorandum dated 9/9/01, marked for
16     identification, as of this date.)
17 BY MR. LODEN:
18     Q.   The reporter has just handed you
19 what's been marked as Exhibit 11, which
20 appears to be another Greenberg Traurig
21 client matter intake memorandum, a
22 three-page document.
23          What is the date on this
24 document?
25     A.   I see a date on the line of Roman

Page 237

1           P. Sutton
2  Numeral I, September 9, 2001.
3      Q.   And on the new client existing
4  client options, which box is checked?
5      A.   There is an X in a box next to
6  existing client new matter only.
7      Q.   And what was the new matter,
8  client matter number established for this
9  intake sheet?
10     A.   On the line carrying Roman
11 Numeral II, there is a writing of the
12 digits 51822.0102.
13     Q.   And then right below that it
14 references a concentric passive knotless
15 suture terminator and then the matter
16 description is patent prosecution.
17          Is the question is, is this a new
18 matter for a prosecution of a separate
19 patent?
20     A.   The matter name, line 6 of
21 Exhibit 11, is not identical with the
22 matter name on line 6 of Exhibit 10.
23     Q.   Right.
24          So what does that mean to you?
25     A.   It's possible that this is a

1 (Pages 238 to 241)

Page 238

P. Sutton

1
2 patent or patent application that is
3 distinct from the one on Exhibit 10.
4    Q.   And then you are listed as the
5 billing attorney.
6       Do you see that?
7    A.   I see my name there, yes.
8    Q.   Turning again to page 2, there is
9 a representation letter and agreement
10 letter in place, no is checked.
11       Do you see that?
12    A.   I see the X next to the word no.
13    Q.   Is that your signature on line
14 24?
15    A.   That looks like my signature,
16 yes.
17    Q.   You referenced back to Exhibit 10
18 and said that the matter name for in
19 Exhibit 10 appears to be different than
20 Exhibit 11.
21       What is the purpose of setting up
22 separate matters for different patent
23 prosecution work?
24    A.   So that work on the different
25 matters can be billed separately and both

Page 239

P. Sutton

1
2 we and the client can regenerate separate
3 invoices and the client can keep track of
4 fees and approve each matter separately
5 where that is appropriate or requested by
6 the client.
7       There are instances where a
8 separate matter is not created for more
9 than one patent prosecution matter for the
10 same client.
11    Q.   But at least with respect to 10
12 and 11, it looks like two different matters
13 were set up.
14    A.   There are two different matter
15 numbers on the lines of the Roman Numeral
16 II.
17    Q.   As we'll see there are more
18 matter numbers.
19       MR. LODEN:  If you can mark
20 Exhibit 12, please.
21       (Exhibit 12, Client Matter Intake
22 Memorandum dated 11/1/01, marked for
23 identification, as of this date.)
24 BY MR. LODEN:
25    Q.   I've just handed you what's been

Page 240

P. Sutton

1
2 marked as Exhibit 12, which is another
3 Greenberg Taurig client matter intake
4 memorandum, existing client new matter only
5 is checked.
6       Do you see that?
7    A.   I see the X in the box next to
8 those words.
9    Q.   November 1, 2001 is the date?
10    A.   I see that date on the line of
11 Roman Numeral 1.
12    Q.   And then the matter number in
13 Roman Numeral II is 518220103?
14    A.   With a decimal point before the
15 0103.
16    Q.   The matter name is atrial --
17 excuse me, Arterial Fixation Avoiding
18 Sutures.
19       Do you see that?
20    A.   I see those words on line 6.
21    Q.   Do you recall anything about that
22 matter name?
23    A.   Not as I sit here today.
24    Q.   Matter description is patent
25 application.

Page 241

P. Sutton

1
2       Do you see that?
3    A.   I do.
4    Q.   How does patent application
5 differ from patent prosecution?
6    A.   As those terms are used by patent
7 attorneys, the patent application is an
8 application for letters patent.  Patent
9 prosecution is the handling or the
10 transactions or arguments back and forth
11 between the attorney of record and the U.S.
12 Patent and Trademark Office seeking to get
13 the patent application allowed and a patent
14 granted.
15    Q.   So patent application is the work
16 done to prepare the application and then
17 once the application is filed, patent
18 prosecution refers to the work that's done
19 between filing and either granting or
20 denial of the application, is that fair?
21    A.   A patent application is an
22 application for the patent.  The work to be
23 done may or may not include preparation of
24 that patent application or revisions to an
25 application that has already been prepared.

62 (Pages 242 to 245)

Page 242

1        P. Sutton
2  So the words patent application do not
3  necessarily mean preparation from scratch
4  on a patent application.
5        The words patent prosecution is a
6  category that may or may not include
7  preparation of a patent application or if
8  one has already been prepared the
9  prosecution of transactions with the Patent
10  and Trademark Office in an effort to get
11  that patent application allowed.
12     Q.   Okay.
13        Immediately below that, do you
14  see the words existing client, no
15  engagement letter?
16     A.   I see that.
17     Q.   Have you ever seen an engagement
18  letter for matter number 0103 from the
19  Quickie?
20     A.   I have no present recollection of
21  any, of having seen an engagement letter
22  relating to 51822.0103.
23        (Recess taken from 3:58 p.m. to
24  4:08 p.m.)
25        (Exhibit 13, Greenberg Traurig

Page 243

1        P. Sutton
2  client matter intake memorandum dated
3  11/28/01, marked for identification,
4  as of this date.)
5        (Exhibit 14, Document referencing
6  client matter number 51822.010400,
7  marked for identification, as of this
8  date.)
9        (Exhibit 15, Greenberg Traurig
10  client matter intake memorandum dated
11  1/29/02, marked for identification, as
12  of this date.)
13        (Exhibit 16, Greenberg Traurig
14  client matter intake memorandum,
15  client matter number 51822.0106,
16  marked for identification, as of this
17  date.)
18        (Exhibit 17, Greenberg Traurig
19  client matter intake memorandum dated
20  8/5/02, marked for identification, as
21  of this date.)
22        (Exhibit 18, Document dated
23  11/1/02, marked for identification, as
24  of this date.)
25        (Exhibit 19, Greenberg Traurig

Page 244

1        P. Sutton
2  client intake memorandum, marked for
3  identification, as of this date.)
4        (Exhibit 20, Summary of
5  documents, marked for identification,
6  as of this date.)
7        (Recess taken from 4:11 p.m. to
8  4:20 p.m.)
9  BY MR. LODEN:
10     Q.   During the break I had the
11  reporter mark several more exhibits to
12  hopefully save us some time on the record.
13        I'm handing you what's been
14  marked as Exhibit 13, Mr. Sutton, which is
15  another Greenberg Traurig client matter
16  intake memorandum dated November 28, 2001.
17  The matter name is 51822.0104.
18        Do you see that?
19     A.   I see those numbers.
20     Q.   The matter name is Quickie, LLC
21  versus Medtronics.
22        Is this the client matter setup
23  for the Medtronic litigation?
24     A.   I'm not aware of any other
25  litigation by Quickie against Medtronic.

Page 245

1        P. Sutton
2  So I believe it is.
3     Q.   In fact, in the matter
4  description, it says possible patent
5  infringement litigation and then it
6  references the '160 Patent number there.
7        Do you see that?
8     A.   I see those words.
9     Q.   Under billing attorney, again
10  you're listed. Todd Sharinn is listed as
11  the working attorney. Under originating
12  attorney, there is TOS.
13        Do you see that?
14     A.   Where is that?
15     Q.   Roman Numeral III, number 9.
16     A.   Okay.
17     Q.   What is TOS?
18     A.   Is Todd's middle initial O,
19  because that would be Todd O. Sharinn?
20     Q.   I think his middle initial is S,
21  if you look above, it's Todd S. Sharinn.
22     A.   That may be a typo.
23     Q.   Okay.
24     A.   But I don't think it would be
25  Todd or Sutton.

63 (Pages 246 to 249)

Page 246

1         P. Sutton
2    Q.    Okay, sorry. That one hadn't
3 occurred to me.
4       Okay.
5       To the second page of Exhibit
6 13, line 19, do you see that the no box has
7 an X in it there on representation
8 agreement letter --
9    A.   Yes.
10   Q.    But, in fact, there was an
11 engagement letter for the Medtronic
12 litigation.
13      Do you recall that?
14   A.   If you can show me a document,
15 that will help refresh my recollection.
16   Q.    I'm handing you Exhibit 14.
17   A.   Actually, if you look at the date
18 November 28, 2001 on Exhibit 13, at that
19 time I don't think there was a
20 representation, because the representation
21 agreement is dated February 5, 2002.
22   Q.    Okay.
23   A.   So while there was none then,
24 there was a follow-up Exhibit 14.
25   Q.    And in fact, in Exhibit 14 it

Page 247

1         P. Sutton
2 references client matter number
3 51822.010400 there on the regarding line.
4       Do you see that on the first
5 page?
6    A.   Yes, yes.
7    Q.    And if you turn to the last page,
8 it looks like, is your signature there by
9 Paul J. Sutton?
10   A.   Yes, that appears to be my
11 signature.
12   Q.    And then going back to the first
13 page, your name appears on the letterhead,
14 correct?
15   A.   Correct.
16   Q.    And you state, "Paul and I are
17 pleased that Quickie, LLC has retained
18 Greenberg Traurig in connection with
19 Quickie's claims of infringement of the
20 United States Patent No. 6,066,160 by
21 Medtronic."
22      Do you see that?
23   A.   Yes.
24   Q.    So this was the engagement letter
25 for the Medtronic litigation that we were

Page 248

1         P. Sutton
2 referring to earlier?
3    A.   That's correct.
4    Q.    And if you look at paragraph 9,
5 it's on page 2 of the engagement letter, do
6 you see where it says, "Quickie
7 acknowledges that GT represents it in other
8 matters"?
9    A.   Yes.
10   Q.    So --
11   A.   "But that" -- and it continues.
12   Q.    Right.
13      "But that GT has not represented
14 Quickie in connection with the negotiation
15 or execution of this agreement."
16   A.   Correct.
17   Q.    So then is it fair to say that --
18   A.   Because it had general counsel in
19 the form of Alan Fell.
20   Q.    Right.
21      So this engagement letter in
22 Exhibit 14 relates only to matter number
23 0104, the Medtronic litigation, not to the
24 other matters?
25   A.   It's been a while since I saw

Page 249

1         P. Sutton
2 this. So I do, I can say that this is,
3 this relates to the claims of infringement
4 of the '160 Patent against Medtronic.
5    Q.    Okay.
6       And that's matter number 0 --
7    A.   And also possibly Guidant
8 Corporation, if you'll see at the end of
9 the first paragraph because that was a
10 potential target as well, infringer.
11      As we're talking about this, a
12 couple of things come to mind.
13      While we went back and forth
14 regarding letters to and from clients or to
15 and from new attorneys of record --
16   Q.    Let me just -- there wasn't a
17 question pending, so what are you doing
18 here?
19   A.   Well, this refreshes my
20 recollection on something that has to do
21 with my testimony here today and that
22 concerns the -- you asked me previously
23 about letters accompanying papers or files
24 or whatever going to or from new attorneys
25 or coming from other attorneys to my firm,

64 (Pages 250 to 253)

Page 250

1           P. Sutton
2  and I just wanted to be clear that, because
3  I hesitated about what is good practice or
4  whatever, that I didn't want that to be
5  misconstrued as anything other than our
6  view, my view, my personal view that when
7  Quickie revoked our Power of Attorney that
8  we had no responsibility whatsoever for the
9  '160 Patent thereafter.
10         If that was not clear, it's
11  important that I make that clear on the
12  record. This representation letter,
13  Exhibit 14, just brings this to mind that
14  here Exhibit 14 is we're taking on
15  responsibility of a matter, but earlier you
16  talked about transferring of the matter to
17  Thelen. Once Thelen assumed responsibility
18  by virtue of our revocation of our Power of
19  Attorney, we had no responsibility
20  thereafter.
21     Q.    Are you done with that statement?
22     A.    Yes, yes.
23         MR. LODEN: Objection.
24     A.    What I'm doing is clarifying
25  prior testimony that I gave you.

Page 251

1           P. Sutton
2     Q.    Well, as you've said multiple
3  times here, the testimony is what it is.
4  There wasn't a question pending, so I'll
5  object to nonresponsiveness of your
6  statement.
7     A.    No, I'm further responding to the
8  question that you asked me previously. So
9  there is a question and a response that
10  I've just supplemented.
11     Q.    Okay.
12         The objection stands.
13         MR. SCOTT: Move to strike as
14  nonresponsive.
15         MR. LODEN: Move to strike as
16  nonresponsive.
17  BY MR. LODEN:
18     Q.    Going to Exhibit 15, again
19  Greenberg Traurig client intake or client
20  matter intake memorandum dated January 29,
21  2002 with the client matter number
22  51822.0105.
23         Do you see that?
24     A.    I see those numbers on the line
25  of Roman Numeral II.

Page 252

1           P. Sutton
2     Q.    Under matter name, what is the
3  matter name listed there?
4     A.    I believe that that's a
5  misspelling of Guidant, G-U-I-D-A-N-T,
6  Corporation. I believe that that's a typo.
7     Q.    Let me show you then Exhibit 16.
8         I've just handed you Exhibit 16,
9  which is another Greenberg Traurig client
10  matter intake memorandum with matter
11  number, client matter number 51822.0106,
12  and the matter name is Guidant Corporation.
13     A.    All right. So I don't have a
14  present recollection of the entity that
15  appears on line 6 of Exhibit 15.
16     Q.    Okay.
17     A.    They're both possible patent
18  infringement litigation, 15 and 16.
19     Q.    And then 16, again, is for client
20  matter number 518220106, right?
21     A.    I see those numbers on Roman
22  Numeral line II.
23     Q.    And the matter name given is
24  Guidant Corporation and the description is
25  possible patent infringement litigation?

Page 253

1           P. Sutton
2     A.    Yes, somehow I see what appears
3  to be my signature on line, on item number
4  24.
5     Q.    Right.
6     A.    And that of what appears to be Al
7  Jacobs with regard to Mr. Jacobs that his
8  name appears on matters in our files for
9  administrative purposes in a number of
10  instances, that would include with respect
11  to Exhibit 8.
12     Q.    So his name just appears there
13  for administrative purposes, he has no
14  responsibility other than --
15     A.    I don't believe the appearance of
16  his name on Exhibit 8 has anything to do
17  with responsibility for actions to be
18  taken, but more for administration
19  purposes.
20     Q.    What about Exhibit 16?
21     A.    Exhibit 16, he signed Exhibit 16
22  under the 26, which is intake member
23  committee member signature. So he signed
24  in that capacity on that. He served more
25  than one capacity.

65 (Pages 254 to 257)

Page 254

1            P. Sutton
2    **Q.   Okay.**
3        **I'm going to hand you Exhibit 17.**
4    **Do you have Exhibit 17 in front**
5    **of you?**
6    A.   I do.
7    **Q.   What is Exhibit 17?**
8    A.   It's a Greenberg Traurig client
9    matter intake memorandum, and it carries a
10   date in the upper right of August 5, 2002.
11   **Q.   Is this an intake memorandum for**
12   **a new client or an existing client?**
13   A.   The box next to existing client
14   new matter only is marked with an X, and
15   with regard to Exhibits 10, 11, 12, 13,
16   14 -- I'm sorry, 10, 11, 12, 13, 15, 16 and
17   17, these client matter intake memoranda
18   are completed so that physical files can be
19   set up and the appropriate papers
20   corresponding to each matter can go into
21   the appropriate files.
22   **Q.   And you also said earlier that**
23   **the client matters are set up for billing**
24   **purposes?**
25   A.   That's correct.  So it serves the

Page 255

1            P. Sutton
2    purpose of having a separate client matter
3    number, so there's a separate physical
4    folder for papers having to do with that
5    matter that can go in there, and if there's
6    time entries, if there are time entries
7    that carry that client matter number, those
8    time entries work their way through the
9    accounting system to possible billing.
10   **Q.   And going back to Exhibit 17,**
11   **what is the matter or client matter number**
12   **assigned for this piece of business?**
13   A.   That carries the numbers
14   51822.0107.
15   **Q.   And the matter name?**
16   A.   Next to that on line 6 it says,
17   "Passive knotless suture system patent" and
18   then it references the '160 Patent.
19   **Q.   And do you see where it says**
20   **matter description, patent for medical**
21   **instrument?**
22   A.   I see that.
23   **Q.   What, what work was being**
24   **conducted in this client matter number?**
25   A.   Possibly no work at all, but if

Page 256

1            P. Sutton
2    we have records or documents relating to
3    that '160 Patent, we would want them to be
4    in a file that has its own identifying
5    client matter so that it doesn't get mixed
6    in with other things, but the opening of
7    this client matter, that matter number
8    0.010700 does not suggest that there is
9    work to be done or that time is to be
10   billed.  It's part of the organization of
11   our files in our IP department.
12   **Q.   As you sit here today, do you**
13   **know whether work was done in matter number**
14   **0107?**
15   A.   I'd have to see the timesheets or
16   bills to know that.
17   **Q.   Do you know who requested matter**
18   **number 0107 to be created?**
19   A.   The client requested us to handle
20   that patent to accept files relating to
21   that patent, and I believe that Todd
22   Sharinn would have been the person, the
23   attorney within our firm who initiated the
24   opening of the client matter intake
25   memorandum.

Page 257

1            P. Sutton
2    **Q.   But the date on Exhibit 17 is**
3    **August 5, 2002.**
4    A.   Correct.
5    **Q.   And I believe earlier you**
6    **testified that the client told Mr. Sharinn**
7    **in April 2002 that Thelen was taking over**
8    **responsibility for the '160 Patent?**
9    A.   While that's so, nonetheless
10   there are papers that need to be kept in an
11   organized way and you need a separate
12   number for the appropriate file within
13   which, for example, the 160-related matters
14   are located and must be filed.
15       So we, it's our practice to have
16   a physical file or folder with a distinct
17   matter number for each matter that we're
18   handling so that even though we don't have
19   to do any work, there are papers
20   nonetheless that need to be orderly kept.
21       So the setting up of a separate
22   matter facilitates the orderly keeping of
23   documents.
24   **Q.   I believe previously you said**
25   **that those documents need to be kept, need**

66 (Pages 258 to 261)

Page 258

1        P. Sutton
2  to be kept in an organized way.
3        Why do they need to be kept that
4  way?
5     A.   It's our practice. Under our
6  practice, we keep documents in an orderly
7  way. You can keep them in a disorderly
8  way, but it's our practice to keep them
9  separated, and separated by matter numbers.
10 That does not suggest that work needs to be
11 done or the time needs to be entered or the
12 time needs to be billed.
13    Q.   Do you know if the papers that
14 were kept in an organized way with respect
15 to this client matter number 0107, do you
16 know whether those have been produced in
17 this litigation?
18    A.   I was not charged with
19 responsibility for transmitting copies of
20 documents to you. So I have no personal
21 information on that.
22    Q.   If you look back at Exhibit 3 to
23 your deposition, that's the PATS, patent
24 record sheet.
25    A.   Yes.

Page 259

1        P. Sutton
2     Q.   It reflects this client matter
3  number 51822.0107, does it not?
4     A.   That's part of the client matter
5  number in the PATS system. The matter
6  number is 010700 U.S.
7     Q.   Right.
8     A.   At the top left of Exhibit 3.
9     Q.   Right.
10       And then if you turn to Exhibit
11 7 --
12    A.   Yes.
13    Q.   -- the file number there
14 referenced is the same client matter
15 number?
16    A.   I see next to file number
17 51822.010700.
18    Q.   Do you have any reason to believe
19 that the file number referenced on the
20 first page of Exhibit 7 is not the same
21 file number that was established by the
22 client matter intake memorandum in Exhibit
23 17?
24    A.   I don't know one way or another,
25 but I just don't have any information one

Page 260

1        P. Sutton
2  way or another.
3     Q.   If you look at Exhibit 8, which
4  is the DIAMS record sheet. Again, the
5  docket number up there reflects
6  051822010700/U.S.
7     A.   I see those numbers.
8     Q.   Do you have any reason to believe
9  that that client matter number refers to
10 anything other than the client matter that
11 was established through the intake
12 memorandum in Exhibit 17?
13    A.   I have no information one way or
14 another. If you go to Exhibit 3 --
15    Q.   I was done with Exhibit 3.
16    A.   I know, but I just want to
17 supplement my response with respect to your
18 query about Exhibit 3 and Exhibit --
19    Q.   7?
20    A.   I gave you an incomplete answer.
21 Hold on. 8, Exhibit 8.
22       Exhibit 3 is a patent record
23 report generated by the PATS software.
24       Exhibit 8 is the patent record
25 report generated by DIAMS.

Page 261

1        P. Sutton
2       All information with respect to
3  this '160 Patent and any Quickie matters
4  that were in PATS was transferred
5  completely to the DIAMS system when there
6  was the conversion from one to the other,
7  so that the databases with respect to each
8  PATS and the DIAMS system would be
9  identical from the standpoint of the
10 information in there.
11       MR. SCOTT: Strike,
12 nonresponsive.
13       MR. LODEN: Move to strike.
14 Objection. Nonresponsive.
15    A.   It's not responsive to what?
16    Q.   A pending question. We've talked
17 about that for hours this morning.
18    A.   Excuse me, I have a question for
19 you. If I have given you an incomplete
20 answer, are you instructing me not to
21 complete the answer?
22    Q.   No, I'm not giving that
23 instruction at all.
24    A.   I've just completed that answer
25 that I had previously given in my testimony

67 (Pages 262 to 265)

Page 262

1      P. Sutton
2 today pursuant to what you just said.
3          MR. SCOTT: Same objection.
4      **Q.  I show you Exhibit 18, dated**
5 **November 1, 2002.**
6      A.  Yes.
7      **Q.  For matter number 0108, do you**
8 **see that?**
9      A.  I do.
10     **Q.  And the matter name is new**
11 **surgical drape patent license?**
12     A.  I see those words next to, on
13 line number 6.
14     **Q.  Was Todd Sharinn of counsel at**
15 **Greenberg Traurig on November 1, 2002?**
16     A.  I don't recall.
17     **Q.  Was he ever of counsel at**
18 **Greenberg Traurig?**
19     A.  I believe he was, yes.
20     **Q.  So is that why -- well, strike**
21 **that.**
22         **Is that why no other name other**
23 **than Todd Sharinn appears on the billing**
24 **information in Roman Numeral III?**
25     A.  I have no personal information

Page 263

1      P. Sutton
2 one way or another.
3      **Q.  If you look on page 2, it appears**
4 **that the same person signed Roman Numeral**
5 **VI, conflicts, Roman Numeral VII**
6 **authorization, and Roman Numeral -- or**
7 **excuse me, number 26, intake committee**
8 **signature.**
9          **Do you see that those signatures**
10 **look very similar?**
11     A.  Actually, I don't agree with what
12 you just said.
13     **Q.  What part don't you agree with?**
14     A.  I see similarities between
15 signatures on lines 21, 24 and 26.
16 However, on line 26, I see additional
17 indicia with the name Albert it looks like
18 Jacobs spelled out.
19     **Q.  Okay.**
20     A.  If I'm reading that correctly.  I
21 don't recognize the signature.
22     **Q.  It looks like with respect to 26,**
23 **there are two signatures there on that**
24 **line, is that what you're saying?**
25     A.  It could be two signatures.

Page 264

1      P. Sutton
2      **Q.  Exhibit 19.  Again, Exhibit 19 is**
3 **a Greenberg Traurig client intake**
4 **memorandum.**
5          **Do you see that?**
6      A.  I see the date December 3, 2002
7 on Roman Numeral line number I.
8      **Q.  And what client matter number do**
9 **you see on Roman Numeral line II?**
10     A.  I see the numbers 51822.0109.
11     **Q.  And what matter name do you see**
12 **on line VI?**
13     A.  I see the words re-examination of
14 U.S. Patent No. 6,066,160 by Medtronic.
15     **Q.  And what does that matter number**
16 **mean to you?**
17     A.  It suggests that to the extent
18 that we had any papers or received any
19 documents or copies of anything relating to
20 the re-examination that's referred to, that
21 the matter number 010900 would be on
22 physical file so that those copies could be
23 collected in the proper place, namely that
24 physical file.
25     **Q.  Okay.**

Page 265

1      **P. Sutton**
2      **I'm going to hand you what I've**
3 **marked as Exhibit 20.**
4      **I'll tell you, Mr. Sutton, that**
5 **Exhibit 20 is a document that we had**
6 **prepared to list all the matter numbers for**
7 **client number 51822 that we've just gone**
8 **through in the preceding exhibits.**
9      A.  Do I understand what you're
10 saying is that your firm prepared what you
11 marked as Exhibit 20?
12     **Q.  Yes.**
13     A.  So that's not a document that
14 came from Greenberg Traurig or any of the
15 parties?
16     **Q.  It is not.  It's a summary of a**
17 **document -- it's a summary of the documents**
18 **that Greenberg Traurig produced in this**
19 **case.  Take all the time you need to look**
20 **at the exhibits in front of you.  We can**
21 **take a break and you can look at all the**
22 **exhibits.**
23     A.  No, no, I'm not going to
24 authenticate or make comparisons --
25     **Q.  I'm not asking you --**

68 (Pages 266 to 269)

Page 266

1          **P. Sutton**
2     A.    Please let me finish.
3     **Q.    There is not a question.**
4     A.    Please let me finish.
5          You've handed me something that
6     was generated by your firm that is not a
7     document kept in the ordinary course of
8     business or a document that I've seen
9     before and you're making a representation
10    as to what you believe it is.
11         Did you physically type this
12    yourself?
13    **Q.    I'm not the one being deposed**
14    **here.**
15    A.    I know, I'm just asking.
16    **Q.    I'm just waiting for you to**
17    **finish so I can object and ask a question.**
18    A.    Why don't you go ahead with your
19    question?
20         MR. LODEN:  Objection.
21    Nonresponsive.
22    BY MR. LODEN:
23    **Q.    My question is with the exhibits**
24    **that we've just gone through, does the**
25    **listing in Exhibit 20 reference the matter**

Page 267

1          **P. Sutton**
2     **numbers for the exhibits that we just went**
3     **through, does it contain the description of**
4     **the matter number and the date that was**
5     **reflected on each of the exhibits that we**
6     **just gone through the client intake matter**
7     **memorandum?**
8          MR. CHU:  I'm going to object to
9     that.  I think that's improper.
10    That's your summary, which is fine.
11    But to ask this witness about it is
12    unfair.  It's not his job.
13    A.    I have no idea whether what you
14    have -- and you refused to say whether you
15    personally typed this -- did you personally
16    type this?
17    **Q.    I'm not the one on deposition**
18    **today.**
19    A.    I know, but I'm asking you, did
20    you personally type this so that you can
21    make the representation that you typed it
22    and that you believe it's accurate?
23    **Q.    I believe it's accurate.**
24    A.    Did you type it yourself?
25    **Q.    I'm not on deposition,**

Page 268

1          **P. Sutton**
2     **Mr. Sutton.**
3     A.    Well, I'll take that as a
4     response, suggesting that you did not
5     create this yourself physically, and so I'm
6     not in a position to answer any questions
7     regarding Exhibit 20 because I don't know
8     the answer to your question.
9     **Q.    I don't believe a question was**
10    **asked.**
11    A.    Yes, you suggested that I be
12    reviewing this to confirm that it contains
13    information regarding other documents that
14    I've given testimony to, but I'm sorry, I'm
15    not able to --
16         MR. SCOTT:  The simple question
17         is do you believe that this accurately
18         reflects or summarizes the various
19         intake memorandums that you --
20         MR. CHU:  I think that's a
21         question for you guys to answer, not
22         for him to answer.
23    A.    I do not know whether the
24    information on Exhibit 20 is accurate.  I
25    have reason to believe that it is not

Page 269

1          P. Sutton
2     complete or accurate.
3     **Q.    What's the reason to believe that**
4     **it's not complete or accurate?**
5     A.    The matter numbers do not appear
6     to be complete.
7     **Q.    In what respect?**
8     A.    The numbers under the column
9     matter numbers do not appear to be accurate
10    and complete.
11    **Q.    In what respect?**
12    A.    There seem to be characters
13    missing or digits missing.
14    **Q.    Is that what you're referring to,**
15    **two additional zeros?**
16    A.    Again, I'm not going to answer
17    any further questions with regard to
18    Exhibit 20 because you can say what you'd
19    like as to what it is.  You refuse to tell
20    me whether you typed it yourself.
21         Since you refused to tell me if
22    you typed it yourself, I'm not going to
23    answer any further questions with respect
24    to Exhibit 20.  I think it's improper
25    questions.

69 (Pages 270 to 273)

Page 270

1          P. Sutton
2     Q.   Just so I understand your
3  position, you refuse to answer any
4  questions about Exhibit 20?
5     A.   You can ask me questions, but I
6  must say that you're using up time
7  unnecessarily.  Ask me whatever you want to
8  ask me question by question and I'll deal
9  with it.  But I'm just telling you not to
10  waste your time with a document that, you
11  know -- this is like an exhibit for trial
12  perhaps, but this is not proper.
13       Can you identify any category on
14  the 30(b)(6) Notice that Exhibit 20
15  corresponds or relates to?
16     Q.   Once again --
17       MR. CHU:  Can we go off the
18  record?
19       MR. LODEN:  Sure, we can go off
20  the record.  Stop the clock right
21  here.
22       (Recess taken from 4:53 p.m. to
23  4:56 p.m.)
24  BY MR. LODEN:
25     Q.   Mr. Sutton, based upon your

Page 271

1          P. Sutton
2  refusal to answer any questions about --
3     A.   I said if you want to waste your
4  time and ask me specific questions
5  regarding Exhibit 20, I prepared you for
6  the fact that this is something that you
7  and/or your firm had prepared that I have
8  not seen before and that I didn't want you
9  to waste your time.
10       But go ahead and ask me what
11  you'd like and I'll give you an answer as
12  to each with respect to Exhibit 20.
13     Q.   Mr. Sutton, were you aware that
14  Todd Sharinn had promised Quickie to
15  provide notice before maintenance fees were
16  due on the '160 Patent?
17     A.   What time frame are you talking
18  about, please?
19     Q.   When you hired Todd Sharinn, when
20  Greenberg Traurig hired Todd Sharinn.
21     A.   I don't believe the premise of
22  your question is accurate.
23     Q.   What premise is inaccurate?
24     A.   Regarding a promise.  I believe
25  you misspoke.

Page 272

1          P. Sutton
2       MR. LODEN:  I ask you to mark
3  Exhibit 21.
4       (Exhibit 21, Pepe & Hazard letter
5  dated 5/30/00, marked for
6  identification, as of this date.)
7  BY MR. LODEN:
8     Q.   Do you have 21 in front of you?
9     A.   I have it in front of me.
10     Q.   Have you ever seen Exhibit 21
11  before?
12     A.   I may have.  I believe I have.
13  You're talking about the letter from Pepe &
14  Hazard?
15     Q.   I'm talking about Exhibit 21.
16     A.   The Pepe & Hazard letter dated
17  May 30, 2000?
18     Q.   Signed by Todd Sharinn, yes, that
19  letter.
20     A.   I have Exhibit 21 in front of me.
21     Q.   Thank you.
22       If you look at the last sentence
23  of the first paragraph on page 2 of that
24  letter --
25     A.   Yes.

Page 273

1          P. Sutton
2     Q.   -- will you read that into the
3  record, please.
4     A.   This is page 2, the last sentence
5  of the very first paragraph, yes?
6     Q.   Will you read that in the record,
7  please.
8     A.   Yes.
9       "We, namely Pepe & Hazard" --
10     Q.   Does it say -- stop.
11     A.   Please let me finish -- "will
12  notify you regarding payment of the
13  maintenance fees several months before they
14  are due."  Signed by Todd S. Sharinn on
15  behalf of Pepe & Hazard.
16     Q.   Where in that last sentence does
17  it say, meaning Pepe & Hazard, will
18  notify you regarding payment?
19     A.   I'll refer you to the upper left
20  corner of the very first page of Exhibit
21  21, Pepe & Hazard, this letter is being
22  written on behalf of Pepe & Hazard by Todd
23  S. Sharinn.
24     Q.   So were you aware that Todd S.
25  Sharinn had written this letter when he was

70 (Pages 274 to 277)

Page 274

1           P. Sutton
2  hired by Greenberg Traurig?
3      A.   I had no personal information
4  about this letter at or about the time that
5  Todd Sharinn was hired, and I don't believe
6  I've seen anything in our records that
7  would indicate an assumption of
8  responsibility that may have been
9  undertaken by Pepe & Hazard.
10         MR. LODEN:  Objection.
11     A.   That was part of our engagement.
12         MR. LODEN:  Objection.
13     Nonresponsive.  Move to strike.
14 BY MR. LODEN:
15     Q.   Mr. Sutton, are you aware of Todd
16 Sharinn ever telling Quickie that Greenberg
17 Traurig would not monitor the maintenance
18 fee deadlines after Todd moved to
19 Greenberg?
20     A.   I can't answer your question
21 because the premise is not accurate.
22     Q.   What premise is not accurate?
23     A.   I'm not aware of any personal
24 promise made by Todd Sharinn.  I see
25 reference to a statement in Exhibit 21,

Page 275

1           P. Sutton
2  where is reference to Mr. Sharinn about
3  Pepe & Hazard's undertaking
4  responsibilities during Pepe & Hazard's
5  representation of Quickie, but I see
6  nothing about any that would suggest any
7  personal assumption of responsibility by
8  Todd Sharinn individually.
9      Q.   Are you aware of Todd Sharinn
10 ever telling Quickie that Pepe & Hazard's
11 responsibility for providing notice about
12 maintenance fees was not being transferred
13 to Greenberg when Todd moved to Greenberg?
14     A.   Are you talking about prior to
15 the time that Todd Sharinn joined Greenberg
16 Traurig?
17     Q.   I'm talking about at the time he
18 joined Greenberg Traurig.
19     A.   I don't recall knowing or meeting
20 Todd Sharinn at or about the time he was
21 hired by Greenberg Traurig.
22     Q.   At any time, are you aware of
23 Todd Sharinn telling Quickie that Greenberg
24 Traurig would not honor the commitment that
25 you say Pepe & Hazard made in Exhibit 21?

Page 276

1           P. Sutton
2      A.   The premise of your question is
3  ridiculous in the sense that it suggests an
4  obligation on the part of Greenberg Traurig
5  to honor an obligation of another law firm
6  that previously represented Quickie.  I
7  really don't understand the premise or the
8  content of your question.  It makes no
9  sense.
10     Q.   Maybe you're misunderstanding my
11 question.
12     A.   I don't think so.
13     Q.   Well, let me try it again.
14         As you sit here today, do you
15 know whether Todd Sharinn ever told Quickie
16 that Greenberg would not provide the notice
17 of maintenance fees that you say Pepe &
18 Hazard committed to provide as reflected in
19 Exhibit 21?
20         MR. CHU:  Objection.
21     A.   You've mischaracterized my
22 testimony and --
23     Q.   I'm asking --
24     A.   Please let me finish.  If you
25 don't get the answer you like, you

Page 277

1           P. Sutton
2  interrupt me and don't permit me to finish.
3  Please.
4          The premise of your question
5  makes no sense, is not based on anything
6  I'm aware of, and I respond to this last
7  question that you've asked me with the same
8  response I just gave you to the next
9  previous question.
10     Q.   Which is what?
11         THE WITNESS:  Madam Reporter,
12     please read that last response to the
13     prior question to me.
14         (Whereupon, the requested portion
15     was read back by the court reporter.)
16     A.   That same response applies and is
17 responsive to the last question that you've
18 asked me.
19     Q.   Well, didn't you and I agree
20 earlier today that at least as of October
21 2002 Greenberg Traurig actually did have
22 that obligation to provide notice of
23 maintenance fees due to Quickie, right --
24 that's the date that Mr. Sharinn told the
25 Patent and Trademark Office that he was the

71 (Pages 278 to 281)

Page 278

1       **P. Sutton**
2  **notice in Exhibit 7?**
3          MR. CHU: Objection.
4      A.   You are confusing -- your prior
5  questions had to do with an obligation of
6  Pepe & Hazard that might or might not have
7  existed while they represented Quickie.
8  There is nothing that I'm aware of, and
9  it's ridiculous to suggest that Greenberg
10 Traurig would assume a questionable
11 obligation that may have been undertaken by
12 Pepe & Hazard prior to Greenberg's
13 representation of Quickie.
14         It makes no sense whatsoever and
15 the premise of your question, frankly, is
16 ridiculous. I'm sorry to use terms that
17 strong, but where you're going makes no
18 sense whatsoever and the question makes no
19 sense.
20         Until you showed me Exhibit 21, I
21 never testified about Pepe & Hazard in
22 connection with any obligation possible or
23 otherwise that they might have undertaken
24 to Quickie. So I just think my response to
25 the prior question is appropriate here as

Page 279

1          P. Sutton
2  well.
3          MR. SCOTT: I think the entire
4      response was ridiculous and I move to
5      strike as nonresponsive.
6          MR. LODEN: As I do. Thank you.
7  BY MR. LODEN:
8      Q.   **When you testified earlier this**
9  **morning that Leviton moved from Thelen to**
10 **Greenberg, when you moved to Thelen to**
11 **Greenberg -- you took that client with you,**
12 **correct?**
13     A.   The client chose for Greenberg
14 Traurig to represent it at the time I moved
15 from Thelen to Greenberg Traurig.
16     Q.   **And the existing matters that you**
17 **were representing Leviton on while you were**
18 **at Thelen, is it your testimony that you**
19 **had no further responsibility for those**
20 **matters after you moved to Greenberg**
21 **because those were responsibilities taken**
22 **on while you were at your prior firm, or**
23 **did the responsibilities move with you?**
24     A.   I don't understand your question
25 at all.

Page 280

1          P. Sutton
2      Q.   **The responsibilities to your**
3  **client Leviton while you were at Thelen,**
4  **did those responsibilities carryover to**
5  **your client at Greenberg?**
6          MR. CHU: Objection.
7      A.   If, and I don't recall any, there
8  were any obligations undertaken by Thelen
9  to Leviton while Thelen represented
10 Leviton, those would not have been
11 transferred to Greenberg Traurig unless
12 Greenberg Traurig agreed to assume those
13 responsibilities if there were any, so that
14 the premise of your question makes no
15 sense.
16         These are not -- you're
17 suggesting that Todd Sharinn individually
18 or personally separately represented
19 Quickie or that his reference to
20 question -- who do you think "we" is in
21 Exhibit 21 on the second page?
22     Q.   **I don't know.**
23     A.   Oh, I do know.
24     Q.   **Let me ask, let me ask a**
25 **question --**

Page 281

1          **P. Sutton**
2      A.   I do know.
3      Q.   **How do you know that?**
4      A.   The "we" is -- because it's
5  written on the Pepe & Hazard letterhead and
6  the" we" relates to that law firm.
7      Q.   **Has Todd Sharinn told you that**
8  **the "we" relates to Pepe & Hazard?**
9      A.   He may have, but I don't recall.
10         MR. CHU: I just want to caution
11     you that if it involves conversations
12     while in the presence of lawyers in
13     discussions, then that would be
14     privileged.
15         THE WITNESS: Okay.
16     A.   I have no response to that
17 question. I have no information to provide
18 you in response to that question other than
19 what would come under attorney-client
20 privilege.
21         MR. SCOTT: Just so we're clear,
22     conversations between Todd Sharinn and
23     Mr. Sutton, whether or not in the
24     presence of lawyers, are not
25     privileged if they're not seeking or

72 (Pages 282 to 285)

Page 282

1         P. Sutton
2    receiving advice of counsel.
3         MR. CHU: Well --
4         MR. SCOTT: I don't want to get
5    into it. You've taken the
6    instruction. You're not answering.
7    I'm just --
8         MR. CHU: And when I mean
9    counsel, I mean counsel in this
10   litigation.
11        MR. SCOTT: I know what you
12   meant, and he's a lawyer and I think
13   he understood what you meant, so....
14        MR. LODEN: Right.
15        THE WITNESS: How much time has
16   elapsed since the start of this
17   deposition?
18        MR. CHU: We started at 9:30
19   sharp pretty much.
20        MR. SCOTT: Let's take a quick
21   break.
22        (Recess taken from 5:12 p.m. to
23   5:16 p.m.)
24   BY MR. LODEN:
25   Q.   I don't want to rehash the entire

Page 283

1         P. Sutton
2    deposition, Mr. Sutton, but I want to make
3    sure that the record is clear. I
4    understand that Greenberg's position is
5    that they did not assume Pepe & Hazard's
6    promise to provide advanced notice of the
7    maintenance fees becoming due, I understand
8    that that's --
9    A.   That's not accurate. What you
10   just stated is not accurate.
11   Q.   How is that not accurate?
12   A.   It assumes facts not in evidence.
13   Q.   Well, did or did not Greenberg
14   assume Pepe & Hazard's statement that they
15   would provide notice before the maintenance
16   fees were due?
17   A.   I don't understand your question.
18   When --
19   Q.   Look back at Exhibit 21. We just
20   went through, you told me --
21   A.   Greenberg Traurig has never
22   assumed any responsibilities undertaken by
23   Pepe & Hazard. Greenberg Traurig was
24   separately engaged to perform legal
25   services, and I'm not aware of any instance

Page 284

1         P. Sutton
2    where there was an assumption of another
3    law firm's responsibilities of the type you
4    have suggested which I don't really
5    understand.
6    Q.   No, you just restated in probably
7    more clear terms what I just restated, that
8    that's Greenberg's position, that Greenberg
9    did not assume any obligations taken on by
10   Pepe & Hazard?
11   A.   I just mischaracterized what I
12   said.
13   Q.   Okay. You would agree with me,
14   though --
15   A.   You're asking me about
16   Greenberg's position. I'm not here to give
17   you testimony about Greenberg's position.
18   I'm here to give you testimony about facts
19   and to respond to questions about
20   documents. I'm not here to argue this
21   litigation. I'm not the attorney handling
22   that. We have outside counsel handling
23   that. I think that's where you're
24   confused.
25   Q.   Okay.

Page 285

1         P. Sutton
2         So your testimony today then is
3    that Greenberg Traurig did not assume Pepe
4    & Hazard's agreement, as you characterized
5    it, to provide notice before the
6    maintenance fees were due, that's your
7    testimony today?
8    A.   That's not accurate, and it does
9    not properly characterize my testimony.
10   Q.   Well, please tell me what aspect
11   of Pepe & Hazard's agreement to provide
12   advanced notice that Greenberg did assume?
13   A.   I cannot give you testimony about
14   obligations undertaken by Pepe & Hazard,
15   okay.
16   Q.   I'm not asking for you to do
17   that.
18   A.   Yes, you are. Yes, you are.
19   Q.   I'm asking if Greenberg took on
20   those obligations.
21   A.   Give me a second. You are asking
22   me -- no matter what kind of words you are
23   couching in your question, I'm not here
24   with knowledge or ability to testify about
25   obligations undertaken by the firm of Pepe

73 (Pages 286 to 289)

Page 286

1          P. Sutton
2  & Hazard, if any, to Quickie prior to
3  Greenberg Traurig's representation of
4  Quickie.
5          Your questions really are, I'm
6  sorry, but make no sense.
7      Q.  I'm trying to find common ground
8  with you, Mr. Sutton.
9      A.    No.  This is not a negotiation to
10 find common ground.  I'm here to give you
11 truthful testimony.
12     Q.   Okay.  Well, let's see if this
13 one works for you then.
14         Would you agree with me that when
15 the file was transferred from Pepe & Hazard
16 to Greenberg Traurig, Greenberg Traurig had
17 no obligation to provide advanced notice of
18 maintenance fees for the '160 Patent?
19     A.   I don't understand your question.
20 I'm sorry.
21     Q.   You know --
22     A.   At the time that Greenberg
23 Traurig was retained by Quickie, it
24 undertook obligations to perform legal
25 services to Quickie, and from that date

Page 287

1          P. Sutton
2  forward I'm not aware of any agreement.
3          It's ridiculous to suggest an
4  agreement that Greenberg Traurig undertook
5  obligations of a prior firm.  It really
6  makes no sense, I'm sorry.
7      Q.   I'm not suggesting that they did.
8      A.   I'm sorry, but you did suggest
9  that we did, and I'm sorry, but I cannot
10 let you -- I must disabuse you of that
11 concept.  It just makes no sense.
12     Q.   You're misunderstanding my
13 question, but I'll move on.
14         At some point, though, you would
15 agree with me Greenberg Traurig did take on
16 the responsibility for monitoring and
17 docketing maintenance fee deadlines for the
18 '160 Patent, correct?
19     A.   You've asked me those questions
20 and I gave you answers previously today and
21 I'm not going to repeat them again.  I
22 mean, why go back over stuff that you've
23 asked me and I've answered?
24     Q.   I'm trying to make sure that your
25 testimony is clear.

Page 288

1          P. Sutton
2      A.   Well --
3          MR. CHU:  I'm going to object to
4      that because I think his testimony is
5      very clear.
6      A.   I gave you long testimony
7  regarding what was in our, the nature of
8  our docketing system.  So I'm sorry, but --
9      Q.   So has any of the testimony with
10 respect to that topic that you gave earlier
11 today, has it changed?
12         MR. CHU:  Objection.  I'm not
13     sure I understand.
14     A.   Okay.  Let me try to --
15         MR. SCOTT:  I thought it was
16     perfectly clear.
17         MR. CHU:  No, I do not
18     understand.
19     A.   Are you asking me to either
20 correct or supplement my prior testimony?
21 Yes or no?
22     Q.   What I'm asking is you would
23 agree with me Greenberg Traurig did take on
24 the responsibility for monitoring and
25 docketing maintenance fee deadlines on the

Page 289

1          P. Sutton
2  '160 Patent at some point, and your
3  response was you've already asked me those
4  questions and I'm not going to repeat my
5  answers again.
6          So my question is:  Do you have
7  any reason to supplement those prior
8  answers, or do you believe that they are
9  still accurate and correct, as you sit here
10 right now?
11     A.   To augment and supplement my
12 prior testimony, all of the data
13 transferred from the PATS computerized
14 docketing system to the DIAMS computerized
15 docketing system, all of that data was
16 transferred so that what was put into DIAMS
17 corresponded to what was previously in the
18 PATS system.  That's number one.
19         Number two, to the extent that Al
20 Jacobs' name appears on Exhibit 8, his name
21 was added in connection with administrative
22 responsibilities.
23         Three, at the time that Greenberg
24 Traurig's Power of Attorney was revoked, it
25 is my view that it had no further

74  (Pages 290 to 293)

Page 290

1           P. Sutton
2  responsibility to Quickie and that that
3  responsibility lay with Thelen.
4       Other than that, I don't wish at
5  the present time to augment or correct or
6  to supplement any of my testimony that I
7  gave previously today.
8     Q.   Nothing else at all?
9     A.   If I have additional information
10  to share with you, I will, I'll feel
11  comfortable offering that to you and you
12  can take it, if you're willing.
13       MR. LODEN:  I'll ask the reporter
14  to mark Exhibit 22.
15       (Exhibit 22, Document, marked for
16  identification, as of this date.)
17  BY MR. LODEN:
18     Q.   Mr. Sutton, you've just been
19  handed what's been marked as Exhibit 22.
20       Have you seen this document
21  before?
22     A.   I believe I have seen Exhibit 22
23  prior to today.
24     Q.   When did you last see Exhibit 22?
25     A.   I do not recall.

Page 291

1           P. Sutton
2     Q.   Did you look at it during your
3  preparation for today?
4     A.   I may have.  I reviewed many,
5  many documents so that I may have, but I
6  don't recall.
7     Q.   Do you see in the regarding line
8  it references Quickie, LLC versus
9  Medtronic, do you see that?
10     A.   I do.
11     Q.   And then Civil Action Number
12  02-CV-1157, do you see that?
13     A.   I see those numbers.
14     Q.   Do you recall if that's the case
15  number assigned to the Quickie versus
16  Medtronic litigation?
17     A.   I do not recall from memory the
18  civil action number.
19     Q.   How did you become aware that
20  Thelen Reid was going to be substituted for
21  Greenberg Traurig in that litigation?
22     A.   I became aware through a number
23  of instances of events.  I became aware
24  from Steve Colvin that he wanted to help
25  his family's relative Mark Evens in

Page 292

1           P. Sutton
2  connection with the income derived from
3  handling matters that we were handling.
4       The fact that -- let me give you
5  those.  The fact that Mark Evens asked to
6  monitor and counsel Quickie in connection
7  with the Medtronic and 160 matters that we
8  were handling for Quickie and that Steve
9  Colvin asked us to cooperate and to,
10  cooperate with him in that regard.
11       The communications between Mark
12  Evens, myself and Mark Evens and Todd
13  Sharinn gave that indication, the fact that
14  Mark Evens of Thelen sat at the table, at
15  counsel's table during the Markman Hearing
16  is another instance.
17       The fact that Allan Fell told
18  Todd Sharinn the day after the Markman
19  Hearing, September 5, 2002, that Thelen was
20  going to replace Greenberg Traurig.
21       This Exhibit 22, the October 15,
22  2002 letter, I think, there were
23  indications over several months that this
24  was likely going to happen, notwithstanding
25  what Allan Fell refers to in the next to

Page 293

1           P. Sutton
2  last paragraph, "I want to personally thank
3  you for the superb job you have done in
4  litigating this matter."
5       If you're doing a superb job, you
6  don't transfer the work to another firm,
7  except under special circumstances such as
8  this, where he wanted to help one of his
9  relatives.
10     Q.   Allan Fell wanted to help one of
11  his relatives?
12     A.   Steve Colvin and Quickie wanted
13  to help Mark Evens, who was a relative of
14  Stephen Colvin's family.
15     Q.   And how did you know that
16  Dr. Colvin had that desire?
17     A.   He personally told that to me
18  himself.
19     Q.   In person or over the phone?
20     A.   Possibly both.  He shared a
21  number of things with me and I shared a
22  number of things with him in person and
23  over the phone, if you're interested in
24  what those were.
25     Q.   When did those conversations take

75 (Pages 294 to 297)

Page 294

1        P. Sutton
2  place?
3     A.   They took place, they began
4  during the summer of 2001 and occurred then
5  and thereafter.
6     Q.   So when did Dr. Colvin tell you
7  that he wanted to give the income from this
8  litigation to his family member?
9     A.   Well, he let us know when I very
10 first met Dr. Colvin in person at his
11 offices at the hospital, I think it was on
12 a weekend, his office had a remarkable view
13 because it was a clear day, a view of the
14 East River because I'm a boater, I'm a
15 sailor -- he indicated that he was
16 considering giving the matter to Mark
17 Evens.
18       I informed him that I knew Mark
19 Evens, that he's a former partner of mine
20 and that I headed up the practice that Mark
21 was part of, and I gave him information
22 regarding the number of litigations that I
23 was involved in, and it was the gray hair
24 or no hair experience factor that I think
25 influenced Steve, that he indicated to that

Page 295

1        P. Sutton
2  effect that he wanted us to negotiate with
3  Medtronic, see if we could settle it, if
4  not to litigate.
5       He also indicated that he had a
6  very fine relationship with Medtronic where
7  they relied on him for ideas and inventions
8  and that he felt that his existing
9  relationship with Medtronic would influence
10 them in terms of Medtronic's actions and
11 possible settlement.
12    Q.   Who else was present when
13 Dr. Colvin --
14    A.   I didn't finish.  You want to
15 know the remainder of the conversation?
16    Q.   Sure.
17    A.   I indicated to Dr. Colvin the
18 potential problems associated with, that
19 there were no guarantee on the outcome of a
20 fight with Medtronic, that they had
21 resources to put into the defense, and I
22 indicated to him that there were questions
23 that they would raise about infringement
24 because the patent, the '160 Patent has a
25 focus which was not identical with the

Page 296

1        P. Sutton
2  product that Medtronic was marketing and
3  there were genuine questions about how the
4  claims would be interpreted and whether or
5  not there would be an ultimate finding of
6  infringement, and I explained to him about
7  the Markman Hearing and how there would be
8  a de novo Markman Hearing by the Court of
9  Appeals for the Federal Circuit, so that he
10 understood that these cases are often
11 litigated through appeal because sometimes
12 the district court judge's decision on
13 Markman is disregarded by the Court of
14 Appeals for the Federal Circuit.
15       So I gave him explanations as to
16 what to expect from the litigation because
17 I don't believe he had ever been through
18 one of these patent infringement fights
19 previously, and there were other things
20 that we discussed, but why don't you ask me
21 your next question.
22    Q.   My next question is anything else
23 that you discussed?
24    A.   Yes.  I got into discussions
25 about damages because sometimes you can

Page 297

1        P. Sutton
2  win, but the attorneys' fees can exceed the
3  amount of damages that you can recover.
4       So we discussed -- he had a hope
5  that he would recover 8 figures, $10
6  million or more from Medtronic.  I tried to
7  temper -- managing client expectations is a
8  tricky business and not realizing that the
9  patent would be gutted and rendered almost
10 worthless by the re-examination, I tried to
11 prepare him for the possibility that you
12 could win, but that you might not wind up
13 with anything because we were not taking
14 this case on a contingency basis, this was
15 going to be on a fee basis.
16       We discussed -- I asked him
17 whether he had licensed any other parties,
18 and he indicated no, he had not, and I
19 explained to him that if he had that that
20 would enhance his chances of success in the
21 court.
22       I asked him if he ever marketed a
23 product covered by the '160 Patent because
24 that would enhance his chances in the
25 court.  He said no.

76 (Pages 298 to 301)

Page 298

1        P. Sutton
2        We discussed the inside and
3   outside the body matter.
4        I also had discussions with him
5   regarding my negotiations with Medtronic
6   because Medtronic did offer to settle the
7   dispute, but I believe that Hal Patton as
8   part of the Medtronic offer to Quickie
9   capped the amount that Quickie would
10  realize at $185,000, if my memory serves me
11  right, which if the court felt that was a
12  true measure of damages, that would limit
13  his recovery and that the attorneys' fees
14  would far exceed that.
15       So we discussed these types of
16  matters in an open and candid way with one
17  another, both in person and from time to
18  time by phone thereafter.
19       Q.  Well, I thought we were talking
20  about the conversation you had at his
21  office on the weekend over on the East
22  Side?
23       A.  Everything I just testified, the
24  time at the weekend, my personal visit to
25  his office with Todd Sharinn, the three of

Page 299

1        P. Sutton
2   us were in the room together -- what I just
3   testified to was discussed some in person,
4   some by phone. Some of those were
5   discussed between the two of us while I was
6   negotiating with Hal Patton at Medtronic.
7        Q.  On the phone conversations, was
8   anyone else on the phone other than you and
9   Dr. Colvin?
10       A.  I don't recall anyone else being
11  on the phone.
12       Q.  And you've mentioned that Todd
13  Sharinn accompanied you to Dr. Colvin's
14  office --
15       A.  Actually, he brought me to
16  Dr. Colvin's office to introduce me to him
17  because he was familiar with Dr. Colvin. I
18  had not met him before. Although I had
19  heard of his reputation as a thoracic
20  surgeon.
21       Q.  And was it at that meeting that
22  Dr. Colvin informed you that he wanted to
23  transfer the file to Mark Evens to give
24  Mr. Evens the revenue?
25       A.  I believe it was at that meeting

Page 300

1        P. Sutton
2   that he informed us or me that he had, he
3   knew somebody affiliated with his family
4   who was in the business of litigating
5   patents, namely Mark Evens, and it was just
6   a coincide that Mark and I knew each other
7   because we were at the same firm. He came
8   in while I was heading up the IP practice
9   there.
10       Q.  What I'm trying to find out,
11  though, is when did Dr. Colvin tell you I
12  want to give the work to Mark because I
13  want to give him the money?
14       A.  I had the feeling from the very
15  beginning, including that very first
16  meeting, that there was a possibility,
17  possibly a strong possibility that at any
18  time this work would or could be
19  transferred to Mark Evens because of the
20  nature of the conversations I've described.
21       MR. SCOTT:  Just hang on a
22  second. Just because I want to speed
23  this up.
24       MR. LODEN:  Thank you.
25       MR. SCOTT:  With all due respect,

Page 301

1        P. Sutton
2   Mr. Sutton, we let you go on and give
3   your jury argument and all that. His
4   question was simply when did
5   Dr. Colvin tell you that he wanted to
6   give the case to Evens and you went on
7   to I had this feeling. So I'm just
8   asking you --
9        THE WITNESS:  Okay, it began with
10  his asking us to permit Mark to
11  monitor it and that we should
12  cooperate with Mark and give him
13  copies of documents so that he could
14  independently guide and counsel and
15  represent Dr. Colvin and Quickie.
16       So it was not a sudden thing that
17  occurred. It occurred over time where
18  initially he may be aware of Mark
19  Evens and the relationship, then
20  asking us to share and to permit Mark
21  to monitor, and then his indicating
22  that he wanted to help Mark.
23  BY MR. LODEN:
24       Q.  And how did he indicate that he
25  wanted to help Mark?

77 (Pages 302 to 305)

Page 302

1       P. Sutton
2    A.   By making statements to the
3  effect that he'd like Mark to get involved,
4  words to that effect, which to me I
5  interpreted to mean Mark would take an
6  increasing role and an increasingly
7  important role headed towards his taking
8  over the case.
9    Q.   So then Dr. Colvin never actually
10  said I want Mark to get involved because I
11  want him to get the fees for this case?
12    A.   I don't remember the specific
13  words that Dr. Colvin used, but that's my
14  interpretation because there would be no
15  other reason for Mark to be involved, if
16  the client thought our work was superb and
17  we had more experience than Mark, and Mark,
18  I don't know that Mark has a technical
19  background.  He has handled litigation, but
20  I believe that that was the obvious reason.
21       MR. LODEN:  If I could get the
22    reporter to mark Exhibit 23, please.
23       (Exhibit 23, Fax dated 11/11/02,
24    marked for identification, as of this
25    date.)

Page 303

1       P. Sutton
2    A.   I did forget to mention one
3  thing, something that I discussed with
4  Dr. Colvin and that is Hal Patton at
5  Medtronic during our negotiations indicated
6  that he felt it would be relatively easy
7  for Medtronic to alter the design of their
8  product to in effect design around the '160
9  Patent, that they preferred not to do that,
10  but that was one of their options that they
11  considered an active option.
12       He indicated that he felt that
13  claims were limited to a point where he
14  would be able to do that without
15  infringing, and I did share that with
16  Dr. Colvin.
17    Q.   Okay, thank you.
18       Exhibit 23, which I believe you
19  now have in front of, Mr. Sutton --
20    A.   I do.
21    Q.   -- is a three-page fax that
22  appears to be from Mark Evens to Todd
23  Sharinn dated October 11, 2002.
24       Have you ever seen this document
25  before? I'm not going to ask you detailed

Page 304

1       P. Sutton
2  questions about it.  If you want to go off
3  the record and read it in detail, that's
4  fine, but my questions are very simple.
5    A.   I'm just taking two minutes to
6  review it.
7       MR. LODEN:  Let's go off the
8    record then for two minutes.
9    A.   No, I don't want to go off the
10  record.
11    Q.   Well, I don't want --
12    A.   Then why don't you ask me a
13  question, because let's see if I need to
14  read it to answer it.
15    Q.   That's fine.
16       The RE line refers to Quickie
17  versus Medtronics, Southern District of New
18  York.
19       Do you see that?
20    A.   I see those words.
21    Q.   And do you see the numbers below
22  it, 02-Civ-1157?
23    A.   I see a civil action number
24  ending in 1157.
25    Q.   Looking back at Exhibit 22,

Page 305

1       P. Sutton
2  that's the same civil action number
3  referenced in the top of Mr. Fell's
4  correspondence to Todd Sharinn, correct?
5    A.   The number is not identical, but
6  parts of it are.
7    Q.   How is the number not identical?
8    A.   One says 02-CV-1157 on Exhibit
9  22.  On Exhibit 23, it says 02-Civ-1157 and
10  then the initials of the judge.
11    Q.   Do you understand those to refer
12  to the same case?
13    A.   They appear to be a reference to
14  the same civil action number.
15    Q.   Looking at the first sentence of
16  the correspondence in Exhibit 23, it
17  appears that Mr. Evens is formally
18  requesting that Todd Sharinn transfer all
19  of the litigation files in the
20  above-captioned action to our office in New
21  York as soon as possible.
22       Do you see that?
23    A.   I see the first sentence of
24  exhibit, of the second page of Exhibit 23.
25    Q.   Where he's asking for the

78  (Pages 306 to 309)

<table>
<tr><td>

Page 306

1          P. Sutton
2   litigation files in the above-captioned
3   action to be sent?
4       A.   I see that sentence.
5            MR. LODEN:  If I can get the
6   reporter to mark Exhibit 24, marked for
7            (Exhibit 24, Letter, marked for
8   identification, as of this date.)
9   BY MR. LODEN:
10      Q.   Do you have Exhibit 24 in front
11  of you?
12      A.   I have it in front of me.
13      Q.   Exhibit 24 appears to be a letter
14  from yourself.
15           Is that your signature there at
16  the bottom, Paul J. Sutton?
17      A.   It is, it appears to be my
18  signature, yes.
19      Q.   And you sent this letter to
20  Mr. Evens at Thelen Reid & Priest?
21      A.   That's correct.
22      Q.   And the date you sent the letter
23  via fax and Federal Express was October 15,
24  2002?
25      A.   That's the date at the top of

</td><td>

Page 308

1          P. Sutton
2       Q.   Okay.
3            Did he call you or did you call
4   him?
5       A.   I don't recall who initiated the
6   call.
7       Q.   Okay.
8            Do you recall why it is that if
9   Mr. Evens' correspondence in Exhibit 23 was
10  directed to Todd Sharinn why you ended up
11  talking to Mr. Evens about the file
12  transfer?
13      A.   Yes.  Mark Evens was a former
14  partner of mine at Thelen.  Part of my
15  intellectual property department.  I had a
16  fine relationship with him.  Frankly, I
17  welcomed the opportunity to say hello to
18  him because I hadn't spoken to him in a
19  while.  So the transfer of these files
20  opened up an opportunity for me to say
21  hello to him or if he called me to have a
22  nice conversation with him.
23      Q.   Okay.
24           At the end of the first sentence
25  there you reference relevant files relating

</td></tr>
<tr><td>

Page 307

1          P. Sutton
2   Exhibit 24.
3       Q.   And in the RE line for the
4   correspondence you referenced 02-Civ-1157.
5            Do you see that?
6       A.   I do.
7       Q.   Do you understand that to refer
8   to the same civil action number as
9   referenced in the correspondence in Exhibit
10  23?
11      A.   It appears to be the same civil
12  action number.
13      Q.   You reference, or you say that it
14  was good to talk to you this afternoon in
15  the first sentence.
16           Do you see that?
17      A.   Yes.
18      Q.   Tell me about that conversation
19  between yourself and Mr. Evens.
20           How did it occur; via phone or in
21  person?
22      A.   Oh, this would have been by
23  telephone.
24      Q.   Did he --
25      A.   Not in person.

</td><td>

Page 309

1          P. Sutton
2   to the above-referenced litigation.
3            Do you see that?
4       A.   I do.
5       Q.   What files are you referring to
6   there?
7       A.   Those would be physical files
8   that related to the Quickie versus
9   Medtronic litigation.
10           Prior to that time, Mark had
11  received from Todd Sharinn possibly the
12  entire file wrapper, I just don't know, but
13  certainly the information on the first
14  cover of the file wrapper with Todd's April
15  11, 2002 letter.  So that anything that we
16  had that enabled us to prosecute this
17  litigation is something that we will have
18  turned over to Mark so that he could
19  continue that.
20      Q.   Do you know if the patent record
21  sheet was included in those files that were
22  transferred?
23      A.   Well, Mark had that information
24  on the patent record sheet already.  I
25  don't know whether that was included in

</td></tr>
</table>

79 (Pages 310 to 313)

Page 310

1           P. Sutton
2  this because I don't believe I personally
3  physically handled the assembly of the
4  documents in the boxes.
5     **Q.   Who did handle that assembly?**
6     A.   I don't know the specific name,
7  but that would normally be done by a
8  litigation, a patent litigation paralegal.
9     **Q.   Okay.**
10        **The first -- the paragraph that**
11 **begins finally, the last paragraph there --**
12    A.   Yes.
13    **Q.   You say, "Finally, for the**
14 **benefit of our mutual client Quickie" --**
15 **why was Quickie a mutual client if you were**
16 **transferring the litigation to Thelen?**
17    A.   I don't understand your question.
18    **Q.   Well, was Quickie still a client**
19 **of yours after the litigation was**
20 **transferred to Thelen?**
21    A.   The revocation of --
22    **Q.   I'm talking about in October '02.**
23    A.   I know.  The revocation of our
24 Power of Attorney involving the '160 Patent
25 I believe occurred in 2003.

Page 311

1           P. Sutton
2     **Q.   Correct.**
3     A.   So that, technically speaking,
4  Quickie was still a client of GT and
5  therefore they were a mutual client.
6     **Q.   Why do you say technically**
7  **speaking? I mean, you had other open**
8  **matters for other patents with Quickie,**
9  **right?**
10    A.   I think you're substantiating
11 what I just said.
12    **Q.   Well, you qualified it**
13 **technically. I'm just trying to understand**
14 **why you qualified it.**
15    A.   Well, I don't understand why you
16 would be asking why, why I would refer to
17 our mutual client, when in fact at that
18 point on October 15, 2002 Greenberg Traurig
19 was representing Quickie and obviously Mark
20 Evens of Thelen was representing Quickie.
21 So that made the client mutual.
22    **Q.   Okay. Okay.**
23        **It looks like you provided a**
24 **carbon copy of this letter to Dr. Colvin.**
25        **Do you see that at the bottom?**

Page 312

1           **P. Sutton**
2     A.   Likely not a carbon copy, but
3  perhaps a photocopy.
4     **Q.   CC stands for carbon copy,**
5  **doesn't it, in your experience?**
6     A.   We don't use carbon copies using
7  carbon paper as of this date.  So CC does
8  not literally mean the use of carbon on one
9  side of a piece of paper, but is used to
10 suggest a true copy, whether by photocopy
11 or otherwise.
12    **Q.   Mr. Sutton, as I understand that,**
13 **you're concerned about the time today,**
14 **frankly I am, too, but I really wish that,**
15 **you know, if you want to waste time**
16 **nitpicking with answers -- my question --**
17 **you provided a copy of this to Dr. Colvin,**
18 **right -- I mean, why does it take five**
19 **minutes to answer that question?**
20        MR. CHU:  You have the answer.
21 BY MR. LODEN:
22    **Q.   He provided a copy of it,**
23 **correct?**
24    A.   I believe you're taking more time
25 taking issue with me than I took to answer

Page 313

1           P. Sutton
2  your question.
3     **Q.   Okay.**
4        **Yes or no, you provided a copy of**
5  **this correspondence to Dr. Colvin?**
6     A.   Exhibit 24 indicates that Steve
7  Colvin was copied.  I have no independent
8  recollection as to whether or not, but I
9  believe he was sent a photocopy of my
10 letter.
11    **Q.   Why was he copied on this letter?**
12    A.   To demonstrate to our client my
13 cooperation with my former partner our
14 firm's cooperation with Thelen so that the
15 interests of Quickie would be served
16 completely and fully.
17        MR. LODEN:  I'd ask the reporter
18    to mark Exhibit 25, please.
19        (Exhibit 25, Document, marked for
20    identification, as of this date.)
21 BY MR. LODEN:
22    **Q.   Do you have Exhibit 25 in front**
23 **of you?**
24    A.   Here it is.
25    **Q.   Exhibit 25 is a 4-page document,**

80 (Pages 314 to 317)

Page 314

```
 1        P. Sutton
 2  and it looks like it was faxed from Paul
 3  Jergensen of Greenberg Traurig, that's the
 4  paralegal you referred to previously, if
 5  you look at the first page, fax cover page?
 6     A.  I see the title paralegal under
 7  his name.
 8     Q.  I'm on the first page.
 9     A.  I'm sorry, okay, Exhibit 25, I
10  see.  Yes, I see Paul A. Jergensen.
11     Q.  And that is a paralegal at, he is
12  a paralegal at Greenberg Traurig, correct?
13     A.  I believe he was as of the date,
14  as of October 16, 2002.
15     Q.  And then turning to the second
16  page dated October 16, 2002, it looks like
17  he's writing to someone at Thelen Reid &
18  Priest.
19        Do you see that?
20     A.  Yes.
21     Q.  And on the RE line he references
22  Quickie, LLC versus Medtronic, Inc.
23        Do you see that?
24        MR. CHU:  He hasn't got the page
25     yet, hold on.
```

Page 315

```
 1        P. Sutton
 2        MR. LODEN:  No, he's at the page
 3  I'm talking about.
 4        MR. CHU:  Oh, I'm sorry.
 5     A.  Bear with me.
 6     Q.  You're looking at the right --
 7     A.  No, excuse me -- okay.
 8        Now, I'm looking at the page
 9  ending in 98948 Bates number of Exhibit 25.
10     Q.  That's correct.
11     A.  Yes.
12     Q.  Mr. Jergensen references Quickie,
13  LLC versus Medtronic, Inc.
14        Do you see that?
15     A.  I do.
16     Q.  And then he states "our reference
17  number."
18        Do you have an understanding as
19  to who "our" refers to there, is that
20  Greenberg Traurig?
21     A.  That would be Greenberg Traurig's
22  reference number.
23     Q.  And then the number there
24  51822.010400, do you see that?
25     A.  I see that number.
```

Page 316

```
 1        P. Sutton
 2     Q.  If you look back to Exhibit 13 --
 3     A.  I have it in front of me.
 4     Q.  That's the matter entitled
 5  Quickie, LLC versus Medtronics, correct?
 6     A.  Correct.
 7     Q.  Did you ask Mr. Jergensen to send
 8  this letter to Thelen Reid & Priest?
 9     A.  Actually, Mark Evens in Exhibit
10  23, his letter of October 11th, 2002 on the
11  fourth line in the first paragraph starting
12  in the third line, please send the file,
13  see attention of Shari Markovitz-Savit, it
14  was Mark Evens that requested that this be
15  done.
16     Q.  Well, he requested that be done
17  and he made that request to Todd Sharinn.
18  My question is how did Paul Jergensen end
19  up being the one to respond to Mr. Evens'
20  request?
21     A.  Well, you'll note in the second
22  paragraph Mr. Sutton has instructed me to
23  get these documents into the hands of Mark
24  Evens pronto.
25     Q.  Okay.
```

Page 317

```
 1        P. Sutton
 2     A.  So Paul Jergensen is reflecting
 3  my request that he take care of that ASAP.
 4     Q.  Okay.
 5        And actually, this letter from
 6  Mr. Jergensen dated October 16, 2002, if
 7  you look at the last sentence of the first
 8  paragraph, he says a copy of my cover
 9  letter accompanying the files is faxed
10  herewith.
11     A.  I'm sorry, where are you?
12     Q.  The last sentence of the first
13  paragraph.  A copy of my cover letter
14  accompanying the files is faxed herewith.
15        Do you see that?
16     A.  Yes, I see that sentence.
17     Q.  And then if you turn to the next
18  page, you'll see a two-page letter written
19  by Mr. Jergensen.
20     A.  Yes, with item number 5
21  reflecting the '160 Patent and its file
22  history and prior art being forwarded on
23  October 16th.
24        MR. LODEN:  Objection.
25     Nonresponsive.
```

81 (Pages 318 to 321)

Page 318

1         P. Sutton
2  BY MR. LODEN:
3      Q.   So the two-page, the last two
4  pages of Exhibit 25, the letter from
5  Mr. Jergensen, the two-page letter dated
6  October 16, 2002, it also references
7  Quickie, LLC versus Medtronic.
8         Do you see that?
9      A.   It references not only Quickie,
10 LLC versus Medtronic, but also it makes
11 express reference to U.S. Patent No.
12 6,066,160 file history and prior art next
13 to number 5 on the first page of the letter
14 to Shari Markovitz-Savit dated October 16,
15 2002.
16     Q.   And the reference for the client
17 matter number on this document is
18 51822.010400, correct?
19     A.   It appears on the top, in the
20 reference clause of the first page of Paul
21 Jergensen's letter to Markovitz-Savit.
22     Q.   Where in the 137 items listed
23 here on this letter would there be
24 reference to the patent record sheet for
25 the '160 Patent?  Is it included in that

Page 319

1         P. Sutton
2  list?
3      A.   Item number 5 is broad enough to
4  include that?  You're saying that the
5  patent record sheet in Exhibit 3 was
6  included as part of Item number 5.
7         Certainly -- the description
8  under item number 5 on Exhibit 25 I read as
9  broad enough to contemplate inclusion of
10 that patent record sheet of Exhibit 3.
11 BY MR. LODEN:
12     Q.   If I could get you to turn to
13 Exhibit 8?
14     A.   8?
15     Q.   8.
16     A.   It's in front of me.
17     Q.   The two-page document that's in
18 Exhibit 8 was this document, the two-page
19 document, was it transferred to Shari
20 Markovitz-Savit at Thelen Reid as part of
21 this letter that we're looking at in
22 Exhibit 25?
23     A.   Very possibly under item number
24 5, but I personally did not pack a copy of
25 Exhibit 8 in the box at the time that Paul

Page 320

1         P. Sutton
2  Jergensen did this transfer.
3      Q.   Who did pack that box?  Was it
4  Mr. Jergensen?
5      A.   Either Mr. Jergensen or somebody
6  at his direction, but likely Mr. Jergensen.
7      Q.   And is Mr. Jergensen still
8  employed at Greenberg Traurig?
9      A.   I don't know the answer to that.
10        MR. CHU:  It's just past 6:00.
11 We've been here for I guess eight and
12 a half hours.  Assuming that, you
13 know, our lunch break and all the
14 other breaks take collectively one and
15 a half hours, we've been here for
16 seven hours, so I'm just asking you
17 guys to -- I'm just asking you to have
18 this done as quickly as you can.
19        MR. SCOTT:  Wrap it up?
20        MR. LODEN:  That's what he's
21 trying to say.
22        MR. CHU:  Yes.
23        MR. SCOTT:  We hear you loud and
24 clear, Justin.
25        MR. LODEN:  If I can get the

Page 321

1         P. Sutton
2  reporter to mark Exhibit 26.
3         (Exhibit 26, March 11, 2003
4  letter, marked for identification, as
5  of this date.)
6      A.   Counselor, I noticed at the
7  bottom of Exhibit 8 that there is it a date
8  at which Exhibit 8 was printed.  It's a
9  2007 date.
10        So I don't believe Exhibit 8 as
11 it appears here in its entirety have
12 been transferred back to 2002.
13     Q.   But if we wanted to find out
14 whether any part of it was packed up in
15 those boxes and transferred, Paul Jergensen
16 or someone at his direction would be the
17 one to answer?
18     A.   Actually, Thelen would be the
19 best party to ask because they would have
20 received it and they would have a record of
21 it.
22        MR. SCOTT:  They didn't.
23        MR. LODEN:  They didn't, so...
24        THE WITNESS:  Well, I'm not sure
25 what their document retention policy

82 (Pages 322 to 325)

Page 322

1          P. Sutton
2    is.
3    BY MR. LODEN:
4        Q.    Exhibit 26 is before you now?
5        A.    I have that.
6        Q.    Which appears to be a March 11,
7    2003 letter from Todd Sharinn to
8    Dr. Colvin.
9             Do you see that?
10       A.    I do.
11       Q.    Just one quick question. The
12   reference number up there on top
13   51822.010400.
14            Do you see that?
15       A.    I do see those numbers.
16       Q.    And Mr. Sharinn enclosed a copy
17   of Mr. Jergensen's October 16, 2002
18   correspondence.
19            Do you see that?
20       A.    Yes, I do see that.
21       Q.    Have you seen any other -- strike
22   that.
23            MR. LODEN:  If I can get the
24       reporter to mark Exhibit 27, please.
25            (Exhibit 27, May 15, 2003 letter,

Page 323

1          P. Sutton
2    marked for identification, as of this
3    date.)
4    BY MR. LODEN:
5        Q.    Do you have Exhibit 27 in front
6    of you?
7        A.    I do.
8        Q.    This appears to be a May 15, 2003
9    letter from Todd Sharinn to Quickie, LLC,
10   care of Rick Steiner Siegel & Fell.
11            Do you see that?
12       A.    I see Exhibit 27 consisting of
13   two pages, yes.
14       Q.    Well, that wasn't my question.
15            Could you answer my question?
16       A.    I'm sorry, your question?
17       Q.    My question is: Is Exhibit 27
18   correspondence from Todd Sharinn to
19   Quickie, LLC care of Rick Steiner Siegel &
20   Fell dated May 15, 2003?
21       A.    It appears to be that, yes.
22       Q.    And in that correspondence
23   Mr. Sharinn references 51822.010900, do you
24   see that?
25       A.    I see those numbers.

Page 324

1          P. Sutton
2        Q.    I believe it's Exhibit 19?
3        A.    Yes, I see Exhibit 19 and I see
4    those comparable numbers 51822.0109 --
5    shorthand, I believe that there are two
6    zeros that follow.
7        Q.    So that matter number 0109, the
8    010900 is entitled re-examination of U.S.
9    Patent No. 6,066,160 by Medtronic, correct?
10       A.    Yes.
11       Q.    So in this correspondence on page
12   27 --
13       A.    On Exhibit 27?
14       Q.    Yes, I apologize, Exhibit 27,
15   Mr. Sharinn states, "We enclose for your
16   information and records a copy of a notice
17   regarding change of Power of Attorney filed
18   in connection with the above-referenced
19   re-examination application."
20            Do you see that?
21       A.    I see that first sentence, yes.
22       Q.    So the notice of change of Power
23   of Attorney related to the re-examination
24   which was reflected in Greenberg's files as
25   client matter number 51822.010900?

Page 325

1          P. Sutton
2            MR. CHU:  Objection.
3        A.    Actually, if you take a look at
4    the second page of Exhibit 27, it recites
5    the Power of Attorney to you in this
6    application has been revoked by the
7    assignee who has intervened as provided by
8    37 CFR 3.71, future correspondence will be
9    mailed to the new address of record.
10            So it references the application.
11       Q.    So was Mr. Sharinn just wrong
12   when he referenced matter number 010900?
13       A.    Not necessarily, no, because the
14   re-examination actually is part of the file
15   history of the '160 Patent.
16            We separated the re-examination
17   documents into a separate physical file,
18   but that's all part of the same file
19   history, so that I don't believe it's
20   incorrect.
21       Q.    Just maybe not complete, is that
22   what you're saying?
23       A.    There were two matter numbers
24   that dealt with different aspects of the
25   file history of the '160 Patent, one of

83 (Pages 326 to 329)

Page 326

1              P. Sutton
2  those being the re-examination papers that
3  for orderliness would have been separated
4  for ease of reference.
5      Q.  And the other one was the patent
6  prosecution matter?
7      A.   Not patent prosecution, because
8  at the time that the '160 Patent was
9  granted, Greenberg Traurig did not
10  represent Quickie. That prosecution had
11  already been completed.
12      Q.   So what other matter number are
13  you referring to then?
14      A.   The matter of the patent itself
15  having already been granted at the time
16  that GT was retained.
17      Q.   Which matter number is that, is
18  it 0104, Quickie versus Medtronics, 0107 --
19      A.   See, I think your problem is that
20  you're referring to the table that your
21  firm has created instead of to the
22  documents.
23      Q.   Well, we can refer to the
24  documents.
25          If you look at Exhibit 17, 0107

Page 327

1              P. Sutton
2  is the patent.
3      A.   Exhibit 17?
4      Q.   Yes.  Exhibit 101, the patent
5  prosecution for the '160 Patent?
6      A.   The mattered number 010700
7  relates to the issued patent, the '160
8  Patent on line 6 of Exhibit 17.
9      Q.   So then you're saying that to be
10  complete, Todd Sharinn should have also
11  referenced 010700?
12      A.   I didn't say that.
13      Q.   Well, he only says that he's
14  providing a notice of change regarding
15  Power of Attorney filed in connection with
16  010900?
17      A.   He said what he said. I'm
18  calling your attention to the fact that the
19  re-examination proceedings, documents
20  relating to which were physically kept
21  separate under matter number 010900 related
22  to the file history of the '160 Patent
23  which carried a Greenberg Traurig matter
24  number 010700. That's what I testified to,
25  and I reference you in that regard to

Page 328

1              P. Sutton
2  Exhibit 17.
3      Q.   Are you aware of any
4  correspondence from yourself or Todd
5  Sharinn or a paralegal at Greenberg Traurig
6  saying that they're transferring files
7  related to matter number, client matter
8  number 51812.010700 to Thelen?  Do you
9  recall seeing any such document?
10      A.   Can you rephrase that question,
11  please?
12      Q.   My question is we've looked at
13  correspondence that references 010400 and
14  now we've looked at correspondence that
15  references 010900.
16          My question is:  Have you ever
17  seen any correspondence that references
18  010700?
19      A.   Yes.  I refer you to my prior
20  testimony with respect to item number 5 on
21  Exhibit 26 indicating that the documents
22  involving the '160 Patent which had a
23  matter number associated with it of '01
24  0700 were forwarded on October 16, 2002 to
25  Thelen by Paul Jergensen.

Page 329

1              P. Sutton
2      Q.   I'm sorry, it's late in the day,
3  but bear with me.
4          Where on Exhibit 26 do the
5  numbers 010700 appear, because I'm not
6  seeing it?
7      A.   You have to then go to find the
8  0107, that is on line 17, which is the
9  Greenberg Traurig client matter intake
10  memorandum associated with item number 5 on
11  Exhibit 26.
12      Q.   So the number, the actual number
13  010700 don't appear on Exhibit 26, but
14  you're saying that they're incorporated
15  within item number 5, that's what you're
16  saying?
17      A.   I said what I said.
18      Q.   Okay, fine.
19      A.   You have a tendency to attempt to
20  summarize my testimony and it's rarely
21  accurate.
22      Q.   I'm just trying to make sure I
23  understand that you're not saying that the
24  number 010700 appear on Exhibit 26?
25      A.   Listen --

84 (Pages 330 to 333)

Page 330

1        P. Sutton
2        MR. CHU: Why don't we take a
3    break.
4        MR. LODEN: There's a question
5    pending. I'd like to get an answer to
6    the question pending.
7    **Q.   You're not saying, are you, that**
8    **number 010700 appears on Exhibit 26, are**
9    **you?**
10   A.   I have not testified to that
11   effect, no.
12   **Q.   Okay.**
13       **Well, point to me where those**
14   **numbers appear on Exhibit 26.**
15   A.   I don't see those numbers on 26
16   as I look at it quickly.
17   **Q.   Okay.**
18   A.   I see item number 5 which
19   corresponds to that number on the second
20   page of Exhibit 26.
21       MR. SCOTT: Objection. Move to
22   strike as nonresponsive, everything
23   after "I see."
24       MR. LODEN: Do you want to take a
25   break?

Page 331

1        P. Sutton
2        (Recess taken from 6:17 p.m. to
3    6:27 p.m.)
4    BY MR. LODEN:
5    **Q.   Before the break, Mr. Sutton,**
6    **we've looked at several pieces of**
7    **correspondence where there's reference of**
8    **files being transferred to Thelen.**
9        **Do you know if Greenberg kept**
10   **copies of any of those files that were**
11   **transferred to Thelen?**
12   A.   As I sit here today, I don't
13   know.
14   **Q.   Do you know if those files were**
15   **included in the documents reviewed in**
16   **response to our request for production, if**
17   **there were such copies made?**
18   A.   I was not charged with that
19   responsibility, so I don't know the answer
20   to that question.
21   **Q.   Who was charged with the**
22   **responsibility of reviewing Greenberg's**
23   **files and gathering them for response to**
24   **our request for production?**
25   A.   Office of general counsel,

Page 332

1        P. Sutton
2    outside counsel with support from employees
3    of Greenberg Traurig.
4    **Q.   You said office of general**
5    **counsel.**
6        **That's Greenberg Traurig's**
7    **general counsel?**
8    A.   That's correct.
9        MR. LODEN: I'll ask the reporter
10   to mark Exhibit 28.
11       (Exhibit 28, Document, Bates
12   stamped Bates numbers GT 15831 to
13   15841, marked for identification, as
14   of this date.)
15   BY MR. LODEN:
16   **Q.   Mr. Sutton, the reporter has just**
17   **handed you what's been marked as Exhibit**
18   **28.**
19       **Before we get to it, I just want**
20   **to make sure you and I agree that the, if**
21   **you look at Exhibit 27?**
22   A.   Yes.
23   **Q.   Exhibit 27, the second page,**
24   **there's a date on there, date mailed, April**
25   **2, 2003.**

Page 333

1        **P. Sutton**
2    A.   I see that date.
3    **Q.   So is that the date that your**
4    **testimony is that Greenberg's Power of**
5    **Attorney with respect to the '160 Patent**
6    **was revoked and Thelen was given Power of**
7    **Attorney?**
8    A.   That's the same date I was
9    referring to previously in my testimony.
10   **Q.   With respect to that transfer of**
11   **Power of Attorney? It's not a trick**
12   **question. I'm just trying to make sure**
13   **we're talking about the same date when the**
14   **Power of Attorney was transferred.**
15   A.   I believe it's the same date that
16   our Power of Attorney was revoked and the,
17   and our responsibility ended.
18   **Q.   Okay.**
19   A.   With respect to the '160 Patent.
20   **Q.   If you look at Exhibit 28, which**
21   **is a multipage document bearing Bates**
22   **numbers GT 15831 through 15841, the top of**
23   **page 1, it appears that Todd Sharinn is**
24   **e-mailing you, copies of the Quickie**
25   **re-examine papers in an e-mail dated April**

85 (Pages 334 to 337)

Page 334

1          **P. Sutton**
2  **6, 2004.**
3          **Do you see that?**
4      A.    I see those dates and I see the
5  reference to me by Todd, yes.
6      **Q.    Do you know why Todd was sending**
7  **you the Quickie re-examine papers on April**
8  **6, 2004?**
9      A.    Probably more than one reason.
10  He asks in the second sentence do you have
11  time to discuss Todd.  He was sending them
12  to me so that I could review them prior to
13  our discussing them.
14      **Q.    Well, I thought you said that**
15  **Greenberg's Power of Attorney was revoked**
16  **on April 2, 2003, so my question is:  Why**
17  **are you and Todd discussing the re-examine**
18  **a year later, roughly a year later?**
19      A.    Well, we take an interest in
20  matters that we've helped clients for and
21  we monitor cases that are handled by other
22  firms, and we inform our own opinions.
23          There are times that we learn
24  from the practices of other firms, not the
25  case in all instances, and I think that

Page 335

1          P. Sutton
2  Todd's having had a relationship with Steve
3  Colvin prompted him to want to discuss this
4  with me.
5      **Q.    Well, did you actually discuss it**
6  **with Todd?**
7      A.    You're talking about four years
8  ago, more than four years ago.  It's likely
9  I did.
10      **Q.    What did you all talk about?**
11      A.    The papers that he forwarded with
12  his April 6, 2004 e-mail to me.
13      **Q.    Well, in what aspect did you**
14  **discuss those papers?**
15      A.    It would have included a
16  discussion of the substance of those
17  papers.
18      **Q.    Okay.**
19          **But at that time, Greenberg did**
20  **not have Power of Attorney concerning**
21  **160359 at the time that this discussion**
22  **occurred?**
23      A.    Todd's April 6, 2004 e-mail to me
24  requesting time to discuss is after the
25  April 2, 2003 revocation, so that we no

Page 336

1          P. Sutton
2  longer after April 2, 2003 had any
3  responsibility for the '160 Patent or
4  matters affecting the '160 Patent.
5      **Q.    Did someone ask you to monitor**
6  **the re-examination of the '160 Patent even**
7  **after the Power of Attorney was revoked?**
8      A.    I am not aware of any such
9  request, as I sit here today.
10      **Q.    If you turn to page 2, looks like**
11  **a fax cover page from someone at New York**
12  **University School of Medicine to Todd**
13  **Sharinn.**
14          **Do you see that?**
15      A.    Yes.
16      **Q.    Do you know why these papers were**
17  **being faxed from New York University School**
18  **of Medicine to Todd Sharinn?**
19      A.    If you take a look at the fax
20  cover sheet, which is the second page, it's
21  the fax cover sheet of Stephen Colvin,
22  Dr. Colvin of Quickie.
23      **Q.    Uh-huh.**
24      A.    As I look at these papers and the
25  fact that he's forwarding it to our firm --

Page 337

1          P. Sutton
2  I don't know what's in his mind at that
3  time.
4      **Q.    Okay.**
5      A.    Do you notice to the fax cover
6  sheets to Thelen Reid & Priest to the
7  attention of Hal Bolner.
8      **Q.    You're referring to page 3 of the**
9  **document?**
10      A.    That's correct.
11      **Q.    Right, that's the document that**
12  **Dr. Colvin had forwarded to Todd Sharinn,**
13  **right -- I mean, that's the attachment to**
14  **the fax cover page on page 2 of the**
15  **exhibit?**
16      A.    I believe that that sheet ending
17  in 5833 is from the Patent and Trademark
18  Office Technology Center in Alexandria,
19  Virginia.
20      **Q.    Then Dr. Colvin forwarded that**
21  **fax from the PTO office to Todd Sharinn,**
22  **and my question is:  Again, I think you've**
23  **already said you don't know why he did it,**
24  **but do you have any reason to know why**
25  **Dr. Colvin wanted this information**

86 (Pages 338 to 341)

Page 338

1          **P. Sutton**
2  **forwarded to Todd Sharinn?**
3     A.   I would imagine he would be
4  concerned about the events taking place
5  after his having revoked our power.
6     **Q.   Do you know if you billed your**
7  **time to Quickle for this discussion with**
8  **Todd concerning the re-examine papers?**
9     A.   I'm not aware of any billing of
10 time with regard to my looking at
11 re-examination papers, but I would be able
12 to confirm whether that's the case or not
13 by looking at our invoices. I do not
14 recall any time being billed.
15    **Q.   Would your answer be the same**
16 **with respect to Mr. Sharinn?**
17    A.   You have to ask Mr. Sharinn that.
18    **Q.   Well, if you wanted to -- you**
19 **personally don't know if Mr. Sharinn billed**
20 **time or not for that conversation?**
21    A.   I'd have to refer to --
22       MR. CHU: Objection.
23    A.   -- I'd have to refer to invoices
24 to answer that question.
25       MR. LODEN: If we can mark

Page 339

1          P. Sutton
2  Exhibit 29.
3       (Exhibit 29, Document, marked for
4       identification, as of this date.)
5  BY MR. LODEN:
6     **Q.   Do you have Exhibit 29 in front**
7  **of you?**
8     A.   Yes.
9     **Q.   Who is Marilyn Dawkins?**
10    A.   She's the assistant, whose name I
11 gave you in my earlier testimony today.
12    **Q.   Right.**
13    A.   She's my assistant and another
14 word for that would be secretary.
15    **Q.   Got it, okay.**
16       **There is a portion up at the top**
17 **that's redacted, but the portion that**
18 **remains looks to be a transcription of a**
19 **voicemail that Alan Fell left for you at**
20 **12:20 p.m.**
21       **Do you see that? Is that what**
22 **that is?**
23    A.   This appears to be a
24 transcription of a voicemail that Alan Fell
25 left for me at 12:20 p.m. on the date that

Page 340

1          P. Sutton
2  he called.
3     **Q.   Okay.**
4       **In that voicemail, he referenced**
5  **a conversation with Todd Sharinn and that**
6  **Todd thought it maybe was a good idea that**
7  **Allan spoke with you.**
8       **Do you see that?**
9     A.   I see reference to that type of
10 thing in the body of this transcription of
11 the voicemail.
12    **Q.   Did you actually talk to Mr. Fell**
13 **after this voicemail?**
14    A.   I have no recollection of talking
15 to Mr. Fell after receiving this voicemail.
16    **Q.   He asks you to give him a call**
17 **when you have a chance, when you get a**
18 **chance.**
19       **Do you recall whether you made**
20 **that phone call?**
21    A.   I just answered that question.
22    **Q.   I asked if you talked to him. I**
23 **didn't ask if you called him. Maybe you**
24 **didn't get it. But did you try to call him**
25 **back?**

Page 341

1          **P. Sutton**
2     A.   I have no recollection as to
3  that.
4     **Q.   Do you know why Todd thought that**
5  **it would be a good idea for Mr. Fell to**
6  **speak with you?**
7     A.   You're asking me about the
8  operation of the mind of Todd Sharinn and I
9  really, I'm not in a position to give you
10 testimony that's truthful and honest --
11    **Q.   You don't want to speculate as to**
12 **what he was thinking?**
13       MR. CHU: Objection to that.
14    Let's move forward.
15       MR. LODEN: I'm just asking.
16 BY MR. LODEN:
17    **Q.   Do you want to speculate as to**
18 **what Mr. Sharinn was thinking?**
19       MR. CHU: No, he does not.
20       MR. SCOTT: Nor do we.
21       MR. LODEN: That's fine.
22 BY MR. LODEN:
23    **Q.   Todd Sharinn eventually left**
24 **Greenberg Traurig and moved to Baker**
25 **McKenzie, correct?**

87 (Pages 342 to 345)

Page 342

```
1        P. Sutton
2    A.   I believe that that's so.
3    Q.   For the Quickle matters that were
4  open that did not relate to the '160
5  Patent, were those matters transferred to
6  Baker McKenzie when Todd moved to Baker
7  McKenzie?
8    A.   As I sit here today, I don't
9  know.
10   Q.   When did you last speak with
11  Todd?
12   A.   Yesterday.
13   Q.   Was that in person or over the
14  phone?
15   A.   That was in person at the offices
16  of outside counsel.
17   Q.   Do you know if there was any file
18  transfer correspondence between Greenberg
19  Traurig and Baker McKenzie concerning the
20  transfer of files to Baker McKenzie?
21   A.   I have no personal information or
22  knowledge that would enable me to answer
23  that question.
24   Q.   Who would?
25   A.   I don't know.
```

Page 343

```
1        P. Sutton
2    Q.   If you wanted to see whether
3  files were transferred from Greenberg
4  Traurig to Baker McKenzie, where would you
5  look?
6    A.   I'm not sure as I sit here right
7  now.
8        MR. CHU: Other than in the files
9  themselves.
10       MR. LODEN: Well, I mean, that
11  seems reasonable, but he's not willing
12  to say that.
13       MR. CHU: It's late in the day.
14       MR. LODEN: Well, I'm just trying
15  to understand.
16  BY MR. LODEN:
17   Q.   Do you have any knowledge at all
18  of the transfer of Quickie's files from
19  Greenberg Traurig to Baker McKenzie when
20  Todd left Greenberg Traurig and moved to
21  Baker McKenzie?
22   A.   I personally have no knowledge of
23  that, and to the extent that I wanted to
24  find out if that occurred, I would have to
25  seek information from our records
```

Page 344

```
1        P. Sutton
2  department at our firm.
3    Q.   Okay.
4        Why did Todd leave Greenberg, if
5  you know?
6    A.   He left for what I believe was a
7  better opportunity, and I think that there
8  was a mutual feeling that he did not quite
9  fit in at Greenberg and felt that, it would
10  be a better fit for him at Baker.
11   Q.   How did he not fit in at
12  Greenberg, in what respect?
13   A.   I think just general personality.
14   Q.   Well, what aspect of his
15  personality made him a poor fit for
16  Greenberg?
17   A.   I don't know how to -- I mean,
18  I'm not in a position to give you a concise
19  statement. His style was different than
20  the style of others with whom he worked and
21  he had the feeling and we had the feeling
22  that he did not fit in.
23       MR. SCOTT: Are you going to ask
24  anymore questions about that?
25       MR. LODEN: One or two.
```

Page 345

```
1        P. Sutton
2        MR. SCOTT: It's late in the day
3  and I just don't want you to say
4  something that you don't need to say
5  in terms of a personal insult on Todd.
6        THE WITNESS: I don't want to do
7  that.
8        MR. SCOTT: -- a high regard for
9  him, and it doesn't serve anybody's
10  interest to say something that's
11  extraneous that can be taken wrongly
12  by somebody.
13       THE WITNESS: That's why I'm
14  trying to be careful in giving you a
15  truthful answer, but I have nothing
16  negative to say about Todd Sharinn.
17  BY MR. LODEN:
18   Q.   My only other question was: Was
19  Todd ever nominated for partner at
20  Greenberg Traurig?
21   A.   Not that I'm aware of --
22  actually, I misspoke. We don't have
23  partners at Greenberg Traurig, we have
24  shareholders.
25   Q.   Shareholders.
```

88 (Pages 346 to 349)

Page 346

1         P. Sutton
2     A.   And I don't believe we have a
3  nomination process as such, but Todd never
4  advanced to shareholder status.
5         MR. LODEN:  Two more.
6         Exhibit 30.
7         (Exhibit 30, Document Bates
8     stamped 15842 to 15844, marked for
9     identification, as of this date.)
10 BY MR. LODEN:
11    Q.   You've been handed a document
12 which, a three-page document which has been
13 marked as Exhibit 30, which was produced by
14 Greenberg in this litigation with Bates
15 numbers 15842 through 15844.
16        Have you seen this document
17 before?
18    A.   I believe I have.
19    Q.   When did you last see this
20 document?
21    A.   I believe on or about the time of
22 the e-mail of September 28, 2006.
23    Q.   Okay.
24        Have you ever spoken with Tim
25 Maier?

Page 347

1         P. Sutton
2     A.   Tim?
3     Q.   I'm sorry, look at the last page
4  of the exhibit, do you see the signature
5  block there for Timothy J. Maier,
6  M-A-I-E-R?
7     A.   I don't recall any conversations
8  between myself and Timothy Maier.
9     Q.   Okay.
10        So it looks like Mr. Maier sent
11 pages 2 and 3 of Exhibit 30, somehow he
12 sent them to Charles Berman at Greenberg
13 Traurig.
14        Do you know, who is Mr. Berman?
15    A.   Charles Berman is a patent
16 attorney who works in our Los Angeles
17 office.
18    Q.   Okay.
19        And then the first page, it looks
20 like Mr. Berman or actually the secretary
21 to Mr. Berman was forwarding Mr. Maier's
22 correspondence to you, right?
23    A.   That appears to be the case.
24    Q.   We don't need to spend the time
25 unless you want to actually read the text

Page 348

1         P. Sutton
2  of Mr. Maier's correspondence, but in it he
3  requests copies of any engagement
4  agreements with Quickle, any transfer
5  letters, any docketing records, et cetera.
6         So my question is:  Did you
7  search Greenberg's files for those types of
8  documents in response to Mr. Maier's
9  request?
10    A.   I do not recall, as I sit here
11 today, any information that would permit me
12 to answer your query.
13    Q.   You just don't remember if you
14 searched or not?
15    A.   I don't recall any, I don't
16 recall anything that would help me respond
17 to your question.
18    Q.   What did you do with Mr. Maier's
19 correspondence after Mr. Berman forwarded
20 it to you?
21    A.   I do not recall.
22    Q.   As you sit here today, do you
23 know if Greenberg Traurig produced any
24 documents at all to Mr. Maier in response
25 to his request?

Page 349

1         P. Sutton
2     A.   As sit here, I have, I do not
3  have a recollection or knowledge for me to
4  answer that question.  I just don't know.
5     Q.   And just so the record is clear,
6  you weren't involved -- if there was an
7  effort to find documents, you weren't
8  involved in that effort, correct?
9     A.   I do not recall if --
10    Q.   You don't recall what?
11    A.   I don't recall anything that
12 permits me to answer your question.  I
13 don't recall any events or activities on my
14 part in connection with this, as I sit here
15 today.
16    Q.   Do you know if Greenberg
17 maintains an index of the files it keeps on
18 behalf of clients?
19    A.   What do you mean by index?
20    Q.   For example, and let's talk
21 specifically with respect to the Quickie
22 client matter numbers, do you know if
23 there's a document which lists the files
24 that are maintained or that were maintained
25 for the Quickie engagements?

89 (Pages 350 to 353)

Page 350

```
 1          P. Sutton
 2     A.   I'm not aware of any as I sit
 3  here today.
 4     Q.   Okay.
 5          Does Greenberg have a document
 6  retention policy?
 7     A.   I'm sure it does, but I am not
 8  familiar with the details of that.
 9     Q.   As you sit here today, do you
10  know if Greenberg has ever destroyed any
11  documents created during the Quickie
12  engagements, any engagement for Quickie,
13  LLC?
14     A.   I'm not aware of any.
15          MR. LODEN: If I can have two or
16  three minutes to go over my notes and
17  chat with my co-counsel real quick, I
18  think that we can wrap this up from
19  our side.
20          MR. CHU: Absolutely, absolutely.
21          MR. LODEN: Off the record.
22          (Recess taken from 6:51 p.m. to
23  6:57 p.m.)
24          MR. LODEN: Mr. Sutton, I
25  appreciate your time today and your
```

Page 351

```
 1          P. Sutton
 2  effort to answer my questions.  At
 3  this time, we have no further
 4  questions for you I pass the witness.
 5          MR. CHU: Thank you.
 6          THE WITNESS: Thank you.
 7          (Time Noted: 7:00 p.m.)
 8
 9          _____
10               PAUL SUTTON
11
12  Subscribed and sworn to before me
13  this ____ day of _____, 2008.
14
15          _____
16
17
18
19
20
21
22
23
24
25
```

Page 352

```
 1
 2          C E R T I F I C A T E
 3  STATE OF NEW YORK    )
 4                       : SS.
 5  COUNTY OF NEW YORK   )
 6
 7          I, Joan Urzia, a Notary Public
 8  within and for the State of New York,
 9  do hereby certify:
10          That PAUL SUTTON, the witness
11  whose deposition is hereinbefore set
12  forth, was duly sworn by me and that
13  such deposition is a true record of the
14  testimony given by the witness.
15          I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I
18  am in no way interested in the outcome
19  of this matter.
20          IN WITNESS WHEREOF, I have
21  hereunto set my hand this 11th day of
22  June, 2008.
23
24          _____
25               Joan Urzia
```

Page 353

```
 1
 2  --------------- I N D E X ----------------
 3  WITNESS        EXAMINATION BY       PAGE
 4  PAUL SUTTON      MR. LODEN           5
 5
 6  ------------------ EXHIBITS ----------------
 7                    FOR ID.
 8  1    30(b)(6) Notice of Greenberg  17
 9       Traurig
10  2    Document              26
11  3    Patent Record Sheet Form    45
12  4    30(b)(6) Deposition Notice   54
13  5    Correspondence dated 4/11/02 123
14  6    Greenberg Traurig's Responses 162
15       to Plaintiff's Interrogatories
16  7    Document Bates stamped 380   174
17       to 384
18  8    DIAMS Patent Record Sheet    174
19  9    Client Matter Intake      219
20       Memorandum
21  10   Client Matter Intake      230
22       Memorandum dated 9/9/01
23
24
25                 (Continued)
```

90 (Pages 354 to 355)

Page 354

```
 1
 2  ------------ EXHIBITS (Cont'd) ------------
 3              FOR ID.
 4  11    Client Matter Intake       236
 5        Memorandum dated 9/9/01
 6  12    Client Matter Intake       239
 7        Memorandum dated 11/1/01
 8  13    Greenberg Traurig client   242
 9        matter intake memorandum
10        dated 11/28/01
11  14    Document referencing client  243
12        matter number 51822.010400
13  15    Greenberg Traurig client   243
14        matter intake memorandum
15        dated 1/29/02
16  16    Greenberg Traurig client   243
17        matter intake memorandum
18  17    Greenberg Traurig client   243
19        matter intake memorandum
20        dated 8/5/02
21  18    Document dated 11/1/02      243
22  19    Greenberg Traurig client   243
23        intake memorandum
24
25                  (Continued)
```

Page 355

```
 1
 2  ------------ EXHIBITS (Cont'd) ------------
 3              FOR ID.
 4  20    Summary of documents       244
 5  21    Pepe & Hazard letter dated  272
 6        5/30/00
 7  22    Document                   290
 8  23    Fax dated 11/11/02         302
 9  24    Letter              306
10  25    Document            313
11  26    March 11, 2003 letter      321
12  27    May 15, 2003 letter       323
13  28    Document, Bates stamped    332
14        Bates numbers GT 15831 to
15        15841
16  29    Document            339
17  30    Document Bates stamped     346
18        15842 to 15844
19
20
21
22
23
24
25
```

<u>Quickie LLC  v. Greenberg Traurig LLP</u>

## CORRECTIONS IN DEPOSITION
## OF
## <u>PAUL SUTTON</u>

<u>Page/line</u>                      <u>Correction</u>

p. 99, l. 16 and 18          Change:  "Covan" to "Colvin"

p.106, l. 6                      Change: "2000" to "2003"
              <u>Reason for Change:</u>  typographical error, as the balance of my
           answer show

p.173, l. 21-24               Change:   entire answer to "yes"
              <u>Reason for Change:</u> I misheard the question; this change is
           consistent with my prior answers

p.197, l. 3-4                  Change; "pat at any time" to "patent"
              <u>Reason for Change:</u>   transcription error

p. 198, l. 15-16               Change:   "appear I can't say" to "appearance"
              <u>Reason for Change:</u>   transcription or typographical error

p.228, l. 23                  Change:   "come" to "comes"
              <u>Reason for Change:</u>   typographical error

p. 274, l. 11                 Change:  add "not" after "was" and before "our"
              <u>Reason for Change:</u>  transcription error as shown by the earlier
           portion of that answer, particularly on lines 5-9 and my subsequent
           answers, e.g. on p. 275-76 and 283-84

1

p.300, l. 6                    Change:  "coincide" to "coincidence"
                              Reason for Change:    typographical error


p.319, l. 4                    Change:  "?" to "."
                              Reason for Change:    transcription or typographical error


                                        _____
                                                  Paul Sutton

Sworn to before me
this 21 day of July, 2008


_____
       Notary Public

        LINDA GARRAMONE
   Notary Public, State of New York
         No. 01GA5047743
      Qualified in Suffolk County
   Commission Expires August 7, 2009

                              2

# EXHIBIT U

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------

QUICKIE, LLC,

      Plaintiff,

   vs.               07-CV-10331

GREENBERG TRAURIG, LLC,    (RMB)(DFE)

et al.,

      Defendants.

------------------------------

DEPOSITION OF TODD SHARINN

Wednesday, June 11, 2008

9:30 a.m.

Reported by:

Joan Urzia, RPR

JOB NO. 203575

2 (Pages 2 to 5)

| Page 2 | Page 4 |
|---|---|
| 1 | 1 |
| 2  June 11, 2008 | 2  IT IS HEREBY STIPULATED AND |
| 3  9:30 a.m. | 3  AGREED, by and between the attorneys |
| 4  New York, New York | 4  for the respective parties herein, that |
| 5 | 5  filing and sealing be and the same are |
| 6 | 6  hereby waived. |
| 7  DEPOSITION of TODD SHARINN, held | 7  IT IS FURTHER STIPULATED AND |
| 8  at the offices of Diamond McCarthy, 620 | 8  AGREED that all objections, except as |
| 9  Eighth Avenue, New York, New York, pursuant | 9  to the form of the question, shall be |
| 10  to Notice, before Joan Urzia, a Notary | 10  reserved to the time of the trial. |
| 11  Public of the State of New York. | 11  IT IS FURTHER STIPULATED AND |
| 12 | 12  AGREED that the within deposition may |
| 13 | 13  be sworn to and signed before any |
| 14 | 14  officer authorized to administer an |
| 15 | 15  oath, with the same force and effect as |
| 16 | 16  if signed and sworn to before the |
| 17 | 17  Court. |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

| Page 3 | Page 5 |
|---|---|
| 1 | 1  T. Sharinn |
| 2  A P P E A R A N C E S: | 2  TODD SHARINN, |
| 3 | 3  called as a witness, having been duly |
| 4 | 4  sworn by a Notary Public, was examined |
| 5  DIAMOND McCARTHY, LLP | 5  and testified as follows: |
| 6  Attorneys for Plaintiff | 6  EXAMINATION BY |
| 7  620 Eighth Avenue | 7  MR. SCOTT: |
| 8  39th Floor | 8  Q.  My name is Skip Scott, together |
| 9  New York, New York 10018 | 9  with my colleague Steve Loden, whom you've |
| 10  BY: STEPHEN T. LODEN, ESQ. | 10  just met. We represent Quickie and we're |
| 11  WALTER J. SCOTT, ESQ. | 11  with the law firm Diamond McCarthy. |
| 12 | 12  Could you please just identify |
| 13 | 13  yourself for the record. |
| 14  POLLACK & KAMINSKY | 14  A.  Sure. My name is Todd Sharinn. |
| 15  Attorneys for Defendant | 15  Q.  Could you spell that, because it |
| 16  114 West 47th Street | 16  has a little unique spelling? |
| 17  New York, New York 10036 | 17  A.  It does S-H-A-R-I-N-N. |
| 18  BY: MARTIN I. KAMINSKY, ESQ. | 18  Q.  And you're appearing here |
| 19  JUSTIN Y.K. CHU, ESQ. | 19  pursuant to a deposition notice today, |
| 20 | 20  correct? |
| 21 | 21  A.  Yes, sir. |
| 22 | 22  Q.  Are you represented by counsel? |
| 23 | 23  A.  I am, yes, sir. |
| 24 | 24  Q.  Could you identify your counsel |
| 25 | 25  for us? |

3 (Pages 6 to 9)

Page 6

1          T. Sharinn
2     A.    Kaminsky & Pollack.
3     Q.    Are you a party to this
4 litigation, to your understanding?
5     A.    I am not.
6     Q.    You were previously a party to
7 this litigation?
8     A.    I think I was a third-party
9 defendant, if I'm not mistaken.
10    Q.    All right.
11          MR. SCOTT:  Why don't we go ahead
12    and mark as our first exhibit this
13    morning, deposition notice.
14          (Exhibit 31, Deposition Notice,
15    marked for identification, as of this
16    date.)
17 BY MR. SCOTT:
18    Q.    Mr. Sharinn, did you have a
19 chance to review the deposition notice
20 previously?
21    A.    Yes, sir.
22    Q.    Are you appearing here today with
23 any documents pursuant to the document
24 request attached to that?
25    A.    I'm not.

Page 7

1          T. Sharinn
2     Q.    Okay.
3          Did you take an opportunity to
4 look through the document request just to
5 ensure that you didn't have any personal
6 files that you might have had, you know, at
7 home or in your office, that weren't
8 previously produced by your counsel?
9     A.    I don't know exactly what was
10 produced, but I did not have any files, and
11 yes, I did -- to answer your question, yes,
12 I did look.
13    Q.    Okay.
14          You understand that you're
15 appearing here today as a fact witness,
16 correct?
17    A.    Yes, sir.
18    Q.    And you are an attorney, correct?
19    A.    Yes, sir.
20    Q.    You have been engaged in
21 litigation as counsel, correct?
22    A.    Yes, sir.
23    Q.    You've taken depositions?
24    A.    I have.
25    Q.    So we can dispense with some of

Page 8

1          T. Sharinn
2 the do's and don't's of deposition taking
3 and answering of questions.
4     A.    I'm hoping to learn today.
5     Q.    Well, I can't promise you
6 anything in that regard.
7          What I would ask, though, is that
8 what I'm after today is your testimony,
9 what you can recall, and I'm not asking you
10 to speculate or to give an opinion or
11 anything of that nature.
12          So in terms of trying to move
13 forward through this deposition, if you
14 don't remember, that's fine.  If you
15 weren't party to the communication or
16 anything like that, I would just ask you to
17 try and stay close to what it is that you
18 know from your own personal knowledge.
19    A.    Yes, sir.
20    Q.    If you don't understand a
21 question, it's probably because I butchered
22 the question, and just ask me to repeat it
23 and I'll do my best to do so.
24    A.    Yes, sir.
25    Q.    You understand that this

Page 9

1          T. Sharinn
2 litigation concerns the failure to pay a
3 maintenance fee, in particular the 3.5-year
4 maintenance fee on a particular patent
5 known as the '160 Patent, correct?
6     A.    Generally stated, yes.
7     Q.    Okay.
8          And you understand that that
9 patent was assigned to a former client of
10 Greenberg Traurig's and yours by the name
11 of Quickie, LLC, correct?
12    A.    They were Greenberg's client,
13 yes, sir.
14    Q.    What, if anything, have you done
15 in preparation for your deposition here
16 today?  Give me a sense of what documents
17 or volume of documents you might have
18 looked at and things of that nature.
19    A.    I met with my attorneys and they
20 showed me some documents.  Specifically
21 which ones would be hard to identify, but
22 we discussed the contents of those
23 documents and tried to refresh my
24 recollection as best as possible so that I
25 could provide you with as full testimony as

4 (Pages 10 to 13)

Page 10

1        T. Sharinn
2   possible today.
3      **Q.   Did you look at any of your --**
4   **when I say yours, Greenberg Traurig's,**
5   **invoices for Quickie?**
6      A.   I think we discussed them
7   generally, but I don't recall whether I had
8   actually looked at any or not. I think I
9   may have looked at one or two.
10     **Q.   All right.**
11         **And then generally just some**
12  **correspondence during the time period, the**
13  **relevant time period?**
14     A.   We did look at a couple of
15  correspondence, yes, sir.
16     **Q.   About how much time did you spend**
17  **with your attorneys?**
18     A.   In total, probably about two and
19  a half hours, including this morning.
20     **Q.   So some this morning as well as**
21  **some yesterday or the day before?**
22     A.   Something like that, yes, sir.
23     **Q.   All right.**
24         **Have you previously given**
25  **testimony in any suits?**

Page 11

1        **T. Sharinn**
2   A.   No, sir.
3      **Q.   Either by way of deposition or at**
4   **trial?**
5   A.   No, sir.
6      **Q.   I noted in some of the**
7   **correspondence that there was reference to**
8   **your possibly testifying in connection with**
9   **the Medtronic litigation.**
10         **That never occurred?**
11     A.   I don't recall me testifying or
12  being asked to testify.
13     **Q.   Do you recall providing an**
14  **affidavit in connection with the Medtronic**
15  **litigation?**
16     A.   I do, but it was not in regards
17  to the Medtronic litigation.
18     **Q.   What was that in regards to?**
19     A.   My recollection was it was in a
20  petition to revive the '160 Patent.
21     **Q.   Petition to revive, can you**
22  **explain what that is?**
23     A.   Technical terms, patent goes
24  abandoned through no fault of your own, it
25  could be just circumstances, the Patent and

Page 12

1        T. Sharinn
2   Trademark Office allows you to revive the
3   patent to bring it back to life again.
4         I was asked by a gentleman out of
5   Virginia --
6      **Q.   Mr. Maier?**
7      A.   Yes, sir, I didn't remember his
8   name.
9      **Q.   That's okay.**
10     A.   -- to sign a declaration
11  regarding my involvement in the case.
12     **Q.   Do you recall another affidavit**
13  **in which you were asked by Mr. Evens to**
14  **attest to prior art reviewed by you in**
15  **connection with the second re-examination**
16  **for the '160 Patent?**
17     A.   I didn't even know there were two
18  reexaminations, so no, I don't.
19     **Q.   Any other affidavits that you can**
20  **recall providing in connection with this**
21  **particular patent, the '160 Patent?**
22     A.   Only the one I discussed with
23  you.
24     **Q.   Okay.**
25     A.   If you want to show me a

Page 13

1        T. Sharinn
2   document, maybe it can refresh my
3   recollection.
4      **Q.   I just want to get a general feel**
5   **of what you might, and then we may get to**
6   **some specific documents as we go.**
7      A.   Okay.
8      **Q.   You are a licensed patent**
9   **attorney?**
10     A.   Yes, sir.
11     **Q.   When did you pass the patent bar**
12  **and begin practicing as a patent attorney?**
13     A.   I don't recall. It's been a long
14  time, though. Well over 10 years.
15     **Q.   Did you take the patent bar**
16  **immediately or shortly upon being licensed**
17  **as an attorney, or did you wait some time?**
18     A.   I don't remember. You know, if
19  you give me a moment to think. I think it
20  was pretty close to about the time I got
21  licensed as an attorney.
22     **Q.   The reason I asked is that I've**
23  **taken the liberty of pulling up your press**
24  **release and bio upon joining Harris Beach.**
25     A.   Was it good?

5  (Pages 14 to 17)

Page 14

1         T. Sharinn
2    Q.   Actually, it is, and
3  congratulations on your partnership.
4    A.   Okay, I hadn't read it, so I
5  don't know.
6    Q.   Let me just hand it to you and
7  you don't need to go through it all.  It's
8  Exhibit 32.
9         (Exhibit 32, Press release and
10        biography, marked for identification,
11        as of this date.)
12 BY MR. SCOTT:
13   Q.   I'm happy for you to read about
14 yourself at your leisure --
15   A.   I prefer not to.  I try to avoid
16 reading about myself.
17   Q.   So if I can direct your attention
18 then and bypass some of that --
19   A.   That would be great.
20   Q.   -- to the third page JD 1991 from
21 Cardoza Law School.
22   A.   That's right.
23   Q.   And then in just looking at the
24 licensures, United States Patent Bar 1998,
25 and does that refresh your recollection as

Page 15

1         T. Sharinn
2  to any gap?
3    A.   Yes, sir.
4    Q.   So when you first came out of law
5  school and began practicing -- by the way,
6  where did you first start out at?
7    A.   I was at a firm in Los Angeles
8  called Pom Smith Lande & Rose.
9    Q.   All right.
10        And just so I have it clear in my
11 mind, can you maybe just walk me through
12 the benchmarks of the different firms that
13 you've been at during the course of your
14 career?
15   A.   To the best of my recollection, I
16 moved around a lot, so it's hard to --
17   Q.   Everybody does nowadays.
18   A.   I was also playing hockey
19 professionally at the time.
20   Q.   Well, I'll ask you about that on
21 a break.  I'm sorry, the firm -- I don't
22 know the name of that firm.
23   A.   Pom Smith Lande & Rose.
24   Q.   And that's an L.A. firm?
25   A.   Yes, sir.

Page 16

1         T. Sharinn
2    Q.   And you were there for about how
3  long?
4    A.   A couple of years, few years.
5    Q.   Okay.
6         And then you moved to the east
7  coast?
8    A.   I did.
9    Q.   And Pepe & Hazard or --
10   A.   No, no, I took a coaching job
11 with Yale, so I worked with a patent
12 boutique called St. Onge.
13   Q.   And where is that firm?
14   A.   New Haven.
15   Q.   And then you were there for how
16 long?
17   A.   About a year, and then I took a
18 job somewhere else for coaching hockey.  I
19 was head coach at Villanova.  The early
20 part of my legal career followed my hockey
21 career.
22   Q.   So you were working at a
23 different law firm while you were moving
24 from different coaching positions?
25   A.   Well, playing and coaching, yes.

Page 17

1         T. Sharinn
2    Q.   Well, then, just walk me through.
3  So you were then at Villanova?
4    A.   Yes, sir.
5    Q.   And that's in Pennsylvania?
6    A.   It is.
7    Q.   And what's the firm there?
8    A.   I did a lot of work for St. Onge
9  actually by proxy.
10   Q.   Okay.  So you were in a sense
11 freelancing a bit?
12   A.   Yes.
13   Q.   All right.
14        And so what's the next firm that
15 you associate yourself with during this --
16   A.   Well, pretty much my hockey
17 career came to an abrupt end and I went and
18 worked for one of my law school professors,
19 it was a firm called Levenson Lerner.
20   Q.   And where is that?
21   A.   New York City.
22   Q.   And you were there for how long?
23   A.   About a year.
24   Q.   And then you --
25   A.   Bryan Cave.

6 (Pages 18 to 21)

Page 18

1    T. Sharinn
2    **Q.    And then for how long?**
3    A.    I don't know, a couple of years.
4    **Q.    And then where?**
5    A.    Pepe & Hazard.
6    **Q.    And you were at Pepe for how**
7    **long?**
8    A.    About a couple of years, maybe a
9    little more.
10   **Q.    And then we get to, you go**
11   **straight from Pepe to Greenberg?**
12   A.    Yes, sir.
13   **Q.    The reason I ask is --**
14   A.    No, no, that's correct.
15   **Q.    -- there's a letter in which a**
16   **Pepe & Hazard attorney is asking about**
17   **transferring files and saying that you're**
18   **going to open up your own shop.**
19   A.    Oh, I didn't tell them where I
20   was going.
21   **Q.    All right.**
22       So Greenberg then, and then after
23   **Greenberg, Baker McKenzie?**
24   A.    Baker.
25   **Q.    And then after Baker McKenzie to?**

Page 19

1    **T. Sharinn**
2    A.    Harris.
3    **Q.    To Harris.**
4        All right.  That's a little more
5    **traveling than most.**
6        During all of that time, were you
7    **practicing in the intellectual property**
8    **space?**
9    A.    Yes, sir.
10   **Q.    Prior to taking and passing the**
11   **patent bar, I take it that you were**
12   **primarily involved with the patent**
13   **litigation side of the business?**
14   A.    Primarily.
15   **Q.    Well, let me just ask then, were**
16   **you, prior to taking the patent bar,**
17   **prosecuting any patent applications?**
18   A.    Under the supervision of other
19   attorneys, yes, sir.  In fact, even after I
20   passed the patent bar, I was still under
21   the supervision of most senior attorneys.
22   **Q.    Can you kind of give a percentage**
23   **over the course of your career as to how**
24   **much of your practice has been in the**
25   **patent prosecution space as opposed to**

Page 20

1    **T. Sharinn**
2    **patent litigation?**
3    A.    Well, first, let's take a step
4    back from that, if it's okay.  A lot of my
5    practice was also in trademark litigation
6    or trademark prosecution, copyright
7    counseling, to the degree there's
8    prosecution and litigation as well.
9        But litigation versus
10   prosecution, I would have to say it was
11   probably 15 to 85 in favor of litigation,
12   give or take.
13   **Q.    About what percentage of your**
14   **practice has been directed or focused on**
15   **other intellectual property interest,**
16   **copyrights, trademarks as opposed to**
17   **patents?**
18   A.    It's varied over the years.  More
19   recently, it's moved more closer to more
20   trademark than patent, but it's always been
21   kind of 50/50 depending on the year.
22       When I grew up as an attorney, an
23   IP attorney did everything, you didn't
24   just -- today it's very specialized, today
25   you're a trademark litigator and you may

Page 21

1    T. Sharinn
2    just be a counterfeiting litigator, you may
3    not even be just a trademark litigator.
4        Back when I was first working as
5    an associate at these various firms, you
6    were expected to do a little bit of
7    everything and to learn and to hopefully
8    mature into a specialty that suited you and
9    the firm best.
10   **Q.    And so have you matured into a**
11   **specialty that is more directed towards**
12   **trademark?**
13   A.    I think that's where I felt most
14   comfortable litigating, what I've enjoyed
15   most.
16   **Q.    And more specifically, I take it**
17   **from some of the things that are mentioned**
18   **in terms of representations in the**
19   **counterfeiting knock-off type goods?**
20   A.    Yes, sir.  That's where I've had
21   my greatest fortune.
22   **Q.    Do you recognize -- I don't even**
23   **know if it's a bisection or perhaps it's**
24   **even more than that in terms of patent**
25   **lawyers or intellectual property lawyers**

7 (Pages 22 to 25)

Page 22

1          T. Sharinn
2   who are more on the prosecution application
3   side of it versus those who are on the
4   litigation side of it?
5       A.   You know, that's a tough question
6   to answer just for a couple of reasons.
7          One, I haven't seen or discussed
8   people's specific day to days with them
9   unless they were my partner or a colleague,
10  pretty close, a pretty close colleague. So
11  I don't know what consumed them 50 percent
12  or 90 percent of their days.
13         What I would say, though, as a
14  general overview for being in the industry
15  is I've noticed that when I was younger,
16  everybody did everything and now people are
17  much more specialized, or at least claim to
18  be.
19      Q.   It is the case, is it not, that
20  an attorney can litigate a patent without
21  being a licensed patent attorney before the
22  PTO?
23      A.   I think that's correct -- well,
24  they don't litigate in front of the PTO.
25  You're talking about litigation, you do

Page 23

1          T. Sharinn
2   with the PTO's administrative and it would
3   be for an interference or looking to force
4   a reissue or re-examination. But you would
5   litigate in front of a federal court.
6       Q.   Right.
7          And so again, I'm just trying to
8   get a sense of, there are those who are out
9   there in infringement litigation in the
10  district courts who don't necessarily have
11  to be licensed before the PTO, right?
12      A.   That's correct.
13      Q.   And then there are those who
14  might do administrative enforcement or
15  adversarial actions before the PTO that
16  need to be licensed by the Patent Office?
17      A.   I don't know specifically whether
18  someone who is unlicensed could handle one
19  of these administrative actions in front of
20  the PTO. I'm not familiar with those
21  specific rules. It's never been an issue
22  that was presented to me.
23      Q.   It is the case that you cannot
24  prosecute an application before the PTO
25  unless you're licensed by the PTO?

Page 24

1          T. Sharinn
2       A.   That's my understanding.
3       Q.   Can you just patent anything, or
4   are there some general standards that a
5   patent attorney has to abide by in deciding
6   whether or not something that a client
7   comes to them with can be patented?
8       A.   Well, I mean, there's two
9   questions there, can you or should you.
10         On the "can" side, we can
11  obviously do anything we want, although
12  ethically we may be doing the wrong thing.
13         "Should we" is where it really
14  plays into -- I can only speak from my own
15  personal experiences.
16      Q.   Let me rephrase then.
17         Would you, as a licensed patent
18  attorney, patent something that you did not
19  believe was in fact patentable?
20      A.   No.
21      Q.   And what makes something in your
22  opinion patentable?
23      A.   Just look at the Rules 101
24  through 103.
25      Q.   So it has to be new or novel?

Page 25

1          T. Sharinn
2       A.   Of course.
3       Q.   And there can't be any prior art
4   that essentially teaches the same
5   invention?
6       A.   That would be 102.
7       Q.   And I'm not going to let you test
8   me, my full knowledge of the various
9   provisions, but essentially those rules
10  that say something is unique are the ones
11  that you would apply?
12      A.   I would, but there is also the
13  other thing that comes into play when
14  you're really, if you're really going to
15  counsel a client appropriately is for them
16  to understand the expense they're going to
17  put in for doing this and what the value of
18  the invention really is.
19      Q.   You're ahead of me, because I was
20  just going to ask even if a person came to
21  you and had something that was perhaps
22  novel and unique and whatnot, but you did
23  not believe it to be commercially feasible,
24  would you advise that client and undertake
25  to try and patent it?

8 (Pages 26 to 29)

Page 26

1           T. Sharinn
2    A.   I would advise that client that I
3 didn't think it was commercially viable.
4 If the client assured me that they felt
5 they were okay with that, they were willing
6 to take the risk because they had a
7 passion, I would probably still undertake
8 to file the application if I felt it was at
9 least patentable.
10    Q.   Have you ever undertaken to
11 pursue the prosecution of a patent that you
12 did not believe to be commercially viable
13 on behalf of a client?
14    A.   If I had a strong belief, one of
15 my problems has always been that I'm not a
16 yes guy. It's been an issue for me
17 throughout my life. I'm very quick to tell
18 people if I don't agree with something.
19 I'll think about it, but I will be honest,
20 sometimes to a fault.
21        So to answer your question
22 honestly, no, I wouldn't. If I really
23 thought something had no chance of success,
24 I would suggest they find another counsel.
25        Having said that, if the client

Page 27

1           T. Sharinn
2 was of means and had assured me that they
3 were willing to take this risk and that
4 they were big girls or big boys and really
5 believed that I didn't understand the
6 industry correctly, and it would be a lot
7 of conversation, then I might, under those
8 circumstances, file a patent application
9 and I can tell you right now since we're
10 sitting here for these clients that at
11 least on one occasion I had done that.
12    Q.   All right.
13        What was that occasion?
14    A.   That would be for S&A Rings.
15    Q.   S&A rings is --
16    A.   Is another iteration of Quickie
17 that was owned by Colvin, et al., and was
18 for various angioplasty rings and they
19 developed and technology relating to it.
20    Q.   A separate patent from the '160
21 Patent?
22    A.   It is separate.
23    Q.   Involving --
24    A.   In that case, it involved memory
25 metal.

Page 28

1           T. Sharinn
2    Q.   And I'm just trying to step back
3 a little bit, and I understand you have a
4 degree in molecular biology or something
5 like that?
6    A.   Yeah, but don't hold it against
7 me.
8    Q.   I'm not even sure I know what it
9 is to hold it against you.
10    A.   Genetic engineering.
11    Q.   In any event, these are all
12 inventions and procedures associated with
13 heart surgery, correct?
14    A.   Well, yes and no. The Quickie
15 invention that's at the center of this --
16    Q.   The 160?
17    A.   Yes, sir -- was initially
18 intended for minimally invasive open heart
19 surgery.
20        However, if you read the
21 application and the claims as originally
22 drafted, those claims were much broader
23 than that with the intention of being able
24 to make it applicable to more than just
25 minimally invasive heart surgery, and

Page 29

1           T. Sharinn
2 rather just minimally invasive surgery or
3 surgical techniques, and that's how it was
4 initially issued. I have not seen the
5 re-examine.
6    Q.   So just to see if I understand,
7 and I'm not going to try and delve into
8 this too much, the '160 Patent involves
9 essentially a knotless means of terminating
10 sutures, is that fair?
11    A.   That's what we called it. It was
12 a boat cleat.
13    Q.   So rather than having to tie off
14 a suture --
15    A.   It's a boat cleat. That's what
16 it was. I mean, that's how it was
17 invented. Paul Otto and Steve Colvin
18 fishing on a boat, came up with a boat
19 cleat, called me from the boat.
20    Q.   I understand that. I'm not sure
21 the jury would even know what a boat cleat
22 necessarily does.
23    A.   Probably more than a suture.
24    Q.   So I'm trying to describe
25 essentially a means of not having to tie

9  (Pages 30 to 33)

Page 30

1          T. Sharinn
2   off a suture during a surgery --
3      A.    During a procedure.
4      Q.    -- during a procedure, whether it
5   was on the heart, the leg, another internal
6   organ or an appendage to the body?
7      A.    No.
8      Q.    I went too far.
9      A.    You went too far.  A minimally
10  invasive surgical procedure is what it was
11  directed towards.
12     Q.    All right.
13          Fair enough.  I think we have a
14  sense of it.
15          The S&A rings or SA Rings also
16  involved surgery and a means of doing a
17  procedure, correct?
18     A.    No.  They had various inventions.
19  Some of them dealt with devices that were
20  used to replace valves inside the heart or
21  arteries.  They had other inventions that
22  would have involved tying, closing a knot
23  or tying off a suture without having to tie
24  a knot.  They had a concentric ring
25  invention that I had forgotten about until

Page 31

1          T. Sharinn
2   preparing for this that involved pulling
3   sutures through concentric rings.
4      Q.    And the common denominator here
5   is all of these things were involved in
6   surgery?
7      A.    They would be involved in
8   minimally invasive surgery.
9      Q.    Right.
10     A.    And in some cases very
11  specifically in just heart surgery.
12     Q.    And all of these were different
13  permutations or inventions that you were
14  working with Quickie together on?
15     A.    Quickie or other companies that
16  were owned by the same people from Quickie.
17     Q.    You see where I'm trying to go?
18     A.    No, I don't.
19     Q.    That there were other Quickie
20  affiliates that you were also working with?
21     A.    No, they weren't affiliates.
22  They were separate entities.  I don't know
23  exactly the structure, you'll have to ask
24  Allan Fell because he's the one who set all
25  of those up, but my recollection was, is

Page 32

1          T. Sharinn
2   that they had different owners depending
3   upon who was involved in the invention and
4   what degree they played.
5      Q.    So you, for example, were working
6   on matters involving Quickie vision?
7      A.    Yes, sir.
8      Q.    As a separate entity from
9   Quickie, LLC?
10     A.    That would be what I would hope
11  to do, yes.
12     Q.    Well, in fact you did do,
13  correct?
14     A.    Yeah.  I mean, it got blurred at
15  times because Alan Fell was really the
16  common denominator and so was Steve Colvin.
17  So when I represented any of these
18  entities, it was constant interaction with
19  both of them and the bills would get sent
20  to basically Allan Fell to sort out.
21     Q.    All right.
22          Just in terms of some of the
23  other entities that you may have had some
24  involvement with, do you recall liberty?
25     A.    Liberty Health, you mean?

Page 33

1          T. Sharinn
2      Q.    Yes.
3      A.    Yes, sir.
4      Q.    And that was a separate entity,
5   to your understanding, from Quickie LLC?
6      A.    Absolutely.  That was -- I don't
7   even remember anymore, it's been a long
8   time, a lot of life, but I think that was
9   some kind of a wellness center or something
10  that Steve, meaning Steve Colvin, had
11  wanted to create.
12     Q.    And was that more of a branding
13  trademarking --
14     A.    That was all trademark.  There
15  was no patent there, to my recollection.
16  Again, if I'm wrong, I apologize, but let
17  me just state right now for the record it's
18  been a lot of life since I've did this
19  work.
20     Q.    Understood.
21     A.    So, you know, maybe I just don't
22  have the greatest memory, but I'm trying.
23     Q.    Do you recall the surgical drape?
24     A.    I don't.  You know, it's funny, I
25  remember the title.  I have no idea what

10 (Pages 34 to 37)

Page 34

```
 1            T. Sharinn
 2  the invention regards.
 3     Q.    How about the surgical hooks?
 4     A.    No. Again, you know, I remember
 5  the name, but I don't remember the specific
 6  invention.
 7         There are three inventions, four
 8  actually that I have any specific
 9  recollection of.
10     Q.    What are those?
11     A.    One is the high definition
12  endoscope, only because that was right when
13  HDTV came out and I just thought it was
14  really cool.
15     Q.    And what did that basically
16  entail?
17     A.    It entailed using, if I remember
18  correctly -- it's hard for me to describe
19  at this point --
20     Q.    That's why I asked you to, not
21  me.
22     A.    It involved using filaments to
23  carry the light from the source to an HD
24  screen, and the way the filaments were
25  packed in the endoscopic tools was
```

Page 35

```
 1            T. Sharinn
 2  different than it would have been with an
 3  analog picture. So it's more of a digital
 4  situation.
 5     Q.    That was one of them.
 6         The second one?
 7     A.    Would be those two S&A Rings
 8  inventions, the memory metal, which is one
 9  that I really didn't want to file and
10  basically was told by Steve I had a choice
11  of either filing it or being fired, and we
12  went around on that for a long time and we
13  agreed to work on it, and Gene Grassi put a
14  lot of time in that to really create an
15  invention out of what they originally
16  disclosed to me.
17         And it was, it is an invention.
18  I just didn't see it being as particularly
19  marketable invention.
20         And then the last one --
21     Q.    You said two S&A rings --
22     A.    Yeah, I was about to say the last
23  S&A ring would be the concentric rings.
24         And then there's obviously the
25  patent that's in the center of this, which
```

Page 36

```
 1            T. Sharinn
 2  would be the Quickie patent.
 3     Q.    Were any of the other inventions
 4  actually patented by you?
 5     A.    I don't recall. I'd have to
 6  look. Nobody's shown me anything.
 7     Q.    Do you recall the '745 Patent?
 8     A.    Not by number. What is it?
 9         MR. SCOTT: Let me just go ahead
10  and take these a little bit out of
11  order.
12         (Exhibit 33, Document, marked for
13  identification, as of this date.)
14  BY MR. SCOTT:
15     Q.    I'll hand you Exhibit 33 to your
16  deposition.
17         I'll give you a second to look at
18  that.
19     A.    Oh, look at that. Is that what
20  it is, the concentric --
21     Q.    Is that one of the S&A rings that
22  you were talking about?
23     A.    It is, yes, sir.
24     Q.    And that's a patent that you
25  prosecuted to issuance while at Greenberg
```

Page 37

```
 1            T. Sharinn
 2  Traurig, correct?
 3     A.    Yes, sir. I think it was started
 4  while I was at Pepe & Hazard, but I don't
 5  recall offhand. I'd have to look at the
 6  file.
 7     Q.    Does this refresh your
 8  recollection as to any other inventions or
 9  permutations that you might have pursued to
10  issuance on behalf of Quickie or any of its
11  affiliates like Liberty or Quickie Vision?
12     A.    Again, I don't know what the
13  relationships are as far as how they're
14  affiliated. That would be something to ask
15  Mr. Fell.
16         It does not jog my memory other
17  than you've shown me this. If you have
18  other ones like this, I'm more than happy
19  to confirm whether or not they were ones
20  that I have specific recollection of. But
21  this doesn't surprise me that this one
22  actually did issue. I was actually
23  wondering if it did.
24     Q.    I want to step back and try and
25  get a handle on how it is that you came to
```

11 (Pages 38 to 41)

Page 38

1          T. Sharinn
2  first represent Quickie or, I don't know
3  how to try and lump in the others, the
4  Colvin interests, if you will.
5     A.    That's how I would refer to them,
6  as the Colvin group.
7          The way I came to Steve Colvin
8  was through Alan Fell.  He had brought me
9  into the fold, for lack of a better term.
10    Q.    General --
11    A.    Probably back at Levenson Lerner
12 or Bryan Cave, one of those.  Probably more
13 like Bryan Cave.  Levenson Lerner was just
14 a short period because I had just finished
15 a hockey career.  He was my patent
16 professor, I had scored highest in his
17 class, and he had asked me to help him try
18 a case.
19         When the case was over, we had
20 agreed -- he actually offered me a job, but
21 I didn't want to be in that small of a
22 boutique.  In retrospect, maybe it wasn't
23 my smartest career move, I don't know.
24    Q.    Bryan Cave, are we talking
25 1995-ish?

Page 39

1          T. Sharinn
2     A.    I don't know offhand.  You
3  probably have that information already
4  somewhere.
5     Q.    Not really, but I suppose I could
6  find it.
7          In any event --
8     A.    I don't know.
9     Q.    -- prior to Pepe & Hazard though,
10 to your recollection?
11    A.    Oh, absolutely.
12    Q.    And the Pepe & Hazard stint, I
13 don't mean to be pejorative in any sense --
14    A.    None taken.
15    Q.    -- was essentially from, say, the
16 1998 to 2000 time frame?
17    A.    Again, I don't remember the
18 specific years.  It was a lot of life.  But
19 my ex-wife and I took that job because we
20 wanted out of the city and we had just had
21 a child and they had approached me not even
22 through a head hunter, they had found me
23 somehow and made me some great promises and
24 it just sounded like too good to be true.
25 It turned out it was.

Page 40

1          T. Sharinn
2     Q.    I chuckle only because I've had
3  my own path and so there's not a lot of
4  dissimilarity in some respects.
5     A.    No, stuff happens and I probably
6  would have stayed at Pepe longer, but my
7  ex-wife didn't like living up in the
8  Hartford area, so we left.
9     Q.    And so how did Alan Fell find you
10 out, so to speak?
11    A.    My parents and Alan knew each
12 other.  If I'm not mistaken, Alan may have
13 actually done their will some years ago.
14         Again, this is -- it's spelled
15 F-E-L-L, not F-E-L-D.  Sorry, I just
16 unfortunately learned to read upside down.
17    Q.    And so there is some family
18 connection and he then approaches you in
19 connection with doing some intellectual
20 property work for a client of his?
21    A.    Yes, sir.
22    Q.    And was the representation or
23 involvement that you had at the
24 beginning -- I'm trying to get a sense of
25 was it one-dimensional, here is a specific

Page 41

1          T. Sharinn
2  project we'd like you to work on, or was it
3  hey, here are some things we're doing, we
4  want to get you up to speed and have you
5  have more of a multifaceted counseling and
6  working relationship?
7     A.    I'm smiling because nothing with
8  Steve Colvin was ever simple, and I'm sorry
9  he's passed --
10    Q.    We all are.
11    A.    -- Steve and I were very friendly
12 for a long time, including even just before
13 this began.  No.  For lack of a better way
14 of saying this, it was a very New York
15 relationship in that it started off with a
16 cup of coffee at NYU Medical with Alan and
17 Steve, and I think Gene Grassi was there
18 the first time, and we all just kind of
19 talked for hours, and some of it was about
20 some ideas he had and some of it was about
21 what I would do.
22         I told him at that point, I think
23 I was at Levenson, I said I'm moving on to
24 this place called Bryan Cave, and nothing
25 really formal ever grabbed.

12 (Pages 42 to 45)

Page 42

1         T. Sharinn
2         I mean, with Steve it was a lot
3    of hurry up, slow down -- always, on every
4    issue, a lot of helter-skelter thought
5    patterns. He would have epiphanies in the
6    middle of the night and call me regularly
7    either to just kibitz for lack of a better
8    word -- I apologize, K-I-B-I-T-Z -- or to
9    talk business or just because he couldn't
10   sleep, okay. That's how Steve was. You
11   know, he had a good heart, but he also had
12   a lot going on inside his head.
13       **Q.   So it was fairly comprehensive**
14   **relationship?**
15       A.   I don't know what comprehensive
16   means to you. To me, what it was was more
17   than a professional relationship. And it
18   involved more than just getting patents.
19   It involved just kind of helping them focus
20   their ideas a little bit.
21       They had a lot of really smart
22   people in a very small group collected.
23   They were teaching at NYU Medical School --
24   I mean, these are not dummies, these were
25   really bright people and very talented

Page 43

1         T. Sharinn
2    surgeons, and they just had great ideas,
3    they didn't know what to do with them.
4         So we would sit down and we would
5    talk about it and what we could do with
6    them, what made sense, what didn't make
7    sense.
8        **Q.   And how --**
9        A.   Just so we're clear, because you
10   had asked me earlier, for the applications
11   that I filed, there were probably 10 for
12   each one that I absolutely refused to
13   engage in.
14       **Q.   Iterations of a particular --**
15       A.   Just various things. I mean,
16   sometimes it wasn't surgically related. I
17   mean, Steve would call me up sometimes with
18   ideas that I can't even begin to guess
19   anymore right now because it got to the
20   point where you just listened, took notes,
21   thought about it and then got back to him.
22       **Q.   So essentially he used you as a**
23   **sounding board to vet his ideas as to**
24   **whether there was something there --**
25       A.   Not just me. I was one of many.

Page 44

1         T. Sharinn
2    It was me, it was Alan, it was Gene -- I
3    mean, Gene was the smartest guy in the
4    group as far as engineering goes, and then
5    it was this other Alan, who I can't
6    remember his last name, he wasn't a doctor,
7    but he was an engineer and he was actually
8    the guy really responsible for --
9        **Q.   Was it Katz?**
10       A.   Katz, right. You know, I've
11   never seen Steve make rounds, but I suspect
12   that he probably threw it at a couple of
13   his patients, too. I mean, Steve was just
14   like that. He would just talk.
15       In fact, one of the things I had
16   always cautioned Steve was that if he
17   discloses this publicly, and just talking
18   about it, a third party is considered a
19   public disclosure, that he runs the risk of
20   losing his patent rights.
21       **Q.   Did you see any dividing line, if**
22   **you will, or compartmentalization between**
23   **yourself and Alan Fell in terms of your**
24   **representation, co-representation perhaps**
25   **of the Colvin group?**

Page 45

1         **T. Sharinn**
2        A.   Yeah, very strong divided line.
3        **Q.   And can you describe that for me?**
4        A.   Yeah. I mean, Alan made it clear
5    to me that they're his client, I'm just
6    providing the service he can't. He was
7    very territorial.
8        **Q.   So Alan Fell would have been the**
9    **general counsel, the in-house counsel, if**
10   **you will, of the group and you were the**
11   **intellectual property provider/vendor, if**
12   **you will?**
13       A.   I think that's one way of putting
14   it.
15       **Q.   You know, I'm not trying to be**
16   **pejorative. I'm just trying to get a sense**
17   **of the dynamic.**
18       A.   You know, let me just say this.
19   I don't know if you're being pejorative or
20   not, it doesn't really matter, I just want
21   to give you the answers, and it's fine, you
22   just ask me the questions the way you feel.
23   If I don't understand it, I'll ask you to
24   explain it.
25       **Q.   All right.**

13 (Pages 46 to 49)

Page 46

1          **T. Sharinn**
2          **Was the Quickie group just one**
3  **amorphous client matter for you at Pepe &**
4  **Hazard, or did you divide it up into**
5  **different billing matters?**
6      A.    That's an excellent question and
7  I'm still not sure I know the answer to it.
8          They -- I tried.  I honestly
9  tried.  I would say -- because Alan Fell
10  tried, also.  Alan would say look, you need
11  to send me separate bills for the different
12  things.
13          And you know, law firms are good
14  at a lot of things, but maybe they're not
15  so good at their accounting always, and so
16  a lot of times some things would go on one
17  bill that should be on another and vice
18  versa.
19          And I don't think Pepe or
20  Greenberg or any of those firms are an
21  exception to that rule.
22          That said, on top of that, to
23  make things further complicated, you know,
24  again, Colvin and even Fell and Grassi
25  would in midstream switch subjects.

Page 47

1          T. Sharinn
2          So we could be talking about the
3  Quickie patent, and in midstream I can hear
4  about all of a sudden, well, we're going to
5  be giving you this other work, or what do
6  you think about this, or can you believe
7  the Yankees blew it last night -- it could
8  be any of those, and then still other
9  things.
10          And then to make it still further
11  complicated, I could send a bill to Quickie
12  and get a check from S&A rings.
13      Q.    **Is it fair to say then that as**
14  **far as the intellectual property interests**
15  **of the Quickie group, nothing was really**
16  **off the table?**
17      A.    I don't know what that means.
18      Q.    **Well, I'm just trying to**
19  **characterize, and admittedly, so your**
20  **statement that anything could come up in**
21  **the course of the conversation from S&A**
22  **rings to the '160 Patent to the Liberty**
23  **Wellness center at any point in time and**
24  **there was no real dissection?**
25      A.    The Liberty Wellness Center

Page 48

1          T. Sharinn
2  really was more of a very separate entity.
3  He did that and he had a charitable
4  organization also where they were trying to
5  provide surgical assistance to the
6  underprivileged in third world nations.
7          I don't recall what that one was
8  called.  But both of those were with
9  someone who is now, if I'm not mistaken,
10  either had a stroke or also passed away or
11  both, I don't remember his name, who was an
12  employee of Colvin's at the hospital, but
13  he wasn't a doctor either.  He really
14  handled that.
15          So those were actually pretty
16  separate matters, and I dealt with either
17  Steve or to a small degree Alan on those or
18  this other person and his assistant.
19      Q.    **All right.**
20          **So but as far as surgical**
21  **procedures and the inventions or ideas**
22  **associated with them, pretty much a lot of**
23  **spillover from one to the next?**
24      A.    Yeah.  I mean, I hate to say it,
25  but they were characters.  Woody Allen

Page 49

1          T. Sharinn
2  would have had a tough time creating people
3  with more personality.
4      Q.    **Was there anybody apart from you,**
5  **to your understanding, that was guiding**
6  **them as you indicated in terms of their**
7  **intellectual or focusing their intellectual**
8  **property interests?**
9      A.    Say this again.
10      Q.    **Was there anybody else besides**
11  **you, to your understanding, that was**
12  **guiding or focusing them with regards to**
13  **their intellectual property interests?**
14      A.    Well, I mean, without sounding
15  paranoid, Steve probably spoke to several
16  people on a regular basis because Steve
17  never took anything at face value.
18          So yes or no never meant yes or
19  no to Steve.  It just meant we'll talk
20  about it later if it wasn't the position he
21  wanted to take.  So we need to understand
22  that as a baseline.
23          I know on a couple of occasions
24  he had spoken to other counsel only because
25  he would say things to me sometimes to get

14  (Pages 50 to 53)

Page 50

```
 1            T. Sharinn
 2   my goat or other times just to draw out a
 3   conversation.
 4        And I know at the end Mark Evens
 5   was very, very heavily involved, you
 6   know -- but yeah, other than that, I'm not
 7   really sure.
 8     Q.   What did you understand Mark
 9   Evens' involvement to be?
10     A.   Well, let me make one request,
11   after we're done with this line, can I
12   please go to the bathroom?
13     Q.   Well, we can --
14     A.   No, I'll finish your question
15   first. I'm just asking the next few
16   minutes.
17        With Mark Evens, it's hard to
18   explain what he is, and I don't want to be
19   insulting, but saying that alone I am,
20   okay -- your pejorative phrase. He was an
21   interesting guy. He had applied for
22   partnership at Greenberg Traurig while he
23   was at Thelen Reid.
24        I know Paul knew him from back at
25   Thelen Reid. I know that he had listed
```

Page 51

```
 1            T. Sharinn
 2   Quickie and some other of these cases and
 3   their value at much higher than what they
 4   were when he applied for Greenberg. It
 5   came up on a conflict report and they
 6   brought it to my attention that he was
 7   claiming to have been handling them -- that
 8   was the first I had learned of him. I had
 9   never met him at this point.
10        And what I had said to Greenberg
11   at that point from what I can remember,
12   what I always say about things like that, I
13   don't know. If he is, he is. It's news to
14   me. I had never spoken to him.
15        Later on when I got to meet him,
16   you know, he's a nice enough guy, but I
17   don't think he was a patent attorney,
18   although I know he professed to be.
19     Q.   Why do you say that you don't
20   think he was a patent attorney, because he
21   wasn't licensed before the Patent Office?
22     A.   No, I guess I'm under oath here,
23   because he was clueless. Okay. He was
24   probably in 17 years now since law school
25   the most underwhelming individual that I
```

Page 52

```
 1            T. Sharinn
 2   have ever dealt with in a professional
 3   capacity.
 4     Q.   Any capacity or just patent
 5   related?
 6     A.   Any.
 7     Q.   Okay.
 8     A.   I never met anybody who knew less
 9   about the law they professed to have an
10   expertise in.
11     Q.   Well, those are pretty strong
12   remarks.
13     A.   Feel free to share it with him.
14        MR. SCOTT: All right. Go ahead
15     and take that break.
16        THE WITNESS: Thank you.
17        (Recess taken from 10:21 a.m. to
18     10:28 a.m.)
19   BY MR. SCOTT:
20     Q.   Having just talked about the
21   somewhat chaotic nature of the ideas and
22   the inventions that are brought up in the
23   course of your relationship with the Colvin
24   group, how do you recall trying to
25   rationalize or make sense of the different
```

Page 53

```
 1            T. Sharinn
 2   billing matters, to the best of your
 3   recollection?
 4     A.   You know, I would enter my time
 5   regularly and I would look at my pre-bills
 6   most of the time, pretty quickly though,
 7   and I would basically not -- it's funny,
 8   there are some clients I was very, very
 9   concerned about making sure the billable
10   items fell into the correct matter.
11        With them I didn't worry about it
12   as much because they didn't worry about it
13   that much. So I just made sure that the
14   numbers were right, that nobody was
15   overbilling them, that the value made sense
16   for what the job that was done, and I
17   looked at the entries to make sure that the
18   entries made sense. But a lot of times I
19   wouldn't look at the bills as closely as I
20   probably should have.
21     Q.   Let me just jump ahead and see if
22   I can help us out.
23     A.   Sure, okay.
24        MR. SCOTT: We'll mark this as
25     Exhibit 34.
```

15  (Pages 54 to 57)

| Page 54 | Page 56 |
|---|---|

**Page 54**

```
 1          T. Sharinn
 2          (Exhibit 34, Letter dated 5/4/01,
 3     marked for identification, as of this
 4     date.)
 5  BY MR. SCOTT:
 6     Q.   On the second page you'll see
 7  some different files, if you will, that are
 8  to be transferred or not transferred.
 9          This is a May 4, 2001 letter from
10  one of your former colleagues at Pepe &
11  Hazard to Alan Fell in connection with your
12  prospective departure from Pepe to
13  someplace else.
14     A.   Right. I didn't -- I'm very
15  funny -- it's not funny, but it's just the
16  way I do things -- when I've left jobs in
17  the past, until I was walking out the door,
18  I never told anybody where I was going
19  unless I felt it was appropriate. I never
20  felt it was their business. I look at them
21  as my past, not my future.
22     Q.   So they didn't know you were
23  going to Greenberg?
24     A.   I didn't tell them anything other
25  than I was going to be leaving, and then
```

**Page 55**

```
 1          T. Sharinn
 2  when it was time to go, I gave them my
 3  address as to where they should mail the
 4  stuff.
 5     Q.   In this particular instance, Mr.
 6  Urbanik is writing to Alan on behalf of
 7  Pepe & Hazard to basically say do you want
 8  the files to stay here or do you want them
 9  to go with Todd Sharinn?
10     A.   They didn't want it to go,
11  obviously. I mean, they're a law firm.
12     Q.   At this time frame, do you have
13  any general recollection as to the amount
14  of annualized income that's coming off of
15  the Quickie group, if you will?
16     A.   At the time it seemed like a lot.
17  In retrospect, it was very, very little.
18     Q.   Any kind of numbers that go with
19  that?
20     A.   I would say probably 115, maybe
21  100 at the most.
22     Q.   Well, that was worth a lot more
23  than it is now?
24     A.   Yeah, I'm saying at the most. It
25  was really -- maybe even less than that. I
```

**Page 56**

```
 1          T. Sharinn
 2  don't remember offhand.
 3          I remember this, that as an
 4  associate I always was treated differently
 5  because I always had some origination of my
 6  own, and it wasn't just from them, I had
 7  other clients, but it was never enough to
 8  be treated really different, like to be put
 9  into the realm of we've got to make this
10  guy a partner sooner than later.
11     Q.   But this is a tidy book of
12  business on a pretty --
13     A.   Again, as I'm reflecting on it, I
14  think it's probably lower than that. I
15  think probably realistically that was my
16  whole book of business, with other clients
17  too, I was thinking maybe like 75, 80, now
18  that I'm looking about it a little more. I
19  don't know offhand.
20     Q.   So they don't want it to go, of
21  course. You're expecting it to go with
22  you, right?
23     A.   That was the indication I had
24  gotten when I had spoken to Steve and Alan.
25     Q.   And in fact, Quickie has followed
```

**Page 57**

```
 1          T. Sharinn
 2  you consistently from wherever you were
 3  before Pepe, to Pepe, from Pepe to
 4  Greenberg, and from Greenberg to Baker
 5  McKenzie?
 6     A.   Not to Baker.
 7     Q.   No?
 8     A.   No, sir. Not that I'm aware of.
 9  I don't think I did a thing for them when I
10  was at Baker. I signed the affidavit in a
11  personal regard. The firm didn't want me
12  to handle that as part of their firm.
13     Q.   Do you recall Alan Fell
14  instructing Greenberg to transfer all files
15  to Baker McKenzie on your behalf?
16     A.   I really don't recall that, no.
17          (Exhibit 35, Letter dated
18     10/3/05, marked for identification, as
19     of this date.)
20  BY MR. SCOTT:
21     Q.   This is an October 3, 2005 letter
22  from Alan Fell of Rick Steiner to Greenberg
23  Traurig. I'll give you a chance to look at
24  that.
25     A.   Okay. I see the letter. I don't
```

16 (Pages 58 to 61)

Page 58

1         T. Sharinn
2  recall it. I think by that time my
3  involvement with them was zilch, as far as
4  I recall.
5     Q.  This letter, just for the record,
6  does reflect that Mr. Fell was asking
7  Greenberg Traurig to transfer all of the
8  files for Quickie to Baker McKenzie which
9  is where you were going, right?
10     A.   That's what the letter says, yes,
11  sir.
12     Q.  Do you recall, and I'm not sure I
13  understood your testimony a moment ago, do
14  you recall that Baker McKenzie did not want
15  you to represent Quickie, is that what you
16  were saying?
17     A.   No. I said that the affidavit
18  that I was asked to sign by Mr. Maier, I
19  think you said his name was --
20     Q.  Yes.
21     A.   -- they didn't want me to sign it
22  as an attorney for Baker McKenzie. So I
23  signed it in my individual capacity.
24     Q.   I take it that you don't recall
25  opening any matters on behalf of Quickie or

Page 59

1          T. Sharinn
2  in connection with Quickie while at Baker
3  McKenzie?
4     A.   I have no recollection of that at
5  all. Again, like I said, I don't even
6  recall doing work for Quickie in my final
7  year at Greenberg Traurig.
8     Q.   Do you recall Greenberg Traurig
9  refusing to abide Mr. Fell's wishes and not
10  send files to your attention?
11     A.   I don't.
12         Let me explain something, if I
13  could.
14     Q.  Okay.
15     A.   At that time in my life I had
16  just left my ex-wife around the time when I
17  was switching firms, and really, I was just
18  focusing on starting fresh at Baker and --
19  I always looked at, just so you understand,
20  I always looked at Dr. Colvin and his crew
21  as friends as much as clients, and the
22  relationships chilled quite a bit by that
23  point.
24         So it's nice to read this, that
25  he followed me there, too, but I have no

Page 60

1          T. Sharinn
2  recollection at all of handling work for
3  them at that point.
4     Q.   Is it possible that in your
5  effort to really just start afresh not
6  something that you picked up on and tried
7  to cultivate as a transferring file to
8  Baker McKenzie?
9     A.   Like said, this is the first I
10  can recall seeing this letter. I'm not
11  even sure that Greenberg ever even showed
12  me this letter.
13         They must have, because that
14  would be their obligation, and Jerry
15  Goldberg is a very honest lawyer as far as
16  I know. So I would assume that he did show
17  me the letter, but I don't recall seeing it
18  and I don't recall taking their files with
19  me, I'm sorry.
20     Q.   You said that the relationship
21  had chilled.
22         Can you tell me when that came
23  about?
24     A.   They had caused, you know, some
25  problems. They didn't pay bills and they

Page 61

1          T. Sharinn
2  were, you know -- Steve -- I don't know how
3  to put this, but Steve was pretty obnoxious
4  to a couple of my assistants and to some
5  paralegals on a regular basis and I didn't
6  like it.
7         I guess maybe part of it was my
8  own maturation as not just an attorney but
9  as an individual. Like I said, I had just
10  left my wife, I never expected to do that,
11  but I kind of decided that I was not
12  willing to compromise in certain regards,
13  and one of them was I didn't want to work
14  with people who were overtly rude to people
15  who worked with me, or to me. And at times
16  they could be, you know, somewhat rude.
17     Q.   Is it possible then that, whether
18  you saw this or not, you simply did not
19  want to have a continuing relationship with
20  the Quickie group going forward at Baker
21  McKenzie?
22     A.   Anything is possible. Again,
23  like I said, this is unfortunately, you're
24  asking me to give you answers that I have
25  no basis to give them. So I mean, if you

17 (Pages 62 to 65)

Page 62

1        T. Sharinn
2  want me to speculate, I'll speculate.
3    Q.   No, I don't want you to
4  speculate.
5    A.   Okay. I'm trying to work with
6  you on this. I just don't know myself.
7    Q.   I'm just trying to get a sense,
8  Mr. Sharinn, as to whether you can recall
9  having seen this now and whether it
10  refreshes your recollection as to having
11  perhaps an attitude in October of 2005, you
12  know what, I'd rather just start fresh and
13  not have any strings coming over with
14  regards to the Quickie group.
15    A.   I don't have any specific
16  recollection.
17    Q.   Fair enough.
18    A.   So I can't really say. It could
19  be what happened. It could also be
20  something completely different. I don't
21  know. Did they ever get any bills for me
22  at Baker McKenzie?
23    Q.   I don't know, because I've never
24  seen anything from Baker McKenzie.
25    A.   They would have had the bills.

Page 63

1        T. Sharinn
2    Q.   Yeah, but we just haven't
3  received any discovery from them.
4    A.   I'm not saying Baker. I'm saying
5  Quickie. Wouldn't they have it at Baker
6  McKenzie if they had gotten them?
7    Q.   That's possible, yeah. I haven't
8  seen any, put it that way.
9    A.   Okay. I don't know.
10    Q.   They just haven't been brought to
11  my attention.
12    A.   If I were a fly on the wall, ask
13  my opinion, it would sound to me like we
14  went our own ways.
15    Q.   And that's what it seems.
16        I'm going to go back to Exhibit
17  34 for a second.
18    A.   You still want me to look at page
19  2?
20    Q.   I'm going to go there, but I'm
21  going to ask a couple of questions about
22  page 1.
23    A.   Sure.
24    Q.   The second paragraph, "His
25  departure, however, raises the question of

Page 64

1        T. Sharinn
2  responsibility for your files in the
3  above-captioned matters."
4        The matters are reflected on the
5  second page, right, the different matters?
6    A.   You know, I guess, again, this is
7  one of those situations where I have to say
8  I do recall each of those matters, with the
9  exception of General Corp. So yeah, I
10  would assume those are the matters. There
11  might have been others that I'm not aware
12  of.
13    Q.   And you took, you'll agree with
14  me that in taking those matters to
15  Greenberg Traurig, you took the
16  responsibilities associated with those
17  matters to Greenberg Traurig, correct?
18        MR. KAMINSKY: Objection to the
19    form of the question.
20    A.   I'm not sure I understood that,
21  to be honest with you. Would you mind
22  rephrasing it?
23    Q.   Yeah, let me try.
24    A.   Sure.
25    Q.   This reflects that the

Page 65

1        T. Sharinn
2  responsibility for those files is going to
3  go with you to wherever you go, correct?
4    A.   You know, I think more than
5  anything, for lack of a better term, this
6  is Pepe & Hazard's way of saying we'd like
7  to do the work if you're willing to give it
8  to us. Otherwise, we want to make sure
9  we're off the hook for any responsibility.
10        I'm not sure it's saying anybody
11  else is taking responsibility, just that
12  they're not.
13    Q.   The question that I have then for
14  you is: In entering Greenberg Traurig, did
15  they understand that you were coming to
16  them with these matters and
17  responsibilities for these matters?
18    A.   I can't speak for what Greenberg
19  Traurig understood. My understanding would
20  have been that, yes, they were aware I was
21  bringing work with me.
22    Q.   Let me ask you more specifically,
23  do you recall advising or informing
24  Greenberg Traurig that these are matters
25  that I'm bringing with me to Greenberg

18 (Pages 66 to 69)

Page 66

1          **T. Sharinn**
2    **Traurig that I will have continuing**
3    **responsibility for?**
4        A.   I understand your question now.
5    Thanks.
6           I guess the way I would put this
7    is Greenberg Traurig is one of the most
8    organized firms I've ever worked for, even
9    though their billing may not be great, but
10   that's a different story, and like I said,
11   I can't see many law firms where the
12   accounting is great, but they are very
13   organized.
14          I don't have a specific
15   recollection of discussing these particular
16   matters with them.
17          I do recall prior to being
18   engaged in employment by Greenberg Traurig
19   that I would have had to go through a
20   conflicts issue.
21       **Q.   That's what I was going to ask**
22   **next.**
23       A.   So my guess is:  They would have
24   asked me at that time could you list as
25   many of the matters that you are aware of

Page 67

1          T. Sharinn
2    for us so that we can run a conflict on it.
3           I mean, that's how we learned
4    about Mark Evans, or how I learned about
5    Mark, the first time was the same process.
6        **Q.   Not when you were entering**
7    **Greenberg, but --**
8        A.   No -- well, he was trying to
9    enter Greenberg.
10       **Q.   Enter, right.**
11          **After you were already there?**
12       A.   I had been there, I think at that
13   point, about a year and a half.
14       **Q.   And I assume, just given the**
15   **nature of how law firms work, not only are**
16   **they looking at a conflicts situation here,**
17   **but they're asking you what portable**
18   **business are you potentially bringing to**
19   **us, right?**
20       A.   I'm sure that was part of the
21   equation when they brought their offer to
22   me.
23       **Q.   And we're going to look at --**
24       A.   Again, just so we're clear,
25   that's the kind of question you have to

Page 68

1          T. Sharinn
2    pose more to Greenberg Traurig than me
3    because I don't really know what their
4    process was.
5        **Q.   It's one of those mysteries of**
6    **life.**
7        A.   Well, you know, I guess if you've
8    been around long enough, and you say you
9    have, and travel to enough firms, which you
10   say you did, you know that every firm has
11   their own way of doing things, and we as
12   junior individuals don't always know
13   exactly what their things are.
14       **Q.   Right.  Fair enough.**
15          **Now, I want to try and --**
16   **obviously at Pepe & Hazard you brought this**
17   **Quickie client or Quickie group into at**
18   **least these different categories, correct?**
19       A.   No, not correct, That's why I'm
20   saying I recognize specifically.
21          By the time I was at Greenberg
22   Traurig, the Ethicon and the U.S. surgical
23   matters would have been dead.  They may
24   have asked us to transfer the files, but
25   those matters were dead.

Page 69

1          T. Sharinn
2        **Q.   And what are those, is that the**
3    **licensing negotiations?**
4        A.   They were negotiations, right, to
5    try and get a licensed deal for Quickie
6    because Medtronic, while they were -- I
7    guess we'll talk about that obviously --
8    while they were expressing some interest in
9    the technology, weren't being particularly
10   overly interested, and so Steve wanted to
11   go out and build a sense of urgency and
12   necessity.
13       **Q.   So he has this idea, and is it**
14   **just the '160 Patent that he's trying to**
15   **shop to Ethicon U.S. surgical or Medtronic,**
16   **or is there other stuff as well?**
17       A.   No, just the 160, as I recall.
18       **Q.   So the 160, you get it patented**
19   **while you're at Pepe & Hazard, right?**
20       A.   I did, yes.
21       **Q.   Applied for in 1998, issued in**
22   **May of 2000, does that jive with your**
23   **recollection?**
24       A.   Sounds about right.
25       **Q.   So it's prior to you going over**

19 (Pages 70 to 73)

Page 70

1           T. Sharinn
2  to Greenberg Traurig --
3     A.   Right.
4     Q.   -- that it issues?
5     A.   Right.
6          The other matter, this General
7  Corp, I have no recollection at all of what
8  that is.
9     Q.   All right.
10         I just want to come back to -- so
11 were there negotiations with Ethicon U.S.
12 Surgical and Medtronic prior to the
13 issuance of the '160 Patent or only after?
14    A.   Prior.
15    Q.   Prior.
16    A.   There were no -- we should
17 understand something, there were no real
18 negotiations.  There was a non-disclosure
19 agreement/non-compete agreement that I
20 negotiated with each of those specific
21 companies that were entered into by both
22 those companies.
23    Q.   Just so you can look?
24    A.   So look and talk, because the
25 application was still pending.

Page 71

1            T. Sharinn
2  Ethicon, I'm not quite sure we
3  were even on the plane back from
4  Cincinnati, it was where they were located
5  before they had said they weren't
6  interested.  They couldn't have shown less
7  interest at the meeting if they tried.
8          In fact, I remember Steve was
9  very upset because the guy that was
10 supposed to meet with us didn't even come
11 to meet with us, and we ate in a cafeteria
12 which he made a comment about.
13         U.S. Surgical, they were nicer,
14 but I don't think they took even a week
15 before they started avoiding phone calls,
16 and then it ultimately took my pressing
17 their lawyer to say, guys, my guys are a
18 little anxious here to know what's going
19 on, can someone give us some information.
20 And they basically at that point said they
21 were going to punt.
22    Q.   All right.
23         Medtronic, it reflects license
24 agreement.  There is something there?
25    A.   There was negotiations that were

Page 72

1           T. Sharinn
2  ongoing, even when I was at Pepe & Hazard.
3  I think the agreement actually was entered
4  into at Pepe & Hazard, and I also think
5  shortly after the agreement was entered
6  into that Medtronic was already trying to
7  break the agreement.
8     Q.   All right.
9          But you do recall that there was
10 a license and development agreement that
11 was executed in connection with Medtronic?
12    A.   Oh, sure, absolutely.
13    Q.   While we're at it, let's go
14 ahead -- Exhibit 21, which was marked
15 yesterday --
16    A.   Do I need this document any
17 longer?
18    Q.   Yeah, for a second.
19    A.   Okay, then I'll hold onto it.
20         I've got it.  Is this what you're
21 looking for?
22    Q.   Yeah.
23    A.   Okay.
24    Q.   These are the ones that were
25 marked yesterday, just so you know as we go

Page 73

1            T. Sharinn
2  through the deposition.
3          This is a letter that you sent to
4  Dr. Colvin upon the issuance of the '160
5  Patent, correct?
6     A.   Probably.  It looks like it is,
7  yes, sir.
8     Q.   Dated May 30th of 2000.  You're
9  sending him the actual copy of the '160
10 Patent?
11    A.   It's not a copy.  It's the
12 certificate of patent.  The specific word
13 is called letters of patent.
14    Q.   Have you seen this document
15 before?
16    A.   I signed it.
17    Q.   Well, fair enough.
18         What I really meant to say --
19    A.   What I can tell you is I didn't
20 draft it.
21    Q.   Did you see it in prepping for
22 your deposition?
23    A.   Oh, no.
24         Let me ask one question, because
25 at this point if I were defending this

20 (Pages 74 to 77)

Page 74

1           T. Sharinn
2   deposition, I might be concerned that we're
3   breaching attorney-client privilege.
4           But if my attorney is not upset
5   and doesn't mind me answering specific
6   questions of what we reviewed together,
7   I'll continue to do that.
8           MR. KAMINSKY: In a malpractice
9       case such as this there is no
10      attorney-client privilege as between
11      the plaintiff and the law firm.
12      That's deemed to have been waived by
13      the bringing of a malpractice case.
14          THE WITNESS: That's fine. I
15      just wanted to make sure I wasn't --
16          MR. KAMINSKY: As to other
17      matters such as our communications
18      with you, there is an attorney-client
19      privilege.
20          THE WITNESS: Okay, thank you. I
21      just don't want to break any rules.
22  BY MR. SCOTT:
23      Q.   What do you recall about the
24  prosecution of the '160 Patent? Was it a
25  difficult one to prosecute, easy?

Page 75

1           T. Sharinn
2       A.   No, it was the easiest patent I
3   ever prosecuted.
4       Q.   And why is that?
5       A.   The examining attorney issued all
6   claims on filing. It's almost unheard of.
7   In fact, probably nobody was more surprised
8   than me when we got that response.
9       Q.   This wasn't the first patent that
10  you had prosecuted to issuance, was it?
11      A.   I don't recall.
12      Q.   And the only reason I ask that is
13  because we saw that you were licensed by
14  the patent bar in 1998?
15      A.   It may have been the first one
16  where I was the primary attorney on it, but
17  I don't recall. You know, I had done a lot
18  of work for other partners at firms that I
19  was with, for instance, at Bryan Cave, I
20  worked under a couple of partners and
21  helped them with theirs, and those have
22  gone to issuance, but I'm not sure whether
23  my name would have been associated when it
24  was on the PTO of records ultimately.
25      Q.   Well I guess that's what I was

Page 76

1           T. Sharinn
2   really asking, Mr. Sharinn, is did you take
3   any pride in, do you recall taking any
4   particular pride in this patent to the
5   extent that it might have been the first
6   one where your name showed up as the
7   counsel of record at the Patent Office?
8       A.   I guess if you don't mind, and at
9   the risk of bothering everybody with who I
10  am and how I view myself, yes is the answer
11  on a short level, but for me, what I take
12  pride in is the fact that my son is a great
13  kid, I took pride in the fact that I was
14  married to an absolutely difficult lady and
15  worked really hard at trying to sustain a
16  relationship, I took pride in the fact that
17  I represented people honestly as a lawyer
18  and worked really hard to do the best job I
19  could do for people.
20          Certificates and trophies, you
21  know, I mean, like we said before, I played
22  sports at pretty high levels, I got lots of
23  certificates and trophies, they're all in
24  my younger brother's room, they never went
25  to my room once because he wasn't any good

Page 77

1           T. Sharinn
2   and because I never really cared.
3           I don't have a single certificate
4   hanging on my wall for any bar I've ever
5   passed, any award I've ever won. I have
6   pictures of my kid in my office. I got
7   letters in my drawer from different clients
8   I've got thanking me for being honest and
9   open and upfront with them.
10          So would I have felt good that
11  this passed muster and the we got the
12  results we got -- like I said, I was
13  shocked partly because I did not think this
14  invention rose to the level of novelty that
15  the claims I had originally drafted would
16  go through without any kind of disruption,
17  and the reason I say that is that I was
18  trained always to draft patent claims
19  broader than what you expected to be able
20  to accomplish.
21          One of the conversation that I
22  even had with Steve Colvin was, right after
23  we got this, I told him very honestly that
24  I was concerned that perhaps we should file
25  our own reissue and try and go even broader

21 (Pages 78 to 81)

Page 78

1          T. Sharinn
2   to just get some kind of a reaction from
3   the Patent and Trademark Office so in case
4   we ever needed to litigate this, nobody
5   would ever raise the issue that perhaps the
6   examiner was asleep at the wheel.
7          So to answer your question, yes,
8   I was proud, and yes, it may very well have
9   been the first certificate where I was the
10  attorney.  But more than anything, I was
11  amazed because the invention, again, I do
12  think is novel and I do think it's an
13  invention, but I never thought it was the
14  invention in which the examiner treated it
15  like, and I'm giggling only because it blew
16  me away when this happened.
17     **Q.   If I can probe that just a bit,**
18  **it really comes down to your belief that**
19  **you were essentially taking a boat cleat**
20  **and incorporating it into a surgical**
21  **procedure?**
22     A.    Not into a surgical procedure --
23  yes, there is a claim to a surgical
24  procedure, if I remember in the original
25  patent, but into a device that's used in a

Page 79

1          T. Sharinn
2   surgical procedure.
3          And understand something, I
4   always agreed with them that it was unique
5   what they came up with and rose to the
6   level of passing the 101 litmus test of
7   novelty.  Never did I ever feel that it
8   wasn't an invention.
9          But also understand that when you
10  call 1-800-PATENTS and tell them you just
11  invented this cap to this bottle, they'll
12  write you claims and they'll get you a
13  patent, it will cost you $20,000 in the
14  process -- good luck at being able to
15  market it or to defend it, and that was
16  something I always made clear to Steve
17  Colvin and Alan Fell.
18         It's actually the example I
19  always use because that was the example
20  that was used when I was taught by the
21  people who taught me when they tried to
22  explain to me what exactly having a patent
23  really means in the real world.
24     **Q.   Well, but there might be**
25  **something unique to the cap that you**

Page 80

1          **T. Sharinn**
2   **actually do design.**
3     A.    You're absolutely right.  The
4   question is what is it worth to somebody
5   else and can you convince a judge or a jury
6   that you should exclude others from being
7   able to use it or a derivative of it.
8          I will say this, which is maybe
9   good or bad for your case, but when this
10  issued the way it issued, I do recall
11  saying to Steve it's a double-edge sword
12  because at the same token Medtronic, who
13  had been claiming all along that this is
14  not very novel, I said well, you know, you
15  can always throw to them that if the Patent
16  and Trademark Office agreed, they would
17  have objected in some form and rejected our
18  claims.  They didn't.
19     **Q.   But your concern was because it**
20  **was broad, because you had drafted --**
21     A.    I had drafted this broader than I
22  had thought possible.  In fact, I had
23  gotten spoken to by my supervisor because I
24  showed it to him before I filed the claims
25  and he expressed concern that I had gone

Page 81

1          T. Sharinn
2   far with this, too, that I wasn't going to
3   get them a patent without prosecution, and
4   I had that conversation with Steve
5   specifically.
6          I remember this only because,
7   again, back to Steve as an individual, no
8   doesn't necessarily mean no.  No means
9   let's talk about it.  And so Steve wanted
10  to take the shot at this and I felt it was
11  a worthwhile shot to take.
12     **Q.   Are you familiar with what the**
13  **result of the re-examination was?**
14     A.    I'm not specifically familiar.
15  I've been, you know, advised that it wasn't
16  very positive to Quickie.  I'm sorry to
17  hear that.
18     **Q.   Are you talking about the first**
19  **office action, or are you talking about the**
20  **ultimate --**
21     A.    I just know about the ultimate.
22  I don't know any specifics.  If I spent 30
23  seconds talking about this, it would have
24  been a lot.
25     **Q.   Then I'm not going to bother you**

22 (Pages 82 to 85)

Page 82

1          **T. Sharinn**
2     **with --**
3        A.   No, no, that's fine. I mean, I'm
4     happy to say "I don't know" to a lot of
5     questions, it's okay.
6        **Q.   You said that you didn't draft**
7     **this letter?**
8        A.   No.
9        **Q.   Form letter?**
10       A.   Yeah.
11       **Q.   Basically some paralegal in Pepe**
12    **& Hazard spits out the vital statistics of**
13    **the patent and --**
14       A.   It's a patent paralegal. You
15    know, you have a docket system wherever you
16    are, you enter the information in the
17    docket system and I would assume, I don't
18    know because I've never specifically done
19    it, you press a button and you have a
20    letter.
21       **Q.   We saw from the previous exhibit**
22    **on the '745 Patent --**
23       A.   The '745 Patent, I don't have
24    that handy.
25       **Q.   Similar letter, slightly**

Page 83

1          **T. Sharinn**
2     **different formatting --**
3        A.   Every firm has their own forms,
4     but yeah, that's all this is. That's the
5     same concept, you press a button basically,
6     as far as I know, a paralegal reads it to
7     make sure that substantively it makes sense
8     and everything fell in the right place, and
9     then you sign it.
10       **Q.   I just want to draw your**
11    **attention to the last -- the second page of**
12    **Exhibit 21, and let me see --**
13       A.   I'm sorry, I'm looking at the
14    wrong letter. Let me take a look at it.
15    Okay.
16       **Q.   "We will notify you regarding**
17    **payment of the maintenance fees several**
18    **months before they are due."**
19          **Do you see that?**
20       A.   Yeah, that's standard language in
21    a letter like this.
22       **Q.   What do you mean by -- standard**
23    **language, is it also standard practice**
24    **that's what intellectual property groups**
25    **do?**

Page 84

1          **T. Sharinn**
2        A.   Well, you have a computer system,
3     you enter the information on it and the
4     docketing system sends ticklers when things
5     are due.
6        **Q.   And Pepe & Hazard had that,**
7     **Greenberg Traurig had that, Baker McKenzie**
8     **had that?**
9        A.   As far as I know, all three had
10    it, yeah. I can't imagine they did it the
11    old-fashioned way. I wouldn't be
12    specifically involved in something like
13    that. That would be a paralegal's job.
14       **Q.   It's a docketing clerk?**
15       A.   Right. Nobody including Steve
16    Colvin or any of them would want to pay my
17    hourly rate to look at a calendar.
18       **Q.   Now, when you took the matter,**
19    **and let's just focus for now on the '160**
20    **Patent, when you took that matter, that**
21    **particular matter with you to Greenberg**
22    **Traurig --**
23       A.   When it was sent to Greenberg
24    Traurig -- understand something, these
25    are --

Page 85

1          T. Sharinn
2        **Q.   The client chose to --**
3        A.   I work for law firms, those
4     clients were the firm's clients. I managed
5     them because I originated them.
6        **Q.   Well, that's the question that I**
7     **really want to ask you, is that an**
8     **obligation that Greenberg Traurig, to your**
9     **understanding, assumed upon the matter**
10    **being transferred to Greenberg Traurig?**
11       A.   While the matter was at Greenberg
12    Traurig, certainly they would be
13    responsible for -- I mean, you know, when
14    you're handling a matter, you're expected
15    to be able to tell somebody something is
16    due.
17       **Q.   And in fact, as you can see from**
18    **Exhibit 33, the letter that you sent out**
19    **under Greenberg Traurig's letterhead in**
20    **connection with the '745 Patent makes the**
21    **same sort of commitment?**
22       A.   There is no magic here.
23          MR. KAMINSKY: Objection to the
24    form of the question.
25          MR. SCOTT: You don't like

23 (Pages 86 to 89)

Page 86

1          T. Sharinn
2   commitment?
3          MR. KAMINSKY: As the same
4   statement.
5   BY MR. SCOTT:
6     Q.   Makes the same statement, that's
7   the word I was going to use -- makes the
8   same statement.
9     A.   Let me say this, if you don't
10  mind. Yes to your question, but let's
11  understand something, there is no magic to
12  this. This is a form letter. This is done
13  with every patent that's issued everywhere.
14         I'm sure you're going to get an
15  expert witness to testify about that. They
16  are not going to tell you any differently
17  than I'm telling you. Letters are prepared
18  by paralegals. Letters are prepared from a
19  database. When a client is in the
20  database, the client is kicked out. The
21  client is not in the database, the letter
22  doesn't get kicked out.
23         It's no different than if you do
24  a mass mailing to customers and you delete
25  a customer from your database because they

Page 87

1          T. Sharinn
2   said they either wanted to be removed from
3   the mailing or because they're no longer a
4   customer -- same thing.
5     Q.   All right. Fair enough.
6          During the entire time that you
7   were at Greenberg Traurig, Quickie was in
8   fact a client of yours, a client of
9   Greenberg Traurig's, where you were the
10  responsible attorney, correct?
11    A.   I don't agree with that, no. I
12  had been fired by Quickie or removed by
13  Quickie or replaced, whatever word you'd
14  like to use, depending on how politically
15  correct you are -- but no, I don't agree
16  that they were a client of mine while I was
17  at Greenberg Traurig for the entire
18  duration.
19    Q.   Let me see if I can refine this a
20  little bit.
21    A.   Sure, be my guest.
22    Q.   You continued as evidenced by
23  Exhibit 33 to represent Quickie?
24    A.   I'm sorry, let me look at 33.
25  No, that's not Quickie. I think if you

Page 88

1          T. Sharinn
2   look at the patent, and again, this is just
3   my recollection, I may be wrong, but my
4   recollection is that the assignee of that
5   patent would be S&A Rings.
6     Q.   All right. 51822 is Quickie,
7   that's the client for that. I'm going to
8   show you that.
9     A.   That's fine.
10    Q.   Liberty is a different number.
11  S&A Rings is a different number.
12    A.   Okay. Who is on the patent as
13  the assignee?
14    Q.   I don't know the answer to that.
15    A.   Okay. Why don't we take a break
16  and you get me the patent.
17    Q.   Okay, we could do that.
18    A.   I would not have done concentric
19  passive knotless suture terminator for
20  Quickie, because that is not a Quickie
21  invention. So the fact that there is a
22  mission statement on the client reference
23  number I wouldn't have even picked up on
24  because when I'm signing a letter like
25  this, I'm looking to make sure that the

Page 89

1          T. Sharinn
2   number of the patent is correct and that
3   there is, you know, no typos with regards
4   to the name of the person.
5          Outside of that, it's a pretty
6   pro forma thing.
7          (Exhibit 36, Billing letter,
8   marked for identification, as of this
9   date.)
10  BY MR. SCOTT:
11    Q.   I'm going to hand you what we're
12  marking Exhibit 36 to your deposition.
13    A.   I'm sorry, you want me to look at
14  this, Number 36?
15    Q.   This is a billing letter dated
16  September 23rd of 2004 from you to Quickie,
17  correct?
18    A.   It states to Quickie, care of
19  Rick Steiner, it says client number 51822,
20  which you told me is a Quickie number, so
21  yes.
22    Q.   And don't take my word for it
23  because I'm known to be wrong, the next
24  page is the actual ledger, if you will, of
25  outstanding invoice, right?

24 (Pages 90 to 93)

Page 90

1         T. Sharinn
2    A.   Yeah.
3    Q.   And it has outstanding invoices
4  as of October 7, 2004 for Quickie, LLC,
5  right?
6    A.   It does. It says that. I mean,
7  you know, again without seeing the actual
8  invoices, it's really hard to say what
9  specifically. That's why I said to you the
10 one way to know what this really refers to
11 is to look at the actual patent and see who
12 the assignee is.
13   Q.   Well, for billing purposes at
14 Greenberg Traurig are, and you will,
15 all I'm trying to do at this point in time
16 is reflect the fact that you are doing work
17 for Quickie as the 51822 client well into
18 May of '04, is that fair?
19   A.   No, I don't think that is fair,
20 actually.
21        Because, A, I don't know whether
22 the concentric passive knotless is, in
23 fact, a Quickie matter. B, I don't know
24 what General would have been doing.
25 Clearly wasn't much and it stops as the

Page 91

1         T. Sharinn
2  bill says in '03. The Quickie Medtronics
3  stops in '03 and most of it is from '02.
4    Q.   Right.
5    A.   And the surgical drape stops in
6  '02, and I don't even know what that refers
7  to specifically, so no, I can't really say
8  with any clarity that that's the case.
9        I think we had talked about this
10 a little bit earlier, maybe I'm mistaken,
11 where I said it's kind of helter-skelter
12 with those guys, that they would write me
13 checks from S&A for things that were
14 Quickie and vice versa, that bills on our
15 side were sometimes mixed together, and so
16 it's hard for me to say. That's why I'm
17 saying why don't we look at the passive
18 knotless suture terminator and see who that
19 belongs to.
20   Q.   And all I'm saying, Mr. Sharinn,
21 is that I can only go on the documents that
22 have been provided to me, which are the
23 billing records for Greenberg Traurig,
24 where in fact Quickie is being billed for
25 work done by you in the 2004 time frame at

Page 92

1         T. Sharinn
2  a minimum.
3        MR. KAMINSKY:  Objection to the
4    form of the question.
5  BY MR. SCOTT:
6    Q.   Is that true?
7        MR. KAMINSKY:  You're referring
8    to a letter that's written to Quickie,
9    that's what you're referring to.
10 BY MR. SCOTT:
11   Q.   Does this letter not reflect that
12 Quickie was being billed by Greenberg
13 Traurig for work done in 2004?
14       MR. KAMINSKY:  Objection to the
15   form of the question.
16   A.   You know, I guess the best I can
17 answer on that is I don't know. I think
18 the letter is directed to Quickie. Again,
19 as I said, practice and my memory would be
20 such that it would indicate that that's a
21 mistake.
22       I think it would probably be
23 better to, again, like I said a moment ago,
24 look at the patent, maybe look at the
25 underlying invoices and see what was done.

Page 93

1         T. Sharinn
2        If you have those, I'm happy to
3  take time to go through them with you.
4    Q.   We're going to go through some of
5  those invoices, but I'm probably going to
6  do it after lunch when I have it organized
7  so we can move more quickly through that.
8    A.   Okay.
9    Q.   Just so I understand your
10 testimony.
11       When do you believe that you
12 ceased to do work for Quickie?
13   A.   Okay. My recollection is that I
14 no longer did any work from about, I think
15 it was a week or so after the Markman
16 Hearing. I was told by Alan Fell and by
17 Steve that they wanted me to continue on
18 S&A and some other matters, but that all
19 the Quickie matters were going to become
20 the work of Mark Evens and Thelen Reid.
21   Q.   Do you recall continuing to have
22 an involvement with regards to the 160
23 re-examination subsequent to the Markman
24 Hearing?
25   A.   I do have some recollection of

25 (Pages 94 to 97)

Page 94

1          T. Sharinn
2    that, but it was very sporadic and it was
3    always -- again, this was part of the
4    problem is that Steve, like I said, would
5    call me sometimes at 3 in the afternoon,
6    sometimes at 3:00 in the morning to just
7    talk about anything from boats, the
8    Yankees -- he wasn't really a Yankees,
9    Grasse would be more Yankees -- but boats
10   or his divorce at one point, at other
11   points it was his new wife, about patents,
12   about how much Thelen Reid was getting on
13   his nerves, how much they were billing him,
14   what they were doing.
15          And I would constantly tell him
16   that I was no longer engaged by him in that
17   capacity, that I felt uncomfortable talking
18   to him about it.
19          Listen, let's understand
20   something. I would have loved continue
21   doing this case for them, and in my heart I
22   think I could have won at least on the
23   liability issues. But I was replaced, and
24   I knew that, and I told him flat out I
25   would be very happy to pick up the pieces

Page 95

1          T. Sharinn
2    where Thelen Reid had started to drop them
3    and try to fix for him what they were
4    doing, but that I was really not permitted
5    to do what he was asking me to do.
6          At one point he asked me if I
7    wanted to consult or if I would consider
8    consulting. At another point he actually
9    suggested I open a matter and be co-counsel
10   in a very undefined way. But it didn't,
11   never happen really.
12   Q.   Now I want to try and segregate,
13   if I can.
14   A.   Sure.
15   Q.   And I don't know that based on
16   the testimony that you can --
17   A.   It's hard, because again, you
18   have to understand who the people you are
19   dealing with. It sounds like you knew
20   Steve.
21   Q.   For a time.
22   A.   Well, to know Steve for any real
23   period of time and to have real involvement
24   with him, I don't think there's a person
25   who has known him that would argue with me

Page 96

1          T. Sharinn
2    that Steve could be a lot of different
3    things at the same time to a lot a
4    different people in the same room.
5    Q.   All right.
6          Did you understand your
7    responsibility with regards to the '160
8    Patent to cease upon your being replaced in
9    connection with the Medtronic litigation?
10   A.   Absolutely.
11   Q.   Now, this is a different
12   question. If you don't understand the
13   difference, just stop me.
14   A.   That's fine.
15   Q.   Did you understand your
16   responsibility with regards to Quickie as
17   their intellectual property counsel at
18   Greenberg Traurig to cease with your
19   replacement in the Medtronic litigation?
20        MR. KAMINSKY: Objection to the
21   form of the question.
22   A.   That's how I understood it.
23   Let's understand something. I got a call
24   at around 9:30 at night from Alan Fell. I
25   was out celebrating from a different case

Page 97

1          T. Sharinn
2    that we had just won, a trademark case --
3    Q.   By the way, I think you had
4    reason to celebrate with regards to the
5    Quickie Markman Hearing as well.
6    A.   Thank you. Well, you know, we
7    felt good. But I actually didn't celebrate
8    that night because I saw the writing on the
9    wall, knew where it was going.
10         One of the only times my ex-wife
11   and I had any real conversation about my
12   career was at night. I left the
13   celebration after I got that call because I
14   felt like my life at Greenberg Traurig, as
15   I understood it and how I defined it, had
16   pretty much been confirmed to go now in a
17   much different direction than I had hoped.
18         So my understanding was, yes,
19   that -- how to put this other than they had
20   just taken everything that had to do with
21   Quickie away from me.
22   Q.   And what I'm trying to
23   understand, Mr. Sharinn, is that prior to
24   let's just say the Markman Hearing, your
25   involvement with Quickie was multifaceted

26 (Pages 98 to 101)

Page 98

1          T. Sharinn
2   as we described in talking about Pepe &
3   Hazard.
4          I can only assume, and if I'm
5   wrong, tell me, that it continued that way
6   at Greenberg Traurig, that Quickie had many
7   different pieces to it as evidenced by the
8   different billing matters while you were
9   initially coming into Greenberg Traurig?
10     A.   If you're asking me, if I
11  understand your question correctly, you're
12  saying to me when I left Pepe and went to
13  Greenberg did several Quickie matters
14  follow me, the answer would be yes.
15         If you're asking me after the
16  Markman Hearing were those Quickie matters
17  pulled from me and given to Thelen Reid &
18  Priest, again, my answer would be now yes
19  to that, too.
20         No, I was told in uncertain terms
21  that my Quickie days were abruptly over.
22         MR. KAMINSKY:  In certain terms
23  or in no uncertain terms?
24         THE WITNESS:  In no uncertain
25  terms.  Sorry.

Page 99

1          T. Sharinn
2   BY MR. SCOTT:
3      Q.   So you saw then at that point in
4   time, we're talking about the Markman
5   Hearing events, which is October of 2002,
6   that the sum and substance of your
7   representation with regards to Quickie
8   concerned the '160 Patent?
9      A.   Say that again, please, because
10  I'm not sure I understood it.
11     Q.   As of October of 2002, which is
12  when the Markman Hearing came out and you
13  went from, I think, a high point to a low
14  point very quickly, you saw the sum and
15  substance of your representation with
16  regards to Quickie to be the '160 Patent?
17     A.   Forgive me for being dense, but
18  I'm not sure I'm getting it. Could you ask
19  it a different way maybe?
20     Q.   Sure.
21     A.   Because it sounds like it's a
22  very important question.  I don't want to
23  answer without being certain.
24     Q.   Well, from what I take, nothing
25  mattered from that point in time on, and

Page 100

1          T. Sharinn
2   we're talking October of 2002 with regards
3   to your representation of Quickie except
4   the litigation and enforcement of the '160
5   Patent?
6      A.   No, that's not true.  A lot of
7   things mattered.
8      Q.   Well, okay, I'm being way too
9   broad if you're taking me outside of
10  Quickie.
11         As to Quickie, that the sum and
12  substance of your representation as to
13  Quickie was the enforcement of the '160
14  Patent and nothing else?
15     A.   No, that's not true.
16     Q.   All right.
17         So then is it fair to say that
18  you continued to have involvement with and
19  representation of Quickie after October of
20  2002 in connection with the Markman
21  Hearing?
22     A.   No, it's not fair to say that.
23         My understanding was prior to the
24  Markman Hearing that I was responsible for
25  the litigation and the patent that was

Page 101

1          T. Sharinn
2   being litigated, the '160 Patent.  I was
3   the attorney of record with the PTO for
4   that matter, and Greenberg Traurig was the
5   firm of record.
6          Subsequent to the Markman
7   Hearing, whenever the date was, whether it
8   was the next day or the day after the
9   ruling was issued, my responsibilities to
10  that patent immediately terminated by
11  actions of Steve Colvin and Alan Fell.
12  They told me flat out, transfer the files,
13  you're no longer responsible.
14     Q.   And I hear you loud and clear on
15  that.
16     A.   Okay.
17     Q.   I'm simply asking now did you see
18  that as extending to your responsibilities
19  or relationship with Quickie as a whole?
20     A.   Yes, sir.
21     Q.   Separate and apart from just the
22  '160 Patent?
23     A.   I don't know that there was
24  anything else for Quickie other than the
25  '160 Patent and the litigation or defense

27 (Pages 102 to 105)

Page 102

1           T. Sharinn
2 of it. Understand at the time of the
3 Markman, there was no challenge made to the
4 validity of that patent or the breath of
5 those claims.
6           Understand that from what I
7 recall subsequent to the Markman, McDermott
8 Will & Emery on behalf of Medtronic filed a
9 stay in the case, it's easy to be a Monday
10 morning quarterback. If I was still there,
11 I would never have allowed it to occurred
12 without some kind of a real hearing, okay.
13           Thelen dropped the ball there.
14 We had a judge who was very favorable to us
15 at a Markman Hearing who gave us
16 interpretations that were even broader than
17 claims that I ever expected to get.
18           I was responsible for that patent
19 as the attorney of record with the U.S.
20 PTO. From that day on, when I got fired by
21 Fell & Colvin and told to transfer the
22 files to Thelen Reid & Priest, they became
23 responsible. It was their issue to fight,
24 for instance, the stay that Medtronic filed
25 for, it was their issue -- you want me to

Page 103

1           T. Sharinn
2 answer, you've got to let me finish,
3 please --
4    Q.   I am.
5    A.   Because it looks like you're
6 about to interrupt me.
7    Q.   No, I'm not.
8    A.   It was their issue to fight
9 against the re-examination, and they took
10 steps to do all of the above, they just
11 didn't do it very well, and that's why
12 we're all here today.
13           I mean, let's call an ace an ace.
14 This is sour grapes and an opportunity to
15 try and reclaim at the sweat of someone
16 else, someone else's mistake, okay. Thelen
17 Reid and Colvin and Company made a couple
18 of really big mistakes, and because of that
19 we're here today and now trying to hang the
20 blame on someone else who had nothing to do
21 with this.
22           So if I seem a bit upset about
23 it, it's because I've been accused of
24 messing up where I did not mess up and I'm
25 being accused, my former firm is being

Page 104

1           T. Sharinn
2 accused of me messing up where they did not
3 mess up. We didn't have the ball to run
4 with. It was taken away from us and handed
5 to a different back, to speak
6 metaphorically.
7    Q.   I don't want to stop you.
8    A.   We were pulled out of the game.
9           MR. SCOTT: I do have to object
10 and move to strike as nonresponsive
11 everything after "let's call an ace an
12 ace.
13    A.   That's between you and my lawyer.
14           MR. KAMINSKY: I'll, of course,
15 reserve debates on things like that
16 for later.
17 BY MR. SCOTT:
18    Q.   I'm not trying to quibble with
19 you on the '160 Patent and the
20 responsibility for the '160 Patent at
21 Greenberg Traurig or anywhere else.
22           What I'm trying to -- at this
23 point, and I'm not saying that I'm not
24 quibbling, I'm just not at this point --
25 all I'm trying to get an understanding of

Page 105

1           T. Sharinn
2 is separate and apart from the '160 Patent
3 enforcement or defense in the
4 re-examination, did you see yourself as
5 having a continuing relationship with
6 Quickie in any other respect once you got
7 that call following the Markman Hearing?
8    A.   No.
9    Q.   Fair enough.
10    A.   And just to add to that, I do not
11 recall there being any other matters
12 besides the litigation or the actual
13 Quickie patents management at that time
14 that were active.
15    Q.   All right.
16           And let me just try and step
17 through those hoops now.
18           There was a re-examination, there
19 was a re-examination matter opened at
20 Greenberg Traurig for the Quickie '160
21 Patent.
22    A.   Okay.
23           MR. KAMINSKY: Objection to the
24 form of the question.
25    Q.   And it's the point 0109 matter

28 (Pages 106 to 109)

Page 106

1          T. Sharinn
2  that is billed to for re-examination
3  purposes. So you had some involvement, as
4  I think you testified following the Markman
5  Hearing in connection with the
6  re-examination.
7     A.   Let me see if I can put it this
8  way. Steve Colvin became very disenchanted
9  with Thelen Reid very early on in the
10 process. Alan Fell, I'm not sure was ever
11 enchanted with them, I don't know one way
12 or the other. I only know what I remember
13 him saying to me.
14        They called me on a few occasions
15 to talk to me about what was going on in
16 the case. I obviously lent them my ear
17 because I wanted the case back, it was a
18 good case, I was really proud -- you asked
19 me before what was I proud of, I was proud
20 of the Markman results.
21    Q.   As you should have been.
22    A.   Okay, I thought we did a really
23 good job and we got a result that nobody
24 expected to get, most importantly
25 Medtronic. And if I'm not mistaken, and

Page 107

1          T. Sharinn
2  again, I don't remember this specifically,
3  but I thought I remembered Steve Colvin
4  getting an offer to settle after that
5  Markman that was much better than they had
6  ever gotten before.
7        As we're talking about it, that's
8  the only reason I'm saying, I remember
9  something along that, and so I felt like
10 that I did or we did as a firm a really
11 good job for them.
12    Q.   Oh, make no mistake. You did
13 that, though.
14    A.   Whatever.
15    Q.   You're the one that argued the
16 Markman Hearing.
17    A.   Remember that when the next IP360
18 article comes out. Well, it's cost me a
19 partnership in one place.
20    Q.   Let me see if I understand, that
21 you then saw any further involvement
22 with -- and let's separate out the '160
23 Patent altogether, okay?
24    A.   Okay.
25    Q.   So re-examination or litigation,

Page 108

1          T. Sharinn
2  let's just take that and put it on the side
3  and forget about it for a moment.
4     A.   Okay.
5     Q.   Any continuing involvement you
6  had with the Colvin group from that point
7  forward, that point being October of 2002
8  when you got that call, you understood to
9  be on non-Quickie matters?
10    A.   Absolutely. My understanding was
11 the following, and I wasn't really proud of
12 this, but when they released me or removed
13 me from the Quickie matter and that would
14 include the patent and the litigation, I
15 think they felt badly, too.
16        Understand that Alan was at my
17 son's bris, Steve or my father had a
18 stroke, got my father moved into his
19 hospital, made sure we had all the bells
20 and whistles and the best doctors, ones we
21 couldn't even afford, they serviced my dad.
22        When my son was born, Morgan, my
23 son, my ex-wife Mandi, we had a suite, we
24 had rooms that I could never have paid for.
25 We got treatment, the head of anesthesia is

Page 109

1          T. Sharinn
2  the one who gave her her epidural in the
3  middle of the night because Steve was that
4  kind of guy, Steve made sure it was going
5  to be a certain way, and I was almost
6  family, and that's kind of the way to
7  describe this.
8        I think Steve realized that when
9  I lost that case there were going to be
10 questions -- when I lost it, meaning I lost
11 responsibility for that case -- questions
12 were going to be raised inside the firm as
13 to what I did wrong.
14        Only a few people who were
15 intimately familiar with the details would
16 have ever believed that I didn't do
17 anything wrong to lose a client after, like
18 you said, I got the results that I got at
19 the Markman. Nobody gets fired after
20 hitting a grand slam, let alone a home run.
21        You just don't get that, it
22 doesn't happen. It did. So I think they
23 felt bad and let me continue on the other
24 matters which really didn't amount to very
25 much, but let me do it, and I gladly kept

Page 110

1          T. Sharinn
2   it because I wanted to make sure two
3   things; number one, I had always hoped in
4   the back of my mind and in my heart that I
5   would get the Quickie case back.
6          And number two, because I wanted
7   to put forth the best foot I could forward
8   for making partner at Greenberg Traurig,
9   and I had been schooled enough to know that
10  having origination was definitely a
11  positive for making partnership.
12         I hope that answers your
13  question.
14         MR. SCOTT: Are you good for
15  another half hour?
16         THE WITNESS: Can we take a
17  five-second break?
18         MR. SCOTT: Sure, let's go ahead.
19         (Recess taken from 11:31 a.m. to
20  11:37 a.m.)
21  BY MR. SCOTT:
22    Q.  I've handed you what was
23  previously marked in Mr. Sutton's
24  deposition as Exhibits 9 through 13 and 15
25  through 19, all of which are intake reports

Page 111

1          T. Sharinn
2   for Greenberg Traurig in connection with
3   Colvin group related matters. I'll give
4   you a moment to look at that and tell me if
5   I've gotten that wrong in any respect.
6     A.  I'm laughing only because I see a
7   lot of typos already. I mean, I obviously
8   didn't fill these out. This looks like it
9   would be filled out by a secretary or
10  paralegal.
11    Q.  Would you -- well, let's just
12  first, did I accurately reflect what they
13  are, for the record?
14    A.  They are. I'm wondering what
15  happened to Exhibit 14.
16    Q.  14 is an unrelated -- not
17  unrelated, but it's a document that was not
18  an intake memorandum. It was just
19  something that came up in the middle of it.
20    A.  Got it.
21    Q.  So I'm not withholding one of the
22  intake memos.
23    A.  No, I was just wondering. Yeah,
24  they look like intake forms. Like I said,
25  I probably wouldn't have filled this out.

Page 112

1          T. Sharinn
2     Q.  Would you have reviewed it prior
3   to it being completed?
4     A.  Without disparaging Greenberg
5   Traurig and making my life sound hellacious
6   while I was an associate there, I was lucky
7   if I had time to grab a drink of water. I
8   averaged something like 2,400 hours a year
9   for them billable. I probably would have
10  looked at it quickly, but to me it would
11  have been let me get to work whatever I've
12  got to get to work on.
13    Q.  You've heard the saying devils in
14  the detail?
15    A.  Yeah, I've heard that.
16    Q.  I want to work through these, I
17  hate to do it in some respects, but I think
18  what you'll find at the end of it is that
19  there was some effort made to distinguish
20  between various Quickie-related matters in
21  the course of these different intake
22  memorandum.
23    A.  Well, let's go through them.
24    Q.  All right. So let's just take
25  Number 9, Exhibit Number 9. That's a

Page 113

1          T. Sharinn
2   general matter which is given the matter
3   number of point 01, right?
4     A.  Yes.
5     Q.  And that's in the middle of the
6   page where it says matter information.
7          And the client there is 51822,
8   right?
9     A.  Are you talking about the number
10  after matter information?
11    Q.  Yes.
12    A.  Then, yes.
13    Q.  So in your billing for this
14  particular client matter, you would enter
15  the 51822 and then point 01 as a specific
16  matter, right?
17    A.  No. I always just kept a hand
18  diary of my billables. So I would have
19  just wrote down probably something like
20  Quickie or whatever the client was, I'd
21  just write down the name of the client and
22  I probably would write down what the matter
23  concerned and then leave it to my assistant
24  to enter the time and put in the right
25  number.

30 (Pages 114 to 117)

---

Page 114

T. Sharinn

1
2   Q.   All right.
3   A.   But generally speaking --
4   Q.   So you didn't have like a system
5   and maybe we've just advanced, I used to do
6   it by hand, too, where you have on your
7   computer, you know, client, matter and then
8   I type in my own now, that's the only thing
9   I type I think.
10  A.   Funny you should say that. Yeah,
11  I'm no different than probably you. I had
12  never done that prior to my current job,
13  even at Baker.
14          All my partners looked at me like
15  I was crazy everywhere I was, like why
16  don't you just put it in, it's easier than
17  writing it down, but sometimes it's hard to
18  teach an old dog a new trick.
19  Q.   And so when you had your time
20  diary or whatever, you didn't necessarily
21  distinguish between the various client
22  matter numbers. You would just more
23  generally reference what it pertained to
24  and then leave it to your assistant to
25  assign the number?

---

Page 115

T. Sharinn

1
2   A.   Yes and then, you know --
3   exactly, that would be pretty much it. I
4   relied heavily on my assistants for
5   administrative. I did the legal
6   stuff, they did the admin stuff.
7   Q.   All right. So let's just kind of
8   continue. Point 01 -- and I know that
9   there are additional 0's afterwards, I'm
10  just going to go to the first ones that
11  kind of identify the matter.
12  A.   Okay.
13  Q.   101 is general?
14  A.   Okay.
15  Q.   Because that's what it has in
16  terms of matter name, is that right?
17  A.   I don't see it.
18  Q.   Look right below matter
19  information, number 6.
20  A.   Oh, matter name general, yes.
21  Q.   So we have the general matter.
22  And what generally would you think would be
23  billed towards the general matter?
24  A.   Probably not much. I mean, like
25  I said, it's like kind of probably just a

---

Page 116

T. Sharinn

1
2   safe, a trap for things that you can't
3   figure out where else it belongs.
4   Q.   Okay.
5          The next one, which is Exhibit
6   10, is again same client 51822, and the
7   client is in fact Quickie, LLC, right, do
8   you see that up in item number 2?
9   A.   Yes, sir.
10  Q.   And that's the client number that
11  is assigned to that particular client,
12  right?
13  A.   Yes, sir, from what I could see
14  on the paper.
15  Q.   And in this particular intake is
16  for matter number 0101, right?
17  A.   That's what it says, yes, sir.
18  Q.   And that's for, if you look in
19  item number 6, passive knotless suture
20  terminating system?
21  A.   Yes, sir.
22  Q.   And then it says below that
23  number 7, description of matter is patent
24  prosecution, right?
25  A.   Yes, sir.

---

Page 117

T. Sharinn

1
2   Q.   Just sitting here right now, do
3   you have any sense of what patent
4   prosecution that's referring to?
5   A.   I think by that time the patent
6   had already been prosecuted, but you still
7   have ongoing responsibilities when you're
8   the attorney of record.
9   Q.   What kind of ongoing
10  responsibilities?
11  A.   One which is at the center of
12  this matter would be whether or not
13  maintenance fees got paid.
14  Q.   And since we are with the intake
15  of this in September of 2001, this is well
16  after the issuance of the patent in May of
17  2000, right?
18  A.   Well, a calendar would tell us
19  that, yes, sir.
20  Q.   Well, really, I was just pointing
21  you to the reference that this date does
22  come after the issue date as you suggest?
23  A.   Specific recollection I don't
24  have, but yes, from the document, that's
25  what I would read it to mean.

31 (Pages 118 to 121)

Page 118

```
 1              T. Sharinn
 2    Q.   Specific recollection as to the
 3  date of the patent?
 4    A.   Or the date that I opened the
 5  matter.
 6    Q.   Okay.
 7         Do you have any -- I don't want
 8  to belabor it, Mr. Sharinn, but just so
 9  that we have it as we go from a point of
10  reference, that letter that you send out
11  with all the vitals on the patent, in
12  Exhibit 34 -- no, let's see -- Exhibit 21,
13  just to refresh your recollection as to the
14  issue date, 5/23/2000, just as we go
15  forward so you don't have to take my word
16  for it?
17    A.   No, that's fine, I take your
18  word.
19    Q.   So we're now on Exhibit 11 and
20  that is the same client, Quickie, right?
21    A.   Yes, sir.
22    Q.   Also, opened on September 9th of
23  2001?
24    A.   Yep.
25    Q.   Which is sometime after you
```

Page 119

```
 1              T. Sharinn
 2  joined Greenberg, isn't it?
 3    A.   I don't recall. I guess it must
 4  be.
 5    Q.   You did join them in 2001, but do
 6  you recall whether it was beginning of the
 7  year, middle of the year, end of the year?
 8    A.   This is just before 9/11. I know
 9  I had been there for a few months when 9/11
10  hit.
11    Q.   The matter number is point 0102,
12  right?
13    A.   Yes, sir.
14    Q.   And it's the matter number is
15  concentric passive knotless suture
16  terminator, right?
17    A.   Yes, sir.
18    Q.   Is that different from the '160
19  Patent?
20    A.   I don't know. Doesn't look like
21  it.
22    Q.   All right.
23         And then it's described as patent
24  prosecution as well.
25    A.   That's why I'm laughing. I think
```

Page 120

```
 1              T. Sharinn
 2  this might be an example of either my
 3  secretary making two-for-one or just -- I
 4  don't know, maybe there was another that
 5  I'm not aware of.
 6         Again, Steve would call with
 7  great ideas all the time and I would open
 8  matters and then nothing would ever happen
 9  with them. They would kind of die in the
10  vine.
11    Q.   All right.
12         In any event in the previous one,
13  Exhibit 10, 0101, matter 0101, that's a
14  terminating system. 0102 is a suture
15  terminator.
16    A.   That just means they didn't type
17  system.
18    Q.   So you don't know if there's any
19  difference between the two?
20    A.   I don't think there is actually,
21  but I'm not sure.
22    Q.   All right.
23         Exhibit 12 opened or the intake
24  memo created on November 1, 2001 also for
25  Quickie?
```

Page 121

```
 1              T. Sharinn
 2    A.   Yeah.
 3    Q.   Matter information, this one is
 4  point 0103, correct?
 5    A.   Yes.
 6    Q.   And this is for arterial fixation
 7  avoiding sutures, right?
 8    A.   Yes, sir.
 9    Q.   Also for a patent application?
10    A.   Yes, sir.
11    Q.   Refresh any recollection?
12    A.   It does a little bit, yes, sir.
13    Q.   It sounded like it might.
14         Different than the '160 Patent?
15    A.   I think so, yes, sir.
16    Q.   Do you recall anything more as to
17  what was done, whether this had made any
18  progress or --
19    A.   Yes, sir.
20    Q.   It did?
21    A.   Not sir. I recall more. This
22  would be another one of those examples of a
23  4:00 in the morning phone call that I later
24  got reprimanded for from Steve where they
25  wanted to, and I tried to talk them out of
```

32 (Pages 122 to 125)

Page 122

1           T. Sharinn
2  this when I was at Pepe & Hazard, too, but
3  it was relentless -- if it's what I think
4  it is, he wanted to file a patent for the
5  surgical method, and at the time, if I
6  remember the law correctly, the book was
7  still out on whether or not surgical
8  methods were patentable for a variety of
9  reasons, not the least of which is whether
10 it fell into 101 as patentable subject
11 matter, and I remember doing some research,
12 I think on this top either up at Pepe &
13 Hazard or at Greenberg, and I opened the
14 matter primarily just because he was bent
15 on talking -- if this is the correct
16 matter -- he was bent on talking about it.
17         But I think this would be an
18 example to coin the phrase I said a moment
19 ago of something dying on the vine and me
20 just --
21     Q.   But something you did try to
22 distinguish and segregate from other
23 Quickie stuff that you would do?
24     A.   Yeah, that would be a fair way to
25 describe that.

Page 123

1           T. Sharinn
2     Q.   So there is some effort on your
3  part to distinguish the various aspects of
4  your representation with regards to Quickie
5  as evidenced by these intakes?
6     A.   Yeah. I mean, you know, maybe
7  this is part of being an associate, you
8  know, puffing your chest a little bit and
9  trying to make yourself look a little more
10 important than you might be.
11         When I look back on it now, this
12 might be me trying to basically show myself
13 as being the potential of many matters, not
14 just one matter, not being one pony show.
15     Q.   Okay.
16     A.   But I don't know.
17     Q.   Exhibit 13, open November 28,
18 2001. This is also for Quickie, right?
19     A.   I don't know because I'm looking
20 up at the bill sent to, and it's to Alan
21 Fell, care of Rick Steiner. So it might
22 have been, it might not have been. I'm
23 also looking at the number -- I guess the
24 number is the same.
25     Q.   Still the same, 51822 --

Page 124

1           T. Sharinn
2     A.   I don't know.
3     Q.   It still says Quickie, LLC,
4  right?
5     A.   Oh, it's the Quickie v.
6  Medtronics.
7     Q.   I was going to get there. But
8  the client name is Quickie, right?
9     A.   Yes.
10    Q.   And this is now matter point
11 0104, right?
12    A.   Yes, sir.
13    Q.   And this is the litigation?
14    A.   Yes, sir.
15    Q.   Against Medtronics specifically?
16    A.   Yes, sir.
17    Q.   All right.
18        And then we skip to 14 because
19 it's not an intake memorandum. We get to
20 Number 15, and that's opened January 29,
21 2002, so we now are in the 2002 time frame,
22 also for Quickie, correct, as the client?
23    A.   Yes, sir.
24    Q.   This is the 51822 client, right?
25    A.   I don't pay much attention to the

Page 125

1           T. Sharinn
2  number. I'll look up at the number 2,
3  where it says client name because that
4  would probably be a better indicator than
5  necessarily the number.
6     Q.   Right.
7     A.   Only because I wouldn't know if
8  my assistant wrote the wrong number down.
9     Q.   Okay.
10        Fair enough.
11        Matter information, this is point
12 0105, which then has underneath it as a
13 matter name Guidance, Inc.?
14    A.   Yeah, I think that meant to be
15 Guidant. This would be an example of
16 another clerical area.
17    Q.   And this is essentially the
18 possible infringement action against
19 Guidant, much like the Medtronics
20 litigation?
21        It was contemplated that those
22 two parties were potential infringers?
23    A.   I think there were some others,
24 but those were the two major ones that they
25 were most intrigued by.

33 (Pages 126 to 129)

Page 126

1           T. Sharinn
2    Q.   And you initiated against
3 Medtronics and were in a sense considering
4 the Guidant part?
5    A.   I think the way that Steve has
6 rationalized it was that he wanted to do
7 both, and I explained to him that it really
8 was not such a smart move to take them both
9 on at once, that they were really big
10 companies, pick one or the other, and I
11 think that he felt he had a better shot
12 against Medtronic -- and again, this me
13 thinking, not knowing, because it's been
14 many years -- but my recollection is kind
15 of that I said we had a license agreement
16 and that at least on a damages level if we
17 were able to sustain prove that they were
18 liable for patent infringement and it was
19 enforceable, that the license agreement
20 would certainly provide us if nothing else
21 a benchmark possibly for damages, whereas
22 the Guidant case we would require a real
23 expert to get involved and to do a damages
24 work-up.
25    Q.   Okay.

Page 127

1           T. Sharinn
2    Number 16, Exhibit 16 comes just
3 shortly after the openings of the 0105
4 matter. This is 0106, likewise for
5 Quickie, right?
6    A.   Yes, sir.
7    Q.   And this is for Guidant
8 Corporation?
9    A.   Is it okay if I compare it to 15?
10    Q.   Please do, and if you can shed
11 any light on it --
12    A.   I think I can. I mean, I think
13 this is another example of either my
14 assistant opening too many. Paula was a
15 great assistant. She really wanted to see
16 me succeed. I'm not convinced that she
17 didn't open multiple matters at times
18 trying to make me look bigger than I was,
19 and I may not have argued with it at the
20 time because I felt there was no harm, no
21 foul.
22    Q.   You think these are the same
23 matter, though?
24    A.   I do.
25    Q.   And these being Exhibits 15 and

Page 128

1           T. Sharinn
2 16?
3    A.   I do.
4    Q.   All right.
5        Exhibit 17, we're going down the
6 track about 6 months, we're in August of
7 2002 and now this is opened up as matter
8 number 0107 for Quickie, right?
9    A.   Yes, sir.
10    Q.   And the matter name is passive
11 knotless suture system patent, referring to
12 the '160 Patent, correct?
13    A.   Yeah, that's what it says, yes,
14 sir.
15    Q.   And in item number 7, matter
16 description patent for medical instrument.
17        What, if any, light can you shed
18 on the opening of this matter?
19    A.   I can't for the life of me shed
20 any. I couldn't even understand why this
21 would have been opened. The only thing I
22 can think of is Paula's desk was right
23 outside of mine, and I can just see me on
24 the phone with Steve and say Paula, open up
25 another matter for Quickie, because that

Page 129

1           T. Sharinn
2 doesn't even sound like something I would
3 write, patent for medical instrument -- I
4 have no idea.
5        But I do notice that it
6 references the '160 Patent above in number
7 6, so I don't know what that involves.
8    Q.   All right.
9        So whatever it is, it involves in
10 particular the '160 Patent?
11    A.   That's what it says.
12    Q.   All right.
13    A.   I don't know that that is the
14 case or if that's just Paula, you know,
15 putting stuff in and me not noticing it.
16    Q.   And it is different from the
17 patent litigation, which is 0104?
18    A.   It could be one and the same
19 again. I don't know.
20    Q.   Okay.
21    A.   I really don't.
22    Q.   Exhibit 18, we've gone down the
23 tracks a couple of more months and now
24 we're in November of 2002, another matter
25 opened up for Quickie, corrects?

34 (Pages 130 to 133)

**T. Sharinn**

1
2    A.    Yes, sir.
3    **Q.    This is matter number 0108**
4    **referring to a new surgical drape patent**
5    **license, right?**
6    A.    Yes, sir.
7    **Q.    This is not the '160 Patent?**
8    A.    No, sir.
9    **Q.    Do you recall any progress made**
10   **on this or did it die on the vine?**
11   A.    A little bit I understand.  We
12   had talked a little bit about this.  You
13   had asked me earlier do I remember surgical
14   drape, and I told you I remembered there
15   being some kind of an invention, but I had
16   no specific recollection of what the
17   invention was.
18          When I look at this now, it kind
19   of does make a little bit of sense to me.
20   It would have been a new invention.
21   Adrienne was a terrible assistant.  Paula
22   left to go to graduate school and I was
23   kind of thrown into this Adrienne Ivan
24   person for a short while, and she really
25   was terrible.

1                T. Sharinn
2          My guess is I just said open a
3    matter for Colvin and she put it into
4    Quickie.  So it would be a new invention,
5    but the likelihood is, and I don't know if
6    you've taken Mr. Fell's deposition yet, but
7    I'd suspect that he would have probably
8    told you that following the typical Colvin
9    group protocol, a new invention like this
10   that has apparently nothing to do with the
11   Quickie original stuff would have been a
12   new matter for a different client, they
13   would have formed a new company that would
14   concern the drape because, for instance,
15   Paul Otto is a member of Quickie, LLC, if I
16   remember correctly.
17   **Q.    Right, yes.**
18   A.    I only know that because Paul was
19   a high school person that I knew, we played
20   baseball together in high school, and he
21   was a couple of years older than me and had
22   me in a headlock one or two times, so I've
23   never forgotten him.
24          But I can't see how he would have
25   had anything to do with the surgical drape.

1                T. Sharinn
2    It just doesn't have anything to do with a
3    fishing boat, and he was the captain of
4    their boat, that's how he got involved in
5    the other one, because it was a cleat and
6    they were out at sea when they invented.
7    **Q.    All right.**
8          So we go down another month,
9    **Exhibit 19, a matter opened up in December**
10   **of 2002 for Quickie.  This one being matter**
11   **number 0109, right?**
12   A.    Right.
13   **Q.    This one does refer specifically**
14   **to the '160 Patent?**
15   A.    It does.
16   **Q.    And more specifically refers to**
17   **the re-examination of the '160 Patent,**
18   **right?**
19   A.    That's correct.
20   **Q.    By Medtronic?**
21   A.    It is.
22   **Q.    And so this would be separate and**
23   **apart from the 0104 matter which was the**
24   **Medtronic litigation?**
25   A.    Yes, sir.

1                T. Sharinn
2    **Q.    So you are trying to divide**
3    **somewhat?**
4    A.    Yeah.  I mean, this would be
5    wishful thinking on my part, I think, more
6    than anything else.  I was owed money by
7    Quickie and I got a lot of pressure about
8    the fact that I was still owed money, even
9    though we had transferred files, I think,
10   at this point.
11          I don't remember exactly the
12   timing, but I suspect this would have been
13   after the Markman Hearing.  Am I correct?
14   **Q.    Yes, and that's where I was going**
15   **with this in just a minute.**
16   A.    I'm sorry, I'll let you ask your
17   questions.
18   **Q.    As you correctly recall, this is**
19   **after the Markman Hearing and you're**
20   **opening up a new matter in connection with**
21   **Quickie for purposes of the re-examination,**
22   **right?**
23   A.    Well, I think what it was, again,
24   is, was like I said, a little bit of
25   wishful thinking and a little bit of hey,

35 (Pages 134 to 137)

Page 134

1       T. Sharinn
2  guys, if you're going to call me and ask me
3  questions, I need to bill you.
4      **Q.   Do you recall after the Markman**
5  **Hearing notifying the Patent Office that**
6  **you were still counsel of record for the**
7  **'160 Patent for purposes of the Patent**
8  **Office?**
9      A.   I can't imagine where I would do
10 that.  If you're of record, you're of
11 record.  You don't call them up and say
12 hey, I'm still of record.  So I don't know,
13 did I do that?
14     **Q.   I don't want to characterize the**
15 **document.  We'll go through it and see what**
16 **you'd make of it.**
17     A.   I can't imagine why I would.
18     **Q.   So we have then, these are,**
19 **whether rightly or wrongly, these are all**
20 **reflected as being Quickie client matter**
21 **Intake memoranda matter, right?**
22     A.   That's certainly what they say on
23 the document.  I'm not convinced that, it
24 wasn't like I said, a combination of
25 several factors, not the least of which is

Page 135

1       T. Sharinn
2  embarrassing as it is to say in this day a
3  little bit of puffing on my part internally
4  for Greenberg Traurig.
5      **Q.   Exhibit 7.**
6      A.   Exhibit 7.
7         MR. KAMINSKY:  Exhibit 7, we have
8      it here.
9  BY MR. SCOTT:
10     **Q.   Mr. Sharinn, if you would just**
11 **take a moment to look at that.**
12     A.   Okay.
13     **Q.   This is a piece of correspondence**
14 **sent on Greenberg Traurig's letterhead by**
15 **Marsha Twitty --**
16     A.   To Marsha Twitty.
17     **Q.   I'm sorry, to Marsha Twitty from**
18 **the PTO, right?**
19     A.   From the PTO.
20     **Q.   And it's sent by Linda Garamone?**
21     A.   Right.
22     **Q.   Who is she?**
23     A.   Linda was my patent paralegal at
24 Greenberg Traurig.
25     **Q.   And what is being sent to the**

Page 136

1       **T. Sharinn**
2  **Patent Office?**
3      A.   This would be just a pro forma
4  document.  We had moved offices while at
5  Greenberg Traurig, we were in the lipstick
6  building originally and then moved over to
7  200 Park Avenue, and my guess is she had
8  run this out for every matter I had ever
9  had any kind of responsibility for.
10     **Q.   On its face, it's telling the**
11 **Patent Office that you are the**
12 **correspondent and fee address of record,**
13 **right?**
14        MR. KAMINSKY:  Objection to the
15     form of the question.
16     A.   On the face it says change of
17 correspondence, address.  It says it's a
18 patent.  It clearly refers to the '160
19 Patent.  I don't know what else to say
20 about that.
21     **Q.   All right.**
22        **But in looking at the change of**
23 **correspondence address form, it is**
24 **reflecting for the '160 Patent that you are**
25 **the person at Greenberg Traurig that is**

Page 137

1       **T. Sharinn**
2  **reflected as the correspondent address,**
3  **right?**
4      A.   I guess, yes, sir.
5      **Q.   But you don't have to guess, I**
6  **mean, that is what it's reporting.**
7      A.   If that's what the document says
8  to you, that's fine.  I don't know.  I'm
9  telling you I don't have any recollection
10 of this document.
11     **Q.   I just want to understand if this**
12 **is supposed to be telling me something**
13 **different and you know, then please tell me**
14 **that.**
15     A.   I'm not even sure when it was
16 filed.  I mean, I don't really know much
17 about this document.
18        MR. KAMINSKY:  Let me just
19     interject between the two of you.  I'm
20     objecting to the form of the question
21     because the witness says he doesn't
22     recall the document.  So I'm objecting
23     to your asking him what he thinks the
24     document is telling you.
25        MR. SCOTT:  I'm only asking for

36 (Pages 138 to 141)

Page 138

1           T. Sharinn
2    his understanding as a licensed patent
3    attorney familiar with the forms of
4    the Patent Office, does this change of
5    correspondence address on the third
6    page of Exhibit Number 7 reflect you
7    and Greenberg Traurig as the
8    correspondent addressee for the '160
9    Patent.
10        MR. KAMINSKY: I object to the
11   form of the question.
12   A.    I don't think I understand your
13   question to be honest.
14   Q.    Dare I ask what it is that you
15   don't understand about my question?
16   A.    I'm not sure that I can tell you
17   that. I don't really know what you're
18   asking me. Why don't you just ask it to me
19   pretty simple and I'll give you a pretty
20   simple honest answer. I don't know.
21   Q.    All right.
22   A.    I mean, the document speaks for
23   itself. It's a form. As a patent
24   attorney, so you understand, good luck in
25   finding one who would have paid a lot of

Page 139

1           T. Sharinn
2    attention to a document like this.
3        Again, this is something that
4    would have been generated by a paralegal
5    and probably put in front of me with a
6    stack of others just like it.
7        So are you asking me, am I
8    attesting to the PTO under penalty of
9    perjury that I am responsible for this
10   matter?
11   Q.    Well, let me ask a different
12   question.
13   A.    No, I'm asking you is that what
14   you're asking me.
15   Q.    All I asked you was does this
16   form reflect to your understanding that you
17   and Greenberg Traurig are the correspondent
18   addressee of record for purposes of the
19   Patent Office?
20        MR. KAMINSKY: Objection to the
21   form of the question.
22   A.    I don't know.
23   Q.    Did you sign this form?
24   A.    I did, I think, I mean, that's my
25   signature or a very good copy of it.

Page 140

1           T. Sharinn
2    Q.    Do you have any reason to believe
3    that that's not your signature?
4    A.    No, probably not. I mean, there
5    might have been a time where I would be
6    called by an assistant and say this is, you
7    know, this is what we need to send. I
8    could have been on the road, for all I
9    know.
10   Q.    Are you accustomed to signing or
11   having signed on your behalf with
12   permission presumably documents that you
13   don't understand?
14   A.    No.
15        MR. KAMINSKY: Objection to the
16   form of the question.
17   BY MR. SCOTT:
18   Q.    What do you understand this
19   document to say?
20   A.    It looks to me as though it's a
21   fee address indication form.
22   Q.    In connection with what patent?
23   A.    It would appear to be the 160.
24   Q.    As of what date?
25   A.    I see a lot of different dates

Page 141

1           T. Sharinn
2    here. I see October 22, 2002. I see on
3    the cover sheet what looks like December
4    16, 2002. Under my signature, it's October
5    22, 2002.
6    Q.    As being transmitted by Ms.
7    Garamone on or about December 16th of --
8    A.    It looks like that would have
9    been the date I would have signed it.
10   Q.    And we see here in the file
11   number, the Quickie client number, right,
12   51822?
13   A.    Yeah, I mean, like I told you --
14   oh, this is for a different -- can I see
15   the matter intake forms for a second,
16   please. This isn't for the '160 Patent.
17   Q.    Because it's referring to the
18   matter number 0107?
19   A.    Only because I looked at this
20   just a few minutes ago.
21   Q.    I think it's Exhibit 17, if I
22   remember right.
23   A.    I think you're right. Yeah, see
24   I don't know what this -- this is one of
25   the ones we talked about where it just

37 (Pages 142 to 145)

Page 142

1        T. Sharinn
2   doesn't make sense that — I don't know
3   what that invention is.
4       **Q.   Well, we don't have to speculate**
5   **because the intake memorandum says it**
6   **pertains to the '160 Patent, right, that's**
7   **what it matter pertains to?**
8       A.   That's what it says, but that
9   doesn't necessarily mean that's what it
10  says.
11       Like I said, I don't know because
12  it would be silly to open up a second
13  prosecution file on the same device, and if
14  I'm correct, it would be a third, a third
15  matter.
16       I thought that 101 and 102 were
17  also for the passive terminator system.
18  Yeah, here is 102, terminator system, and
19  101 is a terminator system. So why we're
20  opening for a third one is beyond me.
21      **Q.   If it's beyond you, trust me,**
22  **it's beyond me.**
23      **But on the face of the document,**
24  **the intake memorandum, matter 0107 pertains**
25  **to the '160 Patent?**

Page 143

1        **T. Sharinn**
2       MR. KAMINSKY:  Objection to the
3   form of the question.
4   BY MR. SCOTT:
5      **Q.   Correct?**
6       MR. KAMINSKY:  Objection to the
7   form of the question.
8       A.   That's what the document says.
9      **Q.   And that is in fact the matter**
10  **number that's referred to on Exhibit Number**
11  **7 as well, correct?**
12       MR. KAMINSKY:  Objection to the
13  form of the question.
14       A.   That's what it says on the
15  document. Again, without knowing what the
16  file looks like, if you have the file
17  wrapper here, that would be great to look
18  at, I could tell you what that had to do
19  with.
20       MR. SCOTT:  Let me hand you
21  what's marked as Exhibit 37 to your
22  deposition.
23       (Exhibit 37, E-mail, marked for
24  identification, as of this date.)
25       A.   Okay.

Page 144

1        T. Sharinn
2      **Q.   Exhibit 37 is an e-mail from I**
3   **think the disaster secretary --**
4       A.   No, no, that's a different
5   Adrienne.  This one is from Bryan Cave.
6      **Q.   And she is the trademark**
7   **administrator IP docket manager at Bryan**
8   **Cave, to your knowledge?**
9       A.   That's what it says.  I mean, I
10  don't remember.
11      **Q.   Do you recall whether she is that**
12  **person or not?**
13       A.   Only remember her name, but I
14  mean, I read what it says.
15      **Q.   Do you know why she is sending**
16  **this e-mail to you?**
17       A.   It sounded like they had gotten
18  some correspondence concerning the '160
19  Patent and I reached out to find out
20  whether or not we should be getting those
21  documents.
22      **Q.   And what was your response to**
23  **her?**
24       A.   I told her just to send it over
25  and that I would get it to the right

Page 145

1        T. Sharinn
2   people.
3      **Q.   Now, what she says here is:**
4   **"Dear Todd, thank you for having**
5   **your secretary call me this morning to**
6   **confirm that you are still responsible for**
7   **U.S. Patent No. 6,066,160."**
8       **The 160, the patent, right?**
9       A.   Yes, sir, that's what it says.
10      **Q.   Did you understand at that time**
11  **in December of 2002 that you were in fact**
12  **responsible for the '160 Patent for**
13  **purposes of the Patent Office?**
14       A.   No, I did not.
15      **Q.   And it's your testimony that the**
16  **conversation you had with her was simply**
17  **get it to me and I'll get it to the right**
18  **people?**
19       A.   Yes.
20       MR. KAMINSKY:  Objection to the
21  form of the question.
22      **Q.   He doesn't like me characterizing**
23  **your testimony.**
24       A.   It's okay.  I mean, the reason I
25  would do something like this, so I would

38 (Pages 146 to 149)

Page 146

1          T. Sharinn
2 understand, is she's a docketing clerk at
3 Bryan Cave, why would I want to go through
4 the trouble of explaining to her that I've
5 been relieved of my duties with regards to
6 this client when I could just as easily
7 just have the documents walked over to my
8 office and walk them over to Steve's?
9          It's just the relationship I had
10 with Steve. It wouldn't make any sense to
11 do that.
12     Q.   Do you recall who the secretary
13 was that would have made the call to
14 Ms. Leven?
15     A.   I would assume by the year it was
16 either Adrienne Ivan or Paula Specht. Am I
17 right?
18     Q.   I don't know.
19     A.   Oh, I thought this was a quiz.
20     Q.   No. Trust me. There are just
21 some questions --
22     A.   Well, you know, I saw your
23 colleague hand you a note. I thought
24 maybe --
25     Q.   No, he wants to know who is the

Page 147

1          T. Sharinn
2 secretary. I'm just the puppet.
3          You had two secretaries there?
4     A.   I think I had three.
5     Q.   Just kind of give me a sense of
6 who was first.
7     A.   A woman named Martin, Adrienne
8 Martin. I think I had a lot of Adriennes
9 obviously.
10     Q.   And then?
11     A.   And then it was Paula Specht.
12 Paula was great.
13     Q.   That was the great one?
14     A.   Yeah, and then there was Adrienne
15 Ivan, who was terrible, okay. Then I had a
16 woman named Cindy Kozman, who was
17 fantastic, and she left when I left, she
18 went to go adopt a baby and decided to call
19 the legal game over.
20          MR. SCOTT: Are you guys still
21 okay?
22          MR. KAMINSKY: Sure.
23 BY MR. SCOTT:
24     Q.   I'm going to go ahead and ask
25 some questions about what were previously

Page 148

1          T. Sharinn
2 marked as Exhibits 3 and 8. These are the
3 docketing records, if you will. I'll give
4 you a moment to get those.
5          Let me just ask real quick,
6 Mr. Sharinn, have you seen those in
7 preparation for -- I mean, are you familiar
8 with the format of those?
9     A.   Not at all.
10     Q.   Why don't you go ahead and take a
11 second and I'll run around the corner, if
12 that's all right with you.
13     A.   I actually need to do that, too.
14          MR. SCOTT: All right. So let's
15 take a break.
16          (Recess taken from 12:17 p.m. to
17 12:25 p.m.)
18 BY MR. SCOTT:
19     Q.   You've had a moment to kind of go
20 over the two docket entries that have been
21 produced in this litigation by Greenberg
22 Traurig which are Exhibits 3 and 8, right?
23     A.   I've looked at Exhibits 3 and 8,
24 yes, sir.
25     Q.   Are you familiar with either of

Page 149

1          T. Sharinn
2 these two forms?
3     A.   Never seen them before today.
4     Q.   You testified earlier that it was
5 standard practice to docket a patent that
6 you were responsible for during the time
7 that you were responsible, right?
8     A.   I'm not sure if that's exactly
9 what I said, but --
10     Q.   I'm pretty sure it wasn't exactly
11 what you said.
12     A.   What's standard, and I think it
13 would be true of any reputable IP practice
14 is it's standard to, you know, enter dates
15 that are important with ticklers in the age
16 of computers that would pop up and let you
17 know when things are due. This looks like
18 a printout this would have shown something
19 along those lines.
20     Q.   It's fair to say that most IP
21 practices have an IP docketing system in
22 place?
23     A.   As far as I know.
24     Q.   And it's an electronic one
25 typically nowadays?

39 (Pages 150 to 153)

Page 150

1          T. Sharinn
2    A.    Today, yes.
3    Q.    Are you familiar with Data Ease,
4  Flex Track or any other names of the
5  different vendors?
6    A.    No, that wouldn't be something I
7  would get involved in.
8    Q.    Okay.
9          These are snapshots, correct, of
10 at least two at different times?
11   A.    I don't know.  That's what you're
12 telling me, yes, sir.  Understand I've
13 never seen any of these before, so I would
14 assume that when you talked to Greenberg
15 Traurig they would be able to tell you what
16 these are specifically.
17   Q.    And if you don't know, then you
18 don't know and I'm not going to probe too
19 much, but from this you can see that the
20 entry, and let's just take Exhibit Number 3
21 first, pertains to the '160 Patent,
22 correct?
23   A.    Well, I look at the record and
24 I'm able to see a lot of things.  I see
25 Patent Number 160, I see the title of the

Page 151

1          T. Sharinn
2  patent which would reflect the '160 Patent.
3          I also see Power of Attorney
4  revoked on April 2, 2003.  I also see
5  things like modified last on a July 10,
6  2003.
7    Q.    And you see that the number
8  51822.0107 is affixed to this particular
9  patent up in the top left-hand corner?
10   A.    Again, I see that number.  I
11 don't understand it only because we saw all
12 those other numbers, but this looks like
13 it's a reference, but also see up in status
14 that it says it was transferred, and I see
15 a note here that says this application has
16 been transferred to another firm.
17   Q.    But I understand that.
18   A.    Yeah, to, I'm trying to be
19 helpful and give you what I see.
20   Q.    The question I have is you
21 understand the 51822.0107 to be the matter
22 number that we looked at in intake
23 memorandum, which is Exhibit 17, right?
24   A.    It reflects the numbers that we
25 saw on Exhibit 17.

Page 152

1          T. Sharinn
2    Q.    All right.
3          This does reflect the dates of
4  the maintenance fee payments?
5    A.    It does, yes indeed.
6    Q.    And those would be consistent
7  with what you understood to be the 3 and a
8  half, 7 and a half and 11 and a half year
9  dates for the '160 Patent as issued on May
10 23, 2000, right?
11   A.    I wouldn't have anything
12 understood.  I wouldn't have even thought
13 about it.
14   Q.    Well, I'm just looking at it now,
15 but it's consistent with what your
16 understanding is as to what those dates
17 would be given the standard time for --
18   A.    If you want me to calculate the
19 times, I can do that, but no, it looks
20 approximately to fall into the right times,
21 yes, sir.
22   Q.    Now, it says that POA, and I take
23 it you take that to mean Power of Attorney?
24   A.    I don't know what else to take it
25 for.

Page 153

1          T. Sharinn
2    Q.    Revoked and then it has the date
3  of 4/2/2003, right?
4    A.    I see that, yes, sir.
5    Q.    Do I understand, though, that
6  your testimony is that you ceased having
7  responsibility for the '160 Patent as of
8  the date that you received the phone call
9  on October of 2002 from Steve following the
10 Markman Hearing?
11   A.    That would have been my
12 understanding, yes, sir.
13   Q.    And it didn't take any revocation
14 of any Power of Attorney for you to have
15 that understanding?
16   A.    They made it very clear on the
17 telephone conversations that we had that I
18 was to do no more work and bill no more
19 time.
20   Q.    So the revocation of a Power of
21 Attorney would have been a formality in
22 your, to your understanding?
23         MR. KAMINSKY:  Objection to form
24   of the question.
25   A.    I guess that would be a fair

40 (Pages 154 to 157)

Page 154

1          T. Sharinn
2  characterization.
3      **Q.   Let's go ahead to Exhibit 8.**
4      **Do you recall there being a**
5  **change of the docketing systems while you**
6  **were at Greenberg Traurig?**
7      A.   Not at all.
8      **Q.   You don't recall any hubbub about**
9  **how it was a pain or any noise about how**
10 **we've got to put everything onto a new**
11 **system?**
12     A.   I'm not sure if I mentioned this
13 before. I can be very social at times, but
14 discussing docketing systems would not be
15 something that would fall into the purview
16 of my social interests, and that wouldn't
17 even be something I can't imagine falling
18 into a discussion between even two
19 attorneys.
20          I could see maybe paralegals
21 complaining about having to transfer
22 information to the extent they were
23 required to do that, but I can't even see
24 an attorney saying it to another attorney.
25     **Q.   Do you recall being a participant**

Page 155

1          **T. Sharinn**
2  **in any training of paralegals with regards**
3  **to the calculations of maintenance fee**
4  **payments or docketing maintenance fee**
5  **payments?**
6      A.   I have no recollection of it and
7  I can't see why I would have been for a
8  variety of reasons, not the least of which
9  is that the computer program probably did
10 it itself.
11     **Q.   Well, just as an example, how**
12 **would you go about docketing the**
13 **maintenance fee payments for a reissue**
14 **payment?**
15     A.   I would walk over to the
16 paralegal and say would you please take
17 care of this.
18     **Q.   Fair enough.**
19     **Exhibit 8 does reflect again that**
20 **the client matter number is the same client**
21 **matter number that we saw on Exhibit 17,**
22 **the 51822.0107 matter, right?**
23     A.   That's what it appears to be.
24          What's interesting, though, is on
25 the first reference I see Paul Sutton as

Page 156

1          T. Sharinn
2  being the primary responsible attorney. On
3  the second one, I see Al Jacobs. I'm not
4  even sure who Matt Tropper -- oh, I do know
5  who Matt Tropper is, right. I think he was
6  a junior associate.
7      **Q.   Do you know who Albert Jacobs is?**
8      A.   Oh, absolutely.
9      **Q.   Who is he?**
10     A.   Al is probably the best lawyer I
11 ever worked for in my life.
12     **Q.   Is he an administrative partner**
13 **at Greenberg Traurig or --**
14     A.   He was the head of the IP group
15 when I was hired.
16     **Q.   So he's an equivalent to Paul**
17 **Sutton, fair?**
18     A.   Only in title.
19     **Q.   What does that mean?**
20     A.   It means Al forgets more in a day
21 than most people learn in a lifetime.
22     **Q.   So he would be more senior to**
23 **Paul with more wide ranging**
24 **responsibilities at Greenberg Traurig?**
25     A.   Yeah, I mean Al, honestly, if you

Page 157

1          T. Sharinn
2  want to talk about like superstars, I mean,
3  not that Paul was a slouch, Paul's a great
4  attorney, but Al was just amazing.
5      **Q.   Any reason that you can think of**
6  **as to why Al is now reflected as one of the**
7  **attorneys as opposed to Paul Sutton from**
8  **Exhibit 3 to Exhibit 8?**
9      A.   Well, I'm looking at a memo
10 there, and it says per conference with Al
11 Jacobs on 4/18/06, he has taken
12 responsibility for the client of Todd
13 Sharinn or the clients that Todd Sharinn
14 worked.
15          It actually kind of answers two
16 questions. The first is you had asked me
17 were matters ever transferred to me at
18 Baker McKenzie and clearly they weren't
19 because here they are.
20          The second is, is that looks like
21 Al took over my stuff, that he just assumed
22 responsibility for him.
23     **Q.   And my only question and**
24 **follow-up to that is does this refresh your**
25 **recollection as to why it is that Alan**

41 (Pages 158 to 161)

Page 158

1          T. Sharinn
2   Fell's request for files to be transferred
3   to you at Baker McKenzie weren't followed?
4       A.    It doesn't -- I mean, it's very
5   possible I may have just kind of shrugged
6   my shoulders at this point and said please
7   don't transfer them, I don't want them
8   anymore. And remember, they're the firm's
9   clients, not mine. So if I don't want
10  them, it's the firm that needs to
11  disengage.
12      Q.    Did you ever have an engagement
13  agreement with Quickie with regards to any
14  of its various matters?
15      A.    I must.
16      Q.    Why do you say that?
17      A.    I just would have assumed I would
18  have.
19      Q.    Do you recall ever having any
20  engagement agreement with Quickie while at
21  Pepe & Hazard?
22      A.    I would think I would have, yes,
23  sir. I don't have any specific
24  recollection, but it's kind of typical.
25          Actually, I think in Connecticut

Page 159

1          T. Sharinn
2   I must have because if I'm not mistaken,
3   under Connecticut law you have to have a
4   written agreement.
5       Q.    Even on hourly representations?
6       A.    I think so. I don't want to say
7   for sure. I'm certainly not an authority
8   on that kind of stuff.
9       Q.    Let's go ahead and look at
10  Exhibit 14. I want to try and talk about
11  the engagement concerning Medtronic
12  litigation on the '160 Patent.
13          I'll represent to you that from
14  the files that I've looked at, I can't find
15  any other engagement agreements with
16  regards to Quickie other than the
17  engagement letter which is reflected in
18  Exhibit 14 pertaining to the Medtronic
19  litigation.
20      A.    So you have nothing from Pepe &
21  Hazard?
22      Q.    No.
23      A.    That's interesting. I don't
24  know.
25      Q.    And more particularly I have

Page 160

1          T. Sharinn
2   nothing other than this from Greenberg
3   Traurig.
4       A.    That's possible.
5       Q.    And that's consistent with what
6   the intake memorandums say, they say that
7   it's its existing client, not need for --
8       A.    Like I say, it's not that
9   surprising.
10      Q.    So for some reason an engagement
11  agreement was prepared.
12      A.    No, it makes perfect sense why it
13  would have been done here.
14      Q.    And why?
15      A.    Proposal for representation, and
16  we had met with Steve on a couple of
17  occasions at least and talked to him
18  several times and Steve wanted a written
19  proposal.
20      Q.    All right.
21          Do you recall --
22      A.    Actually, I'm not sure Steve
23  wanted it. I think Alan may have wanted
24  it.
25      Q.    Alan Fell?

Page 161

1          T. Sharinn
2       A.    Probably, yeah.
3       Q.    Do you recall whether Steve
4   Colvin was considering other counsel
5   besides Greenberg Traurig for the Medtronic
6   litigation?
7       A.    I think he was.
8       Q.    Do you recall that he was
9   considering Mark Evens at that time as a
10  potential alternative?
11      A.    I think he was.
12      Q.    Do you recall that it was the
13  thought or effort of Greenberg Traurig to
14  persuade Steve to come to Greenberg Traurig
15  with that litigation in part by including
16  Paul Sutton as one of the attorneys who
17  would be working on that matter
18  specifically?
19      A.    No, that's not why Paul was
20  brought in.
21      Q.    Why was Paul brought in?
22      A.    Because I didn't feel comfortable
23  taking on a case of this magnitude without
24  senior supervision.
25      Q.    Did you have any sense that Steve

42 (Pages 162 to 165)

Page 162

1           T. Sharinn
2 Colvin wasn't comfortable with you handling
3 it on your own without somebody like Paul
4 Sutton?
5     A.   Quite the contrary.
6     Q.   Can you elaborate on that? Was
7 there anything specific that gave you that
8 sense that he was not concerned about that?
9     A.   Yeah. Steve, if I remember
10 correctly, had mentioned Mark Evens to me
11 because I think at that time he was pending
12 nuptials, I'm not sure if he was actually
13 married at that point, and actually put
14 Mark on the phone, and the way Steve always
15 does things, I think he tried to make a
16 match between GT and Mark to bring him
17 almost in to do it.
18       I think Mark may have raised
19 concerns that I wasn't gray enough at the
20 time to handle it, but if I remember
21 correctly, Steve had told me he wasn't too
22 worried about it and, you know, he knew
23 this was, for lack of a better term, our
24 baby.
25       We had worked on this from the

Page 163

1           T. Sharinn
2 beginning, nobody knew it better than me,
3 and they had known that I've litigated
4 cases already as a first chairman of point.
5       Again, I don't think the firm
6 would have had a problem with me handling
7 this on my own. This was my choice.
8     Q.   All right.
9     A.   And on a little level, again with
10 the partnership in mind, it doesn't hurt to
11 have a senior member of the IP group
12 gaining by your efforts.
13    Q.   Did you perceive, did you
14 anticipate or expect Paul Sutton to take
15 any active role in the litigation?
16    A.   He did take an active role.
17    Q.   Well, I understand that he was
18 involved in some negotiations with the
19 principals at Medtronic.
20    A.   No. I mean, Paul's door was two
21 doors down from mine. You know, I guess
22 the way I would describe myself as an
23 associate was like the way I expect my
24 associates to be with me now. I had a
25 question, I walked over and I asked them

Page 164

1           T. Sharinn
2 for it. Whether he billed for the answers
3 or not, I don't know.
4     Q.   Well, let me ask it more
5 specifically.
6       Did you anticipate or expect that
7 Paul Sutton would have an active role in
8 the argument of the Markman Hearing or the
9 trial of the case?
10    A.   No. I expected Bill Todd, who
11 was a partner at Greenberg at the time and
12 who had a significant amount of patent
13 litigation experience and real trial
14 experience to have argued the Markman
15 Hearing, and Bill Todd was supposed to
16 argue it up until the Friday before the
17 Monday that the hearing proceeded on.
18    Q.   What happened?
19    A.   Bill Todd had to fly out to
20 Arizona for an emergency, and so I prepared
21 the argument myself all weekend long and
22 argued it, and I guess it worked out okay
23 because we had a very good result.
24    Q.   Similar to the questions that I
25 asked you in connection with prosecuting a

Page 165

1           T. Sharinn
2 patent in filing the suit against
3 Medtronics, you did have in fact a good
4 faith belief in the suit that was being
5 filed, correct?
6     A.   Absolutely.
7     Q.   You satisfied yourself with
8 regards to Rule 11 obligations that --
9     A.   Oh, absolutely. Mean, let's face
10 it, these guys entered into a license
11 agreement and then ended the license
12 agreement, you know, terminated the
13 agreement for whatever reasons and went out
14 and marketed a product that was, while it
15 may not have been a literally infringement,
16 was clearly an equivalent.
17    Q.   So you did not consider it to be
18 a frivolous lawsuit?
19    A.   Absolutely not.
20    Q.   And you would not have pursued it
21 or filed it, if you hadn't thought so?
22    A.   Absolutely.
23    Q.   And so while there may have been
24 warts, since there are in almost all
25 cases --

43 (Pages 166 to 169)

Page 166

1          **T. Sharinn**
2    A.   May have been what?
3    **Q.   Warts, warts -- don't you say it**
4  **that way up here?**
5    A.   Oh, I gotcha.
6    **Q.   -- on the case in terms of maybe**
7  **it's too broad and things of that nature,**
8  **you still felt that there was a good faith**
9  **basis for bringing a lawsuit?**
10   A.   Yeah. I mean, when you bring a
11 patent litigation suit, there is at least
12 two goals usually. One is, know, you want
13 to stop the bleeding, you want to prevent
14 them from infringing any further. The
15 second is hopefully to recoup some damages.
16       On the first front, I absolutely
17 felt very strongly that we should be able
18 to prevent the bleeding from continuing to
19 the level it was, otherwise I would never
20 have allowed this suit to progress.
21       On the second front, you know, I
22 never estimate this to be a very lucrative,
23 you know, action and, you know, I made it
24 clear to Steve on several occasions that he
25 would be foolish if he's doing this for

Page 167

1          T. Sharinn
2  compensation purposes.
3       There are much better ways to go
4  about what he was hoping to do than to
5  initiate a litigation -- I shouldn't say
6  better ways, safer ways, less expensive
7  ways than patent infringement litigation,
8  if that makes sense.
9    **Q.   If the re-examination of the**
10 **patent essentially resulted in the adoption**
11 **of the claim construction by Judge Lynch,**
12 **would you consider that to be a good**
13 **result?**
14   A.   Say that one more time? I'm
15 trying to even read it and it didn't come
16 out quite that clear.
17   **Q.   Let's back up.**
18       **You had the Markman Hearing, the**
19 **Markman decision came out with a claim**
20 **construction for purposes of the patent,**
21 **right?**
22   A.   Yes, sir.
23   **Q.   And that was a good construction**
24 **for Quickie's purposes?**
25   A.   It was better than good.

Page 168

1          T. Sharinn
2    **Q.   And my question simply is: If**
3  **the re-examination of the patent resulted**
4  **in the judge, the judge's construction**
5  **being applied to the patent or incorporated**
6  **in the patent, would that be a good result?**
7    A.   If I understand your question
8  correctly, you're asking me to extrapolate
9  and to say if Judge Lynch's decision was
10 adopted by the PTO for re-examination
11 purposes, would that have been a good
12 result for Quickie?
13   **Q.   Yes.**
14       MR. KAMINSKY:  Objection to the
15       form of the question.
16       THE WITNESS:  Can I answer it?
17       MR. KAMINSKY:  Yes.
18   A.   Yes.
19   **Q.   And just so we don't waste time,**
20 **I just want to be sure, you have not gone**
21 **back to look at the final result of the**
22 **re-examination, the Patent Office's**
23 **decision?**
24   A.   Not once.
25   **Q.   The decision that was vacated.**

Page 169

1          **T. Sharinn**
2    A.   Not once.
3    **Q.   Okay.**
4       **Do you have any intention to**
5  **provide any testimony in this litigation**
6  **regarding the pending office action and**
7  **potential implications with regard to the**
8  **patent?**
9       MR. KAMINSKY:  Objection to the
10      form of the question.
11      MR. SCOTT:  Let me ask you what I
12      got wrong there.
13      MR. KAMINSKY:  Well, you're
14      asking his intention. So I don't
15      think that really matters, to tell you
16      the truth.
17      MR. SCOTT:  Well, on a break I'm
18      going to ask you whether you intend --
19      MR. KAMINSKY:  He can answer the
20      question, that's fine.
21   A.   My intention is to finish up here
22 and answer all your questions and with a
23 little bit of luck to shake your hand and
24 say goodbye and maybe meet you in another
25 circumstance under better terms. I have no

44 (Pages 170 to 173)

Page 170

1           T. Sharinn
2  intention of ever reading that document and
3  unless a court orders me to do so, I never
4  will.  I closed that door a long time ago.
5      Q.   Well, let's not go down that path
6  then.
7           (Exhibit 38, Document, marked for
8           identification, as of this date.)
9      Q.   I'm going to hand you what's been
10 marked as Exhibit 38 to your deposition and
11 I'll give you a second to look at that.
12     A.   I'm sorry, you want me to look at
13 38?
14     Q.   Yes.
15     A.   Sorry about that.
16          I'd love to read the redacted
17 ones.
18          Okay.
19     Q.   Had you ever heard of
20 Mr. Sutton's evaluation of you, either
21 orally or in writing previously?
22     A.   It was shown to me in passing
23 once, you know, when I had met with my
24 counsel, but I didn't read it the way I
25 read it today.

Page 171

1           T. Sharinn
2      Q.   It's a growing endorsement, is it
3  not?
4      A.   It's a pretty good evaluation.
5      Q.   About as good as they get,
6  reflecting the fact that you had
7  successfully argued the Markman Hearing,
8  reflecting that you had the confidence of
9  your clients and that you had in a sense
10 your own book of business, right?
11     A.   I think it says something like
12 that, yes, sir.
13     Q.   Just to kind of ask some
14 questions about this, it says here that
15 I've worked with Todd on several matters so
16 far this year, among them a pending
17 litigation Quickie versus Medtronic, which
18 I helped him originate.
19     A.   Yes, sir.
20     Q.   Did he help you originate the
21 Medtronic litigation?
22     A.   Yes, sir.
23     Q.   In what way did he help you
24 originate that matter?
25     A.   We pitched it together.

Page 172

1           T. Sharinn
2      Q.   And that was because you
3  requested that and thought it was a good
4  idea and not because Mr. Sutton insisted on
5  that?
6      A.   That would be my recollection.  I
7  mean, I can't say with 100 percent
8  certainty that that didn't insist on it,
9  but Paul wouldn't be the one at that time
10 in my career to have insisted on anything
11 like that.  It would have been Al Jacobs
12 who would have insisted.
13     Q.   And that wasn't anything to your
14 recollection that Steve Colvin assisted on?
15     A.   Absolutely not.
16     Q.   Having a gray hair involved.
17     A.   Steve never asked me for that.
18 Remember when I started with Steve I was,
19 that was very early in my career.
20     Q.   And that was my next question, is
21 that although Mr. Sutton may have helped
22 you originate the Medtronic litigation, in
23 other words steer that case to Greenberg
24 Traurig as opposed to somewhere else, you
25 had an existing relationship with Quickie

Page 173

1           T. Sharinn
2  on other matters?
3      A.   I had an existing relationship
4  with Steve and with Alan and with Gene.
5      Q.   With regards to the '160 Patent
6  as well as other matters?
7      A.   Well, just with those guys with
8  regards to various IP matters.
9      Q.   Have you had, have you ever had
10 any --
11     A.   Can I have a copy of this for my
12 refrigerator?  I want to put them next to
13 my son's A in math -- I'm just kidding, I'm
14 sorry.
15     Q.   Well, it's good that you would
16 know this.
17     A.   I wish they told me before I
18 left.
19     Q.   Have you ever, ever, had any
20 conversation with Steve Colvin where he
21 told you or expressed in words or effect
22 that his upset with Greenberg Traurig over
23 the litigation of the Medtronic case was
24 that Paul Sutton said he was going to be in
25 the case and he disappeared from the case?

45 (Pages 174 to 177)

Page 174

1       **T. Sharinn**
2       A.    You know, Steve never said that
3   to me, so I don't know that that would be
4   the case.
5           I think that they were a little
6   rattled when Bill Todd didn't make the
7   argument and I did.  But we talked about it
8   and I told him I could get an adjournment
9   if they wanted and that I would fully
10  respect that and I wouldn't be at all
11  insulted since I had never first chaired a
12  Markman Hearing prior to that.
13          But I also told them that I was
14  confident that I could deliver them the
15  results that they wanted and I think
16  because of the years that we were together
17  and the fact that I never blew smoke at
18  Steve or anybody else that they trusted me
19  and gave me the chance to do it, and
20  obviously by the conversations we've had
21  today, nobody debates whether or not the
22  result was good.
23      **Q.    Nobody does.**
24      A.    I think it exceeded expectations
25  on all parts.

Page 175

1               T. Sharinn
2       **Q.    And I'm trying to take you out of**
3   **the equation right now --**
4       A.    I understand what you're trying
5   to do.
6       **Q.    -- and ask you whether you ever**
7   **understood from Steve Colvin that his upset**
8   **was not with you, but with Paul Sutton for**
9   **promising to be involved in this case and**
10  **disappearing from the case?**
11      A.    Again, I don't know that I could
12  say it any clearer than this.  To know
13  Steve is to know that Steve is an emotional
14  guy.  You have to have your Steve Colvin
15  filter on if you're going to last with him
16  for very long.  So you pick up the big
17  sound bytes and you disregard the small
18  ones.
19          I don't have specific
20  recollection of him saying what you're
21  asking me.  I do think that there was a
22  little shaken, and I'm not sure it was
23  Steve who was shaken so much as Alan Fell.
24  And I know that only because Alan, I think,
25  was the one who had asked me two or three

Page 176

1               T. Sharinn
2   times am I sure I can really do this, and I
3   told him yeah.
4           I mean, at the end of the day,
5   let's understand something, whether Bill
6   Todd argued it or I did, I prepared
7   everything and I prepared all the
8   arguments, and Paul Sutton -- again, I
9   don't know what his time entries look like
10  on this matter because it's too long ago,
11  but Paul would have reviewed documents and
12  would have passed on his comments.  Paul
13  was intimately involved on several
14  documents and did a very good job.  I
15  learned a lot from Mr. Sutton.
16      **Q.    I'm only asking whether you had**
17  **obtained any insight into the**
18  **disappointment or upset of Steve Colvin**
19  **with regards to Paul Sutton?**
20          MR. KAMINSKY:  Objection to the
21      form of the question.
22      A.    You know, I think Steve and Alan,
23  again, this is where it comes down to if
24  I've learned anything, my clients today are
25  clients, and while we may be friendly,

Page 177

1               T. Sharinn
2   they're still clients.
3           I think the lines blurred a
4   little bit with these guys, and it was a
5   very, very close relationship between all
6   of us, we worked really close and hard
7   together, many sleepless nights, the three
8   of us.  Grassi, too, so the four of us.
9           I don't recall Steve objecting to
10  Paul's involvement one way or the other.  I
11  do recall there being a little issue with
12  Bill Todd not being there to argue it, and
13  I know I was very upset by it.
14          But again, if I recall correctly,
15  most likely Paul would have asked me are
16  you comfortable arguing this or do you want
17  me to argue it, and I would have, if I felt
18  uncomfortable, asked him to argue it.
19          The reason I probably didn't is
20  because at that point at Greenberg Traurig
21  there wasn't a partner in the IP group
22  worldwide, let alone just in New York, who
23  didn't have me flying all over the place
24  arguing motions for them or taking
25  depositions for them.  There was not a

46 (Pages 178 to 181)

Page 178

```
 1           T. Sharinn
 2  single one who didn't.
 3        So I mean, I kind of prided
 4  myself on being the most senior of
 5  associates when it came to the litigation,
 6  and in many cases being the choice amongst
 7  other junior or even mid-level partners
 8  being the preference for handling case, and
 9  it wasn't only in the IP group, again not
10  to toot my horn, I really don't like doing
11  that, but I did all the litigation for the
12  entertainment group, which was a sizable
13  grouping at Greenberg Traurig and handled a
14  lot of large matters for them.
15        I wasn't uncomfortable making
16  motion practice, and I had been involved in
17  enough Markman hearings as a second chair
18  to know that stepping up to the plate I
19  wasn't scared to swing at the ball.
20     Q.   When you learned shortly after
21  getting the result of the Markman Hearing
22  that the matter was being transferred to
23  Thelen Reid and Mark Evens, as you
24  testified, you were upset.
25        Did that color your ability to
```

Page 179

```
 1           T. Sharinn
 2  transfer the file in a professional manner?
 3     A.   Not at all.
 4     Q.   Do you recall any angst or upset
 5  or ill-will or mean-spirited words in
 6  connection with the transfer of the files?
 7     A.   That's not my style.
 8     Q.   Do you recall any delay or
 9  holding back of documents or, you know,
10  slow pedaling the delivery of documents?
11     A.   Not that I could recall.  In
12  fact, I think it was quite the contrary.
13        My only concern was and I don't
14  recall who made me concerned about this,
15  but I didn't think of this in a business
16  sense.  I thought of this in a personal
17  sense.  I wanted to just get the documents
18  over to Thelen Reid as quickly as possible
19  for two reasons.
20        Number one, if I'm not going to
21  be responsible, I don't want to be
22  responsible for babysitting it.
23        And number two, because I really
24  cared about these people and if this is
25  what their choice was, I had to support it.
```

Page 180

```
 1           T. Sharinn
 2  They've always supported me, and so I
 3  wanted to get this in their hands and not
 4  handicapped Thelen Reid in any way.
 5        On a business level, I know that
 6  there was discussion that I was privy to,
 7  but not really party to concerning payment
 8  of bills and the transfer of files.
 9        That all said, if my recollection
10  serves me correctly, and again Paul Sutton
11  would be a better person to ask, we did
12  transfer the files almost immediately upon
13  request.
14     Q.   Why do you say Paul Sutton would
15  have been a better person to ask?
16     A.   Because he would have handled
17  that situation.
18     Q.   Why would he handle it?
19     A.   Because he was the partner and I
20  was an associate.  It was a billing matter.
21     Q.   Oh, the fee issue?
22     A.   Yes, sir.
23     Q.   I thought you meant the physical
24  transfer of the files.
25     A.   No, the physical transfer was
```

Page 181

```
 1           T. Sharinn
 2  handled by Paul Jergensen, a paralegal that
 3  I worked with.  He gathered all the files
 4  at our instruction and had them sent over.
 5     Q.   Do you recall any need for Paul
 6  Sutton to step in with regard to ensuring
 7  that the physical transfer of files was
 8  made because of any delay on your part or
 9  your office's part?
10     A.   Well, my office would have
11  included Paul Sutton because I worked in
12  his office.
13     Q.   Well, I meant your secretary or
14  your assistant as opposed to his assistant
15  and his secretary.
16     A.   Okay.  Let me see if I can answer
17  this as fairly as possible and as maybe
18  more than you're even asking.
19        Yes, I was very upset by having
20  this taken away from me.  As I mentioned
21  before, this was Steve's and my baby, not
22  just Steve's.
23        I took a very personal stake in
24  this on a number of levels, not the least
25  of which is that I don't like losing.  I've
```

47 (Pages 182 to 185)

Page 182

1          T. Sharinn
2  never played a game or stepped on a field
3  or a rink, whatever, with the intention of
4  playing half-hearted.  So I put everything
5  in it and I sacrificed family and all sorts
6  of other stuff to do it.
7          When this was taken away, I felt
8  cheated because the first period it ended
9  and we were winning and I wanted to be
10 there for the end of the game.
11         That all said, these were very
12 important people in my life outside of the
13 workforce, and I would never do anything no
14 matter how upset I got at my parents or
15 sibling or cousin, and that happens from
16 time to time.  I'm Hungarian, I can't help
17 it.  I still would never do anything that
18 in the long run would jeopardize them or
19 their interests.
20         So if there was any delay at all,
21 and I don't recall there ever having been
22 any, I certainly don't recall there being a
23 need from any third party to interject
24 themselves and to get me to do something
25 that I wasn't otherwise doing.

Page 183

1          T. Sharinn
2          Now, if I'm wrong, I apologize,
3  but that is my recollection.
4     Q.  Do you recall Mark Evens having
5  any angst or upset over not having to file
6  as quickly as he would like, any
7  discussions with you directly?
8     A.   With me specifically, not that I
9  recall.  But I will say this about Mark
10 Evens, and I haven't hidden it before, I
11 don't really have a great deal of
12 appreciation for Mark as an individual
13 and/or as a professional.
14         I said it before, I don't know
15 anybody less qualified to have handled this
16 case than Mark Evens who would hold
17 themselves out as qualified.
18         That all said, I will say another
19 thing about Mark Evens.  To put it in a
20 Latin legal term, the man is an absolute
21 weenie, W-E-E-N-I-E.  He did everything in
22 his power to play little sophomoric games
23 to improve his relationships with Colvin.
24         So let's understand that from day
25 one, even before Mark was riding coattail,

Page 184

1          T. Sharinn
2  which started very, very early in the
3  process here, including during the drafting
4  of the brief -- I mean of the complaint,
5  before even the drafting of the briefs or
6  any of the discovery requests, Mark was
7  copied on everything.
8          So him saying that I slowed files
9  to him down is just nonsense because he had
10 everything from before I was ever removed
11 from this position at all.
12    Q.  Let's go ahead and look at
13 Exhibit 22, which was previously marked in
14 Mr. Sutton's deposition.
15    A.   Okay.
16    Q.  Dated October 15, 2002, addressed
17 to you by Alan Fell, right?
18    A.   Yes, sir.
19    Q.  And concerning the medicine
20 tonics litigation.
21    A.   Yes, sir.
22    Q.  And essentially documenting that
23 the files will be transferred or the case
24 will be transferred to Thelen Reid, right?
25    A.   Yes, sir.

Page 185

1          T. Sharinn
2     Q.  And that Thelen Reid will be
3  substituted in for Greenberg Traurig for
4  purposes of the litigation?
5     A.   Do you mind if I read this?
6     Q.  Oh, please.
7     A.   It says that, yes, sir.
8     Q.  And in the third paragraph, it
9  states you and Greenberg Traurig will
10 continue to handle various patent
11 application pending on behalf of Quickie,
12 LLC and Quickie Vision, LLC, right?
13    A.   Yes, sir.
14    Q.  And that was your understanding,
15 that you would continue on behalf of
16 Quickie after the substitution of counsel
17 with regards to the litigation?
18         MR. KAMINSKY:  Objection to the
19 form of the question.
20    A.   No, sir.
21    Q.  You take issue with the statement
22 made here?
23    A.   My understanding was that I was
24 to transfer all Quickie matters.  So when I
25 see, and the first time I had ever looked

48  (Pages 186 to 189)

Page 186

1          T. Sharinn
2  at this letter in any real meaningful way
3  would have been when I met with counsel the
4  other day -- and when I saw the Quickie
5  LLC -- I think the Quickie Vision makes
6  perfect sense, and if it had said S&A
7  Rings, that would make perfect sense.
8          I suspect that was a typo by
9  Mr. Fell -- there would be no reason for me
10  to continue prosecuting patents on behalf
11  of Quickie because I don't think Quickie
12  had any pending patents.
13          And so if I had even noticed that
14  when the letter was sent to me, I would not
15  have said anything about it only because
16  what was the point?
17     Q.   It's kind of, you know -- it's
18  just, again, talking about taking the high
19  road, it just didn't make a difference, and
20  just so we're clear, I don't want to get
21  into any great detail, as far as you were
22  concerned, as of this date for sure and
23  before this date in terms of the call that
24  was made to you, any and all activity on
25  behalf of you or Greenberg Traurig with

Page 187

1          T. Sharinn
2  regards to the '160 Patent was done, over,
3  finite?
4     A.   By the date of this letter, that
5  was my understanding, yes, sir.
6     Q.   And so any subsequent actions
7  with regards to the re-examination or the
8  transfer of powers of attorney or
9  revocation of Power of Attorney was
10  essentially noise and of no real
11  consequence in your mind?
12     A.   I think that noise is a good way
13  to describe. I wouldn't say there was no
14  consequence. In my mind and in my heart at
15  that time there was a hope to get back in
16  the game. So if they called me, I was very
17  clear to make sure they understood I wasn't
18  going to do work without being compensated,
19  particularly on this matter.
20          I mean, there was no, how do I
21  put this -- there was a very open
22  relationship between us. On other matters,
23  they wanted to bounce something off me and
24  say, hey, do you think this is patentable,
25  I had asked to set up a new matter.

Page 188

1          T. Sharinn
2          But with this one, because of
3  what had occurred, there is no way I would
4  have engaged in any real meaningful
5  conversation without them having engaged me
6  to do it, because my understanding was that
7  my powers of attorney and my involvement in
8  this case were fully revoked. And when I
9  say this case, I don't just mean the
10  litigation, I mean the 160's existence.
11     Q.   So that begs the question,
12  Mr. Sharinn, as to how did you ensure that
13  that was full legal communicated to your
14  client, former client, however you want to
15  describe it, Quickie, LLC that you were
16  done, over, finite, had no further
17  responsibility with regards to that patent
18  in any way, shape or form?
19          MR. KAMINSKY: I'm just going to
20  object to the very beginning of that
21  question. I don't object to the
22  question part of it, but the phrase
23  "so that begs the question" I do
24  object to.
25          You can answer the question that

Page 189

1          T. Sharinn
2  follows that, which is how did you
3  communicate this to your client.
4          THE WITNESS: Okay.
5          MR. SCOTT: And I'm withdraw the
6  prelude.
7     A.   That's fine. Just to answer your
8  question, I didn't feel like I needed to
9  communicate that fact. They had made this
10  abundantly clear to me that that was their
11  intention and that was their desire.
12          But if for purposes of, as I used
13  the term weenie before, famous Latin term,
14  I was a weenie, too, and I was not going to
15  do work on this, and I made it clear to
16  them you fired me, you have new counsel,
17  your new counsel is Thelen Reid & Priest,
18  you need to take this up with Mark Evens or
19  we can be reengage the and then we can deal
20  with this.
21          So if that's not communication
22  enough, then I'm guilty.
23     Q.   That communication was oral
24  though, that you've just referred to?
25     A.   As far as I can recall. I mean,

49 (Pages 190 to 193)

Page 190

1        T. Sharinn
2 I might have sent an e-mail, I don't know.
3 It wouldn't be beyond me to have sent an
4 e-mail or to respond to an e-mail. I mean,
5 Steve didn't e-mail. Gene e-mailed at
6 times.
7        I know Gene was very upset about
8 this, Gene Grassi, or at least that's the
9 impression I got. Alan, very rarely he
10 e-mailed. He was a big fax guy. But I
11 would have e-mailed Alan from time to time,
12 I would think. I certainly sent him a
13 fax -- I don't know.
14     Q.   You certainly would have sent him
15 a fax essentially stating what you just
16 described for the record?
17     A.   If I were going to write
18 something. I'm not sure at the time it
19 called for that. It seemed pretty clear
20 that they did not want me to do anything on
21 this. Every time I pushed back and I said
22 I'm not going to do this without being
23 engaged to do it, then they stopped and we
24 went on to something else.
25     Q.   All right. I just haven't

Page 191

1        T. Sharinn
2 seen --
3     A.   No, I'm just saying it's not like
4 they said to me, okay, Todd, engage. At
5 one point they did say that and if I'm not
6 mistaken it filled out, you know, I opened
7 up a matter and then nothing ever really
8 came of it because it was just a minimal
9 amount of work and it was just asking me my
10 opinion on the document.
11     Q.   Let me just make sure, though,
12 that the record is there that you don't
13 have any records of your own that haven't
14 already been produced, that's right, right?
15     A.   Well, I think the question you're
16 asking right now is better asked of
17 Greenberg Traurig. I don't have any
18 records that pertain to this or any other
19 matters while I was at Greenberg Traurig
20 concerning the Colvin group.
21     Q.   I just haven't seen anything in
22 writing along the lines you described. I
23 just want to make sure that it's not out
24 there and I just haven't gotten it.
25     A.   Don't know. I don't know if it

Page 192

1        T. Sharinn
2 was ever done or wasn't. A lot transpired
3 a lot of back and forth over the years
4 about various things.
5     Q.   You don't have a specific
6 recollection at this time of having written
7 anything?
8     A.   I do not, and I'm not sure that I
9 would have, as I said, a moment ago.
10     Q.   Okay.
11     A.   Don't know that the circumstances
12 warranted it.
13     Q.   Let's go ahead and look at
14 Exhibit 24, also previously marked in
15 Mr. Sutton's deposition.
16        MR. SCOTT:  Just so you know, if
17     you need to break at any time for your
18     call -- let's go ahead and break.
19        (Recess taken from 1:13 p.m. to
20     1:30 p.m.)
21 BY MR. SCOTT:
22     Q.   Do you have Exhibit 24?
23     A.   I do.
24     Q.   That's an October 15, 2002 letter
25 sent by Mr. Sutton to Mr. Evens, correct?

Page 193

1        T. Sharinn
2     A.   That's what it looks like, yes,
3 sir.
4     Q.   I'll just draw your attention if
5 I could to the first sentence of the last
6 paragraph:
7        "Finally, for the benefit of our
8 mutual client, Quickie, I'll try to make
9 myself available to both you and Steve if
10 you feel like I can be of any help
11 regarding either the prosecution or the
12 litigation or any settlement negotiations
13 that come up."
14        Do you see that?
15     A.   Yes, sir.
16     Q.   If you were not working for
17 Quickie any longer, why is he referring to
18 Quickie as your mutual client, to your
19 understanding?
20     A.   Again, I think the lines are
21 blurred between the name of Colvin's
22 various groups and Colvin himself. I think
23 he's probably, and again, this is something
24 you need to ask Paul, he wrote the letter,
25 but if I were to look at this, I wouldn't

50 (Pages 194 to 197)

Page 194

1           T. Sharinn
2 even think of it that way. I would just
3 think of it as we're referring to Steve
4 Colvin, et al.
5    Q.   Just so we're clear, did you not
6 consider Quickie to be your client any
7 longer as of October 15, 2002?
8    A.   It's a long time ago, but yeah,
9 that's my recollection.
10    Q.   That's your testimony?
11    A.   Well, it's my testimony because
12 it's on the transcript, but yes, that's my
13 recollection.
14    Q.   And so to the extent that Paul
15 understood that that was not, that was not
16 an understanding that you shared with them?
17    A.   Say that again.
18    Q.   To the extent that Paul
19 understood that Quickie was still a client
20 of the firm Greenberg Traurig, that was not
21 an understanding that you shared with him?
22        MR. KAMINSKY: Objection to the
23    form of the question.
24    A.   I don't know what Paul thought,
25 and I never discussed it with Paul, to my

Page 195

1           T. Sharinn
2 recollection.
3    Q.   Okay.
4        If you could look at Exhibit 25,
5 also previously marked.
6    A.   Yes, sir, okay.
7    Q.   I am kind of running through
8 these kind of quick.
9    A.   I appreciate that.
10    Q.   This is a transmittal cover sheet
11 from Greenberg Traurig to Paul Colvin from
12 the person you name Paul Jergensen.
13    A.   Paul Jergensen.
14    Q.   Who was, as I understand it, a
15 Greenberg Traurig paralegal?
16    A.   Yeah. He's terrific.
17    Q.   All right.
18        And attached to it on the second
19 page is an October 16th letter that he is
20 sending to Shari Markovitz-Savit at Thelen
21 Reid, right?
22    A.   That's what it says, yes, sir.
23    Q.   Under the reference of Quickie
24 and Medtronic litigation the 0104 matter,
25 right?

Page 196

1           T. Sharinn
2    A.   That's what it says.
3    Q.   And then attached to that yet on
4 the next page is his actual cover sheet
5 which he refers to in his October 16th
6 letter, which encloses files with regards
7 to the Quickie Medtronic litigation matter,
8 and it delineates the items enclosed,
9 right?
10    A.   It does purport to do that, yes,
11 sir.
12    Q.   Did you participate at all with
13 Mr. Jergensen in compiling those records
14 for transfer?
15    A.   I don't recall. I doubt it.
16    Q.   It makes no mention in this
17 letter of any deadlines that are coming up
18 or any of the docketing entries that
19 Greenberg had at the time with regards to
20 the maintenance fee payments, does it?
21        MR. KAMINSKY: Objection to the
22    form of the question.
23    A.   Why would it?
24    Q.   I'm just asking a question.
25    A.   I mean, the letter says what it

Page 197

1           T. Sharinn
2 says, yes, sir.
3    Q.   And you'll confirm that it has no
4 mention of any of the docketing entries or
5 maintenance fee payments deadlines?
6    A.   I don't see anything in the
7 letter referring to that.
8        MR. KAMINSKY: Objection to the
9    form of the question. The witness
10    answered before I could note my
11    objection for the record.
12 BY MR. SCOTT:
13    Q.   And just so we're clear, the
14 letters on their face are only transferring
15 files with respect to the Quickie 0104
16 matter, which is the Medtronic litigation,
17 correct?
18        MR. KAMINSKY: Objection to the
19    form of the question.
20    A.   On its face, that would be what
21 it says, yes, but that's because Paul is a
22 litigation paralegal. He wouldn't even
23 know the first thing about a patent
24 prosecution matter.
25    Q.   Well, he knew enough to refer to

51 (Pages 198 to 201)

Page 198

1        T. Sharinn
2   the client matter number which pertained to
3   that litigation and that litigation alone,
4   right?
5       A.   That's what he was asked to send
6   over, I'm assuming, but I also see number 5
7   on your list items now that I'm looking at
8   it more closely, and number 4, which would
9   have had all to do with prosecution and
10  nothing to do with litigation.
11      Q.   Well, but the prosecution file
12  does relate to the litigation?
13      A.   I don't want to debate this with
14  you. You asked me a question and I'm
15  giving you a full answer.
16      Q.   If you disagree with me --
17      A.   I disagree with you.
18      Q.   Let's back up.
19      A.   No, I'll answer your question
20  very succinctly.
21          There would be no reason to send
22  item number 5 in particular unless we were
23  transferring the prosecution files,
24  otherwise we wouldn't have them. You asked
25  us for the 160 file history and prior art.

Page 199

1        T. Sharinn
2   That's exactly what it is. That's the file
3   wrapper.
4       Q.   Have you ever undertaken a patent
5   litigation without getting the file
6   wrapper?
7       A.   Of course not, but that would be
8   our file right there, that's what we're
9   sending them.
10      Q.   You must look at in connection
11  with any enforcement litigation, is it not?
12      A.   Not when it's your personal file,
13  you could get that from the PTO if you're
14  defending or prosecuting depending upon
15  where you fall in the V, but in this
16  particular instance, it makes perfect sense
17  to me that that's what was being sent over
18  there. Paul didn't even know it himself.
19  I'm sorry. I mean, you're asking me a
20  question, I'm giving you an answer.
21      Q.   And all I want to make clear, and
22  if you disagree, you disagree, that for
23  purposes of a litigation it would be
24  appropriate to send over the file wrapper
25  and the prosecution file so that those

Page 200

1        T. Sharinn
2   matters are available to successor counsel?
3          MR. KAMINSKY: Objection to the
4   form of the question.
5   BY MR. SCOTT:
6       Q.   That would be standard practice,
7   would it not?
8          MR. KAMINSKY: Objection to the
9   form of the question.
10      A.   It would be, but they would have
11  been covered under number 13, and they
12  would have been covered under number 12 and
13  they would have been covered under number
14  16 and they would have been covered under
15  number 17. There would be no reason to
16  make a separate point of putting that in
17  there.
18      Q.   The file wrapper is not something
19  separate and apart from documents produced
20  by Quickie and documents produced by
21  Medtronic?
22      A.   It is something separate and
23  apart, because the documents, as part of
24  the production, would have been the file
25  wrapper that was not attorney-client

Page 201

1        T. Sharinn
2   privilege.
3       Q.   The file wrapper would include
4   discovery?
5       A.   The file -- let's understand
6   something. In the file wrapper, there's 3
7   folds in it. There is the center fold,
8   which has the correspondence from the PTO
9   and to the PTO on the right side in my
10  files, at least there is correspondence
11  between the client and yourself.
12          On the left side there is prior
13  art and other underlying information that
14  was required in either the drafting of the
15  prosecution of the actual patent. Some of
16  that stuff is discoverable or producible
17  and some of it is not.
18          If you're making a production of
19  all of this stuff here for purposes of a
20  litigation, you would produce all of this.
21          If you're producing, if you're
22  sending over all your documents that relate
23  to that client in a patent litigation, and
24  if you were the one who had ultimately
25  prosecuted that matter, you'd be sending

52 (Pages 202 to 205)

Page 202

1        T. Sharinn
2  over, you know, if you're sending over the
3  prosecution materials you're sending over
4  the prosecution materials.
5        There would be no reason to set
6  up a separate category because all the
7  relevant documents would be under 13 for
8  the litigation. These other documents
9  would include documents that wouldn't have
10  been produced under 13 and you're sending
11  that over because they need to be able to
12  mount it or the application, they're taking
13  responsibility for this, like you asked me
14  when I read this do I see --
15     Q.   That's all I can do is ask you
16  what you understand this to be.
17     A.   That's my understanding when I
18  look at it today. What my understanding
19  was on October 16, 2002, I don't even know
20  where I was on October 16, 2002. I'm sure
21  I was somewhere outside of Paul Jergensen's
22  office, but who knows.
23     Q.   You are not transferring the
24  files with regards to any re-examination
25  proceedings at that point in time, were

Page 203

1        T. Sharinn
2  you?
3     A.   I don't think there were any at
4  that point, were there? We wouldn't
5  transfer files for that because we weren't
6  handling that. We're not the attorneys of
7  record for the re-examination as far as I
8  know. I don't recall ever being that. I
9  may be wrong again.
10        (Exhibit 39, Letter, marked for
11        identification, as of this date.)
12     Q.   Would you identify that for the
13  record, please?
14     A.   It's a letter to Steve Colvin
15  dated January 29, 2003 and since we're
16  making a big thing about who the letter is
17  to, it's not to Quickie, LLC, it's not to
18  any of the ring companies like S&A, not to
19  Quickie Endoscope.
20        It's to Stephen Colvin at his
21  office at NYU and it's regarding a nonslip
22  surgical inside straight.
23     Q.   Which happens to bear the Quickie
24  client number, does it not, 51822?
25     A.   Yes, sir, that's what I've been

Page 204

1        T. Sharinn
2  told today.
3     Q.   And the 0108 is one of the
4  Quickie intake matters that we looked at
5  previously, right?
6     A.   Right, but we also discussed that
7  it was very possible that it was put into
8  the wrong group.
9     Q.   But for the client, you're
10  referring to it as a Quickie matter by way
11  of the Greenberg Traurig billing entry,
12  right?
13        MR. KAMINSKY: Objection to the
14        form of the question.
15        MR. SCOTT: Yeah, that's a bad
16        question.
17  BY MR. SCOTT:
18     Q.   For the client's purposes in
19  receiving this letter, he is seeing your
20  reference which is the Quickie client
21  matter --
22     A.   Okay, let me answer this, if
23  Steve were alive today and you said to
24  Steve, Steve does the number 51822 have any
25  significance to you, Steve wouldn't be able

Page 205

1        T. Sharinn
2  to tell you, and I can tell you undoubtedly
3  I'll testify anywhere to that --
4     Q.   I beg to differ, it would matter
5  to him today.
6     A.   Well, only if you coached him
7  enough to remember that and he actually
8  listened to you and paid attention to you
9  and then chose to say it.
10        And I will notice another thing,
11  it says dictated but not read in bold
12  italics at the bottom. So I wouldn't have
13  even known whether or not this was the
14  right number on it and I notice that my
15  former assistant Adrienne Ivan is the one
16  who signed this.
17     Q.   Who you don't want to vouch for?
18     A.   I wouldn't vouch for Adrienne on
19  her own birthday.
20     Q.   What success are you referring to
21  here, if you can recall?
22     A.   I honestly don't know. So it
23  sounds to me like this may have been one of
24  the days where Steve liked Thelen Reid and
25  had something positive to say about them,

53 (Pages 206 to 209)

Page 206

1          T. Sharinn
2  and so, again, I told you, I tried to
3  always take the high road on things, I
4  congratulated him on it. I don't know what
5  else you'd say to somebody under those
6  circumstances.
7          (Exhibit 40, Letter, marked for
8      identification, as of this date.)
9      Q.    Let's look at what's been marked
10 as Exhibit 40 to your deposition. If you
11 could identify that?
12     A.    This is another letter just to
13 Steve Colvin, not to Quickie or S&A Rings
14 or anybody else, talking about the
15 concentric passive knotless suture
16 terminator. This one was not dictated, but
17 not read. So apparently I did sign and
18 read this one.
19     Q.    And that also bears a Quickie
20 client and matter number, correct?
21     A.    This is what I'm told.
22     Q.    Well, it's not only what you're
23 told --
24     A.    I think I've also testified --
25 no, no, we've been over this several times.

Page 207

1          T. Sharinn
2  It's not going to change, you may like it
3  to, but it won't --
4      Q.    Let me just finish the question.
5      A.    Sorry.
6      Q.    -- that the 51822 is the client
7  matter number at Greenberg Traurig for
8  Quickie, LLC, right?
9      A.    Absolutely. Don't know that
10 that's the correct assignment of the
11 matter, though, and so I'm going to tell
12 you right now, you can ask me this, you
13 know, for as long as you'd like, I have no
14 idea whether this was or was not a Quickie
15 matter. I would tend to doubt it was.
16         (Exhibit 41, Letter, marked for
17     identification, as of this date.)
18     Q.    Let me hand you what's marked as
19 Exhibit 41 to your deposition.
20         Could you identify that for the
21 record, please?
22     A.    Looks like I did pretty good
23 here. It's a letter to Dr. Colvin again,
24 not to Quickie or anybody else, and I'm
25 sorry to make a joke of this, but I mean,

Page 208

1          T. Sharinn
2  it is clearly just a letter to him and it
3  talks about again the concentric passive
4  knotless suture. In this case, we're
5  advising them that the patent has been
6  issued. I guess I got him more patents
7  than I thought I did.
8      Q.    What is the date of that letter,
9  please?
10     A.    2003, December 2nd.
11     Q.    Understand all the
12 qualifications, it likewise bears a Quickie
13 client matter number, correct?
14     A.    Yes, sir.
15     Q.    Let me go ahead and ask you to
16 look at what is Exhibit 26 previously
17 marked in Mr. Sutton's deposition?
18     A.    Just so you understand, what is
19 being shown here -- may I show you
20 something because maybe you'd like to see
21 it.
22         This letter that was, I guess,
23 marked Exhibit 44 to Alan Fell is to S&A
24 Rings, again with the reference number that
25 you're saying is for Quickie.

Page 209

1          T. Sharinn
2      Q.    Right.
3      A.    Okay. So that's what I'm saying,
4  that these get confused a lot and that
5  people just use the same number. It's not
6  unlikely for Ms. Ivan to have just cut and
7  paste a new body into an old letter.
8      Q.    Make no mistake, and I'm not
9  trying to play games, it's very clear that
10 there was, I don't want to call it a
11 Chinese menu, but it borders on somewhat
12 indiscriminate use of billing numbers.
13     A.    I don't disagree at all.
14         MR. KAMINSKY: And names. So
15 long as we agree on that, we can save
16 ourselves a lot of questions.
17         I think all Mr. Sharinn has been
18 trying to say to you is that we used
19 the name Quickie as a shorthand but
20 that some of these things were
21 actually for S&A Rings rather than the
22 Quickie entity or vice versa, but
23 internally we just referred to that as
24 a Quickie matter.
25         Is that right.

54 (Pages 210 to 213)

Page 210

1    T. Sharinn
2    THE WITNESS: That's correct.
3    And hours ago I had said that the
4    concentric passive knotless would not
5    in my recollection have fallen into
6    the Quickie domain, it would have
7    fallen into S&A Rings, and lo and
8    behold, Exhibit 44 I guess from
9    Mr. Sutton's deposition would bear out
10    that fact.
11    MR. KAMINSKY: And if you go back
12    and you look as you showed before in
13    the exhibits, when you have the intake
14    memo from this concentric passive
15    knotless suture terminator, it says
16    address Quickie. We all know that
17    that particular device was for S&A
18    Rings as shown by this letter to
19    Mr. Fell.
20    Correct, Mr. Sharinn.
21    THE WITNESS: Yes, sir.
22    BY MR. SCOTT:
23    Q. And I'm not disputing that there
24    was a somewhat haphazard use of some of the
25    number for some of the claim matter numbers

Page 211

1    T. Sharinn
2    and the various entities within the Colvin
3    group.
4    What I am trying to show again,
5    just to put it out there, is that there
6    were also times when you knew what you were
7    using it for and you used it consistently,
8    whether it was for the litigation in the
9    0104 or for the re-examination in the 0109
10    or with regards to the 0107 matter.
11    MR. KAMINSKY: I think the
12    witness has been trying to tell you
13    that it wasn't used consistently and
14    that he didn't pay attention to those
15    references.
16    Is that correct, Mr. Sharinn.
17    THE WITNESS: Yes, sir.
18    MR. SCOTT: I understand the
19    testimony.
20    A. Do you want me to talk to Number
21    26, Exhibit 26?
22    Q. Yes, that's where we are, thank
23    you for bringing me back to the question.
24    A. My pleasure, glad to help.
25    Q. This is a letter dated March 11,

Page 212

1    T. Sharinn
2    2003 sent by you to Dr. Colvin, not to
3    Quickie.
4    A. Yes, sir.
5    Q. All right.
6    Regarding the Quickie Medtronic
7    litigation, right?
8    A. Among other things, yes, sir.
9    Q. Well, it addresses some
10    personal --
11    A. Yeah, I mean, first and foremost
12    it talks about, you know, at that time he
13    had quoted me in the New England Journal of
14    Medicine.
15    I was having issued with my
16    ex-wife and it had dealt with the effects
17    of cartoons on children of all things,
18    because I'm not a big proponent of
19    cartoons, and she used the TV as basically
20    a babysitter at times.
21    And then it goes on to talking
22    about whether or not certain items were not
23    included in the materials that were
24    forwarded over to Thelen Reid and, I
25    remember this actually specifically because

Page 213

1    T. Sharinn
2    I personally rolled up my sleeves and
3    helped look for these materials, these
4    items.
5    They were prototypes to an
6    invention that both Mr. Katz had made and
7    Dr. Colvin, you know, they had worked
8    together to create these little metal locks
9    that would lock onto the sutures, and I'm
10    not going to lie, I didn't take a little
11    bit of unfortunate pleasure in the fact
12    that, once again, Thelen Reid had dropped
13    the ball.
14    I mean, this is great evidence of
15    the fact that Thelen Reid didn't really pay
16    a lot of attention to this case, and if it
17    did, then I'm not sure what they were
18    thinking when they did certain things -- I
19    mean, this is evidence, and you lose that.
20    You're a litigator, have you ever
21    lost the evidence?
22    Q. I'm not going to answer the
23    question, Mr. Sharinn.
24    A. I know I've never lost a piece of
25    evidence.

55 (Pages 214 to 217)

Page 214

1           T. Sharinn
2    Q.   Let me ask you to direct your
3  attention to Exhibit 28 also previously
4  marked.
5    A.   Not 27?
6    Q.   Not 27.
7    A.   Will you need 27?
8    Q.   No.
9    A.   Okay, I'm there.
10   Q.   This is an e-mail exchange
11 between you and Mr. Sutton, correct?
12   A.   Yes, sir.
13   Q.   Regarding the re-examination
14 papers for the Quickie '160 Patent, right?
15   A.   Yes, sir.
16   Q.   I don't know if you looked at
17 this before, but it basically looks like an
18 office action?
19   A.   I remember it like it was
20 yesterday.
21   Q.   Well, what do you remember about
22 it?
23   A.   I remember this was one of those
24 days where I wasn't congratulating Steve
25 for the great work that Thelen was doing.

Page 215

1           T. Sharinn
2  Rather, I was calming him down because he
3  was really upset and he needed some
4  explanation on these papers and
5  unfortunately they weren't able to explain
6  it in terms that he comprehended.
7      So I remember him asking me to
8  look at these papers and me telling him
9  that I needed to get permission and me also
10 thinking to myself okay, maybe it's a
11 chance to get back in and sending it off to
12 Paul saying do you have time to discuss,
13 because I would not normally bother Paul
14 just because someone called me to talk
15 about something, but in this instance I
16 felt this was a great opportunity for him
17 and me to call Steve together.
18   Q.   And did that happen?
19   A.   I don't recall that happening. I
20 think what ultimately happened is we
21 punted. We decided we didn't want to get
22 involved at this point.
23   Q.   If you could look at Exhibit 29,
24 and it's out of chronological order so I
25 just draw your attention to that.

Page 216

1           T. Sharinn
2    A.   No problem.
3    Q.   This one is dated an e-mail from
4  Ms. Dawkins, who I understand to be Paul's
5  secretary or former secretary dated March
6  18th of 2004. And it looks like Mr. Fell
7  is leaving a voicemail for Mr. Sutton to
8  call him back to discuss the status of the
9  160, right?
10   A.   Yeah.
11   Q.   He referenced, and this is the
12 only reason I ask you --
13   A.   It looks like he's calling him
14 subsequent to speaking to me.
15   Q.   Well, I didn't say that he was
16 calling.
17   A.   Oh, I'm sorry.
18   Q.   He references a conversation with
19 you earlier in the week.
20       Do you recall that conversation?
21   A.   I don't recall the conversation
22 specifically, but it doesn't surprise me
23 that I would have had a conversation with
24 Alan.
25   Q.   And was it pretty much the same

Page 217

1           T. Sharinn
2  as what came out later, about two weeks
3  later in connection with the re-examination
4  office action that was forwarded to you,
5  which is Exhibit 28?
6    A.   Do you mind if I look at Exhibit
7  28 for a minute?
8    Q.   Sure, sure. If there's no
9  connection, just say so. That's what I'm
10 going to try and find out for you right
11 now. I'm not sure that there is a
12 connection.
13   A.   The reason that I say that is
14 when I look at Thelen Reid's cover letter,
15 it's April 2nd and this message is left on
16 the 18th. So I'm not sure how he could
17 have spoken to me about something that
18 didn't occur.
19       The only thing is when I look at
20 the office action, it predates this by
21 quite a few dates?
22   Q.   And as a patent attorney, do you
23 sometimes get advanced notice of what's
24 coming down the pipe?
25   A.   Not really, especially back then

56 (Pages 218 to 221)

Page 218

1           T. Sharinn
2  from the PTO, they weren't very good about
3  anything with regards to communication.
4           Today, they're a little better,
5  but not, still wouldn't get rave reviews.
6  But it's very possible that Alan had called
7  me only because he had a conversation with
8  Steve.
9           Many times Alan would call me
10  because Steve had called him about
11  something and wanted to just understand
12  what Steve was upset about. And so
13  sometimes I didn't even explain for a
14  particular matter so much as just what
15  something was, if that makes any sense, in
16  the abstract.
17      Q.   And as you've testified, these
18  are instances in which you continued to
19  have a dialogue with one or more members of
20  Quickie regarding their intellectual
21  property interests in general and the '160
22  Patent in particular?
23           THE WITNESS:  Are you going to
24  object to that or should I?
25           MR. KAMINSKY:  Thank you for

Page 219

1           T. Sharinn
2  giving me the opportunity.
3      A.   Well, I mean, that's just a
4  terrible question, number one.
5           Number two, it's presuming that I
6  even testified to what you said I testified
7  to, which I testified completely to the
8  contrary.
9           I've told you since the beginning
10  of this that I never stopped talking to
11  Alan Fell or Steve Colvin until just prior
12  to the initiation of the current lawsuit,
13  and even subsequent to the filing of it, I
14  have had conversations with Alan Fell, both
15  on a personal and a professional level.
16           So no, it's not that unusual that
17  Alan Fell would be calling me to talk to me
18  about something. Whether this was in
19  regards to Quickie or not, I can't
20  determine other than that it says counsel
21  for Quickie.
22      Q.   You're referring to Exhibit 29
23  specifically?
24      A.   I am, yes, sir.
25      Q.   But Exhibit 28 is specific to the

Page 220

1           T. Sharinn
2  '160 Patent, is it not?
3      A.   It is, but here again, here are
4  the Quickie re-examination papers, you have
5  time to discuss. You know, before that,
6  it's a meeting over at Steve's office, his
7  secretary, you know, she's just sending me
8  stuff that was sent to him.
9           It's not that, it doesn't look to
10  me as though there's -- I guess what I'm
11  trying to say is that this isn't in my mind
12  refreshing my recollection to believe that
13  I was working with them on this matter in
14  any meaningful way and I certainly, the
15  re-examination would have absolutely
16  nothing to do with the '160 Patent's
17  maintenance fees.
18      Q.   But Mr. Sharinn, you certainly
19  aren't giving an indication to Mr. Colvin
20  or Mr. Fell that you're not working with
21  them insofar as they're continuing to call
22  you up about this particular matter?
23      A.   Well, I tell you what I don't see
24  them calling me up on, is I don't see them
25  calling me up and saying, hey, Todd, you

Page 221

1           T. Sharinn
2  want to talk about the '160 Patent.
3      Q.   But they are talking about --
4      A.   No, they're talking about the
5  reexamination, two separate matters by the
6  PTO serial numbers alone, separate and
7  succinct.
8           MR. KAMINSKY:  Everyone stop for
9      one second and let me just note
10      objections to the last two or three
11      questions, okay.
12  BY MR. SCOTT:
13      Q.   Let me hand you what's been
14  marked as Exhibit 42, and I'm going to give
15  you 43 at the same time because they're
16  related.
17      A.   Yes, sir.
18           (Exhibit 42, Billing letters,
19      marked for identification, as of this
20      date.)
21           (Exhibit 43, Document, marked for
22      identification, as of this date.)
23      A.   Okay.
24      Q.   Exhibit 42, I'll represent to you
25  that that is a compilation of various April

57 (Pages 222 to 225)

Page 222

1        T. Sharinn
2   9, 2003 billing letters that were sent out
3   by you in connection with the 51822 client.
4     A.   Okay.
5     Q.   You've had a chance to at least
6   go through that?
7     A.   I did.
8     Q.   And in that compilation, you sent
9   bills out in April of 2003 to Quickie in
10  connection with the 01 matter, correct?
11    A.   I did, yes.
12    Q.   And one of the entries, if you
13  look at Bates number RS003065 --
14    A.   Yes, sir.
15    Q.   The time entry there, letter to
16  Dr. Colvin regarding status and strategy
17  for various pending matters, do you see
18  that?
19    A.   Yes, sir.
20    Q.   With the date for the actual
21  entry of 3/27/03, correct?
22    A.   Yes, sir. Do you have that
23  letter?
24    Q.   I don't know if I do or I don't.
25    A.   Okay.

Page 223

1        T. Sharinn
2     Q.   Do you have any recollection
3   about the letter as to what various matters
4   you were referring?
5     A.   I can only guess. You want me to
6   do that?
7     Q.   No.
8     A.   Then no.
9     Q.   It doesn't do either of us any
10  good.
11        You likewise invoiced Quickie at
12  that time with regards to the 0101 patent,
13  correct?
14    A.   I'm sorry?
15    Q.   You invoiced Quickie at that time
16  as well in connection with the 0101 matter?
17    A.   Where would that be?
18    Q.   Bates number 3049.
19    A.   They're out of order, so it's
20  really hard to --
21    Q.   I apologize for that.
22    A.   It's okay. I'm just trying to
23  find it. Okay. Say that again.
24    Q.   You invoiced Quickie on April 19,
25  2003 as well in connection with the 0101

Page 224

1        T. Sharinn
2   matter, correct?
3     A.   That's what it says, yes, sir.
4     Q.   And I'm just plowing through,
5   Mr. Sharinn, now Bates number 2794.
6     A.   Okay.
7     Q.   You likewise invoiced Quickie on
8   April 9, 2003 in connection with the 0102
9   matter, correct?
10    A.   Again, that's what it says.
11    Q.   And if you look at Bates page
12  3097?
13    A.   3097?
14    Q.   Yes. It's about 4 pages, 5 pages
15  from the back.
16    A.   Yes, sir.
17    Q.   You likewise invoiced Quickie on
18  April 9, 2003 in connection with the 0107
19  matter as well, correct?
20    A.   Again, that's what it says.
21    Q.   Turning your attention to Exhibit
22  43 --
23    A.   Yes, sir.
24    Q.   -- that's a billing letter from
25  you to Mr. Fell on behalf of Quickie dated

Page 225

1        T. Sharinn
2   May 18, 2004, correct?
3     A.   Well, it is, except that on the
4   break you asked me to look through it and
5   it was interesting you had marked a passage
6   on Bates number 3180, and when I looked at
7   the passage, that's for the concentric
8   knotless and there it looks like we had paid a
9   fee for them there, that would be S&A
10  Rings.
11    Q.   All right.
12        Understanding all of our
13  conversation --
14    A.   No, so I'm saying it's addressed
15  to Fell and Quickie, care of Rick Steiner,
16  but I think it's a bill that covers all the
17  various matters at that time that I might
18  have been billing time for any of the
19  Colvin entities.
20    Q.   And directing your attention to
21  Bates page 3180, the one you just
22  referenced --
23    A.   Yes, sir.
24    Q.   -- that particular invoice which
25  is 1217480 regarding concentric passive

58 (Pages 226 to 229)

Page 226

1           T. Sharinn
2 knotless suture terminator is for a Quickie
3 matter 51822 and specifically matter 0102,
4 right?
5     A.   Oh, I don't know. It doesn't say
6 that, does it?
7     Q.   Look at the top.
8     A.   Oh, okay. That's the number
9 that's given to it, but it doesn't make
10 that -- if 51822 is Quickie, and this is
11 why I said you just have to look at the
12 patent because that would tell you
13 specifically who the assignee is, unless
14 Quickie was paying S&A Rings' bills at that
15 time, and maybe that's the case. That
16 could very well be the explanation. I
17 wouldn't know.
18     Q.   But that's how you're referencing
19 it?
20     A.   Yes, that's how we're referencing
21 it, correct.
22     Q.   And are you familiar with the
23 55217 billing client?
24     A.   No.
25     Q.   Did you understand that 55217 was

Page 227

1           T. Sharinn
2 Quickie vision?
3     A.   No.
4     Q.   Did you understand that 52805 was
5 liberty?
6     A.   I wouldn't understand any of
7 that, even at the time I wouldn't have
8 known the numbers. I wouldn't write the
9 numbers down.
10     Q.   So you don't have any
11 recollection of billing those clients
12 separate and apart from the Quickie client?
13     A.   No, and I don't know if that's
14 the case or not, but I would be surprised
15 unless I was specifically instructed,
16 otherwise, that there might not be invoices
17 where their stuff was on it, too, for these
18 other clients that you're referring to.
19     Q.   Let me see if I understand.
20     A.   Sure.
21     Q.   You would be surprised that there
22 were invoices going out to separate clients
23 at Liberty and Quickie, or you wouldn't be
24 surprised that there were?
25     A.   Correct.

Page 228

1           T. Sharinn
2     Q.   The latter?
3     A.   Yes, sir.
4     Q.   All right. Thank you.
5     A.   As I said, and this is
6 unfortunately not just a Greenberg Traurig
7 thing, this is a Rick Steiner and also just
8 the relationship and the way Colvin managed
9 the relationship, there was a lot of
10 crossover between the various matters with
11 regards to the billing. It just got paid
12 from different accounts.
13     Q.   It's confusing?
14     A.   It was very confusing, and I
15 frankly didn't pay close attention to it
16 because what I paid attention to was that
17 the fees were reasonable and that they were
18 being paid.
19     Q.   The only letters transferring
20 files or matters that I've seen from my
21 review have referenced the 0104, which is
22 the Quickie Medtronics litigation or the
23 0109, which is the re-examination.
24         I have not seen any document that
25 transfers specifically the other Quickie

Page 229

1           T. Sharinn
2 matters to anyone else's attention. I
3 never seen anything transferring the 01,
4 the 0101, or the 0107. Is there anywhere
5 else that you can think of sitting here
6 right now that I can go that those
7 documents might exist?
8         MR. KAMINSKY: Objection to the
9     form of the question.
10        THE WITNESS: Can I answer it?
11        MR. KAMINSKY: Yes.
12    A.   No.
13    Q.   Do you believe any such documents
14 exist?
15    A.   Wouldn't even begin to guess.
16    Q.   Well, let me ask, do you have any
17 reason to believe that any such documents
18 exist?
19        MR. KAMINSKY: Object to the
20    form.
21    A.   Wouldn't even fathom the thought.
22 It's just not something that I would even
23 think about.
24        MR. SCOTT: I'll go ahead and
25    pass the witness.

59 (Pages 230 to 233)

Page 230

1       T. Sharinn
2  EXAMINATION BY
3  MR. KAMINSKY:
4     Q.   Mr. Sharinn, your communications
5  in this matter included frequent
6  communications -- strike that.
7          Your communications in connection
8  with your representation of the Colvin
9  clients included communications with
10 Mr. Fell, is that right?
11    A.   It did.
12    Q.   What did you understand his
13 position to be?
14    A.   He acted in the role of general
15 counsel.
16    Q.   And did you speak with him
17 frequently about the Colvin matters?
18    A.   I spoke to him frequently, and
19 Colvin was among things that we had spoken
20 about.
21    Q.   Now, you saw in the client intake
22 matters that the address of the client was
23 given Quickie, care of Mr. Fell and his law
24 firm, is that right?
25        Do you want to go back and --

Page 231

1       T. Sharinn
2     A.   No, no, I was just thinking about
3  your question. Yes, that's correct.
4     Q.   And the billings went to
5  Mr. Fell, in other words, the billings for
6  these matters were sent to Mr. Fell, is
7  that right?
8     A.   Yes, sir.
9     Q.   And were you --
10    A.   I think there may have one or two
11 occasions where they weren't sent to Mr.
12 Fell. They were actually sent to Steve
13 Colvin, and I think that may have been a
14 time when Steven and Alan may have had a
15 little bit of a falling out.
16    Q.   But, for example, if you look at
17 Exhibit 43, you know, that he was shown by
18 Quickie's counsel, the cover letter goes to
19 Alan Fell, Quickie, LLC, care of Rick
20 Steiner -- that's Mr. Fell's law firm,
21 correct?
22    A.   It is, but that's not my
23 signature.
24    Q.   Exhibit 42, same thing?
25    A.   Yes.

Page 232

1       T. Sharinn
2     Q.   That's the address, correct?
3     A.   Correct.
4     Q.   Were you relying on Mr. Fell to
5  sort out which particular Colvin or Quickie
6  or Quickie or XYZ or S&L or whatever the
7  client was and to appropriately sign the
8  charge to appropriate client?
9          MR. SCOTT: Objection to form.
10 BY MR. KAMINSKY:
11    Q.   Were you relying upon Mr. Fell to
12 determine by particular Colvin entity,
13 particular charges and bills applied to?
14        MR. SCOTT: Objection. Form.
15    A.   May I answer?
16    Q.   Yes.
17    A.   Okay. From what I understand,
18 you're asking me did I wait for Mr. Fell to
19 figure out who should be paying me what,
20 and the answer is yes.
21        Mr. Fell and I established a
22 protocol regards to the Colvin matters that
23 it was just crazy to try and sort them out
24 separately. So he would read the bills and
25 if he had a question about it and a

Page 233

1       T. Sharinn
2  reference he would ask me about it.
3     Q.   And so you, yourself, didn't try
4  to figure out the specific relationship
5  between the Quickie entities or the Colvin
6  entities, is that right?
7     A.   I did early on and then I gave up
8  and that was long before I ever got to
9  Greenberg Traurig.
10    Q.   Now, sometimes you wrote to
11 Mr. Fell with a reference to a matter that
12 might relate to a company other than
13 Quickie and yet you addressed your letter
14 to him care of Quickie, is that right?
15    A.   That did occur.
16        MR. SCOTT: Objection to form.
17 BY MR. KAMINSKY:
18    Q.   And sometimes you wrote to
19 Mr. Fell about a matter that related to a
20 different Colvin entity and you wrote to
21 Mr. Fell care of his law firm, but
22 referenced that entity, isn't that right?
23    A.   That's correct.
24    Q.   For example, let me show you a
25 document which we're going to mark Exhibit

60 (Pages 234 to 237)

Page 234

1          T. Sharinn
2   44 --
3          (Exhibit 44, Letter, marked for
4   identification, as of this date.)
5     Q.   -- which is a letter from Todd
6   Sharinn to Alan Fell, S&A Rings, LLC,
7   December 2, 2003 and it has the Bates
8   number GT505 to 507.
9          Is that an example of a letter
10  that you wrote to Mr. Fell referring to a
11  matter that involved S&A Rings, LLC?
12    A.   Yeah, I mean, in this letter it's
13  addressed to S&A Rings, LLC and this
14  concerns the passive knotless suture
15  terminator, and it does have what I've been
16  drilled into today to learn the Quickie
17  reference number.
18    Q.   Now, this is the concentric
19  terminator, start?
20    A.   Concentric passive knotless
21  suture terminator.
22    Q.   And was that a matter for S&A
23  Rings or would it be Quickie?
24    A.   No, it would be S&A Rings, I
25  would think. The real way to determine

Page 235

1          T. Sharinn
2   that would be to look at the actual letters
3   patent and see who the assignee was.
4     Q.   Do you remember there was a
5   Patent Number 745 that related to the
6   concentric terminator?
7     A.   That would be an application
8   number, not a patent, but yes.
9     Q.   Okay.
10         And that's different than the
11  '160 Patent, isn't it?
12    A.   Again, one would be an
13  application, one would be a serial number
14  for the application, yeah, there would be
15  the actual letters patent and its
16  registration number, but yes, it's a
17  different number than what would have been
18  on the '160.
19    Q.   Do you remember when you looked
20  at client intake form for this concentric
21  passive knotless suture terminator it was
22  stated the client address as Quickie?
23    A.   I do.
24    Q.   But yet this really was a matter
25  for S&A Rings, is that correct?

Page 236

1          T. Sharinn
2          MR. SCOTT: Objection. Form.
3     A.   That's correct.
4     Q.   So this is an example of where
5   you used the references to Quickie as sort
6   of a shorthand for all of the Colvin
7   matters, is that a fair thing to say?
8          MR. SCOTT: Objection to the
9   form.
10    A.   Yeah, if it means I was sloppy in
11  my billing, they be, I guess I was sloppy
12  in my billing.
13    Q.   Did you use references to Quickie
14  as a shorthand to the various Colvin
15  matters?
16    A.   I did.
17         MR. LODEN: Objection to form.
18    Q.   Now I'm going to show you a
19  number of documents that we've marked, I'm
20  going to mark exhibits.
21         We're marking Exhibits 45, 46,
22  47, 48 and 49. Why don't I just identify
23  them for the record. Is that okay with
24  you, Skip?
25         MR. SCOTT: That's fine.

Page 237

1          T. Sharinn
2          (Exhibit 45, Time entries, marked
3   for identification, as of this date.)
4          (Exhibit 46, Time entries, marked
5   for identification, as of this date.)
6          (Exhibit 47, Time entries, marked
7   for identification, as of this date.)
8          (Exhibit 48, Time entries, marked
9   for identification, as of this date.)
10         (Exhibit 49, Time entries, marked
11  for identification, as of this date.)
12         MR. KAMINSKY: Exhibit 45 are the
13  pages containing the time entries from
14  the various bills for the matter
15  referred to as re-examination of U.S.
16  Patent No. 6066160.
17         46 are the time entries for the
18  matter referred to as concentric
19  passive knotless suture terminator.
20         47 are the time entries for the
21  matter referred to as Guidant
22  Corporation.
23         Exhibit 49 are the time entries
24  for the matter referred to as Quickie
25  v. Medtronic and various GT Bates

61 (Pages 238 to 241)

Page 238

```
 1        T. Sharinn
 2    numbers at the bottom of them.
 3        MR. SCOTT:  Did you skip 48?
 4        MR. KAMINSKY:  And Exhibit 48 is
 5    a composite of the time entries for
 6    the matter referred to as surgical
 7    drape patent application.
 8    BY MR. KAMINSKY:
 9    Q.    Mr. Sharinn, I'm showing you the
10    time entries for, from the Greenberg
11    Traurig bills in the various Colvin or
12    Quickie matters, which we've marked as
13    Exhibits 45 through 49.
14        Would you take a look first at
15    Exhibit 45?
16    A.   Yes, sir.
17    Q.    And that's the time entries on
18    the re-examination -- that's the time
19    entries for the -- -- the first page of it
20    is the re-examination of the U.S. Patent
21    No. 6,066,160.
22        Do you see that?
23    A.   Yes, sir.
24    Q.    Now do you have any time entries
25    after December of 2002?
```

Page 239

```
 1        T. Sharinn
 2    A.   No.
 3    Q.    Do you remember you opened up a
 4    new file in December of 2002 with a view to
 5    possibly doing work on this matter, is that
 6    right?
 7    A.   I don't have any independent
 8    recollection of that.
 9    Q.    Let me show you Exhibit 19.
10    A.   Yes, sir.
11    Q.    And do you recall that Mr. Scott
12    showed you that document earlier and
13    pointed out that you had opened up a client
14    intake matter in December of 2002 after you
15    had already been replaced with respect to
16    the '160 Patent?
17        MR. SCOTT:  Object to the form.
18    BY MR. KAMINSKY:
19    Q.    Do you recall that?
20    A.   Yes, sir.
21    Q.    Looking at the first page of
22    Exhibit 45 --
23    A.   Yes, sir.
24    Q.    -- these are the time entries
25    that we found for this particular matter.
```

Page 240

```
 1        T. Sharinn
 2    Q.    Do you see any entries that occur
 3    after December 13, 2002?
 4    A.   No.
 5    Q.    So is it correct to say that
 6    although you opened up a new client matter
 7    in anticipation of doing work on this
 8    matter, in fact you didn't bill Quickie for
 9    work and become directly involved as
10    counsel in the re-examination after that?
11        MR. SCOTT:  Object to the form.
12    A.   That appears to be the case.
13    Q.    Now, if you look at the second
14    page of that exhibit, it actually refers to
15    the passive knotless suture system.
16        Do you see that?
17    A.   I do.
18    Q.    And it has two entries on it in
19    March of 2003.
20        Do you see that?
21    A.   I do.
22    Q.    Can you tell us what work you
23    were doing at that time?
24    A.   No.
25    Q.    Do you see that the second entry
```

Page 241

```
 1        T. Sharinn
 2    says telephone interview with examiner 0.4
 3    hours.
 4        Do you see that?
 5    A.   I do.
 6    Q.    Do you know what that involved?
 7    A.   No.
 8    Q.    Do you remember doing any work as
 9    counsel for Quickie in connection with the
10    re-examination matter after December of
11    2002?
12    A.   I don't have any specific
13    recollection.
14    Q.    Do you remember that after March
15    of 2002 you received a notice from the
16    Patent Office that all authority that you
17    or Greenberg Traurig had had with respect
18    to the '160 Patent had been revoked?
19        MR. SCOTT:  Object to the form.
20        MR. LODEN:  Object to the form.
21    A.   I don't recall the date of the
22    revocation.
23        MR. KAMINSKY:  Let me show you a
24    document which we will mark Exhibit
25    50.
```

62 (Pages 242 to 245)

Page 242

```
1          T. Sharinn
2      (Exhibit 50, Notice, marked for
3    identification, as of this date.)
4    Q.   Is Exhibit 50 a copy of a notice
5  which you received?
6    A.   I'm sorry?
7    Q.   Is Exhibit 50 a copy of the
8  notice that you received from the Patent
9  Office?
10   A.   It appears to be.
11   Q.   Do you see that the notice is
12 dated April 2, 2003, do you see that?
13   A.   It does.
14   Q.   And as a patent lawyer, what do
15 you understand this notice to be telling
16 you?
17   A.   That there is a new person in
18 charge of this file.
19   Q.   Do you have any further authority
20 as to this matter after that?
21       MR. SCOTT:  Object.  Form.
22   A.   No.
23   Q.   Is that what you understood to be
24 the case?
25   A.   I can't speak of what I
```

Page 243

```
1          T. Sharinn
2  understood back then.  It's what I
3  understand, as I sit here today.
4    Q.   Let me show you a document which
5  has been previously marked Exhibit 27 in
6  this case.
7       Is that a letter that you wrote
8  to Quickie, care of Mr. Fell's law firm on
9  May 15, 2003?
10   A.   It appears to be.
11   Q.   And do you see that you write in
12 the first paragraph, "Enclosed for your
13 information and records are a copy of a
14 notice regarding change of Power of
15 Attorney filed in connection with the
16 above-referenced re-examination
17 application."
18       Do you see that?
19   A.   Yes, sir.
20   Q.   And attached to it as the
21 enclosure is a copy of Exhibit 50, is that
22 right?
23   A.   Yes, sir.
24   Q.   So you sent a copy of this notice
25 to Quickie, is that right?
```

Page 244

```
1          T. Sharinn
2    A.   I did.
3    Q.   And then you continue on and say
4  well, we are surprised to have received
5  this document in view of the conversation I
6  had with Dr. Colvin, we respect his
7  decision and take no further action on this
8  matter.
9       Do you see that?
10   A.   I do.
11   Q.   What were you saying to Quickie?
12       MR. SCOTT:  Objection to form.
13   A.   What was I what?
14   Q.   What were you trying to say to
15 Quickie?
16   A.   I don't know if it could be
17 anymore clearer than that, I will take no
18 further action on this matter.
19       MR. SCOTT:  My objection is to
20    the repeat of the same question.
21 BY MR. KAMINSKY:
22   Q.   Did Mr. Fell or Dr. Colvin or
23 anyone else from the Colvin entities or
24 Quickie call you up after that and say to
25 you, oh, no, wait a minute, Todd, we're
```

Page 245

```
1          T. Sharinn
2  still looking to you or to Greenberg
3  Traurig to continue to work on '160 Patent?
4    A.   No.
5    Q.   They did call you at various
6  times, both before and after the fact about
7  the re-examination petition to discuss
8  things that were going on with the Thelen
9  firm, is that correct?
10   A.   Yes, sir.
11   Q.   What did you tell them about your
12 status vis-a-vis the '160 Patent in those
13 conversations?
14   A.   I don't know that we ever really
15 talked about it in any great terms, but I'm
16 certain knowing myself and the way I would
17 conduct myself that I would have told them
18 I had been relieved of all duties for that
19 case.
20   Q.   And is that what you understood
21 had happened?
22   A.   That's what I wrote in the
23 letter, yes, sir.
24   Q.   Now, when you say that case, what
25 are you referring to by the words "that
```

63 (Pages 246 to 249)

Page 246

1              T. Sharinn
2   case"?
3       A.   The 160 matter, whether it be the
4   underlying file wrapper or the actual
5   litigation.
6       Q.   And that would include the
7   Medtronic litigation, is that right?
8       MR. SCOTT: Object to form.
9       A.   It would include the prosecution,
10  the policing and the enforcement of the
11  '160 Patent.
12      Q.   Did you ever see the notice with
13  the Patent Office revoking any Power of
14  Attorney that you at Greenberg Traurig had
15  previously had with respect to the '160
16  Patent?
17      A.   Patent.
18      Q.   Is it your understanding that
19  when you get a document such as Exhibit
20  150 --
21      A.   Exhibit 50, you mean?
22      Q.   Exhibit 50, I'm sorry, thank you,
23  is it your understanding that when you get
24  a document such as Exhibit 50, that is is
25  the result of something that is filed by

Page 247

1              T. Sharinn
2   the patent owner with a Patent Office.
3       A.   It wouldn't happen by itself,
4   yes, sir.
5       Q.   Did you ever see what Quickie had
6   actually filed with the Patent Office?
7       A.   I would imagine it's just a form.
8       (Exhibit 51, Letter, marked for
9       identification, as of this date.)
10      Q.   Exhibit 51, which we've just
11  marked is a letter from Thelen Reid &
12  Priest to Mr. Colvin at Quickie dated April
13  16, 2003 and attaches to it a Power of
14  Attorney by assignee revocation of prior
15  powers form. It's Bates numbered QLLC,
16  62220 through 24.
17      Did you ever see that document
18  before?
19      A.   No. Can I look at it, please?
20      Q.   Yes.
21      A.   I've never seen it before today.
22      Q.   Do you see that on the second
23  paragraph of the cover letter Thelen
24  advises Dr. Colvin and Quickie, "Also
25  enclosed is a copy of Power of

Page 248

1              T. Sharinn
2   Attorney/Revocation of Prior Powers of
3   Attorney filed with the U.S. Patent and
4   Trademark Office on March 10, 2003 for your
5   records."
6       Do you see that?
7       A.   I do.
8       Q.   And then do you see that attached
9   is that form which is signed by Aubrey
10  Galloway of Quickie on March 4, 2003.
11      Do you see that?
12      A.   I do.
13      Q.   Do you see a certificate of
14  mailing that's attached on the last page
15  that certifies that this document was
16  mailed to the U.S. Patent Office on March
17  20, 2003.
18      Do you see that?
19      A.   Yes, sir.
20      Q.   Turning back to the first page of
21  the revocation, do you see that the notice
22  says that all prior powers of attorney
23  previously given are hereby revoked, and a
24  new Power of Attorney for the following
25  attorneys or agents are hereby appointed.

Page 249

1              T. Sharinn
2       Do you see that?
3       A.   Yes, sir.
4       Q.   And underneath that it lists a
5   number of names.
6       Do you see that?
7       A.   I do.
8       Q.   One of the names is Robert E.
9   Krebs and another is Mark Hanish, John
10  Schaub, S-C-H-A-U-B, Stephen Robins and
11  various other names.
12      MR. SCOTT: There's a lot.
13      MR. KAMINSKY: There are a number
14  of names.
15  BY MR. KAMINSKY:
16      Q.   Did you understand that Mr. Krebs
17  was an attorney at Thelen Reid & Priest?
18      A.   Well, I mean, no, not until the
19  commencement of this lawsuit, I would have
20  never even heard of Mr. Krebs.
21      Q.   But you now know that he was an
22  attorney at Thelen Reid & Priest, is that
23  correct?
24      A.   Either that or he's pretending,
25  but yes, it seems like he would be the most

64 (Pages 250 to 253)

Page 250

1          T. Sharinn
2  senior attorney because he's number one on
3  here.
4      **Q.    And the form involved references**
5  **the passive knotless suture terminator.**
6          **Do you see that?**
7      A.  Yes, sir.
8      **Q.    And that's the '160 Patent, is**
9  **that right?**
10     A.  Yes, it is.
11     **Q.    As noted by the patent number at**
12 **the top of the form?**
13     A.   Yes, sir.  If this was directed
14 to only the re-examination, it would have
15 the re-examination serial number.
16     **Q.    But this was with respect to the**
17 **patent itself, is that right?**
18     A.  Yes, sir.
19     **Q.    Now, as an attorney who is**
20 **admitted to practice before the Patent**
21 **Office and experienced in these matters, is**
22 **the effect of this form to say that whoever**
23 **had a Power of Attorney before no longer**
24 **has any involvement here and now these new**
25 **attorneys listed below are the attorneys**

Page 251

1          **T. Sharinn**
2  **with respect to this patent?**
3          MR. SCOTT:  Objection to form.
4      A.   Yeah.  I mean, you're really
5  asking me for my experience what this means
6  as opposed to being a witness in this case.
7          My opinion on this would be that
8  or my interpretation of this document as
9  I've always understood it and as someone
10 who has filed them with regards to others
11 means that those others are no longer
12 permitted to participate in the prosecution
13 or the maintenance of the referenced
14 patent.
15         MR. SCOTT:  I'm going to object
16     and move to strike to the extent that
17     you're not designated as an expert.
18         THE WITNESS:  I'm not, and I
19     don't want to be considered one.
20 BY MR. KAMINSKY:
21     **Q.    But you have experience before**
22 **the Patent Office, is that correct?**
23     A.   I've been doing this for a while.
24     **Q.    You fill this kind of form out**
25 **for clients of your own, is that right?**

Page 252

1          T. Sharinn
2      A.   Never.
3      **Q.    Have you ever seen this kind of**
4  **form before?**
5      A.   I have and it's always been
6  filled out by a paralegal on my behalf.
7      **Q.    But in other words, you've**
8  **submitted them on behalf of your clients?**
9      A.   I've signed them.
10     **Q.    And your understanding from your**
11 **own personal knowledge and observation that**
12 **the purpose of this form is to replace one**
13 **attorney or set of attorneys with a new set**
14 **of attorneys?**
15     A.   It has two purposes.  The first
16 purpose is to remove all powers from the
17 original or existing attorneys with power;
18 and second, in some cases could be a
19 designation of a new attorney.  There is
20 another form similar to this that does not
21 designate other attorneys.  It's a
22 substitute.
23     **Q.    But the one that we've marked**
24 **here did designate new attorneys, correct?**
25     A.   Yes, it does.

Page 253

1          T. Sharinn
2      **Q.    Now, do you remember that you**
3  **were asked at a certain point to submit an**
4  **affidavit in support of an application by**
5  **Quickie petitioning for reinstatement of**
6  **the '160 Patent?**
7      A.   Yes.  I will tell you what I
8  remember most.
9      **Q.    Please tell us what you remember**
10 **about the request that you submit that**
11 **declaration of affidavit of statement.**
12     A.   I remember submitting it.
13     **Q.    Did you submit a statement in**
14 **support of a petition?**
15     A.   I submitted a statement in
16 support of a petition.
17     **Q.    I'm going to show you a document**
18 **that we're going to deem marked Exhibit 52**
19 **and tomorrow we'll substitute a clean copy**
20 **of it.**
21         MR. SCOTT:  It's agreed.
22     A.   Yes, sir.
23         (Exhibit 52, Statement, marked
24     for identification, as of this date.)
25     **Q.    It's a two-page statement.**

65 (Pages 254 to 257)

Page 254

1        T. Sharinn
2        Is that your signature at the end
3   of it?
4   A.   Yes.
5   Q.   And is that a copy of the
6   statement you submitted in November of 2006
7   in support of Quickie's petition?
8   A.   May I look at it?
9   Q.   Yes, please do.
10  A.   Yes, this was a paper that I was
11  asked personally by Alan Fell, and I don't
12  recall, but possibly Steve Colvin to sign
13  and then I ended it a little bit, and yes,
14  I did sign this.
15  Q.   Was it initially drafted by the
16  Maier & Maier firm as counsel for Quickie?
17  A.   It had always been drafted by
18  them.
19  Q.   And you reviewed it and made some
20  changes?
21  A.   My own ones, yes, sir.
22  Q.   And before you signed it, did you
23  have conversations with anyone at Maier &
24  Maier telling them that you were now
25  satisfied and were prepared to sign?

Page 255

1        T. Sharinn
2   A.   Yeah.
3   Q.   Now, in paragraph number two --
4   A.   They didn't tell me what it was
5   going to be used for specifically other
6   than they had mentioned to me that the
7   patent had been abandoned, which I was
8   surprised to hear.
9   Q.   Was that the first that you
10  learned that the patent had been abandoned?
11  A.   Yes, sir.
12  Q.   Now, this is November 2006. You
13  write in paragraph 2:
14       "My responsibility, including the
15  payment of any maintenance fee that may
16  become due for the subject patent ended
17  prior to the date where the payment of a
18  first maintenance fee was due as evidenced
19  by the enclosed revocation of prior powers
20  of attorney signed on behalf of Quickie,
21  LLC on March 4, 2003 wherein all prior
22  powers of attorney previously given were
23  hereby revoked."
24       Do you see that?
25  A.   I do.

Page 256

1        T. Sharinn
2   Q.   Does that refresh your
3   recollection that you had been shown that
4   revocation form sometime before you signed
5   this statement?
6   A.   I must have been. I wouldn't
7   have signed it if I hadn't looked at it.
8   Q.   And is the statement that I just
9   quoted from paragraph 2 true?
10  A.   It is.
11  Q.   Was it true then?
12  A.   It's true always.
13  Q.   Did anyone ever come to you
14  afterwards and say Todd, the statement you
15  submitted at our request on November 20,
16  2006 was actually wrong and we want you to
17  submit a different statement retracting
18  what you said in Exhibit 2?
19  A.   No.
20  Q.   Had anyone ever asked you to say
21  anything different to the Patent Office
22  than was said there?
23  A.   No.
24       (Exhibit 53, Statement, marked
25  for identification, as of this date.)

Page 257

1        T. Sharinn
2   Q.   I'll show you a document which we
3   will mark, deem marked Exhibit 53, which is
4   a statement in support of petition by
5   Aubrey Galloway signed on either October
6   27, 2006 or on November 27, 2006. It's a
7   little hard to see what the date is.
8   A.   It's October 27th.
9   Q.   Have you ever seen his signature
10  before?
11  A.   Sure.
12  Q.   Does that appear to be his
13  signature?
14  A.   Yes.
15  Q.   Have you ever seen this document
16  before?
17  A.   I may have. I don't recall
18  specifically. So you understand, I tried
19  my hardest not to be involved in any
20  further matters with the Colvin companies.
21  This is while I was at Baker McKenzie, and
22  I had very little interest in even doing
23  this.
24  Q.   Now, Dr. Galloway says under oath
25  in paragraph 2:

66 (Pages 258 to 261)

Page 258

1       T. Sharinn
2       "As the managing partner for
3  Quickie, LLC, I retained Robert E. Krebs,
4  et al. of Thelen Reid & Priest, LLP law
5  firm to transact all post-issuance
6  proceedings and responsibilities in the
7  Patent and Trademark Office including, but
8  not limited to, re-examination proceedings
9  and timely payment of the maintenance
10 fees."
11      Continuing in paragraph 3, he
12 says:
13      "As managing partner for Quickie,
14 LLC, I retained the law firm of Thelen Reid
15 & Priest to concurrently conduct litigation
16 services for Quickie, LLC."
17      Is that consistent with your
18 understanding of what had happened when you
19 were replaced by Thelen Reid & Priest in
20 the fall of 2002 or early 2003?
21 A.   It is. It, in fact, underscores
22 another point that unfortunately, and
23 Mr. Scott had asked me earlier whether
24 Dr. Colvin expressed dissatisfaction with
25 the fact that Paul Sutton wasn't involved

Page 259

1       T. Sharinn
2  in the case, and this actually reminds me
3  that, no, Steve Colvin did not.
4       But Aubrey who always seemed to
5  have a problem with everything did express
6  some concern about certain things, not with
7  the Paul Sutton thing, but that he had
8  expressed a favoritism towards Thelen Reid,
9  I remember that.
10 Q.   Let me show you one other
11 document.
12      This is a supplement to the
13 petition in the Quickie reexamination
14 proceeding relating to the '160 Patent,
15 which we'll mark Exhibit 54.
16 A.   Okay.
17      (Exhibit 54, Petition supplement,
18 marked for identification, as of this
19 date.)
20 Q.   It is signed by Maier & Maier as
21 counsel for Quickie, dated December 1,
22 2006.
23      Have you seen this document
24 before?
25 A.   I would need to look at it. I'm

Page 260

1       T. Sharinn
2  not sure.
3  Q.   Please do.
4  A.   I don't believe I have seen this
5  before, no. I may have, and the only
6  reason I say may have is there was an
7  article written about me in IP360, which is
8  a Reg in the IP industry, IP meaning
9  intellectual property, and I got very upset
10 because I was never called by them to ask
11 what my opinion of all this was and that's
12 actually how I learned about the lawsuit in
13 the first place.
14      I had no idea about this until I
15 saw the article. And so I had a paralegal
16 pull off some materials from the PTO
17 website, and I may have looked at this
18 document when I had written them a nasty
19 e-mail saying that I expected a full
20 retraction of the statements that they
21 issued, which they ultimately did do. They
22 republished a new article.
23 Q.   Do you see that in the third
24 paragraph of this petition -- I'm sorry,
25 supplement to petition, Quickie's counsel

Page 261

1       T. Sharinn
2  writes:
3       "A declaration by Todd S.
4  Sharinn is being added as Exhibit 7 showing
5  that he was attorney at Pepe & Hazard, LLP
6  and was responsible for the '160 Patent.
7  Later, he left Pepe & Hazard, but continued
8  to be responsible for the '160 Patent as an
9  attorney at Greenberg Traurig (Exhibit 8).
10      "Further, his responsibility for
11 the '160 Patent ended prior to the time
12 when the payment of a first maintenance fee
13 was due (Exhibits 3 and 10) revocation of
14 prior powers of attorney signed on behalf
15 of the patent owner on March 4, 2003."
16      Do you see that?
17 A.   I do.
18 Q.   Is this statement that your
19 responsibility for the '160 Patent had
20 ended prior to the time the payment of the
21 first maintenance fee was due correct?
22 A.   It is.
23      MR. SCOTT: Objection. Form.
24 BY MR. KAMINSKY:
25 Q.   Did Mr. Maier ever call you up

67 (Pages 262 to 265)

<table>
<tr><td>

Page 262

1          T. Sharinn
2  after submitting this document to the PTO
3  and say, Todd, we submitted a document
4  stating that your responsibility for the
5  '160 Patent had ended prior to the time
6  that the first maintenance fee was due, we
7  were wrong about that, will you sign a new
8  statement and confirm that we were wrong?
9      A.  No.
10     Q.  Would you have signed such a
11 statement if he had asked you to do that?
12     A.  If, in fact, I had messed up and
13 done that, yes.  But I didn't and he
14 didn't.
15     Q.  Based on your understanding
16 today, the statement that your
17 responsibility had ended before the
18 maintenance fee was due is correct, is that
19 right?
20     A.  It is.
21     Q.  Now, in the supplemental
22 petition, Quickie's counsel goes on to say
23 on page 2:
24       "Thelen Reid & Priest was granted
25 and held sole and full power in the '160

</td><td>

Page 264

1          T. Sharinn
2  they made a mistake with Thelen Reid &
3  Priest.
4      Q.  When you say made a mistake with
5  Thelen Reid & Priest, were they referring
6  to the fact that they felt they made a
7  mistake in hiring Thelen Reid & Priest?
8      A.  Yes, sir.
9      Q.  Not in what they said to the PTO
10 about Thelen Reid & Priest's
11 responsibility, is that correct?
12     A.  That's correct.
13     Q.  Now, in an earlier question, the
14 transcript doesn't reflect an answer.
15       I read you a statement from this
16 petition about Thelen Reid & Priest ease
17 responsibility and power of responsibility
18 of the patent.
19       Is it your understanding that
20 that statement in the supplement to the
21 petition was correct?
22     A.  Yes, sir.
23       Can we take a break for a minute?
24       (Recess taken from 2:49 p.m. to
25 2:55 p.m.)

</td></tr>
<tr><td>

Page 263

1          T. Sharinn
2  Patent from March 4, 2003 through August
3  14, 2006 (Exhibits 3, 9 and 10).  This
4  period of time covered the time period up
5  until May 23, 2004 for timely paying the
6  first maintenance fee and then the entire
7  two-year time period starting from the date
8  of the '160 Patent's expiration to file a
9  remedial petition under the unintentional
10 provision (37 CFR 1.378(c)); this time
11 two-year expiration period ended on March
12 24, 2006."
13       Is it your understanding that
14 that is a correct statement of Thelen Reid
15 & Priest's responsibility and power?
16       MR. SCOTT:  Objection.  Form.
17 BY MR. KAMINSKY:
18     Q.  Did anyone on behalf of Quickie
19 ever call you up after that and say we made
20 a mistake when we said that Thelen Reid &
21 Priest have the sole and full power with
22 respect to the maintenance fees and we need
23 to correct that?
24     A.  No one called me up after that.
25 I had gotten calls in the past that said

</td><td>

Page 265

1          T. Sharinn
2  BY MR. KAMINSKY:
3      Q.  I want to show you again Exhibits
4  45 through 49 which are the time entries
5  from the Greenberg Traurig bills that were
6  sent to the Colvin entities, all of which
7  are addressed to Quickie, care of Rick
8  Steiner, as you saw.
9        MR. SCOTT:  Let me just clarify
10 for the record, if I could, Marty.
11       Are you representing that those
12 are all of the time entries that were
13 sent to the Quickie entities, or only
14 all of the time entries that were sent
15 to the Quickie entities with Quickie
16 as the addressee?
17       MR. KAMINSKY:  I believe it is
18 all of the time entries.  That was our
19 intention.
20       MR. SCOTT:  It's not, I can tell
21 you.
22       MR. KAMINSKY:  We'll have to come
23 back to that at some point.
24 BY MR. KAMINSKY:
25     Q.  In these bills to Quickie, other

</td></tr>
</table>

68 (Pages 266 to 269)

Page 266

1         T. Sharinn
2 than the concentric passive knotless suture
3 terminator, for convenience you've turned
4 to the last page of the last time entry, do
5 you see any time entries after March of
6 2003 which is the last month before you
7 received notice of the revocation of your
8 Power of Attorney in connection with the
9 '160 Patent?
10    A.    No.
11    Q.    And as we said before, as you
12 explained before, the concentric passive
13 knotless suture terminator relates to an
14 S&A patent, correct?
15         MR. SCOTT:  Object to form.
16    A.    Yes.
17    Q.    Now, finally, you were shown
18 Exhibit 27, which is a letter from you to
19 Quickie, care of Rick Steiner, dated May
20 15, 2003, sending a copy of the notice of
21 the change of the Power of Attorney that
22 you had received.
23         Do you recall that?
24    A.    Yes, sir.
25    Q.    Did you bill Quickie for sending

Page 267

1         T. Sharinn
2 them this letter?
3    A.    I hope not.
4    Q.    Do you remember ever having done
5 so?
6    A.    I'm having trouble at this point
7 today remembering yesterday.  No.
8    Q.    And as you saw in the time
9 entries that we've marked, there is no time
10 entry for such a bill, is there?
11    A.    That's correct.
12    Q.    Because as far as you were
13 concerned, you were no longer an attorney
14 for Quickie in connection with the '160
15 Patent after the beginning of April at the
16 latest 2003, is that correct?
17         MR. LODEN:  Objection to form.
18         MR. SCOTT:  Objection to form.
19    A.    That's correct.  I mean, I don't
20 know how many different ways I can say it.
21         MR. KAMINSKY:  No further
22 questions.
23         MR. SCOTT:  Can I just see
24 Exhibit 27?
25 FURTHER EXAMINATION BY

Page 268

1         T. Sharinn
2 MR. SCOTT:
3    Q.    Mr. Sharinn, with regards to
4 Exhibit 27 as presented to you by counsel
5 for Greenberg Traurig, that as we've seen
6 in other instances references a specific
7 client matter number, does it not?
8    A.    It has a specific client number
9 on there, yes, sir.
10    Q.    And the client is Quickie,
11 correct?
12    A.    According to what we've learned
13 today about the number and the top line of
14 the RE, one would think, yes, sir.
15    Q.    And it refers to the 0109 matter,
16 correct?
17    A.    It does.
18    Q.    Which we saw as on Exhibit 17
19 applies to the re-examination, correct?
20    A.    It does.
21    Q.    And just so that the record is
22 clear with regards to the billing entries
23 that are exhibit -- Marty, check me on this
24 because I don't know I followed you
25 completely, Exhibit 46 concentric?

Page 269

1         T. Sharinn
2         MR. KAMINSKY:  I believe that's
3    correct, yes.
4 BY MR. SCOTT:
5    Q.    There are billing entries into
6 September and December of '03 with regards
7 to that particular matter, correct?
8    A.    Which matter?
9    Q.    The matter that those billing
10 entries were for, which is a Quickie
11 matter --
12         MR. KAMINSKY:  Which is the
13    concentric passive knotless suture
14    terminator.
15    A.    Joe Shalenberger.
16    Q.    Well, if you turn to the next
17 page, Mr. Sharinn, you'll see that there's
18 entries for yourself as well.
19    A.    Okay.  I don't know who Joe
20 Shalenberger is.
21    Q.    That was going to be one of my
22 questions.
23    A.    He shouldn't have been billing on
24 this, and my guess is that's time put into
25 the wrong matter.

69 (Pages 270 to 273)

Page 270

1           T. Sharinn
2    Q.   If you'll look to the next page
3  and see if there's --
4    A.   Yes, sir.
5    Q.   Does that have entries for you?
6  I don't have a copy in front of me now.
7    A.   There are entries there made by
8  me, yes, sir.
9    Q.   And for what time period?
10   A.   Looks like October '03.
11   Q.   And that's on the Quickie client,
12  correct?
13         MR. KAMINSKY: Objection to the
14  form of the question.
15   A.   Judging by the descriptions, that
16  would be the case, yes, sir.
17   Q.   And what is the matter number for
18  that?
19   A.   The matter number is 518220102.
20   Q.   So the 0102 matter, correct?
21   A.   That's what it looks like, yes,
22  sir.
23         MR. KAMINSKY: Sorry, I do have
24  one more question.
25  BY MR. KAMINSKY:

Page 271

1           T. Sharinn
2    Q.   I'm showing you a copy which we
3  will mark as Exhibit 55.
4        (Exhibit 55, '160 Patent, marked
5    for identification, as of this date.)
6  BY MR. KAMINSKY:
7    Q.   Which is the actual patent issued
8  for the '160 Patent.
9        Do you see that?
10   A.   I do.
11   Q.   What is the title of that?
12   A.   Passive knotless suture
13  terminator for use in minimally invasive
14  surgery and to facilitate standard tissues
15  securing.
16   Q.   Is that the same as the
17  concentric -- that's a different patent
18  than the concentric passive knotless
19  terminator, is that correct?
20   A.   Yes, sir. It concerns very
21  different technology. It's owned by
22  different companies.
23         MR. SCOTT: Objection. Move to
24  strike as nonresponsive.
25  BY MR. KAMINSKY:

Page 272

1           T. Sharinn
2    Q.   Quickie was not the owner of the
3  concentric passive knotless terminator, is
4  that correct?
5         MR. SCOTT: Objection to form?
6    A.   That's my recollection.
7    Q.   It was S&A, is that correct?
8         MR. SCOTT: Object to form.
9    A.   That's my recollection.
10         MR. KAMINSKY: No further
11  questions.
12         MR. SCOTT: Mr. Sharinn, thank
13  you.
14        (Continued on next page to
15  include signature and jurat.)
16
17
18
19
20
21
22
23
24
25

Page 273

1           T. Sharinn
2         MR. KAMINSKY: Thank you very
3  much for being patient. I'm really
4  sorry.
5         THE WITNESS: No problem.
6        (Time noted: 3:02 p.m.)
7
8
9           TODD SHARINN
10
11  Subscribed and sworn to before me
12  this ____ day of _____, 2008.
13
14  _____
15
16
17
18
19
20
21
22
23
24
25

70 (Pages 274 to 276)

Page 274

```
1
2         C E R T I F I C A T E
3   STATE OF NEW YORK   )
4              : ss.
5   COUNTY OF NEW YORK   )
6
7         I, Joan Urzia, a Notary Public
8     within and for the State of New York,
9     do hereby certify:
10        That TODD SHARINN, the witness
11    whose deposition is hereinbefore set
12    forth, was duly sworn by me and that
13    such deposition is a true record of the
14    testimony given by the witness.
15        I further certify that I am not
16    related to any of the parties to this
17    action by blood or marriage, and that I
18    am in no way interested in the outcome
19    of this matter.
20        IN WITNESS WHEREOF, I have
21    hereunto set my hand this 13th day of
22    June, 2008.
23
24        _____
25              Joan Urzia
```

Page 276

```
1
2   ------------ EXHIBITS (Cont'd) ------------
3                        FOR ID.
4    46   Time entries            237
5    47   Time entries            237
6    48   Time entries            237
7    49   Time entries            237
8    50   Notice                  242
9    51   Letter                  247
10   52   Statement               253
11   53   Statement               256
12   54   Petition supplement     259
13   55   '160 Patent             271
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 275

```
1
2   --------------- I N D E X ----------------
3   WITNESS          EXAMINATION BY     PAGE
4   TODD SHARINN     MR. SCOTT        5, 268
5                    MR. KAMINSKY     230
6
7   ---------------- EXHIBITS -----------------
8                    FOR ID.
9    31   Deposition Notice           6
10   32   Press release and biography   14
11   33   Document                36
12   34   Letter dated 5/4/01         54
13   35   Letter dated 10/3/05        57
14   36   Billing letter          89
15   37   E-mail                  143
16   38   Document                170
17   39   Letter                  203
18   40   Letter                  206
19   41   Letter                  207
20   42   Billing letters         221
21   43   Document                221
22   44   Letter                  234
23   45   Time entries            237
24
25              (Continued)
```

# EXHIBIT V

**Levin, Adrienne**

| | |
|---|---|
| **From:** | Levin, Adrienne |
| **Sent:** | Monday, December 02, 2002 10:35 AM |
| **To:** | 'sharinnt@gtlaw.com' |
| **Subject:** | US Patent No. 6,066,160 and reexamination requested |

Dear Todd:

Thank you for having your secretary call me this morning to confirm that you are still responsible for US Patent No. 6,066,160. In that regard, I am forwarding to you by messenger the November 22, 2002 letter and enclosures from Daniel Latham, Esq., of Medtronic, Inc., in respect of the reexamination requested for the subject patent.

Best regards,
Adrienne Levin
Trademark Administrator/IP Docket Manager
Bryan Cave LLP-NY Office
alevin@bryancave.com
(212) 692-1927

1

EXHIBIT
37

RS002009

# EXHIBIT W

10/11/2002 17:21 FAX 2025084321    THELEN-REID-P    ☑001

```
          **************************
     ***   ERROR TX REPORT    ***
          **************************

TX FUNCTION WAS NOT COMPLETED

TX/RX NO                1335
CONNECTION TEL          34521#000002#12124220158
CONNECTION ID           RICK STEINER SEC      Thelen Reid & Priest LLP
ST. TIME                10/11 17:19
USAGE T                 02'16                 OCT 1 1 2002
PGS. SENT               3
RESULT                  NG        ##0779      FAXED
```

# THELEN REID & PRIEST LLP
## MARKET SQUARE
### 701 PENNSYLVANIA AVENUE, N.W., SUITE 800
### WASHINGTON, D.C. 20004
### 202 508-4000

FACSIMILE # 202-508-4321                CONFIRMATION # 202 508-4070

**FACSIMILE MESSAGE**                   **PLEASE DELIVER PROMPTLY**

FOR:   NAME: Alan Fell

       COMPANY:

       FAX NUMBER: 212 422-0158

       CONFIRMATION NUMBER: 212 422-0488

FROM:  NAME: Mark Evens

       DATE/TIME: 10/11/02

       REFERENCE NO.: 034521.000002  NO.OF PAGES (INCLUDING COVER): 5

MESSAGE:

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS
ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND OR EXEMPT
FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE

QLLC 0069667

10/11/2002 17:22 FAX                                                                          ☑001

```
                    ***********************
                    ***   TX REPORT   ***
                    ***********************
```

Thelen Reid & Priest LLP

TRANSMISSION OK

OCT 1 1 2002

TX/RX NO              0753
CONNECTION TEL        34521#000002#12122632246 FAXED
CONNECTION ID
ST. TIME              10/11 17:22
USAGE T               00'39
PGS. SENT             5
RESULT                OK

# THELEN REID & PRIEST LLP
## MARKET SQUARE
### 701 PENNSYLVANIA AVENUE, N.W., SUITE 800
### WASHINGTON, D.C. 20004
### 202 508-4000

FACSIMILE # 202-508-4321                    CONFIRMATION # 202 508-4070

**FACSIMILE MESSAGE**                       **PLEASE DELIVER PROMPTLY**

FOR:    NAME: Dr. Colvin

        COMPANY:

        FAX NUMBER: 212 263-2246

        CONFIRMATION NUMBER:

FROM: NAME: Mark Evens

        DATE/TIME: 10/11/02

        REFERENCE NO.: 034521.000002  NO. OF PAGES (INCLUDING COVER): 5

MESSAGE:

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS
ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND OR EXEMPT

QLLC 0069668

10/11/2002 17:24 FAX 2025084321    tHELEN-REID-P    ☒001

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| TX/RX NO | 1336 |
| CONNECTION TEL | 34521#000002#1212603*2001 |
| CONNECTION ID | Thelen Reid & Priest LLP |
| ST. TIME | 10/11 17:22 |
| USAGE T | 01'24 |
| PGS. SENT | 6 |
| RESULT | OK |

OCT 1 1 2002

FAXED

# THELEN REID & PRIEST LLP

## MARKET SQUARE
### 701 PENNSYLVANIA AVENUE, N.W., SUITE 800
### WASHINGTON, D.C. 20004
### 202 508-4000

FACSIMILE # 202-508-4321    CONFIRMATION # 202 508-4070

**FACSIMILE MESSAGE**    **PLEASE DELIVER PROMPTLY**

FOR:    NAME: Shari Markowitz-Savitt

COMPANY: TRP - NY

FAX NUMBER: 202 603-2001

CONFIRMATION NUMBER:

FROM: NAME: Mark Ewens

DATE/TIME: 10/11/02

REFERENCE NO.: 034521.000002    NO. OF PAGES (INCLUDING COVER): 5

MESSAGE:

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS
ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND OR EXEMPT

QLLC 0069669



# THELEN REID & PRIEST LLP

ATTORNEYS AT LAW

NEW YORK
WASHINGTON, D.C.
MORRISTOWN, N.J.

MARKET SQUARE, SUITE 800
701 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004-2608
TEL (202) 508-4000  FAX (202) 508-4321
www.thelenreid.com

SAN FRANCISCO
LOS ANGELES
SILICON VALLEY

October 11, 2002

**VIA FACSIMILE**

Dr. Stephen Colvin
NYU Medical Center
530 First Avenue
Suite 9V
New York, NY  10016

Alan Fell, Esq.
Rick, Steiner, Segal & Fell, P.C.
Three New York Plaza
New York, NY 10004

    Re:    Transmittal of Documents

Dear Steve and Alan:

    After I met with you earlier this week, Alan told me he would advise Todd about the firm change, so we could obtain the file from Todd's firm. I asked Shari Markowitz, a senior associate in our New York office, to call Todd. o arrange the orderly transfer of the files to our office. Throughout the week, Shari called repeatedly, but was told that Todd either was unavailable or on the phone. Todd never returned any telephone calls. This morning, Todd's secretary advised Shari that Todd was "on trial" although, apparently, he was in the office. This afternoon Todd called Shari. I recognize that this transfer is difficult for Todd, but he was extremely curt with Shari, accused Shari of being rude to his secretary (irrelevant, but ironically ignores his repeated failings to return her calls), and told her that he would deal only with me.

    I then called Todd. Todd was extremely curt with me as well, which is not surprising. He again attacked Shari, but I told Todd to stay focused on the transfer issue and that we wanted the files transferred next week. Todd told me that he could not guarantee when we might receive the files. I reminded Todd of his longstanding relationship with the client and that the client had continuing business with him. Rather snidely, he questioned whether I had forgotten that Paul Sutton was a partner at Thelen and that Thelen also has procedures. I told Todd that our firm always attempted to facilitate the transfer of files as quickly as possible. Frankly, there is no excuse for any

DC #130308 v1

QLLC 0069670

THELEN REID & PRIEST LLP

Dr. Stephen Colvin
Alan Fell, Esq.
October 11, 2002
Page 2

delay since Todd was the attorney on the case, knows the files and need only retain the
copies he wants to keep. The review should entail no work since he was the attorney on
the case. I also asked about Steven's box of documents, which he acknowledged he had,
but had no idea as to its location. He then stated he would search for the box when he
had time.

　　　　I hate to bother you with this tale of woe, but, all in all, Todd is less than
cooperative. Hopefully, we will receive the files with no problem.

　　　　　　　　　　　　　　　Cordially yours,

　　　　　　　　　　　　　　　*Mark*

　　　　　　　　　　　　　　　Mark Fox Evens

Enclosure

DC #130308 v1

QLLC 0069671

 

# THELEN REID & PRIEST LLP

ATTORNEYS AT LAW

NEW YORK
WASHINGTON, D.C.
MORRISTOWN, N.J.

MARKET SQUARE, SUITE 800
701 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004-2608
TEL (202) 508-4000  FAX (202) 508-4321
www.thelenreid.com

SAN FRANCISCO
LOS ANGELES
SILICON VALLEY

October 11, 2002

<u>VIA FACSIMILE</u>

Todd S. Sharinn, Esq.
Greenberg Traurig, LLP
885 Third Avenue
New York, NY  10022-4834

> Re:   Transfer of Files
>        *Quickie v. Medtronic,* Southern District of New York
>        02 CIV. 1157 (GEL)

Dear Todd:

Pursuant to our telephone conversation this afternoon, I am formally requesting that you transfer all of the litigation files in the above-captioned action to our office in New York as soon as possible. The address is 40 West 57th Street. Please send the files to the attention of Shari Markowitz-Savitt, Esq. We also need any files related to negotiations on behalf of Quickie to license its intellectual property. You told me that any such files are contained in the litigation files, but I want to make sure that we have everything.

As we discussed, we would like to accomplish the file transfer as soon as next week as possible. You responded that you must comply with your firm's procedures. I understand that all firms have procedures for the transfer of files. However, recognizing your past relationship with the client and the continuing relationship, I trust that you will ensure an expeditious review so that we will receive all of the files no later than the end of next week. If, for some reason, you are unable to transmit the files, please notify me of any problems as soon as possible so that we can address the problems and obtain the files. I also understand that Dr. Colvin sent you a box of materials that he though were pertinent. I would like those materials transmitted to our firm as soon as possible as well. Again, given your past relationship with the client, I trust transmittal of these files and documents will not be a problem.

Finally, we are sending over a stipulation to substitute our firm as counsel. Please execute the form and return it by messenger to Ms. Markowitz.

DC #130307 v1

QLLC 0069672

THELÉN REID & PRIEST LLP
   Todd S. Sharinn, Esq.
   October 11, 2002
   Page 2


      If you have any questions, or if I can be of additional service, please do not
hesitate to contact me.


                              Cordially yours,

                              *Mark*

                              Mark Fox Evens


cc:    Alan Fell, Esq.
       Dr. Stephen Colvin

QLLC 0069673

# EXHIBIT X

05/19/2003   18:89   GREENBERG/TRAURIG → 2#010200#|212263.2246                    NO.549   083



Todd S. Sbarinn
212-801-2157
tbarinn@gtlaw.com

May 15, 2003

Quickie, LLC
c/o Rick, Steiner, Segal & Fell
Three New York Plaza
New York, New York 10004
Attn: Alan Fell, Esq.

Re:   Quickie, LLC
      Reexamination of U.S. Patent No. 6,066,160 by Medtronic
      Our Ref. 51872.010900

Dear Alan:

    We enclose for your information and records, a copy a of a Notice Regarding Change of Power of Attorney filed in connection with the above-referenced re-examination application. While we are surprised to have received this document in view of the conversations I had with Dr. Colvin, we respect his decision and will take no further action on this matter.

    If we could be of any additional assistance with this matter in the future, please do not hesitate the contact the undersigned. In the interim, kindly note that, it is firm policy that all outstanding fees and expenses incurred in connection with matters be paid upon closing of the same. For your convenience, we will forward our final bills under separate cover.

                                        Very truly yours,

                                        Todd S. Sbarinn

TSS/ui

Cc:   Stephen B. Colvin, M.D.

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
NEW YORK  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  ORLANDO  PHILADELPHIA  PHOENIX
TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON



EXHIBIT
27
6-10-08

QLLC 0103020

05/19/2003   10:09   GREENBERG/TRAURIG + 2001020041212632246                NO.549   004

Page 1 of 1



UNITED STATES
PATENT AND
TRADEMARK OFFICE

Commissioner for Patents
Washington, DC 20231
www.uspto.gov

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 09/198,087 | 11/23/1998 | STEPHEN COLVIN | QUIC-1 |

CONFIRMATION NO. 2082

Todd S. Sharinn
Greenberg Traurig LLP
885 Third Avenue 21st Floor
New York, NY 10022

*OC000000097S7041*

Date Mailed: 04/02/2003

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 04/02/2003.

• The Power of Attorney to you in this application has been revoked by the assignee who has intervened as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

DAVID O LIPSCOMB
OPR (703) 308-7127

FORMER ATTORNEY/AGENT COPY

QLLC 0103021

# EXHIBIT Y



Todd S. Sharinn
212-801-2157
sharinnt@gtlaw.com

April 13, 2004

Dr. Stephen B. Colvin
530 First Avenue - Suite 9V
New York, New York 10016-0648

> Re:   US Patent Application Serial No.: 09/660,745
>        CONCENTRIC PASSIVE KNOTLESS SUTURE TERMINATOR
>        Our Reference: 51822.010200

Dear Steve:

   We are pleased to inform you that the above-identified patent application has issued under U.S. Patent No. 6,716,243 B1. We enclose the formal patent deed, together with two soft copies of the patent, for your file. If you note any errors which require correction, please let us know and we will attend to obtaining a Certificate of Correction.

   You may now refer to any product covered by this patent as "Covered by U.S. Patent No. 6,716,243 B1" or the like. In this regard, we note that if the benefits of the patent marking statute, 35 U.S.C. 287, are to be preserved, all products which embody the subject invention of the above-noted patent, and which are made, sold or used in or introduced into the United States by or under your authority on or after the date of the patent, should have affixed thereto a notice such as:

### U.S. PATENT NO. 6,716,243 B1

   If such patent marking is not applied, no damages may be recovered for infringement of the patent claims, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event, damages may be recovered only for infringements occurring after such notice.

   Please note that maintenance fees are required to be paid at 3 1/2 years (October 6, 2007), 7 1/2 years (October 6, 2011) and 11 1/2 years (October 6, 2015) after issuance to keep the patent in force. We have docketed these dates and will send you reminders in due course. Please let us know if your address changes so we can ensure that these reminders will reach you.

GREENBERG TRAURIG, LLP
885 THIRD AVENUE
\\ny2-srv01\715588v01                    NEW YORK, NEW YORK 10022-4834
212-801-2100  FAX 212-688-2449  www.gtlaw.com
ATLANTA  BOCA RATON  BOSTON  CHICAGO  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW YORK  ORLANDO  PHILADELPHIA  PHOENIX
TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON

**EXHIBIT**
**33**

Dr. Stephen B. Colvin
April 13, 2004
Page 2

Kindly confirm your receipt of these patent documents by signing and dating the enclosed copy of this letter and returning it to the undersigned at the above address. If you have any questions or comments, please do not hesitate to contact us.

Very truly yours,

Todd S. Sharinn

Enclosures

cc:    Alan Fell, Esq. (w/o encl.)
       Eugene Grossi (w/o encl.)

RECEIPT ACKNOWLEDGED

_____

DATED:_____

GREENBERG TRAURIG, LLP

GT 0000504

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

QUICKIE, LLC,

                    Plaintiff,        07 Civ. 10331 (RMB) (DFE)

       -against-

GREENBERG TRAURIG, LLP, THELEN
REID BROWN RAYSMAN & STEINER LLP    **ECF CASE**
(f/k/a THELEN, REID & PRIEST LLP) and
ROBERT E. KREBS,

               Defendants.

---

### EVIDENCE IN SUPPORT OF QUICKIE, LLC'S RESPONSE TO GREENBERG TRAURIG, LLP'S MOTION FOR SUMMARY JUDGMENT

**DIAMOND MCCARTHY LLP**
Allan B. Diamond *(pro hac vice)*
Walter J. "Skip" Scott *(pro hac vice)*
Stephen T. Loden (SL8754)
620 Eighth Avenue, 39th Floor
New York, New York 10018
Tel: (212) 430-5400

*Attorneys for Quickie, LLC*

August 26, 2008

TABLE OF CONTENTS

| TAB | DESCRIPTION |
|---|---|
| Evens | Declaration of Mark F. Evens |
| Fell | Declaration of Alan Fell |
| Galloway | Declaration of Aubrey C. Galloway |
| Krebs | Declaration of Robert E. Krebs |
| A | Letter from M. Evens to A. Fell dated 07/03/01 |
| B | Letter from A. Fell to T. Sharinn dated 10/15/02 |
| C | Letter from M. Evens to T. Sharinn dated 10/11/02 |
| D | Letter from P. Sutton to M. Evens dated 10/15/02 |
| E | Letters from P. Juergensen to S. Markowitz-Savitt dated 10/16/02 |
| F | Change of Correspondence Address and "Fee Address" Indication Form filed by T. Sharinn |
| G | Revocation of Prior Powers of Attorney and New Power of Attorney for R. Krebs, et al |
| H | Change of Attorney Docket Number and Change of Address Notice for R. Krebs |
| I | Letter from M. Evens to S. Colvin dated 02/28/03 |
| J | Declaration and Power of Attorney appointing T. Sharinn |
| K | Application for Patent |
| L | Letter from D. Urbanik to A. Fell dated 05/04/01 and from A. Fell to D. Urbanik signed 05/14/01 |
| M | Change of Correspondence Address and "Fee Address" Indication Form filed by T. Sharinn |
| N | Greenberg Traurig Invoices |
| O | Email from M. Girard to S. Colvin, et al dated 07/23/06 |
| P | Deposition Transcript of Aubrey Galloway dated 06/12/08 |
| Q | Petition for Reconsideration Under 37 CFR 1.378(e) |
| R | Complaint |
| S | Deposition Transcript of Alan Fell dated 06/20/08 |
| T | Deposition of Paul Sutton dated 06/10/08 |
| U | Deposition of Todd Sharinn dated 06/11/08 |
| V | Email from A. Levin to T. Sharinn dated 12/02/02 |
| W | Letter from M. Evens to S. Colvin and A. Fell dated 10/11/02 and letter from M. Evens to T. Sharinn dated 10/11/02 |
| X | Letter from T. Sharinn to Quickie LLC dated 05/15/03 enclosing Notice Regarding Change of Power of Attorney |
| Y | Letter from T. Sharinn to S. Colvin dated 04/13/04 |