UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

QUICKIE, LLC,

                         Plaintiff,                07 Civ. 10331 (RMB) (DFE)

      -against-

GREENBERG TRAURIG, LLP

                                   **ECF CASE**

                        Defendant.

_____

### PLAINTIFF'S RESPONSE TO GREENBERG TRAURIG'S
### RULE 56.1 STATEMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS
### AS TO WHICH THERE EXISTS GENUINE ISSUES TO BE TRIED

Pursuant to Local Civil Rule 56.1, Quickie, L.L.C. ("Quickie") responds to the statement

(the "Statement") of Greenberg Traurig, LLP's ("GT"), and provides additional material facts as

to which there exist genuine issues to be tried, as follows:

### RESPONSE TO GREENBERG TRAURIG'S
### LOCAL RULE 56.1 STATEMENT

**Statement 1.**  This is a legal malpractice action based on the alleged failure of attorneys

for Plaintiff Quickie LLC ["Quickie"] to pay, or to advise Quickie to pay, the maintenance fee

[the "Maintenance Fee"] which was due during the period May 23, 2003 through May 23, 2004

on Quickie's Patent No. 6,066,160 ["the '160 Patent"], resulting in the loss of the '160 Patent [see

Mov. Exs. AO and AP].

Response to Statement 1:

Undisputed as to the extent that this is a malpractice action wherein Quickie alleges that

GT failed to pay, or to advise Quickie to pay, the Maintenance Fee on the '160 Patent, resulting

in the loss of the '160 Patent.  Disputed as to the assertion that the Maintenance Fee was "due"

during the period May 23, 2003 through May 23, 2004.  Pursuant to Patent and Trademark

Office ("PTO") regulations, it is more accurate to state that the Maintenance Fee could have been

paid at any time between May 23, 2003 and November 23, 2003 without surcharge; and that the

Maintenance Fee could have been paid at any time between November 24, 2003 and May 23,

2004 with a surcharge being applied. [Mov. Ex. M, p. 1.]

**Statement 2.**  This action was commenced in mid- April 2007.

Response to Statement 2:

Undisputed, although for clarity's sake Quickie's action against GT was filed in the

Supreme Court for the State of New York, New York County, on April 18, 2007. [Resp. Ex. R].

**Statement 3.**  Quickie is the owner by assignment of Patent No. 6,066,160 ["the '160

Patent"], issued on May 23, 2000 [Mov. Ex. H, p. 11; Mov. Ex. L, p. 1; Mov. Ex. R, pp. 30-31].

Response to Statement 3:

Undisputed.

**Statement 4.**  Under applicable law and regulations, the owner of a patent must pay

periodic Maintenance Fee to keep the patent in effect.

Response to Statement 4:

Undisputed.

**Statement 5.**  The Maintenance Fee for the '160 Patent first became due on November

23, 2003 [Mov. Ex. L, p. 1]. But, Quickie could actually have prepaid beginning on May 23,

2003; and it had a year thereafter (i.e. until May 23, 2004) in which to pay the fee [Id.].

Response to Statement 5:

Disputed.  The Maintenance Fee could have been paid during the period May 23, 2003

through November 23, 2003, without surcharge, so it is inaccurate to state that the Maintenance

Fee first became "due" on May 23, 2003. The Maintenance Fee could have been paid at any time from November 24, 2003 through May 23, 2004 with a surcharge applied. [Mov. Ex. M, p. 1.]

**Footnote 1:**    For simplicity, since the Maintenance Fee could have been paid on May 23, 2003, we will refer herein to that date as the "due date", even though it was not actually due until six months thereafter, i.e. on November 23, 2003.

Response to Footnote 1:

Disputed. The Maintenance Fee could have been paid during the period May 23, 2003 through November 23, 2003, without surcharge, so it is inaccurate to state that the "due date" for the Maintenance Fee was May 23, 2003. Indeed, because the Maintenance Fee could have been paid at any time from November 24, 2003 through May 23, 2004, the actual "due date" for the Maintenance Fee to be paid was May 23, 2004. [Mov. Ex. M, p. 1.]

**Statement 6.** By May 2003, i.e. the first date in which the Maintenance Fee could be paid, Thelen Reid & Priest LLP ["Thelen"] had replaced GT as Quickie's lawyer [see details and cites infra].

Response to Statement 6:

Disputed because, at all relevant times, GT was Quickie's primary outside intellectual property counsel, including with respect to the '160 Patent. As of May 2003, Quickie had only replaced GT as its counsel with respect to the infringement litigation against Medtronic, Inc., Case No. 02-CV-1157 (GEL), which was then-pending in the United States District Court for the Southern District of New York (the "Medtronic Litigation"), and the reexamination proceedings that Medtronic, LLC ("Medtronic") commenced in the PTO, identified by the PTO as "Control

No. 90/006,460" (the "Reexamination Proceedings"). [Galloway Declaration, ¶¶ 9-10; Fell Declaration, ¶¶ 8-11; Evens Declaration, ¶¶ 11-12; Resp. Ex. S, p. 62, line 18 – p. 63, line 15].

**Statement 7.**  Quickie had been advised that maintenance fees would have to be paid to keep the '160 Patent alive, failing which Quickie would lose the '160 Patent [Mov. Ex. H ¶21; see also Mov. Ex. Q at 26-27; Mov. Ex. R at 97-99].

Response to Statement 7:

Undisputed that Quickie was so advised upon issuance of the '160 Patent and that it would be timely reminded of same by its outside intellectual property counsel retained, in part, for that purpose.  [Fell Declaration, ¶ 5; Galloway Declaration, ¶ 4].

**Statement 8.**  But, neither Quickie nor its General Counsel took any steps to calendar the due dates or otherwise make any note in Quickie's files that the Maintenance Fee would be due and would have to he paid [Mov. Ex. Q at 26-27; Mov. Ex. R at 60-61].

Response to Statement 8:

Disputed.   Quickie hired outside counsel, namely Sharinn and GT, to monitor the maintenance fee deadlines to ensure that the fees were timely paid. [Resp. Ex. P, p. 87, line 9 – p. 89, line 10; Resp. Ex. S, p. 60, line 18 – p. 61, line 3]. Mr. Fell, Quickie's general outside counsel, testified that he did not calendar the due dates because he was relying on patent counsel (i.e. Todd Sharinn) to calendar those deadlines which, in fact, GT actually did calendar. [Mov. Ex. S, p. 60, line 18 – p. 61, line 3; Mov. Ex. O; Mov. Ex. P; Resp. Ex. T, p. 96, line 25 – p. 99, line 2; GT Motion for Summary Judgment, p. 6 – 7; p. 14, n. 10.].  Mr. Sharinn likewise confirmed that he was hired to "provide the services that [Alan Fell] can't." [Resp. Ex. U, p. 44, line 21 – p. 45, line 14].

**Statement 9.**  The Maintenance Fee was not paid when due or payable [Mov. Ex. AO ¶ 19]

Response to Statement 9:

Undisputed.

**Statement 10.** The '160 Patent expired due to nonpayment of the Maintenance Fee during that one year period [Mov. Ex. L at 1; Mov. Ex. M, p. 1].

Response to Statement 10:

Undisputed although, for clarity's sake, the '160 Patent expired on May 24, 2004 due to nonpayment of the Maintenance Fee which could have been paid at any time during the period May 23, 2003 through May 23, 2004.

**Statement 11.** Between 1998 and 2001, Pepe & Hazard LLP ["Pepe"], with whom Todd Sharinn was then associated, represented Quickie in its application for what became the '160 Patent [Mov. Ex. R at 33-34].  Sharinn left Pepe to become an associate of Greenberg Traurig LLP ["GT"] in 2001 [*Id.*]. Thereafter, GT provided services to Quickie as to the '160 Patent until it was replaced by Thelen in the fall of 2002 and spring of 2003 as to the '160 Patent [*Id.*; see also detailing *infra*].

Response to Statement 11:

Disputed as to the assertion that Thelen replaced GT as Quickie's counsel on the '160 Patent.  Quickie only replaced GT as its counsel with respect to the Medtronics Litigation and the Reexamination Proceedings.  Quickie at all times continued to look to GT and Mr. Sharinn to monitor the due dates for Maintenance Fees on the '160 Patent and to provide the promised advance notice of those due dates.  [Fell Declaration, ¶¶ 10-11; Galloway Declaration, ¶ 10]. Otherwise, undisputed as to Todd Sharinn's representation of Quickie as to the '160 Patent while

he was at Pepe, which representation Mr. Sharinn transferred to GT when Mr. Sharinn became employed by GT in 2001. [Resp. Ex. T, p. 96, line 25 – p. 99, line 2; GT Motion for Summary Judgment, p. 6 – 7; p. 14, n. 10; Resp. Ex. U, p. 54, line 2 – p. 56, line 24].

**Statement 12.** Alan Fell, a member of Quickie [Mov. Ex. R. at 10] is a lawyer who served as Quickie's General Counsel overseeing its patent counsel [Mov. Ex. R at 25. 86-87; Mov. Ex. T at 230].

Response to Statement 12:

Disputed as to the wholly unsupported assertion that Mr. Fell was responsible for "overseeing" Quickie's patent counsel. [Fell Declaration, ¶¶ 2-4]. Otherwise, undisputed that Mr. Fell is a member of Quickie and that Mr. Fell also serves as Quickie's outside counsel.

**Statement 13.** On March 4, 2003 --- two and a half months before the Maintenance Fee became due --- Quickie expressly revoked, in a writing submitted to the U.S. Patent & Trademark Office ["PTO"], any authority that GT had previously had as to the '160 Patent [Mov. Ex. A, "Quickie's Revocation/Appointment"; see also Mov. Exs. B, C, E. F, G and testimony detailed, cited and quoted *infra*].

Response to Statement 13:

Disputed. On March 17, 2003, Thelen filed a form document required by PTO regulations entitled "Revocation of Prior Powers of Attorney and New Power of Attorney" (the "Reexamination Power of Attorney") to ensure that Thelen was recognized by the PTO as Quickie's authorized representative in connection with the Reexamination Proceedings. [Krebs Declaration, ¶ 6; Evens Declaration ¶ 12]. The Reexamination Power of Attorney did not affect Greenberg's ongoing responsibility for maintenance fees on the '160 Patent, and GT's legally

and factually unsupported interpretation of that document to the contrary is incorrect. [Krebs Declaration, ¶ 7].

**Statement 14.** By and in the Revocation/Appointment, in March 2003, Quickie appointed Thelen (specifying Robert Krebs and several other Thelen attorneys) as its successor counsel for the '160 Patent [see Mov. Ex, A; see also Mov. Exs. B, C, E, F, G, AE and AO ¶¶ 14, 15, 19; Mov. Ex, Q at 63-64].

Response to Statement 14:

Disputed. On March 4, 2003, Thelen filed the Reexamination Power of Attorney as required by PTO regulations to ensure that Thelen was recognized by the PTO as Quickie's authorized representative in connection with the Reexamination Proceedings. [Krebs Declaration, ¶ 6]. The Reexamination Power of Attorney did not affect Greenberg's ongoing responsibility for maintenance fees on the '160 Patent, and GT's interpretation of that document to the contrary is incorrect. [Krebs Declaration, ¶ 7]. Moreover, in executing the Reexamination Power of Attorney, Quickie had no intention whatsoever to discharge GT or Sharinn from their prior commitments to monitor and provide notice of maintenance fee deadlines on the '160 Patent. [Galloway Declaration, ¶ 13; Fell Declaration, ¶¶ 14-15]. Thelen did not accept any such responsibility from GT. [Evens Declaration ¶ 12-14; Krebs Declaration, ¶¶ 6-8]. Had GT truly intended to transfer responsibility for the '160 Patent to Thelen in 2003, it should, could, and would have expressly stated that intent in correspondence or a communication to Quickie and Thelen. GT has not and cannot cite to a single piece of evidence showing that it contemporaneously said anything to Quickie, Thelen, or anyone else concerning its interpretation of the Reexamination Power of Attorney; indeed, all of the contemporaneous evidence leads to the exact opposite conclusion. [Resp. Exs. B, C, D, E, F]. Moreover, even after March 2003,

GT and Mr. Sharinn continued to represent Quickie in connection with the '160 Patent and other intellectual property matters. [Resp. Ex. U, p. 221, line 13 – p. 228, line 18; Resp. Ex. U, p. 105, line 18 – p. 110, line 11].

**Statement 15.** The Revocation/Appointment constituted and evidences Quickie's replacement of GT with Thelen as to all aspects of the '160 Patent, including the payment of the Maintenance Fee [Mov. Ex. E at 1-4; Mov. Ex. F ¶2; Mov. Ex. Q at 95-102; Mov. Ex. S at 20, 28-29, 39; 60-61, 66-68, 71-72, 79-81, 93, 96, 100, 167-69; 172-73, 216-17, 249-50, 289-90; see also 52-53, 62-64, 144-46; Mov. Ex. T at 149; see also Mov. Exs. A, C, O, P, AO ¶¶ 14, 15, 19].

Response to Statement 15:

Disputed. On March 4, 2003, Thelen filed the Reexamination Power of Attorney to ensure that Thelen was recognized by the PTO as Quickie's authorized representative in connection with the Reexamination Proceedings – no more, and no less. [Krebs Declaration, ¶ 6]. The Reexamination Power of Attorney did not affect Greenberg's ongoing responsibility for maintenance fees on the '160 Patent, and GT's interpretation of that document to the contrary is incorrect. [Krebs Declaration, ¶ 7]. Moreover, in executing the Reexamination Power of Attorney, Quickie had no intention whatsoever to discharge GT or Sharinn from their preexisting commitments to monitor and provide notice of maintenance fee deadlines on the '160 Patent, and Thelen did not accept any such responsibility from GT. [Galloway Declaration, ¶ 11-13; Fell Declaration, ¶¶ 14-15; Evens Declaration ¶ 12-14; Krebs Declaration, ¶¶ 6-8]. Had GT truly intended to transfer responsibility for the '160 Patent to Thelen in 2003, it should, could, and would have expressly stated that intent in correspondence to Quickie and Thelen. GT has not and cannot cite to a single piece of evidence showing that it contemporaneously said anything to Quickie, Thelen, or anyone else concerning its interpretation of the Reexamination Power of

Attorney; indeed, all of the contemporaneous evidence leads to the exact opposite conclusion. [Resp. Exs. B, C, D, E, F]. Moreover, even after March 2003, GT and Mr. Sharinn continued to represent Quickie in connection with the '160 Patent and other intellectual property matters. [Resp. Ex. U, p. 221, line 13 – p. 226, line 21; Resp. Ex. U, p. 105, line 18 – p. 110, line 11].

**Statement 16.** GT was formally notified of that change of attorneys and Quickie's Revocation/Appointment by a Notice from the PTO on April 2, 2003, a month and a half before the Maintenance Fee first became due [see Mov. Ex. B].

Response to Statement 16:

Disputed as to GT's erroneous assumption that GT was altogether being replaced by Thelen. [Krebs Declaration, ¶¶ 5-8]. Undisputed that the PTO sent GT the referenced notice.

**Statement 17.** GT was also advised by Quickie's General Counsel Fell and one of its principals Dr. Stephen Colvin that it would no longer represent Quickie as to the '160 Patent [Mov. Ex. T at 96, 101, 105, 153, 1865-86, 194; Mov. Ex. R at 48; see also Mov. Ex S at 291-94].

Response to Statement 17:

Disputed. In early October 2002 – months prior to the Reexamination Power of Attorney being filed – Mr. Fell advised Mr. Sharinn that GT would not be continuing as counsel to Quickie solely in connection with the Medtronics Litigation and the Reexamination Proceedings. Neither Mr. Fell not anyone else with Quickie ever advised GT that GT was being replaced as counsel altogether with regards to either the '160 Patent in particular or Quickie's other intellectual property interests. In fact, Mr. Fell expressly told Mr. Sharinn that Quickie would expect GT to otherwise continue as Quickie's counsel, and wrote a letter to that effect as well in

which Sharinn and GT were assured that they would "continue to handle various patent applications pending on behalf of Quickie." [Fell Declaration, ¶¶ 10-11].

**Statement 18.** Accordingly, GT sent Quickie a letter, with a copy of the Notice, explaining that, in view of it, GT would "take no further action on this matter" [Mov. Ex. AF; see also Mov. Ex. T at 188, 242, 244, 251, 267; see also Mov. Ex. R at 51-54].

Response to Statement 18:

Disputed. The May 15, 2003, letter Mr. Sharinn sent to Quickie, care of Alan Fell, stated that Mr. Sharinn had received "a copy of a Notice Regarding Change of Power of Attorney filed in connection with the above-referenced reexamination application" and that GT would "take no further action on this matter." [Mov. Ex. AF]. That correspondence references the "Reexamination of U.S. Patent No. 6,066,160 by Medtronic" and refers to GT's internal billing number "51822.010900" which refers to the Client/Matter billing number GT opened for the Reexamination Proceedings. [Fell Declaration, ¶ 13]. Mr. Sharinn's contemporaneous interpretation of the PTO notice he referenced in that May 15, 2003 correspondence (i.e., that it related to the Reexamination Proceedings) is entirely consistent with Mr. Krebs' testimony concerning the meaning and importance of the Reexamination Power of Attorney. [Krebs Declaration, ¶ 6-8]. Moreover, this statement inaccurately suggests that Mr. Sharinn sent the May 15, 2003 correspondence to Mr. Fell in response to Mr. Fell's communication of Quickie's decision to transfer the Medtronic Litigation to Thelen. In fact, Mr. Fell's conversation with Mr. Sharinn concerning the transfer to Thelen occurred over 7 months prior to Mr. Sharinn's May 15, 2003 correspondence. [Fell Declaration, ¶ 10].

**Statement 19.** No one from Quickie, including Fell (its General Counsel and Member) told Sharinn that, notwithstanding the Revocation/Appointment and Sharinn's letter, Quickie

would still be looking to GT or Sharinn for further services as to the '160 Patent [Mov. Ex. R at 54,56; Mov. Ex. T at 244-45; Mov. Ex. I ¶¶22, 23].

Response to Statement 19:

Disputed. As discussed previously, Mr. Fell notified Mr. Sharinn orally and in writing that GT would continue to act as Quickie's patent counsel with respect to the '160 Patent even after the Medtronic Litigation was transferred to Thelen. [Fell Declaration, ¶ 10]. After that conversation in October 2002, Mr. Sharinn and GT continued to monitor the maintenance fee deadlines on the '160 Patent, and they notified the PTO that all maintenance fee-related correspondence should be sent to Sharinn's office at GT. [Fell Declaration, ¶ 11]. Mr. Sharinn's May 15, 2003 correspondence, wherein he stated that GT would take no further action with respect to the Medtronic Litigation and the Reexamination Proceedings, was entirely consistent with Mr. Fell's prior conversations with Mr. Sharinn. [Fell Declaration, ¶ 13]. There was no need for Mr. Fell to *reconfirm* to Mr. Sharinn that Quickie was still expecting GT and Sharinn to honor their commitments to monitor and provide notice of the maintenance fee deadlines. [Fell Declaration, ¶ 15]. More to the point, as Mr. Sharinn testified, Dr. Colvin and Mr. Fell, as well as others, did in fact continue to call and ask for advice concerning the '160 Patent, the Medtronics litigation, and the Reexamination Proceedings. [Resp. Ex. U, p. 105, line 18 – p. 106, line 19]. It is Mr. Sharinn and GT, not Quickie, who could have, should have, and would have said something to Dr. Colvin and Mr. Fell had they contemporaneously thought they had no further responsibilities for the '160 Patent.

**Statement 20.** In March 2003, having received the Revocation/Appointment, GT ceased all activity as to the '160 Patent, and removed it from GT's patent watch data file [Mov. Exs. O,

P; Mov.. Ex. S at 20, 28-29, 39, 60-61, 66-68, 71-72, 79-81, 93, 96,100, 167-69; 172-73, 216-17, 249-50, 289-90; see also 52-53, 62-64, 144-46; see also Mov. Ex. O, P, AK, AR, AM].

Response to Statement 20:

Undisputed as to the assertion that GT removed the '160 Patent from GT's patent watch data file at some unknown point in time. Disputed as to the assertion that GT ceased all activity as to the '160 Patent in March 2003. [Resp. Ex. T, p. 333, line 20 – p. 335, line 17; Resp. Ex. U, p. 105, line 18 – p. 106, line 19].

**Statement 21.** In 2006 and 2007, before commencing this action, Quickie (through another new patent counsel) petitioned unsuccessfully to revive the' 160 Patent [Mov. Exs. D through G; see also Mov Exs. H, L and M].

Response to Statement 21:

Undisputed.

**Statement 22.** In its sworn statements and other official filings to the PTO, Quickie confirmed that GT had had no responsibility as to the Maintenance Fee and that Thelen (rather than GT) was solely responsible for the failure to pay the Maintenance Fee [see Mov. Exs. E, F, G; Mov. Ex. Q at 44-48, 77-102; see also Mov. Ex. R at 63-82; Mov. Ex. T at 253-64, 266-67].

Response to Statement 22:

Disputed in that this statement is incomplete and references only part of the submissions Quickie made to the PTO in support of its efforts to obtain reinstatement of the '160 Patent. In other statements GT does not reference, Quickie clarified that it did not believe that the Reexamination Power of Attorney relieved GT of its responsibility for monitoring and providing notice of maintenance fee deadlines on the '160 Patent. [Galloway Declaration, ¶ 17].

**Statement 23.** Thelen replaced GT as Quickie's counsel as to the '160 Patent in the fall of 2002 and the spring of 2003, before the Maintenance Fee became due and first could be paid [Mov. Ex, R at 96-97; Mov. Ex, AO ¶¶14, 15, 19; Mov. Ex. I ¶¶42, 43].

Response to Statement 23:

Disputed.  Quickie only replaced GT as its counsel with respect to the Medtronics Litigation and the Reexamination Proceedings.  Quickie never discharged GT altogether with respect to either the '160 Patent or Quickie's other intellectual property interests.  More specifically, Quickie continued to look to GT and Mr. Sharinn to continue monitoring the due dates for Maintenance Fees on the '160 Patent and to provide the promised advance notice of those due dates. [Galloway Declaration, ¶¶ 10-13; Fell Declaration, ¶ 10-15].

**Statement 24.** The materials and documents which GT sent to Thelen (both when Thelen first became involved and after Thelen replaced GT) showed when the Maintenance Fee on the '160 Patent would become due [Mov. Ex. S at 123-24, 128-29, 136-37, see also 212, 217-18, 309; Mov. Ex, T at 198-202; see also Mov. Exs., W, X; Mov. Ex. R at 63-64; Mov. Ex. I ¶¶22.23].

Response to Statement 24:

Disputed.  On October 16, 2002, GT sent its file concerning the Medtronics Litigation, referenced as GT Client/Matter number 51822.010400, to Thelen because Thelen was retained to represent Quickie in the Medtronics Litigation.  [Mov. Ex. W; Mov. Ex. X].  None of the documents GT sent to Thelen expressly states when maintenance fees were due on the '160 Patent.  Rather, the documents GT provided to Thelen only contain information which "yields" the due date for maintenance fees on the '160 Patent. [Resp. Ex. T, p. 128, line 21 – p. 129, line 12]. In any event, had the dates actually been listed in GT's correspondence to Thelen, it would

still only beg the real question at hand: namely, whether GT had been relieved of its preexisting obligation to remind Quickie of the maintenance fee deadline. The fact that one could glean the deadlines for maintenance fees on the '160 Patent from the litigation files GT transferred to Thelen does not mean that Thelen assumed responsibility for calendaring those maintenance fee deadlines or that GT was relieved of that responsibility. [Krebs Declaration, ¶ 4; Evens Declaration ¶ 4-10].

**Statement 25.** Thelen represented Quickie (as successor to GT) both when the Maintenance Fee first became payable and due and the entire one-year period during which it could be paid [Mov. Exs. E, F, G, L; Mov. Ex. A0 ¶19].

Response to Statement 25:

Disputed insofar as it is meant to suggest that *only* Thelen represented Quickie as to the '160 Patent and other intellectual property matters. Thelen represented Quickie solely in connection with the Medtronic Litigation and the Reexamination Proceedings, and GT continued to represent Quickie as its primary intellectual property counsel, including with respect to the '160 Patent. [Krebs Declaration, ¶¶ 4-8; Galloway Declaration, ¶¶ 9-11; Fell Declaration, ¶¶ 9-15; Evens Declaration, ¶¶ 3-14].

**Statement 26.** Thelen was well aware of its responsibility as to the '160 Patent [Mov. Ex. K]. As Quickie has said [Mov F]: Quickie "retained Robert E. Krebs et al of . . . Thelen . . . [for] . . . timely payment of the maintenance fee" [see also Mov. Ex. E at 4]. Sharinn has also said the same thing [Mov. Ex, G; Mov. Ex, T at 188, 242, 245, 250-52, 266-67,289-90], Former Thelen partner Mark Evens, who was the principal client contact has also so said [Mov. Ex. K].

Response to Statement 26:

Disputed. Thelen has always maintained that it did not take on responsibility for monitoring and payment of maintenance fees on the '160 Patent. [Krebs Declaration, ¶¶ 4, 7; Evens Declaration ¶4-9]. Mr. Evens disputes that GT was in any way absolved from responsibility by Thelen's role as litigation and reexamination counsel to Quickie. [Evens Declaration ¶ 15]. Quickie always looked to GT to separately monitor the deadlines for payment of maintenance fees as its long-standing primary intellectual property counsel. [Fell Declaration, ¶¶ 12-15; Galloway Declaration, ¶¶ 11-13].

**Footnote 2:**    Thelen prepared and filed the Revocation/Appointment [Mov. Ex. Q a166; Mov. Ex. AO 114; see also Mov. Ex. AE]. Evens acknowledged in October 2006 [Mov. Ex. K], writing about Robert Krebs, the lead patent attorney at Thelen for Quickie at the time of the events at issue:

> "[M]y understanding at the time was that we (TRP) was [sic] taking responsibility for the patent, and that is how I read Bob's filing. Second, I remember a conversation early on with Bob about not missing fee deadlines. Finally, maintenance fees are part of representing the patent, so I am surprised that Bob, as a practiced patent prosecutor, wouldn't advisee [sic] Quickie and Steve that deadlines were approaching so he would not lose his patent." (emphasis added)

Response to Footnote 2:

Undisputed that Thelen prepared and filed the Reexamination Power of Attorney. Disputed as to GT's interpretation of Evens' statements insofar as GT incorrectly assumes that Evens believed that Thelen was solely responsible for doing so, and that GT was altogether discharged from doing so. Evens understood Thelen to have independent responsibility as Quickie's litigation and reexamination counsel, and that GT likewise had an independent responsibility as Quickie's long-standing intellectual property counsel. [Evens Declaration, ¶¶ 5-

15]. Evens also acknowledges in the preface to his email which GT omits, that "I don't profess to be the expert . . ." [Mov. Ex. K]. Mr. Krebs, as the registered PTO attorney and author of the Reexamination Power of Attorney, and testifies that he disagrees with Mr. Evens. [Krebs Declaration, ¶¶ 6-8]

**Statement 27.** Although Thelen had full responsibly for the '160 Patent and the Maintenance Fee during the entire period when it was due and payable [Mov. Ex. K; see also Mov. Exs. E, F, G], Thelen failed to advise Quickie that the Maintenance Fee was due, or to pay the Fee for Quickie; so did Fell (its General Counsel) [Mov. Ex. E, AO 1119; Mov. Exs. E, F, G, L, M].

Response to Statement 27:

Disputed because Thelen did not have "full responsibility" for the '160 Patent. [Krebs Declaration, ¶¶ 4-8; Evens Declaration, ¶¶ 5-15]. Rather, GT also was responsible for monitoring deadlines for payment of maintenance fees on the '160 Patent during the entire time that they were due and payable, and GT was aware that Quickie was relying on GT to provide that important service. [Fell Declaration, ¶¶ 10-15; Galloway Declaration, ¶¶ 10-13; Evens Declaration, ¶ 15]. Nevertheless, GT never notified Quickie that it had stopped monitoring those deadlines. [Fell Declaration, ¶¶ 10-15; Galloway Declaration, ¶¶ 10-13]. Undisputed as to the assertion that Thelen did not advise Quickie that the Maintenance Fee was due or pay the Maintenance Fee.

**Statement 28.** After learning of the loss of its '160 Patent in 2006, Quickie filed a Petition to revive the patent, [Mov. Exs. E, F, G; Mov. Ex. Q at 44-48, 77-102].

Response to Statement 28:

Undisputed.

**Statement 29.** In its submissions in support of its Petition, Quickie stated, under oath, that GT's responsibility as to the '160 Patent had completely ended in March 2003 and that Thelen, not GT, had had sole responsibility for payment of the Maintenance Fee [Mov. Exs. E, F, G; Mov. Ex. Q at 44-48, 77-102; see also Mov. Ex. R at 65-71, 74-75, 78-81].

Response to Statement 29:

Disputed. As Quickie subsequently clarified and as Dr. Galloway explained in portions of his deposition not cited by GT, the statements in the PTO submissions GT references were incomplete in that Quickie also was reasonably relying on GT to continue monitoring deadlines for maintenance fees on the '160 Patent. [Resp. Ex. P, p. 81, line 25 – p. 83, line 8; Galloway Declaration, ¶¶ 15-17; Resp. Ex. Q, pps. 3-4]. Quickie later supplemented those submissions to make it clear that while Thelen was given power of attorney to handle the Reexamination Proceedings, Quickie was still relying on GT and Mr. Sharinn to honor their preexisting and continuing promise to provide advance notice prior to maintenance fees becoming due on the '160 Patent. [Galloway Declaration, ¶¶ 15-17].

**Statement 30.** For example, in its Supplement to Petition, Quickie stated [Mov. Ex. E at 1,2,3,4]:

> "[GT's] responsibility for the '160 Patent ended prior to the time period when the payment of a first Maintenance Fee was due (see Mov. Ex. A]).
>
> \* \* \*
>
> Thelen Reid & Priest was granted and held sole and full power in the '160 patent from March 4, 2003 through August 14, 2006 (see [Mov. Exs. A and B D. This period of time covered the time period up until May 23. 2004 for timely paying the first maintenance fee, and the entire two-year time period, starting from the date of the' 160 patent's expiration to tile a remedial Petition under the intention provision (37 CFR 1.378(c)); this two-year expiration period ending on May 24, 2006.
>
> The actions and inactions of Thelen Reid & Priest ... led the Patent Owner to believe that their [sic] '160 Patent was viable.
>
> \* \* \*

> The Patent Owner [Quickie] fully believed that their [sic] valuable
> legal rights in the' 160 patent would be justly protected by the
> attorneys and law firm of Thelen Reid & Priest when the Patent
> Owner chose them for representation and executed the Power of
> Attorney dated March 4, 2003 (see [Mov. Ex. A])". (emphasis
> added

Response to Statement 30:

Disputed.   The statements in Quickie's original PTO submissions that GT references

were incomplete in that Quickie also was reasonably relying on GT to continue monitoring

deadlines for maintenance fees on the '160 Patent. [Resp. Ex. P, p. 81, line 25 – p. 83, line 8;

Galloway Declaration, ¶¶ 15-17; Resp. Es. Q, pps. 3-4].   Quickie later supplemented those

submissions to make it clear that while Thelen was given power of attorney to handle the

Reexamination Proceedings, Quickie was also relying on GT and Mr. Sharinn to honor their

separate and independent promise of providing advance notice prior to maintenance fees

becoming due on the '160 Patent. [Galloway Declaration, ¶¶ 15-17; Resp. Ex. Q, pp. 3-4].

**Statement 31.** In a sworn statement to the PTO filed with the Petition to reinstate the' 160

Patent, Quickie's Managing Member, Dr. Aubrey Galloway, had also stated [Mov. Ex. F, ¶¶1, 2]:

> ". . . I am the Managing Partner of Quickie, LLC, the owner of US
> Patent No. 6,066,160.
>
> As the Managing Partner for Quickie. LLC, I retained Robert
> Krebs et al. of the Thelen, Reid & Priest. LLP law firm to transact
> all post-issuance proceedings and responsibilities in the Patent and
> Trademark Office including. but not limited to timely payment of
> the Maintenance Fee".

Response to Statement 31:

Disputed. As Quickie subsequently clarified and as Dr. Galloway explained in portions

of his deposition not cited by GT, the statements in the PTO submissions GT references were

incomplete in that Quickie also was reasonably relying on GT to continue monitoring deadlines

for maintenance fees on the '160 Patent. [Resp. Ex. P, p. 81, line 25 – p. 83, line 8]. Quickie later supplemented those submissions to make it clear that while Thelen was given power of attorney to handle the Reexamination Proceedings, Quickie was still relying on GT and Mr. Sharinn to honor their separate and independent promise to provide advance notice prior to maintenance fees becoming due on the '160 Patent. [Galloway Declaration, ¶¶ 15-17; Resp. Ex. Q, pp. 3-4].

**Statement 32.** Quickie expressly reaffirmed those statements and their accuracy in response to GT's Request to Admit [Mov. Ex. H ¶¶11-17; Mov. Ex. I ¶¶18-20, 22-25, 40, 42-43].

<u>Response to Statement 32:</u>

Disputed. Quickie has admitted no such thing. GT seeks to improperly impute one of its former co-defendant's admissions to Quickie. Quickie is not bound by the now-dismissed defendant Rick Steiner's responses to GT's requests for admission. *See generally Kittrick v. GAF Corp.*, 125 F.R.D. 103, 1-6 (D. M.D. Pa. 1989) (refusing to grant summary judgment against one party based upon admissions of another party); *citing* C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 2264; *see also* Quickie's Motion to Strike Inadmissible Summary Judgment Evidence, filed concurrently herewith. Moreover, as Quickie subsequently clarified and as Dr. Galloway explained in portions of his deposition not cited by GT, the statements in the PTO submissions GT references were incomplete in that Quickie also was reasonably relying on GT to continue monitoring deadlines for maintenance fees on the '160 Patent. [Resp. Ex. P, p. 81, line 25 – p. 83, line 8; Galloway Declaration, ¶¶ 15-17]. Quickie later supplemented those submissions to make it clear that while Thelen was given power of attorney to handle the Reexamination Proceedings, Quickie was still relying on GT and Mr.

Sharinn to honor their promise of providing advance notice prior to maintenance fees becoming due on the '160 Patent. [Galloway Declaration, ¶¶ 15-17; Resp. Ex. Q, pp. 3-4].

**Statement 33.** Quickie's Managing Member (Dr. Galloway) and its General Counsel (Alan Fell) also reaffirmed those statements and their accuracy in their depositions [Mov. Ex. Q, at 59-64, 83-84,86-102; Mov. Ex. R at 70-74, 78-81; see also Mov. Ex. L at 4].

Response to Statement 33:

Disputed.  As Quickie later clarified and as Dr. Galloway explained in portions of their depositions not cited by GT, the statements in the PTO submissions GT references were incomplete in that Quickie was also reasonably relying on GT to continue monitoring deadlines for maintenance fees on the '160 Patent, and those submissions in no way indicate that Quickie was no longer relying upon GT as its counsel to monitor deadlines for maintenance fees on the '160 Patent and to provide advance notice of same.  [Resp. Ex. P, p. 81, line 25 – p. 83, line 8]. Moreover, the cited testimony from Mr. Fell's deposition does not support GT's assertion that he reaffirmed those statements and their accuracy; instead Mr. Fell simply testified that he was not aware during his deposition of any efforts by Quickie to retract those statements from the PTO filings.  [Resp. Ex. S, p. 74, lines 14 – 20; p. 78, line 8 – p. 81, line 11].  Indeed, Quickie did clarify what was previously incomplete.  [Galloway Declaration, ¶¶ 15-17; Resp. Ex. Q, pps. 3-4].

**Statement 34.** Several affirmative statements in Quickie's Complaint also say the same thing as Quickie told the PTO [Mov. Ex. AO ¶¶ 14, 15, 19].

Response to Statement 34:

Disputed.  Portions of Quickie's complaint not cited by GT make it perfectly clear that:

> During the entire period between May 23, 2003 and May 23, 2004, Greenberg was on record at the PTO as the designated recipient of

> all communications related to maintenance fees on the 160 Patent. Moreover, Greenberg, by hiring Sharinn, adopted Sharinn's express representation that they would notify Quickie several months before the maintenance fees were due. Nevertheless, Greenberg never forwarded the PTO's reminder notices concerning maintenance fees on the '160 Patent, nor did it notify Quickie shortly before maintenance fees were due."

[Mov. Ex. AO, p. 6-7]

**Statement 35.** Quickie requested and obtained a sworn statement from Sharinn corroborating its own representation to the PTO that he and GT had been replaced by Thelen and had had no responsibility as to the' 160 Patent after March 4, 2003 [Mov. Ex, G; Mov. Ex, T at 254, see also 253-64], Quickie has never requested a contrary statement from Sharinn Mov. Ex. Q at 89, 90, 96, 97, 99, 100, 102; Mov. Ex. R at 74-75, 80-81; Mov. Ex. T at 256].

Response to Statement 35

Disputed insofar as GT incorrectly assumes or asserts that Quickie did not clarify matters before the PTO. As Dr. Galloway explained in portions of his deposition not cited by GT, the statements in the PTO submissions GT references were incomplete in that Quickie also was reasonably relying on GT to continue monitoring deadlines for maintenance fees on the '160 Patent. [Resp. Ex. P, p. 81, line 25 – p. 83, line 8; Galloway Declaration, ¶¶ 15-17]. It is undisputed that Quickie did not ask Mr. Sharinn for anything further because it was both unnecessary and futile absent GT's cooperation. [Galloway Declaration, ¶¶ 17-19].

**Statement 36.** Quickie has never retracted its aforesaid prior statements to the PTO --- including that Thelen had had sole responsibility for payment of the Maintenance Fee --- or that Quickie's statements to the PTO were false or inaccurate [Mov. Ex. Q at 89, 90, 96, 97, 99, 100, 102; Mov. Ex. R at 74-75, 80-81; Mov. Ex. T at 256].

Response to Statement 36:

Disputed.  In a supplemental statement filed with the PTO, Quickie clarified its position

with respect its continuing engagement of GT to monitor and provide notice of maintenance fee

deadlines on the '160 Patent:

> Petitioner disagrees with the Office's conclusion that Sharinn's
> responsibility for the '160 Patent terminated on March 4, 2003, and
> Petitioner further notes that there is no objective evidence in the
> record that would support the Office's conclusion in that regard. . .
> . Petitioner has shown with the available evidence that the delay
> was unavoidable because at all relevant times, Thelen held
> Petitioner's general power of attorney and Greenberg/Sharinn were
> the designated recipients of all office communications concerning
> maintenance fees on the '160 Patent.  In light of those facts, it is
> self-evident that Petitioner was reasonably looking to its outside
> counsel to handle maintenance fees on the '160 Patent . . .

[Resp. Ex. Q, pp. 3-4].

**Statement 37.** The PTO denied Quickie's Petition on March 6, 2007 [Mov. Ex. L; Mov.

Ex. R at 81; Mov. Ex. Q at 103-05,121].  In so doing, the PTO expressly noted and relied on

Quickie's statements to the PTO that Thelen "was responsible for payment of the maintenance

fee" and that Sharinn and GT had not been "responsible for the patent" after March 2003 [Mov.

Ex, L at 4].

Response to Statement 37:

Disputed.  In fact, the PTO concluded -- contrary to GT's assertions, and consistent with

Mr. Kreb's declaration – that Thelen Reid was *not* responsible for payment of maintenance fees

on the '160 Patent.  [Mov. Ex. L, p. 4, 2nd full paragraph].  Moreover, disputed insofar as this

statement suggests that the PTO was assigning responsibility for the monitoring and payment of

maintenance fees on the '160 Patent.  In actuality, the PTO only examined whether the failure to

pay those fees was "unavoidable" under applicable PTO regulations and, in so doing, it disavowed any purview over the issues before this Court. [Mov. Ex. M, p. 6].

**Statement 38.** Quickie filed a petition for reconsideration of the PTO's March 6, 2007 decision. The PTO denied Quickie's petition for reconsideration in a further decision on October 5, 2007 [Mov. Ex. M; Mov. Ex. Q at 102-04; Mov. Ex. R at 81].

Response to Statement 38:

Undisputed. Because GT did not attach a copy of Quickie's petition for reconsideration to its motion for summary judgment, however, a complete copy is provided for the Court's review as Respondents' Exhibit Q.

**Statement 39.** In so ruling, the PTO again referenced and relied on Quickie's prior statements, holding that Quickie remained bound by what Quickie has said and submitted [Mov. Ex. M at 3-4; Mov. Ex. Q at 107-09].

Response to Statement 39:

Disputed insofar as this statement suggests that the PTO relied on evidence which the PTO found to be "immaterial to reinstatement of the patent as to whether the actions or inactions of Thelen, Greenberg, Sharinn, or any other voluntarily chosen representative of the Patentee resulted in the failure to timely pay the maintenance fee." [Mov. Ex. M, p. 6]. Contrary to what GT suggests, the PTO was merely determining whether the failure to pay maintenance fees on the '160 Patent was unavoidable, and it expressly refused to become embroiled in any effort to apportion blame on GT, Thelen, Quickie, or anyone else. [Mov. Ex. M, p. 6].

**Statement 40.** Quickie has not sought a further review or reconsideration of that decision [Mov. Ex. T at 123-24].

Response to Statement 40:

Disputed because Quickie has timely noticed its appear of that decision.

## ADDITIONAL MATERIAL FACTS IN DISPUTE

1.  Mr. Sharinn believed and understood that GT was completely terminated as Quickie's outside patent counsel as to the '160 Patent when Mr. Fell orally informed Mr. Sharinn that Quickie was transferring the Medtronic Litigation to Thelen in October 2002. [Resp. Ex. U, p. 153, line 5 – p. 154, line 2].

2.  GT was aware that Quickie was relying on it to monitor and provide advance notice of the deadlines to pay maintenance fees on the '160 Patent. [Galloway Declaration, ¶¶ 10-13].

3.  GT and Mr. Sharinn opened new matters for Quickie after October 2002 when Mr. Sharinn testified that GT had been completely terminated. [Resp. Ex. U, p. 129, line 22 – p. 132, line 25].

4.  GT calendared the deadlines for maintenance fees on the '160 Patent in client/ matter number 51822.010700, and that client/matter number was never transferred to Thelen or any other counsel. [Resp. Ex. U, p. 228, line 19 – p. 229, line 23].

Dated: August 26, 2008
       New York, New York

DIAMOND McCARTHY LLP

By: ___/s/ Stephen T. Loden_____
        Allan B. Diamond (*pro hac vice*)
        Walter J. "Skip" Scott (*pro hac vice*)
        Stephen T. Loden
    620 Eighth Avenue, 39th Floor
    New York, New York 10018

    *Attorneys for Plaintiff Quickie, LLC*